07-CV-01620-EXH  A   11-17

**11**

RECEIVED

2007 SEP 26  PH 3: 02

KING COUNTY
SUPERIOR COURT CLERK
SEATTLE, WA

Assignment of New Judge Pending
Noted for Hearing:  October 4, 2007
Without Oral Argument

RECEIVED

SEP 26 2007

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP

SUPERIOR COURT OF WASHINGTON IN AND FOR KING COUNTY

CITY OF SEATTLE, a first-class charter city,  )
                                              )
                              Plaintiff,      )    No. 07-2-30997-7 SEA
                                              )
v.                                            )
                                              )
THE PROFESSIONAL BASKETBALL                   )
CLUB, LLC, an Oklahoma limited liability      )
company,                                      )
                                              )
                              Defendant.      )
                                              )

NON-WASHINGTON AUTHORITIES IN SUPPORT OF
DEFENDANT'S MOTION TO STAY

NON-WASHINGTON AUTHORITIES IN SUPPORT OF MOTION
TO STAY

# NON-WASHINGTON AUTHORITIES

📖 West Reporter Image (PDF)

72 F.3d 793, 69 Fair Empl.Prac.Cas. (BNA) 1544, 67 Empl. Prac. Dec. P 43,870

United States Court of Appeals,
Tenth Circuit.
Jake ARMIJO, Plaintiff-Appellant,

v.

PRUDENTIAL INSURANCE COMPANY OF AMERICA, Tom Brokaw, Miles Melton, Defendants-Appellees.
Erlinda HOURIGAN, Plaintiff-Appellant,

v.

PRUDENTIAL INSURANCE COMPANY OF AMERICA, Tom Brokaw, Judith Crane, Laura Stubblefield,
Defendants-Appellees.
Pete FUENTES, Plaintiff-Appellee,

v.

PRUDENTIAL INSURANCE COMPANY OF AMERICA, Tom Brokaw, Defendants-Appellants.
Nos. 94-2131, 94-2132, 94-2257.
Dec. 15, 1995.

Sales agents who were terminated by an insurance company filed federal and state discrimination
claims. The United States District Court for the District of New Mexico, Edwin L. Mechem, J., granted
employer's motion to compel arbitration. In action by another sales agent, the District Court, James
A. Parker, J., ruled that agent was not compelled to arbitrate its claim, and insurer appealed. The
Court of Appeals, Ebel, Circuit Judge, held that: (1) agents failed to rebut presumption of arbitrability
of federal claims for employment discrimination, and (2) insurance business exception to arbitration
did not apply.
Decision to compel arbitration affirmed; decision to deny arbitration reversed and remanded.

West Headnotes

[1] KeyCite Notes 

:::25T Alternative Dispute Resolution
  :::25TII Arbitration
    :::25TII(D) Performance, Breach, Enforcement, and Contest
      :::25Tk204 Remedies and Proceedings for Enforcement in General
        :::25Tk213 Review
          :::25Tk213(5) k. Scope and Standards of Review. Most Cited Cases
          (Formerly 33k23.25 Arbitration)

Court of Appeals reviews district court's grant or denial of motion to compel arbitration de novo,
applying the same legal standard employed by the district court.

[2] KeyCite Notes 

:::25T Alternative Dispute Resolution
  :::25TII Arbitration
    :::25TII(D) Performance, Breach, Enforcement, and Contest
      :::25Tk204 Remedies and Proceedings for Enforcement in General
        :::25Tk213 Review
          :::25Tk213(3) k. Decisions Reviewable; Finality. Most Cited Cases
          (Formerly 33k23.20 Arbitration)

⊕ 25T Alternative Dispute Resolution KeyCite Notes 
  ⊕ 25TII Arbitration
    ⊕ 25TII(D) Performance, Breach, Enforcement, and Contest
      ⊕ 25Tk204 Remedies and Proceedings for Enforcement in General
        ⊕ 25Tk213 Review
          ⊕ 25Tk213(2) k. Jurisdiction. Most Cited Cases
            (Formerly 33k23.30 Arbitration)

Court of Appeals had jurisdiction over appeals from final order compelling arbitration; there was no evidence in record of any request for stay and thus failure to grant stay was not erroneous, and order granting motion to compel arbitration to dismiss plaintiffs' claims was final order. 9 U.S.C.A. § 16(a) (3); 28 U.S.C.A. § 1291.

[3] KeyCite Notes

⊕ 25T Alternative Dispute Resolution
  ⊕ 25TII Arbitration
    ⊕ 25TII(A) Nature and Form of Proceeding
      ⊕ 25Tk118 Matters Which May Be Subject to Arbitration Under Law
        ⊕ 25Tk124 k. Employment Disputes. Most Cited Cases
          (Formerly 33k3.3 Arbitration)

An employee can be required to arbitrate federal claims for employment discrimination if he or she has contracted to do so.

[4] KeyCite Notes

⊕ 25T Alternative Dispute Resolution
  ⊕ 25TII Arbitration
    ⊕ 25TII(A) Nature and Form of Proceeding
      ⊕ 25Tk113 k. Arbitration Favored; Public Policy. Most Cited Cases
        (Formerly 33k7.1 Arbitration)

⊕ 25T Alternative Dispute Resolution KeyCite Notes
  ⊕ 25TII Arbitration
    ⊕ 25TII(B) Agreements to Arbitrate
      ⊕ 25Tk136 Construction
        ⊕ 25Tk139 k. Construction in Favor of Arbitration. Most Cited Cases
          (Formerly 33k7.1 Arbitration)

Questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration, and thus any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.

[5] KeyCite Notes

⊕ 25T Alternative Dispute Resolution
  ⊕ 25TII Arbitration

  25TII(D) Performance, Breach, Enforcement, and Contest
    25Tk204 Remedies and Proceedings for Enforcement in General
      25Tk210 k. Evidence. Most Cited Cases
      (Formerly 33k23.10 Arbitration)

Presumption in favor of arbitrability applies where a party bound by an arbitration agreement raises claims founded on statutory rights.

[6] KeyCite Notes 

 25T Alternative Dispute Resolution
  25TII Arbitration
   25TII(D) Performance, Breach, Enforcement, and Contest
    25Tk197 Matters to Be Determined by Court
     25Tk200 k. Arbitrability of Dispute. Most Cited Cases
     (Formerly 33k23.14 Arbitration)

Although the parties' intent controls regarding whether they agree to arbitrate a particular dispute, determining their intent is a question of law for the court to decide.

[7] KeyCite Notes 

 25T Alternative Dispute Resolution
  25TII Arbitration
   25TII(I) Exchanges and Dealer Associations
    25Tk418 Employees of Exchanges or Dealer Associations
     25Tk420 k. Agreements to Arbitrate. Most Cited Cases
     (Formerly 33k92 Arbitration, 160k11(12))

Sales agents failed to rebut the presumption of arbitrability of federal claims for employment discrimination under signed agreement to arbitrate under the National Association of Securities Dealers (NASD) code of arbitration procedure; arbitration clauses were construed liberally, code required that dispute between associated persons and member companies be arbitrated, arbitration clauses had signed forms consenting to arbitration of disputes between sales agents and firms, and NASD had indicated that at least five years prior to promulgation of applicable code that code applied to disputes between employers and sales representatives.

[8] KeyCite Notes 

 25T Alternative Dispute Resolution
  25TII Arbitration
   25TII(B) Agreements to Arbitrate
    25Tk136 Construction
     25Tk138 k. Liberal or Strict Construction. Most Cited Cases
     (Formerly 33k7.1 Arbitration)

 25T Alternative Dispute Resolution KeyCite Notes 
  25TII Arbitration
   25TII(B) Agreements to Arbitrate
    25Tk136 Construction

25Tk139 k. Construction In Favor of Arbitration. Most Cited Cases
(Formerly 33k7.1 Arbitration)

Arbitration clauses must be construed liberally and all doubts resolved in favor of arbitration.

[9] KeyCite Notes 

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(I) Exchanges and Dealer Associations
            25Tk418 Employees of Exchanges or Dealer Associations
                25Tk419 k. In General. Most Cited Cases
                (Formerly 33k92 Arbitration, 160k11(12))

Sales agents were "associated persons" under section of National Association for Security Dealers
(NASD) code governing arbitration of employment disputes; each sales agent engaged in securities
business under control of member company.

[10] KeyCite Notes 

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(B) Agreements to Arbitrate
            25Tk136 Construction
                25Tk138 k. Liberal or Strict Construction. Most Cited Cases
                (Formerly 33k7.1 Arbitration)

Arbitration clauses must be construed broadly wherever possible.

[11] KeyCite Notes 

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(I) Exchanges and Dealer Associations
            25Tk418 Employees of Exchanges or Dealer Associations
                25Tk419 k. In General. Most Cited Cases
                (Formerly 33k92 Arbitration, 160k11(12))

Federal claims of employment discrimination were not excluded from matters eligible for submission
to arbitration in National Association for Security Dealers (NASD) code on ground that they were
disputes involving the insurance business of a member which was also an insurance company; illegal
employment discrimination, if it existed, involved employer's statutory obligations as employer, rather
than as insurer.

**\*795** Kenwood C. Youmans, of Seyfarth, Shaw, Fairweather & Geraldson, Los Angeles, California
(Lorraine H. O'Hara, of Seyfarth, Shaw, Fairweather & Geraldson, Los Angeles, California, with him on
the reply brief; and Duane C. Gilkey, Barbara G. Stephenson, Charles W. Weese, of Rodey, Dickason,
Sloan, Akin & Robb, Albuquerque, New Mexico, on the opening briefs) for defendants.

Narciso Garcia, Jr., Albuquerque, New Mexico, for all plaintiffs.

Before EBEL, Circuit Judge, McWILLIAMS, Senior Circuit Judge and JENKINS,[FN*] District Judge.

> FN* The Honorable Bruce S. Jenkins, Senior District Judge for the District of Utah, sitting by designation.

EBEL, Circuit Judge.

These three cases each involve federal and state discrimination claims by former sales agents, Jake Armijo ("Armijo"), Linda Hourigan ("Hourigan") and Pete Fuentes ("Fuentes"), who were terminated by Prudential Insurance Co. of America ("Prudential"). Prudential moved to compel arbitration and to dismiss Plaintiffs' claims based on a signed agreement to arbitrate under the National Association of Securities Dealers ("NASD") Code of Arbitration Procedure ("Code"). In the actions brought by Armijo and Hourigan, the district court ruled for Prudential, compelling arbitration and dismissing Plaintiffs' claims, and Plaintiffs appealed. In Fuentes' action, a different judge of the same district ruled that Plaintiff was not compelled to arbitrate his claim, and Prudential appealed.[FN1]

> FN1. These cases were assigned to the same panel, orally argued together with one counsel representing all Plaintiffs and another representing all Defendants, and involve the same legal issues. Therefore, we have consolidated our disposition of these cases herein.

## I. BACKGROUND

Plaintiffs Fuentes, Hourigan, and Armijo were all employees who worked as sales agents for Prudential in Albuquerque. Plaintiffs-who are Hispanic-primarily sold insurance policies, but also sold mutual funds through Pruco Securities Corporation ("Pruco"). Because they were authorized to sell mutual funds, each of the Plaintiffs was required to sign a Uniform Application for Securities Industry Registration or Transfer ("Form U-4").

The Forms U-4 committed the plaintiffs to

. . . . .

arbitrate any dispute, claim or controversy that may arise between me and my firm [The Prudential] ... that is required to be arbitrated under the rules, constitutions, or by-laws of the organizations with which I register, as indicated in Item 10 as may be amended from time to time.[FN2]

> FN2. Hourigan's agreement-executed at an earlier time-was slightly different. It ended with: "... organizations with which I register, as indicated in Question 8." Hourigan App. at 23. Hourigan's agreement also left out "as may be amended from time to time."

Each of the Plaintiffs' Form U-4 listed the NASD as an organization with which he or she was to register. Thus, each Plaintiff agreed to arbitrate disputes covered by the NASD Code. It is the interpretation then of the NASD arbitration provisions that forms the crux of this appeal.

Two provisions of the NASD Code are relevant: Section 1 and Section 8. Section 1 defines generally the matters eligible for arbitration, and it provides for

arbitration of any dispute, claim, or controversy arising out of or in connection with the business of any member of the Association, with the exception of disputes involving the insurance business of any member which is also an insurance company:

(1) between or among members;

(2) between or among members and public customers, or others; and

(3) between or among members, registered clearing agencies with which the Association has entered into an agreement to utilize the Association's arbitration facilities and procedures, and participants, pledges, or other persons using the facilities of a registered *796 clearing agency, as these terms are defined under the rules of such a registered clearing agency.

Section 8 of the NASD Code addresses which disputes are required to be arbitrated-a subset of the disputes eligible for arbitration under Section 1-and provides that:

[a]ny dispute, claim, or controversy eligible for submission under Part I of this Code [Section 1, quoted above, is in Part I] between or among members and/or associated persons, and/or certain others, arising in connection with the business of such member(s) or in connection with the activities of such associated person(s), shall be arbitrated under this Code, at the instance of:

(1) a member against another member;

(2) a member against a person associated with a member or a person associated with a member against a member; and,

(3) a person associated with a member against a person associated with a member.

The version of the Code in effect during the alleged acts of discrimination was the February 1992 version of the Code. On October 1, 1993, the NASD amended the Code. Each of the Plaintiffs was terminated and filed discrimination claims with the EEOC prior to October 1, 1993, claiming that they were terminated because of their race, sex, or national origin. However, each of the Plaintiffs' complaints were not filed in federal court until after October 1, 1993. On November 24, 1993, Prudential filed motions to compel arbitration and to dismiss Plaintiffs' complaints in each of these actions. [FN3] Initially, the district courts denied all three motions. However, upon a motion for rehearing and submission to the court of the October 1, 1993 Code amendments, the district court granted Prudential's motion in *Hourigan* and *Armijo*. In *Fuentes,* the district court denied Prudential's motion for rehearing based on the amended Code. Each of the losing parties appealed.

> FN3. Prudential cited only "9 U.S.C. § 1 *et seq.*" in its motions to compel arbitration and dismiss. Armijo App. at 8; Hourigan App. at 15. Presumably, Prudential's motions were based on 9 U.S.C. § 4, which allows a district court to order the parties to proceed to arbitration under a written agreement to arbitrate the dispute in question. However, Prudential did not make any request for a stay of the proceedings pending arbitration, as allowed under 9 U.S.C. § 3. It is unclear whether Prudential preferred to request dismissal rather than a stay pending arbitration or was simply unaware of the stay provisions of section 3.

## II. DISCUSSION

### Standard of Review

[1]    We review a district court's grant or denial of a motion to compel arbitration *de novo,* applying the same legal standard employed by the district court. *MidAmerica Federal Sav. and Loan Ass'n v. Shearson/American Express, Inc.,* 886 F.2d 1249, 1259 (10th Cir.1989); *Kidd v. Equitable Life Assurance,* 32 F.3d 516, 518 (11th Cir.1994); *Sunkist Soft Drinks, Inc. v. Sunkist Growers,* 10 F.3d 753, 756 (11th Cir.1993), *cert. denied,* 513 U.S. 869, 115 S.Ct. 190, 130 L.Ed.2d 123 (1994); *Trap Rock Industries, Inc. v. Local 825, Int'l Union of Operating Engineers,* 982 F.2d 884, 887 (3d Cir.1992).

## A. Jurisdiction Over Armijo and Hourigan Appeals of District Court Decisions to Compel Arbitration

[2] As a preliminary issue, with respect only to Armijo and Hourigan, FN4 Prudential argues that we do not have jurisdiction over Plaintiffs' appeals from the district court decisions to compel arbitration. See 9 U.S.C. § 16(b)(2). In *Adair Bus Sales, Inc. v. Blue Bird Corp.*, 25 F.3d 953 (10th Cir.1994), we held that interlocutory appellate review of a district court's grant of a motion to compel arbitration was inappropriate when the district *797 court also should have granted the motion to stay proceedings pending arbitration. *Id. at 955.* Had the motion to stay been properly granted, the order granting arbitration would then not have been a final order. *Id.* Hence, we declined to consider the arbitrability issue on its merits. *Id.* Prudential argues that our holding in *Adair* precludes our exercise of jurisdiction in this case. However, the difference is that *Adair* ultimately dealt with a non-final order compelling arbitration whereas here we have a final order compelling arbitration. 9 U.S.C. § 16(a)(3) expressly provides for the appealability of a final order with respect to arbitration.

> FN4. Our jurisdiction over Prudential's appeal results from the district court's July 22, 1994, denial of Prudential's motion for a rehearing of its original motion to compel arbitration. Pursuant to Fed.R.App.Proc. 4(a)(5), Prudential filed a timely Motion for Extension of Time for Filing Notice of Appeal on Sept. 20, 1994, which the district court approved on Nov. 2, 1994. Prudential then timely filed its Notice of Appeal on Nov. 10, 1994.

In *Adair,* the plaintiff brought a breach of contract claim, along with a claim for declaratory judgment that an arbitration clause in the parties' agreement did not compel arbitration of the particular contract dispute at issue. 25 F.3d at 954. Defendant argued that the agreement provided for mandatory arbitration and moved for a stay pending arbitration. *Id.* The district court found that the contract dispute was within the scope of the arbitration agreement and ordered the parties to proceed to arbitration. *Id.* However, instead of granting the motion for a stay pending arbitration, the district court dismissed the complaint, and plaintiff appealed. *Id.* at 955.

The Federal Arbitration Act provides that the district court "shall *on application of one of the parties* stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3 (emphasis added). Because the defendant in *Adair* had requested a stay, it was error for the district court not to have stayed the action pending arbitration. 25 F.3d at 955. We, therefore, vacated the district court's order of dismissal. *Id.* When we vacated the district court's dismissal and remanded the case to the district court to enter a stay, the district court's disposition was no longer final, and thus we declined to consider the arbitrability of the claim. *See* 9 U.S.C. § 16 (b)(1) and (2).

However, in the case before us, we are not faced with a district court's erroneous failure to enter a requested stay. Prudential moved the district court to compel arbitration, but, instead of requesting a stay pending such arbitration, Prudential requested only that the district court dismiss Plaintiffs' complaints with prejudice. Hourigan App. at 15; Armijo App. at 8. We find no evidence in the record of any request for a stay. We therefore cannot find error here in failing to grant a stay. Thus, in this case, the district court's order granting Prudential's motion to compel arbitration and to dismiss Plaintiffs' claims was clearly a final order, permitting us to exercise jurisdiction over this case pursuant to 28 U.S.C. § 1291. *See Farrand v. Lutheran Brotherhood,* 993 F.2d 1253, 1254 (7th Cir.1993) (in a similar action, holding that 9 U.S.C. § 16(b) does not preclude plaintiffs' appeal of an order compelling arbitration and dismissing plaintiffs' claims because such an order conclusively disposes of all issues in the case).

## B. Whether the Parties Agreed to Arbitrate These Claims

[3] [4] [5] [6] [7]  The Supreme Court has held that an employee can be required to arbitrate federal claims for employment discrimination if he or she has contracted to do so. *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 35, 111 S.Ct. 1647, 1651, 114 L.Ed.2d 26 (1991) (holding that plaintiff's ADEA claim was subject to arbitration). "[Q]uestions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration," and thus, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626, 105 S.Ct. 3346, 3353, 87 L.Ed.2d 444 (1985). This presumption in favor of arbitrability also applies "where a party bound by an arbitration agreement raises claims founded on statutory rights." *Id.; see also Metz v. Merrill Lynch, Pierce, Fenner & Smith*, 39 F.3d 1482, 1487-88 (10th Cir.1994) (evaluating arbitrability of Title VII claims). Although the parties' intent controls regarding whether they agreed to arbitrate a particular dispute, determining their intent is a question of law for the court to decide. *See Mitsubishi Motors, 473* U.S. at 626, 105 S.Ct. at 3353-54. Here, we decide ***798** that Plaintiffs have failed to rebut the presumption of arbitrability.

## 1. Arbitration of Employment Disputes Under the February 1992 Version of the NASD Code

As of October 1, 1993, NASD amended its Code to make it clear that its arbitration provisions covered at least certain employment disputes.[FN5] Unfortunately, the February 1992 Code is less than clear regarding its applicability to employment disputes.

> FN5. After October 1, 1993, the NASD Code was amended to read as follows, with the new material shown in underlining:
>
> " *Section 1*. This Code of Arbitration Procedure is prescribed and adopted ... for the arbitration of any dispute, claim, or controversy arising out of or in connection with the business of any member of the Association, *or arising out of the employment or termination of employment of associated person(s) with any member,* with the exception of disputes involving the insurance business of any member which is also an insurance company:
>
> (1) between or among members;
>
> *(2) between or among members and associated persons;*
>
> ....
>
> *Section 8(a)*. Any dispute, claim or controversy eligible for submission under Part I of this Code between or among members and/or associated persons, and/or certain others, arising in connection with the business of such member(s) or in connection with the activities of such associated person(s), *or arising out of the employment or termination of employment of such associated person(s) by and with such member,* shall be arbitrated under this Code...."
>
> NASD Code §§ 1, 8. We need not decide whether the October 1, 1993 version of the Code should apply to these claims which arose before that date but which were not filed in federal court until after that date because of our conclusion that even the February 1992 Code requires arbitration of these Plaintiffs' claims.

Notwithstanding the ambiguity of the February 1992 version of the Code (or perhaps more correctly, because of such ambiguity), we conclude that the most appropriate construction of the February 1992 Code is to apply its arbitration provisions to employment disputes involving these Plaintiffs.

[8] First, we must interpret arbitration clauses liberally, and all doubts must be resolved in favor of arbitration. As discussed *supra*, "The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration...." *Moses H. Cone Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983). Here, considerable doubt exists regarding the meaning of the arbitration clauses in question. Other courts that have sought to interpret these provisions have recognized the ambiguity and unclarity presented although they have resolved the ambiguities in different ways. *Compare Kidd v. Equitable Life Assurance Society of the United States*, 32 F.3d 516 (11th Cir.1994) (Code applies to employment disputes) *with Farrand v. Lutheran Brotherhood*, 993 F.2d 1253 (7th Cir.1993) (Code does not apply to employment disputes). However, to acknowledge the ambiguity is to resolve the issue, because all ambiguities must be resolved *in favor* of arbitrability.

[9] Second, the only way that Section 8 of the Code can be reconciled with Section 1 is to interpret Section 1 to include the arbitration of employment disputes. Section 1 defines the general universe of issues that *may* be arbitrated, and Section 8 describes a subset of that universe of disputes that *must* be arbitrated under the Code. Among the issues which Section 8 requires to be arbitrated are the following:

Any dispute ... eligible for submission under Part I of this Code [including Section 1] between or among members and/or associated persons ... arising in connection with ... the activities of such associated person(s) *shall* be arbitrated under this Code.

NASD Code § 8 (emphasis added).

The mandate of Section 8(a) that disputes between associated persons and member companies must be arbitrated requires us to construe the phrase "others" in Section 1(2) to include "associated persons." [FN6] It appears *799* that Plaintiffs are associated persons because that term is defined to include "any natural person engaged in the ... securities business who is directly or indirectly ... controlled by [a] member." NASD By-Laws, Art. I, ¶ 1101[m]. It appears that each Plaintiff did engage in the securities business under the control of Prudential.[FN7] Because we are required to give significance to all provisions in a contract, whenever possible, and to interpret one provision so as to avoid negating another, we must give Section 1 an interpretation at least as broad as that clearly called for in Section 8. *See Mastrobuono v. Shearson, Lehman Hutton, Inc.*, 514 U.S. 52, ----, 115 S.Ct. 1212, 1219, 131 L.Ed.2d 76 (1995).

FN6. Section 1 provides for arbitration of disputes among various categories of persons. The relevant category for our purposes is that group discussed in subpart (2) of Section 1, "[disputes] between or among members and public customers, or *others.*" *See* NASD Code § 1 (emphasis added). Contrary to the Eleventh Circuit in *Kidd*, 32 F.3d at 519, we believe that the enumerated subparts (1), (2) and (3) of Section 1 apply to the entire Section, not merely to the insurance exception contained in that Section.

FN7. Plaintiffs each concede in affidavits that they sold mutual funds, although they argue that they did so only while working for Pruco Securities Corp. *See* Hourigan App. at 54; Armijo App. at 46; Fuentes App. at 39. Although Pruco was listed as the "firm" on item 4 of Plaintiffs' Form U-4, Prudential was listed on item 9 as a firm with which Plaintiffs intended to maintain registration. Paragraph 8 on page 4 of the U-4 forms provides that the applicant "understand[s] and certif[ies] that the representations herein apply to all employers with whom I seek registration as shown in Items 4 and 9 of this form." Armijo's and Fuentes's Form U-4 also represented that Prudential and Pruco were "under common ownership or control." Furthermore, Pruco is a wholly owned subsidiary of Prudential and has no sales force or employees other than the agents and/or employees of Prudential. Hourigan App. at 61; Armijo App. at 50; Fuentes App. at 21-22.

[10]   Third, we note that most of the other courts that have addressed the arbitrability of employment disputes under the November 1992 NASD Code have concluded that such disputes are arbitrable. Although we do not always agree with the reasoning advanced in each of those cases, they reflect a faithfulness to the same general mandate that is driving our decision in this case-the requirement to construe arbitration clauses broadly where possible. See *Kidd,* 32 F.3d 516; *Johnson v. Piper Jaffray, Inc.,* 530 N.W.2d 790, 796-97 (Minn.1995); *Foley v. Presbyterian Ministers' Fund,* No. 90-1053, 1992 WL 63269 (E.D.Pa. March 19, 1992); *Gardner v. Benefits Communications Corp.,* No. 91-0536 JGP, 1991 WL 294564 (D.D.C. Dec. 31, 1991); *Trumbetta v. Metropolitan Life Ins. Co.,* No. 94-3275, 1994 WL 481152 (E.D.Pa. Sept. 1, 1994); *Prudential Ins. Co. v. Shammas,* 865 F.Supp. 429, 432 (W.D.Mich.1993). See also *Assoc. of Investment Brokers v. Securities and Exchange Comm'n,* 676 F.2d 857, 861 (D.C.Cir.1982) (dicta by Judge Ginsburg that "NASD rules mandate arbitration of employer-employee disputes"). But see *Farrand,* 993 F.2d at 1254-55 (7th Cir.1993) (declining to require arbitration of employment dispute between a member of NASD and one of its registered representatives).

Fourth, each of the parties signed a Form U-4 which provides:

I agree to arbitrate any dispute, claim or controversy that may arise between me and my firm ... that is required to be arbitrated under the rules, constitutions, or by-laws of [NASD].

That language clearly indicates that the parties believed, and intended, that at least certain disputes between Prudential and these Plaintiffs would be arbitrated. Unless the word "others" in Section 1(2) of the NASD Code is broadly interpreted to include these Plaintiffs, their explicit agreements in Form U-4 would be a nullity. Furthermore, the language in the parties' Form U-4 agrees that they will submit to arbitration any disputes "required" to be arbitrated under the NASD Code, and the disputes "required" to be arbitrated in Section 8(a) include disputes between a member firm, like Prudential, and associated persons, like Plaintiffs.[FN8] Section 8(a) broadly calls for arbitration of disputes "in connection with activities of such associated person(s)."

FN8. Plaintiffs do not assert on appeal that they are not associated persons of Prudential.

Finally, the NASD has indicated as early as 1987 that the Code applies to disputes between employers and sales representatives. 52 Fed.Reg. 9232 (1987). The association stated that the purpose of the 1993 amendment was simply to "clear up any ambiguity" and "to assure" that employment disputes are arbitrable under Section 8. *800 58 Fed.Reg. at 39071; see also 58 Fed.Reg. 45932 (1993).

## 2. The Insurance Business Exception.

[11]   We similarly reject Plaintiffs' claim that these controversies are excluded from the matters eligible for submission in Section 1 of the NASD Code because they are "disputes involving the insurance business of any member which is also an insurance company." [FN9]

FN9. The text of Section 1, quoted earlier in this opinion, excludes from the scope of arbitration "disputes involving the insurance business of any member which is also an insurance company."

Although Prudential is an insurance company, there is nothing unique about these discrimination claims by Plaintiffs that involve the "insurance business" of Prudential. Plaintiffs are simply alleging that they were wrongfully discriminated against as employees in violation of Title VII of the Civil Rights Act of 1964 (and in some instances claims are also made pursuant to 42 U.S.C. § 1981 and pendant state claims). Illegal employment discrimination, if it exists, involves an employer's statutory obligations as an employer rather than as an insurer. Admittedly, Prudential's explanation for its

actions against these Plaintiffs is that, in part, they replaced one Prudential policy with another or knowingly sold a policy based on a false application form. However, the dispute as framed by the Plaintiffs is predicated on the civil rights laws, not the insurance laws, and they are predicated on Prudential's role as an employer rather than as an insurer.

If Section 1 of the NASD Code were construed to exclude from arbitration any employment dispute that arises within the context of insurance employment, it would render the arbitration language in these Plaintiffs' Forms U-4 illusory. Once again, our obligation is to reconcile and to give meaning to all provisions of the parties' contracts. Our obligation to construe arbitration clauses broadly compels us to construe this exception to the arbitration clause narrowly. Thus, we conclude that the insurance exception to arbitrability does not include an exception for ordinary employment disputes merely because the defendant employer is an insurance company.

Our narrow construction of the insurance exception to arbitrability under Section 1 of the NASD Code is consistent with the other cases that have considered this issue. In *Trumbetta v. Metropolitan Life Ins. Co.*, No. 94-3275, 1994 WL 481152 (E.D.Pa. Sept. 1, 1994), the district court held that the dispute did not fall under the insurance business exception because, "[a]lthough the plaintiff [a former insurance sales agent] [had] made some general allegations concerning the defendants' business practices, I find that the actual basis for each of his claims is the conduct of his supervisors that led to his constructive discharge." Similarly, in *Prudential Ins. Co. v. Shammas*, 865 F.Supp. 429, 432 (W.D.Mich.1993), the district court found that a former insurance sales agent's employment discrimination claims did not fall under the insurance business exception because the suit concerned the conduct of other employees toward the plaintiff-and "had nothing specifically to do with the insurance aspect of Prudential's business." *See also Foley v. Presbyterian Ministers' Fund*, No. 90-1053, 1992 WL 63269 (E.D.Pa. March 19, 1992) (holding that the language of the insurance business exception was not broad enough to cover personnel practices of insurance companies); *Wojcik v. Aetna Life Ins. and Annuity Co.*, 901 F.Supp. 1282, 1286-87 (N.D.Ill.1995) (requiring that the plaintiff allege unlawful insurance practices, not merely wrongful employment conduct directed at plaintiff, to invoke exception).

## CONCLUSION

For the reasons stated above, we REVERSE the district court's decision to deny arbitration in *Fuentes* and we REMAND for further proceedings consistent with this opinion. We AFFIRM the district court's decision to compel arbitration in *Hourigan* and *Armijo*.

JENKINS, Senior District Judge, concurring in the judgment.
I concur in the judgment. I write separately because I believe the case law interpreting the federal Arbitration Act, title 9 of **\*801** the U.S.Code, has gotten far afield from Congress's original intent in enacting the statute.

The Arbitration Act was enacted "to reverse the longstanding judicial hostility to arbitration agreements that had existed at English common law and had been adopted by American courts, and to place arbitration agreements upon the same footing as other contracts." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24, 111 S.Ct. 1647, 1651, 114 L.Ed.2d 26 (1991). The "presumption of arbitrability" the court applies elevates arbitration agreements to a preferred position over other contracts.

The issue in this case, as in any case of contract interpretation, is the parties' intent. *See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626, 105 S.Ct. 3346, 3354, 87 L.Ed.2d 444 (1985) (with agreements to arbitrate, "as with any other contract, the parties' intentions control"). Ordinarily, the court determines that issue as a matter of law, from the terms of the contract itself. *See, e.g., Florom v. Elliott Mfg.*, 867 F.2d 570, 575 (10th Cir.1989). But where the terms of the contract are ambiguous (and I agree that the contracts at issue here are hopelessly ambiguous), the issue then becomes a factual question, to be decided from external evidence of the parties' intent, unless only one conclusion can be drawn from the undisputed evidence. *See, e.g.,*

*Amoco Rocmount Co. v. Anschutz Corp.*, 7 F.3d 909, 917 (10th Cir.1993), *cert. denied*, 510 U.S.
1112, 114 S.Ct. 1057, 127 L.Ed.2d 377 (1994); *Lumpkin v. Envirodyne Indus., Inc.*, 933 F.2d 449,
456 (7th Cir.), *cert. denied*, 502 U.S. 939, 112 S.Ct. 373, 116 L.Ed.2d 324 (1991); *LaSalle Nat'l Bank
v. General Mills Restaurant Group*, 854 F.2d 1050, 1052 (7th Cir.1988); *Teton Exploration Drilling,
Inc. v. Bokum Resources Corp.*, 818 F.2d 1521, 1526 (10th Cir.1987); *Southern Natural Gas Co. v.
Pursue Energy*, 781 F.2d 1079, 1081 (5th Cir.1986); *Gardner-Zemke Co. v. State*, 109 N.M. 729, 790
P.2d 1010, 1014 (1990); *Shaeffer v. Kelton*, 95 N.M. 182, 619 P.2d 1226, 1229-30 (1980).

It seems to me that the rule that doubts about the scope of arbitrable issues should be resolved in
favor of arbitration, like other rules of construction, should be applied only as a last resort, after the
court or trier of fact has considered extrinsic evidence of the parties' intent and found it inconclusive.
*Cf. Gardner-Zemke*, 790 P.2d at 1014 (the rule construing ambiguities against the drafter applies
"only if the court is otherwise unable to ascertain the parties' intent"); *Wilburn v. Interstate Elec.*, 748
P.2d 582, 585-86 (Utah Ct.App.1988) (the doctrine of construing ambiguities against the drafter acts
"as a kind of tie-breaker, used as a last resort by the fact-finder after the receipt and consideration of
all pertinent extrinsic evidence has left unresolved what the parties actually intended"), *cert.
dismissed*, 774 P.2d 1149 (Utah 1989). Here, the court applies "the presumption of arbitrability" to
resolve the ambiguity and determine the parties' intent as a matter of law. Under the majority's
reasoning, which, I believe, is consistent with controlling Supreme Court precedent, as long as a
colorable argument can be made that a contract requires arbitration, the court is required to bypass
the usual methods of contract interpretation and compel arbitration regardless of the parties' actual
intent.

Although I believe the issue should ordinarily be resolved as a question of fact (applying the
presumption only as a last resort), because the appellants here have not argued that the parties'
intent was a disputed issue of material fact, precluding summary judgment, I believe the court has
properly disposed of the issue as a matter of law in these cases. Therefore, I concur in the judgment.

Nevertheless, I am troubled by the direction the case law under the Arbitration Act has taken. What I
believe was originally intended only to put arbitration agreements on the same footing as other
contracts is now seen as a strong federal policy favoring arbitration agreements.

I believe part of the reason for the historical hostility towards arbitration agreements was the
conventional wisdom that the litigation process was superior to alternative forms of dispute
resolution, such as arbitration. The pendulum has now swung to the other extreme. Implicit in the
Supreme Court's current position that "any doubts concerning the scope of arbitrable issues,"
including doubts about "the construction of **\*802** the contract language itself," be resolved "in favor
of arbitration," *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25, 103 S.Ct.
927, 941, 74 L.Ed.2d 765 (1983), is a preference for arbitration over litigation as a process for
resolving disputes. Despite recent criticisms of the litigation process and the search for alternative
means of resolving disputes, I believe the current antipathy towards litigation is as short-sighted as
the former antipathy towards arbitration. Each has its place.

I am particularly troubled in cases such as this involving arbitration of employment disputes. The
Arbitration Act expressly says it does not apply "to contracts of employment of seamen, railroad
employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1.
Presumably, insurance agents who are also qualified to sell securities are "workers engaged in foreign
or interstate commerce." In making an exception for employment contracts, Congress recognized that
arbitration provisions in such contracts are not really bargained for at all. Ordinarily, if a person wants
a job, he must agree to the employer's terms, however onerous they may be. *See Gilmer*, 500 U.S. at
39, 111 S.Ct. at 1659 (Stevens, J., dissenting) (quoting Hearing on S.4213 & S.4214 before a
Subcommittee of the Senate Committee on the Judiciary, 67th Cong., 4th Sess., 9 (1923)). The
plaintiffs in these cases, however, have not argued that the exception for employment contracts
contained in section 1 of the Arbitration Act applies to them, presumably because the Supreme
Court's decision in *Gilmer* appears to have foreclosed that argument. *See* 500 U.S. at 25 n. 2, 111
S.Ct. at 1651 n. 2 (section 1's exclusionary clause does not apply to arbitration clauses contained in
securities registration applications, which are contracts between the applicant and a securities
exchange, not between an employee and his employer). I do not believe that an employer, such as

Prudential, should be able to escape the strictures of the Arbitration Act indirectly, by requiring its employees to enter into contracts with third parties (such as securities exchanges) to arbitrate disputes with their employer, when it could not demand such a concession from the employee directly, in the contract of employment.

Nevertheless, I believe that the case law under the Arbitration Act is now so firmly established that a return to Congress's original intent will require congressional action.[FN1]

> FN1. Congress is not unaware of the problem. Legislation has been introduced in the 103d and 104th Congresses to invalidate existing agreements between employers and employees that require the mandatory arbitration of employment discrimination claims. See 141 Cong.Rec. S2271-72 (daily ed. Feb. 7, 1995) (statement of Senator Feingold). In introducing the most recent bill, S.366, Senator Feingold, the bill's sponsor, indicated that the proposed legislation
>
> closes a widening loophole in the enforcement of civil rights laws in our Nation. An entire industry-Wall Street-and a growing number of companies and firms in many other industries have been able to circumvent formal legal challenges to their unlawful employment practices in court-a right intended to be protected by the [civil rights] statutes this bill amends. Employers can tell current and prospective employees, "if you want to work for us, you'll have to check your rights as an American citizen at the door."
>
> Id. at S2272. The bill has been referred to committee.

C.A.10 (N.M.),1995.
Armijo v. Prudential Ins. Co. of America
72 F.3d 793, 69 Fair Empl.Prac.Cas. (BNA) 1544, 67 Empl. Prac. Dec. P 43,870

END OF DOCUMENT

West Reporter Image (PDF)

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

West Reporter Image (PDF)

252 F.3d 707

Briefs and Other Related Documents

United States Court of Appeals,
Fourth Circuit.
CHOICE HOTELS INTERNATIONAL, INCORPORATED, Plaintiff-Appellee,
v.
BSR TROPICANA RESORT, INCORPORATED, a Florida Corporation; Susan Hounsom; Milton Johnson,
Defendants-Appellants.
No. 00-2507.
Argued May 8, 2001.
Decided June 8, 2001.

Motel franchiser brought action against proposed franchisee and affiliated individuals, alleging defendants failed to pay affiliation fee and breached franchise agreement. Defendants moved to dismiss in favor of arbitration. The United States District Court for the District of Maryland, Peter J. Messitte, J., denied the motion. Upon defendants' interlocutory appeal, the Court of Appeals, Wilkins, Circuit Judge, held that: (1) defendants properly invoked the Federal Arbitration Act (FAA), as would permit stay of action; (2) exemption to arbitration clause in agreement was limited to traditional collection actions; (3) franchiser's action to enforce affiliation fee provision was a collection action, and therefore exempt; but (4) franchiser's breach of contract claim was not a collection action, and thus was subject to arbitration.
Vacated and remanded.

West Headnotes

[1] KeyCite Notes 

⇐25T Alternative Dispute Resolution
　　⇐ 25TII Arbitration
　　　⇐25TII(D) Performance, Breach, Enforcement, and Contest
　　　　⇐25Tk190 Stay of Proceedings Pending Arbitration
　　　　　⇐25Tk196 k. Particular Cases. Most Cited Cases
　　　　　　(Formerly 33k23.9 Arbitration)

Proposed franchisee and affiliated individuals properly invoked the Federal Arbitration Act (FAA) in motel franchiser's action against them, as would permit stay of franchiser's action, where defendants made clear during proceedings in district court that they were seeking enforcement of arbitration clause in parties' franchise agreement. 9 U.S.C.A. § 3.

[2] KeyCite Notes 

⇐25T Alternative Dispute Resolution
　　⇐ 25TII Arbitration
　　　⇐25TII(D) Performance, Breach, Enforcement, and Contest
　　　　⇐25Tk204 Remedies and Proceedings for Enforcement in General
　　　　　⇐25Tk212 k. Judgment or Order. Most Cited Cases
　　　　　　(Formerly 33k23.7 Arbitration)

Dismissal is a proper remedy when all of the issues presented in a lawsuit are arbitrable. 9 U.S.C.A. §

3.


[3] KeyCite Notes

170B Federal Courts
  170BVIII Courts of Appeals
    170BVIII(K) Scope, Standards, and Extent
      170BVIII(K)1 In General
        170Bk776 k. Trial De Novo. Most Cited Cases

When appeal involves a matter of contract interpretation, appellate court reviews the decision of the district court de novo.


[4] KeyCite Notes

25T Alternative Dispute Resolution
  25TII Arbitration
    25TII(B) Agreements to Arbitrate
      25Tk136 Construction
        25Tk137 k. In General. Most Cited Cases
          (Formerly 33k7 Arbitration)


25T Alternative Dispute Resolution KeyCite Notes
  25TII Arbitration
    25TII(B) Agreements to Arbitrate
      25Tk136 Construction
        25Tk139 k. Construction in Favor of Arbitration. Most Cited Cases
          (Formerly 33k7 Arbitration)

Agreements to arbitrate are construed according to the ordinary rules of contract interpretation, as augmented by a federal policy requiring that all ambiguities be resolved in favor of arbitration.


[5] KeyCite Notes

25T Alternative Dispute Resolution
  25TII Arbitration
    25TII(B) Agreements to Arbitrate
      25Tk150 Operation and Effect
        25Tk152 k. As Ousting Jurisdiction of or Precluding Resort to Courts. Most Cited Cases
          (Formerly 33k8 Arbitration)

Scope of exemption to arbitration clause in franchise agreement for "actions for collection" was limited to traditional collection actions, and thus franchiser was permitted to bring action against franchisee and affiliated individuals only to enforce specific payment obligation fixed by parties' agreement and not contingent on additional events, rather than any claim seeking monetary damages.


[6] KeyCite Notes

95 Contracts
　95II Construction and Operation
　　95II(A) General Rules of Construction
　　　95k151 Language of Instrument
　　　　95k155 k. Construction Against Party Using Words. Most Cited Cases

Any doubts in the interpretation of a contract must be resolved against the drafter.

[7] KeyCite Notes 

25T Alternative Dispute Resolution
　25TII Arbitration
　　25TII(B) Agreements to Arbitrate
　　　25Tk142 Disputes and Matters Arbitrable Under Agreement
　　　　25Tk143 k. In General. Most Cited Cases
　　　　(Formerly 33k7.5 Arbitration)

Motel franchiser's action to enforce affiliation fee provision in franchise agreement was a collection action, and as such was not subject to arbitration clause in agreement pursuant to exception for collection actions, where agreement between franchiser and franchisees expressly required franchisees to pay affiliation fee, fee was not a remedy for either party's deviation from contract, but a part of contract itself, and amount of fee was a sum certain under agreement.

[8] KeyCite Notes 

25T Alternative Dispute Resolution
　25TII Arbitration
　　25TII(B) Agreements to Arbitrate
　　　25Tk142 Disputes and Matters Arbitrable Under Agreement
　　　　25Tk143 k. In General. Most Cited Cases
　　　　(Formerly 33k7.5 Arbitration)

Motel franchiser's breach of contract claim was not a collection action within provision in franchise agreement exempting collection actions from general arbitration requirements, and thus franchiser's claim against franchisees was subject to arbitration, where franchisees' alleged obligation to pay liquidated damages did not arise from formation of contract itself, but rather from an alleged breach of contract.

**\*709 ARGUED:** Onkar Nath Sharma, Sharma & Bhandari, Silver Spring, MD, for Defendants-Appellants. Kerry Shanahan McGeever, Silver Spring, MD, for Plaintiff-Appellee.

Before WILKINSON, Chief Judge, and WILKINS and LUTTIG, Circuit Judges.

Vacated and remanded by published opinion. Judge WILKINS wrote the opinion, in which Chief Judge WILKINSON and Judge LUTTIG joined.

### OPINION

WILKINS, Circuit Judge:

SR Tropicana Resort, Incorporated and two affiliated individuals (collectively, "BSR") appeal the denial of their motion to dismiss a lawsuit against them in favor of arbitration. Because the relevant contractual language requires arbitration of one of the two claims against BSR, we vacate the decision of the district court and remand for further proceedings.

## I.

This case arises from a franchise agreement ("the Agreement") between BSR and Appellee Choice Hotels International, Incorporated (Choice). Under the Agreement, BSR agreed to open a motel in Davenport, Florida, and Choice authorized BSR to use the "Quality Inn" brand name. Three terms of the Agreement are relevant here. First, BSR was required to pay Choice a non-refundable $25,000 "affiliation fee" upon signing the Agreement. J.A. 10. Second, in the event of termination, the Agreement allowed Choice to recover liquidated damages. Third, the Agreement contained the following arbitration provision:

Except for claims for indemnification, *actions for collection of moneys owed [to Choice] under this Agreement,* or actions seeking to enjoin [BSR] from using [Choice's trademarks] in violation of this Agreement, any controversy or claim relating to this Agreement, or the breach of this Agreement, including any claim that this Agreement or any part of this Agreement is invalid, illegal, or otherwise voidable or void, will be sent to final and binding arbitration....

*Id.* at 20 (emphasis added).

After less than two years, and before BSR opened its hotel, Choice sued BSR, alleging that (1) BSR failed to pay the affiliation fee and (2) BSR breached the Agreement, prompting Choice to terminate it and causing damages to Choice of $586,600. BSR moved to dismiss, asserting, *inter alia,* that the Agreement required arbitration of Choice's claims. The district court denied the motion; as is relevant here, the court ruled that Choice's claims were not arbitrable because they fell within the exception for "actions for collection of moneys owed." After the district court denied reconsideration, BSR took this interlocutory appeal. *See* 9 U.S.C.A. § 16(a) (West 1999) (authorizing interlocutory appeals from certain orders favoring litigation over arbitration).

## II.

[1] Before addressing BSR's appellate claim, we must consider Choice's contention that BSR never properly invoked the Federal Arbitration Act (FAA). We hold that this contention is meritless.

[2] As is relevant here, the FAA requires a district court, upon motion by any party, to stay judicial proceedings involving issues covered by written arbitration agreements. *See* 9 U.S.C.A. § 3 (West 1999). According to Choice, BSR's motion to dismiss was not a proper § 3 motion because the sole remedy available under § 3 is a stay. Notwithstanding the terms of § 3, however, dismissal is a proper remedy when all of the issues presented in a *710 lawsuit are arbitrable. *See Alford v. Dean Witter Reynolds, Inc.,* 975 F.2d 1161, 1164 (5th Cir.1992). Moreover, a hypertechnical reading of BSR's pleadings would be inconsistent with the "liberal federal policy favoring arbitration agreements." *Moses H. Cone Mem. Hosp. v. Mercury Const. Corp.,* 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). BSR made clear during proceedings in the district court that it was "seeking enforcement of the arbitration clause of the Agreement." J.A. 141. This is sufficient to invoke the full spectrum of remedies under the FAA, including a stay under § 3.

## III.

[3] 🔲 [4] 🔲  We now turn to BSR's assertion that the Agreement requires arbitration of both of Choice's claims. Because this appeal involves a matter of contract interpretation, we review the decision of the district court de novo. See _United States v. Bankers Ins. Co._, 245 F.3d 315, 319 (4th Cir.2001). Agreements to arbitrate are construed according to the ordinary rules of contract interpretation, as augmented by a federal policy requiring that all ambiguities be resolved in favor of arbitration. See _First Options_ of Chicago, _Inc. v. Kaplan_, 514 U.S. 938, 944-45, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995).

A.

[5] 🔲  The Agreement provides for arbitration of "any controversy or claim relating to this Agreement, or the breach of this Agreement," subject to three exceptions. J.A. 20. This appeal requires us to interpret one of these exceptions, which embraces "actions for collection of moneys owed [to Choice] under this Agreement" ("the collection exemption"). _Id._

The crucial terms within this phrase are "collection" and "owed." "To _collect_ a debt or claim is to obtain payment or liquidation of it, either by personal solicitation or legal proceedings." _Black's Law Dictionary_ 263 (6th ed.1990) (emphasis added). To "owe" means "[t]o be bound to do or omit something, especially to pay a debt." _Id._ at 1105. Both of these definitions point us to the word "debt," which denotes a "sum of money due by certain and express agreement" or a "fixed and certain obligation to pay money or some other valuable thing or things." _Id._ at 403. In light of these definitions, we hold that the collection exemption applies to actions by Choice to enforce specific payment obligations that are "fixed" by the Agreement and not contingent on additional events. This interpretation of the phrase "actions for collection" accords with the ordinary understanding of the phrase "collection action." See, e.g., _Young v. Commissioner,_ 240 F.3d 369, 372 (4th Cir.2001) (referring to "collection action" against defaulting debtor); cf. _Laborers Health & Welfare Trust Fund v. Advanced Lightweight Concrete Co.,_ 484 U.S. 539, 548-51, 108 S.Ct. 830, 98 L.Ed.2d 936 (1988) (holding, in the context of the Employee Retirement Income Security Act, that a procedure known as a "collection action" may be used to enforce payment of promised contributions to retirement plans but not to determine whether additional contributions are mandated by law).

The parties offer two alternative readings of the collection exemption. BSR contends that the exemption is limited to the enforcement of judgments. For its part, Choice asserts that the phrase embraces all actions seeking monetary damages. We find neither of these interpretations persuasive.

Under BSR's interpretation, most disputes between Choice and BSR would proceed to arbitration first, and then Choice could resort to judicial proceedings to recover damages awarded by the arbitrator. This interpretation is inconsistent with the contractual language referring to "moneys *711 owed ... under this Agreement," J.A. 20 (emphasis added), which describes debts arising from the Agreement rather than debts imposed by judicial or arbitral judgment. Moreover, under BSR's interpretation, the collection exemption applies only after claims have already been arbitrated; this is not a plausible reading of a phrase designed to exclude certain claims from arbitration.

Choice, by contrast, favors an extremely broad reading of the collection exemption. According to Choice, the exemption excludes from arbitration all claims (by Choice) seeking monetary damages. Given the opportunity at oral argument to identify claims that _would_ be arbitrable, counsel for Choice was able to offer only two examples-demands for specific performance and actions for replevin. Choice's interpretation is intuitively unsatisfying, however, because most breach of contract claims seek monetary relief; consequently, most breach of contract claims by Choice would be exempt from arbitration, notwithstanding that the arbitration clause expressly embraces "any controversy or claim relating to ... the breach of this Agreement." _Id._ Our discomfort with Choice's interpretation is heightened by the fact that a separate exemption within the arbitration clause excludes certain equitable actions brought by Choice to arrest "violation[s] of this Agreement." _Id._ Thus, the interpretation urged by Choice effectively transforms the arbitration provision into a unilateral

commitment by BSR to arbitrate its claims, while claims by Choice are subject to judicial determination. We are reluctant to give the arbitration provision this effect, as the structure of the provision does not imply such an imbalance in its application.

[KC]

[6]    At best, Choice's construction offers a minimally plausible alternative to the interpretation we set forth above and thereby renders the collection exemption ambiguous. To resolve this ambiguity, we resort to three interpretive guides. First, as noted above, federal policy requires that ambiguities in arbitration clauses be resolved in favor of arbitration. See *Am. Recovery Corp. v. Computerized Thermal Imaging, Inc.,* 96 F.3d 88, 92 (4th Cir.1996) ("[W]e may not deny a party's request to arbitrate an issue unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." (internal quotation marks omitted)); see also *Armijo v. Prudential Ins. Co.,* 72 F.3d 793, 800 (10th Cir.1995) (noting that policy favoring broad construction of arbitration clauses compels narrow construction of exceptions to arbitration clauses). Second, when faced with a general rule and enumerated exceptions, we interpret the exceptions narrowly, lest they overwhelm the rule. See *Commissioner v. Clark,* 489 U.S. 726, 739, 109 S.Ct. 1455, 103 L.Ed.2d 753 (1989). Third, any doubts in the interpretation of a contract must be resolved against the drafter-in this case, Choice. See *Bankers Ins.,* 245 F.3d at 321 n. 7. These principles uniformly support a narrow reading of the collection exemption and a correspondingly expansive construction of the general arbitration requirement. Accordingly, we reject Choice's interpretation of the collection exemption and adhere to the conclusion that only traditional collection actions are excluded from the arbitration requirement.

B.

Having determined the scope of the collection exemption, we must now consider the extent to which it applies to Choice's claims. We hold that Choice's effort to recover the affiliation fee is a collection action subject to the collection exemption; the breach of contract claim, however, falls outside the exemption.

[KC]

*712 [7]    The Agreement between Choice and BSR expressly requires BSR to pay the affiliation fee. The fee is part of the contract itself, not a remedy for either party's deviation from the contract. Moreover, the amount of the fee ($25,000) is a sum certain under the Agreement. Thus, Choice's effort to enforce this contractual provision provides a classic example of a collection action. See *Briargate Condo. Ass'n v. Carpenter,* 976 F.2d 868, 869 (4th Cir.1992) (characterizing suit to compel payment of condominium fees as "collection action"). Accordingly, under the collection exemption, this claim is not subject to arbitration. Furthermore, because this claim is not arbitrable, BSR was not entitled to dismissal of Choice's complaint in its entirety.

[KC]

[8]    We nevertheless vacate the order of the district court because Choice's breach of contract claim is not within the collection exemption and therefore is subject to arbitration. The Agreement provides for liquidated damages in the event of termination, and Choice specifically invoked this provision in its complaint; thus, the amount of Choice's damage request is, like the affiliation fee, contractually determined. BSR's obligation to pay this amount, however, does not arise from the formation of the contract, but rather from an alleged breach of contract. Because this is not a debt subject to collection, the collection exemption does not apply. By contrast, the general terms of the arbitration clause specifically embrace claims arising from "the breach of this Agreement." J.A. 20. BSR is therefore entitled to arbitration of this issue and to a stay of proceedings while the arbitration takes place.

IV.

In sum, Choice's complaint is not subject to dismissal, because it contains at least one non-arbitrable claim. However, Choice's breach of contract claim is arbitrable under the Agreement. We therefore vacate the decision of the district court and remand with instructions to stay proceedings on this claim pending arbitration. The court may, in its discretion, stay proceedings on the affiliation fee claim as well. *See Am. Recovery Corp.,* 96 F.3d at 97.

*VACATED AND REMANDED.*

C.A.4 (Md.),2001.
Choice Hotels Intern., Inc. v. BSR Tropicana Resort, Inc.
252 F.3d 707

Briefs and Other Related Documents (Back to top)

• 2001 WL 34109920 (Appellate Brief) Reply Brief of Appellants (Mar. 24, 2001) �ᷤ Original Image of this Document with Appendix (PDF)
• 2001 WL 34109895 (Appellate Brief) Brief of Appellee (Mar. 12, 2001) 🖷 Original Image of this Document with Appendix (PDF)
• 2001 WL 34109894 (Appellate Brief) Brief of Appellants (Feb. 09, 2001) 🖷 Original Image of this Document with Appendix (PDF)
• 00-2507 (Docket) (Nov. 30, 2000)
END OF DOCUMENT

🖺 West Reporter Image (PDF)

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**12**

Assignment of New Judge Pending
Noted for Hearing: October 4, 2007
Without Oral Argument

# RECEIVED

SEP 2 6 2007

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP

SUPERIOR COURT OF WASHINGTON IN AND FOR KING COUNTY

CITY OF SEATTLE, a first-class charter city, )
                                             )
                                Plaintiff, )   No. 07-2-30997-7 SEA
                                             )
v.                                       )   [PROPOSED] ORDER GRANTING THE
                                           )   PROFESSIONAL BASKETBALL
THE PROFESSIONAL BASKETBALL       )   CLUB'S MOTION TO STAY
CLUB, LLC, an Oklahoma limited liability   )
company,                              )
                                           )
                              Defendant. )

THIS MATTER came before the Court on defendant The Professional Basketball

Club's Motion to Stay. Proper notice of said motion having been given to all counsel of

record, the Court having considered the pleadings offered in support of and in opposition to

the motion, and being fully advised, it is hereby

ORDERED that defendant's Motion to Stay is hereby GRANTED.

DATED this ____ day of October, 2007.

_____
                                       JUDGE

Presented by:
BYRNES & KELLER LLP

By: _____
    Bradley S. Keller, WSBA #10665
    Paul R. Taylor, WSBA #14851
Attorneys for Defendant
The Professional Basketball Club, LLC

[PROPOSED] ORDER GRANTING THE PROFESSIONAL       BYRNES & KELLER LLP
BASKETBALL CLUB'S MOTION TO STAY - 1                      38TH FLOOR
                                                 1000 SECOND AVENUE
                                                 SEATTLE, WASHINGTON 98104
                                                 (206) 622-2000



## CERTIFICATE OF SERVICE

The undersigned attorney certifies that on the 26th day of September, 2007, a true copy of the foregoing pleading was served upon the following individuals:

### VIA HAND DELIVERY

Thomas A. Carr
Gregory C. Narver
Seattle City Attorney's Office
600 Fourth Avenue, 4th Floor
Seattle, WA 98124-4769

Slade Gorton
Paul J. Lawrence
Kirkpatrick & Lockhart Preston Gates & Ellis, LLP
925 4th Avenue, Suite 2900
Seattle, WA 98104

_____

[PROPOSED] ORDER GRANTING THE PROFESSIONAL
BASKETBALL CLUB'S MOTION TO STAY - 2

BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

**13**

The Honorable Glenna Hall
Noted for Hearing:  September 26, 2007
No oral argument requested

RECEIVED

2007 SEP 25  AM 10: 04

KING COUNTY
SUPERIOR COURT

2007 OCT -1  A 9 48

BYRNES & KELLER LLP

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON FOR KING COUNTY

CITY OF SEATTLE, a first class charter city, )
                                            )
                    Plaintiff,              )   No. 07-2-30997-7 SEA
                                            )
v.                                          )   [PROPOSED]
                                            )
THE PROFESSIONAL BASKETBALL                 )   ORDER GRANTING DEFENDANT'S
CLUB, LLC, an Oklahoma limited liability    )   MOTION FOR CHANGE OF JUDGE
company,                                    )   PURSUANT TO RCW 4.12.050
                                            )
                    Defendant.              )   [Clerk's Action Required]
                                            )

THIS MATTER came before the Court upon the motion filed on behalf of the Defendant,

The Professional Basketball Club, LLC, for a change of judge pursuant to RCW 4.12.050 and the

Declaration of Prejudice submitted by counsel of record, Bradley S. Keller. The Court, having

reviewed the record and file herein, hereby ORDERS that Defendant's Motion for Change of

Judge is hereby GRANTED.

DATED this ___ day of September 2007.

_____
THE HONORABLE GLENNA HALL

Presented by:
BYRNES & KELLER LLP

By: _____
        Bradley S. Keller, WSBA #10665
Attorneys for Defendant
The Professional Basketball Club, LLC

ORDER GRANTING DEFENDANT'S MOTION FOR CHANGE OF
JUDGE PURSUANT TO RCW 4.12.050 - 1

ORIGINAL COPY

BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

## CERTIFICATE OF SERVICE

The undersigned attorney certifies that on the 25th day of September, 2007, a true copy of the foregoing pleading was served upon the following individuals:

### VIA HAND DELIVERY

Thomas A. Carr
Seattle City Attorney
600 Fourth Avenue, 4th Floor
P.O. Box 94769
Seattle, WA  98124-4769

Slade Gorton
Paul J. Lawrence
Jeffrey C. Johnson
Kirkpatrick & Lockhart Preston Gates & Ellis LLP
925 Fourth Avenue, Suite 2900
Seattle, Washington 98104

ORDER GRANTING DEFENDANT'S MOTION FOR CHANGE OF
JUDGE PURSUANT TO RCW 4.12.050 - 2

BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

**14**

1

RECEIVED

2

2007 OCT -1 A 9 50

3

BYRNES & KELLER LLP

4

5

6

7    **SUPERIOR COURT OF THE STATE OF WASHINGTON FOR KING COUNTY**

8

9

10   CITY OF SEATTLE,                              )    NO.  07-2-30997-7  SEA
                                                   )
11                                                 )
                        Plaintiff,                 )    ORDER FOR CHANGE OF JUDGE
12   vs                                            )
                                                   )
13   THE PROFESSIONAL                              )
14   BASKETBALL CLUB, LLC.,                        )
                                                   )
15                      Respondent.                )    **[CLERK'S ACTION REQUIRED]**
                                                   )

16

17   For the reason cited below:

18   _____         Recusal of the assigned judge
        X            Affidavit of prejudice filed by a party to the action
19   _____         Change of assignment area
     _____         Trial Assignment
20   _____         Other:

21

22   This matter is reassigned from Judge Glenna S. Hall to Judge *Harry McCarthy*.

23   DATED: *Sept. 27*, 2007.

24

                                                   *John P. Erlick*
25
                                                   John Erlick, Chief Civil Judge
26   ORDER FOR CHANGE OF JUDGE

**COPY**

**15**

RECEIVED

2007 OCT -2 A II: 33

BYRNES & KELLER LLP

## IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
### FOR THE COUNTY OF KING

CITY OF SEATTLE

v.

THE PROFESSIONAL BASKETBALL CLUB, LLC

NO. 07-2-30997-7 SEA
**NOTICE FOR HEARING**
**SEATTLE COURTHOUSE ONLY**
(Clerk's Action Required ) (NTHG)

TO:    THE CLERK OF THE COURT and to all other parties listed on Page 2:
PLEASE TAKE NOTICE that an issue of law in this case will be heard on the date below and the Clerk is directed to note this issue on the calendar checked below.

Calendar Date: <u>October 10, 2007</u>                    Day of Week: <u>Wednesday</u>

Nature of Motion:  Cross Motion for Stay of Arbitration and Opposition to Defendant's Motion to Stay

**CASES ASSIGNED TO INDIVIDUAL JUDGES – Seattle**
If oral argument on the motion is allowed (LR 7(b)(2)), contact staff of assigned judge to schedule date and time before filing this notice. Working Papers: The *judge's name*, date and time of hearing *must* be noted in the upper right corner of the Judge's copy. *Deliver Judge's copies to Judges' Mailroom at C203.*

[ ] Without oral argument (Mon - Fri)          [X] With oral argument Hearing
Date/Time:  October 10, 2007
Judge's Name: Harry McCarthy          Trial Date: 3/16/2009

**CHIEF CRIMINAL DEPARTMENT - Seattle in E1201**
[ ] Bond Forfeiture  3:15 pm, 2nd Thur of each month
[ ] Certificates of Rehabilitation– Weapon Possession (**Convictions from Limited Jurisdiction Courts**)
3:30 First Tues of each month

**CHIEF CIVIL DEPARTMENT – Seattle -- (Please report to W1060 for assignment)**
*Deliver working copies to Judges' Mailroom, Room C203. In upper right corner of papers write "Chief Civil Department" or judge's name and date of hearing*
[ ]Extraordinary Writs (Show Cause Hearing) (LR 98.40)  1:30 p.m. Tues/Wed -report to Room W1060

| [ ]Supplemental Proceedings (1:30 pm Tues/Wed)(LR 69) [ ]DOL Stays 1:30 pm Tues/Wed [ ]Motions to Consolidate with multiple judges assigned (without oral argument) (LR 40(a)(4)) | **Non-Assigned Cases:** [ ] Non-Dispositive Motions M-F (without oral argument). [ ] Dispositive Motions and Revisions (1:30 pm Tues/Wed) [ ] Certificates of Rehabilitation (Employment) 1:30 pm Tues/Wed (LR 40(2)(B)) |
|---|---|

You may list an address that is not your residential address where you agree to accept legal documents.
Sign: _____    Print/Type Name: Jeffrey C. Johnson
WSBA # 23066 (if attorney)
Address: 925 Fourth Avenue, Suite 2900          Attorney for: Plaintiff, City of Seattle
Telephone: (206) 623-7580          City, State, Zip: Seattle, WA  98104
Date: October 2, 2007

**DO NOT USE THIS FORM FOR FAMILY LAW, EX PARTE OR RALJ MOTIONS.**


COPY

---

**LIST NAMES AND SERVICE ADDRESSES FOR ALL NECESSARY PARTIES REQUIRING NOTICE**

---

Mr. Bradley S. Keller
Mr. Paul R. Taylor
Byrnes & Keller LLP
1000 2nd Avenue
38th Floor
Seattle, WA 98104-1094
(206) 622-2000

Name_____
Service Address:_____
City, State, Zip_____
WSBA#_____Atty For:_____
Telephone #: _____

Name_____
Service Address:_____
City, State, Zip_____
WSBA#_____Atty For:_____
Telephone #: _____

Name_____
Service Address:_____
City, State, Zip_____
WSBA#_____Atty For:_____
Telephone #: _____

Name_____
Service Address:_____
City, State, Zip_____
WSBA#_____Atty For:_____
Telephone #: _____

Name_____
Service Address:_____
City, State, Zip_____
WSBA#_____Atty For:_____
Telephone #: _____

Name_____
Service Address:_____
City, State, Zip_____
WSBA#_____Atty For:_____
Telephone #: _____

## IMPORTANT NOTICE REGARDING CASES

Party requesting hearing must file motion & affidavits separately along with this notice. List the names, addresses and telephone numbers of all parties requiring notice (including GAL) on this page. Serve a copy of this notice, with motion documents, on all parties.

The original must be filed at the Clerk's Office not less than six court days prior to requested hearing date, except for Summary Judgment Motions (to be filed with Clerk 28 days in advance).

THIS IS ONLY A PARTIAL SUMMARY OF THE LOCAL RULES AND ALL PARTIES ARE ADVISED TO CONSULT WITH AN ATTORNEY.

The SEATTLE COURTHOUSE is in Seattle, Washington at 516 Third Avenue. The Clerk's Office is on the sixth floor, room E609. The Judges' Mailroom is Room C203.

K:\20659321\00001\20598_JCJ\20598P22TX

NOTICE FOR HEARING - SEATTLE COURTHOUSE ONLY
ICSEA031407

**16**

1

RECEIVED

Honorable Harry McCarthy
Hearing Date: October 10, 2007
Oral Argument Requested

2

2007 OCT -2  A II: 33

3

BYRNES & KELLER LLP

4

5

6

7        IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
                          FOR KING COUNTY

8
                                        )
9   CITY OF SEATTLE, a first-class charter city,  )
                                        )
10                      Plaintiff,       )   No.    07-2-30997-7  SEA
                                        )
11          vs.                          )   CITY OF SEATTLE'S CROSS-MOTION
                                        )   FOR STAY OF ARBITRATION AND
12  THE PROFESSIONAL BASKETBALL CLUB,)   OPPOSITION TO THE PROFESSIONAL
    LLC, an Oklahoma limited liability company,  )  BASKETBALL CLUB'S MOTION TO
13                                       )   STAY
                        Defendant.       )
14                                       )
                                        )
15                                       )
                                        )
16

17          **I.     INTRODUCTION AND RELIEF REQUESTED**

18          In 1994, the City of Seattle (the "City") entered into a Premises Use and Occupancy

19  Agreement (the "Lease") with the owners of the Seattle SuperSonics (the "Sonics")[1] wherein,

20  inter alia, the City promised to re-construct the Seattle Center Coliseum into a new state of the

21  art basketball arena at City expense and to provide the Sonics equal rights with respect to the
    _____

22  [1] The defendant and current owner of the Sonics has contractually agreed to assume, and satisfy or perform, all the
    responsibilities of the Sonics' ownership established by the Lease.  Declaration of Gregory C. Narver ("Narver
    Decl."), ¶¶ 2, 4, Exs. A (Article XIX(B)(1)) & C.  As an assignee to the contract, The Professional Basketball Club,
23  LLC ("PBC") stands in the shoes of SSI.  *Int'l Commercial Collectors, Inc. v. Mazel Co., Inc.*, 48 Wn. App. 712,
    716-17 (1987).

CITY OF SEATTLE'S CROSS-MOTION FOR STAY OF ARBITRATION        **Thomas A. Carr**
AND OPPOSITION TO PBC'S MOTION TO STAY - 1                    Seattle City Attorney
                                                             600 Fourth Avenue, 4th Floor
                                                             P.O. Box 94769
K:\20659\00001\20880_MDJ\20880P20BY                          Seattle, WA 98124-4769
                                                             (206) 684-8200



1  new arena's design.  The City ultimately spent more than $74 million constructing what we now

2  know as KeyArena.  The City made this substantial investment "to maintain the SuperSonics

3  NBA franchise in Seattle."   Lease, p. 1.  In exchange, the City obtained a correspondingly

4  significant promise from the Sonics:  they would play all home basketball games in KeyArena

5  for the next 15 years.  This promise was memorialized in Article II of the Lease.  To protect this

6  core promise, the City and the Sonics agreed to exclude from arbitration any dispute that "relates

7  to" the Sonics' promise to play all home games in KeyArena.

8         Despite the express terms of the Lease, Defendant The Professional Basketball Club LLC

9  ("PBC"), which bought the Sonics in July 2006, filed an arbitration demand to determine

10  "whether it makes equitable sense to force the Sonics to play the final two seasons [of the Lease

11  term] in KeyArena."  Arbitration Demand, ¶2.  Specifically, the Arbitration Demand seeks a

12  "declaratory judgment that . . . specific performance is not available to force the Sonics to play

13  the 2008-2009 and 2009-2010 NBA seasons in KeyArena."  *Id.*, ¶38.  The sole purpose of the

14  Sonics' Arbitration Demand is to avoid their express contractual duty under Article II to play all

15  home games in KeyArena through the 2009-2010 NBA season.

16         In response to the Arbitration Demand, the City filed this lawsuit, in which it seeks a

17  declaratory judgment that PBC is required to comply with the requirements of Article II.  The

18  City is asking this Court to declare that PBC must do what Article II requires it to do.  In its

19  cross-motion here, the City asks that this Court enforce the parties' express agreement that

20  disputes related to Article II be decided by this court.

21

22

23

CITY OF SEATTLE'S CROSS-MOTION FOR STAY OF ARBITRATION
AND OPPOSITION TO PBC'S MOTION TO STAY - 2

K:\2065932\00001\20880_MDJ\20880P20BY

Thomas A. Carr
Seattle City Attorney
600 Fourth Avenue, 4th Floor
P.O. Box 94769
Seattle, WA 98124-4769
(206) 684-8200

1

## II.   STATEMENT OF FACTS

2   **A.   The City of Seattle Made a Substantial Financial Investment to Re-Construct the
3   Seattle Center Coliseum in Exchange for the Promise that the Sonics Would Play in
the Re-Constructed Arena Through the 2009-2010 NBA Season.**

4   In 1994, the City of Seattle and PBC's predecessor-in-interest, SSI, Sports, Inc. ("SSI"),

5   entered into the Lease. Declaration of Gregory C. Narver ("Narver Decl."), ¶ 2, Ex. A

6   (hereinafter "Lease"). In the Lease, the City agreed to re-construct the Seattle Coliseum into a

7   new Seattle Center basketball arena – construction that ultimately cost $74 million. Lease,

8   Recitals, at 1; Narver Decl., ¶¶ 2-3, Exs. A & B. Moreover, the City agreed to give SSI rights

9   over the design and construction of the new arena that were virtually equal to the City's. In

10   exchange, SSI promised that the Sonics would play in the new arena (now known as KeyArena)

11   until September 2010 (i.e., through the 2009-2010 NBA Season). The text of the Lease reflects

12   the parties' mutual understanding that the City's long-term investment in constructing KeyArena

13   to SSI's specifications was expressly conditioned on SSI's promise that the Sonics would play

14   their home games in the new arena throughout the term of the Lease. Specifically, the Lease

15   contains:

16   •   An acknowledgement that the City could not construct a "new, state of the art

17   professional basketball facility in order to enhance the City . . . without a long-term, principal

18   user." Lease, Recitals, at 1.

19   •   Agreement that the City was constructing a new Seattle City Coliseum:

20   [I]n order to induce SSI to become the principal user of a new playing facility on
a long-term basis in lieu of having the SuperSonics play in an alternative venue,
21   and to maintain the SuperSonics NBA franchise in Seattle[.]

22   Lease, Recitals, at 1.

23   •   Agreement that the purpose of entering into the Lease was to:

CITY OF SEATTLE'S CROSS-MOTION FOR STAY OF ARBITRATION
AND OPPOSITION TO PBC'S MOTION TO STAY - 3

**Thomas A. Carr**
Seattle City Attorney
600 Fourth Avenue, 4th Floor
P.O. Box 94769
Seattle, WA 98124-4769
(206) 684-8200

K:\206593\00001\20880_MDJ\20880P20BY

Specify[] the terms and conditions under which SSI will use a new Seattle Center Coliseum and certain other facilities at Seattle Center on a long-term basis for the playing of professional basketball by the SuperSonics.

Lease, Recitals, at 1.

Finally, the Lease expressly requires that the Sonics play all of their home games in KeyArena until the conclusion of the 2009-10 NBA season:

. . . the Term of this Agreement shall end on September 30, 2010, unless terminated earlier pursuant to the provisions hereof.

Subject to the provisions of this Agreement, **SSI shall schedule and ensure that the SuperSonics play all Home Games other than pre-season games exclusively in the Coliseum** . . . .

Lease, Article II ("Term; Use Period") (emphasis added).

**B.**     **The Parties Agreed that Disputes Related to Article II Were Not Subject to Arbitration.**

The City and the Sonics ultimately agreed to exclude disputes relating to Article II from arbitration. Specifically, the Lease Arbitration provision provides:

Disputes To Be Resolved Through Arbitration: All claims, disputes and other matters in question between the parties arising out of, or relating to provisions of this agreement shall be decided by binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association then in effect unless the parties mutually agree otherwise or **unless the claim, dispute, or matter in question relates to the provisions of Article II ("Term; Use Period"),** Article III ("Termination of Current Agreement Providing Seattle Center Space for SuperSonics Home Games Use"), Article IV ("Coliseum Design and Construction"), Article V ("Coliseum Planning & Construction Schedule; SSI Opportunities to Void Agreement"), Subsection XVI.F ("Hazardous Substances") or Article XIX ("Subcontracting and Transfer of Ownership").

Lease, Article XXV(A) (emphasis added). As noted above, Article II requires SSI to **"schedule and ensure that the SuperSonics play all Home Games . . . exclusively in the Coliseum"** through the 2009-10 NBA season (emphasis added). Read together, therefore, Article XXV(A)

CITY OF SEATTLE'S CROSS-MOTION FOR STAY OF ARBITRATION AND OPPOSITION TO PBC'S MOTION TO STAY - 4

**Thomas A. Carr**
Seattle City Attorney
600 Fourth Avenue, 4th Floor
P.O. Box 94769
Seattle, WA 98124-4769
(206) 684-8200

K:\2065932\00001\20880_MDJ\20880P20BY

1 and Article II establish that disputes over whether the Sonics must play the 2008-09 and 2009-10

2 seasons at KeyArena are not subject to arbitration.

3        Despite this unequivocal language regarding the scope of arbitrable issues, PBC relies on a

4 different Lease provision, subsection D of the Lease's arbitration clause, to argue that an ambiguity

5 exists. Any claimed ambiguity in the parties' intent to exclude Article II disputes from arbitration is

6 dispelled by review of the drafting history of the Lease. That history is set forth in the

7 accompanying Declaration of Gordon B. Davidson ("Davidson Decl.").

8        The initial draft of the Lease, prepared by SSI's attorney and faxed to Mr. Davidson on

9 September 8, 1993, contained a broad arbitration provision with no enumerated exceptions.

10 Davidson Decl., ¶¶ 8-9 & Ex. B. That first draft also contained subsection D – a corresponding

11 provision that limited the parties' ability to obtain relief in court. *Id.*, ¶ 9 & Ex. B. Subsequently,

12 between January 30, 1994 and February 2, 1994, the parties agreed to exclude from arbitration

13 disputes related to five specific provisions of the Lease – including disputes related to Article II. *Id.*,

14 ¶ 12, Ex. D.   In the very next draft, following the addition of these five exceptions, the parties

15 added a sixth exception to arbitration: disputes related to hazardous substances. *Id.*, ¶ 13. A

16 memorandum between the parties, dated February 2, 1994, reflects their clear intent to "exclude"

17 those disputes "from binding arbitration." *Id.*, ¶ 13, Ex. E (paragraph 11).

18        Additionally, shortly after the parties revised the draft Lease to include express carve-outs

19 to the arbitration provision, they again amended the Lease to add a provision that "[t]he City shall

20 also have such other remedies as may be available to it, which shall include, without limitation,

21 injunctive relief and damages." Lease, Article XXVI(C)(1); Davidson Decl., ¶ 14, Ex. F.

22        These final revisions to the draft Lease were made under intense time pressure to get the

23

CITY OF SEATTLE'S CROSS-MOTION FOR STAY OF ARBITRATION
AND OPPOSITION TO PBC'S MOTION TO STAY - 5

**Thomas A. Carr**
Seattle City Attorney
600 Fourth Avenue, 4th Floor
P.O. Box 94769
Seattle, WA 98124-4769
(206) 684-8200

K:\2065937\00001\20880_MDJI\20880P20RY

1  proposed Lease finalized for approval by the Seattle City Council. Davidson Decl., ¶¶ 15-16. The

2  Lease was submitted to and approved by the Seattle City Council on February 14, 1994. *Id.*, ¶ 15.

3  As approved by the City Council, the final Lease contained all six express exclusions to arbitration

4  and the language permitting the City to seek injunctive relief. *Id.*, ¶ 14, Ex. G. But in this hasty

5  exchange of drafts to obtain City Counsel approval and begin construction, the parties mistakenly

6  overlooked the fact that the "Limitation on Judicial Relief" clause – a holdover from the earliest

7  draft, before the parties added specific exceptions to arbitration – no longer made sense, and no

8  longer reflected the intent of the parties to exclude certain disputes from arbitration. *Id.*, ¶ 16.

9  **C.    There Is a Dispute Between the City and PBC Related to the Provisions of Article II
         of the Lease, and that Dispute Is Non-Arbitrable.**

10

11          PBC filed an Arbitration Demand that asks the arbitrator to declare that the Sonics are not

12  required to play the 2008-09 and 2009-10 seasons in KeyArena. Arbitration Demand, ¶ 6 at 3, ¶ 38

13  at 13. Article II of the Lease requires the NBA to schedule[2] and the Sonics to play all home games

14  in the 2008-09 and 2009-10 seasons in KeyArena. The City has brought this action to protect its

15  right, under Article II, to have the Sonics play the 2008-09 and 2009-10 seasons in KeyArena.

16  Accordingly, the dispute between the parties is one that "relates to" the provisions of Article II. The

17  dispute is therefore not subject to arbitration under the Lease.

18                          **III.    STATEMENT OF THE ISSUE**

19          Is the City of Seattle entitled to an Order Staying PBC's Arbitration Demand and Denying

20  PBC's Motion to Stay Litigation, where the parties dispute whether the Sonics are required to play

21  their home games at KeyArena during the 2008-09 and 2009-10 seasons, and the Lease term

22  requiring the Sonics to play their home games in KeyArena is expressly excluded from arbitration?

23  _____

[2] The NBA, through its Commissioner, expressly approved all terms of the Lease. Lease, Article XX(A)(3).

CITY OF SEATTLE'S CROSS-MOTION FOR STAY OF ARBITRATION
AND OPPOSITION TO PBC'S MOTION TO STAY - 6

**Thomas A. Carr**
Seattle City Attorney
600 Fourth Avenue, 4th Floor
P.O. Box 94769
Seattle, WA 98124-4769
(206) 684-8200

K:\20659321\00001\20880_MD\20880P20BY

1

2

3        IV.    **EVIDENCE RELIED UPON**

4            The City relies on the Declaration of Gregory C. Narver and the exhibits attached thereto;

5    the Declaration of Gordon B. Davidson, and the exhibits attached thereto; and the pleadings and

6    other papers on file in this case.

7        V.    **AUTHORITY**

8    **A.    Summary of Argument.**

9            A party can only be required to arbitrate disputes it has agreed to arbitrate. The parties to

10    the Lease expressly excluded certain kinds of disputes from arbitration. Specifically, Article

11    XXV(A) expressly provides that PBC's obligations related to Article II are not subject to

12    arbitration. Article II requires the NBA to schedule and the Sonics to play all home games at

13    KeyArena until the conclusion of the 2009-10 NBA season. PBC has demanded arbitration on

14    whether the Sonics can play their home games somewhere else during the 2008-09 and 2009-10

15    seasons. This arbitration demand is not just "related" to Article II, but goes to the heart of that

16    provision. Because the parties jointly agreed that this type of dispute is not subject to arbitration,

17    PBC's arbitration demand is improper and should be stayed.

18            PBC's argument to avoid the plain language of the Lease and create an ambiguity is based

19    on an unreasonable interpretation of the Lease. Established rules of contract interpretation, as well

20    as the drafting history of the Lease, establish that the parties intended to allow the City to litigate in

21    court any dispute "relate[d] to" Article II. Article XXV(A) is clear and unambiguous on this point

22    and consistent with the intent of the parties. Article XXV(D), on which PBC relies, creates no

23

CITY OF SEATTLE'S CROSS-MOTION FOR STAY OF ARBITRATION
AND OPPOSITION TO PBC'S MOTION TO STAY - 7

K:\20659321\00001\20880_MDJ\20880P20BY

**Thomas A. Carr**
Seattle City Attorney
600 Fourth Avenue, 4th Floor
P.O. Box 94769
Seattle, WA 98124-4769
(206) 684-8200

1  ambiguity regarding the Sections of the Lease that are subject to arbitration.  Moreover, PBC's

2  interpretation of Subsection D is illogical and would deny the City any right to relief from either a

3  court or arbitrator.  The only reasonable interpretation of Article XXV and the Lease as a whole, in

4  light of the drafting history and overall express purposes of the Lease agreement, is that the specific,

5  express exception to the arbitration provision for claims "relate[d] to" Article II controls, and that

6  any apparent contradiction created by Subsection D of Article XXV is no more than drafting error

7  or a mutual mistake that does not reflect the parties' intentions.

8  **B.      The City of Seattle Did Not Agree to Arbitrate Disputes Related to Article II, and
             thus the Instant Dispute Is Non-Arbitrable.**

9

10          In addition to opposing PBC's Motion to Stay, the City brings a cross-motion as authorized

   by RCW 7.04A.070(2) to protect its rights to have a court resolve this dispute.  RCW 7.04A.070(2)
11
   states that "[o]n motion of a person alleging that an arbitration proceeding has been initiated or
12
   threatened but that there is no agreement to arbitrate, the court shall proceed summarily to decide
13
   the issue."  PBC has filed an arbitration demand seeking to avoid its promise to play all home games
14
   at KeyArena in the 2008-09 and 2009-10 seasons, a requirement expressly imposed by Article II of
15
   the parties' Lease.  Because there is no agreement to arbitrate this issue, the City asks this Court to
16
   declare the issue non-arbitrable under RCW 7.04A.070(2) and issue an order staying arbitration.
17
                **1.      A Party Cannot Be Compelled to Arbitrate Disputes It Has Not Agreed to
18                         Arbitrate, and Courts Must Enforce Exceptions to Arbitration Provisions.**

19          In deciding the scope of an arbitration agreement, a court's main concern is to give effect,

20  faithfully, to the reasonable expectations of the parties.  *Leadertex, Inc. v. Morgantown Dyeing

21  & Finishing Corp.*, 67 F.3d 20, 28 (2nd Cir. 1995).  Thus, the law protects a party from being

22  compelled to arbitrate claims they did not agree to arbitrate.  *State v. Oneida Indian Nation*, 90

23

CITY OF SEATTLE'S CROSS-MOTION FOR STAY OF ARBITRATION
AND OPPOSITION TO PBC'S MOTION TO STAY - 8

K:\20659321\0000\20980_MDJ\20880P20BY

**Thomas A. Carr**
Seattle City Attorney
600 Fourth Avenue, 4th Floor
P.O. Box 94769
Seattle, WA 98124-4769
(206) 684-8200

1    F.3d 58, 59 (1996).[3]  The Federal Arbitration Act ("FAA") "does not require parties to arbitrate

2    when they have not agreed to do so . . . nor does it prevent parties who do agree to arbitrate from

3    excluding certain claims from the scope of their arbitration agreement[.]" *Volt Info. Scis., Inc. v.*

4    *Bd. of Trs. of the Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989).  Arbitration

5    agreements are subject to the same rules as any other contract:  the parties' intent prevails. *Id.*

6    Thus, even if claims might not fit "word for word" within an arbitration provision's exclusionary

7    clause, court "will not don blinders to their obvious meaning and thereby thwart the reasonable

8    expectations of the parties . . . [.]" *Oneida Indian Nation*, 90 F.3d at 63.

9         Where the parties to an arbitration agreement have specifically excepted a certain type of

10    claim from mandatory arbitration, "it is the duty of courts to enforce not only the full breadth of

11    the arbitration clause, but its limitations as well." *Oneida Indian Nation*, 90 F.3d at 62 (denying

12    arbitration).  If an agreement "specifically excludes a subject from arbitration, courts are not free

13    to ignore the plain wording of the agreement and must decline to compel arbitration." *Gen.*

14    *Drivers  v. Ethyl Corp.*, 68 F.3d 80, 83 (4th Cir. 1995) (denying arbitration); *see also Contra*

15    *Costa Legal Assistance Workers v. Contra Costa Legal Serv. Found.*, 878 F.2d 329, 330 (9th Cir.

16    1989) (holding similarly).  Washington courts, like federal courts, have consistently followed

17    this rule.  Thus, in *ACF Prop. Mgmt. Inc. v. Chaussee*, 69 Wn. App. 913 (1993), the Washington

18    Court of Appeals held that a dispute involving claims of more than $200,000 in damages was

19    non-arbitrable and affirmed a stay of litigation pending arbitration, where the arbitration

20    provision expressly excluded disputes over $200,000 from the arbitrator's jurisdiction. *ACF*

21    *Prop. Mgmt,* 69 Wn. App. at 919-20.

22

23    [3] The Federal Arbitration Act creates a body of federal substantive law of arbitrability, which applies to any
      arbitration agreement within the coverage of the Act. *Oneida Indian Nation*, 90 F.3d at 61. It is undisputed that the
      Lease falls within the broad provisions of the FAA.

CITY OF SEATTLE'S CROSS-MOTION FOR STAY OF ARBITRATION
AND OPPOSITION TO PBC'S MOTION TO STAY - 9

**Thomas A. Carr**
Seattle City Attorney
600 Fourth Avenue, 4th Floor
P.O. Box 94769
Seattle, WA 98124-4769
(206) 684-8200

K:\2065932\00001\20880_MDJ\20880I'20BY

**2.    The Lease Expressly and Unambiguously Provides that Disputes Related to Article II Are Not Arbitrable.**

The City and PBC expressly agreed that their Lease's arbitration clause did <u>not</u> apply to disputes regarding the Sonics promise to play all their home games at KeyArena until the end of the 2009-10 NBA season. Lease, Article XXV(A) (emphasis added). In determining whether an arbitration provision excludes certain disputes from arbitration, the words of the provision – like all contractual language – will be given their ordinary meaning. *Martinez v. Miller Indus., Inc.*, 94 Wn. App. 935, 944 (1999). The language of Article XXV(A) is clear: "All claims, disputes and other matters … shall be decided by binding arbitration … **unless** the claim, dispute or other matter in question relates to the provisions of Article II …, Article II …, Article IV …, Article V …, Subsection XVI.F … or Article XIX." (emphasis added).[4]    Thus, all disputes *regarding the Lease are arbitrable* <u>except</u> disputes related to the provisions of Article II (and Articles III, IV, V, XVI(F), and XIX).

Article II, in turn, states in relevant part that:

> . . . the Term of this Agreement shall end on September 30, 2010, unless terminated earlier pursuant to the provisions hereof.

> Subject to the provisions of this Agreement, **SSI shall schedule and ensure that the SuperSonics play all Home Games other than pre-season games exclusively in the Coliseum** after the Use Commencement Date.

Agreement, Article II (emphasis added). Thus, the arbitration provision of the Lease does not require or permit arbitration of disputes "relate[d] to" whether the Sonics must play their home games in KeyArena during the 2008-09 and 2009-10 NBA seasons.

---

[4] The parties' intent to exclude from arbitration disputes related to these six Lease provisions is also evidenced in the February 2, 1994 Memorandum. Davidson Decl., ¶ 13, Ex. E. When adding the sixth Lease provision to the list of exempted disputes, the stated purpose of the addition was *"to exclude issues relating to hazardous substances from binding arbitration." Id.,* ¶ 13, Ex. E (paragraph 11).

CITY OF SEATTLE'S CROSS-MOTION FOR STAY OF ARBITRATION AND OPPOSITION TO PBC'S MOTION TO STAY - 10

Thomas A. Carr
Seattle City Attorney
600 Fourth Avenue, 4th Floor
P.O. Box 94769
Seattle, WA 98124-4769
(206) 684-8200

K:\2065932\00001\20880_MDJ\20880P20BY

1   PBC argues that arbitration is required because "the arbitration clause is ambiguous."[5]

2   Motion to Stay at 7. The plain language of the Lease proves this assertion false. The Lease is

3   not ambiguous as to whether disputes related to Article II are arbitrable. Under the plain

4   language of Article XXV(A), they are not. Moreover, nothing in the Lease says that they are

5   arbitrable.

6       As discussed supra, pp ___, PBC tries to create an ambiguity by citing to Article

7   XXV(D) (and nothing else). But PBC's argument makes Article XXV(D) something that it is

8   not. Article XXV(D) does not purport to expand the scope of claims that are arbitrable. Indeed,

9   PBC is trying to use subsection D to read subsection A's express exceptions to the arbitration

10  provision out of the Lease. Nothing in subsection D, or any other provision of the Lease, allows

11  PBC to force the City to arbitrate disputes "relate[d] to" Article II.

12      **3.    This Dispute Is Not Just "Relate[d] to" Article II, but Goes to the Very Heart
        of the Rights and Responsibilities Established by that Article.**

13

14      PBC's argument that this dispute does not "relate[] to" Article II is meritless. PBC's

15  arbitration demand asks the arbitrator to issue a 'declaratory judgment' that the Sonics are not

16  required to play their home games in KeyArena during the 2008-09 and 2009-10 NBA seasons.

17  This dispute is not just "relate[d] to" the provisions of Article II (although that would be

18  sufficient to bar arbitration), but goes to the very heart at that Article. Article II establishes

19  PBC's responsibility to play all Sonics' home games at KeyArena through the 2009-10 season.

20  Because the arbitration provision expressly excludes disputes related to Article II from the

21  general requirement that disputes be arbitrated, and the instant dispute relates to Article II, it is

22  _____
    [5] PBC is trying to take advantage of a presumption in favor of arbitrability that does not apply here. Where there is
    clear evidence that the parties intended to exclude a particular dispute from arbitration — e.g., an express exception to
23  the arbitration provision for disputes of that type — there is no presumption in favor of arbitration. *Contra Costa*
    *Legal Assistance Workers,* 878 F.2d at 330.

CITY OF SEATTLE'S CROSS-MOTION FOR STAY OF ARBITRATION
AND OPPOSITION TO PBC'S MOTION TO STAY - 11

**Thomas A. Carr**
Seattle City Attorney
600 Fourth Avenue, 4th Floor
P.O. Box 94769
Seattle, WA 98124-4769
(206) 684-8200

1  non-arbitrable. *Volt Info. Scis.*, 489 U.S. at 478; *Oneida Indian Nation*, 90 F.3d at 62; *Ethyl*

2  *Corp.*, 69 at 83-85; *Contra Costa Legal Assistance Workers*, 878 F.2d at 330; *ACF Prop. Mgmt.*,

3  69 Wn. App. at 919-20.

4        Words in a contract are given "their ordinary, usual, and popular meaning unless the

5  entirety of the agreement clearly demonstrates a contrary intent." *Hearst Commc'ns, Inc. v.*

6  *Seattle Times Co.*, 154 Wn.2d 493, 504 (2005).   The ordinary, usual and popular meaning of the

7  term "relate" as used in the Lease is a broad one:  for one thing to have a relationship or

8  connection to another. *See Bellevue Sch. Dist. No. 405 v. Bentley*, 38 Wn. App. 152, 158 (1984)

9  (where words are not defined in contract, "[i]t is therefore presumed that the ordinary dictionary

10  meaning applies"). Without question the current dispute "relates to" Article II.

11        4.      **Subsection D of the Arbitration Provision Should be Read Consistent with
                   the Parties' Express Intent to Require the Sonics to Play in KeyArena Over**

12                **the Long Term, and to Exclude Disputes Regarding Article II from
                   Arbitration.**

13

14        PBC tries to create ambiguity by asking this Court to focus solely on the provisions of

15  subsection D of the arbitration section while ignoring both the circumstances surrounding the

16  negotiation and drafting of the Lease and the plain terms of subsection A of that same arbitration

17  provision. PBC argues that because subsection D states that "No proceedings based upon any

18  claim arising out of or related to this Agreement shall be instituted in any court . . ." (subject to

19  certain exceptions inapplicable to this case), the City cannot seek <u>any</u> relief in this Court related

20  to Article II. This argument is unreasonable when the Lease is read as a whole. Put simply,

21  PBC's interpretation of subsection D would render the most important provision of the Lease

22  from the City's perspective,[6] Article II, meaningless:  the City would have a right to have the

23  [6] *See* discussion of recitals and purpose of long term lease quoted at pp. 3-4, *supra*.

CITY OF SEATTLE'S CROSS-MOTION FOR STAY OF ARBITRATION
AND OPPOSITION TO PBC'S MOTION TO STAY - 12

K:\2065932\00001\20880_MDJ\20880P20BY

Thomas A. Carr
Seattle City Attorney
600 Fourth Avenue, 4th Floor
P.O. Box 94769
Seattle, WA 98124-4769
(206) 684-8200

1 | Sonics play at KeyArena through the 2009-10 season, but would have no means to enforce that

2 | right. Disputes related to that provision would not be subject to arbitration (under subsection A),

3 | nor would the City be able to seek relief from a court (under PBC's interpretation of subsection

4 | D). Instead of adopting PBC's unreasonable interpretation of subsection D, this Court should do

5 | one of two things: interpret the Lease to reflect the parties' shared intent to exclude certain

6 | disputes from arbitration or reform the Lease.

7 | In interpreting a contract, "[t]he role of the court is to determine the mutual intentions of

8 | the parties according to the reasonable meaning of their words and acts." *Fisher Props., Inc. v.*

9 | *Arden-Mayfair, Inc.*, 106 Wn.2d 826, 837(1986). What the Court should consider in doing this

10 | is well-established:

11 | "'In Washington, the intent of the parties to a particular agreement may be discovered not only from the actual language of the agreement, but also from
12 | 'viewing the contract as a whole, the subject matter and objective of the contract, all circumstances surrounding the making of the contract, the subsequent acts and
13 | conduct of the parties to the contract, and the reasonableness of respective interpretations advocated by the parties.'"

14 | *Bort v. Parker*, 110 Wn. App. 561, 573 (2002) (quoting *Scott Galvanizing, Inc. v. N.W.*

15 | *EnviroServices, Inc.* 120 Wn.2d 573, 579-80 (1993) (quoting *Berg v. Hudesman*, 115 Wn.2d

16 | 657, 667 (1990)). The prime principle of contract construction is that all provisions of a

17 | contract should be given effect if possible. *Oneida Indian Nation*, 90 F.3d at 63; *see also*

18 | *Wagner v. Wagner*, 95 Wn.2d 94, 101 (1980); *PUD No. 1. v. Washington Public Power Supply*

19 | *Sys.*, 104 Wn.2d 353, 374 (1985). A court "will not give effect to interpretations that would

20 | render contract obligations illusory." *Taylor v. Shigaki*, 84 Wn. App. 723, 730 (1997).

21 | Accordingly, a court will not allow a party to reap the benefits of a contract and then unilaterally

22 | avoid its obligations. *Id.*

23 |

CITY OF SEATTLE'S CROSS-MOTION FOR STAY OF ARBITRATION
AND OPPOSITION TO PBC'S MOTION TO STAY - 13

Thomas A. Carr
Seattle City Attorney
600 Fourth Avenue, 4th Floor
P.O. Box 94769
Seattle, WA 98124-4769
(206) 684-8200

K:\20650321\00001\20880_MDJ\20880P20BY

1   PBC's interpretation of subsection D would render Article II meaningless and

2   ineffective, as the City would have a right without a remedy. Similarly, the City would have no

3   remedy for PBC's failure to fulfill its duties under Articles III, IV, V, XVI(F) and XIX as these

4   provisions are also expressly excluded from the arbitration provision. This would render PBC's

5   contractual obligation under Article II illusory – a result that cannot be sanctioned. *Taylor*, 84

6   Wn. App. at 730; *see also Gruen v. State Tax Comm'n*, 35 Wn.2d 1, 55 (1949) ("A right without

7   a remedy is as if it were not. For every beneficial purpose it may be said not to exist.") (citations

8   omitted) (*overruled in part on other grounds by State ex rel. Washington State Fin. Comm. v.*

9   *Martin*, 62 Wn.2d 645 (1963)). The Lease was the product of lengthy negotiations between the

10  parties, and all of the provisions to which they agreed, including Article II, should be given

11  effect. *Wagner*, 95 Wn.2d at 101.

12      In fact, PBC's proposed interpretation of subsection D – that it bars court proceedings

13  with respect to "any claim" (subject to limited exceptions) – would deny PBC an adequate

14  remedy for many violations of its rights as well. An interpretation of the Lease that barred either

15  party from enforcing Articles to the Lease would benefit the party that intends to violate the

16  provisions of that Article – in this case, PBC (by its own admission). Instead, the Lease should

17  be interpreted to give effect to the parties' clear desire to exclude certain disputes from

18  arbitration without robbing a party of the ability to effectively enforce those provisions in court.

19      Alternatively, the Court should give effect to the more specific provision (A) limiting the

20  scope of arbitration, rather than the more general provision (D). Where general and specific

21  language conflict, the presumption is in favor of implementing the specific terms. *See McGary*

22  *v. Westlake Investors*, 99 Wn.2d 280, 286 (1983); *Foote v. Viking Ins. Co.*, 57 Wn. App. 831,

23

CITY OF SEATTLE'S CROSS-MOTION FOR STAY OF ARBITRATION
AND OPPOSITION TO PBC'S MOTION TO STAY - 14

**Thomas A. Carr**
Seattle City Attorney
600 Fourth Avenue, 4th Floor
P.O. Box 94769
Seattle, WA 98124-4769
(206) 684-8200

K:\20859:2\00001\20880_MDJ\20880P20BY

Case 2:07-cv-01620-RSM    Document 1-4    Filed 10/09/2007    Page 51 of 109

834 (1990).  Restatement (Second) of Contracts, § 203(c) (1981) ("[S]pecific terms and exact

terms are given greater weight than general language.").  This is because:

> [I]n case of conflict the specific or exact term is more likely to express the
> meaning of the parties with respect to the situation than the general language.  If
> the specific or exact can be read as an exception or qualification of the general,
> both are given <u>some</u> effect, in accordance with the rule stated in Subsection (a)
> [i.e., that "an interpretation which gives a reasonable, lawful, and effective
> meaning to all the terms is preferred to an interpretation which leaves a part
> unreasonable, unlawful, or of no effect"].

Restatement (Second) of Contracts § 203 cmt. c (1981) (emphasis added).  This rule of contract

interpretation is particularly true where the specific language is added to the contract after the

general language, as is the case here:  the general language of subsection D was drafted first, and

the specific exceptions in subsection A agreed to and added later.  *See McGary*, 99 Wn.2d at 286

(specific language of addendum to contract governed over general language of original contract).

Subsection D is written as a provision of general applicability, purportedly applying to

"any disputes."  Subsection A is written as a specific provision; i.e., the parties specifically

excluded certain disputes from arbitration.  A more natural reading, and one that gives effect to

both provisions,  would be that  subsection D is narrowed by subsection A and merely limits the

availability of court proceedings for *arbitrable* disputes; i.e., disputes not expressly carved out

from subsection A's arbitration clause.  This reading honors both the specific exceptions to the

arbitration provision in subsection A, and the general limitation on court proceedings in

subsection D.  The parties are not required to arbitrate certain claims and are allowed to institute

court proceedings with regard to those claims (i.e., claims related to Article II, III, IV, V, XVI(F)

and XIX).  But they do not have the right to institute court proceedings (with certain exceptions)

with regard to any other disputes, those which remain subject to mandatory arbitration pursuant

to Article XXV(A).

CITY OF SEATTLE'S CROSS-MOTION FOR STAY OF ARBITRATION
AND OPPOSITION TO PBC'S MOTION TO STAY - 15

K:\20659321000011\20860_MDJ\20860P20BY

**Thomas A. Carr**
Seattle City Attorney
600 Fourth Avenue, 4th Floor
P.O. Box 94769
Seattle, WA 98124-4769
(206) 684-8200

5.    **The Lease Should Be Reformed to Correct a Scrivener's Error or Mutual Mistake and Give Effect to the Parties' Shared Intention.**

To reflect the parties' shared intent to allow the City to enforce its rights under Article II (and allow SSI to obtain permanent relief for violations of its rights under various Articles), this Court should reform the Lease to correct a scrivener's error or mutual mistake. All that reformation requires is to construe subsection D as barring the institution of court proceedings (subject to the limited exceptions listed in subsection D) with respect to any *arbitrable* claims, rather than with respect to "any" claims.

"In contract law a scrivener's error, like a mutual mistake, occurs when the intention of the parties is identical at the time of the transaction but the written agreement does not express that intention because of that error." *Bort*, 110 Wn. App. at 579. Similar to scrivener's error, "[a] mutual mistake exists when both parties to a contract have an identical intention as to the terms to be embodied in the proposed contract, and the writing executed by them is materially at variance with such intention." *Keesling v. Pehling*, 35 Wn.2d 624, 625 (1950); *see also St. Regis Paper Co. v. Wicklund*, 93 Wn.2d 497, 501 (1980); *Akers v. Sinclair*, 37 Wn.2d 693, 702 (1950); Restatement (Second) of Contracts, § 155 (1981). "This rule has long been followed in [Washington]." *Akers*, 37 Wn.2d at 702. The remedy for both scrivener's error and mutual mistake is reformation of the contract to express the intentions of the parties, and can be sought be either party to the contract. *See id.; Bort*, 110 Wn. App. at 579. In determining whether reformation is appropriate, courts will examine the surrounding circumstances and take into account all facts which shed light on the intentions of the parties. *Akers*, 37 Wn.2d at 704.

It is undisputed that the parties intended to exclude disputes related to Article II from arbitration: both parties accepted the revision to Article XXV(A), which did just that.

CITY OF SEATTLE'S CROSS-MOTION FOR STAY OF ARBITRATION AND OPPOSITION TO PBC'S MOTION TO STAY - 16

**Thomas A. Carr**
Seattle City Attorney
600 Fourth Avenue, 4th Floor
P.O. Box 94769
Seattle, WA 98124-4769
(206) 684-8200

1   Furthermore, the February 2, 1994 Memorandum, produced during Lease negotiations and

2   describing the addition of the hazardous substances provision to the list of exempted provisions

3   reflects the parties' clear intent "to exclude" these provisions "from binding arbitration."

4   Davidson Decl., ¶ 13, Ex. E (paragraph 11). There is no evidence that the parties intended to

5   deny each other a remedy in court to protect their respective rights in disputes related to Articles

6   II, III, IV, V, XVI(F) and XIX.   In the rush to finalize the Lease, the parties mistakenly

7   overlooked the need to revise subsection D to make clear that it applied only to claims that

8   subsection A required the parties to arbitrate. The parties' inadvertent failure to expressly limit

9   subsection D in this way should not trump their intention to give the City and SSI the ability to

10  seek judicial relief for violations of their rights. This is particularly true where the parties to the

11  Lease also added a provision allowing the City to seek injunctive relief – the exact kind of relief

12  that PBC argues only it (through its predecessor in interest) is entitled to seek. The Lease should

13  be reformed to clarify that Subsection D of the arbitration provision applies only to arbitrable

14  claims. This will effectuate the parties' clear intent to carve certain dispute out of the arbitration

15  clause, and in this instance allow the City and PBC to seek final judgments securing their rights

16  in disputes related to Articles II, III, IV, V, XVI(F) and XIX.

17                                    **VI.   CONCLUSION**

18          The City and PBC agreed in their Lease that disputes related to Article II would be

19  decided by a court, not an arbitrator. PBC seeks to avoid this agreement by improperly

20  demanding arbitration of a dispute that goes to the heart of Article II. For the reasons given

21  above, the City respectfully requests that this Court issue an order declaring that, under the terms

22  of the Lease, disputes related to Article II – including disputes over where the Sonics will play

23  home games through September 30, 2010 – are non-arbitrable and staying PBC's arbitration.

CITY OF SEATTLE'S CROSS-MOTION FOR STAY OF ARBITRATION
AND OPPOSITION TO PBC'S MOTION TO STAY - 17

K:\20659321\00001\20880_MDJ\20880P20BY

**Thomas A. Carr**
Seattle City Attorney
600 Fourth Avenue, 4th Floor
P.O. Box 94769
Seattle, WA 98124-4769
(206) 684-8200

1   This will allow the merits of the parties' dispute to be decided where the parties agreed they

2   would be decided: in a King County court.

3

4          DATED this 2ᴺᴰ day of October, 2007.

5

6   KIRKPATRICK & LOCKHART              THOMAS A. CARR
    PRESTON GATES & ELLIS, LLP          Seattle City Attorney

7

8   By: _____      By: _____
        Slade Gorton, WSBA No. 20          Gregory C. Narver, WSBA No. 18127

9       Paul J. Lawrence, WSBA No. 13557   Assistant City Attorney
        Jeffrey Johnson, WSBA No. 23066

10      Jonathan Harrison, WSBA No. 31390  Attorneys for Plaintiff City of Seattle
        Michelle Jensen, WSBA No. 36611

11
    Attorneys for Plaintiff City of Seattle

12

13

14

15

16

17

18

19

20

21

22

23
    CITY OF SEATTLE'S CROSS-MOTION FOR STAY OF ARBITRATION        **Thomas A. Carr**
    AND OPPOSITION TO PBC'S MOTION TO STAY - 18                   Seattle City Attorney
                                                                  600 Fourth Avenue, 4th Floor
    K:\20659320\0001\20880_MD\20880P20DY                          P.O. Box 94769
                                                                  Seattle, WA 98124-4769
                                                                  (206) 684-8200

**17**

RECEIVED

2001 OCT ·? A 11: 34

BYRNES & KELLER LLP

The Honorable Harry J. McCarthy
Hearing Date: October 10, 2007
Oral Argument Requested

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
FOR KING COUNTY

CITY OF SEATTLE, a first-class charter city, )
)
                   Plaintiff, )  No.   07-2-30997-7 SEA
)
          vs. )  DECLARATION OF GORDON B.
)  DAVIDSON
THE PROFESSIONAL BASKETBALL CLUB,)
LLC, an Oklahoma limited liability company, )
)
           Defendant. )
)
_____)

     I, Gordon B. Davidson, declare under penalty of perjury of the laws of the State of

Washington that the following statements are true and correct. I am over the age of 18, have

personal knowledge of the matters stated below and, if called to testify, could and would so

testify.

     1.     I am a retired attorney who formerly practiced in the State of Washington. From

1976 until my retirement in 2002, I was employed by the City of Seattle, first as an Assistant

Corporation Counsel, and later as an Assistant City Attorney and Senior Assistant City Attorney.

DECLARATION OF GORDON B. DAVIDSON - 1

**Thomas A. Carr**
Seattle City Attorney
600 Fourth Avenue, 4th Floor
P.O. Box 94769
Seattle, WA 98124-4769
(206) 684-8200

2.    Within the City Attorney's Office, my principal responsibility was negotiating and drafting contracts and leases to which the City of Seattle was a party. In particular, I drafted numerous leases involving the City, both as lessor and lessee. The Seattle Center was one of the City departments for which I drafted numerous contracts and leases.

3.    . I was the principal drafter, from the City's side, of the Premises Use & Occupancy Agreement (the "Lease") between the City of Seattle and SSI Sports, Inc. ("SSI"), the corporation that owned the Seattle SuperSonics (the "Sonics") at the time that agreement was negotiated.

4.    During the negotiation of the Lease, I exchanged numerous drafts with Eric Rubin, an attorney in Washington, D.C. who represented SSI. I created and modified drafts of the Lease, reflecting ongoing edits contributed by both parties, on my work computer. It was my regular practice to save each distinct draft of the Lease on a 3.5-inch computer disk.

5.    I was recently shown a set of five 3.5-inch computer disks (numbered 1 through 5) that had been retrieved from storage by the City Attorney's Office. Based on the handwriting on the label of each disk, I recognize them as the computer disks on which I saved the drafts of the Lease generated during negotiations with SSI. Attached hereto as **Exhibit A** are true and correct copies of screen shots showing the file directories for each of these five computer disks.

6.    I understand that my original copy of Disk #5 (which contains the last six drafts I saved before the Lease was finalized) is no longer readable, and that the fifth screen shot in Exhibit A was taken from a backup copy of Disk #5 that was created at the time of a 1999 arbitration between the City and SSI.

7.    Each screen shot in Exhibit A shows the date and time on which I last modified a particular draft of the Lease (or other Lease-related document). For example, the third page of Exhibit A shows that a document I created titled "PU&O12" was last modified on February 2, 1994,

DECLARATION OF GORDON B. DAVIDSON - 2

Thomas A. Carr
Seattle City Attorney
600 Fourth Avenue, 4th Floor
P.O. Box 94769
Seattle, WA 98124-4769
(206) 684-8200

1    at 2:31 p.m. "PU&O12" is my shorthand for Draft #12 of the Premises Use and Occupancy

2    Agreement (i.e., the Lease).

3         8.      I believe the first draft of the Lease was prepared by Mr. Rubin and was faxed to me

4    on September 8, 1993. Attached hereto as **Exhibit B** is a true and correct copy of a portion of Mr.

5    Rubin's faxed first draft, namely, the first and final pages of the draft and the sections of the Lease

6    entitled and relating to "Arbitration" and "Default and Remedies Therefor."

7         9.      Mr. Rubin's first draft of the Lease contained a broad arbitration provision that

8    provided virtually all disputes would be submitted to AAA arbitration. It contained none of the six

9    exceptions to arbitration that are set forth in the final version of the Lease entered into on March 2,

10   1994. *See* Exhibit B, Article XXIV(A). Mr. Rubin's first draft contained a corresponding provision

11   (in Article XXIV(D)) that listed the very limited circumstances under which proceedings could be

12   instituted in court. This first draft did not contain the language that appears in the "Remedies"

13   clause of the final version of the Lease providing that "[t]he City shall also have such other

14   remedies as may be available to it, which shall include, without limitation, injunctive relief and

15   damages."

16        10.     After the City received Mr. Rubin's first draft on September 8, 1993, the parties

17   exchanged numerous subsequent drafts over the ensuing five months. In addition, the parties held

18   several negotiating sessions, both in person and over the telephone. Drafts that I prepared for, or as

19   a consequence, of those negotiating sessions and saved to computer disk are shown in Exhibit A.

20        11.     Despite the many changes that were made in the various drafts of the Lease between

21   September 1993 and late January 1994, the initial arbitration clause remained largely unchanged

22   during that period of time. Attached hereto as **Exhibit C** is a true and correct copy of a portion of

23   Draft #11B of the Lease, which I created and saved to disk, and which was printed out from the

DECLARATION OF GORDON B. DAVIDSON - 3

**Thomas A. Carr**
Seattle City Attorney
600 Fourth Avenue, 4th Floor
P.O. Box 94769
Seattle, WA 98124-4769
(206) 684-8200

1   computer disk.[1]  According to the file directory, Draft #11B was last modified on January 30, 1994,

2   at 12:13 p.m.  As with Exhibit B, I have attached the first and final pages of the draft, and the

3   sections entitled and relating to "Arbitration" and to "Default and Remedies Therefor."  As was the

4   case with Mr. Rubin's first draft (and all intervening drafts), the Arbitration clause in Draft #11B

5   provided that virtually all disputes would be submitted to AAA arbitration, and contained none of

6   the six exceptions to arbitration that are set forth in the final version of the Lease.  *See* Exhibit C,

7   Article XXV(A).  And, as was the case with Mr. Rubin's first draft (and all intervening drafts),

8   Draft #11B contained the corresponding provision that listed the very limited circumstances under

9   which proceedings could be instituted in court.  *See* Exhibit C, Article XXV(D).

10          12.     Sometime between January 30, 1994 and February 2, 1994, the Lease's arbitration

11   clause was rewritten to provide that disputes relating to Articles II, III, IV, V and XIX are <u>not</u>

12   subject to arbitration.  Attached hereto as **Exhibit D** is a true and correct copy of a portion of Draft

13   #12 of the Lease (namely, the first and final pages of the draft and the sections entitled and relating

14   to "Arbitration" and to "Default and Remedies Therefor"), which I created and saved to disk on

15   February 2, 1994, and which was printed out from the computer disk.  With respect to these

16   arbitration exceptions, I recall that at some point during the negotiation process the Sonics raised

17   concerns about being able to seek quick resolution of disputes regarding the construction schedule

18   and the amount of time a AAA arbitration would take.  I also recall that City representatives

19   believed there were certain potential situations in which the City would benefit from having a judge

20   as the decision maker rather than an arbitrator.  The carved-out exceptions to the general obligation

21

22          [1] The computer-generated footer at the bottom of this draft identifies it as Draft #11A, but it is saved on the
disk as #11B.  Moreover, since the footer in these documents is programmed to show the date and time the
document was last accessed rather than when it was last modified, the footers in Exhibits C and D hereto do not
23   correspond to the actual dates and times on which these documents were saved to disk.  The actual date and time are
those shown in the file directories, as reflected in Exhibit A.

DECLARATION OF GORDON B. DAVIDSON - 4

Thomas A. Carr
Seattle City Attorney
600 Fourth Avenue, 4th Floor
P.O. Box 94769
Seattle, WA 98124-4769
(206) 684-8200

1  to resolve disputes through arbitration remained in all subsequent drafts of the Lease, including the

2  final version.

3      13.    Shortly thereafter, a sixth exception to the arbitration clause – concerning disputes

4  over Subsection XVI(F) ("Hazardous Substances") – was added. The addition of this exception is

5  reflected in a memorandum I wrote on February 2, 1994 to Bill Ackerley (the President of SSI), Mr.

6  Rubin, and Terry McLaughlin (the Deputy Director of the Seattle Center). A true and correct copy

7  of my memorandum is attached hereto as **Exhibit E**. In the memo, I wrote:

8          §XXV on pg. 80 has been changed to exclude issues relating to hazardous
           substances from binding arbitration.

9  Exhibit E at 2. This change was consistent with the parties' intent to identify particular issues

10 relating to the Lease that would be decided by a judge rather than an arbitrator. The "Hazardous

11 Substances" exception to arbitration is reflected in Draft #13 on computer disk, and remained in all

12 subsequent drafts of the Lease, including the final version.

13     14.    On February 10, 1994, I created and saved Draft #17, which I believe reflects the

14 final set of edits to the Lease. Attached hereto as **Exhibit F** is a true and correct copy of a portion of

15 Draft #17 of the Lease. (I understand that this copy of the Draft #17 was obtained from the City

16 Archives.) In this draft, the remedies language that appears in Article XXVI(C)(1) of the final

17 Lease – "The City shall also have such other remedies as may be available to it, which shall include,

18 without limitation, injunctive relief and damages" – appears for the first time. (The shading around

19 this language in Exhibit E is formatting I used to show that this was new language in that particular

20 draft.) I do not recall the specific details of adding this language, but I do recall that at some point

21 during the negotiations I expressed the City's wish to be able to seek injunctive relief in court. This

22 language was accepted by SSI, and appears in the final version of the Lease. A true and correct

23 portion of the final Lease is attached hereto as **Exhibit G**.

DECLARATION OF GORDON B. DAVIDSON - 5

Thomas A. Carr
Seattle City Attorney
600 Fourth Avenue, 4th Floor
P.O. Box 94769
Seattle, WA 98124-4769
(206) 684-8200

1    15.    As the file directory dates listed in Exhibit A reflect, the parties were exchanging

2    and editing numerous drafts of the Lease in early February 1994. These drafts were created under

3    enormous time pressure; both parties wanted to get the Lease approved by the City Council as soon

4    as possible. The Sonics were concerned about the construction schedule, and ensuring that the

5    renovations to the Coliseum would be completed in time for the 1995-96 NBA season. For its part,

6    the City wanted to get the Lease in place and construction under way, to ensure that it would once

7    again have the Sonics as a tenant at the Coliseum. (During the period of construction, the Sonics

8    were playing their home games at the Tacoma Dome.) As Exhibit A shows, I was saving new

9    drafts of the Lease as late as February 10, 1994. Just four days later, the City Council passed, and

10    the Mayor signed, the Ordinance approving the Lease.

11    16.    I believe that this time pressure during final negotiations and drafting explains the

12    parties' failure to modify or remove the section of the arbitration clause titled "Limitation on

13    Judicial Relief" (Article XXV(D) in the final Lease). As explained above, this section was

14    introduced in the very first draft of the Lease, when all disputes other than those listed in the

15    "Limitation" section would go to arbitration. When specific exceptions to arbitration were agreed

16    upon and added in Draft #12, the "Limitation" section obviously no longer made sense, and no

17    longer reflected the intent of either the City or of the Sonics (as I understood it, based on the Sonics'

18    insistence that certain clauses included in the Lease for their benefit be excluded from the arbitration

19    clause). Unfortunately, neither Mr. Rubin nor I noticed the obvious inconsistency between the

20    "Limitation" provision that had been included since the first draft of the Lease and the exceptions

21    carved out months later in the "Arbitration" and "Remedies" provisions. Throughout the lengthy

22    process of negotiating, drafting, and rewriting the Lease, I endeavored to do careful reviews and

23

DECLARATION OF GORDON B. DAVIDSON - 6

Thomas A. Carr
Seattle City Attorney
600 Fourth Avenue, 4th Floor
P.O. Box 94769
Seattle, WA 98124-4769
(206) 684-8200

1   work diligently to eliminate inconsistencies (as did Mr. Rubin), but this one mistakenly slipped past

2   us.

3       DATED this ⟨1st⟩ day of October, 2007, at Seattle, Washington.

5                     Gordon B. Davidson

DECLARATION OF GORDON B. DAVIDSON - 7

**Thomas A. Carr**
Seattle City Attorney
600 Fourth Avenue, 4th Floor
P.O. Box 94769
Seattle, WA 98124-4769
(206) 684-8200

# EXHIBIT A



A:\

File  Edit  View  Favorites  Tools  Help

Back  ▾    Search    Folders

Address  A:\    Go

| Name ▲ | Size | Type | Date Modified |
|---|---|---|---|
| PU&O-1.NT5 | 35 KB | NT5 File | 9/23/1993 8:37 AM |
| PU&O-5 | 176 KB | File | 12/2/1993 11:06 AM |
| PU&O-6 | 182 KB | File | 12/7/1993 3:25 PM |
| PU&O-7 | 212 KB | File | 2/10/1994 12:53 PM |
| PU&O-7.REV | 54 KB | REV File | 8/22/1994 2:55 PM |
| PU&O-7A | 191 KB | File | 12/10/1993 2:13 PM |
| PU&O-7B | 193 KB | File | 12/14/1993 9:40 AM |

7 objects    1.01 MB    My Computer



A:\

File   Edit   View   Favorites   Tools   Help

Back ▾   Search   Folders

Address A:\

| Name | Size | Type | Date Modified |
|---|---|---|---|
| PU&O09 | 210 KB | File | 1/24/1994 5:25 PM |
| PU&O09B | 210 KB | File | 1/25/1994 5:02 PM |
| PU&O-7.REV | 51 KB | REV File | 1/20/1994 8:14 AM |
| PU&O-8 | 208 KB | File | 1/22/1994 6:24 PM |
| PU&O-8.NTS | 40 KB | NTS File | 1/20/1994 1:38 PM |
| PU&O-9A | 210 KB | File | 1/25/1994 11:02 AM |
| PU&OC10 | 130 KB | File | 3/26/1999 5:11 PM |
| SS112-30.ERD | 165 KB | ERD File | 1/21/1994 10:22 AM |

8 objects    1.19 MB    My Computer



A:\

File   Edit   View   Favorites   Tools   Help

Back  •           •           Search   Folders

Address   A:\                                                    Go

| Name | Size | Type | Date Modified |
|------|------|------|---------------|
| PU&O11 | 202 KB | File | 1/27/1994 5:06 PM |
| PU&O10A | 200 KB | File | 1/26/1994 2:08 PM |
| PU&O10B | 201 KB | File | 1/26/1994 2:11 PM |
| PU&O11.MEM | 21 KB | MEM File | 1/30/1994 12:33 PM |
| PU&O11A | 196 KB | File | 1/27/1994 3:47 PM |
| PU&O11B | 210 KB | File | 1/30/1994 12:13 PM |
| PU&O12 | 213 KB | File | 2/2/1994 2:31 PM |

7 objects                              1.20 MB          My Computer





# EXHIBIT  B

SEP 25 '95  22:31PM PUBIN,WINSTON,DIERCKS,HARRISOCOO

## AGREEMENT

THIS AGREEMENT is entered into by and between THE CITY C SEATTLE, a municipal corporation of the State of Washingto (hereinafter "the City"), and, SSI SPORTS, INC., a corporatio organized and existing under the laws of the State of Washingto (hereinafter "SSI).

### Recitals

WHEREAS, the City is the owner and operator of the New Seattle Center Coliseum located in Seattle, Washington; and

WHEREAS, SSI is the owner and operator of the Seattle franchise of the National Basketball Association; and

WHEREAS, the existing Seattle Center Coliseum is a deteriorating and antiquated thirty year old structure which does not provide a NBA Team with a structurally or economically viab venue in which to conduct professional basketball; and

WHEREAS, the City desires to construct a new state of the art arena in order to enhance the City but cannot do so without a principle user; and

WHEREAS, in order to induce SSI to become the principle user of such an Arena, to forego alternative venues, and to maintain the SuperSonics NBA franchise in Seattle, the City will construct a New Seattle Center Coliseum with a capacity of not less than 17,500 persons when configured for professional basketball including not less than 58 luxury suites and not more than 1100 club seats to replace the existing facility known as the Seattle Center Coliseum; and

SEP 08 '95 03:03PM RUBIN WINSTON DIERKS HARRISON

XXIV.    ARBITRATION.

a.    All claims, disputes and other matters in question between the parties arising out of, or relating to provisions of this Agreement requiring their submission to arbitration shall be decided by arbitration in accordance with the Rules of the American Arbitration Association then in effect unless the parties mutually agree otherwise. Each party shall designate one arbitrator, who together shall designate a third arbitrator. The written decision of a majority of the arbitrators shall be final and binding on all parties to the arbitration proceeding. The costs and expenses (including reasonable attorneys' fees) of the arbitration proceeding shall be assessed in favor of the prevailing party by the arbitrators, and the assessment shall be set forth in the decision and award of the arbitrators.

B.    No arbitration arising out of or relating to this Agreement shall include, by consolidation, joinder or in any other manner any parties other than the parties to this Agreement and any other persons substantially involved in a common question of fact or law, whose presence is required if complete relief is to be accorded in the arbitration. No parties other than the parties to this Agreement shall be included as an original third party or additional third party to an arbitration whose interest or responsibility is insubstantial. Any consent to arbitration involving an additional person or persons shall not constitute consent to arbitration of any dispute not described therein. The foregoing agreement to arbitrate and any other agreement to

arbitrate with any additional party duly consented to by the parties hereto shall be specifically enforceable under prevailing arbitration law.

C.    Notice of the demand for arbitration shall be filed in writing with the other party and with the American Arbitration Association.   The demand for arbitration shall be made within a reasonable time after the claim, dispute or other matter in question has arisen, and in no event shall it be made after the date when institution of legal or equitable proceedings based on such claim, dispute or other matter in question would be barred by the applicable statute of limitations.

D.    No proceedings based upon any claim arising out of or related to this Agreement shall be instituted in any court by any party hereto against any other party hereto except (i) an action to compel arbitration pursuant to this Section, (ii) an action to enforce the award of the arbitration panel rendered in accordance with this Section, (iii) to file arbitration award as a judgment, and (iv) proceedings brought by SSI for injunctive relief or any other interim remedy to protect SSI's rights under this Agreement.

XXV.  DEFAULT AND REMEDIES THEREFOR

A.    Act of Default and Breach by the Parties:  In addition to the acts and omission described this Agreement, the following acts and omissions shall constitute a default and material breach of this Agreement:

1.    The failure of SSI to comply with all of the requirements of Section XXIV hereof, regarding insurance; or

47

2.    The abandonment or vacating of the Premises by SSI; or

3.    The failure of SSI without cause to pay to the City, in a timely manner, the amounts due under Section VIII, hereof; or

4.    The failure of the City to maintain the Premises in good, safe and efficient operating condition including the prompt completion of all maintenance replacement on renovation as required by this Agreement.

5.    The failure by either party to perform or the violation of any other condition, warrant covenant or provision of this Agreement where such default or deficiency in performance was not remedied within a reasonable time.

B.    Notice to Cure:   In the event either party fails to perform any obligation under, or violates any provision of this Agreement, the other party shall notify such party of such failure or violations and, except where impracticable, shall provide the other with a reasonable period to correct, remedy or cease such failure or violations, which period shall not exceed ninety (90) days after the date of such notice.  Nothing herein shall enable SSI to avoid liability for interest on any delinquent payments due to the City.

C.    Rights Upon Default and Breach:

1.    In the event SSI fails to correct, remedy, or cease such failure or violation within the time specified in the City's notice, the City may thereafter terminate this Agreement without any further proceedings, re-enter the Premises, lease and license

48

SEP 25 '95  03:24PM FLD...

others to use said Premises and receive rent and license fees
therefor as if this Agreement had not been made and SSI shall be
entitled to any offset against any portion of the base rent payable
pursuant to Subsection VII.A.1, hereof, as a consequence of such
subsequent lease or license.

    2.   In the event the City fails to correct, remedy, or cease
such failure or violation within the time specified in SSI's
notice, then in addition to any other remedies available to SSI
which shall include without limitation injunctive relief, damages,
and the withholding of rent, SSI may terminate this Agreement upon
no more than 6 month's notice, whereupon all of SSI's obligations
including the obligation to pay rent, shall terminate.

    D.   <u>Termination by Court Decree</u>: In the event that any court
having jurisdiction renders a decision that has become final and
that prevents the performance by the City of any of its obligations
under this Agreement, either party may terminate this Agreement,
without recourse, by providing written notice of termination to the
other party, specifying the effective date thereof, as of which
date all rights and obligations that accrued prior to the effective
date of termination shall terminate.

XXVI.    <u>SURRENDER OF PREMISES: HOLDING OVER</u>

    A.   <u>Surrender and Delivery</u>:  Upon the expiration or
termination of the use period specified in Section II, hereof,
whichever is earlier, SSI shall surrender the Premises and promptly
deliver to the Seattle Center Director all keys SSI, its officers,

SEP 28 '93  03:05PM RUBIN,WINSTON,DIERCE/...

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by having their authorized representatives affix their signatures in the space below:

                              THE CITY OF SEATTLE

                              By: _____

                                   Seattle Center Director (as
                                   authorized by the Mayor and
                                   the City Council)


STATE OF WASHINGTON        )
                           :  SS.
COUNTY OF KING             )


On this ____ day of _____, 1993 before me, the undersigned, a Notary Public in and for the State of Washington, duly commissioned and sworn, personally appeared ____ _____, to me known to be the Seattle Center Director, who executed the foregoing instrument, and acknowledge the said instrument to be the free and voluntary act and deed of the City of Seattle, for the uses and purposes herein mentioned, and on oath stated that he is authorized to execute the said instrument.

WITNESS my hand and official seal hereto affixed the day and year in this certificate above written.

                              _____
                              NOTARY PUBLIC in and for the State
                              of Washington, residing at _____.

# EXHIBIT  C

## PREMISES USE & OCCUPANCY AGREEMENT

THIS AGREEMENT is entered into by and between THE CITY OF SEATTLE (hereinafter "the City"), a municipal corporation of the State of Washington, and SSI SPORTS, INC. (hereinafter "SSI"), a corporation organized and existing under the laws of the State of Washington.

### Recitals

WHEREAS, SSI is the owner and operator of the "SuperSonics" defined herein; and

WHEREAS, the City is the owner and operator of the Current Facility; and

WHEREAS, the Current Facility is a thirty year old structure that can no longer provide the SuperSonics with a playing venue that is either structurally or economically comparable to the sites in which other NBA teams play; and

WHEREAS, its not economically feasible for the SuperSonics to continue playing professional basketball games in the Current Facility after the end of the 1993-94 NBA championship playoffs; and

WHEREAS, the City desires to construct a new, state of the art professional basket-ball playing facility in order to enhance the City but cannot do so without a long-term, principal user; and

WHEREAS, in order to induce SSI to become the principal user of a new playing facility on a long-term basis in lieu of having the SuperSonics play in an alternative venue, and to maintain the SuperSonics NBA franchise in Seattle, the City will construct a new Seattle Center Coliseum to replace the Current Facility in SSI commits to become the principal user of such new Seattle Center Coliseum; and

WHEREAS, the City and SSI desire to enter into an agreement specifying the terms and conditions under which SSI will use a new Seattle Center Coliseum and certain other facilities at Seattle Center on a long-term basis for the playing of professional basketball by the SuperSonics;

WHEREAS, the City and SSI intend to refine their new Seattle Center Coliseum use and occupancy agreement by continuing, after the execution of this Agreement, to negotiate and reach agreement regarding the terms and conditions under which SSI shall conduct and engage in, directly or indirectly through one or more third parties with which SSI may subcontract to engage inand

[gbdd11A-10+1/14:00]

1

The City of Seattle
305 Harrison Street
Seattle, WA 98109

If to SSI:

SSI Sports, Inc.
Attn: President
190 Queen Anne Avenue, North
2nd Floor
Seattle, WA 98109

## 25    ARBITRATION

25.1    Disputes To Be Resolved Through Arbitration:        All claims, disputes and other

matters in question between the parties arising out of, or relating to provisions of this Agreement

requiring their submission to arbitration shall be decided by arbitration in accordance with the

Commercial Arbitration Rules of the American Arbitration Association then in effect unless the

parties mutually agree otherwise.  The dispute shall be determined by majority vote of a panel of

three arbitrators, unless the parties agree to have the matter decided by a single arbitrator.  The

written decision of the arbitrator(s) shall be final and binding on all parties to the arbitration

proceeding.   The costs and expenses (including reasonable attorneys' fees) of the arbitration

proceeding shall be assessed in favor of the prevailing party by the arbitrator(s), and the assessment

shall be set forth in the decision and award of the arbitrator(s).

B.    Limitations on Arbitration Scope:        No arbitration arising out of or relating to this

Agreement shall include, by consolidation, joinder or in any other manner any parties other than the

parties to this Agreement and any other persons substantially involved in a common question of fact

or law, whose presence is required if complete relief is to be accorded in the arbitration.  No parties

other than the parties to this Agreement shall be included as an original third party or additional third

party to an arbitration whose interest or responsibility is insubstantial.  Any consent to arbitration

involving an additional person or persons shall not constitute consent to arbitration of any dispute not

described therein.  The foregoing agreement to arbitrate and any other agreement to arbitrate with

any additional party duly consented to by the parties hereto shall be specifically enforceable under

prevailing arbitration law.

C.    Notice of Demand for Arbitration:    Notice of the demand for arbitration shall be filed in writing with the other party and with the American Arbitration Association. The demand for arbitration shall be made within a reasonable time after the claim, dispute or other matter in question has arisen, and in no event shall it be made after the date when institution of legal or equitable proceedings based on such claim, dispute or other matter in question would be barred by the applicable statute of limitations.

D.    Limitation on Judicial Relief:    No proceedings based upon any claim arising out of or related to this Agreement shall be instituted in any court by any party hereto against any other party hereto except (i) an action to compel arbitration pursuant to this Section, (ii) an action to enforce the award of the arbitration panel rendered in accordance with this Section, (iii) to file arbitration award as a judgment, and (iv) proceedings brought by SSI for injunctive relief or any other interim remedy to protect SSI's rights under this Agreement.


26    DEFAULT AND REMEDIES THEREFOR

A.    Act of Default and Breach by the Parties:    In addition to the acts and omission described this Agreement, the following acts and omissions shall constitute a default and material breach of this Agreement:

1.    SSI's Failure to Insure:    The failure of SSI to comply with all of the requirements of SectionArticle XV, hereof, regarding insurance; or

2.    SSI's Abandonment of Premises:    The abandonment or vacating of the Premises by SSI without cause; or

3.    SSI's Nonremittance of Amounts Due City:    The failure of SSI without cause to pay to the City, in a timely manner, the amounts due under SectionArticle VIII, hereof; or

4.    City's Failure to Maintain Premises:    The failure of the City to maintain the Premises as required by this Agreement; or

5.    Violation of Other Provisions of Agreement:    The failure by either party to

perform or the violation of any other condition, warranty, covenant or provision of this Agreement where such default or deficiency in performance was not remedied within a reasonable time.

      B.     Notice to Cure: In the event either party fails to perform any obligation hereunder, whether imposed by law, ordinance, regulation, or otherwise, or violates any provision of this Agreement, the other party shall notify such party of such failure or violation and, except where impracticable, shall provide the other with a reasonable period to correct, remedy or cease such failure or violation, which period shall not exceed ninety (90) days after the date of such notice unless the nature of the notified party's obligation is such that more than ninety (90) days is reasonably required for its performance, in which case the notified party shall not be in default if, within such ninety (90) day period, it commences the activity necessary to enable it to perform and thereafter diligently undertakes such activity to its completion. Nothing in this Agreement shall enable SSI to avoid liability for interest on any delinquent payments due to the City.

      C.     Rights Upon Default and Breach: After expiration of the cure period provided pursuant to Subsection XXVI.B, hereof:

          1.     City Rights Upon SSI Default & Breach: In the event SSI fails to correct, remedy, or cease such failure or violation within the time specified in the City's notice, the City may thereafter terminate this Agreement without any further proceedings, re-enter the Premises, lease and license others to use said Premises and receive rent and license fees therefor as if this Agreement had not been made; provided, that SSI shall remain liable for the full amount due to the City pursuant to ~~Section~~Article VIII, hereof, as and when due, but may offset against such liability the amount received by the City as a consequence of such subsequent lease or license. The City shall take all reasonable measures to mitigate any damages.

          2.     SSI Rights Upon City Default & Breach: In the event the City fails to correct, remedy, or cease such failure or violation within the time specified in SSI's notice, then in addition to any other remedies available to SSI, which shall include, without limitation, injunctive relief, damages, and the withholding of rent, SSI may terminate this Agreement upon no more than six (6) months' notice, whereupon all SSI's obligations that had not been incurred as of the effective

termination date, including the obligation to pay future rent, shall terminate.

D.    Termination by Court Decree:  In the event that any court having jurisdiction renders a decision that has become final and that prevents the performance by the City of any of its obligations under this Agreement, either party may terminate this Agreement, without recourse, by providing written notice of termination to the other party, specifying the effective date thereof, as of which date all rights and obligations that accrued prior to the effective date of termination shall terminate.

## 27    SURRENDER OF PREMISES; HOLDING OVER

A.    Surrender and Delivery:  Upon the expiration or termination of the use period specified in SectionArticle II, hereof, whichever is earlier, SSI shall surrender the Premises and promptly deliver to the Seattle Center Director all keys SSI, its officers, agents, and employees may have to the Seattle Center and the Premises.

B.    Removal of SSI's Property:  Prior to the expiration of the use period specified in SectionArticle II, hereof, or in the event this Agreement is terminated, within fifteen (15) days after the termination date, whichever is earlier, the SSI shall remove, at its sole expense, all trade fixtures, trade furnishings, trade equipment, Advertising displays and other personal property owned or installed by SSI in, on, or from the Premises, taking due care to not unreasonably injure or damage the Premises, and shall make such repairs to the Premises as shall be necessary to restore the same to their condition as of the commencement date of the use period specified in SectionArticle II, hereof, ordinary wear and tear and improvements, additions, and alterations approved by the City excepted. Notwithstanding any other provision hereof, improvements, additions, and alterations installed on the Premises by the City or by SSI with the City's Approval shall not be removed without the express, written authorization of the Seattle Center Director.

C.    Storage of SSI's Property:  In the event SSI fails to remove all fixtures, furnishings, trade equipment, and other personal property owned by SSI on or by the time specified in Subsection XXVII.B, hereof, the City may, but shall not be required to, remove such material from

following attached exhibits:

| | |
|---|---|
| Exhibit "A" | Coliseum Floorplan showing Club Seat and Courtside Seat locations |
| Exhibit "B" | Coliseum Site Map showing, inter alia, the South Coliseum Parking Lot |
| Exhibit "C" | Coliseum Floorplan showing Function Room locations |
| Exhibit "D" | Map showing Practice Facility site |
| Exhibit "E" | Ground Lease for Practice Facility site |
| Exhibit "F" | Map showing SSI Retail Facility location |
| Exhibit "G-1" | Coliseum Floorplans showing SSI Unlimited Use Facilities |
| Exhibit "G-2" | Coliseum Floorplans showing authorized SSI use and occupancy areas on any Day of Game |
| Exhibit "H" | Food and Beverage Service Agreement |
| Exhibit "I" | Novelties Concession Agreement |

which exhibits, by this reference, are incorporated herein, contains and constitutes all of the covenants, promises, agreements, and conditions, either oral or written, between the parties regarding the subject matter thereof.


IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by having their authorized representatives affix their signatures in the space below:

SSI SPORTS, INC.                                    THE CITY OF SEATTLE


By: _____            By:    _____
       President                                        Seattle Center Director

                                                    Pursuant to Ordinance _____



STATE OF WASHINGTON          )
                                             ) ss:
COUNTY OF KING          )


On this __ day of _____, 1994, before me, the undersigned, a Notary Public in and for the State of Washington, duly commissioned and sworn, personally appeared __, to me known to be the Seattle Center Director, who executed the foregoing instrument, and

[gbdd11A-10+1/14:02]

72

acknowledge said instrument to be the free and voluntary act and deed of The City of Seattle, for the uses and purposes herein mentioned, and on oath stated that she is authorized to execute said instrument.

WITNESS my hand and official seal hereto affixed the day and year in this certificate above written.

_____        _____
(Signature)                                       (Print or type name)

NOTARY PUBLIC in and for the State of Washington, residing at _____.
My appointment expires _____.


STATE OF WASHINGTON            )
                                                   ) ss:
COUNTY OF KING               )

On this ___ day of _____, 1994, before me personally appeared _____, to me known to be the President of SSI Sports, Inc., the corporation that executed the foregoing instrument, and acknowledged said instrument to be the free and voluntary act and deed of said corporation, for the uses and purposes therein mentioned, and further that said officer has the authority to sign on behalf of said corporation.

WITNESS my hand and official seal hereto affixed the day and year in this certificate above written.

_____        _____
(Signature)                                       (Print or type name)

NOTARY PUBLIC in and for the State of Washington, residing at _____.
My appointment expires _____.

[gbdd11A-10+1/14:02]

73

# EXHIBIT D

## PREMISES USE & OCCUPANCY AGREEMENT

THIS AGREEMENT is entered into by and between **THE CITY OF SEATTLE** (hereinafter "the City"), a municipal corporation of the State of Washington, and SSI **SPORTS, INC.** (hereinafter "SSI"), a corporation organized and existing under the laws of the State of Washington.

### Recitals

WHEREAS, SSI is the owner and operator of the "SuperSonics" defined herein; and

WHEREAS, the City is the owner and operator of the Current Facility; and

WHEREAS, the Current Facility is a thirty year old structure that can no longer provide the SuperSonics with a playing venue that is either structurally or economically comparable to the sites in which other NBA teams play; and

WHEREAS, its not economically feasible for the SuperSonics to continue playing professional basketball games in the Current Facility after the end of the 1993-94 NBA championship playoffs; and

WHEREAS, the City desires to construct a new, state of the art professional basket-ball playing facility in order to enhance the City but cannot do so without a long-term, principal user; and

WHEREAS, in order to induce SSI to become the principal user of a new playing facility on a long-term basis in lieu of having the SuperSonics play in an alternative venue, and to maintain the SuperSonics NBA franchise in Seattle, the City will construct a new Seattle Center Coliseum to replace the Current Facility; and

WHEREAS, the City and SSI desire to enter into an agreement specifying the terms and conditions under which SSI will use a new Seattle Center Coliseum and certain other facilities at Seattle Center on a long-term basis for the playing of professional basketball by the SuperSonics;

WHEREAS, the City and SSI intend to refine their new Seattle Center Coliseum use and occupancy agreement by continuing, after the execution of this Agreement, to negotiate and reach agreement regarding the terms and conditions under which SSI shall conduct and engage in, directly or indirectly through one or more third parties with which SSI may sub-contract to engage inand conduct food and beverage concession sales and novelties conces-sion sales in and from such new

lgbdd12-10•1/14:07]

1

## 25    ARBITRATION

25.1    Disputes To Be Resolved Through Arbitration:    All claims, disputes and other matters in question between the parties arising out of, or relating to provisions of this Agree-ment shall be decided by binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association then in effect unless the parties mutually agree otherwise or unless the claim, dispute, or matter in question relates to the provisions of Article II ("Term; Use Period"), Article III ("Termination of Current Agreement Providing Seattle Center Space for SuperSonics Home Games Use"), Article IV ("Coliseum Design And Construction"), Article V ("Coliseum Planning & Construction Schedule; SSI Opportunities to Void Agreement") or Article XIX ("Subcon-tracting and Transfer of Ownership"). The dispute shall be determined by majority vote of a panel of three arbitrators, unless the parties agree to have the matter decided by a single arbitrator. The written decision of the arbitrator(s) shall be final and binding on all parties to the arbitration proceeding.    The costs and expenses (including reasonable attorneys' fees) of the arbitration proceeding shall be assessed in favor of the prevailing party by the arbitrator(s), and the assessment shall be set forth in the decision and award of the arbitrator(s).

B.    Limitations on Arbitration Scope:    No arbitration arising out of or relating to this Agreement shall include, by consolidation, joinder or in any other manner any parties other than the parties to this Agreement and any other persons substantially involved in a common question of fact or law, whose presence is required if complete relief is to be accorded in the arbitration. No parties other than the parties to this Agreement shall be included as an original third party or additional third party to an arbitration whose interest or responsibility is insubstantial. Any consent to arbitration involving an additional person or persons shall not constitute consent to arbitration of any dispute not described therein. The foregoing agreement to arbitrate and any other agreement to arbitrate with any additional party duly consented to by the parties hereto shall be specifically enforceable under prevailing arbitration law.

C.    Notice of Demand for Arbitration:    Notice of the demand for arbitration shall be filed in writing with the other party and with the American Arbitration Association. The demand for

arbitration shall be made within a reasonable time after the claim, dispute or other matter in question has arisen, and in no event shall it be made after the date when institution of legal or equitable proceedings based on such claim, dispute or other matter in question would be barred by the applicable statute of limitations.

D.    Limitation on Judicial Relief:   No proceedings based upon any claim arising out of or related to this Agreement shall be instituted in any court by any party hereto against any other party hereto except (i) an action to compel arbitration pursuant to this Section, (ii) an action to enforce the award of the arbitration panel rendered in accordance with this Section, (iii) to file arbitration award as a judgment, and (iv) proceedings brought by SSI for injunctive relief or any other interim remedy to protect SSI's rights under this Agreement.

## 26    DEFAULT AND REMEDIES THEREFOR

A.    Act of Default and Breach by the Parties:   In addition to the acts and omission described this Agreement, the following acts and omissions shall constitute a default and material breach of this Agreement:

1.    SSI's Failure to Insure:      The failure of SSI to comply with all of the requirements of Article XV, hereof, regarding insurance; or

2.    SSI's Abandonment of Premises:      The abandonment or vacating of the Premises by SSI without cause; or

3.    SSI's Nonremittance of Amounts Due City:      The failure of SSI without cause to pay to the City, in a timely manner, the amounts due under Article VIII, hereof; or

4.    City's Failure to Maintain Premises:      The failure of the City to maintain the Premises as required by this Agreement; or

5.    Violation of Other Provisions of Agreement:      The failure by either party to perform or the violation of any other condition, warranty, covenant or provision of this Agreement where such default or deficiency in performance was not remedied within a reasonable time.

B.    Notice to Cure:   In the event either party fails to perform any obligation hereunder,

whether imposed by law, ordinance, regulation, or otherwise, or violates any provision of this Agreement, the other party shall notify such party of such failure or violation and, except where impracticable, shall provide the other with a reasonable period to correct, remedy or cease such failure or violation, which period shall not exceed ninety (90) days after the date of such notice unless the nature of the notified party's obligation is such that more than ninety (90) days is reasonably required for its performance, in which case the notified party shall not be in default if, within such ninety (90) day period, it commences the activity necessary to enable it to perform and thereafter diligently undertakes such activity to its completion. Nothing in this Agreement shall enable SSI to avoid liability for interest on any delinquent payments due to the City.

      C.    <u>Rights Upon Default and Breach</u>:  After expiration of the cure period provided pursuant to Subsection XXVI.B, hereof:

      1.    <u>City Rights Upon SSI Default & Breach</u>:  In the event SSI fails to correct, remedy, or cease such failure or violation within the time specified in the City's notice, the City may thereafter terminate this Agreement without any further proceedings, re-enter the Premises, lease and license others to use said Premises and receive rent and license fees therefor as if this Agreement had not been made; provided, that SSI shall remain liable for the full amount due to the City pursuant to Article VIII, hereof, as and when due, but may offset against such liability the amount received by the City as a consequence of such subsequent lease or license. The City shall take all reasonable measures to mitigate any damages.

      2.    <u>SSI Rights Upon City Default & Breach</u>:  In the event the City fails to correct, remedy, or cease such failure or violation within the time specified in SSI's notice, then in addition to any other remedies available to SSI, which shall include, without limitation, injunctive relief, damages, and the withholding of rent, SSI may terminate this Agreement upon no more than six (6) months' notice, whereupon all SSI's obligations that had not been incurred as of the effective termination date, including the obligation to pay future rent, shall terminate.

      D.    <u>Termination by Court Decree</u>: In the event that any court having jurisdiction renders a decision that has become final and that prevents the performance by the City of any of its

obligations under this Agreement, either party may terminate this Agreement, without recourse, by providing written notice of termination to the other party, specifying the effective date thereof, as of which date all rights and obligations that accrued prior to the effective date of termination shall terminate.

## 27    SURRENDER OF PREMISES; HOLDING OVER

A.    Surrender and Delivery:  Upon the expiration or termination of the use period specified in Article II, hereof, whichever is earlier, SSI shall surrender the Premises and promptly deliver to the Seattle Center Director all keys SSI, its officers, agents, and employees may have to the Seattle Center and the Premises.

B.    Removal of SSI's Property:  Prior to the expiration of the use period specified in Article II, hereof, or in the event this Agreement is terminated, within fifteen (15) days after the termination date, whichever is earlier, the SSI shall remove, at its sole expense, all trade fixtures, trade furnishings, trade equipment, Advertising displays and other personal property owned or installed by SSI in, on, or from the Premises, taking due care to not unreasonably injure or damage the Premises, and shall make such repairs to the Premises as shall be necessary to restore the same to their condition as of the commencement date of the use period specified in Article II, hereof, ordinary wear and tear and improvements, additions, and alterations approved by the City excepted. Notwithstanding any other provision hereof, improvements, additions, and alterations installed on the Premises by the City or by SSI with the City's Approval shall not be removed without the express, written authorization of the Seattle Center Director.

C.    Storage of SSI's Property:  In the event SSI fails to remove all fixtures, furnishings, trade equipment, and other personal property owned by SSI on or by the time specified in Subsection XXVII.B, hereof, the City may, but shall not be required to, remove such material from the Premises and store the same, all at SSI's expense; and in the event the City removes or arranges for the storage of such material, SSI shall reimburse the City for all costs incurred in connection with such removal or storage, including any administrative costs, which reimbursement shall be paid within

[gbdd12-10+1/14:21]

73

| Exhibit "E" | Ground Lease for Practice Facility site |
| Exhibit "F" | Map showing SSI Retail Facility location |
| Exhibit "G-1" | Coliseum Floorplans showing SSI Unlimited Use Facilities |
| Exhibit "G-2" | Coliseum Floorplans showing authorized SSI use and occupancy areas on any Day of Game |
| Exhibit "H" | Food and Beverage Service Agreement |
| Exhibit "I" | Novelties Concession Agreement |
| Exhibit "J" | Photographs of "Look & Feel" of Salt Lake City Delta Center on September 28, 1992 |

which exhibits, by this reference, are incorporated herein, contains and constitutes all of the covenants, promises, agreements, and conditions, either oral or written, between the parties regarding the subject matter thereof.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by having their authorized representatives affix their signatures in the space below:

SSI SPORTS, INC.                          THE CITY OF SEATTLE

By: _____          By:      _____
        President                               Seattle Center Director

                                            Pursuant to Ordinance _____

STATE OF WASHINGTON        )
                                            ) ss:
COUNTY OF KING               )

On this __ day of _____, 1994, before me, the undersigned, a Notary Public in and for the State of Washington, duly commissioned and sworn, personally appeared __, to me known to be the Seattle Center Director, who executed the foregoing instrument, and acknowledge said instrument to be the free and voluntary act and deed of The City of Seattle, for the uses and purposes herein mentioned, and on oath stated that she is authorized to execute said instrument.

WITNESS my hand and official seal hereto affixed the day and year in this certificate above written.

_____        _____
          (Signature)                                          (Print or type name)

NOTARY PUBLIC in and for the State of Washington, residing at _____.
My appointment expires _____.


STATE OF WASHINGTON           )
                                                      ) ss:
COUNTY OF KING                     )


On this ___ day of _____, 1994, before me personally appeared _____, to me known to be the President of SSI Sports, Inc., the corporation that executed the foregoing instrument, and acknowledged said instrument to be the free and voluntary act and deed of said corporation, for the uses and purposes therein mentioned, and further that said officer has the authority to sign on behalf of said corporation.

WITNESS my hand and official seal hereto affixed the day and year in this certificate above written.

_____        _____
          (Signature)                                          (Print or type name)

NOTARY PUBLIC in and for the State of Washington, residing at _____.
My appointment expires _____.

# EXHIBIT E

SEATTLE CITY ATTORNEY
MARK H. SIDRAN

## M E M O R A N D U M

TO:      Bill Ackerley, President, SSI, Inc.
         Eric Rubin, General Counsel, SSI, Inc.
         Terry McLaughlin, Deputy Director, Seattle Center

FROM:    Gordy Davidson, Assistant City Attorney
         Law Department

SUBJECT:   **FINAL** (?) Premises Use & Occupancy Agreement

DATE: February 2, 1994

Attached please find a red-lined version of the latest draft of the Premises Use & Occupancy Agreement. Most of the changes proposed in the version having the footer [gbdd12-2+1/11:22], which all of you received, were acceptable. The changes not accepted and revisions therefore are noted below:

1.       On page 13 in §IV.H, I've added to the text that prohibits, without SSI Approval, changes to the facility that "would materially and adversely affect the playing, exhibition, and viewing of a Home Game..." language that appears after that quoted provision in many other subsections, which supplements the prohibition by including, as well, changes that would materially and adversely affect "the exercise of any other right granted to SSI hereunder... ." This addition appears twice in this subsection.

2.       The SSI "guarantee" provision on pp. 15-16, in §V.B has been rewritten to mesh, I trust, with the understanding I have regarding SSI concerns and intentions. Please examine this provision carefully so we can get immediate closure on this issue.

3.       Bill has agreed to accommodate Councilmember Donaldson's serious interest in including on pg. 35, the proposed text of §VIII.C.1.i in the Agreement, with the understanding that the words "the most" are to be changed to "an," which change is highlighted in this draft. From what Councilmember Donaldson indicated to me, that inclusion should help considerably in keeping her favorably disposed towards this proposal.

4.       On pp. 48-49, what have been identified as "opportunities" in the titles for §§XII.A, B. and C are now labeled as "rights" to be consistent with the text.

5.       On pg. 49, §XII.C.1 is retitled to reflect the movement of text relating to the "title sponsorship" to a new §XII.C.11 dealing with that topic.

6.       On pg. 49, §XII.C is also changed to reflect the glass sides of the Coliseum and the different desires of the parties to generate interest in Advertising displays in the Coliseum as contrasted to the SSI Retail Facility. The restrictions previously in this subsection regarding SSI Retail Facility Advertising displays have been deleted.

7.    On pg. 52, in §XII.C.5, the performance "black-out" conditions have been reworded to match my understanding of the agreements Bill and Terry reached late Tuesday afternoon.

8.    On pp. 54-55, §XII.C.10 has been changed to eliminate the redundant words "no more than" in referring to the number of allowable Advertising displays in the Coliseum to create a "look and feel" equivalent to that of the Delta Center. The reference to the date in this subsection has also been eliminated (for the date will be noted on an exhibit, which allows for an updating of the photographs in the event they are secured and the "look and feel" is still the same).

9.    A new §XII.C.11 is added on pg. 55 to address title sponsorship issues.

10.    The indemnification provision on pp. 57-58 in §XV.A has been "tweaked" to divide it into general obligations and a peculiar limited obligation (the new §XV.A.3) addressing the situation where property damage or bodily injury results from or arises out of "construction" activity. This language is a paraphrasing of a fairly recent state statute, which has been "FAXed" to Eric.

11.    §XXV on pg. 80 has been changed to exclude issues relating to hazardous substances from binding arbitration.


You will receive changes to the Practice Facility Lease after I receive a corrected property description from Seattle Center, which should occur early Wednesday, I hope. That document will also have the property description and the access easements both set forth as exhibits, so they can be adjusted as necessary without having to go back to the City Council for reauthorization.

Eric, Darren was sent by modem draft 13 of the Premises Use & Occupancy Agreement last nite about 10:40 your time, so I expect you'll have it in your hands early in the morning. Please contact me before I leave home to discuss issues we may still have to deal with. I'll be dry behind the ears and ready to talk with you by 7 AM - Seattle time.

# EXHIBIT  F

## PREMISES USE & OCCUPANCY AGREEMENT

THIS AGREEMENT is entered into by and between **THE CITY OF SEATTLE** (hereinafter "the City"), a municipal corporation of the State of Washington, and **SSI SPORTS, INC.** (hereinafter "SSI"), a corporation organized and existing under the laws of the State of Washington.

### Recitals

WHEREAS, SSI is the owner and operator of the "SuperSonics" as defined herein; and

WHEREAS, the City is the owner and operator of the Current Facility; and

WHEREAS, the Current Facility is a thirty year old structure that can no longer provide the SuperSonics with a playing venue that is either structurally or economically comparable to the sites in which other NBA teams play; and

WHEREAS, it is not economically feasible for the SuperSonics to continue playing professional basketball games in the Current Facility after the end of the 1993-94 NBA championship playoffs; and

WHEREAS, the City desires to construct a new, state of the art professional basketball playing facility in order to enhance the City but cannot do so without a long-term, principal user; and

WHEREAS, in order to induce SSI to become the principal user of a new playing facility on a long-term basis in lieu of having the SuperSonics play in an alternative venue, and to maintain the SuperSonics NBA franchise in Seattle, the City will construct a new Seattle Center Coliseum to replace the Current Facility; and

WHEREAS, the City and SSI desire to enter into an agreement specifying the terms and conditions under which SSI will use a new Seattle Center Coliseum and certain other facilities at Seattle Center on a long-term basis for the playing of professional basketball by the SuperSonics;

WHEREAS, the City and SSI intend to refine their new Seattle Center Coliseum use and occupancy agreement by continuing, after the execution of this Agreement, to negotiate and reach agreement regarding the terms and conditions under which SSI shall conduct and engage in, directly or indirectly through one or more third parties with which SSI may sub-contract to engage in and conduct food and beverage concession sales and novelties concession sales in and from such new Coliseum, which agreements shall become the Food and Beverage Service

1

If to the City:

        Seattle Center Director
        Seattle Center Department
        The City of Seattle
        305 Harrison Street
        Seattle, WA  98109

If to SSI:

        SSI Sports, Inc.
        Attn:  President
        190 Queen Anne Avenue, North
        2nd Floor
        Seattle, WA 98109

## XXV.    ARBITRATION

      A.    Disputes To Be Resolved Through Arbitration:  All claims, disputes and other matters in question between the parties arising out of, or relating to provisions of this Agreement shall be decided by binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association then in effect unless the parties mutually agree otherwise or unless the claim, dispute, or matter in question relates to the provisions of Article II ("Term; Use Period"), Article III ("Termination of Current Agreement Providing Seattle Center Space for SuperSonics Home Games Use"), Article IV ("Coliseum Design and Construction"), Article V ("Coliseum Planning & Construction Schedule; SSI Opportunities to Void Agreement"), Subsection XVI.F ("Hazardous Substances") or Article XIX ("Subcontracting and Transfer of Ownership").  The dispute shall be determined by majority vote of a panel of three arbitrators, unless the parties agree to have the matter decided by a single arbitrator.  The written decision of the arbitrator(s) shall be final and binding on all parties to the arbitration proceeding.  The costs and expenses (including reasonable attorneys' fees) of the arbitration proceeding shall be assessed in favor of the prevailing party by the arbitrator(s), and the assessment shall be set forth in the decision and award of the arbitrator(s). The parties recognize that a need may arise for a more expeditious resolution of disputes concerning Article IV ("Coliseum Design and Construction") and therefore will make their best efforts to develop a mutually satisfactory informal dispute resolution mechanism for such matters.

      B.    Limitations on Arbitration Scope:  No arbitration arising out of or relating to this Agreement shall include, by consolidation, joinder or in any other manner any parties other than the parties to this Agreement and any other persons substantially involved in a common question of fact or law, whose presence is required if complete relief is to be accorded in the arbitration.  No parties other than the parties to this Agreement shall be included as an

53

original third party or additional third party to an arbitration whose interest or responsibility is insubstantial. Any consent to arbitration involving an additional person or persons shall not constitute consent to arbitration of any dispute not described therein. The foregoing agreement to arbitrate and any other agreement to arbitrate with any additional party duly consented to by the parties hereto shall be specifically enforceable under prevailing arbitration law.

C.    Notice of Demand for Arbitration: Notice of the demand for arbitration shall be filed in writing with the other party and with the American Arbitration Association. The demand for arbitration shall be made within a reasonable time after the claim, dispute or other matter in question has arisen, and in no event shall it be made after the date when institution of legal or equitable proceedings based on such claim, dispute or other matter in question would be barred by the applicable statute of limitations.

D.    Limitation on Judicial Relief: No proceedings based upon any claim arising out of or related to this Agreement shall be instituted in any court by any party hereto against any other party hereto except (i) an action to compel arbitration pursuant to this Section, (ii) an action to enforce the award of the arbitration panel rendered in accordance with this Section, (iii) to file arbitration award as a judgment, and (iv) proceedings brought by SSI for injunctive relief or any other interim remedy to protect SSI's rights under this Agreement.

## XXVI.    DEFAULT AND REMEDIES THEREFOR

A.    Act of Default and Breach by the Parties: In addition to the acts and omission described this Agreement, the following acts and omissions shall constitute a default and material breach of this Agreement:

1. SSI's Failure to Insure:    The failure of SSI to comply with all of the requirements of Article XV, hereof, regarding insurance; or

2. SSI's Abandonment of Premises:    The abandonment or vacating of the Premises by SSI without cause; or

3. SSI's Nonremittance of Amounts Due City:    The failure of SSI without cause to pay to the City, in a timely manner, the amounts due under Article VIII, hereof; or

4. City's Failure to Maintain Premises:    The failure of the City to maintain the Premises as required by this Agreement; or

5. Violation of Other Provisions of Agreement:    The failure by either party to perform or the violation of any other condition, warranty, covenant or provision of this Agreement where such default or deficiency in performance was not remedied within a reasonable time unless a specific period of time is specifically provided for herein.

54

B.    Notice to Cure:  In the event either party fails to perform any obligation hereunder, whether imposed by law, ordinance, regulation, or otherwise, or violates any provision of this Agreement, the other party shall notify such party of such failure or violation and, except where impracticable, shall provide the other with a reasonable period to correct, remedy or cease such failure or violation, which period shall not exceed ninety (90) days after the date of such notice unless the nature of the notified party's obligation is such that more than ninety (90) days is reasonably required for its performance, in which case the notified party shall not be in default if, within such ninety (90) day period, it commences the activity necessary to enable it to perform and thereafter diligently undertakes such activity to its completion.  Nothing in this Agreement shall enable SSI to avoid liability for interest on any delinquent payments due to the City.

C.    Rights Upon Default and Breach:  After expiration of the cure period provided pursuant to Subsection XXVI.B, hereof:

1.  City Rights Upon SSI Default & Breach:    In the event SSI fails to correct, remedy, or cease such failure or violation within the time specified in the City's notice, the City may thereafter terminate this Agreement without any further proceedings, re-enter the Premises, lease and license others to use said Premises and receive rent and license fees therefor as if this Agreement had not been made; provided, that SSI shall remain liable for the full amount due to the City pursuant to Article VIII, hereof, as and when due, but may offset against such liability the amount received by the City as a consequence of such subsequent lease or license.  The City shall also have such other remedies as may be available to it, which shall include, without limitation, injunctive relief and damages.  The City shall take all reasonable measures to mitigate any damages.

2.  SSI Rights Upon City Default & Breach:    In the event the City fails to correct, remedy, or cease such failure or violation within the time specified in SSI's notice, then in addition to any other remedies available to SSI, which shall include, without limitation, injunctive relief, damages, and the withholding of rent, SSI may terminate this Agreement upon no more than six (6) months' notice, whereupon all SSI's obligations that had not been incurred as of the effective termination date, including the obligation to pay future rent, shall terminate.

D.    Termination by Court Decree:  In the event that any court having jurisdiction renders a decision that has become final and that prevents the performance by the City of any of its obligations under this Agreement, either party may terminate this Agreement, without recourse, by providing written notice of termination to the other party, specifying the effective date thereof, as of which date all rights and obligations that accrued prior to the effective date of termination shall terminate.

55

STATE OF WASHINGTON    )
                             ) ss:
COUNTY OF KING           )

    On this _____ day of _____, 1994, before me, the undersigned, a Notary Public in and for the State of Washington, duly commissioned and sworn, personally appeared _____, to me known to be the Seattle Center Director, who executed the foregoing instrument, and acknowledge said instrument to be the free and voluntary act and deed of The City of Seattle, for the uses and purposes herein mentioned, and on oath stated that she is authorized to execute said instrument.

    WITNESS my hand and official seal hereto affixed the day and year in this certificate above written.


_____      _____
  (Signature)                             (Print or type name)


NOTARY PUBLIC in and for the State of Washington, residing at _____.
My appointment expires _____.

STATE OF WASHINGTON   )
                               ) ss:
COUNTY OF KING             )

On this _____ day of _____, 1994, before me personally appeared _____ _____, to me known to be the President of SSI Sports, Inc., the corporation that executed the foregoing instrument, and acknowledged said instrument to be the free and voluntary act and deed of said corporation, for the uses and purposes therein mentioned, and further that said officer has the authority to sign on behalf of said corporation.

WITNESS my hand and official seal hereto affixed the day and year in this certificate above written.


_____     _____
(Signature)                            (Print or type name)


NOTARY PUBLIC in and for the State of Washington, residing at _____.
My appointment expires _____.

# EXHIBIT  G

*PREMISES USE*
*&*
*OCCUPANCY*
*AGREEMENT*

between

# THE CITY OF SEATTLE

and

# SSI SPORTS, INC.

March 2, 1994

If to the City:

        Seattle Center Director
        Seattle Center Department
        The City of Seattle
        305 Harrison Street
        Seattle, WA  98109

If to SSI:

        SSI Sports, Inc.
        Attn:  President
        190 Queen Anne Avenue North
        2nd Floor
        Seattle, WA 98109

## XXV.  ARBITRATION

A.    Disputes To Be Resolved Through Arbitration:  All claims, disputes and other matters in question between the parties arising out of, or relating to provisions of this Agreement shall be decided by binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association then in effect unless the parties mutually agree otherwise or unless the claim, dispute, or matter in question relates to the provisions of Article II ("Term; Use Period"), Article III ("Termination of Current Agreement Providing Seattle Center Space for SuperSonics Home Games Use"), Article IV ("Coliseum Design and Construction"), Article V ("Coliseum Planning & Construction Schedule; SSI Opportunities to Void Agreement"), Subsection XVI.F ("Hazardous Substances") or Article XIX ("Subcontracting and Transfer of Ownership").  The dispute shall be determined by majority vote of a panel of three arbitrators, unless the parties agree to have the matter decided by a single arbitrator.  The written decision of the arbitrator(s) shall be final and binding on all parties to the arbitration proceeding.  The costs and expenses (including reasonable attorneys' fees) of the arbitration proceeding shall be assessed in favor of the prevailing party by the arbitrator(s), and the assessment shall be set forth in the decision and award of the arbitrator(s).  The parties recognize that a need may arise for a more expeditious resolution of disputes concerning Article IV ("Coliseum Design and Construction") and therefore will make their best efforts to develop a mutually satisfactory informal dispute resolution mechanism for such matters.

B.    Limitations on Arbitration Scope:  No arbitration arising out of or relating to this Agreement shall include, by consolidation, joinder or in any other manner any parties other than the parties to this Agreement and any other persons substantially involved in a common question of fact or law, whose presence is required if complete relief is to be accorded in the arbitration.  No parties other than the parties to this Agreement shall be

54

included as an original third party or additional third party to an arbitration whose interest or responsibility is insubstantial. Any consent to arbitration involving an additional person or persons shall not constitute consent to arbitration of any dispute not described therein. The foregoing agreement to arbitrate and any other agreement to arbitrate with any additional party duly consented to by the parties hereto shall be specifically enforceable under prevailing arbitration law.

C.  Notice of Demand for Arbitration:  Notice of the demand for arbitration shall be filed in writing with the other party and with the American Arbitration Association. The demand for arbitration shall be made within a reasonable time after the claim, dispute or other matter in question has arisen, and in no event shall it be made after the date when institution of legal or equitable proceedings based on such claim, dispute or other matter in question would be barred by the applicable statute of limitations.

D.  Limitation on Judicial Relief:  No proceedings based upon any claim arising out of or related to this Agreement shall be instituted in any court by any party hereto against any other party hereto except (i) an action to compel arbitration pursuant to this Section, (ii) an action to enforce the award of the arbitration panel rendered in accordance with this Section, (iii) to file arbitration award as a judgment, and (iv) proceedings brought by SSI for injunctive relief or any other interim remedy to protect SSI's rights under this Agreement.

## XXVI.  DEFAULT AND REMEDIES THEREFOR

A.  Act of Default and Breach by the Parties:  In addition to the acts and omission described this Agreement, the following acts and omissions shall constitute a default and material breach of this Agreement:

1.  SSI's Failure to Insure:  The failure of SSI to comply with all of the requirements of Article XV, hereof, regarding insurance; or

2.  SSI's Abandonment of Premises:  The abandonment or vacating of the Premises by SSI without cause; or

3.  SSI's Nonremittance of Amounts Due City:  The failure of SSI without cause to pay to the City, in a timely manner, the amounts due under Article VIII, hereof; or

4.  City's Failure to Maintain Premises:  The failure of the City to maintain the Premises as required by this Agreement; or

5.  Violation of Other Provisions of Agreement:  The failure by either party to perform or the violation of any other condition, warranty, covenant or provision of this Agreement where such default or deficiency in performance was not remedied within a reasonable time unless a specific period of time is specifically provided for herein.

55

B.   Notice to Cure:  In the event either party fails to perform any obligation hereunder, whether imposed by law, ordinance, regulation, or otherwise, or violates any provision of this Agreement, the other party shall notify such party of such failure or violation and, except where impracticable, shall provide the other with a reasonable period to correct, remedy or cease such failure or violation, which period shall not exceed ninety (90) days after the date of such notice unless the nature of the notified party's obligation is such that more than ninety (90) days is reasonably required for its performance, in which case the notified party shall not be in default if, within such ninety (90) day period, it commences the activity necessary to enable it to perform and thereafter diligently undertakes such activity to its completion.  Nothing in this Agreement shall enable SSI to avoid liability for interest on any delinquent payments due to the City.

C.   Rights Upon Default and Breach:  After expiration of the cure period provided pursuant to Subsection XXVI.B, hereof:

1.   City Rights Upon SSI Default & Breach:    In the event SSI fails to correct, remedy, or cease such failure or violation within the time specified in the City's notice, the City may thereafter terminate this Agreement without any further proceedings, re-enter the Premises, lease and license others to use said Premises and receive rent and license fees therefor as if this Agreement had not been made; provided, that SSI shall remain liable for the full amount due to the City pursuant to Article VIII, hereof, as and when due, but may offset against such liability the amount received by the City as a consequence of such subsequent lease or license.  The City shall also have such other remedies as may be available to it, which shall include, without limitation, injunctive relief and damages.   The City shall take all reasonable measures to mitigate any damages.

2.   SSI Rights Upon City Default & Breach:    In the event the City fails to correct, remedy, or cease such failure or violation within the time specified in SSI's notice, then in addition to any other remedies available to SSI, which shall include, without limitation, injunctive relief, damages, and the withholding of rent, SSI may terminate this Agreement, whereupon all SSI's obligations that had not been incurred as of the effective termination date, including the obligation to pay future rent, shall terminate.

D.   Termination by Court Decree:  In the event that any court having jurisdiction renders a decision that has become final and that prevents the performance by the City of any of its obligations under this Agreement, either party may terminate this Agreement, without recourse, by providing written notice of termination to the other party, specifying the effective date thereof, as of which date all rights and obligations that accrued prior to the effective date of termination shall terminate.

56

Q.  Construction of Agreement:  The parties to this Agreement acknowledge that it is a negotiated agreement, that they have had the opportunity to have this Agreement reviewed by their respective legal counsel, and that the terms and conditions of this Agreement are not to be construed against any party on the basis of such party's draftsmanship thereof.

R.  Incorporation of Exhibits; Entire Agreement:  This Agreement, including the following attached exhibits:

| | |
|---|---|
| Exhibit "A" | Coliseum Floorplan showing Club Seat and Courtside Seat locations |
| Exhibit "B" | Coliseum Site Map showing, inter alia, the South Coliseum Parking Lot |
| Exhibit "C" | Coliseum Floorplan showing Function Room locations |
| Exhibit "D" | Map showing Practice Facility site |
| Exhibit "E" | Ground Lease for Practice Facility site |
| Exhibit "F" | Map showing SSI Retail Facility location |
| Exhibit "G-1" | Coliseum Floorplans showing SSI Unlimited Use Facilities |
| Exhibit "G-2" | Coliseum Floorplans showing authorized SSI use and occupancy areas on any Day of Game |
| Exhibit "H" | Food and Beverage Service Agreement |
| Exhibit "I" | Novelties Concession Agreement |
| Exhibit "J" | Photographs of "Look & Feel" of Salt Lake City Delta Center |
| Exhibit "K" | February 4, 1994 communication from Director of Construction and Land Use |

which exhibits, by this reference, are incorporated herein, contains and constitutes all of the covenants, promises, agreements, and conditions, either oral or written, between the parties regarding the subject matter thereof.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by having their authorized representatives affix their signatures in the space below:

SSI SPORTS, INC.                              THE CITY OF SEATTLE

By: _____      By: _____
    Chairman                                   Seattle Center Director

By: _____
    President

Pursuant to Ordinance _____

60

STATE OF WASHINGTON )
) ss:
COUNTY OF KING )

On this _2_ day of _March_____, 1994, before me, the undersigned, a
Notary Public in and for the State of Washington, duly commissioned and sworn, personally
appeared _Virginia Anderson_ to me known to be the Seattle Center Director, who
executed the foregoing instrument, and acknowledge said instrument to be the free and
voluntary act and deed of The City of Seattle, for the uses and purposes herein mentioned,
and on oath stated that she is authorized to execute said instrument.

WITNESS my hand and official seal hereto affixed the day and year in this certificate
above written.

_Carolyn C. Gossard_                    _CAROLYN C. GOSSARD_
(Signature)                             (Print or type name)

NOTARY PUBLIC in and for the State of Washington, residing at _Seattle_.
My appointment expires _11/28/96_

STATE OF WASHINGTON )
                    ) ss:
COUNTY OF KING )

On this _24th_ day of ___FEBRUARY___, 1994, before me personally appeared _BOB NESBITT_ _____, to me known to be the President of SSI Sports, Inc., the corporation that executed the foregoing instrument, and acknowledged said instrument to be the free and voluntary act and deed of said corporation, for the uses and purposes therein mentioned, and further that said officer has the authority to sign on behalf of said corporation.

   WITNESS my hand and official seal hereto affixed the day and year in this certificate above written.

_____          ___SARAH FURTADO___
(Signature)                           (Print or type name)


NOTARY PUBLIC in and for the State of Washington, residing at _KING CTY._
My appointment expires _10-21-96_ .




STATE OF WASHINGTON )
                    ) ss:
COUNTY OF KING )

On this _14th_ day of ___MARCH___, 1994, before me personally appeared _Gary Ackerley_ to me known to be the Chairman of the Board of SSI Sports, Inc., the corporation that executed the foregoing instrument, and acknowledged said instrument to be the free and voluntary act and deed of said corporation, for the uses and purposes therein mentioned, and further that said officer has the authority to sign on behalf of said corporation.

   WITNESS my hand and official seal hereto affixed the day and year in this certificate above written.

_____          ___MARY DAWN ROBERTSON___
(Signature)                           (Print or type name)

NOTARY PUBLIC
STATE OF WASHINGTON
MARY DAWN ROBERTSON
My Appointment Expires JAN 25.

NOTARY PUBLIC in and for the State of Washington, residing at _Seattle, WA_
My appointment expires _1/25/98_

[bd017 2 + 17 > 9:36]                          62