07-CV-01620-EXH A  2-22

**21**

1

RECEIVED

2

2007 OCT -9  A 11: 20

3

BYRNES & KELLER LLP

4

Honorable Harry McCarthy
Hearing Date: October 10, 2007
Oral Argument Requested

5

6

7

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
FOR KING COUNTY

8

9   CITY OF SEATTLE, a first-class charter city,     )
                                                    )
10              Plaintiff,                           )   No.   07-2-30997-7 SEA
                                                    )
11      vs.                                          )   CITY OF SEATTLE'S REPLY IN
                                                    )   SUPPORT OF CROSS-MOTION FOR
12   THE PROFESSIONAL BASKETBALL CLUB,)   STAY OF ARBITRATION
     LLC, an Oklahoma limited liability company,    )
13                                                   )
                Defendant.                           )
14                                                   )
                                                    )
15                                                   )
                                                    )
16  _____)

17

18

19

20

21

22

23

CITY OF SEATTLE'S REPLY IN SUPPORT OF
CROSS-MOTION FOR STAY OF ARBITRATION



**Thomas A. Carr**
Seattle City Attorney
600 Fourth Avenue, 4th Floor
P.O. Box 94769
Seattle, WA 98124-4769
(206) 684-8200

1

## I.    INTRODUCTION

2    The City/Sonics Lease contains only one provision that sets forth the scope of disputes

3 subject to Arbitration. That provision unambiguously excludes from arbitration disputes relating

4 to the Sonics' obligation to play their home games at KeyArena. Rather than address that Lease

5 provision, the Sonics seek to shift the Court's attention by mischaracterizing the City's

6 argument. First, the City does not rely principally on Mr. Davidson's recollections of the

7 drafting history. The City principally relies on the Lease's unambiguous language. Second, the

8 City relies on Mr. Davidson's declaration primarily to document the drafting history which

9 shows key disputes were carved out of arbitration **after the** judicial remedy limitation provision

10 was first included in the Lease. The drafting documents show what in fact happened. Neither

11 Mr. Rubin's nor Mr. McLaughlin's declaration proves anything different. Third, the Sonics pose

12 arguments that are not consistent with the terms of the Lease's arbitration provision. The carve-

13 outs simply do not relate solely to the Sonics' rights during construction. The parties' intent in

14 the Lease is clear: disputes and remedies relating to Article II's requirement that the Sonics play

15 all home games in KeyArena are not subject to arbitration.

16

## II.    ARGUMENT

17

**A.    The Lease Unambiguously Excludes Disputes Related to Article II from Arbitration.**

18    The sole issue before the court is the scope of arbitrable issues under the Lease. Article

19 XXV(A) is the only Lease provision that defines which issues are subject to arbitration. Article

20 XXV(A) unambiguous states disputes related to Article II are not subject to arbitration:

21    All claims, disputes and other matters in question between the parties arising out
    of, or relating to provisions of this Agreement shall be decided by binding
22    arbitration . . . unless the claim, dispute, or matter in question relates to the
    provisions of Article II ("Term; Use Period") . . . .

23

CITY OF SEATTLE'S REPLY IN SUPPORT OF
CROSS-MOTION FOR STAY OF ARBITRATION - 1

Thomas A. Carr
Seattle City Attorney
600 Fourth Avenue, 4th Floor
P.O. Box 94769
Seattle, WA 98124-4769
(206) 684-8200

1    Lease, Article XXV(A). Indeed, PBC implicitly concedes that if this dispute relates to the

2    parties' rights under Article II, it is not arbitrable. PBC's Reply/Opposition at 7.

3        Article II requires the Sonics to play all home games at KeyArena through the end of the

4    2009-10 season. The dispute between the Sonics and the City relates squarely to this

5    requirement. The Sonics do not want to play their home games at Key Arena for the 2008-09

6    and 2009-10 seasons. The City wants to enforce this Lease requirement.

         Faced with the Lease's unambiguous language, PBC argues this dispute is non-arbitrable

7    because it supposedly involves only 'remedies' for violations of Article II, not the City's 'rights.'

8    But a party cannot avoid express exceptions to arbitration by artificially subdividing a dispute.

9    In *ACF Prop. Mgmt., Inc. v. Chaussee,* 69 Wn. App. 913 (1993), the arbitration clause at issue

10   excepted disputes involving "any claim against any party in excess of [\$200,000]." 69 Wn. App.

11   at 919-20. The Court of Appeals held a dispute involving a claim exceeding \$200,000 was non-

12   arbitrable and stated "the unambiguous language of the clause does not permit Chaussee's . . .

     suggested interpretation that the arbitrators had 'partial jurisdiction' or jurisdiction over liability

13   only." *Id.* at 920 n.6. Here, PBC argues the arbitrators have "'partial jurisdiction' or jurisdiction

14   over [remedies] only." As acknowledged in *Chaussee,* PBC cannot artificially divide the right

15   from the remedy and thereby force the City to arbitrate a dispute that the parties expressly agreed

16   was non-arbitrable. Nor can PBC force arbitration by manipulating the language of its

17   Arbitration Demand. PBC's Demand never cites Article II by name, but it certainly seeks to

18   avoid the Article's clear requirement – to play all Sonics home games at KeyArena.

         "[E]vidence of a purpose to exclude a claim from arbitration rebuts the presumption of

19   arbitrability." *Contra Costa Legal Assistance Workers v. Contra Costa Legal Serv. Found.,* 878

20   F.2d 329, 330 (9th Cir. 1989). PBC ignores controlling law that "[a]lthough public policy

21   strongly favors arbitration as a remedy for settling disputes, arbitration 'should not be invoked to

22   resolve disputes that the parties have not agreed to arbitrate.'" *Chaussee,* 69 Wn. App. at 919

23   (quoting *King County v. Boeing Co.,* 18 Wn. App. 595, 603 (1977)). The parties expressly

CITY OF SEATTLE'S REPLY IN SUPPORT OF
CROSS-MOTION FOR STAY OF ARBITRATION - 2

Thomas A. Carr
Seattle City Attorney
600 Fourth Avenue, 4th Floor
P.O. Box 94769
Seattle, WA 98124-4769
(206) 684-8200

1  agreed disputes related to Article II were not arbitrable. That includes determinations about the

2  proper remedy for an Article II breach. This unambiguous intent must be given effect.

3  **B.  The Only Reasonable Interpretation of the Lease, as Proved by the Undisputed
4      Historical Evidence, Is That the City Is Entitled to Seek Judicial Relief.**

5       In addition to the unambiguous Lease language, the parties' intent to exclude Article II

6  disputes from arbitration is evidenced by the drafting history of the Lease. Washington law is

7  clear: In interpreting a contract, the court should determine the mutual intent of the parties by

8  viewing the contract as a whole and considering, among other things, "all the circumstances

9  surrounding the making of the contract" and "the reasonableness of respective interpretations

10  advocated by the parties." *Berg v. Hudesman*, 115 Wn.2d 657, 667 (1990). These factors

11  compel the conclusion that the Lease does not require arbitration of disputes related to Article II.

12       The undisputed drafting history of the Lease establishes:

13       • The Sonics' attorney, Eric Rubin, prepared the first draft of the Lease. It contained an

14  arbitration clause with no carve-outs. It also contained the "limitation on judicial relief"

15  provision that became Article XXV(D) in the Lease's final version. The "limitation" provision

16  remained unchanged through every draft. Davidson Decl., ¶¶ 8-9 & Exs. B, C, D, F & G.

17       • Over time, the parties added the carve-outs to Article XXV(A). The purpose of the

18  carve-outs, as expressed in a contemporaneous memo from Mr. Davidson to both Mr. Rubin and

19  Mr. McLaughlin, was to "exclude" these issues from binding arbitration. *Id.*, ¶ 13 & Ex. E.

20       PBC ignores this undisputed evidence (and common sense) by arguing the parties

21  intended to exclude key Lease provisions from arbitration only for the benefit of the Sonics,

22  allowing the Sonics a judicial remedy for breach and limiting the City's access to a judicial

23  remedy. PBC can only do this by presenting a distorted account. For example:

CITY OF SEATTLE'S REPLY IN SUPPORT OF
CROSS-MOTION FOR STAY OF ARBITRATION - 3

Thomas A. Carr
Seattle City Attorney
600 Fourth Avenue, 4th Floor
P.O. Box 94769
Seattle, WA 98124-4769
(206) 684-8200

1    ● PBC relies principally on a declaration from Mr. Rubin. Mr. Rubin states that Article

2 XXV(D)(iv) was "added" to allow the Sonics to seek injunctive relief for disputes related to the

3 Lease provisions that had been carved out of mandatory arbitration. Rubin Decl., ¶ 5(b). But

4 Mr. Rubin's 13 year-old recollection is disproved by his own draft of the Lease (Davidson Decl.,

5 Ex. B – faxed from Mr. Rubin's law office on September 8, 1993). The language of XXV(D)(iv)

6 was present in Mr. Rubin's first draft (when there were no arbitration carve-outs), and remained

7 unchanged through every subsequent draft. The arbitration carve-outs were added subsequently,

8 and reflect the parties' specific negotiations.

9    ● PBC submits a declaration from Terry McLaughlin (Mr. McLaughlin is now employed

10 by PBC as the Sonics' Executive Vice President of Administration). *See* Declaration of Michelle

11 Jensen, ¶ 2, Ex. A. Mr. McLaughlin states, principally, that he does not recall discussions

12 surrounding the Lease. To the extent he recalls the City wanted arbitration as "the" vehicle for

13 resolving disputes, his declaration is either incomplete or is proved inaccurate by the Lease

14 language and drafting history.

15    Moreover, PBC's argument that judicial relief was intended to flow only to the Sonics to

16 protect the Sonics' right to injunctive relief during the construction of KeyArena ignores the type

17 of rights excluded from arbitration. For example, one of the clauses excluded from arbitration is

18 related to Hazardous Substances (Article XVI(F)). Subsections 3, 4, 5, and 6 of this clause

19 expressly protect the City's rights – not PBC's. The parties added an express carve-out to allow

20 the City to protect these rights through a judicial proceeding (as proved by the contemporaneous

21 memorandum). The carve-outs apply to rights at issue long after construction was complete.

22 Article II not only applies until 2010, but does not start until after the "Use Commencement

23 Date" (i.e., after construction is complete). Article XIX, which governs SSI's transfer of

CITY OF SEATTLE'S REPLY IN SUPPORT OF
CROSS-MOTION FOR STAY OF ARBITRATION - 4

Thomas A. Carr
Seattle City Attorney
600 Fourth Avenue, 4th Floor
P.O. Box 94769
Seattle, WA 98124-4769
(206) 684-8200

ownership, applies throughout the Lease term – indeed, PBC bought the Sonics under the terms of this Article little more than a year ago.

Ironically, if the interpretation advanced by PBC and Mr. Rubin were accepted, it would mean that PBC would have no enforceable damages remedy if the City violated its obligations under any of the carved out provisions, including Article XVI(F). PBC could not require the City to arbitrate the dispute, and it could only obtain injunctive or other "interim" relief.[1]

**C.    At Minimum, the Parties' Intentions Regarding Arbitrability Involve a Question of Fact.**

The Lease language is unambiguous, and the drafting history undisputed:  disputes related to Article II are not subject to arbitration.  PBC cannot create an issue of fact by submitting declaration testimony that contradicts the language of the Lease. *See U.S. Life Credit Life Ins. Co. v. Williams*, 129 Wn.2d 565, 569 (1996) ("extrinsic evidence cannot be considered for the purpose of varying the terms of a written contract").  Even if PBC's evidence created a disputed issue of fact (which it does not), this court should allow discovery on the limited issue of the parties' intentions regarding arbitrability. *See Dependable Highway Express, Inc. v. Navigators Ins. Co.*, ---F.3d---, 2007 WL 2379611, *8 (9th Cir. 2007).  Then, the factual question of the parties' intentions would be determined by the fact-finder, and the City could exercise its constitutional right to have a jury resolve any factual dispute.  RCW 7.04A.070; U.S. Const. amend. VII; Wash. Const. art. I, § 21.

### III.    CONCLUSION

For the reasons stated above, the City requests that its Motion be granted.

---

[1] Mr. Rubin's Declaration does not explain how or why SSI would have knowingly approved a Lease they believed denied them any enforceable remedy in this regard.

CITY OF SEATTLE'S REPLY IN SUPPORT OF
CROSS-MOTION FOR STAY OF ARBITRATION - 5

**Thomas A. Carr**
Seattle City Attorney
600 Fourth Avenue, 4th Floor
P.O. Box 94769
Seattle, WA 98124-4769
(206) 684-8200

1

2

3        DATED this ___ day of October, 2007.

4

5    KIRKPATRICK & LOCKHART                    THOMAS A. CARR
     PRESTON GATES & ELLIS, LLP                Seattle City Attorney
6

7    By: _Michelle Jensen_                     By: _Michelle Jensen_    FOR
        Slade Gorton, WSBA No. 20                  Gregory C. Narver, WSBA No. 18127
8       Paul J. Lawrence, WSBA No. 13557           Assistant City Attorney
        Jeffrey Johnson, WSBA No. 23066
9       Jonathan Harrison, WSBA No. 31390      Attorneys for Plaintiff City of Seattle
        Michelle Jensen, WSBA No. 36611
10
     Attorneys for Plaintiff City of Seattle
11

12

13

14

15

16

17

18

19

20

21

22

23

CITY OF SEATTLE'S REPLY IN SUPPORT OF                    **Thomas A. Carr**
CROSS-MOTION FOR STAY OF ARBITRATION - 6                Seattle City Attorney
                                                        600 Fourth Avenue, 4th Floor
                                                        P.O. Box 94769
                                                        Seattle, WA 98124-4769
                                                        (206) 684-8200

RECEIVED

Honorable Harry McCarthy

2007 OCT -9, A. II: 21

BYRNES & KELLER LLP

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
FOR KING COUNTY

CITY OF SEATTLE, a first-class charter city, )
                                             )
                    Plaintiff,               )    No.    07-2-30997-7 SEA
                                             )
        vs.                                  )    CERTIFICATE OF SERVICE
                                             )
THE PROFESSIONAL BASKETBALL CLUB,)
LLC, an Oklahoma limited liability company,  )
                                             )
                    Defendant.               )
                                             )
                                             )
_____)

I hereby certify under penalty of perjury of the laws of the State of Washington that on

this 9th day of October, 2007, I caused true and correct copies of City of Seattle's Reply in

Support of Cross-Motion for Stay of Arbitration and Declaration of Michelle Jensen in Support

of the City of Seattle's Reply on Cross-Motion for Stay of Arbitration to be delivered via legal

messenger, to the following:

CERTIFICATE OF SERVICE - 1



**Thomas A. Carr**
Seattle City Attorney
600 Fourth Avenue, 4th Floor
P.O. Box 94769
Seattle, WA 98124-4769
(206) 684-8200

1

2

Mr. Bradley S. Keller

3    Mr. Paul R. Taylor
     Byrnes & Keller LLP

4    1000 2nd Avenue
     38th Floor

5    Seattle, WA 98104-1094

6                                      _____

7                                      Dawn M. Taylor

8    K:\205593\00001\21032_PJL\21032P228S

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

CERTIFICATE OF SERVICE - 2

Thomas A. Carr
Seattle City Attorney
600 Fourth Avenue, 4th Floor
P.O. Box 94769
Seattle, WA 98124-4769
(206) 684-8200

**22**

RECEIVED

2007 OCT -9 A 11: 21

BYRNES & KELLER LLP

Honorable Harry McCarthy
Hearing Date: October 10, 2007
Oral Argument Requested

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

IN AND FOR THE COUNTY OF KING

CITY OF SEATTLE, a first-class charter
city,

                        Plaintiff,

        v.

THE PROFESSIONAL BASKETBALL
CLUB, LLC, an Oklahoma limited
liability company,

                        Defendant.

No. 07-2-30997-7 SEA

DECLARATION OF MICHELLE
JENSEN IN SUPPORT OF THE
CITY OF SEATTLE'S REPLY ON
CROSS-MOTION FOR STAY OF
ARBITRATION

        I, Michelle Jensen, declare under penalty of perjury under the laws of the State of

Washington that the following is true and correct. I am over the age of 18, have personal

knowledge of the matters stated below, and, if called to testify, could and would so testify.

        1.      I am an attorney at K&L Gates and am licensed to practice law in the State

of Washington. I represent the City of Seattle in the above-captioned matter.

        2.      Attached hereto as **Exhibit A** is a true and correct copy of the Web page

served at www.nba.com/sonics/contact/front_office.html.

DECLARATION OF MICHELLE JENSEN IN
SUPPORT OF THE CITY'S REPLY ON CROSS-
MOTION FOR STAY OF ARBITRATION - 1
K:\20056321G0001\20880_MDJ\20880P20CF



KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

1
2        3.      Attached hereto as **Exhibit B** is a true and correct copy of a portion of the

3   Exhibits introduced in the May 25, 1999 Deposition of Gordon Davidson (a portion of

4   Ex. 4).

5
6        EXECUTED this 9th day of October, 2007 at Seattle, Washington.

7
8                                                    Michelle Jensen
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

DECLARATION OF MICHELLE JENSEN IN
SUPPORT OF THE CITY'S REPLY ON CROSS-
MOTION FOR STAY OF ARBITRATION - 2
K:\2065932\00001\20880_MD\J20880P20CF

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE; (206) 623-7580
FACSIMILE; (206) 623-7022

# EXHIBIT  A



## SUPERSONICS.COM

### CONTACT



- Corporate Partnerships
- KeyArena Information
- Front Office
- Employment
- FAQ

## Click Here to Visit the Sonics & Storm Team Shop

Receive 10% off on a regular priced merchandise item when you purchase single game tickets at the Team Shop.



## Front Office

Seattle SuperSonics & Storm
1201 Third Avenue, Suite 1000
Seattle, WA 98101
P: 206.281.5800
F: 206.281.5839
E-mail: fans@sonics-storm.com

- Key Arena Info
- Corporate Partnership Information
- Employment Opportunities

Perform at a Sonics game | Request a donation | Broadcast questions/feedback

**Sonics & Storm Staff Directory**

Chairman, The Professional Basketball Club, LLC-Clayton Bennett
Chief Executive Officer & President-Danny Barth

**Sonics Basketball Operations**
General Manager-Sam Presti
Assistant General Manager, Vice President of Legal-Rich Cho
Assistant General Manager-Scott Perry
Head Coach-PJ Carlesimo
Assistant Coach-Scott Brooks
Assistant Coach-Mark Bryant
Assistant Coach-Ralph Lewis
Assistant Coach/Director of Video Scouting-Walt Rock
Assistant Coach of Player Development-Dwight Daub
Player Development Assistant-Brian Keefe
Director of Pro Player Personnel-Bill Branch
Director of Basketball Technology-Paul Rivers
Athletic Trainer-Mike Shimensky
Equipment Manager/Training Facility Manager-Marc St. Yves
Director of West Coast Scouting-Gerald Madkins
Director of East Coast Scouting-Frank Ross
Executive Assistant to General Manager-Janna Ford
Team Physicians-Dr. Jeffrey Cary (Internist), Dr. Richard Zorn (Orthopedist)
Furtado Center Security-Al Lima

**Storm Basketball Operations**
Chief Operating Officer-Karen Bryant
Head Coach & Director of Player Personnel-Anne Donovan
Assistant Coach-Shelley Patterson
Director of Basketball Operations-Missy Bequette
Head Athletic Trainer-Kyla McDaniel
Video Coordinator-Ayana Clinton

**Business & Administration**
Executive Vice President of Administration-Terry McLaughlin
Vice President of Facility Sales & Services-John Croley
Assistant to the President-Lorna Kennedy
Director of Human Resources-Katy Semtner
Facilities Personnel Lead-Glinda Matthews

**Information Technology**

Network & Telecommunications Administrator-Allan Hoffman
Applications & HelpDesk Administrator-Ryan Costiniano
IT HelpDesk-Jayquin Flores

**Business Development & Broadcast**
Vice President, Business Development-Chip Bowers
National Sales Director-Wayne Guymon
Manager of Client Services-Arlene Escobar
Storm Sales Executive-Amy Burdick
Business Development Account Executives-Steve Hitchcock, Andrew Jaye, Stacy Slade
Business Development Account Managers-Laura Reff, Ashley Thorvilson
Business Development Coordinator-Marissa Slavin
Play-By-Play Announcer-Kevin Calabro
Sonics Radio Play-By-Play Announcer-Matt Pinto
Storm Radio Play-By-Play Announcer/Program Director-Alan Horton
Sonics Studio Host-Francis Williams
Radio Engineer-Garry Greth

**Finance**
Controller-Madeleine O'Rourke
Assistant Controller-Valerie Weller
Staff Accountant-Teresa Wong
Payroll & Benefits Coordinator-Katrina Wiley
Accounts Receivable Coordinator-Val Kato
Accounts Payable Supervisor-Anna Mazur
Accounts Payable Specialist-Mary Mellema

**Marketing**
Senior Vice President, Sales & Marketing-Brian Byrnes
Director of Marketing-Ben Wilson
Marketing & Promotions Manager-Laura Sgrecci
Marketing & Promotions Coordinator-Sunne Drinkwater
Marketing & Communications Special Project Coordinator- Matthew Johnson
Senior Coordinator of Storm Business Operations-Kelly Nigh
Senior Coordinator of Sales & Marketing Analysis-Kris Kolehmain
Creative Director-Lisa Waite
Art Director-Ruth Cielo, Cole Meier

**WIRED**
Director of Digital Media-Ron Matthews
Market Research Manager-Jason Hanson
Interactive Marketing Coordinator-Kevin Pelton
Database Coordinator-George Waterstraat
Web Producer-Nathan Affolter

**Merchandising**
Director of Merchandising-Jeremy Owen
Senior Merchandising Manager-Nick Carita
Assistant Director of Retail Distribution-Mark Pillo
Assistant Distribution Center Manager-James Kyle
Assistant Team Shop Manager-Daniel Glenn
Distribution Center Lead-Mark Wilkerson
Team Shop Operations-Russell Nishikawa

**Events & Entertainment**
Director, Events & Entertainment-Pat Walker
Events Manager-Gabriella Buono
Events Coordinator-Todd Albright
Manager of Mascot Affairs-Marc Taylor
Dance Team Manager-Sabrina Chaudhry
Entertainment Manager-Damian Shepard
Entertainment Coordinator-Michael Ferguson

**Public Relations**
Public Relations Director-Tom Savage
Public Relations Manager-Kurt Fedders, Mark Rosenberg
Public Relations Coordinator-Greg Tippett

**Community Relations**
Director of Player Resources-Rick DuPree
Community Programs Manager-Wyjuana Montgomery
Community Programs Coordinator-Dallas Pride

Basketball Outreach Manager-Billy Rodgers
Community Ambassador-Slick Watts

**Guest Relations**
Vice President of Guest Relations-Pete Winemiller
Senior Manager of Guest Relations-Steve Ransom
Suite and Club Service Coordinator-Kevin Kepler
Guest Relations Coordinator-Brian Hunter
Guest Relations Assistant-Jarod Kendall, Courtney Silvester

**Season Ticket Retention & Experience**
Manager of Season Ticket Retention & Experience-Jennifer Tucker
Sonics Season Ticket Experience Specialist-Michael Larson, Martin Resich
Sonics Premium Seating Specialist-Michel Belden
Senior Storm Season Ticket Experience Specialist-Gentry Davis
Storm Season Ticket Experience Specialist-Katie Dahl, Kristina Netzler

**Ticket Sales & Operations**
Senior Vice President, Sales & Marketing-Brian Byrnes
Assistant Director of Sales & Premium Seating-Sharon Wortman
Director of Season Ticket Sales-Chris Fryar
Senior Manager of Season Ticket Sales-Zack Daniels
Premium Services Manager-Travis Herman
Sonics Ticket Sales Account Executives-Rick Dooley, Mike Ernst, Matt Grant, Michael Lown,
Mark Marino, Geoff Sanders, Kevin Shea, Nate Silverman
Storm Ticket Sales Account Executive-Courtney Jeanpierre, Kyle Waters
Inside Sales Manager-Jamie Morningstar
Inside Sales Associates- Victoria Hinds, Joe Loncarich, Patrick Custer, Philip Clark, Cody Jones,
Thomas Adamski
Group Sales Manager-Cory Howerton
Group Sales Senior Program Manager-Megan Cifala
Group Sales Account Executive-Jim Bergem, Tim Castro, Renata Porter, Kati Wescott
Group Events & Ticket Sales Coordinator-Nicole Gatbunton
Director of Ticket Operations-Dave Felsen
Ticket Operations Manager-Darrin Miller
Ticket Operations Coordinators-Derek Long, Megan Thorne

E-mail this story

Copyright 2007 NBA Media Ventures, LLC. All rights reserved. No portion of NBA.com may be
duplicated, redistributed or manipulated in any form. By accessing any information beyond this
page, you agree to abide by the NBA.com Privacy Policy / Your California Privacy Rights and Terms of
Use.

Advertise on NBA.com  |  **Career Opportunities**  |  Help

| NBA | D-LEAGUE | WNBA | GLOBAL | TEAMS | MOBILE | NBA TICKETS | FANTASY | NBATV | STORE | VIDEO |

# EXHIBIT B

SEP 08 '93  02:32PM RUBIN,WINSTON,DIERCKS,HARRIS&COO                    P.3/37

WHEREAS, the City and SSI desire to enter into an agreement specifying the terms and conditions under which SSI will use the New Seattle Center Coliseum and certain other facilities at Seattle Center in connection with the exercising of SSI's rights under its National Basketball Association franchise;

NOW THEREFORE, for and in consideration of the mutual mutual promises, covenants, and agreements, and performances described herein, the parties hereto agree as follows:

I.  DEFINITIONS

All words in this Agreement bearing initial capitals, other than proper nouns, section headings or words required to be capitalized for proper usage, are defined terms and shall have the meanings specifically assigned to them in this section.

As used in this Agreement, the following terms and words are hereby defined as follows:

A.    "Agreement" means this Agreement, as from time to time amended in accordance with the terms hereof, including the license to use the New Seattle Center Coliseum for Home Games.

B.    "Approval" means the prior written consent of a party hereto or a designated representative thereof.

C.    "Basketball and Other Novelties" means general merchandise, goods, wares, and publications including without limitation those bearing the symbol, mark or name of the NBA, the SuperSonics, or any other NBA team, as well as all other general merchandise or items without limitation, except food, for sale in the Coliseum at any time.

2

4-32

D.    "City" means The City of Seattle.

E.    "Commissioner" means the party designated by the NBA as the principal officer of the NBA.

F.    "Day of Game" means the calendar day upon which a Home Game of the SuperSonics is scheduled to be played in the New Seattle Center Coliseum commencing at 9:00 AM PST and ending at 12:00 midnight of that day, unless otherwise specifically provided in this Agreement.

G.    "SSI" means SSI Sports, Inc., the corporation owning and operating the Seattle NBA franchise, and its successor(s), assigns, or designees.

H.    "Home Game" or "Home Games" means 1) any regular season, conference playoff and championship playoff professional basketball game or games played pursuant to a schedule established by the NBA in which the SuperSonics is the host team except for such games that the NBA determines shall not be played in Seattle, such as demonstration games scheduled by the NBA to be played in a City without an NBA franchise or in a foreign country, and 2) five additional dates for uses by SSI for which no admission shall be charged, or where an admission is donated to a nonprofit charitable organization.

I.    "Main Structure" means the arena building.

J.    "NBA" means the National Basketball Association and its successors, assigns or designees or the professional basketball league or organization of which SSI is a member.

3

4-33

K.    "Parking Garage" means a two deck parking facility at Warren Avenue and Thomas Street with at least five hundred individual parking spaces which shall be constructed and ready for use and occupation by SSI at the same time that the New Seattle Center Coliseum is completed and ready for use and occupation by SSI pursuant to this agreement.

L.    The "Supplemental Parking Spaces" shall mean a sufficient number of parking spaces located within one thousand feet of New Seattle Center the) Coliseum necessary to accommodate those Club Seat ticket holders, members of the press and Sonics sponsors during any Home Game who cannot be accommodated within the Parking Garage.

*with the new new date.*

M.    "Parking Area 'A'" means the area on the south side of the New Seattle Center Coliseum that contains not less than (sixty) passenger vehicle parking stalls.

N.    "Practice facility" means a plot of land of _____ square feet located at _____ [Aurora and Broad Street].

*Substitute this word for other NSCC references*
*NNS*

O.    "Premises" means the New Seattle Center Coliseum. — *enlarge the to include other bld*

P.    "Season Tickets" means those tickets to Home Games in the New Seattle Center Coliseum sold by SSI each year as part of a multi-ticket package.

Q.    "Seats" means any seats in the New Seattle Center Coliseum from which professional basketball events in the New Seattle Center Coliseum may be viewed.

R.    "New Seattle Center Coliseum" or "Coliseum" means a 17,500 or more seat facility when configured for professional

*independent "" smaller "C"s Move this "C's so small Coliseum is most prominent word.*

4

4-34

basketball with not less than 58 luxury suites containing (16)
viewing seats, and not more than 1100 Club seats, the final design
of which has been approved in writing by SSI as provided in this
Agreement, and located on the following property:

|  | | As Recorded In Records of |
| Block(s) | Plat | King County, Washington |
| 31 | Supplemental Plat of D.T. Denny's Plan of N. Seattle, EXCEPT the West 93.06 feet of Lots 9 & 10 thereof. | Vol. 3 of Plats, Page 80 |
| 32 & 35 | D.T. Denny's Home Addition to Seattle. | Vol. 3 of Plats, Page 115 |
| 36 | D.T. Denny's Third Addition to Seattle | Vol. 1 of Plats, Page 145 |

and known as the "New Seattle Center Coliseum," or any subsequent
designation accorded to such facility, together with all equipment,
fixtures, and other appurtenances incorporated therein pursuant to
this Agreement including without limitation:

1.  The Practice Facility.

2.  The Parking Garage.

3.  Parking Area A.

4.  The SSI Box Office facility.

5.  The SSI Retail Facility

6.  The SSI Suite.

7.  The SuperSonics and Visiting Team dressing rooms

8.  The SuperSonics Training Room

5

4-35

9.    The SuperSonics Storage facilities

S.    "Seattle Center Director means the Director of the City's Seattle Center Department or such official's designee.

*this isn't clear to me*

T.    "SSI Box Office Facility means a separate and segregated office space of at least _____ square feet located within the Coliseum main ticket facility located on the west side main structure and one ticket booth immediately contiguous to such office space.

*Improve this by adding please*

U.    "SSI Retail Facility means [the approximately 5,000 square foot facility on the ground floor of the West Court Building for use by SSI as a retail facility.]

V.    "SSI Suite means [the center court luxury suite facing the basketball scorers' table location.]

W.    "SuperSonics means the NBA professional basketball team owned and operated by SSI, and its successors, transferees or assignees.

X.    "Food Concession or Food means any item of food or drink without limitation that is sold, given without charge, or in any other manner dispensed or consumed within the Coliseum.

Y.    "Term means the Term of this Agreement as set forth in Section II.

Z.    "Ticket Sales Proceeds means the gross revenues derived from the sale of tickets for a Home Game, less (1) applicable taxes and (2) the value of all complimentary tickets provided or exchanged for goods or services.

6

4-36

"Arena Advertising" means any printed or verbal announcement or display of any kind which refers to any person, place or thing however situated or located within or on the outside of the Coliseum.

AA. "Applicable Taxes" means all taxes and governmentally imposed assessments upon the sale of tickets for admission to any Home Game or preseason game or upon the exercise of any right granted by this agreement, including but not limited to leasehold Excise Taxes

BB. "Courtside Club" shall mean and includes those tickets for admission to Home Games in the Seattle Center Coliseum providing reserved seating in the special area marked as "Courtside Ticket Holders' Seating" on Exhibit "B" (and any subsequent modifications to such areas by SSI).

## II. TERM; USE PERIOD

The Term of this Agreement shall commence on October 1, 1995 or on such date when SSI may commence its use, enjoyment, and occupancy of the New Seattle Center Coliseum ("Lease Commencement Date"), and ending on September 30, 2010, unless terminated earlier pursuant to the provisions hereof.

Subject to the provisions of this Agreement, SSI shall schedule and ensure that the SuperSonics play all Home Games exclusively in the New Seattle Center Coliseum.

## III. SSI's REMEDIES UPON FAILURE OF CITY TO CONSTRUCT COLISEUM IN A TIMELY MANNER

A. The City and SSI agree that construction of the Coliseum will cause a severe economic hardship of revenue and dislocation to

7

4-37

SSI and that time is of the essence in the completion of the Coliseum so that it will be available to SSI on the Lease Commencement Date. In addition, the City and SSI agree that SSI's use of the Premises requires months of advance preparation by SSI and that delays in the financing or construction of the Coliseum so that it is not available to SSI on October 1, 1995 will severely damage SSI.

B.   'The City hereby represents and warrants that it had the statutory authority to finance the construction of the Coliseum either through direct obligation financing or through lease-leaseback financing when approved by the City Council and the Mayor.   Therefore, notwithstanding any other provision of this Agreement, if, for any reason whatsoever, the City has not secured all necessary approvals for financing for the construction of the Coliseum on or before March 30, 1994, and has not secured such financing on or before May 1, 1994, then SSI, at its sole option, may declare this Agreement as null and void.   SSI's right, pursuant to this section to declare this Agreement null and void is in addition to and not in lieu of all its other rights and remedies.

C.   The parties acknowledge and agree that the Coliseum is to be built on the site of the present Coliseum and that demolition of the present Coliseum is a critical and material benchmark toward the completion of the Coliseum in a timely manner.   Therefore, notwithstanding any other provision of this Agreement, if, for any reason whatsoever, demolition of the present coliseum has not commenced on or before July 1, 1994, pursuant to a signed and fully

8

effective contract for the demolition of the present coliseum, then SSI, at its sole option, may declare this Agreement as null and void.  SSI's right, pursuant to this section to declare this Agreement null and void is in addition to and not in lieu of all its other rights and remedies.

D.    If, for any reason whatsoever, construction of the Coliseum does not commence September 1, 1994, pursuant to a signed and fully effective contract on  which guarantees completion by September 30, 1995, then SSI, at its sole option, may declare this Agreement as null and void.  SSI's right, pursuant to this section to declare this Agreement null and void is in addition to and not in lieu of all its other rights and remedies.

E.    If, for any reason whatsoever, on or before March 15, 1995, the project architect fails to certify to SSI that construction of the Coliseum is fifty (50) percent complete then on that date SSI may enter into an agreement for use of alternate sites in which the SuperSonics will play the 1995-1996 season.  If SSI enters into such alternate agreement, then SSI's obligations under this Agreement shall abate until the later of October 1, 1996, or October 1st of the first subsequent year after 1996 that the Coliseum is available for SSI's use.

F.    If SSI elects to declare this Agreement null and void pursuant to subparagraphs B, C or D above, then SSI may relocate its basketball franchise to another venue in or outside the State of Washington and the City specifically waives its rights to object

9

4-39

in any forum to such transfer and the City specifically waives any right it may have to file suit in any court to prevent or impede in any manner such transfer and releases SSI, its officers, directors, shareholders, agents, attorneys, heirs, successors and assigns from any claims for damages, costs or any other relief as a result of such transfer under such circumstances provided however that in any event, nothing in this Agreement shall be construed as an acknowledgement or agreement by SSI that, in any event, the City has any such rights to prevent the relocation of the SuperSonics to any new venue.

G.    The City and SSI agree that time is of the essence in the completion of the Coliseum so that it will be available to SSI on the Lease Commencement Date. The parties agree that if the Coliseum is not available on the Lease Commencement Date SSI will suffer damages which are difficult or impossible to calculate.

H.    In addition to any other rights and remedies SSI has on account of delays in the construction of the Coliseum, and if SSI has elected not to declare this Agreement null and void pursuant to Subsection B, C or D above, the City agrees to pay SSI, as liquidated damages, the sum of $100,000.00 for each and every Supersonics Home Game played in another facility between October 1, 1995, and the date upon which SSI may commence its use, enjoyment and occupancy of the Coliseum. Each such payment shall be made to SSI within Twenty-Four hours after each such Home Game.

J.    The rights and remedies provided to SSI pursuant to the Paragraph III shall be cumulative and SSI's election of any single

10

C-40

remedy shall not constituted a waiver of any other rights and remedies.

**IV.)** **SCHEDULING OF HOME GAMES INTO SEATTLE CENTER COLISEUM**

A.    **City's Reserved Advanced Regular Season:**    On or by
January 1, 1995, and on or by every January 31st thereafter through
2010, the City shall provide SSI with a preliminary schedule
identifying reserved regular season Days of Games during the next
succeeding NBA regular season which schedule shall consist of a
minimum of fifty dates (excluding Mondays) dates separated by
periods of no greater than seven consecutive days, and which shall
include at least eighteen dates that are on Fridays and eighteen
dates that are Saturdays, together with twenty alternate dates,
which alternate dates may be consecutive with themselves and with
any of the fifty other dates.   No Monday date shall be included as
any of the minimum (i.e., non-alternate) dates proposed.   The City
expressly agrees that it shall not enter into any agreement or
commitment of any sort whatsoever for the use of the Coliseum on
such dates whether by the City or any third party and that all such
dates shall be reserved for the exclusive use of SSI unless and
until selected or rejected by SSI.

B.    **SSI's Selection of Regular Season and Preseason Game
Dates:**   On or by September 1, 1995, and on or by every September
1st through 2010, SSI shall:

1.    Select the regular season Home Games established by
the NBA for the next such season from the seventy (70) proposed
dates for the playing of regular season Home Games at the New

11

Seattle Center Coliseum, or such alternative dates as the NBA shall have designated as Home Game dates and notify the Seattle Center Director regarding which dates have been selected.  Thereafter the Seattle Center Director shall schedule and reserve for SSI use of the New Seattle Center Coliseum on each selected Day of Game.

2.    Notify the Seattle Center Director of any additional dates desired for preseason Home Games or other Home Games specified in Paragraph I(H)(2) of this Agreement in the New Seattle Center Coliseum, upon receipt of which notice the New Seattle Center Director shall schedule and reserve for SSI use of the New Seattle Center Coliseum on each such selected Day of Game.

C.    Playoff Game Date Selection: On or before September 1, 1995, and on or before every September 1st or as soon thereafter as practicable through 2010, SSI shall notify the Seattle Center Director of all additional dates or general periods of time during the immediately succeeding months of May and June, or such other period that has been tentatively scheduled or are desired by the NBA or SSI for conference playoff and championship Home Games. Upon receipt of such notice, the Seattle Center Director shall schedule and reserve the New Seattle Center Coliseum for SSI's use such selected date or general periods of time in the event that the SuperSonics qualify for such Home Games and require use of the Coliseum.  In order to assure SSI's use of the Coliseum for all playoff and championship Home Games, the City shall not agree to the use of the Coliseum by any other person during the months of

12

May and June or such other period designated by the NBA during the
term of this Agreement except on an interruptable basis which
provides preemption by SSI of such other person's use. _ *what's* ?  *here*?

     D.    In the event that any provisions of this paragraph shall
no longer satisfy the requirements of SSI or the NBA, then such
provision shall be amended in order to satisfy SSI's requirements.
In any event the parties expressly agree that the provisions are
intended to assure that the City gives sole priority to SSI over
all other uses of the Coliseum in order that SSI may play at the
Coliseum each and every Home Game and that any other use whatsoever
by the City or any third person shall be preempted by the
SuperSonics' use for Home Games.  It is further expressly agreed by
the parties that the failure of the City to make the Coliseum
available for all Home Games would result in irreparable injury to
SSI which could not be redressed through the payment of damages
alone and that therefore the City acknowledges and concedes that
SSI shall be entitled to injunctive and the equitable relief to
prevent any use or occupancy of the Coliseum which conflicts with
SSI's access to or use and occupancy for any Home Game in addition
to any other remedies available to SSI.

V.    PREMISES LICENSED FOR USE AND OCCUPANCE BY SSI

     The City hereby grants to SSI the exclusive right and license
to full and unrestricted use, enjoyment and occupancy of the New
Seattle Center Coliseum, and, to authorize others designated by SSI
to use, enjoy and occupy the New Seattle Center Coliseum as
provided herein in consideration of SSI's payment of the sums

13

*the right + license*

*it~43*

specified in Section _____ hereof, and compliance with all other applicable terms and conditions of this Agreement as follows:

A.    Unlimited Use Facilities: During the entire term hereof, the City shall provide to and SSI shall have sole and exclusive use, custody and occupancy of and access to (without interruption or restriction) the Home Team Dressing Room, the Training Room, Storage facilities consisting of no less than three thousand square feet, the SSI Suite, the Sonics Retail Facility, the Practice Facility Parcel, the Box Office Facility, *AND OPERATIONAL PROBLE*

B.    Basketball Court and Related Areas, and Fixtures:

1)    On *every* Day of Game, the City shall provide to SSI for its exclusive use, the Main Structure of the Seattle Center Coliseum, fully set up and ready for occupancy by SSI including all equipment and fixtures required for the exhibition of professional basketball including but not limited to the basketball court, baskets, timing clocks, scoreboards, visitor's locker rooms and sound and public address systems,

2)    On other than any Day of Game for practice purposes, if no other user or event has been scheduled for use of the main structure of the Coliseum *on* such day and if such facility does not need to be prepared in any respect on such day for any user or event scheduled for any subsequent day.

C.    Scorers' Tables, Special Seating Configurations, and Other Facilities: On *every* Day of Game, beginning two hours prior to the scheduled time for the commencement of a Home Game and ending at

14

the earlier of two hours after the conclusion of such Home Game or at 12:00 midnight, the following facilities fully set up and ready for occupancy:

1.    Courtside facilities designated by SSI and located adjacent to the basketball court side lines and equipped with all necessary tables and chairs for teams, officials and members of the press credentialed by SSI including provision for telephone lines, television cables and other equipment.

2.    All Courtside Club seating, all Luxury Suites, all Club Seats, all other public seating within the Coliseum configured for professional basketball and all specialized entertainment rooms;

3.    All other areas or facilities within the New Seattle Center Coliseum;

D.    Parking Areas and Spaces:

On every Day of Game, SSI shall have exclusive use of the Parking Garage and Supplemental Parking Spaces two hours prior to the start of any Home Game, free of charge for the exclusive use of Luxury Suite ticket holders, Courtside Club ticket holders and Club Seat ticket holders, SSI employees, Sonics sponsors, and members of the press.  It is further agreed that SSI shall apportion parking rights first in the Parking Garage, and then in the Supplemental Parking Spaces in the following manner:  First, three spaces shall be allocated to each Luxury Suite, then one space for every two Courtside Club Tickets held by a single person, then one space for each four Club Seat tickets held a single person, and then one

15

4-45

space for each Sonics sponsor or member of the press credentialed by SSI.

E.   <u>Ticket Sales Facilities</u>:  All ticket booths on each Day of Game.

F.   <u>Restrictions on City's Right to Use or Authorize Use of the New Seattle Center Coliseum</u>

The City shall only make the New Seattle Center Coliseum available for use by individuals and entities other than the SSI only according to a schedule that ensures SSI will play all Home Games in the New Seattle Center Coliseum.   The City shall not use the New Seattle Center Coliseum for any purpose, nor permit the use of the New Seattle Center Coliseum by any other person or entity for any purpose, on any Day of Game without the Approval of SSI. The City shall not permit the New Seattle Center Coliseum to be used for any professional sports other than those involving or hosted or promoted by SSI, without the approval of SSI.   Except as provided in the preceding sentence, nothing herein shall restrict the ability or right of the City to use the New Seattle Center Coliseum or permit the use of the New Seattle Center Coliseum by others for any purpose on any dates not used by SSI provided that such use by others does not impair SSI's full enjoyment of all rights use and occupancy granted to it herein by the City.

VI.   <u>SSI PAYMENTS TO THE CITY</u>

A.   <u>Payments Due</u>:  In consideration of the license to full use and enjoyment of the Premises as granted herein to SSI and the providing to SSI of various services and facilities as described

16

4-46

herein, subject to the provisions of this Agreement, SSI shall pay to the City the following sums during the Term of this Agreement.

1.  **Annual Base Rent:**

a.  An Annual Base Rent of $800,000 payable in equal quarterly installments of $200,000 due and payable on the first day of each and every third month during the Term hereof, provided, however, that in the event that any regular season Home Game is scheduled by the NBA to be played in another location, then the annual base rent for that season shall be reduced pro rata by the average amount paid per regular season Home Game during that season.

*[handwritten margin note: added by Sonics]*

*[handwritten note across lines: No: This is too much. Reduction (if any) should logically be only ÷ where X = # of Home games in regular season. The "avg amt paid" may include other charges assessed like labor.]*

b.  CPI adjustment:  The Annual Base Rent shall be increased or decreased each October 1st, beginning in 1996, to reflect the total percentage increase or decrease in Consumer Price Index (CPI) for All Urban Consumers in "West-A", All Items (1982-84 = 100), as published by the U.S. Department of Labor, Bureau of Labor Statistics, between September of the year in which the adjustment is made and September of the immediately preceding year;

*[handwritten symbol ✳ in left margin]*

provided, that in no event shall any annual adjustment be less than 3% or more than 7%; provided, further, that in the event such CPI is discontinued, the parties shall agree upon another similar index to be used to calculate the contemplated adjustments, and in the event of an inability to agree, the parties shall request the American Arbitration Association or its successor to establish an appropriate adjustment standard; provided, further, that in the event of change in the index base of (1982-84 = 100) the parties

17

*[handwritten note at bottom: ✳ Verify that Sept/Sept is time period for this CPI]*

*[handwritten note bottom right: 4-47]*

shall apply whatever conversion factor is necessary to establish the true percentage increase in the CPI in any year(s) in which the index base is changed, and shall thereafter apply the most recently revised base index; and provided further that the amount paid by SSI shall not be less than $800,000 in any event.

2.    Additional Rent:    In addition to the Annual Base Rent, SSI will pay to the City the following additional payments which shall be added to and paid as part of the next proximate quarterly payment after such amounts have been received by SSI:

a.    In the event that the Supersonics play in any preseason games in the Coliseum, then SSI shall pay to the City an additional amount equal to eight and one half percent (8 1/2%) of all revenue received from the sale of tickets to such games less any applicable taxes.

b.    In the event that the SuperSonics play in any conference or championship Home Games during any NBA season during the terms of this Agreement, then SSI shall pay to the City an additional amount equal to eight and one half percent (8 1/2%) of all revenue received from the sale of tickets to the first two Home games played in the Coliseum during any such post-season playoff series during any season.    SSI shall retain all revenues from the sale of tickets for any other conference or championship Home Games played during each such NBA season.

B.    Books and Records; Audit:

1.    SSI shall keep true, separate, accurate, complete and auditable records and receipts of all tickets and credentials

18

issued or sold for admission to SuperSonics Home Games in the New Seattle Center Coliseum, ~~the form of such~~ *which* records shall be subject to the approval of the City, *as to form,* and shall be retained in King County, Washington, for at least fifteen (15) months after the close of the fiscal year in which they were received *or created* .

2.    The City shall keep true, separate and accurate complete and auditable records of all revenue and appropriations received and all from operation of the Coliseum and all expenditures and expenses incurred in the construction, maintenance and operation of the Coliseum and shall retain such records for at least fifteen months after the close of the fiscal year in which they were paid.

3.    SSI and the City each shall permit the other party from time to time as the other party deems necessary, to inspect and audit in King County, Washington, during regular working hours, all books and records required by this section as well as those books and records pertaining to the providing or serving of food or beverages by or through a caterer, that are necessary to verify the accuracy of the payments previously made by SSI or expenditures or expenses paid by the City; and shall supply the other party with, or shall permit it to make, copies of any such books and records and any portion thereof, upon the other party's request. SSI and the City shall further ensure that such inspection, audit and copying right ~~of the City~~ is a condition of any subagreement or other arrangement under which SSI or the City permits any other person or entity to carry on a business activity in or from the Seattle Center Coliseum.

19

(4.)    In the event that either party claims an amount due to it had not been paid or that it has paid an amount in excess of any obligation hereunder, said party shall notify the other party of such claim within 12 months of the time such amount was due. The party against whom the claim lies shall pay such amount within thirty days or submit that claim to arbitration pursuant to the provisions of Section XXIV of this Agreement.

VIII.    UTILITY, PERSONNEL, MAINTENANCE AND OTHER SERVICES/RESPONSIBILITIES

A.    General Utilities.  The City shall provide at its sole expense, electricity, water, heating, air conditioning and ventilation, public telephone, sewer and solid waste removal, and all other utility services within the Coliseum as are required for the use of the New Seattle Center Coliseum as contemplated herein, provided, however, that SSI shall secure, at no expense to the City, such telephone service SSI desires for its own use to and from the New Seattle Center Coliseum.  The City shall be responsible for the immediate repair or replacement of any malfunction or failure of any utility service and shall be liable for any interruption or impairment of SSI's use enjoyment and occupancy of the Coliseum resulting from such malfunction or failure to repair or replace.

B)    First Aid Facility:  The City shall provide and operate at its sole expense, commencing two hours prior to and ending two hours after each Home Game, a fully equipped first aid facility in the New Seattle Center Coliseum staffed by qualified paramedical personnel, and in addition, an ambulance parked on the premises.

20

4-50

C. **Public Address Facilities:** The City shall install and maintain at its sole expense such state of the art public address systems and specialized musical sound system within the Coliseum as required by SSI. On every Day of Game the City shall provide SSI with exclusive access to, and control of such systems. Notwithstanding any other provision hereof, the City shall have the right to use the public address system on the Day of Game for general safety, health, and legal announcements including but not limited to those for emergency or crowd control purposes.

D. **Scoreboard and Time Clock Facilities:** SSI shall provide install at its sole expense, a center court scoreboard, scorers table and reader boards, which shall be part of the advertising displays referred to in Section XI.A.3 hereof, and which shall not be used by the City or any other third person except pursuant to the specific prior agreement of the SSI provided however, that the City shall be solely responsible for the set up prior to Home Games and the maintenance of such fixtures as required by this Agreement. It is expressly agreed by the City that SSI may use all, or any component parts of the scoreboard that it has previously provided to the Seattle Center Coliseum in satisfaction of this requirement.

*No such subsection*

E. **Personnel:**

1. a) The City shall employ and provide at its sole expense, appropriately trained ticket sellers, ticket takers, security personnel, parking attendants, ushers, janitorial maintenance, backboard repair person, and all other support personnel necessary

21

4-51

to operate the Premises in an efficient and orderly manner and for the purposes contemplated herein.

As part of this obligation, the City shall provide at its sole expense on the premises of the Coliseum on each Day of Game at least two maintenance engineers who are fully competent to determine the cause of and effect emergency repairs on all utility, and other component and operating of systems and fixtures within the Coliseum.

(b) All determinations regarding the number, identity, sufficiency of training, competency, selection, duties and termination of all such personnel shall be subject to the approval of the SSI. The City shall act within three days to resolve any complaint by SSI regarding the performance of duties by any individual employed by the City who provides any service subject to the provision of this Agreement and shall terminate any such individual upon demand by SSI. The City warrants and represents that it shall be solely responsible for any and all acts, omission or commission of all such personnel directly or in connection with this Agreement and shall hold SSI harmless for any and all such acts.

2. All personnel provided by the City necessary for the operation of the New Seattle Center Coliseum as a professional basketball game facility shall be on duty on each Day of Game as follows:

22

4-52

| Personnel | Beginning no Earlier Than: |
|---|---|
| Parking Area attendants | ~~Two~~ *One* and one half hours before scheduled start of Home Game |
| Ticket takers/Ushers Security Personnel | ~~Two~~ *One* and one-half hours before scheduled start of Home Game or when doors are opened to the public, whichever is earlier |
| Maintenance, janitorial, other support personnel not otherwise specified herein | Day of Game |

*1 hr 1 in ushers carts*

3.   SSI shall employ or otherwise secure, train, as necessary, and have on duty at all Home Games in the New Seattle Center Coliseum, ~~such~~ *all required* scoreboard and game-in-progress information controllers/operators and technicians.

4.   The Seattle Center shall employ or secure off-duty Seattle Police Department law enforcement officers to provide security inside the New Seattle Center Coliseum, for crowd control, and protection of players and officials in connection with SSI's use of the New Seattle Center Coliseum.   The City warrants, represents that its shall be solely responsibility with respect to Seattle Center security, and shall indemnify and hold SSI harmless for any and all acts of omission or commission of such security personnel.

5.   SSI and the City will jointly develop performance standards for all persons employed by the City provides any service subject to the provisions of the Agreement as well as performance standards for other operational issues.

23

## IX.  MAINTENANCE RESPONSIBILITIES

A.    Except as provided in subparagraph D herein the City shall be solely responsible to maintain the New Seattle Center Coliseum, including but not limited to all building structures, all interior spaces and adjacent external areas, and all fixtures and systems in a neat, clean, safe and sanitary condition, to immediately effect such repairs or replacements as necessary when malfunctions or defects arise, and to assure that the Coliseum is in compliance with the generally accepted standards and conditions adopted by stadia of comparable size and age, provided however, that the City warrants that it shall spend on ordinary maintenance repairs and replacements no less than two hundred and twenty five thousand dollars per annum, adjusted to include an increase of four percent per annum.

B.    In addition to the general maintenance obligation by subparagraph A of this Paragraph, the City shall after the conclusion of the 2002 NBA season and prior to the beginning of the 2003 NBA season complete a general renovation of the Coliseum which shall include the complete refinishing and painting of all interior surfaces, the replacement of all seating, the replacement of all public address and sound systems and of all deteriorated fixtures, structural components or utility or other component systems; provided further that the total amount to be expended by the City on such renovations shall not be less than three and one half million in 1993 dollars adjusted pursuant to the CPI adjustment formula set forth in subparagraph VI(A)(1)(a).

24

4-54

C. In the event that the City fails to perform maintenance, repairs, replacements or renovations as required by this Agreement than SSI may provide the City with written notice which sets forth the nature of the condition requiring such action. In the event that the City fails to perform a reasonable time given the impact of such condition on SSI's full use of the Coliseum then SSI may elect to: (i) submit the matter to expedited arbitration, as provided in Paragraph XXIV herein, in order to secure an order compelling such performance together with an award to SSI of damages resulting from the City's failure to perform, or (ii) itself perform, or cause such maintenance, repair, replacement or renovation to be performed at commercially reasonable rates and offset the expenses incurred for such work against any other amount that is payable by SSI to the City.

In the event that SSI elects to itself perform or cause such maintenance repair, replacement or renovation to be performed, then the City shall either (i) agree to such offset by SSI, or reimburse SSI for such expenses, or (ii) submit to expedited arbitration the issue of whether amount of the offset claimed by SSI is not commercially reasonable.

D. SSI shall secure and provide, at no expense to the City, janitorial service in and for all exclusive use of facilities, training, and storage facilities in the New Seattle Center Coliseum as defined in Section V.A hereof. In addition, the City shall not be responsible for providing or performing any maintenance, repair or replacement of any of equipment that is installed by SSI

25

4-55

pursuant to section ____ and any maintenance, repair or servicing thereof shall be the sole responsibility of SSI exclusively.

**X.    CITY'S SUPERVISION AND CONTROL OF SEATTLE CENTER BUILDINGS AND GROUNDS AND ACTIVITIES**

A.    The City reserves the right to do the following so long as such actions do not occur on Days of Games or do not otherwise directly or indirectly interfere with any provision of this Agreement.

1.    Increase, reduce, and change in any manner whatsoever the number, appearance, dimension, and locations of the Seattle Center walks, buildings, landscaping, parking, and service areas, and may also make improvements, alterations, and additions to the portions of the New Seattle Center Coliseum that have not been made available to ~~them SSI~~ for its exclusive use;

2.    Regulate all traffic within and adjacent to the Seattle Center;

3.    Impose a reasonable charge for admission to the Seattle Center and facilities therein, including parking facilities at any time or manner not subject to this Agreement.

4.    Erect, display and remove promotional exhibits and material for, and permit special events on the Seattle Center grounds, buildings, and facilities including the New Seattle Center Coliseum provided that in no event shall any such Seattle Center exhibit, material or event within the Coliseum directly promote, in any manner, any commercial product, service or event or in any other manner conflict with the SSI's exclusive rights under Section

26

5. ) Promulgate, from time to time, reasonable rules and regulations regarding the use and occupancy of any area of Seattle Center provided that all such rules or regulations which apply directly or indirectly to any provision of this Agreement shall be approved by SSI prior to their implementation;

6. Determine the days and hours the Seattle Center and various business operations will be open to the public;

7. ) Determine the size, number, and type and identity of concessions, stores, businesses, and operations being conducted or undertaken at Seattle Center other than the New Seattle Center Coliseum.

B. **SSI Principal User:** The City expressly agrees that in all matters to which this Agreement directly or indirectly applies, SSI is the principal user of the New Seattle Center Coliseum and that SSI's convenience and enjoyment of such use shall be paramount and that no other use by any other person shall be permitted to conflict with or impair SSI's convenience and enjoyment of such use. The City shall take no action, or fail to take any necessary action, which in any manner undermines or impinges upon or restricts SSI's convenience and enjoyment of the premises, unless specifically and expressly provided for in this Agreement. All ambiguities in this Agreement or disputes between the parties shall be resolved in accordance with this paragraph.

C. **Supervision and Control:** The City shall at all times exercise overall supervision and control of the New Seattle Center Coliseum, and shall be responsible for the construction, operation

27

4-57

and maintenance of the same as well as for all contiguous external areas and of all fixtures necessary for SSI's use except as otherwise provided herein.

**XI.   SSI EXCLUSIVE CONCESSION RIGHTS TO SALE OF FOOD, BEVERAGE AND NOVELTIES, ADVERTISING, VIDEO PRODUCTION AND BROADCAST RIGHTS**

A.    SSI is hereby granted the exclusive right and obligation to sell food and beverages within the New Seattle Center Coliseum, as more specifically set forth in a Food and Beverage Concession Agreement between the parties dated the date hereof.

B.    SSI is hereby granted the exclusive right to sell Basketball and Other Novelties at the New Seattle Center Coliseum as more specifically set forth in a Novelties Sales Agreement between the parties dated the date hereof. Nothing herein limits the right of SSI to publish, manufacture and distribute Basketball Novelties and other Novelties outside the geographic area of the Seattle Center.

C.    SSI is hereby granted the exclusive right to provide all advertising display services within the New Seattle Center Coliseum, as more specifically set forth in an Advertising Agreement between the parties dated the date hereof.

D.    SSI is hereby granted the exclusive right to provide Video Production and Broadcast and Cablecast transmission services within the New Seattle Center Coliseum.  In addition, it shall be a condition of any agreement for the use of the New Seattle Center Coliseum by any person other than SSI, that in the event that such user desires to broadcast part or all of such use on radio that

28

G-58

such user provide a right of first refusal to KJR-AM to broadcast such event upon such terms and conditions as the user and KJR-AM may establish.

## XIII. HOME GAME PRESERVATION, TRANSMISSION AND REPRODUCTION RIGHTS

SSI hereby reserves and retains, for itself, the exclusive use and control of all rights to all Home Games or off-season games played in the New Seattle Center Coliseum including exclusive rights to preserve, transmit, or reproduce for hearing or viewing such games by whatever means or processes now exist or may hereafter be developed for such preservation, transmission, or reproduction including but not limited to radio and television broadcasting, motion picture and still photography, video taping and closed circuit pay per view and all forms of cablecasting or electronic transmission without any limitation.

## XIV. TICKET ADMINISTRATION

A.   **SSI Responsibilities:**   SSI shall have the exclusive responsibility for and control of the administration of all sales of tickets to Home Games except as otherwise provided in the Luxury Suite and Club Seat Marketing Agreement, including but not limited to the printing and distribution of tickets, the undertaking and conducting of group, season, and special package sales; the establishment of any and all prices for basic admission to SSI events and activities in the New Seattle Center Coliseum and any service charge(s) thereon (but not the establishment by any unit of government of any tax on any such admission or service charges); collection and counting of receipts; and accounting. As part of

29

4-59

this responsibility, SSI shall assume all costs of such administration.

B.   Complimentary Tickets.   SSI shall be authorized to determine in its sole discretion the number and recipients of complimentary admission tickets and credentials issued for admission to Home Games.

XIV.  LIABILITY FOR BODILY INJURY AND PROPERTY DAMAGE: INSURANCE

A.  'Liability Insurance.   SSI shall maintain at all times during the use period specified in Section II, hereof, at no cost or expense to the City, one or more policies of ~~general~~ ~~comprehensive~~ commercial general liability insurance as required below:

1.   Liability Limits:   The limitations of liability shall not be less than Five Million Dollars ($5,000,000.00) Combined Single Limits (bodily injury and property damage) with a deductible or self-insurance retention of no more than Two Thousand Five Hundred Dollars ($2,500.00) for property damage, only.

2.   Coverage:   Coverage shall be provided for all risk liability for any injury, death, damage and/or loss of any sort sustained by any person, organization or corporation (including SSI, its officers, employees and agents) in connection with or arising out of any act or omission of SSI, its officers, employees, agents, or assigns and SSI jointly upon the Premises and for any activity performed by SSI under this Agreement and shall include, but need not be limited to the following types (described in insurance industry terminology):

30

4-60

a. Premises operations liability (O, L & T or M & C);

b. Blanket contractual liability;

c. Broad form property damage;

d. Independent contractor (O & CP);

e. Automobile liability for owned, leased, hired or non-owned vehicles;

f. Products and/or completed operations;

g. Personal injury, including coverages A, B, and C with no employee exclusion;

h. Fire legal liability;

i. Employees as additional insured; and

j. Copyright/Trademark/Tradename infringement.

All such insurance shall be primary to any other insurance that may be valid and collectable. SSI is not required to provide insurance coverage against the City's sole negligence.

3.   Authorized Carriers:   The insurance described herein shall be obtained from insurance companies duly authorized to issue such policies in the State of Washington, and having a financial condition of "XI" or the equivalent as rated from time to time by Best's Rating Guide or any successor substitute rating service accepted by SSI and the City.

4.   Naming of City as Additional Insured:   The City shall be named as an additional insured in such policy(ies) or an endorsement thereto, to the extent provided in Subsection XIII.A.2., above, in the following manner:

31

4-61

The City of Seattle is an additional insured for all coverages provided by this policy of insurance and shall be fully and completely protected by this policy for any claim, suit, injury, death, damage or loss of any sort sustained by any person, organization or corporation in connection with activity upon or use or occupancy of the New Seattle Center Coliseum, and certain automobile parking areas at Seattle Center, as well as any activity performed by the principal or an affiliate of the principal insured under an Agreement with the City regarding use and occupancy of the New Seattle Center Coliseum and certain automobile parking areas at Seattle Center.

The coverages provided by this policy to the City or any other named insured shall not be terminated, reduced or otherwise changed in any respect without providing at least thirty (30) days prior written notice to the City of Seattle, c/o Seattle Center Facility Sales Office, 305 Harrison Street, Seattle, Washington 98109.

B.    Evidence of Insurance:  SSI shall deliver to the City's Risk Manager, a copy of all policies required hereunder, and all endorsements thereto or other evidence to the reasonable satisfaction of the City Risk Manager or his successor, that SSI has secured or renewed and is maintaining insurance as required by this Agreement, as follows:

1.    On or before the effective date of this Agreement; and

2.    Within five (5) City business days prior to the expiration or renewal date of each such policy; and

3.    Within five (5) City business days after SSI's receipt of a written request therefor.

The "ACCORD" form of Certificate of Insurance shall not be submitted as such evidence and shall not be deemed to be satisfactory evidence unless the following changes are made on such form:

32

The wording at the top of the form: "This certificate is issued as a matter of information only and confers no rights upon the certificate holder." - shall be deleted in its entirety.

The wording at the bottom of form: "Should any of the above described policies be cancelled before the expiration date thereof, the issuing company will endeavor to mail thirty (30) days written notice to the below named certificates holder, but failure to mail such notice shall impose no obligation of any kind upon the company." - shall be changed to read - "Should any of the above described policies be cancelled, reduced as to coverage, or otherwise changed before the expiration date thereof, the issuing company shall provide written notice of such action to the below named certificate holder/City of Seattle at least thirty days prior to the effective date of such change or cancellation."

C.   Assumption of Risk:  The placement and storage by SSI of personal property on the Premises shall be the responsibility, and at the sole risk, of SSI.

D.   Adjustments of Claims:  SSI shall provide for the prompt and efficient handling of all claims for bodily injury, property damage or theft arising out of the activities of SSI under this Agreement.   SSI shall ensure that all such claims, whether processed by SSI or SSI's insurer, either directly or by means of an agent, will be handled by a person with a permanent office in the Seattle area.

E.   No Entry onto Premises upon Failure to Insure:  The Seattle Center Director shall notify SSI whenever the Seattle Center Director has a reasonable belief that SSI has failed to secure or maintain insurance as required by this Agreement. Notwithstanding any other provision of this Agreement, after its receipt of any such notice, SSI shall not enter upon the Premises

33

4-63

until SSI has secured and is maintaining insurance as required by this Agreement.

F.    **Mutual Release and Waiver:**   For and in consideration of the execution of this Agreement, the City and SSI each hereby releases and relieves the other, and waives its entire claim of recovery from the other for loss or damage to owned or rented property arising out of or incident to fire, lightning and the perils covered under any extended coverage insurance policy or endorsement approved for use in the State of Washington, whether such loss or damage is due to negligence of either party or any agent or employee of either or any other person, unless an insurance policy secured by either party hereto pursuant to this Agreement or otherwise would become void upon the making of such release and waiver.

**IV.**   **COMPLIANCE WITH LAW**

SSI and the City each, at its sole cost and expense, shall conform and comply with all applicable laws of the United States and the State of Washington, the Charter and ordinances of The City of Seattle, rules and regulations of the Seattle Center, Fire, Health, and Police Departments and licenses, permits and any directives issued by any authorized official thereof with respect to their respective responsibilities under this Agreement.  In this connection,

A.    **Licenses:**   SSI shall obtain all licenses, permits and authorizations required by law and conform with all applicable

34

a-64

requirements of any authorized person acting in connection therewith.

B.  Nondiscrimination in Employment.  SSI agrees to and shall comply with all State and local laws and ordinances prohibiting discrimination with regard to race, color, national origin, ancestry, creed, religion, political ideology, age, sex, sexual orientation, marital status, or the presence of any sensory, mental or physical handicap.

Consistent with that obligation, SSI agrees as follows:

During the performance of the Agreement, SSI agrees as follows:

SSI will not discriminate against any employee or applicant for employment because of creed, religion, race, color, sex, marital status, sexual orientation, political ideology, ancestry, national origin, or the presence of any sensory, mental or physical handicap, unless based upon a bona fide occupation qualification. SSI will take affirmative action to ensure that applicants are employed, and that employees are treated during employment without regard to their creed, religion, race, color, sex, national origin, or the presence of any sensory, mental or physical handicap. Such action shall include, but not be limited to the following: employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship.

SSI agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided by the City setting forth the provision of this nondiscrimination clause. SSI will take affirmative action to ensure that all of its employees, agents and subcontractors adhere to this provision; Provided, nothing herein shall prevent an employer from giving preference in employment to a member of his/her immediate family.

The SSI will, upon the request of the Director (as used herein the Director means the Director of the City's Human Rights Department, or his/her designee) furnish to the Director on such form as may be provided therefor, a report of the affirmative action taken by the SSI in implementing the terms of this provision, and will permit

35

access to the SSI's records of employment, employment advertisements, application forms, other pertinent data and records by the Director for the purpose of investigation to determine compliance with this provision.

If, upon investigation, the Director determines that there is probable cause to believe that the SSC has failed to comply with any of the terms of this provision, the SSI shall be so notified in writing. The Seattle Center Director shall give the SSI an opportunity to be heard after ten (10) days notice. If the Seattle Center Director concurs in the findings of the HRD Director, the Seattle Center Director may suspend or terminate this Agreement or withhold any funds due or to become due to SSI pending compliance by SSI with the terms of these provisions.

Failure to comply with any of the terms of this provision shall be a material breach of this Agreement.

C. **Women's and Minority Business Enterprise Utilization:**

1. The provisions of Seattle Municipal Code Ch. 20.46, (Women's and Minority Business Enterprise Utilization Ordinance), as amended, are hereby incorporated by reference and made a part hereof as if fully set forth herein.

2. During the use period provided in Section II, hereof, SSI shall:

a. Make every ~~good faith~~ effort to utilize minority business enterprises and women's business enterprises as subcontractors, if subcontractors are to be used;

b. Maintain records reasonably necessary for monitoring compliance with the provisions of Seattle Municipal Code Ch. 20.46.

D. **Attendance and Safety Standards:** The Seattle Fire Chief or his/her designee shall have the authority to determine, in the

36

insert regmt f hade its subkors use WMBEs
" achnowledgmt that failure 2 comply = natural breach \K.

reasonable exercise of his/her discretion, the number of persons that may be admitted to, and safely and freely move about in, the New Seattle Center Coliseum; provided however that the City warrants that the Coliseum shall be designed and constructed and shall be maintained and modified as may be necessary to insure that no less than 17,500 persons are able to attend every Home Game during the Term of this Agreement. SSI shall not sell or issue Home Game tickets or credentials for admission to the New Seattle Center Coliseum in an aggregate number that exceeds the Seattle Fire Chief's determined number. The City shall not admit to the New Seattle Center Coliseum more people than the number so determined by the Seattle Fire Chief. SSI shall not permit any chair or movable seat or other obstruction to be erected or placed in any New Seattle Center Coliseum passageway or fire exit. Sidewalks, grounds, entries, passages, vestibules, halls, elevators, abutting streets and all ways of access to the New Seattle Center Coliseum shall not be obstructed by SSI or used for any purpose other than for ingress and egress to the New Seattle Center Coliseum.

XVI. CITY'S ACCESS TO PREMISES: INSPECTION, REPAIR, AND IMPROVEMENT OF PREMISES AND OTHER PROPERTY

A.    Access to Premises:  SSI and the City shall provide each other with access to the Premises at all reasonable times to inspect the same and to make any repair, improvement, alteration or addition thereto or any property owned by or under the other party's control as provided in this Agreement.

37

14-67

SEP 05 '92  03:01PM RUBIN,WINSTON,DIERCKS,HARRIS&CO

B.    Permitted Interference With SSI's Operations:    In
inspecting, and in making repairs, alterations, additions, and
improvements, either party may erect barricades and scaffolding in
and outside of the Premises, and may otherwise interfere in minor
and nonmaterial respects with the conduct of the other party's
business and operations, other than the viewing or conduct of
professional basketball games on a Day of Game, where such action
is reasonably required by the nature of the work; and such
interference shall not be deemed to be a breach or default under
this Agreement.  The City shall use its best efforts to minimize
interference with access to and from the Premises and with SSI
business and operations in, on, or from the Premises.

C.    Retention and Use of Keys to Premises:    Each party shall
deliver to the other such keys as are necessary to enable the other
party at any time, to unlock each of the doors in, upon, and about
the Premises, excluding vaults, safes, and files.  In addition,
City shall have the right to use any and all means that the Seattle
Center Director deems proper to obtain entry to the Premises in an
emergency without liability to SSI except for any failure to
exercise due care for SSI's property.  Any entry to the Premises
obtained by either party by reasonable means shall not be construed
or be deemed, under any circumstances, to be a forcible or unlawful
entry into, or a detainer of, the Premises or a termination of
SSI's license to use and occupy the Premises or any portion
thereof.

38

1-68

D.    _City Solely Responsible for Maintenance_:  Notwithstanding anything herein to the contrary, the City hereby _warrants_ the maintenance in good condition, the safe operation and the structural integrity of the New Seattle Center Coliseum and all fixtures, components and systems and the full use and employment of the Coliseum by SSI pursuant to this Agreement.

XVII.        NO NUISANCES OR OBJECTIONABLE ACTIVITY

The City shall not permit any objectionable noise, odor, dust, vibration, or other similar substance or condition to remain on or be emitted from the Premises; shall not create any nuisance in or adjacent to the Premises; and shall not do anything on the Premises that will create a danger to life or limb.

XVIII.      SUBCONTRACTING AND TRANSFER OF OWNERSHIP

A.    SSI shall not subcontract to another person or entity any of its responsibilities or obligation under this Agreement without the prior Approval of the Seattle Center Director provided however that provisions of this subsection A shall be inapplicable and without effect with respect to the assignment or other transfer of this Agreement as part of the sale or other transfer of any ownership interest in whole or in part in SSI or interest in the Seattle SuperSonics NBA Franchise.  No subcontract under this Agreement shall release or relieve SSI of or from any of the obligations on  SSI's part to be kept and performed under this Agreement.  Any such subcontract shall be subject to all the terms and provisions of this Agreement.

39

4-69

B.    In the event of the sale, assignment or other transfer of any ownership interest in the SuperSonics or in SSI, or both, SSI shall cause to be delivered to the Seattle Center Director, immediately after such assignment, sale, or transfer, an instrument, in writing, executed by the assignee, grantee, purchaser or transferee, in which such person shall assume and agree to perform all of the terms and provisions of this Agreement. There shall be no other restraints on the assignment, grant, purchase, sale or other transfer by SSI of any ownership interest in the SuperSonics or in SSI. Upon the delivery of such instrument of assumption and agreement by such assignee, grantee, purchaser or transferee, each and every obligation of SSI hereunder shall become null and void, and this Agreement shall be terminated and SSI shall have no further direct or indirect liability or obligation hereunder, notwithstanding any other provision of this Agreement.

XIX. RELATIONSHIP WITH NBA

A.    Warranty and Special Covenant:  SSI hereby warrants to, and specially covenants and agrees with, the City as follows:

1.    SSI is the owner and holder of a valid effective NBA franchise that permits and authorizes the SSI to operate a professional basketball team in the New Seattle Center Coliseum; and

2.    No rule, regulation, policy, Constitution or Bylaw (or any provision of any thereof) of the NBA prohibits, limits or

40

affects in any manner or respect the right or power of SSI to enter into, accept, or perform each and every one of the terms, commitments and provisions of this Agreement; and

3.    This    Agreement    has    been    approved    by    the Commissioner.

B.    SSI Subject to NBA Rules and Regulations.    The activities of SSI in owning and playing a professional basketball team in the NBA and in matters related to such activities and the obligations of the Seattle NBA team under this Agreement are subject to the Constitution, Bylaws, and Rules and Regulations of the NBA; provided, however, that nothing in such Constitution, Bylaws, Rules and Regulations shall relieve SSI of its obligation to pay rent in accordance with this Agreement except in the instance of a strike or work slowdown directed against the NBA or SSI by professional basketball players employed by SSI, or a lockout of such players by SSI or the NBA.

XX.    EFFECT OF APPROVAL OF CONSTRUCTION, IMPROVEMENTS, ADDITIONS, AND ALTERATIONS

A.    Prior Approval of Plans and Specifications Required:    The SSI shall submit to the Seattle Center Director, for Approval, schematic designs, design development drawings, and final working drawings and specifications for any construction ~~of~~ in or on the Premises to convert the Premises to the condition desired by ~~the~~ SSI for the operation of its business ~~required of SSI by this Agreement~~.    SSI shall not begin any construction of any such improvement, addition, or alteration on the Premises until after the Seattle Center

41

c — 71

Director has approved the same, such approval not to be unreasonably withheld.

B. No Representation or Liability Created by Approval: The Approval of such plans and specifications by the Seattle Center Director shall not constitute an opinion or representation by the City as to their compliance with any law or ordinance or their adequacy for other than the Seattle Center Department's purposes; and such Approval shall not create or form the basis of any liability on the part of the City or any of its officers, employees, or agents for any injury or damage resulting from any inadequacy or error therein or any failure √applicable laws or ordinances. _to comply with_

C. Work Inconsistent with Approved Plans and Specifications: No improvement, alteration, or addition shall be constructed, placed, or erected on the Premises except in accordance with plans and specifications therefor ~~said~~ to which the Seattle Center Director has given Approval. Immediately following SSI's receipt of notice by the City of any variation between the approved plans and specifications and any improvement, addition, or alteration in, on, or being made to the Premises, SSI shall either desist from occupation, use, and operation of such improvement, addition, or alteration and remove it from the Premises or made it consistent with such approved plans and specifications or submit the matter within ten days to arbitration pursuant to the provisions of Article XXIV to determine whether the variation was materially different than what was approved.

_new of_

42

4-72

D.  Extra Charges:  In the event an improvement, addition, or alteration made or desired to be made by the SSI requires or would require any change in any facility, utility or service provided by the City, SSI shall pay, as an additional charge, any costs incurred by the City in making such change or otherwise in connection therewith.

E.  Improvements, Additions, and Alterations, Become City Property:  All improvements, additions, and alterations made to the Premises, shall become the property of the City upon the expiration of the Term, and shall remain in, and be surrendered with the Premises, as a part thereof at that time without molestation, disturbance, or injury.  Trade fixtures and equipment of SSI including signs installed by or for SSI shall remain the property of SSI and may be removed by SSI upon the expiration of the Term.

*shall ?*

XXI.  DAMAGE AND DESTRUCTION

A.  Notice:  SSI shall submit a written notice to the Seattle Center Director regarding the circumstances of any Premises damage or destruction, within forty-eight (48) hours after SSI's discovery of any such event.

B.  Suspension of Obligation to Pay Fees and Charges in Event of Nonusability of Premises:  In the event that fire or other casualty destroys or damages the New Seattle Center Coliseum so extensively as to render the New Seattle Center Coliseum substantially unusable for the exhibition or viewing of professional basketball, SSI shall have the option in its sole discretion, (1) to terminate this Agreement without further

43

obligation, or in the alternative, (2) to elect to suspend its
obligations under this Agreement upon the City's agreement to
reconstruct or fully repair New Seattle Center Coliseum within a
period not to exceed eighteen months.  In the event that only a
portion of the New Seattle Center Coliseum is destroyed or damaged,
but not to an extent that would in any manner limit or prevent
playing and viewing of basketball than any amounts payable to the
City by SSI pursuant to Section VII hereof, shall be prorated, and
SSI shall pay only an amount that is proportionate to the area that
remains in use by SSI less the amount of damages that SSI has
sustained from the loss of full use of the Coliseum.

C.   <u>Notice</u> <u>of</u> <u>Termination</u>:   Any notice of termination
pursuant to this section shall be provided within one hundred
twenty (120) days after the occurrence of the damage or destruction
and shall specify the effective date of such termination.

D.   <u>No</u> <u>Liability</u> <u>for</u> <u>Termination</u>:  The termination of this
Agreement by either party as provided in this section shall not
create any liability for the benefit of the other party.

E.   <u>SSI</u> <u>Damage</u> <u>of</u> <u>Premises</u>:  SSI shall not damage or in any
manner deface the New Seattle Center Coliseum and shall not cause
anything to be done whereby such New Seattle Center Coliseum shall
be in any manner defaced or damaged, normal wear and tear excepted.

XXII.     <u>SUSPENSION OF OBLIGATIONS (FORCE MAJEURE)</u>

Whenever a party's performance of any obligation under this
Agreement except those obligations set forth in Section III is
prevented, by an act of nature; war or war-like operation; labor

44

dispute including a strike, lock-out, or walk-out including such labor dispute between SSI or the NBA and players employed by the NBA; sabotage, performance of such affected obligation shall be suspended, but only for so long as such performance remains beyond the reasonable control of such party.

XXIII.    NOTICES

Any notice or communication to be given by one party to the other under this Agreement must be in writing; and if given by registered or certified mail, such notice or communication shall be deemed to have been given and received when a registered or certified letter containing such notice or communication, properly addressed, with postage prepaid, is deposited in the United States mail, but if given otherwise than by registered or certified mail, it shall be deemed to have been given when received by the party to whom it is addressed.   Such notices or communications shall be delivered or sent to the following respective addresses or to such other addresses as the parties, from time to time, may specify in writing:

If to the City:

Seattle Center Director
Seattle Center Department
The City of Seattle
305 Harrison Street
Seattle, WA  98109

If to SSI:

SSI Sports, Inc.
Attn:  President
190 Queen Anne Avenue, North
2nd Floor
Seattle, WA 98109

45

4-75

XXIV.    ARBITRATION.

a.    All claims, disputes and other matters in question between the parties arising out of, or relating to provisions of this Agreement requiring their submission to arbitration shall be decided by arbitration in accordance with the Rules of the American Arbitration Association then in effect unless the parties mutually agree otherwise.    Each party shall designate one arbitrator, who together shall designate a third arbitrator.    The written decision of a majority of the arbitrators shall be final and binding on all parties to the arbitration proceeding.    The costs and expenses (including reasonable attorneys' fees) of the arbitration proceeding shall be assessed in favor of the prevailing party by the arbitrators, and the assessment shall be set forth in the decision and award of the arbitrators.

B.    No arbitration arising out of or relating to this Agreement shall include, by consolidation, joinder or in any other manner any parties other than the parties to this Agreement and any other persons substantially involved in a common question of fact or law, whose presence is required if complete relief is to be accorded in the arbitration. No parties other than the parties to this Agreement shall be included as an original third party or additional third party to an arbitration whose interest or responsibility is insubstantial.    Any consent to arbitration involving an additional person or persons shall not constitute consent to arbitration of any dispute not described therein.    The foregoing agreement to arbitrate and any other agreement to

46

arbitrate with any additional party duly consented to by the parties hereto shall be specifically enforceable under prevailing arbitration law.

C.    Notice of the demand for arbitration shall be filed in writing with the other party and with the American Arbitration Association.   The demand for arbitration shall be made within a reasonable time after the claim, dispute or other matter in question has arisen, and in no event shall it be made after the date when institution of legal or equitable proceedings based on such claim, dispute or other matter in question would be barred by the applicable statute of limitations.

D.    No proceedings based upon any claim arising out of or related to this Agreement shall be instituted in any court by any party hereto against any other party hereto except (i) an action to compel arbitration pursuant to this Section, (ii) an action to enforce the award of the arbitration panel rendered in accordance with this Section, (iii) to file arbitration award as a judgment, and (iv) proceedings brought by SSI for injunctive relief or any other interim remedy to protect SSI's rights under this Agreement.

## XXV. DEFAULT AND REMEDIES THEREFOR

A.    **Act of Default and Breach by the Parties**:  In addition to the acts and omission described this Agreement, the following acts and omissions shall constitute a default and material breach of this Agreement:

1.    The failure of SSI to comply with all of the requirements of Section XXIV hereof, regarding insurance; or

47

2. The abandonment or vacating of the Premises by SSI; or

3. The failure of SSI without cause to pay to the City, in a timely manner, the amounts due under Section VIII, hereof; or

4. The failure of the City to maintain the Premises in good, safe and efficient operating condition including the prompt completion of all maintenance replacement on renovation as required by this Agreement.

5. The failure by either party to perform or the violation of any other condition, warrant covenant or provision of this Agreement where such default or deficiency in performance was not remedied within a reasonable time.

B. Notice to Cure: In the event either party fails to perform any obligation under, or violates any provision of this Agreement, the other party shall notify such party of such failure or violations and, except where impracticable, shall provide the other with a reasonable period to correct, remedy or cease such failure or violations, which period shall not exceed ninety (90) days after the date of such notice. Nothing herein shall enable SSI to avoid liability for interest on any delinquent payments due to the City.

C. Rights Upon Default and Breach:

1. In the event SSI fails to correct, remedy, or cease such failure or violation within the time specified in the City's notice, the City may thereafter terminate this Agreement without any further proceedings, re-enter the Premises, lease and license

48

4-78

*clause or continuation of SSI's obligation to pay rent for unexpired term.*

others to use said Premises and receive rent and license fees therefor as if this Agreement had not been made, and SSI shall be entitled to any offset against any portion of the base rent payable pursuant to Subsection VI.A.1, hereof, as a consequence of such subsequent lease or license.

    2.   In the event the City fails to correct, remedy, or cease such failure or violation, within the time specified in SSI's notice, then in addition to any other remedies available to SSI which shall include without limitation injunctive relief, damages, and the withholding of rent, SSI may terminate this Agreement upon no more than 6 month's notice, whereupon all of SSI's obligations including the obligation to pay rent, shall terminate.

    D.   __Termination by Court Decree__:  In the event that any court having jurisdiction renders a decision that has become final and that prevents the performance by the City of any of its obligations under this Agreement, either party may terminate this Agreement, without recourse, by providing written notice of termination to the other party, specifying the effective date thereof, as of which date all rights and obligations that accrued prior to the effective date of termination shall terminate.

__XXVI.__    __SURRENDER OF PREMISES; HOLDING OVER__

    A.   __Surrender and Delivery__:    Upon the expiration or termination of the use period specified in Section II, hereof, whichever is earlier, SSI shall surrender the Premises and promptly deliver to the Seattle Center Director all keys SSI, its officers,

'4-79

agents, and employees may  have to the Seattle Center and the Premises.

B.    Removal of SSI's Property:  Prior to the expiration of the use period specified in Section II, hereof, or in the event this Agreement is terminated, within fifteen (15) days after the termination date, whichever is earlier, the SSI shall remove, at its sole expense, all fixtures, furnishings, trade equipment, and personal property owned or installed by SSI in, on, or from the Premises, taking due care to not unreasonably injure or damage the Premises, and shall make such repairs to the Premises as shall be necessary to restore the same to their condition as of the commencement date of the use period specified in Section II, hereof, ordinary wear and tear and improvements, additions, and alterations approved by the City excepted.    Improvements, additions, and alterations installed on the Premises by SSI or the City shall not be removed.

C.    Storage of SSI's Property:  In the event SSI fails to remove all fixtures, furnishings, trade equipment, and other personal property owned by SSI on or by the time specified in Subsection XXV, hereof, the City may, but shall not be required to, remove such material from the Premises and store the same, all at SSI's expense; and in the event the City removes or arranges the City for all costs incurred in connection with such removal or storage, including any administrative costs which reimbursement shall be paid as provided in Subsection VIII.B.2, hereof.

*I.B* [handwritten annotation above "XXV"]

50

*no there is provided for such reimbursement, nor is there any such provision in VIII re SSI payments (See pp 16-18)* [handwritten annotation]

4-80

D.    Hold-over Use and Occupancy of Premises:  In the event SSI, with the consent of the City, holds over after the expiration or termination of the use period specified in Section II, hereof, whichever is earlier, the resulting rent shall be on a weekly basis, during which time SSI shall be bound by all of the provisions of this Agreement.

E.    No Claims for Removal:  In no event shall SSI make any claim or demand upon the City nor shall the City be liable for any inconvenience, annoyance, disturbance, or loss of business or any other damages suffered by SSI arising out of such removal operations under Subsections XXVV.B and C., hereof.

XXVII.    MISCELLANEOUS PROVISIONS

A.    Use of Language:  Words used in the neuter gender include the masculine and feminine; and words used in the singular or plural includes the other as the context may require.

B.    Captions:  The titles of sections are for convenience only and do not define or limit the contents.

C.    Amendments:  No modification or amendment of the provisions of this Agreement shall be effective unless written and signed by the authorized representatives of the parties hereto. The parties hereto expressly reserve the right to modify this Agreement from time to time by mutual agreement.

D.    Time of Essence:  Time is of the essence in this Agreement.

E.    Remedies Cumulative:  Rights under this Agreement are cumulative; failure to exercise on any occasion any right shall not

51

4 - 81

SEP 28 '93  05:05PM RUBIN, WINSTON, DIERCKS, HARRISON

operate to forfeit such right on another occasion.  Each party
shall also have any other remedy given by the law.  The use of one
remedy shall not be taken to exclude or waive the right to use
another.

F.    No waiver:  No action other than a written notice by one
party to the other specifically stating that such notice has the
effect of waiver, shall constitute a waiver of any particular
breach or default of such other party.  No such notice shall waive
SSI's failure to fully comply with any other term, condition, or
provision of this Agreement, irrespective of any knowledge any City
officer, employee, or agent may have of any breach or default of,
or noncompliance with, such other term, condition, or provision.
No waiver of full performance by either party shall be construed,
or operate, as a waiver of any subsequent default of any of the
terms, covenants and conditions of this Agreement.  The payment or
acceptance of rent for any period after a default shall not be
deemed a waiver of any right or acceptance of defective
performance.

G.    Limited Effect of Approval by Seattle Center Director:
Action of the Seattle Center Director pursuant to or in
implementation of this Agreement does not constitute any official
action by any other City Department or official that may be
required by law, City Charter, ordinance, rule or regulation before
SSI may rightfully commence, suspend, enlarge, or terminate any
particular undertaking or may obtain or exercise any particular
right or privilege under this Agreement.

4-82

H.  No Relationship:  In no event shall the City be construed to be a partner, associate, or joint venturer of SSI, or any party associated with SSI.  The SSI is not an agent of the City for any purpose whatsoever.  The SSI shall not create any obligation or responsibility on behalf of the City or bind the City in any manner.

I.  Powers of the City:  Nothing contained in this Agreement shall be considered to diminish the governmental or police powers of the City.

J.  Binding Effect:  The provisions, covenants and conditions in this Agreement apply to bind the parties, their legal heirs, representatives, successors, and assigns.

K.  Enforcement of this Agreement:  The obligations of the parties to this Agreement are unique in nature; this Agreement may be specifically enforced by either party.

L.  Invalidity of Particular Provisions:  Should any term, provision, condition or other portion of this Agreement or the application thereof be held to be inoperative, invalid or unenforceable, the remainder of this Agreement or the application of such term or provision to persons or circumstances other than those to which it is held invalid or unenforceable shall not be affected thereby and shall continue in full force and effect.

M.  Costs of Suit and Attorneys' Fees:  If either party shall commence suit to enforce any terms or condition or covenant herein, or in any other action for relief against the other, declaratory or otherwise, arising out of this Agreement, the nonprevailing party

4-83

in such action shall pay the prevailing party, in addition to any judgment, a reasonable sum as attorneys' fees together with costs of suit at both trial and appellate levels. ~~If the City prevails, its attorneys' fees shall be computed on the basis of a private attorney with comparable years of experience.~~

N.  **Applicable Law; Venue:** This Agreement shall be construed under the Law of the State of Washington. Venue for any action brought hereunder shall be in King County, Washington.

O.  **Previous Agreements Superseded:** The terms and conditions of this Agreement supersede the terms, obligations and conditions of any existing or prior agreement or understanding, written or oral, between the parties regarding the Premises.

P.  **Incorporation of Exhibits; Entire Agreement:** This Agreement, including any exhibits attached hereto and forming a part hereof, which by this reference are incorporated herein, are all of the covenants, promises, agreements, and conditions, either oral or written between the parties.

54

4-84

SEP 28 '93   03:06PM RUBIN,WINSTON,DIERCKS,PARRISGUGG

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by having their authorized representatives affix their signatures in the space below:

THE CITY OF SEATTLE

By: _____

Seattle Center Director (as authorized by the Mayor and the City Council)

STATE OF WASHINGTON    )
                       : SS.
COUNTY OF KING         )

On this ____ day of _____, 1993 before me, the undersigned, a Notary Public in and for the State of Washington, duly commissioned and sworn, personally appeared ____ _____, to me known to be the Seattle Center Director, who executed the foregoing instrument, and acknowledge the said instrument to be the free and voluntary act and deed of the City of Seattle, for the uses and purposes herein mentioned, and on oath stated that (he) is authorized to execute the said instrument.

WITNESS my hand and official seal hereto affixed the day and year in this certificate above written.

_____
NOTARY PUBLIC in and for the State of Washington, residing at _____.
*[signature]*

my *appt expire*
55

4-85

SSI SPORTS, INC.

By: _____

President


STATE OF WASHINGTON )
                     : ss.
COUNTY OF KING       )


On this _____ day of _____, 1993, before me personally appeared _____, to me known to be the President of SSI Sports, Inc., the corporation that executed the foregoing instrument, and acknowledged said instrument to be the free and voluntary act and deed of said corporation, for the uses and purposes therein mentioned, and further that said _____ _____ has the authority to sign on behalf of said corporation.

WITNESS my hand and official seal hereto affixed the day and year in this certificate above written.


                                    _____
                                    NOTARY PUBLIC in and for the State
                                    of Washington, residing at _____

                                    _____

                                    _____

56