

07-CV-01620-EXH   D

# TAB D

**RECEIVED**

2007 OCT -2 A 11: 33

BYRNES & KELLER LLP

Honorable Harry McCarthy
Hearing Date: October 10, 2007
Oral Argument Requested

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
FOR KING COUNTY

| | |
|---|---|
| CITY OF SEATTLE, a first-class charter city,<br><br>Plaintiff,<br><br>vs.<br><br>THE PROFESSIONAL BASKETBALL CLUB, LLC, an Oklahoma limited liability company,<br><br>Defendant. | No.   07-2-30997-7 SEA<br><br>CITY OF SEATTLE'S CROSS-MOTION FOR STAY OF ARBITRATION AND OPPOSITION TO THE PROFESSIONAL BASKETBALL CLUB'S MOTION TO STAY |

## I. INTRODUCTION AND RELIEF REQUESTED

In 1994, the City of Seattle (the "City) entered into a Premises Use and Occupancy Agreement (the "Lease") with the owners of the Seattle SuperSonics (the "Sonics")[1] wherein, inter alia, the City promised to re-construct the Seattle Center Coliseum into a new state of the art basketball arena at City expense and to provide the Sonics equal rights with respect to the

---

[1] The defendant and current owner of the Sonics has contractually agreed to assume, and satisfy or perform, all the responsibilities of the Sonics' ownership established by the Lease. Declaration of Gregory C. Narver ("Narver Decl."), ¶¶ 2, 4, Exs. A (Article XIX(B)(1)) & C. As an assignee to the contract, The Professional Basketball Club, LLC ("PBC") stands in the shoes of SSI. *Int'l Commercial Collectors, Inc. v. Mazel Co., Inc.*, 48 Wn. App. 712, 716-17 (1987).

CITY OF SEATTLE'S CROSS-MOTION FOR STAY OF ARBITRATION
AND OPPOSITION TO PBC'S MOTION TO STAY - 1

K:\2065932\00001\20880_MDJ\20880P20BY



Thomas A. Carr
Seattle City Attorney
600 Fourth Avenue, 4th Floor
P.O. Box 94769
Seattle, WA 98124-4769
(206) 684-8200

new arena's design. The City ultimately spent more than $74 million constructing what we now know as KeyArena. The City made this substantial investment "to maintain the SuperSonics NBA franchise in Seattle." Lease, p. 1. In exchange, the City obtained a correspondingly significant promise from the Sonics: they would play all home basketball games in KeyArena for the next 15 years. This promise was memorialized in Article II of the Lease. To protect this core promise, the City and the Sonics agreed to exclude from arbitration any dispute that "relates to" the Sonics' promise to play all home games in KeyArena.

Despite the express terms of the Lease, Defendant The Professional Basketball Club LLC ("PBC"), which bought the Sonics in July 2006, filed an arbitration demand to determine "whether it makes equitable sense to force the Sonics to play the final two seasons [of the Lease term] in KeyArena." Arbitration Demand, ¶2. Specifically, the Arbitration Demand seeks a "declaratory judgment that . . . specific performance is not available to force the Sonics to play the 2008-2009 and 2009-2010 NBA seasons in KeyArena." *Id.*, ¶38. The sole purpose of the Sonics' Arbitration Demand is to avoid their express contractual duty under Article II to play all home games in KeyArena through the 2009-2010 NBA season.

In response to the Arbitration Demand, the City filed this lawsuit, in which it seeks a declaratory judgment that PBC is required to comply with the requirements of Article II. The City is asking this Court to declare that PBC must do what Article II requires it to do. In its cross-motion here, the City asks that this Court enforce the parties' express agreement that disputes related to Article II be decided by this court.

CITY OF SEATTLE'S CROSS-MOTION FOR STAY OF ARBITRATION
AND OPPOSITION TO PBC'S MOTION TO STAY - 2

K:\2065932\00001\70810_MDJ\20880P20HY

Thomas A. Carr
Seattle City Attorney
600 Fourth Avenue, 4th Floor
P.O. Box 94769
Seattle, WA 98124-4769
(206) 684-8200

## II. STATEMENT OF FACTS

A. **The City of Seattle Made a Substantial Financial Investment to Re-Construct the Seattle Center Coliseum in Exchange for the Promise that the Sonics Would Play in the Re-Constructed Arena Through the 2009-2010 NBA Season.**

In 1994, the City of Seattle and PBC's predecessor-in-interest, SSI, Sports, Inc. ("SSI"), entered into the Lease. Declaration of Gregory C. Narver ("Narver Decl."), ¶ 2, Ex. A (hereinafter "Lease"). In the Lease, the City agreed to re-construct the Seattle Coliseum into a new Seattle Center basketball arena – construction that ultimately cost $74 million. Lease, Recitals, at 1; Narver Decl., ¶¶ 2-3, Exs. A & B. Moreover, the City agreed to give SSI rights over the design and construction of the new arena that were virtually equal to the City's. In exchange, SSI promised that the Sonics would play in the new arena (now known as KeyArena) until September 2010 (i.e., through the 2009-2010 NBA Season). The text of the Lease reflects the parties' mutual understanding that the City's long-term investment in constructing KeyArena to SSI's specifications was expressly conditioned on SSI's promise that the Sonics would play their home games in the new arena throughout the term of the Lease. Specifically, the Lease contains:

- An acknowledgement that the City could not construct a "new, state of the art professional basketball facility in order to enhance the City . . . without a long-term, principal user." Lease, Recitals, at 1.

- Agreement that the City was constructing a new Seattle City Coliseum:

  [I]n order to induce SSI to become the principal user of a new playing facility on a long-term basis in lieu of having the SuperSonics play in an alternative venue, and to maintain the SuperSonics NBA franchise in Seattle[.]

Lease, Recitals, at 1.

- Agreement that the purpose of entering into the Lease was to:

CITY OF SEATTLE'S CROSS-MOTION FOR STAY OF ARBITRATION AND OPPOSITION TO PBC'S MOTION TO STAY - 3

K:\2065932\00001\20880_MDJ\20880P20BY

Thomas A. Carr
Seattle City Attorney
600 Fourth Avenue, 4th Floor
P.O. Box 94769
Seattle, WA 98124-4769
(206) 684-8200

Specify[] the terms and conditions under which SSI will use a new Seattle Center Coliseum and certain other facilities at Seattle Center on a long-term basis for the playing of professional basketball by the SuperSonics.

Lease, Recitals, at 1.

Finally, the Lease expressly requires that the Sonics play all of their home games in KeyArena until the conclusion of the 2009-10 NBA season:

> . . . the Term of this Agreement shall end on September 30, 2010, unless terminated earlier pursuant to the provisions hereof.
>
> Subject to the provisions of this Agreement, **SSI shall schedule and ensure that the SuperSonics play all Home Games other than pre-season games exclusively in the Coliseum** . . . .

Lease, Article II ("Term; Use Period") (emphasis added).

### B. The Parties Agreed that Disputes Related to Article II Were Not Subject to Arbitration.

The City and the Sonics ultimately agreed to exclude disputes relating to Article II from arbitration. Specifically, the Lease Arbitration provision provides:

> Disputes To Be Resolved Through Arbitration: All claims, disputes and other matters in question between the parties arising out of, or relating to provisions of this agreement shall be decided by binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association then in effect unless the parties mutually agree otherwise or **unless the claim, dispute, or matter in question relates to the provisions of Article II ("Term; Use Period")**, Article III ("Termination of Current Agreement Providing Seattle Center Space for SuperSonics Home Games Use"), Article IV ("Coliseum Design and Construction"), Article V ("Coliseum Planning & Construction Schedule; SSI Opportunities to Void Agreement"), Subsection XVI.F ("Hazardous Substances") or Article XIX ("Subcontracting and Transfer of Ownership").

Lease, Article XXV(A) (emphasis added). As noted above, Article II requires SSI to "**schedule and ensure that the SuperSonics play all Home Games . . . exclusively in the Coliseum**" through the 2009-10 NBA season (emphasis added). Read together, therefore, Article XXV(A)

CITY OF SEATTLE'S CROSS-MOTION FOR STAY OF ARBITRATION
AND OPPOSITION TO PBC'S MOTION TO STAY - 4

Thomas A. Carr
Seattle City Attorney
600 Fourth Avenue, 4th Floor
P.O. Box 94769
Seattle, WA 98124-4769
(206) 684-8200

K:\2065932\00001\20880_MDJ\20880P20BY

and Article II establish that disputes over whether the Sonics must play the 2008-09 and 2009-10 seasons at KeyArena are not subject to arbitration.

Despite this unequivocal language regarding the scope of arbitrable issues, PBC relies on a different Lease provision, subsection D of the Lease's arbitration clause, to argue that an ambiguity exists. Any claimed ambiguity in the parties' intent to exclude Article II disputes from arbitration is dispelled by review of the drafting history of the Lease. That history is set forth in the accompanying Declaration of Gordon B. Davidson ("Davidson Decl.").

The initial draft of the Lease, prepared by SSI's attorney and faxed to Mr. Davidson on September 8, 1993, contained a broad arbitration provision with no enumerated exceptions. Davidson Decl., ¶¶ 8-9 & Ex. B. That first draft also contained subsection D – a corresponding provision that limited the parties' ability to obtain relief in court. *Id.*, ¶ 9 & Ex. B. Subsequently, between January 30, 1994 and February 2, 1994, the parties agreed to exclude from arbitration disputes related to five specific provisions of the Lease – including disputes related to Article II. *Id.*, ¶ 12, Ex. D. In the very next draft, following the addition of these five exceptions, the parties added a sixth exception to arbitration: disputes related to hazardous substances. *Id.*, ¶ 13. A memorandum between the parties, dated February 2, 1994, reflects their clear intent to "exclude" those disputes "from binding arbitration." *Id.*, ¶ 13, Ex. E (paragraph 11).

Additionally, shortly after the parties revised the draft Lease to include express carve-outs to the arbitration provision, they again amended the Lease to add a provision that "[t]he City shall also have such other remedies as may be available to it, which shall include, without limitation, injunctive relief and damages." Lease, Article XXVI(C)(1); Davidson Decl., ¶ 14, Ex. F.

These final revisions to the draft Lease were made under intense time pressure to get the

CITY OF SEATTLE'S CROSS-MOTION FOR STAY OF ARBITRATION AND OPPOSITION TO PBC'S MOTION TO STAY - 5

K:\2065932\XX001\20880_MOJ\20880P20BY

Thomas A. Carr
Seattle City Attorney
600 Fourth Avenue, 4th Floor
P.O. Box 94769
Seattle, WA 98124-4769
(206) 684-8200

proposed Lease finalized for approval by the Seattle City Council. Davidson Decl., ¶¶ 15-16. The Lease was submitted to and approved by the Seattle City Council on February 14, 1994. *Id.*, ¶ 15. As approved by the City Council, the final Lease contained all six express exclusions to arbitration and the language permitting the City to seek injunctive relief. *Id.*, ¶ 14, Ex. G. But in this hasty exchange of drafts to obtain City Counsel approval and begin construction, the parties mistakenly overlooked the fact that the "Limitation on Judicial Relief" clause – a holdover from the earliest draft, before the parties added specific exceptions to arbitration – no longer made sense, and no longer reflected the intent of the parties to exclude certain disputes from arbitration. *Id.*, ¶ 16.

**C.    There Is a Dispute Between the City and PBC Related to the Provisions of Article II of the Lease, and that Dispute Is Non-Arbitrable.**

PBC filed an Arbitration Demand that asks the arbitrator to declare that the Sonics are not required to play the 2008-09 and 2009-10 seasons in KeyArena. Arbitration Demand, ¶ 6 at 3, ¶ 38 at 13. Article II of the Lease requires the NBA to schedule[2] and the Sonics to play all home games in the 2008-09 and 2009-10 seasons in KeyArena. The City has brought this action to protect its right, under Article II, to have the Sonics play the 2008-09 and 2009-10 seasons in KeyArena. Accordingly, the dispute between the parties is one that "relates to" the provisions of Article II. The dispute is therefore not subject to arbitration under the Lease.

### III.    STATEMENT OF THE ISSUE

Is the City of Seattle entitled to an Order Staying PBC's Arbitration Demand and Denying PBC's Motion to Stay Litigation, where the parties dispute whether the Sonics are required to play their home games at KeyArena during the 2008-09 and 2009-10 seasons, and the Lease term requiring the Sonics to play their home games in KeyArena is expressly excluded from arbitration?

---

[2] The NBA, through its Commissioner, expressly approved all terms of the Lease. Lease, Article XX(A)(3).

CITY OF SEATTLE'S CROSS-MOTION FOR STAY OF ARBITRATION AND OPPOSITION TO PBC'S MOTION TO STAY - 6

Thomas A. Carr
Seattle City Attorney
600 Fourth Avenue, 4th Floor
P.O. Box 94769
Seattle, WA 98124-4769
(206) 684-8200

K:\20659320\00001\20880_MIJ\20880P208Y

## IV. EVIDENCE RELIED UPON

The City relies on the Declaration of Gregory C. Narver and the exhibits attached thereto; the Declaration of Gordon B. Davidson, and the exhibits attached thereto; and the pleadings and other papers on file in this case.

## V. AUTHORITY

**A.  Summary of Argument.**

A party can only be required to arbitrate disputes it has agreed to arbitrate. The parties to the Lease expressly excluded certain kinds of disputes from arbitration. Specifically, Article XXV(A) expressly provides that PBC's obligations related to Article II are not subject to arbitration. Article II requires the NBA to schedule and the Sonics to play all home games at KeyArena until the conclusion of the 2009-10 NBA season. PBC has demanded arbitration on whether the Sonics can play their home games somewhere else during the 2008-09 and 2009-10 seasons. This arbitration demand is not just "related" to Article II, but goes to the heart of that provision. Because the parties jointly agreed that this type of dispute is not subject to arbitration, PBC's arbitration demand is improper and should be stayed.

PBC's argument to avoid the plain language of the Lease and create an ambiguity is based on an unreasonable interpretation of the Lease. Established rules of contract interpretation, as well as the drafting history of the Lease, establish that the parties intended to allow the City to litigate in court any dispute "relate[d] to" Article II. Article XXV(A) is clear and unambiguous on this point and consistent with the intent of the parties. Article XXV(D), on which PBC relies, creates no

CITY OF SEATTLE'S CROSS-MOTION FOR STAY OF ARBITRATION AND OPPOSITION TO PBC'S MOTION TO STAY - 7

K:\20065932\00001\20880_MDJ\20880P20BY

Thomas A. Carr
Seattle City Attorney
600 Fourth Avenue, 4th Floor
P.O Box 94769
Seattle, WA 98124-4769
(206) 684-8200

ambiguity regarding the Sections of the Lease that are subject to arbitration. Moreover, PBC's interpretation of Subsection D is illogical and would deny the City any right to relief from either a court or arbitrator. The only reasonable interpretation of Article XXV and the Lease as a whole, in light of the drafting history and overall express purposes of the Lease agreement, is that the specific, express exception to the arbitration provision for claims "relate[d] to" Article II controls, and that any apparent contradiction created by Subsection D of Article XXV is no more than drafting error or a mutual mistake that does not reflect the parties' intentions.

**B.  The City of Seattle Did Not Agree to Arbitrate Disputes Related to Article II, and thus the Instant Dispute Is Non-Arbitrable.**

In addition to opposing PBC's Motion to Stay, the City brings a cross-motion as authorized by RCW 7.04A.070(2) to protect its rights to have a court resolve this dispute. RCW 7.04A.070(2) states that "[o]n motion of a person alleging that an arbitration proceeding has been initiated or threatened but that there is no agreement to arbitrate, the court shall proceed summarily to decide the issue." PBC has filed an arbitration demand seeking to avoid its promise to play all home games at KeyArena in the 2008-09 and 2009-10 seasons, a requirement expressly imposed by Article II of the parties' Lease. Because there is no agreement to arbitrate this issue, the City asks this Court to declare the issue non-arbitrable under RCW 7.04A.070(2) and issue an order staying arbitration.

**1.  A Party Cannot Be Compelled to Arbitrate Disputes It Has Not Agreed to Arbitrate, and Courts Must Enforce Exceptions to Arbitration Provisions.**

In deciding the scope of an arbitration agreement, a court's main concern is to give effect, faithfully, to the reasonable expectations of the parties. *Leadertex, Inc. v. Morgantown Dyeing & Finishing Corp.*, 67 F.3d 20, 28 (2nd Cir. 1995). Thus, the law protects a party from being compelled to arbitrate claims they did not agree to arbitrate. *State v. Oneida Indian Nation*, 90

CITY OF SEATTLE'S CROSS-MOTION FOR STAY OF ARBITRATION
AND OPPOSITION TO PBC'S MOTION TO STAY - 8

K:\2065932\00001\20480 MDJ\20480P20BY

Thomas A. Carr
Seattle City Attorney
600 Fourth Avenue, 4th Floor
P.O. Box 94769
Seattle, WA 98124-4769
(206) 684-8200

1  F.3d 58, 59 (1996).[3] The Federal Arbitration Act ("FAA") "does not require parties to arbitrate when they have not agreed to do so . . . nor does it prevent parties who do agree to arbitrate from excluding certain claims from the scope of their arbitration agreement[.]" *Volt Info. Scis., Inc. v. Bd. of Trs. of the Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989). Arbitration agreements are subject to the same rules as any other contract: the parties' intent prevails. *Id.* Thus, even if claims might not fit "word for word" within an arbitration provision's exclusionary clause, court "will not don blinders to their obvious meaning and thereby thwart the reasonable expectations of the parties . . . [.]" *Oneida Indian Nation*, 90 F.3d at 63.

Where the parties to an arbitration agreement have specifically excepted a certain type of claim from mandatory arbitration, "it is the duty of courts to enforce not only the full breadth of the arbitration clause, but its limitations as well." *Oneida Indian Nation*, 90 F.3d at 62 (denying arbitration). If an agreement "specifically excludes a subject from arbitration, courts are not free to ignore the plain wording of the agreement and must decline to compel arbitration." *Gen. Drivers v. Ethyl Corp.*, 68 F.3d 80, 83 (4th Cir. 1995) (denying arbitration); *see also Contra Costa Legal Assistance Workers v. Contra Costa Legal Serv. Found.*, 878 F.2d 329, 330 (9th Cir. 1989) (holding similarly). Washington courts, like federal courts, have consistently followed this rule. Thus, in *ACF Prop. Mgmt. Inc. v. Chaussee*, 69 Wn. App. 913 (1993), the Washington Court of Appeals held that a dispute involving claims of more than $200,000 in damages was non-arbitrable and affirmed a stay of litigation pending arbitration, where the arbitration provision expressly excluded disputes over $200,000 from the arbitrator's jurisdiction. *ACF Prop. Mgmt*, 69 Wn. App. at 919-20.

---

[3] The Federal Arbitration Act creates a body of federal substantive law of arbitrability, which applies to any arbitration agreement within the coverage of the Act. *Oneida Indian Nation*, 90 F.3d at 61. It is undisputed that the Lease falls within the broad provisions of the FAA.

CITY OF SEATTLE'S CROSS-MOTION FOR STAY OF ARBITRATION
AND OPPOSITION TO PBC'S MOTION TO STAY - 9

K:\2085932\00001\20880_MCL\20880P20BY

Thomas A. Carr
Seattle City Attorney
600 Fourth Avenue, 4th Floor
P.O. Box 94769
Seattle, WA 98124-4769
(206) 684-8200

2. **The Lease Expressly and Unambiguously Provides that Disputes Related to Article II Are Not Arbitrable.**

The City and PBC expressly agreed that their Lease's arbitration clause did *not* apply to disputes regarding the Sonics promise to play all their home games at KeyArena until the end of the 2009-10 NBA season. Lease, Article XXV(A) (emphasis added). In determining whether an arbitration provision excludes certain disputes from arbitration, the words of the provision – like all contractual language – will be given their ordinary meaning. *Martinez v. Miller Indus., Inc.*, 94 Wn. App. 935, 944 (1999). The language of Article XXV(A) is clear: "All claims, disputes and other matters ... shall be decided by binding arbitration ... **unless** the claim, dispute or other matter in question relates to the provisions of Article II ..., Article II ..., Article IV ..., Article V ..., Subsection XVI.F ... or Article XIX." (emphasis added).[4] Thus, all disputes regarding the Lease are arbitrable *except* disputes related to the provisions of Article II (and Articles III, IV, V, XVI(F), and XIX).

Article II, in turn, states in relevant part that:

> . . . the Term of this Agreement shall end on September 30, 2010, unless terminated earlier pursuant to the provisions hereof.
>
> Subject to the provisions of this Agreement, SSI shall schedule and ensure that **the SuperSonics play all Home Games other than pre-season games exclusively in the Coliseum** after the Use Commencement Date.

Agreement, Article II (emphasis added). Thus, the arbitration provision of the Lease does not require or permit arbitration of disputes "relate[d] to" whether the Sonics must play their home games in KeyArena during the 2008-09 and 2009-10 NBA seasons.

---

[4] The parties' intent to exclude from arbitration disputes related to these six Lease provisions is also evidenced in the February 2, 1994 Memorandum. Davidson Decl., ¶ 13, Ex. F. When adding the sixth Lease provision to the list of exempted disputes, the stated purpose of the addition was "to exclude issues relating to hazardous substances from binding arbitration." *Id.*, ¶ 13, Ex. F (paragraph 11).

CITY OF SEATTLE'S CROSS-MOTION FOR STAY OF ARBITRATION AND OPPOSITION TO PBC'S MOTION TO STAY - 10

Thomas A. Carr
Seattle City Attorney
600 Fourth Avenue, 4th Floor
P.O. Box 94769
Seattle, WA 98124-4769
(206) 684-8200

PBC argues that arbitration is required because "the arbitration clause is ambiguous."[5] Motion to Stay at 7. The plain language of the Lease proves this assertion false. The Lease is not ambiguous as to whether disputes related to Article II are arbitrable. Under the plain language of Article XXV(A), they are not. Moreover, nothing in the Lease says that they <u>are</u> arbitrable.

As discussed supra, pp ___, PBC tries to create an ambiguity by citing to Article XXV(D) (and nothing else). But PBC's argument makes Article XXV(D) something that it is not. Article XXV(D) does not purport to expand the scope of claims that are arbitrable. Indeed, PBC is trying to use subsection D to read subsection A's express exceptions to the arbitration provision out of the Lease. Nothing in subsection D, or any other provision of the Lease, allows PBC to force the City to arbitrate disputes "relate[d] to" Article II.

3.  **This Dispute Is Not Just "Relate[d] to" Article II, but Goes to the Very Heart of the Rights and Responsibilities Established by that Article.**

PBC's argument that this dispute does not "relate[] to" Article II is meritless. PBC's arbitration demand asks the arbitrator to issue a 'declaratory judgment' that the Sonics are not required to play their home games in KeyArena during the 2008-09 and 2009-10 NBA seasons. This dispute is not just "relate[d] to" the provisions of Article II (although that would be sufficient to bar arbitration), but goes to the very heart at that Article. Article II establishes PBC's responsibility to play all Sonics' home games at KeyArena through the 2009-10 season. Because the arbitration provision expressly excludes disputes related to Article II from the general requirement that disputes be arbitrated, and the instant dispute relates to Article II, it is

---

[5] PBC is trying to take advantage of a presumption in favor of arbitrability that does not apply here. Where there is clear evidence that the parties intended to exclude a particular dispute from arbitration – e.g., an express exception to the arbitration provision for disputes of that type – there is no presumption in favor of arbitration. *Contra Costa Legal Assistance Workers*, 878 F.2d at 330.

CITY OF SEATTLE'S CROSS-MOTION FOR STAY OF ARBITRATION AND OPPOSITION TO PBC'S MOTION TO STAY - 11

Thomas A. Carr
Seattle City Attorney
600 Fourth Avenue, 4th Floor
P.O. Box 94769
Seattle, WA 98124-4769
(206) 684-8200

1 non-arbitrable. *Volt Info. Scis.*, 489 U.S. at 478; *Oneida Indian Nation*, 90 F.3d at 62; *Ethyl Corp.*, 69 at 83-85; *Contra Costa Legal Assistance Workers*, 878 F.2d at 330; *ACF Prop. Mgmt.*, 69 Wn. App. at 919-20.

Words in a contract are given "their ordinary, usual, and popular meaning unless the entirety of the agreement clearly demonstrates a contrary intent." *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 154 Wn.2d 493, 504 (2005). The ordinary, usual and popular meaning of the term "relate" as used in the Lease is a broad one: for one thing to have a relationship or connection to another. *See Bellevue Sch. Dist. No. 405 v. Bentley*, 38 Wn. App. 152, 158 (1984) (where words are not defined in contract, "[i]t is therefore presumed that the ordinary dictionary meaning applies"). Without question the current dispute "relates to" Article II.

  **4. Subsection D of the Arbitration Provision Should be Read Consistent with the Parties' Express Intent to Require the Sonics to Play in KeyArena Over the Long Term, and to Exclude Disputes Regarding Article II from Arbitration.**

PBC tries to create ambiguity by asking this Court to focus solely on the provisions of subsection D of the arbitration section while ignoring both the circumstances surrounding the negotiation and drafting of the Lease and the plain terms of subsection A of that same arbitration provision. PBC argues that because subsection D states that "No proceedings based upon any claim arising out of or related to this Agreement shall be instituted in any court . . ." (subject to certain exceptions inapplicable to this case), the City cannot seek <u>any</u> relief in this Court related to Article II. This argument is unreasonable when the Lease is read as a whole. Put simply, PBC's interpretation of subsection D would render the most important provision of the Lease from the City's perspective,[6] Article II, meaningless: the City would have a right to have the

---

[6] *See* discussion of recitals and purpose of long term lease quoted at pp. 3-4, *supra*.

CITY OF SEATTLE'S CROSS-MOTION FOR STAY OF ARBITRATION AND OPPOSITION TO PBC'S MOTION TO STAY - 12

Thomas A. Carr
Seattle City Attorney
600 Fourth Avenue, 4th Floor
P.O. Box 94769
Seattle, WA 98124-4769
(206) 684-8200

Sonics play at KeyArena through the 2009-10 season, but would have no means to enforce that right. Disputes related to that provision would not be subject to arbitration (under subsection A), nor would the City be able to seek relief from a court (under PBC's interpretation of subsection D). Instead of adopting PBC's unreasonable interpretation of subsection D, this Court should do one of two things: interpret the Lease to reflect the parties' shared intent to exclude certain disputes from arbitration or reform the Lease.

In interpreting a contract, "[t]he role of the court is to determine the mutual intentions of the parties according to the reasonable meaning of their words and acts." *Fisher Props., Inc. v. Arden-Mayfair, Inc.*, 106 Wn.2d 826, 837 (1986). What the Court should consider in doing this is well-established:

> "'In Washington, the intent of the parties to a particular agreement may be discovered not only from the actual language of the agreement, but also from 'viewing the contract as a whole, the subject matter and objective of the contract, all circumstances surrounding the making of the contract, the subsequent acts and conduct of the parties to the contract, and the reasonableness of respective interpretations advocated by the parties.'"

*Bort v. Parker*, 110 Wn. App. 561, 573 (2002) (quoting *Scott Galvanizing, Inc. v. N.W. EnviroServices, Inc.* 120 Wn.2d 573, 579-80 (1993) (quoting *Berg v. Hudesman*, 115 Wn.2d 657, 667 (1990)). The prime principle of contract construction is that all provisions of a contract should be given effect if possible. *Oneida Indian Nation*, 90 F.3d at 63; *see also Wagner v. Wagner*, 95 Wn.2d 94, 101 (1980); *PUD No. 1. v. Washington Public Power Supply Sys.*, 104 Wn.2d 353, 374 (1985). A court "will not give effect to interpretations that would render contract obligations illusory." *Taylor v. Shigaki*, 84 Wn. App. 723, 730 (1997). Accordingly, a court will not allow a party to reap the benefits of a contract and then unilaterally avoid its obligations. *Id.*

CITY OF SEATTLE'S CROSS-MOTION FOR STAY OF ARBITRATION AND OPPOSITION TO PBC'S MOTION TO STAY - 13

Thomas A. Carr
Seattle City Attorney
600 Fourth Avenue, 4th Floor
P.O. Box 94769
Seattle, WA 98124-4769
(206) 684-8200

K:\2065932\00001\20680_MO\20680P20HY

PBC's interpretation of subsection D would render Article II meaningless and ineffective, as the City would have a right without a remedy. Similarly, the City would have no remedy for PBC's failure to fulfill its duties under Articles III, IV, V, XVI(F) and XIX as these provisions are also expressly excluded from the arbitration provision. This would render PBC's contractual obligation under Article II illusory – a result that cannot be sanctioned. *Taylor*, 84 Wn. App. at 730; *see also Gruen v. State Tax Comm'n*, 35 Wn.2d 1, 55 (1949) ("A right without a remedy is as if it were not. For every beneficial purpose it may be said not to exist.") (citations omitted) (*overruled in part on other grounds by State ex rel. Washington State Fin. Comm. v. Martin*, 62 Wn.2d 645 (1963)). The Lease was the product of lengthy negotiations between the parties, and all of the provisions to which they agreed, including Article II, should be given effect. *Wagner*, 95 Wn.2d at 101.

In fact, PBC's proposed interpretation of subsection D – that it bars court proceedings with respect to "any claim" (subject to limited exceptions) – would deny PBC an adequate remedy for many violations of its rights as well. An interpretation of the Lease that barred either party from enforcing Articles to the Lease would benefit the party that intends to violate the provisions of that Article – in this case, PBC (by its own admission). Instead, the Lease should be interpreted to give effect to the parties' clear desire to exclude certain disputes from arbitration without robbing a party of the ability to effectively enforce those provisions in court.

Alternatively, the Court should give effect to the more specific provision (A) limiting the scope of arbitration, rather than the more general provision (D). Where general and specific language conflict, the presumption is in favor of implementing the specific terms. *See McGary v. Westlake Investors*, 99 Wn.2d 280, 286 (1983); *Foote v. Viking Ins. Co.*, 57 Wn. App. 831,

CITY OF SEATTLE'S CROSS-MOTION FOR STAY OF ARBITRATION
AND OPPOSITION TO PBC'S MOTION TO STAY - 14

K:\2065932\00001\20BBD_MD\20BBD1120BY

Thomas A. Carr
Seattle City Attorney
600 Fourth Avenue, 4th Floor
P.O. Box 94769
Seattle, WA 98124-4769
(206) 684-8200

Case 2:07-cv-01620-RSM    Document 2-5    Filed 10/10/2007    Page 16 of 19

834 (1990). Restatement (Second) of Contracts, § 203(c) (1981) ("[S]pecific terms and exact terms are given greater weight than general language."). This is because:

> [I]n case of conflict the specific or exact term is more likely to express the meaning of the parties with respect to the situation than the general language. If the specific or exact can be read as an exception or qualification of the general, both are given some effect, in accordance with the rule stated in Subsection (a) [i.e., that "an interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect"].

Restatement (Second) of Contracts § 203 cmt. e (1981) (emphasis added). This rule of contract interpretation is particularly true where the specific language is added to the contract after the general language, as is the case here: the general language of subsection D was drafted first, and the specific exceptions in subsection A agreed to and added later. *See McGary*, 99 Wn.2d at 286 (specific language of addendum to contract governed over general language of original contract).

Subsection D is written as a provision of general applicability, purportedly applying to "any disputes." Subsection A is written as a specific provision; i.e., the parties specifically excluded certain disputes from arbitration. A more natural reading, and one that gives effect to both provisions, would be that subsection D is narrowed by subsection A and merely limits the availability of court proceedings for *arbitrable* disputes; i.e., disputes not expressly carved out from subsection A's arbitration clause. This reading honors both the specific exceptions to the arbitration provision in subsection A, and the general limitation on court proceedings in subsection D. The parties are not required to arbitrate certain claims and are allowed to institute court proceedings with regard to those claims (i.e., claims related to Article II, III, IV, V, XVI(F) and XIX). But they do not have the right to institute court proceedings (with certain exceptions) with regard to any other disputes, those which remain subject to mandatory arbitration pursuant to Article XXV(A).

CITY OF SEATTLE'S CROSS-MOTION FOR STAY OF ARBITRATION AND OPPOSITION TO PBC'S MOTION TO STAY - 15


Thomas A. Carr
Seattle City Attorney
600 Fourth Avenue, 4th Floor
P.O. Box 94769
Seattle, WA 98124-4769
(206) 684-8200

K:\2065932\00001\20860_MDJ\20860P20BY

### 5. The Lease Should Be Reformed to Correct a Scrivener's Error or Mutual Mistake and Give Effect to the Parties' Shared Intention.

To reflect the parties' shared intent to allow the City to enforce its rights under Article II (and allow SSI to obtain permanent relief for violations of its rights under various Articles), this Court should reform the Lease to correct a scrivener's error or mutual mistake. All that reformation requires is to construe subsection D as barring the institution of court proceedings (subject to the limited exceptions listed in subsection D) with respect to any *arbitrable* claims, rather than with respect to "any" claims.

"In contract law a scrivener's error, like a mutual mistake, occurs when the intention of the parties is identical at the time of the transaction but the written agreement does not express that intention because of that error." *Bort*, 110 Wn. App. at 579. Similar to scrivener's error, "[a] mutual mistake exists when both parties to a contract have an identical intention as to the terms to be embodied in the proposed contract, and the writing executed by them is materially at variance with such intention." *Keesling v. Pehling*, 35 Wn.2d 624, 625 (1950); *see also St. Regis Paper Co. v. Wicklund*, 93 Wn.2d 497, 501 (1980); *Akers v. Sinclair*, 37 Wn.2d 693, 702 (1950); Restatement (Second) of Contracts, § 155 (1981). "This rule has long been followed in [Washington]." *Akers*, 37 Wn.2d at 702. The remedy for both scrivener's error and mutual mistake is reformation of the contract to express the intentions of the parties, and can be sought be either party to the contract. *See id.; Bort*, 110 Wn. App. at 579. In determining whether reformation is appropriate, courts will examine the surrounding circumstances and take into account all facts which shed light on the intentions of the parties. *Akers*, 37 Wn.2d at 704.

It is undisputed that the parties intended to exclude disputes related to Article II from arbitration: both parties accepted the revision to Article XXV(A), which did just that.

CITY OF SEATTLE'S CROSS-MOTION FOR STAY OF ARBITRATION
AND OPPOSITION TO PBC'S MOTION TO STAY - 16

K:\2085932\00001\20880_MtJ\20880P20BY

Thomas A. Carr
Seattle City Attorney
600 Fourth Avenue, 4th Floor
P.O. Box 94769
Seattle, WA 98124-4769
(206) 684-8200

Furthermore, the February 2, 1994 Memorandum, produced during Lease negotiations and describing the addition of the hazardous substances provision to the list of exempted provisions reflects the parties' clear intent "to exclude" these provisions "from binding arbitration." Davidson Decl., ¶ 13, Ex. E (paragraph 11). There is no evidence that the parties intended to deny each other a remedy in court to protect their respective rights in disputes related to Articles II, III, IV, V, XVI(F) and XIX. In the rush to finalize the Lease, the parties mistakenly overlooked the need to revise subsection D to make clear that it applied only to claims that subsection A required the parties to arbitrate. The parties' inadvertent failure to expressly limit subsection D in this way should not trump their intention to give the City and SSI the ability to seek judicial relief for violations of their rights. This is particularly true where the parties to the Lease also added a provision allowing the City to seek injunctive relief – the exact kind of relief that PBC argues only it (through its predecessor in interest) is entitled to seek. The Lease should be reformed to clarify that Subsection D of the arbitration provision applies only to arbitrable claims. This will effectuate the parties' clear intent to carve certain dispute out of the arbitration clause, and in this instance allow the City and PBC to seek final judgments securing their rights in disputes related to Articles II, III, IV, V, XVI(F) and XIX.

## VI. CONCLUSION

The City and PBC agreed in their Lease that disputes related to Article II would be decided by a court, not an arbitrator. PBC seeks to avoid this agreement by improperly demanding arbitration of a dispute that goes to the heart of Article II. For the reasons given above, the City respectfully requests that this Court issue an order declaring that, under the terms of the Lease, disputes related to Article II – including disputes over where the Sonics will play home games through September 30, 2010 – are non-arbitrable and staying PBC's arbitration.

CITY OF SEATTLE'S CROSS-MOTION FOR STAY OF ARBITRATION AND OPPOSITION TO PBC'S MOTION TO STAY - 17

Thomas A. Carr
Seattle City Attorney
600 Fourth Avenue, 4th Floor
P.O. Box 94769
Seattle, WA 98124-4769
(206) 684-8200

K:\206593\00001\20880_MIX\20880F20BY

1  This will allow the merits of the parties' dispute to be decided where the parties agreed they

2  would be decided: in a King County court.

3

4  DATED this 2nd day of October, 2007.

5

6  KIRKPATRICK & LOCKHART                THOMAS A. CARR
   PRESTON GATES & ELLIS, LLP            Seattle City Attorney
7

8  By: _____           By: _____ for
       Slade Gorton, WSBA No. 20             Gregory C. Narver, WSBA No. 18127
9      Paul J. Lawrence, WSBA No. 13557      Assistant City Attorney
       Jeffrey Johnson, WSBA No. 23066
10     Jonathan Harrison, WSBA No. 31390  Attorneys for Plaintiff City of Seattle
       Michelle Jensen, WSBA No. 36611
11
   Attorneys for Plaintiff City of Seattle
12

13

14

15

16

17

18

19

20

21

22

23

CITY OF SEATTLE'S CROSS-MOTION FOR STAY OF ARBITRATION         Thomas A. Carr
AND OPPOSITION TO PBC'S MOTION TO STAY - 18                    Seattle City Attorney
                                                               600 Fourth Avenue, 4th Floor
K:\2065932\00001\20880_MDJ\20880P20BY                          P.O. Box 94769
                                                               Seattle, WA 98124-4769
                                                               (206) 684-8200