07-CV-01620-EXH 6

# TAB G

RECEIVED
OCT 08 2007
KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP

RECEIVED
2007 OCT -8 AM 11:18
KING COUNTY CLERK
SUPERIOR COURT CLERK
SEATTLE, WA

2007 OCT -8 AM 11:19
KING COUNTY
SUPERIOR COURT

SEATTLE CITY ATTORNEY
2007 OCT -8 AM 11:24

COPY RECEIVED

[The Honorable Harry McCarthy
Noted for Consideration: October 10, 2007
Without Oral Argument

SUPERIOR COURT OF WASHINGTON IN AND FOR KING COUNTY

CITY OF SEATTLE, a first-class charter city, )
                                             )
                    Plaintiff,               )    No. 07-2-30997-7 SEA
                                             )
v.                                           )    THE PROFESSIONAL BASKETBALL
                                             )    CLUB'S REPLY IN SUPPORT OF
THE PROFESSIONAL BASKETBALL                  )    MOTION TO STAY AND OPPOSITION
CLUB, LLC, an Oklahoma limited liability     )    TO CROSS-MOTION FOR STAY OF
company,                                     )    ARBITRATION
                                             )
                    Defendant.               )
_____  )

## I.    Introduction

The City's scattershot opposition to arbitration is not persuasive.  For example, the
City says that the "plain language" of the Agreement allows it to seek judicial relief.  But in
the same breath, it seeks to change the "plain language" of the Agreement by eliminating the
clause entitled "Limitation on Judicial Relief."  That clause is, of course, fatal to the City's
position.

Likewise, the City's evidence of the supposed intent of the parties rests entirely on the
Davidson declaration.  That declaration contains no relevant evidence of the parties' intent,
offering instead Davidson's subjective intent, belief, opinion and "wishes."  Even if it were
relevant, his testimonial foundation is nonexistent.  In an arbitration between the City and the
Sonics over the same Agreement several years ago, Davidson testified about his role in the
drafting of the Agreement.  Some of his testimony then contradicts his declaration here.
Moreover, in the earlier case he admitted that his role in the negotiations was sharply limited.

THE PROFESSIONAL BASKETBALL CLUB'S REPLY IN
SUPPORT OF MOTION TO STAY AND OPPOSITION TO CROSS-
MOTION FOR STAY OF ARBITRATION - 1

BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

1  He was a "scrivener," inserting language to reflect the City's intent as conveyed to him. As

2  detailed in the attached declaration of the City's lead negotiator, the City intended that

3  arbitration be the dispute resolution vehicle. The Sonics' lead negotiator says the same thing.

4  Davidson and the other faulty theories offered by the City are addressed below. They are not

5  persuasive.

6      Arbitration is intended to provide a prompt, economical vehicle for resolving disputes.

7  For this reason there is a strong preference and presumption for arbitration. Any doubts as to

8  arbitrability are resolved in favor of arbitration. The party seeking to avoid arbitration must

9  prove that there is no plausible contractual interpretation that permits arbitration. The City's

10  brief does not even mention these bedrock principles, much less attempt to explain why they

11  do not require arbitration here.

12      One final, common sense, point bears mention. The Agreement has been in place for

13  over 13 years. It has been subjected to regular and close scrutiny by lawyers for the City and

14  the Sonics, businesspeople, and City Center officials. It has been periodically amended over

15  the years. It was even the subject of an earlier arbitration between the identical parties. If

16  there were a mistake in something as basic as the dispute resolution clause, or the language

17  was wrong, someone in the City would have noticed before now. The silence of more than a

18  decade says much more than the City's belated attempt to rewrite the Agreement.

19                          **II.     Davidson's Declaration Is Irrelevant**

20      The City's factual arguments about the lease negotiations and the parties' intent rest

21  entirely on the Davidson declaration. His declaration does not contain admissible evidence,

22  nor does he demonstrate a memory sufficient to establish a foundation to testify. Ironically,

23  his declaration, if it proves anything at all, shows that this dispute must be arbitrated.

24  **A.     The Davidson Declaration Provides No Admissible Evidence of the Parties'**
        **Intent**
25
26      Davidson's declaration contains no admissible evidence of the parties' contractual

    intent. In Washington, subjective unexpressed intent is not relevant in determining the

THE PROFESSIONAL BASKETBALL CLUB'S REPLY IN
SUPPORT OF MOTION TO STAY AND OPPOSITION TO CROSS-
MOTION FOR STAY OF ARBITRATION - 2

BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

1  parties' contractual intent. Lynott v. Nat'l Union Fire Ins. Co., 123 Wn.2d 678, 684, 871 P.2d

2  146 (1994) ("Unilateral or subjective purposes and intentions about the meanings of what is

3  written do not constitute evidence of the parties' intentions.").

4      Here, Davidson first says:

5          I also recall that City representatives believed there were certain
           potential situations in which the City would benefit from having
6          a judge as the decision maker rather than an arbitrator.[1]

7      Critically, Davidson does not identify who held these beliefs, or whether they were

8  articulated by him or anyone else, much less proposed to and agreed to by the Sonics.

9  Davidson's "recollection" of "beliefs" about "potential situations" is of no relevance.

10     Likewise, Davidson says:

11         I do recall that at some point during the negotiations I expressed
           the City's wish to be able to seek injunctive relief in court.[2]
12

13 Again, Davidson does not identify to whom he expressed this wish, when, or in what context.

14 Nor does he claim that the Sonics agreed to whatever unidentified provision to which he is

15 referring.  Vague recollections of wishes to unknown people about undefined provisions are

16 not relevant under Washington law.

17     Davidson next says:

18         I believe that this time pressure during final negotiations
           and drafting explains the parties' failure to modify or remove
19         the section of the arbitration clause titled "Limitation on
           Judicial Relief."[3]

20     Davidson's "belief" or opinion about the pressure he supposedly felt 13 years ago is

21 not relevant.  It is not admissible to prove anything.

22     Similarly inadmissible is the following opinion:

23         When specific exceptions to arbitration were agreed upon and
           added in Draft #12, the "Limitation" section obviously no
24

25 _____

[1] Davidson Decl. at 4:18-20.
26 [2] Davidson Decl. at 5:21.
   [3] Davidson Decl. at 6:11-13.

THE PROFESSIONAL BASKETBALL CLUB'S REPLY IN
SUPPORT OF MOTION TO STAY AND OPPOSITION TO CROSS-
MOTION FOR STAY OF ARBITRATION - 3

BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

longer made sense, and no longer reflected the intent of either the City or of the Sonics. . . .[4]

Finally, Davidson says that "neither Mr. Rubin nor I noticed the obvious inconsistency . . . ."[5] Davidson has utterly no foundation to state whether Mr. Rubin did or did not notice the language at issue. Incidentally, in his declaration, Mr. Rubin says he saw the language and it accurately reflected the parties' intent.[6]

In short, Davidson's declaration contains no relevant evidence. It offers only the opinions and unexpressed intents that Washington courts do not consider in interpreting a contract.

**B.    Davidson's Faulty Recollection**

One of the central premises of Davidson's declaration is that (i) the Sonics' attorney, Eric Rubin, prepared the first draft of the lease, (ii) Rubin sent it to Davidson on September 8, 1993, and (iii) the draft detailed "the very limited circumstances under which proceedings could be instituted in court."[7] These assertions are contradicted by testimony Davidson gave several years ago in an arbitration between the City and the Sonics based on the Agreement at issue here, and by the draft itself.

While testifying now that Mr. Rubin prepared the first draft, here is what Davidson testified to back in 1999:

> Q.    Who prepared the first draft of [the Agreement]?
>
> A.    That, I do not know. . . .
>
> . . . .
>
> Q.    And you have no memory of who prepared the very first draft?
>
> A.    No.[8]

---

[4] Davidson Decl. at 6:15-17.
[5] Davidson Decl. at 6:19.
[6] Ex. 1.
[7] Davidson Decl. at 3, ¶ 9.
[8] See Ex. 2 at 17.

THE PROFESSIONAL BASKETBALL CLUB'S REPLY IN
SUPPORT OF MOTION TO STAY AND OPPOSITION TO CROSS-
MOTION FOR STAY OF ARBITRATION - 4

BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

1    Likewise, Davidson now says the first draft was on September 8, 1993. Davidson

2    previously testified that the initial draft was prepared months earlier – on April 8, 1993.[9]

3    Equally puzzling is the "record" of the draft leases Davidson says he relied upon for

4    his factual assertions. Davidson says he reviewed five computer disks and they are the disks

5    on which he saved the drafts during the negotiation process.[10] Thus, when he testifies that he

6    received the first draft on September 23, 1993, he obviously has no independent memory but

7    is instead relying on the "screen shot" which shows that he received a draft that day.[11] But as

8    indicated, Davidson previously testified that he received the first draft in April 1993. That

9    draft, and all of the activity over several intervening months, are missing from his "record."

10   Also missing are drafts two, three, and four of the lease.[12] There is no explanation for their

11   absence.

12   A fuzzy memory based on a faulty record of events that occurred 14 years ago does

13   not establish an adequate testimonial foundation. Even if the testimony were relevant (it is

14   not), it deserves little or no weight.

15   Finally, Davidson says the initial draft detailed the "very limited circumstances under

16   which proceedings could be instituted in court."[13] He is wrong. The draft clearly sets forth

17   the bedrock principle that remained constant throughout the negotiations: only the Sonics, not

18   the City, could seek injunctive relief in Court.[14]

19   C.    **Davidson – a "Scrivener"**

20   Davidson conceded in the earlier arbitration that his role in the negotiations was not

21   "principal drafter," as he now claims, but merely "scrivener."[15] He had no independent

22   negotiating authority.[16] In fact, he "was never authorized or instructed to finalize any

23   [9] See Ex. 2 at 90.
     [10] Davidson Decl. at 2, ¶ 5.
24   [11] Ex. A to Davidson Decl. at 1.
     [12] Id.
25   [13] Davidson Decl. at 3:11-12.
     [14] Davidson Decl., Ex. B at § XXIV.D(iv).
26   [15] Ex. 3 at ¶ 4.
     [16] Id.

THE PROFESSIONAL BASKETBALL CLUB'S REPLY IN
SUPPORT OF MOTION TO STAY AND OPPOSITION TO CROSS-
MOTION FOR STAY OF ARBITRATION - 5

BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

1   substantive contract terms on behalf of [the City]."[17]  He testified that he would provide drafts

2   to the Deputy Director of the Seattle Center, Terry McLaughlin.[18]  McLaughlin was the City's

3   businessperson with principal responsibility for the lease negotiations with the Sonics.  Mr.

4   McLaughlin had the authority to tell Davidson which provisions the City would accept, and

5   which the City would not.[19]  Why is this important?  In his declaration, Davidson says that

6   "City representatives believed there were certain potential situations in which the City would

7   benefit from having a judge as the decision maker rather than an arbitrator."[20]  Mr.

8   McLaughlin has no recollection that he or anyone else ever gave scrivener Davidson such

9   instructions.[21]  In fact, McLaughlin says that the City wanted arbitration as the vehicle for

10  resolving disputes.[22]  So, the unidentified "City representatives" to whom Davidson is

11  referring were not a part of the negotiations.

12  **D.    Davidson's "Intent" Evidence Underscores That the City Is Bound to Arbitrate**

13          Davidson cites the following language in the lease as evidence of the City's intent that

14  the City be able to seek judicial relief:

15                  The City shall also have such other remedies as may be available
                    to it, which shall include, without limitation, injunctive relief and
16                  damages.[23]

17  But this language makes no reference to the City seeking injunctive relief in Court.

18  Moreover, injunctive relief is available in AAA arbitration.  AAA Rule R-43 ("Scope of

19  Award") ("The arbitrator may grant any remedy or relief . . . including, but not limited to,

20  specific performance of the contract.").  Thus this clause does not prove the City wanted the

21  right to seek judicial relief.  Moreover, the City's lead negotiator, Terry McLaughlin, says the

22  City wanted arbitration as the dispute resolution vehicle.[24]

---

23  [17] Id.
24  [18] Id.
    [19] Id.
    [20] Davidson Decl. at 4:18-20.
25  [21] Ex. 4.
    [22] Id.
26  [23] Davidson Decl. at 5:17-18.
    [24] Ex. 4.

THE PROFESSIONAL BASKETBALL CLUB'S REPLY IN
SUPPORT OF MOTION TO STAY AND OPPOSITION TO CROSS-
MOTION FOR STAY OF ARBITRATION - 6

BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

1    Finally, Mr. Davidson says that the language in paragraph D of the arbitration clause,

2    which states that only the Sonics can seek injunctive relief in Court, was a "mistake" resulting

3    from "time pressure." Maybe Davidson felt pressured or overworked, but he provides no

4    evidence that the Sonics somehow made a mistake in not removing the language. Mr. Rubin,

5    the Sonics' lead negotiator explains how the language accurately reflects the parties' intent.[25]

6    There was no mistake.

7    **III.    Exclusions From an Arbitration Clause Must Be Construed Narrowly**

8    The City cites several cases for the unremarkable proposition that if the parties have

9    excluded certain claims from an arbitration clause, the Court must enforce the exclusions.[26]

10    These cases add nothing to the analysis. They all involved plain and unambiguous arbitration

11    clauses. They did not involve the situation here, where, at best, the clause is ambiguous.

12    The City also forgets that where the Court is faced with a broad agreement to arbitrate

13    subject to certain "enumerated exceptions," courts must "interpret the exceptions narrowly,

14    less they overwhelm the rule." <u>Choice Hotels Int'l, Inc. v. BSR Tropicana Resort, Inc.</u>, 252

15    F.3d 707, 711 (4th Cir. 2001). Here, the issue to be decided is not whether the lease provides

16    for the Sonics to play all 41 games at home pursuant to Section II. Everyone agrees that it

17    does. The issue is instead the remedy if the Sonics do not. Remedies are controlled by §

18    XXVI ("Default and Remedies Therefor"). This clause is not excluded from the arbitration

19    requirement. Accordingly, the exclusion for Section II must be read narrowly, and cannot be

20    read to provide an exception to arbitration for disputes over remedies.

21    In a similar vein, the City's definition of "relate to" would render the broad arbitration

22    clause void. Under the City's interpretation, almost all disputes under the Agreement would

23    "relate to" the provision that the Sonics play their home games at KeyArena. Thus, for

24    example, although not carved out of the arbitration clause, disputes under Article VI,

25    "Scheduling Home Games Into [KeyArena]"; Section VII, "Premises, License for Use and

26

---

[25] Ex. 1.
[26] City's Brief at 8-9.

THE PROFESSIONAL BASKETBALL CLUB'S REPLY IN
SUPPORT OF MOTION TO STAY AND OPPOSITION TO CROSS-
MOTION FOR STAY OF ARBITRATION - 7

BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

1    Occupancy by SSI"; and Section VIII, "SSI Payments to the City," would all "relate to" the

2    Sonics' obligation to play home games at KeyArena under Section II. Thus, they would all be

3    subject to judicial action even though none is carved out of the arbitration clause.

#### IV.    The City Is Not Left Without a Remedy

5        The City argues that under the Sonics construction of the arbitration clause, the City

6    would have a right without a remedy:

> Put simply, PBC's interpretation of subsection D would render
> the most important provision of the Lease from the City's
> perspective, Article II meaningless: The City would have a
> right to have the Sonics play at KeyArena through the 2009-10
> season, but would have no means to enforce that right.[27]

10       The City's argument is difficult to follow. To the extent the City is arguing that it

11   cannot obtain injunctive relief in arbitration, it is wrong. The AAA arbitration panel has the

12   power to award the relief sought by the City:

> The arbitrator may grant any remedy or relief that the arbitrator
> deems just and equitable and within the scope of the agreement
> of the parties, **including, but not limited to, specific
> performance of the contract.**[28]

15       If instead the City is arguing that under the Sonics interpretation, the City is not

16   entitled to pursue either arbitration or judicial relief, it is also wrong. Even the City's

17   tortured reading of the arbitration clause would leave it with a remedy for disputes "relating

18   to" Section II. The City's problem is that it does not understand the issue. The City says that

19   the "issue" is "whether the Sonics are required to play their home games at KeyArena during

20   the 2008-09 and 2009-10 seasons."[29]  There is no such dispute. Section II expressly provides

21   for these games to be played at KeyArena. The issue instead is the remedy to which the City

22   would be entitled for a breach of Section II: specific performance or damages. This issue is

23   governed by Article XXVI, "Default and Remedies Therefor." Section XXVI is not

24   exempted from arbitration by paragraph A. Accordingly, the City has a remedy for any

25   ─────────────────────

26   [27] City's Brief at 12-13.
[28] AAA Rule R-43. Scope of Award (emphasis added).
[29] City's Brief at 6.

1    dispute relating to Section II's requirements:  Arbitration of its remedies under Section

2    XXVI.

### V.    The City's Intent-Based Arguments Actually Point to Arbitration

4        The City argues that the intent of the parties was that the City could seek judicial relief

5    for disputes relating to Section II.  The City's evidence on this point comes exclusively from

6    Davidson.  That declaration is partly contradicted by Davidson himself, and wholly

7    contradicted by the two other principal players in the negotiations    Messrs. Rubin and

8    McLaughlin.

9        Regardless, even taking Davidson at face value, the City's argument suggests that at

10   best, there are competing interpretations of the arbitration clause.  Under these circumstances,

11   any and all doubts or differences are resolved in favor of arbitration.  See, e.g., King County

12   v. The Boeing Co., 18 Wn. App. 595, 603, 570 P.2d 713 (1977); Mendez v. Palm Harbor

13   Homes, Inc., 111 Wn. App. 446, 454, 45 P.3d 594 (2002).

### VI.    Paragraphs A and D Must Be Read in Harmony

15       The City forgets that a basic principle of contract interpretation requires that contracts

16   be read to give effect to all provisions.  Therefore, paragraphs XXV.A and D must be read in

17   harmony to give effect to each.  Doing so produces the following result:  by the plain

18   language of Section D(iv), the Sonics, but not the City, can seek judicial relief.  Under that

19   same language, the only judicial relief the Sonics can seek is injunctive relief.  The kinds of

20   claims for which they can seek judicial relief are spelled out in paragraph A.  This is the only

21   reading of the arbitration clause that gives effect to all provisions.  It is also, not

22   coincidentally, consistent with the evidence of the parties' intent.  Messrs. Rubin and

23   McLaughlin both say that the City wanted arbitration as the dispute resolution vehicle with

24   the exception of certain limited carve outs by which the Sonics, but not the City, could seek

25   judicial relief.[30]  The City's interpretation by contrast, requires the Court to ignore Section D.

26

---

[30] See Exs. 1, 4.

THE PROFESSIONAL BASKETBALL CLUB'S REPLY IN
SUPPORT OF MOTION TO STAY AND OPPOSITION TO CROSS-
MOTION FOR STAY OF ARBITRATION - 9

BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

1    In a related vein, the City suggests that the carve outs of paragraph A conflict with the

2    general language of paragraph D. In such conflicts, says the City, the specific clauses control

3    over the general. But the City forgets there is no conflict between paragraphs A and D.

4    Paragraph D establishes who can seek judicial relief – the Sonics. Paragraph A delineates the

5    claims for which the Sonics can seek judicial relief.

6                   **VII.   The City Even Rewrites the Sonics Arbitration Demand**

7            The City's brief focuses on Section II of the Agreement. The City forgets that the

8    arbitration was not brought under Section II, but rather the Remedies clauses, Sections XXVI

9    and XXVII. Thus, the Arbitration Demand seeks "a declaratory judgment that under Sections

10   XXVI and XXVII of the Agreement, specific performance is not available to force the Sonics

11   to play the final two seasons at KeyArena. The City, recognizing that the Demand, by itself,

12   makes this case arbitrable, rewrites the arbitration demand:

13               Specifically, the Arbitration Demand seems a 'declaratory
             judgment that . . . specific performance is not available to force
14           the Sonics to play the 2008-2009 and 2009-2010 NBA seasons
             in KeyArena.[31]
15

16   In other words, the City removed the references to Sections XXVI and XXVII and replaced

17   them with an ellipses, seeking to rewrite the Arbitration Demand just as it seeks to rewrite the

     Agreement.
18

19                               **VIII.   Conclusion**

20           Taking the City's arguments in the very best light, they show that if you (i) eliminate

     the clause entitled "Limitation on Judicial Relief," (ii) consider Davidson's irrelevant and
21
     subjective opinions, wishes, and beliefs, (iii) ignore his prior testimony, (iv) accept scrivener
22
     Davidson, who had no negotiating authority, as a verity, (v) ignore the testimony of lead City
23
     negotiator McLaughlin, (vi) disregard Rubin, and (vii) indulge every argument in favor of the
24
     City, then there is a strained interpretation of the lease by which the City might be able to
25
     argue against arbitration. But that is not enough. The test is much different and much harder.
26

[31] City's Brief at 2.

THE PROFESSIONAL BASKETBALL CLUB'S REPLY IN
SUPPORT OF MOTION TO STAY AND OPPOSITION TO CROSS-
MOTION FOR STAY OF ARBITRATION - 10

BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

1  Under that test, which resolves all doubts in favor of arbitration, the City must show that there

2  is no interpretation by which arbitration could be required. The City fails to meet this heavy

3  burden. TPBC's motion should be granted, and the City's cross-motion should be denied.

4      DATED this 8th day of October, 2007.

5                            BYRNES & KELLER LLP

6

7                          By _____

8                              Bradley S. Keller, WSBA #10665
                               Paul R. Taylor, WSBA #14851

9                             Attorneys for Defendant
                              The Professional Basketball Club, LLC

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

THE PROFESSIONAL BASKETBALL CLUB'S REPLY IN
SUPPORT OF MOTION TO STAY AND OPPOSITION TO CROSS-
MOTION FOR STAY OF ARBITRATION - 11

BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

1

## CERTIFICATE OF SERVICE

2

The undersigned attorney certifies that on the 8th day of October, 2007, a true copy of
3  the foregoing pleading was served upon the following individuals:

4          **VIA HAND DELIVERY**

5          Thomas A. Carr
           Gregory C. Narver
6          Seattle City Attorney's Office
           600 Fourth Avenue, 4th Floor
7          Seattle, WA 98124-4769

8          Slade Gorton
           Paul J. Lawrence
9          Jeffrey Johnson
           Kirkpatrick & Lockhart Preston Gates & Ellis, LLP
10         925 4th Avenue, Suite 2900
           Seattle, WA 98104

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

THE PROFESSIONAL BASKETBALL CLUB'S REPLY IN
SUPPORT OF MOTION TO STAY AND OPPOSITION TO CROSS-
MOTION FOR STAY OF ARBITRATION - 12

BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

# NON-WASHINGTON
# AUTHORITIES

West Reporter Image (PDF)

252 F.3d 707

Briefs and Other Related Documents

United States Court of Appeals,
Fourth Circuit.
CHOICE HOTELS INTERNATIONAL, INCORPORATED, Plaintiff-Appellee,
v.
BSR TROPICANA RESORT, INCORPORATED, a Florida Corporation; Susan Hounsom; Milton Johnson,
Defendants-Appellants.
No. 00-2507.
Argued May 8, 2001.
Decided June 8, 2001.

Motel franchiser brought action against proposed franchisee and affiliated individuals, alleging defendants failed to pay affiliation fee and breached franchise agreement. Defendants moved to dismiss in favor of arbitration. The United States District Court for the District of Maryland, Peter J. Messitte, J., denied the motion. Upon defendants' interlocutory appeal, the Court of Appeals, Wilkins, Circuit Judge, held that: (1) defendants properly invoked the Federal Arbitration Act (FAA), as would permit stay of action; (2) exemption to arbitration clause in agreement was limited to traditional collection actions; (3) franchiser's action to enforce affiliation fee provision was a collection action, and therefore exempt; but (4) franchiser's breach of contract claim was not a collection action, and thus was subject to arbitration.
Vacated and remanded.

West Headnotes

[1] KeyCite Notes 

⊹ 25T Alternative Dispute Resolution
    ⊹ 25TII Arbitration
        ⊦25TII(D) Performance, Breach, Enforcement, and Contest
            ⊹25Tk190 Stay of Proceedings Pending Arbitration
                ⊹25Tk196 k. Particular Cases. Most Cited Cases
                    (Formerly 33k23.9 Arbitration)

Proposed franchisee and affiliated individuals properly invoked the Federal Arbitration Act (FAA) in motel franchiser's action against them, as would permit stay of franchiser's action, where defendants made clear during proceedings in district court that they were seeking enforcement of arbitration clause in parties' franchise agreement. 9 U.S.C.A. § 3.

[2] KeyCite Notes 

⊹25T Alternative Dispute Resolution
    ⊹ 25TII Arbitration
        ⊹ 25TII(D) Performance, Breach, Enforcement, and Contest
            ⊹ 25Tk204 Remedies and Proceedings for Enforcement in General
                ⊹25Tk212 k. Judgment or Order. Most Cited Cases
                    (Formerly 33k23.7 Arbitration)

Dismissal is a proper remedy when all of the issues presented in a lawsuit are arbitrable. 9 U.S.C.A. § 3.

[3] KeyCite Notes 

⇐ 170B Federal Courts
  ⇐ 170BVIII Courts of Appeals
    ⇐ 170BVIII(K) Scope, Standards, and Extent
      ⇐ 170BVIII(K)1 In General
        ⇐ 170Bk776 k. Trial De Novo. Most Cited Cases

When appeal involves a matter of contract interpretation, appellate court reviews the decision of the district court de novo.



[4] KeyCite Notes

⇐ 25T Alternative Dispute Resolution
  ⇐ 25TII Arbitration
    ⇐ 25TII(B) Agreements to Arbitrate
      ⇐ 25Tk136 Construction
        ⇐ 25Tk137 k. In General. Most Cited Cases
          (Formerly 33k7 Arbitration)



⇐ 25T Alternative Dispute Resolution KeyCite Notes
  ⇐ 25TII Arbitration
    ⇐ 25TII(B) Agreements to Arbitrate
      ⇐ 25Tk136 Construction
        ⇐ 25Tk139 k. Construction in Favor of Arbitration. Most Cited Cases
          (Formerly 33k7 Arbitration)

Agreements to arbitrate are construed according to the ordinary rules of contract interpretation, as augmented by a federal policy requiring that all ambiguities be resolved in favor of arbitration.



[5] KeyCite Notes

⇐ 25T Alternative Dispute Resolution
  ⇐ 25TII Arbitration
    ⇐ 25TII(B) Agreements to Arbitrate
      ⇐ 25Tk150 Operation and Effect
        ⇐ 25Tk152 k. As Ousting Jurisdiction of or Precluding Resort to Courts. Most Cited Cases
          (Formerly 33k8 Arbitration)

Scope of exemption to arbitration clause in franchise agreement for "actions for collection" was limited to traditional collection actions, and thus franchiser was permitted to bring action against franchisee and affiliated individuals only to enforce specific payment obligation fixed by parties' agreement and not contingent on additional events, rather than any claim seeking monetary damages.



[6] KeyCite Notes

⇐ 95 Contracts
  ⇐ 95II Construction and Operation
    ⇐ 95II(A) General Rules of Construction
      ⇐ 95k151 Language of Instrument
        ⇐ 95k155 k. Construction Against Party Using Words. Most Cited Cases

Any doubts in the interpretation of a contract must be resolved against the drafter.

[7] KeyCite Notes 

⇐25T Alternative Dispute Resolution
  ⇐25TII Arbitration
    ⇐25TII(B) Agreements to Arbitrate
      ⇐25Tk142 Disputes and Matters Arbitrable Under Agreement
        ⇐25Tk143 k. In General. Most Cited Cases
          (Formerly 33k7.5 Arbitration)

Motel franchiser's action to enforce affiliation fee provision in franchise agreement was a collection action,
and as such was not subject to arbitration clause in agreement pursuant to exception for collection actions,
where agreement between franchiser and franchisees expressly required franchisees to pay affiliation fee, fee
was not a remedy for either party's deviation from contract, but a part of contract itself, and amount of fee
was a sum certain under agreement.

[8] KeyCite Notes

⇐25T Alternative Dispute Resolution
  ⇐25TII Arbitration
    ⇐25TII(B) Agreements to Arbitrate
      ⇐25Tk142 Disputes and Matters Arbitrable Under Agreement
        ⇐25Tk143 k. In General. Most Cited Cases
          (Formerly 33k7.5 Arbitration)

Motel franchiser's breach of contract claim was not a collection action within provision in franchise agreement
exempting collection actions from general arbitration requirements, and thus franchiser's claim against
franchisees was subject to arbitration, where franchisees' alleged obligation to pay liquidated damages did
not arise from formation of contract itself, but rather from an alleged breach of contract.

**\*709 ARGUED:** Onkar Nath Sharma, Sharma & Bhandari, Silver Spring, MD, for Defendants-Appellants.
Kerry Shanahan McGeever, Silver Spring, MD, for Plaintiff-Appellee.

Before WILKINSON, Chief Judge, and WILKINS and LUTTIG, Circuit Judges.

Vacated and remanded by published opinion. Judge WILKINS wrote the opinion, in which Chief Judge
WILKINSON and Judge LUTTIG joined.

## OPINION

WILKINS, Circuit Judge:
SR Tropicana Resort, Incorporated and two affiliated individuals (collectively, "BSR") appeal the denial of
their motion to dismiss a lawsuit against them in favor of arbitration. Because the relevant contractual
language requires arbitration of one of the two claims against BSR, we vacate the decision of the district
court and remand for further proceedings.

I.

This case arises from a franchise agreement ("the Agreement") between BSR and Appellee Choice Hotels
International, Incorporated (Choice). Under the Agreement, BSR agreed to open a motel in Davenport,
Florida, and Choice authorized BSR to use the "Quality Inn" brand name. Three terms of the Agreement are
relevant here. First, BSR was required to pay Choice a non-refundable $25,000 "affiliation fee" upon signing

the Agreement. J.A. 10. Second, in the event of termination, the Agreement allowed Choice to recover liquidated damages. Third, the Agreement contained the following arbitration provision:

> Except for claims for indemnification, *actions for collection of moneys owed [to Choice] under this Agreement*, or actions seeking to enjoin [BSR] from using [Choice's trademarks] in violation of this Agreement, any controversy or claim relating to this Agreement, or the breach of this Agreement, including any claim that this Agreement or any part of this Agreement is invalid, illegal, or otherwise voidable or void, will be sent to final and binding arbitration....

*Id.* at 20 (emphasis added).

After less than two years, and before BSR opened its hotel, Choice sued BSR, alleging that (1) BSR failed to pay the affiliation fee and (2) BSR breached the Agreement, prompting Choice to terminate it and causing damages to Choice of $586,600. BSR moved to dismiss, asserting, *inter alia*, that the Agreement required arbitration of Choice's claims. The district court denied the motion; as is relevant here, the court ruled that Choice's claims were not arbitrable because they fell within the exception for "actions for collection of moneys owed." After the district court denied reconsideration, BSR took this interlocutory appeal. *See* 9 U.S.C.A. § 16(a) (West 1999) (authorizing interlocutory appeals from certain orders favoring litigation over arbitration).

II.

[1] Before addressing BSR's appellate claim, we must consider Choice's contention that BSR never properly invoked the Federal Arbitration Act (FAA). We hold that this contention is meritless.

[2] As is relevant here, the FAA requires a district court, upon motion by any party, to stay judicial proceedings involving issues covered by written arbitration agreements. *See* 9 U.S.C.A. § 3 (West 1999). According to Choice, BSR's motion to dismiss was not a proper § 3 motion because the sole remedy available under § 3 is a stay. Notwithstanding the terms of § 3, however, dismissal is a proper remedy when all of the issues presented in a ***710** lawsuit are arbitrable. *See Alford v. Dean Witter Reynolds, Inc.,* 975 F.2d 1161, 1164 (5th Cir.1992). Moreover, a hypertechnical reading of BSR's pleadings would be inconsistent with the "liberal federal policy favoring arbitration agreements." *Moses H. Cone Mem. Hosp. v. Mercury Const. Corp.,* 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). BSR made clear during proceedings in the district court that it was "seeking enforcement of the arbitration clause of the Agreement." J.A. 141. This is sufficient to invoke the full spectrum of remedies under the FAA, including a stay under § 3.

III.

[3] [4] We now turn to BSR's assertion that the Agreement requires arbitration of both of Choice's claims. Because this appeal involves a matter of contract interpretation, we review the decision of the district court de novo. *See United States v. Bankers Ins. Co.,* 245 F.3d 315, 319 (4th Cir.2001). Agreements to arbitrate are construed according to the ordinary rules of contract interpretation, as augmented by a federal policy requiring that all ambiguities be resolved in favor of arbitration. *See First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 944-45, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995).

A.

[5] The Agreement provides for arbitration of "any controversy or claim relating to this Agreement, or the breach of this Agreement," subject to three exceptions. J.A. 20. This appeal requires us to interpret one of these exceptions, which embraces "actions for collection of moneys owed [to Choice] under this Agreement" ("the collection exemption"). *Id.*

The crucial terms within this phrase are "collection" and "owed." "To collect a debt or claim is to obtain payment or liquidation of it, either by personal solicitation or legal proceedings." *Black's Law Dictionary* 263 (6th ed.1990) (emphasis added). To "owe" means "[t]o be bound to do or omit something, especially to pay a debt." *Id.* at 1105. Both of these definitions point us to the word "debt," which denotes a "sum of money due by certain and express agreement" or a "fixed and certain obligation to pay money or some other valuable thing or things." *Id.* at 403. In light of these definitions, we hold that the collection exemption applies to actions by Choice to enforce specific payment obligations that are "fixed" by the Agreement and not contingent on additional events. This interpretation of the phrase "actions for collection" accords with the ordinary understanding of the phrase "collection action." *See, e.g., Young v. Commissioner,* 240 F.3d 369, 372 (4th Cir.2001) (referring to "collection action" against defaulting debtor); *cf. Laborers Health & Welfare Trust Fund v. Advanced Lightweight Concrete Co.,* 484 U.S. 539, 548-51, 108 S.Ct. 830, 98 L.Ed.2d 936 (1988) (holding, in the context of the Employee Retirement Income Security Act, that a procedure known as a "collection action" may be used to enforce payment of promised contributions to retirement plans but not to determine whether additional contributions are mandated by law).

The parties offer two alternative readings of the collection exemption. BSR contends that the exemption is limited to the enforcement of judgments. For its part, Choice asserts that the phrase embraces all actions seeking monetary damages. We find neither of these interpretations persuasive.

Under BSR's interpretation, most disputes between Choice and BSR would proceed to arbitration first, and then Choice could resort to judicial proceedings to recover damages awarded by the arbitrator. This interpretation is inconsistent with the contractual language referring to "moneys *711 owed ... under this Agreement,"* J.A. 20 (emphasis added), which describes debts arising from the Agreement rather than debts imposed by judicial or arbitral judgment. Moreover, under BSR's interpretation, the collection exemption applies only after claims have already been arbitrated; this is not a plausible reading of a phrase designed to exclude certain claims from arbitration.

Choice, by contrast, favors an extremely broad reading of the collection exemption. According to Choice, the exemption excludes from arbitration all claims (by Choice) seeking monetary damages. Given the opportunity at oral argument to identify claims that *would* be arbitrable, counsel for Choice was able to offer only two examples-demands for specific performance and actions for replevin. Choice's interpretation is intuitively unsatisfying, however, because most breach of contract claims seek monetary relief; consequently, most breach of contract claims by Choice would be exempt from arbitration, notwithstanding that the arbitration clause expressly embraces "any controversy or claim relating to ... the breach of this Agreement." *Id.* Our discomfort with Choice's interpretation is heightened by the fact that a separate exemption within the arbitration clause excludes certain equitable actions brought by Choice to arrest "violation[s] of this Agreement." *Id.* Thus, the interpretation urged by Choice effectively transforms the arbitration provision into a unilateral commitment by BSR to arbitrate its claims, while claims by Choice are subject to judicial determination. We are reluctant to give the arbitration provision this effect, as the structure of the provision does not imply such an imbalance in its application.

[6]    At best, Choice's construction offers a minimally plausible alternative to the interpretation we set forth above and thereby renders the collection exemption ambiguous. To resolve this ambiguity, we resort to three interpretive guides. First, as noted above, federal policy requires that ambiguities in arbitration clauses be resolved in favor of arbitration. *See Am. Recovery Corp. v. Computerized Thermal Imaging, Inc.,* 96 F.3d 88, 92 (4th Cir.1996) ("[W]e may not deny a party's request to arbitrate an issue unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." (internal quotation marks omitted)); *see also Armijo v. Prudential Ins. Co.,* 72 F.3d 793, 800 (10th Cir.1995) (noting that policy favoring broad construction of arbitration clauses compels narrow construction of exceptions to arbitration clauses). Second, when faced with a general rule and enumerated exceptions, we interpret the exceptions narrowly, lest they overwhelm the rule. *See Commissioner v. Clark,* 489 U.S. 726, 739, 109 S.Ct. 1455, 103 L.Ed.2d 753 (1989). Third, any doubts in the interpretation of a contract must be resolved against the drafter-in this case, Choice. *See Bankers Ins.,* 245 F.3d at 321 n. 7. These principles uniformly support a narrow reading of the collection exemption and a correspondingly expansive construction of the general arbitration requirement. Accordingly, we reject Choice's interpretation of the collection exemption and adhere to the conclusion that only traditional collection actions are excluded from the arbitration requirement.

Having determined the scope of the collection exemption, we must now consider the extent to which it applies to Choice's claims. We hold that Choice's effort to recover the affiliation fee is a collection action subject to the collection exemption; the breach of contract claim, however, falls outside the exemption.

*712 [7]    The Agreement between Choice and BSR expressly requires BSR to pay the affiliation fee. The fee is part of the contract itself, not a remedy for either party's deviation from the contract. Moreover, the amount of the fee ($25,000) is a sum certain under the Agreement. Thus, Choice's effort to enforce this contractual provision provides a classic example of a collection action. *See Briargate Condo. Ass'n v. Carpenter,* 976 F.2d 868, 869 (4th Cir.1992) (characterizing suit to compel payment of condominium fees as "collection action"). Accordingly, under the collection exemption, this claim is not subject to arbitration. Furthermore, because this claim is not arbitrable, BSR was not entitled to dismissal of Choice's complaint in its entirety.

[8]    We nevertheless vacate the order of the district court because Choice's breach of contract claim is not within the collection exemption and therefore is subject to arbitration. The Agreement provides for liquidated damages in the event of termination, and Choice specifically invoked this provision in its complaint; thus, the amount of Choice's damage request is, like the affiliation fee, contractually determined. BSR's obligation to pay this amount, however, does not arise from the formation of the contract, but rather from an alleged breach of contract. Because this is not a debt subject to collection, the collection exemption does not apply. By contrast, the general terms of the arbitration clause specifically embrace claims arising from "the breach of this Agreement." J.A. 20. BSR is therefore entitled to arbitration of this issue and to a stay of proceedings while the arbitration takes place.

IV.

In sum, Choice's complaint is not subject to dismissal, because it contains at least one non-arbitrable claim. However, Choice's breach of contract claim is arbitrable under the Agreement. We therefore vacate the decision of the district court and remand with instructions to stay proceedings on this claim pending arbitration. The court may, in its discretion, stay proceedings on the affiliation fee claim as well. *See Am. Recovery Corp.,* 96 F.3d at 97.

*VACATED AND REMANDED.*

C.A.4 (Md.),2001.
Choice Hotels Intern., Inc. v. BSR Tropicana Resort, Inc.
252 F.3d 707

Briefs and Other Related Documents (Back to top)

• 2001 WL 34109920 (Appellate Brief) Reply Brief of Appellants (Mar. 24, 2001) 🖼 Original Image of this Document with Appendix (PDF)
• 2001 WL 34109895 (Appellate Brief) Brief of Appellee (Mar. 12, 2001) 🖼 Original Image of this Document with Appendix (PDF)
• 2001 WL 34109894 (Appellate Brief) Brief of Appellants (Feb. 09, 2001) 🖼 Original Image of this Document with Appendix (PDF)
• 00-2507 (Docket) (Nov. 30, 2000)
END OF DOCUMENT

🖼 West Reporter Image (PDF)

(C) 2007 Thomson/West. No Claim to Orig. US Gov. Works

# EXHIBIT 1

1
2
3
4
5
6
7           SUPERIOR COURT OF WASHINGTON IN AND FOR KING COUNTY

8     CITY OF SEATTLE, a first-class charter city,  )
                                                     )
9                              Plaintiff,            )    No. 07-2-30997-7 SEA
                                                     )
10    v.                                             )    **DECLARATION OF ERIC M. RUBIN**
                                                     )
11    THE PROFESSIONAL BASKETBALL                    )
      CLUB, LLC, an Oklahoma limited liability       )
12    company,                                       )
                                                     )
13                              Defendant.           )
      _____

14          Eric M. Rubin declares as follows:

15          1.      I am an attorney with the firm of Rubin, Winston, Diercks, Harris & Cooke,

16    L.L.P., in Washington, D.C. I have personal knowledge of and am competent to testify to the

17    matters stated herein.

18          2.      I represented SSI Sports, Inc., in negotiations with the City of Seattle over the

19    Premises Use & Occupancy Agreement ("Agreement") by which the Seattle Sonics were

20    permitted to use what became known as KeyArena. I was the lead negotiator for SSI.

21          3.      I understand that there is a dispute between the City of Seattle and the current

22    owners of the Sonics, the Professional Basketball Club, LLC. I also understand that part of this

23    dispute concerns the scope of the Agreement's arbitration clause.

24          4.      In the course of the negotiations that led to the Agreement, the City and the

25    Sonics initially agreed that all disputes would be arbitrated. However, the Sonics were

26    concerned about the risks of entering into a long-term lease for a facility that had not yet been

      designed, much less built. Therefore, the Sonics wanted to be able to seek prompt injunctive

      DECLARATION OF ERIC M. RUBIN - 1

BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

1    relief for certain issues, primarily those relating to design and construction, and when occupancy

2    would begin.

3        5.    Accordingly, the Agreement was modified to reflect the parties' discussions and

4    agreement to the effect that all claims would be subject to arbitration, except for certain one-way

5    "carve outs," which allowed the Sonics, but not the City, to bring claims for injunctive relief, as

6    follows:

7        a.    Paragraph A of the arbitration clause provides that "all claims and

8    disputes" between the parties shall be decided by binding arbitration. However, given the

9    Sonics' concerns, certain "carve outs" were added: Article II, Term; Use Period; Article III,

10   Termination of Current Agreement Providing Seattle Center Space for SuperSonics Home

11   Games Use; Article IV, Coliseum Design and Construction; Article V, Coliseum Planning and

12   Construction Schedule; SSI Opportunities to Void Agreement; Section XXVI.F, Hazardous

13   Substances; and XXIX, Subcontracting and Transfer of Ownership.

14       b.    Paragraph D of the arbitration clause provides that no dispute relating to

15   the Agreement is to be brought in any court except (i) an action to compel arbitration; (ii) an

16   action to enforce an arbitration award; or (iii) an action to file an arbitration award as a

17   judgment. However, Paragraph D (iv) was added to allow claims brought by the Sonics

18   regarding the Paragraph A carve outs for "injunctive relief or any other interim remedy to

19   protect [the Sonics'] rights under this Agreement."

20       6.    The parties also discussed and agreed that once KeyArena was built and occupied,

21   all disputes would be subject to arbitration.

22       I declare under penalty of perjury under the laws of the State of Washington that this

23   declaration is true and correct.

24       DATED at Washington, D.C., this 7th day of October, 2007.

25

26                                        _____
                                          Eric M. Rubin

DECLARATION OF ERIC M. RUBIN - 2

BYRNES & KELLER llp
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

# EXHIBIT 2

**City of Seattle vs SSI, Inc.      GORDON DAVIDSON 5-25-99**

**Mills & Lessard**

**Page 1 to Page 124**

MICRO-DEP TRANSCRIPT AND CONCORDANCE
PREPARED BY:

**MILLS & LESSARD**
1411 4th Avenue, Suite 740
Seattle, WA    98101
Phone:    206-292-9063
FAX:    206-292-8183

(1)        CITY OF SEATTLE v. SSI INC. ARBITRATION
(2)
(3) -----------------------------------------------------------
(4) CITY OF SEATTLE,                    )
(5)              Plaintiff,             )
(6)         vs.                         )
(7) SSI, INC.,                          )
(8)              Defendant.             )
(9) -----------------------------------------------------------
(10)        DEPOSITION UPON ORAL EXAMINATION
(11)                        OF
(12)             GORDON B. DAVIDSON
(13) -----------------------------------------------------------
(14)                    11:07 a.m.
(15)                   May 25, 1999
(16)         1000 Second Avenue, Suite 3800
(17)               Seattle, Washington
(18)
(19)
(20)
(21)
(22)
(23)
(24) Patricia Lessard
(25) Court Reporter

Page 2

(1)                  A P P E A R A N C E S
(2)
(3)
(4) FOR THE PLAINTIFF:      MS. HELAINE HONIG
(5)                         Seattle City Attorney
(6)                         600 Fourth Avenue, Tenth Floor
(7)                         Seattle, Washington 98104
(8)
(9)
(10) FOR THE DEFENDANTS:    MR. PETER D. BYRNES
(11)                        MS. KIMBERLY A. BOYCE
(12)                        Byrnes & Keller
(13)                        Attorneys at Law
(14)                        1000 Second Avenue, Suite 3800
(15)                        Seattle, Washington 98104
(16)
(17)
(18) ALSO PRESENT:          MR. JERRY McLAUGHLIN
(19)
(20)
(21)
(22)
(23)
(24)
(25)

(1)                 INDEX OF EXAMINATIONS
(2) ATTORNEY                           PAGE LINE
(3) BY MR. BYRNES:                        4    4
(4) BY MR. BYRNES:                       78    5
(5)
(6)               E X H I B I T   I N D E X
(7) EX#            DESCRIPTION           PAGE LINE
(8)  1  Anticipated testimony of Gordon B.  5   21
(9)     Davidson.
(10) 2  Memorandum of Understanding between  16  9
(11)    the City of Seattle/Seattle Center
(12)    and Ackerley Communications, Inc./
(13)    SSI Sports, Inc.
(14) 3  Premises Use and Occupancy          19   10
(15)    Agreement between the City of
(16)    Seattle and SSI Sports, Inc.,
(17)    dated March 2, 1994.
(18) 4  Collection of documents beginning   29   11
(19)    with a May 18, 1999, letter to Peter
(20)    Byrnes from Helaine Honig.
(21) 5  Handwritten notes by Gordon.        56   11
(22)    Davidson.
(23) 6  Handwritten Post-It.                83    9
(24)
(25)

Page 4

(1) GORDON B. DAVIDSON, being duly sworn, testified
(2) upon oath, as follows:
(3) E X A M I N A T I O N
(4) BY MR. BYRNES:
(5)    Q.   State your name and employer, please.
(6)    A.   My name is Gordon Davidson. I'm employed by
(7) the City of Seattle Law Department.
(8)    Q.   Do you have a title of any sort in the law
(9) department?
(10)    A.   Assistant city attorney.
(11)    Q.   Do you have any area of specialty practice,
(12) Mr. Davidson?
(13)    A.   Within the law department, yes; I concentrate
(14) on contracts and leases.
(15)    Q.   Okay. And when you say you concentrate on
(16) contracts and leases, can you be more specific?
(17)    A.   I spend most of my time writing leases
(18) involving the City, whether as a lessor or as a lessee.
(19) And I have written a variance of those leases that can
(20) be denominated as, in some cases, license agreements,
(21) use and occupancy agreements, concession agreements.
(22) And I have been involved in the writing of a
(23) variety of other contracts.
(24)    Q.   How long have you been with the City of
(25) Seattle?

Page 5

(1) A. Since 1976.

(2) Q. And are you a member of in good standing of

(3) the bar of the State of Washington?

(4) A. I am.

(5) Q. You were involved, were you not, in the

(6) discussions that took place between the City of Seattle,

(7) on the one hand, and SuperSonics, Inc., on the other,

(8) concerning a possible lease arrangement on a new

(9) facility to be erected at the site of the old Coliseum?

(10) A. I was.

(11) Q. When was your first involvement in those

(12) discussions?

(13) A. It's hard to say, but probably in the early

(14) 1990s.

(15) Q. I take it you have seen a copy of your

(16) anticipated testimony in this arbitration?

(17) A. I saw a draft version. I participated in the

(18) development of it.

(19) Q. All right. Let me mark as Exhibit 1 to the

(20) deposition and hand you a copy and counsel a copy

(21) (Marked Deposition Exhibit No. 1.)

(22) Q. (By Mr. Byrnes) Have you seen this document

(23) before? You can use the original; the other is for your

(24) counsel

(25) A. Yes, I've seen this before.

Page 6

(1) Q. And were you involved in the preparation of

(2) this draft?

(3) A. I was.

(4) Q. Is there anything in this statement of

(5) anticipated testimony with which you disagree?

(6) A. Not that I recall, no.

(7) Q. Is it an accurate portrayal of your knowledge

(8) and information concerning the matters stated?

(9) A. Yes.

(10) Q. Among other things, it indicates that you were

(11) involved in the Memorandum of Understanding, the

(12) so-called MOU, is that correct?

(13) A. Yes.

(14) Q. Did you have any role in connection with the

(15) drafting or preparation of the old lease between the

(16) Sonics, and I'll call the Sonics that entity, and the

(17) City of Seattle on the old facility?

(18) A. And the old lease you refer to as what?

(19) Q. Well, the old arena lease. The old coliseum

(20) lease, excuse me.

(21) A. By "old Coliseum lease," you refer to the

(22) lease that was in effect prior to the current lease?

(23) Q. Yes.

(24) A. Yes.

(25) Q. What was your role in that connection?

Page 7

(1) A. I participated to some extent in the

(2) negotiation of various changes to it, and was the -- a

(3) significant, if not the principal, drafter of it.

(4) Q. And who else participated with you in that

(5) endeavor?

(6) A. Seattle Center administrators at the time, and

(7) conceivably my supervisor at the time, whether it was --

(8) and I don't remember whether it was Rodney Eng or Don

(9) Stout during that period.

(10) Q. Who participated in the discussions that led

(11) to the Memorandum of Understanding and the current

(12) lease, and it's called actually a "Premises Use and

(13) Occupancy Agreement," but I'll refer to it as the

(14) "lease," is that all right?

(15) A. That's fine.

(16) Q. Who participated first for the City in those

(17) discussions?

(18) A. I can't tell you everyone who participated,

(19) because I may not know all of those people. I know that

(20) Jerry McLaughlin participated, I know that Virginia

(21) Anderson participated, I know that Rodney Eng

(22) participated. In terms of -- and within the City,

(23) Margaret Wetter participated in discussions, internal

(24) ones.

(25) Q. I was interested in group discussions with the

Page 8

(1) other side.

(2) A. Okay.

(3) Q. Let me put another question. Your anticipated

(4) testimony refers to the fact that you participated in

(5) approximately five negotiation sessions, is that

(6) correct?

(7) A. That's my recollection.

(8) Q. Do you maintain time records?

(9) A. To some extent, yes.

(10) Q. How is it that you know that there were five

(11) negotiating sessions that you participated in, as

(12) opposed to some other number?

(13) A. Because I would have made various notations,

(14) either in my calendar about the location of a meeting

(15) and who was likely to be there, or the general scope of

(16) it, in contrast to a mere meeting, for instance, with

(17) Terry or other people, other Seattle Center people.

(18) Q. Is it your testimony that there were five and

(19) only five meetings, or approximately five meetings that

(20) you were present at with officals of SSI or

(21) representatives of the Sonics?

(22) A. That's my recollection.

(23) Q. And you say that's your recollection, but you

(24) also say that you had your recollection apparently

(25) refreshed by looking at some underlying notes or

Page 9

(1) calendars, is that true?

(2) A.  Uh-huh.

(3) Q.  When did you do that?

(4) A.  Within the last two months.

(5) Q.  And did you go back to your time records?

(6) A.  Let me think. No.

(7) Q.  Are you required to maintain any sort of time

(8) records by the law department?

(9) A.  "Required" is probably too strong a word,

(10) since there isn't a billing out by people in our

(11) department, except for utility-related work. It's

(12) merely a tracking device.

(13) Q.  What documents did you look at to ascertain

(14) that you participated in approximately five negotiation

(15) sessions?

(16) A.  I looked at contract versions, notes, and my

(17) calendar.

(18) Q.  And pardon?

(19) A.  And my calendar.

(20) Q.  And your calendar for what year?

(21) A.  1993 and 1994.

(22) Q.  And do you still have those?

(23) A.  Yes.

(24) Q.  In addition to these face-to-face sessions

(25) that you're describing, did you also have telephone

---

Page 10

(1) discussions?

(2) A.  Yes.

(3) Q.  With whom?

(4) A.  Eric Rubin, primarily.

(5) Q.  Anyone other Eric Rubin?

(6) A.  There may have been some telephone discussions

(7) with Bill Ackerley and with Terry.

(8) Q.  With you and Terry on the one hand, and with

(9) Rubin and/or Ackerley on the other?

(10) A.  Yes.

(11) Q.  And were those sessions, other than the fact

(12) that they were on the telephone rather than face to

(13) face, any different in kind than the ones that were face

(14) to face?

(15) A.  Depending on who was involved in the

(16) conversations, yes.

(17) Q.  Okay. How were they different?

(18) A.  When there were conversations with – between

(19) just Eric and myself, we were largely focusing on

(20) language, particular language that was used in the – or

(21) to be used or proposed to be used in the agreement.

(22) When we were – when I was involved in

(23) telephonic negotiations involving Bill Ackerley, there

(24) would have been discussions more focusing on business

(25) points, in many cases. And I'll stop there.

---

Page 11

(1) Q.  Do you know how many telephone discussions you

(2) had in which Terry McLaughlin and/or Bill Ackerley were

(3) involved?

(4) A.  No.

(5) Q.  Do you not have a list of those as well on

(6) your calendar?

(7) A.  No.

(8) Q.  Do you have the dates of the five sessions

(9) somewhere?

(10) A.  They were – since it's – my statement I

(11) think says approximately five, I have the dates of some

(12) that can be extrapolated. I have some that are more

(13) clearly in my memory, one in particular.

(14) Q.  Well, have you – in your effort to

(15) reconstruct these meetings, but not the telephone

(16) discussions, have you actually gone back and found dates

(17) of meetings?

(18) A.  To some extent, yes.

(19) Q.  Well, tell me the dates of meetings that you

(20) recall.

(21) A.  There was one, to my recollection, on

(22) November 10th and 11th. And I know that because it was

(23) over Veteran's Day.

(24) Q.  All right.

(25) A.  I don't recall at this point the dates of any

---

Page 12

(1) other particular meeting.

(2) Q.  So other than the November 10 and 11 meeting,

(3) insofar as the face-to-face meetings are concerned, am I

(4) correct that you cannot assign a date to any of those

(5) meetings?

(6) A.  At this point, no, without the benefit of

(7) other hints.

(8) Q.  Without the benefit of what?

(9) A.  Of other hints, other materials.

(10) Q.  And those materials would be your personal

(11) calendars?

(12) A.  Either personal calendars, yeah, conceivably.

(13) Because I would have –

(14) Q.  Anything else?

(15) A.  Conceivably some of the contract drafts.

(16) Q.  Okay. Do you recall, even though you can't

(17) assign dates to these meetings, approximate dates? Can

(18) you say, for example, that, of the five, so many were in

(19) the fall, so many were in the spring?

(20) A.  No.

(21) Q.  Have you compiled any list of dates on some

(22) document or piece of paper anywhere?

(23) A  No.

(24) Q  When you went back to your calendars, did you

(25) actually see a meeting, for example, October 12th, and

---

(1) say to yourself, "Oh, yes, that's a meeting"?

(2) A. My calendar would have had a notation about

(3) it, the matter being probably a Sonic negotiation

(4) session.

(5) Q. Pardon?

(6) A. I said my calendar probably would have had a

(7) notation about the meeting being a Sonic negotiation

(8) session, and where it was supposed to be and when it was

(9) supposed to start.

(10) Q. For example, then, it would say, under a

(11) certain date, "Sonic negotiation session"?

(12) A. Something like that, yes.

(13) Q. And do you keep a monthly calendar, or do you

(14) keep a daily calendar, the type we see on top of

(15) people's desks where they flip each day?

(16) A. It's a monthly calendar.

(17) Q. It's a Month-At-A-Glance, in effect?

(18) A. Well, it's a weekly calendar at a glance.

(19) Q. And have you looked back at that within the

(20) last month or so, since this arbitration got under way,

(21) to check these dates?

(22) A. Yes.

(23) Q. And do you have any memory at all, as you sit

(24) here today, of any meeting, in terms of its approximate

(25) time frame, other than this November 10 and 11?

Page 14

(1) A. My recollection is that there was a meeting in

(2) December of 93, and conceivably a meeting in January,

(3) but I do not remember the date.

(4) Q. Do you believe, as you sit here today, that

(5) the November 10 and 11 meeting was the first

(6) face-to-face meeting in which you participated?

(7) A. I do not remember that.

(8) Q. Do you believe that, interspersed throughout

(9) the period of the face-to-face meetings, there were

(10) these telephonic meetings that you've referred to?

(11) A. To some extent, yes.

(12) Q. And they took – if I understand you, they

(13) took one of two forms: either just you and Eric Rubin

(14) talking about lease language, or, in some cases, you and

(15) Terry McLaughlin on the one hand, and Bill Ackerley and

(16) Rubin on the other, having a telephone conference?

(17) A. That's right. But the latter would have been

(18) far fewer than the former.

(19) Q. Approximately how many telephone conferences

(20) of the latter type were there? In other words, with

(21) McLaughlin and Ackerley.

(22) A. I can't tell you.

(23) Q. Were there some?

(24) A. I have a vague recollection of there being

(25) some, right.

(1) Q. And how many were there where there was just

(2) you and Mr. Rubin talking?

(3) A. I believe more than 20.

(4) Q. Would your time records show the dates of your

(5) meetings?

(6) A. All meetings, yes, but not necessarily

(7) meetings in which I could say that Bill Ackerley or Eric

(8) or anybody else representing the Sonics were there.

(9) They would simply be identified probably as a Sonics and

(10) a meeting, whether it was a meeting with Terry or more

(11) people.

(12) Q. Okay. So if I understand, what you're telling

(13) me is you'd go back to your time records, and it would

(14) say "Sonics meeting," but it wouldn't identify the

(15) participants?

(16) A. That's right.

(17) Q. And you wouldn't have any way, then, from your

(18) time records, to identify the participants?

(19) A. No.

(20) Q. And is that generally the same – is generally

(21) the same thing true with respect to your calendars, it

(22) would not identify participants, but simply state

(23) "Sonics negotiating session," to use your words?

(24) A. I can't say. I don't remember what is on the

(25) notations in the calendars.

Page 16

(1) Q. Do you recall when the Memorandum of

(2) Understanding was negotiated and arrived at?

(3) A. Vaguely, yes.

(4) Q. Well, when was it?

(5) A. Sometime in 1993 is my recollection.

(6) Q. All right. Let me have marked, as the next

(7) exhibit in order, a copy of the memorandum of

(8) understanding.

(9) (Marked Deposition Exhibit No. 2.)

(10) Q. (By Mr. Byrnes) It appears to have been

(11) signed in approximately March of 1993. Does that

(12) refresh your memory?

(13) A. Yes.

(14) Q. And when were the actual negotiations for a

(15) lease commenced?

(16) A. I'm sorry, I didn't –

(17) Q. Yeah. Following the signing of this, was

(18) there a time frame in which lease negotiations began for

(19) a premises use and occupancy agreement?

(20) A. Yes, if one assumes that this wasn't really

(21) the beginning of that.

(22) Q. All right. So the beginning of the process

(23) was the discussions that led up to the memorandum of

(24) understanding, and thereafter discussions ensued leading

(25) to a premises use and occupancy agreement?

**Page 17 / Page 19 (left column)**

(1) A. Yes.

(2) Q. Who prepared the first draft of a premises use

(3) and occupancy agreement?

(4) A. That, I do not know, because, for a period of

(5) time, both Eric Rubin and I were preparing drafts; and

(6) that phenomenon itself became somewhat problematical,

(7) because drafts were being shifted back and forth, and it

(8) was difficult to track which draft was really supposed

(9) to be under discussion.

(10) Q. So as I understand you, both sides were at

(11) different times preparing drafts?

(12) A. Yes.

(13) Q. And you have no memory of who prepared the

(14) very first draft?

(15) A. No.

(16) Q. Do you recall that there was a rent provision

(17) in the Memorandum of Understanding?

(18) A. Yes. It's identified as Section II.

(19) Q. All right. And let's take a look at page one

(20) of the Memorandum of Understanding, paragraph two,

(21) "Rental and Other Payments," and specifically the second

(22) sentence, does that indicate that the Sonics have to pay

(23) a base rent of $800,000 per year, subject to a CPI

(24) adjustment, for 41 regular season games and five

(25) additional games, or "determined Sonic events," to be

**Page 18**

(1) more accurate?

(2) A. That's what it says.

(3) Q. And was it your understanding that if there

(4) were more games than that, then there was an additional

(5) rental of eight and a half percent due?

(6) A. That's the third sentence.

(7) Q. All right. I'm going to mark, just so you can

(8) have it before you –

(9) A. Let me correct that. There was – there was

(10) a –

(11) Can you read back your last question.

(12) (The reporter read back as requested.)

(13) A. Yeah, the third sentence generally describes

(14) that sort of arrangement.

(15) Q. (By Mr. Byrnes) But to be more accurate, it

(16) requires eight and a half percent due for preseason and

(17) the first two home playoff games?

(18) A. That's correct.

(19) Q. Does this Memorandum of Understanding address

(20) the subject of additional games, other than the first

(21) two home playoff games and preseason games?

(22) A. I don't believe it does.

(23) Q. So it doesn't address the potential that there

(24) might be 42 home games, regular season?

(25) A. I don't recall that it does.

**Page 19 (right column)**

(1) Q. And does it address the subject of what would

(2) occur, if anything, if there were less than 41 home

(3) games?

(4) A. Not explicitly, no.

(5) Q. It doesn't say anything about that subject?

(6) A. Not to my recollection.

(7) Q. All right. I'd like to direct your attention

(8) now to what I'm having marked as Exhibit 3, which is

(9) what I refer to as the lease.

(10) (Marked Deposition Exhibit No. 3.)

(11) Q. (By Mr. Byrnes) Would you take a look at

(12) that and just verify it for me that that appears to you

(13) to be a copy of the current lease.

(14) A. It is not – the first part of this appears to

(15) be the initial lease. The second part, after this

(16) yellow page, is identified as the "Second Amendment to

(17) the Premises Use and Occupancy Agreement." To my

(18) recollection, the parties have agreed only on our first

(19) amendment.

(20) Q. Okay. We'll get to that. I'm principally

(21) interested in asking you, though, is this a document

(22) that was executed in early 1994 as the first lease?

(23) A. It appears to be.

(24) Q. All right. Let me ask you some questions

(25) about the subject of rent. You understand what's

**Page 20**

(1) involved in this arbitration, I take it?

(2) A. Yes, generally.

(3) Q. Take a look at paragraph eight, if you will,

(4) at the rent of $800,000. Do you see that on page 19?

(5) Do you have that before you?

(6) A. I do.

(7) Q. And there's a base rent to be potentially

(8) adjusted by the CPI indicator in paragraph B, is that

(9) right?

(10) A. Yes, there is.

(11) Q. And there are certain circumstances under

(12) which there could be additional rent, i.e., for

(13) preseason games, conference or championship games, and

(14) more than 41 regular season home games?

(15) A. That's right.

(16) Q. Are there instances in this lease document

(17) where rent would be less than $800,000, if there were,

(18) for whatever reason, fewer than 41 games?

(19) A. There are instances in this lease when the

(20) rent might be different than $800,000, for, for

(21) instance, you know, certain reasons. For instance, in

(22) subsection VII.A.1.a., there's a provision for an

(23) adjusted rent in the event the use and occupancy didn't

(24) commence on October 1, 1995.

(25) Q. All right. Continue.

(1) A. My recollection is that there were minimal

(2) other provisions in which the rent would be less than

(3) $800,000, one being if the – if I recall correctly, the

(4) facility were damaged, but the principle that this lease

(5) maintained was the same principle generally expressed in

(6) the MOU, that the City was to receive a base rent of

(7) $800,000.

(8) Q. Let's take your first exception where the rent

(9) would be lower than $800,000. What paragraph did you

(10) specifically refer to?

(11) A. VII.A.1.a. Roman seven, capital A, Arabic

(12) one, small A.

(13) Q. What page is that on?

(14) A. Nineteen.

(15) Q. Pardon?

(16) A. Nineteen.

(17) Q. And that provides, in effect, for a prorated

(18) or reduced rent in the event that the facility was not

(19) ready by October 1, 1995?

(20) A. For the very first – for partial year of the

(21) use and occupancy.

(22) Q. And the rent would be reduced on a per day –

(23) a per-day basis, is that correct?

(24) A. It doesn't say, as I recall.

(25) Q. It doesn't say "prorated on a daily basis"?

Page 22

(1) A. Yes, there it does, "prorated on a daily

(2) basis."

(3) Q. All right. So if a portion of the particular

(4) season at issue here, the first one, if it didn't

(5) commence on October 1, 1995, but commenced

(6) hypothetically 30 days later, then the rent for that

(7) first year of $800,000 was to be prorated on a daily

(8) basis?

(9) A. Exactly.

(10) Q. All right. Now, I want to direct your

(11) attention, if you would, to paragraph 20, Roman 20 of

(12) the lease, on page 48. Are you familiar with this

(13) clause or this paragraph?

(14) A. Yes.

(15) Q. Were you involved in discussions and

(16) negotiations concerning this paragraph?

(17) A. Yes.

(18) Q. Who else was involved in those discussions and

(19) negotiations?

(20) A. I can't tell you with assurance, other than

(21) Terry McLaughlin. I don't remember how many other

(22) people would have been involved in those discussions,

(23) but there could have been others.

(24) Q. And who would have been involved in those

(25) discussions and negotiations on behalf of SSI?

(1) A. Eric Rubin, conceivably. Conceivably Bill

(2) Ackerley. I don't know who else besides those two.

(3) Q. Well, do you have a memory that those two

(4) gentlemen, or either of them, were involved in

(5) discussions concerning paragraph 20?

(6) A. Not Bill Ackerley. A memory of discussions

(7) with Eric Rubin about this.

(8) Q. You do remember them?

(9) A. I do have some recollection of a discussion

(10) with Eric Rubin.

(11) Q. And what do you remember about your

(12) discussions with Eric Rubin about paragraph 20?

(13) A. I have recollection of requesting copies of

(14) the constitution, bylaws, rules and regulations of the

(15) NBA. I have a recollection of talking with him about

(16) changes in the text.

(17) Q. What specifically do you recall about the

(18) discussions, if anything, other than what you've said?

(19) A. I have a recollection that we discussed the

(20) addition of the last phrase.

(21) Q. Beginning with the words "Except in the

(22) instance of .."?

(23) A. No. Beginning with the word "during."

(24) Q. What do you recall about that?

(25) A. I have a recollection that we talked about the

Page 24

(1) addition of that phrase or other language to further

(2) qualify that exception.

(3) Q. To further qualify what exception?

(4) A. The exception beginning with the word

(5) "except."

(6) Q. Do you have any memory of any discussions

(7) about the exception, as you referred to it?

(8) A. Not extensive memories, no.

(9) Q. Well, tell me – however inextensive they are,

(10) tell me what you do recall about the exception, if

(11) anything.

(12) A. I have a recollection of discussing with Eric

(13) the appropriateness of the exception, given my

(14) perception that these were activities that were

(15) controllable by SSI. And for that reason, I questioned

(16) whether or not the exception was an appropriate

(17) provision to include in the agreement.

(18) Q. And what did you say to him about that?

(19) A. Probably something just like I described to

(20) you.

(21) Q. And when you say that you questioned whether

(22) it was appropriate, what did you say about its

(23) appropriateness or inappropriateness?

(24) A. I would have suggested to him that it was

(25) inappropriate because the language that was being

(1) excepted was an activity that I thought was, again,
(2) within the control largely of SSI.
(3)    Q.   And what, if anything, do you recall that
(4) Mr. Rubin said in response?
(5)    A.   I don't recall his response, other than a
(6) general impression of his -- to use a colloquialism, a
(7) pooh-poohing of the position that was I was taking, and
(8) arguing that in fact it was not something that was
(9) within the control of SSI.
(10)    Q.   When you say "something in the control," are
(11) you talking about a lockout of players?
(12)    A.   Or strike.
(13)    Q.   So you were saying, you know, "This is within
(14) your control" and he was saying "No, it's not"?
(15)    A.   That's my recollection, yes.
(16)    Q.   And pursuant to that, did you then say, "Well,
(17) let me see the NBA rules and regulations"?
(18)    A.   I can't say whether that was the sequence, but
(19) there was a request made, to my recollection.
(20)    Q.   And did you get them?
(21)    A.   I cannot recall whether we got them or not. I
(22) have a recollection of having received at least some
(23) portion of them.
(24)    Q.   And what do you recall about that?
(25)    A.   That we received some portion.

---

Page 26

(1)    Q.   And do you recall what they said?
(2)    A.   I did not see anything in that portion, at
(3) this point. At this point, I cannot recall what it
(4) said, and how it related to the particular provision.
(5)    Q.   Who proposed the exception?
(6)    A.   I can only assume someone on behalf of SSI.
(7) It wouldn't have -- I don't think it would have come
(8) from us.
(9)    Q.   What do you recall about the discussions on
(10) the exception, other than what you've just testified to?
(11) Is there anything else that you can tell us?
(12)    A.   With the exception, including the final
(13) phrase, as it turns out, in this agreement, my
(14) perception that it was not harmful to the City as
(15) written.
(16)    Q.   Okay. I'm not so much interested in your
(17) perception as I am in what was said. What did you say,
(18) what did the negotiators for the Sonics say, and
(19) what did Mr. McLaughlin say?
(20)    A.   In my discussions -- my discussions would
(21) primarily have been with either Eric on this or with
(22) Mr. McLaughlin. And Mr. McLaughlin and I would have
(23) examined, and I believe did examine, this clause in
(24) particular; and examined the language and tried to parse
(25) out the circumstances under which this clause might
come

---

Page 27

(1) into play; and decided that, as it was written, it was
(2) not likely to be -- to cause a particular problem for
(3) us.
(4)    Q.   Well, do you recall initially that when the
(5) exception was first proposed, there was no provision
(6) about beginning with "during which," that it was just a
(7) provision?
(8)    A.   I have a recollection of that, yes.
(9)    Q.   And the discussion was that the Sonics didn't
(10) want to pay rent in the event of a strike or lockout,
(11) isn't that case?
(12)    A.   I can't tell you that that was the position of
(13) the Sonics. One might surmise that from the language,
(14) but, you know, you're stating a position that I'm not in
(15) a position of validating or verifying at this point.
(16)    Q   Well, was that stated to you in substance in
(17) any of the meetings or telephone calls?
(18)    A.   I don't recall.
(19)    Q   You don't recall one way or the other?
(20)    A.   I don't recall one way or the other.
(21)    Q   Okay Did you have -- do you have a memory as
(22) to when that exception was first proposed?
(23)    A.   No, not without any tools to aid me.
(24)    Q.   And you knew the effect of that exception at
(25) the time you saw it, did you not?

---

Page 28

(1)    A.   I perceived what some of the effects could be.
(2)    Q.   And what was your perception of the effect of
(3) the exception?
(4)    A.   It appeared to me that if the exception -- if
(5) the facts described in the exception occurred, there
(6) were -- if there were a strike or work slowdown directed
(7) against the NBA or SSI by professional basketball
(8) players employed by SSI, or a lockout of such players by
(9) SSI or the NBA, then, if there was something -- if there
(10) were something in the constitution and bylaws, rules and
(11) regulations, that related to and provided for the
(12) avoidance of a payment obligation as provided in the
(13) agreement, that would be the effect allowed by the
(14) clause.
(15) It was a provision that had several conditions
(16) and required essentially sort of a sequencing in order
(17) to make it operational.
(18)    Q.   Well, didn't you report to your superiors that
(19) the exception as drafted allowed the Sonics to avoid
(20) paying rent to the City of Seattle in the event that
(21) they experienced labor difficulties with their players?
(22)    A.   I may have done so, assuming that there were
(23) provisions in the constitution and bylaws that related
(24) to that.
(25) You appear to be reading from something that I

---

Page 29

(1) don't have in front of me, and I don't have an immediate

(2) recollection of that.

(3) Q. Well, do you know what I'm reading from?

(4) A. I do not know.

(5) MR. BYRNES: Well, let me have marked as the

(6) next exhibit in order a batch of so-called "privileged

(7) documents" which were withheld and then subsequently

(8) produced after we had a hearing.

(9) Let me give a counsel a copy, and I'll have

(10) marked a copy for you to look at.

(11) (Marked Deposition Exhibit No. 4 )

(12) Q. (By Mr. Byrnes) I'm asking you to turn to a

(13) memorandum of September 23, 1993. That's a memorandum

(14) you authored, a typed memorandum?

(15) A. Okay. And I have it.

(16) Q. Do you see that?

(17) A. I have it.

(18) Q. And this reports on your observations of the

(19) proposed first draft of lease.

(20) A. That's what it says, yes.

(21) Q. All right. And if you'll turn to the next to

(22) the last page of that document, which is numbered ten,

(23) would you read into the record your comment on page 41

(24) referring to section XIX.B. And before you read that,

(25) let me ask you, was XIX.B. the clause that subsequently

Page 30

(1) was renumbered to XX.B., or the paragraph?

(2) A. I can't say that with certainty without

(3) looking at the –

(4) Q. Is that your best belief?

(5) A. It looks like it is, yes. Because the

(6) version – there's a version attached to this memo that

(7) has a section XIX.B. that is comparable to what's

(8) labeled XX.B. in the executed version of the release.

(9) Q. Would you read into the record your

(10) observation of that paragraph, as you reported it to

(11) Virginia Anderson and Terry McLaughlin in September of

(12) 93.

(13) A. It says, "The exception added at the end of

(14) this text allows the Sonics to avoid paying rent to the

(15) City in the event the Sonics experience labor

(16) difficulties with the players. A business's personnel

(17) difficulties don't usually insulate it from its rent

(18) obligations to a third party."

(19) Q. And the draft agreement that you referred to

(20) that was attached – and I don't know whether it was

(21) attached or not, but in any event, is it the agreement

(22) that says "Get disk for this?" with a star on it in the

(23) upper right-hand corner?

(24) A. I can't say that this is the version without

(25) further review.

Page 31

(1) Q. Well, I won't ask you –

(2) A. Certainly the section number matches up.

(3) Q. All right. And in addition to that – if you

(4) want to take the time, you can – but if you'll see your

(5) comments in your memorandum, they generally track the

(6) handwritten notes on this draft, do they not?

(7) A. Yeah. I'm assuming that you have – well, let

(8) me do a quick review.

(9) In doing a very cursory spot check, it appears

(10) that this memo relates to the document that immediately

(11) follows it.

(12) Q. In the exhibit?

(13) A. Yes.

(14) Q. And that document, just for identification

(15) purposes, in the upper right-hand corner, has some

(16) handwriting that says, "Get disk for this" with a star.

(17) A. Yes.

(18) Q. Turn to page 41 of that document, if you will,

(19) please

(20) A. Uh-huh.

(21) Q. And you have some handwritten notes over in

(22) the outside column of that.

(23) A. Uh-huh.

(24) Q. Could you read that for us?

(25) MR. BYRNES: Do you have the originals,

Page 32

(1) Ms. Honig? We asked to have them here.

(2) MS. HONIG: Yes.

(3) Q. (By Mr. Byrnes) Let me give you the

(4) original, because it might be easier for you to read,

(5) Mr. Davidson.

(6) May I step around behind you, just to look at

(7) that one note?

(8) A. Sure.

(9) Q. Thank you. Would you read that into the

(10) record, please.

(11) A. It looks like "Same: see what ER does."

(12) Q. And what does that mean?

(13) A. At this point, I haven't the slightest idea.

(14) Q. Is "ER" Eric Rubin?

(15) A. Possibly.

(16) Q. And what were you proposing to do?

(17) A. At this point, I have no idea.

(18) Q. Well, can you tell from your red lettering

(19) that you were proposing to take out the exception to see

(20) what Eric Rubin did?

(21) A. That's supposition. I don't know.

(22) Q. Well, is that what it indicates?

(23) A. I don't know what it indicates. All it is is

(24) an angular line that goes across the text.

(25) Q. All right. Keep that page before you, please.

(1) A. Fine.

(2) Q. The angular line that goes across the text is

(3) on page 41?

(4) A. 41, right.

(5) Q. And does it bracket the exception?

(6) A. It brackets the exception.

(7) Q. And were you proposing in effect, then, to

(8) remove the exception and see what Eric Rubin did after

(9) it was removed?

(10) A. I don't know. It doesn't indicate that from

(11) the note.

(12) Q. Did you attempt to remove the exception?

(13) A. I don't remember.

(14) Q. Do you have any memory of attempting to do

(15) that?

(16) A. I certainly have a memory of trying to qualify

(17) it. I might have tried to remove it; I don't remember.

(18) Q. Let me ask you to take a look at some

(19) handwritten notes of yours. Incidentally, were you

(20) involved in the decision-making process concerning the

(21) withholding of documents in this matter on the basis of

(22) a claim of privilege?

(23) A. No.

(24) Q. Did you know anything about it?

(25) A. Yeah, I was aware that there was a discussion

(1) going on about it.

(2) Q. Are you the one that gathered these privileged

(3) documents in the first instance and furnished them to

(4) counsel?

(5) A. I would have been the person who saved the

(6) documents initially.

(7) Q. Are you aware, as you sit here today, of any

(8) additional documents relating to this matter that are

(9) being withheld on any basis whatsoever?

(10) A. I'm aware that there are duplicate copies.

(11) I'm aware of – I have not paid attention to what is

(12) being withheld or not being withheld in response to

(13) requests for documentation. I have moved all of my

(14) files – any file that I had relating to this is no

(15) longer in my office.

(16) Q. Well, why don't you take a moment and look

(17) through the exhibit that's before you, which are the

(18) documents that were turned over by Ms. Honig by letter

(19) following the hearing before the arbitrators, and tell

(20) me, if you can, whether or not there are any other

(21) documents that you're aware of of a similar nature, in

(22) the sense that a privilege was claimed.

(23) A. I can't tell you that, even if I looked at

(24) them, the quantity of documents is extensive enough.

(25) You're saying this is what was provided?

(1) Q. That's correct.

(2) A. In connection with – in response to a claim

(3) of privilege. But it's my impression that there were

(4) earlier documents provided to you.

(5) Q. There was one set of notes which I'll show

(6) you. That's it.

(7) When you gave these documents to litigation

(8) counsel, Ms. Honig, did you make any designation of them

(9) as privileged or not privileged, or was that done by

(10) someone else?

(11) A. I did not.

(12) Q. Did you separate them from any other files

(13) that you turned over, or were they part of your total

(14) file?

(15) A. I didn't make a determination whether or not

(16) the materials were privileged or not.

(17) Q. Where did these files – documents come from?

(18) What office?

(19) A. The law department. We have both a

(20) consolidated filing system, and we keep certain files in

(21) our individual offices. I have some files in my own

(22) office; other files were stored in archives.

(23) Q. Where did these documents, like this

(24) memorandum of yours and the handwritten notes, did they

(25) come from your personal office or from the archives?

(1) A. I can't tell you at this point.

(2) Q. Pardon?

(3) A. I can't tell you at this point.

(4) Q. What documents did you physically turn over to

(5) counsel?

(6) A. Almost everything in my office; and she had

(7) access to the rest of the law department files.

(8) Q. What was the volume of documents that you

(9) turned over from your office?

(10) A. Probably a quantity of about like that.

(11) Q. Would you indicate approximately how many

(12) inches that is.

(13) A. Six inches.

(14) Q. And how many inches do you see before you as

(15) the so-called privileged documents? And don't count

(16) that lease twice.

(17) A. Assuming that this is in here, you know, the

(18) others may be at most an inch.

(19) Q. Please listen to my question very carefully.

(20) Are you aware of any other documents that bear on the

(21) issue of rent to be paid by the Sonics in the event of a

(22) lockout, that, for whatever reason, have not been

(23) produced in this case?

(24) A. I can't answer your question because I don't

(25) know all of the documents that have been produced in

Page 37

(1) this case. My perception is that there has been an
(2) issue about privilege asserted with respect to certain
(3) documents. But to my recollection, there were other
(4) documents provided to you without an assertion of
(5) privilege.
(6) Q. All right. Fair enough
(7) Let me rephrase that question. Do you know of
(8) any documents relating to the subject of the payment of
(9) rent in the event of a lockout of players, that were
(10) claimed to be privileged, that have not been produced?
(11) MS. HONIG: Objection, asked and answered
(12) about three times.
(13) Q. (By Mr. Byrnes) You may answer
(14) A. Read the question back again, please.
(15) (The reporter read back as requested )
(16) A. Again, I can't answer that question because I
(17) have no knowledge about the claim of privilege that's
(18) been asserted.
(19) Q. (By Mr. Byrnes) What have you looked at, if
(20) anything, in preparation for your deposition?
(21) A. My calendar, a telephone log, a variety of
(22) draft contracts, you know, various memoranda that I
(23) wrote to Seattle Center personnel.
(24) Q. Was this one of them, the memorandum of
(25) September 23?

Page 38

(1) A. I assume so, because I probably did look at
(2) that one.
(3) Q. You probably what?
(4) A. Did look at that one, yes.
(5) Q And did you look at other memoranda?
(6) A. If they were readily available, yes, scanned
(7) them.
(8) Q. What else? Did you read the anticipated
(9) testimony of Mr. Rubin?
(10) A. I have seen that.
(11) Q. And Mr. McLaughlin?
(12) A. I have seen that.
(13) Q. And Mr. Ackerley?
(14) A. I have not seen that, to my recollection.
(15) Q. Another document, in this pile of documents
(16) which were withheld under a claim of attorney-client
(17) privilege but have now been produced, is a handwritten
(18) set of notes entitled "Problems to be addressed."
(19) Would you look for that document, please.
(20) A. In this pile here?
(21) Q. Yes, in the so called privileged documents.
(22) A. Do you have an idea how far down it might be?
(23) Q. Well, it's closer to the top. It's not one of
(24) those leases. There are a few draft leases, and then a
(25) few sets of handwritten notes It looks like this.

Page 39

(1) Do you have that?
(2) A. I have it.
(3) Q. Is that your handwriting?
(4) A. It is.
(5) Q. Incidentally, is the handwriting on the draft
(6) we just looked at, which was attached to the -- or at
(7) least referenced in the September 23 memo · are all the
(8) comments on that in your hand?
(9) A. From a quick scan, those that I can read
(10) appear to be in my handwriting. I have not noticed,
(11) from the quick scan, anyone else's handwriting.
(12) Q. All right Going back to the handwritten
(13) notes entitled "Problems to be addressed," which you've
(14) now located, is that document entirely in your
(15) handwriting? And can we have that original of that as
(16) well?
(17) A. Yes.
(18) Q. What date were those notes prepared?
(19) A. I can't tell you that.
(20) Q. Is there any way for you to reconstruct that?
(21) A. The only -- I don't believe so. One can only
(22) got into an approximation at best, because the only way
(23) that one might be able to do that is to do a comparison
(24) with every one of the pages and sections noted against
(25) various drafts that existed at the time to try and come

Page 40

(1) up with a draft document that had a date on it that
(2) either matched what was being reviewed, and to my
(3) perception some of those drafts don't exist.
(4) Q. So is it fair to say that it would be
(5) difficult at best to try to pinpoint even an estimated
(6) time frame for notes like this, if they're not dated?
(7) A. It would be difficult. Uh-huh.
(8) Q. Have you tried to do that?
(9) A. I did make an early attempt, and decided that
(10) it wasn't worth the effort.
(11) Q. Did you decide it was futile?
(12) A. No. It was going to take far more time than I
(13) could devote to it.
(14) Q. Is there any way for you to tell, looking at
(15) these notes, whether they were taken in a meeting, or
(16) under what circumstances they were written?
(17) A. Not easily, because they could have been taken
(18) at various times. They may have been taken in the
(19) course of a meeting, they may have been subsequently
(20) edited with additional text inserted.
(21) Q. All right. Take a look, if you will, on the
(22) next to the last -- excuse me -- three pages from the
(23) back I believe it says up at the top "Number 39,
(24) Noise." Do you see that?
(25) A. Yes.

Page 41

(1) Q. Just to pick a page so I can be on the same

(2) page with you

(3) A. Uh-huh.

(4) Q. · to use a cliche.

(5) A. Yes.

(6) Q. The "41," does that refer to a page number?

(7) A. I believe so.

(8) Q. Would you read into the record what that says?

(9) A. "NBA game, or games, permanently canceled

(10) because of strike, then there will be pro rata reduction

(11) in rent. If any game is held, there is rent due."

(12) Q. You have sort of an unusual shorthand there.

(13) After the word "canceled" and before the word "strike"

(14) there looks like a big "V" and the number one. Is that

(15) an abbreviation for "because of"?

(16) A. It is.

(17) Q. And is that shorthand, or is that just Gordon

(18) Davidson shorthand?

(19) A. That's my shorthand.

(20) Q. And after the word "then," which is

(21) underlined, there is kind of – it looks like an "L" or

(22) a loop with a line, and what is that little symbol

(23) shorthand for, in Gordon Davidson's shorthand?

(24) A. It's a verb form. To answer your – what I

(25) would anticipate is your next question, in the last line

Page 42

(1) of that, or the next line, there is the loop without the

(2) diagonal line running through it. That loopy thing

(3) means "there is." The loopy thing, right after the

(4) "then" means "there will be," because there's a line

(5) going from the upper left to the lower right.

(6) Q. All right. So let's stick with the first one.

(7) where it says. "then," what did you read into the record

(8) a moment ago?

(9) A. "There will be."

(10) Q. Okay. And so when there's a line across it.

(11) it means "there will be," and –

(12) A. Only if it's going in that particular

(13) direction.

(14) Q. All right. Could it go in another direction?

(15) A. It certainly could.

(16) Q. And then what would it mean?

(17) A. "There was."

(18) Q. And if there's no line, then it means?

(19) A "There is."

(20) Q. "There is"?

(21) A. Yes.

(22) Q. Okay. So it's a fair reading, then, that

(23) means "there will be pro rata reduction in rent"?

(24) A. Uh-huh.

(25) Q And then, "if any game is held, there is," to

Page 43

(1) use the shorthand loop, "rent due"?

(2) A. That's what it says.

(3) Q. And that was your wording?

(4) A. Yes.

(5) Q. Do you have a memory that that was wording

(6) that you wrote – put on a piece of paper in the

(7) presence of Mr. McLaughlin?

(8) A. I have no recollection.

(9) Q. Did you put it on a piece of paper, on this

(10) piece of paper, in the presence of Mr. Rubin or

(11) Mr Ackerley?

(12) A. I have no recollection.

(13) Q. Do you have any recollection of discussing

(14) that specific language as you wrote it on this piece of

(15) paper?

(16) A. No.

(17) Q. Do you have any recollection of discussing

(18) that language either before or after you wrote this

(19) piece of paper?

(20) A. Not a recollection of doing so, though it

(21) would have been more than likely something that I would

(22) have done.

(23) Q. Okay. But I'm only asking you what you

(24) recall, not for speculation.

(25) You have no memory?

Page 44

(1) A. Not at this point.

(2) Q. Okay. Did you furnish these notes to

(3) anyone –

(4) A. No.

(5) Q. – at any time before this arbitration

(6) commenced?

(7) A. They were provided to Ms. Honig, I believe.

(8) Q When, with respect to the commencement of this

(9) arbitration, were they provided to Ms. Honig?

(10) A. I have no idea.

(11) Q. When did you see them last, before today or

(12) before this deposition?

(13) A. I believe in the half hour before.

(14) Q. Were they shown to you in preparation for your

(15) deposition?

(16) A. Yes.

(17) Q. What else was shown to you in preparation for

(18) your deposition?

(19) MS. HONIG. Objection. I think the witness

(20) has already answered as to what he looked at. If you

(21) want to talk about what he and I discussed, then I think

(22) it's inappropriate, and I'll instruct him not to answer.

(23) Q. (By Mr Byrnes) What else was shown to you

(24) in preparation for your deposition?

(25) MS. HONIG: Same objection.

(1)   Q.   (By Mr. Byrnes) You may answer.

(2)   MS. HONIG:   I'm going to instruct him not to

(3)   answer.

(4)   MR. BYRNES:   You're going to instruct him not

(5)   to answer what documents he saw? Not what you said to

(6)   him, what documents he saw?

(7)   MS. HONIG:   What documents were shown to him.

(8)   MR. BYRNES:   That doesn't give them any

(9)   privilege. If he looked at materials in preparation for

(10)  his deposition, I'm entitled to ask what they were.

(11)  MS. HONIG:   Right. Well, you asked him the

(12)  question of what he looked at, and he already answered

(13)  the question.

(14)  MR. BYRNES:   Counsel, you're wasting my time.

(15)  I need to take his deposition and not hear you on the

(16)  record.

(17)  Q.   (By Mr. Byrnes) I just want to know what

(18)  documents you saw in preparation for your deposition,

(19)  other than this one and the September 23 memo which

(20)  you've just told me about. And let me limit it to

(21)  today, for starters.

(22)  MS. HONIG:   Well, I'm going to instruct him

(23)  not to answer any questions about what he and I looked

(24)  at together, or discussed at our meeting before coming

(25)  here.

---

Page 46

(1)   MR. BYRNES:   Counsel, I only want to know what

(2)   documents he saw in preparation for the deposition.

(3)   MS. HONIG:   And he answered that at the

(4)   beginning of his deposition.

(5)   MR. BYRNES:   Well, then, let him answer it

(6)   again and we can move on.

(7)   Q.   (By Mr. Byrnes) Would you tell me what

(8)   documents you saw in preparation for your deposition

(9)   today.

(10)  A.   I'm not sure I can, at this point.

(11)  Q.   Well, describe them as best as you can.

(12)  A.   I saw a package of notes, and I have a

(13)  recollection of looking at a contract version, but I

(14)  don't remember whether or not it was the final version

(15)  or not.

(16)  Q.   Did you look at any memoranda, typed

(17)  memoranda, other than the September 23, 1993, memo?

(18)  A.   I didn't look at that in preparation for this

(19)  deposition.

(20)  Q.   All right. Did you look at any typed

(21)  memoranda?

(22)  A.   Not to my recollection.

(23)  Q.   Did you look at any notes that are not in the

(24)  package before you?

(25)  A.   Not to my recollection.

---

Page 47

(1)   Q.   Did you look at any notes that discuss in any

(2)   way the subject of rent due or not due in the event of a

(3)   lockout or strike, other than the ones we've discussed?

(4)   MS. HONIG:   I object to the form.

(5)   Can you read back that question.

(6)   (The reporter read back as requested.)

(7)   A.   Yes, I think so.

(8)   Q.   (By Mr. Byrnes) Okay. Tell me what you

(9)   recall in that regard.

(10)  A.   In one of the contract versions that I looked

(11)  at, there was a note, and it related to the rent issue.

(12)  That's my recollection.

(13)  Q.   And what was the substance of the note?

(14)  A.   To my recollection, it was going to the issue

(15)  of, again, the constitution, the bylaws issue, and the

(16)  clause that we have discussed previously relating to the

(17)  exception in the event of a lockout or strike.

(18)  Q.   And in substance, what did it say?

(19)  A.   At this point, I don't have a recollection.

(20)  Q.   Was it a handwritten note by you?

(21)  A.   Yes.

(22)  Q.   And on what draft or drafts was it placed?

(23)  A.   I do not recall.

(24)  Q.   Is it either of the two drafts that are in the

(25)  package?

---

Page 48

(1)   A.   I can't tell. We went through – you know,

(2)   there have been so many drafts of this particular

(3)   agreement, one must look very carefully at a variety of

(4)   pages in order to discern which draft it is.

(5)   Q.   Well, Mr. Davidson, this is important. You

(6)   said that you looked at a draft this morning that had a

(7)   note on it relating to paragraph XX, and the subject of

(8)   the exception to paying rent in the event of a lockout

(9)   or strike.

(10)  A.   Uh-huh.

(11)  Q.   And it was in your handwriting.

(12)  A.   Uh-huh.

(13)  Q.   And I've shown you the two drafts that are

(14)  before you as a part of that exhibit. Was it either one

(15)  of those? And you can go right to paragraph XX or XIX

(16)  on both of those, and tell me if it was one of those

(17)  two.

(18)  A.   To my recollection, it would have to have been

(19)  XIX, section XIX in an earlier draft.

(20)  Q.   You'll have to hold your voice up, please.

(21)  A.   I'm sorry. To my recollection, it would have

(22)  had to have been one of the drafts that referred to

(23)  section XIX, which is the one that says "SSI Subject to

(24)  NBA Rules and Regulations."

(25)  Q.   Yes, I understand. That's fine. But what I'm

---

Micro-Dep Condensed Transcript   Mills & Lessard

(1) asking you is is it the one that's in front of you, or

(2) is it some other draft that's not on the table?

(3) A. I don't remember.

(4) Q. Well, do you see anything on paragraph XIX in

(5) either of those drafts that relate to the subject you've

(6) just told us about?

(7) A. On this particular version, no.

(8) Q. All right. So this morning, in preparation

(9) for your testimony, you looked at a draft that had your

(10) handwritten comments pertaining to paragraph – then

(11) paragraph XIX.B., and specifically the exception

(12) language that we've been talking about; is that a fair

(13) statement?

(14) A. Uh-huh.

(15) Q. You have to answer audibly.

(16) A. Yes.

(17) Q. And tell me now, in substance, what those

(18) words said, your handwritten words.

(19) A. I can't do that, because I don't remember what

(20) they said.

(21) Q. Is this a document that you know has been

(22) produced in this case?

(23) A. You couldn't have gotten it without it being

(24) produced.

(25) Q. The document that you saw this morning,

(1) Now, I think that this was removed this

(2) morning, but I did not look at the documents after they

(3) were copied. So what I am assuming is that perhaps

(4) whoever was copying these took them off, because they

(5) were obstructing what was underneath, rather than copy

(6) them. So that those are the notes that Mr. Davidson is

(7) referring to.

(8) MR. BYRNES: All right. Let the record show

(9) that Ms. Honig has handed me a yellow Post-It, which

(10) we'll have copied in a moment, that I've never seen

(11) before.

(12) And it's your representation that this Post-It

(13) was attached to the draft agreement that we've been

(14) referring to, identified by the words "Get disk for

(15) this, asterisk," in the upper right-hand corner?

(16) MS. HONIG: Yes.

(17) MR. BYRNES: And it was attached to page 41?

(18) A. Well, you have my copy now, so let

(19) me just check.

(20) THE WITNESS: That note was attached to page

(21) 41

(22) MS. HONIG: I'm sorry?

(23) THE WITNESS: Attached to page 41.

(24) MS. HONIG: Okay, attached to 41. And there's

(25) another Post-It on a different page.

---

Page 50

(1) Mr. Davidson.

(2) A. To my knowledge, yes.

(3) Q. Okay.

(4) MR. BYRNES: Counsel, I know of no such

(5) document. I have been through every single draft that's

(6) been produced.

(7) Are you aware of any documents for any reason

(8) that are being withheld? I've been very careful about

(9) this.

(10) MS. HONIG: Can I talk to Gordy for a minute?

(11) MR. BYRNES: Certainly. Why don't we take a

(12) five-minute recess.

(13) (Recessed from 12:24 to 12:29 p.m.)

(14) MS. HONIG: Let me say that when I had these

(15) documents copied for you, the previously withheld

(16) documents, it was my recollection that there were two

(17) Post-It notes on the documents, and I assumed that those

(18) pages with the Post-It notes on them were copied and

(19) sent to you.

(20) And here is one at page 38, and I want to

(21) compare it with what is in your documents.

(22) MS. BOYCE: I've never seen that.

(23) MS. HONIG: And then the other that is not

(24) here, and the other was on paragraph XIX, and that

(25) actually – and that is also not here

---

Page 52

(1) MR. BYRNES: Relating to some other subject.

(2) MS. HONIG: Yes.

(3) Q. (By Mr. Byrnes) The handwritten note on page

(4) 38 has to do with the limitation on the City's right to

(5) interfere with the conduct of SSI's business, is that

(6) correct?

(7) A. Yes.

(8) Q. I've not seen this note before. Do you know

(9) when this note was affixed to this draft?

(10) A. I assume –

(11) Q. Well, I didn't ask you to assume. Do you

(12) know?

(13) A. No, I can't tell you a date that it was

(14) affixed.

(15) Q. Is this in your handwriting, this Post-It?

(16) A. Yes.

(17) Q. And when you first saw this draft - and by

(18) 'this draft' I'm talking about the one that's in front

(19) of you, the same one we've been referring to - was this

(20) Post-It attached to it?

(21) A. When I first saw it, no, couldn't have been,

(22) because I just said that note was in my handwriting.

(23) Q. Okay. I phrased it poorly. When you first

(24) saw it in connection with this arbitration, was this

(25) Post-It affixed?

---

Page 53

(1) A. Yes.

(2) Q. And did this come from your personal office or

(3) from the archives?

(4) A. I have no recollection. I would assume from

(5) the archives, because the stuff that I would have kept

(6) in my own office would have been the more current

(7) operating agreements.

(8) MR. BYRNES: Let the record show that I've

(9) never seen this Post It before, nor have I been advised

(10) of its existence, but I'd like to ask you some questions

(11) about.

(12) Q. (By Mr. Byrnes) Was it physically posted or

(13) attached or stuck to Exhibit 4?

(14) A. I just removed it, in fact, when you came

(15) around to focus your attention on the green notation

(16) that seemed to be your attention. So rather than

(17) distract you, I pulled it off so that you could look at

(18) that particular portion.

(19) Q. Well, that was nice of you, but it was never

(20) produced. Why don't you read into the record slowly,

(21) and I'll come around behind you and look at, the

(22) Post-It, exactly what it says.

(23) A. The grammar isn't particularly great. It

(24) says, "It won't be anything in the bylaws, constitution

(25) or rules/regs of the NBA that is likely to help the

Page 54

(1) Sonics avoid paying rent in the instance of a strike;

(2) therefore, the exception doesn't logically connect with

(3) the text that precedes it. The exception should be" –

(4) Q. Moved?

(5) A. "– moved to some other location."

(6) Q. And what does that mean, in effect?

(7) A. Certainly, it was my questioning the

(8) appropriateness of the provision, certainly where it was

(9) located.

(10) Q. Well, is it fair to say that you were saying

(11) that "Look, this provision about not paying rent in the

(12) event of a strike or a lockout doesn't really connect to

(13) the NBA bylaws, so it should be moved to some other

(14) section of the lease"?

(15) A. That was an idea that I was addressing.

(16) Q. Did you communicate that idea to anyone

(17) representing the Sonics?

(18) A. I assume that I –

(19) Q. Now, no assumptions, please.

(20) A. I believe I expressed that to Eric.

(21) Q. Are you certain?

(22) A. I can't say that. I'm fairly certain, yes.

(23) Q. Isn't it true that you discussed with Terry

(24) McLaughlin on more than one occasion that the

(25) understanding and agreement with the parties was that it

Page 55

(1) there was a lockout, and basketball games were not

(2) played, the Sonics would not pay rent?

(3) A. I don't think that we discussed that

(4) repeatedly. I know we would have discussed this

(5) particular clause.

(6) Q. Okay. Listen to my question, Mr. Davidson

(7) Isn't it true that you and Terry McLaughlin, in the

(8) presence of Eric Rubin and/or Bill Ackerley, discussed

(9) the fact that rent would not be due in the event of a

(10) lockout, if games were not played in the coliseum?

(11) A. I can't say that that is true, no.

(12) Q. Do you deny it, or are you just saying you

(13) don't remember?

(14) A. I'm saying I don't have a recollection of

(15) that.

(16) Q. Was this exception about not paying rent if

(17) there was a lockout or a strike moved to another

(18) section?

(19) A. Not to my recollection, no.

(20) Q. Do you recall any discussions about why it

(21) wasn't moved?

(22) A. There would have been no reason to move it,

(23) once it was sufficiently qualified.

(24) Q. Did you have discussions about the exception,

(25) raising a concern that you had that the Sonics shouldn't

Page 56

(1) get out of paying rent in the event of a lockout, if

(2) they brought in scabs?

(3) A. Yes, I have a recollection of that.

(4) Q. Why did you raise that?

(5) A. It's another way of qualifying what the

(6) exception was, and because in fact if scabs were being

(7) used, there was in fact a game being played.

(8) Q. And in connection with that, did you write

(9) another note, which I want to show you, we'll have

(10) marked as the next exhibit in order

(11) (Marked Deposition Exhibit No. 5.)

(12) Q. (By Mr Byrnes) Is this your handwriting.

(13) this entire document?

(14) A. It looks like it, yes.

(15) Q. Now, you say that you didn't negotiate this

(16) lease, but you participated in the negotiations. Is

(17) that your testimony?

(18) A. I believe so.

(19) Q. And that means you were present while people

(20) were negotiating, and then you tried to carry out the

(21) agreements and understandings reached?

(22) A. Frequently.

(23) Q. Well, did you, when you were talking to

(24) Mr Rubin, negotiate with him over language?

(25) A. I did negotiate with him over language; but,

Page 57

(1) in each case, I would have discussed that with Seattle
(2) Center people immediately afterwards or very shortly
(3) thereafter.
(4)  Q.  And I'm interested in the Seattle Center
(5) people. Was Terry McLaughlin the main person, the main
(6) point person for the City in these negotiations?
(7)  A.  Yes.
(8)  Q.  And he reported to Virginia Andersen?
(9)  A.  Yes.
(10)  Q.  And were most of your dealings on the terms
(11) and conditions and business points in the lease, were
(12) most of those discussed by you with Mr. McLaughlin?
(13)  A.  Yes.
(14)  Q.  Did you have discussions with Ms. Andersen
(15) from time to time, as well?
(16)  A.  Yes.
(17)  Q.  Did you get into the nitty-gritty details with
(18) Ms. Andersen, or was that something you discussed with
(19) Mr. McLaughlin?
(20)  A.  I wouldn't have gotten into the nitty-gritty
(21) details of every clause, but there may have been a
(22) particular issue that we talked about.
(23)  Q.  Do you have any memory, as you sit here today,
(24) of having discussed the issue of rent in the event of a
(25) lockout or strike with Ms. Anderson?

Page 58

(1)  A.  No, not at this point.
(2)  Q.  Do you have any memory of discussing it with
(3) anyone in the City, other than Terry McLaughlin?
(4)  A.  Not at this point.
(5)  Q.  Okay. And I want to exhaust your memory of
(6) your discussions with Mr. McLaughlin on that point,
(7) whether they were in a meeting with the Sonics or in a
(8) meeting with you and other non-Sonics people. What do
(9) you recall you and Terry discussed about the subject of
(10) rent being paid?
(11)  A.  That's a very broad question. Can you --
(12)  Q.  In the event of a lockout or strike
(13)  A.  I know we discussed section -- what was, you
(14) know, in this version labeled XIX.B., at some length
(15) We discussed ways in which it could be qualified or
(16) narrowed.
(17) We discussed my -- some, you know, one or more
(18) versions of qualifications that I drafted. And we
(19) discussed, you know, possible or the likelihood in which
(20) this clause might ever -- might ever have to come into
(21) play.
(22)  Q.  Do you believe that Terry McLaughlin is a
(23) person of truth and candor?
(24)  A.  Generally, yes.
(25)  Q.  And you've known him for a number of years?

Page 59

(1)  A.  Yes.
(2)  Q.  Worked with him in the City?
(3)  A.  Yes.
(4)  Q.  And if it's his testimony that the
(5) understanding and intent of the parties was that if
(6) there were no basketball games played because of the
(7) strike or lockout, then rent would not be due under the
(8) lease, is it your testimony that that's a mistake on his
(9) part, or do you simply not have a memory?
(10)  A.  It's not my recollection of the intent of the
(11) parties at that point.
(12)  Q.  But you've told me you don't have a
(13) recollection of the discussions on this subject with
(14) Messrs. Rubin and Ackerley in the broad meetings, do
(15) you?
(16)  A.  I have a recollection of the general direction
(17) and tenor that the City's negotiations took, and the
(18) general, you know, orientation that we took towards that
(19) particular lease.
(20)  Q.  Was Mr. McLaughlin the one formulating the
(21) intent of the City, as opposed to you?
(22)  A.  The intent of the City would have been
(23) formulated largely in the MOU.
(24)  Q.  Where it specifically said you would get
(25) $800,000 for 41 games, correct?

Page 60

(1)  A.  That's true.
(2)  Q.  Now, are these notes all taken on the same
(3) day, or is it a compendium of different notes, or do you
(4) know?
(5)  A.  At this point, I don't know.
(6)  Q.  Is there any way for you to identify these
(7) notes by date or persons in attendance when they were
(8) taken?
(9)  A.  Without spending a great deal of time looking
(10) at these notes individually and thinking about how they
(11) fit into the negotiation, I can't tell you.
(12)  Q.  Have you ever done that with these notes?
(13)  A.  I don't recall that I have.
(14)  Q.  Now, those notes were originally withheld from
(15) production under a claim of attorney-client privilege --
(16) I'm giving you some information you may or may not know.
(17) this is a predicate - and then were subsequently
(18) produced at the time briefs were filed on the subject of
(19) attorney-client privilege
(20) It was only later, after the briefing and oral
(21) argument, that the package I gave you previously was
(22) furnished. This was furnished before that date, but
(23) withheld originally. Do you know why these were
(24) withheld as privileged?
(25)  A.  At this point, no.

(1) Q. Is there anything about them that you can

(2) point to that signifies they were or were not

(3) privileged?

(4) A. No. I have not focused on that particular

(5) aspect.

(6) Q. And none of them are dated?

(7) A. Not dated in the sense of a date that they

(8) were prepared. There are date references in some of

(9) these notes.

(10) Q. Turn, if you will, to the fourth page of this

(11) compendium of attorney's notes, Exhibit No. 5. And you

(12) see where it says "XIX.B.," following the number 41 --

(13) A. Uh-huh.

(14) Q. -- toward the bottom of that page?

(15) A. Uh-huh.

(16) Q. Would you read into the record your notes.

(17) And why don't we get out the original so we can see

(18) that.

(19) A. It says, "XIX.B. If there is any play by

(20) anybody ID'd," meaning "identified," "as a Sonic player,

(21) rent is due."

(22) Q. Okay. And do you recall any discussions about

(23) that language in connection with the negotiations?

(24) A. My recollection is that there was a concern

(25) about the possibility that, in the event of a strike or

---

(1) a lockout, there may be some kind of means by which the

(2) Sonics would try to continue playing basketball games

(3) without the use of the regular, you know, the known

(4) players that had been previously identified as team

(5) members, and that they would bring in other people, put

(6) Sonics uniforms on them, and play a game.

(7) And the City's position was that, if that

(8) occurred, rent should be paid for that, because it was

(9) essentially a not in any respect different use of the

(10) Coliseum or Key Arena than there would have been had

he

(11) regular team members been used.

(12) Q. So what? Why did you want such a provision?

(13) Isn't it because there was an exception that rent would

(14) not be due in the event of a strike or lockout?

(15) A. That's tied to section XIX; but this is also a

(16) very labor-oriented town.

(17) Q. It's what?

(18) A. It's also a very labor-oriented community.

(19) Q. So you were writing down -- was this a note to

(20) yourself, or was this a note of a discussion?

(21) A. If could have been either.

(22) Q. No memory now, as you sit here?

(23) A. My perception is that this could well have

(24) been the notes of a discussion, because of some other

(25) things that are in here; but when, I can't tell you.

---

(1) Q. Well, give me your perception and tell me what

(2) it's based upon and who and what it was a discussion with.

(3) A. My perception is that it would have been

(4) discussion with Terry McLaughlin. These could well have

(5) been notes to myself to follow up on matters.

(6) MR. BYRNES. Excuse me

(7) (Discussion off the record.)

(8) Q. (By Mr Byrnes) Proceed.

(9) A. There were a variety of comments in the

(10) preceding page that indicate that there were pieces of

(11) information that were needed. There's also a notation

(12) of an upcoming meeting, and notations about or

(13) conclusions about particular language or general topics

(14) in the agreement that needed to be addressed by

someone.

(15) Q. So if I understand you, you don't know whether

(16) these notes were made by yourself alone or in a

(17) discussion with Terry?

(18) A. The notes would have been -- the notes would

(19) have been made by myself. Whether they occurred in the

(20) course of a discussion with Terry, my sense is that they

(21) were, because I wouldn't have made some of these notes

(22) simply sitting in my office, without any kind of input

(23) from them.

(24) Q. Well, were these made in discussions -- or can

(25) you tell -- whether these notes were made in discussions

---

(1) with any Sonics people?

(2) A. There are some indications that prompt a

(3) recollection that some of the notes may have been taken

(4) in connection with meetings with some Sonics people.

(5) Q. Do you know which pages or which sets of

(6) notes?

(7) A. There is a color change in the notes from red

(8) and black to green. There's a page that, for instance,

(9) says "Call DOT and get information on incentives and

(10) disincentives bid for" -- bid for something or other --

(11) "Bid for," unknown word, "for time construction, for

(12) on-time" -- maybe -- "premium," I can't tell exactly,

(13) "premium for on-time construction. Was bridge contract

(14) bid versus negotiated?" And "How was premium

addressed

(15) in specs?"

(16) This note prompts a recollection that, in a

(17) meeting with the Sonics, there were some questions

(18) relating to construction and construction timing; and I

(19) wrote that note to myself to try and find some

(20) additional information that might have some bearing on

(21) that.

(22) Q. Could I just see those originals for a moment?

(23) That's in a different color than the note I had you read

(24) in on "If any play by anybody ID'd as a Sonic player,

(25) rent is due." Is that right?

---

Micro Dep Condensed Transcript    Mills & Lessard

Page 65

(1) A.  It is; and that's what I said.

(2) Q.  How about this specific note I just read into

(3) the record that's in the red? Can you tell whether you

(4) discussed that with any Sonics person; or was that just

(5) you and Terry, or just you?

(6) A.  Let me have the preceding papers. I can't

(7) tell; there's a pen change as well. On that particular

(8) page, there are three different pen changes, which

(9) suggests to me there could have been three different

(10) times that this page was written on.

(11) Q.  Did you ever propose specific language that

(12) would in effect provide for the payment of rent in the

(13) event of a lockout or strike if the Sonics used scab

(14) labor?

(15) A.  I have a recollection of doing so.

(16) Q.  Tell me what you recall about the

(17) discussions –

(18) A.  I don't –

(19) Q.  – if anything.

(20) A.  I don't have a great deal of recollection

(21) about it. To my recollection, there is a provision in

(22) the agreement that deals with that.

(23) Q.  And what provision is that?

(24) A.  There is a provision in the executed version,

(25) the initial executed version – it's section 23 –

Page 66

(1) dealing with the suspension of obligations. There's a

(2) clause that relates to the playing of professional

(3) basketball games by people who are not participants in a

(4) labor dispute.

(5) Q.  Uh-huh.

(6) A.  There's by implication also language that

(7) could be read in section XX.B. of that final version

(8) that, under certain circumstances, could address that

(9) issue.

(10) Q.  All right. Now, we've talked about the

(11) exception under which the Sonics would not pay rent in

(12) the event of a lockout or a strike, have we not?

(13) A.  We've talked about it.

(14) Q.  And you reported to the City your

(15) understanding of that clause, did you not?

(16) A.  I made an observation with respect to a very

(17) early draft about that.

(18) Q.  And your observation was that if that

(19) exception were left in the lease, then rent would not be

(20) due in the event of a lockout or strike?

(21) A.  My observation was that that particular

(22) language in that original or very early draft could have

(23) that possibility.

(24) Q.  Well, it was more than a possibility. You

(25) stated it as an observation in reporting to your

Page 67

(1) superiors, didn't you, on the 23rd of September?

(2) A.  My observation went to my client, dealing with

(3) and reported -- and my belief that if the language

(4) essentially was left as it was written, there could be

(5) an implication, or the effect could be, that rent

(6) wouldn't be due.

(7) Q.  Well, you didn't say "the effect could be,"

(8) you said "the effect was," correct?

(9) A.  Well, you've got the memo.

(10) Q.  Well, you wrote the memo, and you've looked at

(11) it.

(12) A.  That's fine, I've looked at it.

(13) Q.  You've looked at it this morning and again in

(14) your deposition. And it says, "The exception allows the

(15) Sonics to avoid paying rent to the City, in the event of

(16) labor difficulties with the players." It's not

(17) qualified, is it? Is it?

(18) A.  Hold on, please.

(19) That was my conclusion at the time, uh-huh.

(20) Q.  And you reported that to your superiors?

(21) A.  I reported it to my client.

(22) Q.  And it was your intent to be forthcoming with

(23) your client, and to state things accurately for them,

(24) wasn't it?

(25) A.  It certainly was.

Page 68

(1) Q.  And was it after that that you raised the

(2) issue of scab labor or before that?

(3) A.  I have no recollection.

(4) Q.  Okay. When did the language that follows the

(5) exception, when was that first discussed, the language

(6) "during which"?

(7) A.  You would have to go back and look at the

(8) various drafts to determine that.

(9) Q.  Well, I'm asking you for your current memory.

(10) A.  I have no current memory. I would have to go

(11) back and look at those drafts.

(12) Q.  Well, do you have any memory of any discussion

(13) with Terry McLaughlin about the words "...during which

(14) SSI does not use the coliseum for any purpose"?

(15) A.  I'm sure I would have discussed that.

(16) Q.  That wasn't my question.

(17) Do you have a memory of a discussion? Not

(18) whether you "would have had" a discussion."

(19) And if you do, I want to know what you said

(20) and what he said.

(21) A.  I can't tell you that.

(22) Q.  All right. Do you have a memory of discussing

(23) the "during which" clause with Bill Ackerley?

(24) A.  No.

(25) Q.  Do you have a memory of discussing the "during

Page 69

(1) which* clause with Eric Rubin?

(2) A.   I'm sure I discussed it with him.

(3) Q.   Do you have a memory of discussing it with

(4) him? And if so, tell me what you recall, if you can

(5) recall anything.

(6) A.   I can't tell you the words that were in the

(7) conversation. I know we discussed it. I know that

(8) language was exchanged. I also know the language

(9) ultimately got in – got into the accepted agreement.

(10) Q.   Who drafted the language?

(11) A.   I believe I added that clause.

(12) Q.   Why do you believe that?

(13) A.   Simply because of the sequencing of the

(14) various drafts; and it wouldn't have been language

(15) logically that would have been offered by the Sonics.

(16) Q.   When you say "logically," do you have a memory

(17) of who drafted it?

(18) A.   I have a recollection of adding the

(19) qualification.

(20) Q.   And do you recall when that was added?

(21) A.   I can make some guesses.

(22) Q.   We don't want guesses. I want to know what

(23) you recall.

(24) A.   Then if you would provide me with the various

(25) drafts you've seen – you undoubtedly have copies of the

Page 70

(1) various drafts – it can easily be found which draft

(2) that language appears in first.

(3) Q.   All right. And it could easily be found who

(4) prepared that draft?

(5) A.   I believe so.

(6) Q.   Would that necessarily signal who had come up

(7) with the language?

(8) A.   If it first appears in a draft that's

(9) generated by me, I would think so.

(10) Q.   Okay. And if it first appears in a draft

(11) generated by the Sonics, what does it signify, the

(12) converse?

(13) A.   It might. On the other hand, it could also be

(14) language that Eric accepted and included in his draft

(15) after I had proposed it, you know. But it's, you know,

(16) I would assume more than likely that it was in my

(17) version.

(18) Q.   You've told me about these negotiations, and

(19) one and only one circumstance that you recall being

(20) discussed about when rent would be due, even in the face

(21) of a lockout or strike, and that was if they used scab

(22) labor. You told me about a discussion on that subject.

(23) Do you remember that?

(24) A.   To a point, yeah.

(25) Q.   All right. This is just a predicate to my

next question

(2) A.   Okay.

(3) Q.   Do you have a memory of any discussion of any

(4) kind other than that about when rent might be due in

(5) the event of a lockout or strike?

(6) A.   There certainly would have been discussions

(7) with Terry about the language that begins with the words

(8) "... during which SSI does not use the coliseum for any

(9) purpose...," the tail end of now section XX.B.

(10) Q.   But you don't remember?

(11) A.   I don't remember when they occurred.

(12) Q.   I asked you if you remembered any of them, and

(13) you said you didn't other than the fact that there have

(14) been discussions

(15) If you remember them I need to know about

(16) them; but don't guess.

(17) A.   I can't tell you the substance of the

(18) discussion. I can give you surmisings of the

(19) conclusions or the discussions, but I can't tell you who

(20) said what when

(21) Q.   All right. You know, you're a lawyer, and I

(22) don't want any surmise here. What I want is if you have

(23) a memory of the substance of any discussion with anyone

(24) on the subject of the clause "during which," now's the

(25) time for you to tell me

Page 72

(1) And if you don't, just say 'I'm sorry, I

(2) don't.'

(3) A.   If you give me a particular question to

(4) answer, I would be happy to try to answer it. I can't

(5) tell you that I have a memory of the substance of the

(6) conversation, other than what I can only conclude from

(7) the language that I proposed, and that it got into the

(8) agreement, from that I can only deduce.

(9) There was acceptance by my client and by the

(10) Sonics of that language.

(11) Q.   But I'm not here for deductions. I'm trying

(12) to find out what the people talked about, and what they

(13) said to each other, all right? Because what's in your

(14) mind is not relevant to a contract interpretation case

(15) It's what were the spoken words that the parties

(16) exchanged? What did they say to each other? What did

(17) you say to Terry, and what did he say to you? And then

(18) what did he repeat to the Sonics?

(19) And if you don't know, just tell me you don't

(20) know

(21) A.   I can't tell you what Terry said to the Sonics

(22) during times when I was not there.

(23) Q.   Well you can tell me what he said to the

(24) Sonics when you were there about that subject, if you

(25) recall anything

Page 73

(1) A. Casey recollection -- there was a strong

(2) desire to ensure that we had -- that we minimized the

(3) opportunity under which the Sonics could avoid paying

(4) rent. This was a potential provision that needed to be

(5) squeezed or needed to be controlled in a way to minimize

(6) that impact.

(7) Q. All right. And specifically, did you discuss

(8) what uses could be made of the Coliseum in the context

(9) of when rent would or would not be paid, other than if

(10) basketball games were played?

(11) A. I believe so.

(12) Q. Tell me what was --

(13) A. If I'm understanding your question.

(14) Q. Tell me what was said that you recall, and who

(15) said it.

(16) A. I can't tell you, you know, the word-for-word

(17) description of who said what when. I said I cannot tell

(18) you who said what when.

(19) Q. Well, can you tell me the substance of what

(20) they said, if not the specific words?

(21) A. My recollection is that we would have tried

(22) to -- we would have hypothesized, it seems to me, about

(23) circumstances in which there was use of the Coliseum.

(24) Q. You know, I'm not interested in what you would

(25) have done. You're a lawyer, and I'm having trouble with

Page 74

(1) you. I want to know what you did do

(2) So if you don't remember, you're supposed to

(3) say under oath, "I don't remember." And if you do

(4) remember, now is the time to tell me.

(5) But to say, "I could hypothetize that we

(6) talked about uses" is not productive of anything that

(7) has testimonial significance.

(8) And if you don't remember, just say you don't

(9) remember, and let's move on

(10) A. Let's move on at this point. I can't tell you

(11) that -- I am confident that we discussed situations in

(12) which this particular clause applied and didn't apply in

(13) the event of a lockout or strike, with or without that

(14) particular final qualification phrase which begins...

(15) "during which...."

(16) Q. But you don't remember what any of them were?

(17) A. I -- at this point, I can't recall specific

(18) instances, no.

(19) Q. Did you propose any examples, other than the

(20) playing of basketball games, in either discussions with

(21) Terry or in group meetings with the Sonics?

(22) A. I can only assume that I did. I have no

(23) recollection of doing so. I believe we discussed a

(24) variety of -- of possible kinds of instances, of various

(25) uses.

Page 75

(1) Casey, a manager, or a

(2) A. The language was broadly written --

(3) Q. I'm not --

(4) A. -- to include --

(5) Q. What memory do you have, Mr. Davidson, if any?

(6) A. My memory is that I purposefully wrote that

(7) language broadly.

(8) Q. What memory of the discussions; not your

(9) secret, personal writing of the clause. What did you

(10) say in discussions with the Sonics, if anything, as a

(11) non-negotiator?

(12) A. I'm not sure I identified those particular

(13) uses in discussions with the Sonics. I know I would

(14) have discussed them with Terry to the best of my ability

(15) at the time to identify various uses of the Coliseum.

(16) Q. And is the "Coliseum" a term of art?

(17) A. In this particular version, yes, the Coliseum

(18) is the building in which the, among other things, games

(19) were being held. It's now known as the Key Arena.

(20) Q. The "Coliseum," as it's used in paragraph

(21) XX.B., does not include the separate building in which

(22) the Sonics Store is, does it?

(23) A. It does not.

(24) Q. Thank you. And it does not include the

(25) practice facility which is two or three blocks down the

Page 76

(1) street, does it?

(2) A. It does not.

(3) Q. Is there any note that you've seen, at any

(4) time within the last few months, that relates in any way

(5) to the language "during which SSI does not use the

(6) Coliseum for any purpose"?

(7) A. I can't answer that. It's too broad of a

(8) question.

(9) Q. Well, have you seen any listing of any

(10) examples that pertain to that clause, other than the one

(11) we've talked about for playing basketball with scabs?

(12) A. I'm not sure I'm understanding your question.

(13) Q. Yeah. It says, "... during which SSI does not

(14) use the Coliseum for any purpose." Have you seen any

(15) listing of purposes of any kind in which they wouldn't

(16) play -- pay rent in the event of a lockout?

(17) A. I know I wrote down some ideas.

(18) Q. When?

(19) A. When I probably first heard about the rent

(20) dispute.

(21) Q. You mean you wrote some ideas down that

(22) Ms. Hong could argue?

(23) A. Conceivably. I don't know whether she picked

(24) up on those ideas or not.

(25) Q. Like somebody wandering into the Coliseum to

Page 77

(1) do some maintenance, was that one of your ideas?

(2) A. I don't remember whether I thought of that,

(3) but it would have been one of the things that I could

(4) have done some investigation about, or thought about.

(5) Q. Mr. Davidson –

(6) A. I wouldn't characterize it as "wandering in to

(7) do some maintenance," but whatever.

(8) Q. Isn't it true, Mr. Davidson, as you sit here

(9) today, under oath, that you know that what Terry

(10) McLaughlin, Bill Ackerley, and Eric Rubin say is the

(11) truth is, in fact, the truth; namely, that it was

(12) understood and agreed to that if the Sonics didn't play

(13) basketball games there, rent would not be due? You know

(14) that to be the truth, don't you?

(15) A. I do not know that to be the truth.

(16) Q. Do you deny that that's the truth?

(17) A. I do not know that to be the truth.

(18) Q. Do you deny it?

(19) A. Well, I'll repeat my language. I said I do

(20) not know that to be the truth.

(21) Q. Do you decline to deny it?

(22) A. It's not my belief; let's put it that way.

(23) MR. BYRNES: Let's go off the record for a

(24) minute, and consider a recess.

(25) (Deposition recessed at 1:15 p.m.)

Page 78

(1) AFTERNOON SESSION

(2) 1:50 p.m.

(3) May 25, 1999

(4) E X A M I N A T I O N

(5) BY MR. BYRNES

(6) Q. Mr. Davidson, were there discussions, either

(7) with Terry or with the Sonic representatives, concerning

(8) the bases for calculating the $800,000?

(9) A. When you say "bases," what do you mean?

(10) Q. Well, isn't it true that there were

(11) discussions that the $800,000 was designed to cover the

(12) City's cost of putting on 41 games?

(13) MS. HONIG: I missed the very beginning of

(14) that question. Could I hear it again?

(15) MR. BYRNES: Sure. Read it back, please.

(16) (The reporter read back as requested.)

(17) A. That's not my perception or my recollection.

(18) Q. (By Mr. Byrnes) Do you recall?

(19) A. The basis was not, you know, cost oriented, to

(20) my recollection.

(21) Q. Okay. You don't recall any discussions to

(22) that effect by Mr. McLaughlin with Mr. Rubin and

(23) Mr. Ackerley?

(24) A. I don't recall discussions with those three

(25) that the basis was to cover City costs.

Page 79

(1) Q. Do you recall discussions that the debt

(2) service was to be covered by the club seat and suite

(3) revenue?

(4) A. Not – I don't recall discussions that those

(5) two revenue sources were supposed to cover the debt

(6) service. My recollection is that there were several

(7) revenue sources or revenue streams or lines of business,

(8) however you want to characterize it, that were available

(9) for parties, and that they looked to divide them in a

(10) way that strengthened the team's capacity, and also

(11) provided a guaranteed revenue stream to the City and

(12) provided for debt service.

(13) Q. Do you recall, or do you have any information

(14) as you sit here today, of what the approximate cost is

(15) to the City of putting on a game?

(16) A. No.

(17) Q. Do you have any – Terry McLaughlin, when he

(18) was there would he have more information on that

(19) subject?

(20) A. He would have had.

(21) Q. Would he have more information on the previous

(22) subject I asked you about, the rent and what it was

(23) designed to cover than you?

(24) A. Yes.

(25) Q. And would he have more information on the

Page 80

(1) question of what the suite and club seat revenue was

(2) designed to cover than you?

(3) A. Yes. Although it's – well, let's put it that

(4) way.

(5) Q. So the answer is "Yes"?

(6) A. Uh-huh.

(7) Q. Now, in point of fact, the Sonics don't pay

(8) rent for the right to advertise, they pay a service

(9) charge?

(10) A. That's correct.

(11) Q. And it's specifically denominated as not being

(12) a rent in the agreement, is it not?

(13) A. That's correct.

(14) Q. And isn't the same true with respect to

(15) concession income, that it's denominated or designated a

(16) service charge and specifically stated not to be rent?

(17) A. I don't remember whether it's specifically

(18) stated not to be rent, but I think it is identified as a

(19) service charge.

(20) Q. All right. Why don't you take a look at that

(21) paragraph, if you would – that's paragraph VIII 3 –

(22) and read for the record the preamble after the word

(23) "Service Charges."

(24) A. It says, "SSI shall pay to the City as a

(25) service charge, and not as rent, within 30 days after

Page 81

(1) presentation of an invoice therefor unless specified
(2) below the following:"
(3)    Q.    And all of the items listed below are
(4) designated as being a service charge, not rent?
(5)    A.    That's right.
(6)    Q    And that includes the Coliseum's advertising
(7) fee?
(8)    A.    That's correct.
(9)    Q.    The Coliseum's title sponsorship and marquee?
(10)    A.    Yes.
(11)    Q.    Gross receipts from food sales, both in the
(12) stands, and in suites and clubs and seat areas and
(13) function rooms?
(14)    A.    Yes.
(15)    Q.    And the percentage of club seat gross
(16) receipts?
(17)    A.    Yes.
(18)    Q.    And suite gross receipts?
(19)    A.    Yes.
(20)    Q.    And gross receipts from basketball and other
(21) novelties?
(22)    A.    Yes.
(23)    Q.    And let's focus on event service costs in
(24) excess of City base costs  What understanding, if any,
(25) do you have about that paragraph?

Page 82

(1)    A.    Let me refresh my memory.
(2)    Q    Please.
(3)    A.    There was a concern that the Sonics or SSI,
(4) however you want to denominate it, would want to do
(5) something, or one or more things, in connection with
(6) games that would make the – sort of the functioning of
(7) the holding of those games, and the costs thereof – the
(8) holding of those games more expensive.
(9) That the center had an experience with certain
(10) kinds of activities in the normal kind of basketball
(11) game, where not much out of the ordinary happened that
(12) wasn't basketball related. And because of some past
(13) experiences with sort of special events, whether it was,
(14) oh, something like having members of the audience come
(15) down on to the floor and do something, or a special kind
(16) of presentation that warranted additional staff coming
(17) on or being required, the Center wanted to limit those
(18) costs  And this –
(19)    Q.    Well, they didn't want to limit them, they
(20) just wanted the Sonics to pay
(21)    A.    Well, there was a recognition that there was
(22) some kinds of special activities that, because of past
(23) practice, could be viewed as part of a normal basketball
(24) game. But beyond that, there was no desire on the part
(25) of the Center to pay for those costs, and that those

Page 83

(1) costs should be passed on to the Sonics.
(2)    Q.    Above and beyond the $800,000?
(3)    A.    Yes.
(4)    MR. BYRNES:    Let me mark this next exhibit in
(5) order, the other Post-It note, which apparently fell off
(6) the privileged document version which was given to us
(7) Would you mark that as the next exhibit in
(8) order.
(9)    (Marked Deposition Exhibit No. 6.)
(10)    MR. BYRNES:    Ms. Honig, would you state for
(11) the record which page of the draft that was attached to
(12) the September 23, 1993, memorandum this Post-It belonged
(13) on.
(14)    MS. HONIG:    Well, if you can identify for me
(15) which Post-It it was that you had just marked.
(16)    MR. BYRNES:    This was the other Post-It that I
(17) just handed you.
(18)    MS. HONIG:    The one that begins, "This
(19) limitation ..."?
(20)    MR. BYRNES:    Correct.
(21)    MS. HONIG:    That was on page 38.
(22)    MR. BYRNES    Thank you.
(23)    Q.    (By Mr. Byrnes) Do you know of any other
(24) Post-It notes that you've seen, Mr. Davidson, within the
(25) last 24 hours, that has not been on the table for any

Page 84

(1) reason?
(2)    A.    I know of none.
(3)    Q.    Now, what role, if any, do you have in
(4) connection with this arbitration, other than serving as
(5) a witness today?
(6)    A.    Do I have now?
(7)    Q    Or have you had in the last –
(8)    A.    I have had – in the early, very early stages
(9) of the lockout, I consulted with Seattle Center staff
(10) about the implications of the actions taken. I answered
(11) questions that they had regarding the agreements written
(12) to date. I reviewed documents. I consulted with other
(13) people in my own office about the matter.
(14)    Q    Now, do you know why it was, Mr. Davidson,
(15) that the City stated to the arbitrators, on more than
(16) one occasion, that you would not be a witness in this
(17) case?
(18)    A.    I do not.
(19)    Q.    Did you ever tell anyone that you didn't want
(20) to be a witness?
(21)    A.    No. It's conceivable to me that there was a
(22) concern about privilege, privileged communications going
(23) to my client, Seattle Center. That there was – and
(24) that there was an interest in not having testimony
(25) provided that would waive that privilege.

(1) Q. That would waive the privilege on the
(2) documents I showed you today?
(3) A. Waive the privilege with respect to anything
(4) in particular.
(5) Q. Okay. Well, are there any other documents
(6) that you're aware of, memoranda that you wrote to the
(7) City, that we haven't talked about today?
(8) A. I could not tell you.
(9) Q. Have you produced any memoranda to the City,
(10) since the lockout started, with respect to whether or
(11) not rent is or is not due?
(12) A. I could not tell you that.
(13) Q. Well, at any time have you given any advice to
(14) the City since the lockout started?
(15) MS. HONIG: I'm going to object and instruct
(16) the witness not to answer.
(17) MR. BYRNES: Let me ask the question first,
(18) please. I think you're jumping the gun.
(19) Q. (By Mr. Byrnes) My question is since the
(20) lockout started, have you been called upon to give any
(21) advice to the City, with respect to whether or not rent
(22) was or was not due for the period of the lockout. That
(23) calls for a "Yes" or "No" answer.
(24) MS. HONIG: That's right, and that's all
(25) A. My answer would be "Yes."

---

Page 86

(1) Q. (By Mr. Byrnes) And did you give such
(2) advice?
(3) A. Yes.
(4) Q. To whom did you give such advice?
(5) MS. HONIG: Objection.
(6) MR. BYRNES: You may answer.
(7) MS. HONIG: I'm going to instruct him not to
(8) answer.
(9) MR. BYRNES: Well, I'm entitled to know.
(10) These are facts; facts are never privileged.
(11) To whom he gave the advice is not privileged.
(12) You may answer.
(13) MS. HONIG: Just the names.
(14) Q. (By Mr. Byrnes) Just the names.
(15) A. I'm not sure I can tell you at this point who
(16) I discussed that with, partly because of the time delays
(17) and the fact that I have not been working on this
(18) particular, you know, matter as an involved attorney or
(19) principally involved attorney for a period of time.
(20) My perception is that I would have advised
(21) either John Rhamstine – I think it would probably have
(22) been John Rhamstine with whom I would have had
(23) conversations.
(24) Q. How about Virginia Anderson?
(25) A. It's possible, but I don't remember.

---

(1) Q. Anybody on the City Council?
(2) A. Not likely.
(3) Q. Was whatever advice you gave written or oral
(4) or a combination?
(5) A. Probably oral.
(6) Q. Sir?
(7) A. It was probably oral.
(8) Q. You say "probably." Do you have a memory of
(9) putting anything in writing?
(10) A. Not that would have been anything other than
(11) drafts, or draft material, or my own, you know, notes to
(12) myself or whatever. But I have no recollection of any
(13) such material.
(14) Q. So as you sit here today, you don't recall
(15) preparing any memorandum for anyone in the City?
(16) A. There was not, to my knowledge.
(17) Q. Or any statement or opinion in writing?
(18) A. I don't think there was, no.
(19) Q. And do you plan to be a witness at the
(20) arbitration hearing?
(21) A. It's on my calendar to be available.
(22) Q. And is Ms. Honig going to represent the City
(23) of Seattle at that hearing?
(24) A. It's my understanding.
(25) Q. Are you and Ms. Honig colleagues in the City

---

Page 88

(1) Attorney's office?
(2) A. We are.
(3) Q. You're both – what's your titles?
(4) A. They're comparable.
(5) Q. Comparable titles?
(6) A. Yes.
(7) Q. All right. Let me ask you a few questions
(8) about paragraph XXIII of the lease. And you said
(9) that – before I do that, let me back up. You said
(10) the second amendment to lease was not executed?
(11) A. It's my recollection.
(12) Q. But the first amendment to lease was executed?
(13) A. That's my recollection.
(14) Q. And is there anything in the first amendment
(15) to lease that changes the definition of "Coliseum?"
(16) A. I don't remember.
(17) Q. Do you have paragraph XXIII on page 53 of the
(18) lease, the "Premises Use and Occupancy Agreement"?
(19) A. Twenty-three on page 53?
(20) Q. Correct.
(21) A. Uh-huh. Yes.
(22) Q. Did you have discussions either with
(23) McLaughlin about that provision or with the Sonics
(24) negotiators?
(25) A. I'm sure I did.

---

Page 89

(1) Q. Do you recall the substance of any such

(2) discussions?

(3) A. I'm sure that I discussed with Mr. McLaughlin

(4) the initial language and ways in which that language

(5) could be minimized, in terms of its impact on the City,

(6) and undoubtedly recommended to him that the City try to

(7) minimize the impact of that provision.

(8) Q. When you say you undoubtedly did something, or

(9) you would have done something, it sounds to me like

(10) that's speculation. I'm only interested in what you can

(11) tell us with certainty that you did do.

(12) A. I know that I discussed this with

(13) Mr. McLaughlin.

(14) Q. Do you know what you discussed in substance

(15) with Mr. McLaughlin on any occasion concerning any

(16) portion of XXIII?

(17) A. I know we discussed the original language, I

(18) know we discussed the ways in which this language

(19) changed in the various drafts. I know we discussed the

(20) issue of the use of what I might call "scab labor," and

(21) the way in which the provision played out, how it would

(22) be implemented in that event.

(23) I believe we also discussed differences in the

(24) various labor actions and the involvement of SSI in

(25) those actions.

Page 90

(1) I think we also – I believe we also discussed

(2) the words used. You know, we probably didn't discuss

(3) each and every word, as, you know, what the effect of

(4) the word "the" is, but we discussed certainly the

(5) significant words.

(6) Q. Anything else?

(7) A. Not to my recollection at this time.

(8) Q. You've listed five items, we're going to talk

(9) about each one seriatim. The first one was you said you

(10) were sure you discussed the "initial language." First

(11) of all, what do you mean by the "initial language"?

(12) A. The language that showed up in the very first

(13) draft.

(14) Q. What language was that?

(15) A. Well, we go back to the first draft that we

(16) have available.

(17) Q. Is that the one from which the stickies fell

(18) off?

(19) A. It's a draft that shows an e-mail or a fax

(20) transmittal date of April 8, 1993, I believe.

(21) Q. And who was the fax transmittal from?

(22) A. The firm from which, or with which Eric Rubin

(23) is associated.

(24) Q. So this draft that was attached or followed

(25) the memo of September 23 that we've referred to earlier

Page 91

(1) which says, "Get this for this," that came from

(2) Mr. Rubin's office initially?

(3) A. Yes. You can see that from the fax

(4) transmission code that shows up on the top of the

second

(5) page. A lot of these pages are Xeroxed in a way that

(6) makes that transmission note not visible, but it shows

(7) up, for instance, on the top of the second page. It

(8) shows up in part at least on this version, on page 38.

(9) It shows up in part on page 52, et cetera.

(10) Q. All right. And tell me what you were

(11) referring to about the initial language.

(12) A. Let's go back to the – let me find it in this

(13) version so I have it.

(14) Q. Why don't you look at 44.

(15) A. Yeah, it's labeled section XXII here.

(16) Q. Okay.

(17) A. You go back to – I know there's a comment in

(18) my memorandum about this, but I know we would have

(19) looked at this. There's, for instance, an underlining

(20) of the phrase – that's the second to the last line on

(21) page 44, the clause that refers to "Obligations set

(22) forth in Section III..,"

(23) Q. What obligations were those?

(24) A. I don't know. I would have to go back and

(25) look.

Page 92

(1) Q. Do those relate to the failure to construct

(2) the Coliseum in a timely manner?

(3) A. Right. That's what's labeled Section III in

(4) this particular version.

(5) Q. All right. Who proposed the exception?

(6) A. That would have been Eric.

(7) Q. Okay. All right. What else did you include

(8) in your phrase "The initial language"?

(9) A. This particular version – the whole contract

(10) could be viewed as that, but certainly the language in

(11) Section XXII, I would have – I would have tried to

(12) look at this particular clause, again, in the context of

(13) the whole agreement.

(14) Q. Do you recall any discussions with Mr. Rubin

(15) or anyone from the Sonics concerning the "initial

(16) language" as you've used that term? And if so, tell me

(17) what the substance of those discussions was, and with

(18) whom they were held.

(19) A. I undoubtedly discussed –

(20) Q. No, I want – I don't want you to speculate

(21) by – and when you say "undoubtedly," that signifies

(22) that someone is hypothesizing.

(23) I would like for you to tell me "I recall

(24) this," "I recall this," or "I don't recall anything."

(25) Whatever words you want to use, but don't use

## Page 93

(1) "undoubtedly."

(2)    A.   I know I talked about this clause with Terry

(3) McLaughlin. I know I talked about this clause with Eric

(4) Rubin. I --

(5)    Q.   Tell me what you talked about concerning this

(6) clause with Terry McLaughlin.

(7)    A.   We talked about the implications of the

(8) "exception" language, whether or not that was an

(9) appropriate provision in there. We talked about --

(10)    Q.   The exception for Article III?

(11)    A.   Yeah.

(12)    Q.   Okay.

(13)    A.   We talked about the -- whether or not this

(14) should be -- we should make an effort to try to limit

(15) this.

(16)    Q.   Limit it to --

(17)    A.   How we might limit it.

(18)    Q.   Do you recall the genesis of this force

(19) majeure clause, where it came from in the first place?

(20)    A.   There certainly was a force majeure clause in

(21) the preceding agreement. I don't remember at this point

(22) whether or not it is worded the same way or not.

(23)    Q.   Do you recall that Mr. Rubin added the words

(24) "including such labor dispute between SSI or the NBA and

(25) players employed by the NBA"?

## Page 94

(1)    A.   Added it from the language that existed there

(2) before?

(3)    Q.   Yes.

(4)    A.   I don't have a recollection of him adding it

(5) at that point. I have a recollection of discussing with

(6) Mr. McLaughlin the issue of this particular phrase,

(7) "Players employed by the NBA," because it seemed to be

(8) curious language.

(9)    Q.   Well, what was discussed about it?

(10)    A.   Whether or not in fact the NBA employed the

(11) players, as opposed to the individual teams or the team

(12) owners, franchisees.

(13)    Q.   And that's the way it came out in the final

(14) lease?

(15)    A.   Is that a question?

(16)    Q.   Yes, that's a question.

(17)    A.   Well, I'll have to take a look at it. That

(18) language is in the final lease.

(19)    Q.   And what, if any, discussions did you have

(20) with McLaughlin or anyone on that subject? What did you

(21) say, and what'd they say?

(22)    A.   We talked about the appropriateness of the

(23) language, whether or not in fact the players were

(24) employed by the NBA, or whether they were employed by

(25) SSI, and whether this was appropriate language in the

## Page 95

(1) agreement. Whether it accurately stated the facts or

(2) did not, and what the implications were, if it did or

(3) did not.

(4)    Q.   Did you discuss it with Mr. Rubin or

(5) Mr. Ackerley?

(6)    A.   I don't have a recollection of discussing it

(7) with Mr. Ackerley at all. I recall discussing the

(8) clause generally with Mr. Rubin, and ways in which this

(9) particular clause should be narrowed.

(10)    Q.   Well, did you discuss with Mr. Rubin -- I'm

(11) limiting you right now to your comments about the

(12) players employed by the NBA. Did you discuss that with

(13) Mr. Rubin?

(14)    A.   I did not. Since the language was his, I saw

(15) no reason to bring to his attention language that I

(16) thought was ambiguous or inappropriate, and that in my

(17) perception wasn't in fact, you know, the employment

(18) relationship that existed with these players. If he

(19) chose to -- what I thought was mischaracterize it, that

(20) was his problem, as far as I was concerned.

(21)    Q.   Did you understand that this clause applied to

(22) a labor dispute?

(23)    A.   I did.

(24)    Q.   And that it applied to a lockout or a walkout?

(25)    A.   I did.

## Page 96

(1)    Q.   Or a strike?

(2)    A.   I did.

(3)    Q.   Who suggested the insertion of the last

(4) sentence in that paragraph?

(5)    A.   I believe I did.

(6)    Q.   And was this -- did this relate to the subject

(7) of scab labor which you've mentioned?

(8)    A.   It does.

(9)    Q.   So that if the Sonics played a game with

(10) people who were not participants in such labor dispute,

(11) would those people be scabs?

(12)    A.   Yes.

(13)    Q.   And then, in those circumstances, did you

(14) suggest that the Sonics obligations would not be

(15) suspended?

(16)    A.   Yes.

(17)    Q.   Why was that?

(18)    A.   Because they were effectively using the same

(19) premises. It didn't make any difference whether or not

(20) the -- from the City's perspective, whether the players

(21) were those that had a labor agreement or not.

(22) If there were nonrepresented people being used

(23) as basketball players, and if a game was being played in

(24) the facility, the impact on the City was the same; we

(25) were still providing the same services. The public

Page 97

(1) might have had a different reaction, but, you know, from

(2) our perspective, the Sonics were using the premises for

(3) the playing of a basketball game.

(4) Q.  So what?

(5) A.  So there should be no impact in rent, no

(6) impact on any of the charges.

(7) Q.  But what if they didn't play with scab labor?

(8) A.  If they didn't play, there wasn't necessarily

(9) any kind of impact on rent, either, from my perspective.

(10) Q.  Well, you just said that there would be, if

(11) they played with scab labor, there shouldn't be any

(12) impact on rent. Isn't the converse true?

(13) A.  Not necessarily. This talks about a

(14) suspension. There was, for instance, no explanation in

(15) this particular clause about how the labor dispute is

(16) going to be resolved. If, for instance, the labor

(17) dispute involved a strike that lasted a week, and the

(18) schedule, game schedule, was adjusted so that it was –

(19) so that it was extended by a week, that would be –

(20) that's a season that lasted the same length of time.

(21) There would be no logical change in the relationship.

(22) Q.  Well, what if the entire season was lost due

(23) to a strike or a lockout?

(24) A.  The language here allowed for the resumption

(25) of that, it seems to me, and the, you know, the

Page 98

(1) continuation of the obligation. That situation –

(2) Well, strike the last. The –

(3) Q.  Well, you know, I want to know what was talked

(4) about. Did you talk about examples of the season being

(5) lost, or half a season in these discussions?

(6) A.  I believe we talked about certainly partial

(7) seasons being lost. I don't have a recollection of

(8) discussing the possibility that the entire season might

(9) be lost.

(10) Q.  Did you have discussions about the word

(11) "suspension" with Mr. Rubin or Mr. Ackerley?

(12) A.  I believe I had a discussion with Mr. Rubin

(13) about the word "suspension."

(14) Q.  Tell me what was the discussion

(15) A.  To my recollection, we discussed that, you

(16) know, a suspension means what it says. It's a –

(17) Q.  Well, what do you think a suspension does

(18) mean?

(19) A.  I think a suspension means the obligation is

(20) essentially, you know.

(21) Q.  Stopped?

(22) A.  Put on hold and –

(23) Q.  Stopped?

(24) A.  You're not telling me what the language says.

(25) Are you asking me the question?

Page 99

(1) Q.  What is the plain meaning of "suspension"?

(2) MS. HONIG.  I think the witness is attempting

(3) to answer your question, if you would let him.

(4) A.  You're interjecting my answer. You want to

(5) answer my question.

(6) Q.  (By Mr. Byrnes)  Proceed.

(7) A.  From my perception –

(8) Q.  No, I'm asking you what you said to Mr. Rubin,

(9) and what he said to you about the term "suspension," if

(10) anything. Not your perception.

(11) A.  We discussed that the word "suspension" means

(12) what it says. "Suspension" means the obligation is put

(13) in essentially a holding pattern until the matter is

(14) taken care of.

(15) Q.  Was Mr. McLaughlin present at those

(16) discussions?

(17) A.  I don't know that he was present in those

(18) discussions, because we had some of those discussions

(19) over the telephone. I would have had the same

(20) conversation with Mr. McLaughlin, to my recollection.

(21) Q.  And did you have the same kind of conversation

(22) in the presence of Mr. Rubin?

(23) A.  Over the telephone, probably, yes.

(24) Q.  And with Mr. Ackerley?

(25) A.  I don't remember whether Mr. Ackerley was

Page 100

(1) involved in those discussions.

(2) Q.  Well, is it your testimony under oath here,

(3) Mr. Davidson, that you said to Mr. Rubin, in substance,

(4) 'Look. The word 'suspension' means that something is

(5) only temporarily stopped, and if it starts up again,

(6) then you've got to pay us for what was stopped

(7) initially'?

(8) A.  I don't know that I said those words per se.

(9) It's my recollection we discussed the word "suspension,"

(10) and what its impact was, and how we might address a

(11) particular labor dispute. And the word "suspension" was

(12) there originally; it remained there.

(13) Q.  Did you discuss what the impact on rent would

(14) be if an entire season were lost?

(15) A.  I don't have a recollection of discussing

(16) that.

(17) Q.  Well, is it your testimony that even though

(18) you didn't discuss it, that your own perception was that

(19) the $800,000 would simply be postponed until the next

(20) year, and then 1.6 million would be due for the second

(21) year, assuming the strike was over?

(22) A.  At this point, I can't recall what – how I,

(23) you know, looked at the issue of the elimination of an

(24) entire season

(25) Q.  Well, what about two seasons? Let's say it

Page 101

(1) was a long work stoppage, and two full seasons were
(2) lost. Was it your understanding that suspension meant
(3) that to start season three, the Sonics would have to pay
(4) $2.4 million for the third season plus a CPI escalator?
(5) You know that's not what was intended, don't you?
(6)   A.   I'm not going to answer it that way.
(7)   Q.   Well, do you know that that was what was
(8) intended?
(9)   A.   I can't tell you that's what was
(10) intended. It's my recollection and belief that the
(11) parties intended that the obligation be suspended,
(12) meaning put into a suspense pattern, a holding pattern,
(13) until and for so long as the obligation remained beyond
(14) a reasonable control of the parties, just like the
(15) language says.
(16)   Q.   And what do you mean by "Put in a suspense or
(17) holding pattern"?
(18)   A.   That for those obligations that were affected
(19) by the particular event, that there would – and
(20) presumably it directly affected – that there was an
(21) opportunity to temporarily not do those particular, you
(22) know, carry out those particular obligations or carry
(23) out the duties.
(24)   Q.   Well, did Mr. Rubin tell you that the
(25) Ackerleys or the Sonics were in such a financial

Page 102

(1) position that they needed to postpone the rent for a few
(2) months, if there was a few-month strike?
(3)   A.   I didn't think that was a perception that
(4) anybody had.
(5)   Q.   What was your perception if the entire season
(6) were lost, in terms of regular games, but at the end of
(7) the season, the NBA decided to hold some sort of a
(8) shortened playoff format? What would happen in those
(9) circumstances to the rent, if anything?
(10)   A.   I don't know. I think the parties would have
(11) looked at the agreement at the time and tried to examine
(12) that. It's a hypothetical situation.
(13)   Q.   Does the Memorandum of Understanding
(14) accurately reflect the intent of the parties?
(15)   A.   It reflected the intent of the parties at the
(16) time it was written. The intent of the parties changed
(17) as the negotiations with respect to this lease went on.
(18)   Q.   Was it the intent of the parties, in the
(19) spring of 1993 when the Memorandum of Understanding was
(20) executed, that the $800,000 was to cover 41 games?
(21)   A.   There is language in the MOU that refers to 41
(22) games, to my recollection.
(23)   Q.   So is the answer to my question "Yes"?
(24)   A.   Yes, I think you could say that the intention
(25) was that the language in the MOU was the intention of

Page 103

(1) the parties.
(2)   Q.   And that language provides $800,000 for 41
(3) games.
(4)   A.   It says there's a base rent of $800,000 per
(5) annum, and then there's a CPI adjustment that relates to
(6) 41 regular season games and five additional games. You
(7) could read the $800,000 either as tying to 41 games, or
(8) maybe the CPI.
(9)   Q.   Well, how did you read it?
(10)   A.   I tried to deal with this particular document
(11) after it had been dealt with in a way that would keep
(12) this being used as essentially the base of the
(13) negotiations, and as a starting point for the lease.
(14) negotiations, and directions for the lease.
(15) As it turned out, there were a variety of
(16) provisions in this MOU that, upon further recollection,
(17) didn't work well, or weren't worded in a way that was as
(18) clear as one might have hoped. And it required further
(19) additional language, and it required further additional
(20) language to flesh out what the parties' intention was.
(21)   Q.   Well, that's a lot of words, but did you just
(22) tell me that you can't tell from looking at this
(23) sentence whether the 41 regular season games modifies
(24) the $800,000 per year or the CPI adjustment, and that
(25) they – it was the intent that they would pay a CPI

Page 104

(1) adjustment for 41 games?
(2)   A.   I think you can easily read this to apply to a
(3) 41 regular season, a regular season of 41 games.
(4)   Q.   For $800,000 rent plus a CPI adjustment,
(5) correct?
(6)   A.   Why don't you give me your whole sentence so I
(7) can answer it.
(8)   Q.   Well, why don't you read the sentence that
(9) you've been trying to parse into the record.
(10)   A.   It says, "The Sonics will pay the City a base
(11) rent of $800,000 per annum, subject to an annual CPI
(12) adjustment of not less than three percent nor more
(13) seven percent for 41 regular season games and five
(14) additional to be determined Sonic events."
(15)   Q.   Well, is it your testimony that the intent of
(16) the parties was that the 41 regular season games and
(17) five additional events only pertained to the CPI
(18) adjustment?
(19)   A.   No, I'm not saying that. I'm saying that the
(20) sentence could have been written in a way that would
(21) have been more clear. I think it can easily be read,
(22) and I think probably the parties did focus on a rent per
(23) annum for this 41 regular season games and five
(24) additional events, as determined by the Sonics.
(25)   Q.   Who drafted that?

Page 105

(1)  A.   I drafted it, on the basis of information
(2)  provided to me by the parties.
(3)  Q.   And who provided it to you, specifically?
(4)  A.   Who provided the data on which —
(5)  Q.   Yes, the sentence we're talking about.
(6)  A.   I can't tell you. I have no recollection.
(7)  Q.   It was language that you understood to have
(8)  been agreed to by the parties?
(9)  A.   Yes. I know that there were a variety of
(10) drafts of the Memorandum of Understanding that went
back
(11) and forth.
(12) Q.   And in the final lease, is it not true that
(13) the annual rent of $800,000 plus the CPI adjustment
(14) contemplates 41 NBA regular season home games?
(15) A.   I don't think it's as easily answered as that.
(16) The annual rent is for a variety of rights that go to
(17) the Sonics.
(18) Q.   Well, I'm only asking about home games,
(19) regular season home games. I'm not asking about
(20) championships or other things.
(21) Does it contemplate 41 regular season home
(22) games, with an additional payment of eight and a half
(23) percent if there's more than that?
(24) A.   There is a specific provision dealing with
(25) additional rent that says, "In the event the regular

Page 106

(1)  season is expanded to more than 41 home games, there
is
(2)  an additional eight and a half percent of ticket sales
(3)  proceeds for those additional games."
(4)  I don't think there — as this agreement is
(5)  written, I don't think there is necessarily an
(6)  implication that one gets that the rent is 41 games.
(7)  It's for a regular season.
(8)  Q    Well, don't the Sonics get to play 41 season
(9)  games, regular season games, for 800 grand, under this?
(10) A.   If that's what the regular season is.
(11) Q.   Yeah. And if it goes over 41, they have to
(12) pay some other rent?
(13) A.   That's right.
(14) Q.   But they're entitled to 41 without paying any
(15) more rent
(16) A.   They're entitled to the regular season.
(17) Q.   All right. And how long has the regular
(18) season been 41 home games?
(19) A.   I don't know.
(20) Q.   Well, wasn't it 41 home games way back when
(21) you were drafting the old Coliseum lease?
(22) A.   I can't recall. I have a vague recollection
(23) at one time that there were 39 games during the time
(24) that I've been dealing with the Sonics.
(25) Q    But if the Sonics played 41 regular season

Page 107

(1)  home games, they would pay $800,000 rent plus the CPI?
(2)  A.   Uh-huh.
(3)  Q.   Under the lease?
(4)  A.   Yes.
(5)  Q.   And under the MOU, if they played 41 home
(6)  games, they would pay $800,000 in rent?
(7)  A.   Subject to the, you know, annual CPI
(8)  adjustment, that's right.
(9)  Q.   And under the old lease, they didn't pay
(10) $800,000, they paid eight and a half percent of the
(11) ticket sales proceeds.
(12) A.   That may be the case. I don't have a strong
(13) recollection of that at this point.
(14) Q.   Do you recall discussions that the parties
(15) wanted to get away from one of the problems in the old
(16) lease, namely, that there were always disputes and
(17) debates about the Sonics giving complimentary tickets
(18) away, therefore possibly eroding the ticket sale
(19) proceeds?
(20) A.   I do.
(21) Q.   That was a subject that was actually discussed
(22) in connection with the new lease negotiations, was it
(23) not?
(24) A.   I know it was discussed in connection with one
(25) of the amendments to the old lease. I don't have a

Page 108

(1)  strong recollection of it being discussed in connection
(2)  with the new lease at all.
(3)  Q.   Well, I don't want to ask you about a strong
(4)  recollection. Do you have any recollection?
(5)  A.   I don't have a recollection of it being
(6)  discussed.
(7)  Q.   At all, one way or the other?
(8)  A.   I don't have a recollection of it being
(9)  discussed, no.
(10) Q.   One way or the other?
(11) A.   One way or the other, yeah.
(12) Conceptually, I'm not sure it makes — it
(13) would have been a subject for discussion in fact.
(14) Q    Well, was it discussed in connection with
(15) discussing the $800,000, and moving from a game-based
(16) eight and a half percent rent to an annual rent?
(17) Let me be more specific. You look puzzled.
(18) In fact, if Terry McLaughlin were to testify that indeed
(19) that was the main reason the City of Seattle wanted an
(20) annual rent, to get away from this free ticket thing —
(21) A.   Uh-huh.
(22) Q.   — would you disagree with that?
(23) A.   I wouldn't have reason to disagree.
(24) Q.   Now, you said in order for you to attempt to
(25) reconstruct the dates of meetings or telephone calls,

(1) you would need your calendar from 1993, and your
(2) calendar from 1994, your telephone log and your time
(3) records.
(4)   A.   Say it –
(5)   Q.   Anything else?
(6)   A.   Say it again.
(7)   Q.   In order to reconstruct, to the extent you're
(8) able to, the dates of telephone calls and/or
(9) face-to-face negotiating sessions, you would look to
(10) your calendars for 93 and 94, your telephone log, and
(11) your time records?
(12)   A.   I would look to all those, I would look also
(13) to any negotiations that I might have made on contract
(14) copies or memoranda or whatever other documents that
(15) were relating to the negotiations that were underway.
(16) There could have been, you know, a notation, as I've
(17) seen in this material here, about the date of a
(18) negotiation session.
(19)   Q.   What is your telephone log?
(20)   A.   What's my telephone log?
(21)   Q.   Yes. What is it? Describe it for me.
(22)   A.   My telephone log is a log that keeps track of
(23) long distance telephone calls on the date that they
(24) occur.
(25)   Q.   Does it show the time of call?

---

Page 110

(1)   A.   No.
(2)   Q.   Does it show the subject matter?
(3)   A.   No.
(4)   Q.   Is it kept for billing or accounting purposes
(5) in the City?
(6)   A.   Accounting purposes.
(7)   Q.   And how about your time records? When you
(8) dictate your time records, do you put the date of the
(9) entry?
(10)   A.   It's on a sheet that shows the date, the
(11) general kind of activity that's involved, whether it's a
(12) meeting, you know, a writing, researching, travel.
(13)   Q.   Does it allocate the specific number of hours
(14) that day?
(15)   A.   Yes.
(16)   Q.   Is that typed or handwritten?
(17)   A.   Handwritten.
(18)   Q.   What's done with it physically after you write
(19) it up?
(20)   A.   It's provided to my secretary. She logs it
(21) into an office record of hours kept on particular
(22) projects.
(23)   Q.   Does she type it in?
(24)   A.   Yes, I believe so.
(25)   Q.   And does it show the subject matter of

---

(1) meetings or discussions or opinions?
(2)   A.   It would show the project. It would not show
(3) much more.
(4)   Q.   Now, do you have a copy of your statement in
(5) front of you, your anticipated testimony?
(6)   A.   Yes.
(7)   Q.   Who prepared the first draft of your
(8) statement?
(9)   A.   Ms. Honig and I discussed the general subject
(10) matter. She summarized it.
(11)   Q.   In a first draft?
(12)   A.   Yes.
(13)   Q.   Did you propose changes in it?
(14)   A.   I did.
(15)   Q.   And do you have a copy of the changes that you
(16) proposed?
(17)   A.   No.
(18)   Q.   Well, can you look at this draft and tell me
(19) about anything that you added or deleted from the draft
(20) presented to you?
(21)   MS. HONIG:   Well, I'm going to object and
(22) instruct him not to answer the question.
(23)   MR. BYRNES:   Well, there's no attorney-client
(24) privilege as to this testimony.
(25)   MS. HONIG:   Certainly there is.

---

Page 112

(1)   MR. BYRNES:   Counsel, please don't interrupt.
(2) This purports to summarizes his testimony
(3) relating to subject matters that occurred back in 1994,
(4) and I want to know if he made changes in this draft,
(5) additions or deletions. They may be very material, and
(6) I'm entitled to know that.
(7)   MS. HONIG:   Well, Mr. Byrnes, you can ask him
(8) about anything that's on this piece of paper, and if you
(9) want to ask him about anything that he discussed with
(10) me.
(11)   MR. BYRNES:   I don't care what he discussed
(12) with you.
(13)   MS. HONIG:   Well, that's what your question
(14) relates to.
(15)   MR. BYRNES:   I want to know what he took out.
(16)   MS. HONIG:   I'm going to instruct him not to
(17) answer any of the conversation – any changes to this
(18) document, or any changes to earlier documents that
(19) related in this document, were made in the context of
(20) confidential communications that we had.
(21) I'm going to instruct him not to answer, so
(22) it's settled
(23)   MR. BYRNES:   Well, I took it as a waiver of
(24) the attorney-client privilege here.
(25)   MS. HONIG:   With regard to the advice that was

---

(1) given in connection with the drafting of the lease.

(2) MR. BYRNES: And that's what this affidavit

(3) relates to.

(4) MS. HONIG: Well, you can question him about

(5) what is in this document.

(6) MR. BYRNES: I really want to ask him what's

(7) not in here, that he wouldn't accept that you put to

(8) him.

(9) MS. HONIG: That's fine. I'm going to

(10) instruct him not to answer the question.

(11) Q. (By Mr. Byrnes) There's nothing in this

(12) document about paragraph XX.B. or XIX.B. that we've been

(13) talking about, is there, Mr. Davidson?

(14) A. No.

(15) Q. In fact, it's silent on that subject, rather

(16) startlingly so.

(17) A. Well, if you look on the bottom of page two,

(18) the bottom paragraph relates to, whatever section it is,

(19) the force majeure clause on page –

(20) Q. That's XXIII. I'm asking you about XX, the

(21) NBA clause.

(22) A. I don't remember that there was anything like

(23) that in the earlier versions. In any event, I can and

(24) will testify about it. I have this morning.

(25) Q. Well, did you ask that anything be removed

---

**Page 114**

(1) from the original draft presented to you?

(2) MS. HONIG: Don't answer the question.

(3) MR. BYRNES: Let's take a short recess.

(4) (Recessed from 2:48 to 2:56 p.m.)

(5) MR. BYRNES. So far this deposition has

(6) consumed two hours and 58 minutes of the four hours

(7) allotted. I just have a couple more short questions,

(8) Mr. Davidson; I appreciate your courtesy in coming here

(9) today, and then I'll be done.

(10) And incidentally, Counsel, let me reiterate

(11) that this deposition tomorrow of Mr. McLaughlin is

(12) scheduled at 8:30 a.m. to run until 12:30 or even a

(13) quarter to 1:00, if necessary, and I think you are

(14) generally limited to four hours. I'm not going to make

(15) it four hours on button.

(16) And as we talked about at the arbitration

(17) hearing, if you're in the middle of a line of inquiry

(18) that requires some additional time to finish up, that's

(19) fine. And maybe you'll finish short of four hours, like

(20) I did; that's your privilege.

(21) But I am offering to start earlier than 8:30

(22) so that we can definitely finish tomorrow, because I

(23) have a matter that I can't postpone. It's 1:00, and

(24) that's why we scheduled at 8:30. So if you want to

(25) start before 8:30 tomorrow morning, just let me know

---

(1) before we adjourn for today, and I'll be happy to

(2) accommodate you. And if you don't, we'll leave it at

(3) 8:30.

(4) Q. (By Mr. Byrnes) Now, having said that, let

(5) me ask you, Mr. Davidson, if you have ever yourself

(6) written any statements or narratives concerning the

(7) issue of when rent is or is not due in connection with a

(8) strike or a lockout?

(9) A. I may have written some notes to myself, but

(10) certainly to my recollection wrote no memoranda to

(11) anyone, like particularly my client.

(12) Q. When would you have written those notes?

(13) A. My recollection is that I would have written

(14) them probably either during those initial – sort of at

(15) the first part of the lockout or some weeks into it.

(16) Q. And what was the purpose of those notes to

(17) yourself?

(18) A. Look at – you know, refresh my recollection

(19) about the terms of the contract, and look at what was

(20) likely to play out.

(21) Q. Where are those notes?

(22) A. At this point, I have no recollection. I

(23) don't even know that they even exist anymore.

(24) Q. Did you turn those notes over to someone at

(25) any time?

---

**Page 116**

(1) A. I can't say, because I – the Sonics-related

(2) matters were shifted to others, and I didn't – I began

(3) working on other projects and disregarded where, you

(4) know, the implications of this particular dispute.

(5) Q. Well, if I understand what you're testifying

(6) to, you have a memory of writing some notes to yourself

(7) at the time of or in connection with the lockout itself

(8) A. Because at that time I was involved, in my

(9) recollection, in advising Seattle Center on a variety of

(10) issues, but have not recently been doing that.

(11) Q. Yeah. Did you intentionally destroy those

(12) notes?

(13) A. I didn't intentionally destroy them. I don't

(14) know what happened to them.

(15) Q. Well, were they in the materials that you gave

(16) to Ms. Honig?

(17) A. I have no knowledge.

(18) Q. They may have been?

(19) A. They may have been, I just do not know.

(20) MR. BYRNES: Counsel, I'm going to ask you,

(21) Ms. Honig, to produce those documents. And if you

(22) decline to do so, I'm going to ask you to bring them to

(23) the arbitration hearing, so that the arbitrators can

(24) hear argument on the subject.

(25) I'm also going to request that you bring his

---

(1) calendars, his telephone logs, his time records, and any

(2) other documents that have been withheld from us under a

(3) claim of privilege, in any way relating to the subject

(4) matters of this arbitration.

(5) I'm not satisfied with the production that's

(6) taken place, and I want to be sure that the arbitrators

(7) and I and my clients have the benefit of all of the

(8) pertinent materials, not just some of them.

(9) MS. HONIG: Well, first of all – and assuming

(10) that notes of the kind Mr. Davidson described exist, and

(11) with regard to all of these things that you're

(12) requesting be produced, first of all with regard to the

(13) notes, I would like you tell me under what theory or

(14) authority you are requesting those.

(15) As I recall, we had an agreement that we would

(16) produce documents that pertain to the negotiation and

(17) drafting of the lease itself. Now if Mr. Davidson were

(18) to have written any such notes to himself after the

(19) lockout began, please explain to me how that is within

(20) the scope of the agreed production in this case.

(21) MR. BYRNES: Absolutely. First of all, we

(22) don't have any agreement on anything. I had to go and

(23) argue and write a bunch of briefs, get you to waive a

(24) privilege that never existed in the first place, so we

(25) don't have any agreements on anything.

---

Page 118

(1) But I think that if this gentleman sat down

(2) and talked about the lockout, and started giving advice

(3) about the lockout in connection – or to the Seattle

(4) Center officials, and that advice obviously relates to

(5) the lease itself, as he just testified very clearly, and

(6) the meaning of the lease, and how the lease should be

(7) construed or not construed, vis-a-vis the payment of

(8) rent in connection with the lockout, A, it couldn't be

(9) more pertinent and, B, you know, the privilege has been

(10) waived.

(11) It's just like Judge Miflin used to say, and

(12) other judges down in King County used to say, "It's kind

(13) of like being a little bit pregnant. There's no such

(14) thing. You can't sort of waive the privilege, you

(15) either waive it or you don't waive it, and there can't

(16) any selective waiver."

(17) And I think that those materials that reflect

(18) upon his understanding, his belief, the intent of the

(19) parties, proper construction of the lease, other

(20) constructions of the lease, regardless of when written,

(21) should be produced. And that's my position. I

(22) appreciate you may not agree with me and we don't have

(23) to solve that here. I'm just asking you to have them at

(24) the hearing in a sealed envelope, and we'll take it up

(25) with the arbitrators

---

Page 119

(1) MS. HONIG: Since we're sitting in your office

(2) and you have your files, you might want to go and get a

(3) correspondence from Mr. Taylor, in which he did made

(4) certain requests for certain documents and that defined

(5) the scope of the production in this case.

(6) So I am not inclined to produce anything, if

(7) such documents exist, beyond what was requested and

(8) produced pursuant to that agreement.

(9) MR. BYRNES: Well, consider this a request, if

(10) it hasn't previously been made, just like you've been

(11) making requests all along for new and additional

(12) documents as recently as the other day in connection

(13) with advertising revenue.

(14) So let's not debate it. Just bring them with

(15) you, and put them in a sealed envelope, and if the

(16) arbitrators say they're not to be produced, I won't see

(17) them. And the same for his notes, diaries, time logs,

(18) and all the other materials I've listed.

(19) MS. HONIG: Well, I think that before I put

(20) myself to the trouble of doing that, we should just

(21) place a call to Judge Doran and let him decide the

(22) issue.

(23) MR. BYRNES: I'm done for the day. So I'll

(24) write a letter to you, how's that, and I'll send it to

(25) Judge Doran. And if you want to have a hearing before

---

Page 120

(1) June 7th, that's fine.

(2) MS. HONIG: Do what you want. That's fine.

(3) MR. BYRNES: Just bring them with you.

(4) MS. HONIG: Well, I don't intend at this point

(5) to bring anything with me. I think that the scope of

(6) the production was clearly defined by Mr. Taylor at the

(7) outset.

(8) MR. BYRNES: All right. We'll take this up

(9) with the arbitrators at the outset of the arbitration.

(10) MS. HONIG: Fine.

(11) MR. BYRNES: All right. We're done.

(12) Mr. Davidson. Thank you for your courtesy.

(13) THE WITNESS: You're welcome

(14) MR. BYRNES: I'm ordering the deposition in

(15) Min-u-script form, with a full set of exhibits as

(16) marked

(17) MS. HONIG: I'll take a copy.

(18) Mr. Davidson, do you wish to reserve the right

(19) to read it?

(20) THE WITNESS: I'll read it.

(21) MR. BYRNES: One final comment for the record.

(22) Mr. Taylor's letter of March 22, you were saying you

(23) didn't bring them with you because we didn't ask for

(24) them, asks for notes of conversations between the

(25) parties, analyses of the lease, and comments from any

---

(1) department within the City concerning the lease. And

(2) he's just testified that he made analyses of the lease,

(3) and comments concerning the lease. That's what we want.

(4) MS. HONIG:   Well –

(5) MR. BYRNES:   You're always trying to be

(6) technical.

(7) MS. HONIG:   No. I'm trying – the agreement

(8) was that we would produce documents related to the

(9) drafting and negotiation of the lease, and we're not

(10) going to produce documents that were created after the

(11) controversy arose.

(12) Have you produced those type of documents?

(13) MR. BYRNES:   You know, I didn't – I wasn't

(14) the subject of a privilege claim, and besides which, I

(15) think I would be very cautious after these Post-Its

(16) mysteriously fell off, when one of them is the most

(17) relevant piece of evidence that you produced yet. So

(18) let's just get on with it.

(19) MS. HONIG:   Well, Mr. Byrnes, you haven't ever

(20) even answered the question of whether or not your client

(21) has documents. You've been certainly very crafty on

(22) that one.

(23) (Deposition recessed at 3:10 p.m.)

(24)

(25)

---

Page 122

(1) A F F I D A V I T

(2) STATE OF .. ....... ...)

(3) ) ss.

(4) COUNTY OF ......... ...)

(5) I have read the attached transcript, and the same

(6) is true and accurate, save and except for changes and/or

(7) corrections, if any, as indicated by me on the

(8) correction sheet.

(9) ...... . .............. ....

(10) GORDON B. DAVIDSON

(11)

(12) STATE OF ........... )

(13) ) ss

(14) COUNTY OF... ......   )

(15) SUBSCRIBED AND SWORN TO before me this   . day

(16) of ......   , 19..

(17) .. .......... .   ....

(18) NOTARY PUBLIC in and for the

(19) State of ..........   .

(20) residing at ..........

(21)

(22)

(23)

(24)

(25)

---

(1) C E R T I F I C A T E

(2) STATE OF WASHINGTON )

(3) ) ss.

(4) COUNTY OF KING )

(5) I, the undersigned Notary Public in and for the

(6) state of Washington, do hereby certify that.

(7) I am not a relative or employee or counsel of

(8) any of the parties to said action, or a relative or

(9) employee of any such attorney or counsel, and that I am

(10) not financially interested in the said action or the

(11) outcome thereof;

(12) The witness, before examination, was duly sworn

(13) to testify the truth, the whole truth, and nothing but

(14) the truth; and

(15) The transcript attached hereto is a true record

(16) of the proceedings.

(17) In witness whereof, I have hereunto set my hand

(18) and affixed my seal this...... day of . ...........,

(19) 1999.

(20) ............................. ... .......

(21) PATRICIA LESSARD

(22) CSR #UCHIDPL503JT

(23) Notary Public in and for

(24) the State of Washington,

(25) residing at Seattle

---

Page 124

(1)

(2)

(3)

(4)

(5)

(6)

(7)

(8)

(9)

(10)

(11)

(12)

(13)

(14)

(15)

(16)

(17)

(18)

(19)

(20)

(21)

(22)

(23)

(24)

(25)

---

**Report**

UNIQUE WORDS: 1,599
TOTAL OCCURRENCES: 6,818
NOISE WORDS: 384
TOTAL WORDS IN FILE: 22,041

- - -

SINGLE FILE CONCORDANCE

- - -

CASE SENSITIVE

- - -

COVER PAGES = 3

- - -

INCLUDES ALL TEXT
OCCURRENCES

- - -

DATES ON

- - -

INCLUDES PURE NUMBERS

- - -

POSSESSIVE FORMS ON

## – DATES –

**April 8, 1993 [1]**
  90:20
**December [1]**
  14:2
**January [1]**
  14:2
**June 7th [1]**
  120:1
**March 22 [1]**
  120:22
**March of 1993 [1]**
  16:11
**May 25, 1999 [1]**
  78:3
**November 10 [3]**
  12:2; 13:25; 14:5
**November 10th [1]**
  11:22
**October 1, 1995 [3]**
  20:24; 21:19; 22:5
**October 12th [1]**
  12:25
**September [2]**
  30:11; 67:1
**September 23 [4]**
  37:25; 39:7; 45:19; 90:25
**September 23, 1993 [3]**
  29:13; 46:17; 83:12

## – $ –

**$2.4 [1]**
  101:4
**$800,000 [25]**
  17:23; 20:4, 17, 20; 21:3, 7,
  9; 22:7; 59:25; 78:8, 11; 83:2;
  100:19; 102:20; 103:2, 4, 7,
  24, 104:4, 11; 105:13; 107:1,
  6, 10; 108:13

## – 1 –

**1 [5]**
  5:19, 21, 20:24; 21:19, 22:5
**1.6 [1]**
  100:20
**10 [3]**

**10th [1]**
  11:22
**11 [3]**
  12:2; 13:25; 14:5
**11th [1]**
  11:22
**12:24 [1]**
  50:13
**12:29 [1]**
  50:13
**12:30 [1]**
  114:12
**12th [1]**
  12:25
**19 [2]**
  20:4; 122:16
**1976 [1]**
  5:1
**1990s [1]**
  5:14
**1993 [9]**
  9:21; 16:5, 11; 29:13; 46:17;
  83:12; 90:20; 102:19; 109:1
**1994 [4]**
  9:21; 19:22; 109:2, 112:3
**1995 [3]**
  20:24; 21:19; 22:5
**1999 [2]**
  78:3; 120:19
**1:00 [2]**
  114:13, 23
**1:15 [1]**
  77:25
**1:50 [1]**
  78:2

## – 2 –

**2 [1]**
  16:9
**20 [5]**
  15:3; 22:11; 23:5, 12
**22 [1]**
  120:22
**23 [8]**
  29:13; 37:25; 39:7; 45:19;
  46:17; 65:25; 83:12; 90:25
**23rd [1]**
  67:1
**24 [1]**
  83:25
**25 [1]**
  78:3
**2:48 [1]**
  114:4
**2:56 [1]**
  114:4

## – 3 –

**3 [2]**
  19:8, 10
**30 [2]**
  22:6; 80:25
**38 [4]**
  50:20; 52:4, 83:21, 91:8
**39 [2]**
  40:23; 106:23
**3:10 [1]**
  121:23

**4 [1]**
  29:11
**41 [40]**
  17:24; 19:2; 20:14, 18; 29:23;
  31:18; 33:3, 4; 41:6; 51:17,
  21, 23, 24; 53:13; 59:25;
  61:12; 78:12; 102:20, 21;
  103:2, 6, 7, 23; 104:1, 3, 13,
  16, 23; 105:14, 21; 106:1, 6,
  8, 11, 14, 18, 20, 25; 107:5
**42 [1]**
  18:24
**44 [2]**
  91:14, 21
**48 [1]**
  22:12

## – 5 –

**5 [2]**
  56:11; 61:11
**52 [1]**
  91:9
**53 [2]**
  88:17, 19
**58 [1]**
  114:6

## – 6 –

**6 [1]**
  83:9

## – 7 –

**7th [1]**
  120:1

## – 8 –

**8 [1]**
  90:20
**800 [1]**
  106:9
**8:30 [5]**
  114:12, 21, 24, 25; 115:3

## – 9 –

**93 [3]**
  14:2; 30:12; 109:10
**94 [1]**
  109:10

## – A –

**a.m. [1]**
  114:12
**abbreviation [1]**
  41:15
**ability [1]**
  75:14
**able [2]**
  39:23; 109:8
**Absolutely [1]**
  117:21
**accept [1]**
  113:7
**acceptance [1]**
  72:9
**accepted [2]**
  69:9; 70:14

36:7
**accommodate [1]**
  115:2
**Accounting [1]**
  110:6
**accounting [1]**
  110:4
**accurate [4]**
  6:7; 18:1, 15; 122:6
**accurately [3]**
  67:23; 95:1; 102:14
**Ackerley [21]**
  10:7, 9, 23; 11:2; 14:15, 21;
  15:7; 23:2, 6; 38:13; 43:11;
  55:8; 59:14; 68:23; 77:10;
  78:23; 95:5, 7; 98:11; 99:24,
  25
**Ackerleys [1]**
  101:25
**action [2]**
  123:8, 10
**actions [3]**
  84:10; 89:24, 25
**activities [3]**
  24:14; 82:10, 22
**activity [2]**
  25:1; 110:11
**actual [1]**
  16:14
**Added [1]**
  94:1
**added [5]**
  30:13; 69:11, 20; 93:23;
  111:19
**adding [2]**
  69:18, 94:4
**addition [4]**
  9:24; 23:20; 24:1; 31:3
**additional [20]**
  17:25; 18:4, 20; 20:12; 34:8,
  40:20; 64:20; 82:16; 103:6,
  19; 104:14, 17, 24; 105:22,
  25, 106:2, 3; 114:18; 119:11
**additions [1]**
  112:5
**address [5]**
  18:19, 23; 19:1; 66:8; 100:10
**addressed [4]**
  38:18; 39:13; 63:14; 64:14
**addressing [1]**
  54:15
**adjourn [1]**
  115:1
**adjusted [3]**
  20:8, 23; 97:18
**adjustment [9]**
  17:24; 103:5, 24; 104:1, 4,
  12, 18; 105:13; 107:8
**administrators [1]**
  7:6
**advertise [1]**
  80:8
**advertising [2]**
  81:6; 119:13
**advice [9]**
  85:13, 21; 86:2, 4, 11; 87:3,
  112:25; 118:2, 4
**advised [3]**
  53:9; 86:20
**advising [1]**

From April 8, 1993 to **advising**

116:9

**affected [2]**
101:18, 20

**affidavit [1]**
113:2

**affixed [4]**
52:9, 14, 25; 123:18

**AFTERNOON [1]**
78:1

**afterwards [1]**
57:2

**agree [1]**
118:22

**agreed [4]**
19:18; 77:12; 105:8; 117:20

**Agreement [3]**
7:13; 19:17; 88:18

**agreement [27]**
10:21, 16:19, 25; 17:3; 24:17;
26:13; 28:13; 30:19, 21; 48:3;
51:13; 54:25; 63:14; 65:22;
69:9; 72:8; 80:12; 92:13,
93:21; 95:1; 96:21; 102:11;
106:4; 117:15, 22; 119:8;
121:7

**agreements [7]**
4:20, 21; 53:7; 56:21; 84:11;
117:25

**aid [1]**
27:23

**allocate [1]**
110:13

**allotted [1]**
114:7

**allowed [3]**
28:13, 19; 97:24

**allows [2]**
30:14; 67:14

**alone [1]**
63:16

**ambiguous [1]**
95:16

**Amendment [1]**
19:16

**amendment [4]**
19:19; 88:10, 12, 14

**amendments [1]**
107:25

**analyses [2]**
120:25; 121:2

**Andersen [3]**
57:8, 14, 18

**Anderson [4]**
7:21; 30:11; 57:25; 86:24

**angular [2]**
32:24; 33:2

**annual [6]**
104:11; 105:13, 16, 107:7,
108:16, 20

**annum [3]**
103:5; 104:11, 23

**answer [32]**
36:24; 37:13, 16; 41:24;
44:22; 45:1, 3, 5, 23; 46:5;
49:15; 72:4; 76:7; 80:5;
85:16, 23, 25; 86:6, 8, 12;
99:3, 4, 5, 101:6; 102:23;
104:7; 111:22; 112:17, 21;
113:10; 114:2

**answered [7]**
37:11; 44:20; 45:12; 46:3;

84:10; 105:15, 121:20

**anticipate [1]**
41:25

**anticipated [5]**
5:16; 6:5; 8:3; 38:8; 111:5

**Anybody [1]**
87:1

**anybody [4]**
15:8; 61:20; 64:24; 102:4

**anymore [1]**
115:23

**anywhere [1]**
12:22

**apparently [2]**
8.24; 83:5

**appear [2]**
28:25; 39:10

**appeared [1]**
28:4

**appears [8]**
16:10; 19:12, 14, 23; 31:9;
70:2, 8, 10

**applied [3]**
74:12; 95:21, 24

**apply [2]**
74:12; 104:2

**appreciate [2]**
114:8; 118:22

**appropriate [4]**
24:16, 22; 93:9; 94:25

**appropriateness [4]**
24:13, 23; 54:8; 94:22

**approximate [3]**
12:17, 13:24; 79:14

**Approximately [1]**
14:19

**approximately [6]**
8.5, 19; 9:14, 11.11, 16:11;
36:11

**approximation [1]**
39:22

**April [1]**
90:20

**Arabic [1]**
21:11

**arbitration [12]**
5:16; 13:20; 20:1; 44:5, 9;
52:24; 84:4; 87:20; 114:16;
116:23; 117:4, 120:9

**arbitrators [7]**
34:19; 84:15, 116:23; 117:6,
118:25; 119:16; 120:9

**archives [4]**
35:22, 25; 53:3, 5

**area [1]**
4:11

**areas [1]**
81.12

**Arena [2]**
62:10; 75:19

**arena [1]**
6.19

**argue [2]**
76:22; 117:23

**arguing [1]**
25:8

**argument [2]**
60:21; 116:24

**arose [1]**
121:11

**arrangement [2]**

5:8; 18:14

**arrived [1]**
16:2

**art [1]**
75:16

**Article [1]**
93:10

**ascertain [1]**
9:13

**asking [11]**
19:21, 29:12; 43:23; 49:1;
68:9; 98:25; 99:8; 105:18, 19;
113:20; 118:23

**asks [1]**
120:24

**aspect [1]**
61:5

**asserted [2]**
37:2, 18

**assertion [1]**
37.4

**assign [2]**
12.4, 17

**Assistant [1]**
4.10

**associated [1]**
90:23

**assume [8]**
26:6, 38:1; 52:10, 11; 53:4;
54:18; 70.16; 74:22

**assumed [1]**
50:17

**assumes [1]**
16:20

**Assuming [1]**
36:17

**assuming [5]**
28.22; 31:7; 51:3; 100:21;
117:9

**assumptions [1]**
54:19

**assurance [1]**
22:20

**asterisk [1]**
51:15

**Attached [1]**
51:23

**attached [14]**
30:6, 20, 21; 39:6; 51:13, 17,
20, 24; 52.20; 53:13; 83:11,
90:24; 122:5; 123:15

**attempt [3]**
33.12; 40.9; 108:24

**attempting [2]**
33:14; 99:2

**attendance [1]**
60:7

**attention [6]**
19:7; 22:11; 34:11; 53:15, 16;
95:15

**attorney [4]**
4:10; 86:18, 19; 123:9

**Attorney's [1]**
88:1

**attorney's [1]**
61.11

**attorney-client [5]**
38:16; 60:15, 19; 111:23;
112:24

**audibly [1]**
49:15

**audience [1]**
82:14

**authored [1]**
29:14

**authority [1]**
117:14

**available [4]**
38:6; 79:8; 87:21; 90:16

**avoid [5]**
28:19; 30:14; 54:1; 67:15;
73:3

**avoidance [1]**
28:12

**aware [8]**
33:25; 34:7, 10, 11, 21;
36:20; 50:7; 85:6

– B –

**bar [1]**
5:3

**base [7]**
17:23; 20:7; 21:6; 81:24;
103:4, 12; 104:10

**based [1]**
63:2

**bases [2]**
78:8, 9

**basis [9]**
21:23, 25; 22:2, 8, 33:21;
34:9; 78:19, 25; 105:1

**basketball [15]**
28:7; 55:1; 59:6; 62:2; 66:3;
73:10; 74:20; 76:11; 77:13;
81:20; 82:10, 12, 23; 96:23;
97:3

**batch [1]**
29:6

**bear [1]**
36:20

**bearing [1]**
64:20

**begins [3]**
71:7; 74:14; 83:18

**behalf [2]**
22:25; 26:6

**behind [2]**
32:6; 53:21

**belief [5]**
30:4; 67:3; 77:22; 101:10;
118:18

**believe [25]**
14:4, 8; 15:3; 18:22; 26:23;
39:21; 40:23; 41:7, 44:7, 13;
54:20; 56:18; 58:22; 69:11,
12; 70:5; 73:11; 74:23; 89:23;
90:1, 20; 96:5; 98:6, 12;
110:24

**belonged [1]**
83:12

**benefit [3]**
12:6, 8; 111:7

**besides [2]**
23:2; 121:14

**Bid [1]**
64:11

**bid [3]**
64:10, 14

**Bill [10]**
10:7, 23; 11:2; 14:15, 15:7;
23:1, 6; 55:8; 68:23, 77:10

billing [2]
  9:10; 110:4
bit [1]
  118:13
black [1]
  64:8
blocks [1]
  75:25
BOYCE [1]
  50:22
brackel [1]
  33:5
brackets [1]
  33:6
bridge [1]
  64:13
briefing [1]
  60:20
briefs [2]
  60:18; 117:23
broad [3]
  58:11; 59:14; 76:7
broadly [2]
  75:2, 7
building [2]
  75:18, 21
bunch [1]
  117:23
business [4]
  10:24; 52:5; 57:11; 79:7
business's [1]
  30:16
button [1]
  114:15
bylaws [6]
  23:14; 28:10, 23; 47:15;
  53:24; 54:13
BYRNES [46]
  4:4; 29:5; 31:25; 45:4, 8, 14;
  46:1, 5; 50:4, 11; 51:8, 17;
  52:1; 53:8; 63:6; 77:23; 78:5,
  15; 83:4, 10, 16, 20, 22;
  85:17; 86:6, 9; 111:23; 112:1,
  11, 15, 23; 113:2, 6; 114:3, 5;
  116:20; 117:21; 119:9, 23;
  120:3, 8, 11, 14, 21; 121:5, 13
Byrnes [27]
  5:22; 16:10; 18:15; 19:11;
  29:12; 32:3; 37:13, 19; 44:23;
  45:1, 17; 46:7; 47:8; 52:3;
  53:12; 56:12; 63:8; 78:18;
  83:23; 85:19; 86:1, 14; 99:6;
  112:7; 113:11; 115:4; 121:19

-- C --

calculating [1]
  78:8
calendar [15]
  8:14; 9:17, 19, 20; 11:6; 13:2,
  6, 13, 14, 16, 18; 37:21,
  87:21; 109:1, 2
calendars [8]
  9:1; 12:11, 12, 24, 15:21, 25;
  109:10, 117 1
Call [1]
  64:9
call [4]
  6:16, 89:20; 109:25, 119:21
calls [5]
  27:17; 85:23; 108 25, 109 8,

canceled [2]
  41:9, 13
candor [1]
  58:23
capacity [1]
  79:10
capital [1]
  21:11
care [2]
  99:14; 112:11
careful [1]
  50:8
carefully [2]
  36:19; 48:3
carry [3]
  56:20; 101:22
case [10]
  27:11; 36:23; 37:1; 49:22;
  57:1; 72:14; 84:17, 107:12,
  117:20; 119:5
cases [3]
  4:20; 10:25; 14:14
cautious [1]
  121:15
Center [11]
  7:6; 8:17; 37:23; 57:2, 4;
  82:17, 25; 84:9, 23, 116:9,
  118:4
center [1]
  82:9
certainly [1]
  30:2; 89:11
certify [1]
  123.6
cetera [1]
  91:9
championship [1]
  20:13
championships [1]
  105:20
change [3]
  64:7; 65:7; 97:21
changed [2]
  89:19; 102:18
changes [10]
  7:2; 23:16; 65:8; 88:15,
  111:13, 15; 112:4, 17, 18;
  122:6
characterize [1]
  77:6; 79:8
charge [5]
  80:9, 16, 19, 25; 81:4
Charges [1]
  80:23
charges [1]
  97:6
check [3]
  13:21; 31:9; 51:19
chose [1]
  95:19
circumstance [1]
  70:19
circumstances [7]
  20:11; 26:25; 40:16; 66:8;
  73:23, 96:13; 102 9
City [39]
  4:7, 18, 24; 5:6; 6:17, 7:16,
  22, 21:6; 26:14; 28 20; 30:15;
  57:6, 58:3; 59:2, 21, 22;
  66:14; 67:15; 78:25; 79:11,

15; 5oliso8/24; 81:20:77,
9, 14, 21; 87:1, 15, 22, 25;
89:5, 6; 96:24; 104:10;
108:19; 110:5; 121:1
city [1]
  4:10
City's [5]
  52:4; 59:17; 62:7; 78:12;
  96:20
claim [7]
  33:22; 35:2; 37:17; 38:16;
  60:15; 117:3; 121:14
claimed [2]
  34:22; 37:10
clause [31]
  22:13; 26:23, 25; 28:14;
  29:25; 47:16; 55:5; 57:21;
  58:20; 66:2, 15; 68:23; 69:1,
  11; 71:24; 74:12; 75:9; 76:10;
  91:21; 92:12; 93:2, 3, 6, 19,
  20; 95:8, 9, 21; 97:15;
  113:19, 21
clear [2]
  103:18; 104:21
cliche [1]
  41:4
client [7]
  67:2, 21, 23; 72:9; 84:23;
  115:11; 121:20
clients [1]
  117:7
closer [1]
  38:23
club [3]
  79:2; 80:1; 81:15
clubs [1]
  81:12
code [1]
  91:4
Coliseum [15]
  5:9; 6:21; 62:10; 73:8, 23;
  75:15, 16, 17, 20; 76:6, 14,
  25; 88:15; 92:2; 106:21
coliseum [4]
  6:19; 55:10; 68:14; 71:8
Coliseum's [2]
  81:6, 9
colleagues [1]
  87:25
colloquialism [1]
  25:6
color [2]
  64:7, 23
column [1]
  31:22
combination [1]
  87:4
coming [3]
  45:24; 82:16; 114:8
commence [2]
  20:24; 22:5
commenced [3]
  16:15; 22:5; 44:6
commencement [1]
  44:8
comment [3]
  29:23; 91:17; 120:21
comments [7]
  31:5; 39:8; 49:10; 63:9;
  95:11; 120:25; 121:3
communicate [1]

communications [2]
  84:22; 112:20
community [1]
  62:18
Comparable [1]
  88:5
comparable [2]
  30:7; 88:4
compare [1]
  50:21
comparison [1]
  39:23
compendium [2]
  60:3; 61:11
compiled [1]
  12:21
complimentary [1]
  107:17
conceivable [1]
  84:21
Conceivably [2]
  12:15; 23:1; 76:23
conceivably [4]
  7:7; 12:12; 14:2; 23:1
concentrate [2]
  4:13, 15
Conceptually [1]
  108:12
concern [2]
  55:25; 61:24; 82:3; 84:22
concerned [2]
  12:3; 95:20
concerning [12]
  5:8; 6:8; 22:16; 23:5; 33:20;
  78:7; 89:15; 92:15; 93:5;
  115:6; 121:1, 3
concession [2]
  4:21; 80:15
conclude [1]
  72:6
conclusion [1]
  67:19
conclusions [2]
  63:13; 71:19
conditions [2]
  28:15; 57:11
conduct [1]
  52:5
conference [2]
  14:16; 20:13
conferences [1]
  14:19
confident [1]
  74:11
confidential [1]
  112:20
connect [2]
  54:2, 12
connection [19]
  6:14, 25, 35:2; 52:24; 56:8;
  61:23; 64:4; 82:5; 84:4;
  107:22, 24; 108:1, 14; 113:1;
  115:7; 116:7; 118:3, 8;
  119:12
consider [2]
  77:24; 119:9
consolidated [1]
  35:20
constitution [5]
  23:14; 28:10, 23; 47:15;

BSA
City of Seattle v. SSI, Inc. GORDON DAVIDSON 5/29/08
Case 2:07-cv-01620-RSM Document 2-8 Filed 10/10/2007 Page 61 of 78 Look See(36)

53:24
construct [1]
  92:1
construction [5]
  64:11, 13, 18; 118:19
constructions [1]
  118:20
construed [2]
  118:7
consulted [2]
  84:9, 17
consumed [1]
  114:6
contemplate [1]
  105:21
contemplates [1]
  105:14
context [3]
  73:8; 92:12; 112:19
continuation [1]
  98:1
Continue [1]
  20:25
continue [1]
  62:2
contract [9]
  9:16; 12:15; 46:13; 47:10;
  64:13; 72:14; 92:9; 109:13;
  115:19
contracts [4]
  4:14, 16, 23; 37:22
contrast [1]
  8:16
control [5]
  25:2, 9, 10, 14; 101:14
controllable [1]
  24:15
controlled [1]
  73:5
controversy [1]
  121:11
conversation [5]
  69:7, 72:6; 99:20, 21; 112:17
conversations [4]
  10:16, 18; 86:23; 120:24
converse [2]
  70:12; 97:12
copied [4]
  50:15, 18; 51:3, 10
copies [4]
  23:13; 34:10; 69:25; 109:14
copy [12]
  5:15, 20; 16:7; 19:13; 29:9,
  10, 51:5, 18; 111:4, 15;
  120:17
copying [1]
  51:4
corner [3]
  30:23, 31:15; 51:15
correction [1]
  122:8
corrections [1]
  122:7
correctly [1]
  21:3
correspondence [1]
  119:3
cost [3]
  78:12, 19; 79:14
costs [7]
  78:25; 81:23, 24; 82:7, 18,

25; 83:1
Council [1]
  87:1
Counsel [1]
  45:14, 46:1; 50:4; 112:1;
  114:10; 116:20
counsel [8]
  5:20, 24; 29:9; 34:4; 35:8;
  36:5; 123:7, 9
count [1]
  36:15
COUNTY [3]
  122:4, 14; 123:4
County [1]
  118:12
couple [1]
  114:7
course [2]
  40:19; 63:20
courtesy [2]
  114:8; 120:12
cover [6]
  78:11, 25; 79:5, 23; 80:2;
  102:20
covered [1]
  79:2
CPI [13]
  17:23, 20:8; 101:4; 103:5, 8,
  24, 25; 104:4, 11, 17; 105:13;
  107:1, 7
crafty [1]
  121:21
created [1]
  121:10
CSR [1]
  123:22
curious [1]
  94:8
current [6]
  6:22; 7:11; 19:13; 53:6; 68:9,
  10
cursory [1]
  31:9

– D –

daily [4]
  13:14; 21:25; 22:1, 7
damaged [1]
  21:4
data [1]
  105:4
date [16]
  12:4; 13:11; 14:3; 39:18;
  40:1; 52:13; 60:7, 22; 61:7, 8;
  84:12; 90:20; 109:17, 23;
  110:8, 10
dated [3]
  40:6; 61:6, 7
dates [12]
  11:8, 11, 16, 19, 25; 12:17,
  21; 13:21; 15:4; 108:25;
  109:8
DAVIDSON [2]
  4:1; 122:10
Davidson [22]
  4:6, 12, 32:5; 41:18; 48:5;
  50:1; 51:6; 55:6; 75:5; 77:5,
  8; 78:6, 83:24; 84:14; 100:3;
  113:13; 114:8; 115:5; 117:10,
  17; 120:12, 18

Davidson's [1]
  41:23
Day [1]
  11:23
day [8]
  13:15; 21:22, 60:3; 110:14;
  119:12, 23; 122:15; 123:18
days [2]
  22:6; 80:25
deal [3]
  60:9, 65:20, 103:10
dealing [4]
  66:1; 67:2; 105:24; 106:24
dealings [1]
  57:10
deals [1]
  65:22
dealt [1]
  103:11
debate [1]
  119:14
debates [1]
  107:17
debt [3]
  79:1, 5, 12
December [1]
  14:2
decide [2]
  40:11; 119:21
decided [3]
  27:1; 40:9; 102:7
decision-making [1]
  33:20
decline [2]
  77:21; 116:22
deduce [1]
  72:8
deductions [1]
  72:11
defined [2]
  119:4; 120:6
definitely [1]
  114:22
definition [1]
  88:15
delays [1]
  86:16
deleted [1]
  111:19
deletions [1]
  112:5
denominate [1]
  82:4
denominated [3]
  4:20; 80:11, 15
deny [4]
  55:12; 77:16, 18, 21
Department [1]
  4:7
department [7]
  4:9, 13; 9:8, 11; 35:19; 36:7,
  121:1
Depending [1]
  10:15
Deposition [8]
  5:21; 16:9; 19:10; 29:11;
  56:11; 77:25; 83:9; 121:23
deposition [17]
  5:20; 37:20; 44:12, 15, 18,
  24, 45:10, 15, 18; 46:2, 4, 8,
  19; 67:14; 114:5, 11; 120:14

Describe [1]
  109:21
describe [1]
  46:11
described [3]
  24:19; 28:5; 117:10
describes [1]
  18:13
describing [1]
  9.25
description [1]
  73:17
designated [2]
  80:15; 81:4
designation [1]
  35:8
designed [3]
  78:11; 79:23; 80:2
desire [2]
  73:2; 82:24
desks [1]
  13:15
destroy [2]
  116:11, 13
details [2]
  57:17, 21
determination [1]
  35:15
determine [1]
  68:8
determined [3]
  17:25; 104:14, 24
development [1]
  5:18
device [1]
  9:12
devote [1]
  40:13
diagonal [1]
  42:2
diaries [1]
  119:17
dictate [1]
  110:8
difference [1]
  96:19
differences [1]
  89.23
difficult [3]
  17:8; 40:5, 7
difficulties [4]
  28:21; 30:16, 17; 67:16
direct [2]
  19:7, 22:10
directed [1]
  28:6
direction [3]
  42:13, 14; 59:16
directions [1]
  103:14
disagree [3]
  6:5; 108:22, 23
discern [1]
  48:4
discuss [8]
  47:1; 73:7, 90:2; 95:4, 10, 12,
  100:13, 18
discussed [52]
  23:19; 44:21; 45:24; 47:3, 16,
  54:23; 55:3, 4, 8; 57:1, 12,
  18, 24; 58:9, 13, 15, 17, 19;

65:4; 68:3, 15; 69:2, 7; 70:20;
74:11, 23; 75:14; 86:16; 89:3,
12, 14, 17, 18, 19, 23; 90:1, 4,
10; 92:19; 94:9; 98:15; 99:11;
100:9; 107:21, 24; 108:1, 6,
9, 14; 111:9; 112:9, 11

**discussing [13]**
24:12; 43:13, 17; 58:2; 68:22,
25; 69:3; 94:5; 95:6, 7; 98:8;
100:15; 108:15

**Discussion [1]**
63:7

**discussion [20]**
17:9; 23:9; 27:9; 33:25;
62:20, 24; 63:2, 4, 17, 20;
68:12, 17, 18; 70:22; 71:3,
18, 23; 98:12, 14; 108:13

**discussions [60]**
5:6, 12; 7:10, 17, 23, 25;
10:1, 6, 24; 11:1, 16; 16:23,
24; 22:15, 18, 22, 25; 23:5, 6,
12, 18; 24:6; 26:9, 20; 55:20,
24; 57:14; 58:6; 59:13; 61:22;
63:24, 25; 65:17; 71:6, 14,
19, 74:20; 75:8, 10, 13; 78:6,
11, 21, 24; 79:1, 4; 88:22;
89:2; 92:14, 17; 94:19; 98:5,
10; 99:16, 18; 100:1; 107:14;
111:1

**disincentives [1]**
64:10

**disk [3]**
30:22; 31:16; 51:14

**dispute [9]**
66:4; 76:20, 93:24; 95:22;
96:10; 97:15, 17; 100:11;
116:4

**disputes [1]**
107:16

**disregarded [1]**
116:3

**distance [1]**
109:23

**distract [1]**
53:17

**divide [1]**
79:9

**document [22]**
5:22; 12:22; 19:21; 20:16;
29:22; 31:10, 14, 18; 38:15,
19; 39:14; 40:1; 49:21, 25;
50:5; 56:13; 83:6; 103:10;
112:18, 19; 113:5, 12

**documentation [1]**
34:13

**documents [50]**
9:13; 29:7; 33:21; 34:3, 6, 8,
18, 21, 24; 35:4, 7, 17, 23;
36:4, 8, 15, 20, 25; 37:3, 4, 8;
38:15, 21; 45:5, 6, 7, 18;
46:2, 8; 50:7, 15, 16, 17, 21,
51:2; 84:12; 85:2, 5; 109:14;
112:18; 116:21; 117:2, 16;
119:4, 7, 12; 121:8, 10, 12, 21

**doesn't [8]**
18:23; 19:5; 21:24, 25, 33:10;
45:8; 54:2, 12

**Don [1]**
7:8

**Doran [2]**
119:21, 25

**draft [42]**
5:17; 6:2; 17:2, 8, 14; 29:19;
30:19; 31:6; 37:22; 38:24,
39:5; 40:1; 47:22; 48:4, 6, 19;
49:2, 9; 50:5; 51:13; 52:9, 17,
18; 66:17, 22; 70:1, 4, 8, 10,
14; 83:11; 87:11; 90:13, 15,
19, 24; 111:7, 11, 18, 19;
112:4; 114.1

**drafted [6]**
28:19; 58:18; 69:10, 17;
104:25; 105:1

**drafter [1]**
7:3

**drafting [5]**
6:15; 106:21; 113:1; 117:17;
121:9

**drafts [20]**
12:15; 17:5, 7, 11; 39:25;
40:3; 47:22, 24; 48:2, 13, 22;
49:5; 68:8, 11; 69:14, 25;
70:1; 87:11; 89:19; 105:10

**due [21]**
18:5, 16; 41:11, 43:1; 47:2;
55:9; 59:7; 61:21; 62:14;
64:25; 66:20; 67:6; 70:20;
71:4; 77:13, 85:11, 22, 97:22;
100.20; 115:7

**duly [2]**
4:1; 123:12

**duplicate [1]**
34:10

**duties [1]**
101.23

– E –

**e-mail [1]**
90:19

**early [7]**
5:13; 19:22; 40:9, 66:17, 22;
84:8

**easier [1]**
32:4

**easily [6]**
40:17; 70:1, 3, 104:2, 21;
105:15

**edited [1]**
40:20

**effect [14]**
6:22; 13:17, 21:17; 27:24;
28:2, 13; 33:7; 54:6, 65:12,
67:5, 7, 8; 78.22; 90:3

**effectively [1]**
96:18

**effects [1]**
28:1

**effort [3]**
11:14; 40:10, 93:14

**eight [7]**
18:5, 16; 20:3, 105:22; 106:2;
107:10; 108:16

**elimination [1]**
100:23

**else's [1]**
39:11

**employed [8]**
4:6; 28:8; 93:25; 94:7, 10, 24;
95:12

**employee [2]**
123:7, 9

**employer [1]**
4:5

**employment [1]**
95:17

**end [3]**
30:13; 71:9; 102:6

**endeavor [1]**
7:5

**Eng [2]**
7:8, 21

**ensued [1]**
16:24

**ensure [1]**
73:2

**entitled [7]**
38:18; 39:13; 45:10; 86:9;
106:14, 16; 112:6

**entity [1]**
6:16

**entry [1]**
110:9

**envelope [2]**
118:24; 119:15

**ER [2]**
32:11, 14

**erected [1]**
5:9

**Eric [23]**
10:4, 5, 19; 14:13; 15:7; 17:5;
23:1, 7, 10, 12; 24:12; 26:21;
32:14, 20; 33:8; 54:20; 55:8;
69:1; 70:14; 77:10; 90:22;
92:6; 93:3

**eroding [1]**
107:18

**escalator [1]**
101:4

**essentially [6]**
28:16; 62:9; 67:4; 98:20;
99:13; 103:12

**estimated [1]**
40:5

**et [1]**
91:9

**event [30]**
20:23; 21:18; 27:10; 28:20;
30:15, 21; 36:21; 37:9; 47:2,
17; 48:8; 54:12; 55:9; 56:1,
57:24; 58:12; 61:25; 62:14;
65:13; 66:12, 20; 67:15; 71:5;
74:13; 76:16; 81:23; 89:22;
101.19; 105:25; 113:23

**events [5]**
17:25; 82:13; 104:14, 17, 24

**evidence [1]**
121:17

**Exactly [1]**
22:9

**exactly [2]**
53.22; 64:12

**examination [1]**
123:12

**examine [2]**
26:23; 102:11

**examined [2]**
26:23, 24

**example [3]**
12:18, 25; 13:10

**examples [3]**

**Except [1]**
23:21

**except [3]**
9:11, 24:5; 122:6

**excepted [1]**
25:1

**exception [40]**
21:8; 24:2, 3, 4, 7, 10, 13, 16;
26:5, 10, 12; 27:5, 22, 24;
28:3, 4, 5, 19; 30:13; 32:19;
33:5, 6, 8, 18; 42:17; 48:8;
49:11; 54:2, 3; 55:16, 24;
56:6; 62:13; 66:11, 19; 67:14;
68:5; 92:5; 93:8, 10

**excess [1]**
81:24

**exchanged [1]**
69:8; 72:16

**Excuse [1]**
63:6

**excuse [2]**
6:20; 40:22

**executed [7]**
19:22; 30:8; 65:24, 25; 88:10,
12; 102:20

**exhaust [1]**
58:5

**Exhibit [10]**
5:19, 21; 16:9; 19:8, 10;
29:11; 53:13; 56:11; 61:11;
83:9

**exhibit [8]**
16:7; 29:6; 31:12; 34:17;
48:14; 56:10; 83:4, 7

**exhibits [1]**
120:15

**exist [4]**
40:3; 115:23; 117:10; 119:7

**existed [4]**
39:25; 94:1; 95:18; 117:24

**existence [1]**
53:10

**expanded [1]**
106:1

**expensive [1]**
82:8

**experience [2]**
30:15; 82:9

**experienced [1]**
28:21

**experiences [1]**
82:13

**explain [1]**
117:19

**explanation [1]**
97:14

**explicitly [1]**
19:4

**expressed [2]**
21:5; 54:20

**extended [1]**
97:19

**extensive [2]**
24:8; 34:24

**extent [5]**
7:1; 8:9; 11:18; 14:11; 109:7

**extrapolated [1]**
11:12

– F –

face [5]
 10:12, 13, 14; 70:20
face-to-face [5]
 9:24; 12:3; 14:6, 9; 109:9
facility [6]
 5:9; 6:17; 21:4, 18; 75:25;
 96:24
fact [17]
 8:4; 10:11; 25:8; 53:14; 55:9,
 56:6, 7; 71:13; 77:11; 80:7;
 86:17; 94:10, 23; 95:17;
 108:13, 18; 113:15
facts [4]
 28:5; 86:10; 95:1
failure [1]
 92:1
Fair [1]
 37:6
fair [4]
 40:4; 42:22; 49:12; 54:10
fairly [1]
 54:22
fall [1]
 12:19
familiar [1]
 22:12
fax [3]
 90:19, 21; 91:3
fee [1]
 81:7
fell [3]
 83:5; 90:17; 121:16
few-month [1]
 102:2
fewer [2]
 14:18; 20:18
file [2]
 34:14; 35:14
filed [1]
 60:18
files [8]
 34:14; 35:12, 17, 20, 21, 22;
 36:7; 119:2
filing [1]
 35:20
final [6]
 26:12; 46:14; 66:7; 74:14,
 94:13, 18; 105:12; 120:21
financial [1]
 101:25
financially [1]
 123:10
find [3]
 64:19; 72:12; 91:12
Fine [2]
 33:1; 120:10
fine [7]
 7:15; 48:25; 67:12; 113:9;
 114:19; 120:1, 2
finish [3]
 114:18, 19, 22
firm [1]
 90:22
First [2]
 90:10; 117:21
first [40]
 5:11; 7:16; 14:5; 17:2, 14;
 18:17, 20; 19:14, 18, 22;
 21:8, 20; 22:4, 7; 27:5, 22,
 29:19; 34:3; 42:6; 52:17, 21,
 23; 68:5; 70:2, 8, 10, 76:19;

85:17; 88:12, 14; 90:9, 12,
 15; 93:19; 111:7, 11; 115:15;
 117:9, 12, 24
fit [1]
 60:11
five [15]
 8:5, 10, 18, 19; 9:14; 11:8,
 11; 12:18; 17:24; 90:8; 103:6;
 104:13, 17, 23
five-minute [1]
 50:12
flesh [1]
 103:20
flip [1]
 13:15
floor [1]
 82:15
focus [3]
 53:15; 81:23; 104:22
focused [1]
 61:4
focusing [2]
 10:19, 24
follow [1]
 63:5
followed [1]
 90:24
Following [1]
 16:17
following [3]
 34:19; 61:12; 81:2
follows [3]
 4:2; 31:11; 68:4
food [1]
 81:11
force [3]
 93:18, 20; 113:19
form [3]
 41:24; 47:4; 120:15
format [1]
 102:8
former [1]
 14:18
forms [1]
 14:13
formulated [1]
 59:23
formulating [1]
 59:20
forth [3]
 17:7; 91:22; 105:11
forthcoming [1]
 67:22
found [3]
 11:16; 70:1, 3
four [4]
 114:6, 14, 15, 19
fourth [1]
 61:10
frame [3]
 13:25, 16:18; 40:6
franchisees [1]
 94:12
free [1]
 108:20
Frequently [1]
 56:22
front [4]
 29:1; 49:1; 52:18; 111:5
full [2]
 101:1; 120:15

function [1]
 81:13
functioning [1]
 82:6
furnish [1]
 44:2
furnished [3]
 34:3, 60:22
futile [1]
 40:11

   – G –

game [12]
 41:9, 11; 42:25; 56:7; 62:6;
 79:15, 82:11, 24; 96:9, 23;
 97:3, 18
game-based [1]
 108:15
games [55]
 17:24, 25; 18:4, 17, 20, 21,
 24; 19:3; 20:13, 14, 18; 41:9;
 55:1, 10; 59:6, 25; 62:2; 66:3;
 73:10; 74:20; 75:18; 77:13;
 78:12; 82:6, 7, 8; 102:6, 20,
 22; 103:3, 6, 7, 23; 104:1, 3,
 13, 16, 23; 105:14, 18, 19, 22;
 106:1, 3, 6, 9, 18, 20, 23;
 107:1, 6
gathered [1]
 34:2
gave [5]
 35:7; 60:21; 86:11; 87:3;
 116:15
generated [2]
 70:9, 11
genesis [1]
 93:18
gentleman [1]
 118:1
gentlemen [1]
 23:4
gets [1]
 106:6
give [10]
 29:9; 32:3; 45:8; 63:1; 71:18;
 72:3, 85:20; 86:1, 4; 104:6
given [4]
 24:13; 83:6; 85:13; 113:1
giving [3]
 60:16; 107:17; 118:2
glance [1]
 13:18
goes [3]
 32:24; 33:2; 106:11
GORDON [2]
 4:1; 122:10
Gordon [3]
 4:6; 41:17, 23
Gordy [1]
 50:10
gotten [2]
 49:23; 57:20
grammar [1]
 53:23
grand [1]
 106:9
great [3]
 53:23, 60:9; 65:20
green [1]
 53:15; 64:8

Gross [1]
 81:11
gross [3]
 81:15, 18, 20
group [2]
 7:25; 74:21
guaranteed [1]
 79:11
guess [1]
 71:16
guesses [2]
 69:21, 22
gun [1]
 85:18

   – H –

half [8]
 18:5, 16; 44:13; 98:5; 105:22;
 106:2; 107:10; 108:16
hand [7]
 5:7, 20; 10:8; 14:15; 39:8;
 70:13; 123:17
handed [2]
 51:9; 83:17
handwriting [10]
 31:16; 39:3, 5, 10, 11, 15;
 48:11; 52:15, 22; 56:12
Handwritten [1]
 110:17
handwritten [12]
 31:6, 21; 33:19; 35:24; 38:17,
 25; 39:12; 47:20; 49:10, 18;
 52:3; 110:16
happy [2]
 72:4; 115:1
hard [1]
 5:13
harmful [1]
 26:14
hasn't [1]
 119:10
haven't [3]
 32:13; 85:7; 121:19
he's [1]
 121:2
hear [3]
 45:15; 78:14; 116:24
heard [1]
 76:19
hearing [8]
 29:8, 34:19; 87:20, 23;
 114:17; 116:23; 118:24;
 119:25
held [4]
 41:11, 42:25; 75:19; 92:18
help [1]
 53:25
hereby [1]
 123:6
hereto [1]
 123:15
hereunto [1]
 123:17
hints [2]
 12:7, 9
Hold [1]
 67:18
hold [3]
 48:20; 98:22; 102:7
holding [5]

82:7, 8; 99:13; 101:12, 17

**home** [14]
18:17, 21, 24; 19:2; 20:14;
105:14, 18, 19, 21; 106:1, 18,
20; 107:1, 5

**HONIG** [47]
32:2; 37:11; 44:19, 25; 45:2,
7, 11, 22; 46:3; 47:4; 50:10,
14, 23; 51:16, 18, 22, 24;
52:2; 78:13; 83:14, 18, 21;
85:15, 24; 86:5, 7, 13; 99:2;
111:21, 25; 112:7, 13, 16, 25;
113:4, 9; 114:2; 117:9; 119:1,
19; 120:2, 4, 10, 17; 121:4, 7,
19

**Honig** [13]
32:1; 34:18; 35:8; 44:7, 9;
51:9; 76:22; 83:10; 87:22, 25;
111:9; 116:16, 21

**hoped** [1]
103:18

**hour** [1]
44:13

**hours** [8]
83:25; 110:13, 21; 114:6, 14,
15, 19

**how's** [1]
119:24

**hypothesized** [1]
73:22

**hypothesizing** [1]
92:22

**hypothetical** [1]
102:12

**hypothetically** [1]
22:6

**hypothetize** [1]
74:5

— I —

**I'd** [2]
19:7; 53:10

**I've** [11]
5:25; 48:13; 50:8, 22; 51:10;
52:8; 53:8; 67:12; 106:24;
109:16; 119:18

**i.e.** [1]
20:12

**ID'd** [2]
61:20; 64:24

**idea** [6]
32:13, 17; 38:22; 44:10;
54:15, 16

**ideas** [4]
76:17, 21, 24; 77:1

**identification** [1]
31:14

**identified** [8]
15:9; 17:18; 19:16; 51:14;
61:20; 62:4; 75:12; 80:18

**identify** [5]
15:14, 18, 22; 60:6; 75:15;
83:14

**II** [1]
17:18

**III** [3]
91:22; 92:3; 93:10

**immediate** [1]
29:1

**immediately** [2]

**impact** [10]
73:6; 89:5, 7; 96:24; 97:5, 6,
9, 12; 100:10, 13

**implemented** [1]
89.22

**implication** [3]
66:6; 67:5; 106:6

**implications** [4]
84.10; 93:7; 95:2; 116:4

**important** [1]
48.5

**impression** [2]
25:6; 35:3

**inappropriate** [3]
24:25; 44:22; 95:16

**inappropriateness** [1]
24:23

**Inc** [1]
5:7

**incentives** [1]
64:9

**inch** [1]
36:18

**inches** [3]
36:12, 13, 14

**incidentally** [2]
33:19; 39:5

**incidentally** [1]
114:10

**inclined** [1]
119:6

**include** [5]
24:17; 75:4, 21, 24; 92:7

**included** [1]
70:14

**includes** [1]
81:6

**income** [1]
80:15

**indicate** [4]
17:22; 33:10; 36:11; 63:10

**indicated** [1]
122:1

**indicates** [3]
6:10; 32:22, 23

**indications** [1]
64:2

**indicator** [1]
20:8

**individual** [2]
35:21; 94:11

**individually** [1]
60:10

**inextensive** [1]
24:9

**information** [10]
6:8; 60:16; 63:11; 64:9, 20;
79:13, 18, 21, 25; 105:1

**initial** [9]
19:15; 65:25; 89:4; 90:10, 11;
91:11; 92:8, 15; 115:14

**initially** [1]
27:4, 34:6; 91:2, 100:7

**input** [1]
63:22

**inquiry** [1]
114:17

**inserted** [1]
40:20

**insertion** [1]

96:3

**insofar** [1]
12:3

**instance** [11]
8:16; 20:21; 23:22; 34:3;
54:1; 64:8; 91:7, 19; 97:14,
16

**instances** [4]
20:16, 19; 74:18, 24

**instruct** [10]
44:22; 45:2, 4, 22; 85:15;
86:7; 111:22; 112:16, 21;
113:10

**insulate** [1]
30:17

**intend** [1]
120:4

**intended** [4]
101:5, 8, 10, 11

**intent** [12]
59:5, 10, 21, 22; 67:22;
102:14, 15, 16, 18; 103:25;
104:15; 118:18

**intention** [3]
102:24, 25; 103:20

**intentionally** [2]
116:11, 13

**interest** [1]
84:24

**interested** [7]
7:25; 19:21; 26:16; 57:4;
73:24; 89:10; 123:10

**interfere** [1]
52:5

**interjecting** [1]
99:4

**internal** [1]
7:23

**interpretation** [1]
72:14

**interrupt** [1]
112:1

**interspersed** [1]
14:8

**investigation** [1]
77:4

**invoice** [1]
81:1

**involved** [20]
4:22; 5:5; 6:1, 11; 10:15, 22;
11:3; 20:1; 22:15, 18, 22, 24;
23:4; 33:20; 86:18, 19; 97:17;
100:1; 110:11; 116:8

**involvement** [2]
5:11; 89:24

**involving** [2]
4:18; 10:23

**issue** [15]
22:4; 36:21; 37:2; 47:11, 14,
15; 57:22, 24; 66:9; 68:2;
89:20; 94:6; 100:23; 115:7;
119:22

**issues** [1]
116:10

**items** [2]
81:3; 90:8

— J —

**January** [1]
14:2

**Jerry** [1]
7:20

**John** [2]
86:21, 22

**Judge** [3]
118:11; 119:21, 25

**judges** [1]
118:12

**jumping** [1]
85:18

**June** [1]
120:1

— K —

**Keep** [1]
32:25

**keep** [6]
13:13, 14; 35:20; 103:11

**keeps** [1]
109:22

**kept** [3]
53:5; 110:4, 21

**Key** [2]
62:10; 75:19

**kinds** [3]
74:24; 82:10, 22

**KING** [1]
123:4

**King** [1]
118:12

**knowledge** [5]
6:7; 37:17; 50:2; 87:16;
116:17

— L —

**labeled** [4]
30:8; 58:14; 91:15; 92:3

**labor** [19]
28:21; 30:15; 65:14; 66:4;
67:16; 68:2; 70:22; 89:20, 24;
93:24; 95:22; 96:7, 10, 21;
97:7, 11, 15, 16; 100:11

**labor-oriented** [2]
62:16, 18

**language** [63]
10:20; 14:14; 24:1, 25; 26:24;
27:13; 43:14, 18; 49:12;
56:24, 25; 61:23; 63:13;
65:11; 66:6, 22; 67:3; 68:4, 5;
69:8, 10, 14; 70:2, 7, 14;
71:7; 72:7, 10; 75:2, 7; 76:5;
77:19; 89:4, 17, 18; 90:10,
11, 12, 14; 91:11; 92:8, 10,
16; 93:8; 94:1, 8, 18, 23, 25;
95:14, 15; 97:24; 98:24;
101:15; 102:21, 25; 103:2,
19, 20; 105:7

**largely** [1]
10:19; 25:2; 59:23

**last** [14]
9:4; 13:20; 18:11, 23:20;
29:22; 40:22; 41:25; 44:11;
76:4; 83:25; 84:7; 91:20;
96:3; 98:2

**lasted** [1]
97:17, 20

**latter** [2]
14:17, 20

**Law** [1]
4:7

BSA
Case 2:07-cv-01620-RSM   Document 2-8   Filed 10/10/2007   Page 65 of 78
City of Seattle vs SSI, Inc   GORDON DAVIDSON 5 - 99   Look-See(40)

**law** [5]
  4:8, 13; 9:8; 35:19; 36:7
**lawyer** [2]
  71:21; 73:25
**leading** [1]
  16:24
**lease** [58]
  5:8; 6:15, 18, 19, 20, 21, 22;
  7:12, 14; 14:14; 16:15, 18;
  19:9, 13, 15, 22; 20:16, 19;
  21:4; 22:12; 29:19; 36:16;
  54:14; 56:16; 57:11; 59:8, 19;
  66:19; 88:8, 10, 12, 15, 18;
  94:14, 18; 102:17; 103:14;
  105:12; 106:21; 107:3, 9, 16,
  22, 25; 108:2; 113:1; 117:17;
  118:5, 6, 19, 20; 120:25;
  121:1, 2, 3, 9
**leases** [6]
  4:14, 16, 17, 19; 38:24
**leave** [1]
  115:2
**length** [2]
  58:14; 97:20
**LESSARD** [1]
  123:21
**lessee** [1]
  4:18
**lessor** [1]
  4:18
**Let's** [6]
  21:8; 74:10; 77:23; 91:12,
  100:25; 114:3
**let's** [8]
  17:19; 42:6; 74:9; 77:22;
  80:3; 81:23; 119:14; 121:18
**letter** [3]
  34:18; 119:24; 120:22
**lettering** [1]
  32:18
**license** [1]
  4:20
**likelihood** [1]
  58:19
**Limit** [1]
  93:16
**limit** [5]
  45:20; 82:17, 19; 93:14, 17
**limitation** [2]
  52:4; 83:19
**limited** [1]
  114:14
**limiting** [1]
  95:11
**line** [11]
  32:24; 33:2; 41:22, 25; 42:1,
  2, 4, 10, 18; 91:20; 114:17
**lines** [1]
  79:7
**list** [2]
  11:5; 12:21
**listed** [3]
  81:3; 90:8; 119:18
**Listen** [1]
  55:6
**listen** [1]
  36:19
**listing** [2]
  76:9, 15
**litigation** [1]
  35:7

**located** [2]
  39:14; 54:9
**location** [2]
  8:14; 54:5
**lockout** [39]
  25:11; 27:10; 28:8; 36:22,
  37:9; 47:3, 17; 48:8; 54:12;
  55:1, 10, 17; 56:1; 57:25,
  58:12; 59:7; 62:1, 14; 65:13;
  66:12, 20; 70:21; 71:5; 74:13;
  76:16; 84:9; 85:10, 14, 20,
  22; 95:24; 97:23; 115:8, 15;
  116:7; 117:19; 118:2, 3, 8
**log** [7]
  37:21; 109:2, 10, 19, 20, 22
**logical** [1]
  97:21
**logically** [3]
  54:2; 69:15, 16
**logs** [3]
  110:20; 117:1; 119:17
**looks** [6]
  30:5; 32:11; 38:25; 41:14, 21,
  56:14
**loop** [3]
  41:22; 42:1; 43:1
**loopy** [2]
  42:2, 3
**lost** [7]
  97:22; 98:5, 7, 9; 100:14;
  101:2; 102:6
**lot** [2]
  91:5; 103:21
**lower** [2]
  21:9; 42:5

-- M --

**main** [2]
  57:5; 108:19
**maintain** [2]
  8:8; 9:7
**maintained** [1]
  21:5
**maintenance** [2]
  77:1, 7
**majeure** [3]
  93:19, 20, 113:19
**manner** [1]
  92:2
**March** [2]
  16:11; 120:22
**Margaret** [1]
  7:23
**mark** [4]
  5:19; 18:7; 83:4, 7
**Marked** [6]
  5:21; 16:9; 19:10; 29:11;
  56:11; 83:9
**marked** [7]
  16:6; 19:8; 29:5, 10; 56:10;
  83:15; 120:16
**marquee** [1]
  81:9
**matched** [1]
  40:2
**matches** [1]
  31:2
**material** [4]
  87:11, 13; 109:17; 112:5
**materials** [6]

12:9, 10; 35:16; 45:9; 116:15;
  117:8; 118:17, 119:18
**matter** [10]
  13:3; 33:21; 34:8, 84:13;
  86:18; 99:13; 110:2, 25,
  111:10; 114:23
**matters** [5]
  6:8; 63:5; 112:3; 116:2; 117:4
**May** [1]
  78:3
**McLaughlin** [37]
  7:20; 11:2; 14:15, 21; 22:21;
  26:19, 22; 30:11; 38:11; 43:7;
  54:24; 55:7; 57:5, 12, 19;
  58:3, 6, 22; 59:20; 63:4;
  68:13; 77:10; 78:22; 79:17;
  88:23; 89:3, 13, 15; 93:3, 6;
  94:6, 20; 99:15, 20; 108:18;
  114:11
**mean** [8]
  32:12; 42:16; 54:6; 76:21;
  78:9; 90:11; 98:18; 101:16
**meaning** [4]
  61:20; 99:1; 101:12; 118:6
**means** [12]
  42:3, 4, 11, 18, 23; 56:19;
  62:1; 98:16, 19; 99:11, 12;
  100:4
**meant** [1]
  101:2
**meeting** [23]
  8:14, 16; 12:1, 2, 25; 13:1, 7,
  24, 14:1, 2, 5, 6; 15:10, 14;
  40:15, 19; 45:24; 58:7, 8;
  63:12; 64:17; 110:12
**meetings** [19]
  8:19; 11:15, 17, 19; 12:3, 5,
  17; 14:9, 10; 15:5, 6, 7;
  27:17; 59:14; 64:4; 74:21,
  108:25; 111:1
**member** [1]
  5:2
**members** [3]
  62:5, 11; 82:14
**memo** [8]
  30:6; 31:10; 39:7; 45:19,
  46:17; 67:9, 10; 90:25
**memoranda** [9]
  37:22; 38:5; 46:16, 17, 21;
  85:6, 9; 109:14; 115:10
**Memorandum** [9]
  6:11; 7:11; 16:1; 17:17, 20;
  18:19, 102:13, 19; 105:10
**memorandum** [11]
  16:7, 23; 29:13, 14; 31:5;
  35:24; 37:24, 83:12; 87:15;
  91:18
**memories** [1]
  24:8
**memory** [35]
  11:13; 13:23; 16:12; 17:13,
  23:3, 6; 24:6; 27:21; 33:14,
  16; 43:5, 25; 57:23; 58:2, 5;
  59:9; 62:22; 68:9, 10, 12, 17,
  22, 25; 69:3, 16; 71:3, 23;
  72:5, 75:1, 5, 6, 8; 82:1; 87:8;
  116:6
**mentioned** [1]
  96:7
**mere** [1]
  8:16

**Messrs** [1]
  59:14
**middle** [1]
  114:17
**Miflin** [1]
  118:11
**million** [2]
  100:20; 101:4
**Min-u-script** [1]
  120:15
**mind** [1]
  72:14
**minimal** [1]
  21:1
**minimize** [2]
  73:5; 89:7
**minimized** [2]
  73:2; 89:5
**minute** [2]
  50:10; 77:24
**minutes** [1]
  114:6
**mischaracterize** [1]
  95:19
**missed** [1]
  78:13
**mistake** [1]
  59:8
**modifies** [1]
  103:23
**moment** [1]
  34:16, 42:8; 51:10; 64:22
**month** [1]
  13:20
**Month-At-A-Glance** [1]
  13:17
**monthly** [2]
  13:13, 16
**months** [3]
  9:4; 76:4; 102:2
**morning** [7]
  48:6; 49:8, 25; 51:2; 67:13;
  113:24; 114:25
**MOU** [7]
  6:12; 21:6; 59:23; 102:21, 25;
  103:16; 107:5
**move** [4]
  46:6; 55:22; 74:9, 10
**Moved** [1]
  54:4
**moved** [5]
  34:13; 54:5, 13; 55:17, 21
**moving** [1]
  108:15
**MR** [46]
  4:4; 29:5, 31:25; 45:4, 8, 14;
  46:1, 5; 50:4, 11; 51:8, 17,
  52:1; 53:8; 63:6; 77:23; 78:5,
  15; 83:4, 10, 16, 20, 22;
  85:17; 86:6, 9; 111:23; 112:1,
  11, 15, 23; 113:2, 6; 114:3, 5;
  116:20; 117:21; 119:9, 23;
  120:3, 8, 11, 14, 21; 121:5, 13
**Mr** [94]
  4:12; 5:22, 15:2, 16:10;
  18:15; 19:11; 25:4; 26:19, 22,
  29:12; 32:3, 5; 37:13, 19;
  38:9, 11, 13; 43:7, 10, 11;
  44:23; 45:1, 17, 46:7; 47:8,
  48:5; 50:1; 51:6, 52:3; 53:12;
  55:6; 56:12, 24, 57:12, 19;

58:6; 59:20; 63:6, 9; 77:10;
8; 78:6, 18, 22, 23; 83:23, 24;
84:14; 85:19; 86:1, 14; 89:3,
13, 15; 91:2; 92:14; 93:23;
94:6; 95:4, 5, 7, 8, 10, 13;
98:11, 12; 99:6, 8, 15, 20, 22,
24, 25; 100:3; 101:24; 112:7;
113:11, 13; 114:8, 11; 115:4,
5; 117:10, 17; 119:3; 120:6,
12, 18, 22; 121:19

**MS** [48]
32:2; 37:11; 44:19, 25; 45:2,
7, 11, 22; 46:3; 47:4; 50:10,
14, 22, 23; 51:16, 18, 22, 24;
52:2; 78:13; 83:14, 18, 21;
85:15, 24; 86:5, 7, 13; 99:2;
111:21, 25; 112:7, 13, 16, 25;
113:4, 9; 114:2; 117:9; 119:1,
19; 120:2, 4, 10, 17; 121:4, 7,
19

**Ms** [16]
32:1; 34:18; 35:8; 44:7, 9;
51:9; 57:14, 18, 25; 76:22;
83:10; 87:22, 25; 111:9;
116:16, 21

**myself** [7]
10:19; 63:5, 19; 64:19; 87:12;
115:9; 119:20

**mysteriously** [1]
121:16

**— N —**

**name** [2]
4:5, 6

**namely** [2]
77:11; 107:16

**names** [2]
86:13, 14

**narratives** [1]
115:6

**narrowed** [2]
58:16; 95:9

**nature** [1]
34:21

**NBA** [17]
23:15; 25:17; 28:7, 9; 41:9;
48:24; 53:25; 54:13; 93:24,
25; 94:7, 10, 24; 95:12;
102:7; 105:14; 113:21

**negotiate** [3]
56:15, 24, 25

**negotiated** [2]
16:2; 64:14

**negotiating** [4]
8:11; 15:23, 56:20; 109:9

**negotiation** [10]
7:2; 8:5; 9:14; 13:3, 7, 11;
60:11; 109:18; 117:16; 121:9

**negotiations** [17]
10:23; 16:14, 18; 22:16, 19,
25; 56:16; 57:6; 59:17, 61:23;
70:18; 102:17; 103:13, 14;
107:22; 109:13, 15

**negotiators** [2]
26:18; 88:24

**nice** [1]
53:19

**Nineteen** [2]
21:14, 16

**nitty-gritty** [2]

**Noise** [1]
40:24

**non-negotiator** [1]
75:11

**non-Sonics** [1]
58:8

**nonrepresented** [1]
96:22

**normal** [2]
82, 10, 23

**NOTARY** [1]
122:18

**Notary** [2]
123:5, 23

**notation** [5]
13:2, 7; 53:15; 63:11; 109:16

**notations** [1]
8:13; 15:25; 63:12

**note** [21]
32:7, 33:11; 47:11, 13, 20;
48:7; 51:20; 52:3, 8, 9, 22;
56:9; 62:19, 20; 64:16, 19,
23; 65:2; 76:3; 83:5; 91:6

**noted** [1]
39:24

**notes** [53]
8.25, 9:16; 31:6, 21; 33:19;
35:5, 24; 38:18, 25; 39:13,
18; 40:6, 15; 44:2; 46:12, 23;
47:1, 50:17, 18; 51:6; 60:2, 3,
7, 10, 12, 14; 61:9, 11, 16;
62:24; 63:5, 16, 18, 21, 25;
64:3, 6, 7; 83:24; 87:11;
115:9, 12, 16, 21, 24; 116:6,
12; 117:10, 13, 18; 119:17;
120:24

**noticed** [1]
39:10

**novelties** [1]
81:21

**November** [4]
11:22; 12:2; 13:25; 14:5

**now's** [1]
71:24

**Number** [1]
40:23

**number** [7]
8:12; 31:2; 41:6, 14; 58:25;
61:12; 110:13

**numbered** [1]
29:22

**— O —**

**oath** [4]
4:2; 74:3; 77:9, 100:2

**object** [3]
47:4, 85:15; 111:21

**Objection** [3]
37:11; 44:19; 86:5

**objection** [1]
44, 25

**obligation** [6]
28:12; 98:1, 19; 99:12;
101:11, 13

**Obligations** [1]
91:21

**obligations** [6]
30:18; 66:1; 91:23; 96:14;
101:18, 22

**observation** [1]
30:10; 66:16, 18, 21, 25; 67:2

**observations** [1]
29:18

**obstructing** [1]
51:5

**obviously** [1]
118:4

**occasion** [3]
54:24; 84:16; 89:15

**Occupancy** [3]
7:13; 19:17; 88:18

**occupancy** [6]
4:21; 16:19, 25; 17:3; 20:23,
21:21

**occur** [2]
19:2; 109:24

**occurred** [5]
28:5; 62:8; 63:19; 71:11;
112:3

**October** [4]
12:25; 20:24; 21:19; 22:5

**offered** [1]
69:15

**offering** [1]
114:21

**office** [14]
34:15, 35:18, 22, 25; 36:6, 9,
53:2, 6; 63:22; 84:13; 88:1;
91:2; 110:21; 119:1

**offices** [1]
35:21

**officials** [2]
8:20; 118:4

**Oh** [1]
13:1

**oh** [1]
82:14

**Okay** [28]
4:15; 8:2; 10:17; 12:16;
15:12; 19:20; 26:16; 27:21;
29:15; 42:10, 22; 43:23; 44:2;
47:8; 50:3; 51:24; 52:23;
55:6, 58:5; 61:22; 68:4,
70:10; 71:2; 78:21; 85:5;
91:16; 92:7; 93:12

**old** [11]
5:9; 6:15, 17, 18, 19, 21;
106:21; 107:9, 15, 25

**on-time** [2]
64:12, 13

**ones** [3]
7:24; 10:13; 47:3

**operating** [1]
53:7

**operational** [1]
28:17

**opinion** [1]
87:17

**opinions** [1]
111:1

**opportunity** [2]
73:3; 101:21

**opposed** [3]
8:12; 59:21; 94:11

**oral** [4]
60:20; 87:3, 5, 7

**order** [9]
16:7; 28:16; 29:6; 48:4;
56:10, 83:5, 8; 108:24; 109:7

**ordering** [1]

**ordinary** [1]
82:11

**orientation** [1]
59:18

**oriented** [1]
78:19

**original** [7]
5:23; 32:4; 39:15; 61:17,
66:22; 89:17; 114:1

**originally** [3]
60:14, 23, 100:12

**originals** [2]
31:25; 64:22

**outcome** [1]
123:11

**outset** [2]
120:7, 9

**outside** [1]
31:22

**owners** [1]
94:12

**— P —**

**p.m.** [5]
50:13; 77:25; 78:2; 114:4;
121:23

**package** [4]
46:12, 24; 47:25; 60:21

**page** [36]
17:19; 19:16; 20:4; 21:13;
22:12; 29:22, 23; 31:18;
32:25; 33:3; 41:1, 2, 6; 50:20;
51:17, 20, 23, 25; 52:3;
61:10, 14; 63:10; 64:8; 65:8,
10; 83:11, 21; 88:17, 19;
91:5, 7, 8, 9, 21; 113:17, 19

**pages** [6]
39:24; 40:22; 48:4; 50:18;
64:5; 91:5

**paid** [6]
34:11, 36:21; 58:10; 62:8;
73:9; 107:10

**paper** [7]
12:22; 43:6, 9, 10, 15, 19;
112:8

**papers** [1]
65:6

**paragraph** [26]
17:20, 20:3, 8; 21:9; 22:11,
13, 16; 23:5, 12; 30:1, 10;
48:7, 15; 49:4, 10, 11; 50:24;
75:20; 80:21; 81:25; 88:8, 17;
96:4; 113:12, 18

**Pardon** [3]
13:5; 21:15; 36:2

**pardon** [1]
9:18

**parse** [2]
26:24; 104:9

**part** [10]
19:14, 15; 35:13; 48:14; 59:9,
82:23, 24; 91:8, 9; 115:15

**partial** [1]
21:20; 98:6

**participants** [5]
15:15, 18, 22; 66:3; 96:10

**participated** [15]
5:17; 7:1, 4, 10, 16, 18, 20,
21, 22, 23, 8:4, 11; 9:14;

From MS to participated

14:6; 56:16
parties [23]
  19:18; 54:25; 59:5, 11; 72:15;
  79:9; 101:11, 14; 102:10, 14.
  15, 16, 18; 103:1, 20; 104:16.
  22; 105:2, 8; 107:14; 118:19;
  120:25; 123:8
partly [1]
  86:16
party [1]
  30.18
passed [1]
  83:1
PATRICIA [1]
  123:21
pattern [4]
  99:13; 101:12, 17
pay [18]
  17:22; 27:10; 55:2; 66:11;
  76:16; 80:7, 8, 24; 82:20, 25;
  100:6; 101:3; 103:25; 104:10;
  106:12; 107:1, 6, 9
paying [10]
  28:20; 30:14; 48:8; 54:1, 11;
  55:16; 56:1; 67:15; 73:3;
  106:14
payment [5]
  28:12; 37:8; 65:12; 105:22;
  118:7
Payments [1]
  17:21
pen [2]
  65:7, 8
people [19]
  7:19; 8:17; 9:10; 15:11;
  22:22; 56:19; 57:2, 5; 58:8;
  62:5; 64:1, 4; 66:3; 72:12;
  84:13; 96:10, 11, 22
people's [1]
  13:15
per-day [1]
  21:23
perceived [1]
  28:1
percent [8]
  18:5, 16; 104:12, 13; 105:23;
  106:2; 107:10; 108:16
percentage [1]
  81:15
perception [17]
  24:14; 26:14, 17; 28:2; 37:1;
  40:3; 62:23; 63:1, 3; 78:17;
  86:20; 95:17; 99:7, 10;
  100:18; 102:3, 5
period [5]
  7:9; 14:9; 17:4; 85:22; 86:19
permanently [1]
  41:9
person [5]
  34:5; 57:5, 6; 58:23; 65:4
personal [5]
  12:10, 12; 35:25; 53:2; 75:9
personnel [2]
  30:16; 37:23
persons [1]
  60.7
perspective [3]
  96:20; 97:2, 9
pertain [2]
  76:10, 117:16
pertained [1]

104:17
pertaining [1]
  49:10
pertinent [2]
  117:8; 118:9
phenomenon [1]
  17.6
phrase [7]
  23.20; 24:1; 26:13; 74.14;
  91:20; 92:8; 94:6
phrased [1]
  52:23
physically [3]
  36:4; 53:12; 110:18
pick [1]
  41:1
picked [1]
  76:23
piece [8]
  12:22; 43:6, 9, 10, 14, 19;
  112:8; 121:17
pieces [1]
  63:10
pile [2]
  38:15, 20
pinpoint [1]
  40:5
place [5]
  5:6; 93:19; 117:6, 24; 119:21
placed [1]
  47:22
plain [1]
  99:1
plan [1]
  87:19
play [11]
  27:1; 58.21; 61:19; 62:6;
  64:24; 76:16; 77:12; 97:7, 8;
  106:8; 115:20
played [11]
  55:2, 10; 56:7; 59:6; 73:10;
  89:21; 96:9, 23; 97:11;
  106:25; 107:5
player [2]
  61:20; 64:24
Players [1]
  94:7
players [15]
  25:11; 28:8, 21; 30:16; 37:9;
  62:4; 67:16; 93:25; 94:11, 23;
  95:12, 18; 96:20, 23
playing [5]
  62:2; 66:2; 74:20; 76:11; 97:3
playoff [3]
  18:17, 21; 102:8
Please [2]
  36:19; 82:2
please [13]
  4:5; 31:19; 32:10, 25; 37:14;
  38:19; 48:20; 54:19; 67:18;
  78:15; 85:18; 112:1; 117:19
plus [4]
  101:4; 104.4; 105.13; 107:1
point [32]
  11:25; 12:6; 26:3; 27:15;
  32:13, 17; 36:1, 3; 44.1,
  46:10; 47:19; 57:6; 58:1, 4, 6;
  59:11; 60:5, 25; 61:2; 70:24;
  74:10, 17; 80:7; 86:15; 93:21;
  94.5; 100:22; 103:13; 107:13;
  115:22; 120:4

points [2]
  10.25; 57:11
pooh-poohing [1]
  25:7
poorly [1]
  52.23
portion [6]
  22:3, 25:23, 25; 76:2; 53:18.
  89:16
portrayal [1]
  6:7
position [7]
  25.7, 27:12, 14, 15; 62:7;
  102:1, 118:21
possibility [4]
  61:25; 66:23, 24; 98:8
Post-It [14]
  50:17, 18; 51:9, 25; 52:15,
  20, 25; 53:9, 22; 83:5, 12, 15,
  16, 24
Post-it [1]
  51:12
Post-Its [1]
  121:15
posted [1]
  53:12
postpone [2]
  102:1; 114.23
postponed [1]
  100:19
potential [2]
  18:23; 73:4
potentially [1]
  20:7
practice [3]
  4:11; 75:25; 82:23
preamble [1]
  80:22
precedes [1]
  54:3
preceding [3]
  63:10, 65:6; 93:21
predicate [2]
  60:17; 70:25
pregnant [1]
  118:13
Premises [3]
  7:12; 19:17; 88:18
premises [5]
  16:19, 25; 17.2; 96:19; 97:2
premium [2]
  64:12, 13, 14
preparation [12]
  6:1, 15; 37:20; 44:14, 17, 24;
  45:9, 18; 46:2, 8, 18; 49:8
prepared [6]
  17:2, 13; 39.18; 61:8; 70:4;
  111:7
preparing [3]
  17:5, 11; 87:15
preseason [3]
  18:16, 21; 20:13
presence [4]
  43.7, 10, 55.8; 99:22
present [4]
  8.20; 56:19; 99:15, 17
presentation [2]
  81.1; 82.16
presented [2]
  111:20; 114.1
presumably [1]

101:20
previous [1]
  79:21
previously [5]
  47:16; 50:15; 60:21; 62:4;
  119-10
primarily [2]
  10.4; 26:21
principal [1]
  7.3
principally [2]
  19:20; 86:19
principle [2]
  21:4, 5
prior [1]
  6.22
privilege [22]
  33:22; 34:22; 35:3; 37:2, 5,
  17; 38:17; 45:9; 60:15, 19;
  84:22, 25; 85:1, 3; 111:24;
  112:24; 114:20; 117:3, 24;
  118:9, 14; 121:14
privileged [14]
  29:6; 34:2; 35:9, 16; 36:15;
  37:10; 38:21; 60:24; 61:3;
  83:6; 84:22; 86:10, 11
pro [2]
  41:10; 42:23
problem [2]
  27:2; 95:20
problematical [1]
  17:6
Problems [2]
  38:18; 39:13
problems [1]
  107:15
Proceed [2]
  63:8; 99:6
proceedings [1]
  123.16
proceeds [3]
  106:3; 107:11, 19
process [2]
  16.22; 33:20
produce [5]
  116:21; 117:16; 119:6; 121:8.
  10
produced [17]
  29:8; 36:23, 25, 37:10; 38:17;
  49:22, 24; 50:6; 53:20; 60:18;
  85:9; 117:12; 118:21; 119:8,
  16, 121:12, 17
production [5]
  60:15; 117:5, 20; 119:5;
  120.6
productive [1]
  74.6
professional [2]
  28:7; 66.2
project [1]
  111:2
projects [2]
  110:22; 116:3
prompt [1]
  64:2
prompts [1]
  64:16
proper [1]
  118:19
propose [3]
  65:11, 74:19; 111.13

propose [3]
  10:21; 26:5; 27:5, 22; 29:19;
  70:15; 72:7; 92:5; 111:16
proposing [3]
  32:16, 19; 33:7
prorated [4]
  21:17, 25; 22:1, 7
provide [2]
  65:12; 69:24
provided [14]
  28:11, 12; 34:25; 35:4; 37:4;
  44:7, 9; 79:11, 12; 84:25;
  105:2, 3, 4; 110:20
provides [2]
  21:17; 103.2
providing [1]
  96:25
provision [19]
  17:16; 20:22; 24:17; 26:4;
  27:5, 7; 28:15; 54:8, 11;
  62:12; 65:21, 23, 24; 73:4;
  88:23; 89:7, 21; 93:9; 105:24
provisions [3]
  21:2; 28:23; 103:16
PUBLIC [1]
  122:18
Public [2]
  123:5, 23
public [1]
  96:25
pulled [1]
  53:17
purports [1]
  112:2
purpose [5]
  68:14; 71:9; 76:6, 14; 115:16
purposefully [1]
  75:6
purposes [4]
  31:15; 76:15; 110:4, 6
pursuant [2]
  25:16; 119:8
putting [3]
  78:12; 79:15; 87:9
puzzled [1]
  108:17

**– Q –**

qualification [2]
  69:19; 74:14
qualifications [1]
  58:18
qualified [3]
  55:23; 58:15; 67:17
qualify [3]
  24:2, 3; 33:16
qualifying [1]
  56:5
quantity [2]
  34:24; 36:10
quarter [1]
  114:13
question [35]
  8:3; 18:11; 36:19, 24, 37:7,
  14, 16; 41:25; 45:12, 13;
  47:5, 55:6, 58:11; 68:16;
  71:1; 72:3; 73:13; 76:8, 12;
  78:14; 80:1; 85:17, 19; 94:15,
  16, 98:25; 99:3, 5; 102:23;
  111:22; 112:13; 113:4, 10;

questioned [2]
  24:15, 21
questioning [1]
  54:7
questions [7]
  19:24; 45:23; 53:10; 64:17;
  84:11; 88:7; 114:7
quick [3]
  31:8; 39:9, 11

**– R –**

raise [1]
  56:4
raised [1]
  68:1
raising [1]
  55:25
rata [2]
  41:10; 42:23
reaction [1]
  97:1
Read [2]
  37:14; 78:15
read [30]
  18:11, 12; 29:23, 24; 30:9;
  31:24; 32:4, 9; 37:15; 38:8;
  39:9; 41:8; 42:7; 47:5, 6,
  53:20; 61:16; 64:23; 65:2;
  66:7; 78:16; 80:22; 103:7, 9;
  104:2, 8, 21; 120:19, 20;
  122:5
readily [1]
  38:6
reading [3]
  28:25; 29:3; 42:22
reason [9]
  20:18, 24:15; 36:22; 50:7;
  55:22; 84:1, 95:15; 108:19,
  23
reasonable [1]
  101.14
reasons [1]
  20.21
recall [58]
  6:6; 11:20, 25; 12:16; 16:1;
  17:16; 18:25; 21:3, 24; 23.17,
  24; 24:10; 25:3, 5, 21, 24;
  26:1, 3, 9; 27:4, 18, 19, 20;
  43:24; 47:9, 23; 55:20; 58:9;
  60:13; 61:22; 65:16, 69:4, 5,
  20, 23; 70:19; 72:25; 73:14;
  74:17; 78:18, 21, 24; 79:1, 4,
  13; 87:14, 89:1; 92:14, 23,
  24; 93:18, 23; 95:7; 100:22;
  106:22; 107.14; 117:15
receipts [4]
  81.11, 16, 18, 20
receive [1]
  21.6
received [2]
  25:22, 25
recently [2]
  116:10; 119:12
recess [3]
  50:12; 77:24; 114.3
Recessed [2]
  50:13, 114:4
recessed [2]
  77:25; 121:23

82:21
recollection [87]
  8:7, 22, 23, 24; 11:21; 14:1,
  24; 16:5; 19:6, 18; 21:1; 23:9,
  13, 15, 19, 25; 24:12; 25:15,
  19, 22; 27:8; 29:2; 37:3;
  38:14; 43:8, 12, 13, 17, 20;
  46:13, 22, 25; 47:12, 14, 19;
  48:18, 21; 50:16; 53:4; 55:14,
  19; 56:3; 59:10, 13, 16;
  61:24; 64:3, 16; 65:15, 20,
  21; 68:3; 69:18; 73:1, 21;
  74.23; 78:17, 20; 79:6; 87:12;
  88:11, 13; 90:7; 94:4, 5; 95:6;
  98:7, 15; 99:20; 100:9, 15;
  101:10; 102:22; 103:16;
  105:6; 106:22; 107:13; 108:1,
  4, 5, 8; 115:10, 13, 18, 22;
  116:9
recommended [1]
  89:6
reconstruct [4]
  11:15; 39:20; 108:25; 109:7
record [19]
  29:23; 30:9; 32:10; 41:8;
  42:7; 45:16; 51:8; 53:8, 20;
  61:16; 63:7; 65:3; 77:23;
  80:22; 83:11; 104:9; 110:21;
  120:21; 123:15
records [11]
  8:8; 9:5, 8; 15:4, 13, 18;
  109:3, 11; 110:7, 8; 117:1
red [3]
  32:18; 64:7; 65:3
reduced [2]
  21:18, 22
reduction [2]
  41:10; 42:23
refor [6]
  6, 18, 21; 7:13; 19:9; 21:10;
  41:6
referenced [1]
  39:7
references [1]
  61:8
referred [5]
  14:10; 24:7; 30:19; 48:22;
  90:25
referring [5]
  29:24; 51:7, 14; 52:19; 91:11
refers [3]
  8:4; 91:21, 102:21
reflect [2]
  102:14; 118:17
reflected [1]
  102:15
refresh [3]
  16:12; 82:1; 115:18
refreshed [1]
  8:25
regard [4]
  47:9; 112:25; 117:11, 12
regarding [1]
  84:11
regardless [1]
  118:20
regs [1]
  53:25
regular [23]
  17:24; 18:24; 20:14, 62:3, 11,

recognized [2]
  104:3, 13,
  16, 23; 105:14, 19, 21, 25;
  106:7, 9, 10, 16, 17, 25
Regulations [1]
  48:24
regulations [3]
  23:14; 25:17; 28:11
reiterate [1]
  114:10
relate [3]
  49:5; 92:1; 96:6
related [7]
  26:4; 28:11, 23; 47:11; 82:12;
  112:19; 121:8
relates [8]
  31:10; 66:2; 76:4; 103:5;
  112:14; 113:3, 18; 118:4
Relating [1]
  52:1
relating [9]
  34:8, 14; 37:8; 47:16; 48:7;
  64:18; 109:15; 112:3; 117:3
relationship [2]
  95:18; 97:21
relative [2]
  123:7, 8
release [1]
  30:8
relevant [2]
  72:14; 121:17
remained [2]
  100:12; 101:13
remember [30]
  7:8; 14:3, 7; 15:24; 22:21;
  23:8, 11; 33:13, 17; 46:14;
  49:3, 19; 55:13; 70:23; 71:10,
  11, 15; 74:2, 3, 4, 8, 9, 16;
  77:2; 80:17; 86:25; 88:16;
  93:21; 99:25; 113:22
remembered [1]
  71:12
remove [3]
  33:8, 12, 17
removed [4]
  33:9; 51:1; 53:14; 113:25
rent [85]
  17:16, 23; 19:25; 20:4, 7, 12,
  17, 20, 23; 21:2, 6, 8, 18, 22;
  22:6; 27:10; 28:20; 30:14, 17;
  36:21; 37:9; 41:11; 42:23;
  43:1; 47:2, 11; 48:8; 54:1, 11;
  55:2, 9, 16; 56:1; 57:24;
  58:10; 59:7; 61:21; 62:8, 13;
  64:25; 65:12; 66:11, 19; 67:5,
  15; 70:20; 71:4; 73:4, 9;
  76:16, 19, 77:13; 79:22; 80:8,
  12, 16, 18, 25; 81:4; 85:11,
  21, 9/ 5, 9, 12, 100:13;
  102:1, 9; 103:4; 104:4, 11,
  22; 105:13, 16, 25; 106:6, 12,
  15; 107:1, 6; 108:16, 20;
  115:7; 118:8
Rental [1]
  17.21
rental [1]
  18:5
renumbered [1]
  30:1
repeat [2]
  72:18; 77:19
repeatedly [1]

**55:4**
rephrase [1]
   37:7
report [1]
   28:18
reported [6]
   30:10; 57:8; 66:14; 67:3, 20,
   21
reporter [4]
   18:12; 37:15; 47:6; 78:16
reporting [1]
   86:25
reports [1]
   29:18
represent [1]
   87:22
representation [1]
   51:12
representatives [2]
   8:21; 78:7
representing [2]
   15:8; 54:17
request [3]
   25:19; 116:25; 119:9
requested [5]
   18:12; 37:15; 47:6; 78:16;
   119:7
requesting [3]
   23:13; 117:12, 14
requests [3]
   34:13; 119:4, 11
Required [1]
   9:9
required [5]
   9:7; 28:16; 82:17; 103:18, 19
requires [2]
   18:16; 114:18
researching [1]
   110:12
reserve [1]
   120:18
residing [2]
   122:20; 123:25
resolved [1]
   97:16
respect [10]
   15:21; 37:2; 44:8; 62:9;
   66:16; 80:14; 85:3, 10, 21;
   102:17
response [4]
   25:4, 5; 34:12; 35:2
rest [1]
   36:7
resumption [1]
   97:24
revenue [7]
   79:3, 5, 7, 11; 80:1; 119:13
review [2]
   30:25; 31:8
reviewed [2]
   40:2; 84:12
Rhamstine [2]
   86:21, 22
Right [2]
   45:11; 92:3
right [56]
   5:19; 7:14; 11:24; 14:17, 25;
   15:16; 16:6, 22; 17:19; 18:7;
   19:7, 24; 20:9, 15, 25; 22:3,
   10; 29:21; 31:3; 32:25; 33:4;
   37:6; 39:12; 40:21; 42:3, 5, 6,

14; 46:20; 48:15, 49:8; 51:8;
52:4; 64:25; 66:10; 68:22;
70:3, 25; 71:21; 72:13; 73:7;
80:8, 20; 81:5; 85:24; 88:7;
91:10; 92:5, 7; 95:11; 106:13,
17; 107:8; 120:8, 11, 18
right-hand [3]
   30:23; 31:15; 51:15
rights [1]
   105:16
Rodney [2]
   7:8, 21
role [3]
   6:14, 25; 84:3
Roman [2]
   21:11; 22:11
rooms [1]
   81:13
Rubin [37]
   10:4, 5, 9; 14:13, 16; 15:2;
   17:5; 23:1, 7, 10, 12; 25:4;
   32:14, 20; 33:8; 38:9; 43:10;
   55:8; 56:24; 59:14; 69:1;
   77:10; 78:22; 90:22; 92:14,
   93:4, 23; 95:4, 8, 10, 13;
   98:11, 12; 99:8, 22; 100:3;
   101:24
Rubin's [1]
   91:2
Rules [1]
   48:24
rules [4]
   23:14; 25:17; 28:10; 53:25
run [1]
   114:12
running [1]
   42:2

-- S --

sale [1]
   107:18
sales [3]
   81:11; 106:2; 107:11
sat [1]
   118:1
satisfied [1]
   117:5
save [1]
   122:6
saved [1]
   34:5
saying [9]
   25:13, 14, 34:25, 54, 10;
   55:12, 14; 104:19; 120:22
scab [7]
   65:13, 68:2; 70:21; 89:20;
   96:7; 97:2, 11
scabs [4]
   56:2, 6; 76:11; 96:11
scan [2]
   39:9, 11
scanned [1]
   38:6
schedule [2]
   97:18
scheduled [2]
   114:12, 24
scope [4]
   8:15; 117:20; 119:5; 120:5
se [1]

100:8
seat [1]
   123:18
sealed [2]
   118:24; 119.15
season [33]
   17:24; 18:24, 20:14; 22:4;
   97:20, 22; 98:4, 5, 8; 100:14,
   24; 101:3, 4, 102:5, 7; 103:6,
   23, 104:3, 13, 16, 23; 105:14,
   19, 21, 106:1, 7, 8, 9, 10, 16,
   18, 25
seasons [3]
   98:7; 100:25; 101:1
seat [4]
   79:2; 80:1; 81:12, 15
Seattle [17]
   4:7, 25; 5:6; 6:17; 7:6; 8:17;
   28:20; 37:23, 57:1, 4; 84:9,
   23; 87:23; 108:19; 116:9;
   118:3; 123:25
Second [1]
   19:16
second [7]
   17:21; 19:15; 88:10; 91:4, 7,
   20, 100:20
secret [1]
   75:9
secretary [1]
   110:20
Section [4]
   17:18; 91:22; 92:3, 11
section [14]
   29:24; 30:7; 31:2; 48:19, 23;
   54:14; 55:18; 58:13; 62:15;
   65:25; 66:7; 71:9; 91:15;
   113:18
sections [1]
   39:24
selective [1]
   118:16
send [1]
   119:24
sense [3]
   34:22; 61:7; 63:20
sentence [5]
   17:22; 18:6, 13; 96:4; 103:23;
   104:6, 8, 20; 105:5
separate [2]
   35:12; 75:21
September [9]
   29:13; 30:11; 37:25; 39:7;
   45:19; 46:17; 67:1; 83:12;
   90:25
sequence [1]
   25:18
sequencing [2]
   28:16; 69:13
seriatim [1]
   90:9
Service [1]
   80:23
service [9]
   79:2, 6, 12; 80:8, 16, 19, 25;
   81:4, 23
services [1]
   96:25
serving [1]
   84:4
SESSION [1]
   78:1

session [9]
   13:4, 8, 11; 15:23; 109:18
sessions [7]
   8:5, 11; 9:15, 24; 10:11; 11:8;
   109:9
sets [2]
   38:25; 64:5
settled [1]
   112:22
seven [2]
   21:11; 104:13
sheet [2]
   110:10, 122:8
shifted [2]
   17:7; 116:2
shortened [1]
   102:8
shorthand [6]
   41:12, 17, 18, 19, 23; 43:1
show [10]
   15:4; 35:5; 51:8; 53:8; 56:9;
   109:25; 110:2, 25, 111:2
shows [6]
   90:19; 91:4, 6, 8, 9; 110:10
sides [1]
   17:10
signal [1]
   70:6
signed [1]
   16:11
significance [1]
   74.7
significant [2]
   7:3; 90:5
signifies [2]
   61.2; 92:21
signify [1]
   70:11
signing [1]
   16:17
silent [1]
   113.15
single [1]
   50:5
Sir [1]
   87:6
sit [8]
   13:23, 14:4; 34:7; 57:23;
   62:22; 77:8; 79:14; 87:14
site [1]
   5:9
sitting [2]
   63:22; 119:1
situation [2]
   98:1; 102:12
situations [1]
   74.11
Six [1]
   36.13
slightest [1]
   32:13
slowdown [1]
   28:6
slowly [1]
   53:20
so-called [4]
   6:12; 29:6; 36:15; 38:21
solve [1]
   118:23
somebody [1]
   76:25

BSA
City of Seattle vs SSI, Inc.
GORDON DAVIDS  5-25-99
Case 2:07-cv-01620-RSM  Document 2-8  Filed 10/10/2007  Page 70 of 78
Look-See(45)

**someone** [3]
26:6; 35:10; 63:14; 92:22;
115:24

**somewhat** [1]
17:6

**somewhere** [1]
11:9

**Sonic** [8]
13:3, 7, 11; 17:25; 61:20;
64:24; 78:7; 104:14

**Sonics** [59]
6:16; 8:21; 15:8, 9, 14, 23;
17:22; 26:18; 27:9, 13; 28:19;
30:14, 15; 36:21; 54:1, 17;
55:2, 25; 58:7; 62:2, 6; 64:1,
4, 17; 65:4, 13; 66:11; 67:15;
69:15; 70:11; 72:10, 18, 21,
24; 73:3; 74:21; 75:10, 13,
22; 77:12; 80:7; 82:3, 20;
83:1; 88:23; 92:15; 96:9, 14;
97:2; 101:3, 25; 104:10, 24;
105:17; 106:8, 24, 25; 107:17

**Sonics-related** [1]
116:1

**sorry** [4]
16:16; 48:21; 51:22; 72:1

**sort** [10]
4:8; 9:7; 18:14; 28:16; 41:12;
82:6, 13; 102:7; 115:14;
118:14

**sounds** [1]
89:9

**sources** [2]
79:5, 7

**special** [3]
82:13, 15, 22

**specialty** [1]
4:11

**specific** [9]
4:16; 43:14; 65:2, 11; 73:20;
74:17; 105:24; 108:17;
110:13

**specifically** [10]
17:21; 21:10; 23:17; 49:11;
59:24; 73:7; 80:11, 16, 17;
105:3

**specified** [1]
81:1

**specs** [1]
64:15

**speculate** [1]
92:20

**speculation** [2]
43:24; 89:10

**spend** [1]
4:17

**spending** [1]
60:9

**spoken** [1]
72:15

**sponsorship** [1]
81:9

**spot** [1]
31:9

**spring** [2]
12:19; 102:19

**squeezed** [1]
73:5

**ss** [3]
122:3, 13; 123:3

**SSI** [19]

**SSI's** [1]
52:5

**staff** [2]
82:16; 84:9

**stages** [1]
84:8

**standing** [1]
5:2

**stands** [1]
81:12

**star** [2]
30:22; 31:16

**start** [4]
13:9; 101:3; 114:21, 25

**started** [4]
85:10, 14, 20; 118:2

**starters** [1]
45:21

**starting** [1]
103:13

**startlingly** [1]
113:16

**starts** [1]
100:5

**STATE** [3]
122:2, 12; 123:2

**State** [4]
4:5; 5:3; 122:19; 123:24

**state** [4]
15:22; 67:23; 83:10; 123:6

**stated** [7]
6:8; 27:16; 66:25; 80:16, 18;
84:15; 95:1

**statement** [6]
6:4; 11:10; 49:13; 87:17;
111:4, 8

**statements** [1]
115:6

**stating** [1]
27:14

**step** [1]
32:6

**stick** [1]
42:6

**stickies** [1]
90:17

**stop** [1]
10:25

**stoppage** [1]
101:1

**Stopped** [2]
98:21, 23

**stopped** [2]
100:5, 6

**Store** [1]
75:22

**stored** [1]
35:22

**Stout** [1]
7:9

**stream** [1]
79:11

**streams** [1]
79:7

**street** [1]
76:1

**strengthened** [1]

**strike** [29]
25:12; 27:10; 28:6; 41:10, 13;
47:3, 17; 48:9; 54:1, 12;
55:17; 57:25; 58:12; 59:7;
61:25; 62:14; 65:13; 66:12,
20, 70:21; 71:5; 74:13; 96:1;
97:17, 23; 98:2; 100:21;
102:2; 115:8

**strong** [5]
9:9; 73:1; 107:12; 108:1, 3

**stuck** [1]
53:13

**sluff** [1]
53:5

**Subject** [2]
48:23; 107:7

**subject** [23]
17:23; 18:20; 19:1, 5, 25;
37:8; 47:2; 48:7; 49:5; 52:1;
58:9; 59:13; 60:18; 70:22;
71:24; 72:24; 79:19, 22;
94:20; 96:6; 104:11; 107:21;
108:13; 110:2, 25; 111:9;
112:3; 113:15; 116:24; 117:3;
121:14

**SUBSCRIBED** [1]
122:15

**subsection** [1]
20:22

**subsequently** [4]
29:7, 25; 40:19; 60:17

**substance** [12]
27:16; 47:13, 18; 49:17,
71:17, 23; 72:5; 73:19; 89:1,
14; 92:17; 100:3

**sufficiently** [1]
55:23

**suggest** [1]
96:14

**suggested** [2]
24:24; 96:3

**suggests** [1]
65:9

**suite** [3]
79:2; 80:1; 81:18

**suites** [1]
81:12

**summarized** [1]
111:10

**summarizes** [1]
112:2

**superiors** [3]
28:18; 67:1, 20

**SuperSonics** [1]
5:7

**supervisor** [1]
7:7

**supposed** [5]
13:8, 9; 17:8, 74:2; 79:5

**supposition** [1]
32:21

**surmise** [2]
27:13; 71:22

**surmisings** [1]
71:18

**suspended** [2]
96:15, 101:11

**suspense** [2]
101:12, 16

**Suspension** [1]
99:10

**suspension** [14]
66:1; 97:14; 98:11, 13, 16,
17, 19; 99:1, 9, 11; 100:4, 9,
11; 101:2

**SWORN** [1]
122:15

**sworn** [2]
4:1; 123:12

**symbol** [1]
41:22

**system** [1]
35:20

— T —

**table** [2]
49:2; 83:25

**tail** [1]
71:9

**talk** [4]
44:21; 50:10; 90:8; 98:4

**talked** [19]
23:25; 57:22; 66:10, 13;
72:12; 74:6; 76:11; 85:7;
93:2, 3, 5, 7, 9, 13; 94:22;
98:3, 6; 114:16; 118:2

**talking** [9]
14:14; 15:2; 23:15; 25:11;
49:12; 52:18; 56:23; 105:5;
113:13

**talks** [1]
97:13

**Taylor** [2]
119:3; 120:6

**Taylor's** [1]
120:22

**team** [3]
62:4, 11; 94:11

**team's** [1]
79:10

**teams** [1]
94:11

**technical** [1]
121:6

**telephone** [20]
9:25; 10:6, 12; 11:1, 15;
14:16, 19; 27:17; 37:21;
99:19, 23; 108:25; 109:2, 8,
10, 19, 20, 22, 23; 117:1

**telephonic** [2]
10:23; 14:10

**telling** [2]
15:12; 98:24

**temporarily** [2]
100:5; 101:21

**ten** [1]
29:22

**tenor** [1]
59:17

**term** [3]
75:16; 92:16; 99:9

**terms** [6]
7:22; 13:24; 57:10; 89:5;
102:6; 115:19

**Terry** [30]
8:17; 10:7, 8; 11:2; 14:15;
15:10, 22:21; 30:11; 54:23;
55:7; 57:5; 58:3, 9, 22; 63:4,
17, 20; 65:5; 68:13, 71:7;
72:17, 21; 74:21; 75:14; 77:9,

BSA — City of Seattle v. SSD, Inc. — GORDON DAVIDSON 5/6/2007

78:7; 79:17; 93:2, 6; 108:18

testified [4]
4:1; 26:10; 118:5; 121:2

testify [3]
108:18; 113:24; 123:13

testifying [1]
116:5

testimonial [1]
74:7

testimony [16]
5:16; 6:5; 8:4, 18; 38:9; 49:9,
56:17; 59:4, 8; 84:24; 100:2,
17; 104:15; 111:5, 24; 112:2

text [6]
23:16; 30:14; 32:24; 33:2;
40:20; 54:3

Thank [4]
32:9; 75:24; 83:22; 120:12

theory [1]
117:13

There's [7]
63:11; 64:8; 66:1, 6; 91:19;
113:11; 118:13

there's [13]
20:7, 22; 30:6; 42:4, 10, 18;
51:24; 65:7; 91:17; 103:4, 5;
105:23; 111:23

thereafter [2]
16:24; 57:3

therefor [1]
81:1

thereof [2]
82:7; 123:11

They're [2]
88:4; 106:16

they're [3]
40:6; 106:14; 119:16

thinking [1]
60:10

third [4]
18:6, 13; 30:18; 101:4

three [8]
37:12; 40:22; 65:8, 9; 75:25;
78:24; 101:3; 104:12

ticket [4]
106:2; 107:11, 18; 108:20

tickets [1]
107:17

tied [1]
62:15

timely [1]
92:2

times [5]
17:11; 37:12; 40:18; 65:10;
72:22

timing [1]
64:18

title [2]
4:8; 81:9

titles [2]
88:3, 5

tomorrow [3]
114:11, 22, 25

tools [1]
27:23

topics [1]
63:13

total [1]
35:13

towards [1]
59:18

town [1]
62:16

track [3]
17:8; 31:5; 109:22

tracking [1]
9:12

transcript [2]
122:5; 123:15

transmission [2]
91:4, 6

transmittal [2]
90:20, 21

travel [1]
110:12

trouble [2]
73:25; 119:20

true [3]
9:1; 15:21; 54:23, 55:7, 11;
60:1; 77:8, 78:10; 80:14;
97:12; 105:12; 122:6; 123:15

truth [11]
58:23; 77:11, 14, 15, 16, 17,
20; 123:13, 14

turns [1]
26:13

Twenty-three [1]
88:19

twice [1]
36:16

tying [1]
103:7

type [4]
13:14; 14:20; 110:23; 121:12

typed [4]
29:14; 46:16, 20; 110:16

**– U –**

UCH1DPL503JT [1]
123:22

Uh-huh [16]
9:2; 31:20, 23; 40:7; 41:3;
42:24; 48:10, 12; 49:14;
61:13, 15; 66:5; 80:6; 88:21;
107:2; 108:21

uh-huh [1]
67:19

ultimately [1]
69:9

underlined [1]
41:21

underlining [1]
91:19

underlying [1]
8.25

underneath [1]
51:5

undersigned [1]
123:5

understand [8]
14:12; 15:12; 17:10; 19:25,
48:25; 63:15; 95:21; 116:5

Understanding [9]
6:11; 7:11, 16:2; 17:17, 20;
18:19; 102.13, 19; 105:10

understanding [12]
16:8, 24, 18:3, 54:25; 59:5;
66:15; 73:13, 76:12; 81:24,
87:24; 101:2; 118.18

understandings [1]
56:21

understood [2]
77:12; 105:7

underway [1]
109:15

undoubtedly [6]
69:25; 89:6, 8; 92:19, 21;
93:1

uniforms [1]
62:6

unknown [1]
64:11

unusual [1]
41:12

upcoming [1]
63:12

upper [4]
30:23; 31:15; 42:5; 51:15

uses [5]
73:8; 74:6, 25; 75:13, 15

utility-related [1]
9:11

**– V –**

vague [2]
14:24; 106:22

Vaguely [1]
16:3

validating [1]
27:15

variance [1]
4:19

variety [9]
4:23; 37:21; 48:3; 63:9;
74:24, 103.15; 105:9, 16;
116:9

verb [1]
41:24

verify [1]
19:12

verifying [1]
27:15

version [19]
5:17; 30:6, 8, 24; 46:13, 14;
49:7; 58:14; 65:24, 25; 66:7;
70:17; 75:17; 83:6; 91:8, 13;
92:4, 9

versions [4]
9, 16, 47.10, 58:18; 113:23

versus [1]
64:14

Veteran's [1]
11:23

viewed [2]
82:23; 92:10

VII.A.1.a. [2]
20:22; 21:11

VIII.3 [1]
80:21

Virginia [4]
7:20; 30:11; 57:8; 86:24

vis-a-vis [1]
118:7

visible [1]
91.6

voice [1]
48:20

volume [1]
36:8

**– W –**

Waive [1]
85:3

waive [6]
84.25; 85:1; 117:23; 118:14,
15

waived [1]
118:10

waiver [2]
112:23; 118:16

walkout [1]
95:24

wandering [2]
76:25; 77:6

wanted [4]
82:17, 20, 107:15; 108:19

warranted [1]
82:16

WASHINGTON [1]
123:2

Washington [3]
5:3; 123:6, 24

wasting [1]
45:14

ways [4]
58:15; 89:4, 18; 95:8

We'll [2]
19:20; 120:8

we'll [4]
51:10; 56:9; 115:2; 118:24

We're [1]
120:11

we're [4]
90:8; 105:5; 119:1; 121:9

We've [1]
66:13

we've [8]
47:3; 49:12; 51:13; 52:19;
66:10; 76:11; 90:25; 113:12

week [2]
97:17, 19

weekly [1]
13:18

weeks [1]
115:15

welcome [1]
120:13

weren't [1]
103:17

Wetter [1]
7:23

what'd [1]
94:21

What's [2]
109:20; 110.18

what's [6]
19:25; 30:7; 72:13; 88:3;
92:3; 113:6

whatsoever [1]
34:9

whereof [1]
123:17

whoever [1]
51:4

wish [1]
120:18

withheld [11]
29:7; 34:9, 12; 38.16; 50:8,
15; 60:14, 23, 24; 117:2

withholding [1]
33:21

WITNESS [4]

estified to WITNESS

51:20, 23; 56:12; 67:

**witness [9]**
44:19; 84:5, 16, 20; 85:16;
87:19; 99:2; 123:12, 17

**won't [3]**
31:1; 53:24; 119:16

**word [16]**
9:9; 23:23; 24:4; 41:13, 20;
64:11; 80:22; 90:3, 4; 98:10,
13; 99:11; 100:4, 9, 11

**word-for-word [1]**
73:16

**worded [2]**
93:22; 103:17

**wording [2]**
43:3, 5

**words [17]**
14:20; 15:23; 23:21; 49:18;
51:14; 68:13; 69:6; 71:7;
72:15; 73:20; 90:2, 5; 92:25;
93:23; 100:8; 103:21

**work [4]**
9:11; 28:6; 101:1; 103:17

**Worked [1]**
59:2

**working [2]**
86:17; 116:3

**world [1]**
41:23

**worth [1]**
40:10

**wouldn't [11]**
15:14, 17; 26:7; 57:20; 63:21;
67:6; 69:14; 76:15; 77:6;
108:23; 113:7

**write [4]**
56:8; 110:18; 117:23; 119:24

**writing [8]**
4:17, 22; 62:19; 75:9; 87:9,
17; 110:12; 116:6

**written [18]**
4:19; 26:15; 27:1; 40:16;
65:10; 67:4, 75:2; 84:11;
87:3, 102:16; 104:20; 106:5,
115:6, 9, 12, 13; 117:18;
118:20

**wrote [11]**
37:23; 43:6, 14, 18; 64:19;
67:10; 75:6; 76:17, 21; 85:6;
115:10

─── – X – ──

**Xeroxed [1]**
91:5

**XIX [7]**
48:15, 19, 23; 49:4; 50:24;
62:15

**XIX.B. [8]**
29:24, 25; 30:7; 49:11; 58:14;
61:12, 19; 113:12

**XX [3]**
48:7, 15, 113:20

**XX.B. [6]**
30:1, 8; 66:7; 71:9, 75:21;
113:12

**XXII [2]**
91:15; 92:11

**XXIII [4]**
88:8, 17; 89:16; 113:20

**Yeah [9]**
16:17; 18:13; 31:7; 33:25;
76:13, 91:15; 93:11; 106:11;
116:11

**yeah [3]**
12:12; 70:24; 108:11

**year [7]**
9:20; 17:23; 21:20; 22:7;
100:20, 21; 103:24

**years [1]**
58:25

**yellow [2]**
19:16; 51:9

**you'd [1]**
15:13

**You'll [1]**
48:20

**you'll [3]**
29:21; 31:4; 114:19

**You've [4]**
67:13; 70:18; 90:8; 121:21

**you've [18]**
14:10; 23:18; 26:10; 39:13;
45:20; 49:5; 58:25; 59:12,
67:9, 10; 69:25, 76:3; 83:24;
92:16; 96:7; 100:6; 104:9;
119:10

**yours [2]**
33:19; 35:24

**yourself [6]**
13:1; 62:20; 63:16; 115:5, 17;
116:6

# EXHIBIT 3

1

2

3                    CITY OF SEATTLE v. SSI, INC. ARBITRATION

4

5    CITY OF SEATTLE                    )
                                        )
                                        )    DECLARATION OF
6              vs.                      )    GORDON B. DAVIDSON
                                        )
7    SSI, INC.                          )
                                        )
                                        )
8    _____)

9        I, Gordon B. Davidson, declare:

10       1. I am an Assistant City Attorney for The City of Seattle. As part of my duties, I provided legal

11   advice to Seattle Center personnel responsible for negotiating agreements with SSI Sports, Inc. ("SSI")

12   for its use and occupancy of the Seattle Center Coliseum (now, KeyArena). These agreements include

13   the March 1993 Memorandum of Understanding between the City and SSI, and the Premises Use &

14   Occupancy Agreement ("the Lease"). I have read the declaration submitted by Terry McLaughlin in

15   connection with SSI's Motion for Production and believe it does not correspond with my recollection of

16   my involvement in these transactions.

17       2. During the 12 months between March 1993, and February 1994, Mr. McLaughlin met regularly

18   and often with representatives of SSI to negotiate the terms of the proposed occupancy. In that year, I

19   attended no more than five (5) such meetings.

20       3. During the meetings I attended, the negotiation of business issues was left to Mr. McLaughlin.

21   My role was to ensure that the language of the drafts accurately reflected the agreements of the parties. In

22   that regard, I asked questions to clarify the parties' positions, took notes of agreements reached, and

23   recorded edits agreed upon by the negotiators.

DECLARATION OF GORDON B. DAVIDSON - 1

Mark H. Sidran
Seattle City Attorney
600 Fourth Avenue, 10th Floor
Seattle, WA 98104-1877
(206) 684-8200

4.  After the first few drafts of the proposed Lease were exchanged, I became the primary scrivener. As I refined the document, I would provide copies of the most recent draft to Mr. McLaughlin and Seattle Center Director Virginia Anderson. They would decide whether to accept the language I drafted and if so, the draft would be circulated to SSI for its review or the language of the redrafted provisions would be discussed with SSI. Mr. McLaughlin would then notify me which provisions the parties accepted and which needed further work. While I did communicate with SSI's in-house attorney concerning the wording of many provisions, I was never authorized or instructed to finalize any substantive contract terms on behalf of my client.

5.  I frequently told both Mr. McLaughlin and Ms. Anderson what I thought various contract provisions meant and shared my understanding of what their effects would be when implemented, but I did not provide them with business advice. I was particularly sensitive to the difference between legal and business advice because not long before this transaction, the Seattle Center Director expressly stated that she wished to receive only legal and not business advice from the City's Law Department.

Signed at Seattle, WA, this 13th day of May, 1999.

By:  _____
     GORDON B. DAVIDSON

DECLARATION OF GORDON B. DAVIDSON - 2

Mark H. Sidran
Seattle City Attorney
600 Fourth Avenue, 10th Flo
Seattle, WA 98104-1877
(206) 684-8200

# EXHIBIT 4

The Honorable Harry McCarthy

SUPERIOR COURT OF WASHINGTON IN AND FOR KING COUNTY

CITY OF SEATTLE, a first-class charter city,  )
                                               )
                        Plaintiff,             )    No. 07-2-30997-7 SEA
                                               )
v.                                             )    DECLARATION OF TERRY
                                               )    MCLAUGHLIN
THE PROFESSIONAL BASKETBALL                    )
CLUB, LLC, an Oklahoma limited liability       )
company,                                       )
                                               )
                        Defendant.             )
                                               )
_____    )

Terry McLaughlin declares as follows:

1.      I am over 18 years of age and am competent to testify as a witness in this action.

2.      I was the Deputy Director of the Seattle Center at the time the agreement with the Sonics for their use of the KeyArena was negotiated. I was the principal businessperson on behalf of the City in those negotiations.

3.      I have read Mr. Davidson's declaration where he states: "I also recall that City representatives believed that there were certain potential situations in which the City would benefit from having a judge as the decision maker rather than an arbitrator."[1] I have no recollection that I or any other City representative expressed such a view to Mr. Davidson, nor do I recall that anyone instructed Mr. Davidson to include language giving the City the right

_____
[1] Davidson Declaration at 4.

DECLARATION OF TERRY MCLAUGHLIN - 1

BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

1     to seek relief in Court, as opposed to arbitration. I recall that the City wanted arbitration as

2     the vehicle for resolving disputes.

3        I certify under penalty of perjury that the above is true and correct to the best of my

4     knowledge.

5        DATED at Seattle, Washington, this 3rd day of October, 2007.

6

7

8                  Terry McLaughlin

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DECLARATION OF TERRY MCLAUGHLIN - 2

BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000