1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

CITY OF SEATTLE,

             Plaintiff,

       v.

THE PROFESSIONAL BASKETBALL
CLUB, LLC,

            Defendant.

CASE NO.  C07-1620RSM

ORDER DENYING DEFENDANT'S
MOTION TO STAY AND
GRANTING PLAINTIFF'S CROSS-
MOTION FOR STAY OF
ARBITRATION

## I.  INTRODUCTION

      This matter comes before the Court on defendant's Motion to Stay, (Dkt. #2, Exhibit B) and plaintiff's Cross-Motion for Stay of Arbitration.  (Dkt. #2, Exhibit D). Defendant argues that this Court should stay this litigation on the grounds that an agreement signed between plaintiff and defendant's predecessor-in-interest compels the underlying dispute to be resolved through arbitration.  Plaintiff responds that the agreement specifically excludes the underlying dispute from arbitration, thereby subjecting the dispute to adjudication before this Court.

      For the reasons set forth below, the Court finds that the language of the agreement supports plaintiff's position.  Therefore the Court DENIES defendant's motion to stay, and GRANTS plaintiff's cross-motion for stay of arbitration.

MEMORANDUM ORDER
PAGE - 1

1

## II. DISCUSSION

2

### A. Background Facts

3        On July 18, 2006, the Professional Basketball Club, LLC ("PBC"), purchased the

4    Seattle SuperSonics ("Sonics") and the Seattle Storm from the Basketball Club of Seattle,

5    LLC ("BCOS").  PBC is an Oklahoma City based investment group, and is led by Clay

6    Bennett ("Bennett"), the current chairman of PBC.  Pursuant to the sale, PBC agreed to

7    assume all obligations and responsibilities associated with a Premises Use & Occupancy

8    Agreement  ("Lease") that was entered into in 1994 by the City of Seattle ("City") and

9    PBC's predecessor-in-interest, SSI, Sports, Inc. ("SSI").  Under the terms of the Lease, the

10    City agreed to appropriate approximately $74 million to renovate KeyArena (formerly

11    known as the Seattle Coliseum).  In exchange, SSI signed a 15-year lease in which it agreed

12    to play all home games in KeyArena through the 2009-2010 National Basketball Association

13    ("NBA") season.  PBC's intention to assume its obligations under the Lease was formalized

14    on October 23, 2006, when PBC signed an Instrument of Assumption.  (Dkt. #2, Exhibit F

15    at p. 81 ).  The document provides in pertinent part:

16        PBC acknowledges having been provided with a copy of the [Lease] and agrees that,
        from and after the Closing date, it shall assume, and hereby agrees to satisfy or
17        perform (as applicable), all liabilities and obligations of BCOS under the [Lease].

18    *Id.*

19        In addition, the Lease contained three relevant provisions that are at issue in the

20    instant case.  The first provision is under Article II[1] of the Lease and is titled "Term; Use

21    Period."  Article II provides:

22        The Term of this Agreement shall commence on the date it is executed by an
        authorized representative of each of the parties hereto. [PBC's] use and occupancy
23        rights to the premises shall commence on the "Use Commencement Date." [PBC's]
        use and occupancy rights with respect to the Premises and the Term of this
24        Agreement shall end on September 30, 2010, unless terminated earlier pursuant to
        the provisions hereof.
25

26

27        [1] Defendant PBC characterizes the provisions of the Lease as "Sections."  However, the
    Court shall adhere to the precise terms of the Lease, which characterizes the provisions as
28    "Articles."

MEMORANDUM ORDER
PAGE - 2

> Subject to the provisions of this Agreement, [PBC] shall schedule and ensure that the SuperSonics play all Home Games other than pre-season games exclusively in [KeyArena] after the Use Commencement Date.

(Dkt. #2, Exhibit B at p. 25).

The next important provision is found in subsection A of Article XXV ("subsection A"). Article XXV is titled "Arbitration" and indicates which matters under the Lease may or may not be resolved through binding arbitration. Subsection A specifically provides in pertinent part:

> All claims, disputes and other matters in question between the parties arising out of, or relating to provisions of this Agreement shall be decided by binding arbitration . . . unless the parties mutually agree otherwise *or unless the claim, dispute, or matter in question relates to the provisions of Article II* ("Term; Use Period"), Article III ("Termination of Current Agreement Providing Seattle Center Space for SuperSonics Home Game Use"); Article IV ("Coliseum Design and Construction"), Article V ("Coliseum Planning & Construction Schedule; [PBC] Opportunities to Void Agreement"), Subsection XVI.F ("Hazardous Substances") or Article XIX ("Subcontracting and Transfer of Ownership").

(*Id.* at p. 73) (emphasis added).

Also found within Article XXV is subsection D ("subsection D"), which contains a limitation on which party can seek judicial relief. That section provides:

> No proceedings based upon any claim arising out of or related to this Agreement shall be instituted in any court by any party hereto against any other party hereto except (i) an action to compel arbitration pursuant to this Section, (ii) an action to enforce the award of arbitration panel rendered in accordance with this Section, (iii) to file arbitration award as a judgment, and (iv) proceedings brought by [PBC] for injunctive relief or any other interim remedy to protect [PBC]'s rights under this Agreement.

(*Id.* at p. 74).

The last important provision of the Lease is found in Article XXVI, titled "Default and Remedies Therefor." This provision indicates the rights of the respective parties should the other be in default under the terms of the Lease. Subsection C of Article XXVI provides:

> 1. City Rights upon [PBC]'s Default & Breach: In the event [PBC] fails to correct, remedy, or cease such failure or violation within the time specified in the City's notice, the City may thereafter terminate this Agreement without any further proceedings, re-enter the Premises, lease and license others to use said Premises and receive rent and license fees therefor as if this Agreement had not been made;

MEMORANDUM ORDER
PAGE - 3

1

2

3

> provided, that [PBC] shall remain liable for the full amount due to the City pursuant to Article VIII, hereof, as when due, but may offset against such liability the amount received by the City as a consequence of such lease or license. The City shall also have such other remedies as may be available to it, which shall include, without limitation, injunctive relief and damages.

4    (*Id.* at p. 75).

5        According to the City's complaint, when the sale by BCOS to PBC was announced,

6    Bennett promised to assume and honor PBC's obligations under the Lease, and put forth his

7    "good faith best efforts" to find a venue in the Greater Seattle area for the Sonics after the

8    expiration of the KeyArena Lease term. However, the complaint states that the actions and

9    statements of PBC were inconsistent with their Lease obligations. The City alleges that

10   Bennett made an attempt to submit an arena plan to the 2007 Washington State Legislature,

11   but that it was guaranteed to fail because it was filed too late in the session and relied on

12   public subsidies of $400 million compared to a private investment of $100 million. The City

13   also states that PBC rejected efforts by the City to put together a viable financial package to

14   renovate KeyArena with equal commitments of investment from the new owners and the

15   City. The City's complaint goes on to state that the new owners rejected requests from

16   local selling owners and other local partners to join the Sonics ownership. Further, the City

17   alleges that the new owner's intent to move the team was acknowledged by Aubrey

18   McClendon, a minority owner of PBC, who stated that "[w]e didn't buy the team to keep it

19   in Seattle, we hoped to come [to Oklahoma City]."

20       As a result of PBC's failed attempts to build an arena for the Sonics in the Greater

21   Seattle area, PBC filed a Demand for Arbitration with the American Arbitration Association

22   on September 21, 2007 (Dkt. #2, Exhibit B at p. 91). In its demand, PBC indicated that

23   KeyArena was no longer a financially viable option for PBC, citing losses of $17 million

24   from 2006 to 2007. *Id.* PBC also argued that they had the right to leave KeyArena after

25   the 2007-2008 season so long as they honored their financial commitment to the City. *Id.*

26       Three days later, on September 24, 2007, the City filed this lawsuit in King County

27   Superior Court. The City's complaint seeks: (1) a declaratory judgment that Article II is

28

MEMORANDUM ORDER

PAGE - 4

1   enforceable through a specific performance clause of the Lease; and (2) an order from the

2   Court directing that disputes relating to Article II of the lease are not subject to arbitration.

3   PBC subsequently filed a motion to stay the litigation, arguing that the Lease compelled the

4   parties to enter into arbitration.  The City filed a cross-motion opposing PBC's motion to

5   stay, reiterating its argument that the Court should issue an order preventing the dispute

6   from entering arbitration.  After the motions were fully briefed, PBC removed the case to

7   this Court on October 9, 2007.  The City did not oppose removal.

8              **B.  Washington Law Governing Arbitrability**

9              In applying Washington law to determine whether two parties agreed to arbitrate a

10  particular dispute, courts consider four guiding principles: (1) the duty to arbitrate arises

11  from the contract; (2) a question of arbitrability is a judicial question unless the parties

12  clearly provide otherwise; (3) a court should not reach the underlying merits of the

13  controversy when determining arbitrability; and (4) as a matter of policy, courts favor

14  arbitration of disputes.  *See Stein v. Geonerco, Inc*., 105 Wash. App. 41, 45-46, 17 P.3d

15  1266 (2001) (citations omitted).  It is well-established that a strong public policy favoring

16  arbitration exists under Washington law in order "to avoid the formalities, the expense, and

17  the delays of the court system."  *Perez v. Mid-Century Ins. Co.*, 85 Wash. App. 760, 765,

18  934 P.2d 731 (1997) (citing *Barnett v. Hicks*, 119 Wash. 2d 151, 160, 829 P.2d 1087

19  (1992)).  Relatedly, Washington law also favors arbitration when the contract is ambiguous.

20  *See, e.g., Kamaya Co. v. American Prop. Consultants, Ltd.*, 91 Wash. App. 703, 714, 959

21  P.2d 1140 (1998) (holding that a contractual dispute is arbitrable "unless it can be said with

22  positive assurance that the arbitration clause is not susceptible of an interpretation that

23  covers the asserted dispute").

24             Notwithstanding the public policy referenced above, arbitration "should not be

25  invoked to resolve disputes that the *parties have not agreed to arbitrate*."  *King County v.*

26  *Boeing Co.*, 18 Wash. App. 595, 603, 570 P.2d 713 (1977) (emphasis added).  Whether an

27  arbitrator has the authority to address a dispute is wholly dependent upon the express terms

28

MEMORANDUM ORDER
PAGE - 5

of the agreement. *See Sullivan v. Great American Ins. Co.*, 23 Wash. App. 242, 246, 594
P.2d 454 (1979). Arbitration is a "matter of contract and a party cannot be required to
submit to arbitration any dispute which he has not agreed so to submit." *United Steel
Workers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347 (1960); *see
also Teamsters Local 315 v. Union Oil Co. of California*, 856 F.2d 1307, 1314 (9th Cir.
1988) (finding that evidence of a purpose to exclude a claim from arbitration rebuts the
presumption of arbitrability); *see also Building Materials and Constrs. Teamsters Local No.
216 v. Granite Rock Co.*, 851 F.2d 1190, 1195 (9th Cir. 1988) (holding that "[t]he parties . .
. decide whether and to what extent their disputes will be subject to binding arbitration").
Ultimately, the "first task of a court asked to compel arbitration of a dispute is to determine
whether parties agreed to arbitrate that dispute." *Mitsubishi Motors Corp. v. Soler
Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626, 105 S.Ct. 3346 (1985).

### 1. The Underlying Dispute Relates to Article II

In the instant case, the primary issue is whether Article II or Article XXVI under the
Lease controls the underlying dispute between the parties. If Article II controls, then it is
clear that the City is not compelled to proceed with arbitration under subsection A because
that provision expressly excludes any "claim, dispute, or matter in question [that] relates to
the provisions of Article II." The City argues that Article II is at the very "heart" of the
underlying dispute. Consequently, the City contends that the unambiguous language of
subsection A clearly excludes the underlying dispute from arbitration. On the other hand,
PBC argues that Article II does not control because there is no dispute over the language of
Article II. PBC concedes that the Lease requires the Sonics to play home games at
KeyArena through the 2009-2010 NBA season. Instead, PBC claims that by not playing in
KeyArena for the final two seasons pursuant to the Lease, they are in default and therefore
the "Default and Remedies Therefor" provisions of Article XXVI controls this dispute. As
a result, PBC argues that arbitration is mandatory because Article XXVI is not listed as a
specific carve-out that is to be excluded from arbitration under subsection A. PBC also

MEMORANDUM ORDER
PAGE - 6

1    argues that this Court should construe the exception clause in subsection A narrowly as

2    required by contract law.  Failing to do so, PBC suggests, would exclude almost all disputes

3    from arbitration because the entire agreement relates to the Sonics playing their home games

4    at KeyArena.

5         PBC's attempt to side-step Article II and shoot for Article XXVI is as errant as a

6    typical Shaquille O'Neal free throw.  PBC's arguments ignore the clear language of Article

7    II which states that PBC's "use and occupancy rights with respect to the Premises and the

8    Term of this Agreement *shall end on September 30, 2010*[.]"  (Dkt. #2, Exhibit B at p. 25)

9    (emphasis added).  Article II goes on to state that PBC "shall schedule and ensure that the

10   SuperSonics play all Home Games other than pre-season games exclusively in [KeyArena]

11   after the Use Commencement Date."  *Id.*  Based on this language, it cannot be any clearer

12   that the underlying dispute squarely revolves around the language of Article II.  Despite

13   PBC's claims to the contrary, PBC is the party who filed the initial arbitration demand and is

14   also the party seeking to break the terms of the Lease; terms that specifically compel PBC

15   under Article II to ensure the Sonics play in KeyArena through September 30, 2010.  The

16   City has subsequently initiated the instant litigation against PBC in an effort to enforce this

17   specific obligation under the Lease.  Indeed, Article II is titled "Term; Use Period," and the

18   underlying dispute fundamentally relates to whether the Sonics will fulfill the 15-year use

19   period the parties negotiated when the Lease was entered into.

20        This Court also finds no merit in PBC's contention that Article II "swallows"

21   subsection A.  PBC argues that under the City's interpretation, almost all disputes would

22   relate to Article II's requirement that the Sonics play their home games at KeyArena.  PBC

23   points to Articles VI, VII, and VIII to support this argument.  These Articles do not,

24   however, essentially relate to the Sonics' obligation to play in KeyArena through 2010 as

25   Article II does.  For example, Article VI, titled "Scheduling of Home Games Into Seattle

26   Center Coliseum," establishes the procedure for how the Sonics will schedule its home

27   games at KeyArena.  Article VII, titled "Premises Licensed For Use and Occupancy by SSI"

28

MEMORANDUM ORDER
PAGE - 7

grants PBC the exclusive right and license to full and unrestricted use and enjoyment of KeyArena. Lastly, Article VIII, titled "SSI Payments to the City" fixes the amount to which the City is entitled to under the Lease and the procedures by which payments are to be made. None of these Articles expressly governs the length of the Lease, which Article II clearly does both in terms of its title and the language contained therein. Contrary to PBC's arguments, Article II controls the underlying dispute.

Moreover, it is well established that words in a contract are to be given their ordinary, usual, and popular meaning unless the entirety of the agreement clearly demonstrates contrary intent. *Hearst Communications, Inc. v. Seattle Times Co.*, 154 Wash. 2d 493, 504, 115 P.3d 262 (2005) (citing *Universal/Land Constr. Co. v. City of Spokane*, 49 Wash. App. 634, 637, 745 P.2d 53 (1987)). Here, there is no indication in the Lease that the words "relate to" under Article II should be given anything short of their ordinary meaning. The current dispute between the parties arises out of PBC's intention to leave KeyArena before September 30, 2010. Thus, it is undeniably clear that this dispute is not only "related" to Article II, but it goes to the very "heart" of why the City has brought its complaint against PBC.

In addition, the declarations attached to both parties' moving papers also clearly indicate that both parties intended to exclude from arbitration any disputes relating to Article II. The declaration of Eric M. Rubin ("Rubin") submitted by PBC states: "[Subsection] A of the arbitration clause provides that 'all claims and disputes' between the parties shall be decided by binding arbitration. However, given the Sonics' concerns, certain 'carve-outs' were added [such as] Article II, Term; Use Period." (Dkt. #2, Exhibit G at p. 23). The declaration of Gordon B. Davidson submitted by the City also states: "Sometime between January 30, 1994 and February 2, 1994, the Lease's arbitration clause was rewritten to provide that disputes relating to *Article II*, III, IV, V and XIX are not subject to arbitration." (Dkt. #2, Exhibit E at p.5) (emphasis added). Thus, compelling arbitration in this case would be contrary to the parties' intent. A party cannot be required to submit to

MEMORANDUM ORDER
PAGE - 8

1    arbitration if it has not agreed to do so.  *See United Steel Workers*, 363 U.S. at 582.  This

2    Court finds that the underlying dispute relates to Article II and that this dispute is not

3    subject to arbitration pursuant to the specific agreement of the parties.

### 2.  Subsection D of Article XXV

5            PBC argues that regardless of whether the Court were to find that the express terms

6    of Article II were to control this dispute, the City is still not entitled to seek judicial relief

7    given the plain language of subsection D.  That specific provision, PBC contends, only

8    allows PBC to institute an action in court.  Alternatively, PBC argues that when subsection

9    A is read in conjunction with subsection D, an ambiguity is created, thereby compelling

10   arbitration pursuant to Washington law's strong public policy in favor of arbitration.

11           In interpreting a contract, "[t]he role of the court is to determine the mutual

12   intentions of the parties according to the reasonable meaning of their words and acts."

13   *Fisher Props. Inc. v. Arden-Mayfair, Inc.*, 106 Wash. 2d 826, 837, 726 P.2d 8 (1986)

14   (citing *Dwelley v. Chesterfield*, 88 Wash.2d 331, 560 P.2d 353 (1977)); *see also Berg v.

15   Hudesman*, 115 Wash.2d 657, 663, 801 P.2d 222 (1990) (finding that the cardinal rule with

16   which all interpretation begins is to ascertain the intention of the parties).  The intent of the

17   parties to a contract "may be discovered not only from the actual language of the

18   agreement, but also from 'viewing the contract as a whole, the subject matter and objective

19   of the contract, all circumstances surrounding the making of the contract, the subsequent

20   acts and conduct of the parties to the contract, and the reasonableness of respective

21   interpretations advocated by the parties.'" *Bort v. Parker*, 110 Wash. App. 561, 573, 42

22   P.2d 980 (2002) (citations omitted).  A court shall "not give effect to interpretations that

23   would render contract obligations illusory." *Taylor v. Shigaki*, 84 Wash. App. 723, 730,

24   930 P.2d 340 (1997) (citing *Kennewick Irrigation Dist. v. United States*, 880 F.2d 1018,

25   1032 (9th Cir. 1989)).

26           In the instant case, the only reasonable interpretation of subsection D, when viewing

27   the contract as a whole, is that its scope is limited to the arbitration clause of Article XXV.

28

MEMORANDUM ORDER
PAGE - 9

1    The drafting history of the Lease, which is not in dispute by either party, establishes that

2    subsection D was present in the initial draft of the Lease, and the specific carve-outs were

3    subsequently added in later drafts.  Therefore the clear intent of the parties with regard to

4    subsection D was that it was intended to apply only to matters which subsection A required

5    the parties to arbitrate.  It does not, as PBC suggests, apply to matters that were

6    subsequently carved-out of subsection A.  Furthermore, the purpose of subsection D was to

7    allow for PBC's predecessor-in-interest, SSI, to protect its interests when the Lease was

8    entered into.  The moving papers provided by PBC through Rubin's declaration support this

9    interpretation.  Rubin states that "the Sonics were concerned about the risks of entering into

10   a long-term lease for a facility that had not yet been designed, much less built.  Therefore,

11   the Sonics wanted to be able to seek prompt relief for certain issues, primarily those relating

12   to design and construction, and when occupancy would begin."  (Dkt. #2, Exhibit G at pp.

13   23-24).

14          Moreover, accepting PBC's interpretation of the Lease would provide the City with

15   no method in which to seek relief for any disputes relating to Article II, or any other matter

16   that was carved out from arbitration under subsection A.  This is an unreasonable

17   interpretation of the Lease given the placement of subsection D, which is embedded within

18   Article XXV.  While counsel for PBC stipulated in oral argument that the City can make its

19   demands for specific performance in arbitration, this Court cannot overlook the parties'

20   clear intention on the face of the contract.  The parties *unequivocally* excluded from

21   arbitration disputes relating to Article II.  Had the parties clearly intended that only PBC be

22   able to seek judicial relief for any disputes regarding the Lease, the parties would not have

23   placed such prominent language within the arbitration clause of their agreement.

24          In any event, there is no doubt that subsection A is unambiguous, even when read in

25   conjunction with subsection D.  As *Kamaya* indicates, a contractual dispute is arbitrable

26   unless it can be said with "positive assurance that the arbitration clause is not susceptible of

27   an interpretation that covers the asserted dispute."  91 Wash. App. at 714 (citations

28

MEMORANDUM ORDER
PAGE - 10

1    omitted).  Here, subsection D is silent on which disputes under the Lease are excluded from

2    arbitration, whereas subsection A is not.  The Supreme Court has clearly mandated that

3    courts should "not override the clear intent of the parties, or reach a result inconsistent with

4    the plain text of the contract, simply because the policy favoring arbitration is implicated."

5    *E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 294, 122 S.Ct. 754 (2002).  Subsection D

6    has no relevance to the fact that disputes relating to Article II were specifically intended by

7    the parties to be excluded from arbitration.

8                                    **III.  CONCLUSION**

9          The Court, having reviewed the parties' motions, the exhibits and declarations

10   attached thereto, and the remainder of the record, hereby finds and ORDERS:

11         (1)  Defendant's Motion to Stay (Dkt. #2, Exhibit B) is DENIED.

12         (2)  Plaintiff's Cross-Motion for Stay of Arbitration (Dkt. #2, Exhibit D) is

13   GRANTED.  The Court finds that the underlying dispute between the parties relates to

14   whether the Sonics are compelled to play all regular seasons home games in KeyArena until

15   September 30, 2010.  This dispute therefore relates to Article II of the Premises Use &

16   Occupancy Agreement.  The Court additionally finds that disputes relating to Article II are

17   excluded from arbitration.

18         (3) The Clerk shall forward a copy of this Order to all counsel of record.

19

20         DATED this 29  day of October, 2007.

21

22

23                                    RICARDO S. MARTINEZ
                                      UNITED STATES DISTRICT JUDGE

24

25

26

27

28

MEMORANDUM ORDER
PAGE - 11