# EXHIBIT G

Dockets.Justia.com



The Honorable Marsha J. Pechman

1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

9

10

CITY OF SEATTLE, a first-class charter city,　）

11                                        Plaintiff,　）    No. C07-1620MJP
                                              ）
12            v.                              ）    DECLARATION OF JAMES R. WEBB
                                              ）
13   THE PROFESSIONAL BASKETBALL CLUB,）
     LLC, an Oklahoma limited liability company,　）
14                                        ）
                                              ）
15                                        Defendant.　）
     _____）

16        James R. Webb declares as follows:

17        1.    I am counsel for The Professional Basketball Club ("PBC").  I have personal

18   knowledge of and am competent to testify to the matters stated herein.

19        2.    I have investigated and become familiar with the manner in which members of

20   PBC operate email.  A listing of those members is attached.

21        3.    PBC does not maintain or operate email accounts for its members.  Instead, each

22   member, or member of an LLC which is a member of PBC, maintains his or her own email.

23        4.    PBC has four members who each hold approximately a 20 percent share.  Two of

24   those four members are not individuals, but separate LLCs.  One of the LLCs is owned by Mr.

25   Bennett.  The other LLC consists of numerous trusts and individuals.  The third 20 percent owner

26   is Aubrey McClendon.  The final 20 percent owner, Mr. Ward, uses his company's email system

DECLARATION OF JAMES WEBB (C07-1620MJP) - 1

BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

1  exclusively. That company, SandRidge Energy, Inc., is a publicly-traded company with which

2  PBC has no legal or business relationship, and PBC has no right to access that company's IT

3  system. Everett Dobson's email resides within the server of his former employer, AT&T.

4  Likewise, the majority member of PBC member Cameron Hoops, LLC, is a revocable trust of

5  which Bill Cameron is the beneficiary. Mr. Cameron's email is owned by his company,

6  American Fidelity. Other smaller owners are themselves LLCs.

7      5.    Messrs. Bennett and McClendon each use an email account from their respective

8  companies (not PBC) for their email. They do not maintain or use separate personal email

9  accounts. Both of their company's systems are such that when they send or receive an email, it

10 is automatically "trapped" or stored in the company's server before it arrives at their desktop. As

11 a result, even if it is deleted or double-deleted at the desktop, a copy of the email remains in the

12 respective server.

13     I declare under penalty of perjury under the laws of the state of Washington that this

14 declaration is true and correct.

15     DATED at Seattle, Washington, this 8th day of February, 2008.

16

17                         _James R. Webb_____

18                         James R. Webb

19

20

21

22

23

24

25

26

DECLARATION OF JAMES WEBB (C07-1620MJP) - 2

BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

1

2

## CERTIFICATE OF SERVICE

I hereby certify that on the 8th day of February, 2008, I caused the foregoing document to be served on the following counsel:

### *VIA EMAIL*

Thomas A. Carr (thomas.carr@seattle.gov)
Seattle City Attorney
600 Fourth Avenue, 4th Floor
P.O. Box 94769
Seattle, WA 98124-4769


Slade Gorton (slade.gorton@klgates.com)
Paul J. Lawrence (paul.lawrence@klgates.com)
Jeffrey C. Johnson (jeff.johnson@klgates.com)
K&L Gates
925 4th Avenue, Suite 2900
Seattle, WA 98104

_____
Paul R. Taylor, WSBA #14851
Byrnes & Keller LLP
1000 Second Avenue, 38th Floor
Seattle, WA 98104
Telephone: (206) 622-2000
Facsimile: (206) 622-2522
bkeller@byrneskeller.com

DECLARATION OF JAMES WEBB (C07-1620MJP) - 3

## Schedule 1

### Owners

| | Indirect Ownership of PBC | Direct Ownership of PBC |
|---|---|---|
| **DP-OKCB, LLC** | | |
| Clayton I. Bennett | 19.23% | |
| Total DP-OKCB, LLC | | 19.23% |
| **HUNTINGTON, LLC**[1] | | |
| G. Jeffrey Records, Jr. | 3.28% | |
| Kathryn R. Ryan | 0.62% | |
| Martha E. Records | 1.10% | |
| KATHRYN C. RECORDS 1976 TRUST(George J Records, Trustee) | | |
| Kathryn R. Records (Ryan), beneficiary | 1.82% | |
| Total KATHRYN C. RECORDS 1976 TRUST | | 1.82% |
| G.J. RECORDS JR. 1976 TRUST (George J. Records, Trustee) | | |
| G.J. Records, Jr., beneficiary | 1.82% | |
| Total G.J. RECORDS, Jr. 1976 TRUST | | 1.82% |
| MARTHA E. RECORDS 1976 TRUST (George J. Records, Trustee) | | |
| Martha E. Records, beneficiary | 1.82% | |
| Total MARTHA E. RECORDS 1976 TRUST | | 1.82% |
| GEORGE J. & NANCY J. RECORDS 1990 IRREVOCABLE TRUST (Ellen Records Morgan, Trustee) | | |
| Kathryn R. Ryan, beneficiary | 0.21% | |
| G. Jeffrey Records, Jr., beneficiary | 0.21% | |
| Martha E. Records, beneficiary | 0.21% | |
| Total GEORGE J. & NANCY J. RECORDS 1990 IRREVOCABLE TRUST | | 0.63% |
| THE RYAN FAMILY SECURITY TRUST (G.J. Records Jr., Trustee) | | |
| Ryan Minor Child #1, beneficiary | 0.58% | |
| Ryan Minor Child # 2, beneficiary | 0.58% | |
| Ryan Minor Child #3, beneficiary | 0.58% | |
| Total THE RYAN FAMILY SECURITY TRUST | | 1.75% |
| MARTHA RECORDS FAMILY 1997 GST EXEMPTION TRUST (G.J. Records Jr., Trustee) | | |
| Records - Renaldi Minor Child #1, beneficiary | 0.42% | |
| Records - Renaldi Minor Child #2, beneficiary | 0.42% | |

---

[1] Each of the equity owners of an intermediate entity owns a percentage of that intermediate entity that is in proportion to that equity owner's indirect ownership of PBC. For example, G. Jeffrey Records, Jr., as an individual (and not as a beneficiary), is attributed 3.28% of the ownership interests of PBC. Because Huntington, LLC directly owns 19.23% of the ownership interests of PBC, one can calculate Mr. Records' ownership of Huntington, LLC as 3.28% divided by 19.23% (3.28%/19.23% = 17.05%).

Records - Renaldi Minor Child #3, beneficiary | 0.42% |
Total MARTHA RECORDS FAMILY 1997 GST EXEMPTION TRUST | 1.27%

G. JEFFREY RECORDS, JR. 2003 FAMILY TRUST (GJR) (G.J. Records, Jr. & Ellen R. Morgan, Co-trustees)

G. J. Records, Jr., beneficiary | 1.74%
Total G. JEFFREY RECORDS, JR. 2003 FAMILY TRUST (GJR) | 1.74%

G. JEFFREY RECORDS, JR. 2003 FAMILY TRUST (NJR) (G.J. Records, Jr. & Ellen R. Morgan, Co-trustees)

G. J. Records, Jr., beneficiary | 1.56%
Total G. JEFFREY RECORDS, JR. 2003 FAMILY TRUST (NJR) | 1.56%

G. JEFFREY RECORDS, JR. 2004 FAMILY TRUST (KRR) (G.J. Records, Jr. & Ellen R. Morgan, Co-trustees)

G. J. Records, Jr., beneficiary | 0.91%
Total G. JEFFREY RECORDS, JR. 2004 FAMILY TRUST (KRR) | 0.91%

G. JEFFREY RECORDS, JR. 2004 FAMILY TRUST (MER) (G.J. Records, Jr. & Ellen R. Morgan, Co-trustees)

G. J. Records, Jr., beneficiary | 0.91%
Total G. JEFFREY RECORDS, JR. 2004 FAMILY TRUST (MER) | 0.91%

Total HUNTINGTON, LLC | | 19.23%

**Aubrey K. McClendon** | | 19.23%

**Tom L. Ward** | | 19.23%

**CAMERON HOOPS, LLC**[1]

WILLIAM M. CAMERON REVOCABLE TRUST U/T/A DATED AUGUST 30, 2004 (William M. Cameron, Trustee)

William M. Cameron, beneficiary | 5.77%
Total WILLIAM M. CAMERON REVOCABLE TRUST U/T/A DATED AUGUST 30, 2004 | 5.77%

LYNDA L. CAMERON REVOCABLE TRUST U/T/A DATED DECEMBER 22, 2004 (Lynda L. Cameron, Trustee)

Lynda L. Cameron, beneficiary | 1.92%
Total LYNDA L. CAMERON REVOCABLE TRUST U/T/A DATED DECEMBER 22, 2004 | 1.92%

Total CAMERON HOOPS, LLC | | 7.69%

**Everett R. Dobson** | | 3.85%

**TRIPLE DOUBLE, LLC**[1]

Domer Scaramucci, Jr. | 1.925%
Janis Scaramucci | 1.925%
Total TRIPLE DOUBLE, LLC | | 3.85%

**Robert E. Howard II** | | 7.69%

| | | 100.00%

# EXHIBIT H

# THE PROFESSIONAL BASKETBALL CLUB, LLC

## AMENDED AND RESTATED OPERATING AGREEMENT

**DATED EFFECTIVE
OCTOBER 27, 2006**

THE UNITS REPRESENTED BY THIS AMENDED AND RESTATED OPERATING AGREEMENT HAVE NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES LAWS OF THE STATE OF OKLAHOMA OR SIMILAR LAWS OF OTHER STATES IN RELIANCE UPON EXEMPTIONS UNDER THOSE LAWS. THE UNITS MAY NOT BE SOLD, ASSIGNED, PLEDGED OR OTHERWISE DISPOSED OF OR HYPOTHECATED AT ANY TIME WITHOUT EFFECTIVE REGISTRATION UNDER SUCH ACT AND LAWS OR EXEMPTION THEREFROM, IN COMPLIANCE WITH THE OTHER SUBSTANTIAL RESTRICTIONS ON TRANSFERABILITY SET FORTH HEREIN.

# TABLE OF CONTENTS

**ARTICLE I. DEFINITIONS**.........................................................................1
    Section 1.1    Certain Definitions..............................................................1
    Section 1.2    Interpretation.....................................................................1

**ARTICLE II. ORGANIZATION** ...............................................................2
    Section 2.1    Formation; Effective Date ....................................................2
    Section 2.2    Name..................................................................................2
    Section 2.3    Registered Office; Registered Agent .....................................2
    Section 2.4    Principal Office; Other Offices.............................................2
    Section 2.5    Purpose ..............................................................................2
    Section 2.6    Foreign Qualification .........................................................2
    Section 2.7    Term..................................................................................2
    Section 2.8    No State-Law Partnership ...................................................3
    Section 2.9    Partnership Tax Characterization .........................................3

**ARTICLE III. CAPITALIZATION**...........................................................3
    Section 3.1    Initial Classes of Units.......................................................3
    Section 3.2    Initial Offering of Common Units ........................................3
    Section 3.3    Options; Issuance of Equity Participation Units.....................3
    Section 3.4    Authorization and Issuance of Additional Units ....................5
    Section 3.5    Pre-Emptive Rights.............................................................5
    Section 3.6    Operating Advances............................................................6
    Section 3.7    No Pledge of Units.............................................................7
    Section 3.8    No Certification .................................................................7
    Section 3.9    Liability to Third Parties.....................................................7
    Section 3.10   Lack of Authority ..............................................................7
    Section 3.11   Withdrawal .......................................................................7
    Section 3.12   Negative Capital Accounts ..................................................7

**ARTICLE IV. CAPITAL CONTRIBUTIONS** .........................................7
    Section 4.1    Capital Contributions.........................................................7
    Section 4.2    Failure to Contribute..........................................................8
    Section 4.3    Return of Contributions ......................................................9
    Section 4.4    Capital Account.................................................................9
    Section 4.5    Approved Budget................................................................9

**ARTICLE V. ALLOCATIONS AND DISTRIBUTIONS**.........................10
    Section 5.1    Allocations of Net Income.................................................10
    Section 5.2    Allocations of Net Losses..................................................11
    Section 5.3    Loss Limitations ...............................................................11
    Section 5.4    Special Allocations............................................................11
    Section 5.5    Code Section 704(c) Allocations. ........................................13
    Section 5.6    Other Allocation Rules. .....................................................13
    Section 5.7    Ordinary Distributions Determined by Controlling Member ...13
    Section 5.8    Ordinary Distributions on Pro Rata Basis .............................13

Section 5.9    Tax Distributions. ....................................................................... 14
Section 5.10   Distribution Limitations ............................................................. 14
Section 5.11   Withholding .................................................................................. 15

**ARTICLE VI. MANAGEMENT** ............................................................................ 15
Section 6.1    Appointment and Removal of Controlling Member........................ 15
Section 6.2    Composition of Board.................................................................... 16
Section 6.3    Meetings of the Board. .................................................................. 16
Section 6.4    Action by Managers Without a Meeting ........................................ 17
Section 6.5    Expenses; Compensation ............................................................... 17
Section 6.6    Authority of Controlling Member; Limitations. ............................ 17
Section 6.7    Delegation of Duties to Committees................................................ 20
Section 6.8    Obligations and Authority of Managers ........................................ 20
Section 6.9    Conflicts of Interest ...................................................................... 20
Section 6.10   Related Party Transactions .......................................................... 20

**ARTICLE VII. OFFICERS** .................................................................................... 20
Section 7.1    Officers ......................................................................................... 20
Section 7.2    Term of Office; Removal; Vacancies ............................................. 21
Section 7.3    Additional Powers and Duties ...................................................... 21

**ARTICLE VIII. RIGHTS AND OBLIGATIONS OF MEMBERS** ........................ 21
Section 8.1    Voting Rights of Members ............................................................ 21
Section 8.2    No Participation in Management ................................................... 21
Section 8.3    Limited Liability ........................................................................... 21
Section 8.4    Meetings of Members. ................................................................... 22
Section 8.5    Action by Members Without a Meeting ......................................... 22

**ARTICLE IX. INDEMNIFICATION** ..................................................................... 23
Section 9.1    Limitation on Liability .................................................................. 23
Section 9.2    Indemnification. ........................................................................... 23
Section 9.3    Advancement of Expenses............................................................. 23

**ARTICLE X. TAX MATTERS** .............................................................................. 24
Section 10.1   Tax Returns. ................................................................................. 24
Section 10.2   Tax Elections. ............................................................................... 24
Section 10.3   Tax Matters Partner ..................................................................... 24

**ARTICLE XI. BOOKS, RECORDS, REPORTS, AND BANK ACCOUNTS** ........ 24
Section 11.1   Books and Records. ....................................................................... 24
Section 11.2   Capital Accounts and Taxable Year .............................................. 25
Section 11.3   Financial Statements ..................................................................... 25
Section 11.4   Reports. ......................................................................................... 25
Section 11.5   Information .................................................................................... 25
Section 11.6   Bank Accounts............................................................................... 26

**ARTICLE XII. TRANSFER RESTRICTIONS; BANKRUPTCY OF A MEMBER** ..........26
    Section 12.1    General Prohibition; Permitted Transfers; NBA Approval. .............................26
    Section 12.2    Indirect Dispositions ....................................................................................27
    Section 12.3    Right of First Offer. .....................................................................................27
    Section 12.4    Tag-Along Right ...........................................................................................27
    Section 12.5    Drag-Along Right .........................................................................................28
    Section 12.6    Violation of NBA Rules ...............................................................................28
    Section 12.7    Assignees and Substitute Members. .............................................................28
    Section 12.8    Bankrupt Members ......................................................................................29

**ARTICLE XIII. DISSOLUTION, LIQUIDATION, AND TERMINATION** .......................30
    Section 13.1    Events of Dissolution....................................................................................30
    Section 13.2    Effect of Dissolution ....................................................................................30
    Section 13.3    Distributions Upon Liquidation ....................................................................30

**ARTICLE XIV. MISCELLANEOUS** .............................................................................31
    Section 14.1    Notices .........................................................................................................31
    Section 14.2    Successors and Assigns ................................................................................31
    Section 14.3    No Waiver ....................................................................................................32
    Section 14.4    Signatures ....................................................................................................32
    Section 14.5    Amendment to Agreements. .........................................................................32
    Section 14.6    Counterparts ................................................................................................33
    Section 14.7    Applicable Law.............................................................................................33
    Section 14.8    Entire Agreement; No Third Party Beneficiaries .........................................33
    Section 14.9    Attorney's Fees ...........................................................................................33
    Section 14.10   Severability ..................................................................................................33
    Section 14.11   Special Enforcement Rights .........................................................................33

# AMENDED AND RESTATED OPERATING AGREEMENT OF THE PROFESSIONAL BASKETBALL CLUB, LLC

This AMENDED AND RESTATED OPERATING AGREEMENT (this "Agreement") of THE PROFESSIONAL BASKETBALL CLUB, LLC (the "Company"), dated as of October 27, 2006, is made by and among the parties listed on Annex A attached hereto and those other Persons who become Members of the Company from time to time, as hereinafter provided.

## RECITALS:

WHEREAS, the Company has heretofore been formed as a limited liability company under the Oklahoma Limited Liability Company Act (the "Act") pursuant to a Certificate of Formation (the "Certificate") filed in the office of the Secretary of State of the State of Oklahoma on July 14, 2006, and an Operating Agreement dated as of July 14, 2006 (the "Original Agreement");

WHEREAS, the Members of the Company now desire to admit certain other Persons (as defined below) as Members and, in connection therewith, to amend and restate the Original Agreement in order to reflect such admission and to further provide for the rights and obligations of the Members.

NOW, THEREFORE, the Original Agreement is hereby amended and restated in its entirety as follows:

## ARTICLE I.
## DEFINITIONS

Section 1.1    Certain Definitions.    Unless the context otherwise specifies or requires, capitalized terms used herein shall have the respective meanings assigned thereto in Annex B, attached hereto and incorporated herein by reference, for all purposes of this Agreement.

Section 1.2    Interpretation.

(a)    Reference to a given Section, clause, Exhibit or Schedule is a reference to a Section, clause, Exhibit or Schedule of this Agreement, unless otherwise specified. The terms "hereof," "herein," "hereto," "hereunder" and "herewith" refer to this Agreement as a whole unless the context otherwise requires.

(b)    Except where otherwise expressly provided or unless the context otherwise necessarily requires: (i) references to a given law or rule are references to that law or rule as amended or modified as of the date on which the reference is made, (ii) reference to a given agreement or instrument is a reference to that agreement or instrument as originally executed, and as modified, amended, supplemented and restated through the date as of which reference is made to that agreement or instrument, and (iii) accounting terms have the meanings given to them by U.S. generally accepted accounting principles applied on a consistent basis by

the accounting entity to which they refer.

(c)     The singular includes the plural and the masculine includes the feminine and neuter, and vice versa. "Includes" or "including" means "including, without limitation."

## ARTICLE II.
## ORGANIZATION

Section 2.1    <u>Formation; Effective Date</u>.  The Company was organized as an Oklahoma limited liability company on July 14, 2006 pursuant to the Act and by the filing of the Certificate with the Office of the Secretary of State of the State of Oklahoma under and pursuant to the Act.

Section 2.2    <u>Name</u>.  The name of the Company is "The Professional Basketball Club, LLC," and all Company business must be conducted in that name or such other names that comply with applicable law as the Controlling Member may select from time to time.

Section 2.3    <u>Registered Office; Registered Agent</u>.  The registered agent of the Company to accept service of process is Frank D. Hill. The registered office of the Company required by the Act to be maintained in the State of Oklahoma and the address of the registered agent shall be c/o McAfee & Taft A Professional Corporation, Two Leadership Square, 211 N. Robinson, 10th Floor, Oklahoma City, Oklahoma  73102 or such other agent or office (which need not be a place of business of the Company) as the Controlling Member may designate from time to time in the manner provided by law.

Section 2.4    <u>Principal Office; Other Offices</u>.  The principal office of the Company shall be at such place as the Controlling Member may designate from time to time. The Company may have such other offices as the Controlling Member may designate from time to time.

Section 2.5    <u>Purpose</u>.  The character of the business and the purpose of the Company are (a) to operate, manage, exploit and otherwise conduct the business of the SuperSonics and the Storm and their related businesses and activities, including, without limitation, businesses and activities that are (i) generally related to the National Basketball Association or the Women's National Basketball Association, (ii) customarily conducted by professional basketball teams participating in the National Basketball Association or the Women's National Basketball Association and/or (iii) required to be conducted by the Company under NBA Regulations, and (b) to engage in such other businesses and to have such other purposes as may be necessary, incidental or convenient thereto as may be permitted by the Act.

Section 2.6    <u>Foreign Qualification</u>.  Prior to the Company conducting business in any jurisdiction other than the State of Oklahoma, the Controlling Member shall cause the Company to comply with all requirements necessary to qualify the Company as a foreign limited liability company in that jurisdiction if the nature of its business makes such qualification necessary. At the request of the Controlling Member, each Member shall execute, acknowledge, swear to and deliver all certificates and other instruments conforming with this Agreement that are necessary or appropriate to qualify, continue and terminate the Company as a foreign limited liability company in all such jurisdictions in which the Company may conduct business.

Section 2.7    <u>Term</u>.  The Company commenced on the date the Certificate was filed

with the Secretary of State of the State of Oklahoma and shall continue indefinitely unless and until terminated pursuant to Section 13.1.

Section 2.8    No State-Law Partnership.  The Members intend that the Company not be a partnership (including, without limitation, a limited partnership) or joint venture, and that no Member or Manager be a partner or joint venturer of any other Member or Manager, for any purposes other than Federal and, to the extent permitted, state and local tax purposes, and this Agreement shall not be construed to produce a contrary result.

Section 2.9    Partnership Tax Characterization.  It is the express intention of the Members that the Company be classified as a partnership for federal income taxation and not as an association taxable as a corporation. Neither the Controlling Member nor any other Member or Manager shall take any action inconsistent with such treatment. It is the further intention of the Members that this Agreement be interpreted and applied accordingly.

# ARTICLE III.
# CAPITALIZATION

Section 3.1    Initial Classes of Units.  The Board shall be authorized to create Units of one or more classes (each, a "Class") thereof having such relative rights, powers and duties as determined by the Board when such Classes are created. Initially, the Company shall have two Classes of Units: Common Units and Equity Participation Units. The holders of each Class of Units shall be entitled to the rights and powers, subject to the duties set forth herein, ascribed to such Class. Any holder of more than one Class of Units shall have separate rights under this Agreement with respect to each Class of Unit held by such Member. For example, a holder of both Common Units and Equity Participation Units shall be referred to and shall be treated separately in such Member's separate capacities as a Common Member and Equity Participation Member.

Section 3.2    Initial Offering of Common Units.  The Controlling Member, on behalf of the Company, is authorized to (a) offer and sell up to 300,000,000 Common Units in one or more separate closings in exchange for Capital Contributions of at least $1.00 per Common Unit and (b) admit the subscribers therefor to the Company as Common Members. Each Common Member's Capital Commitment, initial Capital Contribution and the number of Common Units acquired by such Member shall be set forth in Annex A, as such schedule may be amended from time to time. The Capital Commitments and each Common Member becoming a Member shall be conditioned upon Associational Approvals and the subscriber agreeing to accept all of the terms and provisions of this Agreement and shall be subject to the terms and conditions of the applicable subscription agreement entered into between the Company and each Common Member. Funding of the Capital Contributions of each Common Member shall be as provided in Section 4.1 hereof.

Section 3.3    Options; Issuance of Equity Participation Units.

(a)    Subject to compliance with applicable federal and state securities laws, as an incentive to key employees, Officers, advisors, contractors and consultants of the Company and its Affiliates, the Board is authorized to issue to such parties up to 30,000,000 Equity

Participation Units or options to acquire Common Units ("Options") and, upon the issuance of such Equity Participation Units or Common Units upon exercise of any Options, admit the holders thereof as Members of the Company, subject to the following provisions: (i) the Board is authorized to grant such Equity Participation Units or Options at such times and in such amounts (up to an aggregate of 30,000,000 Units) as determined by the Board in its sole discretion; (ii) the purchase price or exercise price, as the case may be, shall be determined by the Board; (iii) neither the sale of Equity Participation Units nor the grant nor the exercise of Options need result in the revaluation or adjustment of Capital Accounts of the other Members, unless such revaluation or adjustment is determined by the Board, in its good faith and reasonable discretion, to be necessary to avoid material adverse economic consequences to such other Members; (iv) the sale of Equity Participation Units and the exercise of Options may be subject to vesting arrangements as determined by the Board; (v) the sale of Equity Participation Units and the exercise of the Options is conditioned upon the purchaser or optionee agreeing to accept all the terms and provisions of this Agreement, as amended as of the date of exercise; and (vi) any applicable Associational Approvals.

(b)     The Company is authorized to enter into agreements with the individuals to whom it grants Equity Participation Units and Options providing for the terms, conditions, restrictions and provisions thereof, including vesting of such Equity Participation Units and Options and granting the Company the right and option to reacquire such Equity Participation Units and Options under certain circumstances on such terms and conditions as the Board shall determine. Any Equity Participation Units or Options reacquired by the Company pursuant to such agreements or otherwise may be regranted by the Company in the same form of security and subject to the applicable provisions of this Section 3.3 to other key employees, Officers, advisors, contractors and consultants of the Company or its Affiliates from time to time for such consideration, if any, as the Board shall deem appropriate, and on such other terms and conditions as the Board shall deem appropriate.

(c)     On the date of each grant of Equity Participation Units, the Board may establish an initial "Participation Threshold" amount with respect to such Equity Participation Units and to provide that Equity Participation Members shall not be entitled to participate in allocations or distributions by the Company until such Participation Threshold has been met. Unless otherwise determined by the Board, the Participation Threshold with respect to such Equity Participation Units shall be equal to or greater than the amount that would be distributed with respect to all Units in a hypothetical transaction in which the Company sold all of its assets for fair market value and distributed the proceeds therefrom in liquidation of the Company pursuant to Section 13.3 (as determined immediately prior to the issuance of such Equity Participation Units). In the alternative, an Equity Participation Unit's Participation Threshold may be stated in terms of an internal rate of return hurdle ("IRR Hurdle") that must be satisfied with respect to Units in the Company held by one or more Members before such Equity Participation Unit is entitled to participate in allocations and distributions pursuant to Article V. The Board may designate a series number for each subset of Equity Participation Units consisting of Equity Participation Units having the same Participation Threshold, which Participation Threshold may differ from the Participation Thresholds of all Equity Participation Units not included in such subset.

A Participation Threshold of Equity Participation Units granted to any

Unitholder that is not stated in terms of an IRR Hurdle shall be adjusted after the grant of such Equity Participation Units in the following manner: (i) in the event of any distribution pursuant to Section 5.8, or any redemption or repurchase of Units by the Company (to the extent attributable to the redeemed or repurchased Units' entitlement to distributions pursuant to Section 5.8), the Participation Threshold of such Equity Participation Units outstanding at the time of such distribution, redemption, or repurchase shall be reduced (but not below zero) by the aggregate amount of such distribution that is made pursuant to Section 5.8, or the portion of which is attributable to the redeemed or repurchased Units' entitlement to distributions pursuant to Section 5.8, as applicable and (ii) increased by the amount of any Capital Contributions made after such grant.

Section 3.4    Authorization and Issuance of Additional Units. Upon the approval of the Board, or, in the case of additional Capital Contributions pursuant to Section 4.1, the Controlling Member, additional Common Units or additional Classes of Units having different rights, powers and duties as determined by the Board may be created and issued to existing Members or to third parties on such terms and conditions as the Board may determine. The terms of admission or issuance must specify the Class of Units and the Capital Contribution or Capital Commitment per Unit applicable thereto. The Board shall reflect the creation of any new Class in an amendment to this Agreement indicating the different rights, powers, and duties of such Class. The admission of additional Members and the issuance of additional Units shall be conditioned upon Associational Approvals and the additional Member agreeing to accept all of the terms and provisions of this Agreement and shall be subject to the terms and conditions of the applicable subscription agreement entered into between the Company and each such Member.

Section 3.5    Pre-Emptive Rights.

(a)    If at any time the Company proposes to issue any equity securities, other than equity securities described in Section 3.5(c) below, the Company shall first offer, in a written notice to each Common Member, to sell to each Common Member its Pro Rata Share of the proposed issue of such equity securities, at the same price and on the same terms at which the Company proposes to sell such issue to other Persons.

(b)    The Company's offer shall describe the equity securities proposed to be issued by the Company, specifying the quantity, the price and payment terms; provided, however, that in no event shall payment for the offered equity securities be required prior to 30 days after notice is provided pursuant to Section 3.5(a). No later than 10 Business Days after the notice required by Section 3.5(a) has been given by the Board to the Members, each of the Members shall advise the Board in writing whether such Member wishes to acquire all or any portion of its Pro Rata Share of the additional equity securities offered by the Company; provided, however, if the proposed issuance includes more than one type or class of securities in connection with such issuance and such types or classes of securities are being offered as a combined unit of issuance, each Member participating in such issuance shall be required to acquire such Member's pro rata portion of each such type and class of securities. The Board shall promptly notify the Members that have elected to acquire their entire Pro Rata Share of the additional equity securities whether any additional equity securities are available because they are not being acquired by the other Members and, within 5 Business Days after such notice is given, each of the Members receiving such notice may elect in writing, on such basis as they

agree or, in the absence of an agreement, in proportion to the percentage of total Units then outstanding owned by such Members, to acquire such remaining offered equity securities. To the extent that the Members do not commit, within 5 Business Days after the notice required by preceding sentence is given to such Members, to acquire all of the offered equity securities, the Board may, without further notice to or approval from any of the Members, offer the Units not subscribed for by one or more of the Members to third parties on the terms and conditions set forth in the notice provided in <u>Section 3.5(a)</u> and admit such third parties as new Members subject to the terms and conditions of such notice. The purchase by any Member of additional equity securities and the admission of any new Member may be subject to Associational Approval. In the event that the Board determines it necessary to materially change any of the terms and conditions pursuant to which equity securities are offered, the Board shall first re-offer such securities to the existing Members by notifying the Members of the changed terms and conditions of the offer and giving them the same rights to acquire the equity securities in accordance with the above procedure under such changed terms and conditions. Thereafter, to the extent the equity securities are not subscribed for by the Members, such securities, on the new terms and conditions, may be offered to third parties.

(c)     The rights of Members under this <u>Section 3.5</u> shall not apply to: (i) the issuance or sale of up to 300,000,000 Common Units by the Controlling Member pursuant to <u>Section 3.2;</u> (ii) the issuance or sale of up to 30,000,000 Equity Participation Units or Options pursuant to <u>Section 3.3</u>; or (iii) any other issuance or sale of Units if a waiver of such pre-emptive rights has been approved by the Required Member Interest.

Section 3.6     <u>Operating Advances</u>.

(a)     The Board may, from time to time and without any further approval of the Members, borrow funds from the Members by and on behalf of the Company (the "<u>Operating Advances</u>") in accordance with the terms of this <u>Section 3.6</u>. For the avoidance of doubt, no provision of this Agreement shall be interpreted to require the Board to seek Operating Advances from all the Members prior to obtaining other forms of financing, including, without limitation, loans from third parties or any Member or group of Members and additional equity issuances.

(b)     Once the Board determines that Operating Advances are needed for the Company's business, the Board may provide all Members notice of the need for such Operating Advances, which notice shall state: (i) the aggregate amount of the Operating Advances being requested by the Board; (ii) the reason for the Operating Advances and a statement itemizing the proposed application of the Operating Advances; (iii) that the Operating Advances will bear interest at the Prime Rate on the date of each Advance; (iv) that the Company will not make any distributions to the Members (other than Tax Distributions) until all due and outstanding principal and interest on the Operating Advances has been paid in full; (v) the other terms and conditions on which the Company is prepared to borrow the Operating Advances, which terms and conditions shall be established by the Board; (vi) that each of the Members shall have the right to lend its Pro Rata Share of Operating Advances pursuant to this <u>Section 3.6</u>; and (vii) the date the Operating Advances are due to the Company, which date shall not be less than 20 days after the request notice is mailed or delivered to the Members.

(c)     No later than 10 days after the notice required by <u>Section 3.6(b)</u> has

been given by the Board to the Members, each of the Members shall advise the Board in writing whether it wishes to lend its Pro Rata Share of the Operating Advances. The Board shall promptly notify the other Members in writing of the total amount of the Operating Advances that will not be satisfied by Members and, within 5 days after such notice is given, each of the other Members may elect, on such basis as they agree, or in the absence of an agreement in proportion to the percentage of outstanding Common Units owned by each Member, to lend in part or in whole the remaining funds needed to make available to the Company the total amount requested by the Board.

Section 3.7    No Pledge of Units.  Notwithstanding anything herein to the contrary, no Member may pledge, or grant a security interest, lien or other encumbrance or restriction in, the Units without the prior written consent of the Company and any attempted pledge, grant, encumbrance or restriction in violation of this provision shall be considered a Deemed Disposition subject to the provisions of Article XII; provided that, notwithstanding the foregoing, any Member may grant a negative pledge with respect to the Units to the extent that such a pledge does not cause the underlying indebtedness incurred by such Member to be considered indebtedness of the Company pursuant to the NBA Regulations and provides to the Controlling Member such evidence and assurances as the Controlling Member may reasonably require.

Section 3.8    No Certification.  No Unit in the Company shall be represented by a separate certificate.

Section 3.9    Liability to Third Parties.  Except as to any obligation it may have under the Act to repay funds that may have been wrongfully distributed to it, neither the Controlling Member nor any other Member or Manager shall be liable for the debts, obligations or liabilities of the Company, including under a judgment decree or order of a court.

Section 3.10    Lack of Authority.  No Member (other than a Member who is, and who is acting in the capacity of, the Controlling Member, a Manager or an Officer) has the authority or power to act for or on behalf of the Company, to do any act that would be binding on the Company, or to incur any expenditures on behalf of the Company.

Section 3.11    Withdrawal.  A Member does not have the right to withdraw from the Company as a Member (except in connection with a Disposition of all of such Member's Units in accordance with this Agreement) and any attempt to violate the provisions hereof shall be void ab initio.

Section 3.12    Negative Capital Accounts.  No Member shall be required to pay to any other Member or the Company any deficit or negative balance which may exist from time to time in such Member's Capital Account (including upon and after dissolution of the Company).

# ARTICLE IV.
## CAPITAL CONTRIBUTIONS

Section 4.1    Capital Contributions.  Subject to the following, each Common Member agrees to make Capital Contributions in one or more separate installments when and as called by

7

the Controlling Member upon at least 10 Business Days' notice (a "Capital Call"). Each Capital Call will designate the total amount to be contributed and the price per Unit for the Units to be issued in exchange for such Capital Contributions. Each Capital Contribution by a Common Member shall be such Member's Pro Rata Share of the total amount of the Capital Contributions requested by the Controlling Member; provided, however, that, a Common Member shall not be obligated to contribute an amount that exceeds such Common Member's Capital Commitment as adjusted pursuant to Section 4.5. Each Capital Contribution shall be made by means of a certified or cashier's check or by wire transfer of funds to an account designated by the Controlling Member. Upon receipt of a Member's Capital Contribution, the corresponding Units as determined pursuant to the Capital Call will be issued to the Member.

Section 4.2    Failure to Contribute.    If a Common Member (a "Delinquent Member") does not contribute all or any portion of a Capital Contribution that such Member is required to make as provided in this Agreement within five Business Days following the due date set forth in the applicable Capital Call, then the Board may take one or more of the following actions with respect to the Delinquent Member:

(a)    One hundred percent (100%) of such Member's Units may be acquired by the Company for a purchase price equal to the lesser of (i) such Member's Capital Account balance or (ii) the fair market value of such Member's Units as determined in the sole discretion of the Board. Payment of the purchase price for such Units shall be made without interest and need only be made by the Company from distributions that would otherwise have been made by the Company to such Member with respect to the acquired Units had such Member not defaulted on its Capital Commitment. Upon such purchase, such Delinquent Member shall no longer be a Member of the Company, and its forfeited Units shall no longer be outstanding.

(b)    The Board may cause the Company to commence legal proceedings against the Delinquent Member to collect the due and unpaid Capital Contribution plus interest at an annual rate equal to the lesser of (i) 18% or (ii) the highest rate permitted by law, compounded daily, as well as the expenses of collection including, without limitation, reasonable attorneys fees. Amounts collected in excess of the Delinquent Member's due and unpaid Capital Contribution shall be deemed for purposes of this Agreement to be income of or a reimbursement to the Company, as appropriate, and shall not be treated as a Capital Contribution by the Delinquent Member.

(c)    The Board may designate one or more Persons (with the prior consent of such Person or Persons) to assume responsibility for (i) the due and unpaid portion of the Delinquent Member's Capital Commitment or (ii) the entire portion of the Delinquent Member's Capital Commitment, and to assume and succeed to all of the rights of the Delinquent Member's interest in the Company attributable to such portion of the Delinquent Member's Capital Commitment.

(d)    The Board may cancel all or any portion of the Delinquent Member's Capital Commitment.

(e)    The Board may determine that up to 50% of the Units and associated Capital Account of the Delinquent Member shall be either forfeited and cancelled or assigned and distributed to the non-Defaulting Common Members on a pro rata basis; each Member

hereto appointing the Controlling Member as its attorney in fact to cause such transfers or cancellations.

Section 4.3    Return of Contributions.    A Member is not entitled to the return of any part of its Capital Contributions or to be paid interest in respect of either its Capital Account or its Capital Contributions. An unrepaid Capital Contribution is not a liability of the Company or of any Member. A Member is not required to contribute or to lend any cash or property to the Company to enable the Company to return any Member's Capital Contributions.

Section 4.4    Capital Account.    A Capital Account shall be established and maintained for each Member in accordance with the following provisions:

(a)    To each Member's Capital Account there shall be credited (i) the Capital Contributions of such Member, (ii) allocations to such Member of Net Income, (iii) any items in the nature of income or gain that are specially allocated to such Member pursuant to Article V, and (iv) the amount of any Company liabilities assumed by such Member or that are secured by any Company property distributed to such Member.

(b)    To each Member's Capital Account there shall be debited (i) the amount of cash and the Gross Asset Value of any property (other than cash) distributed to such Member by the Company, (ii) allocations to such Member of Net Losses, (iii) any items of deductions or losses that are specially allocated to such Member pursuant to Article V, and (iv) the amount of any liabilities of such Member assumed by the Company or that are secured by property contributed to the Company by such Member.

(c)    If the Board elects to adjust the Gross Asset Values of Company property upon the occurrence of certain events as permitted by this Agreement (consistent with the Regulations), the Board shall adjust the Capital Accounts of each Member to reflect such revaluation on the Company's books. The Capital Accounts shall be adjusted to reflect the manner in which the unrealized income, gain, loss or deduction inherent in such property would be allocated among the Members pursuant to the terms of this Agreement if there were a taxable disposition of such property for such Gross Asset Value on that date. Furthermore, the Board, in a manner consistent with Regulations Section 1.704-1(b)(2)(iv)(g), shall adjust the Capital Accounts as necessary to reflect any items of Net Income or Net Losses that are computed based on the Gross Asset Value of the Company property.

In the event any Units in the Company are Disposed of in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Units. The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Regulations Section 1.704-1(b), and shall be interpreted and applied in a manner consistent with such Regulations.

Section 4.5    Approved Budget.    On or before December 15 of each year, the Controlling Member shall prepare and submit to the Members for approval, a budget setting forth in sufficient detail the estimated operating receipts and expenditures for the next succeeding fiscal year. Such budget shall include the anticipated organizational structure of the

Company in reasonable detail to allow the review of the anticipated staffing levels of permanent and temporary employees and contractors by category of functions. The budget shall describe in separate categories those expenditures of an ongoing nature, those of a capital nature and those of a non-recurring or non-routine nature, along with anticipated dates that funds for the expenditures will be needed or available. Once the proposed budget has received approval of the Required Member Interest or the Controlling Member adopts the budget as provided below (such approved or adopted budget, an "Approved Budget"), the Controlling Member is authorized to make those expenditures and to incur those obligations provided for in the budget, and as otherwise provided in this Agreement. To the extent that an Approved Budget contemplates additional Capital Contributions being required (the "Additional Capital Contribution Projections"), the Capital Commitment of each Member listed on Annex A shall be accordingly increased such that each Member's Capital Commitment is increased by such Member's Pro Rata Share of the Additional Capital Contribution Projections. If a Required Member Interest of the Members has not approved of a proposed budget on or before the beginning of the next succeeding fiscal year, then the Controlling Member shall have the authority, in accordance with Section 6.6(a)(v), to adopt any annual capital or operating budget reasonably necessary to operate the SuperSonics and the Storm in a "first class" manner consistent with NBA Regulations and to satisfy all other obligations of the Company, which budget may include Additional Capital Contribution Projections. If the Controlling Member determines that an Approved Budget should be amended during a fiscal year for any reason, the Controlling Member shall submit such amendment to the Members for approval. If a Required Member Interest of the Members has not approved of such proposed amendment within ten days of the date on which such amendment was proposed, then the Controlling Member shall have the authority, in accordance with Section 6.6(a)(vi), to adopt any proposed amendment that contemplates a deviation from an Approved Budget (i) up to 10% in the aggregate in any fiscal year and/or to apply savings in some line items to excess costs in other line items or (ii) as otherwise reasonably necessary to operate the SuperSonics and the Storm in a "first class" manner consistent with NBA Regulations and to satisfy all other obligations of the Company, which amendment may include Additional Capital Contribution Projections. The term "Approved Budget" shall be deemed to include any amendments to an Approved Budget adopted by the Controlling Member pursuant to the preceding sentence. If during any fiscal year which an Approved Budget contemplates Additional Capital Call Projections and the actual Capital Calls made during such year are less than the Additional Capital Call Projections, the Capital Commitment of each Member will be accordingly reduced for such Member's Pro Rata Share of such difference, but may be increased based on subsequent Approved Budgets or as otherwise provided in this Agreement.

## ARTICLE V.
## ALLOCATIONS AND DISTRIBUTIONS

    Section 5.1    Allocations of Net Income. After giving effect to the special allocations pursuant to Section 5.4 and the limitation contained in Section 5.3, Net Income shall be allocated among the Members for each taxable year in the following order and preference:

        (a)    First, among all Members in proportion to and to the extent of the excess, if any, of (i) the cumulative amount of Net Losses allocated to each Member pursuant to

Section 5.2(c) for the current and all prior periods over (ii) the cumulative amount of Net Income allocated to such Member pursuant to this Section 5.1(a) for the current period and all prior periods;

(b)    Second, among all Members in proportion to and to the extent of the excess, if any, of (i) the cumulative amount of Net Losses allocated to each Member pursuant to Section 5.2(b) for the current and all prior periods over (ii) the cumulative amount of Net Income allocated to such Member pursuant to this Section 5.1(b) for the current period and all prior periods; and

(c)    Thereafter, among all Members based on their Pro Rata Share.

Section 5.2    Allocations of Net Losses.  After giving effect to the special allocations pursuant to Section 5.4 and the limitation contained in Section 5.3, Net Losses shall be allocated among the Members for each taxable year in the following order and preference:

(a)    First, among all Members in proportion to and to the extent of the excess, if any, of (i) the cumulative amount of Net Income allocated to each Member pursuant to Section 5.1(c) for the current and all prior periods over (ii) the cumulative amount of Net Losses allocated to such Member pursuant to this Section 5.2(a) for the current period and all prior periods;

(b)    Second, among all Members in proportion to their positive Capital Account balances until each Member's Capital Account is equal to zero; and

(c)    Thereafter, among all Members based on their Pro Rata Share.

Section 5.3    Loss Limitations.  Notwithstanding the allocation of Net Losses pursuant to Section 5.2, the amount of Net Losses allocated to any Member shall not exceed the maximum amount of Net Losses that can be so allocated without causing any Member to have or have an increase to an Adjusted Deficit at the end of any fiscal year. In the event some but not all of the Members would have Adjusted Deficits as a consequence of an allocation of Net Losses pursuant to Section 5.2, the limitation set forth in this Section 5.3 shall be applied on a Member-by-Member basis so as to allocate the maximum permissible Net Losses to each Member under Regulations Section 1.704-1(b)(2)(ii)(d). To the extent Net Losses are subject to the limitation contained in this Section 5.3 and reallocated to other Members, items of income or gain shall be allocated to such other Members to the extent and in reverse order of the Net Losses so reallocated for the purpose of offsetting the effect of this Section 5.3.

Section 5.4    Special Allocations.

(a)    Minimum Gain Chargeback.    Except as otherwise provided in Regulations Section 1.704-2(f), notwithstanding any other provision of this Article V, if there is a net decrease in Company Minimum Gain during any fiscal year, each Member shall be specially allocated items of Company income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Regulations Section 1.704-2(g). Allocations pursuant to the previous sentence shall be made in proportion to the respective

amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Regulations Sections 1.704-2(f)(6) and 1.704-2(j)(2). This <u>Section 5.4(a)</u> is intended to comply with the minimum gain chargeback requirement in Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

(b)    <u>Member Minimum Gain Chargeback</u>.    Except as otherwise provided in Regulations Section 1.704-2(i)(4), notwithstanding any other provision of this <u>Article V</u>, if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any fiscal year, each Member who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Regulations Section 1.704-2(i)(5), shall be specially allocated items of Company income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to such Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Regulations Section 1.704-2(i)(4). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Regulations Sections 1.704-2(i)(4) and 1.704-2(j)(2). This <u>Section 5.4(b)</u> is intended to comply with the minimum gain chargeback requirement in Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(c)    <u>Qualified Income Offset</u>.    In the event any Member unexpectedly receives any adjustments, allocations or distributions described in Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), items of Company income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Deficit of such Member as quickly as possible; <u>provided</u> that any allocation pursuant to this <u>Section 5.4(c)</u> shall be made only if and to the extent that such Member would have an Adjusted Deficit after all other allocations provided for in this <u>Article V</u> have been tentatively made as if this <u>Section 5.4(c)</u> were not in this Agreement.

(d)    <u>Nonrecourse Deductions</u>.    Nonrecourse Deductions for any taxable year of the Company shall be allocated to the Members on a Pro Rata Basis.

(e)    <u>Member Nonrecourse Deductions</u>.    Member Nonrecourse Deductions for any taxable year of the Company shall be allocated to the Member that made, or guaranteed or is otherwise liable with respect to, the loan to which such Member Nonrecourse Deductions are attributable in accordance with principles under Regulations Section 1.704-2(i).

(f)    <u>Curative Allocations</u>.    The allocations set forth in <u>Section 5.3</u> and <u>Section 5.4</u> are intended to comply with certain regulatory requirements under Code Section 704(b). The Members intend that, to the extent possible, all allocations made pursuant to such Sections will, over the term of the Company, be offset either with other allocations pursuant to <u>Section 5.4</u> or with special allocations of other items of Company income, gain, loss or deduction pursuant to this <u>Section 5.4(f)</u>. Accordingly, the Controlling Member is hereby authorized and directed to make offsetting allocations of Company income, gain, loss or deduction under this <u>Section 5.4(f)</u> in whatever manner the Controlling Member determines is appropriate so that, after such offsetting special allocations are made (and taking into account the reasonably

anticipated future allocations of income and gain that are likely to offset allocations previously made under Section 5.4), the Capital Accounts of the Members are, to the extent possible, equal to the Capital Accounts each would have if the provisions of Section 5.3 and Section 5.4 were not contained in this Agreement and all Company income, gain, loss and deduction were instead allocated in accordance with the provisions of Section 5.1 and Section 5.2.

Section 5.5    Code Section 704(c) Allocations.

(a)    Contributed Property.  In accordance with Code Section 704(c), income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall be allocated among the Members, solely for federal income tax purposes, so as to take account of any variation between the adjusted basis of the property to the Company for federal income tax purposes and the initial Gross Asset Value of the property as of the date of the Capital Contribution of the property to the Company in a manner consistent with Code Section 704(c) and Regulations Section 1.704-3(c).

(b)    Reverse 704(c) Allocations.  In the event that the Gross Asset Value of Company assets is adjusted pursuant to the terms of this Agreement, subsequent allocations of income, gain, loss and deduction with respect to such asset shall consistently take into account any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in a manner consistent with Code Section 704(c) and Regulations Section 1.704-3(c).

Section 5.6    Other Allocation Rules.

(a)    For purposes of determining the Net Income or Net Losses or any other items allocable to any period, Net Income, Net Losses or any other items shall be determined on a daily, monthly or other basis as determined by the Controlling Member using any permissible method under Code Section 706 and the Regulations thereunder.

(b)    The allocations of the Net Income and Net Losses and any items of income, gain, loss or deduction thereof pursuant to the terms of this Article V shall be made after taking into account all distributions to and Capital Contributions by the Members for the period to which such allocation relates.

Section 5.7    Ordinary Distributions Determined by Controlling Member.  Within 60 days after the end of each fiscal year, or such shorter fiscal period as may be selected by the Controlling Member, the Controlling Member shall review the financial results of the Company to determine whether the Company should make any distributions.  Before making distributions to the Members, the Company shall repay borrowings (including Operating Advances) then due and payable, and shall set aside such cash as may be necessary to cover the other liabilities and expenses and working capital and reserves that the Controlling Member deems reasonably necessary for proper operation of the business of the Company.

Section 5.8    Ordinary Distributions on Pro Rata Basis.  Any distributions by the Company, other than pursuant to Section 5.9, shall be distributed among the Members on a Pro Rata Basis, subject to the terms of any Class issued pursuant to Section 3.1.

Section 5.9    <u>Tax Distributions</u>.

(a)    The Controlling Member shall, to the extent of Cash Available for Tax Distributions, distribute to each Member in cash, no later than 90 days after the close of each taxable year, an amount of cash equal to the sum of the following:

(i)    The product of the Applicable Percentage (defined below) for such taxable year and such Member's allocated share of the Company's net long-term capital gain (as defined in Code Section 1222(7)) for such taxable year as shown on the Company's U.S. federal income tax return; and

(ii)    The product of the Applicable Percentage for such taxable year and such Member's allocated share of the Company's net ordinary income and net short-term capital gain (as defined in Code Section 1222(5)) for such taxable year as shown on the Company's U.S. federal income tax return, but excluding from the calculation thereof any items of Company expense that are subject to limited deductibility under Code Section 67.

(b)    The Applicable Percentage with respect to items of net long-term capital gain shall be the highest U.S. federal marginal income tax rate applicable to net long-term capital gains recognized by an individual, and the Applicable Percentage with respect to items of net ordinary income and net short-term capital gain shall be the highest marginal U.S. federal income tax rate applicable to ordinary income recognized by an individual. In all cases, the highest marginal income tax rate shall be the highest statutory rate applicable to the specific type of income or gain in question and shall be determined without regard to phase-outs of deductions or similar adjustments. The Controlling Member, acting in his or her reasonable discretion, may adjust the determination of Applicable Percentages pursuant to this <u>Section 5.9(b)</u>: (i) as necessary to ensure that the distribution required to be made to each Member pursuant to <u>Section 5.9(a)</u> for any taxable year is not less than such Member's actual federal and state income tax liability in respect of allocations to such Member by the Company for such taxable year or (ii) to reflect any state, local or city income tax to which any Member may be subject; <u>provided, however,</u> that the Applicable Percentage with regard to a particular type of income or gain shall in all events be the same percentage for all Members.

(c)    Solely for purposes of determining whether the Company has satisfied its distribution obligation under <u>Section 5.9(a)</u>, all cash distributions made during a taxable year shall be treated as distributions made pursuant to <u>Section 5.9(a)</u> in respect of such taxable year except to the extent that such distributions were required to satisfy the obligations of the Company under <u>Section 5.9(a)</u> in respect of one or more prior taxable years.

(d)    Any distributions made pursuant to this <u>Section 5.9</u> shall be made among those Members who held interests in the Company as of the close of such taxable year. All references to "taxable year" are references to the Company's taxable year.

Section 5.10    <u>Distribution Limitations</u>.

(a)    The Controlling Member shall not make any distribution to the Members unless, immediately after giving effect to the distribution, all liabilities of the Company, other than liabilities to Members on account of their interest in the Company and liabilities as to which

recourse of creditors is limited to specified property of the Company, do not exceed the fair market value of the Company assets; provided, however, that the fair market value of any property that is subject to a liability as to which recourse of creditors is so limited shall be included in the Company assets only to the extent that the fair market value of the property exceeds such liability.

(b)    No Member shall be liable to the Company for the amount of a distribution received unless such Member knew, at the time of the distribution, that the distribution was in violation of Section 5.10(a). A Member that receives a distribution in violation of Section 5.10(a), and that knew at the time of the distribution that the distribution violated such condition, shall be liable to the Company for the amount of the distribution; provided, however, that such Member shall not be so liable after the expiration of three years from the date of such distribution.

(c)    No Member shall be obligated at any time to repay or restore to the Company all or any part of any distributions to it from the Company, except as is specifically provided in Section 5.10(b). No Member shall have a claim against the Company for the amount of any distribution to be returned by a Member to the Company pursuant to Section 5.10(b) or pursuant to applicable law.

Section 5.11    Withholding. The Company shall at all times be entitled to withhold taxes, including applicable U.S. withholding taxes, or other governmental charges from distributions or allocations to some or all of the Members to discharge any withholding obligation of the Company. The determination of whether the Company is subject to a withholding obligation shall be made by the Controlling Member in his or her reasonable discretion after consultation with the Company's tax advisor and the affected Member. The treatment of any amount so withheld as a distribution of loan to such Member shall be determined by the Controlling Member.

**ARTICLE VI.**
**MANAGEMENT**

Section 6.1    Appointment and Removal of Controlling Member.

(a)    Appointment. In accordance with the NBA Regulations, a Controlling Member shall be appointed by the Required Member Interest and such Controlling Member shall also serve as the Chairman of the Board and the Company's representative on the Board of Governors of the National Basketball Association. The Members hereby appoint Clayton I. Bennett as the initial Controlling Member. Any individual appointed to serve as Controlling Member must be a Member of the Company beneficially holding at least 15% of the Company's issued and outstanding Common Units. Each Controlling Member shall serve for a term of five years or until such Controlling Member's earlier death, resignation or removal; provided that a Controlling Member's term shall not expire until a successor Controlling Member has been duly appointed. Any proposed successor Controlling Member shall be subject to the prior approval of the National Basketball Association and must satisfy all requirements under the NBA Regulations.

(b)     **Removal; Resignation**.  The Controlling Member may be removed prior to the expiration of his or her term only with the approval of the Required Member Interest (for such purposes, not including any Units held by the Controlling Member) following a showing of Substantial Cause.  The Controlling Member may resign at any time by delivering written notice to the Board, and any such resignation will be effective upon delivery thereof unless the notice of resignation specifies a later effective date; provided that any resignation shall only be effective if a successor Controlling Member has been duly appointed.  The acceptance of such resignation by the Board shall not be necessary to make it effective.

Section 6.2     Composition of Board.

(a)     **Number of Managers; Voting Power**.  The Board shall be composed of a number of Managers equal to the number of Members holding 10,000,000 Units or more.  With respect to any action presented to the Board for approval, each Manager shall have a number of votes equal to the number of Units beneficially owned by the Member appointing such Manager as of the date such action is presented to the Board for approval.

(b)     **Appointment of Managers; Term**.  Each Member holding 10,000,000 Units or more shall be entitled to appoint one Manager to the Board.  Each Manager shall hold office until such Manager dies, resigns or is otherwise removed.

(c)     **Removal of Managers; Resignation**.  A Manager may be removed with or without cause at any time by and in the sole discretion of the Member that appointed or has the right to appoint such Manager and, if any Member becomes a Delinquent Member, the Manager appointed by such Member shall be deemed to be immediately removed from the Board and the total number of Managers appointed to the Board shall be decreased appropriately.  The removal of a Manager who is also a Member shall not affect such Person's rights as a Member and shall not constitute a withdrawal of the Member.  Any Manager may resign at any time by delivering written notice to the Board, and any such resignation will be effective upon delivery thereof unless the notice of resignation specifies a later effective date.  The acceptance of such resignation by the Board shall not be necessary to make it effective.

(d)     **Vacancies**.  Any vacancy occurring on the Board by reason of the death, resignation or removal of a Manager or otherwise shall be filled by the Member that appointed or has the right to appoint such Manager.  The term of any replacement Manager shall extend to the remainder of the term of the departed Manager.  If a vacancy occurs on the Board, notices to any Manager required under this Agreement shall be made to the Member entitled to appoint such Manager.

Section 6.3     Meetings of the Board.

(a)     **Frequency**.  Meetings of the Board shall be held at such times and places as approved by the Board but must be held at least quarterly.  Special meetings of the Board may be called by the Controlling Member or any two Managers.  Such special meetings of the Board shall be held at the principal executive office of the Company unless otherwise approved by the Board.

(b)     **Notice of Meetings**.  Written notice stating the place, day and hour of the

meeting and the purpose or purposes for which the meeting is called shall be delivered to each other Manager by or at the direction of the Controlling Member or Managers calling the meeting not less than 10 or more than 50 days before the date of the meeting, either personally or by mail.

(c)    Meetings by Communications Equipment.    Any Manager may participate in a meeting of the Board by, or conduct the meeting through the use of, any means of communication by which all Managers participating in the meeting can hear each other during the meeting. Participation by such means shall constitute presence in person at a meeting.

(d)    Quorum.    The presence, in person or by proxy, of Managers holding a majority of the voting power of the Board shall constitute a quorum for the transaction of business at any Board meeting. If less than a quorum is present at a meeting, the meeting shall be adjourned without further notice.

(e)    Manner of Acting.    The Controlling Member, in his or her capacity as the Chairman of the Board, will preside at all Board meetings. If the Controlling Member is absent at a duly convened Board meeting, the Managers in attendance shall appoint one of the Managers present to preside over such meeting. If a quorum is present at a Board meeting when a vote is taken, the act of Managers holding a majority of the voting power present at the Board meeting shall be the act of the Board, unless the vote of a greater number is required by this Agreement.

Section 6.4    Action by Managers Without a Meeting.    To the extent permitted by the Act, any action that could be taken at a meeting of the Board may be taken without a meeting if one or more written consents setting forth the action so taken are signed by Managers holding a majority of the voting power of all of the Managers, either before or after the action is taken and delivered to the Company. Action taken by written consent of Managers without a meeting is effective when the last Manager signs the consent, unless the consent specifies a later effective date.

Section 6.5    Expenses; Compensation.    Except as otherwise provided herein, the Company shall pay or cause to be paid (a) all costs and expenses incurred in connection with the formation and organization of the Company and (b) all costs and expenses of the Company incurred in pursuing and conducting, or otherwise related to, the business of the Company. The Managers shall be entitled to reimbursement of their reasonable expenses incurred on behalf of the Company. Subject to the Act, no amount so paid to the Manager shall be deemed to be a distribution of Company assets for purposes of this Agreement. Except for reimbursement of such expenses as provided for in this Section 6.5 and its right to distributions as provided in this Agreement, unless otherwise approved by a Required Member Interest, the Managers shall not receive compensation for their services as Managers.

Section 6.6    Authority of Controlling Member; Limitations.

(a)    Authority of Controlling Member.    Subject to Section 6.6(b) and Section 6.6(c), the Controlling Member shall be vested with complete management and control over, and the exclusive power and authority to act for and bind the Company with respect to all matters relating to, the business and operations of the Company. In furtherance and not in limitation of

the foregoing, the Controlling Member shall have specific authority to:

  (i)  Appoint up to three Alternate Governors to represent the Company on the Board of Governors of the National Basketball Association, and to remove such Alternate Governors;

  (ii)  Delegate day-to-day management responsibilities to officers of the Company in accordance with Article VII and to make all employment decisions with respect to such officers;

  (iii)  Make all employment decisions concerning players, coaches and front office staff;

  (iv)  Adopt and modify marketing plans, ticket pricing and media arrangements;

  (v)  If the Members fail to approve any annual capital or operating budget on or before the beginning of the applicable fiscal year pursuant to Section 4.5, adopt any annual capital or operating budget reasonably necessary to operate the SuperSonics and the Storm in a "first class" manner consistent with NBA Regulations and to satisfy all other obligations of the Company;

  (vi)  If the Members fail to approve any amendment to an Approved Budget within 10 days of the date on which such amendment was proposed, deviate from an Approved Budget (A) up to 10% in the aggregate in any fiscal year and apply savings in some line items to excess costs in other line items or (B) as otherwise reasonably necessary to operate the SuperSonics and the Storm in a "first class" manner consistent with NBA Regulations and to satisfy all other obligations of the Company; and

  (vii)  Determine the amount and timing of any cash distributions.

  (b)  Matters Requiring Board Approval. The Controlling Member shall have no authority over the following matters and shall not cause the Company to do any of the following without the consent of the Board:

  (i)  enter into any player contracts that would result in a deviation of more than 10% from the Approved Budget (such 10% to be computed with reference to the total Approved Budget and not any line item for player compensation) for the applicable fiscal year;

  (ii)  enter into any agreement to borrow money (including Operating Advances) or encumber the Company's assets in excess of the Approved Budget for the applicable fiscal year;

  (iii)  issue Equity Participation Units or Options to key employees; and

  (iv)  issue any additional Units of the Company in excess of the 300,000,000 Common Units authorized by this Agreement except pursuant to Capital Calls pursuant to Section 4.1.

(c)    Matters Requiring Member Approval.  The Controlling Member shall have no authority over the following matters and shall not cause the Company to do any of the following without the consent of a Required Member Interest:

(i)    amend the Certificate or this Agreement, other than amendments contemplated by Section 14.5(a);

(ii)    move the SuperSonics or the Storm to a new geographic playing location outside of King, Pierce or Snohomish Counties of the State of Washington;

(iii)    amend Section 2.5 of this Agreement to include business purposes that are not (A) related to the business of the SuperSonics, the Storm or the National Basketball Association or the Women's National Basketball Association generally, (B) the businesses customarily conducted by professional basketball teams participating in the National Basketball Association or the Women's National Basketball Association or (C) required to be conducted under NBA Regulations;

(iv)    adopt annual capital and operating budgets in accordance with Section 4.5, subject to the Controlling Member's ability to adopt an annual capital or operating budget pursuant to Section 6.6(a)(v) if the Members fail to approve such budget;

(v)    adopt amendments to any annual capital or operating budget in accordance with Section 4.5, subject to the Controlling Member's ability to adopt certain amendments to an Approved Budget pursuant to Section 6.6(a)(vi) if the Members fail to approve such amendment;

(vi)    execute any new arena lease or arena development agreement or materially modify any existing arena lease or arena development agreement;

(vii)    approve any transaction between the Company, on the one hand, and the Controlling Member or his or her Affiliates, on the other hand, unless such transaction is on third-party, arm's-length terms;

(viii)    merge the Company or sell, lease, assign or otherwise Dispose of all or substantially all of the Company's assets or property, unless the Company or the Members hold a majority of the voting interests of the successor company, lessee, purchaser or transferee;

(ix)    acquire, other than in the ordinary course of business, any business by sale, lease, assignment or other transfer or conveyance of assets or property or by merger or other form of business combination;

(x)    any changes to the legal or tax structure of the Company;

(xi)    any of the following: (A) making an assignment for the benefit of creditors; (B) filing a voluntary petition in bankruptcy; (C) filing a petition or answer seeking a reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation; (D) filing an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Company in a proceeding of the

type described in subclauses (A) through (C); or (E) seeking, consenting to, or acquiescing in the appointment of a trustee, receiver, or liquidator with respect to the Company or of all or any substantial part of the Company's properties; or

(xii)    any liquidation or dissolution of the Company.

Section 6.7    <u>Delegation of Duties to Committees</u>.    The Controlling Member and the Board may, from time to time, designate one or more committees, each of which shall be comprised of such Members, Managers and/or Officers as the Controlling Member or the Board, as applicable, may designate. Any committee designated by the Controlling Member shall have and may exercise all of the authority of the Controlling Member that is delegated by the Controlling Member to such committee.  Any committee designated by the Board shall have and may exercise all of the authority of the Board that is delegated by the Board to such committee, subject to the limitations set forth in the Act. Any such committee delegated by the Controlling Member shall be subject to the authority and control of (and removal by) the Controlling Member.   At every meeting of any such committee, the presence of a majority of all the members thereof shall constitute a quorum, and the affirmative vote of a majority of the members present shall be necessary for the adoption of any resolution. The Controlling Member or the Board may dissolve any committee designated by the Controlling Member or the Board, respectively, at any time.

Section 6.8    <u>Obligations and Authority of Managers</u>.    Each Manager shall devote such time and effort to the Company's business as may be necessary or appropriate to manage the affairs of the Company but shall not be required to devote his or her full time thereto. No Manager, in his or her capacity as a Manager, is authorized to act on behalf of the Company without direct authorization from the Controlling Member or the Board.

Section 6.9    <u>Conflicts of Interest</u>.    Any Member may engage independently or with others, directly or indirectly, in other business ventures of every nature and description, except for a business venture that constitutes a Company Business Opportunity unless such business venture has been presented to the Company and rejected by the Controlling Member or the Board. Nothing in this Agreement shall be deemed to prohibit a Member or an Affiliate thereof from dealing, or otherwise engaging in business, with Persons transacting business with the Company and receiving compensation therefor, not involving any rebate or reciprocal arrangement that would have the effect of circumventing any restrictions set forth herein on dealings between the Company and the Members and their Affiliates. Neither the Company nor any Member shall have any right by virtue of this Agreement or the Company relationship created hereby in or to any such other ventures or activities or the income or proceeds derived therefrom.

Section 6.10    <u>Related Party Transactions</u>.    The Company may transact business with the Controlling Member, any other Manager or Member or Affiliate thereof; <u>provided</u> that the terms of those transactions are on third-party, arm's-length terms.

## ARTICLE VII.
## OFFICERS

Section 7.1    <u>Officers</u>.    The Controlling Member may designate one or more individuals

(who may or may not be Managers) to serve as Officers of the Company. The Company shall have such Officers as the Controlling Member may from time to time determine, which Officers may (but need not) include a President, and one or more Executive Officers (and in case of each such Executive Officer, with such descriptive title, if any, as the Controlling Member shall deem appropriate), a Secretary, an Assistant Secretary and a Treasurer. Any two or more offices may be held by the same Person. All Officers shall be subject to the ultimate authority and control of the Controlling Member.

Section 7.2    <u>Term of Office; Removal; Vacancies</u>.  Each Officer of the Company shall hold office at the pleasure of the Controlling Member until his or her successor is chosen and qualified or until his or her earlier death, resignation, retirement, disqualification or removal from office. Any Officer may be removed at any time by the Controlling Member for any reason, but such removal shall be without prejudice to the contract rights, if any, of the Person so removed. Designation of an Officer shall not of itself create contract rights. If the office of any Officer becomes vacant for any reason, the vacancy may be filled by the Controlling Member. The Controlling Member may abolish any office at any time.

Section 7.3    <u>Additional Powers and Duties</u>.  The several Officers of the Company shall perform such other duties and services and exercise such further powers as may be provided by statute, the Certificate or this Agreement, or as the Controlling Member may from time to time determine or as may be assigned to them by any competent superior Officer. The Controlling Member may also at any time limit or circumvent the enumerated duties, services and powers of any Officer. In addition to the designation of Officers and the enumeration of their respective duties, services and powers, the Controlling Member may grant powers of attorneys to individuals to act as agent for or on behalf of the Company, to do any act which would be binding on the Company, to incur any expenditures on behalf of or for the Company, or to execute, deliver and perform any agreements, acts, transactions or other matters on behalf of the Company. Such powers of attorney may be revoked or modified as deemed necessary by the Controlling Member.

**ARTICLE VIII.**
**RIGHTS AND OBLIGATIONS OF MEMBERS**

Section 8.1    <u>Voting Rights of Members</u>.  On matters set forth in this Agreement or in the Act requiring a vote of the Members, each Member shall have one vote per Unit owned by such Member of any Class.

Section 8.2    <u>No Participation in Management</u>.  Except for in their possible capacity as a Manager or an Officer, Members shall take no part in the management or control of the Company business, and have no right or authority to act for the Company or to vote on matters other than the matters set forth in this Agreement or in the Act.

Section 8.3    <u>Limited Liability</u>.  Except as may be set forth in separate written instruments executed by the Members, the Members shall not be personally liable for any indebtedness, obligations or loss of the Company in excess of the amount of their Capital Commitments plus an amount equal to their share of undistributed profits of the Company, if any, plus an amount equal to any distributions made to the Members required to be returned pursuant to this Agreement, the Act or other applicable law.

Section 8.4    <u>Meetings of Members</u>.

(a)    Meetings of the Members for any purpose may be called by the Controlling Member at any time, and notice of a meeting shall be issued by the Controlling Member within 10 days after receipt of a written request for such meeting signed by Members owning 20% or more of the then outstanding Units. Any such request shall state the purpose of the proposed meeting and the matters proposed to be acted on at such meeting. Meetings shall be held at the principal office of the Company or at such other place as may be designated by the Controlling Member or, if the meeting is called upon the request of the Members, at such place in the State of Oklahoma as may be designated by such Members. In addition, the Controlling Member may, and, upon receipt of a request in writing signed by Members owning 20% or more of the then outstanding Units, shall, submit any matter on which the Members are entitled to act to the Members for a vote by written consent without a meeting.

(b)    Notification of any meeting to be held pursuant to <u>Section 8.4(a)</u> shall be given not less than 15 days nor more than 60 days before the date of the meeting to each Member. Such notification shall state the place, date and hour of the meeting, and shall indicate that the notification is being issued at or by the direction of the Controlling Member or the Member or Members calling the meeting. The notification shall state the purpose or purposes of the meeting.

(c)    For the purpose of determining the Members entitled to vote on, or to vote at, any meeting of the Members, or any adjournment thereof, or to vote by written consent without a meeting, the Controlling Member or the Members requesting such meeting or vote may fix, in advance, a date as the record date for any such determination of Members. Such date shall not be more than 50 days nor less than 10 days before any such meeting or submission of a matter to the Members for a vote by written consent.

(d)    Each of the Members or the duly appointed attorney-in-fact of such Member shall be entitled to cast one vote for each Unit owned by such Member: (i) at a meeting, in person, by written proxy or by a signed writing directing the manner in which it desires that its vote be cast, which writing must be received by the Company prior to such meeting or (ii) without a meeting, by a signed writing directing the manner in which it desires that its vote be cast, which writing must be received by the Company prior to the date on which the votes of the Members are to be counted. Each proxy must be signed by the Member or its attorney-in-fact. No proxy shall be valid after the expiration of 12 months from the date thereof unless otherwise provided in the proxy. Each proxy shall be revocable at the pleasure of the Member executing it unless otherwise provided in the proxy. Only the votes of Members of record on the record date established pursuant to <u>Section 8.4(c)</u> or, if there is no such record date, the notification date, whether at a meeting or otherwise, shall be counted. The laws of the State of Oklahoma pertaining to the validity and use of corporate proxies shall govern the validity and use of proxies given by Members.

Section 8.5    <u>Action by Members Without a Meeting</u>.    To the extent permitted by the Act, any action that could be taken at a meeting of the Members may be taken without a meeting if one or more written consents setting forth the action so taken are signed by Members holding the Required Member Interest of the Units in person or by proxy.

## ARTICLE IX.
## INDEMNIFICATION

Section 9.1  <u>Limitation on Liability</u>.  No Controlling Member, Member, Manager, or officer, member, partner, shareholder, employee or agent thereof, or Officer, employee or agent of the Company shall be liable, responsible or accountable in damages or otherwise to the Company or any Member for any act or omission by any such Person if such Person acted in good faith and in a manner in which he, she or it believed to be in the best interests of the Company, unless such conduct constitutes fraud, gross negligence, willful misconduct, bad faith or a material breach of this Agreement.

Section 9.2  <u>Indemnification</u>.

(a)  To the fullest extent not prohibited by law, the Company shall indemnify and hold harmless each Indemnified Person from and against any and all losses, claims, demands, costs, damages, liabilities (joint and several), expenses of any nature (including attorneys' fees and disbursements), judgments, fines, settlements and other amounts arising from any and all claims, demands, actions, suits or proceedings, civil, criminal, administrative or investigative, in which such Person may be involved or threatened to be involved, as a party or otherwise (collectively, "<u>Losses</u>"), arising out of or incidental to any business of the Company transacted or occurring while such Person was a Controlling Member, Member, Manager, officer, member, partner, shareholder, employee or agent thereof, or Officer, employee or agent of the Company, except for fraud, gross negligence, willful misconduct, bad faith or a material breach of this Agreement on the part of such Person. With respect to the satisfaction of any indemnification of the above-mentioned Persons pursuant to <u>Section 9.2(a)</u>, only assets of the Company shall be available therefor and no Member shall have any personal liability therefor.

(b)  To the fullest extent not prohibited by law, each of the Members shall indemnify and hold harmless the Company and each Indemnified Person from and against any and all Losses arising out of or incidental to any fine levied by the National Basketball Association against the Company or such Indemnified Persons as a result of any act or omission (or alleged act or omission) of such Member.

(c)  The indemnification provided by this <u>Section 9.2</u> shall be in addition to any other rights to which those indemnified may be entitled under any agreement, as a matter of law or equity, or otherwise, and shall continue as to a Person who has ceased to serve in their capacity, and shall inure to the benefit of the heirs, successors, assigns and administrators of the Person so indemnified.  Any indemnification required hereunder shall be made promptly as the liability, loss, damage, cost or expense is incurred or suffered. The Board may establish reasonable procedures for the submission of claims for indemnification pursuant to this <u>Section 9.2</u>, determination of the entitlement of any Person thereto, and review of any such determination.

Section 9.3  <u>Advancement of Expenses</u>.  The right to indemnification conferred in this <u>Article IX</u> shall include the right to be paid any expenses incurred in defending any proceeding in advance of its final disposition. Any advancement of expenses pursuant to the preceding sentence shall be made upon delivery to the Company or other indemnifying Member of an undertaking, by or on behalf of such Indemnified Person, to repay all amounts so advanced if it

shall ultimately be determined by final judicial decision from which there is no further right to appeal that such Indemnified Person is not entitled to be indemnified for such expenses under this Section 9.3.

## ARTICLE X.
## TAX MATTERS

Section 10.1    Tax Returns.  The Controlling Member shall cause to be prepared and filed all necessary federal, state and local tax returns for the Company including making the elections described in Section 10.2. Each Member shall furnish to the Controlling Member all pertinent information in its possession relating to Company operations that is necessary to enable the Company's tax returns to be prepared and filed.

Section 10.2    Tax Elections.

(a)       The Controlling Member, in his or her sole discretion, may make an election to adjust the basis of the assets of the Company for federal income tax purposes in accordance with Code Section 754, in the event of a distribution of Company cash or property as described in Code Section 734 or a transfer by any Member of its interest in the Company as described in Code Section 743.

(b)       The Controlling Member may make such other elections for federal, state, local or foreign tax purposes as it deems necessary or desirable to carry out the business of the Company or the purposes of this Agreement.

Section 10.3    Tax Matters Partner.  The Controlling Member shall be the "tax matters partner" of the Company pursuant to section 6231(a)(7) of the Code. The tax matters partner shall take such action as may be necessary to cause each other Member to become a "notice partner" within the meaning of section 6223 of the Code. The tax matters partner shall inform each other Member of all significant matters that may come to its attention in its capacity as tax matters partner by giving written notice thereof promptly after becoming aware thereof and shall forward to each other Member copies of all significant written communications it may receive in that capacity. The tax matters partner may not take any action contemplated by Sections 6222 through 6232 of the Code without the consent of a Required Member Interest, but this sentence does not authorize the tax matters partner to take any action left to the determination of an individual Member under sections 6222 through 6232 of the Code.

## ARTICLE XI.
## BOOKS, RECORDS, REPORTS, AND BANK ACCOUNTS

Section 11.1    Books and Records.

(a)       The Controlling Member shall keep or cause to be kept, for the annual accounting period consisting of the Company's fiscal year, full and accurate books and records reflecting all financial activities of the Company. The books and records of the Company shall be maintained at the principal office of the Company designated in Section 2.4 and shall be available for examination and duplication by any Member or its duly authorized representative at any and all reasonable times. Any Member, or its duly authorized representative, upon paying

the cost of collection, duplication and mailing, shall be entitled to a copy of the list of the names and addresses of the Members, including the number and Class of Units owned by each of them.

(b)     The Company shall maintain with its books and records the following: (i) a current list of the full name and last known address of each Member; (ii) a copy of the Certificate, and all certificates or amendments thereto, together with executed copies of any powers of attorney pursuant to which any Certificate has been executed; (iii) copies of the Company's federal, state and local tax returns and reports, if any, for the three most recent years; (iv) copies of this Agreement and any amendments thereto; and (v) copies of all financial statements for the Company for the three most recent years.

Section 11.2   Capital Accounts and Taxable Year.  The Company shall keep books and records for the Capital Account of each Member maintained as provided in the definition of "Capital Account" and for federal income tax purposes in accordance with tax accounting principles. For federal income tax purposes, the tax year of the Company shall be the calendar year unless a different taxable year is required by the Code.

Section 11.3   Financial Statements.   Financial statements need not be prepared in accordance with generally accepted accounting principles; provided that exceptions to such principles shall be set forth in such statements. Such financial statements shall be audited at Company expense as of the end of each fiscal year of the Company and at any other time that the Controlling Member deems necessary or desirable by a firm of independent certified public accountants selected by the Controlling Member. Any one or more of the Members may, at their expense, have the Company's financial statements audited by a certified public accountant of such Member's choice.

Section 11.4   Reports.

(a)     Within 45 days after the end of each of the first three quarters of each year, the Company shall have prepared at its expense and shall send to each Person who was a Member during such quarter a balance sheet and statement of income (or loss) for, or as of the end of, such quarter, none of which need be audited, together with a report of other pertinent information regarding the Company and its activities during such quarters.

(b)     Within 75 days after the end of each fiscal year, the Company shall send to each Person who was a Member at any time during the fiscal year such tax information about the Company as shall be necessary for the preparation by such Member of its federal income tax return, and required state income and other tax returns with regard to jurisdictions in which the Company is formed or qualified or owns property.

(c)     Within 75 days after the end of each fiscal year, the Company shall send to each Person who was a Member at any time during the fiscal year then ended a balance sheet as of the end of such fiscal year and statements of income, Members' equity and changes in financial position for such fiscal year, all of which shall be prepared on a tax basis of accounting and an accrual basis, audited in accordance with generally accepted auditing standards and accompanied by an opinion of the Company's accountants.

Section 11.5   Information.  Each Member shall have the right to access all information

to which that Member is entitled to have access pursuant to the Act; provided that such Member provides five Business Days' prior written notice to the Company of the materials such Member requests be made available and the purpose for inspecting such materials. Such materials shall be provided at the principal office of the Company during its regular business hours. All expenses of providing the materials requested pursuant to this Section 11.5, including, without limitation, duplication fees, shall be paid by the Member requesting the information. Anything in this Section 11.5 to the contrary notwithstanding, the Controlling Member shall have the right to keep confidential from the Members, for such period of time as the Controlling Member deems reasonable, any information which the Controlling Member reasonably believes to be in the nature of trade secrets or other information the disclosure of which the Controlling Member in good faith believes is not in the best interest of the Company or could damage the Company or its business or the Company is required by law or by agreement with a third party to keep confidential.

Section 11.6    Bank Accounts.    The Company shall be responsible for causing one or more accounts to be maintained in a bank (or banks), which accounts shall be used for the payment of expenditures incurred in connection with the business of the Company, and in which shall be deposited any and all cash receipts. All such amounts shall be received, held and disbursed by the Company for the purposes specified in this Agreement. There shall not be deposited in any of such accounts any funds other than funds belonging to the Company, and no other funds shall in any way be commingled with such funds.

## ARTICLE XII.
## TRANSFER RESTRICTIONS; BANKRUPTCY OF A MEMBER

Section 12.1    General Prohibition; Permitted Transfers; NBA Approval.

(a)    General Prohibition.    Other than Dispositions pursuant to Section 12.1(b), no Member shall Dispose of, or permit the Disposition of, any Units of the Company unless such Member shall first (i) obtain the consent of the Board, such consent not to be unreasonably withheld or delayed and (ii) comply, to the extent applicable, with the provisions of this Article XII.  If any Member attempts to make a Disposition of Units in violation of this Agreement, then such Disposition shall be void ab initio and such Member shall indemnify and hold harmless the Company and the other Members from all costs, liabilities and damages that the Company or any of the other Members may incur as a result of such purported Disposition and efforts to enforce this Agreement, including, without limitation, any incremental tax liability and any attorneys' fees.

(b)    Permitted Transfers.    Without the consent of the Board, any Member may Dispose of all or any portion of its Units to (i) any Affiliate of such Member, (ii) any Relative of such Member, (iii) any trust established for, or in the name of, such Member, (iv) any trust established for, or in the name of, one or more of such Member's Relatives or (v) one or more other Members.

(c)    NBA Approval.    Notwithstanding anything to the contrary herein, the Members acknowledge that any direct or indirect Disposition of Units (whether voluntary or involuntary and including any direct or indirect Disposition of equity interests in a Member)

shall be subject to Associational Approvals and shall not be effective unless the National Basketball Association and/or the Women's National Basketball Association, as applicable, approves such Disposition. Each Member hereby agrees to cooperate with any approval process of the National Basketball Association or the Women's National Basketball Association with respect to any direct or indirect Disposition of Units or any other Disposition requiring Associational Approval.

Section 12.2    Indirect Dispositions.    If a Member is not a natural person but is organized as a legal entity whose interests may be legally and beneficially owned by more than one Person, the Disposition of an equity interest in the Member, subsequent to the date hereof, shall be deemed a Disposition of that portion of the Units of the Company owned by the Member equal to the percentage of interests in the Member so Disposed of and shall be subject to the provisions of this Article XII. In the event the Disposition does not encompass the concurrent disposition of legal and beneficial interests in the Member in like proportion, the greatest interests Disposed of, whether beneficial or legal, shall be deemed the percent of the Units Disposed of for purposes of the preceding sentence.

Section 12.3    Right of First Offer.

(a)    Transfer Notice.    A Member (the "Offering Member") desiring to Dispose of all or any part of such Member's Units will forthwith give a written notice (the "Transfer Notice") to the other Members (the "Non-Transferring Members") which states either: (i) in the case of a Disposition for value to a specific Person, the name and address of the proposed transferee (the "Third-Party Acquirer"), the sales price and all of the terms of the proposed Disposition; or (ii) if no Third-Party Acquirer has been identified, the sale price and all of the terms on which the Offering Member intends to solicit an offer from a Person who is not a Member.

(b)    Purchase Option.    For thirty (30) days after the receipt of the Transfer Notice, the Non-Transferring Members will have the preemptive option to purchase all (but not less than all) of the Units which are the subject of the Transfer Notice at the price and on the terms set forth in the Transfer Notice on a pro rata basis. If the Non-Transferring Members elect to purchase all of the Units of the Offering Member, the Non-Transferring Members will give written notice thereof within said thirty (30) day period. The Disposition of the Units hereunder by the Offering Member to the Non-Transferring Members will be consummated as soon as reasonably practicable at the purchase price and on the terms provided in the Transfer Notice.

(c)    Waiver of Purchase Option; Sale to Third Party.    If the option provided in Section 12.3(b) of this Agreement to purchase all of the Units described in the Transfer Notice has not been exercised on the expiration of the option period, the Offering Member will have the right at any time within sixty (60) days after the expiration of such period to Dispose of the Units of the Offering Member described in the Transfer Notice to the Third-Party Acquirer on the terms stated in the Transfer Notice or to identify another third party who is willing to purchase the Units at the price and on the other terms and conditions stated in the Transfer Notice. At the end of said sixty (60) day period, the right of the Offering Member to Dispose of the Units will terminate.

Section 12.4    Tag-Along Right.    If an Offering Member proposes to sell any of its Units

and the Non-Transferring Members do not offer to purchase all of such Units pursuant to Section 12.3, any Non-Transferring Member may, at its election, require that such Non-Transferring Member's Units be purchased by the third party acquiring the Units of the Offering Member, and such acquisition shall be on the same terms and conditions as the acquisition of the Units of the Offering Member on an equivalent, pro rata basis. In order to exercise the option granted hereunder, the Non-Transferring Member must notify the Offering Member of its election within the thirty (30) day period described in Section 12.3. By execution of this Agreement, each of the Members exercising the option granted herein agree to execute and deliver any and all agreements, documents, undertakings and other commitments necessary to consummate the sale of its Units to the third party purchasing from the Offering Member.

Section 12.5    Drag-Along Right.    If any Offering Member or group of Offering Members (the "Controlling Group") proposes to Dispose of 50% or more of the issued and outstanding Common Units of the Company, and, to the extent applicable, the Non-Transferring Members do not offer to purchase such Units pursuant to Section 12.3 or request to participate in such sale pursuant to Section 12.4, the Controlling Group may, at their election, require the remaining Members to sell all of such Members' Units on the same terms and conditions as the Units held by the Controlling Group are being sold. By the execution of this Agreement, each of the Members agrees to execute, deliver and, where necessary, acknowledge such agreements, documents, instruments and understandings as may be necessary to consummate the sale of its Units if required by the terms of this Section 12.5. For purposes of this Section 12.5, if any Member or group of Members offers to sell its Units to the same Persons or Affiliates thereof, in several different but related transactions, such offers shall be integrated, and considered part and parcel of the same offer, for purposes of applying the rights in this Section 12.5.

Section 12.6    Violation of NBA Rules.    In the event any Member is determined to have breached or otherwise violated any provision of the NBA Regulations and such breach or violation results in the assessment of a material fine or other monetary penalty against the Company or any other Member, then the other Members shall have the option to purchase all (but not less than all) of such Member's Units on a pro rata basis for cash in an amount equal to (i) seventy-five percent (75%), multiplied by (ii) the fair market value of such Member's Units, as determined in good faith by the Board. The Company shall notify all of the Members in writing within 5 Business Days following any assessment meeting the requirements of this Section 12.6. If the other Members elect to purchase all of the Units, the other Members will give written notice thereof to the Company within thirty (30) days of the date of such notice. The Disposition of the Units hereunder will be consummated as soon as reasonably practicable following exercise of the option.

Section 12.7    Assignees and Substitute Members.

(a)    The Company need not recognize for any purposes any assignment or Disposition of all or any portion of the Units of a Member unless (i) the Company shall have received a fee in the amount established by it from time to time sufficient to reimburse it for all its actual costs in connection with such Disposition, including, without limitation, any advice of counsel in connection with such Disposition; (ii) the Company shall have received such evidence of the authority of the parties to such Disposition, including, without limitation, certified corporate resolutions and certificates of fiduciary authority, as its counsel may request, (iii) the

Disposition receives the necessary Associational Approvals and is consistent with and not in violation of the restrictions contained in this Agreement, and (iv) there shall have been filed with the Company and recorded on the Company's books a duly executed and acknowledged counterpart of the instrument making such assignment or Disposition, and such instrument evidences the written acceptance by the assignee of all the terms and provisions of this Agreement, represents that such assignment or Disposition was made in accordance with all applicable laws and regulations (including investor suitability requirements) and in all other respects is satisfactory in form and substance to the Board.

(b)    Any Member who shall assign all of its Units shall cease to be a Member, except that unless and until a Member is admitted in its stead, such assigning Member shall retain the statutory rights of an assignor of a limited liability company interest under the Act. The rights of an assignee of an interest who does not become a Member shall be limited to receipt of its share of Company distributions and allocations of Net Income and Net Losses as determined under Article V and distributions upon liquidation as determined under Article XIII.

(c)    Prior to the admission of any transferee as a Substitute Member (i) the Company must receive a favorable opinion of the Company's legal counsel or of other legal counsel reasonably acceptable to the Board to the effect that the Disposition or admission is exempt from registration under those laws, and (ii) the Company must receive a favorable opinion of the Company's legal counsel or of other legal counsel reasonably acceptable to the Board to the effect that (A) the Disposition or admission, when added to the total of all other sales, assignments, or other Dispositions within the preceding 12 months, would not result in the Company's being considered to have terminated within the meaning of Section 708(b)(1)(B) of the Code and (B) the Disposition or admission does not adversely affect the characterization of the Company as a partnership for U.S. federal income tax purposes. The Board, however, may waive the requirements of this Section 12.7, in whole or in part, in such circumstances as they deem appropriate.

(d)    An Assignee of interest who does not become a Member and who desires to make a further Disposition of its interest shall be subject to all the provisions of this Article XII to the same extent and in the same manner as a Member desiring to make an assignment of Units.

Section 12.8    Bankrupt Members.  If any Member becomes a Bankrupt Member, the Company shall have the option, exercisable by notice from the Board to the Bankrupt Member (or its representative) at any time prior to the 180th day after receipt of notice of the occurrence of the event causing it to become a Bankrupt Member, to buy, and on the exercise of this option the Bankrupt Member or its representative shall sell, its Units. The purchase price shall be an amount equal to the fair market value thereof determined by agreement by the Bankrupt Member (or its representative) and the Board; however, if those persons do not agree on the fair market value on or before the 30th day following the exercise of the option, either such person, by notice to the other, may require the determination of fair market value to be made by an independent appraiser. The independent appraiser shall be selected in good faith by the Board and reasonably acceptable to the Bankrupt Member. The determination of the independent appraiser is final and binding on all parties. The Bankrupt Member and the Company each shall pay one-half of the costs of the appraisal. The Company shall pay the fair market value as so determined in four

equal cash installments, the first due on closing and the remainder (together with accumulated interest on the amount unpaid at the Prime Rate) due on each of the first three anniversaries thereof. The payment to be made to the Bankrupt Member or its representative pursuant to this <u>Section 12.7</u> is in complete liquidation and satisfaction of all the rights and interest of the Bankrupt Member and its representative (and of all persons claiming by, through, or under the Bankrupt Member and its representative) in and in respect of the Company, including, without limitation, any Units, any rights in specific Company property, and any rights against the Company and (insofar as the affairs of the Company are concerned) against the Members.

**ARTICLE XIII.**
**DISSOLUTION, LIQUIDATION, AND TERMINATION**

Section 13.1    <u>Events of Dissolution</u>.  The Company shall be dissolved

(a)    on a date designated by the Members pursuant to <u>Section 6.6</u>; or

(b)    upon the completion of the sale of all or substantially all of the assets of the Company.

Notwithstanding anything to the contrary in the Act, the death, retirement, resignation, expulsion, bankruptcy or dissolution of any Member or the occurrence of any other event that terminates the continued membership of any Member shall not cause the Company to be dissolved or its affairs to be wound up, and upon the occurrence of any such event, the Company shall be continued without dissolution.

Section 13.2    <u>Effect of Dissolution</u>.  Dissolution of the Company shall be effective on the date on which the event occurs giving rise to the dissolution, but the Company shall not terminate until the Certificate is canceled and the assets of the Company are distributed as provided herein. Notwithstanding the dissolution of the Company, prior to the termination of the Company, the business of the Company and the affairs of the Members, as such, shall continue to be governed by this Agreement. Upon dissolution, the Board shall liquidate the assets of the Company, apply and distribute the proceeds thereof as contemplated by this Agreement, and cause the cancellation of the Certificate.

Section 13.3    <u>Distributions Upon Liquidation</u>.

(a)    Upon a dissolution of the Company, the Board or court-appointed trustee if there is no Board (the selection of any such trustee to be subject to Associational Approval) (the "<u>Liquidator</u>") shall take full account of the Company's liabilities and Company property and the Company property shall be liquidated as promptly as is consistent with obtaining the fair market value thereof, and the proceeds therefrom, to the extent sufficient therefor, shall be applied and distributed in the following order and priority:

(i)    to the payment and discharge of all the Company's debts and liabilities (other than those to the Members) including the establishment of any necessary reserves;

(ii)    to the payment of any debts and liabilities to the Members; and

(iii)    to the Members in accordance with Article V.

(b)    In the event the Liquidator sets aside reserves for any contingent or unforeseen liabilities or obligations of the Company, such reserves may be paid over by the Liquidator to a bank, trust company or other financial institution to be held in escrow for the purpose of paying any such contingent or unforeseen liabilities or obligations and, at the expiration of such period as the Liquidator may deem advisable, the amount in such reserves shall be distributed to the Members in the manner set forth in this Section 13.3.

(c)    If the Liquidator shall determine that an immediate sale of part or all of the Company's assets would cause undue loss to the Members, the Liquidator may, after having given notification to all the Members, to the extent not then prohibited by any applicable laws of any jurisdiction in which the Company is then formed or qualified, either (i) defer liquidation of and withhold from distribution for a reasonable time any assets of the Company except those necessary to satisfy the Company's debts and obligations or (ii) distribute any assets to the Members in kind. If any assets of the Company are to be distributed in kind, such assets shall be distributed on the basis of the fair market value thereof, and any Member entitled to any interest in such assets shall receive such interest therein as a tenant-in-common with all other Members so entitled. The fair market value of such assets shall be determined by an independent appraiser selected by the Liquidator. Notwithstanding anything herein to the contrary, any temporary or permanent management of the Company by the Liquidator shall be subject to Associational Approval.

(d)    Each Member shall look solely to the assets of the Company for all distributions with respect to the Company, including the return of its Capital Contribution thereof and its share of liquidation proceeds, and shall have no recourse therefor, upon dissolution or otherwise, against the Board or any other Member. No Member shall have any right to demand or receive property other than cash upon dissolution and winding up of the Company.

## ARTICLE XIV.
## MISCELLANEOUS

Section 14.1    Notices.    Any and all notices, elections or demands permitted or required to be made under this Agreement shall be in writing, signed by the Person giving such notice, election or demand, and delivered personally, sent by confirmed facsimile or electronic transmission or sent by certified mail, return receipt requested, to the Members at their addresses on record with the Company. The date of personal delivery, the date the certified facsimile or electronic transmission (with confirmed receipt) is sent to the recipient, or three days after the date of mailing, as the case may be, shall be the date of such notice.

Section 14.2    Successors and Assigns.    Subject to the restrictions on Disposition set forth herein, this Agreement shall be binding upon and shall inure to the benefit of the Members, their respective successors, heirs, successors-in-title and assignees, and each successor-in-interest to any Member, whether such successor acquires such interest by way of gift, purchase, foreclosure or by any other method, shall hold such interest subject to all the terms and provisions of this Agreement.

Section 14.3   <u>No Waiver</u>.  The failure of any Member to insist on strict performance of any provision of this Agreement, irrespective of the length of time for which such failure continues, shall not be a waiver of such Member's right to demand strict compliance in the future. No consent or waiver, express or implied, to or of any breach or default in the performance of any obligation hereunder shall constitute a consent or waiver to or of any other breach or default in the performance of the same or any other obligation.

Section 14.4   <u>Signatures</u>.  Each Member shall become a signatory hereof by signing, directly or by an attorney-in-fact, (i) such number of counterpart signature pages to this Agreement or (ii) a subscription agreement which shall be treated as an addendum and amendment to this Agreement, and such other instrument or instruments, and in such manner and at such time, as the Board shall determine. By so signing, each Member shall be deemed to have adopted, and to have agreed to be bound by, all the provisions of this Agreement, as amended from time to time in accordance with the provisions of this Agreement; provided, however, that no such counterpart shall be binding until it shall have been accepted by the Board.

Section 14.5   <u>Amendment to Agreements</u>.

(a)      Without prior notice to or consent from the Members, the Controlling Member may amend any provision of this Agreement from time to time (i) for the purpose of adding any further restrictions or provisions for the protection of the Members, (ii) to amend Annex A and the terms of this Agreement as necessary to reflect the issuance of additional Units pursuant to the terms hereof, (iii) to resolve any ambiguity in, or to correct or supplement any provision of, this Agreement that may be defective or inconsistent with any other provision of this Agreement in regard to matters that do not adversely affect the interest of the Members; (iv) to allocate Net Income and Net Losses arising in any year different from the manner provided for in <u>Article V</u> if, and to the extent that, the allocation of Net Income and Net Losses provided for in <u>Article V</u> would cause the determination and allocation of each Member's distributive share of Net Income and Net Losses not to be permitted by Section 704(b) of the Code and the Regulations promulgated thereunder; (v) to comply with requirements of the National Basketball Association or the Women's National Basketball Association; or (vi) to delete or add any provision of this Agreement required to be so deleted or added by the staff of the Securities and Exchange Commission, the Internal Revenue Service or other federal agency or by a state Blue Sky commissioner or similar such official, which addition or deletion is deemed by such commission, agency or official to be for the benefit or protection of the Members; provided, however, that no amendment shall be adopted pursuant to this <u>Section 14.5(a)</u> unless the adoption thereof (A) is for the benefit of or not adverse to the interests of the Members; (B) does not adversely affect the distribution rights of the Members or the allocation of Net Income, Net Losses or other items of Company income, gain, loss or deduction among the Members; and (C) does not affect the limited liability of the Members or the status of the Company as a partnership for federal income tax purposes.

(b)      Furthermore, this Agreement may be amended if the amendment is approved by the Controlling Member and the consent of a Required Member Interest; provided, however, that, notwithstanding anything in this Agreement to contrary no amendment shall be made to this Agreement, without prior Associational Approvals, if the proposed amendment would cause any matters now subject to Associational Approval to be no longer to be subject to

such approval.

        (c)     Any Member shall have the right to propose a vote on amendments to this Agreement.

Section 14.6 <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, all of which together shall for all purposes constitute one agreement, binding on all the Members, notwithstanding that all the Members have not signed the same counterpart.

Section 14.7 <u>Applicable Law</u>.  This Agreement and the rights and obligations of the parties hereunder shall be governed by and interpreted, construed and enforced in accordance with the laws of the State of Oklahoma (regardless of the choice of law principles of the State of Oklahoma or of any other jurisdiction).

Section 14.8 <u>Entire Agreement; No Third Party Beneficiaries</u>.  The terms set forth in this Agreement (including the Exhibits and Schedules hereto) are intended by the parties as a final, complete and exclusive expression of the terms of their agreement with respect to the transactions contemplated by this Agreement and may not be contradicted, explained or supplemented by evidence of any prior agreement, any contemporaneous oral agreement or any consistent additional terms. There are no restrictions, promises, representations, warranties, covenants or undertakings, other than those expressly set forth or referred to herein. This Agreement is not intended to confer upon any person other than the parties hereto any rights or remedies hereunder.

Section 14.9 <u>Attorney's Fees</u>.  In the event that any party hereto brings an action or proceeding for the declaration of the rights of the parties hereunder, for injunctive relief, or for an alleged breach or default of, or any other action arising out of this Agreement or the transactions contemplated hereby, the prevailing party in any such action shall be entitled to an award of reasonable attorneys' fees and any court costs incurred in such action or proceeding, in addition to any other damages or relief awarded, regardless of whether such action proceeds to final judgment.

Section 14.10 <u>Severability</u>.  Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

Section 14.11 <u>Special Enforcement Rights</u>.  The Members acknowledge that certain provisions and terms of this Agreement are intended to benefit the National Basketball Association and the Women's National Basketball Association and that such provisions and terms have been included in this Agreement as a condition to and in consideration of the approval of the acquisition of the SuperSonics and the Storm by the Company and of the documents relating thereto including this Agreement, by the National Basketball Association and the Women's National Basketball Association. Accordingly, it is hereby agreed that the National Basketball Association and the Women's National Basketball Association, although they are not parties to this Agreement, shall be entitled to enforce this Agreement to the same extent as any of

the Members, the Controlling Member or the Board.

*        *        *        *        *

IN WITNESS WHEREOF, the undersigned hereby execute this Agreement as of the date first set forth above.

THE PROFESSIONAL BASKETBALL CLUB, LLC

By: _____

Name:

Title:

IN WITNESS WHEREOF, the parties hereto have executed this Amended and Restated Operating Agreement as of the day and year first above written.

**FOR COMPLETION BY MEMBERS WHO ARE NATURAL PERSONS:**
**(i.e., individuals)**

Member's Name: _____
                        (print or type)

Member's Signature: _____
                        (signature)

Member's Social Security No.: _____

\*\*\*\*\*

**FOR COMPLETION BY MEMBERS WHO ARE NOT NATURAL PERSONS:**
**(i.e., corporations, partnerships, limited liability companies, trusts or other entities)**

Member's Name: *DP-OKCB, LLC*
                        (print or type)

By: _____

Name: *Clayton I. Bennett*
Title: *Member*

Member's Tax Identification No.: _____

**COUNTERPART SIGNATURE PAGE TO**
**THE PROFESSIONAL BASKETBALL CLUB, LLC**
**AMENDED AND RESTATED OPERATING AGREEMENT**

"THE SECURITIES REPRESENTED BY THIS AGREEMENT HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 OR ANY STATE SECURITIES OR BLUE SKY LAWS. THESE SECURITIES MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR AN EXEMPTION FROM OR EXCEPTION TO THE REGISTRATION REQUIREMENTS OF SAID ACT OR LAWS."

IN WITNESS WHEREOF, the parties hereto have executed this Amended and Restated Operating Agreement as of the day and year first above written.

**FOR COMPLETION BY MEMBERS WHO ARE NATURAL PERSONS:**
**(i.e., individuals)**

Member's Name: _____
                         (print or type)

Member's Signature: _____
                              (signature)

Member's Social Security No.: _____

*****

**FOR COMPLETION BY MEMBERS WHO ARE NOT NATURAL PERSONS:**
**(i.e., corporations, partnerships, limited liability companies, trusts or other entities)**

Member's Name: _Huntington  LLC_____
                         (print or type)

By: _G. Records Jr._____

Name: _G. Jeffrey Records Jr_

Title:

Member's Tax Identification No.: _____

**COUNTERPART SIGNATURE PAGE TO**
**THE PROFESSIONAL BASKETBALL CLUB, LLC**
**AMENDED AND RESTATED OPERATING AGREEMENT**

"THE SECURITIES REPRESENTED BY THIS AGREEMENT HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 OR ANY STATE SECURITIES OR BLUE SKY LAWS. THESE SECURITIES MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR AN EXEMPTION FROM OR EXCEPTION TO THE REGISTRATION REQUIREMENTS OF SAID ACT OR LAWS."

IN WITNESS WHEREOF, the parties hereto have executed this Amended and Restated Operating Agreement as of the day and year first above written.

**FOR COMPLETION BY MEMBERS WHO ARE NATURAL PERSONS:**
**(i.e., individuals)**

Member's Name: _____Tom L. Ward_____
(print or type)

Member's Signature: _____
(signature)

Member's Social Security No.: ____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_____

\*\*\*\*\*

**FOR COMPLETION BY MEMBERS WHO ARE NOT NATURAL PERSONS:**
**(i.e., corporations, partnerships, limited liability companies, trusts or other entities)**

Member's Name: _____
(print or type)

By: _____
Name:
Title:

Member's Tax Identification No.: _____

**COUNTERPART SIGNATURE PAGE TO**
**THE PROFESSIONAL BASKETBALL CLUB, LLC**
**AMENDED AND RESTATED OPERATING AGREEMENT**

"THE SECURITIES REPRESENTED BY THIS AGREEMENT HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 OR ANY STATE SECURITIES OR BLUE SKY LAWS. THESE SECURITIES MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR AN EXEMPTION FROM OR EXCEPTION TO THE REGISTRATION REQUIREMENTS OF SAID ACT OR LAWS."

IN WITNESS WHEREOF, the parties hereto have executed this Amended and Restated Operating Agreement as of the day and year first above written.

**FOR COMPLETION BY MEMBERS WHO ARE NATURAL PERSONS:**
**(i.e., individuals)**

Member's Name: _Aubrey K. McClendon_
                (print or type)

Member's Signature: _[signature]_
                    (signature)

Member's Social Security No.: _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_

*****

**FOR COMPLETION BY MEMBERS WHO ARE NOT NATURAL PERSONS:**
**(i.e., corporations, partnerships, limited liability companies, trusts or other entities)**

Member's Name: _____
               (print or type)

By: _____
    Name:
    Title:

Member's Tax Identification No.: _____

### COUNTERPART SIGNATURE PAGE TO
### THE PROFESSIONAL BASKETBALL CLUB, LLC
### AMENDED AND RESTATED OPERATING AGREEMENT

"THE SECURITIES REPRESENTED BY THIS AGREEMENT HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 OR ANY STATE SECURITIES OR BLUE SKY LAWS. THESE SECURITIES MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR AN EXEMPTION FROM OR EXCEPTION TO THE REGISTRATION REQUIREMENTS OF SAID ACT OR LAWS."

IN WITNESS WHEREOF, the parties hereto have executed this Amended and Restated Operating Agreement as of the day and year first above written.

**FOR COMPLETION BY MEMBERS WHO ARE NATURAL PERSONS:**
**(i.e., individuals)**

Member's Name: _____
(print or type)

Member's Signature: _____
(signature)

Member's Social Security No.: _____

\*\*\*\*\*

**FOR COMPLETION BY MEMBERS WHO ARE NOT NATURAL PERSONS:**
**(i.e., corporations, partnerships, limited liability companies, trusts or other entities)**

Member's Name:   CAMERON HOOPS, L.L.C.
(print or type)

By: _____
Name: William M. Cameron, Manager
Title:

Member's Tax Identification No.:   20-5350757

**COUNTERPART SIGNATURE PAGE TO**
**THE PROFESSIONAL BASKETBALL CLUB, LLC**
**AMENDED AND RESTATED OPERATING AGREEMENT**

"THE SECURITIES REPRESENTED BY THIS AGREEMENT HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 OR ANY STATE SECURITIES OR BLUE SKY LAWS.  THESE SECURITIES MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR AN EXEMPTION FROM OR EXCEPTION TO THE REGISTRATION REQUIREMENTS OF SAID ACT OR LAWS."

IN WITNESS WHEREOF, the parties hereto have executed this Amended and Restated Operating Agreement as of the day and year first above written.

**FOR COMPLETION BY MEMBERS WHO ARE NATURAL PERSONS:**
(i.e., individuals)

Member's Name: _Robert E. Howard II_
(print or type)

Member's Signature: _____
(signature)

Member's Social Security No.: _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_

\* \* \* \* \*

**FOR COMPLETION BY MEMBERS WHO ARE NOT NATURAL PERSONS:**
(i.e., corporations, partnerships, limited liability companies, trusts or other entities)

Member's Name: _____
(print or type)

By: _____
Name:
Title:

Member's Tax Identification No.: _____

**COUNTERPART SIGNATURE PAGE TO
THE PROFESSIONAL BASKETBALL CLUB, LLC
AMENDED AND RESTATED OPERATING AGREEMENT**

"THE SECURITIES REPRESENTED BY THIS AGREEMENT HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 OR ANY STATE SECURITIES OR BLUE SKY LAWS. THESE SECURITIES MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR AN EXEMPTION FROM OR EXCEPTION TO THE REGISTRATION REQUIREMENTS OF SAID ACT OR LAWS."

imanageOKC_1392489_11

35

IN WITNESS WHEREOF, the parties hereto have executed this Amended and Restated Operating Agreement as of the day and year first above written.

**FOR COMPLETION BY MEMBERS WHO ARE NATURAL PERSONS:**
**(i.e., individuals)**

Member's Name: _Everett R. Dobson_
(print or type)

Member's Signature: _E~ 2U_
(signature)

Member's Social Security No.: _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_

\*\*\*\*\*

**FOR COMPLETION BY MEMBERS WHO ARE NOT NATURAL PERSONS:**
**(i.e., corporations, partnerships, limited liability companies, trusts or other entities)**

Member's Name: _____
(print or type)

By: _____
Name: _____
Title: _____

Member's Tax Identification No.: _____

## COUNTERPART SIGNATURE PAGE TO
## THE PROFESSIONAL BASKETBALL CLUB, LLC
## AMENDED AND RESTATED OPERATING AGREEMENT

"THE SECURITIES REPRESENTED BY THIS AGREEMENT HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 OR ANY STATE SECURITIES OR BLUE SKY LAWS. THESE SECURITIES MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR AN EXEMPTION FROM OR EXCEPTION TO THE REGISTRATION REQUIREMENTS OF SAID ACT OR LAWS."

IN WITNESS WHEREOF, the parties hereto have executed this Amended and Restated Operating Agreement as of the day and year first above written.

**FOR COMPLETION BY MEMBERS WHO ARE NATURAL PERSONS:**
**(i.e., individuals)**

Member's Name: _____
(print or type)

Member's Signature: _____
(signature)

Member's Social Security No.: _____

\*\*\*\*\*

**FOR COMPLETION BY MEMBERS WHO ARE NOT NATURAL PERSONS:**
**(i.e., corporations, partnerships, limited liability companies, trusts or other entities)**

Member's Name: _____ Triple Double, LLC _____
(print or type)

By: _____
Name: Domer Scaramucci, Jr
Title: Manager

Member's Tax Identification No.: _____ 20-5627600 _____

## COUNTERPART SIGNATURE PAGE TO
## THE PROFESSIONAL BASKETBALL CLUB, LLC
## AMENDED AND RESTATED OPERATING AGREEMENT

"THE SECURITIES REPRESENTED BY THIS AGREEMENT HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 OR ANY STATE SECURITIES OR BLUE SKY LAWS.  THESE SECURITIES MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR AN EXEMPTION FROM OR EXCEPTION TO THE REGISTRATION REQUIREMENTS OF SAID ACT OR LAWS."

**ANNEX A**
**LIST OF MEMBERS**

| Name and Address of Member | Capital Commitment | Capital Contributions | Number and Type of Units Issued |
|---|---|---|---|
| DP-OKCB, LLC<br>c/o Dorchester Capital<br>210 Park Avenue, Suite 3121<br>Oklahoma City, OK  73102<br>Attn: Clayton I. Bennett<br><br>Office: (405) 236-5179<br>Fax:     (405) 236-5010<br>cbennett@dorcap.com | $50,000,000.00 | $50,000,000.00 | 50,000,000<br>Common Units |
| Aubrey K. McClendon<br>Chairman and CEO<br>Chesapeake Energy Corporation<br>P.O. Box 18496<br>Oklahoma City, OK  73154<br><br>Office: (405) 879-9216<br>Fax:     (405) 879-9586<br>amcclendon@chkenergy.com | $50,000,000.00 | $50,000,000.00 | 50,000,000<br>Common Units |
| Huntington, LLC<br>c/o MidFirst Bank<br>P.O. Box 26750<br>Oklahoma City, OK  73126<br>Attn:  G. Jeffrey Records, Jr.<br><br>Office: (405) 767-7777<br>Fax:     (405) 843-6821<br>jeff.records@midfirst.com | $50,000,000.00 | $50,000,000.00 | 50,000,000<br>Common Units |
| Tom L. Ward<br>Chairman and CEO<br>SandRidge Energy, Inc.<br>1601 N.W. Expressway,<br>Suite 1600<br>Oklahoma City, OK  73118<br><br>Office: (405) 753-5505<br>Fax:     (405) 848-5143<br>tward@sdrge.com. | $50,000,000.00 | $50,000,000.00 | 50,000,000<br>Common Units |

| | | | |
|---|---|---|---|
| Cameron Hoops, LLC<br>c/o American Fidelity Company<br>P.O. Box 25523<br>Oklahoma City, OK 73125<br>Attn: William M. Cameron<br><br>Office: (405) 523-5016<br>Fax:    (405) 523-5421<br>bcameron@af-group.com | $20,000,000.00 | $20,000,000.00 | 20,000,000<br>Common Units |
| Everett R. Dobson<br>Chairman and CEO<br>Dobson Communications Corp.<br>14201 Wireless Way<br>Oklahoma City OK 73134<br><br>Phone: (405) 529-8305<br>Fax:    (405) 529-8515<br>everettd@dobson.net | $10,000,000.00 | $10,000,000.00 | 10,000,000<br>Common Units |
| Robert E. Howard II<br>President<br>Bob Howard Auto Group<br>1325 North Broadway<br>Oklahoma City, OK 73103<br><br>Phone: (405) 236-1224<br>Fax:    (405) 228-0642<br>bob@mbokc.com | $20,000,000.00 | $20,000,000.00 | 20,000,000<br>Common Units |
| Triple Double, LLC<br>P.O. Box 720420<br>Norman, OK 73070<br><br>Phone:        (405) 670-8350<br>Home Fax:   (405) 329-5146<br>jay@balon.com | $10,000,000.00 | $10,000,000.00 | 10,000,000<br>Common Units |

## Annex B: Definitions

As used in this Agreement, the following terms have the following meanings:

"Act" has the meaning set forth in the Recitals to this Agreement.

"Additional Capital Contribution Projections" has the meaning set forth in Section 4.5.

"Adjusted Deficit" means, with respect to any Member, the deficit balance, if any, of such Member's Capital Account as of the end of the relevant Fiscal Year or other period, after giving effect to the following adjustments:

    (a)    Credit to such Capital Account any amounts that such Member is obligated to contribute or restore to the Company or is deemed to be obligated to restore to the Company pursuant to the penultimate sentence of Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5) and

    (b)    Debit to such Capital Account the items described in Regulations Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) and 1.704-1(b)(2)(ii)(d)(6).

The foregoing definition of "Adjusted Deficit" is intended to comply with the provisions of Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

"Affiliate" means, with respect to any Person, a Person that, directly or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person. For purposes of this definition, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise. An Affiliate of a Member also shall include any Person that is an officer, director, manager, employee or trustee of such Member.

"Agreement" has the meaning set forth in the Preamble to this Agreement.

"Approved Budget" has the meaning set forth in Section 4.5.

"Associational Approval" means such approval, if any, as may be required by the National Basketball Association, the Women's National Basketball Association, the Office of the Commissioner of the National Basketball Association and/or the Office of the Commissioner of the Women's National Basketball Association pursuant to the NBA Regulations. Determinations as to whether the Associational Approval is required, and from whom such approval must be forthcoming, shall be made by the National Basketball Association and the Women's National Basketball Association, as appropriate.

"Bankrupt" means, with respect to any person, a person (a) that (i) makes an assignment for the benefit of creditors; (ii) files a voluntary petition in bankruptcy; (iii) is adjudged a bankrupt or insolvent, or has entered against him an order for relief, or is declared insolvent in any bankruptcy or insolvency proceedings; (iv) files a petition or answer seeking for the person a reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief

B-1

under any statute, law, or regulation; (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the person in a proceeding of the type described in subclauses (i) through (iv) of this clause (a); or (vi) seeks, consents to, or acquiesces in the appointment of a trustee, receiver, or liquidator of the person's or of all or any substantial part of the person's properties; or (b) against whom, a proceeding seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any law has been commenced and 120 days have expired without dismissal thereof or with respect to whom, without the person's consent or acquiescence, a trustee, receiver, or liquidator of the person or of all or any substantial part of the person's properties has been appointed and 90 days have expired without the appointment having been vacated or stayed, or 90 days have expired after the date of expiration of a stay, if the appointment has not previously been vacated.

"Board" means the Board of Managers appointed pursuant to Article VI.

"Capital Account" means the capital account maintained for each Member pursuant to the terms of Section 4.4.

"Capital Call" has the meaning set forth in Section 4.1.

"Capital Commitment" means the total amount of money committed to be contributed by a Member to the Company set forth in Annex A, subject to increases as provided in Section 4.1.

"Capital Contribution" means, with respect to any Member, the amount of money and the initial Gross Asset Value of any property (other than money) contributed to the Company by such Member.

"Cash Available for Tax Distributions" means cash funds of the Company that are (i) in excess of amounts reasonably required for the repayment of borrowings (including Operating Advances then due and payable), interest thereon, other liabilities and expenses, working capital and reserves that the Controlling Member deems reasonably necessary or advisable for the proper operation of the business of the Company and (ii) not needed to sustain "first class" operations in accordance with NBA Regulations.

"Certificate" has the meaning set forth in the Recitals to this Agreement.

"Class" has the meaning set forth in Section 3.1.

"Code" means the Internal Revenue Code of 1986 and any successor statute, as amended from time to time.

"Common Member" means a Person who owns Common Units of the Company and who has been admitted to the Company as a Member.

"Common Units" means Units of the Company designated as Common Units pursuant to Section 3.1 and may include any other Classes if and when determined by the Board pursuant to Section 3.1.

"Company Business Opportunity" means any business venture that (i) relates to the

ownership, operation or management of a professional men's or women's basketball team in the United States, Canada or Europe; (ii) the sale of goods or provision of services which use or employ, directly or indirectly, any trade name, trademark or logos of the SuperSonics, Storm or any other professional men's or women's basketball team, whether such goods or services are provided in the United States or outside of the United States, and whether or not such sales or services are subject to the protections afforded under federal and state laws governing the use of trade names, trademarks, logos or other similar items; and (iii) the right to broadcast, distribute, market or promote the distribution of, radio broadcasts or television rights of the SuperSonics or Storm games, whether such rights are subject to the rules and regulations of the National Basketball Association, or are offered in the United States or outside of the United States.

"Company" has the meaning set forth in the Preamble to this Agreement.

"Company Minimum Gain" has the meaning of "partnership minimum gain" set forth in Regulations Sections 1.704-2(b)(2) and 1.704-2(d).

"Controlling Group" has the meaning set forth in Section 12.5.

"Controlling Member" means the Member appointed to manage and operate the Company pursuant to Article VI and the NBA Regulations.

"Delinquent Member" has the meaning set forth in Section 4.2.

"Dispose," "Disposing" or "Disposition" means any direct or indirect sale, assignment, transfer, exchange, mortgage, pledge, grant of a security interest, or other disposition or encumbrance (including, without limitation, by operation of law), or the acts thereof; provided that, for the avoidance of any doubt, a negative pledge granted by a Member with respect to any Units shall not be considered a Disposition of such Units so long as such pledge does not cause the underlying indebtedness incurred by such Member to be considered indebtedness of the Company pursuant to the NBA Regulations and such Member provides to the Controlling Member such evidence and assurances as the Controlling Member may reasonably require. The following shall be deemed to be Dispositions subject to the restrictions of this Agreement: (i) any Disposition of any Units pursuant to a property settlement agreement or by court decree in connection with any marriage dissolution proceeding involving an individual Member; (ii) the Bankruptcy or liquidation of any Member; and (iii) the death of an individual Member. With respect to clauses (ii) and (iii), any Disposition of Units by a representative of the Bankrupt Member or the estate of the deceased Member shall be subject to the terms of this Agreement and to the restrictions on Disposition described herein as if such representative or estate constituted a Member.

"Equity Participation Member" means a Person who holds Equity Participation Units of the Company and who has been admitted to the Company as a Member.

"Equity Participation Units" means Units of the Company designated as Equity Participation Units pursuant to Section 3.1.

"Gross Asset Value" means, with respect to any Company asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(a)    The initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as determined by the contributing Member with the approval of the Board;

(b)    In order to preserve the economic interests of each Member in the Company, the Board may (but shall not be required to) adjust the Gross Asset Values of all Company assets to equal their respective gross fair market values, as determined by the Board, immediately prior to the following times: (i) the acquisition of additional Units in the Company by any new or existing Member for more than *a de minimis* Capital Contribution, (ii) the acquisition of additional Units in the Company upon exercise of an Option pursuant to Section 3.3(c); (iii) the distribution by the Company to a Member of more than *a de minimis* amount of Company property, (iv) the withdrawal of a Member, and (v) the liquidation of the Company;

(c)    The Gross Asset Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Regulations Section 1.704-1(b)(2)(iv)(m); provided, however, that Gross Asset Values shall not be adjusted pursuant to this item (c) to the extent an adjustment is made at that time pursuant to item (a) or (b) of this definition; and

(d)    The Gross Asset Value of any Company asset distributed in kind to any Member shall be adjusted to equal its gross fair market value, as determined by the Board on the date of distribution.

"Indemnified Person" shall mean (a) the Controlling Member, (b) each Member and Manager and each officer, member, partner, shareholder, employee or agent thereof and (c) each Officer, employee or agent of the Company.

"IRR Hurdle" has the meaning set forth in Section 3.3(c).

"Liquidator" has the meaning set forth in Section 13.3.

"Losses" has the meaning set forth in Section 9.2(a).

"Manager" means any natural Person (including the Controlling Member) designated to serve on the Board in this Agreement or hereafter appointed to serve on the Board as provided in this Agreement, but does not include any Person who has ceased to serve on the Board.

"Member" means any Person executing this Agreement as of the date of this Agreement as a member or hereafter admitted to the Company as a member as provided in this Agreement, but does not include any Person who has ceased to own any Units.

"Member Nonrecourse Debt" has the meaning of "partner nonrecourse debt" set forth in Regulations Section 1.704-2(b)(4).

"Member Nonrecourse Debt Minimum Gain" has the meaning of "partner nonrecourse debt minimum gain" set forth in Regulations Section 1.704-2(b)(3) and determined in accordance with Regulations Section 1.704-2(i)(3).

"Member Nonrecourse Deductions" means "partner nonrecourse deductions" set forth in Regulations Section 1.704-2(i)(2).

"National Basketball Association" means the National Basketball Association and its constituent owners, teams and governing bodies.

"NBA Regulations" means the Constitution and Bylaws of the National Basketball Association and the operating or governing rules, regulations, policies, bulletins, directives and procedures of the National Basketball Association and the Women's National Basketball Association, each as the same now exists or may be amended or adopted in the future.

"Net Income" and "Net Loss" mean, for each fiscal year or other period, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(a)    Any income of the Company that is exempt from federal income tax shall be added to such taxable income or loss;

(b)    Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulations Section 1.704-1(b)(2)(iv) shall be subtracted from such taxable income or loss;

(c)    Gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of the asset differs from its Gross Asset Value; and

(d)    Notwithstanding any other provision herein, any items of income, gain, loss or deduction specially allocated pursuant to Article V shall not be taken into account in computing Net Income or Net Losses.

"Nonrecourse Deductions" has the meaning set forth in Regulations Section 1.704-2(b)(1).

"Nonrecourse Liability" has the meaning set forth in Regulations Section 1.704-2(b)(3).

"Non-Transferring Members" has the meaning set forth in Section 12.3(a).

"Offering Member" has the meaning set forth in Section 12.3(a).

"Officer" means a Person appointed by the Controlling Member pursuant to Section 7.1 to implement the management decisions of the Controlling Member and handle the day-to-day operational affairs of the Company.

"Operating Advances" has the meaning set forth in Section 3.6.

"Options" has the meaning set forth in Section 3.3(a).

"Original Agreement" has the meaning set forth in the Recitals to this Agreement.

"Participation Threshold" has the meaning set forth in Section 3.3(c).

"Person" means any individual, general partnership, limited partnership, corporation, joint venture, trust, business trust, limited liability company, limited liability partnership, cooperative, association or other legal entity.

"Pro Rata Basis" means, subject to any special or preferential allocation and distribution rights of any Class of Units issued pursuant to Section 3.1, all amounts available will be distributed ratably among all Members based upon the number of outstanding Units entitled to participate in such distribution held by such Member compared to the total number of Units outstanding and entitled to participate. For the avoidance of doubt, all Common Units outstanding are entitled to participate; only Equity Participating Units for which an applicable IRR Hurdle or Participation Threshold has not been met would not participate; once an amount has been distributed which would meet an established Participation Threshold or cause an IRR Hurdle to be satisfied then such Units would participate only in additional amounts thereafter distributed; and any Units outstanding that are subject to other vesting requirements shall not be considered outstanding or entitled to participate until such vesting requirement is satisfied and then only thereafter.

"Pro Rata Share" means that percentage obtained for each Member equal to (i) with respect to any new issuance of equity securities as described under Section 3.5, that amount of such equity securities which would result in the applicable Member owning the same percentage of the Company's issued and outstanding Common Units after the issuance of the equity securities as such Member owned immediately prior to the issuance (excluding Equity Participation Units and the issuance of any Units issuable upon exercise of any unexercised Options and conversion of any convertible equity securities); (ii) with respect to Operating Advances being made under Section 3.6, the number of Common Units owned by a Member divided by the total number of issued and outstanding Common Units; and (iii) with respect to Capital Calls pursuant to Section 4.1 and Capital Commitments pursuant to Section 4.5, the number of Units owned by such Member of any Class subject to Capital Calls divided by the total number of issued and outstanding Units of the Company of any Class subject to Capital Calls.

"Prime Rate" means a rate per annum equal to a varying rate per annum that is equal to the prime rate of interest as reported in the *Wall Street Journal,* with adjustments in that varying rate to be made on the same date as any change in that rate.

"Regulations" means the income tax regulations promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

"Relative" of a specified Person shall mean any parent, spouse, child, grandchild or sibling of such specified Person, and the terms "child" and "grandchild" shall include a Person's natural or legally adopted child and the natural or legally adopted children of such child.

"Required Member Interest" means the consent of one or more Members holding, in the aggregate, at least 66 $^2/_3$% of the then outstanding Common Units.

"Storm" means the Seattle Storm, a professional women's basketball team participating in the Women's National Basketball Association.

"Substantial Cause" with respect to the Controlling Member means: (i) the Controlling Member's willful neglect of duties or failure to act in such a manner that causes, or could reasonably be expected to cause, material harm to the Company, (ii) the Controlling Member's use of alcohol or drugs to an extent that such use interferes with the Controlling Member's ability to perform his or her duties and responsibilities under this Agreement or (iii) the conviction of the Controlling Member for, or a plea of guilty or no contest to, a felony or other crime involving fraud, theft, dishonesty or moral turpitude which, in the case of (i) and (ii), continues after the Controlling Member has received written notice thereof from the Board and been afforded a reasonably opportunity to cure.

"SuperSonics" means the Seattle SuperSonics, a professional men's basketball team participating in the National Basketball Association.

"Third-Party Acquirer" has the meaning set forth in Section 12.3(a).

"Women's National Basketball Association" means the Women's National Basketball Association and its constituent owners, teams and governing bodies.

"Unit" means an interest in the Company issued by the Company pursuant to the terms of Article III and includes all Units of all Classes so issued.

# EXHIBIT I

# Outline of Central Staff presentation to PELL Committee on
# KeyArena Economic Impact Assessment
## March 1, 2006

## KeyArena Impact Assessment: CS Observations

- Seattle Center hired UW professor Bill Beyers to conduct an Economic Impact Study for Seattle Center and KeyArena in an attempt to identify the economic benefits generated by these facilities.

- Economic Impact Studies are often commissioned to measure economic impacts of a certain activity to justify public investment.

- Economic Impact Studies attempt to measure both direct and indirect economic impacts associated with an activity.

- If done correctly, Economic Impact Studies can provide a useful measure of the economic impacts of a specific activity, but their results are sometimes used in inappropriate ways.

- Beyer's concluded that Seattle Center as a whole generates $600 million a year in NEW money business activity and of this amount, KeyArena contributes approximately $165 million.

- New money is defined as money that would not otherwise flow to a community unless a particular activity existed.

- Central Staff did not review Beyer's underlying math and assumptions behind his Economic Impact Study of KeyArena. We are assuming that Beyer's knows how to correctly conduct these types of studies. However, these types of studies, even when done correctly, contain some inherent limitations, which are:

    1. In an Economic Impact Study, the economic impacts of a particular activity are not compared to other economic activity in the regional economy. Consequently, economic impacts can sound large when viewed in isolation but when compared to other drivers, they may be relatively small.

    2. Because an Economic Impact Study focuses on the impacts of only one particular activity, they are not particularly useful for deciding how to best invest among competing alternatives—unless studies have also been done for those competing alternatives.

    3. Economic Impact Studies don't take into account the public sector burden, or the tax impacts, associated with facility development.

KALD_00005437

# Economic Impact models and results

## 1. KeyArena Economic Impact Assessment by Prof. William Beyers

**KeyArena Economic Impact**

| Output Measure | King Co. Economy | KeyArena Gross | KeyArena New $ | Sonics/Storm New $ |
|---|---|---|---|---|
| Business Activity | $100,000 m | $353.3 m | $164.6 m | ? |
| # of Jobs | 1,000,000 | 3,252 | 1,572 | ? |
| Labor Income | $52,000 m | $102.1 m | $47.3 m | |
| Tax Revenue | | | | |
| • State | NA | $7.9 m | $3.7 m | ? |
| • Local | Unknown | $5.5 m | $2.7 m | ? |
| | | | | |
| Income per Job | $52,000* | $31,000 | $30,000 | |

*King Co. annual payroll for 2003 divided by # of employees for week of March 12

CS Observations
- Because of modeling constraints, the local region was "tightly drawn." As a result the KeyArena New impacts above are probably somewhat overstated.
- Report does not identify what part of KeyArena impacts are attributable to Sonics/Storm. But it is clear that non Sonics/Storm events (concerts, etc.) contribute significantly – perhaps as much as half.
- If Sonics and Storm left, to the extent the City was successful in finding replacement events, only part of the Sonics/Storm contribution would be lost.

## 2. Is this a big economic impact?  Compared to what?
- KeyArena economic impacts account for 27% of Seattle Center's overall economic activity.
- KeyArena is a small part of the County's economy.  Sonics are a smaller part.
- Tax revenues would have to be compared to additional burden placed on government services.  Input/output analysis such as the Beyers' Report gives us only one half of this cost/benefit assessment, the benefit side.  The imposition or extension of taxes will to some degree reduce the output, jobs and income associated with some local sectors.

## 3. Is an investment to renovate KeyArena an effective way to create or preserve jobs and what sort of jobs?
- Assuming an investment of public funds of around $200 million is necessary to keep the Sonics and further that Sonics/Storm account for about half the net KeyArena job impact, or 800 jobs, then the cost per job preserved is $250,000.  This figure is comparable to estimates from other studies of major league team benefits but expensive compared to alternative job creation/preservation programs.
- Jobs involved are mostly low wage.  Many are seasonal or part time.

KALD_00005438

4. **What are some implications of using $200 million in public funding for KeyArena?**
   - It would preclude other legally feasible uses of these same tax revenues.
     The City Law Department advises us that constitutionally, the Safeco/Qwest taxes, if extended, could be used for ANY public purpose – with the concurrence of the Washington State Legislature. These include education, social services, roads, rapid transit, etc. The Safeco/Qwest taxes have no more nexus with sports stadiums and professional sports teams than with these other public purposes.

   - It will require local citizens (who will pay a portion of the taxes) to cut back on other expenditures to balance their budgets.. One such cutback may be reduced spending on consumer goods and service. Another may be eroded support for discretionary public spending, such as Seattle's voter approved special purpose levies. Both consumer spending and discretionary public spending have their own positive economic impacts that would be foregone (squeezed out).

5. **An alternative approach to valuing teams and sports venues – a multiple city economic comparison study** (Baade and Sanderson, "Employment Impacts of Teams and Sports Facilities." Pp. 92-118 in Zimbalist and Noll, eds., Sports, Jobs & Taxes: The Economic Impact of Sports Teams and Stadiums [Brooking, 1997].

   - Study looked 10 cities, over 35 years, during which there were 155 gains or losses of teams and/or new sports venues

   Findings
   - In 7 of the 10 cities, having a major league team had no identifiable impact on jobs. In 3 of the cities it did. Jobs created ranged from 128 (San Diego) to 356 (Kansas City).
   - In most cases, public investment in a stadium or arena showed no measurable economic impact. This and the finding above led the authors to conclude that "adding a professional sports team or stadium to a city's economy appear to realign leisure spending rather than adding to it and is therefore neutral with regard to job creation."
   - For both teams and venues, the impact was often negative, i.e., a new stadium or a new franchise seemed to be a drag on the local economy! Two examples the authors highlight are a new stadium in Pittsburg and new teams (Mariners and Seahawks). Of these Baade and Sanderson observe that they may imply "that the stadium or team uses labor less intensively per dollar spent on its activities than the leisure activities for which it substitutes."

**Bottom Line:** There is no empirical evidence showing that major league teams and their stadiums/arenas are effective drivers of local and regional economies. There is abundant evidence that they are not. To quote two authorities in the field, "Few fields of empirical economic research offer virtual unanimity of finding. Yet, independent work on the economic

KALD_00005439

impact of stadiums and arenas has uniformly found that there is no statistically significant positive correlation between sports facility construction and economic development."[1]

**Does this mean that it's not worth $200 million or so to keep the Sonics/Storm in the region?**

No, it does not mean that. Jobs and regional output are only part of the picture. There are benefits associated with sports teams that are not easily quantifiable or captured in the economic studies. People get excited about sports and that's worth something. But precisely how much, we can't tell you. We can tell you that in order to finance a $200 million investment to keep the Sonics here over 20 years, assuming the costs were spread evenly over the approximately 0.5 million families in the King County, each would have to pay about $35 a year. If one were to recover the costs over a larger region, the required per family contribution would be commensurately reduced.

---

[1] Siegfried, John and Andrew Zimbalist. 2000. "The Economics of Sports Facilities and Their Communities," Journal of Economic Perspectives, Summer.

KALD_00005440

# EXHIBIT J

**From:**    Johnson, Gerry (SEA)
**Sent:**    Wednesday, September 29, 2004 08:50 AM
**To:**    Terry McLaughlin; Danny Barth; StanBarer@aol.com
**CC:**    Reich, Jay (SEA)
**Subject:**    Talking Points
**Attachments:**    BGJ_O245A==Sonics Talking Points - 9-04.doc

Some taking points and an outline of a proposal for the City per our discussion - good luck and let us know how it goes.

    <<BGJ_O245A==Sonics Talking Points - 9-04.doc>>

## Sonics Talking Points

Background – The current lease between the City and Sonics does not work for either party.

From the Sonics' perspective, it is the worst lease in the NBA and more importantly does not permit the team to be competitive. The Sonics are losing money and cannot afford to invest more in the team if increased revenues only means larger lease payment to the City. Current Sonics ownership must consider sale of the franchise under these conditions and the real possibility that the team will move to a more modern facility (possibly outside the City or even the region) with lease terms comparable to other teams.

From the City's perspective, the current cash flow from the lease is inadequate to meet the needs of the Center especially if the residual debt service on the Key Arena is allocated to Center operations. The Center and the City faces the real possibility of dwindling revenues from the lease, the admissions taxes and parking in the near term and losing its anchor tenant when the current lease expires in 2010, if not sooner.

We appreciate the City's offer to amend the lease to set a maximum payment from suites, clubs, title sponsorships and concessions, but the guarantee is too high and does not create the needed upside for both the City and the Sonics.

We need to work on a long term solution that is a win-win for the City and the Sonics, which in our opinion involves the development of new or remodeled Key Arena commensurate with contemporary professional standards and a long term lease under which the Sonics with retain suites, clubs, title sponsorship and concessions revenues but will be responsible for operation of the building. This is comparable to the Seahawks and Mariners arrangements.

Specifically, we propose the following:

1.    We agree to modify the existing lease by allowing the Sonics to retain revenues from the suites, clubs, title sponsorships and concessions and payment of a fixed fee to cover the Center's costs of operating Key Arena. We estimate this amount to be approximately $1.2 million per year.

2.    The City and the Sonics would work together in the 2005 and 2006 legislatures to assure that revenue sources currently dedicated to the payment of the bonds issued to build Safeco Field and Qwest Stadium would continue to be levied in some mix/at some level after they currently expire when the stadia bonds are retired and that they be pledged to the payment of City bonds issued to rebuild Key Arena. Ideally, the professional sports franchises (Mariners, Seahawks, Sonics and maybe NASCAR) would concur on a joint approach to the legislature to retain sufficient revenues from these various sources to enable the Sonics Arena project to proceed as well as provide on-going funding for capital improvements for the other facilities as well.

3.  The Sonics would agree to extend the current lease as modified pursuant to #1 above to 2015; provided, that if we were not successful in getting legislation passed as outlined in #2 above, the Sonics would have the right in 2010 to terminate the lease and pay liquidated damages in an amount to be negotiated (but not greater than the difference between $4.5million and the $1.2 million for the years 2005 through 2010), less amounts that were spent by the Sonics in the design, development and lobbying for the new facility.  In the event the legislature does pass and the project goes forward, the Sonics would agree to contribute the same amount as the liquidated damages to construction of the new facility.

4.  The Sonics would agree that prior to any sale to a new ownership group, they would give a right of first refusal on the same terms to a local ownership group.

K:\99980\40000\BGJ\BGJ_O245A

-2-