The Honorable Marsha J. Pechman

1

2

3

4

5

6

7

8                              UNITED STATES DISTRICT COURT
                               WESTERN DISTRICT OF WASHINGTON
9

10   CITY OF SEATTLE, a first-class charter city,    )   No. C07-1620MJP
                                                     )
11                           Plaintiff,              )   DECLARATION OF STEVEN C. MINSON
                                                     )   IN SUPPORT OF DEFENDANT'S
12        v.                                         )   MOTION TO (i) ELIMINATE
                                                     )   ATTORNEY'S EYES ONLY ("AEO")
13   THE PROFESSIONAL BASKETBALL CLUB,)               DESIGNATIONS AND ELIMINATE
     LLC, an Oklahoma limited liability company,     )   IMPROPER PRIVILEGE REDACTIONS;
14                                                   )   (ii) SEAL DOCUMENTS PENDING
                             Defendant.              )   RULING ON AEO STATUS, and (iii)
15                                                   )   ELIMINATE TEN-DAY WAITING
                                                     )   PERIOD
16                                                   )
                                                     )   NOTE ON MOTION CALENDAR:
17                                                   )   April 25, 2008
                                                     )
18                                                   )   [REDACTED VERSION OF
                                                     )   DECLARATION (EX. 2 FILED UNDER
19                                                   )   SEAL)]
                                                     )
20   _____

21        Steven C. Minson declares as follows:

22        I am one of the attorneys of record for defendant the Professional Basketball Club in this

23   action.  The following is true and correct and based upon my own personal knowledge:

24        1.      Attached as Exhibit 1 is a true and correct copy of excerpts of the deposition of

25   Gregory James Nickels, taken April 2, 2008.

26        2.      Attached as Exhibit 2 is a true and correct copy of selected documents produced

     by Matt Griffin pursuant to PBC's Subpoena.

DECLARATION OF MINSON IN SUPPORT OF DEF'S MOTION            BYRNES & KELLER LLP
TO (i) ELIMINATE AEO DESIGNATIONS AND ELIMINATE                   38TH FLOOR
IMPROPER PRIVILEGE REDACTIONS; (ii) SEAL DOCUMENTS,          1000 SECOND AVENUE
and (iii) ELIMINATE TEN-DAY WAITING PERIOD [REDACTED      SEATTLE, WASHINGTON 98104
VERSION OF DECLARATION]] (C07-1620MJP) - 1                      (206) 622-2000

1    3.    Attached hereto as Exhibit 3 is a true and correct copy of the Key Arena Proposal
2    News Conference Potential Questions and Suggested Responses.

3    4.    Attached hereto as Exhibit 4 are true and correct copies of the PBC's March 12,
4    2008, Subpoena to Matt Griffin, and Griffin's Objections and Responses to the Subpoena, dated
5    March 27, 2008.

6    5.    Attached hereto as Exhibit 5 is a true and correct copy of a letter dated April 11,
7    2008, from David M. Byers to Steven C. Minson.

8    6.    Attached hereto as Exhibit 6 is a true and correct copy of the City of Seattle's
9    Memorandum of Law in Support of Motion to Compel, in the New York District Court,
10   Southern District of New York, dated April 9, 2008.

11   7.    After reviewing Matt Griffin's documents on April 11-12, 2008, I challenged
12   Griffin's AEO designations and redactions by email on April 12, 2008, and requested a
13   telephone conference for 3:00 p.m., Monday, April 14, 2008.  Counsel for Griffin were not
14   available for that call and did not return a telephone message.  After further exchange of email, it
15   became clear on April 15 that the parties were at an impasse.

16   I declare under penalty of perjury under the laws of the State of Washington that this
17   declaration is true and correct.

18   DATED in Seattle, Washington, this _l_l_ day of April, 2008.

19

20

21   Steven C. Minson, WSBA #30974

22

23

24

25

26

DECLARATION OF MINSON IN SUPPORT OF DEF'S MOTION
TO (i) ELIMINATE AEO DESIGNATIONS AND ELIMINATE
IMPROPER PRIVILEGE REDACTIONS; (ii) SEAL DOCUMENTS,
and (iii) ELIMINATE TEN-DAY WAITING PERIOD [REDACTED
VERSION OF DECLARATION]] (C07-1620MJP) - 2

BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

**CERTIFICATE OF SERVICE**

I hereby certify that on the 16th day of April, 2008, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Thomas A. Carr (thomas.carr@seattle.gov)
Gregory C. Narver (gregory.narver@seattle.gov)
Seattle City Attorney
600 Fourth Avenue, 4th Floor
P.O. Box 94769
Seattle, WA 98124-4769

Slade Gorton (slade.gorton@klgates.com)
Paul J. Lawrence (paul.lawrence@klgates.com)
Jeffrey C. Johnson (jeff.johnson@klgates.com)
Michelle Jensen (michelle.jensen@klgates.com)
K&L Gates
925 4th Avenue, Suite 2900
Seattle, WA 98104

and I hereby certify that I have hand delivered the document to the following counsel:

J. J. Leary, Jr.
Mike Fandel
Graham & Dunn PC
Pier 70
2801 Alaskan Way ~ Suite 300
Seattle, WA 98121-1128

/s/ Bradley S. Keller
Bradley S. Keller, WSBA #10665
Byrnes & Keller LLP
1000 Second Avenue, 38th Floor
Seattle, WA 98104
Telephone: (206) 622-2000
Facsimile: (206) 622-2522
bkeller@byrneskeller.com

DECLARATION OF MINSON IN SUPPORT OF DEF'S MOTION
TO (i) ELIMINATE AEO DESIGNATIONS AND ELIMINATE
IMPROPER PRIVILEGE REDACTIONS; (ii) SEAL DOCUMENTS,
and (iii) ELIMINATE TEN-DAY WAITING PERIOD **[REDACTED
VERSION OF DECLARATION]]** (C07-1620MJP) - 3

BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

# EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

_____

| | |
|---|---|
| CITY OF SEATTLE, a first-class charter city, | ) ) ) |
| Plaintiff, | ) ) ) |
| vs. | ) No. C07-1620MJP ) |
| THE PROFESSIONAL BASKETBALL CLUB, LLC, an Oklahoma limited liability company, | ) ) ) ) |
| Defendant. | ) |

_____

Videotaped Deposition Upon Oral Examination

of

GREGORY JAMES NICKELS

_____

Taken at 600 Fourth Avenue, 7th Floor
Seattle, Washington

DATE:   April 2, 2008

REPORTED BY:  Brigid M. Donovan, RPR, CCR
        CCR NO.:  2070

STARKOVICH REPORTING SERVICES
(206) 323-0919

44

1  entered into in the mid-1990s, where revenue generated

2  within the building was used to pay for the physical

3  improvements and the debt on the issue to make the

4  physical improvements, no longer was a viable model.

5      Q    So the revenue model of the original lease had

6  become economically dysfunctional?

7      A    Yes, I think that's what they were saying.

8      Q    And that was the same thing that the Schultz

9  organization had said to you during the negotiations and

10 discussions, right?

11     A    Yes.

12     Q    They said this lease is economically

13 dysfunctional.  It doesn't work anymore given the

14 economics of a professional sports franchise?

15             MR. NARVER:  Object to the form.

16     Q    That's what they said to you, right?

17             MR. NARVER:  Object.

18     A    Not in so many words, but the sense was --

19 that was the sense of it.

20     Q    That was the substance of it, right?

21     A    Uh-huh.

22     Q    And here was your task force and they came

23 back and said the same thing to you:  This lease is

24 economically dysfunctional due to the economics of a

25 professional sports franchise.

45

1              MR. NARVER:  Object to the form.  The

2    document speaks for itself.

3         A    They were saying, as this report says, that

4    they didn't believe that the Center, the Key Arena, or

5    the anchor tenants could be financially successful under

6    that model.

7         Q    The lease had become economically

8    dysfunctional, right?

9              MR. NARVER:  Object to the form.

10        Q    For the anchor tenants.

11             MR. NARVER:  Same objection.

12        A    For the Key Arena, the anchor tenants, and

13   Seattle Center.  They had concerns.

14        Q    And the problem, part of the problem was

15   that -- I don't mean to be pejorative here, but there

16   was an overhang from the construction debt, and the cost

17   of financing that debt was so great that it was

18   detracting from that revenue stream being used to

19   improve the facility.

20             MR. NARVER:  Object to the form.

21        A    The economics of basketball had changed, not

22   the lease or the conditions of the facility.  The

23   economics of basketball had changed.

24        Q    But part of the problem was that you had tens

25   of millions of dollars of debt that need to be financed

46

1    from the prior remodel, right?

2        A    Yes, there was a --

3                MR. NARVER:  Object to the form.  Facts

4    not in evidence.

5        Q    And the city -- and for every dollar that

6    went, as you pointed out earlier in the deposition,

7    every dollar that went to the city to pay for principal

8    and interest on that debt was another dollar that didn't

9    go to the basketball operations, right?

10               MR. NARVER:  Object to form.

11       A    Right.  It went to the pay for the facility in

12   which they played.

13       Q    The third bullet point here talks about,

14   quote, Successful arenas hosting NBA basketball are

15   significantly larger than the Key Arena, roughly double

16   the square footage.  See that?

17       A    Yes.

18       Q    Do you agree with that?

19       A    I don't have a personal opinion about that.  I

20   accept that they looked at that and that factually

21   that's correct.

22       Q    These were the experts you asked to go do a

23   fact-finding --

24       A    These were citizens who worked with experts,

25   but yes.

47

1          MR. NARVER:  Object to the form of the

2    question.

3          Q    So do you accept their recommendation or do

4    you question it?

5          MR. NARVER:  Object to the form.

6          MR. KELLER:  That is a good objection.

7          Q    Do you agree with their factual observation or

8    do you challenge it?

9          A    I have no reason to challenge it.  I accept

10   that they looked at it and that it's correct.

11         Q    Now, you knew from your discussions with the

12   Schultz group that the size of the arena impacts other

13   revenue-generating opportunities that the tenant has in

14   the facility, right?

15         MR. NARVER:  Object to the form.

16   Mischaracterizes testimony.

17         A    That more space would allow for more revenue

18   generation.

19         Q    More restaurants, more merchandising?

20         A    Easier access.

21         Q    That's kind of revenue opportunity, correct?

22         A    Yes.

23         Q    In fact, the most recent expansion of Key

24   Arena that you've discussed with the Griffin and Ballmer

25   and Stanton group involves an almost doubling of the

163

1

2

3

4

5                    A F F I D A V I T

6

7   STATE OF WASHINGTON )
                        )    SS.
8   COUNTY OF KING      )

9

10         I have read my within deposition, and the same

11  is true and correct, save and except for changes and/or

12  corrections, if any, as indicated by me on the

13  "CORRECTIONS" flyleaf page hereof.

14

15         _____

16              GREGORY JAMES NICKELS

17

18         SUBSCRIBED AND SWORN to before me

19  this _____ day of _____, 2008.

20

21              _____

22              NOTARY PUBLIC in and for
                the State of Washington,
23              residing at _____.
                My commission expires
24              _____.

25

NICKELS


C E R T I F I C A T E

STATE OF WASHINGTON )
                    ) SS.
COUNTY OF KING      )


        I, the undersigned officer of the Court,
under my commission as a Notary Public in and for
the State of Washington, hereby certify that the
foregoing deposition upon oral examination of the
witness named herein was taken stenographically before
me and thereafter transcribed under my direction;
        That the witness before examination was first
duly sworn by me to testify truthfully; that the
transcript of the deposition is a full, true and correct
transcript of the testimony, including questions and
answers and all objections, motions, and exceptions of
counsel made and taken at the time of the foregoing
examination;
        That I am neither attorney for, nor a relative
or employee of any of the parties to the action;
further, that I am not a relative or employee of any
attorney or counsel employed by the parties hereto, nor
financially interested in its outcome.


        IN WITNESS WHEREOF, I have hereunto set my
hand and seal this 15th day of April, 2008.


                    _____

                    Brigid M. Donovan
                    NOTARY PUBLIC in and for
                    the State of Washington,
                    residing at Federal Way.
                    My commission expires
                    December 19, 2008.


        STARKOVICH REPORTING SERVICES
              (206) 323-0919

STARKOVICH
REPORTING SERVICES
P.O. BOX 22884
SEATTLE, WASHINGTON  98122
(206) 323-0919
FAX (206) 328-0632


April 15, 2008

To:  Gregory Narver
     Seattle City Attorney
     600 Fourth Avenue, 4th Floor
     P.O. Box 94769
     Seattle, Washington 98124

Re: City of Seattle v The Professional Basketball Club
Deposition of:  GREGORY JAMES NICKELS
Date Taken:  April 2, 2008
Cause No.:  C07-1620MJP


Enclosed are two forms:  "Affidavit" and a "Correction
Sheet."  Instruct the deponent to review the deposition,
record any corrections over his signature on the
Correction Sheet, and sign the Affidavit before a Notary
Public.  If there are corrections, please furnish other
counsel with copies.  Return both forms to this office
for their inclusion in the original transcript.  The
transcript will be forwarded to the appropriate party
_____.


Thank you for your assistance in obtaining signature.


By:  Brigid M. Donovan, RPR, CCR


cc: Bradley S. Keller


STARKOVICH REPORTING SERVICES
(206) 323-0919

# FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER DATED 3/13/08

# EXHIBIT 2

# EXHIBIT 3

**KeyArena Proposal News Conference**
**Potential Questions and Suggested Responses**

**Clay Bennett has said he won't sell the team, so why bother?**
- Proposal announced today offers our best opportunity to keep basketball in Seattle and renovate KeyArena with an equitable mix of private and public funds.

- This owners group has said its first priority is to purchase this franchise. Its second is to purchase another franchise to bring to Seattle with the name "Sonics."

- Basketball accounts for just a quarter of the events hosted at KeyArena. The City has an obligation to ensure KeyArena remains a viable public facility for generations to come.

- Proposal announced today ensures a mix of private and public funds will pay for needed improvements. Half of the investment in KeyArena will come from the private sector.

- Providing amenities like KeyArena is one of the things cities do to ensure a better quality of life for their residents.

**What happens if this new group of owners don't buy the team?**
- Deal contingent on buying Sonics or purchasing another team.

**The legislative session is almost over. Why did you wait until the last minute to spring a new proposal?**
- Not a new proposal – been in the works since last December.

- Only change: local ownership group has stepped up with a commitment of $150 million to fix KeyArena.

- Know timing tight, which is why we have been working on this with the Governor, Speaker of the House and other key leaders in Olympia for several months.

- Have been working throughout the session on this.

**Why now? Why not do this for the current owners?**
- With the vote in Oklahoma, Mr. Bennett has made it clear he has no intention of staying in Seattle.

- Have a truly engaged local ownership group for the first time.

- Willing to be full partners with us in solving this problem.

KALD_02000371

**How does this affect the court case with the current Sonics owners?**
- KeyArena proposal announced today and the court case are two separate issues.

- However, with local owners and KeyArena solution, it presents us with a different way of dealing with the NBA in settling this problem.

- The court case is all about an existing lease and holding the current owners to their contractual obligations.

**Initiative 91 limits taxpayer subsidies for a new Sonics arena. How do you get around that?**
- The author of I-91 has said he believes it meets the requirements of I-91.

- Private funds will pay for improvements directly benefiting a basketball team.

- Public funds will pay for general building improvements – things we'd have to do anyway to ensure KeyArena remains a viable facility.

- Keeping a basketball team in KeyArena is the only way to leverage state and private funds. Otherwise, Seattle would have to pay for all the improvements itself.

**Does this have to go a public vote?**
- Have to say I agree with Chris Van Dyk. This proposal meets the terms of I-91 and the public has already had its say-so.

**Who's on the hook for cost overruns?**
- Something we'll discuss when we hammer out the lease agreement.

**How does affect the existing $25 million in KeyArena debt?**
- It's included in the $300 million cost.

KALD_02000372

# EXHIBIT 4

The Honorable Marsha J. Pechman

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

CITY OF SEATTLE, a first-class charter city,      )   No. CV07-1620 MJP
                                                   )
                    Plaintiff,                     )   OBJECTIONS TO SUBPOENA
                                                   )   DIRECTED TO MATT GRIFFIN
vs.                                                )
                                                   )
THE PROFESSIONAL BASKETBALL CLUB,)
LLC, an Oklahoma limited liability company,       )
                                                   )
                    Defendant.                     )
                                                   )

## GENERAL OBJECTIONS

1.      Matt Griffin ("Griffin") objects to the Subpoena, dated March 12, 2008, insofar as it seeks the production of documents by March 27, 2008, and therefore does not provide a reasonable amount of time for Griffin to comply with the Subpoena, particularly in light of the overbroad subpoena topics and the need to identify documents protected by attorney-client privilege or by other defenses to production of confidential information.

2.      Griffin objects to the Subpoena insofar as it potentially seeks privileged or sensitive, highly confidential business, financial or personal information.   Griffin will not produce privileged documents and will only produce such other documents within the context of an appropriate protective order.

OBJECTIONS TO SUBPOENA
DIRECTED TO MATT GRIFFIN – 1

No. CV07-1620 MJP
M38719-1018259

**GRAHAM & DUNN** pc
Pier 70, 2801 Alaskan Way ~ Suite 300
Seattle, Washington  98121-1128
(206) 624-8300/Fax: (206) 340-9599

3.    Griffin objects to the Subpoena to the extent it would require producing electronic documents from sources that are not reasonably accessible or would require an undue burden to produce.

4.    These General Objections apply to each of the responses below, whether or not they are referred to in any response. The responses below do not waive, in whole or in part, any of these General Objections.

## RESPONSES AND OBJECTIONS TO SUBPOENA TOPICS

1.    **All documents constituting, referring or relating to communications between you and any representative of the City of Seattle concerning the Seattle SuperSonics.**

### RESPONSE TO REQUEST NO. 1:

Griffin objects to this request as overly broad and unduly burdensome, in light of the fact that the request seeks documents that are irrelevant to the underlying dispute or of limited relevance in light of the burden involved in identifying and producing them. The lawsuit at issue is between the current owner of the Sonics (The Professional Basketball Club, LLC or "PBC") and the City of Seattle, and relates to the PBC's performance and threatened breach of its lease agreement with the City. This request is overly broad as to time, seeking documents dating back to January 1, 2004 (or, in the case of email accounts, those used over the past three years). That period predates even the involvement of the PBC and the City with each other. Griffin further objects on the grounds that the request is overbroad as to topic, as it seeks production of all communications "concerning the SuperSonics" regardless of whether these documents have anything to do with the PBC or the dispute between the PBC and the City.

Griffin also objects to the production of documents without entry of an appropriate protective order, which may require specific provisions barring review of especially sensitive documents by the PBC or the City.

OBJECTIONS TO SUBPOENA
DIRECTED TO MATT GRIFFIN -- 2

No. CV07-1620 MJP
M38719-1018259

**GRAHAM & DUNN** PC
Pier 70, 2801 Alaskan Way ~ Suite 300
Seattle, Washington 98121-1128
(206) 624-8300/Fax: (206) 340-9599

1    Griffin is prepared to discuss with counsel narrowing the request to avoid unnecessary

2    burden, and producing non-privileged and non-protected documents responsive to an

3    appropriately narrowed request.

4

5    **2.    All documents constituting, referring or relating to communications between**

6    **you and any other person relating to a contemplated acquisition of the Seattle SuperSonics.**

7    **RESPONSE TO REQUEST NO. 2**

8    Griffin objects to this request as overly broad and unduly burdensome, in light of the fact

9    that it seeks documents that are irrelevant to the underlying dispute or of limited relevance in

10   light of the burden involved in identifying and producing them.  Griffin objects on the grounds

11   that the request is overly broad as to time.  The requested period extends well before this dispute

12   arose and well before the PBC and the City of Seattle had any involvement with one another.

13   Griffin further objects on the grounds that the request is overbroad as to topic, as it requires

14   production of all communications concerning the contemplated acquisition of the SuperSonics,

15   regardless of whether these documents are specifically related to the acquisition of the Sonics

16   from the PBC.  Moreover, the request is overbroad in that all documents related to the

17   contemplated acquisition of the Sonics would potentially encompass documents having nothing

18   to do with the underlying dispute regarding the lease or would be of limited relevance in light of

19   the undue burden of identifying and producing them.  Further, Griffin objects that the request is

20   vague and/or overbroad in that it does not limit in any way the "persons" involved, and thus

21   includes communications with parties unlikely to have anything to do with the underlying

22   litigation.

23   Griffin also objects to the production of documents without entry of an appropriate

24   protective order, which may require specific provisions barring review of especially sensitive

25   documents by the PBC or the City.

26

OBJECTIONS TO SUBPOENA
DIRECTED TO MATT GRIFFIN — 3

**GRAHAM & DUNN** PC
Pier 70, 2801 Alaskan Way ~ Suite 300
Seattle, Washington 98121-1128
(206) 624-8300/Fax: (206) 340-9599

No. CV07-1620 MJP
M38719-1018259

1   Griffin is prepared to discuss with counsel narrowing the request to avoid unnecessary

2   burden, and producing non-privileged and non-protected documents responsive to an

3   appropriately narrowed request.

4

5       3.      All documents constituting, referring or relating to any remodel of

6   KeyArena.

7       **RESPONSE TO REQUEST NO. 3**

8       Griffin objects to this request as overly broad and unduly burdensome, in light of the fact

9   that it seeks documents that are irrelevant to the underlying dispute or of limited relevance in

10  light of the burden involved in identifying and producing them.  Griffin objects on the grounds

11  that the request is overly broad as to time, extending well before this dispute arose and well

12  before the PBC and the City of Seattle had any involvement with one another.  Further, a request

13  for all documents related to the remodel of KeyArena is overbroad, in that it encompasses

14  documents that have nothing to do with the requirement of specific performance under the PBC

15  lease.

16      Griffin also objects to the production of documents without entry of an appropriate

17  protective order, which may require specific provisions barring review of especially sensitive

18  documents by the PBC or the City.

19      Griffin is prepared to discuss with counsel narrowing the request to avoid unnecessary

20  burden, and producing non-privileged and non-protected documents responsive to an

21  appropriately narrowed request.

22

23      4.      All documents constituting, referring, or relating to communications between

24  you and any member of the Washington State Legislature regarding KeyArena or the

25  Seattle SuperSonics.

26

OBJECTIONS TO SUBPOENA
DIRECTED TO MATT GRIFFIN -- 4

No. CV07-1620 MJP
M38719-1018259

**GRAHAM & DUNN** PC
Pier 70, 2801 Alaskan Way – Suite 300
Seattle, Washington 98121-1128
(206) 624-8300/Fax: (206) 340-9599

**RESPONSE TO REQUEST NO. 4**

Griffin objects to this request as overly broad and unduly burdensome, in light of the fact that it seeks documents that are irrelevant to the underlying dispute or of limited relevance in light of the burden involved in identifying and producing them. Griffin objects on the grounds that the request is overly broad as to time, extending well before this dispute arose and well before the PBC and the City of Seattle had any involvement with one another. Griffin further objects on the grounds that the request is overbroad as to topic, as it requires production of all communications concerning KeyArena or the SuperSonics, regardless of whether these documents have anything to do with the underlying dispute. Further, Griffin objects that the request is vague and/or overbroad in that it does not limit in any way the members of the Washington State Legislature at issue, and thus potentially includes communications with parties unlikely to have anything to do with the subject at issue in the underlying litigation.

Griffin also objects to the production of documents without entry of an appropriate protective order, which may require specific provisions barring review of especially sensitive documents by the PBC or the City.

Griffin is prepared to discuss with counsel narrowing the request to avoid unnecessary burden, and producing non-privileged and non-protected documents responsive to an appropriately narrowed request.

5.    **All documents constituting, referring or relating to communications between you and the Office of the Governor of the State of Washington concerning the Seattle SuperSonics or KeyArena.**

**RESPONSE TO REQUEST NO. 5**

Griffin objects to this request as overly broad and unduly burdensome, in light of the fact that it seeks documents that are irrelevant to the underlying dispute or of limited relevance in light of the burden involved in identifying and producing them. Griffin objects on the grounds that the request is overly broad as to time, extending well before this dispute arose and well

OBJECTIONS TO SUBPOENA
DIRECTED TO MATT GRIFFIN -- 5

No. CV07-1620 MJP
M38719-1018259

**GRAHAM & DUNN** PC
Pier 70, 2801 Alaskan Way ~ Suite 300
Seattle, Washington 98121-1128
(206) 624-8300/Fax: (206) 340-9599

1  before the PBC and the City of Seattle had any involvement with one another.  Griffin further

2  objects on the grounds that the request is overbroad as to topic, as it requires production of all

3  communications concerning KeyArena or the SuperSonics, regardless of whether these

4  documents have anything to do with the underlying dispute.

5      Griffin also objects to the production of documents without entry of an appropriate

6  protective order, which may require specific provisions barring review of especially sensitive

7  documents by the PBC or the City.

8      Griffin is prepared to discuss with counsel narrowing the request to avoid unnecessary

9  burden, and producing non-privileged and non-protected documents responsive to an

10  appropriately narrowed request.

11      DATED this 27 day of March, 2008.

12                              GRAHAM & DUNN PC

13

14                              By _____
15                                  David M. Byers
                                    WSBA# 29228
16                                  Email: dbyers@grahamdunn.com
                                    Attorneys for Matt Griffin

17

18

19

20

21

22

23

24

25

26

OBJECTIONS TO SUBPOENA
DIRECTED TO MATT GRIFFIN -- 6

No. CV07-1620 MJP

M38719-1018259

GRAHAM & DUNN PC
Pier 70, 2801 Alaskan Way ~ Suite 300
Seattle, Washington 98121-1128
(206) 624-8300/Fax. (206) 340-9599

## DECLARATION OF SERVICE

I, Sharon L. Murphey, hereby declare, under penalty of perjury of the laws of the State of Washington, that on this day I caused to be served a true and correct copy of the document to which this declaration is attached (*Objections to Subpoena Directed to Matt Griffin*) by the method(s) indicated below, and addressed to the following:

Slade Gorton (WSBA #20)
Paul J. Lawrence (WSBA #13557)
Jeffrey Johnson (WSBA #23066)
Jonathon Harrison (WSBA #31390)
Michelle Jensen (WSBA #36611)
KIRKPATRICK & LOCKHART
PRESTON GATES & ELLIS, LLP
925 Fourth Avenue, Suite 2900
Seattle, WA 98104
Phone: 206-623-7580
Fax. 206-623-7022
*Defendant Plaintiff City of Seattle*

XX U.S. Mail ~ Postage Prepaid
___ Hand-Delivered
___ FedEx
___ Facsimile Transmission
___ Electronic Notification

Gregory C. Narver (WSBA #18127)
Assistant City Attorney
THOMAS A. CARR
Seattle City Attorneys Office
600 Fourth Avenue, 4th Floor
PO Box 94769
Seattle, WA 98124
Phone: 206-684-8233
Fax: 206-684-8284
*Attorney for Plaintiff City of Seattle*

XX U.S. Mail ~ Postage Prepaid
___ Hand-Delivered
___ FedEx
___ Facsimile Transmission
___ Electronic Notification

Paul R. Taylor (WSBA #18127)
Bradley S. Keller (WSBA #10665)
BYRNES & KELLER, LLP
1000 - 2nd Avenue, Suite 3800
Seattle, WA 98104
Phone: 206-622-2000
Fax: 206-622-2522
*Attorneys for Defendant The Professional Basketball Club, LLC*

XX U.S. Mail ~ Postage Prepaid
___ Hand-Delivered
___ FedEx
XX Facsimile Transmission
___ Electronic Notification

DATED this 27th day of March, 2008, at Seattle, King County, Washington.

Sharon L. Murphey
Legal Assistant to David M. Byers

OBJECTIONS TO SUBPOENA
DIRECTED TO MATT GRIFFIN -- 7

No. CV07-1620 MJP
M38719-1018259

GRAHAM & DUNN PC
Pier 70, 2801 Alaskan Way ~ Suite 300
Seattle, Washington 98121-1128
(206) 624-8300/Fax: (206) 340-9599

AO88  (Rev. 1/94) Subpoena in a Civil Case

**Issued by the**

# UNITED STATES DISTRICT COURT

WESTERN   DISTRICT OF   WASHINGTON

CITY OF SEATTLE,

                                          Plaintiff,          **SUBPOENA IN A CIVIL CASE**

            v.                                               Case Number:[1]  C07-1620MJP

THE PROFESSIONAL BASKETBALL CLUB, LLC

                                          Defendant.

TO:    Matt Griffin
       Pine Street Group
       1500 4th Avenue, Suite 600
       Seattle, WA  98101

    YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to
☐  testify in the trial of this matter.

| PLACE OF TESTIMONY | COURTROOM: |
|---|---|
| | DATE AND TIME: |

☐  YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition
   in the above case regarding the subject matters identified on Exhibit A.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| | |

☒  YOU ARE COMMANDED to produce and permit inspection and copying of the following documents at the
   place, date, and time specified below (list documents or objects) See Schedule "A" attached hereto.

| PLACE   Byrnes & Keller LLP | DATE AND TIME |
|---|---|
| 1000 Second Avenue, 38th Floor | March 27, 2008, 9:00 a.m. |
| Seattle, WA  98104 | |

☐  YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or
managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the
person will testify.  Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR | DATE |
|---|---|
| Attorneys for Def. The Professional Basketball Club | March 12, 2008 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Steven C. Minson, WSBA #30974

Byrnes & Keller LLP
1000 Second Avenue 38th Floor
Seattle, WA  98104        Telephone:  (206) 622-2000

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

AO88 (Rev. 1/94) Subpoena in a Civil Case

## PROOF OF SERVICE

SERVED: DATE _____          PLACE _____

SERVED ON (PRINT NAME) _____          MANNER OF SERVICE _____

SERVED BY (PRINT NAME) _____          TITLE _____

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on
Date:          _____          SIGNATURE OF SERVER _____

          ADDRESS OF SERVER _____

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(3) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d) (2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to comply production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance,
(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles form the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c) (3) (B) (iii) of this rule, such a person may in order to attend

trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or
(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or
(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or
(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in who behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

## Schedule A – Subpoena to Matt Griffin

### Definitions

1.    "You" means Matt Griffin.

2.    "Communication" or "communications" means any type of oral or written contact between two or more persons in which information, thoughts or opinions in any form are exchanged, imparted or received.

3.    "And" or "or" means "and/or" with the singular form being deemed to include the plural and vice-versa.

4.    "Document" or "documents" is used in the broadest possible sense and means writings of every kind or character pertaining to the designated subject matter, including, without limitation, the original and any copy or draft, regardless of origin or location, or any book, pamphlet, periodical, letter, memorandum, diary, file, note, calendar, newspaper, magazine, statement, bill, invoice, order, policy, telegram, **all email accounts used by you,** correspondence, summary, receipt, opinion, investigation statement or report, schedule, manual, financing statement, audit, tax return, articles of incorporation, bylaws, stock book, minute book, agreement, contract, deed, security agreement, mortgage, deed of trust, title or other insurance policy, report, record, study, handwritten note, map, drawing, working paper, chart, paper, index, tape, microfilm, data sheet, data processing card, computer printout, computer program, check, bank statement, passbook, or any other written, typed, printed, photocopied, dittoed, mimeographed, telecopied, faxed, emailed, recorded, transcribed, punched, taped, filmed, photographic or graphic matter, however produced.

"Document" includes the file and folder tabs associated with each such aforesaid original and/or copy, all correspondence transmitting such documents or explaining or commenting on the contents thereof, and all working or supporting papers.

5.    In assembling responsive documents, you must search all personal email accounts you have used over the past three years.

6.    "Relating to" or "relate to" means pertinent, relevant, or material to, evidencing, concerning, affecting, discussing, dealing with, considering or otherwise relating to in any manner whatsoever to the subject matter of the inquiry.

6.    The time frame for these requests is January 1, 2004, to the present.

### Documents to Be Produced

1.    All documents constituting, referring or relating to communications between you and any representative of the City of Seattle concerning the Seattle SuperSonics.

2.     All documents constituting, referring or relating to communications between you and any other person relating to a contemplated acquisition of the Seattle SuperSonics.

3.     All documents constituting, referring or relating to any remodel of KeyArena.

4.     All documents constituting, referring or relating to communications between you and any member of the Washington State Legislature regarding KeyArena or the Seattle SuperSonics.

5.     All documents constituting, referring or relating to communications between you and the Office of the Governor of the State of Washington concerning the Seattle SuperSonics or KeyArena.

## CERTIFICATE OF SERVICE

The undersigned attorney certifies that on the 12th day of March, 2008, a true copy of the foregoing pleading was served upon the following individuals:

### VIA EMAIL

Thomas A. Carr (thomas.carr@seattle.gov)
Seattle City Attorney
600 Fourth Avenue, 4th Floor
P.O. Box 94769
Seattle, WA 98124-4769

Slade Gorton (slade.gorton@klgates.com)
Paul J. Lawrence (paul.lawrence@klgates.com)
Jeffrey C. Johnson (jeff.johnson@klgates.com)
K&L Gates
925 Fourth Avenue, Suite 2900
Seattle, WA 98104

_____
Steven C. Minson, WSBA #30974
Byrnes & Keller LLP
1000 Second Avenue, 38th Floor
Seattle, WA 98104
Telephone: (206) 622-2000
Facsimile: (206) 622-2522

# EXHIBIT 5

GRAHAM & DUNN PC

RECEIVED

April 11, 2008                      2008 APR 11  P 1: 57

DAVID M. BYERS
(206) 340-9649
dbyers@grahamdunn.com

BYRNES & KELLER LLP

**Hand Delivered**

Steve Minson
Byrnes & Keller
1000 - 2ⁿᵈ Avenue, Suite 3800
Seattle, WA  98104

**Re:    *City of Seattle v. The Professional Basketball Club, LLC, et al.***
**US District Court - Western at Seattle - Case No. CV07-1620MJP**

Dear Steve:

As you know, we represent Matt Griffin in responding to the subpoena he received from your firm on behalf of The Professional Basketball Club, LLC ("PBC").  As you and I have discussed, we are producing those documents under the terms of the March 13, 2008 Protective Order entered by Judge Pechman, subject to certain agreed-upon additional conditions that apply to the documents designated "Attorneys Only Material" ("AOM") in our production.  Those additional conditions are as follows:

1.    Byrnes & Keller will retain possession of all Griffin AOM documents and all copies, and will not disclose them to PBC members, employees, or representatives other than Byrnes & Keller.

2.    If Byrnes & Keller makes a good faith assessment that certain of Griffin's AOM documents will be necessary for use in the instant litigation, you will inform me promptly, and we will make a good faith effort to negotiate a process by which those documents may be disclosed to the PBC.

3.    If we cannot agree on such a process, we will jointly seek a resolution from the court.  In seeking that resolution, you will not argue that our production of documents under these circumstances constitutes any sort of waiver of Griffin's right to shield the AOM documents from disclosure to the PBC or of any other rights secured by the Protective Order.  Until the court rules on that resolution, no Griffin AOM documents will be disclosed to the PBC.

Pier 70
2801 Alaskan Way ~ Suite 300
Seattle WA 98121-1128
Tel 206.624.8300
Fax 206.340.9599
www.grahamdunn.com

SEATTLE ~ PORTLAND

GRAHAM & DUNN PC

Steve Minson
April 11, 2008
Page 2

If I have misunderstood or misstated these additional conditions, please return the enclosed documents to me immediately. Otherwise, our responsive production is enclosed, and we will produce a privilege log of withheld material shortly.

If you have any questions or would like to discuss the matter further, please contact me anytime.

Yours truly,

GRAHAM & DUNN PC

David M. Byers

DMB/slm
Enclosures

cc:    Jeffrey Johnson (w/o Encls)
       Greg Narver (w/o Encls)

M38719-1025777

♲ 100% recycled paper

# EXHIBIT 6

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RECEIVED

2008 APR 10  A 9 14

DEWEY & KELLER LLP

---

CITY OF SEATTLE, a first-class charter
city,

                                        Plaintiff,

        v.

THE PROFESSIONAL BASKETBALL
CLUB, LLC, an Oklahoma limited
liability company,

                                        Defendant.

---

CATEGORY NO. M-8-85

Case No. C07-1620 MJP

The Honorable Marsha J. Pechman
United States District Court for the
Western District of Washington

## THE CITY OF SEATTLE'S MEMORANDUM OF LAW
## IN SUPPORT OF MOTION TO COMPEL

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................ i

I.     INTRODUCTION ................................................................................ 1

II.    FACTUAL BACKGROUND ................................................................ 3

    A.   The New Owners, PBC, Are Contractually Required to Play All Sonics Home Games in KeyArena Through the Conclusion of the 2009-10 NBA Season. ................................................................................................3

    B.   As a Condition of PBC's Purchase of the Sonics in 2006, the NBA Required PBC (a) to Assume All Obligations Under the Lease, (b) to Affirm that It Had No Intention of Relocating the Sonics Outside of the Seattle Area; and (c) to Commit that It Would Work in Good Faith for One Year to Seek an Upgraded Venue for the Sonics in the Seattle Area. ..........4

    C.   Whether PBC Can Relocate the Sonics Is Governed by the NBA's Rules, Policies, and "Custom and Practice." ................................................................5

    D.   PBC Secretly Discussed and Worked Toward Relocation During the One-Year Good Faith Period. ................................................................6

    E.   Shortly Before Its Nominal One Year of Good Faith Efforts Expired, PBC Announced It Intended to Break the Lease and Relocate the Sonics to Oklahoma City. ................................................................9

    F.   The NBA Actively Involved Itself in the Lease Dispute Between the City of Seattle and PBC, Which Reflects the Way in Which the NBA is Generally Involved in Issues Related to Its Teams' Arena Leases. ....................11

    G.   The City's Discovery Requests. ................................................................11

III.   ARGUMENT ................................................................................ 12

    A.   The City's Discovery Requests Are Reasonable In Light of the NBA's Involvement in the Events at Issue, Its Interest in the Lawsuit, and Its Ultimate Choice to Side With PBC. ................................................................12

    B.   The City's Subpoena Seeks Documents Centrally Relevant to Its Claim for Specific Performance and PBC's Purported Defense of Undue Hardship. ................................................................15

    C.   The NBA's Objections Regarding Privilege and Confidentiality Are Moot. ................................................................23

IV.    CONCLUSION ................................................................................ 24

## TABLE OF AUTHORITIES

**Page**

### FEDERAL CASES

Bank of New York v. Meridien Biao Bank Tanzania, Ltd., 171 F.R.D. 136
    (S.D.N.Y. 1997) ......................................................................................23

Behrend v. Comcast Corp., 2008 WL. 250373 (D. Mass. 2008).................................12, 17

Concord Boat Corp. v. Brunswick Corp., 169 F.R.D. 44 (S.D.N.Y. 1996)......................12

Daval Steel Products v. M/V Fakredline, 951 F.2d 1357 (2d Cir. 1991) .........................15

First America Corp. v. Price Waterhouse, LLP, 154 F.3d 16 (2d Cir. 1998)...................14

United States v. Int'l Bus. Machines Corp., 62 F.R.D. 507 (S.D.N.Y. 1974) ..................12

United States v. Int'l Bus. Machines Corp., 83 F.R.D. 97 (S.D.N.Y. 1979) ...12, 14, 15, 17

Williams v. Dallas, 178 F.R.D. 103 (N.D. Tex. 1998) .....................................................14

### STATE CASES

Carpenter v. Folkerts, 627 P.2d 559 (Wash. App. 1981)..................................................21

City of New York v. New York Jets Football Club, 90 Misc. 2d 311, 394
    N.Y.S.2d 799 (N.Y. Sup. Ct. 1977)..................................................................10, 17

City of New York v. New York Yankees, 117 Misc. 2d 332, 458 N.Y.S.2d 486
    (N.Y. Sup. Ct. 1983) ........................................................................................10, 17

Crafts v. Pitts, 162 P.3d 382 (Wash. 2007)..........................................................16, 17, 20

Dean v. Gregg, 663 P.2d 502 (Wash. App. 1983) ............................................................21

Payne v. Still, 38 P. 994 (Wash. 1894) ..............................................................................19

### FEDERAL STATUTES

Fed. R. Civ. P. 26(b)(1)......................................................................................................15

Fed. R. Civ. P. 45 ...............................................................................................................15

### MISCELLANEOUS

Restatement (Second) of Contracts, § 364 (1981) .............................................................20

ii

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CITY OF SEATTLE, a first-class charter
city,

                                    Plaintiff,

    v.

THE PROFESSIONAL BASKETBALL
CLUB, LLC, an Oklahoma limited
liability company,

                                    Defendant.

CATEGORY NO. M-8-85

Case No. C07-1620 MJP

The Honorable Marsha J. Pechman
United States District Court for the
Western District of Washington

## THE CITY OF SEATTLE'S MEMORANDUM OF LAW
## IN SUPPORT OF MOTION TO COMPEL

## I.    INTRODUCTION

This case concerns whether The Professional Basketball Club LLC, the current owners of

the Seattle Supersonics basketball team (the "Sonics"), can break their promise to the City of

Seattle (the "City") to play all home games in Seattle's KeyArena through the term of the

existing Lease in order to move the team to Oklahoma City.  Because the Sonics are a

community asset and irreplaceable tenant with a 41-year history in Seattle, the City seeks

specific performance of the Lease.  In support of their legal case to breach the Lease, the team's

owners argue, inter alia, that KeyArena is an inadequate NBA facility, that this inadequacy is the

cause of their alleged financial losses, and that the team lacks community support in Seattle.

Moreover, the owners claim damages from their breach can be adequately compensated by the

mere payment of rent. In doing so, the owners effectively take the position that the Sonics offer no additional economic or cultural value to the City. The City could not disagree more. Nonetheless, recent statements by NBA Commissioner David Stern, and by other NBA owners on the relocation committee, demonstrate that the NBA is actively supporting the owners' effort to move the Sonics from Seattle.

The City has subpoenaed relevant documents from the NBA that go to the core of these disputed issues. The documents requested address the reasons NBA teams make or lose money and also the indirect economic and intangible local benefits that result from the presence of professional basketball teams. The subpoena seeks information about the NBA's policies towards team relocation and early termination of arena leases. The subpoena also seeks information about the NBA's direct involvement in the owners' efforts to move the Sonics. When the current owners bought the Sonics, the NBA required, as a condition of approval, that the new owners make "good faith best efforts" for a year to keep the Sonics in the Seattle area. During that year, the new owners and the NBA repeatedly discussed the Lease and the Sonics' potential relocation. In the midst of the "good faith best efforts" period, the owners deceived the NBA about their actions and true intentions, which from the outset were to move the Sonics to Oklahoma City. As an apparent result of this deception, the NBA began taking the new owners' side by endorsing their claims about the Lease and KeyArena. Subsequently, in February 2008, NBA Commissioner David Stern encouraged the new owners to try to buy their way out of the Lease rather than fulfill their obligations through the end of the Lease term. The NBA relocation subcommittee has more recently indicated it will approve the owners' proposed relocation of the Sonics to Oklahoma City. Later this month, the NBA is expected to approve and allow the

2

proposed relocation. The new owners cannot relocate the team – and thus cannot breach the Lease – without the NBA's permission.

To protect the confidentiality of the NBA's documents, the City entered a protective order that incorporated specific provisions requested by the NBA. Nevertheless, the NBA refuses to produce responsive documents on the grounds that the City's discovery requests seek irrelevant information and are unduly burdensome. The NBA cannot involve itself in the events underlying the litigation and simultaneously refuse to provide necessary discovery. The City respectfully requests that this Court grant its motion and order the NBA to produce all non-privileged, responsive documents.

## II.    FACTUAL BACKGROUND

### A.    The New Owners, PBC, Are Contractually Required to Play All Sonics Home Games in KeyArena Through the Conclusion of the 2009-10 NBA Season.

The NBA's Seattle SuperSonics have played basketball in the Seattle area since 1967. Declaration of Paul J. Lawrence in Support of the City of Seattle's Motion to Compel ("Lawrence Decl."), Ex. 11 ("Complaint"), ¶ 4.[1] In 1994, as part of an agreement to keep the Sonics in Seattle for the next fifteen years, the City of Seattle agreed to renovate KeyArena as a "new, state of the art professional basketball playing facility." Ex. 12 (Premises Use and Occupancy Agreement) ("Lease"), p. 1 (Recitals). Renovating KeyArena to the Sonics' specifications cost the City $74 million, financed by bonds that it is still paying off. Ex. 11, Complaint, ¶ 11.

---

[1] All Exhibit ("Ex.") cites are to exhibits to the Lawrence Declaration.

In exchange for the City of Seattle's renovation of KeyArena, the Sonics' then-owner, SSI Sports, Inc. ("SSI"), contractually agreed to schedule all Sonics home games in KeyArena through the end of the 2009-10 NBA season. Ex. 11, Complaint, ¶¶ 13-17; Ex. 12, Lease, Section II (p. 6). The City and SSI further contractually agreed that their obligations under the Lease were unique in nature and that the Lease could be specifically enforced by either party. Ex. 11, Complaint, ¶ 17; Ex. 12, Lease, Section XXVII(L) (p. 59). Since 1995, the Sonics have played all their home games in the renovated KeyArena. Ex. 11, Complaint, ¶ 15. The Lease was subject to the prior NBA's approval. Thus, the NBA approved Section II of the Lease and its specific performance clause. Ex. 12, Lease, Section XX(A)(3) (p. 48).

**B.      As a Condition of PBC's Purchase of the Sonics in 2006, the NBA Required PBC (a) to Assume All Obligations Under the Lease, (b) to Affirm that It Had No Intention of Relocating the Sonics Outside of the Seattle Area; and (c) to Commit that It Would Work in Good Faith for One Year to Seek an Upgraded Venue for the Sonics in the Seattle Area.**

In July 2006, PBC bought the Sonics for $350 million. Ex. 11, Complaint, ¶ 19; Ex. 18. PBC is an Oklahoma LLC, and all the members of PBC are from Oklahoma. Ex. 11, Complaint, ¶ 23. PBC expressly assumed all obligations under the Lease when it purchased the Sonics in 2006. Ex. 13. Additionally, when the PBC bought the Sonics, it contractually promised the local ownership group it would work in good faith for a one-year period to keep the Sonics in the Seattle area. Ex. 22, Section 5.3 (p.21).

PBC could not buy the Sonics without the NBA's permission. Ex. 19 (Agreement and Undertaking) ("NBA Agreement"). As a condition of buying the Sonics, the NBA required PBC to assume the existing lease requiring the team to play home games at KeyArena through the 2009-2010 NBA season. Ex. 19, NBA Agreement, § 1(a) (p. 2), § 4(l) (p. 8). In addition, the NBA required PBC to agree to a unique contractual provision: PBC expressly promised the

NBA (as it had promised the former owners) that it would make good faith best efforts for a twelve-month period to find a venue to keep the Sonics in the Seattle area for the long term.  Ex. 19, NBA Agreement, § 6(d) (pp. 14-15).  Further, the NBA required PBC's members to expressly affirm they had no intention of relocating the Sonics outside of the Seattle area.  Ex. 19, NBA Agreement, § 5(a)(v) (p. 10).

**C.    Whether PBC Can Relocate the Sonics Is Governed by the NBA's Rules, Policies, and "Custom and Practice."**

As is the case with all NBA teams, PBC cannot relocate the Sonics without the permission of the NBA.  Ex. 21 ("NBA Constitution") (p. 206); Ex. 19, NBA Agreement, § 2(a) (p. 6).  The NBA Constitution has an express provision governing relocation that sets out factors the NBA considers in evaluating a request to relocate.  Ex. 21, NBA Constitution (pp. 207-08).  Moreover, PBC is contractually bound not only by the NBA's major governing documents (e.g., the NBA Constitution) but by all "present and future rules, regulations, resolutions, directives and policies of each of the NBA Entities and the NBA Commissioner."  Ex. 19, NBA Agreement, § 2(a) (p. 6).  Additionally, PBC is bound by "the custom and practice" under these rules.  *Id.*  Thus, whether PBC can relocate the Sonics in breach of its Lease is ultimately under the control of the NBA and subject to the NBA's policies, whether formal or informal, regarding early termination of arena leases.

A handful of documents in PBC's production prove that PBC and the NBA have been communicating about issues of a Seattle area arena, the Lease and relocation since at least January 2007 (and likely before).  On January 18, 2007, for example, NBA Vice-President of Legal and Business Affairs Joel Litvin emailed PBC Chairman Clay Bennett to ask him "[a]s I've requested before, please be sure to have someone who knows what's going on keep us in the

loop" (regarding the issue of a Seattle area arena) and to send public documents. Ex. 22. On

April 25, 2007, Mr. Bennett emailed Mr. Litvin that "All need to remember the lease expires in

2010 at which time we must leave. Isn't there a better near term solution for all parties?" – to

which Mr. Litvin replied "Still working on this; will call tomorrow." Ex. 23. Similarly, after

PBC member Aubrey McClendon asked Mr. Bennett in an April 2007 email where the Sonics

would be playing during the 2007-08 NBA season, Mr. Bennett replied:

> Working hard on this and don't have an answer yet. Changes day to day. Quite
> likely we will play next year in Seattle, but attempting to quietly and without
> litigation work through the lease. [NBA Commissioner] David [Stern] has said
> we will need to find out soon. Lots of issues for the league on a permanent
> relocation.

Ex. 24. Thus, PBC and the NBA were discussing early termination of the Lease and relocation,

but PBC's documents do not disclose what was said. The NBA may possess more informative

documents.

**D.**     **PBC Secretly Discussed and Worked Toward Relocation During the One-Year**
            **Good Faith Period.**

PBC and its Oklahoma ownership group never really wanted to own an NBA team in

Seattle. They wanted to own an NBA team in Oklahoma City. During the twelve-month period

following its purchase of the team, PBC claimed publicly – and privately to the NBA – that it

was working in good faith to keep the Sonics in the Seattle area. But PBC's document

production shows that, in fact, its members were not only secretly discussing the possibility of

relocating the team during the one-year good faith period, but secretly negotiating with

Oklahoma City to do so.

Mr. Bennett's April 2007 email to Mr. McClendon, cited above, is one example of PBC's

internal discussion of the possibility of relocation. Ex. 24. Another is an April 2007 email

6

exchange between Mr. Bennett, Mr. McClendon, and PBC member Tom Ward regarding their

mutual desire and plan to move the team to Oklahoma City, even though this would involve

breaching the Lease:

> Is there any way to move here [Oklahoma City] for next season or are we doomed
> to have another lame duck season in Seattle? [Tom Ward]

> I am a man possessed! Will do everything we can. Thanks for hanging with me
> boys, the game is getting started! [Clay Bennett]

> That's the spirit!! I am willing to help any way I can to watch ball here [in
> Oklahoma City] next year. [Tom Ward]

> Me too, thanks Clay! [Aubrey McClendon]

Ex. 26.

PBC was not just discussing relocation internally, it was also secretly discussing

relocation of the Sonics with Oklahoma City. As early as January 4, 2007, either as a part of or a

precursor to such discussions, PBC consultant Brent Gooden emailed PBC members Mr.

Bennett, Mr. McClendon, and Mr. Ward, saying that TNT:

> Will interview [Oklahoma City] Mayor Cornett. We briefed the Mayor last night
> on the anticipated questions, which could likely include the prospect of the Sonics
> moving to OKC . . . . We asked the Mayor to use the same talking points he did
> with the reporter from Sports Illustrated who asked similar questions.

Ex. 27; *see also* Ex. 28.

In a June 5, 2007 email, Tim Romani (a PBC consultant) emailed Mr. Bennett that

> Jim and I will reach out to City Manager Couch in OKC [Oklahoma City] to
> engage him in deal negotiations. It would help if you would place a call to him
> letting him know that you have asked us to represent you so he understands we
> are empowered and he should engage in earnest negotiations with us. Jim is
> preparing a Term Sheet that we would use to initiate the negotiations and run it by
> you before we engage to make sure we are in sync. Our approach will be to ask
> for the world so you may or may not want to pull back on the bit. We will start
> with a deal that is better than what the Hornets have.[2] We will also address cost
> items such as NBA Relocation Fee, Relocation Expenses, practice facility and
> Ford Center improvements.

Ex. 29.

Mr. Bennett's reply further reflects that PBC and the NBA were engaged in phone

communications that, in context, were presumably about relocation:

> Tim I spoke with Commissioner Stern this morning. Good conversation on a
> number of fronts. Let's connect on Monday for a download and strategy session.

*Id.*

In August 2007, PBC member Aubrey McClendon made public the private plans to move

the Sonics. He admitted in a published interview that PBC had always intended to bring the

team to Oklahoma City:

> We didn't buy the team to keep in Seattle. We hoped to come here [to Oklahoma
> City]. We know it's a little more difficult financially here in Oklahoma City, but
> we think it's great for the community and if we could break even, we'd be
> thrilled.

Ex. 30 (p. 5). Mr. McClendon's statements are consistent with earlier discussions among PBC

members at the time they bought the team, in July and August 2006. Exs. 31, 32, 33. It would

be an understatement to say the NBA was not happy. NBA Commissioner Stern warned Clay

Bennett that if Mr. McClendon had said what was reported, there would be a "HUGE fine."

---

[2] The Hornets temporarily relocated to Oklahoma City following Hurricane Katrina.

Ex. 34. And there was. The NBA ultimately fined Mr. McClendon $250,000 for his comments, which it deemed "prejudicial" to the NBA. Ex. 35.

To cover up the breach of its promise to the NBA to engage in good faith efforts, PBC insisted that Mr. McClendon was speaking only for himself. In an August 17, 2007 email, Mr. Bennett deceived NBA Commissioner Stern about the ongoing conspiracy:

> [A]s absolutely remarkable as it may seem, Aubrey [McClendon] and I have NEVER discussed moving the Sonics to Oklahoma City, nor have I discussed it with ANY other member of our ownership group.

Ex. 36 (p. 2). As evidenced in the above-referenced internal emails, however, even after Mr. McClendon publicly let the cat out of the bag, PBC continued telling the NBA one thing while doing another.

**E.    Shortly Before Its Nominal One Year of Good Faith Efforts Expired, PBC Announced It Intended to Break the Lease and Relocate the Sonics to Oklahoma City.**

On September 19, 2007, PBC filed an arbitration demand stating that it intended to breach the Lease and stop playing Sonics games in KeyArena after the 2007-08 season. Ex. 15 ("Arbitration Demand"). PBC argued it would be financially impossible to play Sonics games in KeyArena after the 2007-08 season because KeyArena was too small. Ex. 15, Arbitration Demand, ¶¶ 15-21. PBC expressly compared KeyArena to other larger NBA arenas in other cities. *Id.*, ¶¶ 15, 17. Based on this alleged hardship, PBC argued that the City was not entitled to specific performance of the Lease. *Id.*, ¶¶ 13-14.

On September 24, 2007, the City filed a lawsuit seeking a declaratory judgment that it is entitled to specific performance of PBC's obligation to play all Sonics games in KeyArena through the 2009-10 NBA season. Ex. 11, Complaint, ¶¶ 26-30  The City made clear that it sought specific performance, because breach of the Lease would cause the City both tangible and

9

intangible losses. *Id.*, ¶¶ 6, 24.  Courts have expressly recognized that a city suffers intangible losses when a sports team with a long history in its community relocates (even temporarily). *See, e.g., City of New York v. New York Yankees*, 117 Misc.2d 332, 336-37, 458 N.Y.S.2d 486 (N.Y. Sup. 1983); *City of New York v. New York Jets Football Club, Inc.*, 90 Misc.2d 311, 315-16, 394 N.Y.S.2d 799 (N.Y. Sup. Ct. 1977).  The City further specified that it would be impossible to find an alternative tenant with the unique characteristics of the Sonics.  Ex. 11, Complaint, ¶ 24.  The City also sought a declaratory judgment that the dispute was not subject to arbitration, which the court granted.  Ex. 11, Complaint, ¶¶ 31-34; Ex. 16.  PBC has answered, generally denying the City's contentions.  Ex. 14 ("Defendant's Answer and Affirmative Defenses").  The City's declaratory judgment action against PBC is scheduled for trial in June 2008.  Ex. 17.

On March 14, 2008, PBC filed a letter of intent announcing its plan to relocate the Sonics to Oklahoma City, subject to the approval of the NBA.  Ex. 40.  PBC filed this letter shortly after the voters of Oklahoma City approved more than $100 million in taxes to finance improvements to the Ford Center (Oklahoma City's basketball arena).  Ex. 44.  In the run-up to the vote on the Ford Center improvements, PBC, Oklahoma City, and the Oklahoma City Chamber of Commerce publicly asserted that relocation of an NBA team to Oklahoma City would bring substantial benefits, both tangible and intangible, to the City.  Exs. 41, 43.  Moreover, the NBA actively assisted the Oklahoma City Chamber of Commerce's campaign in favor of the vote, by sending out campaign notices to Oklahoma City residents that purchased tickets during the two seasons that the New Orleans Hornets played in Oklahoma City.  Ex. 42.

F.    **The NBA Actively Involved Itself in the Lease Dispute Between the City of Seattle and PBC, Which Reflects the Way in Which the NBA is Generally Involved in Issues Related to Its Teams' Arena Leases.**

The NBA ultimately ended up taking PBC's side in this litigation. The NBA has repeatedly asserted that playing Sonics games in KeyArena is not financially viable. Exs. 37, 39. In February of this year, NBA Commissioner Stern disclosed that he had "encouraged the SuperSonics to make an offer to the city to buy out the remaining two years of the lease to KeyArena." Ex. 37. Commissioner Stern's February 2008 intervention in the City's lawsuit is not the only recent involvement the NBA has had with the possible early termination of a team's arena lease. The New Orleans Hornets recently renegotiated its arena lease with the state of Louisiana to allow the team to buy out the lease's remaining term under certain conditions. NBA Commissioner Stern called the renegotiated lease "fair" to the Hornets and the state. Ex. 38. The NBA thus presumably has standards by which it evaluates the fairness of such provisions, as part of its approval of teams' arena leases.

G.    **The City's Discovery Requests.**

Given the involvement of the NBA in the central issues in this litigation, the City sought third-party discovery from the NBA. Ex. 1. Initially, the NBA objected broadly to the City's subpoena, on the bases of confidentiality, privilege, relevance, and overbreadth / undue burden. Ex. 2. The City does not seek production of privileged documents. With respect to confidentiality, counsel for the City communicated directly with counsel for the NBA, and the City subsequently entered a protective order that includes provisions the NBA specifically requested to protect the confidentiality of its documents. Exs. 3, 4, 6, 7. The City also narrowed its requests to address the NBA's objections to their scope. Ex. 5. Over the course of these communications, the NBA agreed to produce documents related to the Lease, the NBA

Commissioner's approval of the Lease, the NBA's discipline of any PBC member (i.e., the McClendon fine), and the rules and regulations of the NBA. Exs. 8, 9. As discussed below, however, the NBA defines relevance very narrowly and refuses to produce four categories of documents that relate to the City's specific performance claim and PBC's asserted defense of undue hardship.

## III.    ARGUMENT

**A.      The City's Discovery Requests Are Reasonable In Light of the NBA's Involvement in the Events at Issue, Its Interest in the Lawsuit, and Its Ultimate Choice to Side With PBC.**

**1.      The NBA Has an Interest in and Will Be Affected by the Results of this Lawsuit.**

In evaluating the reasonableness of the City's subpoena to the NBA, a central consideration is the NBA's involvement with the events and issues in this lawsuit. It is more reasonable to subpoena discovery from an entity that is involved in some manner in the lawsuit or will be necessarily affected by a final judgment. *See Concord Boat Corp. v. Brunswick Corp.*, 169 F.R.D. 44, 53 (S.D.N.Y. 1996) (citing *United States v. Int'l Bus. Machs. Corp. ("IBM")*, 83 F.R.D. 97, 108-09 (S.D.N.Y. 1979) (denying motion to quash brought by defendant's Chairman of the Board) and *United States v. Int'l Bus. Machs. Corp.*, 62 F.R.D. 507, 509-10 (S.D.N.Y. 1974) (denying motion to quash brought by members of computer industry which would necessarily be affected by final judgment in litigation)); *Behrend v. Comcast Corp.*, --- F.R.D. ---, 2008 WL 250373, *2-*4 (D. Mass. 2008) (burden of production appropriately borne by non-party with interest in litigation). Although technically a non-party, the NBA is involved and will be directly affected by the result of the underlying litigation. The NBA has an interest in – and indeed, controls – where its teams play.

12

From the time PBC bought the team, the NBA involved itself in the question of where the Sonics would play by requiring PBC to agree to work in good faith to keep the Sonics in the Seattle area. The City is entitled to know why it did so. The NBA has been discussing relocation and the Lease with PBC for months. Moreover, PBC was saying one thing to the NBA about relocation while doing another. The City is entitled to know what was said, as it bears directly on the credibility of PBC members in this lawsuit. The NBA fined PBC member Aubrey McClendon $250,000 when he admitted PBC bought the Sonics to move them to Oklahoma City. The City is entitled to know why.

Indeed, the NBA ultimately chose to take PBC's side in the litigation. It publicly supported PBC's claim that fulfilling its contractual agreement to play Sonics games in KeyArena would be financially unviable. The City is entitled to know why the NBA reached this conclusion and to test the factual premise of that conclusion by examining the economics of other NBA franchises.

NBA Commissioner David Stern publicly announced he had encouraged PBC to try to buy its way out of the Lease. By contrast, Commissioner Stern called "fair" the renegotiation of the New Orleans Hornets' arena lease (to allow early termination upon payment of a substantial fee, but only if attendance failed to reach a certain level). The City is entitled to know why the NBA has taken different positions on different leases, and what factors went into its evaluation of those leases. Even if the NBA had maintained a policy of strict neutrality, the City would still need its documents for the reasons discussed above. But it is even more unfair for the NBA to take the side of one party, and then deny the other party discovery centrally relevant to its case.

Moreover, whether or when the NBA allows the Sonics to relocate ultimately depends on the result of the underlying litigation. The NBA is expected to approve the Sonics' request to

relocate for the 2008-09 season, contingent on the results of the litigation between the City and PBC. Ex. 45. If, therefore, Judge Marsha Pechman agrees that the City is entitled to specific performance, the Sonics will stay in Seattle through the 2009-10 NBA season. Any approval granted by the NBA for the Sonics to relocate will be effectively stayed until the end of the Lease. Because the NBA has a direct, substantial and obvious interest in the result of this lawsuit, it is reasonable to require it to produce documents relevant to the underlying claims and defenses.

     2.     **The NBA Cannot Show Undue Burden.**

The NBA likely possesses highly relevant documents, including internal NBA documents available from no other source. Producing these documents will not unfairly burden the NBA. The NBA is a multi-billion dollar organization. *See IBM*, 83 F.R.D. at 108-9 (weighing non-party's resources in evaluating reasonableness of discovery, recognizing burden of production "may be justified by the nature and importance of the inquiry involved[,]" and ordering compliance with subpoena); *see also First Am. Corp. v. Price Waterhouse, LLP*, 154 F.3d 16, 21-23 (2d Cir. 1998) (recognizing reasonableness of compelling non-party production in light of complexity of case). Producing those copies will not impact in any significant way the NBA's ability to continue to carry out its business. *See IBM*, 83 F.R.D. at 109. The NBA has done nothing to substantiate its claim of undue burden. *See IBM*. 83 F.R.D. at 104 (the party claiming 'undue burden' bears the burden of proof); *see also Williams v. Dallas*, 178 F.R.D. 103, 109-114 (N.D. Tex. 1998) (non-party claiming 'undue burden' "must meet the heavy burden of establishing that compliance with the subpoena would be unreasonable and oppressive"). In light of the NBA's involvement in the events underlying this case, its production of documents is not just reasonable, but necessary.

14

**B.      The City's Subpoena Seeks Documents Centrally Relevant to Its Claim for Specific Performance and PBC's Purported Defense of Undue Hardship.**

The key issue in resolving the City's motion for enforcement of its subpoena is whether the documents requested are relevant to its claim or PBC's purported defense. "Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense[.]" Fed. R. Civ. P. 26(b)(1). "For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action." *Id.* Relevance is defined broadly: documents need not be admissible themselves if they are "reasonably calculated to lead to the discovery of admissible evidence." *Id.* This standard is an "obviously broad rule" that is "liberally construed." *Daval Steel Prods. v. M/V Fakredline*, 951 F.2d 1357, 1367 (2d Cir. 1991). The City's subpoena of the NBA under Fed. R. Civ. P. 45 is governed by the same broad standard of relevance that applies under Fed. R. Civ. P. 26(b). *IBM*, 83 F.R.D. at 104. Accordingly, the NBA should be ordered to produce documents related to the City's claim(s), the PBC's defense(s), and the subject matter of the action. For the reasons discussed below, all of the documents subpoenaed by the City are relevant.

**1.      PBC's Attempt to Relocate the Sonics to Oklahoma City Reflects the Importance of an NBA Team to Its Community (Request No. 5).**

The City subpoenaed "All documents regarding or related to any request or plan to relocate the Sonics outside Seattle, Washington, or to the possibility of such a relocation." Request No. 5. (Ex. 1). The NBA refused to produce documents responsive to Request No. 5. Exs. 2, 8. The City is willing to limit Request No. 5 to documents related to any request or plan

15

by PBC to relocate the Sonics outside of Seattle.[3]  The City previously agreed to exclude

documents created by PBC from the scope of that request.

PBC's relocation of the Sonics (Request No. 5) is at the heart of the underlying litigation.

PBC admits it will breach the KeyArena Lease if it relocates the Sonics to Oklahoma City

following the 2008-09 NBA season.  Relocation before the term of the Lease expires is thus

necessarily related to breach of the Lease.  The threatened breach of the Lease, in turn, is not just

at issue in the case – it is *the* issue.  The NBA's objection that documents related to relocation of

the Sonics are irrelevant makes no sense.

Moreover, the proposed relocation of the Sonics bears on a specific issue at the heart of

the City's specific performance claim:  whether having an NBA team brings unique, but difficult

to calculate, benefits to a community; i.e., benefits beyond merely the rent the team pays to play

there.  In its Complaint, the City requests a declaratory judgment that it is entitled to specific

performance of PBC's obligations under the Lease.  The City is entitled to a remedy that does

"perfect justice."  *Crafts v. Pitts*, 162 P.3d 382, 385-86 (Wash. 2007).  Thus, the U.S. District

Court in the Western District of Washington will need to resolve issues including whether:  (1) it

would be difficult to obtain a suitable substitute tenant for an NBA team generally, and the

Sonics in particular; and (2) whether the damages of the Sonics' early lease termination could be

calculated with certainty.  *Id.* at 386.  On the latter issue, the City asserts that the benefits of an

NBA team are unique and in many respects difficult to measure.  For example, the City believes

that the Sonics generate economic activity from persons attending games as well as jobs.  The

---

[3] The City originally agreed to narrow its request to documents related to relocation of the team by its former owners.  Based on the evidence of the NBA's involvement in the relocation of the Sonics by PBC, however, the City now believes documents related to PBC's relocation are relevant and requests production of those documents as called for by its subpoena.

City further believes that the Sonics bring intangible benefits to the City, a factual assertion courts have found both true and relevant in analogous cases. *See, e.g., New York Yankees*, 117 Misc. 2d at 336-37; *New York Jets Football Club*, 90 Misc. 2d at 315-16. PBC, on the other hand, claims the Sonics bring little or no benefit to Seattle besides the rent they pay to the City to play in KeyArena. Ex. 15. The uniqueness of the Sonics and the difficulties of measuring the benefits the team bestows on the City are central to the City's specific performance claim. *Crafts*, 162 P.3d at 386.

In fact, it is exactly these factors – the unique and hard-to-measure benefits an NBA team brings to its community – that are motivating PBC's attempt to relocate the Sonics. The NBA cares about this issue, as reflected in its requirement that PBC make good faith efforts to keep the Sonics in the Seattle area and the substantial fine it levied against Mr. McClendon. PBC's internal documents prove not only that PBC and the NBA have been discussing relocation at length, but that PBC has apparently been deceiving the NBA about its intentions. NBA documents are likely to show that PBC has been saying one thing (to the NBA) while doing another. These documents, then, will serve to impeach PBC's purported defense that their reason for attempting to relocate the Sonics out of KeyArena is alleged economic hardship.

Document Request No. 5 is specific and appropriately narrow in time and scope. *See IBM*, 83 F.R.D. at 104 (compelling the production of documents in response to requests that were appropriately tailored to the issues before the court); *see also Behrend*, --- F.R.D. ---, 2008 WL 250373 at *2-*4 (compelling production where requesting party narrowed the scope of its requests). The City limited its request to a discrete issue: relocation of the Sonics by PBC. The request is thus time-limited to the less than two-year period since the NBA learned PBC intended to purchase the Sonics. The City has further limited its request to exclude documents generated

by PBC. The request thus principally seeks NBA internal documents, many of which are likely unavailable from any other source.

**2.    As Reflected in the Agreement between PBC and the NBA, Documents Related to PBC's Purchase of the Sonics Bear on the Issue of Where the Sonics Play and Why (Request No. 6).**

The City further subpoenaed, in Request No. 6 (Ex. 1), "All documents regarding or related to the possible or actual purchase of the Sonics, by PBC or by any other potential purchaser, from the date the NBA became aware that former team owner The Basketball Club of Seattle, chaired by Howard Schultz, was seeking to sell the Sonics." The City limited Request No. 6 to exclude documents created by PBC. The NBA refuses, however, to produce any documents responsive to Request No. 6, asserting confidentiality, privilege, irrelevance, and overbreadth / undue burden.

In buying the Sonics, PBC expressly promised the NBA that it would work in good faith to keep the Sonics in the Seattle area for the long term. Both the NBA and PBC thus considered the question of where the Sonics would play an integral part of the Sonics' purchase by PBC. It is therefore reasonably likely that NBA documents will address why the NBA cared about the location of the team, which will in turn relate to central issues in this case: what effect an NBA team's presence has on its community (i.e., why the NBA wanted PBC to try to keep the Sonics in the Seattle area), and why an NBA owner might legitimately relocate a team (i.e., what financial considerations might, in the NBA's opinion, constitute undue hardship).

Request No. 6 is specific: it relates only to the sale of the Sonics to PBC. It is limited in time, as PBC bought the Sonics less than two years ago. The City limited its request to exclude documents generated by PBC. The subpoena thus principally seeks internal NBA documents, many of which are likely unavailable from any other source.

3.    **Documents Related to Early Termination Versus Specific Performance of NBA Arena Leases Generally Provide Necessary Context for the City's Claim for Specific Performance of Its Lease Individually (Requests Nos. 17, 19, 20).**

The City subpoenaed the following related documents (Ex. 1):

17.    All documents reflecting or relating to the NBA's position (including any actions taken or contemplated by the NBA, and all communications) related to the termination (actual or contemplated) by any NBA team of its arena lease prior to the expiration of its term, including but not limited to any lease entered into by the New Orleans Hornets.

19.    All documents regarding or related to proposed or actual efforts to relocate NBA teams during the term of an existing lease.

20.    All documents regarding or related to specific performance clauses in NBA arena leases.

The City limited Requests Nos. 17 and 19 to exclude documents created by PBC. The NBA refuses, however, to produce any documents responsive to Requests Nos. 17, 19, or 20, asserting confidentiality, privilege, irrelevance, and overbreadth / undue burden.

PBC's attempt to breach the Lease and avoid specific performance does not occur in a vacuum. PBC's Lease with the City is one of a limited class of contracts – NBA arena leases – that will all address the exact same subjects at issue in this litigation:  the term of a team's lease and the potential for early termination of the lease versus provisions for its specific performance. In evaluating whether it is appropriate to order specific performance, one of the issues that matters is the class of contracts to which the specific contract at issue belongs:

> The adequacy or inadequacy of damages as a remedy is not determined with reference to the circumstances of a particular case, but the inquiry is whether such case is one of a class where, in agreements generally of the kind involved, the terms or the relations of the parties are such that the legal remedy of damages is adequate or inadequate[.]

*Payne v. Still*, 38 P. 994, 994 (Wash. 1894). Thus, under the rule articulated in *Payne*, documents related to early termination versus specific performance of NBA arena leases generally, will bear on the City's specific performance claim with regard to the Lease individually.

Additionally, documents related to these issues will provide context to and shed light on whether the Lease itself is fair. Fairness of the Lease is directly at issue in a specific performance claim. *Crafts*, 162 P.3d at 386. Further, whether a Lease is "fair" relates in turn to the relative benefits and burdens to the team and the arena owner of early termination versus specific performance, which are similarly at issue in a specific performance claim. Restatement (Second) of Contracts, § 364 (1981). It is highly likely that the NBA takes a position on the "fairness" of early termination versus specific performance in arena leases. For example, NBA Commissioner Stern approved as "fair" the renegotiation of the lease between the New Orleans Hornets and the state of Louisiana, which altered the Lease to allow early termination rather than mandating specific performance. Stern's approval of the Hornets' lease renegotiation was not just his personal opinion; the NBA must give prior approval to all NBA arena leases. Ex. 12, Lease, Section XX(A)(3). Documents responsive to Requests Nos. 17, 19, and 20 will thus provide the broader context necessary to evaluate the City's claim for specific performance of the Sonics' Lease in particular.

> **4.    The City Needs Production of Documents Related to the Finances of NBA Teams to Test the Claim by PBC and the NBA that the Cause of PBC's Alleged Financial Losses Is the Adequacy of KeyArena (Requests Nos. 8, 9, 10, and 13).**

The City subpoenaed the following documents related to the financial performance of NBA franchises:

8.    All documents analyzing or assessing the financial impact of the 1998-99 NBA lockout on NBA teams, including but not limited to the financial impact of the lockout on the Sonics.

9.    All profit and loss statements submitted to the NBA by each NBA franchise for the last 10 years.

10.    All documents reflecting formal or informal NBA policies governing or addressing the way in which franchises account for and report their revenues.

13.    All documents regarding or related to the impact on NBA team profits of the most recent collective bargaining agreement between the NBA and the NBA Players' Association.

The NBA objected to all these requests on the basis of privilege, confidentiality, relevance, and undue burden, and has refused to produce any responsive documents.

PBC's defense to the City's specific performance claim turns on its allegation that continuing to play NBA games in KeyArena would necessarily cause it undue hardship. It would be no defense to the City's specific performance claim that the Sonics' owners simply made an allegedly "bad bargain." *See Dean v. Gregg*, 663 P.2d 502, 503 (Wash. App. 1983). Similarly, purported "financial" impossibility is no defense. *See Carpenter v. Folkerts*, 627 P.2d 559, 562 (Wash. App. 1981). The City is entitled to test PBC's allegation that KeyArena is allegedly too small to be "[any] longer an economically viable facility for men's professional basketball." NBA Commissioner Stern makes the same claim:

> The reason that this journey [the proposed relocation of the Sonics to Oklahoma City] began was because KeyArena was not an adequate arena going forward . . . as far as we know, the footprint of Key is at the present time is not viewed as adequate to support what's necessary going forward.

Ex. 39. The NBA thus has publicly supported PBC's purported defense of undue hardship. It must have some reason for doing so. The City is entitled to discovery of NBA documents that will allow the City to evaluate the basis of PBC and the NBA's jointly asserted defense.

Additionally, the City alleges in its Complaint that the Sonics' alleged operating losses stem from other factors (e.g., the poor performance of the Sonics in comparison with other teams). Ex. 11, ¶ 9. The City would be unfairly handicapped in evaluating PBC's claim regarding the Sonics' alleged losses if it is limited to only a single data point; i.e., information about the Sonics. The City believes that to fully and fairly evaluate the causes of the Sonics'

alleged operating losses, it needs to obtain NBA documents bearing on the finances of the NBA and other NBA teams.

Specifically, financial professionals have cited the size of the arena or stadium in which a team plays its home games as just one of many factors that can impact the team's profitability. Other relevant factors potentially include: the population of the metropolitan area in which the team plays; the size of the media market; regional per capita income; the team's salary structure; the team's winning percentage; whether or not the team has a history of championships or playoff appearances; whether the team has a charismatic star player or players on the roster; the team's relationship with the community in which it plays, including activities with charities and schools; the public perception of a team's ownership, including the presence of the owner as a figure in the community; ticket prices; the configuration of the arena, including premium seating and signage; the number of corporations in the community with more than 500 employees; and, the team's expenditures on marketing, advertising and public relations. Lawrence Decl., ¶ 47. Only by analyzing the profitability of each NBA franchise, and taking into consideration other, non-arena factors that impact profitability, can PBC's assertion that its alleged financial losses are attributable solely to KeyArena's size be meaningfully tested. *Id.*

The City has limited the breadth of the discovery requests at issue as much as is reasonably possible. Request No. 13 is limited to a specific topic: the impact on NBA team profits of the most recent collective bargaining agreement between the NBA and the NBA Players' Association. Further, the City has limited Request No. 13 to documents that (1) were communicated to one or more NBA teams by, or on behalf of, the NBA and (2) were generated in anticipation of the negotiation or execution of the most recent collective bargaining agreement. Request No. 10 is also limited both to a discrete topic and to documents addressing

22

"policies" regarding that topic (rather than a broader class of documents); i.e., formal or informal

NBA policies governing or addressing the way in which franchises account for and report their

revenues.

In certain instances, it was necessary for the City to request documents over a 10-year

time period, because one of the factors specifically at issue in this case is an event that occurred

10 years ago; i.e., the effect of the 1998-99 NBA lockout on NBA teams generally and the

Sonics' finances in particular. Nevertheless, the City has limited the scope of these requests.

Request No. 9 requests profit and loss statements submitted to the NBA by each NBA franchise

for the past 10 years. The scope of this request is thus limited to discrete and easily identifiable

documents (profit and loss statements which are provided by the various teams to the NBA).

Request No. 8 is limited both to a specific topic and to documents reflecting an "analysis" of that

topic (as opposed to a broader class of documents); i.e., any analysis of the financial impact of

the 1998-99 NBA lockout on NBA teams.

## C.    The NBA's Objections Regarding Privilege and Confidentiality Are Moot.

The NBA's objections on grounds of privilege and confidentiality are moot. The City

does not seek, nor has it ever sought privileged, documents. Further, the City has entered a

protective order in this case, which allows the NBA to protect the confidentiality of its

documents by designating them "Confidential Material" or "Attorneys Only Material." *See Bank*

*of New York v. Meridien Biao Bank Tanzania, Ltd.,* 171 F.R.D. 136, 145 (S.D.N.Y. 1997)

(ordering production of confidential business information subject to a protective order). In fact,

the NBA specifically asked the City to include a provision in the protective order that would

preclude confidential documents produced to the City in this litigation from being produced to a

third party pursuant to a public records request. Exs. 3, 4, 6. The City agreed to the NBA's

request. Accordingly, the protective order provides that the City attorneys' office will not receive copies of documents marked "Attorneys' Only" or receive or create documents referencing the contents of those documents. Ex. 7, ¶ 6(a).

## IV.    CONCLUSION

The NBA is directly and deeply involved in the issue at the heart of the City's lawsuit against PBC: PBC's intent to breach the Lease by relocating the Sonics to Oklahoma City after the 2007-08 NBA season. PBC needs the NBA's approval to relocate (and break the Lease). From the time PBC bought the Sonics, the NBA has been involved in the issues of where the Sonics would play, the Lease, and relocation. The NBA has agreed playing games in KeyArena is allegedly financially impossible and encouraged the Sonics to buy out their Lease. Although not a party, the NBA has chosen to take sides in this litigation. While the City does not know what the NBA's internal documents say, or what NBA was saying to PBC (and vice versa), that is exactly why the City seeks discovery from the NBA. Particularly in light of the NBA's close relationship to the litigation, the City is entitled to this discovery from the NBA. The City's subpoena should be enforced and the NBA ordered to produce all responsive, non-privileged documents.

Dated:  New York, New York
        April 9, 2008

Respectfully submitted,

Joanna A. Diakos (JD 7269)
KIRKPATRICK & LOCKHART PRESTON
GATES ELLIS LLP
599 Lexington Avenue
New York, New York 10022
Telephone:  212.536.4807
Facsimile:  212.536.3900
joanna.diakos@klgates.com

Paul Lawrence (*pro hac vice pending*)
WSBA No. 13557
paul.lawrence@klgates.com
Jeffrey Johnson (*pro hac vice pending*)
WSBA No. 23066
jeffrey.johnson@klgates.com
KIRKPATRICK & LOCKHART PRESTON
GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WA 98104-1158
Telephone:  206.623.7580
Facsimile:  206.623.7022

*Attorneys for Plaintiff City of Seattle*

25