UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
IN SEATTLE

-------------------------------------------------------------------

CITY OF SEATTLE,                      )
                                      )
                     Plaintiff,       )   No. C07-1620MJP
                                      )
          v.                          )
                                      )
THE PROFESSIONAL BASKETBALL CLUB,     )
LLC, an Oklahoma limited liability)
company,                              )
                                      )
                     Defendant.       )
                                      )
                                      )
-------------------------------------------------------------------


PRETRIAL CONFERENCE


-------------------------------------------------------------------


BEFORE THE HONORABLE MARSHA J. PECHMAN


January 29, 2008

APPEARANCES:

For the Plaintiff
City of Seattle:                Jeffrey Charles Johnson
                                Paul J. Lawrence
                                K&L PRESTON GATES ELLIS
                                Attorneys at Law

                                Gregory Colin Narver
                                SEATTLE CITY ATTORNEY'S OFFICE
                                Attorney at Law

For the Defendant
Professional Basketball
Club LLC:                       Bradley S. Keller
                                Paul R. Taylor
                                BYRNES & KELLER
                                Attorneys at Law

THE COURT:  Okay.  Counsel, good morning.  I have a court reporter here.  I would like everybody to please identify themselves for the court reporter, please.

MR. LAWRENCE:  Paul Lawrence, KL Preston Gates Ellis for the City of Seattle.

MR. NARVER:  Greg Narver of the Seattle City Attorney's Office for the City of Seattle.

MR. JOHNSON:  Jeff Johnson, Preston Gates Ellis.

MR. TAYLOR:  Paul Taylor, Byrnes and Keller.

MR. KELLER:  Brad Keller, Byrnes and Keller for Professional Basketball, LLC.

THE COURT:  At the end of the table is David Coe.  He is the law clerk assigned to this particular case.

Counsel, you asked for a conference with me.  So here I am.  I am ready to listen to anything you would like to tell me.  I have read your materials.

I will tell you what I am not interested in talking about today.  I am not interested in talking about the merits of the case.  I am interested in talking about the development of the case in terms of timeline, what discovery needs to be done and how quickly that can be done.

Those are the issues I am interested in.  Please don't give me the merits.  I am not interested in doing that.  I am not going to decide the merits no matter what the Tacoma News Tribune said this morning, that I am going to decide the fate of anything

today.  We are going to set dates, times, we are going to talk about the structure of what needs to be done.

You asked for this conference so I am going to give each side an opportunity to tell me what you want to talk to me about.

MR. LAWRENCE:  I will start for the City of Seattle.  We proposed in the joint status report a proposed plan, which we think is expedited, given the nature of this case.  We have discovery outstanding to the PBC already.  We have not gotten responses back.  I think they are due later this week.

We have already identified at least one discovery dispute that will need to be resolved by your Honor.  We are going to do the expedited process under the local rules, but there is a dispute already about the scope of records custodians, the need to search for documents.

We have third-party discovery out to four entities already, and a fifth one is going out this week.  And we don't know whether or not there will be objections to those subpoenas.  Three of the entities are not based in Seattle.  It is the NBA, Oklahoma City and the management group that runs the arena in Oklahoma City, in addition to the two former Sonics owners.  Those are out and we don't know whether or not we will get objections or just get documents back.

I think as both parties recognize they are both relying on experts to resolve the issue.  We need this discovery in order for our experts to do their work.  And I believe by the time we

get this discovery --

We also will need some fact depositions to support our expert works.  Our process is to get the discovery responses, review the documents, try to set up depositions as expeditiously as possible, provide all that information to our experts.  We think that they would be ready for their initial disclosures in early June.

And then we have set in the post schedule three weeks for rebuttals, and then a month for concluding discovery, which we anticipate at that point will be the expert depositions.  And so we think the case in that sense will be ready through -- by the end of July.

And then at that point -- we propose what we think is a typical period between time of closed discovery and the trial date proposed in October.  But we do feel that we definitely need that time to get the factual discovery done, get our stuff to our experts and get their work done.

MR. KELLER:  Your Honor, the single issue that this case presents --

THE COURT:  Mr. Keller, it looks like you are hurt.

MR. KELLER:  It was dental surgery.

THE COURT:  I'm sorry.

MR. KELLER:  I wish I could tell you the other guy looks worse than I do, but since he was the surgeon he looks pretty good.

The single issue that this case presents is whether the City, the landlord of Key Arena, is entitled to specific performance of the last two seasons under the lease, specific performance that would require the Sonics to play out their home games at Key Arena, or whether a court, sitting in equity, as your Honor will be doing, deciding a specific performance claim, whether the Court would deny specific performance under these circumstances and limit the City to its contractual right to be paid the rent.

The lease contains a provision that provides the home games will be played at Key Arena.  If that lease provision was all that mattered we could all go home right now.  But the lease provision really is only going to end up being one factor.

It actually turns out there is quite a bit of decisional case law that exists in this area, including prior cases that involve professional sports arrangements and landlord/tenant dealings.

Both sides are definitely going to want an opportunity to discuss that case law with you and make their respective factual showings regarding the issues.  But the issues really are pretty discreet, both factually and legally.

From a factual standpoint, the parties are going to be wanting to present evidence about the economic aspects of their relationship.  They are going to be wanting to present evidence about the suitability of Key Arena for an NBA franchise, what some of the past efforts have been to obtain government/community support for building a new arena, and what kind of net financial

benefits, if any, accrued to a community of Seattle's stature from having an NBA franchise.

I really have only one purpose here today. It is to get the earliest possible trial date that we can get. And hopefully one this May.

There are three reasons why we are asking for the earliest possible trial date. The first is that the Sonics have a very real need to know by this spring whether next season they are or are not going to have the right to play elsewhere.

The NBA as a league does its scheduling for the next season during the June time period. The Sonics have applied to the NBA to relocate the franchise. That relocation and the application itself is subject, of course, to whatever this Court rules are its rights under the lease.

You have an entire basketball organization --

THE COURT: Mr. Keller, you need to help me understand what that outside influence means. In other words, if the NBA says to the Sonics, no, you can't move to Oklahoma, are we done?

MR. KELLER: If they unequivocally say you cannot move to Oklahoma at all?

THE COURT: Or you can't move to Oklahoma for two years or one year or whatever, does that moot this litigation?

MR. KELLER: In the abstract, yes. I suspect the detail would be in the fine print, they would say you can't move to Oklahoma or you can't move elsewhere unless you resolve the lease

situation either through the courts or with the City as your landlord.  And that's what I meant by conditional.

My client very much respects the right of this Court to decide this controversy.  We are not moving out in the middle of the night.  We have applied to the NBA for the right to move, but that application itself to the NBA is conditioned on the presumption that either through a negotiated resolution or a court adjudication that the Sonics get the entitlement to leave.

So what are some of the external factors?  The first reason is you have an entire organization, you've got its players, its coach and its staff and the entire NBA league needing to know by June where this organization is going to be for the '08/'09 season.  That's the first reason.  You also have a fan base that wants to no one way or the other when they are re-upping and considering whether to get season tickets next year.

The second reason is that this case can be ready to be tried in May.  In fact, it could be ready for a trial in April.  Whether you are dealing with a three or four-day bench trial --

THE COURT:  So you have abandoned March?

MR. KELLER:  I have abandoned March.  I asked for March figuring it was going to be April or May.  I can be ready for this case in March.

If I thought that there was a real --  I know that your Honor likes to have a certain period of time that works back from the trial date to arrange for the hearing of dispositive motions.

And so I am abandoning March.  That was in the joint status report in recognition of the fact that if we can get May we can still finish discovery by March and still have that kind of a hiatus that your Honor likes to have for dispositive motions.

But whether this case is a three day or a four-day trial, or a six or a seven-day bench trial, the number of witnesses really is modest and the issues are not complex.  This case has been pending for over three and a half months, since early October.  There really isn't a whole lot of discovery to do.  Maybe a half a dozen or so fact witnesses and some experts and the case is ready.

And there is a third reason why the case should be set for trial in May.  Because of these league scheduling issues if this case doesn't get decided by May you have in effect decided it for the next season.  If the case is not decided in this May/June time frame the practicalities of the situation are that the schedule for next year is going to be probably set as if the Sonics will be in Seattle for the next season.

Whether that scheduling dynamic helps illuminate what might have been the City's motive for asking for an October trial date, that might be something that is interesting to speculate about.

We did try and enlist the City in joining us back in November and early December in requesting the scheduling conference back then, and approaching the Court in December and jointly asking for an early trial date.  They declined to do so.

In sum, this is a dispute that needs to be decided by May. Second, it is a dispute that can be ready for trial and decided in May. And, third, it is a dispute where delay, whether it is intentional or not, works to the strategic advantage of one side and the distinct strategic disadvantage of another side.

Since last fall the City and the Sonics have had this fundamental disagreement over whether specific performance under this lease is an appropriate remedy under these circumstances.

Since last fall the Sonics have been trying diligently to get that to an adjudication. We are asking your Honor to set a spring trial date so we can try the case in this courtroom and have that issue resolved once and for all in a way that makes sense.

THE COURT: Well, Mr. Keller, even if I were to decide it that quickly for you, would that end it? Obviously whoever feels aggrieved can appeal.

MR. KELLER: Whether the right of appeal of one party would or would not be an -- be viewed by the NBA as an impediment to granting the relocation, I am not even going to speculate on. If they gave us the green light, the decision of this Court stands. You can't really -- it is very difficult to try to supersede a ruling like that.

THE COURT: Okay. Let me come back to the City. If there is a date by which people have to set their basketball schedules in order to sell tickets, whether or not the Sonics

stay, isn't that date important to the City because you are not going to sell tickets for them to play in Seattle if it is uncertain?

MR. LAWRENCE:  First of all, Mr. Keller has injected a huge number of facts into his statement that have no -- we have never heard before, that we have no knowledge of whether they are accurate or not.  They are not in the joint status report.  We have seen no discovery.

THE COURT:  You must know what date it is that the NBA sets their schedule.

MR. LAWRENCE:  Actually we don't.  We have discovery going out this week to the NBA.  We don't have that information. We are not privy to the inner workings of the NBA.  For whatever reason, the NBA is relatively discreet in what information --

THE COURT:  Don't you know historically when it is that the tickets go on the market?  I mean, that is something you certainly must know.

MR. LAWRENCE:  Season tickets are sold up to the beginning of the season to people.

THE COURT:  Which by the way is when?

MR. LAWRENCE:  It typically is either the end of September or the beginning of October.

I think in terms of season ticket sales --  I think your Honor pointed out something very significant, regardless what the decision is there is going to be an appeal of this case.  I don't

agree with Mr. Keller that if the decision is to allow the Sonics to leave there is not a good basis to get a stay of that decision pending the appeal.

Putting that aside, we don't even know -- I also don't know -- I think Mr. Keller's description of the NBA decision is also not accurate based on what we have heard.  They can decide unequivocally not to allow the move, they can decide unequivocally to allow the move or they can decide to conditionally allow the move.  There is no sense that I know of that they have made any decision yet.

I think your Honor's question is very pointed, if they decide unequivocally not to allow the move until the end of the lease then this case is over.  And I think we are anticipated to know that sometime in April or May.  That may be relevant.

In terms of preparing for the season, I think it is fair to say that if the Sonics were going to be permitted by the NBA to move, and your Honor would permit them to move, September is a time we need a decision by in order to get tickets sold, etcetera.

As I understand it, the Ford Center available.  So it is not a question of availability of competing arenas.  In fact, Oklahoma City is going to vote in March about spending money on the arena regardless of whatever your Honor does and, I guess, regardless of what the NBA does.

So I think if you need to get a team moved by the end of --

before next season, we will be looking at a trial at the beginning of September.

THE COURT:  Okay.

MR. LAWRENCE:  We really do believe firmly we do not have the information available to us to have our experts ready and our fact stuff done before the end of June.

THE COURT:  Well, let's go back.  Obviously I have no information before me on which to decide what the NBA is going to do.  So I am taking that off the table.  Let's approach this from the standpoint of what has to be done and how fast can it get done.

The City basically claims they need 25 depositions.  But let's go through the categories of those.  I am not understanding why that many are necessary.  You indicate you want to take multiple principals' depositions.  Why do you need that if you have got the capacity to do a 12(b)(6) and get one person speaking for the current Sonics' ownership?

MR. LAWRENCE:  We already know from public statements that at least one of the Sonics -- current Sonics owners made a statement that was radically different than anything that Mr. Bennett was stating.  Mr. McClendon stated that it was never the intent of the team to stay in Seattle.  He made that statement publicly.  It was published.  He was fined by the NBA for making that statement.

We don't believe that having one person speak for the PBC is

sufficient.  We believe that in fact --

THE COURT:  So now I have two.  There are at least two people, the 12(b)(6) and this other guy who made the statement.

MR. KELLER:  Do you mean a 30(b)(6)?

THE COURT:  Excuse me.  30(b)(6).

MR. LAWRENCE:  We can't know better until we get the discovery response back.  This is an issue of dispute.  We have asked for, for example, all the documents of all the owners.  We want to understand, and I think it is very important, what did the owners know going into this.

We think it is pretty clear that the current PBC owners all understood the adequacy of the Key Arena, all understood the economic aspects of the relationship between the City of Seattle and the Sonics, all understood the claimed economic hardship they are claiming here, and they went ahead and purchased the team anyway.  There is nothing equitable that requires them --

THE COURT:  Doesn't this entity operate as an entity?

MR. LAWRENCE:  As far as we know not.  Because McClendon and Bennett --  All I am saying is that we want, and this is the discovery dispute that is going to come before you, to see the documents relating to all the owners and the others that were approached by Bennett to purchase.  And that may indicate additional people to depose or may not.  I can't tell you exactly how many people.

THE COURT:  You want to depose people who aren't

actually -- aren't actually purchasers?

MR. LAWRENCE:  We have information about a former participant that suggests that he may have relevant information about the intent of the PBC to stay or not stay.  But we need to take the deposition of this person.  We need the documents before we can identify how many.  It may be that we just need Bennett and McClendon.  But we need the documents of the other owners.  And it is only this one other former owner we have identified as a potential other witness.

THE COURT:  I am still not understanding what somebody who never purchased into this group, whether he thinks that they intended to leave immediately, has to do with it.

MR. LAWRENCE:  That has nothing to do with it.  What he was told by Mr. Bennett about what the purpose of the purchase was is relevant.  If he was told that the purpose of the purchase was to move to Oklahoma City and break the lease, then the Sonics cannot claim clean hands when we get into the equity.  We need to know what was told to people who were considering the purchase of PBC.

THE COURT:  That is three depositions.  Anybody else in that category of principals?

MR. LAWRENCE:  Again, I can't tell you unless we get the documents.  And once we get the documents, which --

THE COURT:  Well, let's assume I am asking you for what you know right now, as to who it is.  I am trying to see just

exactly what is the scope of discovery that needs to be done.

MR. LAWRENCE:  They have identified 12 people with knowledge in their disclosure requests -- in their disclosure filings.  So to say a half dozen witnesses doesn't make sense consistent with what they have disclosed to the Court and to us as to the scope of --

THE COURT:  I am talking about how many depositions you need to take.

MR. LAWRENCE:  We would like to take the 12 that they identified as persons with knowledge relevant to the case.

THE COURT:  What if they were to tell you they are not going to call 12, they are going to call six?

MR. LAWRENCE:  Again, I think we have the right to take the depositions and decide for ourselves whether or not this is good information or bad information.  We can't rely on --

THE COURT:  Let's move on to representatives of the NBA.  How many representatives of the NBA need to be deposed?

MR. LAWRENCE:  Probably one.

THE COURT:  And you represented the former owners.  Why do they need to be deposed since presumably you have access to them?

MR. LAWRENCE:  We don't have access to information from the former owners.  That is a red herring by the City.

THE COURT:  Well, why do you need a deposition as opposed to going to your former clients and saying, tell us what

you know?

MR. LAWRENCE:  Well, they don't necessarily --  They sold the team to the Sonics.  I don't think there is any reason to believe that Mr. Schultz or whoever is designated by that group is supportive of the City's position in this case.  We need to know what the nature of the discussions were between the Schultz group and PBC.

THE COURT:  So do you think that those two -- your position representing the City and your former clients would be in opposition?  Are we going to interject a problem here with your representation?

MR. LAWRENCE:  No.  We have dealt with that with our former clients.

THE COURT:  So if you have an agreement with your former clients that there isn't a problem, I guess I am wondering why don't you know what your former clients want to say?  There are lots of ways to get information.  The most cumbersome is the deposition.

MR. LAWRENCE:  We don't have access to Mr. Schultz.  I'm sorry.  Mr. Schultz and certain other members of that former ownership are not making themselves available for interviews.  We need to go through the formality of the deposition.

THE COURT:  Okay.  So how many former owners do you need?

MR. LAWRENCE:  We may just need a 30(b)(6) of the former

ownership to indicate what the discussions were, the nature of the negotiations between PBC and the Schultz group.

THE COURT:  You talk about representatives of Oklahoma City.  How many representatives and what would they offer on this particular issue?

MR. LAWRENCE:  Again, part of the question is whether or not the Sonics -- the PBC purchased with the intent to move the team and break the lease.  In which case, again, the equities weigh against any relief from the specific performance provision that exists in the contract.  So it may be, again, one or two people from Oklahoma City, whoever was dealt with by Mr. Bennett. Again, we anticipate at least one person, unless the documents indicate that additional --

THE COURT:  Are you talking about the mayor?  Are you talking about a deputy mayor?  Who is it in Oklahoma that would be the person you would want to depose?

MR. LAWRENCE:  Once we see the documents we can tell you.  How are we supposed to know who Mr. Bennett has been communicating with in Oklahoma City without having seen the documents?

THE COURT:  Well, I don't know.  You are the one who said that you needed to depose representatives in Oklahoma.  I am trying to figure out who those people are and how many of them there are.

MR. LAWRENCE:  There would be at least whoever can speak

for the City, whether it is the mayor or assistant mayor, and whose specific identity is somebody that we have learned through the course of the documents which we have requested.  We filed our document request with the PBC the first possible week that we could after the initial disclosures were done.  We didn't wait or delay in any way.

THE COURT:  Okay.  So when are those documents due?

MR. LAWRENCE:  I believe they are due on Wednesday.

THE COURT:  And so you believe pursuant to the document request you are going to find out who they were talking about this to in Oklahoma?

MR. LAWRENCE:  Yes.

THE COURT:  So you are assuming there is at least one or two people there?

MR. LAWRENCE:  Correct.

THE COURT:  Now let's talk about experts.  How many experts --

MR. LAWRENCE:  There are two.  There are two other third-party groups.  One is the Ackerly group that originally negotiated the lease.  Again, there was probably one representative there, maybe two.  And then the entity that manages the Ford Center.  And depending upon whether or not any documents come back that indicate there have been discussions between the Bennett group and SMG.  And, again, there is probably one person --

THE COURT:  So the Ford Center is someplace in Oklahoma?

MR. LAWRENCE:  Yes, that is the arena.

THE COURT:  You want to know if they have been there basically saying, do you have a place for us?

MR. LAWRENCE:  And talking about lease terms, etcetera, yes.

THE COURT:  All right.  So how many experts?  Assume that you will get one expert per topic.

MR. LAWRENCE:  I think right now based on what we know we are talking about probably at least three experts.

THE COURT:  And what areas of discipline would the experts be in?

MR. LAWRENCE:  One would deal with the economics of the situation, one dealing with the noneconomic factors that are attributable to the presence of a professional sports franchise, and the third is at least addressing a survey that they have identified in their joint status report.  We would probably need an expert to address issues related to that survey, and maybe a counter survey.

THE COURT:  If they are not going to introduce a survey --  In other words, I am trying to figure out what public opinion has to do with the legal issues here.

MR. LAWRENCE:  Well, they raised it in their joint status report, so we need to be prepared to respond to it if your Honor believes it is relevant to the case.

THE COURT:  All right.  I am just counting on my hands but I think I got up to 11.  You said 25.

MR. LAWRENCE:  We want to be over rather than under so we don't have to come back to your Honor based on what the documents --  It is not our intent to take any unnecessary discovery.

THE COURT:  I am wondering why --  Basically I am counting 11.  The usual number is ten.  So you are pretty close to that.  Let me talk to Mr. Keller.  Mr. Keller.

MR. KELLER:  I will start down the same list.

THE COURT:  Let's start down the same list.

MR. KELLER:  I will start actually in the reverse.  The one I can probably be the most specific about is experts.  I do see up to three experts per side.  I do agree with Mr. Lawrence on that.

THE COURT:  Let's back up on whether or not I am going to hear experts about what public opinion has to say.

MR. KELLER:  I would encourage you to wait until you have a little more developed briefing on what the criteria are that you consider under some of the case law that has addressed the issue of specific performance.

THE COURT:  I am running if I am running my own survey. I can't go to the grocery store without somebody putting in their two cents about it.

MR. KELLER:  Well, this is a survey, so this is a

Sonics' fan.  I am kidding.  There is a role potentially for the community perceptions of the value of the franchise to the City as part of one of the criteria that the Court will be asked to consider.  Whether or not you think survey evidence is an appropriate way to get at that criteria or not is the issue for another day.

THE COURT:  But let's assume -- or we can agree that both sides think the survey is something that is out there to be explored.

MR. KELLER:  Three experts for our side as well.

MR. LAWRENCE:  Your Honor, could I interpose?  I forgot one expert.  In addition to the three areas we identified we also are retaining an accountant to analyze the claimed loss that the Sonics are claiming with respect to their continuing to stay in the lease.  So there is the economic factors with respect to what benefits the team brings to the City, there are the noneconomic factors the team brings to the City, an accountant to address their claim that they are losing $20 million a year.  And then if survey is an issue, the survey from the expert.

MR. KELLER:  In terms of the ability of these experts to get ready, I understand counsel's desire to do some more discovery on empirical information.

I think it is also important for the Court to bear in mind the very nature of this landlord/tenant relationship is there has been an enormous amount of ongoing, continuous reporting about

the details of Sonics' organization's finances to its landlord under the existing arrangement. So while there is a need to gap fill, that's what it is, it is gap filling rather than a typical situation where parties are starting with a complete vacuum with lack of knowledge about each other.

Mr. Lawrence also indicated potentially taking some depositions of officials from Oklahoma City. I would like to point out to the Court that for over a month now that the City had previously served a four-year request on the City of Oklahoma, and has already gotten the City of Oklahoma's documents, which consisted of essentially nothing. So there has already been an indication to what extent there is or isn't going to be fruitful discovery in that area. And that has pretty much indicated nothing.

Other than that, we see in terms of factual discovery probably the mayor and one of his chief deputies, two council members, and probably one representative of a strategics task force that the City had several years ago that did a detailed analysis of Key Arena and the Seattle Center, and the suitability of the arena, both for basketball and for other purposes. And that's it.

THE COURT: Okay.

MR. KELLER: I don't understand how ownership groups as far back as the Ackerlys, which haven't owned the organization since I think the '90s, really has much to do with anything

anymore.  We did have a lease interpretation dispute early on about the arbitration provision.  But that has been resolved.

And when counsel indicated that there were 12 persons that we had identified as having knowledge, that included our list of City people that we believe had knowledge.  So I really do get back to where I was before, that I think the whole universe of fact depositions is maybe up to a half a dozen people for each side.  And that's it.  Three experts.

THE COURT:  So you are not intending to take anybody from the NBA?

MR. KELLER:  No.

THE COURT:  You are not intending to take anybody --
You don't want to perpetuate any of your clients' depositions?

MR. KELLER:  Right.  Our client is an LLC.  It has many many LLC members, like a shareholder.  Taking a minority shareholder's deposition about what they know about this doesn't seem very fruitful to us.  I understand discovery is limited.

THE COURT:  Let me go back.  As far as the reps from Oklahoma City, I counted five.  I understood there were five people.  Did I misunderstand you?  The mayor, deputy mayor, two council people --

MR. KELLER:  I was speaking of the City of Seattle.

THE COURT:  I'm sorry.

MR. KELLER:  The Mayor of Seattle, one of his deputy mayors, two council members from the City of Seattle and then a

representative of the strategic task force that the City of Seattle had several years ago. I don't anticipate doing any discovery in Oklahoma.

THE COURT: Gentleman, you are talking about trying to track down some fairly heady folks. In other words, you are trying to schedule perhaps the mayor of Oklahoma, the mayor of the City of Seattle, Howard Schultz, somebody from the NBA. Just how cooperative do you think those folks are going to be with you? If you had a hundred years to do this how fast do you think you can get them in the room?

MR. KELLER: I've got up to seven hours under the rules.

THE COURT: Can you get them served? Can you get them to cooperate? That's what I am saying. It is one thing to say you are going to depose the mayor of the City of Seattle, or you are going to depose Howard Schultz, it is another to get them on the calendar unless you are going to go out and serve them and drag them in.

MR. KELLER: I just don't think it will be a problem for the people I have identified. I don't know what kind of cooperation Mr. Lawrence is going to get from his former client, Mr. Schultz.

I agree with you there are some scheduling issues, but certainly if you start now it is not too much to expect that you can get these people scheduled for a half day or a one-day deposition in the next 90 days. And that's what we are talking

about.

THE COURT: So if the City is talking about 11 people, Mr. Keller, how many different people do you add to that?

MR. KELLER: I think I add five lay people and three experts if my math is right. I take issue with the 11.

THE COURT: All right. They asked for 25 and I got them to basically identify 11 slots. If you are identifying eight, I am already up to 19 depositions. How fast do you think you can do 19 depositions? What is a realistic time frame? What I am really trying to ask the two of you is to reveal your schedules to me. 19 depositions in 90 days means you have to be perpetually available.

MR. KELLER: I think it was Marshal McLuhan who said "work expands to fill the time allotted." If we have 90 days there aren't going to be 19 depositions. Mr. Lawrence will get his pencil out and his list of eleven will go down to six, and my list of five is probably going to go down to three or four. If it doesn't it is because we have made the judgment that we really need to take it, and it will happen. I agree when you say 19 depositions does sound like a lot in 90 days. But if our office -- being available for whatever day they want to go and have a witness available, if that's what it takes to get the case to trial in May it will be done. It will be the highest priority -- it is the highest priority for our client to get this case resolved by May. And I need to do what needs to be done to

accommodate the City's legitimate objectives so that can happen.

THE COURT:  Mr. Lawrence, are you continuously available?

MR. LAWRENCE:  Between Mr. Johnson, Mr. Narver and myself we are continuously available to get this done.  We do think we need the time to get the factual discovery done so that our experts can put their report out.  If they are putting the report out in June that basically anticipates we will try to get our factual discovery done by the beginning of May.  So that is an aggressive schedule.

But I can assure you we will be taking all of those depositions and any others that we find are necessary based on the documents that are disclosed and the information that is disclosed in the depositions of people.

I think we understand even our schedule that takes us out to the beginning of June for expert disclosures is an ambitious schedule.  The City is prepared to meet that schedule.  And between the schedules of the three of us we ought to be able to do that.

THE COURT:  Do you have experts lined up on each side ready to go?

MR. LAWRENCE:  Not ready to go in the sense that they have not --

THE COURT:  I mean, have you identified who -- as soon as you shovel the facts in they are ready to start churning the

numbers for you?

MR. LAWRENCE:  We have identified on two of the four areas.

MR. KELLER:  Yes, we do.  One of the reasons why we put the reference to the survey evidence in the joint status report was we wanted the City to know now rather than wait until disclosures that there was going to be an effort to put this kind of evidence in so they could get an expert on Friday.

THE COURT:  Do you have written discovery outstanding to the City?

MR. KELLER:  For document requests.

MR. TAYLOR:  We did a four-year request earlier, your Honor, and the outstanding written discovery was only to confirm that we got everything.  I think their answer will be they have produced it all already and they did make an extensive good faith production.  So we think we have got all that.

THE COURT:  Okay.  So you think you have everything. You don't think you have everything but you think you are going to get it by Wednesday?

MR. LAWRENCE:  I actually don't think we will get it by Wednesday because the PBC has indicated they are only searching documents for two people.  I don't think that is sufficient. That will be before your Honor expeditiously.  And then we will see.  But we do not believe that we are going to get the document production on Wednesday.

MR. NARVER:  We won't have third-party discovery on Wednesday.  We will have document discovery from the defendant then, but the third-party discovery certainly we won't have that this week.

THE COURT:  When is it due?

MR. NARVER:  The subpoenas are being served --

MR. JOHNSON:  Last week and this week.

THE COURT:  So you served your subpoenas.  When is your return date on your subpoena?

MR. JOHNSON:  I think it is the standard 30 days, I believe.

THE COURT:  Why did you wait until last week to serve your subpoenas?

MR. JOHNSON:  That's within a week of when we were allowed to start discovery.

THE COURT:  Okay.  All right.  Will there be dispositive motions or can you decide right now that it is factually complex enough that somebody is going to be able to raise an issue of fact and we can skip over that part?

MR. LAWRENCE:  Well, given the nature of the issue, which is, of course, the equity we actually don't believe the dispositive motions would be productive.

THE COURT:  So there is no legal issue out there that basically tosses the case one way or the other?

MR. LAWRENCE:  That will decide the case, correct.

MR. KELLER:  I agree.  And that helps a lot from a scheduling standpoint.

I want to give your Honor one other date.  I guess it is not in the materials but I think it is in the public domain.  It does I think go to the first question you asked me.  And that is on April 18th to the 20th is when the Board of Governors of the NBA meets and acts on whatever the recommendation is of the relocation committee.  So to the extent there was a potential for some decision of the NBA rendering a need to get this case resolved, making that go away, that will be a known event as of April 18th to the 20th.

THE COURT:  Okay.  This is what I am thinking about in terms of what it is that is necessary in order to get this done.  I am throwing out a template.  If I give you 90 days to complete your fact discovery, starting from now, add to that 30 days for you to complete your expert discovery, that gets us to 120 days.

MR. LAWRENCE:  Can I ask a question?  When you say "expert discovery" are you talking about disclosures and depositions and rebuttals within that 30 day period?

THE COURT:  Yes.  Well, you are going to roll the material.  You are not going to get --  Any information you need for an expert you are going to pile on earlier than 90 days.  You are not going to wait until the 89th day.

MR. LAWRENCE:  No.  I understand that, your Honor.  I was just making sure that I understand 30 days both to disclose,

file rebuttal reports and take depositions?

THE COURT:  Correct.  But if you are telling me that doesn't work, give me another alternative.

MR. LAWRENCE:  I think we had proposed 60 days, maybe 45 days as a compromise.

THE COURT:  If you have --  I am thinking out loud now. If you have fact discovery 90 days, expert discovery 45 days, and then you take 60 days to get to trial --  If I don't have any -- The reason that I need four months is if there is dispositive motions.  So you understand that is what the usual time frame is, four months, so you can file your motion, ripen your motion, and I have 30 days to decide it and you have got 30 days to get ready for trial after you hear it.  But if there are no dispositive motions, if we are looking at 60 days, we are looking at 185 days.

MR. LAWRENCE:  If my calculation is correct that takes us to mid August.  We have conferred in advance and all three of us are available in mid August.

THE COURT:  I don't think so.

MR. KELLER:  I am missing something.  I have got 90 days for fact discovery.

THE COURT:  45 days for experts, plus 60 days after discovery closes.  185 days.

THE CLERK:  That would be August 2nd?

MR. KELLER:  I guess the question I have is why do we

need 45 days for experts, and why do we need a 60-day hiatus between the close of discovery and trying a four or five day bench trial?

THE COURT:  So you think we can carve that down?

MR. LAWRENCE:  Can I speak on the expert?  I know at least one of our experts will have a challenge meeting this schedule, but he is committed to meeting this kind of schedule because it is consistent with what we proposed.  I am not sure what your Honor anticipates during the 60 day period.  Like I said a minute ago, we did confer and we are available any time in August for trial.

THE COURT:  Let's try 150.

THE CLERK:  That would be June 28th.

MR. LAWRENCE:  Where are you cutting 35 days from?

THE COURT:  I am basically looking at going back to 30 days of --  In other words, basically a total of 120 days for discovery.  30 days from the close of discovery basically gets to you trial.  Mr. Keller makes the point, if there is no motions what do you need the 60 days for, if you have closed them.

Mr. Keller, if the City want to take discovery, and I don't know any authority, and I think you would be hard pressed to defend it to the Ninth Circuit for me to say, no, they don't get any.  That's why we just went through that process of how many people and how long is it going to take.

120 days to take --  I don't think you are going to be able

to take everybody you want to take.  I think you have a pipe dream if you think you are going to get the mayor of Oklahoma City on your schedule that fast, or for that matter Mayor Nichols.  The people you are talking about, I am assuming, this isn't the only thing they are doing today.

MR. LAWRENCE:  Your Honor, if I could make a pitch to keep the 135 day schedule for discovery?  If you add 30 days to that to get ready for trial, that is 165.  That would give a trial in plenty of time to get a decision out so people can plan for the future.

THE CLERK:  June 14th.

MR. KELLER:  The expert side of this, it is not rocket science.

THE COURT:  If it is not rocket science then maybe I don't need it.

MR. KELLER:  There may be some truth to that in the end.  But certainly everybody wants to work it up for you so you can decide.

In terms of figuring out what the financial performance of the team is going to be over the next two seasons that remain, we have got an operating history, we have got an established cost structure.  This just isn't really very complicated stuff.  It seems like 30 days is more than ample.  And I would like to be in trial within two weeks after that and get this thing done.

One nice thing about rolling it right into trial after the

discovery cut off is you don't have a lot of stop and start. Everybody is up, they are geared, they are running, the experts are ready.

THE COURT:  I want to give you a little time to make sure that I don't have to listen to all the stuff you listen to. Okay.

MR. LAWRENCE:  Obviously I don't think they are willing to stipulate to the numerous noneconomic factors that are in support of the equities or the economic benefits to the City beyond simply what's rental payments.  I think those are very complicated issues.  Economists have been arguing about this for years.

MR. KELLER:  I definitely have an agenda though in trying to push this into a mid June trial rather than the end of June.  I know you said it is off the table but there is the scheduling issue.

THE COURT:  Mr. Lawrence, how about if I give you 40 days and I cut back and we go to trial 20 days afterwards?  That still adds up to 150 I think.  That is June 14th.

THE CLERK:  Actually the 16th is Monday.

THE COURT:  The 16th is Monday.  June 16th.  That is not as fast as they want to do it.  I don't know when people are going to start selling these tickets.  But I am realistically looking at what you are going to do.  And I am going to give you the time to do your discovery, but it is going to be a mad

scramble.  You have about this much time.  And that is all you get.  So it is 90 days, 40 days, 20 days, 150.  I am assuming there will be no dispositive motions.  I am assuming that you will file any discovery disputes in a unified format so that it gets in front of me.  I am assuming that you are going to be cooperative in who it is you are going to go get.

I think a lot of this stuff, if you want to really find out what somebody has got to say, it doesn't make a whole lot of sense for everybody to barrel off to Oklahoma to take a deposition when maybe a joint phone call would find out whether somebody has something useful.

You have to start thinking about even if you go to depose somebody are you going to get them back here at time of trial, or am I for five days going to sit and watch videotape.  But those are all practical things.

MR. LAWRENCE:  Sure.

THE COURT:  It doesn't seem like it is so terribly complicated that you get to go out and depose the world --

MR. LAWRENCE:  We are not asking to, your Honor.

THE COURT:  Okay.  If you can get these people to sit down long enough to take their deposition more power to you.  I am doubtful whether you can.  I am doubtful if I gave you two years to do it you would be able to in some instances.

I am asking you to look creatively at how it is you exchange information.  I will look very dimly on anybody who basically

holds information to their chest and doesn't lay it out here. The one thing that is going to be important, when you present your case at the time of trial there should be no fact, there should be no statement that both sides don't know about.  I want to run the Bolshoi, I am not running mud wrestling.  I expect everything is going to be orchestrated and everybody will know what is coming.

So let's talk about some other --  So June 16th.  You are asking for five days of bench time.  That is a lot of time for bench time.  I will put you on an hourly calendar.  If it is five days --  Is that realistic?  Yes?  No?  You said ten previously.

MR. LAWRENCE:  We said two weeks, right?

MR. KELLER:  If you give me five days and put me on the clock I will try my case in two and a half days.

MR. LAWRENCE:  I think it is fairly aggressive. Obviously we will do what your Honor says.  We prefer a little more time.

THE COURT:  How much more time?

MR. LAWRENCE:  It strikes me at least three days per side would be appropriate.

THE COURT:  Okay.  Six days.  We will go for six days. You will be on a clock.

Let's talk a little bit about how it is if I am the decision maker you can maximize my decision making capacity.  You have a couple of problems.  You want to find out what people are going

to say but then you have to transport it here.  I would suggest that both sides sit down and figure out who it is they are actually going to be able to get in the room.  And if you can't get the person in the room then you are going to have to perpetuate them somehow.

I really am not interested in looking at talking heads.  If you decide you must use a videotape deposition, pull the camera back so that the questioner can be seen.

MR. KELLER:  Is a split screen acceptable?

THE COURT:  Split screen is acceptable.  Even better, think about video conferencing them in.

MR. LAWRENCE:  At trial?

THE COURT:  Yeah, at trial.  Here is the problem.  If you just give me a talking head I can read those transcripts three times faster than they can talk.  So what usually happens is if you give me the videotape is I will watch for about ten minutes and then I will read, unless you ask me not to.  In other words, is there something so compelling about the way this person testified that it is their appearance rather than their words that make a difference.

MR. KELLER:  If the parties were willing to agree to it, to the extent there was a perpetuated deposition, notwithstanding all the efforts to avoid it, other than having you watch for five or ten minutes for the flavor of the witness, if the parties agree to just read the transcript on your own time, could that

help expand the trial week in effect?

THE COURT: Well, obviously then you have given me the night job as well as the day job. In other words, if I am reading the transcripts at night and listening to testimony during the day --

MR. KELLER: We will make more work for you but we have managed our clock better.

THE COURT: I will read whatever you give me to read. If you want the impact of what is going to happen, think about it. Do you want to include me on some of your depositions? In other words, if you are going to take a deposition, let me watch the deposition with you. Video conference your deposition in and I will take the testimony as it comes along. That's another option. I am just trying to make it something different than the stack of videotapes.

MR. LAWRENCE: We hear that, your Honor.

THE COURT: I obviously will read whatever you want. I will make you go through and cull your depositions so that I am not reading things that don't really matter to you.

Then there is always the good old fashioned what can you agree to. Is there a stipulated set of facts that you can start with? Some of these things have got to be -- They are past historical events, so what can you put together in terms of an agreed set of facts or an agreed set of documents that say this is the basic set that we are going to build upon to present the

case to you.

MR. KELLER:  I would think there would be a lot of room to try and do that.  It seems like we always go into these cases with great intentions, and then the lawyers sit down and try and agree on the facts and they can't.  There is some basic empirical background, financial dates, documents that I think with a little more constructive effort by the lawyers we ought to be able to achieve something there.

THE COURT:  If there are numbers that you are going to feed to both sets of experts, can you agree on what those are so that you start out with at least what the data premises are?

What I am trying to get you to do is realize that I am the pupil, you are the teacher.  You need to be able to put the information in as creative but as well organized away in front of me as possible.  I will do the homework that you give me but let's think about how you want to do that.

The other thing you need to know is that --  I mean, I certainly have been to a few basketball games in my live, but I have no knowledge and almost no interest in professional sports. So if there is something that I am supposed to know or realize about this that is important, you need to tell me.

MR. KELLER:  Would you be willing to consider taking a site tour in conjunction with a particular witness' testimony?

THE COURT:  If you thought that was -- if you thought that was appropriate, I am happy to.  I have crawled under houses

to look at joists on my belly before to decide cases.  So what, you want to take me to Key Arena?

MR. KELLER:  There are certain aspects of the physical operation that would bear a lot on what I think some of the expert testimony will be about suitability issues.

MR. LAWRENCE:  I don't know.  We will respond to that request when it comes in.

THE COURT:  What I am asking you to do is think about it, be creative about how it is you want to spend your six days, what you want to put in front of me.  Think about who you are going to chase for a deposition, as to whether or not that person is really going to add value to what it is you are trying to put forward.

And if the newspaper reports this as, Judge Pechman doesn't care about professional sports you would be wrong.  Okay.  I have no --  What I am trying to express is I have no personal stake in professional sports in any way.  So you need to teach me and educate me as to why that is important.

Okay.  So what other dates do you need?  Counting back from June 16th; discovery cut off for facts; bench trial set for 6/16. This is what the computer just spit out.  Discovery completed by 2/19 --  That doesn't make any sense.  I am sorry, 4/17.

MR. LAWRENCE:  That is fact discovery.

MR. KELLER:  I like that first date.

THE COURT:  This isn't going to quite work because this

spits out other deadlines that we are talking about not using. Can I get you, with what I have just told you, to sit down and propose a deadline?

MR. LAWRENCE:  Sure.

THE COURT:  In other words, give me a proposal for what you've got.  If you want to do a trial brief, that's fine.  I would like to have the trial brief the week ahead of the trial. I would like a set of proposed Findings of Fact and Conclusions of Law at the same time.

THE CLERK:  That would be by June 11th.

THE COURT:  Okay.  Now, the other thing in your materials, you asked about ordering you into alternative dispute resolution.  You are both very sophisticated litigants.  You can go to anybody you like.  You can pay for anybody you like.  If you want to go, go.  I don't know why it is that I need to order you to.

MR. LAWRENCE:  We didn't ask.  We said we would be willing to go if everything was on the table.  We have been told from the Sonics that is not the case.

THE COURT:  So I'm not going to order you to.  You know how to find a mediator if you want one.

All right.  Other issues?  Anything else that I haven't covered that you want taken care of?

MR. LAWRENCE:  I guess the one other issue is we would ask that you permit us 15 depositions per side.  That gives us a

little leeway over the 11 that you have identified.  And I assume that does not include experts?

THE COURT:  Why would it not include experts?

MR. LAWRENCE:  I'm sorry.  I thought you counted 11 not including experts.

THE COURT:  No, I counted 11 including experts.  Each side gets 11.  If you want more you can come back and ask me and tell me why you need them.  But you are not going to have time to do that many anyway, not unless you start triple tiering.

MR. LAWRENCE:  We are prepared to do that.

THE COURT:  You have 11.  That's more than what the rule sets out.  Okay.  Other issues?  Does that take care of it?

MR. KELLER:  Thank you very much.

THE COURT:  Counsel, the other thing is, if there are issues in discovery that you can agree to talk with me about, as opposed to write to me about, I am willing to listen to you.  I have worked that in other cases that are on a swift schedule, that you say, all right, we need somebody to make the call.  You can call me and we can agree each side has a certain amount of time to present, and then you basically live with whatever I say.  Obviously you don't have the same sort of development issues to create your record that you might otherwise like.  But that is an option I offer to you.

Have you arrived at a protective order?

MR. KELLER:  No.  And I think --

THE COURT:  Is there any need for one?

MR. KELLER:  In this new era it would be pretty restrictive, I think.  I am very cognizant of the Court's temperament on those issues.  I think the City has its own public access issues to deal with on its side.

MR. LAWRENCE:  I think it would come from your side.

MR. NARVER:  If everything we have produced qualifies as a public record, everything we have produced so far, it would be a very small privileged log that went with that production.

MR. KELLER:  We don't anticipate there being a problem over arriving at a protective order.  And when we make that effort we will be very cognizant of the narrow scope that it should embrace.

THE COURT:  Okay.  Finally, if you do settle the case would you make sure I am one of the first and not one of the last to know?  I would prefer to know it before I read about it in the paper.

MR. LAWRENCE:  Sure.

THE COURT:  All right.  Great.  Thank you.  Could I have your proposed schedule on my desk --  Today is Tuesday.  Could I see it by close of business next Monday?

MR. NARVER:  Sure.

THE COURT:  Great.  Thank you.

                    (Adjourned.)

CERTIFICATE

I, Barry L. Fanning, Official Court Reporter, do hereby certify that the foregoing transcript is true and correct.

S/Barry L. Fanning

_____

Barry L. Fanning