The Honorable Marsha J. Pechman

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

CITY OF SEATTLE, a first-class charter city, )
                                             )
                   Plaintiff, )   No. C07-1620MJP
                                             )
      v.                              )   **DECLARATION OF PAUL R. TAYLOR**
                                             )   **IN SUPPORT OF DEFENDANT'S**
THE PROFESSIONAL BASKETBALL CLUB, )  **OPPOSITIONS TO PLAINTIFF'S**
LLC, an Oklahoma limited liability company, )  **MOTIONS IN LIMINE**
                                             )
                 Defendant. )
                                             )
_____ )

Paul R. Taylor declares as follows:

I am co-counsel for the PBC in this action. I make these statements of my own personal knowledge:

I certify that the attached Exhibits 1-15 are true and correct copies.

I declare under penalty of perjury under the laws of the State of Washington that this declaration is true and correct.

DATED in Seattle, Washington, this 3rd day of June, 2008.

/s/ Paul R. Taylor
Paul R. Taylor, WSBA #14851
Byrnes & Keller LLP
1000 Second Avenue, 38th Floor

DECLARATION OF PAUL R. TAYLOR IN SUPPORT OF
DEFENDANT'S OPPOSITIONS TO PLAINTIFF'S MOTIONS IN
LIMINE (C07-1620MJP) - 1

BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

Seattle, WA  98104
Telephone:    (206) 622-2000
Facsimile:    (206) 622-2522
Email: ptaylor@byrneskeller.com
Attorneys for Defendant the PBC

DECLARATION OF PAUL R. TAYLOR IN SUPPORT OF
DEFENDANT'S OPPOSITIONS TO PLAINTIFF'S MOTIONS IN
LIMINE (C07-1620MJP) - 2

BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

## CERTIFICATE OF SERVICE

I hereby certify that on the 3rd day of June, 2008, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Thomas A. Carr (thomas.carr@seattle.gov)
Gregory C. Narver (gregory.narver@seattle.gov)
Seattle City Attorney
600 Fourth Avenue, 4th Floor
P.O. Box 94769
Seattle, WA 98124-4769

Slade Gorton (slade.gorton@klgates.com)
Paul J. Lawrence (paul.lawrence@klgates.com)
Jeffrey C. Johnson (jeff.johnson@klgates.com)
Michelle Jensen (michelle.jensen@klgates.com)
K&L Gates
925 4th Avenue, Suite 2900
Seattle, WA 98104

/s/ Paul R. Taylor
Paul R. Taylor, WSBA #14851
Byrnes & Keller LLP
1000 Second Avenue, 38th Floor
Seattle, WA 98104
Telephone: (206) 622-2000
Facsimile: (206) 622-2522
ptaylor@byrneskeller.com

DECLARATION OF PAUL R. TAYLOR IN SUPPORT OF
DEFENDANT'S OPPOSITIONS TO PLAINTIFF'S MOTIONS IN
LIMINE (C07-1620MJP) - 3

# EXHIBIT 1

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

-------------------------------------------------------
THE CITY OF SEATTLE, a          )
first-class charter city,       )
                                )
            Plaintiff,          )
                                )
                                )
      vs.                       ) No. C07-1620 MJP
                                )
THE PROFESSIONAL BASKETBALL     )
CLUB, LLC, an Oklahoma limited  )
liability company,              )
                                )
            Defendant.          )

-------------------------------------------------------

Excerpt of Deposition Upon Oral Examination

of

TIM CEIS

-------------------------------------------------------

Taken at 1000 Second Avenue, Suite 3800

Seattle, Washington


DATE:   April 28, 2008

REPORTED BY:   Brigid M. Donovan, RPR, CCR
     CCR NO.:   2070


STARKOVICH REPORTING SERVICES

(206) 323-0919

1     A    I am sure that came up, yes.

2     Q    What did you say?

3     A    I told them that it was no slam dunk, I am

4    quite sure, that it would be difficult.

5     Q    Why was it going to be difficult?

6     A    Based on the prior three attempts in the

7    legislature, particularly the last one where Mr. Bennett

8    had asked for, I believe, $400 million to support a new

9    arena construction. I think the legislature was in a

10    bad mood after that attempt.

11     Q    Let me ask you something. You've been -- how

12    long have you been working with the legislature on the

13    Key Arena issue? How many years?

14             MR. NARVER: The city or Mr. Ceis

15    personally?

16             MR. TAYLOR: Mr. Ceis personally on

17    behalf the city.

18     A    Mr. Schultz first came to us in I want to say

19    2004. And our first attempt with the legislature was in

20    the 2005 session with Mr. Schultz's ownership group.

21     Q    So there have been efforts made with the

22    legislature in what, '05, '06 and '07?

23     A    Correct. And now '08 as well.

24     Q    You've been involved in each one of those?

25     A    I was not involved in the '07.

1    Q    Why not?

2    A    It was for a new arena outside the city of

3  Seattle.  And the city remained neutral on that

4  prospect.  So we did not engage in the debate in

5  Olympia.

6    Q    Council Member -- or Council President Conlon

7  testified last week that various council members

8  supported -- or contacted various of the Seattle

9  delegation indicating that they opposed an arena outside

10 Renton.  Were you aware that the council people were

11 doing that?

12   A    I don't believe I was, but they may have.

13   Q    Did you discuss with any member of the Seattle

14 delegation whether or not the city was in favor of a new

15 arena in Renton?

16         MR. NARVER:  The Seattle legislative

17 delegation?

18         MR. TAYLOR:  Yes.

19   A    I do not recall telling any Seattle

20 legislators that we were in favor of a new arena.

21   Q    My question was different.  Maybe I'll ask a

22 different question.  Did you tell -- let me get it

23 right.  Did you tell any member of the Seattle

24 delegation that the city was opposed to a Renton arena?

25   A    I don't recall telling people that we were

1    opposed.

2         Q    Did you finish your answer?

3         A    I will volunteer to you that I did express our

4    concerns about the status of Key Arena should a new

5    arena be built, and that we would hope the legislature,

6    if they decided to do it, would consider giving us

7    financial assistance to deal with remaining obligations

8    at Key Arena.

9                   MR. TAYLOR:  Can we have that read back,

10   please.

11                           (The previous answer was

12                            read.)

13        Q    Who did you express those concerns to?

14        A    I can't tell you precisely which legislator.

15   It was one or two that were in casual conversation.

16        Q    Was it Chopp?

17        A    I don't believe so.

18        Q    Are you sure?

19        A    I am pretty sure.

20        Q    So what you were telling these legislators was

21   that if you authorize a new arena, Key Arena is going to

22   be become a white elephant and we need money?

23        A    No, I did not use that term.

24        Q    What term did you use?

25        A    The exact same terms I just expressed to you,

1    is that it would be competition for Key Arena and we

2    would hope that they would provide official financial

3    assistance to help us with our current obligations at

4    Key Arena.

5        Q    So you were saying if -- essentially then, if

6    you fund a new arena you are also going to have to give

7    us some funding for Key Arena to deal with the

8    competition?

9              MR. NARVER:  Object to the form.  Asked

10   and answered.

11       Q    Fair characterization?

12             MR. NARVER:  Same objection.

13       A    Again, what I was concerned about was that it

14   would be competition for Key Arena and that we had

15   underlying financial obligations that we wanted to be

16   assured could be satisfied if the legislature decided it

17   was in the public's interest to build a new arena.

18       Q    You did this in person in Olympia?

19       A    No.  I did not go to Olympia on the Sonics

20   issue in 2007.

21       Q    So you did it on the phone or were --

22       A    As I said it was in casual conversation at a

23   political event or perhaps at a social event.

24       Q    How many of these casual conversations did you

25   have?

1    A    Perhaps two or three.  I can't imagine -- I

2  did not do a lot on the Sonics issue in 2007.

3    Q    What was your purpose in expressing your

4  concerns on these two or three occasions to these

5  unidentified representatives?

6    A    To hopefully put in their mind to remember

7  Seattle as they were dealing with a new arena outside of

8  the city limits.

9    Q    And these two or three conversations,

10  senators, representatives, what were they?

11    A    Well, I want to say they were representatives,

12  but it could have been a senator as well.  I interact

13  with state legislators, particularly from the Seattle

14  area, quite frequently.

15    Q    And in expressing these concerns, it was your

16  hope they would carry these concerns back to Olympia and

17  look out for Seattle's interests?

18    A    Yes.

19    Q    I am not a politician, but can we call this

20  lobbying?  You were lobbying for this?

21         MR. NARVER:  Object to the form.

22    A    That's to me is not lobbying.

23    Q    How would you describe it then?  If it's not

24  lobbying then what is it?

25    A    It's talking to legislators that are within

1    We are now back on the record.

2                                    (Exhibit 420 marked for

3                                    identification.)

4        Q    420.   There is a quote attributed to you.

5    "The situation is really dysfunctional.   We are all

6    going down the drain together.   The worse we make it for

7    him" -- that's Mr. Bennett -- "the worse he makes it for

8    us."   Do you see that?

9        A    Yes.

10       Q    Did you say it?

11       A    I did.

12       Q    What did you mean?

13       A    I meant that the relationship and his,

14   Mr. Bennett's, position that he was considering -- I

15   believe at this time considering pulling the trigger on

16   the lease, made the relationship between the city and

17   Mr. Bennett dysfunctional.

18       Q    And it was dysfunctional then and it's

19   continued to be?

20       A    Yes.   I would say that right now the

21   relationship has not improved since he initiated this

22   litigation by making his demand for arbitration.   We

23   have not had communications, productive communications

24   directly with him.

25       Q    Has the city tried to project what rent it

A F F I D A V I T

STATE OF WASHINGTON )
                     )  SS.
COUNTY OF KING       )


        I have read my within deposition, and the same
is true and correct, save and except for changes and/or
corrections, if any, as indicated by me on the
"CORRECTIONS" flyleaf page hereof.


        ----------------------------------
                     TIM CEIS


        SUBSCRIBED AND SWORN to before me
this _____ day of _____, 2008.


                     --------------------------
                     NOTARY PUBLIC in and for
                     the State of Washington,
                     residing at _____.
                     My commission expires
                     -------------------------.

CEIS

                    C E R T I F I C A T E

STATE OF WASHINGTON )
                    ) SS.
COUNTY OF KING      )


        I, the undersigned officer of the Court,
under my commission as a Notary Public in and for
the State of Washington, hereby certify that the
foregoing deposition upon oral examination of the
witness named herein was taken stenographically before
me and thereafter transcribed under my direction;
        That the witness before examination was first
duly sworn by me to testify truthfully; that the
transcript of the deposition is a full, true and correct
transcript of the testimony, including questions and
answers and all objections, motions, and exceptions of
counsel made and taken at the time of the foregoing
examination;
        That I am neither attorney for, nor a relative
or employee of any of the parties to the action;
further, that I am not a relative or employee of any
attorney or counsel employed by the parties hereto, nor
financially interested in its outcome.

        IN WITNESS WHEREOF, I have hereunto set my
hand and seal this 8th day of May, 2008.



                    _____

                    Brigid M. Donovan
                    NOTARY PUBLIC in and for
                    the State of Washington,
                    residing at Federal Way.
                    My commission expires
                    December 19, 2008.


            STARKOVICH REPORTING SERVICES
                   (206) 323-0919

# EXHIBIT 2

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE


| | | |
|---|---|---|
| THE CITY OF SEATTLE, a first-class | ) | |
| Charter city, | ) | No. C07-1620 MJP |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| THE PROFESSIONAL BASKETBALL | ) | |
| CLUB, LLC, an Oklahoma limited liability | ) | |
| Company, | ) | |
| Defendant. | ) | |


**EXPERT REPORT OF ANDREW ZIMBALIST**

**MAY 2, 2008**

## I. Introduction.

My name is Andrew Zimbalist. I am the Robert A. Woods Professor of Economics at Smith College in Northampton, Massachusetts, where I have been teaching since 1974. I have been a visiting professor at Doshisha University in Kyoto, Japan, at the University of Geneva in Switzerland and at Harvard University. I received my B.A. degree from the University of Wisconsin and my M.A. and Ph.D. in economics from Harvard University.

I have consulted extensively in the area of sports economics for sports' players' associations, for cities, for teams, for companies, for owners and for law firms. I have also served as an expert witness in several sports-related litigations. I have testified numerous times before the U.S. Congress, state legislatures and city councils on sports-related (and other) matters. The intangible benefits to a community derived from professional sports has been an important issue in many of my consulting engagements over the years, including cases involving the following teams: Anaheim/Los Angeles Angels; the Minnesota Twins; the St. Louis Rams; the Cincinnati Bengals; the New Jersey Nets; the San Francisco Giants; and the Kansas City Chiefs and Royals.

I have published 18 books and dozens of articles in the areas of sports economics, economic development and comparative economic systems. Since 1990 the principal focus of my research, teaching and professional work has been sports economics. Sports economics is a branch of applied

microeconomics that includes the fields of industrial organization, antitrust analysis, urban economics, labor economics and public finance. I serve on the editorial board of various professional journals, including the *Journal of Sports Economics* on which I have served since its inception in February 2000.

For several years, I did a biweekly commentary on the business of sports for NPR's Marketplace and I contribute op-eds frequently on the sports business to leading newspapers and magazines. A full list of my publications, my testimonies in legal proceedings, and my other professional activities is included in my curriculum vitae which appears in the Appendix to this report. I am being remunerated for my services in this matter at the rate of $650 an hour.

## II. Assignment and Summary of Conclusion

I have been asked by the attorneys for the City of Seattle to undertake an economic analysis of the value of a professional sports team to a local economy.

While the scholarly research on the subject uniformly reaches the conclusion that a metropolitan area cannot anticipate a positive economic impact from introducing a professional sports team into its region, there is also a substantial and growing body of scholarly work that finds there are significant intangible benefits to a community from hosting a team. It is, however, extremely complicated to quantify the intangible value involved.

Numerous studies have attempted to do so and while each study produces large estimates, these estimates are very disparate. Therefore, I do not find it feasible to quantify within a reasonable margin of error the size of these intangible benefits.

### III. Analysis

#### A. Tangible, Economic Benefits of Spectator Sports in Seattle

I understand that in this matter the owners of the Seattle SuperSonics NBA team (the "Sonics") claim that a professional sports team does not directly contribute to Seattle's economy. I take this to mean that that the team does not believe the presence of the team contributes significantly either to the level of employment in the city or to the city's per capita income.

If the team's position refers not to the economy of the city limits per se, but to the broader Seattle MSA, then this position accords with the scholarly economic research on the subject. The econometric work that has been done on the issue of economic impact of sports teams and facilities generally reaches the finding, on the basis of cross-sectional and time series data, that one cannot anticipate a positive economic impact on an MSA from a sports team or facility.

This conclusion, however, needs to be qualified in this case on two grounds. First, the overall finding that professional sports teams and facilities by themselves do not boost a local economy is based on the

proposition that there is no economic payoff for the entirety of an investment in a professional team and a facility. The capital investment of public funds in a facility and its infrastructure is a significant part of that conclusion. Of the 29 professional sports facilities built between 2000 and 2006, the median capital cost was $403 million and the median public share of this was 82 percent, or $330 million.[1] This $330 million has to be financed either by new taxes or reduced public services, each of which produces a drag on the local economy. In the instant case, the public investment in the facility has already been made and the debt service will have to be paid whether or not the Sonics play at the KeyArena. If one removes the drag effect of the public component of arena finance, then it is likely that there would be a net positive effect on the local economy.

Second, in the present matter, the City of Seattle does receive a sales tax on tickets sold at the KeyArena as well as a business and occupation tax and some minor taxes.[2] Hence, it is a likely fiscal beneficiary of some transfer of funds from outside to inside the city. Even though there might not be a benefit to the economy of the greater

---

[1] Andrew Zimbalist and Judith Grant Long, "Facility Finance: Measurement, Trends, and Analysis," *International Journal of Sport Finance*, vol. 1, no. 4 (November 2006), pp. 201-211. The capital cost herein cited includes building, land and infrastructure.

[2] For instance, in 2007 the city collected $1.4 million in admission taxes from KeyArena and $287,458 in business and occupation taxes.

metropolitan economy, there could still be a local benefit to the city's budgetary receipts.

Finally, there is an interesting irony in the position of Mr. Clayton Bennett and his partners who own the Sonics. On the one hand, they argue that the Sonics do not have a positive economic impact on Seattle. On the other hand, they have argued to Oklahoma City that, were the team to move there, it would have an enormous positive economic impact of over $171 million annually to the state's economy.[3] It appears that the Sonics have maintained that this differential impact is attributable to the fact that Seattle has other top-level professional sports teams while Oklahoma City does not. However, the impact estimates presented to Oklahoma City do not depend upon, and, indeed, do not appear to be affected by the fact that the Sonics would be the only top-level professional sports team in the city. Further, the scholarly literature on this subject would not sustain this explanation of the presumed differential economic impact.[4]

---

[3] See "Sonics Relocation Proposal: Estimated Total Economic Impact and State and Local Tax Revenues," PBC 14399-14404. The large projected economic as well as intangible impact of the Sonics on Oklahoma City is also discussed in the depositions of James Couch and of Roy Williams in this case.

[4] Beyond that, the estimated impact study is deeply flawed and should not be relied upon in any case. For illustrative examples of the scholarly literature, see: Coates, Dennis and Brad R. Humphreys, "The Growth Effects of Sports

## B. The Role of Spectator Sports in Human Society

Nonetheless, spectator sports have played an important role in many human societies. Human societies, dating back at least to the ancient Greeks and Romans, worshipped heroes. They told stories about gods of love, of water, of fire, and so on, who performed superhuman acts, but still had human characteristics. Sport provides us with such heroes. Athletes train their bodies to transcend the normal physical limitations experienced by the rest of us. The great athletes do the seemingly impossible. They appear to transcend mortality in their displays of physical prowess. The Roman poet and satirist Juvenal referred to a political strategy of Roman emperors as bread and circus. It consisted of distracting the common people from their lack of freedom and the government's policy failures by offering them cheap daily bread and frequent circuses – mainly gladiatorial contests and other riveting games.

In more industrialized societies, as productivity and leisure time has expanded, spectator sports have performed an even greater role. As communities grow larger and more complex, as technology reinforces the minute social division of labor, and as consumerism provides increasing options for separating ourselves from one another (cars, walkmen, ipods,

---

Franchises, Stadia and Arenas," *Journal of Policy Analysis and Management*, 1999, Vol.18, No. 4, pp. 601-624; and, Baade, Rob, "Professional Sports As Catalysts for Metropolitan Economic Development," *Journal of Urban Affairs*, April, 1996, Vol. 18, No. 1, pp. 1-17.

cell phones, televisions, laptop computers, the internet, etc.), the possibility of joining together with one's fellow denizens to root for a local sports team can provide one of the most meaningful outlets for the expression of community available in modern society.

If a taxi driver, a lawyer, a businessman, a doctor and a delivery boy find themselves in the same elevator in a Seattle office building, it is a good bet that one of the only things they will have to talk to each other about is the Sonics, the Seahawks or the Mariners. And if a Seattle resident goes to the KeyArena on a typical night, she will find herself cheering together with 15,000-odd other members of her community every time a Sonics player sinks a basket. That experience might sound trivial, but it provides a sense of community identity and bonding that few other events in U.S. society are able to offer.

In his deposition in this case, Roy Williams, the President and CEO of the Oklahoma City Chamber of Commerce, was asked regarding the city's two-year experience hosting the NBA Hornets whether the team had "a positive impact on the community." He responded clearly: "Yes, they did." Mr. Williams was then asked: "There was an increase in civic pride?" He answered: "Yes, there was." Mr. Williams went on to say that the Hornets created community bonding and the team brought the city together.[5]

---

[5] Deposition of Roy Williams, April 17, 2008, pp. 22-23.

More generally, spectator sport offers personal and political distraction, excitement, community spirit and identity, a basis for social discourse and connection, hero worship and meaning, and a socializing experience for integrating immigrants, among other things. Together, these intangible benefits come in many shapes and forms. Economists tend to group them systematically into certain categories.

### C. Economic Theory and Modeling of the Intangible Benefits of Spectator Sports

In economic theory, there are three types of benefits that a professional sports team might confer that would not be registered in the marketplace. The first is consumer surplus. If a fan attends a basketball game and pays $30 for a ticket, but the value to her of attending the game is $50, then she experiences a consumer surplus of $20. This $20 is a welfare or quality of life gain for the local residents that is not registered in the market. Generally, sports teams have been successful in finding ways to capture much of this surplus for themselves. They do this by season ticket or group ticketing plans, by variable pricing, by selling PSLs, by amenities charges for luxury suites and club seats, and by excessive charges for catering and concessions.

The second area is externalities. When one consumer benefits from an activity or good that he does not purchase, then he is enhancing his welfare or quality of life in a way that is not recorded in a market transaction. Thus, when a Seattle resident watches the Supersonics beat

the Lakers on television, he is benefiting from an externality. Similarly, when he reads about the victory the next morning in the *Seattle Times* or gloats about the win with his co-workers in the office, he is still enhancing his welfare without directly paying for it.

The third area is public goods. A public good is a good that has two characteristics. First, it is non-rival, meaning that when one person consumes it, it does not diminish another person's ability to consume it. The marginal cost of such a good to an additional consumer is zero. To be sure, in the case of a professional sports team, the consumption of the team by an additional person, probably enhances the enjoyment of the other consumers. In this case, consumption is not only non-rival, it is synergistic. Second, the good is nonexclusive, meaning that people cannot be excluded from consuming it. It is difficult or impossible to charge people from consuming such a good.

In the case of a professional basketball team externality and public good benefits overlap substantially. An NBA team can provide a community a sense of identity, commonality and spirit that few other goods are capable of producing.

Because these quality of life benefits are not directly paid for in the marketplace, it is not a simple matter to quantify their value. Economists have employed three basic methodologies to estimate this value: imputing a demand curve to gauge consumer surplus; compensating differentials analysis; and, contingent valuation method (CVM). For sports teams, the

literature in all three methodologies is limited and still being developed, but it is most advanced in the last methodology, CVM.

### 1. Demand Curve Estimation Methodology

The demand curve estimation methodology was employed by Daraius Irani in a 1997 article.[6] Irani uses data on attendance, ticket prices and other variables along with regression analysis to estimate a demand curve for baseball games. He then uses the demand curve to estimate the "choke point", the price at which demand falls to zero and integrates the area under the demand curve to estimate consumer surplus. Irani's results are not reliable for three principal reasons. First, he only uses data for average ticket prices, not the actual differentiated prices for various seating categories. The elasticity of demand may differ substantially by seating category. Second, his data ends in 1991 and, hence, does not take account of many of the new techniques that teams use to capture consumer surplus for themselves. Third, Irani's figures are subject to errors from both the estimated price coefficient and an error in the predicted prices used to define his range of integration. There has only

---

[6] Daraius Irani, "Public Subsidies to Stadiums: Do the Costs Outweigh the Benefits?" *Public Finance Review* 25(2), pp. 238-253. Irani provides consumer surplus estimates for 1985. They vary from a low of $2.18 million for the Cleveland Indians to a high of $54.08 million for the Los Angeles Dodgers.

been one follow up study to corroborate or challenge Irani's work.[7] The 2000 study by Alexander et al. concludes that if baseball teams are profit maximizers and operate on the elastic portion of their demand curves, then, given the existing estimates of the elasticity of demand, the consumer surplus for baseball teams in 1996 never exceeded $23 million – less than half of what Irani concluded for 1985. While Alexander et al. provide a reasonable modification of the Irani estimates, they do not offer a reliable and robust alternative estimate.

A 2004 study that evaluates the different quality of life estimating methodologies concludes that Irani's technique is "unable to account for price discrimination practices ... likely to overstate the magnitude of consumer surplus ... and [produces] only upper bound estimates."[8] Alexander et al. also fail to adjust for team efforts to capture consumer surplus through variable ticket pricing, PSLs and other mechanisms. Furthermore, most goods and services in our economy generate consumer surplus, and do so without any (expectation of) public subsidy.

---

[7] D. Alexander, W. Kern, and J. Neill, "Valuing the Consumption Benefits from Professional Sports Franchises," *Journal of Urban Economics* (48), 2000, pp. 321-337.

[8] Charles Santo, "Measuring the Consumption Benefits of Professional Sports Facilities," *Critical Planning*, vol. 11, summer 2004, pp. 64 – 82. Quote from page 70.

## 2. Compensating Differentials Methodology

The second methodology is compensating differentials. The basic idea behind these estimates is that we can measure the indirect or quality of life benefits to a community by observing whether workers in the area have above or below average wages or above or below average rents. If having a ball team makes living in the community more enjoyable, then, other things equal, residents should be willing to pay higher rents to live in the community and workers should be willing to accept lower wages. Through regression analysis, using the appropriate control variables, it is theoretically possible to measure the extent to which workers and tenants are willing to accept these extra costs in exchange for living in a more appealing community. If the reduced wage per worker or rent per tenant is then multiplied by the number of workers or tenants in the community, the overall welfare effect on the community can be estimated.

While numerous studies have been performed that estimate compensating differentials for variables like work conditions, a warm climate or proximity to the ocean, only one study has been published that explicitly attempts to estimate compensating differentials for a professional sports team. This 2004 study estimated that rents are 8 percent higher in central cities in MSAs that host an NFL team.[9] In 2008,

---

[9] The study is: Gerald Carlino and N. Edward Coulson, "Compensating Differentials and the Social Benefits of the NFL," *Journal of Urban*

there are approximately 310,000 households in a typical central city, with an average monthly rent of approximately $633. Eight percent of this is $50.67, which on an annual basis is $608 per household. The implied average amenity value to a central city hosting an NFL team is $188.5 million per year. Such an annual benefit over 30 years, using a 7 percent discount rate, yields a present asset value of $2.34 billion. Of course, a benefit of this magnitude would be far more than sufficient to pay for any sports stadium or arena in existence or under planning.

Applying a similar type of compensating differential reasoning, Hamilton and Kahn derive an intangible annual value of approximately $72 per household in Baltimore from hosting the Baltimore Orioles.[10] With approximately one million households in Baltimore, this implies an annual intangible benefit of around $72 million. Such an annual benefit over 30 years, using a 7 percent discount rate, yields a present asset value of $893.5 million.

### 3. Contingent Valuation Methodology

The third methodology is the contingent valuation method (CVM). CVM was developed over thirty years ago and was originally

---

*Economics*, 2004(56), pp. 25-50. I co-authored a critique of this study with Dennis Coates and Brad R. Humphreys, "Compensating differentials and the social benefits of the NFL." Therein we contend that the results of this study are unreliable.

[10] Bruce Hamilton and Peter Kahn, "Baltimore's Camden Yards Ballparks," in R. Noll and A. Zimbalist, *Sports, Jobs & Taxes: The Economic Impact of Sports Teams and Stadiums*. Washington, D.C.: Brookings, 1997, p. 270.

applied to a wide range of environmental issues. In the early 1990s, the National Oceanographic and Atmospheric Administration created a blue-ribbon panel that undertook a comprehensive evaluation of CVM as an analytic tool. The panel found CVM to be useful, leading to the general acceptance of the method in government work. Since then there have been several contingent valuation studies that attempt to estimate the quality of life benefits associated with a professional sports franchise. This methodology employs a survey to elicit respondents' willingness-to-pay (WTP) for the preservation or provision of public goods by presenting hypothetical opportunities to "buy" the public good in question. In its conception, the contingent valuation methodology estimation encompasses all three sources of quality of life value: consumer surplus, externalities and public goods benefits.

The first use of contingent valuation analysis to quantify the quality of life benefits of a sports facility was published in 2000.[11] Johnson and Whitehead applied the method to estimate the value of a minor league ballpark and a new basketball arena for the University of Kentucky. In each case the authors found that the quality of life value to the community was between $3.6 million and $7.3 million. In 2001, Johnson, Groothuis and Whitehead applied the method to estimate the quality of life value of the Pittsburgh Penguins hockey team to the

[11] B.K. Johnson and J.C. Whitehead, "Value of Public Goods from Sports Stadiums: The CVM Approach," *Contemporary Economic Policy*, 18(1), 2000, pp. 48-58.

residents of Pittsburgh. Their estimate was between $17.2 million and $48.3 million.[12] Notably, this estimate was well below the expected $200 million that it would cost to build the Penguins a new arena.

The Penguins study, however, might underestimate the value of other professional teams in other cities for two reasons. First, in a larger market, even if each individual respondent assigned the same value to a team as did the study's respondents in Pittsburgh, the aggregate quality of life value to the city would be greater because more people would stand to benefit. Second, hockey is a lesser sport in the popularity hierarchy in the United States.[13] The quality of life benefits may be considerably larger for a baseball, football or basketball team than for a hockey team, other things equal.

With these possible shortcomings in mind for the Penguins' estimates, Johnson, Mondello and Whitehead did a new study in 2002 for the NFL's Jacksonville Jaguars.[14] Because it focuses on an NFL team and a host city with only one major professional sports team, this study

---

[12] B.K. Johnson, P.A. Groothuis & J.C. Whitehead, "The Value of Public Goods Generated by a Major League Sports Team: The CVM Approach," *Journal of Sports Economics*, 2(1), 2001, pp. 6-21.

[13] On the other hand, the Penguins were one of the most successful NHL teams during the 1990s and there was no NBA team in Pittsburgh to compete with the Penguins for winter indoor sports market.

[14] B.K. Johnson, M. Mondello & J.C. Whitehead, "What Is the Value of Public Goods Generated by a National Football League Team? A CVM Approach," *Journal of Sports Economics*, forthcoming.

addresses two of the three possible sources of underestimation in the Penguins study. Using a 7 percent discount rate, the authors found a present value of the quality of life benefits to be between $13.3 million and $35.8 million. The smaller population of Jacksonville can be adjusted for by using the per capita estimates and applying them to a different population for other cities.

Many researchers believe that the contingent valuation methodology produces an inherent upward bias, known as the "hypothetical bias." The hypothetical bias occurs when the respondent is asked how much he or she would be willing to pay for something, knowing that the question is hypothetical and that they won't actually have to pay any amount. Such a bias would not occur if the matter were put to a referendum and the respondent were actually casting a vote.[15]

Since the Seattle MSA is 2.55 times larger than the Jacksonville MSA and 1.38 times larger than the Pittsburgh MSA, the above estimates would have to be augmented by these multiples to derive a corresponding estimate of value for Seattle.

In 1997, Stanford economist Roger Noll and I published a book with Brookings Institution Press entitled *Sports, Jobs and Taxes: The Economic Impact of Sports Teams and Stadiums*. In that book, we wrote

---

[15] Another study under review for publication (A. Fenn & J. Crooker, "The Willingness to Pay for a New Vikings Stadium under Threat of Relocation or Sale," August 2005) estimates the quality of life benefits to the citizens of the Twin Cities from the Minnesota Vikings to be $21.6 million.

as follows: "Unfortunately, the standard method of assessing economic impact overstates the extent to which a team generates a net increase in business (its net exports) and then overstates again the multiplier effects arising from this business. However, it also ignores the consumer benefits of having a team. These benefits may be large enough to offset the subsidy, even if the team has no net effect on local economic activity, although quantifying them is extremely difficult. Most likely, these consumer benefits presumably are the real reason that cities are willing to spend so much on attracting and keeping a team."[16]

### D. The Intangible Benefits of Spectator Sports are Real but Difficult to Quantify

The preceding discussion has described a variety of empirical techniques that economists have used to estimate the intangible benefits to a community from hosting a professional sports team. Economists are all in agreement that such benefits exist and that they are substantial. The prevailing wide range of estimated benefits from scholarly studies (from roughly $20 million to over $2 billion) makes clear that there is no precise way to quantify these values.

This imprecision or uncertainty is only magnified in the circumstances of the present case. That is, the Sonics have been a weak

---

[16] Noll and Zimbalist, p. 87. We estimate what these consumption benefits might plausibly be on p. 58.

team on the court since the 2004-05 season[17] and the current ownership group has made clear its desire and intention to leave town. On the one hand, each of these factors is likely to lower interest in and demand for NBA basketball in Seattle. On the other hand, the news around the team has provided a rallying point for the community. Some fans who had lost interest in the Sonics may now have a reason to show their passion for professional basketball and their nostalgia for the Sonics when they were a more competitive team. The outpouring of emotion at the Sonics last home game of the 2007-08 season was a dramatic expression of the deep ties the team continues to have in the community.[18]

The attendance record of other NBA teams that have announced their intention to move is mixed. Both the Hornets and Grizzlies experienced attendance decreases during their last year in Charlotte (2001-02) and Vancouver (2000-01). Yet, the Grizzlies' average game attendance in 2000-01 fell by only 162 fans from the previous year (13,899 to 13,737), despite the fact that the team finished with a dismal record of 23 wins and 59 losses. The Kansas City Kings also saw their attendance drop before moving to Sacramento, along with poor and deteriorating team performance. In contrast, the Clippers experienced a

---

[17] The Sonics won-loss record went from 52-30 in 2004-05 to 35-47 in 2005-06, 31-51 in 2006-07 and 17-59 through 76 games in 2007-08.

[18] See, for instance, the following two clips on youtube:
http://www.youtube.com/watch?v=A13J2jogN8Q and
http://www.youtube.com/watch?v=6gjop66Xmvc&NR=1.

yearly attendance increase of 70,000 during its last year (1983-84) in San Diego, and did so despite a losing record of 30 wins and 52 losses. These are the only four NBA teams to move since 1980. The only other team to announce its intention to move, the New Jersey Nets, has not yet moved. The new owners, led by Bruce Ratner, announced their intention to move the team to Atlantic Yards in Brooklyn in 2003. Since that announcement, the Nets' yearly attendance at their home arena in New Jersey has increased by roughly between 60,000 and 80,000. Thus, the impact of the Sonics unusual circumstance on attendance at the KeyArena and on the interest of Seattle fans in NBA basketball is difficult to predict.[19] In any event, even in the more recent cases of the Hornets and the Grizzlies, which experienced attendance decreases in their final year at the former host city, average home attendance per game still reached 12,512. At such levels, it seems obvious that the substantial intangible benefits described above are still very much present.

---

[19] I have read the report of MZ Sports, "Seattle SuperSonics Financial Analysis," presented to Byrnes & Keller, LLP, PBC107518-PBC107536, of March 2008. While I do not wish to quarrel with the report's financial projections, I am not persuaded that the report adequately analyzes the expected attendance decline due to a team's lame duck status. There are several issues here, but foremost among them is that the report only considers two cases of team relocation and only one of those is in the NBA. This is a very small sample on which to base an estimate. Nonetheless, even if the attendance impact should be as large as that projected by MZ Sports, my point stands: there is still a very appreciable ongoing intangible benefit from having the Sonics in Seattle during the 2008-09 and 2009-10 seasons.

Further, the existence of the rescission lawsuit filed by the former Sonics owner, the desire of a local, bona fide investor team to purchase the team and support the building of a new arena, the expression of political interest from the city's leaders to find a way to keep the team in town, and the prospect that the team's young players are beginning to come into their own, all suggest that Seattle is in a different situation than these other abandoned NBA cities.

In conclusion, it is my opinion that the Sonics provide very valuable intangible benefits to the citizens of Seattle and that the team will continue to do so during the next two years, even if the team ends up moving to another city after the 2009-10 NBA season. Yet, for the reasons elaborated, it is not possible to estimate within a reasonable margin of error the market value of these benefits.

*I declare that the foregoing is true and correct to the best of my knowledge and belief.*

Andrew Zimbalist
May 2, 2008
Northampton, Ma.

# EXHIBIT 3

# Here Are The Results of SurveyUSA News Poll #10311

Geography Surveyed: City of Seattle
Data Collected: 09/19/2006 - 09/20/2006
Release Date: 09/21/2006 9:15 AM ET
Sponsor: KING-TV Seattle

**Filtering:** SurveyUSA contacted 600 Seattle adults; 513 identified themselves as registered voters and were asked the questions that follow.

**1**  Asked of 513 registered voters

Margin of Sampling Error for this question = ± 4.4%

Do you think the city of Seattle is? Or is not? using your property tax money wisely?

| | |
|---|---|
| 28% | Using It Wisely |
| 54% | Not Using It Wisely |
| 18% | Not Sure |

**2**  Asked of 513 registered voters

Margin of Sampling Error for this question = ± 4.4%

How would you rate the conditions of roads and bridges in Seattle? Excellent? Good? Fair? Or poor?

| | |
|---|---|
| 1% | Excellent |
| 21% | Good |
| 50% | Fair |
| 27% | Poor |
| 1% | Not Sure |

**3**  Asked of 513 registered voters

Margin of Sampling Error for this question = ± 4.4%

Would you be willing to pay more in property taxes if the money was used for road repairs and improvements?

| | |
|---|---|
| 43% | Yes |
| 48% | No |
| 10% | Not Sure |

**4**  Asked of 513 registered voters

Margin of Sampling Error for this question = ± 4.4%

Is your opinion of Seattle Mayor Greg Nickels favorable? Unfavorable? Or neutral?

| | |
|---|---|
| 25% | Favorable |

32%    Unfavorable
42%    Neutral
0%     Not Sure

**5**

Asked of 513 registered voters

Margin of Sampling Error for this question = ± 4.2%

**Is your opinion of initiative promoter Tim Eyman favorable? Unfavorable? Or neutral?**

11%    Favorable
65%    Unfavorable
23%    Neutral
1%     Not Sure

**6**

Asked of 513 registered voters

Margin of Sampling Error for this question = ± 4.4%

**The Sonics basketball team was recently purchased by owners from Oklahoma City. How likely do you think it is that the Sonics will stay in Seattle? Very likely? Somewhat likely? Not very likely? Or not at all likely?**

5%     Very
23%    Somewhat
48%    Not Very
21%    Not At All
2%     Not Sure

**7**

Asked of 513 registered voters

Margin of Sampling Error for this question = ± 3.9%

**Do you believe the city of Seattle should? Or should not? Use taxpayer money to keep professional sports teams in Seattle?**

21%    Should
73%    Should Not
5%     Not Sure

**8**

Asked of 513 registered voters

Margin of Sampling Error for this question = ± 4.4%

**Do you believe taxpayer money was? Or was not? well-spent on Safeco Field, the baseball stadium?**

41%    Was Well-spent
49%    Not Well-spent
10%    Not Sure

**9**

Asked of 513 registered voters

Margin of Sampling Error for this question = ± 4.4%

**Do you believe taxpayer money was? Or was not? well-spent on Qwest Field, the football stadium?**

38%    Was Well-spent

| | |
|---|---|
| 50% | Not Well-spent |
| 11% | Not Sure |

- x̄ Complete Interactive Crosstabs
- ¡ Statement of Methodology
- ! © 2006 SurveyUSA / Contractual Obligations

**EXHIBIT 4**



# PROPRIETARY REPORT

---

### Citizens for More Important Things
## King County Stadium Financing

---

### DECEMBER 2006

---

The information contained herein are the results of proprietary questions included in "The Elway Poll" survey at the request of the sponsor. Elway Research does not encourage publication of these results. However, in accordance with the standards of the American Association for Public Opinion Research, any release of this material must clearly state the following:

1. The findings are not those of "The Elway Poll" but are results of questions that were written and paid for by the sponsor and inserted as a proprietary question in "The Elway Poll";

2. The name of the organization that paid for the questions;

3. The size and composition of the sample (provided on "Sample Profile" page);

4. The margin of sampling error; and

5. The dates of the interviewing.

Elway Research, Inc. reserves the right to correct any misinformation or misimpression resulting from a public release of findings which does not include this information.

7107 Greenwood Ave N. Seattle, WA 98103 (206) 264-1500 Fax 264-0301

KALD_01002673



# The Elway Poll

## METHODOLOGY

**SAMPLE:**           401 Registered voters in King County

**TECHNIQUE:**        Telephone Survey

**FIELD DATES:**      December 26-28, 2006

**MARGIN OF ERROR:**  The overall margin of sampling error is ±5% at the 95% confidence interval. That is, in theory, had this same survey been conducted 100 times, in 95 of those times the results would be within ±5% of the results reported here.

**DATA COLLECTION:**  Calls were made during weekday evenings. All interviews were conducted from a central location by trained, professional interviewers under supervision. Questionnaires were edited for completeness, and a percentage of each interviewer's call was re-called for verification.

It must be kept in mind that survey research cannot predict the future. Although great care and the most rigorous methods available were employed in the design, execution and analysis of this survey, these results can be interpreted only as representing the answers given by these respondents to these questions at the time they completed the survey.

KALD_01002674

# The Elway Poll

## SAMPLE PROFILE

In interpreting these findings, it is important to keep in mind the characteristics of the people actually interviewed. This table presents a profile of the 401 respondents in the survey.

Note:Here and throughout this report, percentages may not add to 100%, because of rounding.

| | | |
|---|---|---|
| AREA | King County | 100% |
| | | |
| GENDER | Male | 51% |
| | Female | 49% |
| | | |
| AGE | 18-35 | 9% |
| | 36-50 | 22% |
| | 51-64 | 33% |
| | 65+ | 36% |
| | | |
| INCOME | $25,000 or less | 12% |
| | $25 to $50,000 | 17% |
| | $50 to 75,000 | 18% |
| | Over $75,000 | 27% |
| | NO ANSWER | 26% |
| | | |
| PARTY ID | Democrat | 43% |
| | Republican | 18% |
| | Independent | 26% |
| | NO ANSWER | 13% |

KALD_01002675



# The Elway Poll

## QUESTION WORDING
## With Response Data

KALD_01002676

# Citizens For More Important Things
# Topline Report

| | |
|---:|:---|
| **SAMPLE**: | 401 King County Voters |
| **MARGIN of ERROR:** | ±5% |
| **FIELD DATES:** | Dec 26-28, 2006 |

1. Recently voters in Seattle approved a measure related to the public financing of professional sports facilitates. As similar measure could be put before voters in the rest of King County. I will read the proposed ballot title:

   "If enacted, the measure would require that for-profit professional sports organizations pay the County at least "fair value" for goods, services, real property, or facilities the County provides or leases from them, either directly of through another public entity or a non-profit organization. The measure defines "fail value," based in part on the rate of return for 30-year Treasury Bonds. Any King County resident would have standing to file a lawsuit challenging County acts that allegedly violated the measure."

   As things stand today, if that measure were on the ballot in King county, would you...

   Strongly Support It...**25**
   Support It...**28**
   Oppose It...**11**
   Strongly Oppose It...**14**
   DK/NA...**22**

KALD_01002677


# The Elway Poll

---

## CROSSTABULATION TABLES

---

### READING THE CROSSTABULATION TABLES

The crosstabulations are presented in a "banner table" format. Categories of respondents (e.g., "Age," "Gender") are listed across the top of each page (the "banner"). There are several "banners".

The questions asked in the survey are listed down the left margin. They are presented in questionnaire order. The key in the upper left corner of the table indicates which questions are found on each page.

The figures in each cell are raw numbers and percentages based on the number of respondents in the category at the head of the column.

By reading across the rows, one can compare answers to a question given by the different categories of respondents.

KALD_01002678

Citizens for More Important Things - January 2007

| | TOTAL | INCOME | | | | PARTY ID | | |
|---|---|---|---|---|---|---|---|---|
| | (N=) | <=$25K | $25-50K | $50-75K | >$75K | Dem | Rep | Ind |
| TOTAL (N=) | 401 100 | 49 100 | 69 100 | 73 100 | 107 100 | 173 100 | 73 100 | 105 100 |
| **[ 1] STADIUM** | | | | | | | | |
| Strongly Support | 101 25% | 17 35% | 18 26% | 15 21% | 33 31% | 52 30% | 12 16% | 30 29% |
| Support | 114 28% | 10 20% | 21 30% | 25 34% | 34 32% | 44 25% | 27 37% | 26 25% |
| Oppose | 43 11% | 8 16% | 7 10% | 8 11% | 9 8% | 22 13% | 8 11% | 4 4% |
| Strongly Oppose | 54 13% | 3 6% | 5 7% | 17 23% | 15 14% | 17 10% | 9 12% | 23 22% |
| DK/NA | 89 22% | 11 22% | 18 26% | 8 11% | 16 15% | 38 22% | 17 23% | 22 21% |

ELWAY RESEARCH, INC.JANUARY 2007

KALD_01002679

Citizens for More Important Things - January 2007

| | TOTAL | GENDER | | AGE | | | |
|---|---|---|---|---|---|---|---|
| | (N=) | Male | Female | 18-35 | 35-54 | 55-64 | 65+ |
| TOTAL (N=) | 401 100 | 205 100 | 196 100 | 36 100 | 83 100 | 126 100 | 139 100 |
| [ 3] STADIUM | | | | | | | |
| Strongly Support | 101 25% | 57 28% | 44 22% | 6 17% | 21 25% | 32 25% | 38 27% |
| Support | 114 28% | 55 27% | 59 30% | 13 36% | 23 28% | 39 31% | 35 25% |
| Oppose | 43 11% | 20 10% | 23 12% | 4 11% | 6 7% | 13 10% | 18 13% |
| Strongly Oppose | 54 13% | 35 17% | 19 10% | 4 11% | 9 11% | 21 17% | 18 13% |
| DK/NA | 89 22% | 38 19% | 51 26% | 9 25% | 24 29% | 21 17% | 30 22% |

ELWAY RESEARCH, INC. JANUARY 2007

KALD_01002680

Citizens for More Important Things – January 2007

| | TOTAL | | 1 | 5 | 11 | 30 | 31 | 32 | LD 33 | 34 | 36 | 37 | 41 | 43 | 45 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | (N=) | | 1 | 5 | 11 | 30 | 31 | 32 | 33 | 34 | 36 | 37 | 41 | 43 | 45 |
| TOTAL (N=) | 401 | 100 | 3 100 | 27 100 | 13 100 | 22 100 | 13 100 | 39 100 | 22 100 | 33 100 | 26 100 | 22 100 | 39 100 | 23 100 | 36 100 |
| [ 1] STADIUM | | | | | | | | | | | | | | | |
| Strongly Support | 101 | 25% | 0 0% | 9 33% | 5 38% | 5 23% | 2 15% | 7 18% | 9 41% | 14 42% | 6 23% | 4 18% | 6 15% | 9 39% | 8 22% |
| Support | 114 | 28% | 1 33% | 7 26% | 3 23% | 9 41% | 5 38% | 11 28% | 7 32% | 5 15% | 11 42% | 8 36% | 8 21% | 4 17% | 11 31% |
| Oppose | 43 | 11% | 1 33% | 4 15% | 1 8% | 0 0% | 2 15% | 5 13% | 0 0% | 6 18% | 3 12% | 1 5% | 6 15% | 2 9% | 4 11% |
| Strongly Oppose | 54 | 13% | 0 0% | 3 11% | 2 15% | 5 23% | 2 15% | 5 13% | 4 18% | 3 9% | 5 19% | 2 9% | 6 15% | 2 9% | 7 19% |
| DK/NA | 89 | 22% | 1 33% | 4 15% | 2 15% | 3 14% | 2 15% | 11 28% | 2 9% | 5 15% | 1 4% | 7 32% | 13 33% | 6 26% | 6 17% |

ELWAY RESEARCH, INC. JANUARY 2007

KALD_01002681

|                  | LD |      |    |      |    |      |
|------------------|----|------|----|------|----|------|
|                  | 46 |      | 47 |      | 48 |      |
| TOTAL            |    |      |    |      |    |      |
| (N=)             | 37 | 100  | 32 | 100  | 14 | 100  |
|                  |    |      |    |      |    |      |
| [1] STADIUM      |    |      |    |      |    |      |
| Strongly Support | 9  | 24%  | 6  | 19%  | 2  | 14%  |
| Support          | 9  | 24%  | 11 | 34%  | 4  | 29%  |
| Oppose           | 5  | 14%  | 2  | 6%   | 1  | 7%   |
| Strongly Oppose  | 3  | 8%   | 4  | 13%  | 1  | 7%   |
| DK/NA            | 11 | 30%  | 9  | 28%  | 6  | 43%  |

ELWAY RESEARCH, INC. JANUARY 2007

KALD_01002682

# EXHIBIT 5

TO: ASSOCIATED PRESS, MEDIA AVISORY, UPDATED 01/04/06
CITIZENS FOR MORE IMPORTANT THINGS NEWS CONFERENCE
DATE: Thursday, January 4th, 2007
TIME: 10:00 AM
PLACE: WEST PLAZA ENTRANCE, KEYARENA (Due North of Sonics Ticket Office on
1st Avenue N.)
QUESTIONS CONTACT CHRIS VAN DYK, CO-CHAIR, CITIZENS FOR MORE IMPORTANT
THINGS, CVANDYK5@MSN.COM, 206-854-6127

CITIZENS FOR MORE IMPORTANT THINGS RELEASES RESULTS OF NEW COUNTY-WIDE POLL
MEASURING SUPPORT FOR SEATTLE INITIATIVE 91, BARRING TAX SUBSIDIES TO PRO-
SPORTS TEAMS. COUNTYWIDE VOTER SUPPORT FOR I-91: 2 TO 1.

Designed to measure voter sentiment were Initiative 91 placed before voters
countywide, the NEW poll repeated the ballot title and question from
Initiative 91, exactly as if it were on the ballot. 53.6% supported I-91,
24.2% opposed, and 22.2% were undecided. As importantly, results were fairly
uniform in the City and in the County, as follows:

| | King County | | | Seattle | | Total | | |
|---|---|---|---|---|---|---|---|---|
| | 260 | 64.8% | 141 | 35.2% | 401 | 100.0% | | |
| Strongly Support | | 59 | 22.7% | 42 | 29.8% | 101 | 25.2% | |
| Support | 77 | 29.6% | 37 | 26.2% | 114 | 28.4% | | |
| Oppose | 26 | 10.0% | 17 | 12.1% | 43 | 10.7% | | |
| Strongly Oppose | 39 | | 15.0% | 15 | 10.6% | 54 | 13.5% | |
| DK/NA | 59 | 22.7% | 30 | 21.3% | 89 | 22.2% | | |
| | | 100.0% | | 100.0% | | 100.0% | | |

Summary Totals
| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Support | 136 | 52.3% | 79 | 56.0% | 215 | 53.6% | |
| Oppose | 65 | 25.0% | 32 | 22.7% | 97 | 24.2% | |
| DK/NA | 59 | 22.7% | 30 | 21.3% | 89 | 22.2% | |
| | | | | | | 100.0% | |

"The relative uniformity of the results is what is critical," said Chris Van
Dyk, Co-Chair of Citizens for More Important Things, and a long-time polical
campaign operative. "The poll shows that there is no significant difference
in sentiment, regardless whether the voter is in Renton or Bellevue or
Seattle. The overwhelming majority do not want to subsidize pro-sports
teams with tax dollars. If an election were held today, the poll indicates
that results countywide would likely not be much different from the actual
vote on I-91 in Seattle. The only change from November is a high
undecided--but that is explained simply because there is no campaign going
on right now, giving voters information to use to decide the issue. Any
politician would start any campaign anytime with this base of support."

At the request of Seattle City Councilmember Nick Licata and SEIU Local 775,
Citizens for More Important Things--sponsor of Seattle Initiative 91--
commissioned the poll to determine current public support if Seattle City
Initiative 91 were offered to voters throughout King County. The poll was
conducted December 26-28th by Elway Research, Inc. and has a margin of error
of +/- 5%.

At the News Conference today, Councilmember Licata and Adam Glickman of SEIU

KALD_01002669

775 will discuss the results and their implication on political prospects for pro-sports tax subsidies in the region.

THE POLL AND SUMMARY ARE ATTACHED.

Initiative 91 required that the City of Seattle obtain a "fair return" on any investment made in a facility leased to a professional sports organization such as the Seattle Sonics, and passed in Seattle with 74.3% of the vote. It effectively barred tax subsidies for pro-sports through the City of Seattle.

The wording of the poll question is as follows:

1. Recently voters in Seattle approved a measure related to the public financing of professional sports facilitates. As similar measure could be put before voters in the rest of King County. I will read the proposed ballot title:

"If enacted, the measure would require that for-profit professional sports organizations pay the County at least "fair value" for goods, services, real property, or facilities the County provides or leases from them, either directly of through another public entity or a non-profit organization. The measure defines "fail value," based in part on the rate of return for 30-year Treasury Bonds. Any King County resident would have standing to file a lawsuit challenging County acts that allegedly violated the measure."

As things stand today, if that measure were on the ballot in King county, would you…

Strongly Support It…
Support It…
Oppose It…
Strongly Oppose It…
DK/NA…

Chris Van Dyk and Mark Baerwaldt, Co-Chairs of Citizens for More Important Things, will also be available at the news conference to answer questions.

FOR FURTHER INFORMATION PLEASE CONTACT:

Chris Van Dyk
for Citizens for More Important Things
PO Box 4473
Seattle, WA 98194
206-854-6127
cvandyk5@msn.com

Citizens for More Important Things
Initiative 91 Countywide Poll Data Summary
Conducted by Elway Research, Inc.
12-26 to 12-28-2006

|  | King County | | Seattle | | Total | |
|---|---|---|---|---|---|---|
|  | 260 | 64.8% | 141 | 35.2% | 401 | 100.0% |
|  |  |  |  |  |  |  |
| Strongly Support | 59 | 22.7% | 42 | 29.8% | 101 | 25.2% |
| Support | 77 | 29.6% | 37 | 26.2% | 114 | 28.4% |
| Oppose | 26 | 10.0% | 17 | 12.1% | 43 | 10.7% |
| Strongly Oppose | 39 | 15.0% | 15 | 10.6% | 54 | 13.5% |
| DK/NA | 59 | 22.7% | 30 | 21.3% | 89 | 22.2% |
|  |  | 100.0% |  | 100.0% |  | 100.0% |
|  |  |  |  |  |  |  |
| Summary Totals |  |  |  |  |  |  |
| Support | 136 | 52.3% | 79 | 56.0% | 215 | 53.6% |
|  |  |  |  |  |  |  |
| Oppose | 65 | 25.0% | 32 | 22.7% | 97 | 24.2% |
| DK/NA | 59 | 22.7% | 30 | 21.3% | 89 | 22.2% |
|  |  |  |  |  |  | 100.0% |

KALD_01002671

Initiative 91 Countywide Poll Analysis By Legislative District
Conducted by Elway Research, Inc.
Sample: 401 Registered Voters, December 26-28, 2006

|  | TOTAL | | | | | LD | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| District | (N=) | | 1 | | 5 | | 11 | | 30 | | 31 | | 32 | | 33 | | 34 | | 36 | |
| Total (N=) | 401 | | 3 | | 27 | | 13 | | 22 | | 13 | | 39 | | 22 | | 33 | | 26 | |
|  | | | KC | | KC | | KC | | KC | | KC | | KC | | KC | | S | | S | |
| (1) Stadium | 401 | | | | | | | | | | | | | | | | | | | |
| Strongly Support | 101 | 25% | 0 | 0% | 9 | 33% | 5 | 38% | 5 | 23% | 2 | 15% | 7 | 18% | 9 | 41% | 14 | 42% | 6 | 23% |
| Support | 114 | 28% | 1 | 33% | 7 | 26% | 3 | 23% | 9 | 41% | 5 | 38% | 11 | 28% | 7 | 32% | 5 | 15% | 11 | 42% |
| Oppose | 43 | 11% | 1 | 33% | 4 | 15% | 1 | 8% | 0 | 0% | 2 | 15% | 5 | 13% | 0 | 0% | 6 | 18% | 3 | 12% |
| Strongly Oppose | 54 | 13% | 0 | 0% | 3 | 11% | 2 | 15% | 5 | 23% | 2 | 15% | 5 | 13% | 4 | 18% | 3 | 9% | 5 | 19% |
| DK/NA | 89 | 22% | 1 | 33% | 4 | 15% | 2 | 15% | 3 | 14% | 2 | 15% | 11 | 28% | 2 | 9% | 5 | 15% | 1 | 4% |

| District | 37 | | 41 | | 43 | | 45 | | 46 | | 47 | | 48 | | KC | | S | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total (N=) | 22 | | 39 | | 23 | | 36 | | 37 | | 32 | | 14 | | 260 | 64.8% | 141 | 35.2% | 401 | |
|  | S | | KC | | S | | KC | | S | | KC | | KC | | | | | | | |
| Strongly Support | 4 | 18% | 6 | 15% | 9 | 39% | 8 | 22% | 9 | 24% | 6 | 19% | 2 | 14% | 59 | 22.7% | 42 | 29.8% | 101 | 25.2% |
| Support | 8 | 36% | 8 | 21% | 4 | 17% | 11 | 31% | 9 | 24% | 11 | 34% | 4 | 29% | 77 | 29.6% | 37 | 26.2% | 114 | 28.4% |
| Oppose | 1 | 5% | 6 | 15% | 2 | 9% | 4 | 11% | 5 | 14% | 2 | 6% | 1 | 7% | 26 | 10.0% | 17 | 12.1% | 43 | 10.7% |
| Strongly Oppose | 2 | 9% | 6 | 15% | 2 | 9% | 7 | 19% | 3 | 8% | 4 | 13% | 1 | 7% | 39 | 15.0% | 15 | 10.6% | 54 | 13.5% |
| DK/NA | 7 | 32% | 13 | 33% | 6 | 26% | 6 | 17% | 11 | 30% | 9 | 28% | 6 | 43% | 59 | 22.7% | 30 | 21.3% | 89 | 22.2% |
|  | | | | | | | | | | | | | | | | 100.0% | | 100.0% | | 100.0% |

|  | | | | |
|---|---|---|---|---|
| SUPPORT | 136 | 52.3% | 79 | 56.0% | 215 | 53.6% |
| OPPOSE | 65 | 25.0% | 32 | 22.7% | 97 | 24.2% |
| DK/NA | 59 | 22.7% | 30 | 21.3% | 89 | 22.2% |

S=Seattle
KC=King County

KALD_01002672

# EXHIBIT 6

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CITY OF SEATTLE, a first-class charter
city,

Plaintiff,

v.

THE PROFESSIONAL BASKETBALL
CLUB, LLC, an Oklahoma limited
liability company,

Defendant.

CATEGORY NO. M-8-85

Case No. C07-1620 MJP

The Honorable Marsha J. Pechman
United States District Court for the
Western District of Washington

## THE CITY OF SEATTLE'S MEMORANDUM OF LAW
## IN SUPPORT OF MOTION TO COMPEL

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................... i

I.      INTRODUCTION ................................................................................................. 1

II.      FACTUAL BACKGROUND ................................................................................ 3

     A.      The New Owners, PBC, Are Contractually Required to Play All Sonics Home Games in KeyArena Through the Conclusion of the 2009-10 NBA Season............................................................................................................3

     B.      As a Condition of PBC's Purchase of the Sonics in 2006, the NBA Required PBC (a) to Assume All Obligations Under the Lease, (b) to Affirm that It Had No Intention of Relocating the Sonics Outside of the Seattle Area; and (c) to Commit that It Would Work in Good Faith for One Year to Seek an Upgraded Venue for the Sonics in the Seattle Area...........4

     C.      Whether PBC Can Relocate the Sonics Is Governed by the NBA's Rules, Policies, and "Custom and Practice." ................................................................5

     D.      PBC Secretly Discussed and Worked Toward Relocation During the One-Year Good Faith Period..........................................................................6

     E.      Shortly Before Its Nominal One Year of Good Faith Efforts Expired, PBC Announced It Intended to Break the Lease and Relocate the Sonics to Oklahoma City. ........................................................................................9

     F.      The NBA Actively Involved Itself in the Lease Dispute Between the City of Seattle and PBC, Which Reflects the Way in Which the NBA is Generally Involved in Issues Related to Its Teams' Arena Leases. ...................11

     G.      The City's Discovery Requests. ........................................................................11

III.      ARGUMENT ...................................................................................................... 12

     A.      The City's Discovery Requests Are Reasonable In Light of the NBA's Involvement in the Events at Issue, Its Interest in the Lawsuit, and Its Ultimate Choice to Side With PBC.........................................................................12

     B.      The City's Subpoena Seeks Documents Centrally Relevant to Its Claim for Specific Performance and PBC's Purported Defense of Undue Hardship. .................................................................................................15

     C.      The NBA's Objections Regarding Privilege and Confidentiality Are Moot. ....................................................................................................23

IV.      CONCLUSION ................................................................................................. 24

# TABLE OF AUTHORITIES

**Page**

**FEDERAL CASES**

Bank of New York v. Meridien Biao Bank Tanzania, Ltd., 171 F.R.D. 136
(S.D.N.Y. 1997) ...................................................................................23

Behrend v. Comcast Corp., 2008 WL 250373 (D. Mass. 2008) ........................12, 17

Concord Boat Corp. v. Brunswick Corp., 169 F.R.D. 44 (S.D.N.Y. 1996) ..................12

Daval Steel Products v. M/V Fakredline, 951 F.2d 1357 (2d Cir. 1991) ...................15

First America Corp. v. Price Waterhouse, LLP, 154 F.3d 16 (2d Cir. 1998) ..............14

United States v. Int'l Bus. Machines Corp., 62 F.R.D. 507 (S.D.N.Y. 1974) .............12

United States v. Int'l Bus. Machines Corp., 83 F.R.D. 97 (S.D.N.Y. 1979) ...12, 14, 15, 17

Williams v. Dallas, 178 F.R.D. 103 (N.D. Tex. 1998) ...................................14

**STATE CASES**

Carpenter v. Folkerts, 627 P.2d 559 (Wash. App. 1981) ...............................21

City of New York v. New York Jets Football Club, 90 Misc. 2d 311, 394
N.Y.S.2d 799 (N.Y. Sup. Ct. 1977) ...............................................10, 17

City of New York v. New York Yankees, 117 Misc. 2d 332, 458 N.Y.S.2d 486
(N.Y. Sup. Ct. 1983) ..............................................................10, 17

Crafts v. Pitts, 162 P.3d 382 (Wash. 2007) ....................................16, 17, 20

Dean v. Gregg, 663 P.2d 502 (Wash. App. 1983) ........................................21

Payne v. Still, 38 P. 994 (Wash. 1894) ...............................................19

**FEDERAL STATUTES**

Fed. R. Civ. P. 26(b)(1) ..............................................................15

Fed. R. Civ. P. 45 ...................................................................15

**MISCELLANEOUS**

Restatement (Second) of Contracts, § 364 (1981) ......................................20

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CITY OF SEATTLE, a first-class charter
city,

                              Plaintiff,

     v.

THE PROFESSIONAL BASKETBALL
CLUB, LLC, an Oklahoma limited
liability company,

                              Defendant.

CATEGORY NO. M-8-85

Case No. C07-1620 MJP

The Honorable Marsha J. Pechman
United States District Court for the
Western District of Washington

## THE CITY OF SEATTLE'S MEMORANDUM OF LAW
## IN SUPPORT OF MOTION TO COMPEL

### I.    INTRODUCTION

This case concerns whether The Professional Basketball Club LLC, the current owners of

the Seattle Supersonics basketball team (the "Sonics"), can break their promise to the City of

Seattle (the "City") to play all home games in Seattle's KeyArena through the term of the

existing Lease in order to move the team to Oklahoma City.  Because the Sonics are a

community asset and irreplaceable tenant with a 41-year history in Seattle, the City seeks

specific performance of the Lease.  In support of their legal case to breach the Lease, the team's

owners argue, inter alia, that KeyArena is an inadequate NBA facility, that this inadequacy is the

cause of their alleged financial losses, and that the team lacks community support in Seattle.

Moreover, the owners claim damages from their breach can be adequately compensated by the

mere payment of rent. In doing so, the owners effectively take the position that the Sonics offer no additional economic or cultural value to the City. The City could not disagree more. Nonetheless, recent statements by NBA Commissioner David Stern, and by other NBA owners on the relocation committee, demonstrate that the NBA is actively supporting the owners' effort to move the Sonics from Seattle.

The City has subpoenaed relevant documents from the NBA that go to the core of these disputed issues. The documents requested address the reasons NBA teams make or lose money and also the indirect economic and intangible local benefits that result from the presence of professional basketball teams. The subpoena seeks information about the NBA's policies towards team relocation and early termination of arena leases. The subpoena also seeks information about the NBA's direct involvement in the owners' efforts to move the Sonics. When the current owners bought the Sonics, the NBA required, as a condition of approval, that the new owners make "good faith best efforts" for a year to keep the Sonics in the Seattle area. During that year, the new owners and the NBA repeatedly discussed the Lease and the Sonics' potential relocation. In the midst of the "good faith best efforts" period, the owners deceived the NBA about their actions and true intentions, which from the outset were to move the Sonics to Oklahoma City. As an apparent result of this deception, the NBA began taking the new owners' side by endorsing their claims about the Lease and KeyArena. Subsequently, in February 2008, NBA Commissioner David Stern encouraged the new owners to try to buy their way out of the Lease rather than fulfill their obligations through the end of the Lease term. The NBA relocation subcommittee has more recently indicated it will approve the owners' proposed relocation of the Sonics to Oklahoma City. Later this month, the NBA is expected to approve and allow the

proposed relocation. The new owners cannot relocate the team – and thus cannot breach the Lease – without the NBA's permission.

To protect the confidentiality of the NBA's documents, the City entered a protective order that incorporated specific provisions requested by the NBA. Nevertheless, the NBA refuses to produce responsive documents on the grounds that the City's discovery requests seek irrelevant information and are unduly burdensome. The NBA cannot involve itself in the events underlying the litigation and simultaneously refuse to provide necessary discovery. The City respectfully requests that this Court grant its motion and order the NBA to produce all non-privileged, responsive documents.

## II.    FACTUAL BACKGROUND

### A.    The New Owners, PBC, Are Contractually Required to Play All Sonics Home Games in KeyArena Through the Conclusion of the 2009-10 NBA Season.

The NBA's Seattle SuperSonics have played basketball in the Seattle area since 1967. Declaration of Paul J. Lawrence in Support of the City of Seattle's Motion to Compel ("Lawrence Decl."), Ex. 11 ("Complaint"), ¶ 4.[1] In 1994, as part of an agreement to keep the Sonics in Seattle for the next fifteen years, the City of Seattle agreed to renovate KeyArena as a "new, state of the art professional basketball playing facility." Ex. 12 (Premises Use and Occupancy Agreement) ("Lease"), p. 1 (Recitals). Renovating KeyArena to the Sonics' specifications cost the City $74 million, financed by bonds that it is still paying off. Ex. 11, Complaint, ¶ 11.

---

[1] All Exhibit ("Ex.") cites are to exhibits to the Lawrence Declaration.

In exchange for the City of Seattle's renovation of KeyArena, the Sonics' then-owner, SSI Sports, Inc. ("SSI"), contractually agreed to schedule all Sonics home games in KeyArena through the end of the 2009-10 NBA season. Ex. 11, Complaint, ¶¶ 13-17; Ex. 12, Lease, Section II (p. 6). The City and SSI further contractually agreed that their obligations under the Lease were unique in nature and that the Lease could be specifically enforced by either party. Ex. 11, Complaint, ¶ 17; Ex. 12, Lease, Section XXVII(L) (p. 59). Since 1995, the Sonics have played all their home games in the renovated KeyArena. Ex. 11, Complaint, ¶ 15. The Lease was subject to the prior NBA's approval. Thus, the NBA approved Section II of the Lease and its specific performance clause. Ex. 12, Lease, Section XX(A)(3) (p. 48).

**B.** **As a Condition of PBC's Purchase of the Sonics in 2006, the NBA Required PBC (a) to Assume All Obligations Under the Lease, (b) to Affirm that It Had No Intention of Relocating the Sonics Outside of the Seattle Area; and (c) to Commit that It Would Work in Good Faith for One Year to Seek an Upgraded Venue for the Sonics in the Seattle Area.**

In July 2006, PBC bought the Sonics for $350 million. Ex. 11, Complaint, ¶ 19; Ex. 18. PBC is an Oklahoma LLC, and all the members of PBC are from Oklahoma. Ex. 11, Complaint, ¶ 23. PBC expressly assumed all obligations under the Lease when it purchased the Sonics in 2006. Ex. 13. Additionally, when the PBC bought the Sonics, it contractually promised the local ownership group it would work in good faith for a one-year period to keep the Sonics in the Seattle area. Ex. 22, Section 5.3 (p.21).

PBC could not buy the Sonics without the NBA's permission. Ex. 19 (Agreement and Undertaking) ("NBA Agreement"). As a condition of buying the Sonics, the NBA required PBC to assume the existing lease requiring the team to play home games at KeyArena through the 2009-2010 NBA season. Ex. 19, NBA Agreement, § 1(a) (p. 2), § 4(l) (p. 8). In addition, the NBA required PBC to agree to a unique contractual provision: PBC expressly promised the

4

NBA (as it had promised the former owners) that it would make good faith best efforts for a twelve-month period to find a venue to keep the Sonics in the Seattle area for the long term. Ex. 19, NBA Agreement, § 6(d) (pp. 14-15). Further, the NBA required PBC's members to expressly affirm they had no intention of relocating the Sonics outside of the Seattle area. Ex. 19, NBA Agreement, § 5(a)(v) (p. 10).

## C. Whether PBC Can Relocate the Sonics Is Governed by the NBA's Rules, Policies, and "Custom and Practice."

As is the case with all NBA teams, PBC cannot relocate the Sonics without the permission of the NBA. Ex. 21 ("NBA Constitution") (p. 206); Ex. 19, NBA Agreement, § 2(a) (p. 6). The NBA Constitution has an express provision governing relocation that sets out factors the NBA considers in evaluating a request to relocate. Ex. 21, NBA Constitution (pp. 207-08). Moreover, PBC is contractually bound not only by the NBA's major governing documents (e.g., the NBA Constitution) but by all "present and future rules, regulations, resolutions, directives and policies of each of the NBA Entities and the NBA Commissioner." Ex. 19, NBA Agreement, § 2(a) (p. 6). Additionally, PBC is bound by "the custom and practice" under these rules. *Id.* Thus, whether PBC can relocate the Sonics in breach of its Lease is ultimately under the control of the NBA and subject to the NBA's policies, whether formal or informal, regarding early termination of arena leases.

A handful of documents in PBC's production prove that PBC and the NBA have been communicating about issues of a Seattle area arena, the Lease and relocation since at least January 2007 (and likely before). On January 18, 2007, for example, NBA Vice-President of Legal and Business Affairs Joel Litvin emailed PBC Chairman Clay Bennett to ask him "[a]s I've requested before, please be sure to have someone who knows what's going on keep us in the

loop" (regarding the issue of a Seattle area arena) and to send public documents. Ex. 22. On April 25, 2007, Mr. Bennett emailed Mr. Litvin that "All need to remember the lease expires in 2010 at which time we must leave. Isn't there a better near term solution for all parties?" – to which Mr. Litvin replied "Still working on this; will call tomorrow." Ex. 23. Similarly, after PBC member Aubrey McClendon asked Mr. Bennett in an April 2007 email where the Sonics would be playing during the 2007-08 NBA season, Mr. Bennett replied:

> Working hard on this and don't have an answer yet. Changes day to day. Quite likely we will play next year in Seattle, but attempting to quietly and without litigation work through the lease. [NBA Commissioner] David [Stern] has said we will need to find out soon. Lots of issues for the league on a permanent relocation.

Ex. 24. Thus, PBC and the NBA were discussing early termination of the Lease and relocation, but PBC's documents do not disclose what was said. The NBA may possess more informative documents.

**D.  PBC Secretly Discussed and Worked Toward Relocation During the One-Year Good Faith Period.**

PBC and its Oklahoma ownership group never really wanted to own an NBA team in Seattle. They wanted to own an NBA team in Oklahoma City. During the twelve-month period following its purchase of the team, PBC claimed publicly – and privately to the NBA – that it was working in good faith to keep the Sonics in the Seattle area. But PBC's document production shows that, in fact, its members were not only secretly discussing the possibility of relocating the team during the one-year good faith period, but secretly negotiating with Oklahoma City to do so.

Mr. Bennett's April 2007 email to Mr. McClendon, cited above, is one example of PBC's internal discussion of the possibility of relocation. Ex. 24. Another is an April 2007 email

exchange between Mr. Bennett, Mr. McClendon, and PBC member Tom Ward regarding their mutual desire and plan to move the team to Oklahoma City, even though this would involve breaching the Lease:

> Is there any way to move here [Oklahoma City] for next season or are we doomed to have another lame duck season in Seattle? [Tom Ward]
>
> I am a man possessed! Will do everything we can. Thanks for hanging with me boys, the game is getting started! [Clay Bennett]
>
> That's the spirit!! I am willing to help any way I can to watch ball here [in Oklahoma City] next year. [Tom Ward]
>
> Me too, thanks Clay! [Aubrey McClendon]

Ex. 26.

PBC was not just discussing relocation internally, it was also secretly discussing relocation of the Sonics with Oklahoma City. As early as January 4, 2007, either as a part of or a precursor to such discussions, PBC consultant Brent Gooden emailed PBC members Mr. Bennett, Mr. McClendon, and Mr. Ward, saying that TNT:

> Will interview [Oklahoma City] Mayor Cornett. We briefed the Mayor last night on the anticipated questions, which could likely include the prospect of the Sonics moving to OKC . . . . We asked the Mayor to use the same talking points he did with the reporter from Sports Illustrated who asked similar questions.

Ex. 27; *see also* Ex. 28.

In a June 5, 2007 email, Tim Romani (a PBC consultant) emailed Mr. Bennett that

> Jim and I will reach out to City Manager Couch in OKC [Oklahoma City] to engage him in deal negotiations. It would help if you would place a call to him letting him know that you have asked us to represent you so he understands we are empowered and he should engage in earnest negotiations with us. Jim is preparing a Term Sheet that we would use to initiate the negotiations and run it by you before we engage to make sure we are in sync. Our approach will be to ask for the world so you may or may not want to pull back on the bit. We will start with a deal that is better than what the Hornets have.[2] We will also address cost items such as NBA Relocation Fee, Relocation Expenses, practice facility and Ford Center improvements.

Ex. 29.

Mr. Bennett's reply further reflects that PBC and the NBA were engaged in phone communications that, in context, were presumably about relocation:

> Tim I spoke with Commissioner Stern this morning. Good conversation on a number of fronts. Let's connect on Monday for a download and strategy session.

*Id.*

In August 2007, PBC member Aubrey McClendon made public the private plans to move the Sonics. He admitted in a published interview that PBC had always intended to bring the team to Oklahoma City:

> We didn't buy the team to keep in Seattle. We hoped to come here [to Oklahoma City]. We know it's a little more difficult financially here in Oklahoma City, but we think it's great for the community and if we could break even, we'd be thrilled.

Ex. 30 (p. 5). Mr. McClendon's statements are consistent with earlier discussions among PBC members at the time they bought the team, in July and August 2006. Exs. 31, 32, 33. It would be an understatement to say the NBA was not happy. NBA Commissioner Stern warned Clay Bennett that if Mr. McClendon had said what was reported, there would be a "HUGE fine."

---

[2] The Hornets temporarily relocated to Oklahoma City following Hurricane Katrina.

Ex. 34. And there was. The NBA ultimately fined Mr. McClendon $250,000 for his comments, which it deemed "prejudicial" to the NBA. Ex. 35.

To cover up the breach of its promise to the NBA to engage in good faith efforts, PBC insisted that Mr. McClendon was speaking only for himself. In an August 17, 2007 email, Mr. Bennett deceived NBA Commissioner Stern about the ongoing conspiracy:

> [A]s absolutely remarkable as it may seem, Aubrey [McClendon] and I have NEVER discussed moving the Sonics to Oklahoma City, nor have I discussed it with ANY other member of our ownership group.

Ex. 36 (p. 2). As evidenced in the above-referenced internal emails, however, even after Mr. McClendon publicly let the cat out of the bag, PBC continued telling the NBA one thing while doing another.

**E.      Shortly Before Its Nominal One Year of Good Faith Efforts Expired, PBC Announced It Intended to Break the Lease and Relocate the Sonics to Oklahoma City.**

On September 19, 2007, PBC filed an arbitration demand stating that it intended to breach the Lease and stop playing Sonics games in KeyArena after the 2007-08 season. Ex. 15 ("Arbitration Demand"). PBC argued it would be financially impossible to play Sonics games in KeyArena after the 2007-08 season because KeyArena was too small. Ex. 15, Arbitration Demand, ¶¶ 15-21. PBC expressly compared KeyArena to other larger NBA arenas in other cities. *Id.*, ¶¶ 15, 17. Based on this alleged hardship, PBC argued that the City was not entitled to specific performance of the Lease. *Id.*, ¶¶ 13-14.

On September 24, 2007, the City filed a lawsuit seeking a declaratory judgment that it is entitled to specific performance of PBC's obligation to play all Sonics games in KeyArena through the 2009-10 NBA season. Ex. 11, Complaint, ¶¶ 26-30  The City made clear that it sought specific performance, because breach of the Lease would cause the City both tangible and

intangible losses. *Id.*, ¶¶ 6, 24. Courts have expressly recognized that a city suffers intangible losses when a sports team with a long history in its community relocates (even temporarily). *See, e.g., City of New York v. New York Yankees*, 117 Misc.2d 332, 336-37, 458 N.Y.S.2d 486 (N.Y. Sup. 1983); *City of New York v. New York Jets Football Club, Inc.*, 90 Misc.2d 311, 315-16, 394 N.Y.S.2d 799 (N.Y. Sup. Ct. 1977). The City further specified that it would be impossible to find an alternative tenant with the unique characteristics of the Sonics. Ex. 11, Complaint, ¶ 24. The City also sought a declaratory judgment that the dispute was not subject to arbitration, which the court granted. Ex. 11, Complaint, ¶¶ 31-34; Ex. 16. PBC has answered, generally denying the City's contentions. Ex. 14 ("Defendant's Answer and Affirmative Defenses"). The City's declaratory judgment action against PBC is scheduled for trial in June 2008. Ex. 17.

On March 14, 2008, PBC filed a letter of intent announcing its plan to relocate the Sonics to Oklahoma City, subject to the approval of the NBA. Ex. 40. PBC filed this letter shortly after the voters of Oklahoma City approved more than $100 million in taxes to finance improvements to the Ford Center (Oklahoma City's basketball arena). Ex. 44. In the run-up to the vote on the Ford Center improvements, PBC, Oklahoma City, and the Oklahoma City Chamber of Commerce publicly asserted that relocation of an NBA team to Oklahoma City would bring substantial benefits, both tangible and intangible, to the City. Exs. 41, 43. Moreover, the NBA actively assisted the Oklahoma City Chamber of Commerce's campaign in favor of the vote, by sending out campaign notices to Oklahoma City residents that purchased tickets during the two seasons that the New Orleans Hornets played in Oklahoma City. Ex. 42.

**F.**   **The NBA Actively Involved Itself in the Lease Dispute Between the City of Seattle and PBC, Which Reflects the Way in Which the NBA is Generally Involved in Issues Related to Its Teams' Arena Leases.**

The NBA ultimately ended up taking PBC's side in this litigation. The NBA has repeatedly asserted that playing Sonics games in KeyArena is not financially viable. Exs. 37, 39. In February of this year, NBA Commissioner Stern disclosed that he had "encouraged the SuperSonics to make an offer to the city to buy out the remaining two years of the lease to KeyArena." Ex. 37. Commissioner Stern's February 2008 intervention in the City's lawsuit is not the only recent involvement the NBA has had with the possible early termination of a team's arena lease. The New Orleans Hornets recently renegotiated its arena lease with the state of Louisiana to allow the team to buy out the lease's remaining term under certain conditions. NBA Commissioner Stern called the renegotiated lease "fair" to the Hornets and the state. Ex. 38. The NBA thus presumably has standards by which it evaluates the fairness of such provisions, as part of its approval of teams' arena leases.

**G.**   **The City's Discovery Requests.**

Given the involvement of the NBA in the central issues in this litigation, the City sought third-party discovery from the NBA. Ex. 1. Initially, the NBA objected broadly to the City's subpoena, on the bases of confidentiality, privilege, relevance, and overbreadth / undue burden. Ex. 2. The City does not seek production of privileged documents. With respect to confidentiality, counsel for the City communicated directly with counsel for the NBA, and the City subsequently entered a protective order that includes provisions the NBA specifically requested to protect the confidentiality of its documents. Exs. 3, 4, 6, 7. The City also narrowed its requests to address the NBA's objections to their scope. Ex. 5. Over the course of these communications, the NBA agreed to produce documents related to the Lease, the NBA

Commissioner's approval of the Lease, the NBA's discipline of any PBC member (i.e., the McClendon fine), and the rules and regulations of the NBA. Exs. 8, 9. As discussed below, however, the NBA defines relevance very narrowly and refuses to produce four categories of documents that relate to the City's specific performance claim and PBC's asserted defense of undue hardship.

## III.    ARGUMENT

**A.    The City's Discovery Requests Are Reasonable In Light of the NBA's Involvement in the Events at Issue, Its Interest in the Lawsuit, and Its Ultimate Choice to Side With PBC.**

### 1.    The NBA Has an Interest in and Will Be Affected by the Results of this Lawsuit.

In evaluating the reasonableness of the City's subpoena to the NBA, a central consideration is the NBA's involvement with the events and issues in this lawsuit. It is more reasonable to subpoena discovery from an entity that is involved in some manner in the lawsuit or will be necessarily affected by a final judgment. *See Concord Boat Corp. v. Brunswick Corp.*, 169 F.R.D. 44, 53 (S.D.N.Y. 1996) (citing *United States v. Int'l Bus. Machs. Corp. ("IBM")*, 83 F.R.D. 97, 108-09 (S.D.N.Y. 1979) (denying motion to quash brought by defendant's Chairman of the Board) and *United States v. Int'l Bus. Machs. Corp.*, 62 F.R.D. 507, 509-10 (S.D.N.Y. 1974) (denying motion to quash brought by members of computer industry which would necessarily be affected by final judgment in litigation)); *Behrend v. Comcast Corp.*, --- F.R.D. ---, 2008 WL 250373, *2-*4 (D. Mass. 2008) (burden of production appropriately borne by non-party with interest in litigation). Although technically a non-party, the NBA is involved and will be directly affected by the result of the underlying litigation. The NBA has an interest in – and indeed, controls – where its teams play.

From the time PBC bought the team, the NBA involved itself in the question of where the Sonics would play by requiring PBC to agree to work in good faith to keep the Sonics in the Seattle area. The City is entitled to know why it did so. The NBA has been discussing relocation and the Lease with PBC for months. Moreover, PBC was saying one thing to the NBA about relocation while doing another. The City is entitled to know what was said, as it bears directly on the credibility of PBC members in this lawsuit. The NBA fined PBC member Aubrey McClendon $250,000 when he admitted PBC bought the Sonics to move them to Oklahoma City. The City is entitled to know why.

Indeed, the NBA ultimately chose to take PBC's side in the litigation. It publicly supported PBC's claim that fulfilling its contractual agreement to play Sonics games in KeyArena would be financially unviable. The City is entitled to know why the NBA reached this conclusion and to test the factual premise of that conclusion by examining the economics of other NBA franchises.

NBA Commissioner David Stern publicly announced he had encouraged PBC to try to buy its way out of the Lease. By contrast, Commissioner Stern called "fair" the renegotiation of the New Orleans Hornets' arena lease (to allow early termination upon payment of a substantial fee, but only if attendance failed to reach a certain level). The City is entitled to know why the NBA has taken different positions on different leases, and what factors went into its evaluation of those leases. Even if the NBA had maintained a policy of strict neutrality, the City would still need its documents for the reasons discussed above. But it is even more unfair for the NBA to take the side of one party, and then deny the other party discovery centrally relevant to its case.

Moreover, whether or when the NBA allows the Sonics to relocate ultimately depends on the result of the underlying litigation. The NBA is expected to approve the Sonics' request to

relocate for the 2008-09 season, contingent on the results of the litigation between the City and PBC. Ex. 45. If, therefore, Judge Marsha Pechman agrees that the City is entitled to specific performance, the Sonics will stay in Seattle through the 2009-10 NBA season. Any approval granted by the NBA for the Sonics to relocate will be effectively stayed until the end of the Lease. Because the NBA has a direct, substantial and obvious interest in the result of this lawsuit, it is reasonable to require it to produce documents relevant to the underlying claims and defenses.

## 2.  The NBA Cannot Show Undue Burden.

The NBA likely possesses highly relevant documents, including internal NBA documents available from no other source. Producing these documents will not unfairly burden the NBA. The NBA is a multi-billion dollar organization. *See IBM*, 83 F.R.D. at 108-9 (weighing non-party's resources in evaluating reasonableness of discovery, recognizing burden of production "may be justified by the nature and importance of the inquiry involved[,]" and ordering compliance with subpoena); *see also First Am. Corp. v. Price Waterhouse, LLP*, 154 F.3d 16, 21-23 (2d Cir. 1998) (recognizing reasonableness of compelling non-party production in light of complexity of case). Producing those copies will not impact in any significant way the NBA's ability to continue to carry out its business. *See IBM*, 83 F.R.D. at 109. The NBA has done nothing to substantiate its claim of undue burden. *See IBM*. 83 F.R.D. at 104 (the party claiming 'undue burden' bears the burden of proof); *see also Williams v. Dallas*, 178 F.R.D. 103, 109-114 (N.D. Tex. 1998) (non-party claiming 'undue burden' "must meet the heavy burden of establishing that compliance with the subpoena would be unreasonable and oppressive"). In light of the NBA's involvement in the events underlying this case, its production of documents is not just reasonable, but necessary.

**B.    The City's Subpoena Seeks Documents Centrally Relevant to Its Claim for Specific Performance and PBC's Purported Defense of Undue Hardship.**

The key issue in resolving the City's motion for enforcement of its subpoena is whether the documents requested are relevant to its claim or PBC's purported defense. "Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense[.]" Fed. R. Civ. P. 26(b)(1). "For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action." *Id.* Relevance is defined broadly: documents need not be admissible themselves if they are "reasonably calculated to lead to the discovery of admissible evidence." *Id.* This standard is an "obviously broad rule" that is "liberally construed." *Daval Steel Prods. v. M/V Fakredline*, 951 F.2d 1357, 1367 (2d Cir. 1991). The City's subpoena of the NBA under Fed. R. Civ. P. 45 is governed by the same broad standard of relevance that applies under Fed. R. Civ. P. 26(b). *IBM*, 83 F.R.D. at 104. Accordingly, the NBA should be ordered to produce documents related to the City's claim(s), the PBC's defense(s), and the subject matter of the action. For the reasons discussed below, all of the documents subpoenaed by the City are relevant.

**1.    PBC's Attempt to Relocate the Sonics to Oklahoma City Reflects the Importance of an NBA Team to Its Community (Request No. 5).**

The City subpoenaed "All documents regarding or related to any request or plan to relocate the Sonics outside Seattle, Washington, or to the possibility of such a relocation." Request No. 5. (Ex. 1). The NBA refused to produce documents responsive to Request No. 5. Exs. 2, 8. The City is willing to limit Request No. 5 to documents related to any request or plan

by PBC to relocate the Sonics outside of Seattle.[3]  The City previously agreed to exclude documents created by PBC from the scope of that request.

PBC's relocation of the Sonics (Request No. 5) is at the heart of the underlying litigation. PBC admits it will breach the KeyArena Lease if it relocates the Sonics to Oklahoma City following the 2008-09 NBA season.  Relocation before the term of the Lease expires is thus necessarily related to breach of the Lease.  The threatened breach of the Lease, in turn, is not just at issue in the case – it is *the* issue.  The NBA's objection that documents related to relocation of the Sonics are irrelevant makes no sense.

Moreover, the proposed relocation of the Sonics bears on a specific issue at the heart of the City's specific performance claim:  whether having an NBA team brings unique, but difficult to calculate, benefits to a community; i.e., benefits beyond merely the rent the team pays to play there.  In its Complaint, the City requests a declaratory judgment that it is entitled to specific performance of PBC's obligations under the Lease.  The City is entitled to a remedy that does "perfect justice."  *Crafts v. Pitts*, 162 P.3d 382, 385-86 (Wash. 2007).  Thus, the U.S. District Court in the Western District of Washington will need to resolve issues including whether:  (1) it would be difficult to obtain a suitable substitute tenant for an NBA team generally, and the Sonics in particular; and (2) whether the damages of the Sonics' early lease termination could be calculated with certainty.  *Id.* at 386.  On the latter issue, the City asserts that the benefits of an NBA team are unique and in many respects difficult to measure.  For example, the City believes that the Sonics generate economic activity from persons attending games as well as jobs.  The

---

[3] The City originally agreed to narrow its request to documents related to relocation of the team by its former owners.  Based on the evidence of the NBA's involvement in the relocation of the Sonics by PBC, however, the City now believes documents related to PBC's relocation are relevant and requests production of those documents as called for by its subpoena.

City further believes that the Sonics bring intangible benefits to the City, a factual assertion courts have found both true and relevant in analogous cases. *See, e.g., New York Yankees,* 117 Misc. 2d at 336-37; *New York Jets Football Club,* 90 Misc. 2d at 315-16. PBC, on the other hand, claims the Sonics bring little or no benefit to Seattle besides the rent they pay to the City to play in KeyArena. Ex. 15. The uniqueness of the Sonics and the difficulties of measuring the benefits the team bestows on the City are central to the City's specific performance claim. *Crafts,* 162 P.3d at 386.

In fact, it is exactly these factors – the unique and hard-to-measure benefits an NBA team brings to its community – that are motivating PBC's attempt to relocate the Sonics. The NBA cares about this issue, as reflected in its requirement that PBC make good faith efforts to keep the Sonics in the Seattle area and the substantial fine it levied against Mr. McClendon. PBC's internal documents prove not only that PBC and the NBA have been discussing relocation at length, but that PBC has apparently been deceiving the NBA about its intentions. NBA documents are likely to show that PBC has been saying one thing (to the NBA) while doing another. These documents, then, will serve to impeach PBC's purported defense that their reason for attempting to relocate the Sonics out of KeyArena is alleged economic hardship.

Document Request No. 5 is specific and appropriately narrow in time and scope. *See IBM,* 83 F.R.D. at 104 (compelling the production of documents in response to requests that were appropriately tailored to the issues before the court); *see also Behrend,* --- F.R.D. ---, 2008 WL 250373 at *2-*4 (compelling production where requesting party narrowed the scope of its requests). The City limited its request to a discrete issue: relocation of the Sonics by PBC. The request is thus time-limited to the less than two-year period since the NBA learned PBC intended to purchase the Sonics. The City has further limited its request to exclude documents generated

17

by PBC. The request thus principally seeks NBA internal documents, many of which are likely unavailable from any other source.

### 2. As Reflected in the Agreement between PBC and the NBA, Documents Related to PBC's Purchase of the Sonics Bear on the Issue of Where the Sonics Play and Why (Request No. 6).

The City further subpoenaed, in Request No. 6 (Ex. 1), "All documents regarding or related to the possible or actual purchase of the Sonics, by PBC or by any other potential purchaser, from the date the NBA became aware that former team owner The Basketball Club of Seattle, chaired by Howard Schultz, was seeking to sell the Sonics." The City limited Request No. 6 to exclude documents created by PBC. The NBA refuses, however, to produce any documents responsive to Request No. 6, asserting confidentiality, privilege, irrelevance, and overbreadth / undue burden.

In buying the Sonics, PBC expressly promised the NBA that it would work in good faith to keep the Sonics in the Seattle area for the long term. Both the NBA and PBC thus considered the question of where the Sonics would play an integral part of the Sonics' purchase by PBC. It is therefore reasonably likely that NBA documents will address why the NBA cared about the location of the team, which will in turn relate to central issues in this case: what effect an NBA team's presence has on its community (i.e., why the NBA wanted PBC to try to keep the Sonics in the Seattle area), and why an NBA owner might legitimately relocate a team (i.e., what financial considerations might, in the NBA's opinion, constitute undue hardship).

Request No. 6 is specific: it relates only to the sale of the Sonics to PBC. It is limited in time, as PBC bought the Sonics less than two years ago. The City limited its request to exclude documents generated by PBC. The subpoena thus principally seeks internal NBA documents, many of which are likely unavailable from any other source.

**3.    Documents Related to Early Termination Versus Specific Performance of NBA Arena Leases Generally Provide Necessary Context for the City's Claim for Specific Performance of Its Lease Individually (Requests Nos. 17, 19, 20).**

The City subpoenaed the following related documents (Ex. 1):

17.    All documents reflecting or relating to the NBA's position (including any actions taken or contemplated by the NBA, and all communications) related to the termination (actual or contemplated) by any NBA team of its arena lease prior to the expiration of its term, including but not limited to any lease entered into by the New Orleans Hornets.

19.    All documents regarding or related to proposed or actual efforts to relocate NBA teams during the term of an existing lease.

20.    All documents regarding or related to specific performance clauses in NBA arena leases.

The City limited Requests Nos. 17 and 19 to exclude documents created by PBC. The NBA refuses, however, to produce any documents responsive to Requests Nos. 17, 19, or 20, asserting confidentiality, privilege, irrelevance, and overbreadth / undue burden.

PBC's attempt to breach the Lease and avoid specific performance does not occur in a vacuum. PBC's Lease with the City is one of a limited class of contracts – NBA arena leases – that will all address the exact same subjects at issue in this litigation: the term of a team's lease and the potential for early termination of the lease versus provisions for its specific performance. In evaluating whether it is appropriate to order specific performance, one of the issues that matters is the class of contracts to which the specific contract at issue belongs:

> The adequacy or inadequacy of damages as a remedy is not determined with reference to the circumstances of a particular case, but the inquiry is whether such case is one of a class where, in agreements generally of the kind involved, the terms or the relations of the parties are such that the legal remedy of damages is adequate or inadequate[.]

*Payne v. Still*, 38 P. 994, 994 (Wash. 1894). Thus, under the rule articulated in *Payne*, documents related to early termination versus specific performance of NBA arena leases generally, will bear on the City's specific performance claim with regard to the Lease individually.

Additionally, documents related to these issues will provide context to and shed light on whether the Lease itself is fair. Fairness of the Lease is directly at issue in a specific performance claim. *Crafts*, 162 P.3d at 386. Further, whether a Lease is "fair" relates in turn to the relative benefits and burdens to the team and the arena owner of early termination versus specific performance, which are similarly at issue in a specific performance claim. Restatement (Second) of Contracts, § 364 (1981). It is highly likely that the NBA takes a position on the "fairness" of early termination versus specific performance in arena leases. For example, NBA Commissioner Stern approved as "fair" the renegotiation of the lease between the New Orleans Hornets and the state of Louisiana, which altered the Lease to allow early termination rather than mandating specific performance. Stern's approval of the Hornets' lease renegotiation was not just his personal opinion; the NBA must give prior approval to all NBA arena leases. Ex. 12, Lease, Section XX(A)(3). Documents responsive to Requests Nos. 17, 19, and 20 will thus provide the broader context necessary to evaluate the City's claim for specific performance of the Sonics' Lease in particular.

4. **The City Needs Production of Documents Related to the Finances of NBA Teams to Test the Claim by PBC and the NBA that the Cause of PBC's Alleged Financial Losses Is the Adequacy of KeyArena (Requests Nos. 8, 9, 10, and 13).**

The City subpoenaed the following documents related to the financial performance of NBA franchises:

8. All documents analyzing or assessing the financial impact of the 1998-99 NBA lockout on NBA teams, including but not limited to the financial impact of the lockout on the Sonics.

9. All profit and loss statements submitted to the NBA by each NBA franchise for the last 10 years.

10. All documents reflecting formal or informal NBA policies governing or addressing the way in which franchises account for and report their revenues.

13.     All documents regarding or related to the impact on NBA team profits of the most recent
        collective bargaining agreement between the NBA and the NBA Players' Association.

The NBA objected to all these requests on the basis of privilege, confidentiality, relevance, and

undue burden, and has refused to produce any responsive documents.

        PBC's defense to the City's specific performance claim turns on its allegation that

continuing to play NBA games in KeyArena would necessarily cause it undue hardship.  It

would be no defense to the City's specific performance claim that the Sonics' owners simply

made an allegedly "bad bargain." *See Dean v. Gregg*, 663 P.2d 502, 503 (Wash. App. 1983).

Similarly, purported "financial" impossibility is no defense. *See Carpenter v. Folkerts*, 627 P.2d

559, 562 (Wash. App. 1981).  The City is entitled to test PBC's allegation that KeyArena is

allegedly too small to be "[any] longer an economically viable facility for men's professional

basketball."  NBA Commissioner Stern makes the same claim:

> The reason that this journey [the proposed relocation of the Sonics to Oklahoma
> City] began was because KeyArena was not an adequate arena going forward . . .
> as far as we know, the footprint of Key is at the present time is not viewed as
> adequate to support what's necessary going forward.

Ex. 39.  The NBA thus has publicly supported PBC's purported defense of undue hardship.  It

must have some reason for doing so.  The City is entitled to discovery of NBA documents that

will allow the City to evaluate the basis of PBC and the NBA's jointly asserted defense.

        Additionally, the City alleges in its Complaint that the Sonics' alleged operating losses

stem from other factors (e.g., the poor performance of the Sonics in comparison with other

teams).  Ex. 11, ¶ 9.  The City would be unfairly handicapped in evaluating PBC's claim

regarding the Sonics' alleged losses if it is limited to only a single data point; i.e., information

about the Sonics.  The City believes that to fully and fairly evaluate the causes of the Sonics'

alleged operating losses, it needs to obtain NBA documents bearing on the finances of the NBA and other NBA teams.

Specifically, financial professionals have cited the size of the arena or stadium in which a team plays its home games as just one of many factors that can impact the team's profitability. Other relevant factors potentially include: the population of the metropolitan area in which the team plays; the size of the media market; regional per capita income; the team's salary structure; the team's winning percentage; whether or not the team has a history of championships or playoff appearances; whether the team has a charismatic star player or players on the roster; the team's relationship with the community in which it plays, including activities with charities and schools; the public perception of a team's ownership, including the presence of the owner as a figure in the community; ticket prices; the configuration of the arena, including premium seating and signage; the number of corporations in the community with more than 500 employees; and, the team's expenditures on marketing, advertising and public relations. Lawrence Decl., ¶ 47. Only by analyzing the profitability of each NBA franchise, and taking into consideration other, non-arena factors that impact profitability, can PBC's assertion that its alleged financial losses are attributable solely to KeyArena's size be meaningfully tested. *Id.*

The City has limited the breadth of the discovery requests at issue as much as is reasonably possible. Request No. 13 is limited to a specific topic: the impact on NBA team profits of the most recent collective bargaining agreement between the NBA and the NBA Players' Association. Further, the City has limited Request No. 13 to documents that (1) were communicated to one or more NBA teams by, or on behalf of, the NBA and (2) were generated in anticipation of the negotiation or execution of the most recent collective bargaining agreement. Request No. 10 is also limited both to a discrete topic and to documents addressing

22

"policies" regarding that topic (rather than a broader class of documents); i.e., formal or informal NBA policies governing or addressing the way in which franchises account for and report their revenues.

In certain instances, it was necessary for the City to request documents over a 10-year time period, because one of the factors specifically at issue in this case is an event that occurred 10 years ago; i.e., the effect of the 1998-99 NBA lockout on NBA teams generally and the Sonics' finances in particular. Nevertheless, the City has limited the scope of these requests. Request No. 9 requests profit and loss statements submitted to the NBA by each NBA franchise for the past 10 years. The scope of this request is thus limited to discrete and easily identifiable documents (profit and loss statements which are provided by the various teams to the NBA). Request No. 8 is limited both to a specific topic and to documents reflecting an "analysis" of that topic (as opposed to a broader class of documents); i.e., any analysis of the financial impact of the 1998-99 NBA lockout on NBA teams.

## C.    The NBA's Objections Regarding Privilege and Confidentiality Are Moot.

The NBA's objections on grounds of privilege and confidentiality are moot. The City does not seek, nor has it ever sought privileged, documents. Further, the City has entered a protective order in this case, which allows the NBA to protect the confidentiality of its documents by designating them "Confidential Material" or "Attorneys Only Material." *See Bank of New York v. Meridien Biao Bank Tanzania, Ltd.,* 171 F.R.D. 136, 145 (S.D.N.Y. 1997) (ordering production of confidential business information subject to a protective order). In fact, the NBA specifically asked the City to include a provision in the protective order that would preclude confidential documents produced to the City in this litigation from being produced to a third party pursuant to a public records request. Exs. 3, 4, 6. The City agreed to the NBA's

request. Accordingly, the protective order provides that the City attorneys' office will not receive copies of documents marked "Attorneys' Only" or receive or create documents referencing the contents of those documents. Ex. 7, ¶ 6(a).

## IV. CONCLUSION

The NBA is directly and deeply involved in the issue at the heart of the City's lawsuit against PBC: PBC's intent to breach the Lease by relocating the Sonics to Oklahoma City after the 2007-08 NBA season. PBC needs the NBA's approval to relocate (and break the Lease). From the time PBC bought the Sonics, the NBA has been involved in the issues of where the Sonics would play, the Lease, and relocation. The NBA has agreed playing games in KeyArena is allegedly financially impossible and encouraged the Sonics to buy out their Lease. Although not a party, the NBA has chosen to take sides in this litigation. While the City does not know what the NBA's internal documents say, or what NBA was saying to PBC (and vice versa), that is exactly why the City seeks discovery from the NBA. Particularly in light of the NBA's close relationship to the litigation, the City is entitled to this discovery from the NBA. The City's subpoena should be enforced and the NBA ordered to produce all responsive, non-privileged documents.

Dated: New York, New York
April 9, 2008

Respectfully submitted,

*signature*

Joanna A. Diakos (JD 7269)
**KIRKPATRICK & LOCKHART PRESTON
GATES ELLIS LLP**
599 Lexington Avenue
New York, New York 10022
Telephone: 212.536.4807
Facsimile: 212.536.3900
joanna.diakos@klgates.com

Paul Lawrence *(pro hac vice pending)*
WSBA No. 13557
paul.lawrence@klgates.com
Jeffrey Johnson *(pro hac vice pending)*
WSBA No. 23066
jeffrey.johnson@klgates.com
**KIRKPATRICK & LOCKHART PRESTON
GATES ELLIS LLP**
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WA 98104-1158
Telephone: 206.623.7580
Facsimile: 206.623.7022

*Attorneys for Plaintiff City of Seattle*

**EXHIBIT 7**

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

------------------------------------------------------------

CITY OF SEATTLE, a first-class )
charter city, )
                                             )
            Plaintiff, )
                                             )
   vs. )  No. C0-1620MJP
                                             )
THE PROFESSIONAL BASKETBALL CLUB, )
LLC, an Oklahoma limited )
liability company, )
                                           )
          Defendant. )

------------------------------------------------------------

Videotaped Deposition Upon Oral Examination

of

RICHARD CONLIN

------------------------------------------------------------

Taken at 1000 Second Avenue, Suite 3800
Seattle, Washington

DATE: April 23, 2008
REPORTED BY: Wade J. Johnson, RPR
         CCR No.: 2574

STARKOVICH REPORTING SERVICES
(206) 323-0919

1    Q.    And who would have to be a party to this agreement?

2    A.    Well, it seems like it would have to be, at a

3    minimum, the ownership of the club, the leadership of the

4    city, and the leadership of the state.    And I think King

5    County would actually have to implement the State tax

6    proposals, so they would probably have to be on board as

7    well.

8    Q.    Have you had -- in the course of these three years

9    or so, have you had any contact with anybody at the State

10   about KeyArena, or the legislature, the governor, staff, that

11   kind of thing?

12   A.    Yes.

13   Q.    Who?

14   A.    Members of the legislature.    I probably talked to

15   half of the Seattle delegation at various times about this,

16   maybe more.

17   Q.    Did you ever talk to them about an arena outside

18   Seattle, for Bellevue, Renton, that kind of thing?

19   A.    Yes.    Yeah, we had discussions on that.

20   Q.    Tell me about those discussions.

21   A.    Well, our preference is, we think that KeyArena is

22   an excellent facility.    And so we suggested that KeyArena was

23   a very good place to maintain the basketball team.    And that,

24   in fact, if you built another arena, that that could

25   potentially not work well for the region in terms of having

1    two competing venues.

2        Q.    So you were concerned that the legislature might

3    pursue, for example, an arena in Renton?

4        A.    I don't know -- concerned may be a higher level

5    than I would put it, but we certainly had heard the idea.

6        Q.    When you say concerned -- you're suggesting concern

7    is not the right word.  What word would you use?

8        A.    Well, I don't know.  Maybe concern is probably the

9    right word, maybe, but what we had -- it didn't appear that

10    it had reached the level where we would feel alarmed, perhaps

11    is the right -- the appropriate statement.

12        Q.    So we were at concerned, but the alarm bells hadn't

13    gone off yet?

14        A.    Yeah, that's right.  Yeah, that sounds reasonable.

15        Q.    And tell us again why you were concerned about, for

16    example, having an arena at Renton?

17        A.    Well, two reasons.  I mean, one is, from a

18    standpoint of the fiduciary responsibility that we have for

19    the city, we thought we need to take care of the KeyArena and

20    the Seattle center.  Our second concern was that, from the

21    City's perspective, having a basketball team in the city and

22    being able to maintain it and that, contributed a lot to the

23    city's economy and contributed a lot to the vitality of the

24    city.  So we really wanted to make sure that that was kept in

25    mind by people.

1    And we felt that, in terms of many of our other

2  priorities, KeyArena is such a wonderful transportation

3  nexus -- in fact, if you go back to some of our earlier

4  discussions, when we talk about priorities, the fact that you

5  have such great bus access to KeyArena, that you have this

6  wonderful concentration of people in the immediate area,

7  makes it the absolute prime spot for the region to have that

8  kind of central facility.

9    Q.   So I want to summarize what you said.  You tell me

10  if I'm doing it fairly.  You, as president of the Council,

11  communicated to legislators from Seattle your concern at the

12  notion of having an arena at Renton, as opposed to KeyArena?

13        MR. NARVER:  Object to the form.

14    A.   What I would say is that we communicated our

15  preferences that, if there were going to be commitments by

16  the State, that KeyArena would be the appropriate venue for

17  the Sonics and the appropriate venue for such commitments.

18    Q.   And you also expressed your concerns, not alarms

19  but concerns --

20    A.   Yeah.

21    Q.   -- about having an arena in Renton, for example?

22    A.   Yeah, that that would cause some problems,

23  potential problems, and was not the best choice.

24    Q.   And which legislators did you communicate that to?

25        Mr. Chopp, I'll bet?

1    A.    Probably.  I'd say I probably talked to half of the

2    members of the Seattle delegation, is my best guess.

3    Q.    You're going to have to educate.  How many in the

4    Seattle delegation?

5    A.    Eighteen.

6    Q.    Okay.

7    A.    Yeah.

8    Q.    So you talked to at least nine senators and

9    representatives about your concerns about --

10   A.    I would say probably.  Yeah, over the course of the

11   last year or so of discussions, yeah.

12   Q.    I'm going to have to finish my question, otherwise

13   Wade will get --

14   A.    Sure.

15   Q.    You communicated your concerns about a Renton arena

16   to at least nine senators and representatives from the

17   Seattle area?

18   A.    You know, I have to be really careful and say that

19   I don't know that I've talked to nine legislators about my

20   concerns about a Renton arena.

21   Q.    Approximately nine?

22   A.    I know that I've been in conversations with more

23   than -- nine or more legislators -- about the overall issue

24   of KeyArena, Renton arena, the Sonics, and so forth, over the

25   course of these discussions.  But whether I specifically said

1    that to nine members or five members, I really don't know.

2        Q.    And how about senators and representatives from

3    other than Seattle; did you express your concerns to them?

4        A.    I may have had some conversations, but we tend to

5    focus largely on our delegation and trying to get them to

6    represent us.

7        Q.    And what was -- for example, Senator Chopp -- is it

8    senator or representative?

9        A.    Representative Chopp.

10       Q.    My mistake.

11       A.    Speaker Chopp.

12       Q.    Speaker Chopp.  What did the speaker have to say in

13   response to these concerns?

14       A.    Let's see.  Boy, ostensibly, he took in the

15   concerns of the City, and he understood what our perspective

16   was on KeyArena, and I don't remember much more than that.

17       Q.    Now, how do you do that?  Do you make a trip to

18   Olympia?  Do you call him on the phone, or is there an

19   organized visit by the Council?  How does that work?

20       A.    Well, any one of those modes would be possible.  I

21   would guess that most of -- well, I wouldn't guess, but I

22   would say my recollection is that most of these conversations

23   with either by telephone or in persons at places in Seattle,

24   yeah.

25       Q.    Okay.  Over what period of time were you expressing

1    concerns to some members of the Seattle delegation about a

2    Renton arena?

3         A.    Yeah, I really can't answer that.  I don't know.  I

4    don't even remember how long that was on the table as a

5    consideration.

6         Q.    How did it first come to your attention as a

7    potential for a Renton arena and the problems it might cause?

8         A.    I can't really remember.  It was probably either

9    through media or through our representative -- our

10   legislative lobbyists, who let us know that this was under

11   consideration.  It might have been the mayor's office.  I

12   don't know.

13        Q.    And, when you first heard it, did you talk about it

14   with your fellow councilmembers?

15        A.    Undoubtedly, we had conversations, yeah.

16        Q.    Tell me about those conversations.

17        A.    I don't know that there's much I can say.  We said,

18   Well, here's this proposal.  What do you think of it?  Is

19   this going to be a problem for us?  And, yeah, maybe there's

20   going to be a problem here.  So --

21        Q.    And so was it on your own that you decided to

22   contact legislators, or did you and your fellow

23   councilmembers say, well, we should get in touch with the

24   delegation, or how did that work, or was it you, as

25   president, kind of tasked with that?

A F F I D A V I T

STATE OF WASHINGTON )

                         )  ss.

COUNTY OF KING       )


        I have read my within deposition, and the same is true and correct, save and except for changes and/or corrections, if any, as indicated by me on the "CORRECTIONS" flyleaf page hereof.



                  RICHARD CONLIN


        SUBSCRIBED AND SWORN to before me this        day of              , 2008.



                  NOTARY PUBLIC in and for

                  the State of Washington,

                  residing at              .

                  My commission expires

C E R T I F I C A T E

STATE OF WASHINGTON )
                   ) ss
COUNTY OF KING      )

    I, the undersigned officer of the Court, under my commission as a Notary Public in and for the State of Washington, hereby certify that the foregoing deposition upon oral examination of the witness named herein was taken stenographically before me and thereafter transcribed under my direction;

    That the witness before examination was first duly sworn by me to testify truthfully; that the transcript of the deposition is a full, true and correct transcript of the testimony, including questions and answers and all objections, motions, and exceptions of counsel made and taken at the time of the foregoing examination;

    That I am neither attorney for, nor a relative or employee of any of the parties to the action; further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially interested in its outcome.

    IN WITNESS WHEREOF, I have hereunto set my hand and seal this 5th of May, 2008.


                   Wade J. Johnson, RPR
                   NOTARY PUBLIC in and for the State
                   of Washington, residing at Seattle.
                   My commission expires 11/9/10.


STARKOVICH REPORTING SERVICES
(206) 323-0919

**EXHIBIT 8**

Not the answer we were looking for

John Stanton | Trilogy Partners| (425) 586-8383 (office) | john.stanton@trilogypartnership.com

**From:** Nicole Kennedy [mailto:NicoleK@moore-info.com]
**Sent:** Tuesday, March 18, 2008 3:18 PM
**To:** John Stanton
**Cc:** Bob Moore
**Subject:** WA Voters and the Key Arena

Good afternoon John,

Attached are the topline results (questionnaire with percentages) for the Key Arena question on our Washington statewide voter survey.  We are working on analysis for this and will send you a PowerPoint presentation on Thursday.

Best,
Nicole Kennedy

**Nicole Kennedy** • Senior Project Manager
503-221-3100 • nicolek@moore-info.com
www.moore-info.com

 **MOORE INFORMATION**
Opinion Research • Strategic Analysis

No virus found in this incoming message.
Checked by AVG.
Version: 7.5.519 / Virus Database: 269.21.7/1333 - Release Date: 3/18/2008 8:10 AM

GRIFF_00001979



# MOORE INFORMATION
### OPINION RESEARCH • STRATEGIC ANALYSIS

Can I speak to (FROM LIST)?  IF NA: SCHEDULE CALL BACK
PLEASE ONLY SPEAK TO THE LISTED PERSON

Hello, this is (FIRST AND LAST NAME).  We are conducting a survey among voters regarding issues in your part of the state and would like to include your views in our study. I assure you we are only seeking opinions and there will be no attempt to sell you anything or solicit a donation.

1.  A plan has been proposed by four local businessmen to invest $150 million dollars to upgrade the Key Arena and keep the Sonics basketball team in Seattle.  Their plan requires that the state authorize the county and city to spend an additional $150 million dollars for improvements to the Key Arena paid for by taxes on restaurants and rental cars in King County.  Would you support or oppose such a plan? IF SUPPORT/OPPOSE: Is that strongly support/oppose or somewhat support/oppose?

| | |
|---|---:|
| strongly support | 13% |
| somewhat support | 17% |
| **Total support** | **31%** |
| don't know | 10% |
| **Total oppose** | **59%** |
| somewhat oppose | 12% |
| strongly oppose | 47% |

Now a few questions for statistical purposes.

2.  What is your approximate age, please?

| | |
|---|---:|
| 18-34 | 16% |
| 35-44 | 14% |
| 45-54 | 23% |
| 55-59 | 15% |
| 60-64 | 10% |
| 65+ | 22% |

GRIFF_00001980

3. Which one of the following best describes how you usually vote?
(READ 1-2, 4-5, 5-4, 2-1)

| | |
|---|---|
| mostly or only for Republicans | 24% |
| a few more Republicans then Democrats | 13% |
| **Total Republican** | **37%** |
| the person/Independent | 13% |
| **Total Democrat** | **44%** |
| a few more Democrats than Republicans | 12% |
| mostly or only for Democrats | 33% |
| don't know | 5% |

4. On political issues, do you consider yourself to be Conservative, Moderate, or Liberal?  IF CONSERVATIVE:  Are you very Conservative or somewhat Conservative?

| | |
|---|---|
| very Conservative | 17% |
| somewhat Conservative | 17% |
| **Total Conservative** | **34%** |
| Moderate | 39% |
| Liberal | 23% |
| don't know | 4% |

5. County (FROM LIST)

6. IF KING COUNTY:  Do you live inside or outside the city of Seattle?

| | |
|---|---|
| inside | 33% |
| outside | 67% |

7. Gender (BY OBSERVATION)

| | |
|---|---|
| male | 47% |
| female | 53% |

8. Vote history (FROM LIST)

GRIFF_00001981

# EXHIBIT 9

SEATTLE.GOV | City Services | Departments | Staff Directory | About Seattle.gov | City Contacts

# SEATTLE.GOV

SEARCH: [ ] Go
● Seattle.gov ○ This Department

## Seattle City Council

🏠 Home | ℹ️ About Us | ✉️ Contact Us

Council Calendar | Current Issues | Council Newsroom | Committees & Agendas | Council Live | Research City Laws

## Council President
## Richard Conlin
Position 2

**Email:** Richard Conlin    **Phone:** (206) 684-8805    **Fax:** (206) 684-8587

Conlin Home
About Richard
Committees
Richard's Video 📹
In the News
Legislation Sponsored by Richard
2008 Work Program
Community Photo Gallery
Newsletter
Newsletter Archives
News Releases
Staff Bios
Council Audio Podcast



## MAKING IT WORK

March 6, 2008, Volume X, Issue 2
Archives
Subscribe/Unsubscribe

The purpose of this newsletter is to provide information, inspire involvement, and make things work in this great city.

**CONTENTS:**

- SONICS AND KEY ARENA
- MAGNUSON PARK DEVELOPMENT, ARENA SPORTS AND HANGAR 27
- THORNTON CREEK AND MEADOWBROOK POND DRAINAGE
- LOBBY REGISTRATION ORDINANCE
- QUOTE AND DEEP THOUGHT

### SONICS AND KEY ARENA

The saga of the relationship of the Seattle Supersonics basketball team and Key Arena/Seattle Center continues, and is not likely to reach a conclusion soon. This article is a snapshot of the current situation, but there are likely to be new developments on a regular basis.

This history of this situation begins with the City of Seattle renovating the Key Arena at a cost of some $74 million in 1994 in partnership with the Seattle Supersonics basketball team. Under the agreement for this renovation, the Sonics guaranteed that they would play in the arena until at least 2010, and the combination of rent payments and other anticipated income associated with the Sonics was intended to pay off the bonds, which mature in 2014.

Unfortunately, it didn't work out that way. The Sonics were sold to a group of Oklahoma business people, who are currently trying to break the lease and move the team. The City has sued to enforce the terms of the lease, but even if Seattle prevails, the Sonics must stay for two years, but will then be free to move, leaving the City holding the bag for the estimated $25 million of remaining debt. If the Sonics succeed in breaking the lease, they will likely be required to provide compensation to the City that exceeds the rent payments that the City would receive, but the City would be left without a basketball team and would probably not be able to fully pay off the debt. Key Arena would be economically viable as a concert venue with some basketball and other sporting events, but at some point in the future would probably either have to undergo a substantial remodel or be superseded by a new venue.

Currently the issue of the Key Arena lease is in litigation and is a matter between the City Attorney and the Sonics. The decision of whether the team stays will ultimately be determined by the team's Oklahoma based ownership.

Recently, a Seattle area group has come forward with a new proposed plan for keeping a basketball team in Seattle. They have offered to purchase the Sonics or one of the other teams looking for a new home (Memphis and New Orleans), and to fund approximately

$150 million of the estimated $300 million cost of reconstructing Key Arena to meet the NBA's request and pay off the remaining debt. This proposal would require commitments by the state and City of approximately $75 million apiece.

State legislators are currently reviewing this proposal, and will consider whether to continue some of the current taxes used to fund Safeco and Qwest Fields for this purpose.

The City of Seattle will have to determine whether investing $75 million in Key Arena would be appropriate and meet the standards of cost effectiveness set by Seattle voters when they approved Initiative 91 by a 74% margin. I have asked the City's Finance Director to provide the Council with an analysis of this. It is likely that the City could justify such an expenditure. Preliminary estimates are that the City will have to invest about $30 million in upgrades to Key Arena even if the Sonics are not tenants, and a good case can be made that the remainder of the investment would be returned through economic activity generated by having a professional basketball team.

It is important that the City act responsibly to protect the City's taxpayers, and not use scarce resources to subsidize a failing NBA business model. Previous proposals called for City investments that could not meet this standard. This new proposal offers the possibility of a win-win solution.

The NBA has approved the sale of the Seattle Storm to local ownership, so there is already a women's professional team scheduled to play in Key Arena. It is great to be able to retain this team, who are exciting and positive role models for women's involvement in sports. Because the Bennett group wants to move the Sonics to Oklahoma City, it is not clear when or how that situation will be resolved. The City Council is committed to doing what we think is right for Seattle, and this latest proposal may offer a way out of the current stalemate. Hopefully at the end of the day we will keep a men's basketball team and have an economically viable Key Arena that continues to work for Seattle and its residents.

**Back to Contents**

---

## MAGNUSON PARK DEVELOPMENT, ARENA SPORTS AND HANGAR 27

When the buildings on the former Sand Point Naval Station were turned over to the City to become part of Magnuson Park, an interesting dilemma was created. The City found itself owning a number of buildings, many of them deteriorating and not meeting current seismic codes. While many of the buildings have historic value, there are serious questions as to how to use them as part of a park, and how to fund needed improvements.

Over the last few years, the City has found uses for some of the buildings, but the most difficult decisions remain to be made. The University faces a similar dilemma with the buildings that it has taken possession of.

Turning over office buildings to nonprofit cultural or athletic organizations has been one solution that seems generally workable, and the City is currently prepared to enter into leases with the Cascade Bicycle Club for Building 15 and the Civic Light Opera for Building 47. There is also support for allowing Seattle Court Sports to construct a new indoor tennis center.

However, there are significant difficulties with the large hangar Buildings 2 and 27 and with the office space in Building 11. These three buildings are in very poor condition, and the City has sought to find ways to operate and renovate them, including considering partnerships with for-profit organizations.

Building 2 has been leased by Arena Sports, a for-profit company that provides indoor soccer and other sports activities for a large number of people. Arena Sports has expressed an interest in moving to Building 27, which they propose to renovate. They were the only respondent to an RFP that the City issued for Building 27, but negotiations for the use of Building 27 have been unsuccessful. The Mayor's office has indicated that they do not believe that the financial agreement proposed by Arena Sports is cost effective for the City.

Building 27 has been used by a variety of nonprofit and for-profit entities for many different purposes. These organizations have banded together as Hangar27.org, and have asked the City to allow them to develop a renovation plan and contract for the renovation and use of the building. It is not clear whether these groups have the financial capability to make the required renovations. The Council and Mayor will have to decide whether and under what conditions these groups would be able to successfully manage Building 27, or whether another RFP would attract viable proposals. A decision is likely to be made sometime in the next several months.

Arena Sports is a valued service provider in our community, and will be able to remain in Building 2 under their current contract. They could also submit a new proposal for renovating and using Building 27, or develop a proposal for renovating Building 2. Arena Sports will have the opportunity to make a business decision about its options. Hopefully, Arena Sports and the City will find common ground for their continued presence in the Park.

The Mayor's Office will propose a contract for the use of Building 11 by a green technology company that wants to occupy some of the space and manage and lease the remaining area that they will not immediately require. The Council will consider this proposal in the near future, and will have to decide whether this is an appropriate use in the Historic District, adjacent to the shoreline, and whether to contract with a for-profit company. If the Council decides not to enter into this lease, the City will continue to have the dilemma of how to manage and renovate Building 11.

The acquisition of the Sand Point Naval Station has been both a challenge and an opportunity for the City. A series of planning exercises have resulted in projects for active recreation, habitat, low income housing, and creative use of some of the buildings. The City has invested considerable sums of money into the development of the Park, but some of the most difficult and challenging decisions remain to be made.

**Back to Contents**

---

## THORNTON CREEK AND MEADOWBROOK POND DRAINAGE

On December 3, 2007, the City experienced a severe storm that caused serious flooding situations in several areas of Seattle. Thornton Creek overflowed in several areas, and Meadowbrook Pond was overwhelmed by the volume of water. Between 30 and 50 houses were severely impacted, and Nathan Hale School was flooded and closed for several days.

While this was an unusually large storm event, there have been problems in some areas of this drainage for some time. Kramer Creek, for example, upstream from Nathan Hale and Meadowbrook Pond, has experienced regular flooding events on several occasions in the recent past. Climate change, which appears to be resulting in an increased frequency of severe storms, will likely exacerbate the issues. Development of megahouses and other projects that have large lot coverages have reduced the resiliency of the natural drainage. Residents have also expressed concerns that the drainage infrastructure around Thornton Creek needs additional work, and have suggested that the City was not adequately maintaining the drainage system.

The City must take a series of actions to address these concerns, including:

1. E valuating past maintenance performance, and providing substantive assurance to residents that maintenance will be performed appropriately;
2. E valuating the performance of Meadowbrook Pond to determine whether improvements are needed;
3. Addressing the flooding problems in the Kramer Creek area by designing a project that improves those conditions without simply passing water downstream that could cause problems for downstream properties;
4. E stablishing a community group that will work with Seattle Public Utilities to monitor and advise on improvements to the Thornton Creek drainage systems.

In addition to these immediate actions, the City must address the issues of increasing impervious surface by addressing the issues of megahouses and development regulations that permit excessive lot coverage. Neighbors have identified several such regulatory issues.

The neighborhood and community actors have developed a series of suggestions for process and infrastructure improvements, and these ideas and recommendations must be carefully and thoughtfully reviewed.

Mayor Nickels and Seattle Public Utilities have committed to a plan for improvements which includes many of these recommendations. The Environment, Emergency Management, and Utilities Committee will review this plan and monitor implementation to ensure that action takes place in a timely and thorough manner.

**Back to Contents**

## LOBBY REGISTRATION ORDINANCE

On Monday, March 17, the City Council will consider a proposed lobbyist registration ordinance, introduced by Councilmember Nick Licata and co-sponsored by myself and Councilmembers Tim Burgess, Jean Godden, and Tom Rasmussen. The ordinance is based on national models of best practices in regulating lobbyists. It requires disclosure of activities by persons who are paid to communicate with city council members, legislative department staff, the mayor or the mayor's staff in an attempt to influence any of those individuals to "develop, propose, draft, consider or reconsider, promote, adopt, enact, reject, take favorable action upon, approve, disapprove, veto, or fail to take action upon legislation."

Lobbyists must detail the issues that they are lobbying on, who they are being compensated by, and what compensation they have received. Employers of lobbyists must also file reports of their activities. All organizations, businesses, or individuals are covered, including public entities such as the Port and private nonprofits, as long as they employ lobbyists who are compensated.

The legislation before the Council does not require citizens who lobby the Council without receiving compensation to register. Lobbying, of course, shades into citizen engagement, and the goal of the legislation is not to discourage citizen involvement or to prevent other entities from providing the City with appropriate information or to advocate on issues of concern. The purpose of the legislation is to ensure full disclosure when paid lobbyists are involved in the legislative process, so that citizens, the media, and other interested parties are fully informed and so that the process is as transparent and open as possible. I look forward to Council approval of the legislation.

**Back to Contents**

## QUOTE
"The best way to predict the future is to invent it."

-- *Alan Kay*

## DEEP THOUGHT:
"The only people who never get lost are those who never leave home."

-- *Michael Wallace*

Citizen participation and engagement are critical for maintaining democracy -- fostering it is a key task of elected officials. It's my hope that this newsletter will inform you about issues, inspire you to get involved, and that together we can make things work better in this great city. Please send me your feedback, so we can keep things lively, interesting, and useful.

Richard Conlin
Your Seattle City Councilmember



**Back to Contents**

Back to MAKING IT WORK Newsletters

For technical assistance click here to contact our web team



**Seattle City Hall**
600 4th Ave. 2nd Floor
Seattle, WA

**Mailing Address:**
PO Box 34025
Seattle, WA 98124-4025

Phone: 206.684.8888
Fax: 206.684.8587
TTY/TDD: 206.233.0025
Listen Line: 206.684.8566

Copyright © 1995-2008 City of Seattle                Questions/Complaints | Privacy & Security Policy

# EXHIBIT 10

# SEATTLE.GOV

SEARCH:  [          ] [Go]
● Seattle.gov ○ This Department

## Seattle City Council

🏠 Home | ℹ️ About Us | ✉️ Contact Us

| Council Calendar | Current Issues | Council Newsroom | Committees & Agendas | Council Live | Research City Laws |



### Council President
### Richard Conlin

Position 2

**Email:** Richard Conlin      **Phone:** (206) 684-8805      **Fax:** (206) 684-8587

Conlin Home
About Richard
Committees
Richard's Video 🎥
In the News
Legislation Sponsored by Richard
2008 Work Program
Community Photo Gallery
Newsletter
Newsletter Archives
News Releases
Staff Bios
Council Audio Podcast

## MAKING IT WORK

Seattle City Councilmember Richard Conlin

The purpose of this newsletter is to provide information, inspire involvement, and make things work in this great city. Send feedback to me at conlin@speakeasy.org. Please reference the newsletter in the subject line.

To SUBSCRIBE to MAKING IT WORK
Send a message to Majordomo@lists.speakeasy.org
In the body of the message type "subscribe makingitwork"
To unsubscribe, type "unsubscribe makingitwork" in the message

**February 9, 2006, Volume VIII, Issue 1**

## CONTENTS

- **NEW COUNCIL COMMITTEE ASSIGNMENTS**
- **COUNCIL PRESIDENCY AND NEW COUNCILMEMBER**
- **SUMMER CONCERTS AT GAS WORKS PARK**
- 
- **QUOTE AND DEEP THOUGHT**

## NEW COUNCIL COMMITTEE ASSIGNMENTS

On Monday, January 30, the Council adopted new Committee assignments for the 2006-2007 term. Most Councilmembers had only served two years as Chair of their respective committees, and Council protocol gives members the right to keep a chairmanship for four years. Having been Chair of Transportation for four years, it was most appropriate for me to move to a new Committee.

I was able to create a portfolio that will give me the opportunity to work on a number of very significant issues with a Committee entitled Environment, Emergency Management and Utilities. My committee will deal with issues of regional water resources and endangered species recovery plans; sustainability and the Office of Sustainability and Environment (including the Urban Forest Management Plan, Green Building, and climate change issues); water, drainage, wastewater and solid waste/recycling/waste reduction issues; energy and environmental policies and conservation programs and initiatives; and emergency preparedness, management and response. I will continue to serve on the Urban Development and Planning and the Parks, Education, Libraries, and Labor Committees. I will also Chair a Special Committee on Annexation and continue to be involved in transportation issues through my regional and neighborhood work, particularly on the SR520 Bridge replacement.

Six Councilmembers will continue their Committee Chair assignments: Jean Godden, Energy and Technology, Richard McIver, Finance and Budget, David Della, Parks, Education, Libraries, and Labor, Tom Rasmussen, Housing, Human Services and Health, Nick Licata, Public Safety, Governmental Relations, and Arts, and Peter Steinbrueck, Urban Development and Planning. Councilmember Jan Drago will take over from me as Chair of Transportation, and new Councilmember Sally Clark will Chair Neighborhoods

and Economic Development.

**Back to Contents**

## COUNCIL PRESIDENCY AND NEW COUNCILMEMBER

In early December, I had secured five votes to become the new Council President. However, Councilmember Jim Compton, who had been one of my votes, suddenly resigned, and Councilmembers who had committed themselves to supporting Jean Godden felt themselves bound to keep voting for her until she released them. This left us in a 4-4 deadlock until the new Councilmember would be selected.

Recognizing that this would be a very awkward position for a new Councilmember, on Monday, January 23rd, I chose to withdraw my candidacy, and endorsed Nick Licata. Councilmember Godden then also agreed to withdraw, and Councilmember Licata was elected that day as President for the next two years.

The Council selected Sally Clark as our new colleague on Friday, January 27. Councilmember Clark brings a strong commitment to neighborhoods, experience with the Council as a former aide to Councilmember Tina Podlodowski, and great talent, intelligence, and energy. The Council received 98 applications for the vacancy, and took three weeks of open and transparent public process to come to a decision. After publicly selecting 14 semi-finalists, the Council conducted televised hour-long interviews with each, and then narrowed the field to 6 finalists. When Councilmembers were asked to rank their top three choices, Sally Clark was the only candidate named by all eight Councilmembers. Ultimately she was selected by a 6 to 2 vote.

In choosing candidates to vote for, I used these criteria:

1. Commitment to Seattle values and involvement in a range of civic activities.
2. Cu ltural competence and experience in working with diverse communities.
3. Demon strated ability to work collegially in a small group setting.
4. K nowledge and engagement in a variety of issues, with special emphasis on key city concerns.
5. Abili ty to thoughtfully assess alternatives, discuss options, and manage challenging problems and issues.
6. Commitment to involvement with City government and clear enthusiasm for engaging in intense discussion and exchange of perspectives.

Choosing from among the many talented people was a challenging task. I ultimately voted for Sally Clark, Darryl Smith, Venus Velasquez, Stella Chao, and Sharon Maeda as finalists, with Stella Chao and Sally Clark as my top choices.

**Back to Contents**

## SUMMER CONCERTS AT GAS WORKS PARK

On Monday, January 30, the Council agreed to allow the Parks Department to proceed with arrangements to host the Concerts on the Pier series at Gas Works Park. The Council required Parks and One Reel, the sponsor of the concerts, to work with the affected community to develop a working agreement that will: -- Ensure that sound levels are mitigated;
-- Manage traffic within one mile of the concert site to minimize its impact on the community, and encourage concertgoers to use public transportation;
-- Manage parking so that adequate parking is still available for residents and businesses;
-- Restore the Park to its original condition at the end of each concert season;
-- Minimize the presence of equipment and structures;
-- Protect the existing soil remediation project.

The Council also required an annual evaluation of the series and that a new venue be selected after the 2008 season. The Parks Department has also reoriented the concert venue to ensure that access remains open to areas of the Park that were of greatest concern to community members.

I very much regret that there was conflict between One Reel, a nonprofit organization with a strong record of community involvement, and members of the Wallingford

community over this proposal. The Parks Department did not approach the community in a timely fashion. The community should have been worked with much earlier, before a decision had been made, and had the opportunity to review the proposal and work with Parks to address issues like parking and noise impacts. I believe that many of the concerns could have been mitigated, and that the path towards an agreement would have been smoother.

The South Lake Union community, which was originally skeptical of the move to South Lake Union Park when the downtown pier location had to be closed for renovation, wound up enthusiastically supporting the concerts after the first few demonstrated the effectiveness of the management plan. It is regrettable that development plans for South Lake Union Park required moving the series again after only one year.

The Summer Nights concerts are enjoyed by thousands of Seattle families, and I hope that ultimately most people in Wallingford will find that their presence enhances the neighborhood. Arts events are very appropriate uses of Parks, but must meet reasonable standards for noise, parking, and traffic impacts. I will continue to monitor the work of the Parks Department in ensuring that these issues are addressed.

**Back to Contents**

## SONICS AND KEY ARENA

Over the next few months, the City Council must decide about a proposed major renovation of Key Arena under pressure from the professional basketball teams. The Sonics and Storm are an important part of the Seattle sports scene, and I regret that they are threatening to leave Seattle if they do not get their way on Key Arena. The Arena was renovated to the Sonics specifications in 1995, and performed well until 2001. Since then, for reasons on which the interested parties do not agree, the Arena has not delivered the expected revenues, and the City has had to pay millions of dollars out of the General Fund to cover the debt service on the improvements.

The Sonics have proposed a package of some $220 million in modifications to the Key Arena that they argue are necessary. They propose that the taxpayers fund these improvements and turn over the management of the Key Arena to the Sonics. While some of the improvements will improve the field area and seating capacity of Key Arena, much of the proposal is designed to improve the concessions areas to create what will be in effect a shopping mall.

While I certainly wish the team well, I am concerned that the taxpayers will not receive a return on their investment if this plan is implemented. I am also concerned that turning over the facility's operations and revenues to the Sonics will further erode the City's finances, and that creating this expanded business area will cut into the revenues of other businesses in the Uptown community.

An analysis of Key Arena finances indicates that it can operate at a profit with concerts and other sports events without the Sonics, although under the current financial arrangement Key Arena will be more profitable with them. I am willing to discuss renovations and improvements that will improve the bottom line for the City and taxpayers, but I will not support any renovation that is not designed to provide a return on investment to the taxpayer. My impression is that there may be some modest improvements that meet this standard, but that the proposed $220 million package is likely to fail this test.

The Council is currently evaluating the City's options on the Key Arena, and will make a recommendation sometime in April as to a formal City position.

**Back to Contents**

## QUOTE
"It is not your obligation to complete your work, but you are not at liberty to quit."

-- *The Talmud*

## DEEP THOUGHT:
"It may take a village to raise a child, but history also keeps telling us it takes a village to

burn a witch."

-- *Laura Miller*

Citizen participation and engagement are critical for maintaining democracy -- fostering it is a key task of elected officials. It's my hope that this newsletter will inform you about issues, inspire you to get involved, and that together we can make things work better in this great city. Please send me your feedback, so we can keep things lively, interesting, and useful. And please forward it along to friends who might be interested. You can get more information or send me feedback through the City Council website at http://cityofseattle.net/council/

Richard Conlin
Your Seattle City Councilmember

To subscribe to this list, send a message to: Majordomo@lists.speakeasy.org
In the body of the message, type: subscribe makingitwork
To unsubscribe, send a message to: Majordomo@lists.speakeasy.org
In the body of the message, type: unsubscribe makingitwork

**Back to Contents**

Back to MAKING IT WORK Newsletters

For technical assistance click here to contact our web team
Council Home | About Us | Contact Us | News Releases | Legislation | Issues | Committees & Agenda | Calendar

| **Seattle City Hall** | **Mailing Address:** | Phone: 206.684.8888 |
| 600 4th Ave. 2nd Floor | PO Box 34025 | Fax: 206.684.8587 |
| Seattle, WA | Seattle, WA 98124-4025 | TTY/TDD: 206.233.0025 |
| | | Listen Line: 206.684.8566 |

**Seattle.gov: Services** | **Departments** | **Staff Directory** | **Mayor** | **City Council**

Copyright © 1995-2008 City of Seattle

Questions/Complaints | Privacy & Security Policy

**EXHIBIT 11**

| Witness: | Nick Licata, Councilmember, City of Seattle, Washington State |
|---|---|
| Committee: | Subcommittee on Domestic Policy, Committee on Oversight and Government Reform |
| HEARING: | State of Urban America |
| DATE & TIME: | Thursday, March 29, 2007 @ 10:00AM |

Thank you, Chairman Kucinich, Ranking Member Issa, and members of the Domestic Policy Subcommittee for the opportunity to speak with you today. I am Nick Licata, a Seattle City Councilmember. For the past 12 years, I have been at the heart of Seattle's debate about the use of public financing for professional sport stadiums.

In 1995, before I was elected to the City Council, and while I was still an insurance broker, I co-founded Citizens for More Important Things, along with two other businessmen, Chris Van Dyk and Mark Baerwaldt. This group fought the use of taxes to construct three stadiums for professional sports organizations over the past dozen years. Since becoming a City Councilmember I have continued to be involved in this issue.

Appendix 1 provides a chronology of the efforts to secure public funding for these facilities in Seattle. It is a pattern that has been repeated across the nation, where perfectly useable facilities are declared too shabby for the home team. If they are not replaced with a more expensive facility, it's adios amigo to the home fans. Consider our experience with three different professional sport teams.

Seattle rebuilt our Seattle Coliseum in 1995 to the specifications of Seattle's professional basketball team, the Supersonics, creating the state-of-the-art NBA Key Arena at a cost of $75 million in public money. The sale of luxury boxes was to pay off the construction bonds. When the team could not sell enough of them, the city had to pick up the tab. Nine years later, after the City had paid millions annually and with over half the public debt still outstanding, the team said that the facility was outdated and it could not be profitable unless the public invested over $200 million for a new facility. When thy got the cold shoulder from political leaders and the public, the Sonics were sold for an estimated $80 million profit to a new owner, who now wants the public to contribute more than $400 million for an even bigger facility, this time in a suburban area.

In 1995, while the City was remodeling our Coliseum for the Supersonics, our professional baseball team, the Mariners, declared that their venue, the 18 year old Kingdome, was obsolete for baseball, and threatened to leave Seattle, if they were not provided with a new stadium with a retractable roof, at a cost to the public of over $300 million. The previous year the County had spent $73 million repairing the Kingdome's leaky roof. A few weeks after local voters rejected a sales tax increase to pay for the new Mariners stadium, the State Legislature met in an emergency session, to approve a tax package that eventually built it, despite voter's wishes.

EXHIBIT 529 DATE 4/30/08
WITNESS Licata
BRIGID DONOVAN 206-323-0919

PBC_08101

The Seattle Seahawks, seeing how successful the Mariners were, demanded significant remodeling of the Kingdome for football in 1997, threatening to move to California if they did not get it. Before they could move, Microsoft Co-founder Paul Allen purchased the team, subject to public approval of a $300 million public funding package. He spent $7 million on the election, outspending opposition 21 to 1, and won by approximately 00.2 percent. The Kingdome was then imploded, with about $100 million in debt still unpaid.

What does this pattern reveal? It says just what our City Staff discovered when reviewing the life of professional sport facilities around the nation. "When public money is used, professional sport facilities are remodeled every six years." Why, because public money is readily available and free to the teams. They have little reason to conserve it.

Where does this money come from? Proponents have argued that these taxes are insignificant since they are on restaurant meals, hotel rooms, car rentals, and other retail purchases. This mixture of revenue streams does mount up. If pending state legislation passes for the new Sonics basketball arena, and a speedway that NASCAR has requested, our City, County and State governments will have contributed a breathtaking $2.3 billion over the past dozen years for new professional sports venues.

This money could have gone to provide public benefits or public facilities with a broader, more important use. For instance, City admission taxes used to fund such services as police and social services; there are County service taxes which could go to hundreds of local community groups to support economic development; and finally there are State retail sales taxes that normally fund education throughout the state. And while our state does not have an income tax, there are 45 states that do, and issuing tax exempt bonds for building professional sport facilities deprives those states and the federal government revenue to provide these same basic services.

What about the benefits from these facilities? I'm no economist, but what I have seen in Seattle, and in other cities that I have visited in my capacity as a member of the National League of Cities, has not revealed any lasting advantage of subsidizing huge stadiums or arenas. While some retail businesses do more business on game nights, overall there is meager visible evidence that new stadiums improve urban living or increase retail shopping in their vicinity. Our own Seattle experience, as evidenced in Appendix 2, shows that certain crimes increased around the two new stadiums from what they had been previously in that same neighborhood, contributing to increased public safety costs.

Our city had an economic down-turn after the two new stadiums were built. This was a national recession, but there was no sign that the stadiums softened its impact. If anything, they denied us revenue that could have avoided cutting city services.

Municipalities need to provide more important pubic services than building half-billion dollar multi-hundred sports venues whose primary purpose is not the enjoyment of sports games but producing profits for team owners and huge salaries for players. The Federal Government can stop this trend by using its regulatory authority. I urge you to do so.

PBC_08102

| Witness: | **Nick Licata, Councilmember, City of Seattle, Washington State** |
|---|---|
| Committee: | United States House of Representatives<br>Subcommittee on Domestic Policy,<br>Committee on Oversight and Government Reform |
| HEARING: | State of Urban America |
| DATE & TIME: | Thursday, March 29, 2007 @ 10:00AM |
| LOCATION: | Rayburn House Office Building, Room 2247 |

## Appendix I– Seattle's History with financing stadiums

1994   The Seattle Coliseum is rebuilt to the specifications of the Seattle Supersonics, at a cost of approximately $100 million, and is specifically designed to exclude hockey. Naming rights are sold, and the facility becomes "KeyArena". Bonds are to be paid from revenue generated from luxury box leases. (As of 2003, luxury box proceeds no longer cover bond payments. Approximately $7 million annually is now paid by the City of Seattle. Outstanding debt is about $44 million.)

1994   The Kingdome, built for about $52 million, gets a leaky roof. $73 million is spent repairing it. One reason for extraordinary cost is an accelerated schedule, to minimize Seahawks' having to play outdoors at Husky Stadium.

1995   The Seattle Mariners declare the 18 year old Kingdome obsolete for baseball, and threaten to leave Seattle, if they are not provided with a new stadium with a retractable roof, largely at public expense. Voters reject a sales tax increase by 1,065 votes, out of approximately 350,000 cast. Proponents spend $1 million, opponents about $20,000. Shortly after, concurrent with the Mariners being in the playoffs for the first time in their seventeen year history, a special session of the Washington State Legislature is convened. Taxes on restaurants, hotels/motels, rental cars and a general sales tax credit are implemented to fund a Public Facilities District, for the sole purpose of constructing a stadium for the Mariners, despite Washington State constitutional prohibitions against the lending of public credit for private purposes.

1996   Legal challenges to Mariners funding on constitutional and other grounds are filed.

1997   Citizens for More Important Things files King County Initiative 16, which would have prohibited the issuance of the Mariners stadium bonds without another public vote. The Courts throw it out, along with all other legal challenges to stadium funding.

1997   The Seattle Seahawks demand significant remodeling of the Kingdome for football. When demands are not met, they move to Southern California. Microsoft Co-founder Paul Allen is persuaded by local lawmakers to purchase the team. He does, subject to public approval of a $400 million outdoor football stadium, with $300 million in public funding and $100 million in private funding. A special statewide vote is held at his expense. Voters narrowly approve, by about 34,000 out of 2.5 million votes cast. Paul Allen spends $7 million promoting; opponents $350,000.

2000   The Kingdome is imploded with approximately $100 million in debt outstanding.

PBC_08099

| | | | |
|---|---|---|---|
| 2004 | The Seattle Sonics declare KeyArena obsolete for basketball, and demand $200 million for a significant remodeling. | | |
| 2005 | The Washington State Legislature declines to act on Sonics request. | | |
| 2006 | The Washington State Legislature, a second time, declines to act on Sonics request despite Sonics threat to leave town. | | |
| 2006 | Starbucks Coffee Chairman Howard Schultz sells the Sonics to a group from Oklahoma City led by media and entertainment investment magnate Clayton Bennett. | | |
| 2006 | Seattle voters in November approve Initiative 91, sponsored by Citizens for More Important Things, and largely underwritten by SEIU Local 775, with 75%, effectively barring the City of Seattle from subsidizing or being a conduit to subsidize professional sports organizations. | | |
| 2006 | NASCAR requests $135 million in tax subsidy for speedway construction in suburban Kitsap County, Washington. | | |
| 2006 | Peter Hart poll shows 80% public opposition in Washington State to NASCAR and 77% opposition to Sonics tax subsidies. | | |
| 2007 | Sonics declare intent to move to Renton, a suburb of Seattle, demanding $300 million in state & King County subsidies, and $100 million from the City of Renton, and threaten again to leave for Oklahoma if denied. The new facility is also promoted as, unlike KeyArena, able to host the National Hockey League. | | |

The Sonics & NASCAR tax subsidy bills are pending before the Washington State Legislature.

## Appendix II – Select Seattle Police Department Crime Statistics 'Before' and 'After' Stadiums Open

| *Stadium* | *Before* | *After* | *% Change* |
|---|---|---|---|
| Safeco Field | 7/1/98-6/30/99 | 7/1/99-6/30/00 | |
| | | | |
| Auto theft | 49 | 87 | + 77% |
| Detox | 46 | 71 | + 54% |
| Prowler, Trespass | 29 | 40 | + 38% |
| | | | |
| Qwest Field | 8/1/00-7/31/02 | 8/1/02-7/30/04 | |
| | | | |
| Auto theft | 466 | 497 | + 7% |
| Detox | 407 | 1,267 | + 311% |
| Prowler, Trespass | 177 | 222 | + 25% |

PBC_08100

# EXHIBIT 12

## Seattle City Council

🏠 Home | ℹ About Us | ✉ Contact Us

Council Calendar | Current Issues | Council Newsroom | Committees & Agendas | Council Live | Research City Laws

## Councilmember Nick Licata

Position 6

**Email:** Nick Licata    **Phone:** (206) 684-8803    **Fax:** (206) 684-8587

Licata Home
Bios
Committees
Nick's Video 🎬
Nick's Issues:
Urban Politics
Critical Crossings
Nick's Legislation
In the News
Nick's Links
News Releases
Pedestrian Master Plan
Advisory Committee
Image Gallery
Poet Populist
Words' Worth Poetry
Council Audio Podcast

# Urban Politics

**Issue #217 • 7/28/2006**
**SONICS SOLD, NOW WHAT?**

Past Issues
Subscribe/Unsubscribe

**By City Councilmember Nick Licata.**

**Urban Politics (UP) blends my insights and information on current public policy developments and personal experiences with the intent of helping citizens shape Seattle's future.**

The Sonics sale to an out-of-state business group caused a huge flurry in the media and the public. However, the question remains as to whether the Sonics will move now that the new owners are from Oklahoma City and that city built a new arena for the purpose of securing a NBA team. Their arena is currently occupied by the NBA team The Hornets. However they are officially based in New Orleans and are expected to return to their home town possibly as soon as the end of the next season. That would leave Oklahoma City without a NBA tenant.

The new Sonic ownership group is headed by Clayton Bennett, who is a major business and civic leader in Oklahoma City and is credited in the media for getting the Hornets to locate there. He has said that he wants to keep the Sonics in Seattle, provided that that can get a new world-class arena; a very similar request that the former ownership group, headed by Howard Shultz, had made to the City and State.

I have been saying for months that I would like to see the Sonics stay in Seattle, but not at a cost of over $200 million. And while economists have said that if the Sonics move the financial impact on our region would be negligible, there is no doubt that my glib, foolish remark several months ago on the relative unimportance of professional basketball in Seattle was smug and wrong. In my clumsy way I was trying to point out that Seattle is a world-class cultural city for a variety of reasons, not just because of the Sonics.

Public leaders need to ask the right questions, and then listen to the answers instead of providing good press copy. As an elected official, it is my job to weigh competing interests and decide what is the best use of tax payer dollars. Let me give you some background on this issue.

In 1995, after a City Council vote, the former Coliseum was rebuilt into KeyArena at the request of the Sonics. That same year, the voters of King County narrowly voted down a baseball stadium. The State Legislature and the King County Council overturned that decision. In 1997, state voters narrowly passed a measure for a football stadium.

Partly as a result of voter anger at the baseball stadium vote being overturned, state voters then passed a series of anti-tax initiatives that constrained the ability of local governments to pay for basic services. This forced cuts in services, and has had a lasting impact. Some governments, such as King County, have had to eliminate entire lines of business, such as providing swimming pools and park construction.

Right now the Seattle City Council is considering a tax levy proposal from Mayor Greg Nickels

to provide funding for road and bridge maintenance. This is needed because a principal funding source for this basic, core service was removed by an anti-tax measure. One goal of anti-tax measures was to force local governments to put measures on the ballot for voters to decide what they want government to do, so this is in line with the intent expressed by the voters. That is why I believe it is fair for the City Council to insist on a public vote for any tax proposal for a new basketball arena.

These initiatives have forced elected officials to carefully choose what items to fund. For this reason, the Council crafted a set of reasonable conditions for negotiations, and the Mayor's office began discussions with the Sonics former ownership.

The economic model for professional basketball includes a reliance on public subsidies, The level of subsidy required for a NBA franchise has increased considerably in recent years. The Sonics consider the 1995 version of KeyArena obsolete, only 11 years after its construction. This is not an isolated case: Memphis built a new arena in 1991, and then again in 2004. The economic lifespan of NBA arenas is decreasing and the amount of public subsidy-formerly a small portion-is now expected to be the overwhelming majority. This is the economic model of the NBA nowadays.

Keep in mind, the bonds used to finance construction of KeyArena will not be paid off until 2014, four years after the Sonics lease expires, leaving the City still owing over $25 million on them.

The current business model of the NBA depends not only on public subsidies, but on generating revenues from arenas that are much large than KeyArena, in order to generate revenue from restaurants and shops. They want all the revenue the arena can generate, including from concerts, which are more profitable than Sonics games. NBA arenas are becoming as much malls as sports arenas. That is why KeyArena is considered obsolete, not because of any structural defects, or lack of good sightlines. For example the KeyArena business plan notes, it was rated "Best Venue in the NBA" in 2004, and has won Facilities and Event Management's "Prime Site" award three times since opening.

The question is, how much is enough? The proposal for a $220 million KeyArena remodel, when including the remaining debt, and financed at 6% interest, would cost the public an annual $40 million tax subsidy for 15 years.

I developed a proposal that would have provided $8-10 million in new annual revenues for the Sonics. The Mayor of Seattle proposed three options to the Sonics. One of the options would have provided a $20 million annual increase in revenues for the Sonics. The Sonics former owners did not respond to any of the offers, and instead sold the team for $350 million; they had purchased it 5 years ago for $200 million. This was their business choice; they chose to take their profits by selling the team, rather than accepting one of our offers and submitting it to the public for a vote.

The city and the public will now have to wait to see if the new owners are willing to keep the team in Seattle without expecting a huge public subsidy. I hope they do, but that is their decision to make.

**Return to Top**

**Urban Politics Subscription Information:**

- To **Subscribe**, send a message to urbanpolitics-subscribe@speakeasy.org
- To **Unsubscribe**, send a message to urbanpolitics-unsubscribe@speakeasy.org

  You do not need to include a message in the body of the email.

**Council Member e-mail adresses:**
- sally.clark.@seattle.gov
- richard.conlin@seattle.gov
- david.della@seattle.gov
- nick.licata@seattle.gov
- richard.mciver@seattle.gov
- tom.rasmussen@seattle.gov

- jan.drago@seattle.gov
- jean.godden@seattle.gov
- peter.steinbrueck@seattle.gov

To contact the **Mayor's Office** go to the following website:
http://www.seattle.gov/mayor/citizen_response.htm

For technical assistance click here to contact our web team



Council Home | About Us | Contact Us | News Releases | Legislation | Issues | Committees & Agenda | Calendar

**Seattle City Hall**
600 4th Ave. 2nd Floor
Seattle, WA

**Mailing Address:**
PO Box 34025
Seattle, WA 98124-4025

Phone: 206.684.8888
Fax: 206.684.8587
TTY/TDD: 206.233.0025
Listen Line: 206.684.8566

Seattle.gov: Services | Departments | Staff Directory | Mayor | City Council

Copyright © 1995-2008 City of Seattle

Questions/Complaints | Privacy & Security Policy

# EXHIBIT 13

1

2

3

4

5

6    ------------------------------------------------------------

7

8              MAYOR NICKEL'S PRESS CONFERENCE

9                          regarding

10          KEY ARENA IMPROVEMENT PROPOSAL

11             THURSDAY, MARCH 6, 2008

12

13   ------------------------------------------------------------

14

15          Verbatim Transcript of Recording

16

17

18

19

20

21

22

23

24   Transcribed by:  Marjorie Jackson, CETD

25                    Notary Public

1                          March 6, 2008

2                               -o0o-

3

4          MAYOR NICKELS:   Good afternoon, and welcome.

5     There has been a lot of talk lately about the future of

6     the Key Arena and the Seattle Supersonics and their

7     future here in our city.  We're here today to shed some

8     light on the issue and bring some hope as well to the

9     issue.  I would like to begin by confirming reports that

10    were in the paper this morning that there is, in fact, a

11    new local group that is willing to work with us in

12    securing the future of Key Arena and the Seattle

13    Supersonics.

14          One of the members of that potential ownership

15    group, Matt Griffin, is with us here this afternoon.

16    The other partners include Steve Ballmer, John Stanton

17    and Jim Sinegal.  I want to thank each of them for being

18    willing to step forward to this important opportunity.

19    I look forward to working with them in the weeks and

20    months ahead on a plan that will serve both the public

21    and the fans of professional basketball.

22          This is a critical moment for the Seattle

23    Center and for the Key Arena.  The Key is much more than

24    a basketball arena.  It's where people come together in

25    our community to enjoy more than a hundred musical,

1   cultural, entertainment and civic events each and every

2   year.  For more than 45 years it's been the anchor for

3   the Seattle Center, and generations of families share

4   great memories of this building.  It is not a throw-away

5   facility.

6           My goal has always been to keep Key Arena a

7   place where the public can enjoy a wide variety of

8   events that bring us together as a city and as a region.

9   But what we have lacked has been a group of investors,

10  local investors, committed to being an equal partner in

11  achieving this goal.  I am glad to say that we have

12  found that missing ingredient.

13          The proposal that we have put before the

14  legislature in Olympia is a strong package of

15  improvements that will ensure Key Arena's future without

16  requiring any new taxes.  Most importantly, it will be

17  divided equally between public and private investments.

18  It's what you call a partnership.

19          It's a good deal for the people of Seattle.  We

20  own this landmark building, this icon from the World's

21  Fair of 1962, and we will be required to make

22  significant investment in it, regardless of whether it

23  remains a home for professional basketball.

24          This proposal ensures that our public

25  investments will directly benefit the public.  This

1   would be a good deal for Washington state, which would

2   see more than $20 million returned through sales taxes

3   on the construction alone.

4           And this would be a good deal for the NBA,

5   which would continue to count the vibrant Seattle market

6   amongst the great basketball cities in our country.

7           Here's how it would work:

8           The private investment group would provide $150

9   million to make improvements that directly benefit the

10  team, including club seating, suites, practice

11  facilities and other upgrades.

12          The $150 million public investment would

13  benefit the common areas of the building, including such

14  things as widening the concourses, upgrading heating and

15  plumbing, improving concession stands and rest rooms,

16  amongst others.  These are critical investments in this

17  landmark building.  It would not only keep Key Arena in

18  good working order, it would keep it the most vibrant

19  and best venue in the Northwest for music,

20  entertainment, as well as professional basketball, and,

21  soon, we hope Division One basketball when it returns to

22  Seattle University.

23          The public investment would come from two

24  sources.  The state legislature would allocate $75

25  million from current taxes on restaurants, bars and

1    rental cars in King County.  This would not require

2    extending the taxes which expire in 2016.  It would use

3    a portion of the money generated from these sources

4    after Safeco Field bonds are paid off.  And it would

5    require approval from the King County Council.

6             The remaining $75 million would come from the

7    city, offset by leases, admissions taxes, sales taxes on

8    construction and other revenue generated in and around

9    Key Arena.

10            I would like to stress that all of this is

11   contingent on this ownership group's ability to purchase

12   the Seattle Supersonics or another NBA team.

13            This effort also does not affect our lawsuit

14   against the current ownership.  We attempt to hold them

15   to the terms of their lease with the city.  But what it

16   does do, is it opens a window of opportunity for the

17   Seattle Center and for the Key Arena.  We are going to

18   work hard in the coming days to make sure that the Key

19   Arena remains a vibrant and exciting venue for people to

20   enjoy, for everyone in this region to enjoy.

21            Last year I announced that we were going to

22   vigorously fight to maintain our rights under the lease

23   that had been signed years ago by the Seattle

24   Supersonics.  And we chose a person to represent us in

25   that who has great experience in this area, as Attorney

1    General of Washington state, and in other roles more

2    recently.

3         I would like to ask Senator Slade Gorton to

4    talk a little bit about what this partnership means and

5    what this means for the future of the Seattle Sonics.

6         Senator?

7         SENATOR GORTON:  I want to make three points.

8         The first point is that this is an opportunity

9    for right now, this week and next week, not for next

10   year.  Why?  Because next month the relocation committee

11   of the National Basketball Association is going to vote

12   on Clay Bennett's desire to move the team to Oklahoma

13   City.  Without an alternative from the City of Seattle,

14   that relocation application is almost certain to be

15   granted.

16        Now, it will be granted subject to our lawsuit,

17   but that lawsuit will come to trial very, very shortly

18   after that meeting and, at the very best, will provide a

19   two-year delay to that move.  Unringing that bell next

20   year will be somewhere between very, very difficult and

21   almost impossible.  We have a wonderful opportunity that

22   we have to take today.

23        In fact, reaching this offer, accepting this

24   offer will greatly buttress our lawsuit because one of

25   the principal defenses on the Bennett part is that the

1    community doesn't care and doesn't have an alternative.

2    If we do have an alternative, we will be -- we will be

3    better off.

4            The second point I would like to make for

5    everyone, for the general public and for the

6    legislators, is that there are three huge differences

7    between what is before the legislature right now and

8    what was rightly rejected last May and last June.  Then,

9    the demand was a brand-new arena at a cost of $500

10   million.  Now, we have the opportunity to renew and

11   refurbish and make, for all practical purposes,

12   brand-new an arena we already have a major asset to the

13   City of Seattle.

14           That's number one.

15           Number two is:  At most, the offer of private

16   contributions last year was 20 percent.  And earlier

17   than that, it was a mere $18 million by the Schultz

18   Group for Key Arena.  This is the extraordinarily

19   generous offer of $150 million as a private gift, half

20   of what it will cost to make Key Arena into a

21   magnificent facility.

22           And the third difference from last year is that

23   these are our folks.  These are people from here in

24   Seattle who are committed to our community and will

25   continue to be committed to that community.

1          Those are immense differences.

2          And the third point I would like to make is

3    that, personally, just as a volunteer, I got involved in

4    this early last summer, after the Bennett proposal

5    obviously had failed, but it really started to move when

6    Mayor Nickels called and asked me and my firm to see to

7    it that we enforced the present lease.

8          It was after that, on parallel tracks, that

9    this wonderful group of four civic-minded citizens came

10   together to come up with this proposal.  And we work and

11   have worked hand-in-glove with the City from the

12   beginning to the end of this process, but I can say that

13   we would not be here before you today with this great

14   offer were it not for the leadership and the courage of

15   the Mayor of the City of Seattle.

16         He's had a lot of cooperation from others.  I'm

17   delighted at much of the reception that we have gotten

18   in the City Council and in the County Council and in

19   Olympia itself.  But, for me, this particular

20   partnership has been a great privilege, and I look

21   forward to its being an entire success.

22         MAYOR NICKELS:  Thank you, Senator.  The

23   Seattle City Council is an independent body, independent

24   legislative body.  They have their strong opinions on

25   many issues, including this one.  I am joined -- I'm

1    very pleased -- by three members of that council,

2    Councilmember Bruce Harrell, Councilmember Jan Drago,

3    Councilmember Richard McIver.

4         Councilmember McIver is going to talk for a

5    moment about the City Council and its feeling about Key

6    Arena as an important part of the Seattle Center and

7    this particular partnership as an opportunity to improve

8    and sustain that facility and that institution.

9         Councilman?

10        COUNCILMEMBER McIVER:  Thank you, Mayor

11   Nickels.  I am here purely selfishly to say we want NBA

12   basketball.  We want it to stay here; it's been here;

13   and we want to do everything we can to keep it here.

14   Alls we want to do is have a reasonable group work with

15   us in some sort of public and private partnership that

16   we can make some sense out of.  We're willing to look at

17   everything.  This one can work.  We're here to make it

18   work, and we'll keep working to keep the Sonics here

19   along with the Storm.

20        Thank you.

21        MAYOR NICKELS:  Thank you, Councilmember.

22        And I mentioned earlier that the State's action

23   would essentially authorize King County and the King

24   County Council to allocate funds that are now going to

25   the payment of Safeco Field bonds to this purpose of

1    preserving and upgrading Key Arena.  That will require

2    the approval of another very independent legislative

3    body, that's the King County Council.  And it would

4    require, in fact, I think the amendment of Ordinance

5    12000, the prime sponsor of whom is standing before you

6    today, Greg Nickels.  And I am happy to have that

7    legislation amended.

8           And I have asked my longtime colleague and

9    friend, someone who is passionate about the Seattle

10   Center -- it's the heart of his council district -- and

11   also someone who's passionate about the arts and the

12   cultural life in our community, Councilmember Larry

13   Phillips, to talk about the importance of this

14   development.

15          COUNCILMEMBER PHILLIPS:  Well, Mr. Mayor, thank

16   you very much for the opportunity to be here today and

17   to talk a little bit about the proposal and, of course,

18   the role of the King County Council.  I want to express

19   my deep appreciation for your leadership on this issue

20   to find a way to help keep the Seattle Sonics here and

21   playing in town and at the Key Arena, and also to the

22   new ownership group who is stepping forward to not only

23   buy the Sonics, if that's a possibility, but also move

24   to help us with the public funding of this really

25   wonderful facility.

1          The Mayor is quite correct.  I am quite

2     passionate about Seattle Center.  It's because -- not

3     only it's a part of my district, at the heart of my

4     district and it supports so many wonderful public

5     endeavors, but I actually grew up in and around the

6     Seattle Center.  My family has a long history with the

7     Center.  I won't go into that.

8          But, in addition to my support for what goes on

9     there, I am one of the few, I think, elected officials

10    in the area that's actually had an opportunity to play

11    at the Key Arena as a hoopster.  I think Jay Inslee may

12    actually be the only other one, and that's another story

13    which we'll talk about another time.

14         But it's a fabulous facility with a great

15    tradition, a great history, and it deserves our support,

16    especially under the terms of the agreement as it's been

17    laid out for me, the outline that I have seen.  It's the

18    best proposal I think that this community has seen in a

19    long time.  I know -- I think I can speak with some

20    authority on the stadium issues.  It's the kind of

21    proposal that would not be rejected out of hand by the

22    County Council, as other previous proposals have been

23    and Senator Gorton alluded to.

24         I look very much forward to seeing this

25    legislation move through the legislature with our

1    legislative leadership concurring, and has expressed its

2    support to the Governor so that this might have an

3    opportunity before the end of the session next week.

4            This is a very important opportunity for us to

5    form a public-private partnership where there is a

6    division for where the monies go, and that we are able

7    to use the public monies to provide the support for

8    public amenities for all tenants and all those who come

9    to use the facility, not just the sports teams.

10           So with that, I look forward to the opportunity

11   to see this legislation come to the King County Council

12   and work with the Mayor and others to look at the fine

13   points and how we make sure that this is in the best

14   interests of the public and the protection of the

15   taxpayer.

16           Thank you.

17           MAYOR NICKELS:  Thanks, Larry.

18           We're happy to answer any questions.  Mr.

19   Griffin is here, as I said, representing the local

20   investors and potential ownership group.  He is not

21   either a current or recovering politician so he doesn't

22   have prepared remarks, but he would be happy to answer

23   questions, as the rest of us would as well.

24           PRESS MEMBER:  We're hearing from the

25   legislature that this is not going to happen, they're

1    not going to listen to this deal.

2            What do you have to say to that?

3            MAYOR NICKELS:  Well, if we took "no" for an

4    answer, we wouldn't be here today.  We are very intent

5    on making sure that the Key Arena remains a vibrant

6    place for Seattle citizens and people of the region to

7    be able to come and enjoy a wide variety of activities,

8    and we believe that should include professional

9    basketball as a centerpiece of the Key Arena.

10            So we're going to press our case.  We have had

11    the opportunity to talk with the legislative leadership

12    and the Governor about this.  This particular

13    announcement we think is a game changer.  We think the

14    fact that local investors are willing to step up with

15    the first 50 percent of the money to get this job done,

16    as well as the incredible investment they're going to

17    make in buying the team to begin with, changes the game.

18    It is a very different proposition than we have been

19    talking about for the last several months with

20    legislative leadership.  So none of these ideas is a

21    surprise, except the delightful surprise that there is a

22    local group willing to step forward and put money on the

23    table to make this happen.

24            PRESS MEMBER:  Is this the last chance?  I

25    mean, if this doesn't work and the legislature doesn't

1   want to hear this, is this the --

2            MAYOR NICKELS:  This is a remarkable window of

3   opportunity.  It is one that we cannot pass up.  As

4   Senator Gorton said and will gladly say again, once the

5   NBA makes the decision that this team can move to

6   another city, the rules change pretty dramatically.

7   This is a window of opportunity we should not let go by.

8            Yes, go ahead.

9            SENATOR GORTON:  If I can just say one thing.

10  I do want to emphasize what I told you before:  We're

11  never going to say never, but this is an opportunity for

12  now.  A number of legislators who are quite sympathetic

13  say, well, you know, we think we can take care of this

14  next year.

15           But by next year, the league will have made its

16  decision.  That will take place in April.  By next year,

17  the trial will be over.  Maybe if we're successful --

18  and I trust that we will be -- they may be required to

19  stay here for two years, but nothing in our lawsuit will

20  require them to stay here after that.  And so now we

21  have an opportunity.

22           I want the ability, with representatives of the

23  City, to go back to New York City and tell the NBA,

24  before they make this decision, "We've got a place and

25  we've got the people and we've got a much better city in

1    which to play basketball."

2            But I can only do that if the legislature gives

3    us this authorization now.

4            PRESS MEMBER:  Yeah, but you're only giving

5    them six days, right?

6            MAYOR NICKELS:  That isn't really very fair.

7    We have had conversations with the legislative

8    leadership for months.  In this room, in December, as a

9    matter of fact.  So nothing is new except the fact that

10   50 percent of the cost of the renovation is being put on

11   the table by the private investors.

12           PRESS MEMBER:  Why did that offer take, you

13   know, so long to materialize, given that this situation

14   has been headed this way for a long time?  Maybe Matt

15   Griffin, you want to answer that, or Mayor Nickels.

16   It's only $150 million --

17           (General laughter is heard.)

18           MR. GRIFFIN:  And I've got it here.

19           MAYOR NICKELS:  Matt, why don't you come up

20   here to the...

21           MR. GRIFFIN:  In our earlier discussions with

22   the City, we talked about a partnership at that time.  I

23   will admit that early on we expected that our share

24   might be $75 million.  It's been in the last couple of

25   weeks that we realize the importance of having this move

1    forward this year and basically doubled that to $150

2    million.  So while the discussions have been going on

3    for some time, that is a piece that's new information.

4         But I would hope that the fact that that piece

5    of new information came along didn't hurt our chances of

6    getting it done.

7         PRESS MEMBER:  But you had informed legislative

8    leaders of the $75 million offer --

9         MR. GRIFFIN:  That was the range of numbers we

10   were talking about.  That was the range of numbers we

11   were talking about in earlier discussions.  Our earlier

12   discussions were not with the state legislators.  Our

13   earlier discussions were with the Mayor and the Mayor's

14   office about how we could collaborate and be their

15   partner.

16        Then the Mayor's office basically had the

17   discussion with the state legislators.

18        PRESS MEMBER:  If the Sonics were to leave to

19   go to Oklahoma City and another team in another city,

20   maybe New Orleans or Memphis -- would your group be

21   willing to try to purchase that team and still do the

22   renovations at Key Arena?

23        MR. GRIFFIN:  Yes, we would.  Obviously, our

24   preference is to have the Sonics.  I mean, let's face

25   it.  There's a lot of great legacy there.  You know, we

1    think about Lenny Wilkens and Gus Williams and Detlef

2    Schrempf and Sikma and all those guys.  We would rather

3    not lose that, but if the way the negotiations happen

4    with the league is that Seattle got another NBA team, we

5    would be willing to do the same offer.

6              PRESS MEMBER:  What about keeping the name like

7    the Cleveland Browns did?

8              MR. GRIFFIN:  That would be a nice idea.  I

9    mean, all those kind of pieces would have to be

10   negotiated, but that would clearly be a preference.

11             SENATOR GORTON:  Let me make a comment on that

12   subject.  Obviously, there has been talk about that and,

13   obviously, the New Orleans franchise is relatively weak,

14   but it's one thing to talk about it in the context of

15   our having made this offer right now, and another to

16   have it come up a year or so from now.  There are a lot

17   of other cities with a lot of money that want a free --

18   a franchise that just (inaudible).  We would be in

19   competition with San Jose, with Las Vegas, two or three

20   other places under those circumstances, and under

21   circumstances under which we had left a sour taste in

22   the mouth of the NBA.  We need to get this done now.

23   That's pie in the sky, by and by.

24             PRESS MEMBER:  Mayor Nickels --

25             MAYOR NICKELS:  Yes.

1        PRESS MEMBER:  -- this is probably for you.

2    Commissioner Stern was in the Northwest just a couple of

3    days ago.  Have you or anybody else had discussions him

4    in the last couple days with these new figures, with

5    this new announcement coming?  Did you talk to

6    (inaudible) and the current ownership group, because a

7    lot of this is contingent on what they may or may not

8    do with that franchise?

9        MAYOR NICKELS:  The answer would be "no" and

10   "no."

11       PRESS MEMBER:  Do you have any signal from the

12   NBA that they will take this seriously?  And how do you

13   move forward with (inaudible)?

14       MAYOR NICKELS:  Well, the NBA has a decision to

15   make, and that decision is whether they are going to

16   stay in the 13th largest market in the United States or

17   move a team to the 48th or 49th largest market in the

18   United States, a fine city, but not the same size or

19   scope as the Seattle -- greater Seattle area.  So that's

20   their decision.

21       What we're telling them is that there is local

22   ownership available, committed local owners who will

23   step up and pay a market price for this team and will

24   contribute to an arena solution; that there is political

25   support for an arena solution that involves the Key

1   Arena, the historic home of the Seattle Supersonics.  So

2   committed ownership and a facility that they believe

3   is -- they're willing to invest their money in, as well

4   as the public willing to step forward for its share.

5          PRESS MEMBER:  Shouldn't this go to a public

6   vote?

7          MAYOR NICKELS:  The public in Seattle had a

8   vote.  It was called Initiative 91.  We believe that

9   this complies with Initiative 91 and is in the spirit of

10  what people told us they wanted, which was no give-aways

11  but the opportunity to make good sound investments on

12  the part of the public.

13         PRESS MEMBER:  Mr. Griffin, have you reached

14  out to the Sonics ownership group or Clay Bennett in any

15  way or made them any kind of offer?

16         MR. GRIFFIN:  So on the question, I have not.

17  One of my colleagues extended calls this morning to let

18  them know that the Mayor would be making this press

19  conference today and announcing their names, but that's

20  the extent of the discussion so far.

21         PRESS MEMBER:  Who was called?  Or who called?

22         MR. GRIFFIN:  One of my colleagues called, and

23  called the two people in question.  Okay.

24         PRESS MEMBER:  Assuming this thing goes forward

25  the way you envision it, then is the next step that you

1  make the offer, assuming the NBA Board of Governors

2  delays everything?

3        MR. GRIFFIN:  Well, the first step, as Senator

4  Gorton said, is we have been told by the NBA for a long

5  time that, you know, if you want to have a serious

6  discussion with us, you need to have a competitive arena

7  and a plan to build it and a way to finance it.

8        And so our belief is that we need to put that

9  piece in place so that we can have a serious discussion

10  with the NBA about what is the way that they have a

11  chance now to stay in the 12th largest market in the

12  country.

13        And, again, my hope is that that would be a way

14  that the NBA would help facilitate the Sonics staying

15  here.  It may be another team.  But we need to have that

16  facility in place that says that we have a financing

17  plan for the arena so we can have that discussion now

18  before they meet in April.

19        PRESS MEMBER:  Is that the only carrot that you

20  have -- that we have for the NBA as far as the market

21  size, now that Oklahoma City has passed its tax and all

22  that money is essentially lined up?

23        MR. GRIFFIN:  I don't know if it's the only

24  carrot, but it's clearly a piece that ought to be in

25  their best interests.  We would hope.

1       MR. GORTON:  We also have a lawsuit.

2       PRESS MEMBER:  All right.  Last question.

3       Is this a -- are you asking the legislature to

4  approve like a tentative deal, like, we'll give you this

5  stack of money to build this arena, but it only -- we

6  only have to spend it if there is a team here?  If I am

7  sitting down there in the legislature, I'm not going to

8  vote to build an arena that's going to sit there and sit

9  empty.

10      MAYOR NICKELS:  We don't intend -- as I said

11 earlier, Danny, we're going to need to put money into

12 Key Arena regardless of whether professional basketball

13 is there, but the investments would be different in

14 those circumstances.  So we're asking them to give the

15 authority to the King County Council, to devote a

16 section of those revenues after the Safeco Field bonds

17 are paid off.  That can be contingent upon local

18 ownership being successful in buying the team.

19      We are not going to move forward tomorrow on

20 the construction.  We'll have time for this to play out,

21 for our lawsuit to be concluded, and for the NBA Board

22 of Governors to make their decisions.

23      We're saying there's an ownership, there is a

24 facility answer, and there's a great market here.

25      SENATOR GORTON:  It's a specific condition of

1    the legislation we submitted to them.

2         PRESS MEMBER:  And the other thing I wanted to

3    clarify when I said you're only giving six days, that's

4    what they're saying.  They're saying this is too late in

5    the session.

6         MAYOR NICKELS:  Sure.

7         PRESS MEMBER:  It requires two-thirds of the

8    votes to get it in.  I know they can get around that,

9    but it's highly controversial to have public money in

10   this arena.  And you would think -- if I'm in the

11   legislature, I would want to shield myself by having

12   public hearings, et cetera, et cetera.  I'm just

13   wondering, what is the path that you perceive in getting

14   them to pass this in the next six days?

15        MAYOR NICKELS:  You know, I have said from the

16   beginning that if people of good will want to find

17   answers to this issue, there are answers that can be

18   made to work.  And we have shown, I think, a lot of

19   progress here today in that direction.

20        Controversial?  Perhaps.  Although, if my

21   morning paper this morning was accurate, the people who

22   sponsored Initiative 91 are saying this is a pretty good

23   deal for the people of Seattle.  So I am not sure how

24   controversial it's going to be, but, you know, as

25   elected officials, we run not to duck from hard

1    decisions, but to make hard decisions.

2            Is this a hard decision?  Yes.  But I think we

3    made it a whole lot easier today.

4            PRESS MEMBER:  Thank you.

5            MAYOR NICKELS:  All right.  Thank you all.

6            (Press conference is concluded.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              C E R T I F I C A T E

2     STATE OF WASHINGTON          )

3                                  )

4     COUNTY OF SNOHOMISH          )

5

6              I, the undersigned, under my commission as

7     a Notary Public in and for the State of Washington, do

8     hereby certify that the foregoing recorded statements,

9     hearings and/or interviews were transcribed under my

10    direction as a transcriptionist; and that the transcript

11    is true and accurate to the best of my knowledge and

12    ability; that I am not a relative or employee of any

13    attorney or counsel employed by the parties hereto, nor

14    financially interested in its outcome.

15

16             IN WITNESS WHEREOF, I have hereunto set my

17    hand and seal this   3rd   day of   May

18    2008.

19

20

21    _____

22    NOTARY PUBLIC in and for

23    the State of Washington,

24    residing at Lynnwood.

25    My commission expires 4-27-10.

# EXHIBIT 14

# CONFIDENTIALITY AGREEMENT

The National Basketball Association, including its Board of Governors and its individual team owners (collectively, the "NBA"), the Professional Basketball Club, LLC ("PBC") and the City of Seattle (the "City") (collectively, "the parties") have agreed to meet on October 15, 2007 to discuss issues related to the lease of the KeyArena facility for professional basketball including compromise of claims disputed as to either validity or amount. As a condition to this meeting, the NBA, PBC, the City, and all other persons participating in the meeting, agree as follows.

All communications of any kind made during the meeting, and all materials prepared for, introduced at, or created during the meeting, are confidential and protected from disclosure for any purpose, including without limitation disclosure in the pending litigation in the United States District Court for the Western District of Washington, entitled *City of Seattle v. The Professional Basketball Club, LLC,* Cause No. 07-1620, and in the arbitration proceeding filed by PBC with the American Arbitration Association, captioned 77-196-00381-07 DEAR; provided that materials that otherwise would not be confidential and protected from disclosure will not be deemed confidential and protected from disclosure simply as a result of such material having been introduced or used at the meeting.

There will be no discussion at the meeting about the issues raised in the pending litigation between the City and the PBC, entitled *City of Seattle v. The Professional Basketball Club, LLC,* in the United States District Court for the Western District of Washington, Cause No. 07-1620, or the AAA arbitration proceeding filed by PBC, captioned 77-196-00381-07 DEAR.

The parties and all other persons participating in the meeting agree not to disclose to any third party (other than each of such party's attorneys, advisors, and consultants, who also will be subject to this Confidentiality Agreement) the fact of, the content of, or the results of the meeting except to the extent compelled by law.

So agreed:

THE NATIONAL BASKETBALL
ASSOCIATION

By: _____

THE PROFESSIONAL BASKETBALL
ASSOCIATION, LLC

By: _____ (counsel)

EXHIBIT 400  DATE 4/28/08
WITNESS Ceis
BRIGID DONOVAN  206-323-0919

imanageOKC_2588856_1 (2)

*Leaders In Creating Legal Solutions®*

| THE CITY OF SEATTLE | Other Meeting Participants: |
|---|---|
| By: *[signature]* Paul L_____ <br> *[signature]* city attorney | *[signature]* <br> Slade Gorton, K&L Gates <br> *[signature]* <br> Frank Hill, McAfee and Taft <br> *[signature]* <br> Martin Stringer, McAfee and Taft |

*[signature]*

- 9 -

# EXHIBIT 15

**From:** Brian Robinson <b_e_robinson@yahoo.com>
**To:** Tim Ceis <Tim.Ceis@Seattle.Gov>
**Date:** 12/21/2007
**Subject:** Re: SOS

Brunner has been bugging me about confirming your trip to NY. I believe his source is actually a personal friend who recognized Slade on the streets of Manhattan. Sounds improbably. Don't share that I disclosed that with him. I advised him I know nothing about it.

Both Brunner and Greg Johns have had stories lately that people are calling me asking if I'm the source. I chat with them but have kept everything close. They have someone else.
I have a good contact in Frank Chopps office. Providing nice insight into the speakers mindset. He's a tough obstacle obviously.

In our lobbying efforts I make one assumption that has had extremely positive feedback. I assume that whatever solution is proposed will encompass the existing Key Arena debt and ensure that these funds do not have to be paid out of the general fund. If my assumption is wrong find a way to let me know so I don't damage the situation. Met with Licata earlier this week and he is actually quite worried about that issue. If the deal were along the lines of what is being rumored he advised that he would tentatively be supportive so long as the public/private partnership was somewhat close to other investments in the center. If that were the case he would call Chopp to encourage his support. Hard to believe but maybe possible.

Obviously I have nothing other than informed speculation regarding the package. You run a tight ship.

If I had one question to be resolved it is whether the existing debt is being addressed.

I spoke with Trent House of the WRA yesterday and he advised the WRA had not changed their position and would commit the restaurant tax to a Sonics solution so long as it expired in 2015. He did not want that made public yet but we can refer to last years statement of support. He felt that Chopp wants to get his hands on the restaurant tax for other purposes and Chopp doesn't think the Sonics are necessary to do so. If they have ironclad assurances that the tax will end in 2015 the WRA may get vocal rather than let Chopp take over the revenue indefinitely.

I'm curious about the revenue streams from the OKC proposal that was out yesterday. How can a $100 million remodel of a $90 million facility provide revenue greater than a $300 million remodel of a $180 million facility in a larger market? I'm trying to figure out what that means to this whole process.

We got a call from a reporter in New Orleans yesterday. He advised that the rumor around Louisiana is that the region is facing difficulties being a major league city for 1 sport, let alone 2. They fear that money will be needed to ensure that the city is a viable long term NFL city for the Saints and that every dollar invested in the Hornets could result in the eventual loss of the much more beloved Saints. He advised that the states "Guaranteed Sellout" agreement with the Hornets was rumored to have an escalating price tag of $14 million this year.

Not sure if it is true, but interesting gossip figuring out how the Saints are involved.

I'm holding my horses for the time being. We're an asset here waiting if you want to make use of us. We talk to a lot of people.

EXHIBIT 401 DATE 4/28/08
WITNESS Ceis
BRIGID DONOVAN 206-323-0919

KALD_02000735

Happy Holidays

Brian

Brian Robinson
Fenpro, LP
2622 NW Market St, Suite A
Seattle, WA 98107
Phone: 206-784-6004
Fax: 206-782-0323

—— Original Message ——
From: Tim Ceis <Tim.Ceis@Seattle.Gov>
To: Brian Robinson <brian@fenproperties.com>
Sent: Friday, December 21, 2007 10:46:07 AM
Subject: Re: SOS

We are not talking publicly about an arena proposal.  We are still
working things behind the scenes.  I know there are some rumors
starting
due to the fact we are talking to political leaders.  You will not be
caught off guard.  So you know. Brunner now has some evidence that
Slade
and I were in New York in October.  He has nothing that states the
reason but enough information to know we were there.

>>> Brian Robinson <b_e_robinson@yahoo.com> 12/20/2007 6:30 PM >>>
Tim,

I'm being asked to go on KIRO tomorrow night.  I assume you do not want
me to talk about your recent meeting with Chopp, the proposal basics,
or
really much of anything.  Right now I have avoided the media even on
the
court case just because things seem especially sensitive.

I need to know what my information threshold is.  Something has to come
out eventually. If this whole arena proposal comes out in an article
and
I was publicly blindsided then I lose credibility and the ability to
lobby for it. If I earn some "buzz" by outing all the things you are
working on then I potentially mess things up.  My cel is 206.349.6447

We are meeting with several members of legislature over the next couple

of weeks. I have a pretty good idea of the lobby points and think that
there needs to be an active lobby top push this through.

Did you know Clay was in town this week? I don't hold out much hope
that he met with you.

The players union mess is going to get nasty for them.

Brian Robinson
Fenpro, LP
2622 NW Market St, Suite A
Seattle, WA 98107
Phone: 206-784-6004
Fax: 206-782-0323

---- Original Message ----
From: Tim Ceis <Tim.Ceis@Seattle.Gov>
To: Brian Robinson <b_e_robinson@yahoo.com>
Sent: Monday, November 19, 2007 1:55:09 PM
Subject: Re: SOS

Just to give you some confidence. We are working on updated revenue
projections with the same consultant who has done the work before.
Stand by and in a couple or weeks I will be ready to talk with you
more.

>>> Brian Robinson <b_e_robinson@yahoo.com> 11/17/2007 7:55 AM >>>
Great interview on KJR.

We discussed a Key Arena remodel with Joel Litvin at the NBA in NY and
tried hard to pin them down on whether they share Clays opinion. They
commented that "Remodels are usually band-aid solutions but in the end
the revenue streams are what we are interested in. If a remodel could
create the same or similar revenue streams then we would support it."

Additionally they advised that the company who performed the Key Arena
Subcommittee report is competant to judge whether a proposal is market
rate and that with a market rate proposal the league would vote
against
a relocation application regardless of Clays intentions. I think
Litvin
is a friends. The type of friend who would eat his own children and
betray us in a heartbeat if it was in the leagues interest, but still
a
friend at this point.

You're in politics so you're used to guys like that.

Keep up the good work and call me if you ever want to meet.

Brian Robinson
Fenpro, LP
2622 NW Market St, Suite A

KALD_02000737

Seattle, WA 98107
Phone: 206-784-6004
Fax: 206-782-0323


—— Original Message ——
From: Tim Ceis <Tim.Ceis@Seattle.Gov>
To: brian@fenproperties.com
Sent: Tuesday, October 30, 2007 10:22:22 AM
Subject: Re:

Your not being a pain don't worry.  Great news yesterday.  I really
wonder if they will continue to pursue breaking the lease in court.
They must be looking at the timing and expense and wondering if it is
worth it

>>> <brian@fenproperties.com> 10/29/2007 1:36 PM >>>
I apologize for being such a persistant ass.  It's no
fun on this end either.

Unfortunately it is the only way for the "volunteer
corp" to get involved in this process.  The squeaky
wheel gets the grease, or in this case hopefully a
little information tossed their way.

Hopefully we get to chat once in a while.  Until then
keep up the good work and let us know when the mayor
needs some pubic kudos.  W
hen all goes public we'll be
there.

Brian


--- Tim Ceis <Tim.Ceis@Seattle.Gov> wrote:

> Our goal of keeping the Sonics to the lease and in
> Seattle has not
> changed
>
> >>> <b_e_robinson@yahoo.com> 10/28/2007 12:06 PM >>>
> I understand this and frankly am encouraged by it.
> Anyone can disclose
> that "no conversations are ongoing."  I am hopeful
> that some actual
> dialogue is begining and want to be publicly
> supportive of the mayor and
> city given the increased publicity that will occur
> with the seasons
> start.
> That said I would still like to review with you our
> intended course of
> action to ensure that it is not contrary to city
> goals.
>

KALD_02000738

> Brian
>
> Sent via BlackBerry from T-Mobile
>
> -----Original Message-----
> From: "Tim Ceis" <Tim.Ceis@Seattle.Gov>
>
> Date: Sun, 28 Oct 2007 11:47:06
> To:"Brian Robinson"
>
<brian@fenproperties.com>,<vietshelton@hotmail.com>
> Subject: Re:
>
>
> I'm sorry Brian but I am not at liberty to discuss
> any communications
> we
> may or may not be having with the league or the team
> for the time
> being.
>
> >>> Brian Robinson <brian@fenproperties.com>
> 10/26/2007 2:21 PM >>>
> Tim & Viet,
>
> Yesterday NBA Commissioner David Stern commented on
> the situation with
> the Seattle SuperSonics. While his comments were
> pessimistic he
> essentially stated that he would welcome involvement
> but had no role
> in
> this process.
>
> â€œIf there were a role for me, the answer is
> absolutely yes,â€? he
> said.
>
> Please contact the commissioners office and let them
> know that you
> would welcome his participation in any level. Make
> the request public
> so that he is obligated to bypass Clay and get
> involved. We need
more
> parties other than Clayton Bennett involved. If
> this city loses the
> Sonics without making so much as an attempt to reach
> out or offer a
> new
> venue it will be an embarassment and greatly affect
> my voting
> decision.
>
> I know the mayor is working on something and I am
> curious when it will

KALD_02000739

> go public. Please let me know if we can schedule a
> meeting to
> discuss.
>
> Brian Robinson
> Fenpro, LP
> 2622 NW Market St, Suite A
> Seattle, WA 98107
> Phone: 206-784-6004
> Fax: 206-782-0323
>