The Honorable Marsha J. Pechman

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| CITY OF SEATTLE, a first-class charter city,<br><br>Plaintiff,<br><br>v.<br><br>THE PROFESSIONAL BASKETBALL CLUB, LLC, an Oklahoma limited liability company,<br><br>Defendant. | No. C07-1620MJP<br><br>PBC'S OPPOSITION TO MOTION IN LIMINE TO EXCLUDE EVIDENCE RELATED TO LOCAL INVESTORS<br><br>NOTE ON MOTION CALENDAR: JUNE 6, 2008<br><br>**[REDACTED VERSION]** |

## I. INTRODUCTION

The City's motion should be denied for several reasons. First, in the guise of a motion in limine, the City actually seeks summary judgment on the PBC's unclean hands defense. But the City's motion only highlights the disputed facts which require denial of the motion. These disputed facts revolve around the City's decision to use specific performance to try to lock in huge losses for the PBC, hoping to force the PBC to sell the team to the City's preferred tenant—a group led by Steve Ballmer.

Second, the City's claim—that it has the legal right to *seek* specific performance—is true, but misses the point: it has no right to *obtain* this equitable remedy, and is presumptively left to its legal remedy. Under well-settled law, unclean hands bears directly on the equities of the matter. Moreover, specific performance cannot be used to obtain more than is available under

PBC'S OPPOSITION TO MOTION IN LIMINE TO EXCLUDE EVIDENCE RELATED TO LOCAL INVESTORS [REDACTED VERSION] (C07-1620MJP) - 1

BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

the lease. But that is what the City seeks to do – use specific performance to force the PBC to sell the team to the City's preferred tenant.

Third, the City incorrectly argues that its motive in bringing and pursuing this lawsuit is irrelevant. The case law is to the contrary.

Fourth, implicitly acknowledging its improper motive, the City says that motive is not enough—there must be improper conduct. Here there is ample evidence of improper conduct, starting with the creation and execution of the plan to force the PBC to sell the team. Likewise, the City disclosed confidential Sonics' financial information to the Ballmer group so that they could analyze the financial issues. This was done by the City's "consultant," Wally Walker, after he was retained by the City to aid in its efforts, and in plain violation of his fiduciary duties as the former President of the Sonics. Likewise, when it became clear that Walker's actions might surface in discovery, the City's lawyers wrote a letter to Walker retroactively making him a "consultant" to the Ballmer group, and supposedly making his actions confidential. As explained in the letter, this was done to provide Walker "cover" in hopes that his actions would not surface. This plan failed after Walker obtained independent counsel who recognized Walker's obligations.

## II. BACKGROUND

The City long ago recognized that, standing alone, this lawsuit has no purpose. Regardless of the outcome, the Sonics are free to leave after the lease expires in 2010. Here is how K&L Gates analyzed the situation:

[REDACTED]

Given this fundamental problem with the lawsuit, the City developed a two-pronged plan. First, as detailed in a document laying out the City's strategy entitled 

---

[1] Second Declaration of Paul R. Taylor in Opposition to Plaintiff's Motions in Limine ("2d Taylor Decl."), Ex. 2 at 1.

PBC'S OPPOSITION TO MOTION IN LIMINE TO EXCLUDE
EVIDENCE RELATED TO LOCAL INVESTORS [REDACTED
VERSION] (C07-1620MJP) - 2

BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

[REDACTED] [2] the City wanted to use specific performance to lock in huge losses for the PBC, hoping to force the PBC to sell the team:

[REDACTED] [3]

[REDACTED] [4]

The plan relied on ensuring the PBC incurred huge losses:

[REDACTED] [5]

Second, the City realized that it needed to disrupt the relationship between the PBC and the NBA, as the PBC was seeking the NBA's permission to move the team to Oklahoma City. The City desperately wanted the NBA not to approve the move. To this end, the plan was to:

[REDACTED] [6]

The City's consultant, Wally Walker, was given the following task:

[REDACTED] [7]

The City suggests that it was not involved in the above plan until after it filed the lawsuit.[8] As detailed below, that is no defense. But more fundamentally, it is not accurate. The City's involvement in the plan began well before the lawsuit.

Beginning in at least early July 2007, Seattle Deputy Mayor Tim Ceis and K&L Gates were in frequent contact with Walter "Wally" Walker, who was spearheading the strategy.[9] On August 10, Ceis met with Walker.[10] Three weeks later, Walker – in early September – attended a meeting at K&L Gates.[11] Days later, on September 9, Walker brought Ballmer into the fold.[12]

---

[2] Id., Ex. 3.
[3] Id., Ex. 3 at WW00148, and "Making Them Sell," id. at WW000139-41.
[4] Id., Ex. 1 at 2.
[5] Id., Ex. 4 at ¶ 4(d)(iii).
[6] Id., Ex. 3 at WW000139 and WW000128.
[7] Id., Ex. 5 at WW0005.
[8] Motion at 8:7-9:5.
[9] Walker's calendar shows he was in contact with K&L Gates on July 9, 2007; with Ceis and K&L Gates on July10; with Ceis on July 13 and Aug 8. 2d Taylor Decl., Ex. 6 at WW00018-23.
[10] Id., Ex. 6 at WW00024.
[11] Id. at WW00025-26.

PBC'S OPPOSITION TO MOTION IN LIMINE TO EXCLUDE
EVIDENCE RELATED TO LOCAL INVESTORS [REDACTED
VERSION] (C07-1620MJP) - 3

BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

On September 19, the PBC filed its arbitration demand. In response, the City continued refining the Poisoned Well strategy.[13] Ultimately, the document detailing the Poisoned Well strategy was finalized by the City's lawyers—K&L Gates—on October 6, 2007, for review at a meeting with Walker, Ballmer and K&L Gates the following day.[14]

The City also tries to distance itself from the effort of Deputy Mayor Ceis, Walker (its consultant) and its lawyers, saying it simply had "some discussions" with the Ballmer group, but never really knew what K&L Gates (the City's lawyers), City consultant Walker, Deputy Mayor Ceis and Ballmer were doing.[15] This is absurd, and, as detailed above, the evidence proves otherwise. And indeed, at the March 6, 2008, press conference with the Mayor and Griffin, the City confirmed that the Ballmer group had "worked hand-in-glove with the City from the beginning to the end of this process."[16] And this is exactly what the evidence shows.

### III. ARGUMENT

**A. Specific Performance Is an Equitable Remedy Which Requires the City to Have Clean Hands as a Way to Protect the Integrity of the Court.**

Specific performance is an equitable, and extraordinary, remedy. There is no right to specific performance, which is unavailable where there is an adequate remedy at law. Indeed, with respect to commercial leases, "it has long been held in Washington that there is an adequate remedy at law in damages for the breach of a lease agreement." Wash. Trust Bank v. Circle K Corp. 15 Wn. App. 89, 93, 546 P.2d 1249 (1976), review denied, 87 Wn.2d 1006. The City apparently hopes to distinguish this case from Circle K and show entitlement to an equitable remedy. But it is well settled that to obtain equitable relief, the City "must show" not only that it

---

[12] Id. at WW00027-28.
[13] Id., Ex. 7.
[14] Id., Ex. 8. Seeking to distance itself from the document, the City claims that it was prepared by Mike McGavick. Motion at 4:11. The City makes no mention of K&L Gates' role in its preparation. The document's "metadata," however, leaves no doubt that the final version came from K&L Gates.
[15] Motion at 4:3-15.
[16] Declaration of Paul R. Taylor in Opposition to Plaintiff's Motions in Limine ("Taylor Decl.") at Ex. 13, Transcript at 8-12.

PBC'S OPPOSITION TO MOTION IN LIMINE TO EXCLUDE
EVIDENCE RELATED TO LOCAL INVESTORS [REDACTED VERSION] (C07-1620MJP) - 4

BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

has "a good and meritorious cause of action" but that it has clean hands. J.L. Cooper & Co. v. Anchor Sec. Co., 9 Wn.2d 45, 73, 113 P.2d 845 (1941).

Contrary to the City's suggestion, unclean hands does not require "high" misconduct.[17] Instead, "[e]quity will not interfere on behalf of a party whose conduct in connection with the subject-matter or transaction in litigation has been unconscientious, unjust, or marked by the want of good faith." Income Investors, Inc. v. Shelton, 3 Wn.2d 599, 602, 101 P.2d 973 (1940).[18]

Thus, there are no mechanical rules for the application of equitable maxims. Instead, equitable rules "must be applied with more or less flexibility as the equities of the particular case warrant, having in mind the special facts and circumstances surrounding each case." Hallauer v. Certain., 19 Wn. App. 372, 380, 575 P.2d 732 (1978).[19] Here, the "special facts and circumstances" warranting the Court's attention include the relationship between the City and the Ballmer group – including their plan to use specific performance to force the PBC to sell to the City's preferred tenant or lose $70 to $80 million dollars.

Importantly, "clean hands" protects the Court's integrity, rather than the opposing party's interests. It ensures that the judicial system does not become a party to impropriety:

> That doctrine is rooted in the historical concept of court of equity as a vehicle for affirmatively enforcing the requirements of conscience and good faith. This presupposes a refusal on its part to be 'the abetter of iniquity.'

Precision Instrument Mfg. Co. v. Auto. Maintenance Mach. Co., 324 U.S. 806, 814 (1945).

---

[17] Motion at 6:10.
[18] Stated somewhat differently:
   any willful act in regard to the matter in litigation, which would be condemned and pronounced wrongful by honest and fair-minded men, will be sufficient to make the hands of the applicant unclean.
Rose v. Nat'l Auction Group, Inc., 646 N.W.2d 455, 463 (Mich. 2002) (quoting 2 Pomeroy's Equity Jurisprudence, ch. I, § 404 (1941)).
[19] Accord, Keystone Driller Co. v. Gen. Excavator Co., 290 U.S. 240, 245, 246 (1933) ("not bound by formula").

PBC'S OPPOSITION TO MOTION IN LIMINE TO EXCLUDE
EVIDENCE RELATED TO LOCAL INVESTORS [REDACTED
VERSION] (C07-1620MJP) - 5

BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

Here, the question is whether it is appropriate for the City to ask the Court to place its imprimatur on a landlord's plan to bleed its tenant so that the tenant will sell to the landlord's preferred prospective tenant.

### B. Equity Will Not Allow a Plaintiff to Use Specific Performance to Extract More Than It Bargained for.

In Portion Pack, Inc. v. Bond, 44 Wn.2d 161, 265 P.2d 1045 (1954), for example, plaintiffs paid defendant to assign them certain property rights. When defendant failed to do so, plaintiffs stopped payment on their check. Thereafter, plaintiffs not only required defendant to execute the assignment, but also to execute a non-compete agreement. Plaintiffs sought an injunction to enforce the non-compete. This was denied:

> Appellant could have gone to court and obtained an order requiring Bond to assign his [property] rights. . . . It was justified in stopping payment on the check when he refused to fully perform his agreement of March 3rd. However, when the officers of the corporation had him where he could not wriggle one way or the other, they were not satisfied with exacting their pound of flesh-they chose to take more.

44 Wn.2d at 170. Thus, because plaintiffs had every right to stop payment on the check but no right to force defendant to sign a non-compete, they had unclean hands, and the non-compete agreement was declared a nullity. Id. Likewise, the City here seeks to extract far more than it bargained for, and this must not be allowed.

### C. Evidence Regarding the City's Motives Is Relevant

The City claims that because it had a legal right to seek specific performance, its motive for doing so is "irrelevant." The law says otherwise. Evidence of an inequitable purpose is sufficient to deny specific performance. A court sitting in equity is "still, even in this modern day of merged practice, a court of conscience, and it ought not grant equitable relief for an unconscionable *purpose*, however strong the legal rights asserted may be." U.S. Jaycees v. Cedar Rapids Jaycees, 794 F.2d 379, 382 (8th Cir.1986) (emphasis added).

PBC'S OPPOSITION TO MOTION IN LIMINE TO EXCLUDE
EVIDENCE RELATED TO LOCAL INVESTORS [REDACTED
VERSION] (C07-1620MJP) - 6

BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

For example, in Nelson v. Nelson, 57 Wn.2d 321, 356 P.2d 730 (1960), the plaintiff sought to specifically enforce a real estate contract, and argued that defendant simply should be held to a "bad bargain." The Court disagreed, explaining that plaintiff's desire for equitable relief was "whetted by his expressed intention 'to get even with' the defendant." Id. at 324. Thus, equitable relief was denied. Likewise, in Port of Walla Walla v. Sun-Glo Producers, Inc., 8 Wn. App. 51, 504 P.2d 324 (1972), the landlord demanded that the tenant provide an increased performance bond, and deposit a large sum in escrow to guarantee the bond. Although the landlord had a statutory right to demand an increased bond, the tenant's initial bond was still in effect and had two years to run. The Court found that:

> although the Port had a legal basis for its demand of a new bond 2 years in advance, its position in doing so was anomalous and inconsistent. The Port was seeking to destroy Sun-Glo's lease and demanding a long term costly performance bond at one and the same time.

Id. at 55. Accordingly, for reasons including its improper motives, the landlord "did not do equity nor come into court with clean hands." Id. at 56. See also Ingram v. Kasey's Assocs., 531 S.E.2d 287, 292 (S.C. 2000) (tenant's claim to specific performance of lease's purchase option denied in part because "he acted with unclean hands by misleading both [the landlord and the subtenant], and because he acted with the improper ulterior motive to force [the subtenant] to pay him $40,000"); City of Duluth v. Riverbrooke Props., Inc., 502 S.E.2d 806 (1998) (City's request for equitable relief denied in part because it was based on improper "ulterior motive" of requiring contractor to perform extra unbargained-for work).

Accordingly, evidence of the City's motives, as expressed in the Poisoned Well power points and the other evidence the City seeks to exclude, is relevant to whether the City's hands are unclean or is otherwise not entitled to equitable relief. And, from the Poisoned Well power points, through the final push to block the NBA's vote to allow the PBC to relocate, the City's motives—to force huge losses and a sale to its preferred tenant—are inequitable.

PBC'S OPPOSITION TO MOTION IN LIMINE TO EXCLUDE
EVIDENCE RELATED TO LOCAL INVESTORS [REDACTED
VERSION] (C07-1620MJP) - 7

BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

### D. There Is Ample Evidence of Inequitable Conduct.

To the extent the City says that evidence of inequitable motive is not enough, but inequitable "conduct" is required, there is ample evidence. For example, beginning in July 2006, the PBC devoted considerable energy and millions of dollars to an effort to obtain a new arena in the greater Seattle area. The PBC was seeking assistance from the legislature and ultimately settled on a site in Renton. Had the arena legislation passed, the Sonics would have played the remaining seasons at KeyArena as the new facility was being built, and this lawsuit would never have happened. Unbeknownst to the PBC, however, the City of Seattle was engaged in a behind-the-scenes lobbying effort to kill the PBC's attempt to obtain a Renton arena.[20] The City's view about keeping the Sonics in the greater Puget-Sound area was simple: if not at KeyArena, nowhere. The City cannot seek specific performance when it sabotaged the good faith effort that would have resulted in the outcome the City now says it seeks in this case – two more years at KeyArena.

Second, the City acted to further its purpose. It sought specific performance, and then took steps to achieve its goal of forced bleeding and a forced sale. The deputy mayor and the City's lawyers worked with the Ballmer group, setting that group up as the preferred tenant to buy the Sonics at a "forced bleeding" price. It also worked hard to persuade the NBA not to permit the PBC to move the team.

Here is more inequitable conduct. In mid-October 2007, at the City's request, there was a meeting in New York among the City, the NBA, and the PBC. This was the City's first step in seeking to block the PBC's effort to move to Oklahoma City. K&L Gates represented the City at the meeting, along with Deputy Mayor Tim Ceis and the Director of the Seattle Center. At the City's insistence, all present signed a confidentiality agreement barring disclosure of the contents of the meeting, or even the fact of the meeting, to anyone.[21] Notwithstanding, less than 24 hours

---

[20] Taylor Decl., Ex. 1, Ceis Dep. at 48:11-52:10; Id., Ex. 7, Conlin Dep. at 24:8-29:16
[21] Id., Ex. 14, Confidentiality Agreement.

PBC'S OPPOSITION TO MOTION IN LIMINE TO EXCLUDE
EVIDENCE RELATED TO LOCAL INVESTORS [REDACTED
VERSION] (C07-1620MJP) - 8

BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

later, K&L Gates sent a detailed memo about the meeting to the Ballmer group.[22] Not to be outdone, Ceis later disclosed the meeting to the head of a fan group working to keep the team in Seattle.[23]

Similarly, Wally Walker was the former General Manager and Chief Executive Officer of the Sonics. Under both his fiduciary duties and his employee manual, he was obligated not to disclose confidential Sonics' financial information, which belongs to the PBC. Nevertheless, the Ballmer group needed team financial information to aid its analysis of how to best proceed with the Poisoned Well plan. After his retention as a consultant by the City, and in plain disregard of his fiduciary duties:

[24]

Walker, who bragged of having a "deep throat" within the NBA,[25] was also tasked with creating discord between the NBA and the PBC. Here was his assignment:

[26]

After discovery started in this lawsuit, K&L Gates became concerned that Walker's activities might surface, along with those of Mike McGavick's.[27] Here is what K&L Gates lawyer Gerry Johnson wrote to McGavick:

[28]

---

[22] 2d Taylor Decl., Ex. 9.
[23] Taylor Decl., Ex. 15.
[24] 2d Taylor Decl., Ex. 10.
[25] Id., Ex. 11.
[26] Id., Ex. 5 at 2.
[27] McGavick was one of the originators of the "bleed the Oklahomans" strategy.
[28] Id., Ex. 12 (emphases added).

PBC'S OPPOSITION TO MOTION IN LIMINE TO EXCLUDE
EVIDENCE RELATED TO LOCAL INVESTORS [REDACTED
VERSION] (C07-1620MJP) - 9

BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

The problem with the "cover" strategy is that, contrary to the letter, neither Walker nor McGavick ever acted as advisors to the prospective new ownership group. The letter was an effort to conceal information. Nevertheless, at K&L Gates' request, Walker signed a letter saying he was a consultant to the buyers and pledging confidentiality.[29] Walker, who finally obtained independent counsel, ultimately disregarded the letter and produced his files, including those detailing his work with the City.

### E. Post-Filing Conduct Is Relevant.

The City suggests that evidence of conduct after it filed this case is irrelevant. This is not the law. In Income Investors, Inc. v. Shelton, 3 Wn.2d 599, 101 P.2d 973 (1940), for example, plaintiffs among other things concealed and withheld evidence during discovery. Accordingly, their hands were unclean and they were denied equitable relief. Id. at 602-03. Indeed, it is well settled that "one who does not come into equity with clean hands, and keep them clean, must be denied all relief, whatever may have been the merits of his claim." Hall v. Wright, 240 F.2d 787, 794-95 (9th Cir. 1957).

Accordingly, to the extent it has a bearing on the equities of the matter, everything that has transpired with respect to the City's relationship with the PBC and the lease, both before and after the City filed suit, is relevant and admissible.

## IV. CONCLUSION

Although the City has every right to seek equitable relief, it has no right to obtain it. And it has no right to use specific performance to impose huge losses on the PBC and thereby force it to sell the Sonics to its hand-picked local buyers. The City's efforts are well documented, such that the matter will not create any timing problems at trial. Accordingly, the evidence bearing on the equities of the matter – including the City's plan to force the PBC to sell or face millions in losses – is relevant. The City's motion should be denied.

---

[29] McGavick signed one, too. 2d Taylor Decl., Ex. 13.

PBC'S OPPOSITION TO MOTION IN LIMINE TO EXCLUDE
EVIDENCE RELATED TO LOCAL INVESTORS [REDACTED
VERSION] (C07-1620MJP) - 10

BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

DATED this 3rd day of June, 2008.

BYRNES & KELLER LLP

By: /s/ Paul R. Taylor, WSBA #14851
  Bradley S. Keller, WSBA #10665
  Paul R. Taylor, WSBA #14851
  Steven C. Minson, WSBA #30974
  Byrnes & Keller LLP
  1000 Second Avenue, 38th Floor
  Seattle, WA 98104
  Telephone:(206) 622-2000
  Facsimile: (206) 622-2522
  Email: bkeller@byrneskeller.com
      ptaylor@byrneskeller.com
      sminson@byrneskeller.com
  Attorneys for Defendant
  The Professional Basketball Club, LLC

PBC'S OPPOSITION TO MOTION IN LIMINE TO EXCLUDE
EVIDENCE RELATED TO LOCAL INVESTORS [REDACTED
VERSION] (C07-1620MJP) - 11

BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

## CERTIFICATE OF SERVICE

I hereby certify that on the 3rd day of June, 2008, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

>Thomas A. Carr (thomas.carr@seattle.gov)
>Gregory C. Narver (gregory.narver@seattle.gov)
>Seattle City Attorney
>600 Fourth Avenue, 4th Floor
>P.O. Box 94769
>Seattle, WA 98124-4769

>Slade Gorton (slade.gorton@klgates.com)
>Paul J. Lawrence (paul.lawrence@klgates.com)
>Jeffrey C. Johnson (jeff.johnson@klgates.com)
>Michelle Jensen (michelle.jensen@klgates.com)
>K&L Gates
>925 4th Avenue, Suite 2900
>Seattle, WA 98104

>/s/ Paul R. Taylor
>Paul R. Taylor, WSBA #14851
>Byrnes & Keller LLP
>1000 Second Avenue, 38th Floor
>Seattle, WA 98104
>Telephone: (206) 622-2000
>Facsimile: (206) 622-2522
>ptaylor@byrneskeller.com

PBC'S OPPOSITION TO MOTION IN LIMINE TO EXCLUDE
EVIDENCE RELATED TO LOCAL INVESTORS [REDACTED
VERSION] (C07-1620MJP) - 12

BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000