The Honorable Marsha J. Pechman

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

CITY OF SEATTLE, a first-class charter city,  )
)
Plaintiff,  )     No. C07-1620MJP
)
v.  )
)
THE PROFESSIONAL BASKETBALL CLUB,)
LLC, an Oklahoma limited liability company,  )
)
Defendant.  )
)

# DEFENDANT'S TRIAL BRIEF

## [REDACTED VERSION]

BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

Dockets.Justia.com

# TABLE OF CONTENTS

I.      INTRODUCTION ...........................................................................................1

II.     FACTS ........................................................................................................2

        A.      KeyArena, the Lease, and the Troubled Financial State of the
                Relationship for Both Parties ...............................................................2

        B.      The Economics of the Lease No Longer Work for the City ..............................3

        C.      The Economics No Longer Work for the Sonics Because KeyArena
                Is Not a Competitive NBA Facility ......................................................4

        D.      City Has Been Unable to Find a Solution for KeyArena.................................5

        E.      The Rental Payments for the Final Two Seasons Can Be Quantified ..............6

        F.      By All Available Measures, the General Public Is Indifferent Over
                Whether the Sonics Leave .................................................................7

        G.      Oklahoma City Strongly Supports the Sonics ...................................................9

        H.      The Presence of the Sonics in Seattle Does Not Generate Any
                Net Economic Benefit for the City Beyond the Rent Payments
                Under the Lease .........................................................................9

        I.      The PBC Endeavored to Keep the Team in the Greater Seattle
                Area; the City Worked to Defeat These Efforts.................................10

        J.      The City's Lawsuit – Force the PBC to Sell by Locking in Huge
                Losses ......................................................................................11

III.    LEGAL ISSUES .........................................................................................13

        A.      Specific Performance Should Be Denied Because:  (i) the City Has
                an Adequate Remedy at Law; and (ii) Specific Performance Would
                Require Lengthy Supervision of Parties Whose Relationship Is
                Broken......................................................................................13

                1.      Money Damages Are Adequate in This Case ...........................14

                2.      Specific Performance is Denied If Ongoing Supervision Is
                        Necessary ......................................................................14

        B.      There Is No "Sports Teams" Exception to the General Rule............................16

        C.      The City Has No Legally Cognizable Injury Beyond the Amounts
                Owed Under the Lease .....................................................................19

        D.      In Balancing the Equities, the City Will Gain Little From Specific
                Performance, and the Hardships on the PBC Would be Great .......................20

DEFENDANT'S TRIAL BRIEF [REDACTED VERSION]
(C07-1620MJP) - i

**BYRNES & KELLER** LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

E.    Even If Specific Performance Were Otherwise Proper, the City's Claim Is Barred By Its Inequitable Conduct.................................................21

F.    Equity Does Not Allow a Plaintiff to Use Specific Performance to Extract More Than It Bargained For.................................................23

IV.    CONCLUSION.................................................24

DEFENDANT'S TRIAL BRIEF **[REDACTED VERSION]**
(C07-1620MJP) - ii

BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

# TABLE OF AUTHORITIES

## FEDERAL CASES

8600 Associates, Ltd. v. Wearguard Corp., 737 F. Supp. 44 (E.D. Mich. 1990) ..............13

CBL & Associates, Inc. v. McCrory Corp., 761 F. Supp. 807 (M.D.Ga. 1991)................15

Keystone Driller Co. v. General Excavator Co., 290 U.S. 240 (1933)............................22

Northern Indiana Public Service v. Carbon County Coal Co., 799 F.2d 265 (7th Cir 1986) ................................................................................................... 19-20

Precision Instrument Manufacturing Co. v. Automobile Maintenance Machine Co., 324 U.S. 806 (1945) ..............................................................................22

United States Jaycees v. Cedar Rapids Jaycees, 794 F.2d 379 (8th Cir.1986)..................22

## STATE CASES

Arnold v. Melani, 75 Wn.2d 143, 449 P.2d 800 (1968) ....................................24

Bradlees Tidewater, Inc. v. Walnut Hill Investment, Inc., 391 S.E.2d 304 (Va. 1990) ..................................................................................................15

Cahalan Investment Co. v. Yakima Central Heating Co., 113 Wash. 70, 193 P. 210 (1920) ..............................................................................................14

City of Duluth v. Riverbrooke Properties, Inc., 502 S.E.2d 806 (Ga. App.1998).............23

City of New York v. New York Yankees, 458 N.Y.S.2d 486 (N.Y. Sup. Ct. 1983) .................................................................... 18-19

Crafts v. Pitts, 161 Wn.2d. 16, 162 P.3d 382 (2007) ..................................... 20-21

Grossman v. Wegman's Food Markets, Inc., 350 N.Y.S.2d 484 (N.Y. App. 1973)..........15

HMC Management Corp. v. New Orleans Basketball Club, 375 So. 2d 700 (La. Ct. App. 1979)..........................................................................................16-17

Hallauer v. Certain, 19 Wn. App. 372, 575 P.2d 732 (1978) ............................................22

Income Investors, Inc. v. Shelton, 3 Wn.2d 599, 101 P.2d 973 (1940)............................21

Ingram v. Kasey's Associates, 531 S.E.2d 287 (S.C. 2000) ..............................................23

Port of Walla Walla v. Sun-Glo Producers, Inc., 8 Wn. App. 51, 504 P.2d 324 (1972)................................................................................................................23

Lorch, Inc. v. Bessemer Mall Shopping Center, Inc., 310 So. 2d 872 (Ala. 1975)...........15

M. Leo Storch Ltd. v. Erol's, Inc., 620 A.2d 408 (Md. Ct. App. 1993)...................... 14-15

DEFENDANT'S TRIAL BRIEF **[REDACTED VERSION]**
(C07-1620MJP) - iii

BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

Madison Plaza, Inc. v. Shapira Corp., 387 N.E.2d 483 (Ind. Ct. App. 1 Dist. 1979) ..................................................................................................15

Mayor's Jewelers, Inc. v. State of California Public Employees' Retirement System, 685 So. 2d 904 (Fla. App. 4th Dist. 1996) ........................13

Metropolitan Sports Facilities Com'n v. Minnesota Twins Partnership, 638 N.W.2d 214 (Minn. Ct. App. 2002) ..................................................17

Nelson v. Nelson, 57 Wn.2d 321, 356 P.2d 730 (1960) .................................22

New Park Forest Associates II v. Rogers Enterprises, Inc., 552 N.E.2d 1215 (Ill. Ct. App. 1 Dist. 1990) .........................................................15

New York City v. New York Jets Football Club, Inc., 394 N.Y.S.2d 799 (N.Y. Sup. Ct. 1977) .......................................................................18

Portion Pack, Inc. v. Bond, 44 Wn.2d 161, 265 P.2d 1045 (1954) ................23

Price v. Herman, 81 N.Y.S.2d 361 (N.Y. Sup. Ct. 1948), aff'd, 87 N.Y.S.2d 221 (N.Y. App. 1949) ........................................................15

Rose v. National Auction Group, Inc., 646 N.W.2d 455 (Mich. 2002)............22

Sizeler Property Investors, Inc. v. Gordon Jewelry Corp., 544 So. 2d 53 (La. Ct. App. 4th Cir. 1989) ...........................................................15

State ex rel. Schoblom v. Anacortes Veneer, Inc., 42 Wn.2d 338, 255 P.2d 379 (1953).....................................................................................16

Washington Trust Bank v. Circle K Corp., 15 Wn. App. 89, 546 P.2d 1249 (1976) ........13

## DOCKETED CASES

The City of San Diego v. National League of Professional Baseball Clubs, Nos. 343508, 344027 (Cal. Super. Ct. filed June 15, 1973).................17

Brotherson v. The Professional Basketball Club, LLC, W.D. Wash. C07-1787RAJ .................................................................................19

## MISCELLANEOUS

71 Am.Jur.2d § 94 (2008) ...............................................................................21

Restatement (Second) of Contracts § 313(2) (1981 & Supp. 2008)................20

Restatement (Second) of Contracts § 364(1) ................................................21

25 Washington Practice: Contract Law & Practice § 15:1 (2007)..................21

DEFENDANT'S TRIAL BRIEF [REDACTED VERSION]
(C07-1620MJP) - iv

Byrnes & Keller LLP
38th Floor
1000 Second Avenue
Seattle, Washington 98104
(206) 622-2000

# I. INTRODUCTION

Leases are generally not specifically enforceable. There are two reasons. First, damages in the form of rent make the landlord whole. Second, specific performance under a lease is not a discrete act like conveying a piece of property, but requires a series of ongoing acts. Specific performance of a lease requires ongoing supervision by the Court.

There is nothing about this case that takes it outside the general rule. To the contrary, the facts show that it is time to end the relationship, not continue it by force. Both parties will be worse off financially with forced performance, and there is no offsetting benefit. While the City relies on the interests of the public at large, the public is not a party to the lease. As nonparties, their interests are legally irrelevant. But even if they could be considered, the result is the same. The great majority of the public has a yawning indifference to the Sonics departure. Save for some diehard fans like Mr. Alexie, not many people care very much. Both parties' expert economists agree that the departure of the Sonics will have no economic impact on businesses in Seattle. Again, these businesses are not parties to the lease, and their interests are not relevant. But even if they were, the Sonics will not take consumer spending with them when they leave. Money spent on the Sonics will "transfer," i.e., be spent on other forms of local entertainment. The sole dissenter, a different City expert, opines that money once spent on the Sonics will cease to be spent on anything.

Even if the City could get past the rule that leases are not specifically enforceable, it runs headlong into traditional equity considerations. Long-term forced performance is disfavored given the likelihood (strong here) that the Court will become a referee. For example, given the City's use of specific performance to lock in huge losses and force the PBC to sell the team, ongoing disputes are inevitable. Similarly, if forced to stay, the PBC may need to drastically alter its business methods, potentially reducing the rent to the City. There is little doubt that this would involve the court in a challenge to the team's business methods. Likewise, while staying in

DEFENDANT'S TRIAL BRIEF **[REDACTED VERSION]**
(C07-1620MJP) - 1

BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

Seattle for two years, the team will be finalizing plans to move to Oklahoma City. Conversely, the City will be pressing for new ways to block the move. Collision is inevitable.

There is also the lingering cloud of unclean hands. The City brought this action to force the PBC to sell the team to the City's preferred tenant through "forced bleeding." It took steps to "drive a wedge" between the PBC and the NBA as a means of persuading the NBA not to allow the team to move to Oklahoma City. The City now asks the Court to put its equitable imprimatur on this effort.

Finally, there is an overarching fact that the City must concede, and which informs the outcome. The lease ends in 2010, at which point the Sonics can leave, regardless. Given that the departure is inevitable, what will be gained by two years of forced performance, measured against huge financial losses and putting a business and its employees on hold for two years? Unless this balance tips heavily towards the City, it is not entitled to the extraordinary remedy of specific performance.

## II. FACTS

### A. KeyArena, the Lease, and the Troubled Financial State of the Relationship for Both Parties

KeyArena was built almost 50 years ago for the 1962 Seattle World's Fair. After the Fair, the City purchased the building from the State of Washington for $2.9 million. The City converted it into the Seattle Coliseum – a multipurpose venue for sports, concerts, trade shows, family events (e.g., the circus), etc. In 1967, the Coliseum began being used by the Seattle SuperSonics, then a new franchise in the NBA.

Fifteen years ago, in 1993, the Sonics and the City began discussing a private/public partnership for a $100 million remodel of the aging and deteriorating Coliseum. The funding mechanism envisioned – using a percentage of the team's revenues to pay off bonds issued to fund the renovation – with no tax dollars, was unprecedented.

The financial terms of the arrangement were as follows. First, the Sonics contributed approximately $20 million cash. Second, they agreed to pay an annual base rent, initially $1

DEFENDANT'S TRIAL BRIEF [REDACTED VERSION]
(C07-1620MJP) - 2

BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

1   million with a yearly inflationary escalator. Most importantly, the Sonics committed to pay, as

2   additional rent, a percentage of the team's revenues from suite sales and rentals, club seats and

3   other income streams to satisfy the debt service. For its part, the City pledged its credit to support

4   the issuance of bonds to pay for the project. The arrangement was designed so that no tax dollars

5   would be used. The parties predicated the agreement on two interrelated assumptions: (i) that

6   KeyArena would be a competitive NBA arena for the life of the lease, and (ii) the revenue sharing

7   payments would be adequate to cover the first fifteen years of debt service on the bonds.

8          From 1995 to 2007, the Sonics paid approximately $110,000,000 in base and revenue

9   sharing rent. They also made capital improvements of approximately $10,000,000. In other

10  words, the Sonics (not the City, and not the taxpayers) have been the primary funder of the

11  renovations made in 1995.

12  **B.      The Economics of the Lease No Longer Work for the City**

13         Unfortunately, after several years, and due to circumstances beyond the parties' control,

14  the once visionary agreement began failing for both parties. From the City's perspective,

15  beginning in around 2000, the financial component of the arrangement began failing because of

16  several events. First, when the remodeled KeyArena opened, it was the only professional sports

17  facility in the region with modern suites and so-called premium seating arrangements. Thus, it

18  had a monopoly on these key components of the revenue sharing arrangement. But with the

19  addition of taxpayer-subsidized Safeco and Qwest Fields, the available suite and premium seating

20  inventory in the City nearly tripled, as did the competition for high net worth season ticket

21  dollars. This dramatically increased competition, combined with regional economic downturns,

22  created in the words of the director of the Seattle Center, a "perfect economic storm." As a result,

23  the revenue sharing stream was no longer enough to cover debt service. The City began paying a

24  portion of the debt service out of Seattle Center's general budget, and later other sources.

25  Unfortunately, this debt service shortfall will continue during the last two years of the lease,

26  regardless of whether the Sonics play the remaining two seasons in KeyArena.

BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

Ironically, if the Sonics do not play the remaining two seasons at KeyArena, the City will be better off financially. It will avoid nearly $1 million per season in "day in game" costs that it presently incurs, including security for games and other variable costs. It will also have an additional 41 dates per year that it can rent KeyArena for other events, including prime weekend evenings.

**C.**     **The Economics No Longer Work for the Sonics Because KeyArena Is Not a Competitive NBA Facility**

From the Sonics perspective, the agreement likewise no longer works, and has not worked for years. In addition to the suite competition, economic climate, etc., that caused problems for the City, the PBC and its predecessors have been economically crippled by (i) the revenue sharing obligations under the lease, and (ii) the revenue generating limitations of KeyArena. The evidence will show that this is not a new problem. The City – the landlord – has known for several years that the lease is economically dysfunctional for the tenant.

Looking first at the lease, as early as 2003, the law firm of K&L Gates, which was then representing the Sonics prior owner – the Schultz group – concluded that "the current lease between the City and Sonics does not work for either party." They described it as "the worst lease in the NBA." K&L Gates urged the owners to consider moving the team.

As to the arena itself, the parties agree that KeyArena is no longer economically viable for men's professional basketball. As recently as March 8, 2008, the City's lawyers acknowledged that ██████████████████████████████████[1] The problem is KeyArena's size and these physical limitations restrict the potential revenue streams.

Of the 29 NBA arenas, KeyArena is the smallest, barely one-half the average size of other NBA facilities. The limited square footage is economically crippling. The size and configuration make it impossible to offer enough premium seating alternatives. As a result, the Sonics premium seating revenues are among the lowest in the NBA.

---

[1] Trial Ex. 585.

DEFENDANT'S TRIAL BRIEF **[REDACTED VERSION]**
(C07-1620MJP) - 4

BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

The small size also limits point of sale opportunities for food, beverages, and merchandise. For example, a number of NBA venues offer (and profit from) a variety of restaurant-type dining alternatives. By comparison, Toyota Center (Houston) has 13,500 square feet of restaurant/club space. AT&T Center (San Antonio) has 11,400 square feet. Fed Ex Forum (Memphis) has 6,000 square feet. KeyArena has only 1,300 square feet of restaurant/club space.

As a result of these shortcomings, the PBC's losses for the 07/08 season are estimated at approximately $30 million.[2] For the remaining two seasons (08/09 and 09/10) the combined projected operating loss for the PBC is between $60 and $65 million.

By contrast, if the Sonics are permitted to move to Oklahoma City beginning with the 08/09 season, they are projected to earn $7.3 million in 08/09 and $11.5 million in 09/10. Accordingly, the swing from remaining in Seattle for the last two seasons to relocate to Oklahoma City is from $60 to $65 million in losses to approximately $19 million in operating profit.

**D.** **The City Has Been Unable to Find a Solution for KeyArena**

Although the parties agree about KeyArena's deficiencies, the parties disagree about whether KeyArena could, at considerable expense, be made economically viable for men's professional basketball. Even the City acknowledges that a minimum investment of $300 million would be required. The PBC does not believe that even that investment would be sufficient. Regardless, it does not appear that the requisite funding for remodeling KeyArena can be obtained in the foreseeable future. Three different groups have tried since 2004 to obtain funding for renovations and/or a new arena. All three failed. Initially, the Schultz group made repeated unsuccessful efforts with the Washington legislature. When the PBC purchased the team, it too worked hard, but unsuccessfully, for funding legislation (more about this below). Most recently, a group of private investors sought assistance from the legislature. The private investors committed to spending $150 million of their own funds toward the renovation, and the City was

---

[2] The fiscal year does not end until September 30, 2008.

BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

willing to contribute $75 million. The legislature was not even willing to bring the matter to a vote.

Despite the acknowledged shortcomings of KeyArena as a venue for men's professional basketball for over five years, the City has been unable to find a solution. There is no prospect that it will be remodeled, renovated or upgraded by the end of the existing lease, or at any time in the foreseeable future. This observation is not by way of criticism, but simply a reflection of the legislature's focus on our state's other pressing needs.

What is important is that the City, as landlord, seeks specific performance of a lease it knows does not permit the tenant to be successful, even though it has had years to try to resolve the problems.

### E.   The Rental Payments for the Final Two Seasons Can Be Quantified

One of the issues in a specific performance case is whether the monetary damages can be determined with reasonable certainty. Here, the amounts owed under the lease by the PBC for the two remaining seasons can be estimated with reasonable certainty. The payments due under the lease are broken into two categories. The first consists of fixed pre-season and quarterly rental payments. These are fixed amounts which are subject to annual set increases. The second is a variable component consisting of a percentage of suite rentals, suite leases, club seat sales, and a five percent admission tax. Finally, there is an annual "title sponsorship" which is a percentage of the amount KeyBank pays to have the name "KeyArena."

The amounts due under the lease can be calculated with reasonable certainty under either of two scenarios. First, based on the averages for the 05/06 and 06/07 seasons, and applying a reduction factor based on the decline in revenues in the 07/08 season, the amounts owed are as follows: 08/09-$5,113,051; 09/10-$4,909,605.

An alternate measure, based on comparable attendance declines for "lame-duck" sports franchises, i.e., those publicly known to be leaving for a different city, the payments are as follows: 08/09-$4,532,394; 09/10-$4,673,880.

BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

**F.** **By All Available Measures, the General Public Is Indifferent Over Whether the Sonics Leave**

There is a demonstrably high degree of public apathy about the Sonics leaving Seattle. This is evident from every available measure of public opinion and interest. And it is uncontradicted by any measure. This pronounced apathy speaks volumes about the supposed "benefits" of forcing the team to play here two more years.

The results of a survey of a nationally-known polling firm, Field Research, taken in November 2007, show that 66 percent of Seattleites either believe it would make no difference to them if the Sonics left Seattle, or they would be "better off." Of the remainder, 13 percent said they would be only "slightly worse off if the Sonics left," 8 percent said they would be "somewhat worse off" and only 12 percent said they would be "much worse off" if the Sonics left Seattle.

The Field Research poll results are consistent with earlier polls. For example, in 2005, 79 percent of Seattleites did not support using tax dollars to keep the Sonics in Seattle. In 2006, 65 percent said they did not support using tax dollars to keep the Sonics in Seattle.

The poll results are consistent with the election results on Seattle Initiative 91 in November 2006. That initiative provided that City funds could not be used on professional sports facilities unless the City was guaranteed a minimum rate of return on the funds it contributed to building the facility. The "Statement for" Initiative 91 in the official Voting Guide, authored by City Councilperson Nick Licata, explained that in terms of City priorities, there were more important things than new sports facilities, "such as keeping schools open, affordable housing, healthcare, lower taxes, roads and transit, and real economic development." Initiative 91 passed overwhelmingly – by 75 percent.

The polling results are also consistent with the television ratings for team broadcasts. For example, Nielsen ratings have declined by more than 50 percent since 2004:

| 2004 | 3.12 |
|------|------|
| 2005-2006 | 1.67 |
| 2006-2007 | 1.60 |
| 2007-2008 | 1.24 |

DEFENDANT'S TRIAL BRIEF [REDACTED VERSION]
(C07-1620MJP) - 7

BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

The 1.24 rating for the 07/08 season means that, on average, out of 1,500,000 potential households, only 19,000 were watching the Sonics. The ratings for some individual games this past season were even lower. For example, the ratings for the April 4, 2008, Sonics game was .59, meaning that only 11,700 households turned on the game.

The drop in television ratings tracks the drop in attendance. For example, the number of season ticket holders dropped from 5,242 in 03/04 to 2,933 in 07/08, a decline of 55 percent. Overall average attendance per game has dropped from 13,798 in 00/01 to 9,146 for the 07/08 season. Seattle's attendance ranks 27th out of 29 NBA teams. Similarly, since the 03/04 season, there has been a 50 percent increase in "no shows," i.e., people who paid for a ticket but did not attend. No shows went from 19 percent in the 03/04 season to 28 percent in the 07/08 season. In other words, nearly one-third of those who paid for a ticket did not attend. This is, unfortunately, compelling evidence of the level of disinterest.

An editorial from the Tacoma News Tribune in April 2007 summarizes the prevailing apathy towards the Sonics. In April 2007 the Washington legislature declined to vote on funding for a new multipurpose arena – a key to the Sonics staying in the Seattle area. In response, Sonics' Chair Clay Bennett said there was "little hope of remaining in the Puget Sound region." Here is the Tacoma News Tribune's response:

> [I]t seems obvious that the region's love affair with the Sonics is all but over.
> . . . .
> We didn't notice a sense of general crisis in the Puget Sound region following [Bennett's] pronouncement. The sky turned dark, but that was just the rain. Life goes on.
> . . . .
> If the city of Seattle is in a panic about the prospect of losing the Sonics, we haven't noticed. . . . The Sonics' biggest problem is that Seattle and the rest of the metropolitan region doesn't need the Sonics to feel big-league any more.[3]

It may be that at some time in the past, the Sonics were a meaningful part of Seattle's community fabric. For many reasons that is no longer true. Even if it were true, an order of

---

[3] "The Sonics are headed for Oklahoma? Oh woe," Tacoma News Tribune, April 17, 2007, editorial (Trial Ex. 559).

BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

specific performance can, at most, only require the team to play in Seattle for two additional seasons. Whatever the Sonics role in the community, it will be gone in two years.

## G. Oklahoma City Strongly Supports the Sonics

In contrast to Seattle, the majority of Oklahoma City residents are enthusiastic about the Sonics, and genuinely want the team to play in Oklahoma City. For example, in March 2008, Oklahoma City voters approved an increase in their sales tax to generate funds to upgrade Ford Center, where the Sonics will be playing once they move to Oklahoma City. The vote passed by 62 percent. This is in sharp contrast to Seattle where, in 2006, 75 percent voted against using tax funds to fund improvements for professional sports venues.

Likewise, in April 2008, the Oklahoma Legislature overwhelmingly passed a bill providing job tax credits for the Sonics in Oklahoma City. This is in direct contrast to the Washington legislature's inactivity. Despite repeated attempts by the Sonics current and prior ownership beginning in 2005, the Washington legislature has declined to even bring legislation for a remodeled or new arena to a vote on the floor.

These comparisons between Oklahoma City and Seattle are not intended as a criticism of Seattle. They do, however, reflect that the value a community places on a professional sports team is measured by the actions it does, and does not, take.

## H. The Presence of the Sonics in Seattle Does Not Generate Any Net Economic Benefit for the City Beyond the Rent Payments Under the Lease

The Sonics departure from Seattle will not have any impact on Seattle's economy. The Sonics presence at KeyArena does not generate any net economic benefit for the City beyond the stream of rental payments under the lease. The City's own analysis, done well before any prospect of this litigation, supports this conclusion:

> There is no empirical evidence showing that major league teams and their stadiums/arenas are effective drivers of local and regional economies. There is abundant evidence that they are not. To quote two authorities in the field, "Few fields of empirical economic research offer virtual unanimity of finding. Yet, independent work on the economic impact of stadiums and arenas has uniformly found that there is no statistically significant

BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

positive correlation between sports facility construction and economic development.[4]

Indeed, the City's expert economist, Professor Zimbalist, concedes that professional sports teams do not generate any net economic benefit for a host city.

Likewise, the "For" statement regarding Initiative 91 in the official Voters Guide, authored by Councilperson Licata, explained that:

> Studies show that the Sonics have a limited economic impact on Seattle, that the money spent at pro-sports games is discretionary and would otherwise be spent elsewhere in our region.[5]

Consistent with the City's analysis, there is an overwhelming and unanimous body of peer reviewed academic research concluding that the presence of a professional sports team in a city does not generate a net economic benefit for the city. That literature, endorsed by the City's expert economist, Mr. Zimbalist, is based on many studies of many teams in many cities. It shows that money spent at professional sports games comes from discretionary consumer spending. If a professional sports team is no longer available as an entertainment option, those discretionary dollars will be spent on other forms of entertainment. Stated simply, if the Sonics leave Seattle, they will not take consumer spending with them.

I.     **The PBC Endeavored to Keep the Team in the Greater Seattle Area; the City Worked to Defeat These Efforts**

As a part of its acquisition of the Sonics from the Schultz ownership group, the PBC committed to making good faith efforts to obtain what would be, in their discretion, a viable new arena in the greater Seattle area, thus keeping the Sonics in the area. The PBC devoted considerable money, time, and energy to this commitment. The PBC spent over $2 million in this effort, including lobbying, real estate consultants, site selection and analysis, legal fees, travel costs, public relations efforts, etc. The PBC retained a local law firm to draft proposed funding legislation and advice on the lobbying process. They retained a separate firm for land use

---

[4] Trial Ex. 525, Outline of Central Staff presentation to PELL Committee on KeyArena Economic Impact Assessment.
[5] Trial Ex. 518.

DEFENDANT'S TRIAL BRIEF **[REDACTED VERSION]**
(C07-1620MJP) - 10

BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

planning and real estate advice. They retained a well regarded public relations firm for public relations and lobbying. They hired one of the nation's lead arena architect firms to provide arena design advice. Through its real estate consultants, the PBC analyzed over 100 potential sites in the greater Seattle area, ultimately settling on Renton as the best location for a new multipurpose arena.

Clay Bennett, Chair of the PBC, made numerous trips to Seattle and Olympia, and had many meetings with Seattle area political, business and community leaders seeking to generate support for a new arena. Despite those efforts, the PBC was unsuccessful. The legislature declined to vote on legislation for funding a new multipurpose arena.

Part of the reason for the PBC's lack of success with the legislature may have been efforts by representatives of Seattle. The Mayor and the City Council were concerned that if a new arena were built in the greater Seattle area, it would create competition for KeyArena, which would suffer as a result. Accordingly, and unbeknownst to the PBC, members of the Seattle City Council, and the Deputy Mayor, lobbied legislators to oppose the PBC's proposal for a new arena. Those efforts likely doomed the PBC's efforts at securing a new arena, which would have kept the Sonics in the area. In short, the City wanted the Sonics to remain, but only if it was in Seattle proper, and not the greater Seattle area.

**J.    The City's Lawsuit – Force the PBC to Sell by Locking in Huge Losses**

K&L Gates long ago recognized that a "win" would accomplish little:



Because winning the lawsuit would not accomplish its goal, the City formulated a strategy to use this lawsuit, and the threat of specific performance, to try to force the PBC to sell the Sonics to a group of local owners:

---

[6] Trial Ex. 576 at 1.

DEFENDANT'S TRIAL BRIEF [**REDACTED VERSION**]
(C07-1620MJP) - 11



The strategy was detailed in a document prepared in part by K&L Gates and distributed at an October 7, 2007, meeting. Present were K&L Gates, potential buyer Steve Ballmer, Mike McGavick, and Wally Walker. One of the purposes of the meeting was to discuss how to force the PBC to sell the team to Seattle–based owners, and how the City could persuade the NBA not to allow the PBC to relocate the team to Oklahoma City. The strategy included the following:



With respect to persuading the NBA not to permit relocation in particular, Walker was tasked with "driving a wedge" between the PBC and the NBA.

Soon after this meeting, prominent local developer Matt Griffin joined the buyer's group, becoming its manager and public spokesman. As Griffin explained, the goal of the lawsuit was to [11]

Thereafter, the City pursued a three-track strategy – persuade the NBA not to approve relocation of the Sonics to Oklahoma City (the "wedge"), induce the PBC to sell through the threat of specific performance ("forced bleeding"), and seek funding for their proposed $300 million renovation of KeyArena. To date, these efforts have failed. There is little doubt, however, that these efforts will be redoubled if specific performance is ordered.

---

[7] Id. at 2.
[8] Trial Ex. 567 at WW00227.
[9] Id. at WW00229.
[10] Id. at WW00236.
[11] Trial Ex. 575 at Griff_00001052.

BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

### III. LEGAL ISSUES

**A.** **Specific Performance Should Be Denied Because: (i) the City Has an Adequate Remedy at Law; and (ii) Specific Performance Would Require Lengthy Supervision of Parties Whose Relationship Is Broken**

Specific performance is an extraordinary remedy. There is no right to specific performance, and it is not available where there is an adequate remedy at law. <u>Wash. Trust Bank v. Circle K Corp.</u>, 15 Wn. App. 89, 546 P.2d 1249 (1976).

The general rule is that landlords may not obtain specific performance compelling tenants to operate businesses. <u>See</u> <u>8600 Assocs., Ltd. v. Wearguard Corp.</u>, 737 F. Supp. 44, 46 (E.D. Mich. 1990) (decisions denying injunctive relief to landlords reflect "the modern trend and the majority rule"); <u>Mayor's Jewelers, Inc. v. State of Cal. Pub. Employees' Retirement Sys.</u>, 685 So.2d 904 (Fla. App. 4th Dist. 1996) ("[A]lmost every other court confronted with this issue has denied injunctive relief requiring a tenant to specifically perform a lease."). Indeed, specific performance is typically denied even where the landlord and tenant have agreed that the landlord is entitled to *mandatory injunctive relief* if the tenant failed to keep the store open as required. <u>See</u> <u>8600 Assocs. Ltd. v. Wearguard Corp.</u>, 737 F. Supp. 44, 46 (E.D. Mich. 1990).

Washington follows the general rule. <u>Wash. Trust Bank v. Circle K Corp.</u>, 15 Wn. App. 89, 546 P.2d 1249 (1976). In that case, Circle K negotiated a long-term lease to operate a convenience store. Before signing, Circle K inspected the premises and negotiated an addendum allowing it to remodel. The City's planning department, however, later indicated certain desired changes would not be permitted. Without actually applying for a permit to remodel in conformity with code, Circle K announced that it was unable to obtain a permit and "cancelled" the lease. The landlord sought specific performance. This was denied. The denial was affirmed on appeal because "[i]t has long been held in Washington that there is an adequate remedy at law in damages for the breach of a lease agreement." <u>Id.</u> at 93.

Landlords are denied specific performance for two reasons. First, a landlord's legal remedy – money damages for compensable losses – is an adequate remedy. Second, specific

BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

performance of a lease cannot be accomplished with a single act, such as conveying a piece of property, but requires continuous, protracted interaction between parties and court supervision of that relationship. Both reasons apply here, and require that the City be left to its legal remedy.

### 1. Money Damages Are Adequate in This Case

The compensable monetary damages to the City – the rent for the remainder of the term can be easily calculated. This payment makes the City whole. There is no other cognizable injury. Even if the public's interest can be considered (as a matter of law it cannot, see § IIIC), the result is the same. The overwhelming attitude of the public towards the Sonics departure is "so what," and the departure will have no economic impact on the City.

### 2. Specific Performance Is Denied If Ongoing Supervision Is Necessary

Specific performance is also denied where the contract calls for a succession of acts whose performance cannot be consummated by one transaction, and which requires ongoing supervision. This has long been the rule in Washington. In Cahalan Investment Co. v. Yakima Central Heating Co., 113 Wash. 70, 193 P. 210 (1920), for example, plaintiff sought an order requiring defendant to provide its apartment building with steam heat for the remaining three years of a commercial services contract. As the Court explained:

> A court of equity is always loath to specifically enforce a contract the enforcement of which requires the subsequent supervision and direction of the court, especially so where the contract extends over a considerable period of time. ...Many differences can arise, and most certainly will arise, between the parties during this time over the question whether the contract is being properly performed, to settle which will require investigations and orders on the part of the court. ...

113 Wash. at 74-75. Accordingly, specific performance was denied, and plaintiff was left to its legal remedy. Id. at 75 ("To conduct a private business is not the function of a court of equity.").

Given the burdens of requiring parties to run a business, this rule applies when landlords seek to enforce "continuous operations" clauses. In M. Leo Storch Ltd. v. Erol's, Inc., 620 A.2d 408 (Md. Ct. App. 1993), the Court recognized that knowledge and judgment was required in "innumerable" day-to-day business decisions. Hoping to persuade the Court that the burdens of

DEFENDANT'S TRIAL BRIEF [REDACTED VERSION]
(C07-1620MJP) - 14

BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

1    ordering specific performance would be minimal, the landlord argued that the Court could issue

2    "a simple order that says, you may not continue to breach the continuous operations clause." 620

3    A.2d at 412. This was rejected. As the Court explained, "if a dispute arises in the future, the

4    court will become a referee." Id.

5        Accordingly, and because a landlord can be compensated with money, the rule against

6    specific performance of continuous operations clauses is almost universal. See, e.g., CBL &

7    Assocs., Inc. v. McCrory Corp., 761 F. Supp. 807, 809-10 (M.D.Ga. 1991) (specific enforcement

8    of continuous operations clause denied because "it would require continuous and detailed

9    supervision by the court and the threat of irreparable injury is not present"); New Park Forest

10   Assocs. II v. Rogers Enters., Inc., 552 N.E.2d 1215 (Ill. Ct. App. 1 Dist. 1990); Sizeler Prop.

11   Investors, Inc. v. Gordon Jewelry Corp., 544 So.2d 53 (La. Ct. App. 4th Cir. 1989); Lorch, Inc. v.

12   Bessemer Mall Shopping Ctr., Inc., 310 So.2d 872, 876 (Ala. 1975); Madison Plaza, Inc. v.

13   Shapira Corp., 387 N.E.2d 483, 486-87 (Ind. Ct. App. 1 Dist. 1979); Price v. Herman, 81

14   N.Y.S.2d 361 (N.Y. Sup. Ct. 1948), aff'd, 87 N.Y.S.2d 221 (N.Y. App. 1949); Bradlees

15   Tidewater, Inc. v. Walnut Hill Inv., Inc., 391 S.E.2d 304 (Va. 1990); Grossman v. Wegman's

16   Food Markets, Inc., 350 N.Y.S.2d 484 (N.Y. App. 1973).

17       Here, there can be little doubt that the parties will be back before the Court during a two-

18   year period of forced performance. For example, there is currently a dispute about how the lease

19   governs suite sales. A potential purchaser wants an "out" clause if the Sonics leave. The City

20   does not want to allow such a clause, and claims the right to veto it. This veto right is disputed.

21   The City either does not understand, or does not care, that their action will cost the PBC in excess

22   of $100,000. This is an example of the kinds of day-to-day operational disputes which, upon an

23   order of specific performance, fall within the Court's jurisdiction.

24       The City's stated goal is to inflict "pain" on the finances and reputation of PBC members

25   in order to force the PBC to sell the team or lose upwards of $80 million. The City has also

26   worked to "drive a wedge" between the PBC and the NBA. City officials, including the Mayor

DEFENDANT'S TRIAL BRIEF [REDACTED VERSION]
(C07-1620MJP) - 15

BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

1  and the City Attorney, have repeatedly vilified the PBC in public statements and in the media.

2  The relationship is anything but a normal commercial business relationship. The dispute has been

3  ugly, and will require that people who no longer wish to associate with each other continue to do

4  so. State ex rel. Schoblom v. Anacortes Veneer, Inc., 42 Wn.2d 338, 255 P.2d 379 (1953).

5      Likewise, the City's Statement of Facts in the Pretrial Statement challenges the PBC's

6  decision to trade two players, contending the PBC is purposefully diminishing the quality of the

7  team. In its briefing in opposition to the motion to exclude the testimony of talk show host Mitch

8  Levy, the City argued that the team is improperly seeking to reduce its publicity, thereby reducing

9  revenues. These are previews of future disputes that will come before the Court if forced

10  performance is ordered.

11      Similarly, in order to survive a two-year lame-duck period in the face of tens of millions

12  of dollars in losses, the PBC may be required to fundamentally alter its methods and approach to

13  doing business. For example, the PBC may need to slash ticket prices to attract customers. This

14  will reduce the City's income under the lease, and it is reasonable to assume the City would return

15  to Court asking for assistance. Will the City fight the changes in order to continue the forced

16  bleeding? Difficult questions about how to stem "the bleeding" the City seeks to impose through

17  forced performance will lead to court involvement and questions about financial management.

18      Finally, throughout the forced performance period, the PBC will be preparing to move the

19  team to Oklahoma City at the end of the lease. Seattle, by contrast, will continue to do anything it

20  can to block the move. A collision between these mutually inconsistent goals is unavoidable, and

21  will force the parties back into the courtroom.

22  **B.**    **There Is No "Sports Team" Exception to the General Rule**

23      The City tries to avoid Circle K and the long line of cases denying specific performance

24  by claiming that this case is somehow different because the tenant is a professional sports team.

25  But there is no special rule holding that stadium landlords are entitled to specific performance. In

26  HMC Management Corp. v. New Orleans Basketball Club, 375 So.2d 700, 711 (La. Ct. App.

BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

1979), for example, the trial court denied the landlord's request for specific performance of a stadium lease by the New Orleans Jazz, noting that "as a legal proposition, the Courts do not issue injunctive relief for specific performance to enforce contracts of lease."

Also, in The City of San Diego v. National League of Professional Baseball Clubs, Nos. 343508, 344027 (Cal. Superior Ct. filed June 15, 1973), the court denied the landlord's request for injunctive relief.[12] The San Diego Padres announced a decision to relocate the team to Washington D.C. Based on a stadium lease, the City sued to enjoin the team from moving, which was denied. Similar to the City's allegations in this case, the landlord claimed that a lease providing that the team would "play major league baseball games" at the stadium entitled the City to specific performance. The court rejected this argument, concluding:

> [I]t is apparent that the City does have an action at law for damages and for a breach of their contractual relationship. And I am further of the opinion that that matter of damages is measurable in terms of dollars, in terms of money, and if that be so, then the Court of Equity must deny its process by way of injunctive relief.[13]

The stadium cases on which the City relies involve different facts and different procedural postures. They are neither controlling, nor even informative. For example, the City relies on Metropolitan Sports Facilities Com'n v. Minnesota Twins P'ship, 638 N.W.2d 214 (Minn. Ct. App. 2002). But the Twins case simply held that the trial court did not abuse its discretion in enforcing a *temporary restraining order* preventing Major League Baseball from eliminating a team before its final year under a stadium lease. The trial court determined that money damages were inadequate because the team paid *no rent* for use of the stadium, locker rooms, or offices. Thus, there were no monetary damages. Perhaps not surprisingly, the Court found that the lease was not a "typical commercial lease." Instead, "with no rent being collected," the major benefit the landlord received under the lease was the team playing at the stadium, which was built with public funds to attract major league sports teams. Id. at 219. Therefore, and because the team's

---

[12] July 10, 1973, Transcript of oral decision from City of San Diego v. Nat'l League of Prof'l Baseball Clubs at 304 (Appendix A hereto).
[13] Id. at 303.

BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

claimed financial hardship was unsupported and the parties' relationship was not in "open rupture," a temporary restraining order was affirmed, pending adjudication on the merits.

This case is fundamentally different. First, this is not a "rent free" lease. Through the base and revenue sharing rent provisions, the Sonics have paid the overwhelming majority – over $100,000,000 – of the cost of the renovation of KeyArena. Second, unlike Minneapolis in the Twins case, there is widespread public apathy about the Sonics remaining in Seattle. Only a small minority of the public sees a "benefit" in watching the Sonics. Third, the PBC's economic hardship is demonstrable. Fourth, there is an "open rupture."

The City's reliance on two New York state trial court decisions is similarly misplaced. Both simply issued TRO's on facts different from those here. In <u>New York City v. New York Jets Football Club, Inc.</u>, 394 N.Y.S.2d 799 (N.Y. Sup. Ct. 1977), the trial court issued a temporary restraining order preventing a team from leaving New York for New Jersey two games earlier than agreed, explaining that "the people of the City" were threatened with irreparable injury at a time when the City was near bankruptcy:

> Every business that leaves the City; every major corporate home office that departs for the suburbs; every drop in the number of people employed reported by the Bureau of Labor Statistics; every downward thrust in the City's credit standing; each team that leaves for a greener (larger) stadium is another drop of the City's life blood. Every reduction in the number of home games seriously adds to the cumulative effect upon the City's viability. Two games may sound small but they are an important part of the home game schedule.

<u>Id.</u> at 803.

Seattle is on different, and better, economic footing than New York City in the late 70's.

Similarly, in <u>City of New York v. New York Yankees</u>, 458 N.Y.S.2d 486 (N.Y. Sup. Ct. 1983), the trial court issued a temporary restraining order preventing the Yankees from scheduling three home games in Denver during stadium construction. The Court explained that:

> Much more is at stake than merely the loss of direct and indirect revenue to the city.

BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

The Yankee pinstripes belong to New York like Central Park, like the Statue of Liberty, like the Metropolitan Museum of Art, like the Metropolitan Opera, like the Stock Exchange, like the lights of Broadway, etc. Collectively they are "The Big Apple". Any loss represents a diminution of the quality of life here, a blow to the city's standing at the top, however narcissistic that perception may be.

Id. at 490.

If the Sonics were this much a part of Seattle, they would not be moving. But they are not. As the plaintiffs in the ticket holder class action explain, watching the Sonics during a two-year lame-duck period would be like "spending Valentine's Day with a spouse who has filed for divorce and professed love for someone else."[14]

## C. The City Has No Legally Cognizable Injury Beyond the Amounts Owed Under the Lease

The City contends that the Sonics departure will damage the community's "civic pride" and injure local businesses. None of this is true, but even if it were, it is legally irrelevant. The City of Seattle is a distinct legal entity, separate and apart from Sonics' fans or the citizens of Seattle. They are not one in the same. The City is a party to the lease and to this lawsuit. The citizens are not party to either, nor is the dwindling Sonics fan base. Their interests are not cognizable in determining whether specific performance should be granted.

This principle was illustrated in Northern Indiana Public Service v. Carbon County Coal Co., 799 F.2d 265 (7th Cir 1986). In that case, a public utility contracted to buy coal from the Carbon County Coal Co. for 20 years. The utility breached the contract. The coal company sued for specific performance, claiming, among other things, that the miners and merchants of Hanna, Wyoming, where the coal mine was located, would suffer if the contract were not specifically enforced. The Court rejected specific enforcement. First, it pointed out that the miners and merchants were not parties to the contract at issue, nor were they third-party beneficiaries. As a result, "they have no legal interest in the contract." Id. at 280.

---

[14] Pltf's Opp. to PBC's Motion to Stay at 5 (Dkt. No. 14), Brotherson v. The Professional Basketball Club, LLC, W.D. Wash. C07-1787RAJ.

DEFENDANT'S TRIAL BRIEF [REDACTED VERSION]
(C07-1620MJP) - 19

BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

The court also explained that "public interest" is a factor in deciding whether to grant or deny injunctive relief. But when the focus is on whether third parties would be injured by denial of an injunction, the third parties are only those with a legally recognizable interest in the lawsuit. Id. Unless the third parties are real parties in interest, their interests cannot be taken into account in determining the propriety of equitable relief. Applying that principle to the workers of Hanna, Wyoming, the Court concluded that:

> Treating them as real parties in interest would evade the limitations on the concept of a third-party beneficiary and would place the promisor under obligations potentially far heavier than it had thought it was accepting when it signed the contract.

Id.

This is consistent with the fact that injury to "the public" has long been held not cognizable in cases involving contracts between a private citizen and the government. The Restatement (Second) of Contracts § 313(2) (1981 & Supp. 2008) explicitly precludes consideration of public injury:

> (2) In particular, a promisor who contracts with a government or governmental agency to do an act for or render a service to the public is not subject to contractual liability to a member of the public for consequential damages resulting from performance or failure to perform unless

> (a) the terms of the promise provide for such liability; or

> (b) the promisee is subject to liability to the member of the public for the damages and a direct action against the promisor is consistent with the terms of the contract and with the policy of the law authorizing the contract and prescribing remedies for its breach.

The Commentary to this Section adds: "Government contracts often benefit the public, but individual members of the public are treated as incidental beneficiaries unless a different intention is manifested." Restatement cmt. a. Here, no such intention is expressed in this Lease.

**D.    In Balancing the Equities, the City Will Gain Little From Specific Performance, and the Hardships on the PBC Would be Great**

Even if the City could overcome these other hurdles, a court must ensure enforcement will not be oppressive, unconscionable, or result in undue hardship to any party involved. Crafts v.

BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

Pitts, 161 Wn.2d. 16, 162 P.3d 382 (2007). "The relative burden imposed upon the defendant as compared with the benefit the plaintiff will derive from the performance of a contract may be a ground for a court's refusal to direct specific performance." 71 Am.Jur.2d § 94 (2008). Restatement (Second) of Contracts § 364(1)(b) (1981); 25 Washington Practice: Contract Law & Practice § 15:1 (2007).

Here, the "hardship" on the City will be minimal or nonexistent if the Sonics depart now. The City will lose the "benefits" of a team that few care about, two years earlier than will otherwise be the case. It will, on the other hand, gain real dollars in terms of avoided game day costs for which it is responsible, and now rent by having the building available an additional 41 days per year. By contrast, the PBC will lose upwards of $65 million if forced to stay in Seattle these two years. Likewise, the business will degrade as people depart for other jobs rather than put their lives on hold for two years before departing for Oklahoma City. Maintaining morale among staff will be a difficult, if not insurmountable, challenge.

**E.**     **Even If Specific Performance Were Otherwise Proper, the City's Claim Is Barred By Its Inequitable Conduct**

The City has unclean hands. This lawsuit seeks specific performance as further way of "locking" the PBC into huge losses and thereby forcing a sale. Accordingly, the City's inequitable conduct– both before and after this Court's equity jurisdiction was invoked – bars it from the relief it purports to seek.

Contrary to the City's suggestion, unclean hands does not require "high" misconduct.[15] Instead, "[e]quity will not interfere on behalf of a party whose conduct in connection with the subject-matter or transaction in litigation has been unconscientious, unjust, or marked by the want of good faith." Income Investors, Inc. v. Shelton, 3 Wn.2d 599, 602, 101 P.2d 973 (1940).

Stated somewhat differently:

> any willful act in regard to the matter in litigation, which would be condemned and pronounced wrongful by honest and fair-minded men, will be sufficient to make the hands of the applicant unclean.

---

[15] City's Mot. in Limine re Local Investors (Dkt. No. 67) at 6:10.

DEFENDANT'S TRIAL BRIEF **[REDACTED VERSION]**
(C07-1620MJP) - 21

BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

Rose v. Nat'l Auction Group, Inc., 646 N.W.2d 455, 463 (Mich. 2002) (quoting 2 Pomeroy's Equity Jurisprudence, ch. I, § 404 (1941)).

Thus, there are no mechanical rules for the application of equitable maxims. Instead, equitable rules "must be applied with more or less flexibility as the equities of the particular case warrant, having in mind the special facts and circumstances surrounding each case." Hallauer v. Certain, 19 Wn. App. 372, 380, 575 P.2d 732 (1978).[16] Here, the "special facts and circumstances" warranting the Court's attention include the relationship between the City and the Ballmer group – including their plan to use specific performance to force the PBC to sell to the City's preferred tenant or lose $70 to $80 million dollars.

Importantly, "clean hands" protects the Court's integrity, rather than the opposing party's interests. It ensures that the judicial system does not become a party to impropriety:

> That doctrine is rooted in the historical concept of court of equity as a vehicle for affirmatively enforcing the requirements of conscience and good faith. This presupposes a refusal on its part to be 'the abetter of iniquity.'

Precision Instrument Mfg. Co. v. Auto. Maintenance Mach. Co., 324 U.S. 806, 814 (1945).

The City also argues that because it had a legal right to seek specific performance, its motive for doing so is "irrelevant." That is not the law. Evidence of an inequitable purpose is sufficient to deny specific performance. A court sitting in equity is "still, even in this modern day of merged practice, a court of conscience, and it ought not grant equitable relief for an unconscionable *purpose*, however strong the legal rights asserted may be." U.S. Jaycees v. Cedar Rapids Jaycees, 794 F.2d 379, 382 (8th Cir.1986) (emphasis added).

For example, in Nelson v. Nelson, 57 Wn.2d 321, 356 P.2d 730 (1960), the plaintiff sought to specifically enforce a real estate contract, and argued that defendant simply should be held to a "bad bargain." The Court disagreed, explaining that plaintiff's desire for equitable relief was "whetted by his expressed intention 'to get even with' the defendant." Id. at 324. Thus,

---

[16] Accord, Keystone Driller Co. v. Gen. Excavator Co., 290 U.S. 240, 245, 246 (1933) ("not bound by formula").

BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

1  equitable relief was denied. Likewise, in <u>Port of Walla Walla v. Sun-Glo Producers, Inc.</u>, 8 Wn.

2  App. 51, 504 P.2d 324 (1972), the landlord demanded that the tenant provide an increased

3  performance bond, and deposit a large sum in escrow to guarantee the bond. Although the

4  landlord had a statutory right to demand an increased bond, the tenant's initial bond was still in

5  effect and had two years to run. The Court found that:

6          although the Port had a legal basis for its demand of a new bond 2
           years in advance, its position in doing so was anomalous and
7          inconsistent. The Port was seeking to destroy Sun-Glo's lease and
           demanding a long term costly performance bond at one and the
8          same time.

9  <u>Id.</u> at 55. Accordingly, for reasons including its improper motives, the landlord "did not do equity

10  nor come into court with clean hands." <u>Id.</u> at 56. <u>See also</u> <u>Ingram v. Kasey's Assocs.</u>, 531 S.E.2d

11  287, 292 (S.C. 2000) (tenant's claim to specific performance of lease's purchase option denied in

12  part because "he acted with unclean hands by misleading both [the landlord and the subtenant],

13  and because he acted with the improper ulterior motive to force [the subtenant] to pay him

14  $40,000"); <u>City of Duluth v. Riverbrooke Props., Inc.</u>, 502 S.E.2d 806 (Ga. App.1998) (City's

15  request for equitable relief denied in part because it was based on improper "ulterior motive" of

16  requiring contractor to perform extra unbargained-for work).

17         Here, the question is whether it is appropriate for the City to ask the Court to place its

18  imprimatur on a landlord's plan to bleed its tenant so that the tenant will sell to the landlord's

19  preferred prospective tenant.

20  **F.     Equity Does Not Allow a Plaintiff to Use Specific Performance to Extract
            More Than It Bargained For**

21

22         In <u>Portion Pack, Inc. v. Bond</u>, 44 Wn.2d 161, 265 P.2d 1045 (1954), for example,

23  plaintiffs paid defendant to assign them certain property rights. When defendant failed to do so,

24  plaintiffs stopped payment on their check. Thereafter, plaintiffs not only required defendant to

25  execute the assignment, but also to execute a non-compete agreement. Plaintiffs sought an

26  injunction to enforce the non-compete. This was denied:

DEFENDANT'S TRIAL BRIEF **[REDACTED VERSION]**
(C07-1620MJP) - 23

BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

> Appellant could have gone to court and obtained an order
> requiring Bond to assign his [property] rights. . . . It was justified
> in stopping payment on the check when he refused to fully
> perform his agreement of March 3rd. However, when the officers
> of the corporation had him where he could not wriggle one way or
> the other, they were not satisfied with exacting their pound of
> flesh-they chose to take more.

44 Wn.2d at 170. Thus, because plaintiffs had every right to stop payment on the check but no right to force defendant to sign a non-compete, they had unclean hands, and the non-compete agreement was declared a nullity. Id. Likewise, the City here seeks to extract far more than it bargained for, and this must not be allowed.

Similarly, equitable relief is denied where plaintiffs assert a legal right to obtain "an equitable club to be used as a weapon of oppression rather than in defense of a right." Arnold v. Melani, 75 Wn.2d 143, 152-153, 449 P.2d 800 (1968) ("[E]quity has a right to step in and prevent the enforcement of a legal right whenever such an enforcement would be inequitable."). The City's mantra has been that it simply seeks to assert its legal rights, but its own documents confirm the City wants to use specific performance as a "weapon of oppression" to force the PBC to sell the Sonics to hand-picked buyers by inflicting "pain" on the PBC's finances and reputations.

## IV.    CONCLUSION

What started as an innovative landlord tenant relationship in 1995 has become economically obsolete and inefficient. It benefits no one. The law does not permit specific performance, and equity does not result from specific performance. The City's claims should be denied.

DATED this 11th day of June, 2008.

BYRNES & KELLER LLP

By: /s/ Paul R. Taylor, WSBA #14851
    Bradley S. Keller, WSBA #10665
    Paul R. Taylor, WSBA #14851
    Steven C. Minson, WSBA #30974
    Byrnes & Keller LLP

DEFENDANT'S TRIAL BRIEF [REDACTED VERSION]
(C07-1620MJP) - 24

BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

1000 Second Avenue, 38th Floor
Seattle, WA 98104
Telephone:(206) 622-2000
Facsimile: (206) 622-2522
Email:     bkeller@byrneskeller.com
           ptaylor@byrneskeller.com
           sminson@byrneskeller.com
Attorneys for Defendant
The Professional Basketball Club, LLC

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DEFENDANT'S TRIAL BRIEF **[REDACTED VERSION]**
(C07-1620MJP) - 25

## CERTIFICATE OF SERVICE

I hereby certify that on the 11th day of June, 2008, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Thomas A. Carr (thomas.carr@seattle.gov)
Gregory C. Narver (gregory.narver@seattle.gov)
Seattle City Attorney
600 Fourth Avenue, 4th Floor
P.O. Box 94769
Seattle, WA 98124-4769


Slade Gorton (slade.gorton@klgates.com)
Paul J. Lawrence (paul.lawrence@klgates.com)
Jeffrey C. Johnson (jeff.johnson@klgates.com)
Michelle Jensen (michelle.jensen@klgates.com)
K&L Gates
925 4th Avenue, Suite 2900
Seattle, WA 98104


/s/ Paul R. Taylor
Paul R. Taylor, WSBA #14851
Byrnes & Keller LLP
1000 Second Avenue, 38th Floor
Seattle, WA 98104
Telephone: (206) 622-2000
Facsimile: (206) 622-2522
ptaylor@byrneskeller.com

DEFENDANT'S TRIAL BRIEF [REDACTED VERSION]
(C07-1620MJP) - 26

BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

# APPENDIX A

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SAN DIEGO

DEPARTMENT NO. 11     BEFORE HON. ELI H. LEVENSON, JUDGE

THE CITY OF SAN DIEGO, a
municipal corporation,

             Plaintiff,

      vs.

NATIONAL LEAGUE OF PROFESSIONAL
BASEBALL CLUBS, an association,
et al.,

             Defendants.

No. 343508

- - - - - - - - - - - - - - -

SERVOMATION DUCHESS, INC., a
California corporation,

             Plaintiff,

      vs.

SAN DIEGO PADRES, INC., a
Nevada corporation, et al.,

             Defendants.

No. 344027

Faye Hurst, CSR,
Official Reporter
Courthouse Building
San Diego, Ca. 92101

APP. 296

| | |
|---|---|
| For Plaintiff, City of San Diego: | JOHN W. WITT, City Attorney<br>By: Ronald L. Johnson, Chief Deputy<br>City Administration Bldg.<br>Community Concourse<br>San Diego, Ca. 92101 |
| For Plaintiff, Servomation Duchess, Inc.: | LUCE, FORWARD, HAMILTON & SCRIPPS<br>By: Jack W. Crumley and William M. McKenzie, Jr.<br>1700 Bank of California Plaza<br>San Diego, Ca. 92101 |
| For Defendant, National League: | GRAY, CARY, AMES & FRYE<br>By: David E. Monahan<br>2100 Union Bank Bldg.<br>San Diego, Ca. 92101 |
| For Defendants San Diego Padres, C. Arnholt Smith and E. J. Bavasi: | FRIEDMAN, HEFFNER, KAHAN & DYSART<br>By: Vincent P. Master<br>900 U.S. National Bank Bldg.<br>San Diego, Ca. 92101 |
| For Defendant Joseph B. Danzansky: | SCALES, PATTON, ELLSWORTH & CORBETT<br>By: Lawrence A. Patton<br>2150 First National Bank Bldg.<br>San Diego, Ca. 92101 |

---o0o---

THE COURT:  Good morning, Gentlemen.

THE CLERK:  The City of San Diego versus National
League of Professional Baseball Clubs, et al., and
Servomation Duchess versus San Diego Padres, et al.

MR. JOHNSON:  Ready for the City, your Honor.

MR. MONAHAN:  Ready for National League.

MR. MASTER:  Ready for Defendants, San Diego Padres,
Mr. Bavasi, and Mr. Smith, your Honor.

MR. PATTON:  Ready for Defendant Danzansky, your
Honor.

MR. CRUMLEY:  Ready for Servomation Duchess, your
Honor.

THE COURT:  I have been unable to reduce my remarks
to writing because of the intense calendars of this depart-
ment.  However, I have spent considerable time in again
reviewing all of the documents that were presented to me by
way of declarations, points and authorities, and the plead-
ings, and I think I should state that I am indeed mindful
of the possible repercussions that might result from the
decision of this Court either way.

I am particularly mindful of the attitudes and
opinions of the People of San Diego who have expressed
themselves to me by way of correspondence.  Some of that
correspondence is rather difficult to answer.  I might read

one letter that came to me that I think is of interest.  It
is dated July 8th.  It's written in pencil, and it came to
me sealed with a covering letter by the father of this young
man who promised his son that he would not look at the
letter, so the father was unaware of what it contained.
The letter reads:

"Dear Judge Levenson:  I am eight years old,
and I do not understand why Mr. Smith and other men
do not keep their word and keep our San Diego Padres
home.  My dad has always told me a man's word is
his bond, but today many people do not keep their
word.  Why?

"Please try to help keep our baseball team in
town.

"Thank you."

And it's signed "Mike."

The other correspondence is not quite as eloquent.
It comes from older persons but it is of the same tenor.

I don't know how I can answer Mike nor the other
persons who feel so keenly about this matter because the
issues that I have to determine are not whether the San
Diego baseball club will play ball in San Diego.  This
Court has no control over the San Diego baseball club as
such, and whether it plays ball or not would have nothing
to do with the decision of this Court.  And I think that
would be true not only at this stage, where the plaintiffs

in both actions seek injunctive relief by way of preliminary injunction, but also in the event these matters were to go to a final solution.  So I think it should be clear that the decision of this Court can in no way compel the Padres to play baseball here.

Now the City of San Diego, coming to the technical aspects and perhaps in an attempt to answer some of the questions that are in the minds of others, seeks relief by this injunctive action against the National League; the San Diego Padres, Inc., a Nevada corporation; E. J. Bavasi, an individual and a stockholder in the Padres establishment; C. Arnholt Smith, who is perhaps the principal stockholder of the Padres; and one Joseph B. Danzansky, who is alleged to be the purported purchaser of the assets of the San Diego Padres, Inc.  The action arises out of a partial use lease arrangement between the City of San Diego and the Padres providing for the occupancy of the stadium during the baseball seasons for a period of 20 years terminating in 1988.

It is the theory of the City -- perhaps I should put that in the plural -- that by reason of the announced declarations of Mr. Smith and some announcement on the part of the Defendant Danzansky having to do with a removal of the assets, including the franchise, to Washington, D. C., that the City will suffer irreparable damage; that the nature of the business entity of the San Diego baseball

1  club -- that is, the Padres -- is of such a unique nature

2  that it should be enjoined from moving to Washington, D.C.;

3  and finally, it argued that between the Defendants Smith,

4  Danzansky, and the National League there has been a wrongful

5  or tortious interference with the contractual relationship

6  existing between the City and the San Diego ball club.

7         Those of us in the legal community are well aware

8  of the prerogatives of a Court of Equity, and the Court in

9  this proceeding sits as a chancellor in an equity court to

10  grant equitable relief; that is to say, unusual or extra-

11  ordinary relief by way of injunction or perhaps other types

12  of relief; in this case only the matter of injunction, as

13  distinguished from the court which sits as a court of law.

14  And I think it also should be emphasized that in this pro-

15  ceeding the Court is acting only on the basis of an applica-

16  tion for a preliminary injunction.  This is not the trial of

17  the action.

18         In reviewing the declarations and the pleadings,

19  it is apparent that the projected move of the Padres was

20  initiated and instituted by the Defendant Smith.  The

21  declarations of the Defendant Danzansky negate any partici-

22  pation on his part in terms of initiating or instigating or

23  being a party to the arrangement.  He does not deny the

24  awareness of the existence of the contractual relationship,

25  either with the City of San Diego or with the Plaintiff

26  Serveration, but his negotiations at all times indicate that

he will have nothing to do with any of the obligations or commitments on the part of the ball club. That is left to the San Diego Padres and to Mr. Smith to work out for themselves.

I think it also should be noted that although the Court sitting as a chancellor in equity exercises discretionary powers in terms of granting or denying injunctive relief, the discretion which it exercises must of necessity be a sound discretion and must be in accordance with equitable principles.

Reverting then to the declarations of the National League, here again the President of the National League by way of a declaration -- and the president emeritus of the Defendant National League -- have specifically and without equivocation indicated that no request to transfer has been made, no action has been taken; and insofar as the National League is concerned it is not a matter for their disposition at this time, and nothing in the record indicates a participation on the part of the National League with reference to the negotiations which may have gone forward between Mr. Smith and Mr. Danzansky.

Because of those facts which are before the Court, and which may be completely different at the time of trial, the Court is constrained to the position that there has been no tortious or wrongful interference with the contractual relationship at this time which should or would

justify injunctive relief to the City.

With reference to the theory that this is a peculiar type of service and that it should be analogized with the famous "opera singer" case -- I guess is the best way to refer to it --, the Court has expressed itself in terms of not being able to compel the playing of baseball although it might prevent the transfer of the franchise.

With that development, query as to what the position of the City might be.

It is relegated to its position at law, and this is the only answer that I can give to Mike and to the others who ask this very serious question. There is a remedy against persons who do not keep their contracts.

This is not to say that I am in any way indicating that Mr. Smith has taken whatever action he has taken without justification or that he may not have defenses to this action because they are not before me, but at this stage of the proceeding, it is apparent that the City does have an action at law for damages and for a breach of their contractual relationship. And I am further of the opinion that that matter of damages is measurable in terms of dollars, in terms of money, and if that be so, then the Court of Equity must deny its process by way of injunctive relief.

So as to the several theories proposed by the City, the Court can only conclude at this time that it has

an action on its contract for damages; that the damages are
measurable; that adequate relief can be obtained in the
courts of law; and that the pleading stage in which I now
find myself is such as to require a denial of the injunctive
relief sought by the City.

That will be the order in the City's case.

Turning to the matter of Servomation versus
the same defendants, we have a different factual situation.
The thrust of the claims by Servomation arises out of a
security agreement with the San Diego Padres in which a
loan of some million and a half dollars is collateralized
by the circuitous assignment, I suppose one might say, of
concession funds which go from concessionaires, City of
San Diego, the San Diego baseball club, and that in this
relationship the San Diego baseball club in order to col-
lateralize its loan from the Plaintiff Servomation has
allowed Servomation to have recourse to the funds in the
hands of the City prior to the time it goes to the San Diego
baseball club, if I read those contracts correctly. And so
Servomation seeks to have this Court by way of injunctive
relief assist it in preserving its security arrangement.

There is a second prong to the Servomation case
for in that security agreement we find a clause which is
referred to in the trade -- and I am now quoting, and I
guess I am quoting Justice Clark -- the "follow the franchise"
clause. This clause requires the San Diego Padres to move

the concession agreement along with any movement of the franchise, and thus if the franchise were to be moved to Washington, D.C., the franchise agreement or the concessionaires agreement, I should say, should follow the franchise.

That complaint and the declarations which accompany it raise substantially the same questions as are presented in the City's case. But if I understand the argument of counsel -- the concluding argument at least -- it was conceded that injunctive relief was not obtainable as against any of the defendants except the Defendant Smith and the Defendant San Diego baseball club.

MR. CRUMLEY: And the City.

THE COURT: And the City, that is true.

Here again I find that this is merely asking a court of equity to exercise its injunctive powers to prevent the breach of a contract, and this would be in both instances.

Although there is an allegation -- and I think several of them perhaps -- going to the question of the irreparable nature of the damages which might be sustained both in the matter of the security and in the matter of failure to allow the concessions to follow the franchise, here, too, it appears that resort may be had to the Court sitting as a court of law and that the damages are measurable.

Again let me state that I am sitting here in an

1 initial stage of proceeding in which the facts are not

2 before me except in rather outlined form by way of

3 declaration and pleadings. No testimony has been taken.

4 I do not know what defenses are or might be available in

5 either situation. I do not know by the process of cross-

6 examination, for example, whether or not the declarations

7 before me are true or untrue, and so I must go only upon the

8 basis of that which is before me, and upon that basis the

9 Court is of the opinion that the preliminary injunction

10 should not lie.

11 That will be the order in the Servomation matter

12 as well.

13 MR. JOHNSON: Your Honor, on behalf of the City of

14 San Diego, I would like to respectfully request the Court

15 order a stay to allow us the opportunity to test the ruling

16 on appeal.

17 THE COURT: How much time would that require?

18 MR. JOHNSON: I would suggest -- we have to get, of

19 course, the judgment on the books to file the notice of

20 appeal.

21 THE COURT: What is the time; ten days?

22 MR. JOHNSON: I believe ten days, your Honor.

23 THE COURT: All right, I will stay the temporary

24 restraining order for ten days and thereafter for such time

25 as is required by the -- I'm not so sure I can do it

26 thereafter. I think the Appellate Court would have to do it

1       MR. JOHNSON:  I am not sure but we could request an

2 extension on that in this court or the appropriate court if

3 this is not the appropriate court.

4       THE COURT:  Well, for the ten days' period the Court

5 will allow the restraining order to remain in effect.

6       MR. JOHNSON:  Thank you, your Honor.

7       MR. PATTON:  May it please the Court, I appreciate the

8 Court has already ruled but the defendants did not have an

9 opportunity to respond.

10       I would only point out to the Court, if I may,

11 your Honor, that I don't know what can happen in this ten-

12 day period in any event, and what you are doing is giving

13 them an additional ten days, and what is going to happen in

14 those ten days could be very serious on this side of the

15 table.

16       THE COURT:  I am very well aware of the possible

17 repercussions, but I think because of the seriousness of the

18 matter, because of the matters I have discussed, the City

19 and Servomation should have an opportunity to present the

20 matter to a higher court.  I have taken that into considera-

21 tion.  I am satisfied that ten days is not going to disturb

22 the situation, albeit the declaration which was filed, which

23 I read very carefully, points out the problems in Washington,

24 D.C., with reference to the stadium there and so on.  I

25 think that Mr. Danzansky is going to have to live with that.

26 I don't think it's something over which he has lost control.

I am satisfied that if Washington wants that Franchise as much as we do in San Diego they will find a way.

That will be the order.

MR. MONAHAN: May it please the Court, so there is no misunderstanding as to time, could we have the date and time that the temporary restraining orders will automatically dissolve?

THE COURT: Well, I am of the opinion that it will take -- I don't know. I know you have ten days. As a matter of fact, on a writ I don't think there is any time limit, is there?

MR. JOHNSON: Well, your Honor, we can't request a notice of appeal until the judgment is filed.

THE COURT: I don't know that this is an appealable order.

MR. JOHNSON: Yes, it is. We checked and it is an appealable order.

MR. PATTON: May it please the Court, this isn't even a judgment. It doesn't have to be entered as such.

THE COURT: I don't know what counsel means by judgment being entered. In any event, I will stay it for ten days. If the Appellate Court feels there is merit and wants to stay it further, upon notice I think counsel should be given an opportunity to respond. It may be you will want to take depositions and --

MR. CRUMLEY: Your Honor, since you have found there is

1  remedy in damages here, would you consider requiring them

2  to post the money they get for this, the problem being

3  Mr. Smith has filed a declaration here that they are broke,

4  in effect, and there won't be enough money even with the

5  sale to go around, and this is a serious problem to us.  If

6  the money is held in a fund where we can get paid, then we

7  have a remedy in damages, but in absence of that and with

8  that declaration I really think we have --

9       THE COURT:  Do I have the power to do that, Mr.

10  Crumley?  I looked at the Finley case quite carefully in

11  the matter of the injunction issued preliminarily in that

12  case, and there were some rather interesting things about

13  it that didn't come out because they were talking so much

14  about the Sherman Antitrust Act they didn't give us the

15  factual background which gave rise to the injunctive relief

16       which was before the other court and which was bifur-

17  cated, as I understand it, but the court in that case did

18  point out that Mr. Finley was estopped, as I recall, that

19  he actually had agreed or consented to allow the franchise

20  to move to the Philadelphia Club, but that was dissolved

21  at the time that Justice Clark made his decision.  There was

22  something in that injunction that I had in mind when I

23  discussed the Finley case. -- Oh, yes, as I recall in that

24  injunction the court during the pendency of the trial

25  required the concessionaires or required the concessionaire

26  to be allowed to operate wherever the club operated.  Is that

not true?

MR. CRUMLEY:  As I recall, they were barred from entering into a contract but they allowed the concessionaire to go ahead and operate but not enter into a contract.  But to answer your basic --

THE COURT:  I don't know what the theory was behind it, and whether the Court is authorized.

MR. CRUMLEY:  This is a Court of Equity, and certainly that's the equitable thing to do is protect the security.

THE COURT:  How am I going to run around the country? How am I going to know when this is going to be concluded? Supposing it is placed in escrow in New York or Washington or somewhere else?  I suppose I could order the parties and compel them to produce the money, but it might be an idle act.

MR. CRUMLEY:  You can compel them to fail from disbursing the money.  I would agree you can't take it from an escrow in Washington, but you can certainly restrain Mr. Smith who appeared before you and the San Diego Padres from disbursing that money.

MR. MASTER:  Your Honor, may I make a statement?

I am Vincent Master of the firm of Friedman, Maffner, Kahan & Dysart.

First of all, counsel I believe is asking for some sort of constructive trust which is outside the scope of this proceeding, and, number two, I believe in the

declaration of Mr. Smith there is no showing that the consummation of the sale will in any way render the Padres organization unable to respond in damages should this matter ultimately go to trial and damages be awarded. There has not been, as I have indicated, even in oral argument or any pleadings, any insinuation that the Padres will be rendered insolvent as a result of this transaction. Further, I might add for the Court's edification, that Servomation has presently attempted to perfect one of its remedies under the contract, and that is serving on the City of San Diego a stop order notice asking that the City not pay the San Diego Padres pursuant to Section 10d of the Partial Use Agreement those concession fees which flow from Servomation to the City.

THE COURT: I think I do have some control there. Let me talk about that for a moment. I think maybe you are suggesting I might use my powers in that regard, is that so?

MR. MASTER: No. I am saying I believe Servomation has already taken steps and is now asking for additional support in trying to ask this Court to impose some sort of constructive trust, and I am suggesting they have a remedy under the contract if they wish to pursue it, and apparently they have. Whether or not they have properly done so remains to be seen. But I think that they are asking for something that this Court should not at this time --

THE COURT: The problem there as I see it -- and I am

1 sure Mr. Crumley will make me aware of it -- is that there

2 have been no breaches as yet in terms of the payment, and

3 that means he has to come into a court of equity for some

4 help. I don't think he can go to law to pursue any type

5 of damages if there are no arrearages in the agreement.

6 Isn't that right?

7     MR. CRUMLEY: That is correct, except we do contend

8 there has been a breach, but as far as the payments, that's

9 true. But Mr. Master I believe has been stating Mr. Smith's

10 declaration on file here. He says he has put millions of

11 dollars into the Padres and he is not going to put any more

12 in as I understand it.

13     THE COURT: I think that's true, but does that say

14 the Padres are bankrupt or they have no funds?

15     MR. CRUMLEY: If they were bankrupt I think we could

16 start a bankruptcy proceeding. I don't think it states

17 that. But it certainly says they have more debts than they

18 have assets.

19     THE COURT: Aren't you reading something into that.

20 Mr. Crumley?

21     MR. CRUMLEY: He certainly implies that there is no --

22 that with the $12 million it isn't going to make them whole.

23     THE COURT: Let's look at it to make sure. I didn't

24 read his declaration in that tone. I did read it as you

25 have indicated, and that is that he does not desire to put

26 any further funds into the operation of the San Diego Padres

but it doesn't indicate that the Padres are going to be
without funds. If this goes through, that's probably all
they will have. All the assets will be tied up in money.

MR. MASTER: That's correct, your Honor. If the sale
goes through as we, of course, hope that it does, there
will be cash.

THE COURT: I don't think you make yourself popular
by that statement, Counsel. I know I haven't made myself
popular.

MR. CRUMLEY: If it were true, why don't they come to
us and say we will pay you? They have never once come to
us and offered to pay off this loan, and that's the reason
we are here. We want some arrangements made to be paid
off substantial sums of money, and they have not taken one
step, one word, to indicate they will do it, and we feel
we absolutely have to have some sort of protection or we
are going to lose the money or a substantial part of it.

THE COURT: Well --

MR. MASTER: Your Honor, I was just informed Mr.
Bavasi told one of Servomation's people and made a repre-
sentation to them that after this matter was consummated
that Servomation would be paid the balance of the loan
which is outstanding at that time, which loan was a million
and a half loan.

THE COURT: When was that representation made?

MR. CRUMLEY: Your Honor, you notice they say "after."

THE COURT: Well, if the deal doesn't go through,
you still have the Padres and you still have your security
agreement.

MR. CRUMLEY: After the contract has been completed,
we are to be paid out of the money from the completion.
That's what he said.

MR. MASTER: That's what I said, your Honor.

THE COURT: That's what I understood him to say.

Was there such a representation made to
Servomation?

MR. CRUMLEY: I don't know.

MR. McKENZIE: If I might, your Honor, my understand-
ing is that comment was made by Mr. Bavasi. Whether that's
a legal obligation on the part of the Padres I think is
open to question. If they are now representing it is --

MR. CRUMLEY: Are these counsel representing we will
be paid out of the proceeds of the sale or are they merely
saying somebody else told somebody else that we would be
paid?

THE COURT: Gentlemen, I don't think the Court wants
to put itself in the position of a negotiator or of a
bargainer. I think this is a matter of a relationship
between the parties. I think the only question before me
is whether I have the power to protect you in the manner
you suggest, and I think I do not because to do so would be
in effect giving you a most extraordinary remedy. It would

be in the nature of an attachment. It would be in the nature of a receivership or something of that sort which I don't think is contemplated by the pleadings before me.

MR. CRUMLEY: Since you have stayed the injunction anyway, could we have two or three days to convince you that you do have the authority by finding authority?

THE COURT: If you can do it within the ten-day period I have stated, I will take a look at it, and counsel have an opportunity to respond.

MR. MASTER: Is the order in the Servomation case also stayed for ten days?

THE COURT: Do you desire such a stay?

MR. CRUMLEY: Yes, that certainly would be -- in the event the City works out something with them, which I don't think is probable, that they want to submit it without giving us the opportunity to come in.

THE COURT: I don't understand you, Mr. Crumley.

MR. CRUMLEY: I really don't see much effect to us having a stay. The injunctive relief we had has been nullified.

THE COURT: The point is this: I have denied your preliminary injunction. Ordinarily that would terminate the matter, unless you want a stay for some purpose. If I stay it for ten days or if I stay -- you have never had a temporary restraining order, so I have nothing to stay.

MR. CRUMLEY: That is what I am trying to say in my

clumsy way. All we have is the right to come in and get a
T.R.O. Since you have denied a preliminary injunction, I
don't think you are going to grant us a T.R.O. We will be
happy to take the stay.

THE COURT: I don't know how I can protect you on
that, Mr. Crumley. I think there have been reservations,
that you should avail yourself of whatever remedies you have
in that regard. I can only take notice of certain state-
ments that have been made on the part of the Padres and by
Mr. Smith -- they are certainly extrajudicial and not part
of the record -- which would indicate he wants if at all
possible to meet his commitments. If that's true and if
he will keep his word in that regard, certainly one of the
most important commitments has to do with Servomation.
I don't know how I can help you at this point.

MR. CRUMLEY: Well, we will attempt to get authority.

MR. JOHNSON: For the purpose of the record, we would
join in that motion for Servomation. Since we are being
denied the preliminary injunction and likely may be left
to our remedies at law, we are very concerned that there may
be nothing in the pot to satisfy our judgment in the event
we are successful in an action at law for damages.

THE COURT: Are you talking about the moneys the City
derives from the concession agreement?

MR. JOHNSON: Not from the concession agreement. We
have several sources of income. One is a percentage of the

gate receipts which we were to receive from all at-home baseball receipts for the next 15 years. I would think the $12 million sale price would be an asset of the corporation.

THE COURT: You are requesting the same thing. I don't see how I can do that. Your request will be of record but I don't think this Court has the power.

MR. MONAHAN: So there is no misunderstanding on the part of all parties, it is this Court's order that the temporary restraining order now in effect will continue until July 17th.

THE COURT: You want the hour and the minute?

MR. MONAHAN: We want to know when we are not restrained or when we are no longer restrained. I am sure all the parties would like to know that.

THE COURT: I don't think the National League has to worry too much about it, do they? I think the real problem is with Mr. Smith and Mr. Danzansky. I don't think the National League is really in trouble, Mr. Monahan.

MR. MONAHAN: I agree with that, your Honor.

In any event, it seems to me any party, whether they are going to change their conduct by reference to an existing court order, ought to know when they are restrained or not restrained.

THE COURT: I agree, but when the Court says ten days I don't think I have to put the minute and the hour on it. I am not sure I know just what hour will be the hour. I

think the ten days will be sufficient.  By that time I
anticipate that the matter will be before the District Court
or some other court which may carry my order further.

Thank you, Gentlemen.

COUNSEL (In Unison):  Thank you, your Honor.

(Adjournment in this matter.)

STATE OF CALIFORNIA   )
                     )   ss.
COUNTY OF SAN DIEGO   )

      I, Faye Hurst, an official reporter for the Superior Court of the State of California, in and for the County of San Diego, do hereby certify:

      That, as such reporter, I reported in shorthand the proceedings had in the above-entitled cause, and that the foregoing transcript, consisting of pages numbered from 1 to 23, both inclusive, is a full, true, and correct transcription of said proceedings as had at the time and place therein indicated.

      DATED: At San Diego, California, this 13th day of July, 1973.

_____
Official Reporter

COURT OF APPEAL—STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

FILED
JUL 19 1974

JOHN R. McDOWELL, Clerk

DIVISION ONE

CITY OF SAN DIEGO,
    Plaintiff-Appellant,
        vs.
NATIONAL LEAGUE OF PROFESSIONAL
BASEBALL CLUBS, et al.,
    Defendants-Respondents

4 Civil NO. 12741

SUPERIOR COURT NO. 343508

THE COURT:*

    The petition for writ of supersedeas is denied.

    Granting the relief prayed for would have the effect of issuing preliminary injunction.

    This Court has the power to make a stay order in a case in which an injunction might properly issue. (People ex rel S.F. Bay, etc. Com. v. Town of Emeryville, 69 Cal. 2d 533.) An injunction cannot be granted to prevent the breach of a contract the performance of which would not be specifically enforced. (Civ. Code §3423.)

    The lease between City and San Diego Padres contains a covenant on the part of the Padres that it will play and cause to be played baseball games at the stadium during a period of 20 years; and a covenant that Padres will not do anything which will cause the franchise to be transferred to any other city or location. Thus it contains both affirmative and negative covenants on the part of the Padres.

    Where a contract contains both affirmative and negative stipulations, equity will not interfere to prevent a breach of the negative covenant when the affirmative covenant is of such a nature that it cannot be specifically enforced by a judicial decree. (Long Beach Drug Co. v. United Drug Co., 13 Cal. 2d 158, 168.)

(1)

# COURT OF APPEAL — STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

### DIVISION ONE

THE CITY OF SAN DIEGO,
Plaintiff-Appellant,
vs.
NATIONAL LEAGUE OF PROFESSIONAL
BASEBALL CLUBS, et al,
Defendants-Respondents.

4 Civil NO. 12741

SUPERIOR COURT NO. 343508

Courts of equity will not decree the specific performance of a contract which by its terms stipulates for a succession of acts whose performance cannot be consummated by one transaction, but will be continuous and require protracted supervision and direction. (Long Beach Drug Co. v. United Drug Co., supra, 13 Cal. 2d 158, 171; see also Thayer Plymouth Center, Inc.. v. Chrysler Motors Corp., 255 Cal. App. 2d 300.)

Consequently it was not shown to the trial court or to this Court that the contract is capable of being specifically enforced and so one whose breach may be enjoined. (Code Civ. Proc., §526.)

Nor has City shown that the superior court probably erred or abused its discretion in denying the preliminary injunction. (Saltonstall v. Saltonstall, 148 Cal. App. 2d 109; Nuckolls v. Bank of California Nat. Assn., 7 Cal. 2d 574.)

*Ault, Jr., deeming himself disqualified, did not participate in the consideration or disposition of this case.

_Whelan_ Acting P.J.

Copies to: John W. Witt-SD
Gray, Cary, Ames & Frye-SD
Friedman, Heffner, Kahan & Dysart-SD
Scales, Patton, Ellsworth & Corbett-SD
Superior Court-SD

ATTORNEY:

DAVID E. MONAHAN
~~GRAY, CARY, AMES & FRYE~~

2100 Union Bank Building

San Diego, California   92101

## DECLARATION OF SERVICE BY MAIL (C.C.P. 1013a and 2015.5)

I, the undersigned, say:  I am ✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗ over 18 years of age,
_employed_ in the County of _____San Diego_____ , California,
   (RESIDENT/EMPLOYED)

in which county the within-mentioned mailing occurred, and not a party to the subject cause.
My _____employment_____ address is ___2100 Union Bank Building___
  (BUSINESS/RESIDENCE)             (NO. STREET),

_San Diego, California_ I served the ___ANSWER TO PETITION FOR___
   (CITY, STATE)

HEARING AND POINTS AND AUTHORITIES IN OPPOSITION THERETO

of which a true and correct copy of the document filed in the cause is affixed, by placing a copy thereof in a separate envelope for each addressee named hereafter, addressed to each such addressee respectively as follows:

(SEE ATTACHED SHEET)

Each envelope was then sealed and with the postage thereon fully prepaid deposited in the United States mail by me at _____San Diego_____ California, on
                          (CITY)

_August  8_ , 19 _73_ .

I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___August  8___  19 _73_ , at ___San Diego___ ,
                                     (PLACE)

California.

_Madeleine J. Hunter_
Madeleine J. Hunter

PROOF OF SERVICE BY MAIL

Form 9A Co Clk. X1008)
(Rev. 5-73)

Clerk of the Supreme Court ***
of the State of California
217 West First Street
Los Angeles, California   90012

*** personally delivered


John R. McDowell, Clerk
Court of Appeal
Fourth Appellate District
State of California
6010 State Building
1350 Front Street
San Diego, California


The Honorable Eli H. Levenson
c/o Mr. George Bernstein
Clerk of Department Sixteen
Superior Court of San Diego
San Diego County Courthouse
220 West Broadway
San Diego, California   92101


John W. Witt, City Attorney
c/o Ronald L. Johnson, Chief Deputy
    Robert J. Logan, Deputy
City of San Diego
City Administration Building
San Diego, California   92101

Lawrence A. Patton, Esq.
Scales, Patton, Ellsworth & Corbett
National Bank Building
San Diego, California   92101

C. Hugh Friedman
Friedman, Heffner, Kahan & Dysart
Suite 900, U. S. National Bank Bldg.
San Diego, California   92101

Jack W. Crumley, Esq.
Luce, Forward, Hamilton & Scripps
1700 Bank of California Plaza
San Diego, California   92101