Honorable Marsha J. Pechman

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

CITY OF SEATTLE, a first-class charter
city,

                         Plaintiff,

     v.

PROFESSIONAL BASKETBALL CLUB
LLC, an Oklahoma limited liability company,

                       Defendant.

No. C07-01620-MJP

CITY OF SEATTLE'S TRIAL BRIEF

## I.    INTRODUCTION

In 1994, the City determined to pledge more than $80 million taxpayer dollars to rebuild what is now KeyArena to the specifications of the Seattle Sonics in exchange for the Sonics' promise to play all their home games there through the 2009-10 NBA Season. That policy decision and promise were memorialized in a Lease that included a provision acknowledging that "the obligations of the parties . . . are unique in nature; this Agreement may be specifically enforced by either party."

In 2006, PBC purchased the Sonics, contractually assumed the Sonics' obligations under the Lease, and promised in writing and orally to "honor" the Lease obligations. At the time of PBC's purchase, the City made clear its intent to hold the new Sonics' ownership to the Lease for its full term.

CITY OF SEATTLE'S TRIAL BRIEF - 1
Case No. C07-01620-MJP

K:\2065932\00001\20516_HAH\20516P227V

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

1    Less than a year later, PBC started trying to escape the Lease.  First, in the spring of

2  2007, PBC asked the NBA about moving the team to Oklahoma City for the 2007-08 NBA

3  season and contacted Oklahoma City to reserve arena dates.  Immediately thereafter, PBC

4  tried to buy its way out of the Lease, but Seattle Mayor Greg Nickels made the policy

5  decision to reject that offer.  In response to the City's decision, PBC initiated arbitration to

6  breach the Lease and leave two years early.  The City then filed this lawsuit consistent with its

7  prior policy decisions to enforce the Lease rather than accept a buy-out.

8    Here, the City seeks to enforce its contractual rights and to obtain the benefits,

9  economic and intangible, that it bargained for when deciding to pledge taxpayer dollars in a

10  completely renovated basketball arena.  Those benefits are unique in nature and cannot

11  reasonably be measured in monetary terms.  Under these circumstances, the City is entitled to

12  specifically enforce the Lease to prevent the Sonics' breach.

13    On the other hand, PBC asks this Court to ignore the City's contractual rights and let

14  PBC breach the Lease.   PBC wants out of the Lease because of claimed undue hardship.  The

15  facts say otherwise.  PBC bought the Sonics knowing the team historically lost millions of

16  dollars per year, and that such losses were expected to continue into the future.  PBC

17  exacerbated its financial losses by announcing before last season – three years prematurely

18  according to the Lease – its intent to move the team to Oklahoma City.  The announcement

19  came on the heels of PBC's demand for a $500 million dollar publicly financed "world-class"

20  arena that did not include a specific dollar contribution commitment from the PBC, nor a

21  willingness to cover cost overruns – an effort, in other words, that PBC knew might (and

22  indeed likely would) fail.   PBC's billionaire owners understood the deal they were making.

23  There is no justification for PBC to breach the Lease, ask the Court to rewrite the Lease to

24  insert an escape clause that is not there, and take Seattle's 41-year history with the team to

25  Oklahoma City.

26

CITY OF SEATTLE'S TRIAL BRIEF - 2
Case No. C07-01620-MJP

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

## II.    FACTUAL BACKGROUND

The following are the key facts that will be proved at trial.

**A.    In Exchange for a Specifically Enforceable 15-Year Lease the City Paid $84 Million to Build KeyArena to Keep the Sonics in Seattle and Preserve the Benefits the Sonics Bring to the Community.**

In entering into the Lease, the City committed to completely renovate the Seattle Center Coliseum ("Coliseum") (now known as KeyArena) as a venue for professional basketball. SSI Sports, Inc. ("SSI"), which owned the Sonics at the time, had equal rights with the City in the design and construction of the renovated KeyArena. *See* Ex. 45 (Lease), Article IV.D. The City was required to accept all reasonable requests by SSI during the design and construction process. The City ultimately spent approximately $84 million to make KeyArena a "new, state of the art professional basketball playing facility" and financed those expenditures with a $74 million bond issue to be paid with revenues from KeyArena. *See* Ex. 45, Lease, Recitals, pp. 1-2.

The Lease also required the City to spend no less than $3.5 million in 1993 dollars (adjusted as required by the Lease) in general renovations to KeyArena between the 2002-03 and 2003-04 seasons. *See* Ex. 45, Article X.C. The City fully complied with these Lease obligations.

**B.    The Lease is Valid and Binding and has Clear and Definite Terms, Including a "Specific Performance" Provision.**

The terms of the Lease are undisputed. Article II states PBC must play Sonics games exclusively at KeyArena through 2010. Article XXVII.L states that "[t]he obligations of the parties to this Agreement are unique in nature; this Agreement may be specifically enforced by either party."[1] The recitals to the Lease state that the benefit of the City's bargain was the Sonics' long-term presence in Seattle and KeyArena. *See* Ex. 45, Recitals, pp. 1-2.

---

[1] More than half of NBA arena leases have specific performance clauses. No NBA teams

CITY OF SEATTLE'S TRIAL BRIEF - 3
Case No. C07-01620-MJP

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

PBC admits the Lease with the City is valid and binding. PBC assumed the obligations of the Lease in an Instrument of Assumption signed by PBC Chairman Clay Bennett and the City in October 2006. *See* Ex. 79 (Instrument of Assumption). PBC admits that if this Court orders specific performance, PBC will comply and continue to run the Sonics the same way it would have otherwise. *See* Ex. 197 (PBC's Answer to RFA No. 7).

**C.    The Benefit of the Parties' Bargain Includes Both Economic and Intangible Benefits, Which the City Will Lose if PBC Breaches the Lease.**

PBC's performance under the Lease provides the City broad economic and – in particular – intangible benefits. If PBC is allowed to breach and relocate the Sonics two years early, the City will lose the benefit of its bargain.

**1.    The Sonics provide the City substantial economic benefits, but those benefits are difficult to quantify with reasonable precision.**

The City derives substantial economic benefits from the Sonics. In addition to rent, revenue sharing and taxes, the Sonics spend $30 million annually in the City (exclusive of player salaries), creating approximately 150 jobs. The Sonics also bring substantial game-related spending to Seattle from outside the City.[2] Third parties, including the NBA, the Mayor of Oklahoma City, and the president of the Oklahoma City Chamber of Commerce, have all acknowledged that NBA teams provide broad economic benefits to the cities in

have relocated early in breach of a specific performance clause (i.e., without the lessor's agreement). The NBA has stated that before PBC can relocate the Sonics prior to the expiration of the Lease, PBC must either have the City's permission to leave or obtain a court order allowing it to do so.

[2] These benefits to Seattle are consistent with the representations PBC itself has made about the financial benefits it expects the Sonics to bring to Oklahoma City. Specifically, PBC asserted the Sonics will bring Oklahoma City more than $65 million in economic benefits annually. It also asserted the Sonics will bring the State of Oklahoma approximately $170 million a year. In the arena lease with Oklahoma City, PBC agreed the Sonics will provide "unique value . . . not only in terms of generating funds to operate the Arena, but also in terms of generating new jobs, additional revenue sources and economic development and increased tourism for the City[.]" Ex. 193, p. 65.

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

which they play.  If the Sonics are permitted to leave before the expiration of the Lease, the City will lose two full years of these economic benefits.

**2.      The Sonics provide the City intangible benefits that cannot be compensated with monetary damages.**

The City will show that the Sonics bring substantial intangible benefits to the City of Seattle.  These benefits, however, are difficult to measure.  Hundreds of thousands of Seattle residents value the Sonics and their 41-year history.  The Sonics create civic pride, a sense of community, greater visibility to the country and the world, and attract new businesses and residents.  The Sonics contribute to the vibrancy of the Seattle Center.  The Sonics bring citizens from all walks of life together, attracting a racially diverse gathering to a central public space.  The Sonics also make substantial contributions to Seattle through charitable work by the players.

Before it decided to breach the Lease, PBC acknowledged the Sonics brought these benefits to Seattle.  Although PBC now rejects this position, its economic expert still admits the Sonics bring Seattle intangible benefits, which have monetary value but are difficult to measure.  Moreover, PBC admit s that the Hornets, the NBA team now located in New Orleans, brought substantial non-economic benefits to Oklahoma City when the team relocated there temporarily for two years in the aftermath of Hurricane Katrina.  Similarly, PBC admits the Sonics will bring non-economic, intangible benefits to Oklahoma City if PBC is allowed to breach the Lease and relocate the team.  The mayor of Oklahoma City and the president of the Oklahoma City Chamber of Commerce testified similarly.

**III.     ARGUMENT IN SUPPORT OF SPECIFIC PERFORMANCE**

The City summarizes below the elements of a specific performance claim, and then explains why specific enforcement should be granted in the circumstances of this case.

CITY OF SEATTLE'S TRIAL BRIEF - 5
Case No. C07-01620-MJP

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

**A.      Elements of a Specific Performance Claim.**

A party is entitled to specific performance if: there is a "valid binding contract"; the contract has "definite and certain terms"; the contract is "free from unfairness, fraud and overreaching"; and the other party has "committed, or has threatened to commit, a breach." *Crafts v. Pitts*, 162 P.3d 382, 385-88 (Wash. 2007). Specific performance is the presumptive remedy if those requirements are satisfied. *Egbert v. Way*, 546 P.2d 1246, 1248 (Wash. Ct. App. 1976); *Church v. Bruce*, 251 P. 854, 855 (Wash. 1927) (same). "While a decree of specific performance rests within the sound discretion of the trial court, this does not permit a court to deny specific performance when otherwise appropriate." *Crafts*, 162 P.3d at 389. "'To preclude specific performance," the defendant must demonstrate that a 'remedy afforded at law' exists that is 'as *plain, adequate, complete and efficient as the remedy of specific performance.*'" *Id*. at 388 (emphasis in original) (quoting 71 Am. Jur. 2d Specific Performance § 11). [3]

> **1.      The terms of the Lease are clear and binding – including the City's contractual right to specific performance.**

PBC admits the Lease is a valid binding contract. The terms of Article II are definite and certain: Article II provides that PBC is required to schedule Sonics games exclusively in KeyArena through the end of the 2009-10 NBA season. Article XXVII.L provides that the parties' obligations are "unique," and they may seek specific performance as a remedy. Ex. 45. PBC admits the terms of the Lease speak for themselves. *See* Ex. 158 (PBC's Answer).

As they did here, parties are free to contract for their own remedies, including the remedy of specific enforcement.[4] This is consistent with the general rule that parties have

---

[3] Section III.B describes why specific performance is warranted in this case, due to the difficulty of proving damages with any degree of certainty.

[4] *See Mahoney v. Tingley*, 529 P.2d 1068, 1070 (Wash. 1975) ("Where parties expressly provide for [specific performance, liquidated damages or actual damages], there can be no objection to the [party's] choice of one remedy from among those contemplated in the

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

freedom to contract as they choose absent a contrary public policy.[5]  Personal services

contracts have been held at times to be an exception to this rule,[6] but commercial contracts

where one party can assign its rights (as is the case with the Lease) are not personal services

contracts. [7] *Sherman v. Lunsford,* 723 P.2d 1176, 1181-82 (Wash. Ct. App. 1986) (granting

---

agreement."); *Gildor v. Optical Solutions, Inc.*, 2006 WL 1596678, *10 (Del. Ch. 2006)
(where parties agree by contract to specific enforcement, "Delaware courts do not lightly
trump the freedom to contract and, in the absence of some countervailing public policy
interest, courts should respect the parties' bargain"); *Qantum Commc'ns v. Star Broad., Inc.*,
473 F. Supp. 2d 1249, 1266 (S.D. Fla. 2007) ("[I]t is well-settled that parties are free to
choose their own remedies in a contract and that courts can enforce such remedies."); *Media
Gen. Broad. v. Pappas Telecasting*, 152 F. Supp. 2d 865, 869 (W.D. N.C. 2001) ("Regardless
of whether money damages would be sufficient compensation, the parties [are] free to shape
their remedies according to their particular needs … .  [T]herefore, the Court will enforce the
contract as written, giving effect to the parties' election of remedies.") (citation omitted); *Fin.
Auth. v. L.L. Knickerbocker Co., Inc.,* 106 F. Supp. 2d 44, 52 (D. Me. 1999) (specific
enforcement in light of contractual provision providing for same); *Terex Trailer Corp. v.
McIlwain*, 579 So.2d 237, 241-42 (Fla. Dist. Ct. App. 1991) (same); *Humphries v. Ables*, 789
N.E.2d 1025, 1035-36 (Ind. Ct. App. 2003) (same); *Stumpf v. Richardson*, 748 So.2d 1225
(La. Ct. App. 1999) (same); *Ludington v. LaFreniere*, 704 A.2d 875, 878 (Me. 1998) (same);
*Peuse v. Malkuch*, 911 P.2d 1153, 1155 (Mont. 1996) (same) (decided under statute).

[5] *See Keystone Land & Dev. Co. v. Xerox Corp.*, 94 P.3d 945, 948 (Wash. 2004); *see also Nw.
Airlines v. Hughes Air Corp.*, 679 P.2d 968, 970 (Wash. Ct. App. 1984) ("Freedom of
contract is the general condition.").

[6] *See, e.g.*, *In re Mitchell*, 249 B.R. 55, 59 (Bankr. S.D.N.Y. 2000) (personal services
contracts); *Zannis v. Lake Shore Radiologists, Ltd.*, 392 N.E.2d 126, 129 (Ill. Ct. App. 1979)
(same); *Kakaes v. George Washington Univ.*, 790 A.2d 581, 583-85 (D.C. 2002) (dicta)
(same, and noting that enforcing personal services contract in educational context would be
contrary to public interest).  The rule against specific enforcement of personal services
contracts is meant to protect the Court from maintaining a coercive "personal" relationship,
which it could not do.  *See State ex rel. Schoblom v. Anacortes Veneer, Inc.*, 255 P.2d 379,
381 (Wash. 1953) (court cannot enforce personal employment contract "against an unwilling
party with any hope of ultimate or real success"); *Martin v. Martin*, 230 S.W.2d 547, 550
(Tex. App. 1950) (it is effectively "impossible for the court to enforce the rendering of
personal services") (citation omitted).

[7] Sports arena leases are routinely specifically enforced because they are not contracts for
personal services.  *See Fla. Panthers Hockey Club, Ltd. v. Miami Sports & Exhibition Auth.*,
939 F. Supp. 855, 858 (S.D. Fla. 1996) ("The Panthers License Amendment is a lease
agreement and such an agreement may be subject to specific performance.").

---

CITY OF SEATTLE'S TRIAL BRIEF - 7
Case No. C07-01620-MJP

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

specific performance where investor in fishing permit "always ha[d] an option to sell his interest to … another party"); Restatement (Second) of Contracts § 367 (1979) ("performance is not personal … unless it is personal in the sense of being non-delegable"); *Kreisher v. Mobil Oil Corp.*, 243 Cal. Rptr. 662, 667-68 (Cal. App. 1988) (franchise agreement, which contained assignment provisions, constituted a standard commercial lease and not a personal services contract). Enforcement of a contractual specific performance provision is particularly appropriate where, as here, the parties agreed that the subject of the contract is unique.[8]

PBC is asking this Court to rewrite the Lease to include an early termination clause – i.e., allow it to breach and pay damages.[9] But a court in equity cannot rewrite a party's contract.[10] "It is too well settled to need citation of authorities that a court of equity, in the

---

[8] *See Castle v. Cohen*, 676 F. Supp. 620, 629-30 (E.D. Pa. 1987), *aff'd and remanded on other grounds*, 840 F.2d 173 (3d Cir. 1988) (ordering specific performance where parties argued that stock was unique and damages were inadequate remedy); *R.L. Kimsey Cotton Co., Inc. v. Ferguson*, 214 S.E.2d 360, 363 (Ga. 1975) ("Specific performance of these contracts is available to the plaintiffs here since the parties stipulated that the cotton involved was unique."); *Hamlet v. Hayes*, 641 S.E.2d 115, 118 (Va. 2007) (enforcing contractual provision stating damages were inadequate and specific performance available as remedy); *cf.* Restatement (Second) of Contracts § 359 cmt. a (1979) (in evaluating whether to grant specific performance, "a court may take appropriate notice of facts recited in [the] contract"). The Washington Supreme Court gave effect to an analogous contractual provision in *Crafts* in concluding that the subject matter of the contract was unique. *Crafts*, 162 P.3d at 387. The contract imposed an obligation to deliver a quit-claim deed which, if performed, would have had an analogous effect to a specific performance clause. *Id.*

[9] Other NBA contracts include early termination provisions that allow a team owner, by paying compensation, to terminate a lease early if certain conditions are met (e.g., if revenues fall below a certain level). In fact, the lease PBC executed with Oklahoma City two months ago contains such a provision (*see* Ex. 193, § 20.4), but the Lease in this case does not.

[10] If the parties contract for a remedy, even one so extreme as forfeiture, "a court of equity will not interfere with that contract term in the absence of fraud, accident, surprise, or improper practice." *Dunkin' Donuts of America, Inc. v. Middletown Donut Corp.*, 495 A.2d 66, 74 (N.J. 1985). In particular, a court will not rewrite a contract to relieve a party of its obligations on the grounds that its expectations in entering into the contract were disappointed, and thus specific performance would be unduly burdensome. *Blanck v. Pioneer Mining Co.*, 159 P. 1077, 1079-80 (Wash. 1916) (citing 6 Pomeroy's Equity Jurisprudence § 797).

CITY OF SEATTLE'S TRIAL BRIEF - 8
Case No. C07-01620-MJP

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

absence of fraud, accident, or mistake, cannot change the terms of a contract."[11]

**2.  The City and SSI fairly negotiated the Lease.**

Unfairness should be determined as of the time the Lease was negotiated.  *See Nelson v. Nelson*, 356 P.2d 730, 731-32 (Wash. 1960) (procedural unfairness and inadequacy of consideration determined at time of exchange); *Gilman v. Brunton*, 161 P. 835, 837-38 (Wash. 1916) (same); *Pasco Fruit Lands Co. v. Timmerman*, 152 P. 675, 676-77 (Wash. 1915) (inadequacy of consideration determined at time of exchange).  Washington courts will not conclude a contract is procedurally unfair when it is the product of a long period of negotiation by parties represented by counsel.  *See Wagner v. Wagner*, 621 P.2d 1279, 1283 (Wash. 1980).  Here, PBC admits that both the City and SSI were represented by counsel when the Lease was negotiated in 1993-94.  *See* Ex. 197 (PBC's Answer to RFA No. 4).  Virginia Anderson, the former director of the Seattle Center, will describe the extensive negotiations between the City and SSI that culminated in the Lease.  Thus, the requirements of procedural fairness are satisfied.[12]

_____

[11] *Hedges v. Dixon County*, 150 U.S. 182, 189 (1893); *see also, Mfrs.' Fin. Co. v. McKey*, 294 U.S. 442, 449 (1935) (same); *Dunkin' Donuts*, 495 A.2d at 75 (same); *Pac. Fin. Corp. v. Snohomish County*, 295 P. 110, 112 (Wash. 1931) (referring to statutory law and stating "the courts have no authority on any equitable principle to rewrite the contract for the parties"); *cf. Mayflower Realty Co. v. Sec. Sav. & Loan Soc'y*, 72 P.2d 1038, 1040 (Wash. 1937) (agreeing with the rule that "it is not within the province of the court, in the absence of fraud, deceit, or mistake, to rewrite contracts, but rather to interpret and enforce them as made by the parties themselves in accordance with their terms"); *Chaffee v. Chaffee*, 145 P.2d 244, 252 (Wash. 1944) ("[I]t is elementary law, universally accepted, that the courts do not have the power, under the guise of interpretation, to rewrite contracts which the parties have deliberately made for themselves.").

[12] Absent procedural unfairness, "'extraordinary circumstances,'" or "'countervailing equities,'" "[e]quitable relief cannot be claimed because a contract is oppressive, improvident, or unprofitable, or because it produces hardship." *Dunkin' Donuts*, 495 A.2d at 75 (*quoting Monmouth Lumber Co. v. Indem. Ins. Co. of Am.*, 122 A.2d 604, 610 (N.J. 1956)).  None of

CITY OF SEATTLE'S TRIAL BRIEF - 9
Case No. C07-01620-MJP

K:\2065932\00001\20516_HAH\20516P227V

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

Unfairness may also arise when the parties contract for the exchange of something of grossly unequal value. *Gilman*, 161 P. at 837-38; *Pasco Fruit*, 152 P. at 676-77. That is not the case here. The contract between SSI and the City provided that the City would construct a new state of the art basketball arena, and that is exactly what SSI received. PBC and its predecessors-in-interest have played in KeyArena for thirteen years (and should for the remaining two years of the Lease). SSI did not receive an unfair bargain.

Any attempt by PBC to argue that the Lease was unfair at the time PBC assumed it should fail. Such an argument is legally irrelevant and unsupported by the facts. PBC was not required to purchase the team and assume the Lease, and any burdens the Lease may impose on PBC presumably were reflected in the price it paid for the team.

### 3. PBC wants to breach the Lease less than a year after signing it.

PBC initiated arbitration to breach the Lease less than a year after it agreed its obligations were unique and the City was entitled to specific enforcement. Ex. 45, Section XXVII.L. A sophisticated entity like PBC cannot agree to a specific enforcement clause and then claim a year later that clause should be disregarded. *Metro. Sports Facilities Comm'n v. Minnesota Twins P'ship* ("*Minnesota Twins*"), 638 N.W.2d 214, 227 (Minn. Ct. App. 2002).

Amusingly, PBC Chairman Clay Bennett claimed at deposition that PBC does not intend to breach and pay damages. Instead, he testified, PBC asks only "to understand more clearly our rights and obligations under the lease." If this were true, the City would never have been forced to file this lawsuit. PBC's obligations under Article II and the City's rights under Article XXVII.L are clear.

those circumstances apply here. *See* Section IV.A.

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

**B.**     **Specific Performance is Appropriate Because Money Damages Are Inadequate.**

Specific performance is appropriate in this case because a legal remedy is not "'as *plain, adequate, complete and efficient as the remedy of specific performance.*'" *Crafts*, 162 P.3d at 388 (emphasis in original) (quoting 71 Am. Jur. 2d Specific Performance § 11). A court considers principally two things in deciding whether a remedy at law is equally adequate: whether the subject matter of the contract is unique and whether damages would be difficult to measure. *Crafts*, 162 P.3d at 387.

**1.**     **The Sonics are a unique tenant.**

Damages are inadequate because the subject matter of the contract – the Sonics' tenancy – is unique. Specific performance is the appropriate remedy if the subject of the contract is not available on the open market.[13] In such a case, money damages will not make a party whole because the party cannot obtain the contracted-for benefit for any amount of money. *Crafts*, 162 P.3d at 387. Only specific performance will put the parties in the position they would have been in had the contract been performed. *Crafts*, 162 P.2d at 385-86; *Mont. Co. v. St. Louis Mining & Milling Co.*, 152 U.S. 160, 167 (1894). The City cannot obtain another NBA tenant as a substitute tenant between now and 2010, and certainly not a team with whom the City has had a 41-year relationship.

---

[13] *McLeod v. Keith*, 417 P.2d 861, 864 (Wash. 1966) (affirming specific performance of a contract to convey stock in a close corporation where the stock was not available on the market and its value could not be readily ascertained); *cf. King Aircraft Sales, Inc. v. Lane*, 846 P.2d 550, 556 (Wash Ct. App. 1993) (specific performance appropriately ordered where planes that were subject of contract were so rare as to be essentially unobtainable on the open market and therefore buyer's ability to cover was "virtually impossible") (decided under UCC).

CITY OF SEATTLE'S TRIAL BRIEF - 11
Case No. C07-01620-MJP

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

**2.** **The damages from PBC's breach are hard to measure.**

    **a.** **The City's intangible benefits cannot be measured with precision.**

Damages are inadequate because no one can precisely value the intangible benefits the Sonics bring the City.[14] When damages are uncertain, money damages are likely to be inadequate and specific performance warranted. *Crafts*, 162 P.2d at 387; *McLeod v. Keith*, 417 P.2d 861, 864 (Wash. 1966) (specific performance is appropriate where the value of the contract "cannot be readily ascertained"). The difficulty of measuring the intangible benefits of having the Sonics play in Seattle over the next two years is admitted universally.

    **b.** **The City's broad economic benefits are real and merit protection, but are difficult to measure.**

PBC is expected to argue that the City's economic damages only encompass rent, its share of KeyArena revenues, and possibly direct taxes, all of which it suggests can be measured with reasonable certainty. This argument fails because it ignores the public interests promoted by the Sonics' Lease. When public interests are implicated in an equitable action, a court weighs the public interest along with the private interests of the parties.[15] *Rabon v. City of Seattle*, 957 P.2d 621, 623 (Wash. 1998) (when using its equitable powers, the court balances "the relative interest of the parties and the interests of the public, if appropriate"); *Seattle Elec. Co. v. Snoqualmie Falls Power Co.*, 82 P. 713, 715 (1905) (affirming specific performance of a contract to supply electricity to the City of Seattle, where the City's operation of street cars, lighting systems and the "public interest requires it"). A public lease, like the KeyArena Lease, has broader effects on the public, both intangible and

---

[14] Restatement (Second) of Contracts § 360, cmt. b (1979) (strong personal attachment to heirlooms, family treasures and works of art makes damages hard to assess).

[15] *See also Virginian Ry. Co. v. Sys. Fed. No. 40*, 300 U.S. 515, 552 (1937) (courts sitting in equity not only weigh the public interests, but "may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved").

CITY OF SEATTLE'S TRIAL BRIEF - 12
Case No. C07-01620-MJP

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

economic. The Washington State Supreme Court has recognized this. "[P]ublic provision of a venue for professional sports franchises serves a public purpose in that the presence in a community of a professional sports franchise provides jobs, recreation for citizens, and promotes economic development and tourism." *CLEAN v. State*, 928 P.2d 1054, 1061 (1996).[16]

### 3. Specific performance is appropriate because this is a sports arena lease.

In the last twenty-five years, courts regularly have granted specific enforcement of sports team leases on the grounds that sports teams are unique and the benefits lost through breach (particularly intangible benefits, but also economic benefits) cannot be measured with accuracy. *King County v. Seattle Seahawks Inc., et al.* ("*Seahawks*"), No. 96-2-03538-6 SEA (King County Sup. Ct. of Wash. for King County Feb. 2, 1996) (granting a temporary restraining order preventing the Seahawks from relocating) (attached hereto); *Minnesota Twins*, 638 N.W.2d at 223-25 (granting equitable relief to prevent the Minnesota Twins, a professional baseball team, from breaching its lease); *City of New York v. New York Yankees,* 117 Misc.2d 332, 336-37 (N.Y. Sup. Ct. 1983) (granting equitable relief to prevent the Yankees from relocating even for a period of a few games); *City of New York v. New York Jets Football Club, Inc.*, 90 Misc.2d 311, 315-16 (N.Y. Sup. Ct. 1977) (same); *see also Nat'l Basketball Ass'n v. Minn. Prof'l Basketball Ltd. P'ship*, 56 F.3d 866, 871 (8th Cir. 1995) (affirming district court's finding that injunction against Minnesota Timberwolves' move to New Orleans served the

---

[16] The Washington Supreme Court in *CLEAN* cited numerous other court decisions holding similarly. *Kelly v. Marylanders for Sports Sanity, Inc.*, 530 A.2d 245, 257 (Md. 1987); *Lifteau v. Metro. Sports Facilities Comm'n*, 270 N.W.2d 749, 753-54 & n.5 (Minn. 1978); *Rice v. Ashcroft*, 831 S.W.2d 206, 210 (Mo. Ct. App. 1991); *Martin v. City of Philadelphia*, 215 A.2d 894, 896 (Pa. 1966); *Libertarian Party v. State*, 546 N.W.2d 424, 434 (Wis. 1996).

CITY OF SEATTLE'S TRIAL BRIEF - 13
Case No. C07-01620-MJP

K:\2065932\00001\20516_HAH\20516P227V

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

"public interest"); *cf. Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 726 F.2d 1381, 1397 (9th Cir. 1984) (noting "local governments ought to be able to protect their investment through the leases they negotiate with the teams for the use of their stadia").[17]

In the *Seahawks* case, a Washington state trial court granted a temporary restraining order barring the Seattle Seahawks from relocating. *Seahawks* at 2-3. The court explained:

> King County and citizens of this region will be injured through loss of the revenue and other economic benefits they derive from the playing of Seahawks football games in the Kingdome and through loss of intangible benefits flowing from the presence of a professional football team in Seattle. The Court finds that these intangible benefits were an important element of the bargain reflected in the 1986 Amended Agreement of the parties. The Court further finds that these injuries would be irreparable because the amount of damages will not be subject to reasonable calculation, the economic benefits to the community cannot be replaced by a monetary award to King County[,] the intangible benefits cannot be replaced by money, and because the chief source of revenue, the loyalties of the advertisers and fans, will be irreparably eroded unless the team is foreclosed from any further steps toward implementing a move to another community.

*Id*.

The rationale of these sports arena specific performance cases applies here.

---

[17] PBC might cite two cases from the 1970s in which courts did not require specific performance. In each, the parties' contract did not contain a specific performance clause. In the one published case an injunction would have been futile because the New Orleans Jazz had already relocated to Utah; in the other, the San Diego Padres never moved, and remain in San Diego today. *HMC Mgmt. Corp. v. New Orleans Basketball Club*, 375 So.2d 700, 711 (La. Ct. App. 1979) (lease clause requiring specific performance had been superceded and injunction would be futile because team had already moved); Matthew J. Mitten & Bruce W. Burton, *Professional Sports Franchise Relocations from Private Law and Public Law Perspectives: Balancing Marketplace Competition, League Autonomy, and the Need for a Level Playing Field*, 56 Md. L. Rev. 57, 73 n.92 (citing *City of San Diego v. Nat'l League*, No. 343508 (Sup. Ct. for the County of San Diego 1973) and noting that lease "did not expressly provide for specific performance through injunctive relief").

CITY OF SEATTLE'S TRIAL BRIEF - 14
Case No. C07-01620-MJP

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

**4.     Specific performance is appropriate because the City designed and built KeyArena for the Sonics, and the Sonics have been the anchor tenant in possession since KeyArena's construction.**

The City made an $84 million investment to renovate KeyArena as a basketball-specific venue for the Sonics as consideration for a 15-year term. It is still paying off that debt. Washington courts recognize that a lessor that makes tenant-specific improvements is entitled to specific performance when the lessee has been in possession of the property for a period of time. *Rowland v. Cook*, 38 P.2d 224, 225-26 (Wash. 1934); *Forrester v. Reliable Transfer Co.*, 109 P. 312, 316 (Wash. 1910). Except through specific performance, the parties cannot be put in the position for which they bargained. *Rowland*, 38 P.2d at 225-26.

PBC likely will rely on other cases involving shopping center landlord-tenant cases involving disputes regarding continuing operations lease provisions.[18] Specific enforcement is rejected in many of those cases because the courts were not qualified, or would be unduly burdened,[19] by overseeing the operations of a continuing business.[20] In contrast, a declaratory judgment here that the City is entitled to specific performance of Article II will end this case. PBC has admitted it will comply with the Lease and the Court's order. PBC admits it will operate the team in exactly the same way. The issue is the term of the Lease, not the operation of the Sonics. Once this Court rules, the dispute is over, and the men who run PBC will manage the Sonics like they have successfully run their other businesses.

---

[18] *See, e.g.*, *Mayor's Jewelers, Inc. v. State of Cal. Pub. Employees' Ret. Sys.*, 685 So.2d. 904 (Fla. Dist. Ct. App. 1996) (citing cases).

[19] A court may consider whether specific performance will impose an undue burden on the court. This consideration is given less weight, however, where the public interest is affected. *Laclede Gas Co. v. Amoco Oil Co.*, 522 F.2d 33, 39 (8th Cir. 1975) ("While a court may refuse to grant specific performance where such a decree would require constant and long-continued court supervision, this is merely a discretionary rule of decision which is frequently ignored when the public interest is involved."); Restatement (Second) of Contracts § 366, cmt. a (1979).

[20] *Mayor's Jewelers, Inc.*, 685 So.2d. at 904-05.

CITY OF SEATTLE'S TRIAL BRIEF - 15
Case No. C07-01620-MJP

K:\2065932\00001\20516_HAH\20516P227V

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

In sum, the City determined to serve the public interest by paying for renovation of KeyArena to provide a home for the Sonics for fifteen years. The Sonics' owners have enjoyed the benefits of their bargain. The City has now determined that its best interests are served by specifically enforcing the Lease. The City's decision is within its legal rights and should be upheld by this court.

## IV.    ARGUMENT REJECTING PBC'S DEFENSES

PBC asserts three affirmative defenses to the City's claim for specific performance:

1.    The City has an adequate remedy at law;

2.    Specific performance would impose an undue hardship on PBC; and,

3.    The City has unclean hands.[21]

With regard to the first defense, the City incorporates its arguments above to demonstrate that damages are inadequate to fulfill the City's benefit of the bargain under the Lease. The second and third defenses are not supportable by either law or fact.

## A.    Undue Hardship Does Not Apply Because There is None.

### 1.    The City and public will suffer significant harm from PBC's breach

A court may decline to grant specific performance if it would result in undue hardship to a party. *Crafts*, 162 P.3d at 386. "[T]o establish the hardship defense, a defendant must show that specific performance would create a hardship or injustice that is out of proportion to the relief sought." *Perel v. Brannan*, 594 S.E.2d 899, 905 (Va. 2004).[22] Thus, undue hardship is found only where the burden of performance on the defendant is substantially greater than any benefit received by the plaintiff, or where a plaintiff will derive no benefits or

---

[21] Although there are many possible defenses to a specific performance claim, the Court need only consider those argued and supported by the evidence. *See Crafts*, 162 P.3d at 386 n. 4.

[22] *See also Gager v. Gager & Peterson, LLP*, 820 A.2d 1063, 1070-71 & n. 10 (Conn. App. Ct. 2003); 71 Am. Jur. 2d, Specific Performance § 94 (2001).

CITY OF SEATTLE'S TRIAL BRIEF - 16
Case No. C07-01620-MJP

K:\2065932\00001\20516_HAH\20516P227V

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

inconsequential benefits from performance. *Compare Minnesota Twins*, 638 N.W.2d at 223, 225-36 (granting specific performance despite breaching party's claim that the cost of performing was $4,000,000 and cost of breach was only $500,000) *with 3615 Corp. v. N.Y. Life Ins. Co.*, 717 F.2d 1236, 1238 (8th Cir. 1983). In cases involving the public interest, moreover, courts look beyond the monetary damages involved and examine the equities more broadly. *Minnesota Twins*, 638 N.W.2d at 221-26 (giving weight to intangible benefits provided by team's presence in community and to harm to the public if team did not fulfill its lease term); *cf Rabon*, 957 P.2d at 623 (when using its equitable powers, the court balances "the relative interest of the parties and the interests of the public, if appropriate").

Here, if PBC breaches, the City will suffer concrete harm, both in terms of direct economic loss and broader economic and non-economic (intangible benefit) loss. If the Sonics leave, the City will lose at least the $4.5 million in annual direct economic benefits it derives from the presence of the Sonics. Moreover, the City will lose substantial non-economic benefits and additional indirect economic benefits. The City's nationally renowned expert, Andrew Zimbalist, will testify that sports teams provide substantial intangible benefits. These benefits have been found to have value when measured in different contexts using different tools. The precise value of these benefits, however, cannot be quantified with precision. Lon Hatamiya, another expert for the City, will testify that the Sonics generate between $183 and $193 million a year in aggregate economic impact, 940 to 985 jobs, and an additional $25.3 to $26.3 million a year in additional household income (exclusive of player and staff salaries) in the Seattle metropolitan area. Thus, the substantial harm suffered by the City and the public substantially tips the balance of equities in their favor.

The circumstances in which hardships are such that equity will intervene are rare. *Dunkin' Donuts*, 495 A.2d at 75 (describing the need for "extraordinary circumstances" to

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

excuse performance); *Lindenberger Cold Storage & Canning Co. v. J. Lindenberger, Inc.*, 235 F. 542, 565 (W.D. Wash. 1916) (declining to grant specific performance of a contract entered into before World War One began, where the changed circumstances were such that "the court is asked to give a German's property to an English company to use, knowing that that company will not pay for its use when due, although it promised so to do, or, if at all, until the conclusion of the war"). In the history of the NBA, no other team has relocated in breach of a specific enforcement clause. Hurricane Katrina might have constituted extraordinary circumstances. Even there, however, the Hornets did not breach their Lease's specific enforcement clause. Instead, they amended their lease with the state of Louisiana to allow their temporary relocation.

Indeed, absent some element of procedural unfairness (not present here), the City has not identified any Washington appellate cases in which the court denied specific performance based on allegations of undue hardship.[23]

**2.    PBC's foreseeable losses do not constitute undue hardship.**

A court will not deny specific performance where the alleged hardship was foreseeable.[24] *Carpenter v. Folkerts*, 627 P.2d 559, 562 (Wash. Ct. App. 1981). Hardship

_____

[23] *See e.g.*, *Nelson*, 356 P.2d at 731-33 (Wash. 1960) (procedural unfairness and inadequacy of consideration at time of exchange); *Gilman v. Brunton*, 161 P. 835, 837-38 (Wash. 1916) (procedural unfairness and inadequacy of consideration at time of exchange); *Pasco Fruit Lands Co. v. Timmermann*, 152 P. 675, 676-77 (Wash. 1915) (inadequacy of consideration at time of exchange); *cf. In re Arland's Estate*, 230 P. 157, 158 (Wash. 1924) (specific performance denied where it would cause unfair hardship to innocent third party); *Bernard v. Benson*, 108 P. 439 (Wash. 1910) (same).

[24] *Craft Builders, Inc. v. Ellis D. Taylor, Inc.*, 254 A.2d 233, 235-36 (Del. 1969) (no undue hardship where the cost of preparing land for flood control was not unforeseen by defendant); *Mohrlang v. Draper*, 365 N.W.2d 443, 447 (Neb. 1985) ("One form of hardship equitably excusing specific performance of a contract may be a circumstance unforeseeable at entry into the contract."); *Portland Section of Council of Jewish Women v. Sisters of Charity of Providence in Oregon* (hereinafter "*Council of Jewish Women*"), 513 P.2d 1183, 1188 (Or. 1973) (holding that "'[s]pecific performance should seldom be refused…if nothing has occurred since the making of the bargain that was not within the actual contemplation of the

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

that should have been foreseen, but was not, likewisee is not an undue hardship.[25]   The fact

that "performance becomes more expensive than originally anticipated does not justify setting

the contract aside." *Carpenter*, 627 P.2d at 562.  Stated differently, the fact that a contract "is

more costly than anticipated is a poor excuse [for breach], for contracts are designed to

allocate risks such as this . . . ." *Union Oil Co. v. Leavell*, 220 F.3d 562, 566 (7th Cir. 2000)

(ordering specific performance); *see also Wimberly v. Caravello*, 149 P.3d 402, 410 (Wash.

Ct. App. 2006) (undue hardship defense inappropriate if result of party's calculated risk).

Ultimately, courts in equity will not save a party from a bad bargain.[26]

---

parties when they were bargaining'" and granting specific performance on a contract for
providing hospital services at fixed rate entered into in 1927 even though the defendant's
financial burden kept increasing, because the rising cost of health care was foreseeable at the
time of contracting) (quoting 5A Corbin, *Contracts* § 1162 (1964).  *Cf. Wash. State Hop
Producers, Inc. Liquidation Trust v. Goschie Farms, Inc.*, 754 P.2d 139, 142-43 (Wash. Ct.
App. 1988) (requiring that a supervening event be unforeseeable when claiming
impracticability as a defense to breach of contract).

[25] *Blanck v. Pioneer Mining Co.*, 159 P. 1077, 1079-80 (Wash. 1916) (equity will not
intervene to relieve against hardship caused by a subsequent, forseeable change in events,
such as a rise or fall in the value, profits, or losses of the undertaking); *Mohrlang*, 365
N.W.2d at 447 (citations omitted) (holding that the defendant's "belated realization that his
financial burden under the contract was greater than initially anticipated at origination of the
agreement does not constitute hardship excusing specific performance...."); *cf. Pub. Util.
Dist. No. 1 v. Wash. Pub. Power Supply Sys.*, 705 P.2d 1195, 1204 (Wash. 1985) ("A party
who incurs an obligation with limited knowledge, conscious disregard of surrounding
circumstances and awareness of uncertainty must bear the consequences of its decision.").

[26] *Dean v. Gregg*, 663 P.2d 502, 503 (Wash. Ct. App. 1983); *Council of Jewish Women*, 513
P.2d at 1188 ("'Specific performance will not be refused merely because the contract turned
out to be a losing one.'") (quoting 5A Corbin, *Contracts* § 1162 (1964)); *Mohrlang*, 365
N.W.2d at 447 ("An imprudent or bad bargain in and of itself is not an excuse for
nonperformance of a contract.") (citing *Dean v. Gregg*).

CITY OF SEATTLE'S TRIAL BRIEF - 19
Case No. C07-01620-MJP

K:\2065932\00001\20516_HAH\20516P227V

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

Here, PBC knew the Sonics were losing $20 million a year and would continue to lose this amount. It chose to accept that risk. Any harm was foreseeable. That PBC now anticipates some additional loss does not preclude specific performance.

PBC's assertion that it expected to succeed in building a new arena to avoid losses rings false. PBC's investors admitted in security disclosure statements that they understood the risk that PBC would not get a new arena and, moreover, that the City would not let PBC out of the Lease. *See* Ex. 75, at p. 3. The NBA also specifically informed PBC of that risk. PBC chose to invest despite these risks. Thus, consistent with Washington law, specific performance is appropriate because "[a]ny expenses which [PBC] will have to incur . . . were within the foreseeable contemplation of the parties . . . ." *Carpenter*, 627 P.2d at 562.

### 3. Self inflicted harm is not undue hardship.

If a party causes its own harm, that is not a defense to a specific performance claim. *Carpenter*, 627 P.2d at 562 (specific performance ordered where defendants' financial inability to fulfill the contract resulted from their own decisions to encumber the land subject to a lease-option).[27] Specific performance is appropriate where a defendant has "voluntarily assumed [] self-induced obligations and performance [i]s not prevented by an Act of God or through any fault of the [plaintiffs]." *Carpenter*, 627 P.2d at 562.

PBC's asserted "undue hardship" is self-inflicted. By PBC's own account, its alleged losses – to the extent they exceed those the Sonics were incurring at the time of sale – principally stem from its decision to make the Sonics a "lame duck." PBC will have to

---

[27] *Mohrlang*, 365 N.W.2d at 447 ("Hardship…cannot be self-inflicted or caused through inexcusable neglect on the part of the person seeking to be excused or exonerated from specific performance. Were the rule otherwise one would derive a benefit from his or her own inexcusable neglect.") (citations omitted).

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

explain why its hardship was not self inflicted after it decided to publicly announce its intent to breach three years before the end of the Lease term. Moreover, PBC will admit that it traded away the team's best players, producing the worst Sonics team in the history of the franchise, which in turn impacted revenue. Finally, the evidence will show that PBC demanded a $500 million publicly financed global arena – more expensive than any prior NBA arena – but refused to make more than a "negligible" or "nominal" contribution and refused to cover cost overruns. Its failure to secure a new arena is its own fault.

> **4.    PBC admits its can easily bear the anticipated losses over the next two years.**

PBC's only substantive defense is that it anticipates losing approximately $30 million a year over the next two years. PBC admits the team was losing $20 million a year when it bought the team, but now claims $30 million a year is unreasonable. PBC's experts will admit on cross-examination that this estimation of anticipated loss is subject to fluctuation based on a variety of factors. More importantly, however, PBC readily admits it can bear those losses regardless of the amount, making the losses neither undue nor a hardship.

**B.    An Unclean Hands Defense Requires Fraudulent or Willful Misconduct Related to the Immediate Matter in Litigation that Causes Injury.**

An unclean hands defense will defeat a specific enforcement claim in very limited and well-established circumstances, which do not exist in this case. Unclean hands exist only when a party has engaged in fraudulent or willful misconduct, with respect to the immediate matter in litigation that causes the injury of which the party complains. *See J.L. Cooper & Co.,* 113 P.2d at 857-58 (Wash. 1941). Absent injury, hands cannot be unclean. *See J.L. Cooper & Co. v. Anchor Secs.,* 113 P.2d 845, 857-58 (Wash. 1941); *McKelvie v. Hackney,* 360 P.2d 746, 752 (Wash. 1961). In the context of a specific performance claim, "unclean hands" typically is at issue where the party seeking specific performance induced the other

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

party to enter into the contract through fraud or misrepresentation. *Cascade Timber Co. v. Northern Pac. Ry. Co.*, 184 P.2d 90, 104-05 (Wash. 1947) (*cited in Crafts*, 162 P.3d at 386 n.4.

Importantly, as a matter of law, a party cannot act in bad faith if it is suing to enforce its contractual rights. *See Badgett v. Sec. State Bank,* 807 P.2d 356, 360 (Wash. 1991). The City cannot have unclean hands in this action where it "simply stands on its rights to require performance of a contract according to its terms." *Id.*

PBC claims injury based on the City's alleged wrongful conduct, but those are losses PBC claims it will suffer as a result of its lame duck status. The City did not wrongfully induce PBC to buy the Sonics and assume the obligations of the Lease. The City did not induce PBC to announce it wanted to breach the Lease and move the team to Oklahoma City before the end of the Lease. An unclean hands defense does not exist.

Finally, PBC's Machiavellian "plan" theory is not supported by the facts. From the day PBC bought the Sonics, the City announced its intent to enforce the Lease and obtain the benefits of having the Sonics play in Seattle through the Lease term. Indeed, because of the substantial benefits that flow to the City from the presence of the team, the City has worked to find a long term solution at a renovated KeyArena with the Sonics prior owners, with PBC and with Matt Griffin's group subsequent to PBC's announced plan to move to Oklahoma City. The City's hope to find a solution that would keep the Sonics in Seattle was not wrongful. Moreover, PBC admits it threatened to breach before the City filed suit. The City's interactions with the Griffin Group came after PBC's threat to breach. Thus, the City's suit and subsequent interactions with the Griffin Group cannot support an unclean hands defense.

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

# V. CONCLUSION

PBC's owners are sophisticated businessmen and investors. They purchased the Sonics with the understanding that the team was contractually committed to play in KeyArena through the 2009-10 NBA season, that the Sonics were losing tens of millions of dollars at KeyArena, and that the Lease had a specific performance clause. Less than a year later, faced with the reality of what it agreed to purchase, PBC asked the City to accept money instead of enforcing the Lease as written. The City made a policy decision to refuse that request and instead to enforce the Lease as written to obtain the full measure of benefits that the taxpayers paid for in 1994 when the Lease was signed. As a matter of law and equity, the City's decision to enforce the Lease should be upheld by this Court.

DATED this 11th day of June, 2008.

KIRKPATRICK & LOCKHART                    THOMAS A. CARR
PRESTON GATES & ELLIS, LLP                Seattle City Attorney


By: /s/ Paul J. Lawrence                        Gregory C. Narver, WSBA No. 18127
    Slade Gorton, WSBA No. 20                 Assistant City Attorney
    Paul J. Lawrence, WSBA No. 13557
    Jeffrey Johnson, WSBA No. 23066
    Jonathan Harrison, WSBA No. 31390
    Michelle Jensen, WSBA No. 36611

Attorneys for Plaintiff City of Seattle          Attorneys for Plaintiff City of Seattle

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

FILED

96 FEB -2 PM 4: 36

KING COUNTY
SUPERIOR COURT CLERK
SEATTLE, WA

SUPERIOR COURT OF WASHINGTON FOR KING COUNTY

| | |
|---|---|
| KING COUNTY, a Washington municipal corporation,<br><br>    v.<br><br>               Plaintiff,<br><br>SEATTLE SEAHAWKS INC., a Washington corporation; KEN BEHRING, individually and in his capacity as president of, and member of the board of directors for, the Seattle Seahawks Inc.; STEPHEN BEINKE, in his capacity as vice president of, and member of the board of directors for, the Seattle Seahawks Inc.; KENNETH HOFMAN, in his capacity as treasurer of the Seattle Seahawks Inc.; DAVID BEHRING, in his capacity as secretary of the Seattle Seahawks Inc.; JOHN and JANE DOES 1-50,<br><br>              Defendants. | ))))))))))))))))))))))))))))))) NO. 96-2-03538-6 SEA<br><br>TEMPORARY RESTRAINING ORDER ~~[PROPOSED]~~ |

This matter came before this court on February 2, 1996, on King County's motion for a temporary restraining order against Seattle Seahawks Inc. (SSI) and its agents. SSI received notice of this motion on this date before the hearing.

TEMPORARY RESTRAINING ORDER - 1
moore\seahawks\tro.ord

**Norm Maleng**
Prosecuting Attorney
CIVIL DIVISION
E550 King County Courthouse
Seattle, Washington 98104-2312
(206) 296-9015
FAX (206) 296-0191



The Court heard oral argument of counsel and also reviewed the pleadings filed in this action:

Complaint for Injunctive and Declaratory Relief and Damages

Motion for Temporary Restraining Order

Memorandum in Support of Motion for Temporary Restraining Order

Affidavits of Neil M. Campbell, A. Richard Gemperle, John Hooper, Ann Masaye Kawasaki, John T. Kaatz, John Nesholm, Quentin Yerxa, Tony Guererro, and Kevin Raymond

Based on the argument of counsel and the evidence presented, the Court finds that if SSI and its agents are permitted to do the acts sought to be enjoined, King County and citizens of this region will be injured through loss of the revenue and other economic benefits they derive from the playing of Seahawks football games in the Kingdome and through loss of intangible benefits flowing from the presence of a professional football team in Seattle. The Court finds that these intangible benefits were an important element of the bargain reflected in the 1986 Amended Agreement of the parties. The Court further finds that these injuries would be irreparable because the amount of damages will not be subject to reasonable calculation, the economic benefits to the community cannot be replaced by a monetary award to King County the intangible benefits cannot be replaced by money, and because the chief source of revenue, the loyalties of the

TEMPORARY RESTRAINING ORDER - 2
moore\seahawks\tro.ord

**Norm Maleng**
Prosecuting Attorney
CIVIL DIVISION
E550 King County Courthouse
Seattle, Washington 98104-2312
(206) 296-9015
FAX (206) 296-0191

advertisers and fans, will be irreparably eroded unless the team
is foreclosed from any further steps toward implementing a move to
another community.  The Court concludes that this risk of
irreparable injury justifies a temporary restraining order
pursuant to RCW 7.40 and CR 65.

Based on the above findings of fact and conclusion of law, IT
IS HEREBY ORDERED:

1.   King County's motion is granted.

2.   ~~SSI, its agents, servants, employees, attorneys, and~~ all
persons in active concert and participation with them who receive
actual notice of this order, and Ken Behring, Stephen Beinke,
Kenneth Hofman, and David Behring are enjoined from (a)
transferring the Seattle Seahawks franchise to a new owner without
the County's consent and the necessary approvals required under
the Constitution, Bylaws, and Rules and Regulations of the
National Football League, and provisions whereby the transferee
assumes all of SSI's obligations under the Amended Agreement; (b)
moving the Seahawks to another city; (c) playing Seahawks home
games in any location other than the Kingdome; (d) entering or
consummating any agreement, understanding or transaction or
business deal which would materially impair the Court's ability to
grant the equitable relief that plaintiff claims; (e) transfering
any assets or equipment necessary or incidental to the playing of
professional football to any city outside the State of Washington;
and (e) ~~otherwise failing to comply~~ substantially with the

TEMPORARY RESTRAINING ORDER - 3
moore\seahawks\tro.ord

**Norm Maleng**
Prosecuting Attorney
CIVIL DIVISION
E550 King County Courthouse
Seattle, Washington 98104-2312
(206) 296-9015
FAX (206) 296-0191

(2)     The court hereby enjoins the defendants for 14 days from the date of this order, from taking

any steps to transfer the franchise to a City outside the State of Washington, including (1) the sale

of the franchise to a third party that is not a resident of the State of Washington, (2) entering into

contracts with third parties that would obligate the defendants to have the football team play its home

games outside the Kingdome or that would interfere with defendants ability to have the team play its

home games in the Kingdome, or (3) transferring any assets or equipment, except in the ordinary

course of business, necessary to the playing of the teams home games in the Kingdome.

p. 3 A

<del>provisions of</del> the 1986 Amended Agreement between SPF and King
County.

    3.    This order is granted without the requirement of any
bond, pursuant to RCW 4.92.080 and CR 65(c).

    4.    This temporary restraining order shall expire 14 days
from entry.

DATE AND HOUR OF ISSUANCE: *February 2, 1996*.
*4:24 PM*

_____
SUPERIOR COURT JUDGE/<del>COMMISSIONER</del>

Presented By:

DANIELSON HARRIGAN & TOLLEFSON

By: _____
    ARTHUR W. HARRIGAN, JR., WSBA #1751
    Attorneys for Plaintiff King County

*5. Hearing on application
for preliminary injunction
set for 2/16/95 at 8:45
unless otherwise ordered by
court.*

TEMPORARY RESTRAINING ORDER - 4
moore\seahawks\tro.ord

**Norm Maleng**
Prosecuting Attorney
CIVIL DIVISION
E550 King County Courthouse
Seattle, Washington 98104-2312
(206) 296-9015
FAX (206) 296-0191

## CERTIFICATE OF SERVICE

I hereby certify that on June 11, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all parties of record.

Dawn M. Taylor, Legal Assistant

CERTIFICATE OF SERVICE - 1
Case No. C07-01620-MJP

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022