UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

CITY OF SEATTLE,                    )  Cause No. 07-01620MJP
                                    )
            Plaintiff,              )  Seattle, Washington
                                    )  June 16, 2008
        vs.                         )  Volume 1
                                    )
PROFESSIONAL BASKETBALL CLUB,)
LLC,                                )
                                    )
            Defendant.              )
                                    )
_____)

BENCH TRIAL
VERBATIM REPORT OF PROCEEDINGS
BEFORE THE HONORABLE MARSHA J. PECHMAN
UNITED STATES DISTRICT JUDGE

APPEARANCES:

  For the Plaintiff:       Paul Lawrence
                           Jeffrey Charles Johnson
                           Gregory Narver

  For the Defendant:       Bradley S. Keller
                           Paul R. Taylor

  Reported by:             Barry L. Fanning, CCR, RMR, CRR
                           Nichole Rhynard, CCR, RMR, CRR

Proceedings recorded by mechanical stenography, transcript
produced by Reporter on computer.

EXAMINATION INDEX

EXAMINATION OF:                                                      PAGE
MAYOR GREGORY J. NICKELS
 DIRECT EXAMINATION              BY MR. JOHNSON          42
 CROSS-EXAMINATION               BY MR. KELLER           63
 REDIRECT EXAMINATION            BY MR. JOHNSON         121
 RECROSS-EXAMINATION             BY MR. KELLER          132
VIRGINIA ANDERSON
 DIRECT EXAMINATION              BY MR. NARVER          133
 CROSS-EXAMINATION               BY MR. TAYLOR          155
 REDIRECT EXAMINATION            BY MR. NARVER          178
JOYTINDER SINGH
 DIRECT EXAMINATION              BY MR. NARVER          181
 CROSS-EXAMINATION               BY MR. TAYLOR          198

EXHIBIT INDEX

EXHIBITS ADMITTED                                                   PAGE
  231                                                                46
  147                                                                55
  31                                                                 61
  500                                                                69
  45                                                                 78
  529                                                                80
  516                                                                83
  527                                                                89
  599                                                                95
  175                                                               110
  32                                                                117
  40                                                                137
  41                                                                141
  33                                                                146
  215                                                               153

P R O C E E D I N G S

_____

THE CLERK:  CR 07-1620MJP, City of Seattle versus Professional Basketball Club, LLC.  Counsel, please make your appearances.

MR. LAWRENCE:  Paul Lawrence of K&L Gates for the City of Seattle.  Along with me at counsel table are Jeff Johnson of K&L Gates, Greg Narver from the City Attorney's Office, Robert Nellams, who is the director of the Seattle Center, Michelle Jensen, John Harrison and Dennis Tessier. Also in the courtroom is Mayor Greg Nickels for the City of Seattle.

THE COURT:  Thank you.

MR. KELLER:  Good morning, your Honor.  Brad Keller from Byrnes & Keller.  I have the privilege of representing the Professional Basketball Club.  Here at counsel table, at the end is Mr. Clay Bennett, principal in the Professional Basketball Club.  Ms. Mika Kitamura with my office.  If things go right technology wise it is because I listened to what she said; if they go wrong it is because I didn't follow her directions.  Mr. Paul Taylor also with my firm, also representing the Professional Basketball Club.  Mr. Jim Webb from the McAfee & Taft firm from Oklahoma City, also representing the PBC.

THE COURT:  Well, good morning, all.  Counsel, before we begin you had asked me if I would please read the depositions of Mr. Litvin, Mr. Couch, Mr. Gooden and Mr. Roy Williams.  I have done that.  However, the deposition notebooks that were provided to me did not include any of the exhibits used in the deposition, so it is very difficult for me to follow when I don't have the exhibit you are referring to.  So if there were exhibits in those notebooks that you wished to call my attention to you are going to have to do that during the course of the proceedings.

All right.  Counsel, are we ready to begin?  Would you like to offer up opening statements?

MR. LAWRENCE:  Yes, your Honor.  Good morning, your Honor, Paul Lawrence for the City of Seattle.

This is a case about the City of Seattle's policy decision to specifically enforce their lease with the Seattle SuperSonics to obtain the full benefits this bargained for in 1994, benefits that are unique and cannot be measured in dollar damages reasonably.

Back in 1993 the City of Seattle was faced with a situation perhaps somewhat like today.  The Sonics were nearing the end of their first lease with the City, the Sonics were saying that the arena that they were playing in, then the Seattle Coliseum, was inadequate as a basketball facility.

And faced with that situation the City of Seattle made a policy decision that they would invest in building a new, state-of-the-art basketball facility to the Sonics' specifications in order to keep the Sonics in Seattle and reap the benefits of having the Sonics in Seattle.

This was not simply a renovation.  This was a complete rebuild from the ground up of the Seattle Coliseum.  The City invested $84 million, $10 million out of its pocket, $74 million in a pledge of taxpayer dollars to lease this, not at a profit, and lease it in a way that outstanding debt would be left to the City after the end of the lease term.

The KeyArena was essentially rebuilt to meet the Sonics' specification into the building it is today, a state-of-the-art basketball facility, at least as of the time that the Sonics and the City entered into their lease.

So to effectuate this decision and the investment of taxpayer dollars and taxpayer credit the City entered into a lease with the Sonics.  That lease recognized that the City was going to construct a state-of-the-art basketball facility in order to enhance the City, but needed a long-term principal user to occupy the building.  And that was the Sonics.

The lease was clear about its term.  The lease ran to the end of September 2010 to encompass the 2009/2010 NBA season. And the lease was clear that the SuperSonics were to play all

home games, other than preseason games, exclusively in the Arena, now KeyArena once the lease began.

The parties also recognized in this lease that the obligations between them were unique in nature.  And they further agreed that the lease agreement may be specifically enforced because of the unique nature of those obligations.

As PBC, the defendants, admit in their answer, the lease says what it says, and we are simply here, your Honor, asking to enforce the lease as written.

In 2006 when PBC purchased the Sonics they specifically agreed to assume all the obligations and satisfy and perform under the lease.  This was signed in October of 2006 by Clay Bennett on behalf of the Professional Basketball Club, LLC.

Mr. Bennett and the other principal owners of the PBC are very successful, very well off, sophisticated businessmen and investors.  Mr. Bennett you will hear is the chairman of Dorchester Capital.  Mr. McClendon, with a net worth of over $2 billion is CEO, chairman and cofounder of Chesapeake Energy, one of the largest natural gas producers in the US. Mr. Ward co-founded that company with Mr. McClendon, and subsequently became the CEO of Sandridge Energy, a company he founded.  And Jeffrey Records is the President of the MidFirst Bank, the top performing private financial institution in the United States in 2005.  The point is, these are all sophisticated businessmen who understand what

it means to assign and assume a contract.

So what is the City's position here? The City, faced with a new ownership coming into the Sonics in 2006, has made clear from day one to that ownership that the City intended to make a policy decision to enforce the lease to get the full benefit of the bargain that they bargained for in 1994.

Mayor Nickles announced in July of 2006 when the sale was first announced between the Sonics prior ownership and current ownership that we expect to enforce that lease.

In May of 2007 when PBC approached the City to see if the City was interested in a buyout of the lease the City said, no, we are not interested in a buyout of the lease. And when PBC filed its arbitration demand seeking to breach the lease and leave early Mayor Nickels made clear that consistent policy decision he will do everything in his power to enforce the contract, keeping the Sonics where they belong, in Seattle and in KeyArena.

The policy decision was fully supported by the City Council and enacted an ordinance that recognized the history of the Sonics in Seattle; they recognized the enrichment of the community through the volunteer work of the Sonics; they recognized the financial contributions of the Sonics and Storm Foundation; they recognized the cultural, civic and community benefits derived from having the Sonics play their home games in Seattle. And they passed an ordinance

reflecting their policy decision, that they will not pass any -- take any actions to allow the Sonics to vacate KeyArena prior to the end of the lease term.

So what are these benefits that the City bargained for in 1994 and hopes to continue to receive?  They are the benefits to the community and charitable activities that the Sonics engage in.  There are economic impacts from the presence of the Seattle SuperSonics.

One of our experts will testify that on average the Sonics generate $187 million plus in economic impact from their presence and playing games here in Seattle, people living here in Seattle, etcetera.  There is an aggregate increase to household income for the residents of Seattle from the Sonics.  1200 to 1300 full and part-time jobs are supported by Sonics related activity, generally related to game-day spending for restaurants, bars, parking, hotels, and of course the activities of the Sonics themselves.

But perhaps more importantly there are noneconomic intangible benefits.  Professional Andrew Zimbalist from Smith College will be testifying about those, that an NBA team can provide a community a sense of identity, commonality and spirit that few other goods are capable of producing.

Now, Clay Bennett is going to argue here, as they do, that there are no benefits from the presence of the Sonics in Seattle.  But in reaching out to the Oklahoma State

legislature in order to receive a state tax benefit related to the Sonics move, he told the State legislature of Oklahoma that if the Sonics moved to Oklahoma City it would have an enormous positive economic impact of over $171 million annually to the state's economy.  Very much in line with what our expert will testify with respect to the Seattle economy.

Now, these benefits that we have talked about, they are unique and cannot be reasonably measured.  Again, Professor Zimbalist will testify that the Sonics provide very valuable and tangible benefits to the citizens of Seattle and will continue to do so during the next two years.  Yet, it is not possible to estimate within a reasonable margin of error the market value of those benefits.

The Sonics are indeed a unique tenant.  They are one of 30 basketball franchises in the country.  And there is no evidence that an alternative NBA franchise can be gotten for The Seattle Center for the final two years of the lease as a replacement tenant.

So what is the PBC's defense in this case?  They argue undue hardship.  But the evidence will show that at the time they purchased the Sonics in 2006 they knew they had to assume the KeyArena lease.  They knew that lease required Sonics to play all their home games in KeyArena through the end of September 2010.  They knew that NBA Commissioner David Stern had told them the lease was the worst lease in the

league economically.  They understood that the team was losing at that time more than $20 million a year, and that losses were expected to continue through 2010.  They, in short, understood the risk of where they ended up today.  In fact, the NBA warned them of that risk at the time they approved the transfer of ownership to PBC.

They claim undue hardship, but the principal owners of the PBC readily admit that given their substantial financial resources that suffering even the losses that they will argue they are going to suffer here for the last two years would not cause an undue burden to them.  They can afford the losses that they knew were coming at the time they entered into the agreement to buy the Sonics.

We will also hear evidence that the harms that PBC complains about are self inflicted.  I think you will hear a case about how hard Mr. Bennett worked to obtain a successor arena in Washington.  But you will also hear that Mr. Bennett rejected from day one the idea of a renovated KeyArena, the most cost effective resolution to providing a new venue for the Sonics, and instead sought a $500 million plus world class arena paid for by taxpayer dollars with a, quote, nominal, Mr. Bennett's words, and, quote, negligible, again Mr. Bennett's words, PBC contribution.

And you will hear that he and his team never met the deadlines set by the governor and legislative leaders to

propose legislation to the legislature in early 2007.  And ironically, although he never met his deadlines, he has steadfastly refused to move the deadline that he imposed of October 2007 to find a successor venue.

So what is really going on here?  We have some clues.  In April of 2007, six months into the 12 month period that Mr. Bennett was supposed to be looking for a successor venue, Mr. Ward, one of the principal owners of PBC, asked Mr. Bennett, is there any way to move here, meaning Oklahoma City, for the next season or are we doomed to take another lame duck season in Seattle?

Mr. Bennett replied:  I am a man possessed.  We will do everything we can.  Thanks for hanging with me, boys, the game is setting started.  To which Mr. Ward replied:  That's the spirit.  I am willing to help any way I can to watch ball here in Oklahoma City next year.

Now, Mr. Bennett testified at his deposition, and I assume he will testify consistently at trial, that he was a man possessed to keep the team in Seattle rather than move to Oklahoma City.  But let's see what the evidence will show that a man possessed did in the two weeks following this e-mail exchange.

Mr. Bennett contacted the NBA to seek to relocate the team to Oklahoma City for the 2007/2008 season.  He contacted Oklahoma City to reserve arena dates there for the 2007/2008

season.  He announced publicly that the Sonics have little hope of staying.  He meets with Brad Keller his litigation attorney in Seattle.

He was a man possessed.  I think the evidence will show he was possessed to get to Oklahoma City.

We have further evidence of what the intent of PBC was. Aubrey McClendon, one of the principal owners of PBC, was interviewed and told the press in August of '07, we didn't buy the team to keep it in Seattle.  When we deposed him he told us, that is not the truth, in April of '08.  But on the morning after he read the press release of his interview Mr. McClendon wrote to Mr. Bennett and said, oh, no, just read this.  Have I created problems for you?  I am so sorry. The truth is we did buy it with the hope of moving to Oklahoma City.

PBC's harms are also self inflicted.  The financial information prepared for PBC with respect to this past basketball season shows two reasons -- they show two reasons to themselves why they are suffering the losses they did last season.  One is because they announced they were moving the team to Oklahoma City three years before the end of their lease term.  They didn't have to do that but they did.  And, second, they had poor on-court performance, which you will hear testimony about, affects attendance which in return affects revenue.  In fact, last year was the worst Sonics

season in their 41 year history, that followed a trade away of the team's best player, and letting the team's next best player leave.

The point is not to say that your Honor or the mayor has any rights with respect to player decisions. The point is that when the Sonics make player decisions that have impact on their records, that have impact on their revenues they can't come to court and complain about their losses.

The next defense of the Sonics is the alleged Machiavellian plan, the unclean hands argument. The evidence will not show a Machiavellian plan. The plan supposedly is between Mayor Greg Nickels, a long time civic servant, serving his whole life, served on the County Council before being mayor; Senator Slade Gorton, prior to that Washington State Attorney General, member of the 911 Commission, who had experienced twice in helping save baseball for Seattle; Steve Balmer, the CEO and chairman of Microsoft, who is involved in substantial charitable activities and is an avid basketball fan; Wally Walker who is a member of the 1979 championship Sonics and became president of the Sonics under the prior ownership; and Matt Griffin, a developer who is native to Seattle and very active in the community.

Faced with what was happening in the spring of 2007 where Mr. Bennett made clear that he was trying to take the team to Oklahoma City these civic leaders individually and then

subsequently after arbitration was filed together did have a goal to try to keep the Sonics in Seattle. They did what any civic leaders would do faced with the prospect of a city losing the team.

There is nothing wrongful about what they did. There is nothing wrongful about trying to keep a team in Seattle. There is nothing wrongful about the City enforcing the lease rights it has bargained for. And there are no losses that are being suffered by the Sonics other than the losses they understood they would face when they purchased the team.

PBC argues that, your Honor, if you issue specific performance we are going to be in court every week in a dispute about how to run the team. That is simply not the case. PBC admits that they will comply fully with your Honor's order if you order specific performance.

You will hear testimony that the staff of Seattle Center and the staff of the Sonics get along together as partners, and there was no deterioration of that relationship last year, and that should continue.

And, finally, this is just a case about a lease term. There are no provisions in the lease relating to operations at all. And certainly that is not what you are being asked to rule on.

So the question has been asked, what can happen in two years? There is only two years left in the lease. Well, a

lot can happen in two years.  In 1993, faced with the same situation, policymakers found a way to fund the KeyArena rebuild, a lease was negotiated and signed between the City and the Sonics.  On the court between 1977 and 1979 the Sonics went from a below 500 record to become NBA champions. And for the next two years the legislature has two sessions to address the future of KeyArena.  In fact, the NBA's approval to move the Sonics is limited to a one-year period, and that approval to subject to changed circumstances.  A lot can happen in two years.

But if it is only to obtain the benefits that they bargained for the City is happy to obtain those benefits.

PBC would like to treat this as a simple landlord/tenant dispute.  But as the evidence we have discussed shows that simply is not the case.  The Sonics are a unique tenant. They are one of only 30 teams, they played 41 games in KeyArena that cannot be replaced.  They bring unique benefits to the City of Seattle.  They can't be replaced or measured. They have a unique history with the City from the 1979 championship team to the Gary Payton led teams of the 1990s that went to the NBA finals with the Chicago Bulls, to the current team with Kevin Durant, the NBA rookie of the year.

As writer Sherman Alexie will testify, the health and pride of a city depends on more than its politics, it also needs art, and, yes, it needs athletics.  A great city needs

to work on its soul, mind and body.  A great city needs to embrace as much greatness as it possibly can.

As Mr. Bennett recognized, the Sonics and the Storm are synonymous with Seattle.

The City of Seattle has made a policy decision to get the benefit of the bargain it achieved in 1994.  The facts will show that that decision is fully justified and supported legally and we will ask your Honor to defer to that policy decision of the City and allow it to specifically enforce its lease against the Sonics.  Thank you.

THE COURT:  Thank you, Mr. Lawrence.  Mr. Keller, do you wish to make an opening?

MR. KELLER:  Thank you.  Good morning, your Honor. Brad Keller for the Professional Basketball Club which I will refer to as PBC.

The evidence is going to show that there were two fundamental premises that underlay this lease back in 1994. The first premise was that the City of Seattle wanted a 15 year commitment by the Sonics to play their home games here. That's right, your Honor, I just said that back in 1994 the home game provision was an important provision in this lease.

But there was an equally important and a second fundamental premise that underlay this lease.  And that second fundamental premise was that the Sonics would have a venue where it was economically feasible to operate an NBA

franchise, a venue that was comparable from both an economic and a physical standpoint to other NBA arenas.

Now, you heard a lot this morning about the first premise, the commitment to play 15 years of home games here.  But you heard nothing, not a word, about that second and equally important assumption that KeyArena would be an economically viable venue for an NBA franchise.

Yet these two underpinnings of this lease, 15 years of home games and having a competitive NBA arena, they went hand in hand back in 1994.  And they remain joined at the hip today.  And what the evidence will show is that KeyArena is no longer an economically viable NBA arena.  And what's more, your Honor, it will show that it hasn't been one for many, many years.

The evidence is going to show that this economic relationship, the lease, it started with such great hope, great expectations and promise on both sides.

You know, everyone always thinks in the beginning the marriage will last, and everyone hopes that it will last. But like many relationships do, this relationship broke down. It failed as the years went by and it has just gotten worse and worse as time went by.

Now, you know there is a tendency when a relationship breaks down for one side to blame the other.  And I think you heard a little bit of the blame game this morning in the

opening comments of the City's counsel.

But the evidence is going to show that the underlying cause of the breakdown of this relationship is not the fault of the City and it is not the fault of PBC.  In fact, you will see that it is not anyone's fault.  The evidence is going to show that despite hopes and expectations back in 1994, despite good intentions, the world in which this lease operated changed.  And it changed in ways that the contracting parties never envisioned.  And it changed in ways that the contracting parties didn't plan for when they took their 15 year battle.  These changes that occurred, they took what had been and what was supposed to be a 15 year win/win lease for both the City and the team and they turned it upside down.  They turned it into what is now and what for the last five years has been a lose/lose economic arrangement.

Am I doing something with the electronics here?

THE COURT:  Ms. Scollard says you are moving too much.

MR. KELLER:  Thank you, Ms. Scollard.

THE COURT:  Mr. Keller, what we are trying to do -- As you know, we are piping into the other courtroom.  So the sound system is up to the max.  I don't expect you to stand their like a stiff but we are still working on it.

Ms. Scollard, let's turn it down so that we don't get that

screeching and interrupt Mr. Keller.

Also, it is very, very important that every electronic device be turned off.  If anyone has a cell phone on vibrate you please must turn it completely off.  It affects the transmission.

All right.  Mr. Keller, why don't you back up?

MR. KELLER:  The point I was trying to make, your Honor, is that the world around this contract and these parties changed in ways they never envisioned and they didn't plan for.  And these changes took what was supposed to be a 15 year win/win lease, turned it upside down and has turned it into what is now and what for the last five years has been a lose/lose economic arrangement.

In fact, the evidence is going to show that this is a broken relationship that no longer works.  And like a broken marriage the estranged parties shouldn't be forced to continue under the same roof for two more years.

Instead PBC should be permitted to honor its financial obligations under the lease.  It should be allowed to stop the bleeding.  The parties should go their separate ways with the City receiving the direct economic benefits it bargained for in this lease.

Now, you are going to learn that this economic relationship was virtually unprecedented when it was put in place back in 1994.  This was a revenue sharing arrangement.

It was an arrangement where a portion of the team's revenue was to be paid to the City, as a win, to pay for bonds that the City sold to help renovate this building.

But to make it work the Sonics needed a state-of-the-art NBA venue in which the team could be profitable.  And that's what KeyArena was supposed to be.

And what really made this unprecedented was that a publicly owned arena was going to be renovated without dedicated public tax sources being used.  Instead the revenues from the Sonics were going to financial the reconstruction.  Or at least that was the plan.

Tax monies were not used to renovate this building.  The revenue sharing features of this lease are what paid for this building.  And it was Sonics team revenues, over $100 million of which the Sonics have paid over the life of this lease, that have paid for this building.

And you will learn that nothing like this revenue sharing arrangement to finance a public arena had ever been done in Seattle before.  And it hasn't been done here since. Unfortunately hindsight has shown it didn't work.  The lease began to fail in around 2000 and 2001, falling far, far short of what these contracting parties had hoped for when they tied the knot.  And the lease has failed miserably since then for both the City and the team.

You will learn beginning in 2000 and 2001 the Sonics

didn't generate the revenue contemplated, and on which the parties based their 15 year vow.  What started as a trickle of red ink later ended up being a torrent.  The revenue shortfalls you will see have caused a lot of economic hardship, hardship on both the City and the team.  The whole economic model that underlay the lease, from the City's perspective, went down the drain.

Instead of having a tenant whose lease payments were covering the bond payments the City ended up with a building whose debt was draining and impeding the operations of all of Seattle Center.

The situation was even worse for the team.  The evidence is going to show that the team has sustained significant, very significant, operating losses every year.  And those losses, continuing today, far exceed anything projected, are only going to increase during the lame duck period of this lease as the eroding customer base in recent years will inevitably erode further.  A lame duck franchise does not engender fan loyalty.  And that is understandable.

The evidence is going to be that the team's operating losses during the last two years of this lease will increase to over $60 million.  And that's on top of a loss of over $20 million in this past basketball season.

So what is the evidence going to show about how and why this went from what was supposed to be a win/win 15 year deal

to a lose/lose proposition that we say should not be specifically enforced?  How did we get here?

We ended up here today for two reasons.  The first is that KeyArena no longer is a competitive NBA arena.  And it hasn't been a competitive NBA arena for many, many years.  And although KeyArena's deficiencies have existed for years nothing has been done to fix the problem.

The second reason is that the inadequacies of the arena and the financial terms of this lease became economically debilitating for an NBA franchise, especially after Safeco Field was built for the Mariners and Qwest was built for the Seahawks.

The evidence is going to show that there is nothing new or recent about the broken relationship that brings us here today.  This is a saga that has played out over the last five years.  The inadequacies of KeyArena, that is not a competitive NBA facility, the economic hardship to the Sonics team, these are all issues that have festered and remained unresolved for over five years now.

That is not to say that the broken down economic relationship didn't get attention.  It did.  The problem was the relationship was broken and it just never got fixed.

You are going to hear about the prior ownership group, the Basketball Club of Seattle, they tried to work with the City to fix the problem.  They and the Mayor's office pursued a

resolution trying to use a remodel, trying to use over $200 million of taxpayer funds. Olympia said no. Olympia said no once in 2005 and Olympia said no again a second time in 2006.

PBC bought the problem in 2006 when it purchased the team. You heard this morning how PBC knew about the problem when it bought the team. That is true.

So why would it buy the problem? Because PBC believed that the losses would be both lower and temporary because it was going to champion a solution that would fix it, a solution that would retain the team's customer base both for the short term and the long-term.

Instead of renovating KeyArena PBC wanted to build a new, world class, multi-sport regional arena. And after a very extensive site selection process, and working with an enormous number of highly capable and highly expensive consultants they selected Renton, and spent over $2 million trying to fix the problem with the new Renton arena. But the efforts of PBC to get Olympia and taxpayer funds met with the same lack of success that the prior owners did.

Now, Olympia's unwillingness to act may say something about the perceived role of NBA basketball here in our community. But those are choices that Olympia is entitled to make.

However, what PBC didn't know then, and what it only

learned because of discovery in this lawsuit, and what you will learn in this case, is that while PBC was down in Olympia trying to find a regional solution the City of Seattle was working behind the scenes against that solution, thwarting that effort.  While PBC was working Olympia, Seattle city officials were letting the legislators know they didn't support that effort.

Here is a tenant in a broken economic relationship, that has been broken down for five years, trying to find a regional solution that, if successful, would keep the team here.  And the landlord's response?  Not Renton.  The landlord's response was, either you play in my sandbox or you can just drown in red ink.

Now, what is the evidence going to show as to why KeyArena ended up being so inadequate such that it would be unfair to specifically enforce this lease?  When KeyArena was remodeled in 1995 it was reconfigured so there would be high end suites and other seating and special amenities for high end customers, many of which would be area businesses and high net worth individuals who could afford and wanted to enjoy professional sports in that kind of a setting.

The suites in these higher end seating were supposed to drive the increased revenues, and because of those revenue sharing features in the lease it was going to be a win/win situation.  And you know what?  They were right.  At least

for the first five years.  KeyArena did really, really well for those first five years, because when it came to luxury suites, when it came to that high end professional sport fan experience KeyArena --

THE COURT:  Just a minute, Mr. Keller.  Sir, you need to sit down, please.

MR. KELLER:  When it came to that high end, high amenity fan experience, KeyArena and the Sonics, they were the only game in town.  The Mariners and the Seahawks were at the King Dome, which was a facility that was lacking in amenities that those kinds of fans wanted.

You are going to hear from one of the head lease negotiators for the City.  The City's own negotiator is going to tell you that the financial modeling that underlay this lease assumed that KeyArena would be the only upscale sports arena in the area, giving it an enormous advantage, indeed a monopoly, on the competition for that high end professional sports fan experience.

But when the King Dome was imploded that financial model was reduced to rubble.  KeyArena went from being the only luxury suites in town to offering the least amenities to fans, whether you were in a high end suite, whether you were a corporate sponsor or if you were in the cheapest seats in the house.  Within a span of a few years, from the City's perspective, the economic model was broken.

KeyArena went from being fully supported by the City's share of the Sonics' revenue stream to having to be subsidized, first by the rest of the Seattle Center and later out of the general fund.

The physical shortcomings of KeyArena made the unexpected economic impact even harder on the team.  This may come as a shock but an NBA franchise is a business, and like any business to be sustainable revenues need to exceed expenses. The physical inadequacies of KeyArena had a direct impact on the team's inability to generate revenue.

The problem, from the team's perspective, included but went way beyond the nicer facilities at the other brand new stadiums in town.  And it goes way beyond the financial terms of this lease, terms that are regarded as the worst or the second to worst in the NBA, financial terms that PBC has always stood ready to and will honor.

The problem is that to be a competitive NBA arena, that is an arena where you can generate the kinds of revenues that are needed to be profitable, the facility needs to have a lot more than 15,000 seats, a basketball court, a scoreboard and some good sight lines for the fans.

You are going to learn about the economics of an NBA arena and a team that operates in it in this case.  You are going to learn that an arena needs to enable a team to generate revenue streams well beyond the price of a ticket.

You will learn that an arena physically needs to facilitate and promote a fan experience that means dining, beverages and retail merchandise sales.  And you will learn that an arena must have very, very special amenities to attract suite holders who are being asked to pay 50 to $140,000 per year on multiyear contracts.  Today, and for many years now, all of this takes a much larger and a physically very different facility than what KeyArena is.

I would like to just quickly show you what some of the evidence will be about some of the physical inadequacies of KeyArena.

The current NBA competitive arena has a square footage exceeding 700,000 square feet.  KeyArena is about half of that.  You need to have things like unobstructed movement on public concourses.  You need to have free and easy access to the concessions and merchandise.  You need to have space for restaurants and clubs, good locations for stores, attractive merchandise kiosks, all the things that will drive incremental revenue streams.  KeyArena is lacking in all of these features.

You are going to also learn that the NBA has guidelines about the physical support facilities that an arena should have.  And KeyArena is well below the NBA guidelines on a number of these fronts.  It is more than a little ironic that a sports arena doesn't even have a press conference room, yet

we have a separate one here in this courthouse today for this trial. All NBA arenas have these kind of facilities, larger locker rooms, larger coaches' offices, larger weight room facilities. KeyArena falls well short of what the NBA guidelines are in many of these areas.

Now, you are going to learn that for five years now the City has been very acutely aware of KeyArena's shortcomings. And more important, the City has known that these shortcomings, the physical and economic, absolutely hamstring its NBA tenant from being profitable.

The evidence is going to show that the prior owners before PBC complained frequently and loudly to the City, including raising the specter of moving the team if the dysfunctional economic arrangement wasn't fixed.

You are going to see evidence -- This is an e-mail that was sent in the fall of 2004 when the Basketball Club of Seattle owned the team. At that time their attorneys, who is now the K&L Gates and Ellis firm, were providing messages and talking points to the then team's owner about points to be making in their negotiations and dealings with the City.

Can I see the next one, please? The message being delivered, even back then, was, from the Sonics' perspective, it is the worst lease in the NBA and it doesn't permit the team to be competitive. The Sonics are losing money and cannot afford to invest more in the team. And it goes on to

say that they would have to consider leaving the team to a more modern facility if it can get worked out.

Now, something that may surprise you is that the City really doesn't disagree that the economic model for both it and the team is broken, and that it has been broken for many, many years.

When the mayor's office and the prior owners went to Olympia the second time in 2006 the City Council said to the mayor, wait a minute, Mr. Mayor, not so fast, we need to study this a little bit before the City Council is going to support spending over $200 million worth of taxpayer funds on renovating KeyArena for a basketball team.

You will learn that the mayor and the City Council appointed a blue ribbon task force, hired lots of consultants to study the situation. And after five months of work in February of 2006 guess what that task force concluded? They concluded that the economic model that was the underpinning for the lease is broken. And it is broken from both the City's perspective and the team's perspective.

Can we see number 6, please? This is from that 2006 report. It is called the KeyArena subcommittee report. And the very first thing in the introduction says, KeyArena has significant shortcomings and issues that affect the financial health of both Seattle Center and the building users. And one of the primary users was the Sonics.

The next paragraph in the report says the point I have been trying to make and have probably made too much already, the original funding plan doesn't work.  That from the City's perspective the original idea was a revenue sharing arrangement, and it was supposed to generate enough revenue, and it hasn't.

Look at the last sentence in the paragraph.  It says, at the same time the Sonics had lost $58 million since 2001.  This is as of early 2006.

Next slide, please.  And there the task force went on to make another point that I tried to make this morning, that the impact of the broken economic model, from the City's perspective, was that it was draining Seattle Center and its budget.

The next one, please.  And then the City's own consultants and its blue ribbon task force made the point that I just made before, the reason why it is broken in part is because it is just not big enough.  It is a little more than half the size of what a current NBA facility is.

Next one please.  And then it made the point that I made, this all means that the arena has a low revenue potential in comparison with other NBA arenas.  The lack of size, the layout of the concourses, the lack of high end amenities, the unattractiveness of retail.  All of these things mean you can't generate the kind of revenues that are needed to

sustain an NBA franchise.  In the last sentence here it says that it ranked 17 out of 18.

One thing you are going to learn later this morning from one of the witnesses is that 17 out of 18 -- the average NBA facility was generating --  KeyArena has the revenue potential generation of one third of the average NBA arena as of 2006.  That compared to $18 million on average.  KeyArena was $6 million.  A $12 million shortfall directly attributable to the physical layout and how that impacts the ability to drive revenue streams.  And that was February of 2006.

Later that spring you will learn that the prior ownership group tried for the second time to fix the problem.  And for the second time Olympia said, not interested, and it took no action.

And it was the next year after that PBC failed as well in its efforts to get a new arena in Renton.  For the third time Olympia said, not interested, and Seattle city officials would not support a Renton solution.

So when I stand here and I tell you that the economic model that was the basis for this 15 year vow is broken, this is not something new.  This is not a state of affairs that PBC has suddenly and unexpectedly pounced on to move this team to Oklahoma City two years early.

This problem, the economically dysfunctional lease in an

arena that is no longer, and hasn't been for many years, a competitive facility, this is a problem that has existed and been unresolved for many, many years. And the prior owners told the City if the problem didn't get fixed they were considering relocating the team.

And when PBC bought the team it very publicly stated that the problem needed to be fixed by the fall of '07 or it too would seek relocation.

But the problem didn't get fixed. It just got worse. It got worse as the team's operating losses reached staggering proportions, over $20 million in the season that just ended.

The evidence is going to show that the City's response to all this is, let them drown in red ink. They knew they were going to lose money. Besides, the bigger the team's loss the next two years the better. If PBC wants to stop the bleeding they can just sell the team. If we can just force PBC to face losing $60 million over two years we can force them to sell the team. And, oh, by the way, we have a buyer ready to buy.

The evidence is going to show from the outset of this case specific performance has been the City's weapon of choice to try to inflict undue economic hardship on PBC to force it to sell, something we submit a landlord with a two-year lease interest has no right to pursue, and something to which equity should not lend assistance.

You are going to hear about how in the fall of 2007 a potential buyer and attorneys from the K&L Gates law firm were talking about using this litigation and specific performance as a means of inflicting financial pain as a way to impose, quote, forced bleeding, close quote, to try to coerce a sale.

Let me show you some of that evidence real quickly. I have actually put together a piece from two documents on one slide, your Honor. The top one is called "the path forward." That is actually what it says. It is a Power Point slide that was used in early October 2007 to solicit one of the civic minded citizens that Mr. Lawrence referred to in his opening. That would be Mr. Ballmer.

And sitting on a Sunday at Mr. Wally Walker's house they presented their plan to Mr. Ballmer. And the person who brought the Power Point slides over to Mr. Walker's house and who printed them off the computer was Mr. Gorton. And part of the presentation that was made about the path forward and part of the steps referred to, that Mr. Gorton and his crew would increase the pain of staying, both financial and the reputation of the PBC.

And Mr. Griffin, one of the other civic minded citizens Mr. Lawrence referred to, in December of '07 -- By then he was on board. In an e-mail to Mr. Ballmer he laid out the strategy to be used vis-a-vis Mr. Bennett, quote, litigation

win to stay and forced bleeding of about 20 million per year will help.  That is help trying to get them to sell.

Now, the City says, Mr. Gorton, he was just being civic minded, and he was just doing his own thing and it really didn't know what its lawyer was doing.  Well, your Honor, last Thursday, after weeks and weeks of delay, a third party finally produced some documents in response to a subpoena that showed the City had been in agreement with this bleed-them-until-they-sell strategy since the summer of 2007, months before any litigation was commenced.

Can we see the next one, please?  In July of 2007 Mr. Wally Walker sent an e-mail to John Stanton talking about a meeting he had had that day with the City administration. You will learn that he met with the person immediately under Deputy Mayor Ceis.  And he wrote, I met with the City today and felt better about my message of fighting Clay's attempt to leave.  Make it too expensive and too litigious for him. I get the impression that they were in total agreement, and that they, administration, understand the value of buying more time.

That strategy of making it too expensive and too litigious is what is playing out in this courtroom today.

The evidence will also show that, like other landlords, the City does have an adequate remedy of law.  That remedy is the City's right to recover whatever legally cognizable

losses it is going to sustain.

Most of what the City is going to present is evidence of claimed impacts that are neither cognizable nor compensable. This lease very specifically spells out the financial benefits that the City, wearing its landlord hat, is entitled to receive, its based rent at a fixed amount, its percentage rent on suite and club seat sales and a handful of other specified payments.  The economic benefits that are compensable are the ones that are specified in the lease.

You are going to see that this is not a situation where a public entity landlord is receiving no rent or below market rent because of some perceived public benefit about having a professional sports team.  You will learn it is just the opposite.  You are going to learn that this lease provides for rent and other direct financial payments in amounts that are currently five or six times higher than what the fair market rent would be for a renovated facility, let alone a competitive NBA facility.

I am not going to go through this entire Power Point, but if you look up at the top --  The bottom line is that in 2007 and 2008 you are going to learn that the Sonics have paid six to $7 million to the City.

The City did a study recently by an outfit called Northmart (phonetic) as to what fair market rent and what fair market lease terms would be for a renovated facility.

The bottom line is it is somewhere between a million and $2 million. All of the things that you see in our lease with the City receiving a percentage of club seat sales, a percentage of suite sales, the major portion of the title sponsorship, all of those revenues streams that are shared under a current fair market deal would go 100 percent to the Sonics.

PBC is obligated under this lease to pay the City the evidence will show will be about nine to $10 million over the next two years. We are not asking to be relieved of that financial obligation, even though the economic model is broken and even though this facility is no longer an NBA competitive facility and hasn't been for many years.

This may be the worst or second worst lease in the NBA from a tenant's perspective, but when it comes to what the lease says should be paid, the amounts are measurable and they will be paid. The economic commitment that was made is quantifiable, is compensable, it is the adequate remedy of law that exists.

Instead what you are going to see in this case, though, is an effort, and you have seen it already, to talk about things that are neither compensable nor legally cognizable, things that were not part of the bargain for exchange expressed in this contract, and that we submit should have no bearing on the outcome.

Seattle is a world class city. It is a city with a diverse and vibrant and rich variety of cultural and artistic activities and sporting events. And, yes, the Sonics leaving now as opposed to their leaving two years from now means that for two years there will be one less professional sport here in this town. But this will still be a world class city, it will still have a rich and diverse amount of cultural and athletic events and it will still be a town of professional sports. And all the funny math of an economic impact economist doesn't change that.

You are going to learn that the City's litigation economist is going to testify to get to that big number, the one that Mr. Lawrence referred to in his opening, the City's expert has assumed that the money people now spend going to the Sonics games, they are essentially going to stick it in the coffee can and bury it in their backyard instead of spending those dollars elsewhere in our community. You will learn that these are discretionary, leisure spending dollars that are statistically insignificant to our economy here. But like all discretionary spending, people are going to spend those dollars on some other activity that they enjoy.

In fact, you are going to learn that when the City's staff, whose job it was to evaluate these economic impacts, back when they were doing that subcommittee and task force report in 2006, that is exactly what they concluded, that

people are going to spend the money elsewhere.

The evidence is also going to show that in addition to over $60 million in operating losses, that continuing to try and operate this business during a lame duck period would impose enormous hardships on PBC.

You are going to hear from some of the people that will have to try and run this business day-to-day in the next two years. You are going to hear about the significant operating challenges that they will face as key personnel have already left and will, understandably, continue to leave.

You will hear about the challenges of trying to sign free agents to come and live and play in an environment where the team is a lame duck in the City where it is playing. And you will hear about the other operational challenges.

There is going to be evidence about the extent to which the Sonics will or will not provide noneconomic, intangible benefits. The City apparently intends to introduce what I call anecdotal evidence about things you will find nowhere in the expressed provisions of this lease, things such as civic pride, sense of community, national visibility.

There is an old saying: Judge people by what they do not what they say. Our elected officials have had four separate occasions in four separate legislative sessions to try to fix the problem to preserve whatever such intangibles they might perceive exists, as is their right. Four times they have

declined to act.

Equally important, the public through its actions has given a pretty clear view into its view of the Sonics. You are going to learn about the passage of I-91 in the fall of 2006. This was a public referendum that passed by over 70 percent. What it said was you can't put public money into a sports arena unless you are going to get a return on the investment in cash payments commensurate with what your investment would be in treasury bills.

Well, you are going to learn that in 2006 when the mayor's task force studied this they concluded that all arenas that were being built were built with 80 percent public moneys, and they don't get -- they get virtually no return. Safeco and Qwest Field wouldn't have been built, couldn't have been built if I-91 existed. The public has made it very clear about how it views sports teams and the use of public funds.

You are going to learn that the waning interest in the team has also manifested itself in declining attendance, plummeting Nielsen Ratings which reflect the number of people who are watching the team on TV. And you are going to learn that 30 percent of the people who buy season tickets, they don't even bother to come to the game. They don't even bother to give the tickets that they already paid for to their kids to come to the game or their friends. Just think about that. They pay for the tickets, they were not going,

and they are not even giving it to somebody to come.

Is this declining customer base in some degree explainable by the public fighting that has been going on, the rancor that exists between the City and the team's owner, the performance of the team on the basketball court?  Probably.  Some of what we are here -- where we find ourselves today is due to that.  But those considerations would just get worse during the last two years of this lease.

You know, reminiscing about the glory days of yesteryear, when 30 years ago this team won an NBA title, or when three years ago when it was quickly eliminated in the playoffs, that is not what the issue is in this case.

If civic pride has anything to do with this case, and we submit it doesn't, the issue is what civic pride will there be over the next two years when this will be a lame duck franchise?  What civic pride will there be as the steadily decreasing attendance continues to decline when a few thousand dedicated but loyal fans sit in a seemingly empty arena?  What civic pride will there be as an already disappointed fan base, and understandably so, becomes even more embittered during what would be a prolonged lame duck period?

Vague notions about positive visibility we submit don't stack up compared to the concrete reality of $60 million in operating losses and a dysfunctional and failing

relationship.

The last two years of this lease is all that this case is about. And rightly or wrongly the owner of this team has decided to try to relocate this team to Oklahoma City, where instead of losing $60 million it stands to make a profit of over $10 million. Why? Because there is an NBA competitive facility there, and because of the way the community has embraced it. And the NBA has approved that.

The issue then in equity here is not the Sonics' legacy or the sometimes good and sometimes bad memories of bygone years. Instead the issue is what the evidence is going to show or not show will be preserved for two years by forcing this business to operate here for two more years in a relationship that has been broken for over five years.

Now, I have gone on longer than I should and the clock is ticking. The ruling that we seek is not a popular one in some quarters of our community. But this is a courthouse. It is not a courthouse of local opinion. And this is an equitable proceeding where specific performance is considered an extraordinary remedy that is warranted only where there is no adequate financial remedy. And even then, only where there will not be undue hardships in a forced relationship. Those are the principles that should govern the outcome, not posters on the courthouse plaza.

Your Honor, in sum, this marriage is broken. It has been

broken for over five years.  The City wants to increase and force the bleeding.  We say it is time to stop the bleeding. Thank you.

THE COURT:  Thank you.  Mr. Lawrence, your first witness, please.

MR. LAWRENCE:  The City will call mayor Greg Nickels.

Whereupon,

GREG NICKELS

Called as a witness, having been first duly sworn, was examined and testified as follows:

MR. JOHNSON:  Your Honor, our technician is not being allowed in the courtroom.  He went to use the facilities and is not being allowed back in.

THE COURT:  Could the CSO please invite him in.

THE CLERK:  Please state your full name for the record, spelling your first and last name.

THE WITNESS:  Gregory James Nickels, G-R-E-G-O-R-Y N-I-C-K-E-L-S.

MAYOR GREGORY J. NICKELS

The witness, after being duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. JOHNSON:

Q   Good morning, Mayor Nickels.

A   Good morning.

THE COURT:  Counsel, because we are broadcasting this

into the other room, can you please state your name?

MR. JOHNSON:  Yes.  Jeffrey Johnson, K&L Gates.

THE COURT:  Thank you, Mr. Johnson.

BY MR. JOHNSON:

Q    Mayor Nickels, when did you become mayor of Seattle?

A    January 1st of 2002.

Q    So this would be your second term that you are on now?

A    Yes.

Q    And what did you do before you were the mayor of Seattle?

A    For 14 years I was a member of the King County Council.

Q    And prior to that were you involved in public service?

A    I was.  For eight years I was a legislative assistant to then city council member Norm Rice.

Q    Were you involved in public service even before then?

A    I was.

Q    Has your entire adult life been involved with public service?

A    Yes.

Q    Mayor Nickels, as you heard in sitting through opening there has been quite a history with the Sonics in Seattle. Were you involved in working on the Sonics with the prior ownership group, the Schultz group?

A    Yes, I was.

Q    What was the purpose of your work with the prior ownership group?

A    Really in two ways.  One is the landlord for the building and making sure that we had a good relationship and a tenant that was being successful.  And second, as a civic leader in the community, to make sure that that activity was able to do well in our city.

Q    Did you go with the Schultz group and try to help them get funding in Olympia to fix up KeyArena?

A    I did.

Q    How many times did you do that?  How many different legislative sessions, is what I am getting at?

A    There were two sessions we were directly involved before the old ownership sold the team.

Q    And the last one was in the spring of 1996 -- I'm sorry, 2006?

A    I believe so.

Q    And those failed?

A    Yes.

Q    Did you give up after the session failed in the spring of '96?

A    No.

Q    What did you do?

A    Well, we continued to try and find an answer that would allow both the City and the basketball team to succeed at KeyArena.  Recognizing that there would be needed investment in that facility to make it work on into the future, and that

we wanted to continue to have professional basketball as the key tenant at the arena.

Q    Do you recall in the spring of 2006 offering a series of alternatives to the Schultz group for going forward with KeyArena?

A    Yes.  Having not been successful in Olympia, in a couple of tries we looked at different ways to try and accomplish something that would work for both the City and for the basketball team.

Q    All right.  Do you recall the details of those three options that you offered to the Schultz group?

A    I recall the general outlines of them, not the specific details of them.

Q    Would it help refresh your recollection to look at an outline showing those details?

A    Probably, yes.

Q    Please turn to Exhibit 231.

A    Okay.

Q    Is this an outline of the three options that you discussed with the Schultz group in May of 2006?

A    Yes.

Q    And was the concept here that --  Were all of these options related to some form of renovation of KeyArena?

A    I believe that all three were, and they were at different levels of renovation.

Q   And did all three of these options contemplate a change in the leasing terms at KeyArena going forward?

A   Yes, they did.

Q   And in the middle you see there is a column, annual revenue increases to Sonics?

A   Yes.

Q   And these were -- are these projected --  Are you aware whether they were your projections or the Sonics' projections?

A   I don't know.  I don't know.

Q   The idea was to come up with a solution that would increase the Sonics' revenues?

A   Yes, that's right.

          MR. JOHNSON:  Your Honor, move for admission of 231.

          MR. KELLER:  No objection, your Honor.

          THE COURT:  231 will be admitted.

                    (Exhibit No. 231 admitted.)

BY MR. JOHNSON:

Q   Mayor Nickels, in the summer after presenting this to the Schultz group did you come to learn that the Sonics had been sold?

A   I don't recall exactly when but, yes, sometime later that year.

Q   And you had a conversation --

          THE COURT:  Counsel, the year we are talking about,

please?

MR. JOHNSON:  I'm sorry, your Honor?

THE COURT:  The year we are talking about?

MR. JOHNSON:  2006.  The summer of 2006.

THE COURT:  Thank you.

BY MR. JOHNSON:

Q   You at some point came to learn that the Sonics had been sold to PBC?

A   Yes, I did.

Q   And what was your reaction to that?

A   My reaction was one of disappointment, in large part because we thought with these three options we had come up with some alternatives that would work for the prior ownership and for the City in resolving concerns and allowing a longer term future for the team at the KeyArena.

And, secondly, a concern that one of the key elements of success that I have found in my personal experience in this area is a committed local owner, someone who has a stake in the community in which they live and own a team.

Q   When you learned about the sale did you express a view as to your intent regarding enforcement of the KeyArena lease?

A   Yes, I believe I expressed that we would enforce the terms of the lease.

Q   And that was expressed at or around the time you learned of the purchase?

A   Yes.

Q   You also had some discussions with Mr. Bennett over the course of their ownership?

A   Yes.

Q   Can you recall the first such discussion?

A   I believe the first conversation was a telephone call.  It was either the day that the sale was announced or very shortly thereafter.  And then some period of time, but just probably a few days, perhaps a week later, we had lunch and had a face-to-face conversation.

Q   In either of these conversations did you have the opportunity to discuss with Mr. Bennett the three options that were identified from Exhibit 231 that you were discussing with the Schultz group?

A   I don't remember if we talked about them in -- We didn't talk about them in any kind of detail, but I indicated to him I was looking forward to talking to him about KeyArena, Seattle Center, and the opportunities there and some of the options we had been talking with the prior ownership about.

Q   And either in the first telephone conversation or during your lunch meeting can you tell us what the response from Mr. Bennett was?

A   Well, the conversations were very much get acquainted conversations.  So there were pleasantries involved.  I mentioned certainly at the lunch and I think in the telephone

call my excitement about talking to him about KeyArena and the Seattle Center.  And the reaction was -- there wasn't much of a reaction to that.

Q   Did you come to learn sometime, either later that summer or into the fall, that the PBC was not interested in the KeyArena solution?

A   Yes.

Q   And how did you learn that?

A   Well, not in the direct conversations but the communications that were coming out from PBC indicated that their focus was on a new arena and not on KeyArena.

Q   Something you read in the newspaper?

A   Read in the newspaper or heard through a channel.

Q   It wasn't a phone call from Mr. Bennett?

A   No.

Q   I want to switch your attention now to the spring of 2007, the May time period.

A   Okay.

Q   Do you recall being approached by PBC seeking to engage the City in conversations about a buyout from the KeyArena lease?

A   I wasn't approached directly.  My staff was approached, yes.

Q   Tell us what you recall about that.

A   Well, my staff, specifically the deputy mayor Tim Ceis

approached me, said he had been talking to some of the staff over at the PBC and that they were interested in a buyout of the remaining years of the lease.

Q    And what were your instructions to Mr. Ceis?

A    My instructions were that we were not interested in a buyout of the lease.

Q    And this was in May of 2007?

A    I believe that's right.

Q    I believe you had one more conversation with Mr. Bennett during the summer of 2007?

A    Yes.  Mr. Bennett called to say that we should get together and have a meeting face-to-face.

Q    And what did you say to him?

A    I welcomed that.  I said I would be very excited to talk to him about KeyArena and the opportunity to renovate KeyArena and looked forward to that conversation.

Q    And did you end up having that conversation?

A    We did not.

Q    Why not?

A    Mr. Bennett indicated in a press statement that if my intent was to talk about renovation of KeyArena it wasn't something that he wanted to talk about.

Q    Did you respond to Mr. Bennett's press statement?

A    I did.  I said if the only thing he wanted to talk about was a buyout of the lease it might not be worth the cost of a

plane ticket.

Q    Did you tell him your doors were closed to him?

A    No, my doors have been opened.  I have repeated that very consistently throughout the time that PBC has owned the team.

Q    So the phone conversation in July of 2007 was the last conversation you had with Mr. Bennett?

A    I believe that is true.

Q    So the next thing you heard from Mr. Bennett -- Would you take a look at Exhibit 147?

A    Yes.

Q    Is this the next communication you received from Mr. Bennett after your July conversation with him?

A    I don't know.  I don't recall.  We have had a number of direct conversations.  This is the next thing I remember.

Q    And what is this?

A    This appears to be what is called a demand for arbitration, a proceeding that the basketball team made against the City to determine how it could get out of the lease.

Q    What was your reaction to receiving this?

A    Well, I was disappointed.  The lease it seemed to me was pretty clear.  This was an attempt to undermine what I thought were our rights under that lease.

Q    Did you make any public statements about the arbitration demand?  Do you recall?

A    I probably did.   I don't recall the specifics of those comments.

Q    Was it your view that the doors were closed with respect to discussions between you and Mr. Bennett in light of this arbitration demand?

A    No.   Although more awkward because of the presence of litigation.

Q    How did you respond to the arbitration demand?

A    The City filed a suit that we are now engaged in that sought to uphold our rights as we see them under the lease.

Q    And whose responsibility or whose authority was that suit brought under?

A    Mine.

Q    And under the City charter is that your -- do you have the ability to direct this kind of litigation?

A    Yes, I have the responsibility to uphold our lease rights.

Q    You have been involved with the Sonics going back three or four years now with Mr. Schultz and then trying to work with PBC.   Why all the efforts on the Sonics?

A    Well, the Sonics, first and foremost, are the prime tenant of Seattle Center's KeyArena.   KeyArena is an extraordinarily important facility within that campus.   And that campus is an important gathering place for our city in many different ways, arts, athletics, recreation and other civic engagements.   So having that prime tenant there is very

important to us.

Secondly, there is a long history, over 40 years history, of professional NBA basketball in Seattle.  It was the first major professional sport in Seattle.  And that is an important part of our civic history.

Q   Do you think that the Sonics could ever --  Strike that.  Can't the Sonics be replaced by having a college team or some other team play at KeyArena?

A   Not the role as the key tenant in the arena, and neither as a piece of the civic fabric of the City.  No, I don't believe so.

Q   Do you believe that the City derives economic benefit from having the Sonics play?

A   I do.

Q   Can you elaborate a little bit on that?

A   Well, there certainly is the direct revenue that comes through the lease.  That lease, as was described, contemplates the revenues to cover the debt service on the building.

Secondly, there is a lot of economic activity that takes place in the neighborhood around the arena.  That neighborhood is known as the uptown arena -- uptown neighborhood, and that indirectly provides jobs and tax revenue, economic activity for the City.  And then there is the larger economy, and the presence of professional

basketball is an element of that.

Q   Mayor Nickles, would you look at Exhibit 140 please?

A   Yes.

Q   Can you identify this exhibit for us?

A   It is a letter with the greeting Mr. Mayor from Paul E. Gould who is general manager of the SPORT Restaurant and Bar.

Q   And what is the SPORT Restaurant and Bar --

MR. KELLER:   Excuse me, your Honor.   We have a hearsay objection to the exhibit that maybe should be dealt with before it is displayed.

THE COURT:   All right.   Lay your foundation, please.

MR. JOHNSON:   My response is that it goes to the state of mind of the mayor.

THE COURT:   That is your response to the hearsay objection?   Anything further?

MR. JOHNSON:   This was a letter received by the mayor from a constituent who was interested in having the mayor enforce the lease because it believes that there is direct economic impact to this constituent.

THE COURT:   The objection is sustained.

BY MR. JOHNSON:

Q   Let's move on, Mayor.   Is there a reason why you think that the Sonics add value to Seattle's ability to compete in the world for talented employees?

A   Well, certainly.   Seattle is a city of almost 600,000

people, 590,000 people, and a metropolitan area of 3.5 million people.  We have world class companies that make their homes in this region and in this city.  They are competing every day for the top talent in those industries.  The attractions that the City has to offer, cultural, athletic, physical, environment are all important to those companies and institutions' ability to attract people to work here.

THE COURT:  Mr. Johnson, we need to take a break.  Ladies and gentlemen, we are going to be at recess for 15 minutes.  We will be returning at 10:45.  I would like to have you in your seats for the next session.  We will be at recess.

(At this time a short break was taken.)

THE COURT:  Please be seated.

Go ahead, Mr. Johnson.

MR. JOHNSON:  We move to admit Exhibit No. 147, the arbitration demand.

MR. KELLER:  No objection.

(Exhibit No. 147 admitted.)

BY MR. JOHNSON:

Q   Mayor Nickels, does the City of Seattle still have financial obligations associated with the initial renovation of KeyArena?

A   We do.

Q    Do you have a sense of what those financial obligations are?

A    I believe it's about $35 million.

Q    So the Sonics haven't paid for renovations of KeyArena?

A    There is -- there is about $35 million principle outstanding.

Q    At some point in the last few months, or maybe a little longer, you have heard of Matt Griffin Seattle Center Investment Group?

A    Yes.

Q    When did you first learn of this group's existence?

A    I believe it was late last year.  December, maybe November.  Somewhere in that timeframe.

Q    So December November of 2007?

A    Yes.

Q    So you were not aware of the Griffin group when you rejected the PBC buyout offer in May of 2007?

A    No.

Q    Did you assist in the formation of the Griffin group?

A    I did not.

Q    Did anyone in your office assist in the formation of this group to your knowledge?

A    No.

Q    What's your understanding of Griffin group's purpose?

A    The Griffin group, at the time that I learned it, I didn't

know of any of the principals other than Mr. Griffin, was to try and preserve NBA basketball in the City of Seattle by purchasing the team.

Q    And did they also make offers regarding fixing up KeyArena?

A    Yes.

Q    What are your understandings and views of that offer?

A    That which came a bit later, was to partner with the City in a renovation of KeyArena.  That would make it an economically viable partner in terms of a dollar-for-dollar match of private dollars with public dollars.

Q    Do you know the range of the private dollars that the Griffin group was willing to put in to fixing up KeyArena?

A    $150 million I believe.

Q    What's your view of that?

A    I think that's a remarkable offer.  I think that it does represent a real partnership, and I think it is in the range of dollars that are likely to provide us a facility that will work very well for the long term.

Q    You hired K&L Gates to help you in this litigation?

A    Yes.  The city attorney did at my Qwest.

Q    Was your purpose in hiring the K&L Gates firm to try and force Mr. Bennett to sell the team?

A    No.  To make sure our lease rights under the lease were protected.

Q    Let me ask you, assuming the Sonics get to stay here for the next two years at least, what are your hopes for the performance of the team during those last two years?

A    I would like to see the team do very well.  When the team does well financially the city does well, and when the team does well, it reflects well on the city.  I would like them to do very well.

Q    Do you know who Wally walker is?

A    I do.

Q    Who is Wally walker?

A    Wally walker was a player of the Sonics in the late '70s, early '80s.  He was on the championship in '79, on the Portland championship prior to that.  And during the time that the team was owned by the Ackerley group, he took on a management role with that group, and then retained that during the Schultz group's ownership of the team.

Q    I want to take you back to summer of 2006, July of 2006, when you learned that PBC purchased the Sonics.

     You announced at that time that you intended to enforce the KeyArena lease?

A    Yes.

Q    Did you consult with Mr. Walker before you made that announcement?

A    No.

Q    I want to take you to May of 2007, when PBC approached you

for a buyout of the lease.

You rejected that buyout offer, correct?

A    Correct.

Q    Did you consult with Mr. Walker before you decided to reject that buyout offer?

A    No, I did not.

Q    All right.  I want to take you to September 21, 2007, when PBC filed their arbitration demand.

You filed the lawsuit in response to that?

A    Yes, that's right.

Q    Did you consult with Mr. Walker --

A    No, I did not.

Q    How about Mr. Griffin, did you consult with Mr. Griffin during any of these time frames?

A    No, I don't believe that I did.  I have talked to him more recently.

Q    How about Steve Ballmer, did you consult with him back in summer of 2006 when you made the policy decision to enforce the lease?

A    No, I did not.

Q    Did you consult with Mr. Ballmer when you decided to file the lawsuit?

A    No.

Q    Assuming that PBC does only stay here two more seasons and the Sonics are here two more seasons, do you still consider

that worthwhile to enforce the lease for the last two years?

A   I do.

Q   Why?

A   Because anything can happen.   My experience as a member of county council during a time when the Mariners were in flux, and my time in public office as a county council member when the Seahawks were literally in moving vans going to Southern California tells me that the longer that this team is here, the more possibilities might open up for us to keep them here as a long-term part of our community.

Q   How many years of NBA basketball did the City pay for when tell --

A   I'm sorry --

Q   How many years of NBA basketball did the City pay for when it renovated KeyArena?

A   Fifteen.

Q   Does the Council share your view that the last two years are important?

A   Yes, they do.

Q   Can you turn to Exhibit No. 31.

A   Yes.

Q   Do you recognize this document?

A   Yes.

Q   Can you identify it for us?

A   It's an ordinance, 122992, although the -- I'm not sure of

that number.  The copying isn't that great.  It's signed by the President of the City Council and myself, and it outlines the Council and my intent to uphold the lease.

MR. KELLER:  Move the admission of Exhibit No. 31.

MR. JOHNSON:  No objection.

THE COURT:  31 is admitted.

(Exhibit No. 31 admitted.)

BY MR. KELLER:

Q   I would like to turn your attention to half way down, beginning line 16, the items highlighted on your screen.

A   Yes.

Q   The first item discusses -- first of all, backing up.
    You signed this ordinance?

A   I did.

Q   Is that rare for the mayor to sign an ordinance, city council ordinance?

A   No.  It would be rare for me not to sign it.

Q   Is it required for the mayer to sign it?

A   No.  If the mayor does not sign an ordinance it goes into effect ten days -- or 30 days after enactment, and then the third alternative it would be a veto, which would send it back to city council.

Q   All right.
    Going back to the highlighted sections here.
    First of all, you were here in 1979 and recall the

championship team?

A   I do very well.

Q   Did you participate in any activities yourself around that activities?

A   I did.  I remember the celebration after they won the championship.  There was a parade down Fifth Avenue and a gathering on the plaza and street area, University Street, in front of the Olympic Hotel.  I remember standing up on the roof of what was then the Rainier Bank Tower.

Q   Do you have a view about the community enriched by volunteer work done by the Seattle SuperSonics?

A   Yes.  Seattle SuperSonics and other professional sports teams, the athletes are seen as role models in the community, and their presence at various community events and visiting schools and hospitals and the like is an important part of what they contribute to our community.

Q   Focus on the first highlighted section.

A   Yes.

Q   Do you agree with the Council's resolution here, that whereas the lease term was a material term of the contract and the principal incentive for council approval of the original contract?

A   Yes, I believe that was very much their intent.

Q   And do you agree with the second highlighted section from the Council's resolution that there are intangible factors,

such as goodwill, prestige, trade, commerce and cultural and general economic benefits to the city from having the Sonics?

A    Yes.  I do.

MR. JOHNSON:  Thank you, Mayor.

THE COURT:  Mr. Keller, do you wish cross-examination?

MR. KELLER:  I do, Your Honor.

CROSS-EXAMINATION

BY MR. KELLER:

Q    Good morning, Mr. Mayor.  May I call Mr. Mayor, since I only call one person his Honor in this courtroom?

THE COURT:  It's actually Her Honor.

MR. KELLER:  So much for trying to be cute.

BY MR. KELLER:

Q    Could you turn to Exhibit No. 231.  It's coming up on the screen in front of you.

I believe this is one of the documents that your attorney was asking you about.  You remember you described this as one of the three alternative proposals that were made when Mr. Schultz owned the organization?

A    Yes.

Q    There is a note there on the bottom.

Do you see it says that all three options assume funding is available to the City to retire the existing debt?

A    Yes, I do.

Q   And it says that is estimated to be 40 to $45 million in addition to the redevelopment costs that are indicated in the chart, right?

A   Yes.

Q   So let's go back up to the chart and look at what some of the redevelopment costs are.

Under Option A, as I understand it, public moneys that would have been needed would be total of about 90 to $95 million, right?

A   My math would suggest the same thing, yes.

Q   You didn't have that public money, did you?

A   In hand at that time, no, we did not.

Q   You had just been recently told in Olympia that they weren't going to fund the proposed 200-million-dollar proposal, correct?

A   Yes.   Shortly before that.

Q   Now, be to be sure we understand here, in Option A where public moneys over 90 to $95 million were still have -- somebody was going to have to come up with it, you didn't have it.

Under that proposal, the lease was going to get torn up and the amount of rent that the Sonics was going to pay would be flat one million dollars, right?

A   Plus some adjustment for inflation, yes.

Q   All revenue-sharing features in the lease where the City

gets significant percentage of club seats and suites, all that was going away, right?

A    Yes.

Q    You recognized that those provisions were causing, among other things, an economic hardship on the team, right?

A    In large part because we wanted to extend the term that the team was going to spend at the KeyArena.

Q    Do you remember my question?

The lease was going to be rewritten to eliminate all the revenue-sharing features in part because you recognized those were causing an economic hardship on the team, weren't they?

A    Our motivation was to make sure we had a long-term primary tenant and to come to an agreement with the primary tenant.

Q    I'm sorry if my question is not clear.

Was part of the reason the revenue-sharing feature was going to be done away with because you recognized it was causing an economic hardship on the team?

A    We recognized that to have a long-term tenant there we needed to rewrite the lease and financial features of the lease.

Q    Because they were causing an economic hardship on the team, right?

A    Because it was not working for either party.

Q    Is there some reason why you won't just concede that the existing terms were causing an economic hardship on the

Sonics as well?

MR. JOHNSON:  Objection, argumentative.

THE COURT:  Overruled.

A   No.   There is no reason why I wouldn't say that.

BY MR. KELLER:

Q   Can we agree that part of this proposal involved eliminating of revenue-sharing features because, among other things, you recognized that they were causing an economic hardship on them?

A   We recognized the team wouldn't sign something that didn't make economic sense for it, yes.

Q   And the revenue-sharing features under the existing arrangement didn't make sense?

A   Going forward they do not.

Q   That was back when you were making this proposal in early 2006, right?

A   May of 2006.

Q   Option B would have required 150 to $160 million of public moneys, right?

A   Yes.

Q   You didn't have the funding source that existed at that time this proposal was being made; you had hopes but it didn't happen, right?

A   For the local share we believed we had ideas of where that would come from.   The 40 to 45 million, no.

Q    Option C would have required the total of close to $200 million in public moneys, right?

A    Yes.

Q    You didn't have the public funding component for that?

A    In hand, no.

Q    In your dealings with the prior ownership group, the Basketball Club of Seattle, referred to as Mr. Schultz's group, they argued to you that they were losing money, didn't they?

A    Yes.

Q    They made you aware of the fact that they were losing money and that for them to be a viable venture they needed to restructure the lease and have a different facility, didn't they?

A    Yes.

Q    You would agree it's perfectly reasonable for a business owner to want to have an economically viable and profitable business?

A    Certainly.

Q    It was reasonable, wasn't it, for the team, under the Schultz organization, to ask for changes so that their business could be profitable and viable?

A    Yes.

Q    It's reasonable, isn't it, for PBC to want its operations to be profitable and viable?

A    Yes.

Q    And is an important consideration in whether a professional sports franchise is profitable or not is what is the facility and what are the lease terms?

A    Yes.

Q    And there is nothing wrong, is there -- it's completely appropriate for a professional sports franchise to want to be in a modern competitive facility; isn't that right, sir?

A    Yes.

Q    By NBA standards, KeyArena is not a modern competitive facility, is it?

A    The KeyArena which was renovated in the mid-1990's is smaller and doesn't have the same revenue-generating potential as some of the other arenas.

Q    Is that slightly along the way of saying, agreeing with me, that by NBA standards KeyArena no longer is a modern competitive facility?

A    By NBA standards it doesn't -- it doesn't meet all of the NBA's current standards, no.

Q    There is nothing wrong, is there, Mr. Mayor, with the professional sports franchise wanting to be in a facility where their lease will enable them to be financially successful, is there?

A    No.

Q    Does KeyArena have significant shortcomings that affect

the financial health of the Sonics?

A    Long term it does, yes.

Q    Could you turn to Exhibit No. 500?

MR. KELLER:  We'll move for the admission of 500.

THE COURT:  Any objection to 500?

MR. JOHNSON:  No, Your Honor.

THE COURT:  500 admitted.

(Exhibit No. 500 admitted.)

BY MR. KELLER:

Q    Mr. Mayor, Exhibit No. 500 is the KeyArena's subcommittee financial report and recommendation; is that right, sir?

A    That's right.

Q    This is something that was procured in February of 2006, it was finalized?

A    Yes.  It was finalized February of 2006.

Q    This is the culmination of many, many months of work, right?

A    Yes.

Q    And I think it was -- I think you told me, when I had a chance to chat with you at a deposition, that you're the one appointed this group, correct?

A    That's correct.

Q    And you charged them with doing fact-finding and coming up with recommendations, right?

A    I did.

Q   And this report is the final work of the group that you appointed and empowered to study the situation to come up with recommendations, right?

A   Yes.

Q   Take a look at the second page, page number 2, five or six pages in.

A   Okay.

Q   Let's pull up the whole section from KeyArena Challenges to the bottom.

            THE COURT:   Mr. Keller, Bates number, please?

            MR. KELLER:   Last Bates digits are 865.

BY MR. KELLER:

Q   First section here under the heading, Mr. Mayor, it says, "While widely praised as an intimate venue with outstanding sidelines for basketball and other events, KeyArena has significant shortcomings and issues that affect the financial health above Seattle Center and building users."

    Do you see that?

A   I do.

Q   Now, one of the principal users is the Sonics basketball franchise, right?

A   That's correct.

Q   And would you agree with me that it was the conclusion of your administration as of February of 2006 that that facility has got significant shortcomings that are impacting the

financial health of this basketball team?

A   Yes.   And Seattle Center, yeah.

Q   Well, the impact on the basketball team flows into an impact on the building which flows into an impact on the Center, right?

A   Yes.

Q   It's been that way since around 2000, 2001, hasn't it? That the limitations and shortcomings of the facility were having an impact on the financial health of the team?

A   Yes.   With the one exception of the year that the team went to the playoffs.

Q   Now, let's take a look at what the original funding plan was.   Now, you've talked a little bit about that in your direct exam.

    Do you see the section here that says, Original funding plan no longer working?

A   Yes, I do.

Q   Take a minute to read that to yourself, if you would.

A   Yes.

Q   Is that basically making the point that hey, the original plan was under this revenue sharing the team's operations were supposed to generate enough rent under the lease to make the bond payments and it's not working and it hasn't been working since around 2000, 2001?

A   Yes.

Q   And among other reasons, it hasn't been working is because of the new arenas that were built in the city, right?

A   Yes.   The Qwest Field and Safeco Field.

Q   And it talks about recession.   Do you see that?

A   I do.

Q   Then it goes on and it says that the Sonics have reported losing $58 million since 2001.   Do you see that?

A   I do.

Q   So that's as of early '06, right?

A   Correct.

Q   The red ink has just continued since then, hasn't it, Mr. Mayor?

A   I believe that's the team's assertion.   I don't know directly what the financial condition is.

Q   You haven't tried to find out the -- how the building has impacted the financial health of this tenant that you said is so important to you?

A   I do know that the revenues that we receive have not been very healthy, but I don't know the team's overall financial.

Q   Your task force report in February of '06 was saying that the team had lost $58 million in the prior five years or so?

A   Yes.

Q   You made no effort to find out what the team's losses are since February of '06?

A   No.

Q    Is it fair to say that your task force concluded that the team was losing a lot of money and that it was in part because of the KeyArena facility had low revenue potential?

A    Yes.

Q    And if we look over at the next page.   There is a section there called KeyArena -- well, why don't you blow up.

"KeyArena is undersized and has low revenue potential."

That first section there is talking about the fact that the arena is about approximately half the size of what a modern competitive NBA facility is, right?

A    Yes.

Q    You've known that since long before February of '06, right?

A    I don't know long before, but somewhere before.

Q    Several years at least, right?

A    No, not several years, no.

Q    Next section is talking about how the arena has low revenue potential in comparison to other NBA arenas.   Do you see that?

A    I do.

Q    And you see it's talking about the reasons why it has low revenue potential because it's basically the facilities and amenities and being able to have the kind of environment that will drive revenue streams, right?

A    Yes.

Q   That's the same thing that Mr. Schultz's group had been complaining frequently and loudly to you about, right?

A   Yes.

Q   And do you see it talks in the last sentence there about KeyArena ranking 17 out of 18 in terms of NBA facilities?

A   I do.

Q   You agree with that, don't you?

A   Yes.

Q   Now, let's flip if we could to page numeral 47 of the same exhibit.

THE COURT:   Bates number, please?

MR. KELLER:   910.

BY MR. KELLER:

Q   Do you have that in front of you, Mr. Mayor?

A   I do.

Q   That's providing a little more detail about where KeyArena stacks up compared to other competitive NBA facilities as of 2006, right?

A   Yes.   For seating revenue, right.

Q   Just as we just saw on the text, it shows KeyArena as the second to the worst of the NBA facilities, right?

A   Yes.

Q   And you see this is your task force, they concluded that the average potential revenue was $18.8 million, if you excluded KeyArena from the math, right?

A    I'm sorry, what?

Q    Your task force concluded that the average potential revenue of a modern NBA facility was $18.8 million, if you excluded KeyArena when you do the math, right?

MR. JOHNSON:   Objection, lack of foundation.

THE COURT:   Overruled.

A    At least for this characteristic, premium seating.   That appears to be what they are saying.

BY MR. KELLER:

Q    Okay.   And by way of comparison -- could you pick up the footer at the bottom there -- KeyArena's potential premium seating revenue was $6 million, right?

A    Yes.

Q    One-third of the other NBA arenas compared, right?

A    Yes.

Q    If KeyArena was just average, just average, that means there would have been $12 million more of revenue generated from the premium seating facilities, correct?

A    Yes.

Q    And those kinds of complaints about the revenue generation potential, that is exactly what the Schultz group starting bending your ears about, right?

A    Yes.

Q    And PBC's concern that it cannot be economically viable at KeyArena, you've been hearing that from the NBA tenant at

KeyArena for many years now, haven't you?

A    Last three or four years, yes.

Q    Well, this takes us back to 2006 what we're looking at right now, right?

A    Uh-huh (affirmative).

Q    And you've been dealing with the Schultz group down in Olympia since at least the legislative session of 2005, right?

A    Right.

Q    And I assume you didn't just kind of meet with them one day and hop down to Olympia and ask for $200 million overnight, so you were dealing with them sometime before early '05, right?

A    Yes.

Q    So is that four-plus years now?

A    We are.

Q    Okay.  And is it fair to say that your task force concluded that these concerns about the facility and its limitations on revenue generation potential were legitimate concerns?

A    Yes.

Q    And that an NBA franchise in today's world can't be viable in KeyArena under this lease arrangement, can it?

A    Long term, no.

Q    Did you also understand that your task force concluded

that the revenue model assumptions that were the premise for the lease basically no longer worked for either team or the City?

A    Yes.

Q    To put it a bit bluntly, Mr. Mayor, did you and your task force essentially conclude that the lease between the City and the Sonics had become economically dysfunctional?

A    No, I wouldn't go that far.

MR. KELLER:    Could we have page 43 of Mayor Nickels' deposition, please?

I would like to play this, Your Honor.

(Video played.)

BY MR. KELLER:

Q    Mr. Mayor, did your subcommittee and you conclude that KeyArena's angered tenants could not be financially successful given limitations of the facility and the economic terms of the lease?

A    Long term, yes.

MR. KELLER:    May I have page 44 of Mayor Nickels' deposition?

(Video played.)

BY MR. KELLER:

Q    Mr. Mayor, you agree, don't you, that this facility and under this lease an NBA tenant cannot be successful?

A    Long term I do agree that that's the case, yes.

Q   Mr. Mayor, wasn't one of the fundamental premises of this lease back in 1994 was that KeyArena was supposed to be an economically viable venue for an NBA franchise?

A   I believe that is the case, yes.

Q   In fact, if we look at the -- could you turn to Exhibit 45?  I'll put that up.

MR. KELLER:  We'll move for the admission of 45, Your Honor.

THE COURT:  Any objection?

MR. JOHNSON:  No objection, Your Honor.

THE COURT:  45 will be admitted.

(Exhibit No. 45 admitted.)

BY MR. KELLER:

Q   Could we turn first page -- go to the next page.  Pull up the third one if you could.

That clause there on the lease was reflective of the intent that KeyArena would be a venue that was both structurally and economically comparable to other -- that which other NBA teams have?

THE COURT:  Mr. Keller, could I have a page, please?

MR. KELLER:  It's page -- it's the first page that's numbered.

THE COURT:  Okay.  Thank you.

BY MR. KELLER:

Q   Mr. Mayor, that whereas clause was reflective of the

intent that KeyArena would be a venue that was both structurally and economically comparable to other NBA venues, right?

A    Well, it says that the previous facility was not.  If I'm looking at --

Q    The goal here was to build one that would be, right?

A    I presume that was the goal, yes.

Q    And when it was first built it was, right?

A    Yes.

Q    But the world changed, right?

A    The world has changed.

Q    Wasn't one of the goals here to try and retain the team, that is back in '94, wasn't one of the goals here to try and retain the team by providing a building that would enable the team to make money and be competitive in the NBA because it was profitable?

A    Yes.  I think it was.

Q    And for going on five years, the first five years, excuse me.  For four-plus years now, your tenants have been telling you that the original plan isn't working, right?

A    Yes.

Q    And your task force concluded that as well, right?

A    Yes.

Q    And that subcommittee report and task force report that we looked at, that was February of '06, right?

A    Yes.

Q    Was there another task force that you appointed regarding -- that took a more global look at Seattle Center as opposed to just KeyArena?

A    Yes.    This was -- the February of 2006 report was a subcommittee specifically looking at KeyArena.

Q    And did you then have another task force to look more globally at Seattle Center?

A    Yes.

MR. KELLER:    And I'll move for the admission of 529.

MR. JOHNSON:    No objection.

THE COURT:    529 will be admitted.

(Exhibit No. 529 admitted.)

BY MR. KELLER:

Q    And is this the report that was done by the Seattle Center task force later in the year in 2006?

A    Yes.

Q    Would you turn to page 40 of that, please?  Would you pull up Action Step No. 6 in the first two paragraphs.

Do you see that your Seattle Center task force concurred with your KeyArena subcommittee and you, I guess, and if KeyArena is going to be a competitive major league NBA facility it needs work and lots of money?

A    Yes.

Q    From a financial standpoint, from the City's perspective,

this lease didn't play out the way the City believed it would be when this 15-year vow was taken, right?

A    I don't believe so.

Q    And you're agreeing with me, right?

A    Yes, I think I am.

Q    From the Sonics' perspective, financially, your tenants over the last four-plus years have been complaining that this lease didn't play out the way they planned on it back in 1994 either, right?

A    Yes.

Q    Now, remember when we were looking at -- if we could turn to Exhibit 516.  Is that the one that you still have up there?

            MR. KELLER:  I'm sorry, I move the admission of 516.

            MR. JOHNSON:  Objection, lack of foundation.

BY MR. KELLER:

Q    Would you turn to Exhibit 516 in the book, please, Mr. Mayor?

A    Yes.  I think I have it here.

Q    Can you identify that for us?

A    It appears to be part of the -- I guess it would be the report of either the full task force or the subcommittee talking about the accumulated debt on the KeyArena.

Q    Is this sort of like an executive summary synopsis of these larger -- one of these larger documents we've been

looking at?

A    Probably.

Q    Done by groups that you appointed and anointed to investigate and study these issues?

A    Yes.

MR. KELLER:  I'll offer 516.

MR. JOHNSON:  And I'll oppose, Your Honor, because there are multiple drafts of these various documents produced and I have no idea what we have here.

THE COURT:  Are you telling me --

MR. JOHNSON:  Lack of foundation still.

THE COURT:  Are you telling me that you did not produce these?

MR. JOHNSON:  We've produced thousands of pages of documents, including multiple drafts of multiple documents.

THE COURT:  Well, presumably you would give them the final operative draft, correct, if that's what they asked for?

MR. JOHNSON:  They asked for all drafts.

THE COURT:  Okay.  So what do you need to do in order to check to make sure that this is the final?

MR. JOHNSON:  Check with the people that drafted it, I suppose.  But --

THE COURT:  So you don't know what the Bates stamps here is 12534.  When you turn that over, did you keep track

of what you were turning over; in other words, isn't this the last draft?

MR. JOHNSON:  I don't know, Your Honor.  On that basis it's part of my objection --

MR. KELLER:  May I ask another question?

THE COURT:  Go ahead.

BY MR. KELLER:

Q  I'm just asking, Mr. Mayor, do you have any reason to believe that this isn't the final draft?

A  No.  I don't know.

THE COURT:  516 will be admitted.

(Exhibit No. 516 admitted.)

MR. KELLER:  Thank you, Your Honor.

BY MR. KELLER:

Q  Could we turn to the second page, please, starting about midway down?  There is a paragraph that says "However" and take it down there to the next heading, if you would.

You see there it's talking, Mr. Mayor, about the fact that when the KeyArena operating model was adopted -- I'm going to quote here, "KeyArena was the only show in town"?

A  Yes.  There were no other premium boxes and seats in the region.

Q  Do you remember the Kingdome?

A  I do.

Q  Regardless of what feelings you or I might have had about

the Kingdome, its lack of amenities were something -- were the subject of much public comment and joking?

A    I think that's fair.

Q    All right.  And that was the situation that the Kingdome where the Mariners and Seahawks were playing back when this lease was negotiated, right?

A    Yes.

Q    And what your task force was basically saying is, look, when we did the original model here, we had the -- the only high-end professional sports fan experience in town, and that's changed, right?

A    Yes.

Q    And points out your task force concluded that this had a profound impact on the sale of high-end seating for professional sports exhibition, right, at KeyArena?

A    Yes.

Q    And the impacts from the competition from those two brand-new stadiums, that's not your administration's fault, you would agree with me on that, right?

A    Correct.

Q    And it's not the Sonics' fault either, right?

A    No.

Q    The marketplace just fundamentally changed since the 13 years that this lease was entered into, right?

A    Yes.

Q    And it changed and it had a profound impact on the lease economics from both tenant's perspective and the landlord's perspective, right?

A    Yes.

Q    I'm going to switch gears and ask you about a different area.

You told us in direct examination that there was -- you became aware that Mr. Bennett and PBC wanted to go in the direction of a different facility in Renton rather than a renovated KeyArena?

A    Yes.

Q    I gather you became aware that they were -- his desire was to build a multi-sport regional entertainment complex ultimately in the Renton area?

A    Yes.

Q    You have lobbyists that work for the City of Seattle, right?

A    We do.

Q    And part of your job is to keep your ears to the ground and your finger on the pulse as what's going on in Olympia, right?  That would affect the City of Seattle?

A    Yes.

Q    So you were aware during spring of 2007 that the PBC was down in Olympia trying to get public funding for a significant portion of a new regional sports complex in

Renton, right?

A    Yes.

Q    You knew, didn't you, that if the PBC succeeded the plan was to keep the Sonics here?

A    Yes.

Q    But you also knew that if PBC succeeded Sonics would be moving to Renton, that would be a bad thing for KeyArena, right?

A    It would be a bad thing for KeyArena.

Q    All right.  So during 2007, while you were kind of aware and keeping tabs on what was going on in Olympia, would you get reports and updates about what was going on down there in terms of the PBC's efforts to lobby Olympia for --

A    Yes.

Q    -- an arena?

Were you aware that the city council members were letting legislative representatives know that they were not in favor of the Renton facility?

A    No.

Q    Were you told that your deputy mayor was telling legislators that, you know, if you do anything for Renton, you better include an extra 30 to $40 million for us to pay off the KeyArena debt?

A    We had indicated that at the beginning of the discussion of a regional facility that there was still the debt on the

public facility.

Q    Were you told that your deputy mayor was down in Olympia telling legislators and legislative staff that any funding for Renton better include another 30, 40 million to pay off the debt at KeyArena?

A    I don't remember being told that.  That doesn't --

Q    That's okay with you?

A    To take care of the KeyArena debt, yes.

Q    So you thought it was perfectly legitimate for you to try and tack on a 30, 40 million dollar cost for the Renton facility?

A    To recognize --

Q    To pay off the debt of KeyArena?

A    To pay off the cost of the KeyArena, yes.

Q    Do you think PBC might be having a hard enough time as it is getting public funding for a big chunk of $500 million that maybe logging on another 30 to $40 million there was just going to make it harder?

A    Our concern was the concern of the taxpayer of Seattle, which was that there would still be this remaining debt after the tenant left.

Q    Yeah, I understand that.  But maybe I'm not asking the question well.  Did you think that logging on a request for another 30 to $40 million would make it harder for PBC to try and achieve what it was trying to achieve, original sports

complex that would keep the team here?

A    No, that was not our intent.  That wasn't my thinking.

Q    Just think about it.  Given what you know about the legislative process.  Do you think in fact saying you better add another 30, 40 million onto that for us, is going to have a negative impact on those efforts?

A    I -- I -- as I say, we weren't concerned about the KeyArena debt.

Q    Yes, you told me that.  But I'm trying to get an answer to my question if I could.  Do you think adding on a request for another 30 to $40 million would have a negative impact on PBC's efforts to try and get funding for Renton?

A    I think it's part of the picture that we needed to be looking at in terms of the public investment.

Q    I know.  I know you told me that.  Do you think it would have a negative effect on the lobbying effort?

A    No.

Q    When you were getting these reports about what the PBC was doing down in Olympia, fair to say that you had no -- you had no criticisms or questions that were raised about the efforts that the PBC was making to get passage in Olympia?

A    I'm sorry.  Did you --

Q    At the time that you were receiving reports about PBC's activities, were any criticisms or questions raised by either the City's lobbying folks or other people who were providing

you with these reports, criticisms about the efforts of PBC was making to get legislation from Olympia?

A    No.

Q    And as you sit here today, do you have any criticisms of the effort that was put forth by the City of Renton and the PBC and their lobbyists to get passage of legislation in 2007 to facilitate the building of a new arena?

A    No.

Q    Met with the same lack of success that you had on three other occasions, right?

A    Two other occasions, I believe.

Q    Two other occasions before that; one since?

A    Okay.  Very good, yes.

Q    All right.

Was it your position and the position of the City government in Olympia that if there was going to be a new arena it shouldn't be a new arena elsewhere, that it should be in Seattle?

A    No.

MR. KELLER:  I'll move for the admission of Exhibit 527.

THE COURT:  Any objection to 527?

MR. JOHNSON:  No objection, Your Honor.

THE COURT:  527 admitted.

(Exhibit No. 527 admitted.)

BY MR. KELLER:

Q   Is this a letter that you and the city council members signed and sent in the spring of 2006?

A   In 2006, yes.

Q   Are those all the members of the city council then?

A   Yes.   Those are all the members at that time.

Q   This was the mayor of the City, and every member of the city council making a statement to Olympia, wasn't it?

A   Yes.

Q   And this was in the spring of 2006, right?

A   Right.

Q   Let's go to the top of that last page if we could.   By the way, a letter was addressed to Governor Gregoire?

A   Correct.

Q   Take a moment to read that paragraph to yourself.

A   Right, got it.

Q   You and the city council were making a very adamant, unanimous, strong statement to the governor that there is going to be money invested here, that it shouldn't be at some facility outside of Seattle, right?

A   Yes.   In the spring of 2006 that was our position.

Q   And you never told them otherwise, did you?   Afterwards?

A   Not that I recall, no.

Q   So nine months later, PBC is down beating the halls of Olympia trying to get funding --

THE COURT:  Just a minute, Mr. Keller.  Could I please have the person who is coughing excuse themselves?

UNIDENTIFIED GENTLEMAN:  For how long?

THE COURT:  Until you stop coughing, please.

UNIDENTIFIED GENTLEMAN:  Okay.  I think I'm okay right now.

THE COURT:  I'm going to ask if you cough again please remove yourself.  It's very distracting and others will not be able to hear in the other room.

UNIDENTIFIED GENTLEMAN:  Absolutely.

THE COURT:  Mr. Keller, would you back up, please, and give me your last two questions?

MR. KELLER:  I'll do my best.

BY MR. KELLER:

Q   And I think we're on Exhibit 527, Mayor Nickels.

A   Yes.

Q   Which was written in April of 2006.  And I think we agreed that this was the pretty firm, adamant, unanimous statement by City government that a new facility outside of Seattle should not be funded?

A   Yes.

Q   And my question to you was:  You know, nine months later, when PBC is down there beating the halls of Olympia trying to find funding for an arena elsewhere in the region, you never changed your position on this, did you?

A    We did not.  As far as I know we did not.

Q    Earlier we were looking at that subcommittee report from February of 2006.  You remember it talked about how because of the physical aspects of the arena came to premium seating, its potential was about one-third of the other NBA facilities?

A    Yes.

Q    And we were looking at the task force thing about how the shortcomings of the arena affect financial health of the team.  Do you remember that?

A    I do.

Q    If everything stays the same for the next two years with this team playing at the KeyArena, you know the team is going to lose a lot of money, right?

A    -- the variables include how well the team does on the floor, whether they go to the playoffs, and those are things I cannot control.

Q    Let me ask you a question.  If you've never even looked at the financial statements, how can you say that?

A    Because after the team went to the playoffs a few years ago I asked our staff to advise me on whether or not the team could make money in the arena in the short term and was advised that indeed they could if they made the playoffs, increased their attendance during the season and then went deep into the playoffs.

Q    And how many --

A    So on a short-term basis --

Q    I'm sorry, go ahead.

A    On a short-term basis they could make money in the building.  On the long-term basis I concede to you it needs to be renovated.

Q    Year and year out, you know they're going to lose money, right?  Not this time?

A    Long term, it needs to be renovated in order for it to perform for either the City or the team financially.

Q    In fact, when you started to work with Mr. Griffin and Mr. Ballmer's group, I think you told us it was late in 2007; is that right?

A    Yes, right, December and November.

Q    By the way, you were asked a whole bunch of questions about, you know, did you consult with people like Mr. Walker before you did this and did you before you did that, did you know that your staff was meeting with Mr. Walker as early as July 2007, long before there was an arbitration demand and long before this --

A    I have known that over time my staff has talked to Mr. Walker, yes.

Q    But getting back to it from a financial perspective, didn't the Griffin group, Ballmer group, whatever you want to call them, didn't they tell you the same thing that PBC's

been saying and the same thing that the Schultz group has been saying and that same thing you've known for the last four-plus years, that this lease and this facility cannot sustain an NBA franchise?

A    Yes.

Q    Now, you would like to see the team sold to a local ownership group; is that right?

A    I would.

Q    And you've been working to try and make the sale of that team to a local ownership group happen, right?

A    I have been focused on the lease and making sure that our rights under the lease have been protected.

Q    Have you been working to try and make a sale of the team to the Ballmer group happen?

A    I support that.  But I don't -- working toward it, no.

MR. KELLER:  Can we please pull up page 87 of the Mayor Nickels' deposition?

(Video played.)

BY MR. KELLER:

Q    Mr. Mayor, during the summer of 2007, did representatives of your administration meet with Wally Walker and discuss making it expensive and litigious for the PBC?

A    I don't know.

Q    Would you take a look at Exhibit 599?

MR. KELLER:  And we'll move for the admission of 599,

Your Honor.

MR. JOHNSON:  I believe there is no objection.
No objection.

THE COURT:  599 will be admitted.

(Exhibit No. 599 admitted.)

THE CLERK:  Counsel, I have no 599.

MR. KELLER:  You have no 599?

THE COURT:  That would make two of us.

MR. KELLER:  May I approach, Your Honor?

THE CLERK:  Book 600.

THE COURT:  Book 600 has 599.  Okay.

BY MR. KELLER:

Q   Do you see Exhibit 599, sir, the e-mail from Mr. Walker?
Let me ask you this question, Mr. Mayor.  Do you see this is July 24th, right?

A   I do, yes.

Q   PBC had not commenced an arbitration proceeding yet, had it?

A   I don't remember the date that they commenced it.

Q   I think we looked at that earlier when you were --
Exhibit 147.  Do you want to take a look at that?  And counsel asked you about that.  I'll just put it up on the screen real quickly so you can see the dates here.
Do you remember you were asked about this in your direct exam, do you see it's in about the third week of September?

A   Okay.  So this was before.

Q   Let's go back to Exhibit 599.

A   Okay.

Q   There is no specific performance lawsuit at that time, right?

A   Pardon me?

Q   No specific performance lawsuit?

A   No.

Q   It says, Nickels taking public positions and Clay Bennet taking public positions, and some overtures about a potential buyout of the lease, right?

A   I believe so, yes.

Q   And in July of that summer, did Mr. Walker meet with members of your administration to talk about making it too expensive and litigious for Mr. Bennett?

A   It appears -- it appears that Mr. Walker did meet with members of my administration sometime around July 24th.

Q   Let's put a name on it.

A   Okay.

Q   Who is Mr. Ken Makatzu, I believe it's M-A-K-A-T-Z-U?

A   Ken Makatzu is the Chief of Department Operations in my office.

Q   Is he right under Mr. Ceis?

A   Or coequal with Mr. Ceis.

Q   And if we were, like, to do an organizational chart does

he report to you?

A    Yes.

Q    If this meeting was with Mr. Makatzu and Mr. Walker had, this would have been with somebody that is was a direct report right under you, right?

A    Yes.

Q    Did you know or were you later apprised that Mr. Walker had met with somebody from your administration back in July?

A    As I said, I knew that there were meetings over time. This particular meeting I don't remember getting a report on.

Q    But did you know that there were meetings between your staff and Mr. Walker?

A    Over time, yes.

Q    Did you know it in the summer of 2004?  Forget about what was happening.  Did you know there were meetings?

A    No, I wasn't specifically aware of meetings in the summer of 2007.

Q    Do you see the reference in the e-mail about a message fighting PBC's attempt to leave?

A    Yes.

Q    And it was just a few months before this in May that PBC had approached the City and expressed an interest in exploring a consensual termination of the lease, right?

A    Yes.  I believe that's right.

Q    And you were told that, I think you told us, by Mr. Ceis.

He told you that he had been approached by someone from PBC and wanting to talk about a consensual resolution, right?

A   Yes.

Q   This e-mail which talks about a message of fighting, this is also back during the time when you were publicly stating that you would fight any attempt to terminate the lease, right?

A   I believe so.

Q   And you were sending similar messages about fighting, right?

A   I have consistently said I would uphold the provisions of the lease.

Q   And Mr. Walker is talking about sending messages of fighting and you're sending messages of fighting, right?

A   I was sending messages of fighting, yes.

Q   And your deputy mayor, Mr. Ceis, he was publicly proclaiming by this time whole relationship had become completely dysfunctional, wasn't he?

A   I don't know the timing of those comments.  But at some point I believe he did make those comments, yes.

Q   Let me see if I can help you.  Turn to Exhibit 564.

THE COURT:  Before you leave this, can you tell me who Mr. Stanton is?

MR. KELLER:  Mr. Stanton was a former owner and a part of the Schultz group and he was very much in the

background of the efforts regarding the Griffin and Ballmer.

THE COURT:   Thank you.   Go ahead.

BY MR. KELLER:

Q   Do you have 564, Mr. Mayor?

I just want to help you out a little bit here on the timing of all this.   That's the newspaper article from August of 2007.

A   Yes.   Right.

Q   Does that refresh your recollection that within a few weeks after this e-mail here, talking about sending messages, about fighting; your deputy mayor is out publicly stating that the situation is really dysfunctional.   "We're going down the drain together.   Worst we make it for him the worst he makes it for us"?

A   Yes, I see that.

Q   Was Mr. Ceis speaking to your administration when he was making those comments?

A   Yes.

Q   Does that reflect your views as well by that time?

A   The -- yes.

Q   That was before the arbitration demand was filed too, right?

A   Yes.   Well, yes, I think so.

Q   And wasn't it very shortly after Mr. Ceis's public statements in August of 2007 about everything being

dysfunctional and going down the drain together, wasn't it shortly after that that you announced to the press that the City was lawyering up and hired Mr. Gorton's law firm?

A   Yes.

Q   So let's go back to Exhibit 599 together.  That e-mail.

A   Okay.

Q   It says, It too expensive -- make it too expensive and too litigious for him.

I get the impression they, "they" there refers to the City administration personnel, right?

A   I believe so.

Q   I get the impression they were in total agreement and that they, administration, understand the value of buying more time in terms of making it litigious.  Do you see that?

A   Yes.

Q   City announced shortly afterwards it was lawyering up, right?

A   Yes.

Q   And it certainly has become litigious, hasn't it?

A   It has.

Q   Do you see the reference to making it too expensive?

A   I do.

Q   When you announced that you were lawyering up you also publicly announced that you had set aside a million dollars for --

A    I did.

Q    Certainly has become expensive, right?

A    Yes.

Q    So although everything that's talked about here in this e-mail, sending messages, making it expensive, making it litigious, although the City did all those things, it's your testimony there was no agreement, right?

A    There was no agreement to what?

Q    There's no agreement to do those things with Mr. Walker and his group --

A    No.

Q    Just purely coincidental that there is a meeting in July, where you're talking about being -- there's a reference to being in total agreement and that you do all the things that are discussed there?

A    I was preparing to defend the City's ability to receive the benefits of the lease that had been signed years before.

Q    Making it expensive, litigious and sending messages about fighting the efforts, right?

A    I have been very consistent about upholding the City's rights under the lease.

Q    And it was the consistent thing that was discussed as of July with Mr. Walker, right?

A    Again, I was not at this meeting and I don't remember receiving a report about this meeting.  My knowledge is --

Q   Certainly what the e-mail suggests, right?

A   It seems to, yes.

Q   I'm going to switch gears and ask you about something else, Mr. Mayor.

A   Okay.

Q   You talked about some of the things that you perceive as the value of having the Sonics here.  I guess I wanted to ask you, you know that the PBC purchased the team in the fall of '06, right?

A   Right.

Q   So there's been, what, two full basketball seasons since PBC purchased the team?

A   Right.

Q   Tell us how many Sonics games you've been to since PBC purchased the team.

A   I don't think I've been to one yet.

Q   How about prior to that, the last year the Schultz group owned the team, when you were down there in Olympia trying to support their efforts to get funding.  Tell us how many Sonics games you showed up at to show your support for the team that year.

A   I don't know if I went to any.

Q   You didn't, did you?

A   I don't think so.

Q   Am I right that the last two games that you can remember

attending was the last -- one is the last time the team was in the playoffs and the other was when Gus Williams' jersey was retired?

A    Those are the last two that I remember, yes.

Q    You know that Gus Williams' jersey was retired almost seven or eight years?

A    It was -- I think I was mayor.  But it could have been seven.  Six.

Q    Now, I asked you, you know, you talked about some of the pride about the team and its history, right?

A    Uh-huh (affirmative).

Q    And I asked you about this at your deposition because at that time I don't think the season was quite over, but the record was looking pretty bad for the team.  Do you remember that?

A    Yes.

Q    Remember I showed you that a pleading that your lawyers had filed where they wanted the Sonics to admit, formally admit in this proceeding that the team had one of its worst records and was unfortunately the worst record in the NBA?

A    Uh-huh (affirmative).  I -- I think I remember that.

Q    Would you agree that pride and exuberance are not the emotions that come to mind about coming about to --

A    I would.

Q    Are you going to feel pride and exuberance about the team

if the only reason they're here for next two years is because there was a court order compelling them to be here?

A   I believe that a team, professional team reflects on a city and having that team reflects on a city, and I would like it to be a positive reflection.  I would like the team to do very well.  The last two years of the lease are knowing that a team is leaving are probably less exciting than the earlier parts of a lease when you're looking forward to the future.

Q   I think my question was are you going to feel pride and exuberance, if the only reason they're here is because there's a court order saying they've got to be here?

A   It will be muted.

Q   Thank you, sir.

Would you describe the City administration's relationship with PBC this last year as a productive one?

A   Well, I would have to answer that two ways.  One would be the operations of the Seattle Center and the operational people of PBC.  And I think that actually has worked just fine.  But there hasn't been a strong relationship between the ownership and my administration.

Q   It's been downright frosty, hasn't it, Mr. Mayor?

A   It's not been very active.

Q   I think nobody said it better, I guess, than Deputy Mayor Ceis.  He says it's dysfunctional and you're

going down the drain together, making it miserable for each other, right?

A    I don't feel like the City is going down the drain, but it has been not the most active relationship.

Q    Do you believe Seattle is a great city?

A    I do, indeed.

Q    Do you think it's a world class city?

A    I do, indeed.

Q    Do you think part of what makes our city a great place to live is the wide diversity of cultural opportunities for people here?

A    Couldn't say it better myself.

Q    The City government has a separate office of six to eight people to promote arts and cultural affairs in this city, right?

A    Yes.

Q    We're reported to have more arts and cultural jobs per capita than any other person in the United States, right?

A    We do.

Q    That office doesn't promote professional sports, does it -- the Office of Arts and Culture?

A    No.

Q    Is part of what makes our city a great place to live the quality of healthcare and diversity of our economy?

A    Yes.

Q    Is part of what makes this city greatly abundance of wonderful tourist attractions and serve as a magnet for tourism regionally, nationally and internationally?

A    Certainly.

Q    Is part of what makes this city a great world class place is the educational opportunities that exist here?

A    Yes.

Q    Do you participate in promoting our city business and other institutions considering expanding here?

A    I do.

Q    Do you participate in efforts to retain Seattle area businesses that are considering leaving?

A    Yes.

Q    Is it correct that when I took your deposition you could not recall a single instance where any company or any institution considering relocating or expanding here told you that it is important to them as to whether or not there was an NBA franchise here?

A    Well, yes.   I think that's true in the deposition.

Q    And if the Sonics leave two years earlier than they would otherwise be leaving, Seattle's still going to be a professional sports town, won't it?

A    Yes.

Q    And it will still be a world class city, won't it?

A    Yes.

THE COURT: Mr. Keller, we need to break for lunch.

MR. KELLER: Very good.

THE COURT: All right. We're going to take our recess. It will be from noon until 1:30. Everyone who would like to continue to have a seat in the courtroom needs to be here ahead of time so that you're all seated before we begin.

(Lunch recess taken.)

THE COURT: All right. Mr. Keller, are we ready to continue?

MR. KELLER: Thank you, your Honor. I forgot to and I would now move to publish Mayor Nickels deposition.

THE COURT: All right. We will open it up.

BY MR. KELLER:

Q   Mayor Nickels, I forgot to ask you something about the original funding plan regarding KeyArena. Are we in agreement that this concept of a revenue sharing with the Sonics' operations to provide enough revenue to pay the bonds, that was an unprecedented arrangement for comparable new publicly owned arenas at the time it was entered into?

A   Mr. Keller, I don't know that.

Q   Do you still have Exhibit 500, your task force report?

A   Yes, I do.

Q   Turn to the bottom of the first numbered page, which is

Bates number 864.  If you would like, Mayor Nickles, it is up on the screen in front of you.  The last paragraph at the bottom of the page.  Do you see it starts 1983?

A    Yes.  Okay.

Q    And if you would turn over to the top of the next page with me?

A    Okay.  That indicates it was unprecedented.

Q    And what made it unprecedented was that dedicated public tax sources were not going to be used.  Instead the idea was that the operations of the Sonics would generate enough revenue to pay the bond?

A    Yes.

Q    That was the plan?

A    Right.

Q    I want to switch gears.  Do you remember in March of this year taking the podium at a highly publicized press conference announcing that the Ballmer and Griffin groups stood ready to fund $150 million, and now was the time to act?

A    Yes.  I do.

Q    Do you remember in the course of that press conference saying elected officials like yourself shouldn't run and duck from hard decisions, but it is time to make hard decisions, right?

A    Sounds like me.

Q   And you were trying to send a message to Olympia when you were making that comment as well, weren't you?

A   Yes.

Q   Were you at that time, in March of this year, hoping to get Olympia to authorize the county -- to use $74 million of county taxes toward a $300 million rebuild of KeyArena so that the venue would be able to be a viable NBA franchise location?

A   Yes.

Q   And you worked hard to try to make that happen, right?

A   Yes.

Q   You had your lobbying staff and used all of the tools available to try and convince Olympia for what is now the third time you are down in Olympia, right?

A   Yes.

Q   And Olympia declined to approve any legislation authorizing the utilization of county taxes for what is now the third time in response to your efforts, correct?

A   That's correct.

Q   And it is the fourth time if you include PBC's efforts, right?

A   Yes.

Q   Now, when Olympia responded to you, did Governor Gregoire and the legislative leadership in Olympia basically tell you, in effect, listen, the City can solve this problem.  It has

the taxing capacity to provide that last 75 million if it wants to?

A    I believe that was one of the points it made, yes.

MR. KELLER:    I will more for the admission of 175.

MR. JOHNSON:    No objection, your Honor.

THE COURT:    175 will be admitted.

(Exhibit No. 175 admitted.)

BY MR. KELLER:

Q    Is Exhibit 175, Mr. Mayor, a letter that was sent to you on March 10th of this year and some city council members, to the county executive and county council members?

A    Yes.

Q    And this was after you had very publicly said, no ducking, it is time for people to make hard decisions, and you had put all your efforts into trying to convince Olympia to authorize the use of 75 million in county taxes, right?

A    Yes.

Q    Can we go to the last paragraph on the first page?  Take a minute to look at that, Mr. Mayor.

A    Yes.

Q    Part of this was also you knew the NBA Board of Governors was going to be meeting the following month in response to a relocation application that the team had submitted, right?

A    Yes.

Q    And so you were very intent on demonstrating to the NBA

that this community was prepared to do what it takes to keep an NBA facility by getting funding from Olympia, right?  That was part of the strategy?

A   Right.

Q   You wanted to send a message to the NBA?

A   Yes.

Q   You wanted to make it harder for them to approve the relocation by showing, hey, we really want the Sonics here?

A   Yes.

Q   And this letter that is coming to you -- Can we go to the second page for a minute?  I want to see who all signed it.  This was being sent to you by Governor Gregoire and the two leaders of the two chambers in Olympia, right?

A   Yes.

Q   This is Olympia talking to the City of Seattle, right?

A   Yes.

Q   Let's go back to that paragraph on the first page.  They said, look, to solve this problem in the short term the City of Seattle currently has existing taxing capacity through a variety of sources to provide the remaining 75 million needed to reach the estimated 300 million renovation costs.  Do you see that?

A   I do see that.

Q   Let's do the math together.  150 of the 300 Ballmer and Griffin are saying they will come up with?

A    Right.

Q    75 is going to come from the City?

A    Right.

Q    And you are looking to Olympia to authorize the county --
to use the county tax for the last 75 million, right?

A    Yes.

Q    And Olympia says to you, the City of Seattle, you have got
the taxing capacity for that last 75 million, do it yourself
for right now and we will take a look at this next year,
right?

A    Right.

Q    Is that true?

A    Is what true?

Q    Does the City of Seattle have the taxing capacity for that
last 75 million if it wanted to do it?

A    In theory the City has hundreds of millions of dollars of
bonding capacity.  There are other things that compete for
those dollars.

Q    You made the choice, as you have to do, tough choices,
that is why you are elected, that it wasn't worth that last
75 million to use it, right?

A    Yes.

Q    And Olympia was dealing with the same issues, they had to
make some choices based on issues, right?

A    Yes.

Q    In fact, if we go to the next paragraph in this letter, elected state officials pointed out to you some of the tough choices they were having to make about how to use tax resources, right?

A    Yes.

Q    Things like other arts programs, low income housing, education, youth sports.  Do you see a reference to the Husky Stadium renovation?

A    Yes.

Q    You knew that all these things were out there competing for these dollars, right?

A    Yes.

Q    Tough choices to make, right?

A    Right.

Q    And using money for sports stadiums is something that hasn't been very politically popular here in this area, has it?

A    It has been an issue of debate.  There have been supporters and there have been strong opponents to it.

Q    Mr. Nickels, it hasn't been very politically popular has it?

A    It has been controversial.  Qwest Field did go to the ballot and it did pass the voters.

Q    And what happened to Safeco?

A    Safeco went to the voters and it was defeated by a razor

thin margin, and the legislature and the county council stepped up and found a different way to do it.

Q    And tell us about I-91.

A    I-91 was on the ballot a couple of years ago during the conversation around KeyArena.  And it said -- and it passed overwhelmingly and said that there would be a required rate of return in order for public dollars to be used in a sports venue.

Q    It was a pretty anti-sports arena subsidy statement?

A    I think that is fair.

Q    Now, I wanted to ask you a few questions about Exhibit 31. That was that ordinance that your attorney asked you about.

A    Okay.

Q    Can we pull that out, please?  I forgot to ask you, I-91, when you say "overwhelmingly", it was over 70 percent of the people who voted that said don't use public money to build a sports arena unless you can get a commercial rate of return?

A    Yes.  I think it was 74 percent.

Q    This ordinance, you approved this on September 21st; is that right?  You signed it into law?

A    Yes, I did.

Q    That was after the arbitration had been commenced, September 21st.  Do you remember we looked at it earlier, September 19th?

A    Okay.

Q    And this ordinance was passed the Friday before the Monday that the City of Seattle filed this lawsuit that we are here about, right?

A    I will trust your recollection of that.  I don't know.

Q    And this dispute that we are fighting about here today, it had been in full bloom for months at the time this ordinance was passed, right?

A    Sure.  Yes.

Q    You saw before the noon recess the City had already lawyered up and had a million dollars set aside for the litigation before it passed this ordinance, right?

A    I believe so.

Q    So this is something being passed when you know you are headed to the courthouse, right?

A    If your timing is correct I guess that we did.

Q    Would you like to see -- Do you have the complaint?  I have just put it on the screen here to refresh your recollection of the date.  Do you see September 24th is when the complaint was filed?

A    Yes.  Right.

Q    And Friday the 21st of September is when this ordinance we have been talking about was passed, right?

A    Yes.  It passed on the 10th and I signed it on the 21st.

Q    Let's go back to the ordinance if we could, Exhibit 31.  I wanted to ask you about a few of these whereas clauses that

Mr. Johnson asked you about. Look at the third one. I'm sorry. I meant the third to last one at the bottom of the page.

A   Okay.

Q   It says, whereas, the community has been immeasurably enriched through the volunteer work of the Seattle SuperSonics players? Do you see that?

A   I do.

Q   You talked a little bit about the activity of the players in your direct examination, right?

A   Yes.

Q   There is absolutely nothing in the lease that requires Sonics players to provide any level of volunteer effort in the community?

A   I don't think there is.

Q   And if we look at the one here that talks about -- Can we go to the second page, please, the third paragraph? The second one down from the top. This one talks about the cultural and civic and community benefits that are derived from having the team?

A   Yes.

Q   Do you see that?

A   I do.

Q   And you're talking in September of 2007 supposedly about reasons that things were done some 13 or 14 years earlier; is

that right?

A   Yes.

Q   You and nobody on the council in September of 2007 were even there 13 or 14 years earlier when it was done, right?

A   That's probably true.  I don't know how long the longest serving council member has been there.

Q   Have you ever actually looked at the ordinance that authorized Virginia Anderson to sign this lease on behalf of the City to see whether it talks about these kinds of lofty things?

A   I may have.  I don't know.

Q   Let's look at it together.  Exhibit 32.

MR. KELLER:  We will move for the admission of 32.

MR. JOHNSON:  No objection.

THE COURT:  32 is admitted.

(Exhibit No. 32 is admitted.)

BY MR. KELLER:

Q   This is the ordinance that the City Council passed back in '93 or '94 authorizing the signing of the lease agreement, isn't it, sir?

A   It appears to be, yes.

Q   Have you looked at this before to see if there is anything about these so-called cultural, civic or community benefits?

A   Let me take a minute to look at it now.  Okay.

Q   You won't find that phrase anywhere in there, will you,

sir?

A    It doesn't appear, no.

Q    In fact, if it had been in the original ordinance you wouldn't have to put it in there on the eve of filing a lawsuit, right?

A    I don't follow you.

Q    Well, if something like that had been in the original ordinance authorizing the signing of the lease you wouldn't have to be creating something on the eve of filing the lawsuit that talked about these lofty things?

A    I don't know if that is the case or not.

Q    This is -- Back to Exhibit 31, if we could. This ordinance done on the eve of filing the lawsuit, I don't want to inaccurately summarize it, but does it basically say we are not going to renegotiate the lease?

A    Well, it says that there is no intent to renegotiate it to vacate the KeyArena before the end of the lease term.

Q    If you don't want to renegotiate why do you have to pass an ordinance saying I am not going to renegotiate?

A    To express the intent of the mayor and the council to stand up for the provisions and the rights of the City under the lease.

Q    Didn't your deputy mayor agree that this ordinance we have been looking at on the eve of filing the lawsuit was window dressing?

A    I don't know.

Q    Take a look at Exhibit 564, if you would, please?

A    Okay.

Q    I want to direct your attention to another page.  Do you recognize this as an article that was in the Post-Intelligencer in August of 2007?

A    Okay.  I think we looked at this earlier.

Q    If you look midway down the page you see the deputy mayor is being asked about the ordinance.  He makes a comment there.

A    Okay.

Q    Does that refresh your recollection that the deputy mayor in an interview with the PI in August, agreed this ordinance was basically window dressing?

A    Yes.

Q    And it was window dressing being done on the eve of commencing the litigation, right?

A    I believe that's correct.

Q    Now, I asked you this morning about some of these studies that were being done of KeyArena.  The City has been studying alternatives for KeyArena for years, right, sir?

A    Yes, sir.

Q    And those alternatives include what KeyArena would look like without the Sonics, right?

A    Yes.

Q    And putting ten or $20 million into it, making it a premiere concert and other events, amateur sports events?

A    Yes, I think 20 million was a figure the subcommittee suggested.

Q    And your subcommittee concluded it could be a profitable venue if so changed, right?

A    I believe that's right.

Q    If the Sonics played two more years and leave two seasons from now, the City is still going to have to figure out what to do with KeyArena, won't it?

A    Yes.

Q    And whether the team leave in two years or leaves now the team Storm is going to continue to play at KeyArena?

A    I believe so.

Q    Are plans being made for Seattle University to use KeyArena for its home basketball games?

A    Yes, we have begun those conversations.

Q    And the college basketball season, what, runs generally from December to March?

A    March.  I know March.

Q    March Madness.  Okay.  Last month did you present the Seattle basketball team with a ceremonial key to KeyArena?

A    I don't know.  I did attend one of their events.  Maybe I gave them a key.  I think I gave them a proclamation.

Q    A proclamation of welcome to KeyArena?

A    You bet.

MR. KELLER:  Thank you, sir.  Thank you for your time.

THE WITNESS:  Thank you.

THE COURT:  Any redirect?

MR. JOHNSON:  Yes, your Honor.

REDIRECT EXAMINATION

BY MR. JOHNSON:

Q    Mayor Nickels, let's start with exhibit -- the ordinance exhibit, which I believe was 31 you were just looking at.

A    Yes.

Q    The ordinance, when was it passed?

A    It passed, I believe, September 10th of 2007.

Q    Would you please also go to Exhibit 147?

A    Okay.

Q    And this you previously identified as the arbitration demand in this lawsuit?

A    Yes, that's what it says.

Q    So this arbitration demand you received on September 19th?

A    That's the date on it.  I don't know if we received it immediately or not.  September 19th is the date that appears on it.

Q    When the City Council approved this ordinance did you have any reason to believe that PBC was going to serve you with an arbitration demand within a week?

A    No.

Q    Within two weeks?

A    No.

Q    Within three weeks?

A    No.

Q    Did you talk --  When you finally did receive an arbitration demand from them your reaction was?

A    We needed to protect our rights under the lease.

Q    Were you also surprised?

A    Yes, we were surprised, although we were trying to be prepared for whatever might happen.

Q    Why is it important that the council signed off on this ordinance regarding the policy decision to enforce the last two years of the lease?

A    Well, early in the discussions around KeyArena I had lobbied the legislature for financial help for a renovated KeyArena.  And a number of council members had expressed opposition or surprise.  So it was important that the council grapple with the issue and express what its policy and intent was.

Q    All right.  Mayor, can you turn your attention to Exhibit 500, which is the KeyArena subcommittee report.  The first thing I noticed about this when Mr. Keller put it up was the date on it.  Is that date February 15, 2006 when it was delivered to you?

A    On or about the 15th, yes.

Q    Is this a secret document that you would then keep in your office and not share with anyone?

A    No, this was a public document as the final report.  And we may well have it on our website for people to take a look at.

Q    So this public document that discusses all the problems with KeyArena was available several months before PBC purchased the team?

A    It would have been available as of the 15th of February, yes.

Q    What were the -- what was the main conclusion that the subcommittee delivered to you about the Sonics?

A    The main conclusion was that KeyArena needed additional investment to be a viable, long-term facility for the Sonics or concerts or other activities.

Q    Did they make any recommendations about the value of the Sonics to KeyArena?

A    Yes.  In fact, I think they undertook a study of what the economic impact of the KeyArena and the Sonics were to the community.

Q    Let's turn to I believe it is the fourth page of the exhibits, Bates marked 2862.  It is on the upper left hand corner.  It says Page 3 of the KAS final report?

A    Yes.

Q    I want to turn your attention to the second full paragraph there.

A    Okay.

Q    In the second sentence -- I'm sorry, in the second line do you see there where the subcommittee identifies the worthwhile and positive contribution of men's basketball to the community?

A    Yes.

Q    Was that something the committee after having studied this wanted to be sure you were aware of in making these decisions?

A    Yes.

Q    Let's now go to Page 2867 -- Bates number 2867, Page 4, the main report.

A    Okay.

Q    Can we focus in on the KeyArena economic impact session? Now, Mayor Nickels, did you understand as part of the report that the folks that you had asked to look into KeyArena had looked at hiring some consultants to help them in that work?

A    Yes, I did.

Q    And did you understand that one of those consultants was a Dr. Beyers from the University of Washington?

A    Yes.

Q    And do you recall receiving the summary of Dr. Beyers' report that goes on here and then on over to the next page?

A    Yes, I do.

Q    And in general terms what did it tell you about KeyArena as an economic part of the City Center economy?

A    It quantified the impact that KeyArena has both directly in terms of tax revenues and indirectly in terms of the business activity, jobs and the like.

Q    And what part of the KeyArena revenue generation was it your understanding comes from the Sonics?

A    A significant portion.  They are not the only tenant. There are a lot of concerts and other things that go on in there, but the Sonics are clearly the anchor tenant, sort of the 800-pound gorilla.

Q    Mayor Nickels, would you be willing to renegotiate the current KeyArena lease with Mr. Schultz, Mr. Griffin, Mr. Bennett or anyone else with an NBA basketball team?

A    Yes, I would, if there was a return to the public on that renegotiated lease.

Q    And what would be the essential need that the City would need in order to renegotiate that lease?

A    The primary concern would be an extension, a longer term for the lease.

Q    And without some form of extension or other consideration could you even engage in such renegotiations?

A    We have a restriction that we have to get value back for the public.  We cannot give away benefits that a lease

provides to us.  So there would need to be some public benefit.  Extending the lease and enjoining these economic benefits into the future would represent one of those.

Q   Has Mr. Bennett ever asked to renegotiate an extended KeyArena lease?

A   No.

Q   Has anyone from Mr. Bennett's organization ever asked to renegotiate an extended KeyArena lease?

A   Not to my knowledge.

Q   Would you be willing to engage in those discussions?

A   Yes.

Q   Has Mr. Bennett ever offered to contribute any sum of money to renovate KeyArena?

A   No.

Q   Would you be willing to change, renegotiate the lease if Mr. Bennett was willing to contribute funds to renovate KeyArena?

A   Certainly.

Q   Now, Mr. Keller asked you in cross-examination whether it was reasonable for a private business owner to expect to try to make money.  And I think you said of course that is reasonable.  Let me ask you this:  In your view is it reasonable for a private business owner to breach a lease?

A   No.

Q   And Mr. Keller talked to you a lot about what is not in

the lease.  Let me ask you about some other things that are not in the lease.  For example, there is nothing in the lease that says the Sonics get out early if NBA standards change?

A   I believe that is true.

Q   And there is nothing in the lease that says the Sonics get out early if they start to make money?

A   I believe that is true.

Q   And there is nothing in the lease that says if --

MR. KELLER:  Your Honor, we are getting a little leading here.

THE COURT:  Sustained.

BY MR. JOHNSON:

Q   Is there anything in the lease to your knowledge discussing circumstances under which the Sonics can leave because they are losing too much money?

A   No, I am not aware of that.

Q   Is there anything that suggests that they can leave if the facility that earlier owners designed is no longer satisfactory to new owners?

A   No.

Q   Is there anything in the lease that says they can leave because a new football stadium is built?

A   No.

Q   Is there anything you are aware of in the lease that says they can leave because a new baseball stadium is built?

A    No.

Q    When the City first renovated KeyArena for the Sonics'

benefit, did they do so at the Sonics' specific instructions?

A    I believe there were direct negotiations between the then

ownership of the Sonics and the City leadership that led to

the improvements -- agreement upon the improvements, as well

as the lease.

Q    Now, this is a 15-year lease?

A    Yes.

Q    15 years is a long time?

A    It is.

Q    A lot can happen in 15 years?

A    Yes.

Q    The Sonics didn't account for any of the things that have

happened when they negotiated the lease 15 years ago?

A    Not to my knowledge.

Q    And PBC didn't try to renegotiate any of those issues when

they assumed the lease a year ago?

A    No.

Q    Mr. Keller talked to you about the Renton arena prospect.

And I think you testified that if an arena was built in

Renton there would be some potential harm to KeyArena in

terms of added competition?

A    Yes.

Q    So, in fact, having a new world class, 500 plus million

dollar arena built in Renton would not actually be in the City of Seattle's best interest?

A    No.

Q    But you didn't lobby against it?

A    No.

Q    All you asked was that if --

MR. KELLER:  Your Honor, again, we are just leading the witness.  I would ask that the witness testify.

THE COURT:  You have to stop leading, please.

BY MR. JOHNSON:

Q    What did you ask the legislature?

A    The only concern that we raised was that the outstanding debt on the building was still owing, and that we would appreciate some help in retiring that debt.

Q    Well, if building this new arena in Renton was going to hurt the City of Seattle's interests why didn't you oppose it?

A    Because in the larger scheme of things we are part of a region.  And having the Sonics continue to be part of the region is in the best interest of the greater community and ultimately in the best interest of the City.

Q    Mr. Keller tells you that some of your staff were talking to Wally Walker this last summer.  Do you remember that?

A    Yes, I do.

Q    Do you have any idea what your staff would have been

talking to Mr. Walker about last summer?

A   We are not --  We are a landlord for a basketball arena. We are not in the business of basketball, and Mr. Walker had been.  So we would have staff talk to him from time to time just about what is going on with this, how can we make this work, how should we think about this from the standpoint of a professional basketball organization.

Q   Mr. Keller characterized your relationship with the PBC as frosty?

A   He did.

Q   If it is frosty why do you think that is?

A   Well, I have a responsibility, and that is to uphold the City's interests in that lease, and the Professional Basketball Club is attempting to remove the team from this region.  That puts us on opposite sides of the table.

Q   Mr. Keller talked to you about the failures that have occurred thus far in Olympia?

A   Yes.

Q   Are you planning on if the Sonics are here -- or maybe even if they are not, trying Olympia more into the future?

A   Absolutely.

Q   Why is that?

A   Because I am an eternal optimist.  Because the arena, whether it is going to be a home for basketball, which I hope for the long-term, or for other activities, so it continues

to contribute culturally and economically, it will need to be renewed from time to time and we will need to be able to finance that.

Q    In your mind is there any value to the additional two-year lease that is tied to your ability to go back to Olympia?

A    I don't understand the question.

Q    Is part of the reason that you are interested in the additional two years on this lease the ability to have additional chances in Olympia to get funding to renovate KeyArena?

A    Yes.  And the fact that in two years a lot can happen.  It is a long time.  My personal experience has been that issues around professional sports stadiums change often and can change very quickly.  The longer the team is here the better the chances are we can put a deal to keep them here for the long-term.

Q    Do you have any optimism about next year in Olympia?

A    I do.

Q    Why?

A    Because I am an eternal optimist.  I think we have worked hard to demonstrate the value of this asset to our community. I think we were making progress in the last session, and I think we can build upon that in the next session.

MR. JOHNSON:   Thank you, Mayor.

THE WITNESS:   Thank you.

THE COURT:  Any recross?

MR. KELLER:  Very briefly, your Honor.

RECROSS-EXAMINATION

BY MR. KELLER:

Q   Mr. Mayor, would you agree with me that optimism is a good thing but $60 million of loss is a bad thing?

A   Yes.

Q   Can we see Exhibit 599 again, please?  I think you just said you were aware from time to time your staff would talk with Mr. Walker about basketball operations kinds of things?

A   Yes.

Q   Making it too expensive and too litigious for PBC, is that basketball operation kinds of things?

A   No.

Q   Now, I understand you are an optimist, but can we agree that three times you have been to Olympia and three times they have declined to act?

A   Yes.

Q   Can we agree that PBC has been there once in Olympia and they declined to act, the fourth time now?

A   Yes.

MR. KELLER:  Thank you, sir.

THE WITNESS:  Thank you.

THE COURT:  Anything further?

MR. JOHNSON:  No, your Honor.

THE COURT:  Thank you.  You may step down.

THE WITNESS:  Thank you, your Honor.

THE COURT:  The next witness, please.

MR. LAWRENCE:  The City will call Virginia Anderson.

Whereupon,

VIRGINIA ANDERSON

The witness, after being duly sworn, testified as follows:

THE CLERK:  Please state your full name for the record spelling your first and last name.

THE WITNESS:  Virginia Anderson, V-I-R-G-I-N-I-A A-N-D-E-R-S-O-N.

MR. NARVER:  For the record I am Greg Narver for the City of attorney's office for the City of Seattle.

DIRECT EXAMINATION

BY MR. NARVER:

Q    Good afternoon, Ms. Anderson.

A    Good afternoon.

Q    Could you tell us where you presently work?

A    Safeco Insurance Company.

Q    What is your position there?

A    President of the Safeco Insurance Foundation.

Q    What kind of work does the Foundation do?

A    The Foundation has a charitable mission to support and enhance diverse communities through a number of focusing areas.

Q    What job did you hold before you joined the Safeco Insurance Foundation?

A    What did I do before then?

Q    Yes.

A    I was the director of the Seattle Center.

Q    For what years?

A    1988 to 2006.

Q    The Seattle Center I think everyone who lives here has a general idea what that is, it is where the World's Fair was, but what type of organizations are at the Seattle Center?

A    It is an unusual kind of hybrid organization.  It is a department of city government, reporting to the mayor and with the oversight of the city council.  It is a 74-acre urban and civic and cultural center.  It is 75 percent entrepreneurial and 25 percent supported by government revenue.

Q    What are some of the facilities that are located at the Seattle Center?  What are some of the activities that go on there?

A    The Center encompasses the Children's Theater, the Children's Museum.  We are neighbors with the Science Center. The Center includes and operates McCaw Hall, the Exhibit Hall, The Seattle Repertory Theater, The Intiman Theater, Center House, Fisher Pavilion, The Fun Forest is a tenant, the Mural Amphitheater.

Q   And for the benefit of the out-of-towners, McCaw Hall is where the Seattle Opera is?

A   Seattle Opera and the Pacific Northwest Ballet.

Q   Is there a stated purpose for the Seattle Center?  Does it have a mission statement?

A   Yes, we have a mission statement.  And I think it is virtually unchanged today.  And that is that we are the nation's best gathering place.  We exist to delight and inspire the human spirit and bring us together as a rich and varied community.  And it was about those two purposes, inspiring the human spirit and bringing us together as a community.

Q   What does the director of the Seattle Center do to facilitate that mission?

A   Well, that is always a good question.  The director of the Seattle Center is responsible for the staff of Seattle Center.  They run around 300 full-time staff at that time, and around seven or 800 on-call staff, intermittent staff. The director is responsible for the $36 million operating budget, at that time.  I don't know what it is today.  And making sure that that budget -- that we live within that budget, that we are raising the 75 percent entrepreneurial toward that budget.  The director is responsible for creating a vision, for redevelopment opportunities, for lease contracts with the tenants.  There are 27 different tenants

at any given time.

Q    Let's talk about one of those tenants.  Among the features you mentioned at the Center, KeyArena would also be part of the -- falls within --

A    Absolutely.

Q    When you became director of the Seattle Center where were the Seattle Sonics playing their home games?

A    In the Coliseum.

Q    Where is the Coliseum?  We are talking about KeyArena but where was the Coliseum?

A    The Coliseum was the predecessor to KeyArena.

Q    It was built for The World's Fair, wasn't it?

A    It was built as an exhibition facility, a flat-floor exhibition building for The World's Fair, the Washington State Pavilion.  After the Fair they went in and lowered the floor seven or eight feet, created the original bowl for the Coliseum, which was an arena.  And that was the Coliseum.

Q    And that's where the Sonics have been playing their home games for 20 years at that point?

A    Something like that, yeah.

Q    Can we have Exhibit 40, please.

       MR. NARVER:   The City offers Exhibit 40 into evidence.

       THE COURT:   Any objection to 40?

       MR. TAYLOR:   No, your Honor.

THE COURT:  It will be admitted.

(Exhibit No. 40 admitted.)

BY MR. NARVER:

Q   Have you seen Exhibit 40 before?

A   I certainly have.

Q   Can you describe what it is?

A   It is a memo written in January of 1993 to Norman B. Rice, the then mayor of the City of Seattle, from me regarding the Sonics' lease negotiations.

Q   The subject line of Exhibit 40 reads, yes, as you said Sonics lease negotiations.  What negotiations were you referring to there and when did they begin?

A   We were talking about negotiating with the Sonics about having them stay at Seattle Center, creating a new facility for them in which they could expand the revenue opportunities and play their games and stay.  At that point they had been working on building a new facility south of downtown.  And they had spent a couple of years doing that.  I had approached the Ackerleys probably in early '92 to begin discussions about if it doesn't work out there is there a way we could make it work out at The Seattle Center.  And this follows that.

Q   What was wrong with the old building at the Seattle Center?  Why couldn't they keep playing there?

A   There were a number of things.  One, they felt it was too

small.  It was 14,000 seat capacity.  Two, it was, as you mentioned, created in 1962, so it had had a very long and useful life.  It was showing its age.  Three, we had by that point run two and a half miles of indoor gutters along the roof lines to keep the rain off the corridor, off whatever other event was going on.  The systems were really worn out. And most importantly the revenue opportunities were really -- for the Sonics were very limited.

Q   If you could look --  I think it would help if you look at the screen.  There are some portions of Exhibit 40 highlighted.  First of all, I would like to direct your attention to the first two lines -- the first two sentences of Exhibit 40, which says, This memo is in response to a request from Bob Watt.  Who is Bob Watt?

A   Bob Watt was the deputy mayor at the time.

Q   To summarize it, the status of our negotiations with the Sonics for a long-term lease in the newly developed Coliseum. As you know, the current lease expires in August 1995.  And the Sonics have been quite clear they will not renew a lease in the Coliseum unless it is substantially improved and thus able to generate significant new revenue streams.

Is that consistent with what Mr. Ackerley had been telling you the Sonics wanted?

A   Yes.

Q   And to clarify, the Ackerleys were the family that owned

the Sonics?

A   Yes, the Ackerley family owned the Sonics.

Q   If I could point you to the other highlighted part of Exhibit 40.   There is a reference there to a goal to reconstruct the Coliseum as a state-of-the-art arena.   Is that consistent with what the Sonics had told you they were looking for?

A   Yes, it is.

Q   What aspects of the current building -- You mentioned the state the building was in and the size.   Were those the things you were talking about when the Sonics say this is not a state-of-the-art arena?   Were those the deficiencies they were talking about?

A   I am trying to think back to that stage.   As I say, the building was decades old and had had a lot of use.   Basic systems of bathrooms and kitchen facilities for the food that was prepared -- it was kind of jerry-rigged way in which the concessionaire got food from where it was prepared into the facility.   But there were no suites.   Suites were driving a lot of revenue streams in basketball facilities.   No specialty seating areas.   There were limited concession stands, limited club opportunities.   None of that existed in the old Coliseum.   It was important for the Sonics to be able to grow some revenue streams.

Q   Was a state-of-the-art facility something you thought

Seattle could deliver to the Sonics?

A    Actually we looked to the Sonics to help us define that because I am not much a basketball fan.  So I wouldn't presume that we were the expert in that.  And so we really created a partnership with the Sonics that they would help to define state-of-the-art, and what that would mean for them and for the team.

Q    Is that something you thought the City should do for the Sonics, help them develop the state-of-the-art arena that they were going to -- that they had in mind?

A    Yes.

Q    Why?  You are not a basketball fan, why is that important?

A    Well, I think it is important for the City because I think the Sonics have been part of who the City is for a very, very long time and there is a lot of pride in the Sonics for Seattle Center.  Seattle Center is an unusual mix of arts and sports and things for kids and things for elderly.  There aren't many places like it in the country, that bring everybody sort of into one container at the same time.  And I think it is a unique tribute to democracy, if you will.  The Sonics are a key player in that.  A lot of people love the Sonics.  They come to the grounds.  When they come to the grounds to experience the Sonics they also experience what is going on around the grounds, whether it is Winterfest or one of the festivals.  It is part of the mixing and the energy

and the stature of the Center.

Q   You mentioned that there is ballet, opera, theater, an amusement park, those would all be there if the Sonics left, wouldn't they?

A   Yes.

Q   As director of the Seattle Center was it important to keep the Sonics as part of that mix?

A   Absolutely.

Q   Did you see that as something that was consistent with the Seattle Center mission?

A   Very consistent.  If you are bringing together a rich and diverse community, that means everybody.  There are a lot of people who find their way of coming together around opera, there are many others who find it around sports.  There are others who find it around the International Fountain.  It is a way of creating inclusive community.

Q   Could I have Exhibit 41, please.

        MR. NARVER:   The City offers Exhibit 41 into evidence John.

        MR. TAYLOR:   No objection.

        THE COURT:   41 will be admitted.

                (Exhibit No. 41 admitted.)

BY MR. NARVER:

Q   Have you seen Exhibit 41 before?

A    I have.

Q    What is it?

A    It is the memorandum of understanding between the City of Seattle, the Seattle Center and The Ackerley Communications, Inc. slash SSI Sports, Inc.

Q    What was the purpose of this memorandum of understanding?

A    The purpose of this memorandum of understanding was to move forward the negotiations and the design process for the new building.  We took this memorandum of understanding to the City Council, laying out the basic elements of the business deal, to which we had both agreed, and on which we would base the eventual premises use and occupancy agreement, which would be the lease, and on which we based the going forward on this project.  So we needed to get going.

Q    This was a framework for the negotiations that were going to follow; that a fair --

A    Essentially the business deal, and then it became a much longer and much more filled in lease.  But these were the basic elements about the sharing of revenue streams, the commitments of each side as we were going to go forward.

Q    Could you look at Paragraph 8(d) of the memo, which I think will come up on your screen.  It says this:  The City acknowledges the long-standing commitment of the Sonics to the Seattle community.  The Sonics will continue to provide certain public services and benefits as part of their

long-term tenancy in the coliseum.

Why was this in the memorandum of understanding?

A   It is part of why we, as a city, felt it was important and wanted to acknowledge them for what they contributed to the City, in addition to being the team that had brought us the championship, and the team that had been with us a long time. The Sonics and the Ackerley family were very involved in civic endeavors.  They contributed extensively to arts and education.  The Sonics contributed, and do to this day, tickets to youth activity groups.  I know my daughter's school used to get them for when they did the reading program.  You read so many books and you got Sonics tickets. They contributed to building a public basketball court across 5th Avenue that we operated and they donated.  They brought occasionally players to civic events as part of the showcase of what we were doing.  All kinds of ways that they were supporting other ventures that happened.

Q   Was that important to you?

A   It was very important.

Q   I think you weren't in the courtroom, but Mr. Keller brought out earlier with the mayor the lease doesn't actually require the Sonics to do that.  Why?

A   It is a good question.  We focused on the very elements of the deal in the lease.  Maybe we had grown to expect this, we had acknowledged it and it was continuing.  We expected it to

144

continue.

Q   Was it a point of contention at all?  Were the Sonics and the Ackerleys saying, forget it, we are not going to do this anymore?

A   Never.  In fact, their involvement with the Center increased.  They got much more involved with our winter celebration, Winterfest, and provided half time opportunities for some of the performers from the cultural festivals.  So they were very involved with us.

Q   You have the memorandum of understanding in place now.  I think that was sometime in 1993, right?

A   Yes.

Q   What happens next with respect to negotiating a new lease with the Sonics?  Let me ask you this.  Did the lawyers get involved?

A   Yeah.  Then the lawyers on both sides got involved.  And it started to increase the size of the lease, and started to address very specific issues within the arrangement -- the long-term, 15-year lease that would happen.

Q   The City had legal representation during that process?

A   The City Attorney's Office, yes.

Q   And did the Sonics have a lawyer advising them?

A   Yes, they certainly did.

Q   Were you eventually able to come to an agreement with the Sonics on a lease?

A    Yes.

Q    I want to step back for a minute and ask you a bit about the role of the City Council on this.   As director of the Center during this negotiation process what kind of interactions were you having with the Council about the progress of the lease negotiations?

A    This is one of the -- was one of the very challenging parts, because we needed to have -- obviously for anything like this to go forward the City Council has to approve it. And yet the negotiations needed to take place in a way that both sides could trust there was some privacy to them.

So we went to the City Council monthly for six to eight months during that time in executive session to let them know the status, because it was for me critical to know that when we got there with the memorandum of understanding in January of '93, if we were going to meet the Sonics' time frame to open in that building by the end of '95 it had to keep going. So I had to know whether the Council was with these terms, whether these were terms they could support or not.

So I went back and forth between the discussions and then to find out is the City Council okay with the direction we are going with this kind of sharing of revenue, with this kind of term, whatever.

Q    What kind of approval did you need from the Council before you could enter into the lease?   Let me show you an exhibit

that has been introduced into evidence.  Exhibit 32, please.

A   The ordinance?

Q   It is going to come up right there.  Do you recognize this document?

A   Yes.

Q   What is that?

A   This I think authorizes the whole lease, the premises use and occupancy agreement.

Q   Right.  In fact, if you could look at the first paragraph, Section 1.  It says, The director of the Seattle Center, that is you, is authorized to enter into the agreements with the SSI, and one of them is the premises use and occupancy agreement.  That is also referred to as the lease, right?

A   Yes.

Q   I understand we are talking about the same document.

          MR. NARVER:   The City offers Exhibit 33 into evidence.

          MR. TAYLOR:   No objection.

          THE COURT:   33 will be admitted.

                    (Exhibit No. 33 admitted.)

BY MR. NARVER:

Q   If you could have a quick look at 33 and tell me what that is, if you have seen that before?

A   Yes, I have.  It is an ordinance relating -- I am reading

the first line -- to the financing of the capital facilities and authorizing the issuance of bonds.

Q    So how much did the City pay to build what is now KeyArena?

A    The project, as I remember, was around $84 million.

Q    And what percent of that was bonds and what percent came out of other funds?

A    The bonds, as I recall, were $74 million.  The rest of it --  and I was trying to remember -- I think came out of the 1991 levy.  The voters had approved a $25.6 million levy in 1991, most of which went to projects around the grounds. And there was some in there I believe earmarked for the Coliseum.  There were city funds and there were also city capital funds that we used to supplement the bonds.

Q    So about 10 million from capital improvement funds?

A    That is my remembrance.

Q    Now, under the lease the Sonics are supposed to pay lease revenues.  Doesn't that mean the Sonics actually paid to build KeyArena?

A    The Sonics revenue helped to finance the building, yes.

Q    Whose credit was at issue?

A    It was the City's bonds.  The risk was ultimately the City's.

Q    Do you know if there is still any debt left?

A    Yes, there is.

Q    Could you bring up Exhibit 45 that is already admitted into evidence?  It is the lease.

Is this the lease you negotiated with SSI under the memorandum of understanding?

A    Yes, it is.

Q    And it is the one the City Council authorized you to enter into?

A    Yes, it is.

Q    Could we flip ahead to Page 60 that will appear on the screen.  That is you signing on behalf of the City of Seattle, correct?

A    Yes, it is.

Q    Could we go back to article Roman numeral II of the lease. It is on either Page 5 or 6.  I will read the highlighted part to you.  It says, SSI -- SSI is the Ackerley corporation that owned the Sonics?

A    Yes.

Q    SSI's use and occupancy rights with respect to the premises and the terms of agreement shall end on September 30th, 2010 unless terminated earlier pursuant to the provisions hereof.  Subject to the provisions of this agreement, SSI shall schedule and insure that the SuperSonics play all home games, other than preseason games, exclusively in the Coliseum after the use commencement date.

Do you remember when the Sonics started playing at

KeyArena under the lease?

A   I do.   They started playing at the beginning of the '95/'96 season.   I think --

Q   And so it runs through --   I'm sorry.   I cut you off.

A   I think the first week in November of '95 was the first game, and we opened the building in October.

Q   And it was to run until September 30th, 2010.   So this was a 15-year lease; is that right?

A   Yes, it is.

Q   Is that what the City always wanted, a 15-year lease?

A   No.

Q   What is it you asked for?

A   We tried to get a 20-year lease.

Q   And what was the Sonics' position?

A   They would have preferred a ten-year lease.

Q   You compromised at 15?

A   We settled on 15.

Q   15 is in the final agreement?

A   Yes, it is.

Q   Would you agree that business circumstances can change in a community over 15 years?

A   They do indeed.

Q   New stadiums could be built in the region or 15 years?

A   Dot com businesses can be built.

Q   And can collapse?

A    And do collapse.  Many changes, yes.  And arenas and stadiums get built.

Q    In this 15-year lease term is there any opt out clause in there if, say, the NBA business model were to change during that 15 years?

A    No, there is not.

Q    Is there an opt out clause if a new stadium got built somewhere else in town?

A    There is not.

Q    If the circumstances in the local economy changed is there an opt out clause?

A    There is not.

Q    You were out of the courtroom earlier.  There was some discussion about whether this was a lease that a model of it worked well for a while but has completely fallen apart.  In your experience as the director of the Seattle Center do you have an opinion as to whether or not it is possible in a given season for this lease to still be profitable even with the changed economic circumstances in Seattle?

A    I suspect that as the Sonics were to go to the championship you would fill the building and the economics would work again.

Q    But if the team is not doing well you would agree that the changed circumstances would have an effect?

A    My own observation is when the Mariners were in the

championships they filled the old King Dome even though the owners at the time said no one would come to that facility to watch a game.  It is a sport that relies heavily on the performance of the team.

Q   We have a signed lease in place now, this is in 1994. What happens now?  What happened next?

A   The signed lease happened in '94.  We started construction as soon as that season finished in June of '94.  We didn't -- we weren't quite sure what the start date would be because we had to wait until the end of the season.  And then construction began.

Q   Construction.  What about the old building, how much of that were you able to retain?

A   Not a lot.  It was a very wonderfully fascinating construction process.  Basically everything inside was demolished.  We went down 38 feet, which was a lot.  We set up elaborate trucking routes all the way to get all of the trucks of concrete and debris and 38 feet of soil out of there, and then we started reconstructing from the ground up. The thing that remained are the four major structural trusses of the roof system and the ring that -- the concrete ring that went around.

Q   Why were you digging down 38 feet?

A   We were increasing the size of the arena but keeping the profile with its existing roof line.

Q   And increased size was something the Sonics had indicated they needed for the state-of-the-art arena?

A   We were increasing the size not just -- of many things. One, seating capacity.  It was 14,000.  We went to 17,7. Two, the ability to add suites.  There were no suites in the old building.  It takes space to add that whole ring of suites.  Three, to add more capacity for concessions and for the support facilities for concessions.  So, yes, it was to create more volume of space, to build a bigger building.  But to do it we are --  One of the advantages we had to offer the Sonics over their other site south of downtown was that we had an existing site and our environmental impact statement requirements were significantly less and shorter because we had an existing building, we were really only an increment. That was a huge advantage for them in trying to get a new arena, because it cut off something like two years of the time for development.  But to do that and to do it at the base of a residential neighborhood keeping the profile low was important.  So we had that kind of remarkable space age roof lines that we kept with so that the construction of the facility went down instead of went up.

Q   Were you on site during the construction?

A   I was.

        MR. NARVER:   The City is going to offer Exhibit 215, the photographs.

MR. TAYLOR:  No objection, your Honor.

(Exhibit No. 215 admitted.)

BY MR. NARVER:

Q   Could you look at Exhibit 215?  And, John, can you bring this up?  And I am going to ask you to look through the first six photos if you could of Exhibit 215.  And, John, maybe you can run through them.

I want you to sort of give a quick overview of what we are looking at in these photos.

A   What you are looking at is those four major north, south, east and west trusses, and then the concrete rim that connects the four of them.

Q   And move ahead, please, John.

A   You can see the tower crane coming up from the middle. You can see the demolition that is going on.  You can see actually the old curtain wall hanging from that -- I'm sorry, in the back.

Q   And you mentioned the routes in for trucks to do the work here.  Is that what you are seeing in this photo?

A   Yes.  You see the demolition at the bottom.

Q   And also these are the four roof trusses that were retained from the old space age --

A   And the two tower cranes --

Q   -- of The World's Fair?

THE COURT:  If you want a record you have to let the

witness answer.

BY MR. NARVER:

Q    Can you tell us what we are looking at in this one?

A    This is an aerial view, and you are again looking at that concrete rim, that roof and the four major trusses.  Together they supported the old roof which was held in line in place by steel cables and panels in between them, and was completely replaced with a rigid structure roof.  And together they all cover about four acres of space.

Q    Could you go ahead to the color photo, please, John?

     In looking at this photo, is this what is called the end product --

A    It is.

Q    -- of your negotiation and the construction process?

A    It is.

Q    Is this the facility that the Sonics were playing their home games in through the end of your tenure as director?

A    It is.

Q    As director of the Seattle Center did you believe that this building helped facilitate the goals of the Seattle Center?

A    Absolutely.

Q    How?

A    Absolutely.  It brought all new life.  It brought new life to the Sonics.  The first couple of seasons were totally sold

out.  It brought a new energy and spirit to the Center.  It brought a sense of great pride to all the employees that worked there, that they were working in a first class, state-of-the-art building.  It enabled us to be more competitive in bringing concerts in.  When shows are touring and they are out on the east coast and they are talking about where they are going to go it matters whether you have a building that is known and an NBA quality building as opposed to the second tier kind of building.  And so for us it elevated the stature of our national booking and sometimes international booking ability.  And it just created a real hub of huge energy and life on the Center grounds.  And in some ways led to a lot more that happened there.

MR. NARVER:  I have no further questions.

THE COURT:  Any cross-examination?

CROSS-EXAMINATION

BY MR. TAYLOR:

Q   Good afternoon, Ms. Anderson.  My name is Paul Taylor and I represent the Professional Basketball Club.

A   Good afternoon.

Q   Let's go back to 1993, 15 years ago?

THE COURT:  Counsel, they won't be able to hear you in the other room.  You have to stay put or walk with the microphone.

MR. TAYLOR:  Very well, your Honor.

BY MR. TAYLOR:

Q   Let's go back to 1993.  The existing building, the Seattle Coliseum, wasn't working for the Sonics financially?

A   Yes, that's -- that was their assessment, yes.

Q   And Mr. Ackerley who owned the Sonics was thinking about building a private arena?

A   Yes.

Q   And that would have been down towards where the King Dome is right now?

A   South of downtown, yes.

Q   You, on the other hand, wanted to keep the Sonics there at the Sonics there at the Coliseum, right?

A   Yes.

Q   But there was a problem, in terms of if you were going to upgrade the Coliseum that was going to cost a lot of money?

A   Yes.

Q   And the City Council said no taxpayer dollars for this project?

A   Correct.

Q   So you had to come up with a different way to do it?

A   Correct.

Q   And you were the architect of that financing mechanism?

A   I participated in it, yes.

Q   You more than the Ackerleys for example?

A   I proposed to them a revenue sharing.

Q   And so I understand that, when you say "revenue sharing," that means that the Sonics sell tickets, they have suites, they have club seats and the like and they charge their customers for those seats, and then they were going to give a portion of that money to the City?

A   Yes.   The City earned money off of many revenue streams from the building, including sale of suites.  Suites were available not just for Sonics games but for all events that happened in the building.  It included sale of club seats which was related to Sonics games.  It included portions of concessions for non Sonics games.  There were many revenue streams that were shared.

Q   The Sonics payments were the principal revenue streams?

A   The Sonics payments?  No.  Well, the Sonics lease was actually a fairly nominal rent.  It started at $800,000 a year.  The split of revenue streams is where the main source of funding, the largest being in the beginning, the suites.

Q   And those were suites where the principal attraction was seeing the Sonics games?

A   A major attraction to seeing the Sonics games, a major attraction of buying the suites, but in any given year the suites were entitled to as many as -- I think one year we had 178 different events to which the suite holders were entitled.

Q   Didn't you understand that the primary source of funding

to pay off the bonds was going to be coming from the Sonics -- I'm sorry, the revenue sharing function of the Sonics suites and club seats?

A    The principal source of funding under the premises and occupancy agreement is the revenue sharing for the revenue streams.

Q    And over the years, would you agree, the Sonics through that revenue sharing have paid upwards of $115 million?

A    I don't know that number, so I will accept that. I don't really know.

Q    Can we have Exhibit 500, please, Page 26? Do you recognize Exhibit 500?

A    I'm sorry. I don't know what it is I am looking at.

Q    Take a look at the first page. It is the KeyArena subcommittee report and recommendations.

A    Um-hum.

Q    If you take a look at the second page? Were you involved in that process?

A    Absolutely.

Q    Let's go to Page 26.

A    Yes.

Q    As a part of the task force work, the task force sat down with the Sonics and talked about finances and how much the Sonics had spent?

A    Yes.

Q   And if we go to the fourth paragraph down we find that the Sonics reported having invested $115 million in KeyArena, including $77.8 million in building revenues towards debt service.  In order of magnitude do those numbers sound right to you?

A   I have no reason to doubt those numbers.

Q   So stepping back for a second then, you wanted to upgrade KeyArena, the Ackerleys wanted to, the City Council said no tax dollars, so what happened then instead was bonds were issued, right?

A   We used the City's borrowing capacity and interest rate capacity, yes.

Q   And then when we see --  When you issue bonds you have to pay interest on that to the bondholders, right?

A   Yes.

Q   Coming back then to Exhibit 500, Page 26, we see that of those interest payments $115 million of them came from the Sonics?

A   They came from revenue sharing from the revenue streams in the building.  I cannot say that they all came from the Sonics.  The Sonics gave up 60 percent of revenue from the suites.  That was negotiated in the beginning.  That revenue was the City's revenue.  It wasn't the Sonics' revenue.  It declined by two percent per year.  Under the lease they gave up 40 percent --  I am forgetting the starting points of my

numbers. The revenue that was negotiated under the lease, it was the City's revenue. That was our revenue under the terms of the lease.

Q I understand that. And the Sonics had agreed to give out a portion of revenues --

THE COURT: Mr. Taylor, we need to find a place to stop for recess.

MR. TAYLOR: This is fine, your Honor.

THE COURT: Ladies and gentlemen, we will be at recess for 15 minutes. That means we will come back into session at about three minutes after 3:00. We will be at recess.

(Recess.)

THE COURT: Please be seated. Are we ready to begin again?

MR. TAYLOR: Yes, Your Honor.

THE COURT: Go ahead, Mr. Taylor.

BY MR. TAYLOR:

Q I want to wrap up the original funding.

You mentioned that the taxpayers put in $10 million of the original rebuttal costs?

A Of the original project cost, yes.

Q And the Sonics, they put in $21 million in cash upfront?

A I believe that they did. I had never saw an actual accounting of that. But that was what I believed it to be.

Q    The rest was funded with the bonds?

A    With the City's borrowing, yes.

Q    And the lease agreement between the Sonics and the City was designed to fund the reconstruction project then?

A    The financial model that we ran on, which the lease is based, was designed to have revenues from the building accrue to the City sufficient to pay the bonds and the operating costs.

Q    That would be revenues from various tenants, Sonics and perhaps Ice Capades?

A    From Sonics, Thunderbirds, Ice Capades, Disney On Ice, Bruce Springsteen, from all those revenue streams.

Q    Because the Sonics were giving up some revenue streams, this lease was kind to ensure that they could remain competitive within the NBA?

A    I'm sorry, is that a question?

Q    Yeah.  Was the lease designed so that the Sonics could remain financially competitive within the NBA?

A    The lease was signed to work with the Sonics so they could increase revenue streams and that those revenue streams could grow over time so that they could be competitive within the NBA.

Q    Over time?

A    Perhaps.

Q    It wasn't to be competitive for just six months, was it?

A   It was to be competitive within the NBA.   That was the their goal -- to be competitive within the NBA, which meant they had to have enough revenues to be able to get players who would play for the team who were competitive and who were going to help them win.

Q   That was the City's goal also, to create a situation where they could be financially strong so they could remain competitive within the NBA, true?

A   We hoped that that would happen, yes.

Q   You were working to make that happen?

A   We were working to build a building that gave them the opportunity to create the revenue.   To do that, it gave us the opportunity to create the revenue to build the building.

Q   You did a lot of financial modeling prior to entering into the lease?

A   Not I personally.   But we did have financial people who did a lot of modeling, yes.

Q   People on your staff?

A   People on my staff and then financial consultants, yes.

Q   And one of the things you were assuming was that when the building was built, remodeled, the suites and club seats would be the only game in town for high-end premium seat alternatives?

A   Well, the model that we built -- at the time that we built the model that was indeed the case, and we did not in those

models anticipate any additional sports facilities being built.

Q   So we all understand, suites, for example, they rent on a yearly basis for as much as $150,000 a year?

A   I think the original range was 70 to 130,000, yes.

Q   You had 40-odd suites?

A   58.

Q   So that was a significant revenue component if we --

A   Yes, it is.

Q   Figure of 100,000?

A   Yes.

Q   $5.8 million.

Club suites, you generates significant revenue from club suites?

A   Yes.

Q   Those were again, the only game in town or where anticipated be to the only game in town?

A   That one isn't quite the only game in town.  The concept was modeled somewhat on Husky Stadium where they have the Tyee Center's inclusive seating area where people pay a lot more.  Huskies, in my mind, are sort of a professional team.  Because they rely on the same kinds of revenue streams and their expensive and they sell 70,000 tickets, this is the business model.  So that was the other model.  So club seats were considered to be the only game in town.

Q   Husky Stadium has significantly fewer club seats than KeyArena was planning to have, true?

A   I'm thinking that Tyee Center had something like 500 seats or 600 seats, and we had up to 1100 seats.

Q   When you were negotiating this lease that was designed to fund the project and keep the Sonics financially competitive, you had no idea that Safeco Field was coming along, did you?

A   No, I did not.

Q   Or Qwest Field?

A   I did not.

Q   At the time the lease was being be negotiated, was anybody talking about demolishing the Kingdome?

A   They were not, to my knowledge.

Q   At the time it was signed, did you think there was some prospect Kingdome was going to be demolished?

A   I did not.

Q   To the point Safeco Field opened, is it fair to say that the relationship financially was working fairly well?

A   The revenues from the building, from the City's perspective and I believe from the Sonics perspective, met our projections and were meeting the targets.

Q   And, in fact, no tax dollars were being used because the revenue sharing from the building was paying the debt service on the bonds?

A   Pretty much that's true.   Except for admissions tax, which

the City's admission tax was given over toward the financing of the building.  So City's admission tax was around a million dollars a year that the City put back into the building.

Q    The rest of the $78 million came out of the building itself?

A    Yes.

Q    Things changed in 1999?

A    Things?

Q    The financial situation changed in 1999?

A    Revenues -- might be '99.  I would have to go back and look, but revenue started to decline, yes.

Q    And the first reason for that decline was Safeco Field opened?

A    We believed we saw a significant impact from opening of Safeco Field.

Q    When Safeco opened, a number of high-end suites nearly doubled?

A    Available in the marketplace, yes.

Q    So you went from having almost a monopoly to having half the market?

A    Yes.

Q    And then just two years later Qwest Field open up?

A    Yes.

Q    Qwest had a significant number of suites?

A    Yes.

Q    By the time Qwest and Safeco opened, you had gone from a monopoly down to having less than a third of the available suites in the market?

A    It might be a third, might be 40 percent.  I'm not exactly sure.  But yes, we were no longer the only suites available in the sports market.

Q    That had a significant impact on revenue?

A    I believe the City's revenue ultimately declined.  I think first year was $7.5 million and ultimately around that time 2000, 2001 might have gone to 4 something.

Q    At the same time as you were losing suite revenues because of competition of Safeco -- or competition from Safeco and Qwest Field, there was also an economic recession happening?

A    Yeah.  I didn't -- I'm sorry, I didn't mean to misspeak here to your earlier question.  Our total revenues were going down.  That wasn't just solely related to suites.

Q    You were losing club seats, too?

A    We were losing revenue.  When attendance is down, the admission tax which came back to the building goes down, because it's a percentage of ticket sales.  When the number -- when a recession hits and the number of high-end concert tickets goes down, then our share which depends on the concert to be a percentage of the gross also goes down. The concessions, people tend to spend a little bit more

are -- the City's revenue is a percentage of that.  So all revenue streams went down in relationship to the competition and to the decline in the economy.

Q   And in addition to the competition from Qwest Field and Safeco, then the Everett Events Center opened up?

A   Yes.

Q   And would you agree that the combinations of Safeco, Qwest Field and the Everett Events Center had a profound impact on the sales of suites, premium seating for KeyArena?

A   It meant there was a lot more product available for purchase and it's always -- the free market system is always based on supply and demand.  So there was a much larger supply.

Q   And demand was going down, if anything, due to the recession?

A   Demand might have been going down.

Q   Why don't you take a look at Exhibit No. 516, second page. Fourth paragraph from the bottom that begins, However when the KeyArena operating model was adopted --

A   Uh-huh (affirmative).

Q   It says the addition of Safeco, Qwest and Everett Events Center had a profound impact on sales of suites and premium seating?

A   Yes.

Q   Do you agree with that characterization?

A    Yes.

Q    It goes on to say, KeyArena now has less than one-third of the available product.  But then it says, It means there is no opportunity to market our way out of this changed business environment.  Do you see that?

A    Yes.

Q    What that is saying is supply and demand being what it is marketing can't fix it.  We just are facing a whole new business environment for suites and club seats, right?

A    Yes.

Q    And declines beginning in 2000 were significant in terms of revenue streams?

A    Yes.

Q    For example, if we look here, we drop down, suite revenue declined from $4.3 million in 2000 to $1.8 million in 2004?

A    Yes.

Q    It went down more --

A    This City's suite revenue --

Q    Yes.

A    Uh-huh (affirmative).

Q    And if the City's suite revenue is declining so too are the Sonics' suite revenue?

A    Yes.

Q    They're joined at the hip?

     Club seating revenue.  Just the City's portion dropped by

more than 50 percent from 2000 to 2004?

A    Yes.

Q    Continued to drop after that?

A    Yes.

I don't know -- I don't honestly know whether it dipped below $700,000, you need to check into that, after 2004.  I don't remember it going lower than that.  It may have.

Q    By 2004, the City's not earning enough money to cover debt service out of the revenue streams from KeyArena, right?

A    Which is why the Sonics wanted to use the City's credit in the first place.  The City took the risk of building the building.  Yes, that is true.

Q    And Sonics were losing money as well?

A    I have not seen their books.  But I have heard them say they were indeed losing money.

Q    Agreed that by at the latest 2004 this relation -- this lease that had worked so well back in 1995 was now losing money for both sides?

A    Both sides were losing money.

Q    It had gone from what was truly a very innovative scheme-- structure is a better word.  The City didn't want to spend tax dollars.  You and Mr. Ackerley figured out a way to make it happen anyhow.  But it went from a win/win to what ultimately became a lose/lose, fair?

A    I wouldn't be characterize it that way.  The deal was

based on shared risk.  The deal was based on shared investment.  There were several things we had to offer the Sonics.  One was the City's borrowing capacity and its interest rate.

The deal didn't win or lose.  The revenue that was coming in went down.  Both sides, as the deal was structured to do, shared in that risk.  For example, had the Sonics built the building on their own, which is what they were proposing to do at the time, both sides of the equation would have accrued to the Sonics.

In this model, the City shared in the risk.  The City has been paying its share of it and the Sonics shared in the risk.  It didn't help also that the Sonics' sales were off for their games.  It wasn't just the economy and it wasn't just the alternative buildings.

Q    So both sides took risks?

A    Yes, we did.

Q    And both sides lost?

A    Both sides are losing money.  I would not characterize it as lost.  We didn't lose anything.

Q    We'll talk about that more in a second.

A    Okay.

Q    One of the things the City gained, as you testified on direct examination, is a new KeyArena or a remodeled KeyArena?

A    We both gained a new facility; the team and the City.

Q    And the mission of Seattle Center is to delight and inspire the human spirit?

A    Yes, it is.

Q    I want to talk a little bit about that in the context of keeping the Sonics here for two more years.

When the Sonics first started playing in 1995 at the remodeled Key, there was a lot of buzz and excitement, true?

A    Yes.

Q    Would you agree that the situation today in terms of buzz and excitement that they bring to that building is quite a bit different?

A    There is a lot of buzz right now, and there seems to be a fair amount of excitement about this trial.  That's for sure.

What I would say is that my own limited experience with sports is it's a very cyclical business.  And as I understand it, a draft is designed to help make it be cyclical.  So I think one of the biggest lessons that Barry Ackerley taught me when we were going through this original lease and this negotiation was that you had to anticipate the cyclicality of it.  And one of reasons he didn't want a larger building, for example, than 17,700 seats, even though at that time people said it should be larger, was that he predicted the trough of that cycle and the upside of that cycle.

As I stand back, we're in a trough.  They can change very

quickly. They can go from the top and start heading down very quickly, but they can also reverse and come back up very quickly. And so we are definitely -- Sonics seem to me to be in that cycle, and they're in the trough right now. There will be a time when it will come back up.

Q  I want to focus right now not on the future but the buzz if any that is -- take away the lawsuit and the excitement in papers last few days here today.

I want to talk about the feeling in KeyArena. It's not the same as it used to be, is it? If crowds are smaller?

A  Crowds are smaller.

Q  You've heard the expression, You can't even give a ticket away?

A  I have heard that expression.

Q  Do you understand 30 percent of people who buy Sonics season tickets aren't using them and aren't even giving them away? Seats sit empty. Do you understand that?

A  I don't know that 30 percent number. I have heard that is the case. But I have friends who have been season ticket-holders for the Sonics for 20-some years. And this is their cycle. When the team is winning they use their seats; when they aren't, they give them away, if someone wants to use them. It's holding onto their seats. And people buy their season tickets because they know that it will bottom out and it will come back up. That is why they do that.

Q   Do you know total how many season ticket-holders there are at this point?

A   I don't.

Q   If I gave you a number of 1100 people, does that sound right?

A   I have no idea.

Q   Out of a population of greater area of five million people?

A   I have no idea.

Q   The sponsors, they're an important part of the revenue for the Sonics?

A   Yes.

Q   Do you know what happened to sponsorship revenues?

A   I do not.

Q   Do you know that even Starbucks, a Seattle institution, has now abandoned KeyArena?

          MR. NARVER:  I'll object to lack of foundation.

          MR. TAYLOR:  I asked if she knew.

          THE COURT:  It's my understanding she doesn't work there anymore.

          MR. TAYLOR:  Very well.

          THE COURT:  Objection sustained.

BY MR. TAYLOR:

Q   One final point on what the Sonics do or don't add to delighting and inspiring the human spirit at KeyArena.  Have

you watched any of the videos that are in the City's exhibits of games lately?

A    No.

Q    I want to change gears and talk about the notion of avoided costs.  If you don't remember this stuff, tell me and we'll move on.

But the City under the lease had to provide a significant number of staffers for every game -- ushers, ticket takers, security, parking attendants, and the like?

A    The City is the employer of the janitors, laborers, the sound technicians and lighting technicians.  The Sonics also have their own specialty that work with them -- admissions people, security people, yes.

Q    The people the City provided, the City had to pay for them?

A    Yes.

Q    And prevailing wage with benefits $17 or so?

A    Well, as you can imagine, there were a variety of skills involved in that.  So there is a variety of pay ranges.  And I don't know what they average out to be.

Q    All right.  Average number of employees for a game was probably 150 or so?

A    I know we would have as many as 95 to 100 admissions people, and you have all the other trades and other things that are involved in the game.  Could be as high as that.

Q    These people had to arrive two hours before the game?

A    I think the arrival time was hour and a half per game.  I don't remember.  I'm sorry.

Q    They stayed during the game for couple hours.  Game last two hours?

A    Yes.

Q    Then they stay around half hour after the game approximately?

A    Yes.

Q    You've got by my calculation -- let's call it 150 employees, five hours.  That's 750 man-hours.  Then you carry that out over, what, total of 46 home games, if you include the exhibition season?

A    There is -- 41 home games.  Depends on how many exhibition games they do.  Hopefully, there is a playoff season.

Q    I did the math.  If you assume 34,000 or so man-hours and we're paying them with benefits $20 an hour, that comes out to approximately $690,000 that the City has to spend each year to provide support staff for the games.

Does that sound order of magnitude right according to your budgetary recollections?

A    My recollection is not quite that good.  It doesn't sound unreasonable.  I don't know.

Q    If the Sonics don't play in KeyArena, the City won't have to pay that $690,000 in wages, right?

A    If the Sonics game is not happening and an alternative event is not happening, then the marginal costs would not be incurred.

Q    And in talking about marginal costs, there is also a whole different set of marginal costs that come out of what is called staging.  Are you familiar with the concept of staging?  For example, you have the Ice Capades Friday night, but you got Sonics playing there Saturday?

A    I'm very familiar with the concept.

We perfected the three-hour turnaround.

Q    How many employees does it take to do a three-hour turnaround from Ice Capades to Sonics overnight?

A    They have an amazing staff that actually reduced the number of people and the amount of time hugely.  I think these crews -- you would have to talk with current staff --

Q    He's coming up.  We'll take it up with him.  How's that?

A    Let him brag.

Q    Let me finish with some testimony you gave about if the team does well, if they play well on the court, that you think they can make enough money to be profitable in what is called 2009 or 2010.  Do you remember that testimony?

A    Well, actually I don't think those were my words, but I said that there is a cyclicality to this that can turn quickly.  And it's my understanding, and I certainly I am not privy to all the financing of NBA teams, but a significant

portion of revenue to the team accrues from the playoffs.  If I remember in one year seeing the numbers, I recall as much as 40 percent of an annual revenue to a team could be associated with the playoffs.

Now, I obviously I am not the authority in that.  So you'll want to check my numbers.  But it was a shockingly large amount.  If you don't make it into the playoffs, you don't get the revenues.  So were the team to turn around and go into playoffs and go to the end, you could literally nearly double the revenue.  Would your sponsors come back, would your media pay more, would your ticket sales go higher, would your club seats sell out, would your people buy another beer?  All of the above is true.  What that would mean in terms of payroll, I can't say.  I don't know their payroll.  But I would say that it could as much as double their revenue stream in a year.

Q   Why don't you turn to Exhibit No. 500, page 26.  This is the KeyArena task force report.

A   Uh-huh (affirmative).

Q   Look at the fourth paragraph down.

Let's look at the last sentence in that paragraph.

Starts "Sonics cannot market their way out of the problem."

A   Okay.

Q   I appreciate what you say about maybe their revenues would

increase so on and so forth.  But do you see what the task force concluded?  That even if the Sonics sold out every seat in the season -- every seat in the season -- they would still be $6 million below the NBA average in ticket revenue?

A    I see that.  As you well know, ticket revenue is one component of total revenue to the team.  So that may be true.  But first of all, that does not say that they're not breaking even.  It says they're not at the average of NBA.  It has nothing to do with whether they've made money or lost money.

Second thing, it's one of the many sources of revenue, ticket revenue.  It doesn't include sponsorship, doesn't include media revenue, doesn't include concessions.  It doesn't include anything.  I don't have all that in front of me.  But it's not a fair statement to say that tells us that they would be losing money.  We don't know that.

Q    You don't have access to the sponsorship revenues, media revenue --

A    Correct.

Q    Lack of sponsorship revenue or lack of media revenue?

A    I do not.

MR. TAYLOR:  Nothing further.

THE COURT:  Any redirect?

MR. NARVER:  Very briefly, Your Honor.

REDIRECT EXAMINATION

BY MR. NARVER:

Q    Ms. Anderson, Mr. Taylor was asking you about reduced revenue stream because of Safeco and Qwest Field being built?

A    Yes.

Q    Do you know when those were built?

A    I believe that -- I should know this better.  I think 1999 might have been Safeco Field.  Maybe 2001 Qwest, 2002.

Q    Have they both been built before 2006 --

A    Anderson.

Q    When PBC --

A    Yes.

Q    The decline in revenue stream as a result of competition from those new facilities, did the City take any steps to keep that secret, the fact there was a decline in revenue streams?

A    We're a public body.  Not very much is secret.

Q    In fact, it had been published in the task force report published in other public documents?

A    Many newspapers.

Q    Prior to PBC's acquisition of the team?

A    Well, the previous owner, Howard Schultz, was clear in his media discussions that he had lost 58, $60 million over his ownership.  So it was -- you know, it was talked about a lot.

Q    Last thing I want to ask you about, Mr. Taylor asked you some questions about -- really went to the question who paid for this facility.

When the City built it, you said there was $10 million payment out of the capital improvement budget; $74 million in bonds.  But if that is being paid back, why is that a cost of the City?  Were there any advantages --

A   Couple things.  First of all, the City's --

THE COURT:  I'm sorry, you can't jump over the top of each other.  You're not getting a good record here.  So please pose your question; wait until he's finished and respond.

BY MR. NARVER:

Q   My question was:  Were there any advantage to SSI because of the fact the City's credit was being used to build the building?

A   Yes.  At the time that we did the building, the Ackerley family had been working on financing for the alternate building and financing was pretty expensive at that time. The City's cost of borrowing was less.  The availability of it, we were able to build the building at less cost, and we actually documented that because the land was already available.  The amount of structure we saved another $15 million.  And it's a limited commodity what the City can finance, because it's based on -- I think state law that limits what the City can finance for general municipal purposes to three-quarters of a percent of the tax base.

So in the City using that amount to do this project,

they're not doing something else, they're using their credit, their legal authority to borrow, to do this building, to make it work in this case, because at the time the owners of the team were not able to make it work in another place.

MR. TAYLOR:  I have no further questions.

THE COURT:  Any recross?

MR. TAYLOR:  No recross, Your Honor.

THE COURT:  Thank you.  You may step down.  Next witness, please.

MR. NARVER:  The City calls Joe Singh, please.

THE COURT:  Please come forward.

MR. NARVER:  City calls Joe Singh.

JOYTINDER SINGH

The witness, after being duly sworn, testified as follows:

THE CLERK:  Please state your name and spell your last name for the record.

THE WITNESS:  Joytinder Singh, J-O-Y-T-I-N-D-E-R, last name S-I-N-G-H.

MR. NARVER:  For the record, Greg Narver.

DIRECT EXAMINATION

BY MR. NARVER:

Q   Good afternoon, Mr. Singh.

A   Good afternoon.

Q   You go by Joe; is that correct?

A   Yes, I do.

Q    What's your job?

A    Currently, Director of Commercial Facilities and Events at Seattle Center.

Q    How long have you worked for the City of Seattle?

A    About 23 years.

Q    What does the director of commercial facilities and events do?

A    Oversees all events that are not free to the public and all facilities that produce them, including KeyArena, and the McCaw Hall.

Q    What job did you have before?  How long have you had your current job?

A    Approximately three years.

Q    And what was your job before that?

A    I was manager of KeyArena.

Q    What did you do as manager of KeyArena?

A    I was in charge of the overall operation of that facility.

Q    In your current position, what kind of interactions do you have with the staff of the Sonics?

A    Pretty much daily.  Weekly.  With a wide range of their staff from the CEO on down to the game day staff.

Q    Is this everyday occurrence that you work with the Sonics? Almost every day?

A    Almost every day.

Q    How many people on your staff under your direction work

directly with people on the Sonics' staff?

A    30, 35.

Q    Are you in a position to personally observe those interactions?

A    Yes.

Q    How do you do that?

A    By being present, by being at the building, walking into their meetings.

Q    What meetings do the staff have together?

A    Sorry.

Q    What meetings are there between Sonics --

A    There's a regular biweekly meeting that's been held since we opened KeyArena, which is called a client operations meeting, which are major clients.  The Sonics will attend, talk about the last week, talk about the coming week, and any issues that need to be solved and so forth.

Q    How would you describe the day-to-day working relationship between your staff, the City employees and the staff of the Sonics?

A    Very good.  Very cooperative.  Very team oriented.

Q    Has that been the case through the three years you've been in your current job?

A    Yes, sir.

Q    What about your 11 years as manager of KeyArena, were you also in a position to observe the interaction between City

staff and Sonics' staff there?

A    Yes, I was, sir.  And it was pretty much the same.

Q    Have those interactions, were they affected in any way when ownership of the Sonics changed from BCOS, the what we're calling the Howard Schultz ownership to the current ownership?

A    No, sir.  Since the first change in ownership, our regular emphasis to our staff has been that we're professional, we provide service, we don't let outside influences that are beyond our control affect our day-to-day relationships or the provision of the very high level of service.

Q    Let me ask you this, were you aware that in the last NBA season this lawsuit was going on?

A    Yes, I was.

Q    All through the season, correct?

A    Yes, sir.

Q    Did that have any effect on that working relationship?

A    No, sir.

Q    Were you also aware that around the start of last season the PBC announced an intent to relocate the team to Oklahoma City?

A    Yes, I was aware of that.

Q    Did that have any effect on the working relationship between your staff and the Sonics' staff?

A    No, sir.

Q    Did it affect the ability of you to work together to put a game on at KeyArena?

A    No, it did not.

Q    The relationship didn't -- between your staffs didn't become dysfunctional?

A    No, it did not.

Q    Was there taunting, name calling, anything like that?

A    There was nothing acrimonious.  It was fully cooperative and remains to this day.

Q    Has anybody in the Sonics' management, you say sometimes you work with the CEO?

A    Yes.

Q    Is that Danny Barth?

A    Yes.

Q    You work with the CFO also?

A    Yes.

Q    Does anyone --

        THE COURT:  Counsel, you have to slow down.  I can't even -- you can't get a record, and I can't follow you. All right?  And I'm assuming that's something you want me do?

        MR. NARVER:  Yes, I do.  I apologize, Your Honor. And I apologize you have to tell me that several times.

BY MR. NARVER:

Q    Did anyone in the Sonics' management in this last season, Mr. Barth or anyone else, ever tell you that the relationship

between the team and the City has become dysfunctional?

A   No, sir.

Q   Has anyone in Sonics' management ever told you that if the Sonics play their next two seasons in KeyArena that the relationship will be dysfunctional?

A   No, sir.

Q   Has anyone in management told you that they anticipate there will be problems holding the games at KeyArena?

A   No, sir.

Q   Has any Sonics employee ever told you that we just can't work here anymore because of the relationship between the City and the team has become a problem?

A   No, sir.

Q   Have you ever had to call anyone to come resolve a problem between your staffs?

A   No, sir.

Q   Based on your 11 years as manager of KeyArena, your three years in your current job, you've worked with three different groups of ownership; is that correct?

A   Yes, sir.

Q   Do you have any reason to believe based on this experience that if the Sonics play the next two years at KeyArena there will be any problem in putting games on at KeyArena?

A   I don't, sir.  I don't see any reason why the relationship should become acrimonious or difficult because we're there

to -- they're our major clients and we're there to produce the highest quality project that we can.

Q   The Seattle Thunderbirds hockey team, where have they been playing their home games?

A   KeyArena.

Q   What about next year?

A   They will be moving to Kent in approximately January of next year.

Q   During the last hockey season did you -- was everyone aware that the Thunderbirds would be leaving and move to Kent?

A   Yes, sir.

Q   Did that knowledge affect the ability of you or anyone on your staff to work cooperatively with the Thunderbirds' staff?

A   No, sir.

Q   You work closely with Sonics' management -- or you have day-to-day interactions with Sonics' staff.  Have you ever tried to tell them what players they should have on the court or how to price their tickets or how to market the team?

A   No, sir.

Q   That's not part of your job, is it?

A   It's not.

Q   When did you become manager of KeyArena?

A   Approximately 1994, if I remember correctly.

Q   So what was the status of the building at that time?

A   It was just moving up to design phase, to design the new KeyArena.

Q   The old building still exists at that point?

A   Yes, it did.

Q   And then it was demolished and the new one built?

A   Correct.

Q   Do you have interactions with the Sonics' staff during that process?

A   Yes.  A lot.

Q   What was the nature of those -- what was the purpose of your interactions with them at that point?

A   My work at Seattle Center entailed working with the Sonics and the architect and the contractor during the design phase and during the construction phase, and thereafter I opened the building in October of '95.

Q   When you were manager of KeyArena, where was your office?

A   In KeyArena.

Q   Fair to say you're pretty familiar with all of the characteristics of KeyArena?

A   Yes, sir.

Q   Are you familiar with the characteristics, layout, size, other things of other NBA venues?

A   Quite a few.

Q   How is it you're familiar with those?

A    I have been to maybe 15 other NBA arenas.  I'm a member of an organization called IAAM, which is the International Association of Assembly Managers.  That's pretty big, 4,000 members of representing arenas, stadiums and performing arts organizations.  And we have regular conventions and meetings and educational sessions around the country.  And one of the courtesies we do to each other, for each other in terms of professional courtesy is to provide tours of facilities or talk about how we run them.

Q    Let me ask you this about KeyArena.  Since 2006, which is when PBC acquired it, has it shrunk?  Is it the same size as it used to be in 2006?

A    It's the same size as it used to be.

Q    Is the seating capacity the same?

A    Yes, it is.

Q    The concourse is any smaller?

A    No, sir.

Q    The locker room, is the weight room, everything the same size it was when they bought the team?

A    Yes, sir.

Q    How about the condition of the building, has it deteriorated pretty badly in the last two years?

A    No, sir.

Q    Same condition it's been in when they bought the team?

A    Pretty much so, yes.

Q   During your year both as manager of KeyArena and in your current job, have the Sonics requested any improvements or modifications of KeyArena?

A   Quite a few.

Q   What's been the City's response to those requests?

A   To work corroboratively with them so that we could provide the tools that they needed to either enhance the presentation of their games or enhance revenue generation.  And there's been quite a few changes made to the building since it opened.

Q   Can you list a few of the major improvements that have been made that are specifically geared towards the basketball presentation or the -- or that have been made at the request of the Sonics?

A   Yes, I can.  There is an entirely new advertising ring, which is a band that goes around the building that you can change graphics on that can be used for sponsorship as well as fan excitement and so forth.  That was pretty important to the Sonics.  The Sonics wanted to perhaps about four years ago, maybe a little longer, replace the sound system completely.  The lighting was replaced about the same time in order to conform better with NBA regulations about where the light falls and how many foot candles go where.  We spent about a million dollars upgrading the suite level and contributing to new clubs that were built there.

Q    Okay.

A    Recently we built a new or -- the Sonics built a new family room.  And a lot of these projects actually entailed not only the City providing the funds for them, but carving out space that was already being used for other purposes in order for the Sonics to be provided more space for some of these things.

Q    How much has the City paid to make improvements to KeyArena since it opened?

A    Approximately as a capital improvement number I think about $5.5 million.  In addition to which we spend about 120 to $150,000 on major maintenance through the year that's not covered as part of the operating budget.

Q    Mr. Singh, I'd like you to look at Exhibit 215, which is some photos that have already been admitted into evidence.  And the first one I'd like you to look at is a color photo of the exterior of KeyArena, just to set the stage.

This is the building we've been talking about where you had your office for many years?

A    Yes, sir.

Q    What I'd like to do is go through these photos and if you could just point out a few of the features that you've been talking about, improvements that have been made in cooperation with the Sonics, or other things that have been made at the Sonics' request.  You can just tell us what

you're looking at as these photos come up on your screen.

No, just the color photos, please.

A    This would show you enhancements that were done to the scoreboard.  You can see vaguely the band of light going on the top, that ring signage that I alluded to which I think cost about $1.3 million or something like that.  The lighting has been redone.  You will see that the focus of the lighting is mostly on the basketball floor.  Some years ago the NBA was strongly encouraging us so that the light pulls in a particular pattern and only for about 15 rows up.

Yes?

Q    Could we go to the next one, please?  And actually, that's pretty similar.  Let's go one more if we could.

What's that?

A    That's the new family lounge that was built a year ago when the new general manager came on, Sam Presti.  He was very, very keen on increasing the amenities and the quality of the amenities provided for the players' wives and girlfriends and families.  And so we carved out a space that was actually being used for other rental purposes and provided it to the Sonics and worked with them to build this guest lounge.

Q    What's this used for?  It's used for the --

A    Wives, players' wives.

Q    Go to the next photo, please.

That part of it, too?

A    Yes.    That's part of the same complex and that's for the children.    For the players' children.

Q    Okay.    Next one, please?

What are we looking at there?

A    You're looking at a high-end club called the FSN Lounge. Once again, the Sonics wanted to build this lounge.    This was actually pretty vital storage area and also a backstage catering area for traveling shows.    But we changed the use and worked with them in the creation of this club and one that almost adjoins it.

Q    Okay.    And next one, please?

And what are we looking at here?

A    This is called the Lexus Lounge.    It is another high-end club in the KeyArena.    We I think converted four or five suites in order to create this space.    And --

Q    When KeyArena opened and you were the manager, what was the reaction to the building from the Sonics?

A    Extremely enthusiastic.    Extremely appreciative, not only from the Sonics but from a lot of press and TV got very, very high praise about the building.

Q    Do you remember the Sonics made it to the NBA finals that year?

A    Yes.

Q    That brings a lot of national attention to a new building?

A    Absolutely.

Q    Do you remember what the reaction from the press and public was?

A    Superlative.

Q    Do you know what reaction the commissioner of the NBA, David Stern, had to the building of KeyArena?

A    Very positive.

MR. NARVER:  We would like to offer Exhibit 46, which is a video clip that I would like to show.

MR. TAYLOR:  Same foundation.

MR. NARVER:  Your Honor, Mr. Singh has stated that he's aware of what Commissioner Stern's reaction was.  In terms of hearsay, I believe it qualifies as you'll see from the clip as a present sense impression under rule 803(1).

THE COURT:  Counsel, what is it?  You haven't told me what 46 is.  What's it a clip of?

MR. NARVER:  It's Dave Stern being interviewed on opening night at KeyArena stating his impression of the new building.  It's a very short video clip.

THE COURT:  And what difference does that make?

MR. NARVER:  That it is relevant to the City's response to the Sonics' need for a state-of-the-art arena and cooperative relationship they've had throughout this tenure under all facets of the management.  The argument has been made that it's a dysfunctional relationship.  Mr. Singh has

testified that throughout current ownership and past ownership there's always been a very functional relationship that has created a state-of-the-art building.

THE COURT:  But Mr. Stern isn't a party to the lease.

MR. NARVER:  No, he's not, but he's seen a lot of NBA arenas in his day.

THE COURT:  And why should I be concerned about whether or not he likes the arena or not?

MR. NARVER:  Well, because you're being asked to have the Sonics play two more years in this building.  Some shortcomings in terms of the financial things have been set forward.  What this remains is state-of-the-art basketball facility that the team's continue -- the City and the team continue to work cooperatively on.  I think his reaction to the building as it still exists is relevant to where they'll be playing if this Court orders --

THE COURT:  So what is the --

MR. NARVER:  And I would point out the Sonics have argued, and they put in opening statement, a claim that it does not meet NBA standards, a statement by the commissioner about the quality of this building --

THE COURT:  Well, you haven't laid any foundation for this clip.  When was it taken, you know, who took it, who is -- it's an interview.  Who is doing the interviewing?

MR. NARVER:  Your Honor, Mitch Levy is doing the

interview.  He was going to be called as a witness but was excluded.  He was going to authenticate the tape.  The Sonics have stipulated, I believe, to the authenticity of the tape, not as to the hearsay objection or foundation.

Mr. Singh said he was aware of Commissioner Stern's reaction to the building when it opened.  And this is on first night of the new building.  And the hearsay objection we're responding on --

THE COURT:  Well, was Mr. Singh with Mr. Stern on the night the building --

MR. NARVER:  No, but he as a manager of the building is aware of the accolades the building has received.  There's a good collection of them, in fact.

MR. TAYLOR:  Your Honor, under 803(1) present sense impression is there is an act, oh, my goodness, he's hurt.  That is not what this -- a tape from 13 years ago is not what 803 is designed for.  It is hearsay.  No one in this room saw it or heard it when it happened.  It's classic hearsay.

THE COURT:  Sustained.

MR. NARVER:  Okay.

BY MR. NARVER:

Q   Mr. Singh, if the Sonics leave, there's been discussion earlier, when you weren't in the courtroom, that Seattle University may play some basketball games there.

There's going to be basketball at KeyArena.  Doesn't that

take the place of having the Sonics there?

A    Not really.

Q    Why not?

A    Sure, it is basketball.  It wouldn't be professional-level sport.  They would be less dates, far less dates and anticipated audience which would be much, much less than the Sonics currently serve.

Q    Part of your job is to help market the venue to promoters; is that correct?  Other -- for other types of events?

A    Yes, it is.

Q    Is that affected if there is not an NBA team there?  Why can't concerts still come there?

        THE COURT:  Counsel, you're asking three questions at a time, and I can't tell which one I'm going to get an answer to.  One question at a time.

        MR. NARVER:  I understand.

BY MR. NARVER:

Q    Would not having the Sonics there affect your ability to market the venue to other types of events?

A    It would certainly change the profile of the venue, yes.

Q    What does that mean -- the profile of the venue?

A    Having an NBA team there puts your name out in the press and the public to a much greater extent than not having that sort of presence in the marketplace.

        MR. NARVER:  Okay.  No further questions.

THE COURT:  Any cross-examination?

MR. TAYLOR:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. TAYLOR:

Q    The change in the profile of the KeyArena as a result of the Sonics leaving, you understand they could leave in 2010 regardless of what happens here today?

A    Yes, I do, sir.

Q    So you started making plans for a potential change in profile?

A    Vaguely so, yes.

MR. TAYLOR:  Could we have Exhibit 549, please?  And I move its admission at this point.

MR. NARVER:  Your Honor, the City objects to this report on grounds of hearsay, and that it provides expert opinions about a testifying expert.

MR. TAYLOR:  Your Honor, the business record under 803(6).  Pursuant to Rule 902, last week after we got the objection that it was hearsay, we went out and obtained the declaration of Mr. Russ Simmons.  Mr. Simmons prepared this document.  He explains in his declaration that HOK, which is the company that produced this document, is in the business of providing sports architectural services and regularly provides written analyses comparing one facility to another facility.

He goes on to testify that in the ordinary course of his business he prepared this document, he spent approximately 100 hours preparing it.  And he has 25 years of experience preparing these kinds of documents.  This is just the kind of declaration that's envisioned under 902 when there's an objection to a business record exception to the hearsay rules.

THE COURT:  First of all, let's back up.  What is it?  Who is it prepared for?  Whose business record is it?

MR. TAYLOR:  It is HOK.

THE COURT:  So it's HOK's business record?

MR. TAYLOR:  Yes.

THE COURT:  Well, what does HOK have to do with this?  Why was it -- why was it produced?  You need to tell me what this is, please.

MR. TAYLOR:  HOK was retained by the PBC to come in and do an analysis of the adequacy of KeyArena to determine can it be remodeled or what do we need to do here.

THE COURT:  I see.  So this is the report of your client's --

MR. TAYLOR:  Consultant.

THE COURT:  -- consultant?

MR. TAYLOR:  Yes, Your Honor.

THE COURT:  Consultant for the purposes of trial or simply consultant?

MR. TAYLOR:  Business consultant, not trial, Your Honor.

MR. NARVER:  Your Honor, this an expert report.  This is an expert opinion without a witness who is identified as an expert.  Who is not identified as --

THE COURT:  Okay.  You said there was declaration somewhere.  Where is that declaration?

Do you know the docket number on this was?

MR. TAYLOR:  I'm sorry, Your Honor?

THE COURT:  Do you know what the docket number is on this by chance?

MR. TAYLOR:  I think we can find it.

THE COURT:  Docket number 105.

All right, Counsel, basically, it's your position, if I understand, you want to get this document in by laying the foundation through this declaration?

MR. TAYLOR:  Yes, Your Honor.

THE COURT:  Well, in order for me to rule on that I have to read it.  And since I haven't read it I'm not in a position to rule on it.  So why don't you let me read it, and tell me again under what exception you believe it comes in, you're acknowledging hearsay, but it has a -- it has an exception in order to have its admissibility.  What exception again are you trying to move it into evidence?

MR. TAYLOR:  803(6).

THE COURT:  803(6).

MR. TAYLOR:  And 803(6) itself references 902(11), which talks about what kind of a declaration you need to get a business record in.  If I may, Your Honor, so the declaration can be considered under 104.

THE COURT:  Okay.  Now, what does this have to do with this witness?  In other words, what are you intending to do with this?

MR. TAYLOR:  He was talking, for example, about the FSNHD Lounge, we just saw pictures of it, as an example of one of the high-end facilities.  What this document -- one of the high-end amenities available.

What this document shows, for example, is that the high-end amenities at KeyArena are nearly nonexistent compared to other NBA arenas.  For example, KeyArena has approximately 700 --

THE COURT:  You don't need to tell me what's in it. You just need to tell me what are you going to use it for. Are you using it to impeach his testimony?

MR. TAYLOR:  Yes, Your Honor.

THE COURT:  Okay.  And so you're taking this document and using it to impeach him, but he didn't write it, he didn't have anything to do with compiling it.

MR. TAYLOR:  Correct.  But Your Honor, he's testified that he's seen all these other arenas and the KeyArena is

comparable to all of these other arenas.  I believe there were 13 arenas he said he had been to as a member of the professional association.

THE COURT:  All right.

MR. NARVER:  Could I respond to the applicability of the business records exception, Your Honor?

THE COURT:  Certainly.  Go ahead.  Why don't you step up and explain to me.

MR. NARVER:  And Your Honor, if you prefer we can brief this overnight and submit a brief in the morning.  But the business records exception on its face refers to records of regularly conducted business, the -- I believe the authority for it is that records that are kept just as a regular course of business have some indicia of reliability about them.  These people were retained specifically by PBC to provide this analysis.  That's a different course of business and a different reason for admitting that evidence than the records exception contemplates.  Again, we would be happy to write a brief and submit it for your review in the morning.

THE COURT:  All right.  That's all we have time for today.  Thank you, sir, you may step down.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  All right.  Everybody needs to stay put.  Because that's all the testimony we're going take, that's not

all we're going to do today.  So please take a seat, we're not done.

All right.  Let's talk about what's happening tomorrow. And are we ahead or are we behind?

MR. LAWRENCE:  I think we're ahead and they're behind.  I don't know.  Your Honor, we're about where we thought we would be in terms of time used for witnesses --

THE COURT:  I'm sorry, I can't -- I can't hear you.

MR. LAWRENCE:  I think that for -- Paul Lawrence for the City.

I think we're about where we thought we would be in terms of the time used on these witnesses.  It's taken longer than anticipated because the cross-examination by PBC took longer than we would have expected.  That is their time.  So I think on our time, we're doing about what we anticipated.

THE COURT:  Okay.  Well, I really wasn't asking you to tell me about the time.  What I need to know is are we moving through the witnesses about where you thought?

MR. LAWRENCE:  I thought we would be through this witness by the end of the day.

THE COURT:  All right.  So who's coming tomorrow, Mr. Lawrence?

MR. LAWRENCE:  We're filing that.  I don't have that in front of me.  I know Mr. Bennett will be called tomorrow. We may show a video clip of Mr. McClendon.  He's appearing

live later, we understand.  Danny Barth.  We'll be filing the list, Your Honor, but I thought that the protocol here was to file rather than to announce it in court.  So I apologize.

THE COURT:  Well, I suppose you can file it and I'll have to go look it up, or you can tell me and then I'll know.

MR. LAWRENCE:  If Your Honor would give me a minute, I will get the list and we'll prepare it on the file.

THE COURT:  Okay.  I'm just concerned that everybody know what we've got coming tomorrow morning.

MR. LAWRENCE:  We have Clay Bennet, followed potentially by an audio clip of Aubrey McClendon, followed by one of our experts, Andrew Zimbalist, followed by Danny Barth, who was Sonics' CEO, followed by another one of our experts, Todd Menenberg (phonetic), if we get to him, followed by the last of our experts, Ron Hatamiya.

THE COURT:  Okay.  Thank you, very much.  And I am assuming that you'll also file with me those exhibits that you're intending to use at the same time.

MR. LAWRENCE:  Yes.

THE COURT:  Okay.  Yes, Mr. Keller?

MR. KELLER:  I owe Your Honor an apology, the reason you didn't know about the declaration was that it was filed on the foundation for this exhibit, as well as a few others. It was my fault.  Your law clerks were very much on top of this.  They actually communicated with me last week, What are

these declarations you guys have been filing?  And I explained to them that they were issues dealing with foundational things regarding some business records exception to the hearsay.  And they said, Well, is this something Judge Pechman needs to see in advance?  And I said, I don't think so.  It will come up during the trial.  So you can blame me for the fact that --

THE COURT:  Okay.  Well, if there are things like that, if I know they're coming then I'll take -- then I'll take time to read it.  But I don't usually listen and read well at the same time, particularly when I have lots of people watching me.  So give me a heads-up and I'll do the homework.

Now, is there any other deposition that you wanted me to read in order to be prepared for tomorrow's testimony?

MR. LAWRENCE:  No, Your Honor.  We will be filing, though, a list of exhibits that were exclusively referred to in the depositions that won't otherwise be utilized in trial.  So, Your Honor, we will have that and move for those and we apologize for not having them in the books in the first place.

THE COURT:  Okay.  So --

MR. LAWRENCE:  Just couple of exhibits that were in the deposition, designations that were provided to Your Honor that will not otherwise be used in trial.  But we apologize

for not including those in the books when they were filed with you.

THE COURT:  Okay.  When you file those, would you tell me where it is if they show up so that --

MR. LAWRENCE:  Absolutely.

THE COURT:  -- I mean, I spent lots of hours reading them, I don't want to re-read them.  So if you tell me what pages they go to then I can go back and consider them.

MR. LAWRENCE:  We'll tell you exactly what pages they go to, Your Honor.

THE COURT:  Great.  Thank you, very much.

All right.  Is there any other issue that I can help you with or you need some resolution of before tomorrow?

All right.  Then have a good evening.  We'll see you tomorrow morning.

THE CLERK:  Please rise.

(Court adjourned.)

C E R T I F I C A T E

    We certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/S/ Barry L. Fanning, CCR, RMR, CRR

/S/ Nichole Rhynard, CCR, RMR, CRR