208

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

CITY OF SEATTLE,                    )  Cause No. 07-01620-MJP
                                    )
            Plaintiff,              )  Seattle, Washington
                                    )  June 17, 2008
        vs.                         )  Volume II
                                    )
PROFESSIONAL BASKETBALL CLUB,)
LLC,                                )
                                    )
            Defendant.              )
                                    )
_____)

BENCH TRIAL
VERBATIM REPORT OF PROCEEDINGS
BEFORE THE HONORABLE MARSHA J. PECHMAN
UNITED STATES DISTRICT JUDGE

APPEARANCES:

  For the Plaintiff:       Paul Lawrence
                           Jeffrey Charles Johnson
                           Gregory Narver

  For the Defendant:       Bradley S. Keller
                           Paul Taylor

  Reported by:             Barry L. Fanning, CCR, RMR, CRR
                           Nichole Rhynard, CCR, RMR, CRR

Proceedings recorded by mechanical stenography, transcript
produced by Reporter on computer.

EXAMINATION INDEX

EXAMINATION OF:                                                  PAGE
JOYTINDER SINGH
 CROSS-EXAMINATION              BY MR.  TAYLOR            215
 REDIRECT EXAMINATION           BY MR.  NARVER           232
 CLAYTON BENNETT                                                 234
 DIRECT EXAMINATION             BY MR.  LAWRENCE         234
 CROSS-EXAMINATION              BY MR.  KELLER           339
 ANDREW ZIMBALIST
 DIRECT EXAMINATION             BY MR.  NARVER           374
 CROSS-EXAMINATION              BY MR.  TAYLOR           392
 REDIRECT EXAMINATION           BY MR.  NARVER           415

EXHIBIT INDEX

EXHIBITS ADMITTED                                               PAGE
 600                                                            224
 23                                                             243
 75                                                             253
 310                                                            260
 62                                                             263
 65                                                             264
 79                                                             265
 335                                                            271
 264                                                            274
 66                                                             278
 182                                                            289
 60                                                             295
 97                                                             304
 98                                                             306
 115                                                            313
 116                                                            316
 120                                                            318
 501                                                            320
 5                                                              324
 93                                                             332
 268                                                            334
 276                                                            336
 94                                                             345
 535                                                            350
 544                                                            359
 558                                                            365
 554                                                            366
 548                                                            367
 555                                                            368
 62                                                             372

P R O C E E D I N G S

_____

THE COURT:  Good morning.  Please be seated.  All right.  Counsel, yesterday you started out with 900 minutes a piece.  The plaintiff's used 122 minutes, for a balance of 778; the defendant's used 178 minutes, for a balance of 722.  So at least that's my math.

All right.  We have Mr. Singh on the stand.  I believe we stopped yesterday when we were discussing the admissibility of one of the exhibits.  What else would either side like to say about the declaration of Russ Simons and the document attached to it?

Can you help me with the number on the document, please?  549.

MR. NARVER:  Your Honor, the City objected to the admission of this exhibit under the hearsay rule.  Mr. Taylor yesterday said that the record qualifies as a business record under Rule 803(6).  We think that is a misapplication of the Rule.  The Rule refers to records that are kept in the regular practice or regular course of a business.

Quoting hear from the Clark versus City of Los Angeles case, a Ninth Circuit case, 650 F. 2d 1033, "business records are kept in the regular course of business if they are created pursuant to established company procedures for the

systematic or routine making and preserving of company records."

The cases and the advisory comment to the Rule showed what we are talking about here are the kinds of records that a business creates on a regular basis, invoices, bills of lading, things like that. Here we have a report that was commissioned by PBC to do an analysis of KeyArena and is being submitted as if this were a systematic and business record.

This does not fall within the language of the Rule or any of the cases interpreting it. If this is a business record there is a great new way to get expert testimony into evidence without having to actually put an expert on the stand or make them available for deposition.

This is not a systematic or routine record. It was specifically commissioned for a particular purpose, to do an analysis of KeyArena, and should be excluded.

I do have a short brief on this subject if you like but I think I have given you the gist of it.

THE COURT: Your brief is a little later for me to take into consideration if we are moving forward this morning.

Mr. Taylor, what would you like to say?

MR. TAYLOR: Thank you, your Honor. There is a business record. We have to focus on what is the business of

HOK.  The business of HOK is preparing these kinds of reports.  As Mr. Simmons points out in Paragraph 4, "as a part of our business and in the ordinary course of our business," which is preparing these reports, "I prepared the KeyArena comparative analysis."

THE COURT:  How is HOK's business any different than any other expert that would you hire to give a report?  In other words, when I look to the case law I don't see that expert opinions are routinely brought in under the business record exception.

MR. TAYLOR:  Your Honor, this is not an expert opinion.  This was consultant's work commissioned seven months before there was any prospect of litigation.  PBC was in the process of analyzing alternatives and it hired a consultant just as any business would hire a consultant to analyze how to proceed.

THE COURT:  But this data is only collected for the purpose of a specific client's request?

MR. TAYLOR:  Yes.  Correct.

THE COURT:  This isn't something that is done on a regular basis for HOK's business, like paying its bills, logging its phone calls, collecting data to do an analysis on that they would keep in a data bank of some sort.

MR. TAYLOR:  They do keep these kind of reports on file when they prepare them.  It is not, for example, I

admit, an invoice, bill of lading, something like that.

THE COURT:   But this is specifically prepared for a client?

MR. TAYLOR:   Correct.

THE COURT:   So how is this different than anyone else, be it an architect, accountant who does a consultation, and you now asking to get it in as a business record of that particular expert?

MR. TAYLOR:   For example, an audit would come in as a business record.

THE COURT:   Do you have any case law to support that?

MR. TAYLOR:   I don't have case law, your Honor.  I have never encountered an issue where it didn't come in as a business record, however.

THE COURT:   Do you have any case law that supports your position today?

MR. TAYLOR:   I don't have any with me, no, your Honor.

THE COURT:   All right.  What else would you like to argue?  Anything?

MR. TAYLOR:   No, your Honor.

THE COURT:   Admissibility under 803(6) as a business record, this is not a business record that is normally contemplated under the Rule.

There are essentially two reasons why business records are

allowed in.  It is, first, because the businesses depend upon such records to conduct their own affairs, and accordingly the employees who generate them have a strong motive to be accurate and not to be deceitful.  And, second, because routine and habitual patterns of creation lend reliability to business records.

What I have here, at least as it is minimally explained in the affidavit, is that Mr. Bennett hired someone to do an analysis for him and that HOK did that.  HOK apparently is some form of architectural firm.

There are expert opinions that can come under 803(6).  For example, there are some doctors' diagnoses that come in, but that is because doctors in the regular course of business in making those diagnoses is part of their regular routine or practice.

According to the Federal Practice and Procedure, Michael Graham, Chapter 9 on hearsay, "a critical factor is whether the expert opinion was incident to or part of factual reports of contemporaneous events or transactions or conversely whether the expert opinion was specifically prepared for the purpose of being included in a report setting forth the expert's opinion."  I think this falls into the latter side of it, therefore it is not admissible.

All right.  What further questions do we have for Mr. Singh?

JOYTINDER SINGH

The witness, after being duly sworn, testified as follows:

CROSS-EXAMINATION

BY MR. TAYLOR:

Q   Good morning, Mr. Singh.   Again my name is Paul Taylor. Could we have Exhibit 215, the 9th photo, please?  It is the FSNHD Lounge.

You testified yesterday about some improvements that had been done at KeyArena.  One of the things you talked about was the FSNHD lounge.  Do you recall that?

A   Yes, sir.

Q   And that is a $5 million improvement?

A   Five to seven is the number that I heard when this and the adjoining club were created.

Q   And the five to $7 million was paid by the Sonics, not the City, true?

A   That's correct, sir.

Q   And at the end of the lease the City will retain the benefit of those improvements?

A   To a certain extent, sir.  There is quite specific language about what can be removed from the building and what can stay.  It is largely infrastructure, walls, things that are bolted to the walls, a lot of the mobile, movable equipment, TV screens, furniture, so on and so forth, can be removed.

Q    Furniture is removed, fixtures stay, like any lease?

A    Something to that effect, but it is quite detailed about that.

Q    The Family Center you testified about, that was paid for by the Sonics, not the City?

A    Yes.   It is called The Family Lounge.   And it was.

Q    The upgrades to the suites, now, those were paid for by the City, approximately a million dollars?

A    I think 1.5, sir.

Q    The suites are something that primarily benefit the City as opposed to the Sonics, true?

A    We shared the revenues, yes.   And the City gets more than the Sonics do.

Q    The City gets 60 percent of the revenues, the Sonics get 40 percent?

A    Yes, sir.

Q    Scoreboard improvements, a million dollars, those were paid for by the Sonics, not the City?

A    I don't exactly remember.   I think it was some sort of a shared agreement.   The Sonics certainly contributed but there was a City contribution to the improvement to the scoreboards and the video boards.

Q    Exhibit 500, Page 5.   Now, you testified that you were familiar with a number of the arenas throughout the United States and you visited many of them?

A    Yes, sir.

Q    Would you agree that KeyArena has the smallest seating capacity of any NBA arena?

A    Yes, sir, to the best of my knowledge.

Q    Square footage, next block down.  Also, to the best of your knowledge, KeyArena at 368,000 feet is the smallest NBA arena?

A    Yes, sir.

Q    The size of KeyArena creates some problems.  Let's drop down to those checks below that paragraph.  Do you agree that the size of the building limits point of sale opportunities for food and beverages and merchandise?

A    Compared to the larger buildings, yes, sir.

Q    And what that means is there aren't as many places and ways to sell hotdogs, hamburgers and the like to the patrons?

A    Yes, sir.

Q    So it reduces the opportunity to make money?

A    Compared to the other larger arenas, yes, sir.

Q    In addition to concession issues, the size also limits the opportunity to differentiate seating products.  Do you see that?

A    Yes, sir, I do, sir.

Q    And what that means is you can't have various levels -- pricing levels for seats that offer different amenities because there is just not enough room to have different

218

categories?

A   You could, but not to the extent you could with a larger arena.

Q   Limits back of house capacity to support maximized revenue from other arena uses.  KeyArena has what, one loading dock?

A   Yes, sir.

Q   And that creates problems, not so much for basketball games but for all other kinds of events because you can only have one truck in at a time?

A   Actually you can have two trucks in at a time.  And there is an alternative loading dock at an upper level by which you use a freight elevator, and we use both of these accesses for larger shows.

Q   You agree, relative to other arenas, concert tours and the like have trouble getting their equipment into KeyArena relative to the more modern arenas?

A   No, sir, they have no problem getting in.  It takes them slightly long than it would with a building with more loading docks.

Q   Premium seating.  Let's go down to the next paragraph, please.  Suites.  NBA average for suites is 81?

A   I would have to trust you on that, yes.

Q   You have no reason to disagree?

A   No, sir.

Q   KeyArena has about half of that, 48?

219

A    With the creation of the new clubs I think it might be 48, yes.

Q    Let's go to the next page, please, Page 36, top paragraph, club seats, in the middle.  KeyArena has 136 club seats; is that accurate?

A    No, sir.  I don't know what that alludes to.

Q    Do you understand the average for club seats is not 136 but in NBA arenas the average is 1,748?

A    Sir, to the best of my knowledge when this building was constructed and we opened it we had 1,100 club seats.  It was the fact that the club seat program over the course of time was not that successful, and so the concept of club seats was changed and they were sold to season ticket holders.

Q    So the number of club seats was reduced significantly from what it originally was, true?

A    The seats existed, sir.  The way they were sold was changed.

Q    And the amenities that go with them?

A    They still had access to the same amenities.  There are clubs that are by the club seats now service the people -- the season ticket holders who bought those seats.  So the seats didn't go away, they are still there.

Q    I understand the seats are still there.  The amenities that go with them have changed?

A    No, sir, they have not.

Q    Very well.   Do you know Mr. Danny Barth?

A    Yes, I do, sir.

Q    Would you think him to be knowledgeable about club seats and the amenities?

A    Certainly, sir, especially from the financial aspect.

Q    Yes.   And is he the president of the business side of the Sonics?

A    And previously was the CFO.

Q    And you worked with him closely?

A    Yes, sir.

Q    The third paragraph down, please.   It starts, In total. Premium seating revenues for KeyArena, 3.385, average for the NBA is 16.9 million.   IN order of magnitude, do those numbers look right to you?

A    I would have to trust them, sir.   I have no data that tells me otherwise.

Q    KeyArena's best year ever for premium seating was 10 million, 10.5?   Would you disagree with that?

A    I wouldn't disagree with that.

Q    So in its best year it missed the average by $7 million?

A    If that is the data that is being presented, yes.   I have not studied this and have no background to argue otherwise.

Q    KeyArena total has about 1,300 square feet of restaurant space?

A    I don't know the exact number, sir.

Q   Based on your tours of other arenas would you agree that most other NBA arenas have an average of 8,000 to 10,000 square feet of restaurant space?

A   Sir, what I would say is that the newer arenas have larger restaurant space than KeyArena does.

Q   And that is important because it helps generate revenue for the facility?

A   Yes, sir, and for the team.

Q   And the idea is that you want to have a fan not only buying a ticket but instead of going to a restaurant they come to the facility and eat their dinner there, and then go to the game, right?

A   That is the concept, sir.  If you might go back one question.  When you say the revenue comes to the facility for Sonics games, all catering and concessions revenues go 100 percent to the team.

Q   Correct.  And that's how they make money?

A   Yes, sir.

Q   Let me ask you a question.  Let's go to Exhibit 45 at Page 29.

        THE COURT:  I'm sorry, Mr. Taylor, again --

        MR. TAYLOR:  Exhibit 45, Page 29.

By Mr. Taylor:

Q   Let's take a look at paragraph B.

A   Yes, sir.

Q    Ever since KeyArena was opened the City every year has been setting aside money to fund capital improvements, right?

A    That's correct, sir.

Q    And the improvements you talked about yesterday that the City paid for, those came out of the reserve fund, right?

A    A good portion of them, sir.  And then we added some half a million or three-quarters of a million, I don't recall, from other funds.

Q    I did the math.  You were supposed to set aside $225,000 a year, right?

A    Yes, sir.

Q    And that has been escalating at four percent a year ever since 1995?

A    Yes, sir.

Q    I did the math last night.  So in 2004 you would have set aside $320,000?

A    I assume so, if that was the escalation.

Q    All right.  And since 2004 all together there should be $1.75 million in that reserve account?

A    Here is where I am a little bit confused, sir.  And I will be very honest about it.  I thought at some point in the lease this number had gone up to -- I was recalling a $600,000 number.  I am unclear about the 225, it is not ringing a bell.

Q    So it should be even more to your recollection?

A    It would have been even more to reach that level of expenditure that we made.

Q    That was as of 2003.  I am talking 2004 forward, the money that hasn't been spent yet.

A    Okay.  Thank you for that clarification.

Q    What account is that in?

A    It is supposed to be in a separate account.  I don't know what the name is.

Q    I understand it is supposed to be in a separate account. It is sitting there, though, right, this 1.75 million?

A    That is my assumption.  I am not directly in charge of the finances.

Q    And if the Sonics leave that 1.75 million is then freed up for other purposes, true?

A    I can't make a legal answer to that.  I would assume so as a lay person.

Q    I want to change gears on you now and I want it talk to you about the lease.  Have you ever heard the phrase turnkey lease?

A    No, sir, I have not.

Q    Are you familiar with the phrase turnkey at all in a business context?

A    Not really, sir.

Q    Is this a situation, this lease, where the City simply gave us the keys to the building and we gave you the money

and said, see you in 15 years?

A   I am not really tracking where you are going with this.
No.   On the face of it, no, because it is a collaborative
partnership that goes on for 15 years.

Q   Can we have Exhibit 600, please?

MR. TAYLOR:   Your Honor, we move the admission of
Exhibit 600.

MR. NARVER:   No objection, your Honor.

THE COURT:   600 will be admitted.

(Exhibit No. 600 admitted.)

By Mr. Taylor:

Q   Exhibit 600 is a more completed copy of the lease.   Take a
look, please, at Page 60 of Tab 1.

Now, in addition to the lease itself we have various
exhibits to the lease.   And if we drop down to Exhibit H --

A   Yes, sir, I see that.

Q   So we have the lease, and then we have what is called a
food and beverage service agreement.   And then Exhibit I is a
novelties and concession agreement.   What are those?

A   The food and beverage service agreement was a pursuant
document to the premises use and occupancy agreement, which
basically culled out -- providing the Sonics with the
exclusive right to be the caterer/concessionaire for the
building, and culled out how the operations would be handled,
how the revenues would be divided, and also specifically

culled out that the City would receive no percentage of catering revenues in return for the Sonics operating and marketing the suite level.

Q    Take a look at Tab 5, please.

A    I don't have tabs, sir.  If would you give me a page number?

Q    There should be a color sheet separating it.  The color sheets have the tab numbers.

A    Yes, sir.

Q    And this is the -- we will call it the concession agreement?

A    Yes, sir.  The food and beverage/novelties agreement.

Q    And it runs for some 15 odd pages?

A    It would appear so, sir.

Q    So, in addition to those two agreements then, in terms of the relationship between the parties, if you look at Tab 2 --

A    Going back in this?

Q    Yes, going back.

        MR. NARVER:  Paul, can you give a Bates number?

        MR. TAYLOR:  PBC 0275.

        THE WITNESS:  Yes, sir.

By Mr. Taylor:

Q    There we have the first amendment to the lease?

A    Yes, sir.

Q    And then there were two subsequent amendments to the

lease?

A    To the best of my recollection, yes, sir.

Q    Just so we understand the governing document, we have the original lease, three amendments to the lease, the concession agreement, and then an amendment to the concessions agreement?

A    I am not recalling an amendment to the concessions agreement.  I will assume that is the case.

Q    Let me ask you something.  Have you ever seen a lease, for example, between a mall -- I'm sorry, between a shopping center and a restaurant within that shopping center?

A    No, sir, I have not.

Q    Let's take a look at some of the provisions of this lease. For example, at Page 33 of Tab 1.

THE COURT:   How about a Bates number, please?

MR. TAYLOR:   PBC 0237.

THE WITNESS:   Yes, sir.

By Mr. Taylor:

Q    So just like in a shopping center, the landlord controls the signage, if you look at paragraph C?

A    Yes, sir.

Q    And from time to time this has been an issue between the Sonics and the City?  I am not saying anybody yelled at each other or that people were called names, but there have been disagreements under this lease about signage?

A   May I go back one question?

Q   Please.

A   You said that the advertising rights went to the landlord in your previous questions.  In this the advertising rights -- exclusively advertising rights are going to the Sonics.

Q   I think my question may have been unclear.  What I meant to ask is whether the advertising rights are controlled by the landlord?

A   I don't really know how to answer that.  One would assume they were controlled by the landlord, and as part of a bargain were provided as an exclusive right to the tenant.

Q   Well, for example, if you look at paragraph C-1 the lease dictates various aspects of the advertising, true?

A   Yes, sir.  That was for aesthetic reasons, yes.

Q   And there have been disagreements between the Sonics and the City over time about these advertising rights, haven't there?

A   I can't attest to that, sir.

Q   Do you remember any issues regarding the Lexus signage?

A   Vaguely, sir.

Q   And there was Lexus signage, if you will, in the building that the City said was potentially visible from outside the building, and the City said it had to come down?

A   I recall the issue vaguely.  I don't recall the signage being installed and having to be brought down.  If would you

allow me, the purpose of this paragraph was we wanted all signage in the building to be contained within it and not for the building to look like a billboard.

Q    Let me ask you a question about that.   This is not the first lawsuit over this bundle of leases, is it?

A    You will have to refresh my memory, sir.

Q    Do you remember the so-called practice facility sign?

A    I don't remember there being a lawsuit about it.

Q    Do you remember that the City said it is okay to have a picture of the player on the side of the building, but because he was holding a Cellular One telephone the City -- the Sonics were breaking the lease.   Does that ring any bells?

A    No, sir, it doesn't.

Q    And the City sued.   Do you remember that lawsuit?

A    No, sir, I don't recall that.

Q    Let's talk more about the restaurant type component of this.   Exhibit 600, Tab 5, Page 19.

          THE COURT:   How about a Bates number, please.

          MR. TAYLOR:   PBC 0344.

By Mr. Taylor:

Q    Tab 5, 19?

A    Yes, sir.

Q    In opening statement yesterday plaintiff's counsel suggested there were no operational or operating clauses in

this lease.  Let's talk about this for a second.  Sonics, middle paragraph, K-1, the Sonics were the concessionaire under this lease?

A    Yes, sir.

Q    They have to get the landlord's approval for every piece -- every different kind of food they want to sell, right?

A    Yes, sir.

Q    And they even have to get your approval for the prices?

A    Yes, sir.

Q    And if they change the price after they have agreed on a price they have to come back to the landlord?

A    I recall there being some sort of approval -- some sort of process whereby they could increase it by X percent during the season without needing further approval.

Q    Other than that exception, by and large if they wanted to do something they had to get your approval food wise?

A    Yes, sir.  The point of all this was to have a relationship where we were providing the highest quality product to the public and making sure that we didn't get into the realm of any price gouging and that we were competitive with other facilities in the geographic region.  We did the same thing with tickets, where if you came to us and bought tickets at our facility we charged no service fee whatsoever. It was a deliberate action.

Q   So you were trying to essentially regulate the quality and the pricing of the food sold --

A   To be competitive in the marketplace and fair to the citizens, yes.

Q   And even that has given rise to disputes from time to time between you and the Sonics?  I am not saying anybody was yelling but there have been legitimate disagreements?

A   There have been disagreements in terms of when I was KeyArena manager.  It was the concession prices and the concession portions that were subject to my approval, ultimately the director's approval.  And if I saw an item that we were selling for 75¢ or a dollar more than our competitors down the road I asked questions as to why is that.  Frequently I would be told it is because of the portion size, it is because of the quality of the ingredients or it is the brand of the ingredient and we would agree to it.  I wouldn't characterize it as a huge disagreement.  It is part of doing business and part of doing due diligence on this.

Q   Is it fair to say there was a fair amount of interaction on the food related issues and beverages and sizes and portions and that kind of thing?

A   I would say, sir, once a year the concessionaire will provide what they are proposing.  There may be three or four questions or there may be none.

Q   You have been able to work them out for the most part?

A   Yes, sir.

Q   Let me change gears on you.  One of the things the Sonics do is market the suites?

A   Yes, sir.

Q   And there have been recent disagreements over suite marketing issues, have there not?

A   Not that I am aware of personally, no.

Q   Well, for example, the Sonics have been approached by customers who wanted to lease suites but said they wanted an out clause if the Sonics leave.  Do you remember that issue coming up?

A   No, I don't, sir.

Q   Who would have handled that issue in your office?

A   In our office directly it would have been a woman by the flame ever Margaret Wetter, who controls the suite business. But I don't recall such an issue personally.

Q   On the issue of suites for the next two years, the City gets 60 percent of suite revenue, right?

A   Yes, sir.

Q   On court side seats the Sonics get 100 percent of the revenue?

A   Yes, sir.

Q   And if you add up four court side seats that comes out to be an approximate cost of a suite, 100, $125,000?

A   I would assume that is correct, yes.

Q   Would you agree for the next two years the Sonics have more incentives to sell court side seats than they do suites?

A   That would be one way of looking at it, but that would have been the same all along.

Q   Well, typically haven't you sold or offered three-year suite leases?

A   If I recall the last time I was involved in it there were three, five and seven, but I think it has changed since then.

Q   And, in fact, no one wants to buy a three-year lease right now because no one wants to sign a three-year lease because no one knows whether the Sonics are going to be there?

A   I can't speak to that, sir.

Q   Or a five-year lease?

A   I can't speak to that, sir.

MR. TAYLOR:  Thank you, Mr. Singh.

THE COURT:  Any redirect.

MR. NARVER:  Very briefly, your Honor.

REDIRECT EXAMINATION

BY MR. NARVER:

Q   Mr. Singh, Mr. Taylor asked you about the FSN lounge and The Family Lounge and noted that the Sonics paid for the cost of constructing those; is that right?

A   Yes, sir.

Q   Did the City give up anything as part of the arrangement

to make those?

A   The City gave up a lot of space that was the City's exclusive space for the FSN lounge, which I alluded to yesterday that was space that was pretty important to us operationally to be able to turn the building over from one use to the other, as well as provide catering for travelling shows.

Q   Was the City and the Sonics able to work together to come to that arrangement where there is money on one side and giving up space on the other?

A   Absolutely, sir.  And also there was flexibility on both sides, in terms of Sonics giving up a little bit of their exclusive space to help with some of this operational related concerns.

Q   And at least in the case of The Family Lounge, that is all a relationship that occurred after PBC had acquired the team?

A   Yes, sir.

Q   Mr. Taylor asked you some questions about the square footage of KeyArena, the size of the concession spaces.  Has any of that changed in any way since 2006 when PBC bought the team?

A   No, sir.

Q   Have any loading docks been eliminated since PBC bought the team?

A   No, sir.

MR. NARVER:  I have nothing further.

THE COURT:  Anything further?

MR. TAYLOR:  No, your Honor.  Thank you.

THE COURT:  Thank you.  You may step down.

THE WITNESS:  Thank you, your Honor.

MR. LAWRENCE:  The City will call Clayton Ike Bennett, please.

Whereupon,

CLAYTON BENNETT

Called as a witness, having been first duly sworn, was examined and testified as follows:

THE CLERK:  Please state your full name for the record, spelling your first and last name.

THE WITNESS:  Clayton Bennett, C-L-A-Y-T-O-N B-E-N-N-E-T-T.

CLAYTON BENNETT

The witness, testified as follows:

DIRECT EXAMINATION

BY MR. LAWRENCE:

Q   Mr. Bennett, good morning.  How are you sir?

A   Good.  Thank you.

Q   You were you born and raised in Oklahoma City, correct?

A   I was.

Q   And you are active in the Oklahoma City community, correct?

A   Yes, sir.

Q   And do you aspire to be a civic leader in the community?

A   I hope so.

Q   And you have been inducted into the Oklahoma Hall of Fame; is that right?

A   I have, sir.

Q   And I understand that you have married into one of the wealthiest families in the state, is that right, the Gaylord family?

A   A prominent family, yes, sir.

Q   And wealthy family, correct?

A   Yes, sir.

MR. KELLER:   I will object to the relevance.   403 as well.

MR. LAWRENCE:   Your Honor, the relevance is whether or not Mr. Bennett has the financial resources to withstand the losses in this case and whether or not he is a sophisticated investor, in terms of the scope of the investments that he and his wife have engaged in over the course of years.

THE COURT:   Well, why don't we ask Mr. Bennett about his resources and let's leave his family out of it?  I have no idea what the community property laws are in Oklahoma.   I don't know whether his wife's family is at all interested in basketball.   Let's stick with Mr. Bennett.

BY MR. LAWRENCE:

Q   On that line of questions, the Gaylord family has an interest in basketball having owned the San Antonio Spurs, correct?

A   A piece of the team.  Did not own the entire team.

Q   In fact, you were the alternative Board of Governors representative for the San Antonio Spurs during the period of that ownership, correct?

A   Yes, sir.

Q   Now, since 1988 your sole employment has been with an entity called Dorchester Capital, correct?

A   That's correct.

Q   And Dorchester Capital is an investment platform for you and your wife; is that fair?

A   That is correct.

Q   And with respect to Dorchester Capital, you have invested in a variety of different types of investments, including real estate, correct?

A   Yes, sir.

Q   Securities?

A   Yes, sir.

Q   Some venture capital?

A   Yes, sir.

Q   Managed accounts?

A   Yes, sir.

Q    Equities and bonds?

A    Yes, sir.

Q    You have invested in limited partnerships?

A    Yes, sir.

Q    And in operating companies?

A    Yes, sir.

Q    And do you agree, sir, that you are a sophisticated investor?

A    I believe I am a reasonably sophisticated investor, yes.

Q    You want to qualify that.  So I would like to know, sir, what is the total value of the investments of Dorchester Capital?

        MR. KELLER:  Your Honor, I will object under 402 and 403.  PBC is a distinct entity.  The personal resources of Mr. Bennett, whatever probative value they would have is outweighed by the other considerations of 403.

        THE COURT:  Sustained.

BY MR. LAWRENCE:

Q    Mr. Bennett, are you a sophisticated investor in the various entities, types of investments that you have described?

A    Sir, I would say I am reasonably sophisticated.  I am not a financial expert, I am not a tax expert, but I am a reasonably sophisticated and experienced investor.

Q    You invest a lot of money, you know how to do due

diligence, correct, sir?

A    Yes, sir.

Q    And would you agree that whatever losses are anticipated to being incurred over the last two years of the lease with the City of Seattle for KeyArena that those losses would not cause you an undue burden?  Is that fair?

A    They are significant and ever growing, but they would not significantly alter our lifestyle.

Q    Could we play CB 102, please?

THE COURT:   What do you mean by CB 102?

MR. LAWRENCE:   It is a reference to the deposition of Mr. -- it is for the purposes of --  I will be calling out numbers like that.   They reference the deposition excerpts from Mr. Bennett's deposition.

THE COURT:   Have you filed Mr. Bennett's deposition?

MR. LAWRENCE:   I will move to publish Mr. Bennett's deposition at this point, your Honor.

THE COURT:   When you say "CB 102," does that refer to Page 102?

MR. LAWRENCE:   It refers to Page 29, Lines 24 through Page 30 Line 9.   And I will give those and the page numbers in the future, your Honor.

(Audio played.)

BY MR. LAWRENCE:

Q    I would like to turn to the time period that led up to

your purchase of the Sonics basketball team.  Prior to that you made efforts to purchase the Hornets franchise, correct?

A    Yes, sir.

Q    And that was a team located in New Orleans but had moved to Oklahoma City following Hurricane Katrina, correct?

A    The team temporarily relocated to Oklahoma City following the hurricane, yes, sir.

Q    And you and a number of other citizens in Oklahoma City tried to purchase the team, but that fell through, correct?

A    Well, we had discussions with Mr. Shin, the owner of the team, and hoped to invest in the team and acquire the team ultimately, but that was not successful.

Q    The deal fell through because Mr. Shin refused to give you an option at an undetermined point to gain majority ownership of that team; is that fair?

A    He wished to retain the team.

Q    Is that fair?

A    He wished to retain the team.  Negotiations broke down.

Q    Because he did not want to agree to your request to give you an option to buy the majority ownership in the team at some future point, correct, sir?

A    Correct.

Q    Thank you.  And I know that sometimes it is hard, but for the record you need to wait until I finish my question before you answer.  Is that fair?

A    Yes, sir.

Q    Thank you.    And following that transaction falling through you heard about the fact that the Sonics were for sale, correct?

A    Yes.

Q    And you put together a team to approach Howard Schultz and the Sonics, right?

A    Well, the opportunity was brought to me by another individual about the time that the Hornets negotiations had come to an end.

Q    That is Mr. Ed Evans?

A    That's correct.

Q    And with Mr. Evans you approached Mr. Schultz' group through Goldman Sachs to purchase the Sonics?

A    To investigate the opportunity and review the opportunity and determine if we had an entry into the team.

Q    Now, and indeed at the end of the day, you ended up purchasing the team, correct?

A    That's correct.

Q    And through an entity called PBC, Professional Basketball Club?

A    Yes, sir.

Q    And the principal owners are yourself?

A    Yes.

Q    Aubrey McClendon?

A    Yes.

Q    And have you known Mr. McClendon for a while, correct?

A    I have.

Q    Could you describe what the business interests of Mr. McClendon are?

A    Mr. McClendon is the chairman and chief executive officer, in fact cofounder, of Chesapeake Energy Corporation.

Q    And that is one of the largest natural gas companies in the country?

A    Yes, sir.

Q    And another investor was Tom Ward?

A    Tom Ward.  Tom was a cofounder of Chesapeake Energy with Mr. McClendon, and he now is the chairman and CEO of Sandridge Energy Corporation.

Q    Also a natural gas company?

A    Oil/gas, yes.

Q    And then a man named Jeffrey Records?

A    Yes.

Q    Tell me what Mr. Records' business is?

A    Jeff is the chairman and CEO of MidFirst Bank.  And they are a significant financial institution in Oklahoma.

Q    So you are all successful businessmen, correct?

A    Yes, sir.

Q    And you are some of the wealthiest people in Oklahoma City, correct?

MR. KELLER:  Objection, your Honor.  402 and 403.

THE COURT:  Sustained.

MR. LAWRENCE:  Your Honor, these are the people who are the owners of PBC, and their sophistication and wealth bears on their ability to sustain the losses, and also bears on their sophistication with respect to entering into the lease and assumption of the lease in this case.

I was just trying to make argument.  You are looking at me that you are sustaining the objection.

BY MR. LAWRENCE:

Q   So you are all successful businessmen, correct?

A   Relatively so.

Q   And as far as you know you all invest in various entities, you invest in things in addition to the business, correct? You are investors as well?

A   Yes, sir.

Q   Now, one of the things that you relied upon with respect to the investment in the Sonics was the Goldman Sachs report?

A   Yes.

Q   And, in fact, that was what you relied primarily on in terms of coming to an agreement in July with the Howard Schultz group?

A   The research of that document and conversations with the seller, yes.

Q   Could we have trial Exhibit 23, please?  Trial Exhibit 23

is a page from the Goldman Sachs report.  Do you see that?

A   Yes, sir.

MR. KELLER:  Your Honor, I don't think this exhibit has been admitted.

MR. LAWRENCE:  I was just going to move it.  Could we move the admission of 23.

MR. KELLER:  I think in light of this morning's ruling I will object on hearsay.

MR. LAWRENCE:  The purpose is what his understanding was at the time of the purchase.  It is not for the truth of what Goldman Sachs is saying.  He relied on it to do his due diligence.  This is the information he had that informed his purchase of the Sonics.  And what he knew at the time of the purchase is relevant to what hardships he is claiming now.

THE COURT:  So you are not offering it for the truth of the matter?

MR. LAWRENCE:  No, I am offering it for Mr. Bennett's state of mind for the time he purchased the Sonics.

THE COURT:  The objection is overruled.  23 will be admitted.

(Exhibit No. 23 admitted.)

BY MR. LAWRENCE:

Q   Okay.  Directing your attention to Exhibit 23.  This is a page from the Goldman Sachs report, correct?

A   Yes, sir.

Q    And one of the things that the Goldman Sachs report did was talk to you about the opportunities available to you as a potential owner of an NBA team, correct?

A    Correct.

Q    And one of the elements that Goldman Sachs talked about is the scarcity value of teams, correct?

A    Correct.

Q    And that is a rare opportunity, to become part of the NBA; is that right?

A    Yes.

Q    And you would agree with that, that the opportunity to become an NBA owner is a rare opportunity?

A    Yes.

Q    And membership it says is a highly exclusive club.  You would agree with that also, would you not?

A    I didn't view it as a membership of a highly exclusive club but as an opportunity to invest in a rare asset.

Q    And there are only 30 teams in the nation that are NBA franchises, correct?

A    That's correct.

Q    And they don't -- Do you know when the last time the NBA expanded was, did an expansion?

A    I don't know the date precisely.

Q    Do you know whether the NBA has any expansion plans in the next year?

A    I don't.

Q    You are on the Board of Governors, right?

A    Yes.

Q    That is a subject discussed at the Board of Governors, is it not?

A    To some extent but not at great detail at this point.

Q    Are there any proposals before the Board for expansion at this time?

A    No.

Q    The next point that is raised by Goldman Sachs is strong franchise value appreciation.  Do you see that?

A    Yes.

Q    Are you aware that with respect to professional sports franchises, in order to get a reasonable return on investment that ultimately a lot of that return is going to be found in the increased value of the franchise over time?

A    Franchises do increase in value.

Q    So you are aware of appreciation and the value of franchises, correct?

A    Yes.

Q    And that is a typical way that an owner gets return on their investment?

A    I would wouldn't say "typical."  There are many long time owners and there is other owners that do make operational profits.

Q   Well, in the NBA there has never been a transaction, that is the sale of the team, that is less than the previous transaction; is that your understanding?

A   That is my understanding.

Q   Could we move to Exhibit 21, please?

MR. LAWRENCE:  I will move for the admission of Exhibit 21, again, not for the truth, for state of mind.

MR. KELLER:  I have the same objection, your Honor. I don't think these really are being used for state of mind. These things could be established through the witness directly.  I think we are just using the exhibits somewhat inappropriately here.  It also appears to be incomplete.

MR. LAWRENCE:  Exhibit 21 is another page from the Goldman Sachs report that Mr. Bennett relied upon in doing his due diligence with respect to the Sonics.

THE COURT:  Well, let's talk about what you need these reports for.  What are you trying to do with them?  Are you trying to ask Mr. Bennett why he bought the team, what he relied upon?

MR. LAWRENCE:  I am trying to establish his understanding -- with these two documents we are trying to establish the understanding of the types of benefits that were available to NBA owners that may have influenced his purchase of the team.

THE COURT:  So why don't you ask him that?

BY MR. LAWRENCE:

Q   Were you aware that there are substantial tax benefits that may be associated with the ownership of an NBA team?

A   We were generally aware, but we didn't do a lot of drill down on that assessment.

Q   But you were aware of the tax benefits were one of the benefits of owning an NBA team, correct?

A   Yes.

Q   I would like to go through a series of questions to make sure we understand what you knew at the time in July when you came to an agreement with the Howard Schultz group for the purchase of the Sonics.  You understood that the Sonics were losing money on an annual basis at the time of your purchase; is that fair?

A   That is fair.

Q   And you had a general understanding of the amount of the money that the Sonics were losing; is that right?

A   At that time.  It is certainly ever growing.

Q   You had a general understanding of the amount of money they were losing at the time you purchased the team?

A   We did.

Q   And you were given information -- you were made available information about those operating losses in the years preceding the proposed sale; is that correct?

A   Yes.

Q    And did you understand it was likely that those operating losses would continue into the future until there was a new arena?

A    Until there was a new arena development.  Not until a new building was built but until we had a plan in place for a new building.

Q    Did you understand that it was likely that operating losses would continue into the future until there was a new arena?

A    Yes.

Q    And did you understand the possibility that you would not be successful in obtaining a new arena?

A    I didn't understand it well enough.

Q    Could we have CB 106, please?

        THE COURT:  Just a moment.  Could I have the court reporter, please, for just a moment?

                    (Pause in the proceedings)

BY MR. LAWRENCE:

Q    CB 106 is from Mr. Bennett's deposition, Page 96, Lines 5 through 14.  Could you play that please?

                            (Audio played)

BY MR. LAWRENCE:

Q    And did you understand that there was an existing lease with KeyArena that ran through the 2009/2010 season at the time you purchased the Sonics?

A   Yes, sir.

Q   And you were aware that that lease had been characterized as the most unfavorable lease in the league?

A   Yes.

Q   And you understood that as long as the Sonics were playing at KeyArena under the lease the Sonics would lose money?

A   No, we thought perhaps we could turn that around in the last year if in fact we had an arena development in process.

Q   I will play CB 107, which is from your deposition, Page 98, Lines 8 through 19.

(Audio played)

BY MR. LAWRENCE:

Q   Now, your attorney has made a couple of arguments related to the impact of Safeco Field --

MR. KELLER:   Your Honor, I will object to the form of the question.  I don't think it is appropriate to confront the witness with arguments of counsel and then ask him to comment on it as opposed to eliciting facts.

MR. LAWRENCE:   I will rephrase the question.

BY MR. LAWRENCE:

Q   There has been an issue raised about Safeco Field and the impact of KeyArena.  Do you remember that?

A   Yes.

Q   Now, you were aware that Safeco Field was open and competing for the same sports dollars as KeyArena when you

purchased the Sonics, correct?

A    That's correct.

Q    And you were aware that it has been raised in this case that Qwest Field was competing for the same sports dollars as KeyArena, and that has had an impact on the financial success of the Sonics?

A    That's correct.

Q    And you were aware at the time you purchased the Sonics that Qwest Field was open and competing for the same sports dollars as KeyArena, correct?

A    Correct.

Q    Could we show trial Exhibit 500, the cover page, please? Now, you were in the courtroom when there was questioning of Mayor Nickels about the KeyArena subcommittee report, Exhibit 500, correct?

A    Yes.

Q    And that's a report dated February 15th, 2006, correct?

A    Yes.

Q    And that is before you purchased the Sonics, correct?

A    It is.  I am not sure when I first saw this report, though.

Q    That wasn't my question.  My question was, was this report issued before you purchased the Sonics?

A    Yes, sir.

Q    In fact, you didn't purchase the Sonics until July

of 2006, correct?

A   That's correct.

Q   This is a public document.  Did you do due diligence to see what public documents were available within the City of Seattle regarding the performance of KeyArena?

A   We did to some extent.  I just don't recall when I received this document in the process.

Q   So this document was out there, you did due diligence, you just can't recall whether or not you reviewed this particular document; is that correct?

A   That's correct.

Q   It was information that was available to you?

A   If in fact it was, yes.

Q   Exhibit 516, please.  Cover page.  Exhibit 516 is the mayor's task force, the accumulated debt.  Do you remember Mayor Nickels being asked about this document?

A   Yes, sir.

Q   And this was a document that was available.  Do you recall whether or not you reviewed this document?

A   I don't recall, no.

Q   Exhibit 529, please.  The report by the mayor's task force for Seattle Center sustainability.  Do you remember that document?

A   Yes.

Q   And that document is dated May 2006, correct?

A    Correct.

Q    And that is another document that Mr. Keller asked Mayor Nickels about.  Do you recall that?

A    Yes.

Q    This was another document that was available at the time you purchased the Sonics.  Do you recall whether or not you reviewed this document as part of your due diligence?

A    I don't recall.

Q    Did you do due diligence to look at the publicly available information about the status of KeyArena and the profitability of KeyArena and the alleged problems and inadequacies with KeyArena?

A    Primarily through the Goldman Sachs report and discussions with the seller.

Q    You had a team of lawyers assisting you with the purchase, correct?

A    Yes.

Q    And you could look at any public documents that were available about KeyArena at the time of the purchase, fair?

A    Fair.

MR. LAWRENCE:  I would like to move for the admission of trial Exhibit 75.

MR. KELLER:  No objection, your Honor.

THE COURT:  I now have it.  Exhibit 75.  No objection to 75.  It will be admitted.

(Exhibit No. 75 admitted.)

BY MR. LAWRENCE:

Q   Now, Mr. Bennett, this is a memorandum to potential investors in PBC, correct?

A   That's correct.

Q   It is from you, correct?

A   Yes, sir.

Q   And it is dated September of 2006, correct?

A   That's correct.

Q   And the purpose of this memorandum was to give information to the investors of PBC about their investing in PBC, the risks, etcetera, associated with that investment, correct?

A   That's correct.

Q   If we look at the next page of that document, there is a section entitled, risk factors, securities law disclosures, correct?

A   I see that, yes.

        THE COURT:   Can we have the Bates number, please.

        MR. LAWRENCE:   Sorry.   That is PBC 10653.

BY MR. LAWRENCE:

Q   Now, the second list factor there is entitled, expected operating losses, mandatory capital calls, correct?

A   That's correct.

Q   And it states, The company expects to incur operating losses for the foreseeable future, correct?

A   Yes.

Q   And so you were telling potential PBC investors that if they invest money in PBC they are going to incur operating losses at least for the foreseeable future, correct?

A   That's right.

Q   And you also told them that they may need to make capital calls to cover those losses, correct?

A   That's correct.

Q   And a capital call is an additional investment over and beyond the purchase price of the team, correct?

A   Yes, sir.

Q   If we could turn to the next page, 10653?

        THE COURT:   We were on that page.

BY MR. LAWRENCE:

Q   I'm sorry.   10654.   There is a section called, arena negotiations.   Do you see that?

A   I do.

Q   In that section it acknowledges that the Sonics and the Storm play in Seattle's KeyArena under arrangements with the City.   Do you see that?

A   Yes, sir.

Q   And it says, The company will assume such lease arrangements in connection with the acquisition of the Sonics.   Do you see that?

A   Yes, sir.

Q    And it acknowledges that under the lease arrangements PBC will be required to share certain revenue with the City.  Do you see that?

A    Yes.

Q    And then you indicate that there is a proposed business plan that contemplates either a need to renegotiate such lease agreements or locate an alternative playing site in order to reach profitability.  Do you see that?

A    I do.

Q    And that reflects as long as you are playing under the KeyArena lease, as it was written at the time of the purchase, you were going to continue to lose money, correct?

A    Well, the context was relative to the new development, the new building.

Q    Right.  You either needed to renegotiate the lease --  Do you see that?

A    Yes.

Q    Or locate an alternate playing site in order to reach profitability?

A    Correct.

Q    And it says, There can be no assurance the City will agree to any proposed revisions to the lease agreements.  Do you see that?

A    I do.

Q    So it was a known risk that was being disclosed to the

investors that you may invest in the team that is going to be playing at KeyArena under the existing lease until its lease term, correct?

A   Yes, sir.

Q   And further, there can be no assurance that the company will be able to locate a suitable alternative playing site. Do you see that?

A   I do.

Q   And that is saying, look, we may not be able to have an alternative playing site and may have to play under this lease, correct?

A   Yes.

Q   If you could turn now to Page 10684 of the same document?

A   84?

Q   84.   This page shows the statement of operations for the prior ownership for the years ending 2005 and 2004, correct?

A   Correct.

Q   This is showing the level of loss from operations for those two years, correct?

A   Correct.

Q   And this is information that was being disclosed to investors to inform their investment in PBC, correct?

A   That's right.

Q   And it shows for the 2004 season a loss from operations of $20,900,000, correct?

A   Yes, sir.

Q   And a net loss of $23,820,000, correct?

A   That's correct.

Q   That was information that was known to you at the time you decided to invest in the Sonics, correct?

A   That's correct.

Q   And for 2005 it shows a loss from operations of over $27 million, correct?

A   Yes.

Q   And a net loss of over $29 million.  Do you see that?

A   I do.

Q   And that information -- that level of loss was known to the investors at the time they invested in the PBC to purchase the Sonics, correct?

A   Yes, sir.

Q   So looking at the information that you knew and the risks that you were telling the investors about, is it fair to say that at the time that you purchased the Sonics you understood that you were facing -- you were purchasing a team that had over 20 some odd million dollars of losses for the preceding two years, correct?

A   Correct.

Q   It was playing under a lease that ran through 2009/2010, correct?

A   Yes.

Q   That you might not be able to renegotiate the terms of that lease, correct?

A   That is probably where we went a separate way.  We thought we would develop a new building.

Q   You understood it was a risk, and I will go back if you want to look at the language in the risk factors, that there was a risk that you would not be able to get an alternative arrangement -- sorry, renegotiate the lease terms with the City, correct?

A   It was a risk, yes.

Q   And even if you got a new building that doesn't mean you could just walk out on the lease, you would still have to work with the City to renegotiate that lease or play out through the end of the term of that lease, correct?

A   Clearly, yes.

Q   And, in fact, if you got a new building in the Seattle area or the greater King County area, that wasn't going to be built and completed and ready for occupancy until after the Seattle Center lease ran out; is that fair?

A   That was our expectation to negotiate with the City and provide a seamless transition to a new building.

Q   But, sir, it is fair you understood even if you got a new building in King County you would be playing in KeyArena through the end of the 2009/2010 season while that new building was being constructed?

A   In all likelihood, yes.

Q   And you planned and hoped to enter into a lease negotiation with the City, but there was no assurance that the City would renegotiate their lease; is that fair?

A   No assurance, but we assumed they would act in the best interest of the region in we were able to effect the development of a new building.

Q   But you told your investors there was no insurance that you would be able to renegotiate the lease, correct, sir?

A   Yes, sir.

Q   Thank you.  Could we have Trial Exhibit --

MR. LAWRENCE:  We move for the admission of Trial Exhibit 310.

MR. KELLER:  No objection, your Honor.

MR. LAWRENCE:  Your Honor, for purposes of the record, although this is stamped "attorneys only material," we have discussed this with PBC and they are, I guess, releasing that designation.

THE COURT:  310 was not one of the once you identified as being used previously; is that correct?

MR. LAWRENCE:  Well, we didn't identify any documents with respect to Mr. Bennett because he is an adverse witness. Maybe I am not understanding your question.

THE COURT:  I am just trying to find where the document is.  I pulled the documents that you told me were to

be used.  It doesn't appear to be in there.

MR. LAWRENCE:  I'm sorry.  That was added yesterday. I'm sorry.  I apologize.  I misunderstood what you were asking.

THE COURT:  And it is 310.

MR. LAWRENCE:  And specifically -- the page is the exhibit.

(Exhibit No. 310 admitted.)

BY MR. LAWRENCE:

Q   As part of the transaction to purchase the Sonics that transaction had to be approved by the NBA, correct?

A   That's correct.

Q   And you had to submit certain materials to the NBA in seeking approval of the sale to you, correct?

A   Yes, sir.

Q   And among the information you had to submit was information about the financial resources of the owners of PBC, correct?

A   Yes.

Q   And the NBA had to sign off on whether or not you had sufficient financial resources to own an NBA team and absorb any anticipated losses, correct?

A   That's correct.

Q   And you also had to do financial projections about the losses associated with the team in the future, correct?

A    Yes.

Q    And the NBA evaluated what you submitted, correct?

A    That's right.

Q    And they wrote back to you --  If we could look at the fourth paragraph.  With respect to those forecasts, the NBA says, starting with the second sentence, As we spell out in this report we also have concerns whether the operating losses can be kept within the projected levels.  Do you see that?

A    I do.

Q    As a result we believe the team will need as much as $28 million of additional equity or debt capacity prior to the expiration of the KeyArena lease in 2010, correct?

A    Yes.

Q    And that is in addition to a level of additional equity or debt capacity that you told the NBA you would need, correct?

A    I am not sure about that.

Q    And it says, On top of that it will require additional equity or debt capacity if efforts to secure a new arena in Seattle are unsuccessful.  Do you see that?

A    Yes.

Q    And it further warns, If the financial model is a risk to a greater degree than the concerns we note as to the report as a result of the team playing one or more seasons in a lame duck status.  Do you see that?

A   Yes.

Q   So the NBA was warning when you purchase the team you may be facing the exact same situation that you are here in court facing today, that is if you are unsuccessful to secure a new arena you have to stay in the KeyArena through 2010 and that you might be in a lame duck status?  Is that fair, sir?

A   That is what the report says, yes.

Q   And that was something you knew and were told prior to the purchase being completed with the Sonics, correct?

A   I am not sure if I saw the report.  At some point I did, yes.

        MR. LAWRENCE:  This might be a good place for the morning break, your Honor.

        THE COURT:  Well, we are not ready for it.

        MR. LAWRENCE:  Oh, I thought it was at 10:15.  10:30?  Okay.

BY MR. LAWRENCE:

Q   Let's move on to your agreements to abide by the lease.  Trial Exhibits 62, please.

        MR. LAWRENCE:  I would move for the admission of 62.

        MR. KELLER:  No objection, your Honor.

        MR. LAWRENCE:  The cover page.

        THE COURT:  Just a moment, Mr. Lawrence.  That wasn't one of the ones you offered up so we need to find it.

        MR. LAWRENCE:  I'm sorry, your Honor.  That was not

added last night.  I apologize.

THE COURT:  Go ahead.  Is there an objection to 62?

MR. KELLER:  No, your Honor.

THE COURT:  62 will be admitted.

(Exhibit No. 62 admitted.)

BY MR. LAWRENCE:

Q    If you could turn --  Exhibit 62 is the agreement between PBC and the Howard Schultz group to purchase the Sonics, correct?

A    Yes.

Q    If you could turn to Bates stamp PBC 09355?  And do you see Section 1.2 talks about assumption of obligations.  Do you see that?

A    One moment, please.  Yes, sir.

Q    And as part of the deal you agreed to assume, pay, perform, discharge and otherwise satisfy all the liabilities and obligations of the seller.  Do you see that?

A    Yes.

Q    And that would include the obligations under the lease with the City, correct?

A    Yes.

Q    If we could move to trial Exhibit 65?

MR. LAWRENCE:  I would move for its admission.

MR. KELLER:  No objection, your Honor.

THE COURT:  65 will be admitted.

(Exhibit No. 65 admitted.)

BY MR. LAWRENCE:

Q    Exhibit 65 is a letter that you provided to Howard Schultz in conjunction with the purchase.  Do you see that?

A    Yes, sir.

Q    And this was something that Mr. Schultz and his partners required from you in order to make the purchase happen, correct?

A    This was a mutually negotiated side letter, yes.

Q    And in that side letter you indicate --  That is your signature on the bottom, correct?

A    Yes.

Q    And you indicate, We will obviously assume all of BCOS's obligations regarding the KeyArena use agreement at closing. Do you see that?

A    I do.

Q    And intend to honor those obligations just as the current ownership group has done.  Correct?

A    Yes.

Q    And that certainly was an honest statement to Mr. Schultz at the time you wrote that and made that commitment, was it not, sir?

A    It was.

        MR. LAWRENCE:  If we could move for the admission of trial Exhibit Number 79.

MR. KELLER:  No objection, your Honor.

THE COURT:  79 is admitted.

(Exhibit No. 79 admitted.)

BY MR. LAWRENCE:

Q    Trial Exhibit 79 is entitled instrument of assumption.  Do you see that?

A    I do.

Q    And this is the document in which the PBC specifically assumed the obligations under the KeyArena lease; is that right?

A    Yes, sir.

Q    And for the purposes of this document the KeyArena lease is called the PU&O agreement; is that right, sir?

A    That's correct.

Q    And if we could turn to the second page of that document and see what you agreed to do.  Do you see assumption of obligations, sir?

A    Yes.

Q    And it says, PBC acknowledges having been provided with a copy of the agreement, correct?

A    Yes.

Q    And that is the lease, correct?

A    Yes.

Q    And agrees that from and after the closing date --  That is the closing date of the sale of the Sonics to you,

correct?

A    Yes, sir.

Q    It shall assume and agrees to satisfy or perform as applicable all liabilities and obligations of the Schultz group under the lease agreement, correct?

A    Yes.

Q    And you signed that.  Is that your signature?

A    It is.

Q    And if we go back to the first page, what is the date of that agreement at the top?

A    The date is --  I can't read the day.  October of 2006.

Q    Is that the 23rd day of October, sir?

A    I can't read it.  It appears to be.

Q    So sometime in October, sir, you signed the document agreeing to assume and perform under the lease, correct?

A    Yes.

Q    And at that time you were aware of all the risks associated and losses associated with operating under the KeyArena lease, correct?

A    Yes.

Q    And you understood the risk that you would be sitting in the situation you are in today with no successor arena in Seattle, sitting potentially on a lame-duck season, as have you called it, with a signed lease with the City of Seattle that obligates you to play your home games there through the

2009/2010 season?  You knew all that at the time you signed the lease, didn't you?

A   I never envisioned I would be sitting here --  You asked me did I envision sitting here today.  I never envisioned sitting here today because I believed we would build the building, we would negotiate the lease and move forward.

Q   You understood the risk that you would be sitting here today without a new building, without a renegotiated lease, with a lease that obligates you to perform through the 2009/2010 season, a lease under which there were over $20 million a year operating losses at the time you signed this assumption document, correct, sir?

           MR. KELLER:  Compound and argumentative.

           THE WITNESS:  We knew there would be --

           THE COURT:  Just a moment, sir.

           THE WITNESS:  I'm sorry.

           THE COURT:  Overruled.

           THE WITNESS:  We knew there would be risks, yes.

BY MR. LAWRENCE:

Q   And I take it when you signed this --  Did you intend to honor what you signed or did you intend to breach the lease at the time you signed it, sir, for the very reasons you are arguing here in court you can breach your lease?

A   We intended to honor our obligations under the document, which in my mind were whatever it took to satisfy and provide

remedy to the parties.

Q   Let's talk about that for a second, sir.   Is there any provision in the lease that you are aware of that allows you to leave the lease early under any circumstance?

A   No, not that I am aware of.

Q   And you understand the lease requires all Sonics home games to be played through the 2009/2010 NBA season at KeyArena, correct?

A   Yes.

Q   And you understood that the lease included a specific performance clause that allowed either party to specifically perform the obligations of the lease, correct?

A   Well, that is where I am seeking relief here and judgment here.   I am not clear on the legal interpretation.

Q   The lease included a specific performance clause?

A   It did, yes, sir.

Q   Now, on the day of the sale back in July of 2006 you had a conversation with Mayor Nickels, correct?

A   Yes.

Q   And that conversation included a conversation about that lease with the City, correct?

A   The conversation was very short, and he said he wished us well and expected us to play in KeyArena.

Q   And he made clear that he expected you to play in KeyArena through the term of the lease, correct?

A    Generally, yes.  It was more of a courtesy phone call.  It was not a specific call relative to the legalities of the lease.

Q    Could we have CB 112, which is a clip from deposition Page 129, lines 1 through 8?

(Audio played)

BY MR. LAWRENCE:

Q    So you didn't tell Mayor Nickels that you would consider breaching the lease less than a year later?

A    No.

Q    Let's talk a little bit about KeyArena.  Okay?

A    Yes.

Q    There has been, again, some questioning from your counsel about the -- I guess the adequacy of KeyArena as a facility for NBA basketball, correct?

A    Yes.

Q    Now, the KeyArena of today has the same seating capacity of the KeyArena the day before you purchased the lease, correct?

A    Yes.

Q    And the basketball court is the same size as when you purchased the team, correct?

A    Correct.

Q    The parking issues related to KeyArena are the same now as when you purchased the team, correct?

A    That's correct.

Q    And the concession issues are the same now as when you purchased the team, correct?

A    That's correct.

Q    Could we have the demonstrative used by the defendants in opening?  This was a document or a chart that was created by your attorneys that was used as part of their opening statement.

MR. KELLER:  Excuse me, your Honor.  I think it needs to be marked as an exhibit if we are going to use it.  That way we can use it with subsequent witnesses as well.

MR. LAWRENCE:  I am just going to ask him about the information on the document.  If you would rather me ask him without showing it on the screen, that is fine.  It has already been shown in the courtroom.

THE COURT:  In order to create a record you need to put a number on it so that the Court of Appeals will know what you are referring to.

MR. LAWRENCE:  Let me just ask Mr. Bennett then about the document without entering it or showing it to him.  I will ask him a series of questions unrelated to the document. I don't want the document entered for the truth of the document because that is not the purpose.  Let's offer it. We will offer it as an exhibit, sure.

MR. KELLER:  No objection, your Honor.

THE COURT:  The next Exhibit Number, please.  335.
335 will be admitted.

(Exhibit No. 335 admitted.)

BY MR. LAWRENCE:

Q   There is a series of issues listed in 335.  Do you see
that?

A   Yes.

Q   Square footage.  Do you see that?

A   Yes.

Q   That square footage was the same when you purchased the
Sonics as it is today?

A   Yes.

Q   Unobstructed movement.  The same as when you purchased the
Sonics as today?

A   Yes.

Q   Ease of entry to restrooms.  The same as when you
purchased the Sonics as today?

A   Yes.

Q   Access to concessions.  Same as when you purchased the
Sonics as today?

A   Yes.

Q   Space for restaurants.  Same as when you purchased the
Sonics as today?

A   For the most part, yes.

Q   Convenient location, attractiveness of merchandise,

kiosks, interactive fan areas.  The same as when you purchased the Sonics as it is today?

A    Yes.

Q    Size and quality of premium area, sufficient loading docks, sufficient marshaling space, sufficient media and dining areas, press conferences.  The same as when you purchased the Sonics as today?

A    Yes.  The very reason --

Q    I'm sorry.  I thought you had answered my question.

A    I'm sorry.

Q    And the number of concourses at KeyArena is the same when you purchased the Sonics as today, correct?  And you are a sophisticated businessman that knows what it means to sign a contract; isn't that correct, sir?

A    Yes.

MR. LAWRENCE:  I believe it is 10:30 now, your Honor.

THE COURT:  It is.  All right.  We will take our recess.  We will be in session in 15 minutes.  That means we will be back in session at 10:46.

(Break)

THE COURT:  Please be seated.

All right, Mr. Lawrence, you may begin again.

(Direct Examination continues:)

BY MR. LAWRENCE:

Q    Now, Mr. Bennett, would you agree that team play is a

factor that impacts the success of a professional sports franchise?

A   One factor, yes.

Q   In fact, one of the things that is very different now than before you purchased the Sonics was the record of the team this past season, correct?

A   Yes.

Q   In fact, this past season the Sonics had the worst record in their 41-year history; is that right?

A   We did.

Q   And that record is one factor that affected the financial performance of the Sonics last year; is that fair?

A   It is a factor, yes.

Q   Now, I believe that one of the discussions we have been having in court so far is whether KeyArena is a functioning NBA building, correct?

A   Yes.

Q   As I understand the position of the PBC, KeyArena is not a functioning NBA building and it has not been so for a number of years; is that fair?

A   That's correct.

MR. LAWRENCE:   Could we have trial exhibit 264, please?  Let me move for the admission of 264?

MR. KELLER:   No objection, Your Honor.

THE COURT:   Just a minute, please, Mr. Lawrence.

MR. LAWRENCE:  I apologize.  I didn't see you didn't have the document.

THE COURT:  Go ahead.  Is there any objection?

MR. KELLER:  No, there isn't, Your Honor.

THE COURT:  All right.  264 admitted.

(Exhibit No. 264 admitted.)

BY MR. LAWRENCE:

Q   This is an e-mail from Tim Romani to yourself?

A   Yes.

Q   Could you explain who he is?

A   He is the principal with Icon Venture Group.  They are a consulting firm based in Denver, Colorado provide programming economic programming and construction oversight for sports arena and entertainment facilities.

Q   You hired Mr. Romani and Icon to help you with your efforts to find a successor venue in Washington, correct?

A   To help us in conjunction with architectural firm to do the economic modeling and programming for the new building, yes.

Q   So they were part of your team that was trying to figure out what type of building you were going to -- arena you were going to get as a successor venue for the Sonics correct?

A   That's correct.

Q   He wrote to you in December of '06 this e-mail.  It talks about KeyArena.  Do you see that?

A    Yes.

Q    What he says is why try to convince people that KeyArena is not a serviceable NBA arena when they don't have the right comparative to properly judge that.

Do you see that?

A    Yes.

Q    He further says to you it's not that Key is not a functioning building.  Do you see that?

A    Yes.

Q    So Mr. Romani was telling you in December of 2006 that in fact KeyArena was a functional building for an NBA team, correct?

A    No, I would disagree with that.

Q    He goes on to say, "It's that Key can never be the entertainment venue that the entire Seattle area really deserves."

Do you see that?

A    Yes.

Q    You were proposing a global multi-purpose entertainment venue to build for the Sonics to play in, correct?

A    Yes.

Q    For a hockey team potentially to play this, correct?

A    Correct.

Q    For concerts, conventions, correct?

A    Yes.

Q   But Key is a perfectly functional building, is it not, for an NBA team?

A   No.

Q   Well, let's see what you told the Washington State Senate in February 2007.

Do you recall as part of your efforts to obtain funding for a new arena that you provided testimony before the Washington State Senate Ways & Means Committee?

A   Yes.

MR. LAWRENCE:  I would like to play a clip and would move admission of trial Exhibit 97.

MR. KELLER:  Is it all the testimony or just a snippet?

MR. LAWRENCE:  A snippet.

THE COURT:  Any objection, Mr. Keller?

MR. KELLER:  I will take counsel at his word as to what it is.

THE COURT:  It's a snippet?

MR. KELLER:  Yes.

MR. LAWRENCE:  I'm sorry.  The --

MR. KELLER:  All I meant is less than all of his testimony.

MR. LAWRENCE:  Yes.

THE COURT:  This is his testimony where again --

MR. LAWRENCE:  His testimony before the Washington

State Senate Ways & Means Committee on February 13, 2007.

BY MR. LAWRENCE:

Q    Let's now watch what you told the Senate Ways & Means Committee about KeyArena.

(Audio played.)

BY MR. LAWRENCE:

Q    So at least in 2007 before the Senate Ways & Means Committee you were communicating that in the future KeyArena may not be a state-of-the-art facility.

Is that what you told the Senate Ways & Means Committee, sir?

A    I told them that.  And my opinion has certainly evolved on that topic.

Q    And the purpose of your testimony was to obtain, I think at that point $300 million in state public funding to support your new global arena, correct?

A    State-authorized King County taxes, yes.

Q    You would agree owning an NBA team is a relatively rare opportunity, isn't it?

A    Yes.

Q    And they're only 30 franchises, correct?

A    That's correct.

Q    If the Sonics relocate to Oklahoma City, you would agree there is no NBA franchise that could act as a replacement tenant in KeyArena for the final two years of the existing

lease.  Would you probably agree with that?

A    Perhaps.  But I cannot speak to that.

MR. LAWRENCE:  Can we play CB 114 which is from your deposition page 155, lines 24 through 156, line 16.

(Audio played.)

BY MR. LAWRENCE:

Q    I would like to move to some of the benefits that accrue to cities that have NBA teams.  Okay?

A    Yes, sir.

MR. LAWRENCE:  I would like to show you -- move for admission of trial exhibit 66.

MR. KELLER:  No objection, Your Honor.

THE WITNESS:  Pardon me?

MR. LAWRENCE:  Sure.

THE COURT:  66 admitted.

(Exhibit No. 66 admitted.)

BY MR. LAWRENCE:

Q    Exhibit No. 66 is a press release that PBC put out announcing the sale -- or the purchase by them, I guess it's from -- it's announcing that -- let me start again.

66 is a press release from the BCOS about the purchase by you of the Sonics and Storm, correct?

A    That's correct.

Q    If you look on the first page of the bottom paragraph there is a quote from you.  "The Sonics and Storm are

synonymous with Seattle."

Do you see that?

A    I see that.

Q    Was that an accurate quote at that time?

A    That reflected my opinion at the time.  And my opinion has certainly changed.

Q    Do you think when the Sonics won the national championship in 1979 that was a source of civic pride for the City?

A    I would have expected it would have been, yes.

Q    Certainly, you have an understanding that there was a tremendous amount of excitement around the Sonics in the 1990s when they went to the playoffs and NBA championship against the Chicago Bulls?

A    I would expect so, yes.

Q    Now, you understand that NBA teams are corporate citizens that engage in community activities in every city that they are located?

A    Yes.  That's correct.

Q    And they support a broad range of civic and charitable organizations, correct?

A    That's correct.

Q    SuperSonics have a program to support charitable activities in the City of Seattle and Greater Seattle region?

A    We do.

Q    That includes rebuilding basketball courts?

A   Yes.

Q   Playgrounds?

A   Yes.

Q   Appearances at charities?

A   Correct.

Q   Serving meals around the holidays?

A   That's correct.

Q   Appearances in schools?

A   Yes.

Q   Hospitals?

A   Yes.

Q   That is actually part of the NBA mission, is to provide that kind of charitable and community support, correct?

A   That's correct.

MR. LAWRENCE:   Move for admission of trial Exhibit No. 66.

THE COURT:   Are we going pack to the same exhibit again?   66 was already admitted.

MR. LAWRENCE:   I'm sorry.   I don't need to move its admission then.

BY MR. LAWRENCE:

Q   If we could go to the last paragraph, last paragraph on the second page.   Sorry.

In addition to achievements on the court, the team remains active in the community the Sonics -- sorry.   The Sonics and

Storm Foundation donate more than one million dollars to region's community.

Do you see that?

A   I do.

Q   Is that generally your understanding?

A   I would say generally, although the Foundation is a separate entity.  I'm not familiar precisely with their contribution activity.

Q   But the Foundation relates to where the team is, correct?

A   Yes.  Although -- I'm sorry.  The Foundation I would suggest would survive the Sonics' relocation.

Q   There would be a loss to the community activities that you describe the Sonics provide to this community, correct?

THE COURT:   I'm sorry, Mr. Lawrence, you need to back up.  I don't understand the connection with the Foundation.  If the Foundation isn't part of the business --

BY MR. LAWRENCE:

Q   Is the Foundation associated with the team?

A   Well, it's a separate stand-alone not-for-profit entity.  It is not controlled by the team.

Q   Okay.  Who controls it?

A   They have their own private -- their own separate board of directors which some are members of our executive team.

Q   Would you anticipate a foundation to that effect -- I don't know if you're going to keep the team name if your move

your team to Oklahoma City, it may have a different name --
but do you anticipate a foundation with that effect to be
associated with whatever the Oklahoma City team is if you're
successful in moving?

A   Number one, this foundation would survive in this
marketplace.   We've not contemplated such a structure in
Oklahoma.

Q   You're not contemplating have a foundation in Oklahoma
City?

A   I don't know if we'll have a foundation or not.   We will
certainly provide charitable activities.   Perhaps not through
a foundation structure.

Q   Let's talk about the charitable community acts.

A   Yes.

Q   Would you agree there would be a loss to this community of
the charitable and community activity that you describe the
Sonics provide if the team moves to Oklahoma City?

A   Some would be lost, yes.

Q   You would agree an NBA franchise has an economic impact on
every city in which its located?

A   It does.

Q   Part of that is related to the people going to Sonics
games and spending money in the surrounding areas, correct?

A   Going to the games.   The relative economic activity varies
dramatically from market to market.

Q    But part of that economic is related to people going to Sonics games, correct?

A    Yes.

Q    And if the Sonics were to relocate from Seattle to Oklahoma City, one of the consequences would be, for example, that the economic activities relating to the Sonics' presence in the City would no longer be there to generate tax income for the City and the State, correct?

A    Related to -- I can speak to relating to the games themselves, yes.

Q    And related to the Sonics payroll, correct?

A    Yes, sir.

Q    And when you say related to the games, that would be both taxes that the team pays, correct?

A    Yes.

Q    And taxes that are generated by people eating at restaurants, correct?

A    I can't speak to that part.  Only the ticket-related and event-related activities.

Q    Is it your belief people who go to Sonics games sometimes go to neighborhood restaurants?

A    They do.  I can't quantity what --

Q    I didn't ask you to quantify it, sir.

     I asked you to acknowledge whether or not tax receipts of whatever level that are related to spending in restaurants,

bars, hotels, etcetera that would be lost to the City --

A    At -- I'm sorry, at some level, yes.

Q    Thank you.

Sonics themselves account for approximately 125 staff positions; is that right?

A    That's correct.

Q    In fact, all totaled, plus basketball operations 150 to 175 jobs?

A    That's correct.  We have some temporary interns, but generally that's correct.

Q    And there would be a lost to the City of Seattle of those jobs in the Sonics relocate, correct?

A    I suppose so.

Q    And is it correct you think that the presence of a team also generates additional job activities; is that fair?

A    It can in a given market.

Q    So again, I understand you haven't tried to define the amount of jobs, but whatever that undefined additional job activity related to the Sonics is, that would be lost to Seattle if the Sonics were to move to Oklahoma City?

A    Yes, sir.

Q    Now, is it correct in this case that you believe there are no economic benefits related to the Sonics playing in the Seattle community?

A    There certainly are economic benefits relative to the

primary business of the Sonics.

Q   Let's see what you told the State of Oklahoma about what economic activity you think is associated with the Sonics if they move to Oklahoma.

MR. LAWRENCE:  Move admission of trial Exhibit No. 182.

MR. KELLER:  I will object on the grounds of 402 and 403, Your Honor.

THE COURT:  You want to elaborate on that, Mr. Keller?

MR. KELLER:  I put the witnesses not disagree with counsel there are certain degrees of economic impacts which varies widely from market to market.  And I don't know what the purpose is spending our time in this courtroom on what the PBC and folks in Oklahoma City believe that potential upswing is for them.  We're here about Seattle.  Witness's acknowledge certain degree of it.  Counsel said he's not wanting a quantification of it.  This is a quantification in another state.  And --

MR. LAWRENCE:  Two points.  First of all, this was not objected to in the pretrial order.  It's stipulated to its admissibility.

MR. KELLER:  That's the problem.

MR. LAWRENCE:  Secondly, I believe that PBC is going to object or try to suggest that our economist estimate of

$187 million in economic activities related to Sonics here should not be believed by the Court, when Mr. Bennett presented to the Oklahoma state legislature his view in Oklahoma the team would generate a very similar number, $171 million of economic activities.  So it goes to the weight of our economist's expert --

MR. KELLER:  I want to say, Your Honor, this is why it's really a 403 issue.  The situation in Oklahoma -- may come as a surprise, it's a little different down in Oklahoma than it is in Seattle, including higher economic situation, tax structure, the state is different, the benefits to the state because they have an income and we don't have one here, these are all kinds of issues that we start going into when we start going into something like this.  I don't think -- the relevance is so marginal when you get into these collateral issues --

THE COURT:  Mr. Lawrence, let me ask you, I'm assuming every market that the NBA is in there would be a different analysis?

MR. LAWRENCE:  No, Your Honor.  I think in terms of the tax consequences it would be different because different states have different tax consequences.  But in terms of the direct game spending, the difference might be marginal related to cost of living, which might explain why Seattle number is 187 versus 171, but in terms of the relative level

of spending, which is a combination of direct game spending, payroll -- which, again, that is something that is same whether it's here or Oklahoma City.  The payroll of the team is $100 million-plus.  And then there is auxiliary sort of spending, too, that would be again relatively the same but for the cost of living.

And the point is that A, they didn't object; B, we're going to present information that basically --

THE COURT:  I guess --

MR. LAWRENCE:  The same type of estimator as they used for Oklahoma City, and it goes to the weight of that information.

THE COURT:  Let's go back to my original question. Why am I worried about what it is the expenditures, profit or loss, is in Oklahoma City?

MR. LAWRENCE:  I'm not saying you should be worried about it.  All I'm sighing it shows there is a substantial economic benefit associated with teams playing NBA cities. If that's something PBC is willing to stipulate to, then we don't need to discuss it.  But as I understand it, as I know, we asked them in Request for Admissions whether or not there is any economic activity associated with the team being here. And the answer was denied.  And I know they're going to bring in an expert who is going to testify that there is no economic benefit to the City of Seattle at all.

THE COURT:  Well, that's what I'm trying to ascertain.  What does Oklahoma's benefit have to do with Seattle's?  If both sides bring in their expert to tell me what the economic benefit is in Seattle, why do I worry about Oklahoma; in the sense if it's all the same, why do we need an expert at all if there is simply a number that everybody can agree upon?

MR. LAWRENCE:  There are two schools of economists. They are bringing in an economist who believes there is nothing anywhere, while they're telling the State of Oklahoma there is $171 million.  We have an economist who performs a similar analysis to what they did who will show there is $180 million of economic activity.

I think it goes to the weight of that dispute.  They have denied that there is any economic activity related to the Sonics in the Seattle area.  And I believe that in order to address that, we're entitled to show what they said to the Oklahoma state legislature and have Mr. Bennett describe his understanding of where that economic activity stems from, and then ask him isn't that the same type of economic activity we see here in Seattle?

The game day spending is pretty much the same except for cost living.  Their payroll is exactly the same, except the depending upon which players they draft.  The payroll information was based exactly on payroll information of

Seattle team.  To suggest -- for them to deny Requests for Admission that there is no activity here, but tell Oklahoma City there is $171 million I think is relevant to this case, unless they're willing to stipulate there is a huge amount of economic activity in Seattle.  In which case I'm happy to move on.

THE COURT:  I don't hear a stipulation.

MR. LAWRENCE:  Always ask.

Again, they did not object.

THE COURT:  Go ahead, Mr. Lawrence.  I have my doubts as to whether or not Oklahoma's economic background fits the City of Seattle.  Move on put in your evidence.

MR. LAWRENCE:  I will be quick.

THE COURT:  The exhibit is 182 admitted.  Admitted.

(Exhibit No. 182 admitted.)

MR. LAWRENCE:  If we could show trial Exhibit No. 182.

BY MR. LAWRENCE:

Q   This is a study that was prepared by PBC, correct?

A   Yes.

Q   It was prepared for purposes of presentation to the Oklahoma state legislature, correct?

A   That's correct.

Q   And it was in support of an effort by PBC to obtain a tax benefit from the Oklahoma state legislature, correct?

290

A   Payroll tax refund to the team.

Q   It's a tax benefit to the team, correct?

A   Well, it's an incentive.

Q   You have to pay less taxes to the State as a result of this legislation being passed?

A   No.  It's actually a money payment to the team.

Q   You presented this to Oklahoma legislature so that Oklahoma would pay money to the team to move there?

A   That's correct.

Q   Thank you for the clarification.

    If we could move to 1400.  I want to show what you said to the Oklahoma state legislature in order to get them to pay money to the team to move.  You represented to them on an annual basis the combination of indirect -- sorry -- of direct games spending and auxiliary economic impact and estimated payroll spent in Oklahoma will be a total of $171 million a year, correct?

A   Yes.

Q   Thank you.

    Okay.  I would like to turn to the question of NBA leases.

A   Leases?

Q   Yes, leases.

A   Okay.

Q   I believe your lease between the City of Seattle and the Sonics does not have any sort of early termination provision,

correct?

A    That's correct.

Q    But you're aware, are you not, that certain NBA leases do have early termination provisions, correct?

A    Generally aware, yes.  I am aware specifically about the Oklahoma City lease.

Q    Tell us about that.

So the Sonics entered into a lease with Oklahoma City for the Ford Center, correct?

A    Yes, sir.

Q    That's contingent on the outcome of this case?

A    Timing, yes.

Q    That lease contains an earlier termination provision, correct?

A    That's correct.

MR. KELLER:  I'm going to object -- excuse me.

I'll object on 402 and 403.  I don't mind the fact there is a lease and it depends on the outcome of this situation. But we start getting into the terms of a deal that was negotiated with City of Oklahoma here in April and how those provisions do or don't compare to this, I don't see what that has to do with this case.

MR. LAWRENCE:  The question of specific performance of the lease depends in part on how that lease was structured relative to other comparable leases.  The universe of leases,

NBA leases, included leases like the City's, which has a specific performance clause and no earlier termination provisions and other NBA leases that have early termination provisions for the very types of complaints that Mr. Bennett is raising here -- attendance level, revenue levels, etcetera.

The point being that where you have a lease you negotiate a term.  You can either negotiate specific performance or you can negotiate early termination.  And this lease is a specific performance lease.  That is not uniformed in the NBA.  Some have it and some don't.

THE COURT:  The objection is sustained.

BY MR. LAWRENCE:

Q   Let's talk about the your efforts to finance a successor venue.

As early as February of '06 you were 100 percent committed to finding a team for Oklahoma City in the long term; is that right?

A   As a matter of a civic aspiration, yes, sir.

Q   That's a quote that you told USA Today in February of '06, correct?

A   That's correct.

Q   And as a general matter, as you said, you have a long-term aspiration to have a professional basketball team in Oklahoma City, correct?

A    That's correct.

Q    And that's something that is shared with Mr. McClendon, Mr. Ward and Mr. Record in terms of a long-term aspiration?

A    Yes, sir.

Q    When you put your -- the investors together that were going to purchase the Sonics, the investment group that you ultimately put together only contained -- sorry -- only contained investors from Oklahoma City; is that correct?

A    That's correct.

Q    And you understood, did you not, that there were certain local Seattle area investors, principally people in the Schultz ownership group who were against the sale that would have been happy to participate in the new ownership group?

A    I was generally aware of that, yes.

Q    But you and your other owners made a decision to keep the group Oklahoma City at that time?

A    We made a very well-considered and thoroughly discussed decision to not do that because we felt --

Q    I'm sorry.  I misunderstood.  To not do what?

A    To not include -- to not expand our group beyond the Oklahoma City group.

Q    The answer is yes, you made a well-considered decision to keep the investor group to Oklahoma City investors and not include any Seattle area investors, fair?

A    Fair.

Q    Thank you.

At the time you were putting the investor group together, there was some concern by the people that you talked to from Oklahoma City about having a team in Seattle, right?

A    Well, there were --

Q    Is that right, sir?

A    I'm not sure I follow the question.

Q    Let me restate it.

MR. KELLER:  I wonder if we're going to ask a question that we might let the witness answer it.

MR. LAWRENCE:  If he didn't understand it --

THE COURT:  I didn't understand the question.

MR. LAWRENCE:  Then I should restate it.

THE COURT:  Go ahead.

BY MR. LAWRENCE:

Q    Is it correct, sir, that there were certain investors that you reached out to as potential investors in PBC, Devon Energy Group was one, who decided not to invest because the team had this good-faith effort provision to find an arena in Seattle, correct?

A    No.

Q    Are there --

A    They chose -- I'm sorry --

Q    Go ahead.

A    They chose not to invest because of our commitment to stay

in Seattle.

Q    Okay.  That's what I thought I was asking.  I apologize if that wasn't clear.

MR. LAWRENCE:  So let's move for the admission of trial Exhibit No. 60, please.

MR. KELLER:  No objection, Your Honor.

THE COURT:  60 admitted.

(Exhibit No. 60 admitted.)

BY MR. LAWRENCE:

Q    Now, Exhibit No. -- do you have it, Your Honor?

THE COURT:  I do.

BY MR. LAWRENCE:

Q    Exhibit No. 60 is an e-mail change with you and Tom Ward and Aubrey McClendon.  Do you see that?

A    Yes.

Q    And Mr. Ward and Mr. McClendon were two people that ended up in PBC, correct?

A    Yes, sir.

Q    This e-mail involves concern about what does it mean to make a good-faith commitment effort to find a new building for 12 months, which was part of the deal with the Schultz group, correct?

A    Yes.

Q    And what you told to Mr. Ward and Mr. McClendon that you have no problem with making a stronger commitment to gather

faith effort.  Do you see that?

A   Yes.

Q   The reason you have no problem is, "If we are successful, we are looking at a sweet flip and with the strength of our group, I think we would be in good shape or something in Oklahoma City."

Do you see that?

A   Yes.

Q   And "sweet flip" is the concept that if you had a successor arena, you thought that would increase the value of the Sonics franchise?

A   Yes.

Q   Other than owning Sonics franchise in Seattle you could sell it and be in a position to go to the NBA as having done some good for the league and strengthen the ability of getting a team to Oklahoma City; is that fair?

A   Yes.  This was along the options that we considered.  This was just an earlier notion early in the process that we contemplated and ultimately chose not to pursue.

Q   Well, this is the only option you're discussing in this e-mail?

A   In this particular e-mail, that's correct.

Q   Let's talk about what it is that you did to try to find a successor arena in Seattle.

Now, it's correct that you never considered the KeyArena

or renovation of KeyArena as a successor arena; is that fair?

A   That's correct.

Q   Even though Greg Nickels, the mayor, told you the offers he made to remodel KeyArena to the Schultz Group were still available, correct?

A   Well, generally we were aware of those renovation plans but did not concur that those were plans that would work for the long term of the building.  We never considered KeyArena. We considered a successor venue, a new building.

Q   My question was, you understood that Mayor Nickels repeated that the offers he made to the Schultz group to remodel KeyArena and revise the lease were available to you. Do you remember that?

A   Yes.   Which was not acceptable.

Q   You rejected that?

A   Yes.

Q   You never engaged in any negotiations with the City over the proposals they had to remodel KeyArena?

A   That's correct.

Q   Even though you understood that a KeyArena renovation was going to cost, what, 2 or $300 million?

A   I think the Schultz plan was $200 million.

Q   Just so it's clear, the Schultz plan, as you understood it, was supported by NBA at the time it was proposed to the Washington state legislature?

A   Yes.   I think they suggested as a last resort.

Q   But NBA Commissioner Stern went actually to Olympia to --

A   But --

Q   I'm sorry, you have to wait for my question.

A   I'm sorry.

Q   You're aware that NBA Commissioner Stern went down to Olympia in support of the $200 million renovation proposal that the Schultz Group was asking for?

A   I am.

Q   But instead of talking with the City about that $200 million renovation proposal you came up with a $500 million-plus global arena plan, correct?

A   Correct.   And through a comprehensive process that even considered sites on Seattle at a certain point in time.

Q   But it quickly turned to a site in Renton and Bellevue, correct?

A   Yes.   I'm sorry --

Q   I'm sorry --

A   They were the finalist in a comprehensive review process of 30 sites.

Q   You agree $500 million is quite a bit more than $200 million?

A   Yes.

Q   It requires more public subsidy than the $200 million renovation, correct?

A    Yes.

Q    This was an arena that not only served basketball purposes but hockey and all other purposes you talked about, correct?

A    Yes.

Q    The idea was that you were going to put this in legislation proposed to the state legislature to try to get Washington state legislature to pass funding to support the $500 million arena?

A    Yes.   We developed a group of support in the community and with leadership that assisted us in the legislative process after developing what we believed was a community-driven building program.

Q    Now, $500 million for a new arena is more than any other arena has cost in the NBA; is that fair?

A    I'm not sure.   But it's up there.   They're ever increasing.

Q    And in terms of this effort, you understood that you needed to get -- there was only one legislative session that was going to occur during this one-year period where you committed to find a successor venue?

A    Correct.

Q    That started at the beginning of January of 2007?

A    Yes.

Q    You're asking for a lot of state money, correct?

A    Yes.

Q    Let's make sure we understand where you were as a group at the beginning of the legislative session January of 2007. Okay?

A    Okay.

Q    So as of the December 30, on the eve of the legislative session, did you have legislative written in place to submit for consideration?

A    I don't believe it was ready to submit.  It was in development.

THE COURT:  I'm sorry.  I didn't understand. Did you mean, did you have legislation?

MR. LAWRENCE:  I thought I said legislation.

BY MR. LAWRENCE:

Q    Did you have a piece of legislation written and ready to submit to the legislature as of December 30?

A    Developed and close, but I don't think ready to submit.

Q    Did you have arena planned in place at that point?

A    Not completely finished but close.

Q    So the answer is no?

A    Yes.

Q    The answer with legislation is also no?

A    Yes.

Q    Did you have estimate of what it would cost to do an arena as of December 30, 2006?

A    A general idea but not a final number.

Q   The answer is no?

A   That's correct.

Q   Did you have a site selected as of December 30?

A   I believe we were very close to selecting Renton if we had not selected Renton.

Q   As far as you recall, you don't know whether or not you had a site selected?

A   I think we did.

Q   And you had actually committed to the governor and speaker of the house to get a detailed plan prior to February 1, 2008; is that right?

A   That's correct.

Q   Did you meet that commitment?

A   No.

Q   As of February 1, 2008, you had not met your commitment to get a detailed plan for consideration by the Washington state legislature, correct?

A   That's correct.  We were in conversations with the governor and speaker and leadership and they knew where we were.  But we were late in submitting.

Q   And, in fact, the time was running out on the legislative session which ended in mid-April, correct?

A   That's right.

Q   Now, with time running out and missing that February 1, deadline, you asked for an extension from the governor,

correct?

A    We had been working with her consistently.  So she knew our process.

Q    Did she give you an extension?

A    Yes.  I'm not sure it was a formal extension.  It was an ongoing collaborative discussion.  She knew where we were and when our submittal would take place.

Q    Did you ever consider extending your October 31 deadline for getting a successor venue, since we're midway through the session, you're asking for $500 million arena with large public subsidies without specified legislation that maybe it's going to take two sessions?  Did you have consider extending your deadline, so you could bring this back to the legislature --

A    We --

Q    -- in the 2008 session?

A    I'm sorry.  I'm sorry.

We were within the process and ultimately fit within the legislative process.  So no, we felt no requirement to extend our deadline.

Q    So you did not -- you refused to extend your deadline?

A    Correct.

Q    Now, one of the issues that came up with respect to the legislation was what level of commitment in terms of out-of-pocket dollars PBC was willing to make to the arena,

correct?

A    Yes.

Q    And that was an issue which you knew was important to the legislature, correct?

A    Yes.

Q    And is it correct -- well, sorry.

You hired a lobbyist to help you with efforts in Olympia, correct?

A    We hired a political consultant who then organized a full lobby effort.  Probably seven or eight members of that team.

Q    Head was Mr. Kneeland, right?

A    Jim Kneeland.

Q    Mr. Kneeland communicated to you about the need to make a specific financial -- specific commitment for finance contribution by the PBC, correct?

A    That was the recommendation he made, yes.

Q    And your response to Mr. Kneeland was to stay way away, way away, from talking about PBC's investment in the building; is that correct?

A    That's correct.  At that time, yes.

Q    Then when you testified before the Ways & Means Committee -- we talked about that testimony -- you were asked about what commitment you would be willing to make to contribute to the new arena.  Do you remember that?

A    Yes.

Q    That is part of Exhibit No. 97.  If we could play what you were asked and your answer with respect to that.

THE COURT:  Is there an objection to 97?

MR. KELLER:  No, Your Honor.

THE COURT:  97 admitted.

(Exhibit No. 97 admitted.)

(Audio played.)

BY MR. LAWRENCE:

Q    When you were asked in February before the Washington --

MR. KELLER:  I don't know how we can have an exhibit that stops somebody in the middle of a sentence.  I guess it's my fault; I should have objected before.  I didn't realize these clips were literally stopping people in the middle of answers.  It seems like it's incomplete.  We play the rest of answer?  Can I counter-designate the balance under the rule, please?

MR. LAWRENCE:  The entire testimony which is -- I think it goes on for a half hour is complete within the trial Exhibit No. 97.

If Mr. Keller would like to point out on cross-examination or I guess it wouldn't be cross --

THE COURT:  Do you have the clip so you can show the rest of the sentence?

MR. KELLER:  We just want the rest of that particular answer.

THE COURT:  Do you have it?

MR. LAWRENCE:  If we could find it -- because it's part of the entire document that you have and that we have the entire document of the clip played.  We picked a clip that was a designation of a deposition.

THE COURT:  Mr. Lawrence, all I am trying to ask is can you show the rest of sentence.

MR. LAWRENCE:  It would take five minutes.  We can show it after the lunch break if you --

THE COURT:  Why don't you look for it and after the lunch break, we'll see the rest of the sentence.

MR. LAWRENCE:  Sure.  Not a problem with that, Your Honor.

BY MR. LAWRENCE:

Q   But in February before the Senate Ways & Means Committee you knew that was important testimony, correct?

A   Yes.

Q   You knew it was important to be truthful, correct?

A   Yes.

Q   And you knew this was part of your effort to get public subsidy for $500 million arena, correct?

A   Yes.

Q   When asked about your commitment, you stated you bought the team for $350 million; you were committing to stay in the arena, and you hadn't thought about anything beyond that,

correct?

A    That's what I said in the testimony.

Q    Now, I would like to turn to trial Exhibit No. --

MR. LAWRENCE:   Move for admission of trial Exhibit No. 98.

MR. KELLER:   No objection, Your Honor.

THE COURT:   98 admitted.

(Exhibit No. 98 admitted.)

BY MR. LAWRENCE:

Q    98 is an e-mail from you to Jenny Durkan.

It's an e-mail between you and Jenny Durkan, correct?

A    That's correct.

Q    You were considering hiring Jenny Durkan to act as lobbyist for you with respect to King County, correct?

A    Correct.

Q    In this e-mail that you talked about what it was that you were trying to achieve, correct?

A    Yes.

Q    You understood in talking to your lobbyist you wanted to be truthful and correct in what you said?

A    Yes.

Q    The issue that you talked about here was PBC's contribution to a new arena, correct?

A    Yes.

Q    Let's look what you said.

You said, "I am confounded by the focus on our contribution."

Do you see that?

A    I do.

Q    You say, "At the end of the day it will be negligible."

Do you see that?

A    I do.

Q    That was a true statement you were making to your lobbyist who was going to work on your behalf before the King County Council, correct?

A    It is.  What I'm confounded about is we had consistently talked about our commitment to the building.  And why questions kept coming up was becoming confounding to me.

Q    In fact, what you told Ms. Durkan is that your out-of-pocket contribution would be negligible?

A    Could have been.  Commitment was $100 million.

Q    You never told anyone publicly that you would commit out of the investors' pockets a specific amount; is that fair?

A    I'm not sure.  When I committed --

Q    If you're not sure you're not sure.

A    What I'm sure of is our commitment of $100 million to the project.

Q    I understand that's you're saying.  $100 million comes from a variety of sources, correct?

A    That were revenue to the team.

Q   So like admissions, taxes related to a new arena, correct?

A   Ticket surcharges, offsets, naming rights, specified sponsorship relationships, etcetera.

Q   But in terms of the out-of-pocket contribution by PBC to this new arena, the initial contribution, you never committed a specific dollar amount, correct?

A   I just disagreed with you.  We agreed to $100 million.

Q   Did you tell anyone at any time that PBC would take $100 million and invest that, not out of revenue associated with the building, but would take $100 million additional investment on top of the $350 million you spent on the team and the other losses, that you would pay that towards the construction of the building as opposed to revenue from the building?

A   Our commitment to the $500 million was $100 million.

Q   That wasn't my question.

A   I'm sorry.

Q   My question --

A   I will listen better.

Q   My question was, did you ever tell a Washington state legislature or political leader that PBC would pay out of its pocket, in addition to its $350 million investment, any specific dollar amount to contribute to the cost of a new arena, other than this revenue generated by the new arena?

A   My response to your question is yes, $100 million.

Q   I don't think that's a response to my question.

Did you tell them that we'll pay 100 mouth of out pocket --

MR. KELLER:   Objection, argumentative here.

THE COURT:   Sustained.

BY MR. LAWRENCE:

Q   Did you tell a legislature that we would pay any specific dollar amount out of our pocket upfront for construction?

MR. KELLER:   Repetitive and cumulative.

THE COURT:   Sustained.

BY MR. LAWRENCE:

Q   Did you tell Mr. Ballmer about your contribution?

A   I believe so.

Q   Did you tell Mr. Ballmer about your contribution being nominal?

A   I think the word "nominal" is in an e-mail to Mr. Ballmer.

Q   You were trying to be truthful when you made that statement to Mr. Ballmer?

A   I expect so.

Q   Is there any other e-mail that you know where you told anybody you were going to make something other than a nominal or negligible contribution to the new arena?

A   I'm not sure.

Q   Ultimately, you proposed an arena at Renton, correct?

A   Yes.

Q   At the cost of $511 million?

A   Yes.

Q   That was paid out of the tax and state, county revenues, correct?

A   State-authorized King County tax revenue, revenues from the City of Renton, and a private contribution.

Q   And a private contribution that you characterized to Mr. Ballmer and Ms. Durkan as nominal and negligible?

MR. KELLER:   Getting repetitive and cumulative again, Your Honor.

THE COURT:   Sustained.

BY MR. LAWRENCE:

Q   Did you understand what contributions the owners of the Mariners made to the Safeco Field?

A   Generally but not specifically.

Q   Would you agree they --

MR. KELLER:   I will object to the relevance under 402 and 403.   If we're starting to get into financing of Qwest Field and KeyArena, how much upfront moneys were and how much it ended up because of cost overruns, we'll be here much longer than six days.   And we are only here six days.

That is what the 403 objection is.

THE COURT:   Response?

MR. LAWRENCE:   I believe that Mr. Bennett has stated or the argument was made in opening that the community did

well by Safeco Field and Qwest Field.  They didn't treat basketball as well.  And part that is because the owners there made $100 million-plus out-of-pocket contributions to those stadiums, whereas Mr. Bennett was not willing to do so.

And it explains why he failed, whether or not it was in good faith, and his unwillingness to make a specific financial contribution -- $500 million we think was instrumental as to why it failed and it goes to whether or not that was a good --

THE COURT:  I fail to understand how somebody's contribution to a football stadium or a Mariners' stadium has to do with basketball.  So let's move on.

MR. LAWRENCE:  I will move on.

THE COURT:  Go ahead.

BY MR. LAWRENCE:

Q   At the end of the day your proposal failed in Olympia, correct?

A   Yes.  It was never brought out of committee.

Q   And at the end of the day -- did one of the issues come up, cost overruns?

A   I believe it was discussed.  It was brought to me by Mr. Kneeland.

Q   And the issue of cost overruns is when you're building a stadium, sometimes it costs more than originally anticipated, correct?

A    It can.

Q    And in that case, there is a question as to who is going to pay for cost overruns, correct?

A    Well, in our view as a tenant of the building we were not willing to be responsible for cost overruns of the development of a public facility.

Q    You understand that you were going to have substantial input into how to -- the specifications of the building?

A    We were.  We were in those negotiations.

Q    And it was your idea that the $500 million global arena would be built to your specifications?

A    Not necessarily.  In conjunction with all of the appropriate authorities.

Q    Right.  But at the end of the day you needed an arena that met your needs, correct?

A    We certainly need the NBA-specific elements to fit within our requirements.

Q    You never publicly committed to cost overruns; is that correct?

A    That's correct.

Q    So let's turn to what happened after the legislative effort failed.

          MR. LAWRENCE:  If we could move for Exhibit No. 115.

          MR. KELLER:  No objection.

          THE COURT:  All right.  115 admitted.

(Exhibit No. 115 admitted.)

BY MR. LAWRENCE:

Q    115 is a series of e-mails from April 2007.

Do you see that?

A    I do.

Q    And what we have done here is tried to put -- the e-mails run from bottom to top in terms of chronology, correct?

A    Yes, sir.

Q    This is in response to an article that was written by the Seattle Times in which you said there was little hope the team would remain in Seattle.

Do you see that?

A    That's correct.

Q    That was a correct statement at that time?

A    Yes.

Q    This is six months through your 12-month period?

A    Correct.

Q    And Mr. Ward, who is one of the owners of PBC, says to you, "Is there any way to move here for next season?  Are we doomed to have another lame-duck season in Seattle?"

Do you see that?

A    I do.

Q    And you said, "I am a man possessed.  We will do everything we can.  Thanks for hanging with me, Boys.  The game is getting started."

Do you see that?

A   I do.

Q   That was what you responded to Mr. Ward's question, correct?

A   It was a statement as to where I was relative to our status in the process and about my commitment to continue my efforts in Seattle.

Q   Mr. Ward asked you a question, correct?

A   Yes, sir.

Q   And in response, you said, "I am a man possessed.  We will do everything we can."  Correct?

A   I'm not responding to moving to Oklahoma.

I'm responding to -- reiterating my commitment to the process in Seattle.

Q   Well, did Mr. Ward say is there anything we can do now to stay in Seattle?

A   No.

Q   What did Mr. Ward respond when you -- I guess, can I at least admit it's a mechanical response, a literal response to Mr. Ward's e-mail?

A   It's indeed a mechanical response.

Q   We'll use that.

A   Yes.

Q   In response to your mechanical response, what did Mr. Ward say?

A   He says, That's the spirit.  I'm willing to help any way I can to watch ball here next year.

Q   "Ball here next year" meant Oklahoma City?

A   Yes, sir.

Q   And Mr. McClendon, he said?

A   "Me, too.  Thanks, Clay."

Q   You didn't e-mail back to them and say hold on, boys, you misunderstood me.  I'm not possessed to move the team to Oklahoma City; I'm possessed to keep the team in Seattle, correct?

A   Their perspective was well known to me.  I didn't respond. This was right after I found out about our defeat in Olympia. And I specifically want to point out the game is just getting started because that is a reference to what I believed to be the case.  What I had heard time and time again in my process is that nothing will happen here until the very end. Then the game gets started.  That is where I thought we were.

Q   My question to you was, did you respond back to Mr. Ward and Mr. McClendon to correct their impression that what you were saying is you were possessed to move the team to Oklahoma City?

A   No, I did not.

    And I didn't believe that's their impression.  I'm sorry.

Q   Let's see what you did shortly thereafter.

    Can we move for trial Exhibit No. 116.

MR. KELLER:  No objection, Your Honor.

THE COURT:  116 admitted.

(Exhibit No. 116 admitted.)

BY MR. LAWRENCE:

Q    116 is an e-mail dated a few days later, correct?

A    Yes.

Q    It's from you to J. Litvin at NBA.com?

A    Yes.

Q    Who is J. Litvin at NBA?

A    He's the president of basketball operations at NBA.

Q    Basically, he's the number-two guy at the NBA?

A    He's very senior at NBA.

Q    He reports directly to Commissioner Stern?

A    Yes.

Q    And this is reflecting the discussion that you had with him that morning, correct?

A    That's correct.

Q    And what this e-mail reflects is that you were discussing Oklahoma City as a market for an NBA team, correct?

A    Yes.

Q    So within a few days of being a man possessed to stay in Seattle you contacted Mr. Litvin of the NBA and started explaining to him why Oklahoma City is a good place for an NBA team; is that fair?

A    Yes.  We expanded our process following the defeat in

Olympia to explore other locations, and also primarily attempt to keep our eye on Seattle.  Also thinking we would provide leverage to that process.

Q   Let me understand exactly what you did.  You called Mr. Litvin and you asked is there any way for us to move to Oklahoma City for the next NBA season, correct?

A   Yes.

Q   So the man possessed to stay in Seattle, first thing he does is call NBA and says how can we move to Oklahoma City next season?

A   I don't think it was the first thing I did.  It was among the expansion of our process.

Q   You ended up having a conversation with the NBA to figure out how you could make that happen?

A   Exploring that.  Teeing it up, yes.

MR. LAWRENCE:  Could we have Exhibit No. 120.

Move for admission of 120.

MR. KELLER:  Your Honor, I don't have any objection to the upper portion of this which I think is what counsel is interested in.  But there is --

MR. LAWRENCE:  That's correct.

MR. KELLER:  The bottom part I think is neither relevant and it's hearsay.  Subject to counsel fixing up the exhibit later, so he can go on with his examination and use the top half of that first page I would be okay.

MR. LAWRENCE:   That's fine.

THE COURT:   All right 120 will be admitted.

(Exhibit No. 120 admitted.)

BY MR. LAWRENCE:

Q   120 is an e-mail a few days later.

Do you see that?

A   Yes.

Q   E-mail conversation between you and Aubrey McClendon?

A   Yes.

Q   And Mr. McClendon is writing an e-mail with the subject line:   Sonics on early exit.

Do you see that?

A   Yes.

Q   He asks where will we be next year, sir?

Do you see that?

A   Yes.

Q   You say, Working hard on this and don't have an answer, correct?

A   Yes.

Q   You didn't tell him, Aubrey, don't you get it, I am possessed to stay in Seattle, do you?

A   I don't say that in this e-mail, no.

Q   In fact, you were working to move the team to Oklahoma City at that time, correct?

A   We were beginning to discuss the possibility of a

consensual agreement relative to the lease and teeing up relocation.

Q   Now, Mr. Couch, his testimony, which has been submitted by deposition, indicated around this time you called him.

Can you tell us who he?

A   Jim Couch is the City Manager of the City of Oklahoma City.

Q   And as the City manager, does he have responsibility for the Ford Center?

A   Yes.  The manager and the management company of the Ford Center report to him.

Q   And the Ford Center is a basketball-capable arena in Oklahoma City, correct?

A   Correct.

Q   That is where the Hornets played when they relocated from New Orleans to Oklahoma City, correct?

A   That's correct.

Q   And Mr. Couch stated that you called him to reserve dates at your Ford Center --

MR. KELLER:  Your Honor, I don't think we should be asking one witness to comment on testimony of another.  If he just wants to ask this witness about his conversation with Mr. Couch, then it seems that's the way it's done.

THE COURT:  Sustained.

BY MR. LAWRENCE:

Q   Mr. Bennett, do you remember talking with Mr. Couch and asking him to reserve a date at the Ford Center --

A   I had a conversation to ask him, to see where we were with dates and in the event that something transpired.

Q   Okay.  So in the same period of time that you were being a man possessed to keep the team in Seattle, in addition to talking to the NBA about how to move the team to Oklahoma City you contacted Mr. Couch to reserve dates in Oklahoma City for the 2007-2008 season, correct?

A   Yes.

Q   And do you also recall that you came to Seattle at the end of April?

A   I'm not specifically recalling that.  I very well may have.

Q   You submitted travel logs as a potential trial exhibit.

        MR. LAWRENCE:  If we could have Exhibit No. 501, please.  Move admission of 501.

        MR. KELLER:  No objection.

        THE COURT:  501 admitted.

                (Exhibit No. 501 admitted.)

BY MR. LAWRENCE:

Q   This is a travel log that was prepared to reflect your travel to -- during the period of August through -- August '06 through September '07, right?

A   Looks to be.

Q    This is your travel log, correct?

A    Yes.

Q    If you could turn to page 12089, please.  This shows an itinerary for a travel that you did the end of April '07 about -- less than a week after your man-possessed e-mails.

Do you see that?

A    Yes.

Q    It shows that on Wednesday, April 25th, you met with Mr. Brad Keller, correct?

A    That's correct.

Q    And that was for the purposes of potentially retaining him in this litigation?

A    That's correct.  Well, it was for the purposes of meeting him and talking to him about his services if in fact we got to this point.

Q    There has been some suggestion about frosty relations between ownership of the PBC and the administration here in City of Seattle.  Do you remember that?

A    Yes.

Q    I would like to talk about what in fact you did on your part with respect to fostering that relationship.

A    Okay.

Q    So do you recall that shortly after you purchased the team, you had a phone call with the mayor?

A    Yes.

Q    And on that phone call the mayor indicated to you that he liked meeting you, but he expected you to stay in the lease at KeyArena to the end of the term?

A    Yes.

Q    And after that, in August of 2006, you had a meeting with the mayor; is that right?

A    Yes.

Q    And I think it was described as a meal at Wild Ginger?

A    With Mayor Nickels, Tim Ceis, Jim Kneeland and myself.

Q    At that meeting you understood the mayor was interested in a Seattle Center, KeyArena solution for the Sonics?

A    Yes.

Q    That he was willing to -- wanted to talk about renovating KeyArena the same way he talked about to the Schultz group?

A    Yes.

Q    You understood through renovation of KeyArena they were willing to renegotiate the lease, as long as there was a renovation and extension of the lease, correct?

A    I'm not sure about that.  We had no interest in KeyArena. So we didn't pursue the conversation very long.

Q    It was a short conversation?

A    Mr. Ceis indicated it was the finest basketball facility in the country.  I knew we were off track a little bit.

Q    When was the next time you had any contact with anybody at City Hall?

A    Subsequent to that I did visit with Counselman Lacata and Counselman Della (phonetic) just to explore where they were and what their view was.  Mr. Della was heading up the task force to review the master plan of Seattle Center, and Mr. Lacata had been outspoken in opposition to us.  I wanted to have a discussion with him.

Q    When was the next time after August that you contacted the mayor's office?

A    I could not tell you.

Q    Would it have been July of 2007 when you had a phone call with the mayor?

A    Could have been.

Q    In terms of fostering the relationship with the mayor's office, you had no contact between August 8th, 2006 and July of 2007; is that fair?

A    I don't think he called me either.

Q    You had no contact with him during that period?

A    No.

Q    You didn't call him to say is there any way we can renegotiate the lease with you to make this work better?

A    There was no interest in KeyArena.

Q    Did you call him to ask if there is any way to renegotiate the lease to make it work?

A    No.

Q    Did you call him to say, Your Honor, we would be happy to

do some investment in KeyArena to try and make it a better facility for us during the remaining lease term?

A    No.

THE COURT:   Mr. Lawrence, we have to break for lunch.

MR. LAWRENCE:   This is a fine time, Your Honor.

THE COURT:   Okay.   All right, ladies and gentlemen we'll be back in session at 1:30.

(Lunch recess taken.)

THE COURT:   Go ahead, Mr. Lawrence.

MR. LAWRENCE:   Thank you, your Honor.   Move for the admission of trial Exhibit 5, please.

MR. KELLER:   No objection, your Honor.

(Exhibit No. 5 admitted.)

BY MR. LAWRENCE:

Q    Trial Exhibit 5 is an ICON document, correct?

A    Yes, sir.

Q    And as we talked about earlier, ICON was a consultant you hired to assist you; is that correct?

A    That's correct.

Q    And this is a three-year outlook that they prepared, correct?

A    Yes, sir.

Q    And this -- If you turn to the second page of the document, that tells you the assumptions that they are looking at.   Do you see that?

A    I do.

Q    And the assumptions in this economic forecast were the current KeyArena lease.  Do you see that?

A    Yes.

Q    No major roster changes, no top two draft pick, which we know you did get a top two draft pick, correct?

A    Yes.

Q    That was Mr. Durant?

A    Yes.

Q    No playoffs, excludes Storm.

If you could look at page Page 3403?

A    Yes, sir.

Q    And ICON is telling you here that player salaries are a major performance driver.  Do you see that?

A    Yes.

Q    And what that is saying is that in terms of your operating results, your profits or loss, players salaries are a significant component to that, correct?

A    That's correct, yes.

Q    And actually if you look, Page 3408, do you see that ICON was forecasting for you an operating loss of over $26 million for 07/08, $40 million for 08/09, and $52 million for 09/2010, correct?

A    Yes.

Q    In fact, you did try to stem those by trimming salaries;

is that fair?

A    No.

Q    You did trade away Ray Allen who was your highest paid player, correct?

A    With no relation to our perspective on managing the budget element of the business.

Q    If you could answer my question?  You traded away Ray Allen who was your highest paid player?

A    We did.

Q    And then you let Rashard Lewis go who was your second highest paid player, right?

A    Yes.

Q    I would like to talk a little bit about what would happen if the Court were to order specific performance.  Is it correct that you would intend to follow the Court's order and play out the last two seasons at KeyArena?  Correct?

A    Yes, sir.

Q    And in doing so, I take it, you are going to take a business like approach to the business, correct?

A    The best we can, yes.

Q    You are going to do the best you can to make money or lose the least amount of money possible; is that fair?

A    Yes.

Q    You are not going to change your operations in any kind of spiteful way?

A    Not in a spiteful way, but certainly we will have to change elements of our operation.

Q    Well, you are only changing -- making what you think are reasonable business decisions, correct?

A    Correct.

Q    You are not responding to anything negative about the relationship, you are going to move forward in the next two years in making reasonable business decisions in the best interests of the ownership of PBC, correct?

A    Within the parameters that we have going forward, yes.

Q    And the parameters meaning playing the two years at KeyArena?

A    Yes, sir.

Q    You are not going to throw mud at the mayor, correct?

A    No.

Q    He can still go see a game if he decides to see games again at KeyArena, correct?

A    He will probably see more of them than I will be able to.

Q    And the fans would still be able to see the games?  You know, you get a big reaction when you have the Clay Bennett day, a sellout.

A    I don't think that is --

Q    But you will do your best for the team do its best and the business to do its best if the Court orders specific performance?

A    Certainly.

Q    Thank you.  Now, I would like to ask you a couple of questions about the NBA approval of the move, if that's okay?

A    Yes.

Q    You were at the Board of Governor's meeting where that was approved, correct?

A    Yes.

Q    And you got to vote on the move itself?

A    Yes.

Q    And I assume you voted in favor?

A    Yes.

Q    The move approval was for -- was conditioned on the resolution of this trial or a settlement; is that right?

A    Or the end of the term.

Q    Or the end of the -- Well, let's step back.  The approval was for a one-year period, correct, and you could reapply after that?

A    Well, no, it was an approval that had one-year procedural elements to it that subject to material changes in the Oklahoma City program would then be approved.  So the concern was if significant economic changes in the marketplace or reasons, litigation perhaps, prevented the construction of the building or delays in the construction of the building material to Oklahoma City that the league would have a chance to take another look at it before they approved it.

Q   Sir, isn't it true that Article VII of the NBA Constitution does not permit approval for a relocation other than for the season following the application?

A   All I know is my instructions are that we will procedurally reapply to the league, not a comprehensive Article VII type of reapplication process.

Q   I will show you the document called the NBA Relocation Committee Report.  Because it is an attorneys only document I would ask you to read a couple of paragraphs to see if it refreshes your recollection of what the league did.  Okay?

A   Yes.

Q   May I approach the witness, your Honor?

         THE COURT:   What is the exhibit number?

         MR. LAWRENCE:   287.

         THE COURT:   Ms. Scollard will pull it.

BY MR. LAWRENCE:

Q   Do you have that document in front of you, sir?

A   I do, yes.

Q   Could you look to Page 17 of the document?

A   Yes.

Q   And if you could read the second paragraph under the section KeyArena lease litigation?

A   Read it to myself?

Q   Yes, sir.

A   Yes.

Q   And you were at the meeting where this was presented, correct?

A   Yes.

Q   Does this refresh your recollection that with respect to the pending litigation that the NBA's approval was limited to your obtaining a timely legal determination or settlement that the lease agreement does not require the SuperSonics to play home games at KeyArena in Seattle for the remainder of the term?

A   Correct.

Q   And could you look to Page 18 of the document and review to yourself without reading the paragraph that starts, The Sonics also have requested?

A   Yes.

Q   And, again, this was discussed at the Board of Governor's meeting you attended, correct?

A   Yes, sir.

Q   Does that refresh your recollection that the approval for a move for relocation was for the 2008/2009 season?

A   In the context, as it appears in the bottom portion of the paragraph, it would be a procedural renewal, there would not be a formal reapplication, and that the Board -- it is recommended that the Board would approve an application.

Q   I was going to go there.  I want to take it one step at a time?

A    I apologize.

Q    The approval is for 2008/2009, correct?

A    That's correct.

Q    And then furthermore, the league said that, You can renew the application, and absent change and circumstances that would materially affect any of the factors to be considered under Article VII of the NBA Constitution, the board would approve the renewed application?

A    That's correct.

Q    Now, in light of this litigation -- This litigation was filed in September, correct?

A    Yes, sir.

Q    You filed for NBA approval after the litigation commenced, correct?

A    Yes, sir.

Q    And you also signed your lease with Oklahoma City for the Ford arena after the litigation was started, correct?

A    Correct.

Q    And you worked with Oklahoma City to issue -- sorry, to pass funding for renovation of Ford Center after this litigation was started?

A    We participated financially in a campaign. I am not sure what you mean by working with them.

Q    Did that occur -- Strike that. The Oklahoma City campaign to raise funds occurred after the NBA acted or

before the NBA acted on your approval?

A    Yes.

Q    After or before?

A    The campaign occurred in March and the approval took place in April.

Q    And that was after this litigation was filed?

A    That's correct.

Q    I just want to go back just to get a couple more exhibits relating to the deal that you were offering to the Washington state legislature.

I would move for the admission of trial Exhibit 93.

MR. KELLER:  No objection, your Honor.

THE COURT:  I'm sorry, Mr. Keller, I didn't hear you.

MR. KELLER:  No objection.

THE COURT:  93 is admitted.

(Exhibit No. 93 admitted.)

BY MR. LAWRENCE:

Q    Mr. Bennett, do you have 93 in front of you?

A    I do.

Q    Although it is an e-mail that says it is from Brent Gooden to a number of people, let's go back and see.  At the bottom it says, "regards," at the end of the first page.  And then on the next page it shows "Clay."  Do you see that?

A    Yes.

Q    So going back to the first page.  So this is a

communication from you to Mr. Cameron and a number of people. Do you see that?

A    Yes, sir.

Q    And were these people part of the ownership group?

A    Yes, they are.

Q    And you are reporting on important activities for the week of February 2007, correct?

A    Yes.

Q    And this is in the middle of the legislative session?

A    Yes.

Q    And this is in the middle of the legislative session where you are trying to seek funding to support your $500 million arena proposal?

A    Correct.

Q    If we could look at the highlighted section there.  You talked about taking responsibility to aleve the private dollar portion through various means, including ticket surcharges and naming rights.  Do you see that?

A    Yes.

Q    You report, however, to your co-owners, While I am prepared for us to take responsibility for securing private money in order to insure this is a true public and private partnership, I will not be committing to a dollar figure for our ownership group.  Do you see that?

A    Yes.

Q   Was that an accurate report you made to your co-owners regarding the status of things as of February of 2007?

A   Consistent with my previous testimony.

Q   But it was accurate --  It was an accurate statement?

A   Yes.

Q   Could I have Exhibit 268, please?

        MR. LAWRENCE:   I move for the admission of Exhibit 268.

        MR. KELLER:   No objection, your Honor.

        THE COURT:   Exhibit 268 will be admitted.

                (Exhibit No. 268 admitted.)

BY MR. LAWRENCE:

Q   Do you see Exhibit 268?

A   I do.

Q   Mr. Kneeland was, I think you called him, a political operative?

A   He was our primary political advisor, yes.

Q   He was your political advisor in Olympia?

A   Yes.

Q   And Mr. Kneeland is reporting to you about a meeting with Governor Gregoir, correct?

A   Yes.

Q   And she reports to you, I appreciate the challenge that Mr. Bennett and his partners are facing financially, but they cannot expect the taxpayers of Washington to solve their

problems by constructing an arena with no direct participation on their part. Do you see that?

THE COURT: Mr. Lawrence.

MR. LAWRENCE: I was too fast. I apologize.

THE COURT: You have got to slow down.

BY MR. LAWRENCE:

Q In that report Mr. Kneeland quotes the governor as saying, quote, I appreciate the challenge that Mr. Bennett and his partners are facing financially. Do you see that?

A I do.

Q But they cannot expect the taxpayers of Washington to solve their problem by constructing an arena with no direct participation on their part, close quote. Do you see that?

A I do.

Q And then further down in the report there is also a report about the cost overrun issue. Do you see that? It is the bottom highlighted section?

A Yes.

Q And that says -- she also said that she was skeptical about the cost overrun issue. Where there might be some compromise in the end, the Sonics can't dictate the design and the construction of the building and leave the State holding the bag for any cost overruns. Correct?

A Correct.

Q And this is consistent with your understanding that the

success of the arena legislation was dependent in part on the amount of the private contribution the PBC was willing to make and the cost overrun issue, fair?

A   I don't think so, no.

Q   Okay.  The document says what it says and we can move on.

A   Thank you.

THE COURT:  Counsel, I have a question here.  This is dated January 16th, 2006.  Is that correct?

MR. LAWRENCE:  No, it is not, your Honor.  I can correct that with Mr. Bennett if you like.  It is a 2007 document?

THE WITNESS:  Yes.

MR. LAWRENCE:  You know how that happens at the beginning of each year, your Honor.  I would like to move for the admission of 276.

MR. KELLER:  No objection, your Honor.

THE COURT:  276 will be admitted.

(Exhibit No. 276 admitted.)

BY MR. LAWRENCE:

Q   Again, I think he have a date issue.  These reference meetings in January of '06.  I assume that is January '07?

A   Yes.

Q   And these were message points developed for you by Mr. Kneeland, correct?

A   Yes.

Q   And these were in anticipation of a meeting with Governor Gregoir, correct?

A   Yes.

Q   And that meeting took place?

A   Yes.

Q   I would like to focus you on Paragraph 3 of that message point.  Do you see that?

A   Yes.

Q   You state, We bought the team, we were making an investment in the NBA.  Do you see that?

A   I do.

Q   We paid 350 million in a rushed auction and subsequently learned that we paid too much based on the current performance of the franchise, not just on the court but especially in the overall business operations.  Do you see that?

A   I do.

Q   What that means for us as owners is it limits how much we can contribute to this new building.  Do you see that?

A   Yes.

Q   And was that an accurate perception at that time?

A   Well, again, these are recommended messages by Jim Kneeland.  We contemplated --  My overall view of what you described is that we had put together a deal.  We weren't sure at this point exactly what it was going to look like but

it had to be a deal that worked.

Q   Did Mr. Kneeland, your political operative, just make this up or was this just based on his discussions with you?

A   I believe these were recommending messaging points that he developed.  I may have had some involvement in some of them, but a lot of these are his ideas.

Q   Just to tie this down, you understood that the Howard Schultz group had gone to Olympia the two years before you, local owners, asking for a $200 million renovation with a specific financial contribution outlined on behalf of the ownership, correct?

A   Yes.

Q   And the next year you took one shot at the legislature, and that one shot was a $511 million arena proposal without a specific financial commitment from the ownership group and without a specific commitment on cost overruns.  And you thought that would pass in Washington State, sir?

A   I disagree with your categorization of our lack of private commitment.

Q   Do you think --  You thought your proposal would pass, correct?

A   We did.

Q   Because you are an optimist; is that fair?

A   Reasonably so.

Q   Just like Mayor Nickels, correct?

A   Not quite that optimistic.

MR. LAWRENCE:  Thank you, your Honor.  We have nothing further for Mr. Bennett.

THE WITNESS:  Thank you.

THE COURT:  All right.  Mr. Keller, do you wish cross-examination?

MR. KELLER:  I would like to, your Honor.  Thank you.  Brad Keller on behalf of the PBC, your Honor.

CROSS-EXAMINATION

BY MR. KELLER:

Q   Mr. Bennett, did you ever think you would end up sitting in that chair?

A   Never did.

Q   Why is that?

A   I knew we would be successful.  I knew we would get a building built and we would generate something exciting for the region, build a great basketball organization and be on our way.

Q   When PBC acquired the Sonics what was the plan?

A   Well, the plan was to immediately get to work on building a building.  We felt that each of us respectively were very excited about the opportunities personally, and that our own businesses would expand in this part of the country.  We felt in our observations that there was an imminent, important need for the building, not just in terms of keeping the team

but in terms of a commercial facility that was needed in the region.  So we knew we would be successful.

Q    Did you know that the Sonics had been experiencing operating losses in prior years?

A    We certainly did.

Q    Did you know that from a financial standpoint the lease at KeyArena was, how can I put this, less than optimal?

A    Yes.

Q    So why buy the team?

A    Well, we thought it was ripe for a turn around.  We thought it was the perfect candidate for such a turn around.

Q    Why?

A    Well, the dynamic marketplace, great economy, a team -- a business organization that had been unsuccessful in leveraging demand for the building, and we thought we could step in and be effective.

Q    Let me ask a question where I think Mr. Lawrence was kind of going a minute ago.  If a bunch of influential, well connected Washington folks couldn't get Olympia to do something what made you think you would be successful?

        MR. LAWRENCE:  Asked and answered, your Honor.  I would object.

        THE COURT:  Overruled.

        THE WITNESS:  It was precisely that --

BY MR. KELLER:

Q   I don't get it.  Explain.

A   Well, 58 local owners, many of them very influential, very wealthy, highly visible business leaders in the community couldn't get it done.  And part of the reason I think they couldn't get it done is they really never had the leverage they needed to get it done, because certainly that ownership group was never going to relocate that team.  And without that leverage their efforts were mitigated.  And we inherently had that leverage.

Q   Now, you were asked some questions about other people that originally you had talked with about participating in PBC down in Oklahoma?

A   Correct.

Q   But it ended up not.  I don't think you ever got to tell us why that happened.

A   Well, another significant investor was going to be Larry Nichols with Devon Energy.

MR. LAWRENCE:  This calls for hearsay as to Mr. Nichols' state of mind and what his testimony is.

THE COURT:  Overruled.

THE WITNESS:  He had in fact invested in the team and committed to be the same level as the four primary owners. And as we began to formalize our game plan, our business plan, our objectives and how we were going to set forth he made the determination that he didn't feel it was reasonable

for his company, a public company, to have an asset such as the Sonics in Seattle.  So he chose to withdraw from the ownership group.

BY MR. KELLER:

Q   Was he not willing to make the same commitment to try and make it happen here that you were?

A   That was not an objective for him, no.  So he chose to withdraw.

Q   Were there any other people who were initially -- other Oklahoma business folks that were asked to participate that declined because of the commitment to try and make it work?

A   Yes, we had others.

Q   Who were the others?

A   One was Love's Country Stores.  They are a fuel stop location on a highway system around the country.  And another was Bob Moore who is a significant automobile dealer and investor in Oklahoma.

Q   Now, were these folks significant potential investor from a dollar standpoint?

A   Yes.

Q   Can you give us an idea?

A   I think the range of investment that they were contemplating was an equity investment of $20 million a piece, except for Nichols was more in the $50 million range.

Q   You were unable to take their money and put it in the

group because of why?

A    Our commitment to be successful in Seattle.

Q    Let me ask you -- Could you pull up Exhibit 5?  I'm not sure -- that was that ICON set of projections.  When was this done, roughly?

A    I am not sure of the date.  I'm sorry.

Q    I guess what I am trying at, was this something that was done after you had already acquired the team?

A    Yes.

Q    And if you go to page -- Bates number 408.

A    Yes, sir.

Q    And I realize this was subject to the assumptions that were being made at the time.  But what kind of losses were being projected -- excuse me, one of the assumptions was the existing Seattle lease, right?

A    This is with the existing Seattle lease at KeyArena.

Q    At that time based on the assumptions what were the projected losses for this next coming basketball season?  That would be the 08/09.

A    Approximately $41 million.

Q    And how about for the year after that?

A    Approximately $52 million.

Q    That would be a cumulative loss over the two years of $90 million?

A    Yes, sir.

Q   Now, you were asked some questions about --  There is a page here that talks about the assumptions.  Let's take a look at that, Page 403.

A   Yes, sir.

Q   I'm sorry.  Page 399.  My mistake.

A   Yes.

Q   It says no major roster changes, and then it says no top two draft picks.  Do you see that?

A   Yes.

Q   And I think as it was brought out you were lucky enough to get one of the top two?

A   Yes.

Q   Is it public how much the team paid to sign that guy?

A   Yes, relatively so.

Q   Would you share with us what it was?

A   It was in the range of $4 million the first year.

Q   And after that?

A   It is a $4 million contract that escalates.

Q   Whatever movements and transactions that occurred concerning Mr. Allen, that is the player Mr. Allen, and the player Mr. Lewis, did that have anything to do with trying to trim payroll?

A   Nothing at all.  In this business, and certainly as we view this business, basketball is first and foremost, and team development is first and foremost.  Those decisions were

purely made in the effort to reposition and redevelop the basketball program.

Q   Do you have the rest of that video clip from the House Ways and Means?  I think we were supposed to play that when we first came back from the break.

THE COURT:   The Exhibit Number, please?

MR. KELLER:   Exhibit 94.

MR. LAWRENCE:   97.

MR. KELLER:   97.

(Audio played)

MR. KELLER:   I am going to move for the admission of Exhibit 94 at this point, which is the transcript of that entire session.

MR. LAWRENCE:   If it is the same as the video we have no objection.

THE COURT:   94 will be admitted.

(Exhibit No. 94 admitted.)

BY MR. KELLER:

Q   You referred in the answer we just looked at to "the gap," and committed to -- made a commitment to the gap.  Let's look at the earlier portion of the transcript at the bottom of Page 3 that talks about the sources of funding.  Is that basically outlining the conceptual funding package?

A   Yes, I believe so.

Q   And if you look over at the top of the next page,

Mr. Bennett?

A    Yes.

Q    And from the bottom of the prior page it says, the balance of the price tag which in this case would be roughly $200 million would be funded by the municipality and by private contributions?

A    Yes.

Q    Is that the gap you are talking about?

A    Yes.

Q    I want to back up and get a little more general, the bigger picture on the efforts to execute the plan and get an arena in a region that would keep the team here.  You told us about your work with Mr. Kneeland's public affairs group. Tell us their role in this process.  First of all, what is one of the first things you did after you bought the team?

A    We made the announcement on July 18th.  And that very evening I began to make calls to various civic leaders in the community.  These were people recommended to me by Jim Kneeland -- I'm sorry, recommended to me by members of our executive staff, and also through some of my research.  One of those people recommended Jim Kneeland to me as someone who would be a very effective person to talk to.  They had suggested that the previous lobby efforts and exercises in Olympia had not gone very well and perhaps we need to start over, find a new team at go at it again.

Q   So time wise, when were you reaching out to try and put together the beginnings of the legislative effort team?

A   The very day we made the announcement to acquire the team. And I had my first meeting with Jim Kneeland that very next morning at 7:30 a.m.

Q   Was that months before you actually owned the team?

A   Yes, we closed the transaction on November 1.

Q   And so you are reaching out when?

A   In mid July, right, the very day we made the announcement.

Q   Did you retain Mr. Kneeland's group?

A   We met.  We had a very productive conversation.  He outlined to me a strategy that he thought would make sense. It primarily relied on the same funding mechanism, these existing King County taxes that are rental car, restaurant and hotel/motel that are currently in place to fund the Safeco debt and the Qwest Field debt and the King Dome debt and I believe heritage and arts group funding.

Q   Over how many months did you continue to work with Mr. Kneeland and the team that he assembled?

A   Very consistently through the legislative session.

Q   Do you have -- Do you know what order of magnitude that expenses were incurred?

A   I am not precisely on his individual relationship.

Q   That's okay.  What other things did you do early on to begin the process of trying to execute on the plan and make

something happen here in the region that would have kept a team here?

A    Through our law firm in Oklahoma City that had been doing a lot of work for us in developing a plan we retained -- they identified the firm of Foster Pepper, and we identified the firm of Foster Pepper and an attorney by the name of Allen Israel.  And Mr. Israel had previously represented Mr. Paul Allen in his efforts to develop Qwest Field, and had in fact developed a lot of the actual legislation for Qwest Field. So we were able to retain them and they began to help us develop legislation mechanisms that we ultimately took to Olympia.

Q    By when had the Foster Pepper firm been brought onto your team?

A    I think in August.

Q    And over what period of time did you continue to work with them to try to make this happen?

A    Consistently through the end of the legislative session.

Q    And I don't want you to disclose any confidential communications about them, but just generally what kind of work were they doing on the efforts to get a new arena in?

A    Generally helping us on legislation.  But they also provided other counsel on different pieces of the exercise, primarily focused on the development of the legislation.

Q    What are some of the other things you did early on to try

to foster the process?

A    We also early on retained Cushman and Wakefield.

Q    Who are they?

A    They are a real estate advisory firm, and hired their Seattle office.  And the charge was to help us develop a process to evaluate sites for which we could develop the new building.

Q    And what did they do as time unfolded on this effort?

A    They evaluated about 30 sites I think in their final evaluation.  We had already evaluated one site.  In fact, the day after the announcement we went and looked at a site in Bellevue that had been recommended to us by the prior ownership.  We submitted that site to this evaluation by Cushman and Wakefield.  And through time, based on parameters such as available continuous land, transportation systems, market data, etcetera, developed a profile for potential sites.

Q    Take a quick look, if would you, at Exhibit 536.  That's an awfully big exhibit.  I will try to avoid putting that in evidence.  Tell us what that is.

A    This is the report that reviewed and analyzed the 30 primary sites in the region -- in the three-county region that we were reviewing.

Q    And is this something that was provided to you as part of this process?

A    Yes.

Q    Take a look, if you would, at Exhibit 535.

A    Yes.

Q    Can you tell us what that is?

A    This is I believe when they began to look at some of the finalist locations.  And it includes --  Also in our process we began to circle back a little bit, even in light of I-91, to consider Seattle Center.  There had been a notion from some of the leadership I talked to that, you know, the stadium really ought to be at Seattle Center.  Maybe it is not KeyArena but maybe it is a driver of some more comprehensive redevelopment concept for Seattle Center.  So we began to look at that.  And really in the view of the consultants and how we went at it anything we did would affect the Memorial Stadium site.  And we began to understand that was going to be a bit of a political challenge, so we moved on from that.  We did kind of go back and take another look there.  And then other sites that were available -- perhaps available, but that were certainly just from their physical nature and market location nature were viable.

        MR. KELLER:  I will move for the admission of 535, your Honor.  It is not as big as the other one.

        MR. LAWRENCE:  No objection.

        THE COURT:  535 is admitted.

                (Exhibit No. 535 admitted.)

BY MR. KELLER:

Q   What was the date this was prepared?

A   November 1.

Q   Of what year?

A   Of 2006.

Q   When did the deal close?  When did you become the owner of this team -- one of the owners?

A   Technically October 31st at 11:59 p.m., the same day.

Q   By then the universe was getting narrowed down to these sites?

A   Yes, sir.

Q   As time went on did the universe of sites get narrowed down further?

A   They did.  They quickly came down to a site in Bellevue, a site in Renton.

Q   Now, when you are analyzing all these sites and looking at them and trying to narrow it down do land use issues become an issue?

A   Certainly.

Q   Did you need help there?

A   We did.

Q   Who did you reach out to?

A   We reached out to a variety of consultants to help.  And Cushman and Wakefield stayed on board.  We also retained Transpo Group to do some transportation analysis, and then

ultimately had HOK come on board with ICON group to do site analysis of both sites.

Q    I will ask you a little more about HOK later.   How about when it came to legal help on land use issues?

A    We hired a firm by the name of McCullough Hill, Jack McCullough.   Jack became, for lack of a better word, our quarterback on the site selection process and was very, very helpful to us in understanding all of the relative municipal issues and physical issues on the sites.   He has a lot of experience in this.

Q    How early on was he retained?

A    Early on, probably August or September.

Q    And did he continue to provide legal assistance on land use issues throughout the process?

A    He did throughout.

Q    You mentioned HOK.   Who are they and what was their role on your team to try to find a regional solution?

A    If I may, it was ICON Venue Group who assisted us in the selection of HOK.   And ICON, as I described before, is a highly regarded firm in their field.   And we asked them to assist us in the process of selecting an architect.   And so we went through a comprehensive process, short listed to three, and ultimately selected HOK.   And I would suggest that HOK is probably the preeminent sports architecture firm in the world.

Q    And as things got narrowed down to the sites how did the role -- what was the role of HOK?

A    They were highly involved and very, very important to the site.  Also they had a team member that also was doing some work at looking at renovations at the University of Washington football stadium.  So we had been in the market and had a sense of some of the issues we were dealing with.  And was very helpful.  Just looking in closer detail at did we have a big enough footprint, how would parking work, how would transportation access work, beginning to look at design relative to the economic programming that we were contemplating, and then ultimately getting involved with us on the static design of the building.

Q    Did HOK also provide assistance in analyzing KeyArena?

A    They did.

Q    Generally what was their role in that regard?

A    They have a division in their company that does just such work, where they go and evaluate existing buildings and determine their viability relative to other buildings, or their viability relative to renovation programs and things like that.

Q    Now, counsel asked you a number of times about whether you were willing to consider renovation of Key, whether you negotiated with the mayor regarding a renovation of Key, and you told him no.  Why was that?

A    I did.   That was pretty much fundamental from the beginning.

Q    Why is that?

A    Well, because there is an industry understanding of KeyArena, notwithstanding the nice sight lines.

Q    Stop.   What do you mean the "nice sight lines?"

A    KeyArena has been known for nice sight lines.

Q    What does that mean?

A    There is proximate seating to the floor.   So when you are sitting in your seat you have a nice view of the game.   That has always been an attractive feature of KeyArena.

Q    Why was KeyArena a nonstarter --

         MR. LAWRENCE:   Your Honor, I would object to any testimony about industry understanding.   There is no foundation.   It is hearsay.   I don't know what it is.

         THE COURT:   I think we are a question behind there. Let's pose another question and see what we get.

BY MR. KELLER:

Q    Tell us why from your view KeyArena was not something that you were willing to consider as a renovation and why you were pursuing a new building solution?

A    My view is because it could not fundamentally meet the needs of the economic model of the NBA.   And the primary piece of that is high end amenities, high revenue extraction amenities.

Q    Explain what you mean by that.

A    Close seating to the court, suites close to the court, high end clubs and restaurants close to the court, gathering areas and viewing areas close to the court, middle level suites.  That piece of the business is fundamental now to the business and requires the court-side footprint to be dramatically bigger than exists with KeyArena.  And KeyArena, that bowl is dug in and it would require complete reconstruction of the subgrade infrastructure to expand it enough to accommodate such amenities.  That is the fundamental difference between Key and the newer, modern, competitive buildings.

Q    Anything else?  Did you reach out to HOK to help you analyze KeyArena?

A    We did.

Q    Take a look, if you would, at Exhibit 549.

        MR. LAWRENCE:  Your Honor, he needs to move the exhibit before we see it.

        MR. KELLER:  I agree.

BY MR. KELLER:

Q    Do you have 549 in front of you, sir?  Is this work by HOK part of what you took into account in deciding on pursuing a new building solution rather than some renovation of KeyArena?

A    No.  This was well after that decision was made.

Q    Did this have to do with the existing KeyArena?

A    It did.   This is an assessment of the existing KeyArena.

Q    Is this part of what you were taking into account in your decisions about whether to pursue a new arena?

A    No.

Q    Tell us something of the other consultants you worked with as part of your team to find a regional solution early on in the process?

A    If I may go back, there are other amenities relative to the ground level that are important, press management facilities --

Q    I'm sorry.   Have you moved backwards?

A    I went backwards.   Sorry.

Q    What are you answering now?

A    Other reasons why we only looked at the new building and not Key and relative to the infrastructure restrictions.

Q    Please tell us some of the other considerations that drove you towards a new building solution rather than renovating KeyArena.

A    The need for NBA specified facilities that don't exist now in Key.   And this is size of locker room, size of press facilities, size of other operating elements of an NBA franchise.

Q    Thank you.   Anything else there?

A    That's all.   Thank you.

Q   Now, let's go back to where I tried to a minute ago.  Tell us about some of the other consultants you made part of your team to try and find a new arena for a regional solution?

A   I can't think of any right now.

Q   All right.  You have told us about Foster Pepper, you told us about Mr. Kneeland's group, the McCullough firm, Cushman and Wakefield, ICON, HOK, Transpo Group.  Did you reach out to local leadership for assistance in the effort?

A   We did.

Q   What kinds of things did you do in that regard?

A   Well, really from the beginning I began to attempt to personally integrate with elected officials and business leadership through one-on-one meetings, through luncheons, dinner meetings, numerous speaking engagements to civic leaders and business leaders.  As we got further along into the process we established an informal but fairly active group of those leaders that were helping us in terms of communications to leadership in Olympia, and ultimately that fanned out into more formal communications via e-mail, blasts and other mechanisms through our staffs and our staff's family and friends, everything we could muster from our perspective to try to influence Olympia.

Q   I will ask you a little bit more about the final push down in Olympia later.  Let's go back to the process of narrowing it.  At some point did you narrow it down to two sites?

A    Yes.

Q    And what were those two sites?

A    Bellevue and Renton.

Q    And when it came to the Bellevue site what were the issues there?

A    Well, the Bellevue site was -- the commercial elements of the Bellevue site in our view in that significant part of our market potential was near that location was very attractive, but there were restrictions in that site.  The site, first and foremost, required a significant land assemblage that was going to be very expensive.  It was very tight within some road systems in Bellevue.  The differentiation at the end of the day in our minds was that we could not develop proximate parking to the building, and that the notion was that we would utilize existing parking structures in downtown Bellevue through a to-be-developed pedestrian movement system that would move people to the building.  It became problematic in that who controlled garages and availability, etcetera.  The movement system was going to be expensive and a bit of an unknown.  It became ultimately one that we just didn't think would work.

Q    Before it was eliminated were efforts made to find out what the unique needs of likely other users in the Bellevue area would be?

A    Yes.

Q    What was done?

A    The day after we purchased -- or made the announcement of the purchase we went to Bellevue and visited with members of the Bellevue city staff, and in fact took a look at that time what was known as the Safeway site.  We began to develop ideas of what would work there.  One of the first things we considered was what would Microsoft's needs perhaps be relative to a new building.  Microsoft had been talking to Bellevue in terms of an expansion or retooling of their convention center to accommodate their growing needs.  And we felt perhaps if we could integrate this building into that it would be beneficial.  So we in fact reached out and developed a study with Microsoft meetings personnel to add programming to the building.

        MR. KELLER:  I will move for the admission of 544.

        THE COURT:  Any objection to 544?

        MR. LAWRENCE:  I am just looking at it, your Honor. No, your Honor.

        THE COURT:  544 is admitted.

                (Exhibit No. 544 admitted.)

BY MR. KELLER:

Q    Can we pull up that top half of it, please?  Is this e-mail reflecting some of the meetings that were going on between some of your consultants and Microsoft's events people to find out what their needs would be for an events

center to try and make sure that something was built there would be suitable for them?

A    Yes, sir, it does.

Q    Who was CSL?

A    CSL is Convention Sports and Leisure.  They are a market analysis -- market feasibility analysis type firm specializing in convention sports and meetings activities.

Q    Did you reach out to them for assistance in connection with trying to find a regional solution that would keep the team here?

A    We did.  Early on I was getting input from leadership that I also had to make darn sure that we considered NHL hockey.  The current KeyArena could not accommodate NHL hockey, that there is interest in this marketplace for NHL hockey.  And so we wanted to, from a design standpoint, contemplate that, but also take a look at the economics of that and see how that would be added to the performance of the building.

Q    So what did you do to try and analyze the feasibility of the facility that you were trying to get implemented for National Hockey League hockey?

A    Well, two things.  One is we did retain CSL and bring them in to do a report.  And then at the same time I met -- spoke with numerous times and met with a couple of times a commissioner of the NHL to talk about hockey.  In fact, I

appeared before their board at one time to present the Seattle opportunity.

Q   Would you take a look at 552?  Is that part of the work that CSL did for you at your request analyzing feasibility in this area for an NHL team?

A   Yes, sir.

Q   Is that what that is?

A   It is.

Q   Is that part of what you were utilizing to make the business determination about whether to pursue a multi-sport facility as opposed to single use?

A   It is.  In fact, we had some interest locally.  We were beginning to contemplate how we might put together ownership. I think I had commented publicly that, you know, whether we would participate as owners or not that this would be something that we should evaluate as a community.

        MR. KELLER:  Your Honor, I would move for the admission of 552.  My reasoning is that counsel in his direct exam put at issue somewhat Mr. Bennett's state of mind.  And this goes to what he has been advised by his consultants and the work he has been doing to make it happen.

        MR. LAWRENCE:  Your Honor, we object to the exhibit, both on grounds that it appears to be an expert report without the benefit of an expert.  Also as to hearsay.  And also as to relevance as to what NHL market demographics have

to do with this case.

MR. KELLER:  Again, counsel is trying to -- the thrust of his claim is that there was no real bona fide effort that was made here.  I am trying to establish quite a bit was done here.

THE COURT:  Help me understand how the admission of this document, which appears to have an analysis of NHL hockey --

MR. KELLER:  Gets you any further than where we are right now?

THE COURT:  Right.  He testified that he had the analysis done.  What is your point?  Do you want me to read it?

MR. KELLER:  Fair enough.  I will withdraw it.

BY MR. KELLER:

Q   Mr. Bennett, ultimately did you get down to one site that was the one that you wanted to go to bat on?

A   It was the Renton site, what we call the Boeing site.

Q   Now, did the response and cooperation of the local leadership in the Renton area play a role in that decision?

A   It did.  And that is not to suggest that Bellevue was not supportive.  They were.  Renton really wanted the building. They were very enthusiastic about it.  It was a project that they believed could help really complete the beginnings of a very important economic turn around for that location.  There

already is being developed, contiguous to the site, a very nice mixed use commercial site development that would be complimentary.  They loved the notion of having the team at the location.

Q    Did you yourself work directly with Renton city government and elected officials there?

A    I did.  I worked very closely with Mayor Keolker, city manager, the economic development director, members of their staff and had numerous meetings with members of their city council.

Q    When it came time to try to go down to Olympia, did they provide assistance as well?

A    They did.  Mayor Keolker was exceptional and worked very, very hard.  Margaret Apprentice as well, from that area, in the senate was very active and very supportive.

Q    Tell us a little bit about your efforts down in Olympia when it came time to finally go down there and try and make it happen?

A    Well, we had maintained the lobby effort, in fact ramped it up at the end.  I think we added another person or two to help expand our effort.  I did go down and make calls on various legislative leadership through the course of that.  I testified before the Senate Ways and Means committee, as did Lenny Wilkins on our behalf.  I testified in front of the House Finance Committee, and was honored that Bill Russell

attended that with me.  I made numerous calls and meetings with the Governor.  I had a personal meeting with Speaker Chopp and other legislative leadership.  I also reached out to this informal group that I referred to earlier of business leaders to help shore up our efforts and make additional calls and support.

Q    And how was it going initially?

A    I felt it was going pretty well.  I thought the Governor had indicated to me that she thought we were moving along okay.  We always knew that Speaker Chopp had a philosophical difference with us in the pursuit of this.  But we were getting signals that we were making progress and continued to push.

Q    As time went on what happened?

A    Well, as time went on we did not make it.  We found out -- I was in New York and received a call from the Governor that said the bill did not get out of committee, and that was the end.

Q    But before you got that call did you start to learn that maybe were you in trouble then?

A    Well, we were getting signals that we were having trouble on this and we began this kind of more consumer push, if you will, from staff and constituents that we could effect to try to influence their representatives to move on this issue.

Q    What kind of push was made?  What staff?

A   Sonics staff.

Q   What kind of push was made there?

A   Oh, we organized an e-mail blast campaign, for lack of a better term.  Family and friends, relationships, send e-mails to your representatives, make phone calls, we are down to the end, do all you can to pull this through.

MR. KELLER:  I will move for the admission of Exhibit 558.

THE COURT:  Any objection?

MR. LAWRENCE:  No, your Honor.

THE COURT:  558 will be admitted.

(Exhibit No. 558 admitted.)

BY MR. KELLER:

Q   Was this one of the reports you were getting from Mr. Kneeland in the homestretch down in Olympia?

A   That's correct.

Q   Is there a reference to there --  Mr. Barth is the CEO of the Sonics?

A   That's correct.

Q   Mr. Barth and the staff are giving calls into the Governor's office?

A   Yes.

Q   And were you also --  Does this also reflect your communications with the Governor as well?

A   Absolutely.

Q   And you mentioned something about blast e-mails --

MR. KELLER:  I will move for the admission of Exhibit 554, please.

MR. LAWRENCE:  We have no objection, your Honor.

THE COURT:  554 will be admitted.

(Exhibit No. 554 admitted.)

BY MR. KELLER:

Q   Is that Mr. Kneeland informing you about what you referred to as the blast e-mail campaign to opinion leaders and supporters?

A   That's correct.

Q   Did you also reach out to some of the influential business people in the homestretch?

A   I did.  Jim Kneeland and I respectively began to make calls to people we had worked with in the process to make one last call, if they would, to the Governor, the Speaker, whoever they could influence.

Q   Who do you recall reaching out for help?

A   I know we spoke with Mr. Steve Reynolds with Puget Sound -- I believe the chairman and CEO or was or is of Puget Sound Energy, Mr. Dave Sabey who is the president of Sabey Corporation, others that I can't recall the names.

Q   Did you also solicit assistance from Mr. Ballmer over at Microsoft?

A   I did.

MR. KELLER: I will move for the admission of 548.

MR. LAWRENCE: No objection, your Honor.

THE COURT: 548 is admitted.

(Exhibit No. 548 admitted.)

BY MR. KELLER:

Q   Can we look at the top of the e-mail there? Is this an e-mail from you to Mr. Ballmer at 2:02 in the morning on February 15th?

A   Yes.

Q   If you look at the end of that first paragraph there you say, Speaker Chopp blasted us this afternoon. Would appreciate anything you would be willing to do. Thanks.

A   Yes, sir.

Q   What were you trying to get here?

A   Just help in the legislative process, specifically Mr. Ballmer mentioned he would be willing to contact Mr. Ross Hunter, who I believe had been previously a Microsoft employee.

Q   And who was he in state government?

A   He was the Chairman of the House Finance Committee, and ultimately a very important part of this, and may in fact be a Bellevue representative. And so that was a problem with the Renton site. Mr. Ballmer said he would be very willing to contact him.

Q   Did you also meet with Mr. Hunter?

A    I did.

Q    Tell us about that.

A    We had a very cordial meeting.  I met with one of our lobbyists, Linda Hall, and we had a meeting in his office. And he told me that he was not receiving -- he is receiving more opposition than support for the proposal, but he was open to it.  He had to review all of the elements of it, but we had a cordial conversation, he understood our proposition, and looked forward to me testifying in his committee.

            MR. KELLER:  I will move for the admission of 555, your Honor.

            MR. LAWRENCE:  No objection, your Honor.

            THE COURT:  555 will be admitted.

                    (Exhibit No. 555 admitted.)

BY MR. KELLER:

Q    Is this an e-mail string from early April 2007 during this last push down at Olympia?

A    Yes, sir.

Q    Can we take a look at the e-mail at 7:02 a.m. from yourself to Mr. Ballmer?  Take a minute to read that, if you would, to yourself, Mr. Bennett.

    What generally was your concern that you were expressing to Mr. Ballmer in the homestretch in Olympia?

A    We weren't getting anywhere and we needed some big influence to come through for us.

Q   Were you e-mailing somebody you thought might be a person of big influence?

A   I think so.

Q   If we go up on the e-mail string to your e-mail to Mr. Balmer at 12:15 p.m., you say, The legislative leadership needs to get a message that the big boys want this to move. The dirty work will be addressed at the county.  It doesn't need to come directly from you but Ross Hunter.  You told us who he was.  Lisa Brown and Frank Chopp need a push. Continued support of the Governor would help as well.  Thank you.

     What were you trying to accomplish here?

A   I was attempting to urge Mr. Ballmer to utilize his significant influence and support of our proposition.

Q   Why were you doing this?

A   Because we wanted to get it done.

Q   You didn't get it done, did you?

A   No.

Q   After you -- What was your reaction when you didn't get it done?

A   I was very, very disappointed.

Q   What did you do?

A   Well, after that I regrouped, became a man possessed and expanded the process.  It was clear that --

Q   How did you expand the process?

A    Well, primarily by beginning to look at what our other options were relative to relocation.  And on two fronts.  One, believing that this deal was in trouble, we had gotten close, it became clear in my view that there was not broad public support for this type of an investment.  And while we would keep the push on and hope for some private solution or something to develop we also needed to expand the process and look at other cities.  And in doing so we would make progress relative to the qualification of those cities, and hopefully impose some leverage -- some more imminent leverage on a local solution in Seattle.

Q    And what kinds of things did you do to try and get some action here in the Puget Sound area on an arena?

A    I primarily made local calls to people.  I reached out I know to Mr. Dave Sabey again, who had been a very consistent and interested supporter of keeping the team and finding a way to get a building built, who had some creative ideas about how perhaps we could utilize some real estate that he recommended would be perhaps a good site.  That particular recommendation relied on the same legislative solution for the primary funding.  So we didn't get very far with that.  I also did meet with the Muckleshoot Indian Tribe and evaluated their site.  Again, the primary funding for their development relied upon the same legislative funding mechanism that had just failed now for the third time.  I was open to hearing

what might be out there and having meetings but not hearing much.  And then ultimately in July I issued a call to action, if you will --

Q   When you say you issued it what do you mean?

A   We issued it through really a media release and I think a few selected reporters and columnists, had personal meetings with them to issue a call to action.  And we were in July.  If something was going to develop before November 1 time was running out.  And this was a call to anyone and everyone with any ideas to please contact us, please engage with us, and we would be willing to research and understand and endeavor to find ways to make any potential concept work.  And we fortunately did receive significant media coverage of that call to action.

Q   Ultimately nothing happened?

A   No.

Q   You were asked some questions about the extent to which commitments were made to Mr. Schultz' organization referring to the efforts that would be undertaken.  I wanted you to actually look at the actual -- what ended up in the final purchase and sale agreement with the Basketball Club of Seattle.

        MR. KELLER:  I will move for the admission of Exhibit 62, your Honor.

        MR. LAWRENCE:  No objection, your Honor.

THE COURT: 62 will be admitted.

(Exhibit No. 62 admitted.)

BY MR. KELLER:

Q   Is that the -- is this the purchase and sale agreement of the transaction by which the PBC acquired the ball club from the -- from the Basketball Club of Seattle?

A   Yes, sir.

Q   Let's turn if we could to Page 31.  The last three digits are Bates number 381, Section 5.3 of the agreement.

A   I'm sorry, sir?  The page?

Q   Bates numbers in the lower right corner, the last three digits are 381.

A   Yes, sir.

Q   And I want to direct your attention to the language there. It talks about, For a period of 12 months after the closing date buyer shall use good faith best efforts to negotiate an arena lease, purchase, use or similar agree arrangement in the King, Pierce or Snohomish Counties of Washington as a venue for the teams' games to be used as a successor venue to KeyArena.

I will ask you about the rest of the language in a minute. But the reference -- the commitment to a successor venue to KeyArena, was that something that was important to you, that language?

A   Very much so.

Q    Why is that?

A    Because it meant to me a new and different building.

Q    And was that consistent with your unwillingness to consider a different KeyArena because of your beliefs that it just wouldn't work?

A    That's correct.

Q    It goes on in the language and says, However, that the process described in this Section 5.3 -- That's this effort you are going to make, right?

A    Yes, sir.

Q    And the entering into of any such arena lease, purchase, use or similar arrangement shall be at buyer's sole discretion.

     Do you see that?

A    That's correct.

Q    Was it important to you that the process, as well as any ultimate decisions, would be at the discretion of PBC?

          MR. LAWRENCE:  I'm not sure why this is relevant. This is an agreement with the Schultz group.  Why what he thinks is important about what he signed -- The language speaks for itself.

          MR. KELLER:  We are beyond that.  This door was opened up on direct.

          THE COURT:  The objection is overruled.  Counsel, we need to take our afternoon recess.  Can we stop here?

MR. KELLER:  Yes.

THE COURT:  All right.  We will be at recess for 15 minutes.

(Court in recess.)

ANDREW ZIMBALIST

The witness, after being duly sworn, testified as follows:

THE CLERK:  State your full name and spell your last name for the record.

THE WITNESS:  Andrew S. Zimbalist, A-N-D-R-E-W, Z-I-M-B-A-L-I-S-T.

DIRECT EXAMINATION

BY MR. NARVER:

Q   Where are you employed?

A   Smith College North Hampton.

Q   You're an economics professor there?

A   I am.

Q   Is there a particular focus to your teaching and research?

A   Yes, there is.

Since 1990 I have been engaged in researching and writing and consulting in the sports industry.

Q   I'm going to come back to your background in a minute.

But first I would like the Court to understand why you're here today.

Were you retained by the City of Seattle to provide an

opinion in this case regarding the value of a sports team to a local economy?

A    Yes.

Q    What opinion did you reach on that subject?

A    I reached the opinion that Seattle SuperSonics have a very substantial intangible economic benefit to the City of Seattle, but that economic methodology does not permit us to provide a precise estimate or even a estimate within the reasonable bounds of statistical accuracy, what the size of that intangible benefit is.

Q    Thank you.

Could you briefly describe your educational background?

A    I went to University of Wisconsin where I got a Bachelor's degree in economics.  Got a Master's degree from Harvard University, and I got a Ph.D. from Harvard University all in economics.

Q    How long have you been teaching at Smith College?

A    Since 1974.

Q    Have you taught other places as well?

A    Yes.  I have taught at Amherst College, University of Massachusetts, University of Geneva, Doshisha University in Kyoto, Japan, University of Chile, and I believe that's it.

Q    How did you get in the field of sports economics?

A    I was doing international economics March of 1990, and I was putting my then 11 year old son to bed.  He told me after

spending the whole winter thinking about his little league team he didn't think he was going to play little league that you will coming summer. I asked him why not. He said well, major leaguers aren't playing; they were being locked out, spring training. I figured I wouldn't be able to play either. I proceeded to explain to my son, Jeff, that that wasn't true. And I reached up to turn off the light and he said, hey, Dad, you just finished a book on Panama and you like baseball, you're an economist; why don't you write a book on the of economics of baseball.

I went to the Smith College library next morning -- I was not teaching that day -- and went to the stacks and started reading what I could about the business of basketball. I discovered they had an antitrust exemption, and not very much had been written about the subject. So that very day I wrote a book proposal, sent it off to one publishing house, thinking I would never hear anything about it again. Two weeks later I got a call and they gave me a nice advance. I wrote the book. It was a business best seller. And that launched me into the area of sports economic.

Q    Have you published other books since then on the subject?

A    I published ten books in the area of sports economics.

Q    Published other things in professional --

A    Dozens of articles, professional scholarly articles, as well as dozens of of-ed journalistic articles.

Q   Are you associated with any professional journals in the field?

A   I'm a founding member and I have been on the editorial board since its inception of the Journal of Sports Economics in the year 2000.

Q   Served as a consultant in the field of sports economic?

A   Yes.   Extensively for cities, for leagues, for owners, for teams, and in many other instances as well.

Q   Offered testimony before you've been in that chair today on the subject?

A   Many times, yes, in the area of sports economics.

Q   In what context?   Litigation or talking about testimony before legislative --

A   Both.   I have testified before the U.S. Congress probably ten times.   I have talked before state legislatures and city councils.   I have testified in sports antitrust cases.   I have testified in cases concerning the relationship between sports teams and cities and other circumstances in the sports industry.

Q   You used a word in your -- when you summarized you said something about intangible benefits.

Has the issue of the intangible benefits that communities derive from the presence of professional sports franchises, has that been the subject of any of your prior testimony or consulting work?

A    It's been part of the subject matter in a variety of consulting cases that I have been involved with, including the Los Angeles Angels of Anaheim, the Cleveland Browns, Cincinnati Bengals, Miami Heat, the New Jersey Mets, and several others sports teams as well.

Q    What did you do to arrive at your opinion in this case? What's the work you did?

A    I read over several documents in the discovery record in this case.  I reviewed the literature and economic scholarship on intangible benefits, and I sat around and thought a good deal about the issue.  Then I wrote my report.

Q    You talked about intangible benefits.  Before we get there I want to ask you a few questions about the tangible benefits that a community can receive from the presence of a sports franchises.

What do we mean when we say "tangible benefits"?

A    Tangible economic benefit would prominently be a growth in per-capita income in the community.  Could be a growth in employment in the community.  Basically it would be a benefit that provided an economic development impulse to the local community.

Q    Is it fair to say you've written a fair amount on that subject?

A    Yes.

Q    In general, what's the conclusion you come to about the

tangible benefits to a community from the presence of a pro sports franchises, if it can be summarized?

A    Yes.  I come to the same conclusion that I think every economist that has studied the issue comes to.  That is, that a community that is trying to attract professional sports team or contemplating building a new sports facility, from either of those that community cannot anticipate a positive economic development benefit from that activity.

Q    Using the word "community", I want to make sure I understand what kind of community you're talking about.

You're talking about the boundaries of a city like City of Seattle when you make that conclusion?

A    The literature -- scholarly literature concentrates uniformly on metropolitan statistical areas, or MSA's, which would go beyond the geographical limits of a city proper, but would include the county in which the City resides, plus surrounding counties generally.

Q    That general opinion about tangible benefits that you've just expressed relates to an MSA, a larger --

A    Correct.

Q    -- geographic area?

A    Yes.

Q    Do you have any reason to believe the general conclusion you just talked about, that the situation presented here presents some differences from the general conclusion you

talked about?

A    Insofar as we're interested in this case, or one is interested in this case about the City proper of Seattle, rather than the MSA of Seattle, then yes, there could be a difference.  Because insofar as there is relocation of economic activity within the MSA towards the downtown area, that is, to say if people travel from the suburb of Bellevue or other suburbs into downtown Seattle to watch a Sonics game, then that could bring new economic activity into the City proper.  But it's just relocating activity within the broader MSA.  So that may be one factor that could differentiate the tangible benefit conclusion that is the general conclusion.

And the other is that that general conclusion includes the entirety of the investment that a city makes in a team.  Now, in this particular case, where we're talking about I believe the possibility that the team could leave the City, we already have the City having made an investment in the facility, having made more than one investment, but in the mid-'90s made the last investment.  So that is water under the bridge -- money spent.

If we take out the drag that always happens from the investment that the City makes, then the impact of the team leaving could be asymmetrical with the impact of a team coming.  In other words, it could be -- could have, I

emphasize "could", could have a tangible economic impact.

Q   That's two instances in which this situation differs from your general conclusions about effects on an MSA?

A   Two ways in which it might differ, yes.

Q   Let's talk about intangible benefits now.

What do you mean by that term?

What is an intangible benefits to a community?

A   An intangible benefit from for an economist is a benefit or a way in which the consumer welfare, the consumer satisfaction is raised that cannot be directly measured in the marketplace.

Q   How does that -- in the context of a sports team, what are some of the intangible benefits you're talking about?

A   It brings excitement.  It potentially brings excitement. It brings involvement, wholesome entertainment opportunities to a community.  It can be culturally enriching, provide a community with a sense of identity, a sense of togetherness. It can be one of the few things in our very atomized and individualized society one of the very few things people in the community experience together.

So that if you had a taxi driver, a doctor, or a lawyer and a clerk going up in an elevator together in a Seattle office building, the only thing they might have in common to talk about is what happened in the Sonics game the night before.  So it can lift morale.  It can give the community a

sense of pride, sense of involvement.

Q    Any sports fan can understand that.

But what is the role of an economist, to talk about how good people feel about sports?  How does economic theory come into?

A    Most centrally economics is a discipline about efficiency, about maximizing welfare.  In order, to understand the issue of how do you maximize welfare, you have to see and recognize and identify welfare increases when they occur.  So you can look at welfare changes in the context of any resources that are being invested in order to produce that welfare change.

So it's necessary for economists -- if we pretend to be able to talk about welfare changes and pretend to be able to talk about efficiency, we have to identify intangible benefits which are real along with tangible benefits.  So the economics discipline has over the years, over the decades, evolved many different ways to talk about intangible benefits.

Q    You've written about three types of intangible benefits that a community can derive from presence of a sports team.

Can you explain that?

A    Yes.  First, is what we call consumer surplus.  That happens when a consumer buys a good or service for a price below what that consumer would be willing to pay for the good or service.

THE COURT:  Sir, can I have you back up, please.
You're blasting me out.

THE WITNESS:  I am sorry about that.

THE COURT:  Okay.

You were at "consumer surplus".

A   So if I were a very passionate Sonics fan, I bought a ticket for $30, for a particular seat in the arena, but I would have been willing to pay $50 for that seat, had it been offered for $50, then it could be said that I receive the consumer surplus of the difference between the price I paid to consume the good and the price that I would have been willing to pay to consume the good.  In this case, I would have received the consumer surplus of $20.  That's the benefit that I receive and presumably other members of the community receive that they don't pay for.  It's not measured in the marketplace.

Go ahead.

Q   You've also written about externalities.  What are those?

A   Externalities is when somebody receives a benefit from somebody else's activity that the original person doesn't pay for.  If I'm walking down the street and a bunch of people see me very happy and excited, they say what happened; why are you excited, and I say the Sonics won the game, then I might get happy too, even though they went to the game and they bought tickets, I didn't go to the game, I didn't buy

tickets.  So I benefitted from that.  That's an externality.

Q   What are public goods?  What --

A   A public good is a good that has consumption that is not rivaled.  Meaning if I consume it, you can still consume it. If there is one hamburger between us, I grab it first, I have it, you don't have it.  But if it's not a rival we can both consume it.

It's also a public good is a good that has nonexclusion properties, which means that people can't be excluded from consuming it.  A sports team fits very properly into this concept of a public good.  Anybody in Seattle can read the newspapers or listen to TV or talk about their sports teams, and it doesn't prevent somebody else from doing it.  In fact, rather than a rivalry quality, it's almost a synergy, which is to say the more people engaged and are talking about it, the more fun it is for other people to do it.

Q   So you identified three different types of intangible benefits.

Let's talk about you how you quantify them.  I think that is what economists do, right?  They measure things --

A   Do our best.

Q   So how do you measure these things?

A   Well, there are several methodologies that have been used generally within economics to measure consumer surplus and to measure externality benefits and public good benefits that

have been applied outside the sports industry.  The effort to apply them within the sports industry is relatively new, goes back to late 1990s.  There have been a couple of efforts, scholarly efforts, to measure consumer surplus.

In order to do that, it's a fairly complicated exercise. You have to estimate a demand curve.  I could go through the technique, if time permitted, I'm sure it doesn't.  But basically you use econometric techniques to estimate a demand curve that would enable you to make an estimate of consumer surplus.  There have been a couple of articles published about this.  They come to numbers that are quite large, but also quite disparate.

There is another methodology that is called compensating differentials.  This also generally involves econometrics. It's technically rather technically abstruse.

Q  I'm going to stop you for a second.

For those of us who didn't get much passed econ 101. Compensates differentials methodology.  Big words.

Is there any case study that you can describe that people who are common sports fans can understand what that means as an attempt to measure as best as one can, intangible benefits?

A  The idea about compensating differentials is that if a sports team or any other event -- maybe we're talking about a community that is by the Pacific Ocean and that is desirable.

We're talking about a community that has superb weather.  If there is some intangible benefit out there in the community, and people value that, then that should show up in the form of people being willing to make some compensation in their lives to get that benefit.

So one kind of a compensating differential would be rent. Maybe people are willing to pay more rent in a community that has an NFL team than a community that doesn't have an NFL team.

Q    Anybody tried to --

A    If I could say one other thing.

Another kind of compensation that they might be willing to undertake is to accept lower wages than they would otherwise get given their skill set.  Yes, there have been efforts to make those kinds of estimates.

But in the sports industry, they're relatively new.  There was a study published a few years ago by Parlino and Poolsen (phonetic) about the NFL.  And they did a fairly complicated economic analysis that tried to control all of the variables that affect the rent of housing and apartments in an urban environment.

And they also had a variable in their equation that was looking at whether or not there was an NFL team in the City. They came to the conclusion that the presence of an NFL had an intangible benefit because of the increase in rent that

happened as a result of the presence of that team, had an intangible benefit that was over $180 million a year to the typical NFL city.

Q    There is a third methodology to it.

A    Yes.

Q    And what is that called?

A    Contingent valuation methodology.

Q    Again, the summary for the non-economist here.

A    The simplest way to express what the contingent valuation methodology -- it's a methodology that is about 30 years old. Methodology that has been vetted by the government and has been used for a number of government projects.

Contingent valuation methodology is basically a very sophisticated survey instrument where you go out and you ask people in the community how much would you be willing to pay in order to attract this or that team to our community.  As a result of a representative and random survey, you can then draw certain summary conclusions or inferences on the basis of that.

Q    In your report you talked about a couple of examples of cities where that type of analysis had been undertaken.

Can you summarize what the findings or the estimates were that were derived as a result?

A    Sure.  There have been about five or six of these published.  To date there are only two published for

professional sports team.  One was done about the Pittsburgh Penguins, other about the Jacksonville Jaguars.  The one on Penguins came to the conclusion that the intangible benefits measured thereof was in the neighborhood of 17 to 52 or $53 million.  The one for the Jaguars produced a higher number.

Q   How would those examples apply to the Seattle market?

A   Well, I would be very hesitant to apply them directly to the Seattle market for a number of reasons.  But one of the adjustments that you have to make is for the size of the population.  The Seattle MSA, if we're talking about the Seattle MSA, is considerably larger than either Pittsburgh or the Jacksonville MSA's.

Q   Is there anything about what you know of the circumstances of this case that would make valuing the intangible benefits that accrued to Seattle as a result of the presence of the Sonics harder or easier than has been the case in these other case studies?

A   I think when you have a circumstance like this where there is so many balls in the air, where you potentially have a team that is a lame-duck team potentially, or you have a team that might be here one or two more years, or if during that two-year period there was a negotiated extension so that the team was around longer, those factors together with the factor that this case existed, which is something that is being reported on widely in the local media obviously, and

the fact that there is a rescission lawsuit that is also present in Seattle, and I guess -- when I came to town yesterday, I saw some 3,000 people chanting outside. All these things are special and unique to this case. That would make it still more complicated.

Q   Let me back up a second.

You used the term "lame duck". It's been used a few times. And it's been suggested that, okay, the judge orders specific performance. The Sonics play two more years in KeyArena, but it's already been declared they're off to Oklahoma City at the end of those two years.

As you might be aware, the team did not have a particularly successful season on the court last year. Are you aware of that?

A   I am.

Q   A lot of talk about excitement and civic pride and things like that.

How is that going to apply when we have two more years of a team that we all hope is going to really turn it around, they have some exciting young players, but they may not win all that many games in the next two years.

How does that affect your analysis?

THE COURT:   Counsel, that was at least six questions.

MR. NARVER:   It was indeed. I'm sorry. I have an eye on my clock.

THE WITNESS:  Do you want six answers?

THE COURT:  No.

One question at a time.

BY MR. NARVER:

Q   How does the fact that this is a lame-duck team, with all that that implies, affect your analysis of the intangible benefits?

A   Well, basically, Counsel, my analysis is that even under much more stable circumstances and knowable circumstances the results that have come out of the existing scholarship that tries to estimate the tangible benefits are highly variable. All of those results agree upon one thing.  That one thing is that there are very significant substantial intangible benefits that accrue to a community from a professional sports team.  They agree about that.  But the magnitude of those benefits is highly variable.  So that when you throw in some other variables, like the lame-duck status and the other things that I mentioned, it becomes yet more problematic to make that kind of an estimate.

The other thing we don't know -- I don't think we know it and haven't studied the Seattle Sonics roster in any detail, but I know they have young players.  Boston Celtics two years -- last year, they had the lowest avidity rating from their fan base than any other team in the NBA.  This year it's near the top.  It's very variable.  Depends a lot on a

wide number of factors.

THE COURT:  I didn't understand.  The lowest what?

A   Avidity.  A level of how avid the fans are.  That's not my word.  It's what they use.

BY MR. NARVER:

Q   Boston fans were not particularly avid last year?

A   That's correct.

Q   Do you happen to know what they're doing this evening?

A   I know they're playing.  I don't know what is going to happen in the game, if that's what you're asking me.

Q   Have you looked at any other examples of lame-duck teams and how they performed and whether there is still the indica of intangible benefits?

A   I think that -- I have looked at that.  And yes.

Here, again, there is a wide range of experiences, depending on how well the team is performing, depending on the timing of the announcement that the team is going to move, depending on the relationship of the ownership and the management to the local community.  So there have been a very wide variety of outcomes or responses by fans to a lame-duck status.

Q   You did mention one possibility that if two years are extended it might open other opportunities.

Even if you knew this team were to leave in two years, would it affect your conclusion about the value of intangible

benefits for the Sonics?

A   I would still come to the conclusion that the benefits are large, and that the benefits are too variable to produce a scientifically acceptable estimate of what those benefits are.

MR. NARVER:   Thank you.   No further questions.

CROSS-EXAMINATION

BY MR. TAYLOR:

Q   I'm Paul Taylor.   I represent the PBC.

A   How do you do?

Q   It's your opinion that economic analysis does not allow us to reach a number or even a range of numbers for the intangible value of a sports team?

A   There is a range.   I cite the range at the end of my report.   It goes between $20 million and over $2 billion.

Q   Okay.   Let me ask you a question about your report.

To prepare your report you sat down and you reviewed the economic literature on contingent valuation methodology, right?

A   That's one of the things that I did.

Q   And after you did that you talked to people who do this kind of analysis, right?

A   No.   No.   Before I did that I contact -- I didn't talk to anybody.   I wrote e-mails to the individuals who had produced the scholarship in this area, and I asked them in e-mails

whether they had any pieces in the pipeline that I didn't know about, because they hadn't been published.

Q   That's right.  You wanted to be sure you were up to date on the literature?

A   That's right.

Q   It was only after doing that that you sat down at the keyboard and prepared your report, true?

A   After doing that and some other things, correct.

Q   You spent approximately 20 hours writing your report?

A   I don't know if that's an accurate number.  I remember you asked me to estimate that when we were doing our deposition.  That was my off-the-cuff estimate.  I think I said 20 to 25 hours.

Q   Could have been 25 hours?

A   Could have been some other number entirely.  I offered to check my records and you didn't ask me to do that.  So I'm still in that very vague range.  That would be my best estimate, 20 to 25 hours.

Q   For example, at page 9 of your report that is something you wrote from scratch?

A   I wrote --

        THE COURT:  Counsel, there has been no report put in.  I don't know what you're referring to.

        MR. TAYLOR:  If we could take a look at Exhibit No. 205, please.

THE CLERK:  Counsel, I don't have 205.

THE COURT:  It's the exhibit in the notebook.

Are you wanting to put this in?

MR. TAYLOR:  No.  I'm using it for impeachment.

BY MR. TAYLOR:

Q   Page 9 of your report where you start at Section C, "In economic theory there are three types of benefits."

Do you see that?

A   Yes.

Q   You wrote that from scratch for this case.  True statement?

A   As I think I told you in my deposition, it's possible that some parts of this report come from notes that I have.  If that means that it's not written from scratch, as you define the term, then in those cases where I took it from notes that I have, it would not be from scratch.  But this report is an original report for this case.

MR. TAYLOR:  Your Honor, I move to publish Mr. Zimbalist's deposition.

THE COURT:  Okay.

MR. TAYLOR:  Approach, Your Honor?

THE COURT:  You may.

BY MR. TAYLOR:

Q   Could we have up on the screen page 35, line 8?

And this part of your report beginning at page 9, "This is

also part of it you wrote from scratch?"

You told us, "Yes."

Let me ask you about another piece you wrote from scratch. Page 14 of your report that was written specifically for this case. "Contingent valuation methodology."

Do you see that?

A    Yes.

Q    And that also was written from scratch for this case in this original report; true statement?

A    You're not representing my deposition testimony accurately. In both cases the first question you asked me about whether my report is written from scratch references the possibility that it came from notes that I had, but that the report is an original report for this case.

Q    Page 30 --

THE COURT:  Sir, need you to please pull back.

BY MR. TAYLOR:

Q    Page 39, line 16 of your deposition.

MR. TAYLOR:  Line 16.  Let's play the clip, beginning line 14.

(Audio played.)

BY MR. TAYLOR:

Q    That testimony you gave, that's not true, is it?

A    No.  I was honest in that testimony.  Once again, before you asked me that question -- the first question you asked

me, I said it's possible some of the materials in my report came from notes I had taken on the subject.

Q   From notes you had taken?

A   That's correct.

Q   Isn't it true, Mr. Zimbalist, that you lifted large portions of your original report for this case from a report you prepared in state court down in Los Angeles in 2005?

A   I can't tell you that is true.  It's possible that notes from that case were also notes that I used for this case.

Q   Mr. Zimbalist, isn't it true that in Los Angeles, in the Los Angeles Angels case you testified as an expert for the City.  Do you remember that?

A   Yes, I did.

Q   And there you testified about contingent valuation methodology.  Do you remember that?

A   I believe I did, yes.

Q   And unlike this case where you say you can't put a dollar number on it, you put a dollar number on it down in Los Angeles, true?

A   I don't recall doing that.

Q   Let's walk through --

        MR. TAYLOR:  If the witness could be shown Exhibit No. 602.

BY MR. TAYLOR:

Q   This is a report you prepared down in Los Angeles?

A    This appears to be that, yes.

Q    I did an exercise after I got a hold of this.  I sat down and I compared your Los Angeles report, Exhibit No. 602, with your Seattle report, 205.

Would you like to look at the results of the comparison?

A    I'm willing to do whatever you would like to do, Counsel.

MR. TAYLOR:    Could the witness be shown Exhibit No. 604, please?  Could we have the first page of 604-A on the screen?

BY MR. TAYLOR:

Q    Let's compare page 9 of your Seattle report to pages 11 and 12 of your Los Angeles report.

Why don't we all take a minute to see whether you wrote it from scratch or whether you lifted it from something you did elsewhere.

Tell me when you've had a chance to read it.

A    Okay.

Q    You've read it?

A    Yes.

Q    What you did is you made one change.  In Los Angeles you wrote the third line, "If a fan attends a ball game."

Do you see that?

In Los Angeles you use the word "ball game"?

A    Yes.

Q    Seattle, you had to customize it for basketball.  Instead

of ball game, you went back in your computer, you grabbed a report that you had sitting there, two years old, and you changed "ball game" to "basketball game", right?

A    Sir, as I said to you in my deposition, I have notes based upon lectures that I give, and those notes form the basis of both of my reports.  When I undertake expert analysis, I try to do it as efficiently as I can.  I did not need in this case to refashion word for word an argument that I had in my notes.

Q    You spent 25 hours writing this report.

You just told us that, true?

A    That's a mischaracterization of what I said.

Q    Fair enough.

Let's look at the next page, B.

Read it yourself and tell me whether you wrote this from scratch or whether you lifted it from Los Angeles.

A    Again, I don't accept the characterization that I lifted it from Los Angeles.

Q    Fair enough.

Let's take a look at what you did do.

Let's go down four lines down.

"Thus when an Anaheim resident watches the angels."

Do you see that?

A    Yes.

Q    In Seattle, you went back into your computer and instead

wrote, "When a Seattle resident watches the SuperSonics beat the Lakers"; you just changed the teams, right?

A   Sir, I give lectures on this matter.  I give different illustrations depending on the circumstance of the situation.

Q   My question is, did you just go into the computer and change the teams?

A   I have notes that I used to draft my report.

Q   Let's go to page C.

This one is identical, verbatim, isn't it, Professor?

If you find the change tell us.

A   I don't see any changes looking at it quickly.

Q   Well, don't rush.  If you think there is a change we're entitled to know about it.

Any changes?

A   I don't see any changes.

Q   Let's go to the next page, D.

You made a change here.  You told us in Los Angeles that a major league ball team can be something that provides a common bond to an investment banker, lawyer, a janitor, and a taxicab driver.

Do you see that, in Los Angeles?

A   Yes.

Q   Can we presume from your decision to remove it from this report that the investment banker and lawyer and janitor don't have a common bond in Seattle?  Or was it just an

accident?

A    You cannot presume that.

Q    Let's go to E.

This one is verbatim, isn't it?

A    Very small changes.

Q    Can you show them to us?

A    Well, I see, for instance, two parenthetical phrases in the document on the left.

Q    You're going to have to tell me.  I'm not seeing any parentheticals on F.  We have E on the screen.

In F we see in the second line that Los Angeles, you had it as Footnote 9.  By Seattle it gets to Footnote 6.

Do you see that?

A    Yes.

Q    We're going to talk about that footnote in a second.

But other than changing the number, straight out of Los Angeles two years ago, right?

A    It seems to be the same language.

Q    Seems to be the same words, doesn't it?

A    You want me to read the whole thing?

I'm acknowledging for you that it's substantially similar. I can't acknowledge to you that it's exactly similar unless you want me to read each and every word.

Q    We're trying to get you on a plane.

A    That's why I'm trying to --

Q   Let's go to G.

Remember I said we're going to talk about the footnote. It was Footnote 9 in Los Angeles, Footnote 6 in Seattle?

A   Okay.

Q   You even lifted the footnote from your old report, didn't you, to write this report from scratch?

A   The footnotes are not identical, but they're similar.

Q   Took a quick look, if you will, at I, J, K.   Tell me whether you made any changes or you just lifted this when you wrote the report from scratch.

A   Okay.  It's not on -- something is coming up now.

Q   Page I is identical?

Page J is identical, isn't it?

Page K, another lift?

A   Same language.

Q   How many thousands of dollars did you charge the City of Seattle for writing this?

A   Sir, whatever I charged the City of Seattle it was based on time I logged in working on my report, and it was a lot less because I was able to use notes that I had already taken on this matter.

Q   My question was much more simpler and only requires a number.

How many thousands dollars did you charge the City of Seattle to take your report from Los Angeles and bring it up

to Seattle?

A   I have no idea what I have invoiced to date.

Q   I want to ask you something.

You actually went out to authors to make sure you had the up-to-date literature?

A   Yes.

Q   Let's go to page L.  Couple of footnotes here.

It was Footnote 16 in Los Angeles.  The computer changed it to Footnote 14 in Seattle, and you cited the Journal of Sports Economics forthcoming.

Do you see that?

A   Yes.

Q   You know, it took me ten seconds to go ahead and Google and find out that article has been published.

Did you overlook that in your research?

A   I was sent the article by the authors.  They, in the draft the sent me, anticipated publication in that journal.  It was published.  I sent you a correction for this I believe.

Q   Let's go --

A   It was published in a different journal.

Q   Let's go to zjournals.com, the call-out, please.

I'm not finding -- there it is.  Nope.  I'm not informing the right pull-up.  Apologize.

You agree this article was published back in 2001?

A   No.  I don't believe it was.

Q    Let's see if we can find it overnight.

Let me ask you a question.

We get to the end of your report, let's go to page N.

Do you remember you told us that you didn't reach a number in Los Angeles because you can't assign a number under this contingent valuation methodology?

A    Where do you want me to look now, sir?

Q    Page N of Exhibit No. 604.

On the right-hand side, that is the last -- or the end of your Los Angeles report, right?

A    Yes.

Q    And you didn't come to a range, did you?

A    The point of that report --

Q    Did you come to range at the end of your Los Angeles report?

A    I have to look at my whole report.

Q    Please do.   602, page 20.

Page 20 only has three paragraphs.

Have you finished?

A    I was looking at some of the lead-up to that if you didn't mind.

Q    That's fine.

A    Okay.

So I have read it.   There is also a page 21 in my report.

Q    Page 21 actually tells us exactly how you did it to get

down to the exact dollar amount, right, the one you can't do here?

A   I think that you're misunderstanding the purpose of the report.  The quality of life issue is a small part of the larger estimate.  Indeed it comes to about four or five percent of the total calculation.  And it's different to make an estimate for a small part of the total calculation than it is to rest one number at the bottom that would be a settlement -- possible settlement in a case.

Q   You weren't writing a report about a possible settlement.  You were writing a report so you could testify for the City --

A   No.  But the issue -- if I was to produce a report that said that the value of the intangible benefits were such and such, then I would be standing behind that as a value that was the proper amount to compensate the City of Seattle.

Q   Let me ask you something.  I want to ask about your engagement.

Based on your work, is it true that the City of Seattle said to you we need you to say there is lots of money here because we're looking for specific performance you can't give us an exact amount because otherwise we're not entitled specific performance because there is an adequate remedy of law.  That was your charge in this case, wasn't it?

A   No.

Q   Have you had problems getting your testimony admitted before in courts?

A   I have one -- I have one time when -- it's currently under appeal -- that I wrote a report in the NASCAR antitrust case. And that report by the district court judge initially was excluded.  It's currently under appeal.

Q   In fact, he wrote an opinion excluding your expert -- or your supposed expert testimony, didn't he?

A   He did.

Q   That is Kentucky Speedway versus NASCAR, that is the decision?

        THE COURT:  Can I have a cite, Counsel.

        MR. TAYLOR:  I believe it's Exhibit No. 606.

A   You're asking -- I don't recall what his decision is called, but it's an NASCAR antitrust case.

BY MR. TAYLOR:

Q   We're going to go through the decision.  Okay?

A   Yes.

        MR. TAYLOR:  Could we have it on the screen, please.

BY MR. TAYLOR:

Q   Let's go to paragraph 4, Professor -- page 4.  This is the part of the decision that is talking about you, isn't it?

A   He does talk about me, bottom of the page, yes.

Q   And the federal district court judge down there used a phrase, I want to look at it there, the last line.  He's

talking about experts.  And if we could have the last two words highlighted, please.

He referred to "hired gun" experts.

Have you read this opinion before?

A  Yes, I have.

Q  After talking a little bit about hired gun experts -- let's go to page 6.  All right.  Let's see what he concluded about you.  Bottom paragraph.

Start with second line.  "Zimbalist's approach, however, does not meet Daubert criteria."

Do you see that?

A  I do.

Q  After reading all the briefing he said your opinions haven't been tested.

Do you see that?

A  I do.

Q  Any he went on to say, "Not been subject to peer review and publication."

Do you see that?

A  I do.

Q  He went on to say, "There are no standards controlling your opinion."

Do you see that?

A  I do.

Q  "No showing that it enjoys general acceptance within the

scientific community."

Do you see that?

A    I do.

Q    Now, there, though, your report was produced solely for that litigation, right?  You didn't copy reports from someplace else?

A    Report was produced for that litigation.

Q    Los Angeles Angels case, your testimony got tossed there, too, didn't it?

A    No, it did not.

Q    I want to talk to you about this notion of assigning value to -- basically to good feelings.  Is that what it is?  I feel good because the Sonics won; I can talk about it with my friends.  You as an economist say we can put a value on it, right?

A    Are you not interested in any of the content of what you just read to me from the judge's decision?  You just want to enter those words --

THE COURT:  Sir, I need to have you answer the question that is posed, please.  We're trying to accommodate you.  So answer the question posed.

A    Please repeat the question.

BY MR. TAYLOR:

Q    As I understand it, we feel good if the Sonics or the Mariners win, and we talk about it with our buddies, and you

as an economist assign economic value to that; you can't measure it, but you know it's there, right?

A    Economists have tried to quantify it, and I report on the various efforts to try to quantify it in a number of studies.

Q    Assuming there is economic value for the Sonics, then for the Seahawks, we feel good; therefore, they have intangible benefits to us, right?

A    Again, I think it's more complicated than simply feeling good.  But yes, I would think that the Seahawks have a similar type of effect.

Q    Mariners?

A    Correct.

Q    Seattle Storm?

A    Correct.

Q    Husky football?

A    Each time you're mentioning a new team, the community is different and potentially smaller, but I would imagine as well, yes.

Q    Economic value, right?

A    It has consumer value, and therefore, yes, economic value.

Q    Gonzaga basketball, Cougar basketball, Washington crew team, Seattle Sounders, we can go on and on.  We're a wash in economic value in this town, right?

A    Sir, when -- yes, there are lots of ways --

Q    Thank you.

You even assigned economic value to the weather here in Seattle because we talk about it, right?

A    It's possible that it could have economic value.

Q    You say it does, don't you?

Take a look at page 27, line 24 of your deposition.

Do you have that handy, sir?

Do you remember it was raining when we took your deposition?

So I'm clear, for example, the weather.  We all talk in the elevator about the weather in Seattle?

"As an economist do you put value on the weather having some kind of intangible benefits?"

Your answer was "Probably would, yep."

A    It's possible it does, yes.

Q    In fact, it goes beyond sports and the weather, doesn't it?  When I go to mass on Sunday you think I'm getting economic value, right?

A    That happens to be something I presume that you pay for.  It's a consumer good.

Q    Mass?

A    Well, you pay don't -- don't you pay to belong to a church?

Q    My church is free, Mr. Zimbalist.  But maybe you go to a different faith.  I don't pay anything to go to mass.

A    Okay.

Q   Do I get economic value?

A   You might.

Q   And the Jewish faith, when they go to synagogue they're getting economic value?

A   Okay.

Q   Well, are they?  Presbyterians or orthodox --

A   As we said in the context of a fuller discussion during the deposition, there are many instances where people receive satisfaction.  The level of satisfaction they receive and the way they receive that satisfaction differs.  When you talk to me during deposition about going to a high school play, that, too, produces satisfaction.  It's a smaller, much smaller community.  It's an experienced different level of magnitude.

Q   I have two minutes left.  I want it to use them.  I want talk to you about multipliers.  You talked about that a little bit in your direct examination.

Do you remember direct economic benefits?

You have sometimes studied multipliers, right?

A   Yes.

Q   And you know in this case the -- we're going to have another economist from the City, Mr. Hatamiya, and he uses a multiplier analysis.

Have you ever given an opinion about whether or not a multiplier analysis makes any sense?

MR. NARVER:  Objection.  Way beyond the scope of Mr.

Zimbalist's opinion.  He didn't address this at all in his direct testimony.

MR. TAYLOR:  He talked about direct economic benefits and efforts to calculate them.  That's the multiplier analysis.

THE COURT:  Objection is overruled.

BY MR. TAYLOR:

Q   In fact, in your view, these multiplier analyses like the one we'll see from Mr. Hatamiya are quite silly, right?

A   Well, I may have said that about a particular context in which multiplier analysis is used.  Multiplier analysis also has a very commendable and appropriate use.

Q   Would you agree that in your view these multiplier analyses are quite silly?

A   I answered that question.  It depends upon what kind of multiplier analysis you're talking about in the context.  Some are.  Yes, I agree for some.

Q   In fact, you called them "fanciful", right?

A   I don't know what you're citing, and I don't know what context.

Q   Your testimony, Los Angeles Angels case, Exhibit No. 603, if you want to take a look at it, please.

A   Okay.

Q   Page 71.

A   Okay.

THE COURT: Counsel, we can bring the witness back if it you're not done. I have another -- I have another matter that is set. So --

MR. TAYLOR: I have two minutes. If we have to bring him back for those two minutes, they are two important minutes.

THE COURT: I don't know whether the City intends to do any redirect.

MR. NARVER: Your Honor, in light of this cross-examination I can do it in one minute. I just want to do it very briefly.

MR. TAYLOR: I think we should end then and bring him back.

MR. NARVER: Three minutes; two minutes and one minute?

THE COURT: What would you like to do?

MR. TAYLOR: If Your Honor would give me three or four minutes, we can be done. If we have the sentencing I'm happy to stop.

MR. NARVER: Your Honor, to try and accommodate this witness, I rushed through my direct. Mr. Taylor has already taken longer on cross than I took on direct. If he takes two more minutes, I promise to be done as quick as I can in one minute.

THE COURT: Apparently a movement to continue.

BY MR. TAYLOR:

Q    Page 71.    In Anaheim, PriceWaterhouse had calculated a multiplier of 2.5.    That means supposedly for every dollar spent, every dollar, it grows into two and a half dollars, under the multiplier analysis?

A    That's one way of characterizing it.

Q    And the multiplier you were addressing in Anaheim was 2.5? Page 71, line 23?

A    Okay.

Q    Mr. Hatamiya has slightly lower for Seattle, but he's still well above 2, isn't he?

A    I don't know.

Q    He's 2.17.

Anyhow, you took a look at the 2.5 multiplier in Anaheim. First thing you said, it was fanciful?

        THE COURT:    Which exhibit are we talking about now?

        MR. TAYLOR:    Exhibit No. 603, page 71, down at the bottom.

A    Okay.

BY MR. TAYLOR:

Q    Lines 24 and 25.

"To me, it's just, you know, it's fanciful that they come up with these multipliers."

Let's read on, page 72, line 3, "Not at all persuasive."

A    Okay.

414

Q    We read down to line 6, you find that these multipliers are really quite silly.  And you end with at line 11, towards the top --

A    Okay.

Q    -- if we could blow that up.

"It looks like they go through 300 sectors of the economy" and so on.  "It looks like it's done all very meticulously. What did you say down in Los Angeles?  "It's blowing a lot of smoke."

Do you see that?

A    I do.

Q    You told us that in your deposition that TV ratings can be a proxy for measuring intangible value.

Do you remember that?

A    I think I could it could be a partial proxy.

Q    Do you know TV rating for Seattle Sonics got as low as below a one this past season?

A    Okay.

Q    That means out of million and a half household less than 10,000 were watching.  What does that tell us about intangible value?

A    Other things being equal, lower TV ratings would mean at the time that there was less intangible value.

Q    Can't get much lower than one, can you?

A    Sure, you can.  Hockey manages to do so every year.

MR. TAYLOR:  Nothing further, Your Honor.

REDIRECT EXAMINATION

BY MR. NARVER:

Q   Mr. Zimbalist, before you had your deposition taken, had you ever had contact with lawyers for PBC before?

A   No.

Q   Did they contact you to try and hire you for this case?

A   Yes, they did.  Sorry.

Q   How many drafts of your report did you prepare?

A   I don't remember.

Q   It was a number, wasn't it?

A   There were a few.

Q   And there were specific references in your report to documents that were produced by PBC in this case; is that right?

A   Yes.

Q   The MZ sports report?

A   Yes.

Q   Sonics' relocation proposal?

A   Yes.

Q   You looked at some video clips of Sonics games?

A   Yes.

Q   You looked at a lot of documents that were prepared by the City of Seattle?

A   Yes.

Q    None of that had ever been done for any other report; is that right?

A    That's correct.

Q    You were shown some similarities between this current report and one you did in the past, where you're defining certain economic terms like "externalities".

Has the definition of that changed in the last three years?

A    No.

Q    Is there any reason you would have to rewrite what the economic definition of that word is?

A    No.

Q    For public goods, would you have to rewrite the definition for that?

A    No.

Q    Would you have --

THE COURT:   Counsel, we can't get a record. You're too fast.

MR. NARVER:   I am sorry.  I'm tying to do it in one minute.

THE COURT:   Don't try so hard.

BY MR. NARVER:

Q    My question is, these drafts you've been shown, these portions of the two, you are defining basic economic terms; is that correct?

A    Correct.

Q    Have those definitions changed in the last three years?

A    No.

Q    Is there any reason you would have had to write it differently?

A    No.

Q    You were shown a Footnote 14 from your report that said forthcoming for report.

Did you submit an amended version of that?

A    I did.

Q    Do you know if that was provided to PBC's lawyers?

A    I understand it was.

MR. NARVER:  Nothing further.  Thank you, Your Honor.

THE COURT:  I have a question.

Do I understand that you came up with a number in Los Angeles on page N that would be 7.75 million, but you are unable to come that up with a number in Seattle?

A    Yes.  And as I explained --

THE COURT:  Thank you.  You've answered my question.

All right.  Ladies and gentlemen, I have another matter that is scheduled and the people are waiting in the hall.

So if I could have you exit quickly we'll be back in session tomorrow morning.

If I could appeal to the lawyers one more time, would you please give me a list of those documents that you're

intending to use?  If there is some reason you don't want to share it with each other, that's fine.  But Ms. Scollard and I would appreciate it.  She's not going to tell anybody else; I'm not going to tell anybody else.  But I'm getting big biceps carrying documents around.  I would like to make sure that we don't take more time than necessary to do that.  So please give me your documents.  We'll pull them ahead of time so we don't have to wait for the witness or for me to get them.

Have a good evening.  We'll see you tomorrow morning.

(Court adjourned.)

*    *    *    *    *

C E R T I F I C A T E

We certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/S/ Barry L. Fanning, CCR, RMR, CRR

/S/ Nichole Rhynard, CCR, RMR, CRR