419

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

CITY OF SEATTLE,                    )  Cause No. 07-01620-MJP
                                    )
          Plaintiff,                )  Seattle, Washington
                                    )  June 18, 2008
     vs.                            )  Volume III
                                    )
PROFESSIONAL BASKETBALL CLUB,)
LLC,                                )
                                    )
          Defendant.                )
                                    )
_____)

BENCH TRIAL
VERBATIM REPORT OF PROCEEDINGS
BEFORE THE HONORABLE MARSHA J. PECHMAN
UNITED STATES DISTRICT JUDGE

APPEARANCES:

  For the Plaintiff:        Paul Lawrence
                            Jeffrey Charles Johnson
                            Gregory Narver

  For the Defendant:        Bradley S. Keller
                            Paul Taylor

  Reported by:              Barry L. Fanning, CCR, RMR, CRR
                            Nichole Rhynard, CCR, RMR, CRR

Proceedings recorded by mechanical stenography, transcript produced by Reporter on computer.

420

EXAMINATION INDEX

EXAMINATION OF:                                                    PAGE
CLAYTON BENNETT
RECROSS EXAMINATION          BY MR.  KELLER               422
REDIRECT EXAMINATION         BY MR.  LAWRENCE             448
RECROSS EXAMINATION          BY MR.  KELLER               514
REDIRECT EXAMINATION         BY MR.  LAWRENCE             521
DANIEL BARTH
DIRECT EXAMINATION           BY MR.  JOHNSON              523
CROSS-EXAMINATION            BY MR.  KELLER               544
VOIR DIRE EXAMINATION        BY MR.  JOHNSON              581
REDIRECT EXAMINATION         BY MR.  JOHNSON              590
RECROSS EXAMINATION          BY MR.  KELLER               598
REDIRECT EXAMINATION         BY MR.  JOHNSON              613
LON HATAMIYA
DIRECT EXAMINATION           BY MR.  JOHNSON              614

EXHIBIT INDEX

| EXHIBITS ADMITTED | PAGE |
|---|---|
| 111 | 449 |
| 272 | 453 |
| 322 | 457 |
| 316 | 459 |
| 317 | 461 |
| 294 | 462 |
| 69 | 476 |
| 81 | 481 |
| 265 | 484 |
| 324 | 489 |
| 253 | 491 |
| 139 | 493 |
| 138 | 496 |
| 145 | 497 |
| 279 | 502 |
| 89 | 507 |
| 263 | 509 |
| 545 | 511 |
| 90 | 512 |
| 1 | 515 |
| 105 | 531 |
| 107 | 533 |
| 198 | 535 |
| 201 | 538 |
| 203 | 538 |
| 204 | 540 |
| 505 | 545 |
| 508 | 556 |
| 509 | 565 |
| 507 | 568 |
| 510 | 571 |
| 504 | 574 |
| 595 | 584 |
| 511 | 587 |
| 514 | 587 |

P R O C E E D I N G S

_____



THE COURT:  All right.  Counsel, our daily tally for you is yesterday the City used 177 minutes for a remaining balance of 601; and the defense used 129 minutes for a balance of 593.

All right.  Are we ready to continue again.  Mr. Bennett is in the chair.  Mr. Keller.

CLAYTON BENNETT

After being previously sworn, testified as follows:

RECROSS EXAMINATION

BY MR. KELLER:

Q   Good morning, Mr. Bennett.  I think when we left off and interrupted your testimony for Mr. Zimbalist we were talking about Exhibit 62.  And that was the purchase and sale agreement with the prior owners, the Basketball Club of Seattle.  So I would like to pull up Exhibit 62 again, if we could, and take a Section 5.3 that we were looking at, which is on Page 31 of the agreement.

Just to back up a little bit, in the clause there is a reference used to the effort that will be made with respect to a successor venue to KeyArena.  And why was it important to you that it be a successor venue?

A   Well, we had determined that KeyArena was not a viable

option for the team, and the development of a successor venue was critical to our going forward in the transaction.

Q   Is that part of the reason why when Mr. Nickels tried to engage on the discussion about KeyArena you were unwilling to discuss it?

A   Yes.   From the very beginning we were very clear that a successor venue was necessary for the future of the team.

Q   It goes on and says that, however, the process described in this Section 5.3 -- and is that referring to the process of the effort to try and come up with a successor venue?

A   Yes, sir.

Q   The process described in Section 5.3 and the entering into of any such arena lease, purchase, use or similar arrangement shall be in buyer's sole discretion?

A   That's correct.

Q   The buyer was who?

A   We were the buyer, PBC.

Q   And why was it important to you that both the process and any ultimate agreement be in PBC's sole discretion?

A   Because ultimately the viability of the business was the objective, and putting together what would be a very complex business transaction and arrangement would need to come together and be viable, ultimately be profitable, and we needed to have input on the approval of such a construction.

Q   So, for example, when it came to whether you were going to

try and do a multi-sport regional complex or, for example, a single-user NBA facility of not modest, but more modest proportion, is that the kind of thing for which you wanted to have discretion to make a business decision in the best interest of the PBC?

A   That's correct.

Q   And, for example, when it came to issues like how much public funding would be sought versus to what degree there would be private contribution, is that an example --

MR. LAWRENCE:  Excuse me, your Honor.  I want to object that this is leading.  There is a little bit too much argument in the question.  I would like to have Mr. Bennett testify about what he was intending here.

THE COURT:  Any response?

MR. KELLER:  No.

THE COURT:  Let's rephrase.

MR. KELLER:  All right.

BY MR. KELLER:

Q   To what degree was having discretion important on the issues of how much would be public financing versus how much would be private financing?

A   Well, it was all elements of the transaction.  It was what would be the equity participation in the building by any participant that may develop, what would be the financing structure, what would be the lease negotiation and the lease

structure with the team, other tenants, who would manage the building, who would own the building. The comprehensive development of the business enterprise needed to be developed through this process. And we negotiated with the sellers that we would have ultimate discretion.

Q   Does that also include things such as to what extent the PBC would or would not stand up for cost overruns?

A   I believe so, yes. All elements of the economic transaction.

Q   And ultimately in dealing with Olympia, what was the position of the PBC on the cost overrun issue?

A   Well, our position was that we would not be responsible for cost overruns relative to the building itself, that we would be willing to consider responsibility for cost overruns relative to the NBA specific or the PBC specific improvements to the buildings.

Q   Would you explain that last part?

A   For instance, the design of locker room facilities, the design of certain basketball operations facilities. If we had negotiated certain amenities or certain programming elements of the building that we felt were important to the building, and at our discretion felt should be part of the building, then we would be willing to consider cost overrun responsibility for those areas.

Q   I am going to switch gears on you now a little bit, sir.

And I want to ask you about one of the exhibits that the City's counsel showed you yesterday. And that is Exhibit 264.

Do you recall that this was the e-mail -- I am going to mispronounce the name as well. Was it Mr. Romani?

A   Mr. Romani.

Q   It is from yourself in December of 2008. And if we could blow up the second paragraph, please? I am sorry, I think I meant 2006.

I think you were only asked about the last part of here. And that's all that was shown to you, was this last sentence or two talking about whether Key was a functional building?

A   Yes.

Q   I would like you to take a moment and read the entire paragraph, if you would, to yourself.

A   Yes.

Q   Do you see in the first sentence of the paragraph -- excuse me, the first and second sentence it says we don't need to spend time on KeyArena because we don't need a detailed evaluation in terms of it not being an adequate NBA facility because that has been addressed.

MR. LAWRENCE:  Objection, your Honor. Again, we need a question for the witness to answer, not counsel leading by reading a document.

THE COURT:  Overruled. He never got to the question.

MR. LAWRENCE:  I'm sorry.  I object to the statement.

THE COURT:  Overruled.

BY MR. KELLER:

Q   Had these issues already been addressed with HOK and ICON?

A   They had been.  Again, it is common knowledge in the league and the business that Key is not a modern competitive facility.

Q   Now, you were asked a number of questions yesterday about some of your activities in I think it was late April and May in terms of communication you had with Oklahoma City about potential -- whether dates would be available there.  And I think you were shown an e-mail with Mr. Litvin.  Do you remember that question?

A   Yes.

Q   I want everybody -- I want Judge Pechman to understand what it was that was going on in the April/May time period.  First of all, let's start with what had happened in early April in Olympia?

A   Well, it began with our failure in Olympia, the failure of our legislation to move through Olympia.  And in that the principal, if not the only, primary funding provider for the $300 million piece of the building was the legislation and the state authorized King County taxes.  We were in a difficult situation without knowing how to fund that piece.  So we began to expand our process at that point and develop

strategies to understand what other available markets were there, talk to the league about their perspective on any type of relocation or even early relocation, everything in the context of a consensual agreement relative to the lease with the City.

And I did reach out to Oklahoma City to ask the question are dates even available in the next year or subsequent years if in fact we could come to some conclusion and agreement that we would move forward.

Q   I will ask you a little bit more about that, but did you make some very public statements in mid to late April about how you viewed the prospects of succeeding with the plan of building a regional facility here that would keep the team here?

A   I believe we issued a press announcement following the defeat in Olympia saying just that, saying that we had little hope at this point of staying in the region, and that we were concerned about the next steps, we were hopeful to develop new answers and new ideas but that we -- this was clearly at an impasse.

Q   But were you still trying?

A   Absolutely.

Q   As one of the alternatives -- did you as one of the alternatives pursue the possibility of talking with the City about a consensual termination of the lease on a period of

time lesser than the lease term?

A   We did.   We --

Q   Stop.   Let me ask the question.

A   I'm sorry.

Q   When did that -- the idea of doing that start to come into play?

A   Following the defeat in Olympia.

Q   So is this in the late April time period?

A   Yes.

Q   And at what point in time --   And we are in 2007?

A   That's correct.

Q   And at approximately what point in time did folks from PBC actually go and meet with representatives of the City administration and broach the idea of a consensual negotiation of a termination or shortening of the lease?

A   I believe right in that time frame, April, May time frame.

Q   And was that --   Who was it that went on behalf of PBC?

A   Terry McLaughlin, a senior executive of the Sonics and former employee of the City.

Q   Is that one of the reasons why you asked Mr. McLaughlin to make the overture?

A   We did.   Mr. McLaughlin had maintained very positive relationships with the City, was highly regarded by the City and certainly highly regarded by me and our organization.

Q   And who did he meet with?

A    He met with Mr. Ceis.

Q    Is that Mr. Ceis who is here in the courtroom today at counsel table?

A    It is.

Q    But before you could make an overture to the City did you need to know anything about potential venues and availability in Oklahoma City before talking to the City?

A    I did.

Q    Why?

A    Well, it certainly -- it made no sense to begin a negotiation with the City if we had no option and no availability to either have dates in fact in the building in Oklahoma City or the relative approval by the league.

Q    Let's focus on the communications with the Oklahoma City folks.  What did you do to try and find out about potential availability in Oklahoma City as part of the process of talking with the City of Seattle about an early termination?

A    I reached out to the City manager of Oklahoma City and asked him if he would check and see if they had potential availability for an NBA schedule.

Q    Did you also need to have any input from the NBA about their views about the timing of any potential relocation?

A    Yes.  The league was very focused on our situation and the lease.  And so I asked them their view of it.  They were as disappointed as I was relative to the experience in Olympia,

431

and said they would be willing to consider but only if the agreement with the City can be --

Q   Is that why you were referring out to Mr. Litvin in late April in that e-mail, because of the discussions that were about to occur with the City of Seattle?

A   Yes, sir.

Q   Let me back up and just -- I want to ask you a few background questions.  Is this your first experience in amateur or professional sports team ownership?

A   No.

Q   Can you tell us what kind of prior experience you have had regarding -- in the area of amateur or professional sports, either ownership or as part of promoting it?

A   I was involved with the -- at the time it was the US Olympic Festival.  It was also known as the National Sports Festival.  It was an event for the United States Olympic Committee in the non-Olympic years.  It was held in the summer of 1989.  I in fact was the executive director of that event.

Q   Where was that event?

A   Pardon me?

Q   Where was that event?

A   It was in central Oklahoma, many communities around central Oklahoma and Oklahoma City.

Q   What was it?

A    It hosted elite athletes in I believe 32 of the amateur sports, all of the summer sports and some of the indoor winter sports, and elite teams and athletes, coaches, staffs. We had 15,000 volunteers that participated in an Olympic like event.  It was very, very important and exciting for our community.

Q    That was back in '89?

A    '89.

Q    How old are you sir?

A    I am now 48.

Q    Back in '89 you would have been how many years old?

A    Late 20s I suppose.

Q    What is the next involvement you had after the event in amateur or professional sports?

A    I was involved with the Oklahoma City 89ers.  They are the AAA affiliate of the Texas Rangers of Major League Baseball.

Q    So it is a baseball team?

A    Yes.

Q    When you say "AAA affiliate," for those of us -- what does that mean?

A    The minor league team -- the highest level minor league team for the major league team, the Texas Rangers, that play their games in the Arlington, Texas and the Dallas/Fort Worth area.

And we purchased them.  They were in an old stadium.  The

owner was, interestingly enough, wanting to get a new building built.  And instead decided to sell the team.  And we purchased the team and effected the development of a new building in downtown Oklahoma City.

Q    Is that the facility, the Bricktown there, that new stadium?

A    It is new.  It is a modern design building but with a historic esthetics, a beautiful building downtown, called the Bricktown Ballpark.

Q    What role did the successful development of the Bricktown Ballpark for that AAA team have in the revitalization in that part of downtown of Oklahoma City?

A    It was really the trigger.  It was the first development in what had been an old industrial location.  Since that time all of that area has been redeveloped, a river canal concept installed, and now it is full of hotel, retail, restaurant, very exciting entertainment district next to downtown.

Q    I realize the scale was different, but was that conceptually part of what you were trying to achieve in the Renton area with the multi-sports complex arena?

A    It was a reference.  There were certainly many common elements to that experience to what we have experienced here.  A different conclusion but the same objectives at certain times.

Q    Take us forward in time.  What other activities have you

had in professional or amateur sports?

A   I was also a representative of our family company's investment to the San Antonio Spurs.  They are an NBA team in San Antonio.  We owned that investment for five years.  We were the largest single owner of that time.  And I served on the board, and also served and alternative governor and served on the Board of Governors of the NBA.

Q   Approximately what five-year period was that?

A   Approximately '92 to '98.

Q   And what was the other experience you had in either amateur or professional supports?

A   I have been involved and remain involved in volunteer activities with events that come to the City and support those, but on a volunteer basis.

Q   And is the next thing the Hornets?

A   And then the Hornets.  The Hornets were forced to relocate subsequent to Hurricane Katrina.  And on Labor Day of that year in 2005 the commissioner called the mayor of Oklahoma City and myself and asked if we would be willing to talk to him about a structure to relocate the team.  He had already done the investigation to determine that the dates were in fact available in the building.  And our primary role was to provide the civic support and the City accommodation and the revenue support to temporarily relocate the team.

Q   And is the next involvement the Sonics?

A   That's correct.

Q   Are you married?

A   I am married.  I married to my high school sweetheart.  We are married 26 years.

Q   Children?

A   I have three children.  My oldest daughter is 23, and she is close to graduating to become an elementary school teacher.  I have a daughter who is 20, and is at the University of Oklahoma, an accomplished equestrian in American Saddlebred.  And I have a son who is 15, and is enjoying the experience of pro basketball.

Q   Let me get on to something a little more direct here.  Why did you make the decision to pursue relocation?

A   Well, we were out of options in this region, no facility, no prospects for a facility, certainly what had unfortunately become an acrimonious relationship with leadership.  At the same time we had negotiated a one-year best efforts -- good faith best efforts clause.  We performed on that clause pursuant to the rules and regulations of the league.  We applied to relocate.  We ultimately made the decision to relocate because of the response that Oklahoma City has had to the NBA.

Q   And what has that been?

A   Well, it was --

MR. LAWRENCE:  I will object, your Honor.  I believe

that yesterday we determined that what is happening in Oklahoma City really doesn't have much to do with this case.

MR. KELLER:   Counsel inquired on --

MR. LAWRENCE:   Relevance is the objection.

MR. KELLER:   Counsel inquired on direct examination his activities in connection with financing, what he had done in connection with the Oklahoma legislature in terms of benefits.   I am just going into the same areas he went into. It is the same thing, I think.

THE COURT:   Whether or not it is the same thing, is it relevant?   In other words, because he did it doesn't necessarily make his points relevant either.

BY MR. KELLER:

Q   Okay.   Let me move on.

A   Sure.

Q   What do you face in the way of -- from a financial standpoint in terms of the next two years?   What are you anticipating in terms of the team's financial performance?

A   Well, the studies that we have submitted suggest over the two years a $60 million cash loss to the business.   I think that is perhaps reasonable, but certainly moving parts within that that we need to focus on and really take a look at it. I think that is probably a conservative estimate.

Q   And how does that compare to what you anticipate for the financial performance of the organization if you are

permitted to go to Oklahoma City now?

MR. LAWRENCE:  I object as to relevance.

THE COURT:  Overruled.

THE WITNESS:  Our studies indicate and our projections suggest that we would see a 7 million -- approximately $7 million cash profit in year one, and approximately a $10 million profit in year two.

BY MR. KELLER:

Q   What are the primary drivers of such a significant difference between the two?

A   Well, the central driver is the building.

Q   Wait a minute.  You are still going to have to pay your rent here in Seattle, aren't you?

A   We will certainly pay whatever we are required to pay.

Q   Have you always stood ready to meet your financial obligations to the City under this lease for the last two years?

A   Certainly.

Q   I am sorry for interrupting.  What are the primary drivers of this swing between a $60 million loss over a two-year period and upward of $15 million profit?

A   The primary one that allows them all to happen is the building.

Q   Explain that.

A   The building that accommodates the revenue development

necessary to support an NBA economic model.  Part two --

Q    What kinds of things in particular?

A    Court side amenities.

Q    Stop.  Explain that.

A    There are new products developed in these new buildings that primarily relate to close proximity to the court.  The NBA is unique in that the excitement can really be felt more than in other sports, the connection to the players can be felt more than in other sports because of the proximity to the playing surface.  The players can actually run right by you, and maybe even touch you, as they go down the court.  They don't wear protective uniforms.  We can see their faces and see their expressions and feel their energy, etcetera.  So the connection to the court is prime real estate.  And the development of that prime real estate is where the high end revenue extraction makes the most difference.  So the new, competitive buildings have focused on that.  Now, at the same time there is all types of new and modern amenities through every element of the building.

Q    Can you hang on?

A    Yes.

Q    I want to make sure, because we are talking about the economics of this, I want you to explain a little bit what you mean about the development of that real estate down on court side to enhance revenue.  I think that was your phrase.

A   Yes.  For instance, there is a new court side suite product that has recently been developed.  Most think of luxury suites as being on the top of an arena bowl.  In fact, now suites are at the top, they are now in the middle, they are now lower, and in fact there is a new product that we are developing within our new building in Oklahoma City where you would own some court side seats, there would also be other seats throughout the building connected to your court side suite.  You would walk from the court into a corridor, and at court level into a beautiful, modern suite, that would have food service, beverage service, restroom amenities, lounge areas, television and communications right at court side.  So this is a very high end product that begins to extract more of this higher revenue that I have been referring to.

Q   What other things would be the principal drivers of the difference between what would be an approximately $60 million loss here and 15 plus million dollar --

A   More such amenities throughout the building.  In fact --

Q   Explain that to me, if you would.

A   Even at the highest level concourse in the top row seats, the upper level concourse having a nice finish out, higher level concessions and merchandise opportunities.  So every fan that enters the building has a quality, fun, entertainment experience, in addition to the basketball.

     Central to delivering all of that revenue and central to

our ability to negotiate the lease is how we finance the building.  But also the willingness of the City to negotiate a very competitive lease with us that allows us to basically take the revenue from the building to provide to our business model.  They are able to do that because of the funding mechanism for the construction of the building which was built out of cash.

Q    Any other principal drivers?

A    The last and final one, and an important driver, is just the support of the community.  The Hornets enjoyed sellout crowds and wildly enthusiastic support in the community.

Q    Separate and apart from dollars, in terms of numbers, at an operational level if the PBC stays here the next two years, during what I have referred to as this lame duck period, do you anticipate operational challenges?

A    I do.

Q    Tell us one.

A    One is -- number one is the business of the development of our basketball team.

Q    Explain that.

A    That is our most important and central asset.  We are in a highly competitive business, 30 teams, the finest players in the world, the finest coaches in the world, the finest training and rehab professionals in the world.  Each team seeks the best talent.  Notwithstanding our good fortune in

the draft, and we know we are going to attract a fine player next week -- players next week, free agency where players are free to choose what team they want to play for, they have no restrictions --

Q   Can you stop for a minute?  There is a lot of different levels of understanding of basketball in terms of folks in the courtroom.  Explain how --

THE COURT:  I know what a free agent is.

MR. KELLER:  Okay.  You told us at the pretrial conference to not to assume certain things.

THE WITNESS:  I was hoping you weren't going to ask me too much more.

MR. KELLER:  If the truth be known I probably know the least about it in the courtroom.

THE WITNESS:  The salary cap is a science upon itself.  But players have the --

MR. KELLER:  I need to ask a question.

THE WITNESS:  Yes, sir.  I'm sorry.

BY MR. KELLER:

Q   Explain how you would anticipate operational difficulties in the free agency setting.

A   Because players can choose where they want to play.  In terms of the players and the staff that I just described we are in uncertainty.  That is a very difficult element to developing a team, uncertainty.  Players and coaches need

certainty.  They want to know where they are going to play, they want to know where their families are going to be, they want to know where they are going to practice, where they are going to live, where their kids are going to go to school. And because the balance of the business is so highly competitive and challenging and dynamic the team itself is their second home and their life in essence.  And so the stability and the certainty relative to the team and the organization is paramount.

Q   Well, if the Court says you have to be here for two years that sounds pretty certain to me.  Why doesn't that solve that?

A   It would be certain for two years.  But that would -- Players and coaches would perhaps say, well, I don't think I want to move for two years or I don't want to move for one year and have to move again, I think I am just going to put Seattle SuperSonics off the table and I am going to look at my career opportunities with other teams and organizations, and we will see how that may or may not develop.  In the meantime we are out of the mix of being able to compete for that highest level talent.

Q   Any other aspects that you anticipate operational issues on in this first area in terms of team development?

A   That is primarily it.

Q   Any other areas that you anticipate operational

difficulties if you are here playing under court order rather than by desire?

A    Similar concerns relative to our business staff and our professional staff.

Q    Would you explain that?

A    Employees that are not sure if they will be -- if their job will exist, or if they are willing to relocate necessarily to Oklahoma City, because their family may be here or their spouse may have a job here that won't allow them to relocate, or another opportunity comes along and they are not so sure they shouldn't take it because they are not certain about the future of our team.  It is hard to maintain continuity, it is hard to maintain focus and vision with such impending challenges relative to uncertainty and time frame.

Q    Have you had to deal with some retention issues for team players already?

A    Yes.  We have seen retention become an issue.  We have had some senior -- very senior, very important talent leave. They talked to me and told me they just have to move on.

Q    What kind of level?  What positions?  Let's keep names out.

A    Senior level.

Q    What types --

A    Throughout the organization.

Q    Well, what positions?

A    Recently our senior --

MR. LAWRENCE:  I will object as calling for hearsay at this point.  This is for the truth of these statements. He is not even naming names.  We don't have any opportunity to cross.  I don't have any foundation built on this.  It is hearsay and no foundation.

MR. KELLER:  I will name names if he wants them.  I was just trying to be --

THE COURT:  I don't think the names are the issue. The issue of have people left the organization is not hearsay.  Overruled.

BY MR. KELLER:

Q    What key position people, by position, have left the organization given what has happened?

A    We have had positions leave throughout.  We have had most recently our senior corporate sales executive leave the organization.

Q    Any others?  I tell you what, Mr. Barth is coming next. We will go into that in more detail with him.

A    Thank you.

Q    Any other areas from an operational standpoint that cause you significant concerns if you are here during this lame duck period?

A    Yes.  And not just to point to the financial results, but the whole sales and marketing and community integration

platform, how do we market.

Q   Explain that.

A   Well, how do we market this team, how do we attract sponsors to this team for two years.

Q   What is a sponsor?

A   Pardon me?

Q   What is a sponsor?

A   A corporate sponsor is a sponsor that would pay a premium to have signage associated with our brand, to have --

Q   When you say "signage associated with our brand," what do you mean?

A   Signage within the building.  That would be signage you might see if were you in the arena.  They might also appear on a television broadcast, commercials in a television broadcast, radio broadcast, advertisements in a program, sponsors of co-promotions for game ticket give-aways, any number of traditional sports marketing activities.

Q   When you say "our brand," are you talking about the Sonics brand?

A   Yes, sir.

Q   What are the issues and concerns vis-a-vis --  Tell us what kind of dollars sponsorships can represent for a team?

A   They can represent up to --  It varies.  In our case it can be up to $20 million.

Q   It hasn't been though, right?

A    No.

Q    And what is your concern as to how it will be impacting going forward?

A    Just as a matter of looking at the business and understanding how companies might view -- might have a difficult time substantiating an investment in the Sonics when our attendance is down, our viewership is down, there is a difficult environment in the community relative to the Sonics.  Sponsorship is so competitive that there is so many other opportunities, certainly with the other major league teams, but any other broad commercial opportunity that exists in the marketplace.  It is easy to say, we are going to wait on the basketball Sonics issue and spend our money elsewhere. When it settles down maybe we will revisit that but we are not going to participate with you right now.

Q    Any other aspects on this third area we have been talking about regarding the operations?

A    Well, I just think lastly on the operations something that has been difficult for our ownership group, very difficult for me personally, is the inability to integrate more completely with the people, with the business, attempt to insert our culture and our management style and bring what we hope would be additive ideas about how to develop the business because it is difficult for me to be here, I can't go to games --

Q    You are not a real popular guy in this town?

A    Not real popular.  So that is a difficult barrier as well.

Q    How does that impact your ability to provide leadership to your organization?

A    It is difficult.  It is difficult.

Q    Any other aspects in which you have concerns on a go-forward basis at an operational level if you are here during lame duck --

A    Generally that's it.

Q    I started out my questioning, Mr. Bennett, by asking you if ever thought you would be sitting here in this chair.  Do you remember that?

A    I do.

Q    Now that you are here is there anything about the process that got you here that you would like to share with the Court?

A    Well, the following thought that I have come to believe in.  And that is that we bought this team with grand visions for success.  Did we do everything right?  Did we understand everything there was to understand?  Certainly not.  Did we make mistakes?  Certainly.  Did we do everything we knew how to do?  Did we work as hard as we could?  Did we attempt to hire the right team of professionals and consultants and advisors, basically at an all-cost perspective?  Yes.  And I believed from the bottom of my heart we would succeed.  And I

am personally disappointed that we did not.

MR. KELLER:  Thank you, sir.  I have no more questions.

THE COURT:  Cross-examination -- actually redirect.

MR. LAWRENCE:  Whatever you want to call it, your Honor.  If I may approach with a book of the exhibits that we will be using at this point for your Honor?

REDIRECT EXAMINATION

BY MR. LAWRENCE:

Q   Good morning, Mr. Bennett.

A   Good morning, sir.

Q   I guess I would like to start where you left off.  You recall signing the assumption of instrument with the City of Seattle, correct?

A   Yes, sir.

Q   Agreeing to abide by the lease terms with the City of Seattle, correct?

A   Yes, sir.

Q   Did you enter into an agreement at that time that if you hired the right political team and you failed you could break the lease?

A   Pardon me?

Q   Did you tell the City of Seattle or put a proviso in your assumption if you hired the right political team to go to Olympia and made a really good effort that would excuse you

from performing the lease?

A    No.

Q    Did you tell the City of Seattle and put into that instrument that if you made mistakes along the way that would excuse you from performing under the lease?

A    No.

Q    Did you tell the City of Seattle to put a proviso in that assumption that if you misunderstood the political situation in Washington that would excuse you from performing the lease?

A    No.

Q    You indicated concerns about players and staff and how they are affected by the move.  I would like to play for you what you said in your deposition with respect to that issue. And we are going to play CB 70X, which is from the deposition, Pages 370, Line 6, through 371, Line 12.

                    (Audio played)

        MR. LAWRENCE:  I would like to move for the introduction of Exhibit 111.

        MR. KELLER:  No objection, your Honor.

        THE COURT:  111 will be admitted.

                    (Exhibit 111 admitted)

BY MR. LAWRENCE:

Q    This is an e-mail chain between you and Mr. Kneeland, dated April 2007, correct?

A    Yes.

Q    And Mr. Kneeland writes to you first that he is hearing through the grapevine the team is upset about the prospect of a move.  Do you see that?

A    Yes.

Q    He is raising the issue with you that this might have an impact.  I want to show the Court your response in April of 2007 to any concern about players with respect to this move.  Could you move to the next thing?  Let's see what your response was.  Your response was "boo-hoo," sir, is that right?

A    That's correct.

Q    To which Mr. Gooden agreed with you, that is a great response.  Do you see that?

A    I do.

Q    That reflects how you cared about the players at the time, does it not, sir?

A    No, it does not.

Q    That is just what you said to people in a private e-mail, correct?

A    That is what I said to Mr. Kneeland reflecting my frustration.  I might add I have subsequently spoken with each of the --

        MR. LAWRENCE:  I would move to strike as nonresponsive and not answering the question.

MR. KELLER:  Your Honor, I believe the correct procedure is the witness can finish his answer, and if there is an objection it is made at that time rather than talking over him.

THE COURT:  That's correct.  You can't talk over the answer, Mr. Lawrence.

MR. LAWRENCE:  I will let him give an answer and then move to strike as nonresponsive.

THE WITNESS:  I might add that I spoke with our players and discussed this and I was pleased to receive a very supportive and favorable reaction.

BY MR. LAWRENCE:

Q   So now your testimony is that there is no problem because the players are supportive and are going to work with you to move?

A   I called them relative to this comment and offered my apologies for this comment, and I was met with a very positive and supportive response.

Q   They are professionals and they are going to play in Seattle for two years or Oklahoma City for the next two years, wherever, they are under contract with your team, right?

A   The current contract players, yes.  It is the development of the team that is at issue.

Q   Have any free agents refused to sign with you because of

the team moving to Oklahoma City next year?

A   We are beginning to negotiate free agency at this time, so we have not gotten into that yet.

Q   So the answer is no?  No free agents as of this date have refused to sign with your team because of the move; is that right?

A   That's correct.

Q   And you certainly weren't required to leave early to move to Oklahoma City, correct?

A   That's correct.

Q   There is no contract that says after here we have to move to Oklahoma City, correct?

A   That's correct.

Q   The NBA didn't say to you after a year of trying in Seattle you have to move, did they?

A   They did not.

Q   So you could have chosen quietly to play out the lease in Seattle and then apply to move to Oklahoma City or wherever you wanted for the 2010/2011 season?

A   I could have done that, yes.

Q   And if you had not announced that move in I guess September when you filed your arbitration demand of '07 you would have had at least a couple more years of playing in Seattle without the threat of a move pending over your head, correct?

A    I am not sure I follow that question.

Q    Well, you decided to ask the NBA to allow you to move early, correct?

A    Yes.  To consider that, yes.

Q    Well, you filed an application?

A    On the relocation, yes.

Q    You could have waited two more years to file that application, correct?

A    I could have, yes.

Q    I believe Mr. Keller asked you some questions related to your interactions with some civic leaders to try to help your arena search.  And one of those people was -- one of those persons was Steve Ballmer, correct?  You remember that?

A    That's correct.

        MR. LAWRENCE:  I would move for the admission of Exhibit 272.

        MR. KELLER:  No objection, your Honor.

        THE COURT:  272 will be admitted.

                (Exhibit 272 admitted)

BY MR. LAWRENCE:

Q    This is an e-mail from February of 2007.  Do you see that?

A    I do.

Q    And this is a little bit before the time period that Mr. Keller showed you an e-mail, correct?

A    I believe so.

454

Q    And you are giving him an update; is that right?

A    That's correct.

Q    And you are telling him about the status of your efforts in Olympia, correct?

A    Yes.

Q    And on Page 2 of the document you talk about private contribution.  Do you see that?  That is subsection three of that first paragraph?

A    I do, yes.

Q    And you are explaining to him what your view is of the private contribution, this $100 million that you have been talking about in court, right?

A    That's correct.

Q    And you explained to him that it includes a number of things like ticket surcharge, parking fees, extraordinary corporate investment or naming rights.  Do you see those things?

A    I do.

Q    And those are all sort of revenues associated with the new arena, correct?

A    Correct.

Q    And then you talk about a contribution from the team.  Do you see that?

A    I do.

Q    And you say nominal, correct?

A    Yes.

Q    And should include development costs.  Do you see that?

A    Yes.

Q    And that includes the costs that you described with Mr. Keller of hiring Jack McCullough and Jim Kneeland and Foster Pepper, right?

A    That's correct.

Q    And some portion of the ongoing operation losses as a credit for this piece; is that correct?

A    That's correct.

Q    So, in other words, the $100 million is nominal and should include your operating losses.  So it may have been even zero dollars out-of-pocket if you take into account those operating losses?

A    Again, Mr. Lawrence, our commitment was $100 million to the building.

Q    And in this private e-mail to Mr. Ballmer you explained what that meant, correct?

A    This was a potential configuration, yes.

Q    And the notion that the contribution of the team would be nominal and should include development costs and some portion of ongoing operating costs as credit for this piece, that was not information you shared with the Washington State legislative leadership, correct?

A    I don't believe I did.

Q   Or Governor Gregoir?

A   Governor Gregoir and I had an understanding the $100 million could come from any configuration.

Q   Did you tell Governor Gregoir that the contribution from the team would be nominal and include development costs and some portion of ongoing operating losses as a credit for this piece?  Yes or no, did you tell her that?

A   I don't know if I did or not.

Q   Fair enough.  Mr. Keller also showed you an e-mail chain with respect to your discussions with Mr. Ballmer in April, indicating how were you trying to use Mr. Ballmer in your efforts.  And I believe that was Exhibit 555; is that right?  Maybe not.  555, yes.  I think that is the one you used yesterday.

    Do you remember discussing this e-mail with Mr. Keller yesterday?

A   Yes.

        THE COURT:  I'm sorry.  Give me the number again.

        MR. LAWRENCE:  555.

        THE COURT:  Go ahead.

BY MR. LAWRENCE:

Q   Is this the e-mail you discussed yesterday?

A   Yes, it is.

Q   If you go to the top, the last part of that chain, Mr. Ballmer says to you, I am away for a week for vacation

but let me know concretely what you want.  Thanks.  Do you see that?

A    I do.

Q    We didn't see yesterday your response to that, did we?

A    I don't know.

Q    Can we have our trial --

MR. LAWRENCE:  Move for the admission of 322, please.

MR. KELLER:  No objection, your Honor court.

BY MR. LAWRENCE:

Q    Exhibit 322, the middle e-mail --

THE COURT:  Just a minute, Mr. Lawrence.  322 is admitted.  Does the witness have a copy.

THE WITNESS:  I do not.

(Exhibit 322 admitted)

BY MR. LAWRENCE:

Q    Do you have it, sir?

A    I do now, yes.  Thank you.

Q    If you could look at the middle e-mail in this string. That is the last e-mail in Exhibit 555, correct?

A    Yes.

Q    And then you responded to Mr. Ballmer --  We can see your response.  Your response is, we are okay for now, getting a little better news from Olympia.  Do you see that?

A    I do.

Q    We will stay in touch.  Do you see that?

458

A    I do.

Q    So you took Mr. Ballmer off your efforts, so to speak?

A    I think I am just keeping him advised.

Q    Well, he asked you, Is there anything concretely I can do, that's where we left off yesterday.  But today we know that your response -- further response to him was, We are okay for now, I will stay in touch.  Right?

A    That's what it says.

Q    Are you aware of any further e-mail communication in April when the legislative session was occurring subsequent to April '07 in which you told Mr. Ballmer something concrete that he could do with respect to legislature?

A    I don't know.  But I did have ongoing communication and telephone communications with Mr. Ballmer.

Q    You are not aware of any further e-mail conversations with Mr. Ballmer during this April 7th to April 14th period?

A    I am not aware of that.

Q    I think also Mr. Keller discussed with you the proposal for City of Renton, correct?

A    Yes.

Q    And you were very complimentary about how the City of Renton officials were very supportive of your efforts to build an arena down there, correct?

A    That's correct.

Q    Isn't it correct that after the legislative session was

finished in mid April Mayor Keolker of Renton was not willing to give up an effort to find an arena solution in Renton? Correct?

A    I am not exactly sure what you are speaking of.

Q    Okay.

MR. LAWRENCE:    Let's move for the admission of trial Exhibit 316.

MR. KELLER:    No objection, your Honor.

BY MR. LAWRENCE:

Q    Your first --

THE COURT:    Just a minute, Mr. Lawrence.

MR. LAWRENCE:    I thought that was in your --

THE COURT:    It is not.    Does the witness have it?

THE WITNESS:    I do.    Thank you.

THE COURT:    Thank you.

(Exhibit 316 admitted)

BY MR. LAWRENCE:

Q    Exhibits 316 now.    This is the first e-mail from Kathy Keolker to you.    Do you see that?

A    I do.

Q    And Kathy Keolker is the mayor of Renton?

A    She is no longer the mayor, but she was the mayor at the time.

Q    Thank you.    And this is dated 4/20/2007.    Do you see that?

A    That's correct.

Q   That was after the end of the legislative session, correct?

A   That's correct.

Q   And she is indicating that she had a conversation with you, correct?

A   Yes.

Q   And she attached a proposal for you to consider.  Do you see that?

A   Yes.

Q   And she indicates she will give you a call and talk about it.  Do you see that?

A   Yes.

Q   And your response to Ms. Keolker is, God bless you, but I wouldn't get too far out of this.  Do you see that?

A   I do.

Q   Lots to discuss but cost overruns is a nonstarter.  Do you see that?

A   I do.

Q   So Kathy Keolker was proposing some way to get this done but it involved PBC covering cost overruns, right?

A   That's correct.

Q   The same way that Governor Gregoir had told you to make this happen you have to cover cost overruns.  Do you remember that from yesterday?

A   If we were to demand and influence design.

Q   And you told Kathy Keolker, Don't get too far out on this proposal because you are asking us to cover cost overruns; is that correct?

A   That's correct.

        MR. LAWRENCE:   We move for the admission of 317.

        MR. KELLER:   No objection, your Honor.

        THE COURT:   317 will be admitted.

                (Exhibit 317 admitted)

BY MR. LAWRENCE:

Q   And this is a further follow-up e-mail the next day, the 21st of April.  Do you see that?

A   I do.

Q   And you wrote back after further consideration, Sorry, Kathy, this is just nothing we can consider.  Do you see that?

A   I do.

Q   Good to catch you today.  I will be in touch.  Do you see that?

A   I do.

Q   So you shut down her proposal, correct?

A   Yes, we were never willing to cover cost overruns for a public building.

Q   Even though you were promoting the building to be designed to meet NBA standards, correct?

A   We were promoting it to be a regional multipurpose event

center which would accommodate the Sonics and Storm.

Q    But you never -- did you consider just proposing an NBA only stadium that might have been cheaper, sir?

A    No, because it was the suggestion of leadership and the governor that we propose the ultimate building we did propose.

Q    Just so we -- Again, following up.  And this is a week after your man possessed e-mail, correct?

A    Correct.

Q    The man possessed to keep the team in Seattle shuts down a proposal from mayor of Renton to pursue the Renton proposal because you have to cover cost overruns?

A    Fundamental to that proposal was us covering cost overruns, which we were not willing to do.

Q    I want to stay on this man possessed time period.

        MR. LAWRENCE:  I would like to move for the admission of trial Exhibit 294.

        MR. KELLER:  No objection, your Honor.

        THE COURT:  294 will be admitted.

                (Exhibit 294 admitted)

BY MR. LAWRENCE:

Q    Okay.  294 is a series of e-mails between you and Brent Gooden, correct?

A    Yes.

Q    I am not sure we understand who he is.  Can you tell us

who Brent Gooden is?

A    Brent Gooden is a principal of the Gooden group, and they are a public relations firm headquartered in Oklahoma City. They provided public relations counsel to the PBC.

Q    Have they provided public relations counsel to PBC since its purchase of the Sonics?

A    That's correct.

Q    And they were providing you public relations advice in conjunction with your efforts in Olympia, correct?

A    They were involved.  They were part of the team, yes.

Q    So they basically have been a key member of your team from day one of your ownership in the Sonics through today?

A    They are a member of our team.

Q    In fact, Dan Mahoney sitting in court is with the group?

A    Correct.

Q    And they have been privy to conversations with you from day one?

A    Again, they are consultants and part of our team.

Q    And that team also included the McAfee Taft law firm?

A    That's correct.

Q    And you wrote to Mr. Gooden --  And your last e-mail is dated 4/15/07, correct?

A    That's correct.

Q    And this is after Governor Gregoir has called you and told you, it doesn't look like you are going to get legislation

this year, correct?

A    That's correct.

Q    And one of the messages that you propose is Item Number 7?

A    Yes.

Q    We can now speak candidly and openly about our intentions out of the political context.  Do you see that?

A    Yes.

Q    That is one of the messages.  And then you say, We will work to negotiate out a lease with KeyArena.  Do you see that?

A    I do.

Q    And play next season --

        MR. LAWRENCE:  I'm sorry, your Honor.  The bottom of the page marked 14062, is where we are reading from.  Are you finishing reading it, your Honor?

BY MR. LAWRENCE:

Q    This 4/15 was a couple of days before your man possessed e-mail?

A    Correct.

Q    You acknowledge you can speak candidly and open about your intentions.  And a couple of days later in a response to a question from one of your partners, Can you avoid playing a lame duck season in Seattle, you say you are a man possessed to get it done?

A    Correct.

465

MR. KELLER:  Your Honor, this is getting repetitive and cumulative.

THE COURT:  Overruled.

MR. LAWRENCE:  That is the last question I have on this.

THE COURT:  Overruled.

BY MR. LAWRENCE:

Q   Now, let's make sure we understand the focus of the events.  So you do your man possessed e-mail and you call then the NBA, correct?

A   Correct.

Q   Now, if I recall correctly, the deadline for relocation application is in March?

A   Correct.

Q   So we are now in April?

A   Correct.

Q   So you are past the March deadline that typically applies to relocation requests?

A   Correct.

Q   So you need to call the NBA to see if they might process an application for relocation out of the normal course, correct?

A   That's correct.

Q   And your intent was to see, can we get ourselves relocated for the 2007/2008 season, correct?

A    Exploring that option, yes.

Q    And so you raised that with Mr. Litvin, correct?

A    That's correct.

Q    And you explained to him how good a market Oklahoma City would be for the NBA, correct?

A    Yes.

Q    And Mr. Litvin then took your request to Commissioner Stern, I take it?

A    I suppose so.

Q    And he got back to you and said, we can do that if by June you work out your situation with Seattle, correct?

A    That's correct.

Q    So it was the NBA who told you, we will move but you have to work it out with Seattle, correct?

A    They said that.  We operated within that context from the beginning.

Q    Then subsequently, about a month later, you talked to -- you sent Terry McLaughlin to talk to the City?

A    Correct.

Q    Now, you were in town, if you recall, a week later, and that's when you met with Mr. Keller?  Do you remember that?

A    That's correct.

Q    And when you were in town a week later did you think about calling the mayor or deputy mayor and saying, we would like to get a discussion going, and going over with Terry

McLaughlin and saying we would like to get a discussion going on that?

A   Well, Terry was engaged in conversations with the City.

Q   Well, not at that time.  That was later, sir.

A   Okay.  Terry was who our emissary was going to be in conversations with --

Q   Who -- Strike that.  I didn't mean to interrupt.  Finish your answer?

A   I was finished.

Q   I just want to make it clear.  You call the NBA and they say, fine, but you have got to clear your stuff up with Seattle.  And you are in Seattle at the end of April, but instead of meeting with the mayor or Mr. Ceis you meet with Brad Keller; is that fair?

A   I had a meeting with Brad Keller at that time.

Q   And you didn't meet with the mayor or Mr. Ceis?

A   I did not meet with the mayor at that time.

Q   Now, you talked about some of the players that you retained to help you in your efforts to find a successor arena?

A   Yes.

Q   You talked about Jim Kneeland?

A   Yes.

Q   And when did he stop doing work for you?

A   Right after the legislative session.

Q   How about Foster Pepper?

A   Right after the legislative session.

Q   Did HOK do any work for you with respect to Seattle after the legislative session?

A   I don't think they permanently worked.  They were still retained by us and available to us but they had not done any work in Seattle.

Q   Did ICON do any work after the legislative session related to a venue in Washington State?

A   No.

Q   Did Jack McCullough do any work after the legislative session with regard to the venue in Washington?

A   Jack has done a few things for us just to understand any new developments or activities in the marketplace.

Q   His activity slowed way down, correct?

A   Yes.

Q   Is it Cushman and Wakefield?

A   Cushman and Wakefield.

Q   Did they do any work for you after the legislative session?

A   No.

Q   So your team basically shut down after the legislative session; is that fair?

A   Not at all.

Q   They just stopped doing work for you?

A    We were in a position to hope to find --  You know, the physical elements, the consultants you just described for the most part were put into place.  We needed a financing mechanism.  And that's what we were hoping to see emerge.

Q    We will talk about that in a second.  I just want to make clear that as of the end of the legislation the man possessed to keep his team in Seattle stopped using Mr. Kneeland, HOK didn't do any other work, Foster Pepper didn't do any other work, Mr. McCullough did a little work, ICON didn't do any work to keep the team in Seattle; is that fair?

A    You are describing consultants involved in the building and consultants involved in the development of the legislation.  Both of those had been accomplished.

Q    Can you confirm whether that is an accurate statement or not, sir?

A    Would you mind repeating?

Q    Is it fair that after the legislative session the team that you described to Mr. Keller yesterday basically stopped working with respect to finding a successor venue in Washington?

A    In large measure with the consultants you referenced, yes.

Q    And that is six months into this 12 month period, correct?

A    That's correct.

Q    Now, you talked about your focus moving to find a financing mechanism, correct?

A    Yes.

Q    Did you go out and talk to banks about financing an arena for you to move into?

A    Yes.

Q    You could have privately financed an arena?  PBC could have said, I want to go out and build my own arena, correct?

A    Nothing that would have been economically viable.  That's been the challenge from the beginning.

Q    I'm sorry.  That wasn't my question.

A    I'm sorry.

Q    You certainly could have invested money and done a private arena, correct?

         MR. KELLER:  Excuse me, your Honor.  I will object. I think the last answer was entirely responsive.

         THE COURT:  Sustained.

BY MR. LAWRENCE:

Q    You are aware that certain NBA arenas are privately financed?

A    There are a few, yes.

Q    But that was not something that you considered because of the economics for your ownership group?

A    That's correct.

Q    You didn't want to lose any more money, is that the issue?

A    Well, number one, the building in our view was a public building, and would serve the greater public good of the

region, hence the rationale for public financing.  And that's the disconnect I think you are referring to.

Q   Well, you could have made it a private building for the Sonics and Storm, correct?

A   Could have, yes.

Q   And then as a private owner you could have -- I guess you lease it out for concerts, or I don't know if you rent it for concerts, correct?

A   It is not a viable model today.

Q   Can I ask you, as a private owner could you still have concerts at the arena?

A   You certainly could.

MR. KELLER:  Your Honor, I think we are getting pretty far afield here, on 402 and 403.

THE COURT:  Sustained.  Let's move on to another area.

MR. LAWRENCE:  I want to ask --  I will move on.

BY MR. LAWRENCE:

Q   Again, I just want to understand.  So the financing that you are looking at is somebody else to come in and build you a new arena?

A   Well, what we were looking for -- and ultimately after we were not successful with the public financing piece, I did attempt to find private financing.  What it comes down to is an economic model, that if the building is to be viable --

economically viable and profitable, there in this case would be required an approximately $300 million piece of non performing equity to that model for the current business model to work for a new public building of this magnitude.

Q    That is state tax money you asked for?

A    That's correct.

Q    Let's talk a little bit about the Ford Center which you are moving into next season if this all goes your way.

A    Yes, sir.

Q    Now, the Ford Center was built in what year?

A    Built -- I think it is five years old. Five or six years old.

Q    At a cost of what, 89, $90 million?

A    Yes, sir.

Q    And it is not in its current state up to the NBA standards that you described, correct?

A    Not in its current state, that's correct.

Q    In fact, it needs to be substantially renovated to get up to NBA standards, correct?

A    Correct.

Q    And what is going to happen over the next couple of years is that the City of Oklahoma is going to spend $100 million to renovate the Ford Center?

A    That's correct.

Q    And when it has finished renovation it will have all of

these amenities that you talked about?

A    Yes, it will.

Q    So just to be clear, over the next two years you have the old Ford Center, and then at some point when construction is complete you will have a new Ford Center up to NBA standards?

A    Funded by a public referendum which passed by 62 percent.

Q    My question was, for the next two years you will be playing in a substandard arena, and then when the construction is finished it will be up to NBA standards?

A    That's correct.

Q    Could I see Exhibit 215, the slide of the picture of KeyArena completed, showing the basketball floor from above?

Do you recognize that to be KeyArena?

A    I do.

Q    Now, there are a lot of seats right by the floor.  Do you see that?

A    I do.

Q    Those are seats the fans sit in, correct?

A    Yes.

Q    So fans at KeyArena can sit very close to the players, correct?

A    They can.

Q    They can see the players run up and down the court?

A    Yes.

Q    And Ford Center looks basically like that in terms of fans

close to the floor?

A    A little bit different but comparable.

Q    And the notion of the court side amenities, that is something that won't be available in the Ford Center for a couple of years, correct?

A    Not this season, but the following season.

Q    Assuming construction starts.  Has construction started?

A    Plans are being developed currently.  Construction has not started.

Q    Thank you.  You would agree in terms of the average fan's ability to view basketball, KeyArena is a good place to watch basketball?

A    I think it has good sight lines.

Q    In lay terms it is a good place to watch basketball?

A    I don't know.  The seats are too tight, the knee room is too small, the treads are not good, but the sight lines once you are in your seat looking at the game are good.

Q    You are just talking about your ability to view the game from your seat?

A    Yes.

Q    So the long list of amenities that Mr. Keller ran you through, those are all things that are going to be in the new building once construction is completed?

A    That's correct.

Q    Now, I think you indicated from day one you rejected

KeyArena out of hand and that's why you wanted the successor venue language in the Schultz agreement, correct?

A    That's correct.

Q    And that agreement was signed mid July, correct?

A    That's correct.

Q    And you negotiated it over the phone, correct, and are sending drafts and back forth between the lawyers?

A    That's correct.

Q    And actually you didn't come out to Seattle until it was time to sign and announce?

A    That's correct.

Q    So in your due diligence you didn't go out and look at KeyArena, did you?

A    I didn't personally look at KeyArena, no.

Q    Did any of the other owners look at KeyArena?

A    None of the current owners looked at KeyArena.

Q    So during that entire period you considered whether you were going to sign an agreement to purchase the Sonics, neither you nor any of the other owners went out and walked through KeyArena to see its suitability for basketball, did you?

A    No.

Q    Did you send out any other due diligence -- any other representatives of PBC during that period of negotiation and signing to walk through KeyArena?

476

A    On two occasions Ed Evans, who you referenced earlier, came and did a due diligence trip, and then representatives of our law firm came and did a due diligence trip.

Q    Ed Evans is one of the business investors who helped negotiate the deal, correct?

A    Who was the connection between us and the sellers, yes.

Q    And he dropped out because he had wanted to be the operational head of the group but that was a position that the majority of ownership asked you to do, correct?

A    No.    He dropped out, he indicated to me, because he had another business opportunity.

Q    But he was for a period of time one of the key owner representatives along with you?

A    That's correct.

Q    You didn't hire -- you hadn't hired HOK at this point to look at KeyArena?

A    No.

Q    You hadn't hired ICON at this point to look at KeyArena, had you?

A    No.

Q    I believe what I would like is Exhibit 69, I believe.

        MR. LAWRENCE:    I would move for its admission.

        MR. KELLER:    I have no objection, your Honor.

        THE COURT:    69 will be admitted.

                    (Exhibit 69 admitted)

BY MR. LAWRENCE:

Q   69 is an e-mail from Ed Evans.  Do you see that?

A   Yes.

Q   To you and Brent Gooden.  Do you see that?

A   Yes.

Q   It is dated July 20th, 2006, correct?

A   Correct.

Q   That is after you signed your agreement with the Schultz group, correct?

A   Correct.

Q   And after you negotiated your good faith side letter, correct?

A   That's correct.

Q   As you said, Ed Evans, he was out in Seattle, he stayed out after you left; is that right?

A   I am not sure.  I'm sorry.

Q   You both came out for the signing, correct?

A   Yes.

Q   Your testimony was that before this time you completely rejected a KeyArena solution, correct?

A   Correct.

Q   But this indicates that Mr. Evans had a contact with the deputy mayor Tim Ceis?

A   It does.

Q   It says, The call went amazingly well.  Do you see that?

A   I do.

Q   He commented that, What they, the City, had offered was a starting point.   Do you see that?

A   I do.

Q   And that was the offer with respect to the Schultz group on the renovation of KeyArena, correct?

A   Yes.

Q   So Mr. Evans, a few days after you had signed this agreement where you testified today reflected that you had absolutely no interest in a renovated agreement, is out talking to deputy mayor Tim Ceis about the renovated KeyArena solution, correct?

A   Yes.

Q   So I guess Mr. Evans didn't understand when he signed up that a successor arena could not have included KeyArena, correct?

A   I would disagree with that.

Q   He was just wasting Tim Ceis' time?

A   I think he was having a conversation with Mr. Ceis.

Q   About a renovated KeyArena?

A   The beginning of a conversation and a relationship and see where we could go.

Q   Four days after you signed an agreement that you testified included provision that made it clear that you were not interested in renovating KeyArena?

A    KeyArena was never an option.

Q    Did you direct Mr. Evans to give that message to Mr. Ceis?

A    No.

Q    And, in fact, it was all and all, as Mr. Evans indicated, an incredibly positive call, correct?

A    That's what he reported.

Q    And I assume, given what you have heard and given the subsequent conversations with the City, if Mr. Evans had been going to the City saying, we have no interest in a renovated KeyArena, that would not have been a positive call, fair?

A    Perhaps.

Q    Let me ask you a couple of follow-up questions from your testimony yesterday.  In the video clip that was played before the Senate Ways & Means Committee you talked about how proud you were to have Lenny Wilkins working with the organization, correct?

A    That's correct.

Q    He no longer is working with the organization, correct?

A    That's correct.

Q    Now, the good faith best efforts obligation was not simply an obligation with respect to the Schultz group, correct?

A    Correct.  Also with the NBA.

Q    The NBA.  Let's talk about that for a second.  Again, to get the timing and context, in July you signed an agreement with the Schultz group for the transfer of ownership,

correct?

A    That's correct.

Q    You announced it publicly, correct?

A    Yes.

Q    You put money in escrow, correct?

A    Yes.

Q    The contingency in the deal was only NBA approval?

A    That's correct.

Q    And the way the NBA works is they have to look at every agreement, the transfer of ownership, evaluate the ownership for financial stuff and make a determination whether or not to allow the transfer to happen, correct?

A    Generally correct, yes.

Q    And that all occurred with respect to PBC, correct?

A    Yes, it did.

Q    And you submitted all of the materials you needed to to the NBA?

A    Correct.

Q    And as a result of that the NBA gave you the approval, but in so doing they asked that you sign a document, correct?

A    Yes.

          MR. LAWRENCE:    We will move for the admission of 111.

          MR. KELLER:    No objection.

          THE COURT:    I thought 111 was one we already put in.

          MR. KELLER:    Still no objection.

MR. LAWRENCE:  We will just turn to Exhibit 111, your Honor.  I'm sorry it is Exhibit 81.  I will move for the admission of 81.

MR. KELLER:  No objection to 81 either, your Honor.

THE COURT:  81 will be admitted.

(Exhibit 81 admitted)

BY MR. LAWRENCE:

Q    Do you have 81?

A    I do.

Q    81 is a letter dated November 1, 2006 from the NBA to the PBC, correct?

A    Yes.

Q    And it is confirming the approval for sale the Sonics from the Howard Schultz group to your group, correct?

A    That's correct.

Q    If you could turn to the next page?  Basically there is an agreement that you ended up signing, correct?

A    That's correct.

Q    Now, as part of this you did agree, of course, to assume, pay and discharge all liabilities of the Schultz group, correct?  That is Page 6427.

A    Okay.

Q    1(a).

A    Yes.

Q    And if you could turn to 6439?

THE COURT:  There doesn't appear to be a 6439 in this notebook that you gave me.

MR. LAWRENCE:  Since it is 10:30 why don't we take our break and we will supplement that for your Honor immediately after the break.

THE COURT:  We will be at recess for 15 minutes.

(Court in recess.)

(Redirect Examination of Clayton Bennett continues)

THE COURT:  Please be seated.  Go ahead, Mr. Lawrence.

BY MR. LAWRENCE:

Q   At the break, I believe that now everybody has that part of the that NBA approval, pages PBC 06439 and 40, the subsection (d) that carries over on that page.

A   Pardon me?

Q   Do you see that subsection (d) that carries over on the page, between page 14 and 15?

A   Yes.  Thank you.

Q   This was part of essentially an agreement that PBC signed with the NBA in connection with the approval of the sale transfer of ownership?

A   Correct.

Q   And in that section D the NBA also incorporates the notion of giving a period of 12 months for the team and the owners

to use good-faith best efforts, correct?

A   Yes.

Q   In there actually there is -- pretty much mirrors the language of the of the Schultz agreement, correct?

A   Correct.

Q   You understood when you signed this that before there could be -- the first part of the section talks about that the approval of the transaction does not constitute approval of relocation, correct?

A   That's correct.

Q   The NBA is trying to make clear to you that you have to make a good-faith best effort for that 12-month period before they would consider approval of any relocation requests pursuant to the NBA constitution?

A   That's correct.

Q   So you knew from the beginning of this 12-month period that you had to demonstrate to, among others, you had to demonstrate to the NBA, the NBA board of governors that you met this good-faith best efforts requirement before you could submit any relocation application, correct?

A   That we would operate on good-faith best efforts.   Yes.

Q   That was a prerequisite for filing of relocation?

A   That's correct.

Q   In fact, the notion of doing a good-faith best efforts requirement is something that was important to you throughout

this period?

A   Indeed, yes.

Q   You were very concerned that your actions would constitute a good-faith best effort, correct?

A   I consistently kept it in my mind that we wanted to make sure we always did the best we could in pursuing the new building.

Q   And that is, you were consistently focused in making sure that what you did would constitute good-faith best efforts, correct?

A   That we would operate within that context, yes.

      MR. LAWRENCE:   We move for the admission of Exhibit No. 265.

      MR. KELLER:   No objection.

      THE COURT:   265 admitted.

            (Exhibit No. 265 admitted.)

BY MR. LAWRENCE:

Q   265 is an e-mail from Tim Romani to you the end of December of 2006, correct?

A   Yes.

Q   I'm sorry --

A   Yes, it is.

Q   And so this is two months into the good-faith best efforts period, correct?

A   Correct.

Q   And just to remind the Court, Mr. Romani is the principal with Icon, who was consulting with you about your efforts to find a successor venue, correct?

A   Correct.

Q   And you had actually hired him, I think, to look at the financing or the economic -- I think you said the economic implications of that arena and how to build an arena that will work economically?

A   Economic modeling.

Q   Okay.

If I could direct your attention not to what is on the screen, but to the next page of that exhibit, Tim Romani, the fourth question.

So you start the e-mail chain by asking Mr. Romani four questions, correct?

A   Yes.

Q   And you talked about the fact that you think you need a significant public investment in the building to make it a reasonable return on your investment.  Do you see that?

A   Yes.

Q   And so we understand, when you talk about reasonable economic return on your investment, you're talking about your total -- PBC's total investment in the team, $350 million, whatever losses, etcetera?

A   Moreover is operational profits.

Q    Does reasonable economic return include $350 million?  You want a return on your --

A    Well, return on your annual operating profits.  Ultimately we hope to make a return on that global investment.

Q    We'll look at what you said in your deposition.

You're talking to Mr. Romani.  He's not a lawyer, correct?

A    Correct.

Q    He's advising of economics of a stadium.

Question No. 4, you ask him:  In doing the work we have done and now advising Washington leadership of our findings and inviting them to actively participate in the response, have we met our obligation of good-faith best efforts?  Legal question of course, much more.

Do you see that?

A    I do.

Q    At the end of December, in that time period you didn't have legislation, you didn't have a site, you didn't have a financing plan in place, correct?

A    Correct.

Q    You were asking Mr. Romani have what we've done so far met our obligation of good-faith best efforts, correct?

A    I asked him that question.

Q    Is your focus on making sure no matter what that you meet those obligations?

A    I consistently asked that question to our team, of myself

throughout the process.

Q   Throughout the whole 12-month period you consistently wanted to make sure that you met the good-faith best efforts obligations, right?

A   Without question.

Q   And Mr. Romani answers your questions on the first page. He talks about assumptions in the modeling that he has done, and his modeling about the economics of the new stadium only indicates an investment of $3 million cash.

Do you see that?

A   Yes.

Q   And 50 million contractually obligated income.

Do you see that?

A   Yes.

Q   Those are revenue sources related to the arena, like ticket surcharge, parking, etcetera?

A   That's correct.

Q   And, again, you never told the legislative leadership that you would invest $10 million cash?

A   This is his advice to the process and his input to our thinking.  He's an advisor to the group.

Q   I want to make clear, you never took his advice and told Governor Christine Gregoire or anybody in the legislative leaders that you would invest $10 million cash?

A   Once again we committed $100 million to the building.

Q    You didn't invest $10 million cash; yes or no?

A    We invested $100 million.  Whatever that configuration ended up being.

Q    I think we've covered that ground before.

So I just want to make another point in terms of your communication to him go back to the second page.  Bottom.

So two months into the process you haven't been able to get legislation written, you haven't found a site, you haven't found a plan and you already -- you're recognizing that you have some issues about the ability to perform in the timeframe that would "keep me within the window of opportunity relative to relocation."

Do you see that?

A    That's correct.

Q    So at least as of December 30, two months into the good-faith process you were focused on keeping yourself within the window of opportunity relative to relocation, correct?

A    As I was from the day of the announcement.

Q    The day of the announcement you had relocation on your mind?

A    It was an option if we could not be successful in Seattle.

Q    And your favored relocation was to achieve the long-term aspiration that you and your partners have of bringing a team home to Oklahoma City?

A   Only if we could not be successful in Seattle.

Q   That was the -- one of the options of -- top option for relocation?

A   If we were forced to relocate, yes.  Ultimately we did review other markets.

Q   I'm sorry, did someone ever force you to relocate or did you choose to relocate?

A   Pursuant to our agreement and our good-faith best efforts representation, after that one-year time period and pursuant to the League's rules we applied to relocate.

Q   You said "forced to relocate".

    I want to make clear, the agreement with Schultz doesn't say you have to relocate after the year, right?

A   Forced in the sense of attempting to avoid ongoing dramatic financial losses and find a new, appropriate business location.

Q   You've made a choice relocate because of --

A   That's correct.

Q   Let's again sort of stay within the time period, just to make consistent with your testimony.

        MR. LAWRENCE:  Move for admission of Exhibit No. 324.

        MR. KELLER:  No objection.

        THE COURT:  324 admitted.

                (Exhibit No. 324 admitted.)

BY MR. LAWRENCE:

Q   324 is an November 9, 2006 series of e-mails.

Do you see that?

A   Yes.

Q   And as part of that e-mail Mr. Gooden, who is described as part -- he was the leader of the --

A   Principal of the Gooden group.

Q   He was the leader of your PR team?

A   Along with Dan Mahoney and others, he was the principal of the Gooden group.

Q   Is he the person you most often had contact with?

A   At this timeframe, yes.

Q   And, again, he's asking you sort of the same focus.  The question of the hour is what constitutes a good-faith effort, right?

A   I'm not sure I see the --

Q   Second line of his e-mail at 1:55 p.m., third line.

A   Okay.

Q   That's consistent with you is that the main focus of conversation with your team is what constitutes a good-faith best efforts, right?

A   Again, it was very important fundamental principal, and we always focused on it.

Q   Mr. Keller, in talking about the man-possessed e-mail, asked you kind of what your thinking was and what you were trying to achieve and why you were talking to the NBA and all

those things.

MR. LAWRENCE:  I would like to move for the admission of Exhibit No. 253.

MR. KELLER:  No objection.

THE COURT:  253 is admitted.

(Exhibit No. 253 admitted.)

BY MR. LAWRENCE:

Q   253, this is an e-mail from Brent Gooden to the ownership group; is that right?

A   That's correct.

Q   And also two lawyers from McAfee Taft and to you?

A   Yes.

Q   Would you look at the bottom?

This is another example where Mr. Gooden is sending an e-mail from you?

A   He's transmitting this e-mail on my behalf that I have written, yes.

Q   This is the -- about the news release that you talked about with Mr. Keller this morning, correct?

A   Yes.

Q   And you are explaining what you're trying to accomplish here?

A   That's correct.

Q   And you say in that e-mail to your owners:  On a broader basis this action will demonstrate to the commissioner and

the board of governors.

Do you see that?

A    Yes.

Q    Commissioner Stern, correct?

A    Yes.

Q    And board of governors of the NBA?

A    Correct.

Q    "We are exhausting every avenue in Seattle."

A    That's correct.

Q    "We will eventually need the commissioner and board of governor's approval to relocate the team should it come to that."

A    That's correct.

Q    "In some respects, the tactics we are executing in Seattle tomorrow are part of the strategy to lay the groundwork to explore several options, including relocation."

A    That's correct.

Q    This press release was part of your tactics, correct?

A    Strategy, yes.

Q    You used the word "tactics" in talking to your owners about what you were doing, correct?

A    Yes.

Q    And then you go on to say, "We have worked with our legal and PR teams to formulate this strategy", correct?

A    That's correct.

Q    Again that's consistent with your testimony that from day one you and your team were focused on making sure you met your good-faith best efforts -- I'm sorry, meeting your good-faith best efforts obligation, right?

A    That's correct.

Q    And your PR and legal team formulated a strategy that includes the tactics of releasing a press release to the Seattle media, correct?

A    That's correct.

Q    You're saying you'll keep them informed.

As of July 18, when Mr. Keller had you indicate your releasing a press release, that was part of your tactic and executing on a strategy that had been developed by your PR and legal team, correct?

A    That's correct.

MR. LAWRENCE:    I would like to move admission of trial Exhibit No. 139.

MR. KELLER:    No objection.

THE COURT:    139 admitted.

(Exhibit No. 139 admitted.)

BY MR. LAWRENCE:

Q    Now, this is less than a month later in August of a '07.

Do you see that?

A    Yes.

Q    This is an e-mail from Aubrey McClendon to you.    This is

in regard to the article that is attached to the bottom of the e-mail, correct?

THE COURT:   I'm sorry, am I looking at the right one. This is 139 is from Mr. Bennett not Mr. McClendon.

MR. LAWRENCE:   Trial Exhibit No. 139 from -- 139 I have may be different --

THE WITNESS:   I don't have it.

THE COURT:   139 in your book is not what you have up on the stand.

MR. LAWRENCE:   That's not very helpful.

THE COURT:   Go ahead.   I have it.

BY MR. LAWRENCE:

Q   Exhibit No. 139 is an e-mail from Aubrey McClendon to Clay Bennet.   Do you see that?

A   I do.

Q   And it's with reference to an article that came out in an Oklahoma City newspaper?

A   That's correct.

Q   Journal of Record?

A   Yes, sir.

Q   And in that article Mr. McClendon had indicated that -- this is on 6753, that "We didn't buy the team to keep it in Seattle.   We hoped to come here."

Do you see that?

A   I do.

Q    You remember that?

A    I do.

Q    Mr. McClendon then wrote to you about that, going back to the top, "Clay, oh, no, I have read this.  Have I created problems for you?"

Do you see that?

A    I do.

Q    He says "I'm so sorry."

"The truth is we did buy it with the hope of moving to Oklahoma City."

Do you see that?

A    I see that.

MR. KELLER:  In the interest of completeness, I will counter-designate the balance of the sentence.

MR. LAWRENCE:  The whole exhibit is of record.  I'm not sure what -- I wasn't only entering the first sentence, Your Honor.  I will get to the second sentence in a second.

MR. KELLER:  It's not the second sentence.  It's the rest of it.

MR. LAWRENCE:  I understand your point, Mr. Keller.

THE COURT:  You want to address your remarks to me and yes, I will read the second half of the sentence.

Let's ask another question.

BY MR. LAWRENCE:

Q    I was going to ask --

First he said:  The truth is we didn't buy with moving to Oklahoma City.

Then he goes on to say:  We first did have an obligation to Seattle.  We negotiated with faith, which, of course, you have done.

Do you see that?

A    I do.

Q    You actually never negotiated with Seattle at all other than to try to get a buyout of the lease; is that right?

A    He's referring, I assume, in the general region.

MR. LAWRENCE:  Now we go to trial Exhibit No. 138.

BY MR. LAWRENCE:

Q    Let's see what your response was.  This is dated the same --

MR. LAWRENCE:  Move for admission of 138.

MR. KELLER:  No objection.

THE COURT:  138 admitted.

(Exhibit No. 138 admitted.)

BY MR. LAWRENCE:

Q    This is your response to Aubrey McClendon to his e-mail?

A    That's correct.

Q    You say, "Yes, sir.  We get killed on this one."

Correct?

A    That's right.

Q    "I don't mind the PR ugliness."

But then you go on to say, "I'm concerned from a legal standpoint that your statement could perhaps undermine our basic premise of good-faith best efforts when you infer it was basically never the plan to stay in Seattle."

Do you see that?

A    I do.

Q    You don't tell Mr. McClendon, hey, why did you say something so wrong, did you?

A    I had already told him that.

Q    You didn't say that in the e-mail.  You called him?

A    Not in the e-mail.  In the telephone conversation.

Q    But your concern here was whether or not his statement undermined your basic premise of good-faith best efforts and you went to your lawyers to contemplate at strategy to respond?

A    That's correct.

MR. LAWRENCE:  I would like to move for admission trial Exhibit No. 145.

MR. KELLER:  No objection, Your Honor.

THE COURT:  145 admitted.

(Exhibit No. 145 admitted.)

BY MR. LAWRENCE:

Q    This is an e-mail from you to Mr. McClendon, dated August of 2007.

A    That's correct.

Q   This talks about a discussion with a woman named Lisa Levine.

    Do you see that?

A   I do.

Q   That's a new name.   Could you tell us who she is?

A   Lisa Levine is a media relations specialist based in Cleveland, Ohio who provides media relations counseling to owners, general managers, coaches, and high-profile athletes in pro sports.

Q   She worked with PBC to develop a media strategy for the last period of this good-faith best efforts period?

A   Well, I reached out to her at the behest of some people in the league who felt that I needed some additional support, media relations and public relations support, because they didn't feel that the story was being told very well on my behalf.   I needed some enhanced professional support.

Q   The bottom line is you worked with her to develop some sort of strategy at this point?

A   We brought her on board to consider that, yes.

Q   In fact, you did a 60-day media strategy at that point?

A   Well, I think she proposed a strategy to us.

Q   Is this when you did a call to arms, correct?

A   It may have been within that.

Q   You stated Mr. -- you say, "We worked on a 60-day strategic media plan."

Do you see that?

A   Yes.

Q   "The notion is to continually roll out positive messaging regarding basketball, as well as consistent engagement regarding arena development."

Do you see that?

A   That's correct.

Q   You further state:  It's clear that such a strategy will have little or likely negative effect in Seattle.

Do you see that?

A   I do.

Q   But then you describe who you're actually trying to impact with this 60-day media strategy, correct?

A   Yes.

Q   Most importantly David and other owners -- and now you're talking about David Stern.

A   Yes.

Q   The commissioner of the NBA?

A   Yes.

Q   And other owners from the board of governors?

A   That's correct.

Q   At this point you were working on your arbitration demand strategy, correct?

A   I'm not sure of the timing, but in that timeframe, yes.

Q   In fact, early in September you met with the NBA in New

York, with Commissioner Stern and Joe Litvin, correct?

A    Yes.

Q    At that meeting in early September you provided them a copy of the arbitration demand, did you not?

A    We discussed the arbitration.   Whether or not I provided a copy of the demand I can't recall.

Q    But you told them that you were thinking about filing an arbitration demand?

A    Yes.   For purposes of understanding our obligations within the lease.

Q    Right.   This is the idea that you're not asking to breach the lease.   You're just asking to understand whether the lease requires you to stay through its term as it says?

A    Or understand our obligations more clearly.

Q    I want to understand.

So during this 60-day period -- you have a 60-day strategic media plan.   You're working with Lisa Levine.   The goal is to message David Stern and the other owners.   And at the same time you're getting together your arbitration demand and telling Commissioner Stern you're going to file an arbitration demand to get your rights understood.

A    These are unrelated.   The media professionals we brought on board had no knowledge of our arbitration contemplation. They were purely putting together media strategies to help with the arena development, to help with my personal media

relations and the team development, business development media relations.

Q   Yes.   Because it might have been dishonest to do a media strategy talking about an arena development at the time you were going to file a arbitration demand against the City of Seattle.   Isn't that fair?

A   Never.   We always had our eye on the ball in attempting to find a solution in Seattle.

Q   You always had your eye on the ball, messaging to David Stern and the others you were meeting your good-faith best efforts requirement --

A   We were doing what we represented that we would do, yes.

Q   I want to go back for a second to an answer you gave with respect to what you were trying -- what you were referring to with respect to a reasonable return on your investment.

Do you remember that testimony?

A   I do.

Q   You talked about it in terms of operating returns, correct?

A   I amended that answer to say that globally ultimately return on the entire investment.

Q   I would like to play from your deposition page 204 lines 3 through 20.

MR. LAWRENCE:   I should say 3 through 21.

(Audio played.)

BY MR. LAWRENCE:

Q   Mr. Bennett, just a few more questions and then we'll be done.

I wanted to move to one last good-faith best efforts.

MR. LAWRENCE:   The document trial Exhibit No. 279.   I move its admission.

MR. KELLER:   No objection.

THE COURT:   279 admitted.

(Exhibit No. 279 admitted.)

BY MR. LAWRENCE:

Q   Exhibit No. 279 is a memorandum from you to the members of the PBC, correct?

A   Correct.

Q   It's an investor update, correct?

A   Correct.

Q   This is writing that you periodically did to investors with respect to issues relating to the club, correct?

A   Yes, sir.

Q   There is discussion probably about whether you're going to pick Owen or Durant.  Fortunately, you ended up with Durant. We are all happy about that.

A   We were very happy.

Q   There is also a section dealing with arena relocation.

Do you see that?

A   Yes.

Q    Date of this is June of 2007, correct?

A    That's correct.

Q    And this is some discussion you've had before about the league issue.

It says:  We will be playing our games in Seattle next year.

A    Yes.

Q    While the league was willing to consider special relocation process could not meet requirements for June 1 deadline?

A    That's correct.

Q    That's related to the NBA process.  You were in discussions with Joel Litvin --

A    Correct.

Q    Then you talk about there are three projects on the table: Muckleshoot Indian Tribe, Dave Sabey, and KeyArena.

Do you is that?

A    Yes.

Q    You're reporting about that to the ownership group?

A    That's correct.

Q    With respect to the Muckleshoot tribe, the problem is you think they don't have any understanding of economics or scope of the project.

Do you see that?

A    Okay.

Q    And go to the next page.

You say, "I haven't been in contact with them since February."

Do you see that?

A    Yes.

Q    You say nothing in there, in your reports to investors, about the notion that it was another publicly funded arena venture that you had just failed with, do you?

A    I'm certain we had that discussion, but it doesn't appear in this e-mail, no.

Q    So in your report to the investors you say nothing about the problem with Muckleshoot being a publicly funded venture; is that fair?

A    Not in this report, no.

Q    Thank you.

At some point you talk about, you know, Dave Sabey.   You took about "He's a good guy, but doubtful about numerous elements of this deal."

Do you see that?

A    Yes.

Q    And some of that had to do with amount of time left on an existing lease before you could get new construction going?

A    Correct.

Q    His deal was for a new arena in the privately built arena in the Greater King County area, correct?

A    No.    It relied on the same legislative funding source.

Q    I appreciate your answering a different question.

But my question was, his arena plan was for an arena in the King County area, correct?

A    That's correct.

Q    All right.

And you're reporting here:  He believes this can be a private development.

Do you see that?

A    Yes.

Q    So at least -- I'm not sure, maybe there is some other proposal.  But at least what you're recording here is about a private development with a --

A    What I mean and what my understanding is, the proposal was a private mixed-use development of which the arena would be a component of.

Q    But it's private?

A    The entire mixed-use development is private, but the arena building would require the legislative funding.

Q    Doesn't say that here.

A    No.

Q    Okay.  So it's another piece of information you didn't share in this memorandum to your investors?

A    That's correct.  In this particular memo.

Q    Then you talk about the City of Seattle sending signs

expressing hope to reconsider KeyArena after the failure of efforts in Olympia, correct?

A    Yes.

Q    Your response to that is:  In the context of our good-faith best efforts commitment.

Do you see that?

A    Yes.

Q    So you respond to that.  Again, in this context of how do I make sure we meet good-faith best efforts, correct?

A    Correct.

Q    Your response was something that you came up with, working with your lawyers, correct?

A    Yes.

Q    And your communications consultants, correct?

A    Yes.

Q    So the response to the City of Seattle that you were considering was based on good-faith best efforts commitment and working with lawyers and communications consultants to say we will consider a renovation of KeyArena.

Do you see that?

A    I see that.

Q    But in fact, you never even made that offer?

A    No.

Q    But you talked about it.  Because what you were worried about, what you were reporting to investors is how do we make

sure we meet our good-faith best efforts requirements?

A    Continuing to make sure we kept that at top of mind, yes.

Q    If you considered a renovation of KeyArena it would have been a much cheaper proposition, correct?

A    Are you reading form the document?

Q    No, I'm asking you.

You understood the renovation of KeyArena was much cheaper than $500 million, correct?

A    I never considered a renovation of KeyArena.

Q    The proposal from the City, correct, was cheaper than $500 million.

Do you remember that?

A    Yes.

Q    And it had been approved by the NBA for the Schultz Group, correct?

A    That's correct.

Q    As meeting NBA standards at the time, correct?

A    NBA approved it.

Q    Thank you.

MR. LAWRENCE:  I have a couple exhibits to get in. Move admission of trial Exhibit No. 89.

MR. KELLER:  No objection.

THE COURT:  89 is admitted.

(Exhibit No. 89 admitted.)

MR. LAWRENCE:  Thank you, Your Honor.

BY MR. LAWRENCE:

Q   That's a letter from you to Governor Christine Gregoire?

A   Correct.

Q   Dated January 18, 2007?

A   Correct.

Q   After the legislature has started its session?

A   Yes.

Q   If we could turn to the second -- last -- the last paragraph on the second page, 4974.  Do you recognize the need for a private investment?

A   Yes.

Q   But you indicate you can't give numbers today?

A   That's correct.

Q   Then on the final page, last page, you say that you recognize that for the project to move forward there is a need for a significant private contribution.  You're continuing to do the work that will allows us to come forward within an acceptable level of contribution to a new arena.

    Do you see that?

A   Yes.

Q   You clearly would not ask the legislature to take final action or King County to authorize any taxes for the arena until we could clearly define the extent of private contributions.

A   That's correct.

Q    You didn't actually meet that goal, did you, sir?

A    No.  I in fact did.

Q    So you're talking about your $100 million with an undefined component?

MR. KELLER:  This is really getting cumulative at this point and argumentative.

MR. LAWRENCE:  I will move on, Your Honor.  The point has been made.

Move admission of 263.

MR. KELLER:  No objection.

THE COURT:  263 admitted.

(Exhibit No. 263 admitted.)

BY MR. LAWRENCE:

Q    263 is an e-mail that we talked a little bit about yesterday.  This is a communication back and forth between you and Mr. Kneeland?

A    Correct.

Q    Mr. Kneeland is your key political consultant, correct?

A    That's correct.

Q    He talks to you -- if you go back to the beginning of this chain the beginning -- the first --

At the beginning of the chain he's talking about what you're willing to do:  Don't worry.  I will not put any members -- I'm sorry -- I do need you to go down to the Clay Bennet stuff.

Go to the prior page, please.

Mr. Kneeland first writes to you.  Do you see that?

A    I do.

Q    And he's talking about conversation he had with the PI reporter?

A    Yes.

Q    And he's talking to you about potential articles and how to approach to get funding, etcetera, etcetera.

Do you see that?

A    Yes.

Q    And then part of the discussion that he's talking about, third paragraph:  Craig was asking how much the ownership was prepared to commit.

Do you see that?

A    Yes.

Q    And Mr. Kneeland told him that while you publically have said owners will participate in the arena.  Until we know the costs etcetera we can't come up with a number.

Your response to him on the next page was:  Please stay way away, in all caps, from talking about our investment in the building.

Do you see that?

A    Yes.

MR. LAWRENCE:  I would like to move for admission of trial Exhibit No. 545.

MR. KELLER:   No objection.

THE COURT:   545 admitted.

(Exhibit No. 545 admitted.)

BY MR. LAWRENCE:

Q   And this is another memorandum to your partners, dated January 2007.   Do you see that?

A   Yes.

Q   The section entitled Proposal to the Governor and Legislative Leadership.

A   Yes.

Q   And you report there the notion that we've talked about: I want to confirm you're committed to the governor and speaker of house we would have a detailed plan to them prior to February 1st.

Do you see that?

A   Yes.

Q   It's clear we are not in a position to submit such a proposal.

Do you see that?

A   I do.

Q   And as of this date you still have not made final determination on site selection, project costs, and deal structure; is that correct?

A   That's correct.

MR. LAWRENCE:   Move admission of trial Exhibit No.

90.

MR. KELLER:  No objection, Your Honor.

THE COURT:  90 will be admitted.

(Exhibit No. 90 admitted.)

BY MR. LAWRENCE:

Q    This is another e-mail from Mr. Kneeland to you dated February, 2007?

A    Yes, sir.

Q    And he's confirming again that the original plan was to have a site and financing plan for opening day of the legislature in January?

A    I do.

Q    "Now in February people are still waiting for us to name the site and outline a financial package", correct?

A    Yes.

Q    That is consistent that you were late coming to the table with legislation for the state legislature?

A    I wouldn't necessarily agree with that.  We met -- we did miss the February 1 deadline.  It was in conjunction with discussions with the governor and leadership.

Q    He goes on two paragraphs later to say:  Time to get moving.

Do you see that?

A    Yes.

Q    He talks about having to adjust your strategy in light of

fact our objective has not changed -- somewhat but our objective has not changed.

Do you see that?

A    I do.

Q    He notes that traditionally in this state when projects like this have been approved virtually every detail of the project is contained in the state legislation, and King County is only given the right to authorize tax sources that are used to retire the bonds.

Do you see that?

A    I do.

Q    You were never in a position to provide that type of detailed legislation to the State; is that correct?

A    No.  It was our expectation we would negotiate those details with the King County Council.

Q    So it's correct that you were never in the position to provide detailed legislation to the State; is that right?

A    Detailed legislation?

Q    You were never able to deliver to the state legislature legislation that contained details of your project; is that right?

A    That's correct.

Q    Mr. Bennett, you testified that you would suffer $60 million of losses over the next two years at $30 million a year?

A    That's our expectation, yes.

Q    That's consistent with what was in the Goldman Sachs' report when you -- that you knew before you purchased the team that the year before you purchased the team the team had lost $29 million?

A    Yes.

Q    And that's also, when you answered the question earlier yesterday that you had the capacity and your partners had the capacity to absorb the losses, you were talking about that $60 million loss, correct?

A    That's correct.

MR. LAWRENCE:    Thank you, sir.    I have nothing further.

MR. KELLER:    Briefly.

RECROSS EXAMINATION

BY MR. KELLER:

Q    You were just asked about $60 million of losses of Goldman Sachs.    Let's look together at what Goldman Sachs's projections for what the operating loss would be in Seattle compared to what you're facing at this point.

I would like you to turn if you would to what is -- I believe Exhibit No. 1.

A    I don't have it yet, sir.

Q    Is that the Goldman Sachs brochure?

A    It is.

Q   Turn to page 50 which has page number 772.

A   It's hard to read.

THE COURT:   You're going to have to blow this up. It's not readable.

MR. KELLER:   Please put on the screen --

MR. LAWRENCE:   Is this not in evidence?

MR. KELLER:   I was going to do -- is yours readable?

THE WITNESS:   No.

MR. KELLER:   Then we'll have a problem.   Can you -- I'll move for admission of Exhibit No. 1.

MR. LAWRENCE:   Your Honor, Goldman Sachs, I believe the prior ruling would be consistent.   It cannot be admitted for truth of what is in there.   But if he looked at this document as a state of mind, that's fine.

MR. KELLER:   I want to show what projections were for Goldman Sachs compared to the degree of losses that incurred lin light of the last questions.

THE COURT:   Is there an objection?

MR. LAWRENCE:   If it's being offered for that purpose only, no.   That was my statement, Your Honor.

THE COURT:   Exhibit No. 1 admitted.   We've got something admitted that can't be read.

(Exhibit No. 1 admitted.)

MR. KELLER:   Can I try putting it on the screen?

THE COURT:   Sure.

MR. KELLER:  Go to page number 772, page 15 in the document.  Line for EBITDA and I believe the chart as well.

MR. LAWRENCE:  Is this 772?

MR. KELLER:  Yes.

BY MR. KELLER:

Q   Mr. Bennett, what is EBITDA?  Is that what you've been referring to as operating profit?

A   Yes.

Q   That means profit of the business before depreciation taxes and amortization?

A   That's correct.

Q   And this is the sales brochure that Goldman Sachs put together, working with the Schultz group?

A   Yes.

Q   And what were the projections for the operating loss for the -- by the way '09 and '10, are those fiscal years '09 and '10?

A   Yes.

Q   And so we're wanting to know what the projections were for the last two basketball seasons under the City of Seattle lease.  Are we looking at projections for '09 and 2010 fiscal year?

A   That's correct.

Q   And what is the cumulative projection of Goldman Sachs for the operating loss here in Seattle?

A    $5.5 million, approximately.

Q    What is it now?  What is the reality now?

A    60.

Q    Would you pull up Exhibit No. 263.

You were asked about the e-mail on the back page.  I wanted to start at the bottom of the page there.

First thing I want to point out, this is the e-mail you were asked about where you were requesting at that time to stay way, way away, from talking about investments in buildings?

A    Yes, sir.

Q    When was this e-mail sent?

A    This was November of '06.

Q    Why were you wanting to stay way away from that as of November?

A    We were just in the beginning of the development of the program and the process and deal structure.

Q    Did you even have a site selected at that point?

A    No.  We were beginning to firm that up.  We had not.

Q    Did you ever even have architectural renderings for the building?

A    No.

Q    Were you just in the beginning process of working with the architects that you hired and other specialists?

A    Correct.  Putting together things.

Q    I don't think we took a look at Mr. Kneeland's response.

Was Mr. Kneeland's response, "While I wasn't going to put any numbers on it, the message was going to be that we recognize that an investment was going to be necessary"?

A    That's correct.

Q    Okay.  If we go to the e-mail up above from you, it reflects meetings with the architectural firm were coming up to select them, right?

A    Yes.

Q    Is that part of the reason why you couldn't be committing to specific numbers?

A    That's correct.

Q    At that time.

Exhibit No. 545, please.

This was the report that you did to your fellow investors end of January of 2007?

A    That's correct.

Q    I want to take a look at the whole report that you gave about your dealings with the governor and legislative leadership at that time.  On the second page, please.  Could you pull up the whole thing?

After the section that you were asked about by Mr. Lawrence, does it go on to indicate that the determinations are still being made on site selection, project cost, and deal structure.

Do you see that?

A   I do.

Q   Is there a relationship between that sentence and the one before it that says "We're not in a position to submit proposal at that time"?

A   Yes.

Q   What's the relationship?

A   We had more work to do before we could precisely, with confidence put forth the proposition.

Q   Then you went on to write you're going to communicate with the governor and legislative leadership today and tomorrow advising that we're not ready, but we're working diligently, that you will outline key tracks you're working on and hopefully convey make progress and soon have a credible proposal.   Your sense is it will be fine you're working -- is that in fact what was done?

A   Yes.   That was primarily done with the governor.

Q   Exhibit No. 90.

I think you were asked about this one a few minutes, Mr. Kneeland's report to you?

A   Yes.

Q   This was the one where you were shown the paragraph -- I think you were shown the third paragraph down, where it says: But now is the time to get moving.   It goes on -- this is one that talks about the details in the state legislation.

Do you see that?

A    Yes.

Q    Next paragraph, please?

Mr. Kneeland, did he go on and suggest to you a different tactic to take?

A    Yeah.  This became our strategy in view of the timeline that we would focus on the authorization of the tax stream at the King County level and that we would then negotiate the details of the project through the King County Council.

Q    Let's look at the next paragraph.

First sentence, is that exactly what he's saying?

A    That's correct.  In fact, I met with all but one of the members of the King County Council to begin to put this thinking together and was in process of that as well.

Q    Did Mr. Kneeland actually point out to you that there would be hopefully be some advantages by trying to work the details through the King County Council rather than the state legislature?

A    That's correct.

Q    And is that where he talks about how it's going to be easier to work with the nine-member county council than 147 legislatures?

A    That's correct.  Especially given the leadership and ability of the county executive, Ron Sims.

Q    Counsel asked you about some dealings you had with Ms.

Jenny Durkan?

A   Yes.

Q   Was she somebody that was being -- you were having discussions to bring on board because of the hope and expectation that you would be working with the King County Council to try and implement the details?

A   That's correct.

MR. KELLER:   Thank you, sir.   That's all I have.

THE WITNESS:   Thank you.

THE COURT:   Anything further?

REDIRECT EXAMINATION

BY MR. LAWRENCE:

Q   If we could go back to Exhibit No. 1, the Goldman Sachs' report and page 10771.

Mr. Keller just asked you to look at the financial projections by Goldman Sachs.   This page shows the key assumptions that went behind that financial projection, correct?

A   Yes.

Q   With respect to the arena lease, do you see that?

A   I do.

Q   The assumption there is that the team secures a new arena lease on terms as favorable as the average NBA team, correct?

A   Correct.

Q   This is not a projection of where you would be if you

failed to secure a new arena in Washington, correct?

A    I'm not sure I understand.

Q    The projection that is in the Goldman Sachs' report has nothing to do with the situation where you have to stay in KeyArena and you failed to secure a new arena in Washington, correct?

A    I think that's correct.

Q    And you understood that it was a risk when you purchased the team, that you would have to be in KeyArena, that you wouldn't get a new arena, and that the team lost the year before you purchased $29 million.

You understood all those things?

A    That's correct.

Q    You didn't think if you didn't get a new arena, you weren't successful, is it fair that you knew if you weren't successful the last two seasons were not going to get much better than the one before you purchased the team?

A    I'm sorry, Mr. Lawrence, I'm not sure I understand the question.

Q    You understood when you purchased the team there was a risk that you wouldn't get a new arena and that you would be in the lame-duck situation the last two years under KeyArena, right?

A    There was a risk of that, yes.

Q    And you would agree with me that you didn't think in that

lame-duck situation you were going to do any better than that $29 million loss the year before you purchased the team. Is that fair, sir?

A    I did not make that evaluation.

MR. LAWRENCE:  Thank you.  Nothing further.

MR. KELLER:  Unless the Court has anything I have nothing, Your Honor.

THE COURT:  Thank you, sir you may step down.

Next witness, please?

MR. LAWRENCE:  We're calling Danny Barth please.

DANIEL BARTH

The witness, after being duly sworn, testified as follows:

THE CLERK:  Please state your name and spell your last name for the record.

THE WITNESS:  Daniel Barth.  D-A-N-I-E-L, B-A-R-T-H.

DIRECT EXAMINATION

BY MR. JOHNSON:

Q    Good afternoon, Mr. Barth.

You've been working with the Sonics organization since 1998?

A    That is correct.

Q    And you've held various positions with the organization throughout -- first the Ackerley ownership group, then the Schultz ownership group, and now with the Oklahoma ownership group?

A    Yes.

Q    You've been an officer of the company for the past seven years?

A    Yes.

Q    And you're currently the interim president and CEO?

A    That's correct.

Q    And when did you become the interim president and CEO?

A    November 1st, 2006.

Q    You've had the interim title for quite some time?

A    I have.

Q    Are part of your duties to oversee the financial operations of the Sonics organization?

A    They are.

Q    Are part of your duties to generate revenues for the team?

A    They are.

Q    And part of your duties to get fans to fill the seats of KeyArena?

A    Yes.

Q    I want to talk about some of the reasons people might want to buy a ticket to come see the Sonics.

A    Okay.

Q    One of the reasons people might want to come buy a ticket to see a Sonics game is to see the players play and root them on?

A    Yes.

Q   And one of the Sonics' best players this year is a player named Kevin Durant?

A   Yes.

Q   And, in fact, he's a young kid; 19, 20 now maybe?

A   20 years old.

Q   Was number-two amateur player selected in last year's draft?

A   That's correct.

Q   He's, what, 6'10", 6'11"?

A   Not sure of his dimensions.  That sounds about right.

Q   One of the things I have heard said about him is that he's got a wingspan -- do you know what a wingspan is?

A   I do.

Q   -- that is longer than his height.  Most people's wingspan is the same as their height.  His is about four or five inches longer.

A   I have heard that.

Q   That's a big advantage in basketball, isn't it?

A   It is.

Q   All right.  So people come to see Mr. Durant.  He won Rookie of the Year?

A   He did.

Q   Come to see the other players play.  And when they -- another reason people come to see -- buy tickets for a Sonics game is not just to see the Sonics players play, though,

right?

A   I'm not sure what you mean.

Q   Well, it's to see players -- the visiting team's players, all teams in the league come and play KeyArena?

A   Yeah.  The NBA is an attractive audience for many people.

Q   And the NBA actually is the best basketball league in the world?

A   I think so.

Q   They just had a championship last night and they crowned their champion World Champion, didn't they?

A   I believe so.

Q   And, in fact, players from all over the world come to play in the NBA?

A   Yes.

Q   In fact you got players from Canada, Argentina, Russia, China, Congo.  Some of the best players from all over the world come to play in the NBA?

A   They do.

Q   Now, there is only 30 teams in the NBA, though, correct?

A   There is 30 professional teams, yes.

Q   And so if you're not in a city that has one of those 30 teams you go to travel somewhere else to see NBA live?

A   That's correct.

Q   Back up for a second.

    Your organization promotes the Sonics by promoting Kevin

Durant, correct?

A    We promote our whole team, not just him, but the whole team.

Q    You've done special promotions for Kevin Durant?

A    Our philosophy was to promote the team.  But we have Kevin Durant, but normally with other individuals.

Q    But the idea is you promote your players so that you'll get people to buy tickets?

A    Yes.

Q    Sometimes when teams are coming in from out of town to have superstar players like LeBron James or Kobe Bryant, you'll promote those superstar players coming into town?

A    Yes.

Q    And you'll do that to sell tickets?

A    Yes.

Q    You will be able to do all those things next year or the year after, correct?

A    Yes.

Q    Another thing that your organization believes is that going to NBA basketball games is a wholesome, family-kind of thing?

A    I think we think it's good entertainment for everyone, yes.

Q    You promote that fact?

A    Promote the fact it's good entertainment, yes.

Q    You have family nights and family-type promotions?

A    We do.

Q    In fact, you've gone to games with your dad when you were a kid and you've taken your kids?

A    I have.

Q    You agree that the Sonics have a rich tradition in history in the city?

A    They have been around for 41 years, yes.

Q    And you agree that they are synonymous with Seattle -- Sonics?

A    Sonics are known in Seattle, yes.

Q    You agree it would be unfortunate for the Sonics to leave Seattle?

A    I do think it's unfortunate the Sonics have to leave Seattle, yes.

Q    Now, one of the things the Sonics have done throughout their history and throughout your time working with the company is they've been involved -- both the team and the organization, the players -- in the community.

A    Yes.  We're in the community, yes.

Q    And, in fact, the standard NBA contract requires that players make ten community appearances a year?

A    I'm not sure if it's ten.  I think it's actually 12.  But yes.

Q    I might have been looking at an older version of the

contract.  I'm sorry.  Thanks for the correction.

12 public appearances a year?

A    Yes.

Q    And the Sonics have actually two full-time employees that deal with that managing and tracking of these public appearances, correct?

A    We do.

MR. JOHNSON:  Move to admit Exhibit No. 59.

I don't believe there was an objection.

THE COURT:  He hasn't had time.

MR. KELLER:  No objection, Your Honor.

THE CLERK:  Do you have it, Mr. Barth?

THE WITNESS:  I don't.

THE COURT:  Go ahead.

BY MR. JOHNSON:

Q    Do you have Exhibit No. 59 in front of you?

A    I do.

Q    This is an example of one of the periodic tracking sheets that the team would do and then send off to the NBA?

A    Yes.

Q    And this shows that between September 1 of 2006 and December 21 of 2006 the team logged 682 hours of community activity hours?

A    Yes.

Q    And just looking at the first page, one of the things that

the team did during this time period, or the players did that the team tracked, was that Ray Allen and Rashard Lewis went to an assembly at Cleveland High School?

A    Yes.

Q    Cleveland High School is an inner-city high school in the City of Seattle?

A    It is.

Q    The boys' basketball team in that high school had their equipment and uniforms stolen?

A    Yes.

Q    Allen and Lewis heard about that and decided, with some contribution from the Sonics, to chip in and buy them new equipment and new uniforms?

A    Yes.  I believe the actual contribution was actually from their foundations.

Q    But it's something that you tracked on your NBA activities tracker list, right?

A    That's correct.

Q    And so they had a school assembly to present this and Mr. Allen and Mr. Lewis showed up for that?

A    That's correct.

Q    Turn to page 4, PBC 106125.

     Can you turn to the next page, sorry.  126.  And the entry on November 16th.

A    Two entries.

Q    "Chris Wilcox turkey giveaway"?

A    Yes.

Q    Mr. Wilcox gave away 540 turkeys and Sonics tickets to needy families?

A    Yes.

Q    And the rest of this is just a whole bunch of examples of hospitals, schools visits, players, coaches, clinics, things like that; Sonics getting out into the community?

A    Yes.  Our players and organization go out into the community.

Q    All right.  The organization also gets involved with specific causes, correct?

A    Yes.

Q    Okay.  Please take a look at Exhibit No. --

        MR. JOHNSON:  I move for admission of Exhibit No. 105.

        MR. KELLER:  No objection.

        THE COURT:  105 admitted.

                (Exhibit No. 105 admitted.)

BY MR. JOHNSON:

Q    Do you have the exhibit now?

A    I do.

Q    If you look at the second page of the exhibit, this is a letter from Daniel Johnson Boys & Girls Club of King County, President and CEO.

Do you see that?

A    Yes.

Q    To Rick Dupree, who is one of the people that you testified about earlier, who is in charge of community relations, full-time employee in community relations for the Sonics?

A    Yes.

Q    If you look at the very last paragraph of the letter Mr. Johnson -- I assume Mr. Johnson -- says, "You are truly a community partner in every sense of those words."

A    I see that, yes.

Q    At least the Boys & Girls Club thought you were a community partner?

A    Yes.

Q    And they go on in this letter to talk about various things that had happened between Boys & Girls Club.  Kids involved in the organization had the opportunity to go to Sonics games, court side, sit in the suites, correct?

A    I didn't read the letter, but we do do all those things just like a lot of organizations would give out to the -- in the community.

Q    And you've also done ticket donations, suite donations, contributed to their auctions, and players -- Sonics players have donated their time to the Boys & Girls Club to inspire --

A    We have definitely been out in the community.  It's not only a requirement, but something that we feel that we need to do as an organization.

Q    Another organization that you work with is the Ronald McDonald House?

A    We work off and on with the Ronald McDonald House.  That was much more an initiative by Rashard Lewis, one of our players.

MR. JOHNSON:  Move to admit Exhibit No. 107.

MR. KELLER:  No objection.

THE COURT:  107 admitted.

(Exhibit No. 107 admitted.)

BY MR. JOHNSON:

Q    That's an example of a letter -- it's a letter to Rick Dupree?

A    Yes.

Q    It's from Deanna Finnerty (phonetic) executive director of the Ronald McDonald House?

A    Yes.

Q    If you look at the last line of the first paragraph.  The Ronald McDonald House throughout this letter is talking about some of the interactions between the Sonics and Sonics players and the Ronald McDonald House.  But they point out specifically that they considered the Sonics a great partner, correct?

A   Yes.

THE COURT:   We need to stop.

Counsel, let me remind you again what we really need is list of your exhibits.  Notebooks only produce duplicates.  Then we have to sort through duplicates.  Ms. Scollard is very happy to work with you to do that.

So please, if I could just get a list of your direct and cross, she'll pull them in and we won't have multiple notebooks.  All right.

Is there any other issue we need to take care of before we recess?

MR. KELLER:   No, Your Honor.

THE COURT:   We'll be back at 1:30.

(Lunch recess taken.)

A F T E R N O O N   S E S S I O N

THE COURT:  Mr. Johnson, are we ready to continue?

MR. JOHNSON:  Yes, your Honor.

THE COURT:  Go ahead, please.

BY MR. JOHNSON:

Q   Mr. Barth, another thing that the Sonics and the NBA get involved in is Black History Month?

A   That's correct.

Q   In fact, in just this last year the Sonics were involved in going to a school to do some readings for Black History Month?

A   That's correct.

MR. JOHNSON:  Your Honor, I would move to admit Exhibit 198.  It is a video, your Honor.

THE COURT:  Any objection to 198?

MR. KELLER:  No objection, your Honor.

THE COURT:  198 will be admitted.

(Exhibit 198 admitted)

BY MR. JOHNSON:

Q   And that was just this it last year those videos were shot?

A   That's correct.

Q   And that is something the Sonics sent a crew out to shoot so they would have that available for promotional purposes or

whatever?

A    I believe so.

Q    Another thing that the Sonics get involved in are charitable events around the holiday seasons?

A    Yes.

Q    Like we saw in the exhibit that had the schedule of events, the Chris Wilcox turkey thing, there has also been holiday gift give-away type events?

A    Yes.  Various players have foundations along those lines and they will do something.  Ray Allen does a tree giving at Southcenter Mall, along those lines.  It is not just the Sonics, it is oftentimes their foundations as well.

Q    Let me ask you a question about that.  Ray Allen got traded last year from the Sonics?

A    He did.

Q    In fact, he just won the world championship for the Boston Celtics last night?

A    He did.

Q    Is his foundation still active in Seattle?

A    I believe it is actually.

Q    How about Rashard Lewis?

A    I believe so, but I can't tell you for sure.

Q    We have somebody that can talk about that later.  I would like to roll a second clip from Exhibit 198, please.

(Audio played)

BY MR. JOHNSON:

Q    That last gentleman that was speaking on the video is Nick Collison?

A    Yes.

Q    He is a current Sonic player?

A    Yes.

Q    And he signed for the next year?

A    Yes.

Q    And, in fact, he signed for the year after that?

A    Yes.

Q    The NBA has specific programs that it uses to generate -- to support community activities and activities in the community.  It is called NBA Cares?

A    Yes.

Q    And one of the programs within NBA Cares is Hip to be Fit?

A    Yes.  Actually NBA Cares is kind of the national outreach of the NBA.  Each individual team is kind of a member of NBA Cares.

Q    Is Hip to be Fit something that falls within the NBA Cares gambit?

A    Yes.

MR. JOHNSON:  Move to admit Exhibit 201.

MR. KELLER:  No objection, your Honor.

BY MR. JOHNSON:

Q    Mr. Barth, if you have Exhibit 201 in front of you --

538

THE COURT:   201 will be admitted.

(Exhibit 201 admitted

BY MR. JOHNSON:

Q   Mr. Barth, this is something taken off the Sonics website. It is a description of the Hip to be Fit program?

A   Yes, that's correct.

Q   And this, just generally, gives a description of it, but the idea is to get school age kids interested in their physical fitness and to provide some rewards for them being involved in those kinds of activities?

A   Yes.

MR. JOHNSON:   Move to admit Exhibit 203.

MR. KELLER:   No objection.

THE COURT:   203 will be admitted.

(Exhibit No. 203 admitted.)

BY MR. JOHNSON:

Q   Another NBA program is the Read to Achieve Program?

A   Yes.   This one is actually a Sonics' program.

Q   Is Exhibit 203 the web page where you describe the Read to Achieve Program?

A   Yes, it is.

Q   And the idea is that the Sonics partner with local schools to inspire kids to discover the joy of reading?

A   Yes.

Q   Can you show the last video clip, John, on Exhibit 198, an

example?

(Video played)

BY MR. JOHNSON:

Q   Sorry that we didn't get to the end of the story.
Mr. Barth, that is an example of the Read to Achieve outreach
by the Sonics?

A   Yes, it is.

Q   The Sonics also contribute to the Sonic and Storm
Foundation that the Ackerley family founded?

A   Yes.

Q   And, in fact, you are on the board of that foundation,
correct?

A   I am the treasurer.

Q   And so the Sonics have substantial contributions to that
and the Sonics players over time have had substantial
contributions to that?

A   The money is raised from various measures, and the Sonics
are one of the contributors.

Q   One of the things they have done is build -- rebuild
basketball courts around the area?

A   Yes, they refurbish courts.

Q   Another thing they have done is funded scholarships?

A   From time to time, yes.

Q   And they support wheelchair basketball?

A   Yes.

Q   And that's basketball for physically handicapped people that are stuck in wheelchairs?

A   Yes.

MR. JOHNSON:   Move to admit Exhibit 204.

MR. KELLER:   No objection.

THE COURT:   Exhibit 204 will be admitted.

(Exhibit 204 admitted)

BY MR. JOHNSON:

Q   And you recognize Exhibit 204 as another thing coming from the Sonics website, Mr. Barth?

A   Yes.  I think this was actually prior to PBC, but yes.

Q   And it is discussing the Sonic and Storm Foundation?

A   Yes, it is.

Q   Now, Mr. Barth, the NBA encourages the Sonics in all of these community endeavors, correct?

A   Yes.  Just like any other organization, we think it is important to be in the community, yes.

Q   And the NBA, in fact, encourages community involvement because it thinks that involvement improves its overall image, correct?

A   I believe they think it is good for their image but also good just to give back to the community.

Q   But one of the reasons -- and that's one of the reasons why they have this mandatory -- I guess it is now 12 community appearances in the standard player contract?

A   Yes.   They basically -- like I said, it is good for the community and giving back, yes.

Q   And the bottom line is, the Sonics believe this kind of interaction with the community is good for business?

A   Yes.

Q   There was some talk yesterday about ratings, television ratings, and what that might mean or might not mean.   I want to ask you a question.   When the Sonics had the worst season in their history last year --

A   Yes.

Q   We have all heard that.   When they played a game, whether it was at home or on road, didn't the Seattle Times write an article about that game after every game last year?

A   I would guess so.   I am not sure they wrote it after every one.   There may have been a time or two they used AP or something like, but in general, yes.

Q   And the same is true of the Seattle Post-Intelligencer?

A   Yes.

Q   And the box scores, that is where they have all the stats for the players for that game, those are in each paper every morning?

A   That's correct.

Q   And the box scores for NBA games aren't just in the Seattle Times and the Seattle PI, they are in the Spokesman Review, has NBA box scores?

A    I have never seen the Spokesman Review, but I would guess, yes.

Q    Have you ever seen a paper in any decent size town that didn't care NBA box scores?

A    No.

Q    In fact, box scores are carried in national and international newspapers, like USA Today?

A    Yes.

Q    And the people that read those associate the Sonics with Seattle?

A    I would think that would be the case, yes.

Q    And it is not just every daily newspaper that reports on every Sonics game but frequently the evening news reports Sonic highlights as part of the sports section as part of the news program?

A    As they do with all sports.

Q    That's right.  And not only the local sports section but the national sports coverage, like ESPN and FOX Sports report on Sonics highlights?

A    Yes.

Q    And they do that even when the Sonics aren't playing well?

A    Yes.

Q    They do it more typically when a team makes if to the playoffs or does better?

A    There is more exposure, yes.

543

Q    When it was announced that Kevin Durant had won the rookie
of the year there were articles written in local and national
newspapers about that?

A    Yes.

Q    And they always identified him as a player of the Seattle
SuperSonics?

A    Yes.

Q    And there was also news programs and sports shows about
the fact that he had won rookie of year?

A    Yes.

Q    And, again, they always identified him as a player for the
Seattle SuperSonics?

A    Yes.

Q    Attendance last year wasn't what would you like it to be?

A    It was not -- it did not meet our budget.

Q    And the team didn't play as well as you would have liked
it to play?

A    I wish it would have played better, yes.

Q    But, nevertheless, you were at the last game of the
season?

A    I was.

Q    And that game was almost sold out?

A    Yes.   Correct.

Q    And the Sonics weren't playing a particularly great
opponent that night, were they?

A    I don't remember who they were actually playing the last game.

Q    It wasn't a playoff caliber team?

A    I don't believe so, no.

Q    So it wasn't the draw of the other team that brought all those fans out that night, was it?

A    I don't know what brought the fans out that night.  But there is potential, I believe, that people thought it potentially could be the last game in Seattle.

Q    And it became clear near the end of that game that the Sonics were going to win, but there was a time out and some free throws that needed to be shot, and during that space in time everyone in the crowd was sing save --

MR. KELLER:  Your Honor, I will object.  I don't see what this really has to do with anything that we are here about.

THE COURT:  Sustained.  Let's move on, please.

MR. JOHNSON:  No further questions.

CROSS-EXAMINATION

BY MR. KELLER:

Q    Good afternoon, Mr. Barth.

A    Good afternoon.

Q    Are you proud of the charitable and civic affairs the Sonics have done over the years?

A    I am.

Q   You were asking questions about Nielsen Ratings.  Did you prepare a summary chart to help illustrate what the trend has been for the Nielsen Ratings over the last several years?

A   I have.

MR. JOHNSON:  Objection, your Honor.  I don't believe any questions about Nielsen Ratings were asked.

MR. KELLER:  Actually I think there was.

THE COURT:  There were some television questions.

MR. JOHNSON:  Agreed, your Honor.

BY MR. KELLER:

Q   Could you take a look at Exhibit 505 which should be in the notebook?  I believe this one is agreed to.

MR. KELLER:  I will move for the admission of 505.

THE COURT:  Any objection to 505?

MR. JOHNSON:  No, your Honor.

THE CLERK:  505 is admitted.

(Exhibit 505 admitted)

BY MR. KELLER:

Q   What is Exhibit 505, Mr. Barth?

A   It is the ratings of the Sonics games over the last four years.

Q   What is a Nielsen Ratings?

A   It is a demographic rating based on the broadcast, in this case our broadcasts are on FOX Sports Northwest.

Q   What does this mean?  What does each point mean?

MR. JOHNSON:  Objection.  Lack of foundation.

BY MR. KELLER:

Q    Do you know what each point means?

A    Yes.

Q    Is it part of your job to know what the Nielsen Ratings are and to track them?

A    Yes.

Q    What does each point mean?

THE COURT:  The objection is overruled.  Go ahead.

THE WITNESS:  Each point is worth basically 16,000 television households watching the game.

BY MR. KELLER:

Q    And the chart that you put up, is this a summary of what the Nielsen Ratings have been on an annual basis?

A    Yes.

Q    So when we see 1.24 on average, is that per game?

A    That is for the full season.

Q    But is it an average for the season?

A    Yes.

Q    So does that mean it is approximately 20,000 households watching a game?

A    That's correct.

Q    Out of --  What market are we talking about here?

A    Over a million.

Q    A million households?

A    A million households in the demographic area.

Q    Are Nielsen Ratings important to the financial health of the organization?

A    They actually help judge not only the ability to determine the interest level in our product but also they are often used to help sell our sponsorship in other areas.

Q    Can you explain that?

A    Sponsors would often look to see how much exposure they have in television in a given market.  So the lower the ratings obviously the less their exposure is and the more difficult it becomes to sell sponsorships.

Q    Now, I see --  Has it trended steadily downward since the '04-'05 season to the level we talked about of about 20,000 households?

A    It has.

Q    In '04-'05, is that the year that the -- the last time the Sonics made it into any of rounds of the playoffs?

A    It is.

Q    And since I misstepped this morning about free agents, if I misstep again, your Honor, just tell me.  I want Judge Pechman to understand what it takes to make the playoffs just in terms of how the league is organized, the divisions, that process.

       There is how many teams in the whole league?

A    There is 30 teams in the whole league.

Q    And how are they divided up?

A    There are two conferences, an Eastern and a Western Conference.

Q    How many teams are in each of those conferences?

A    There is 15.

Q    What conference are the Sonics in?

A    The Western Conference.

Q    What conference would they be in they moved to Oklahoma?

A    They would be in the Western Conference.

Q    So there are 15 teams in each conference.  Is there some subdivision below the conference?

A    There is a division level below the conference.

Q    Approximately how many teams are in each division?

A    Five.

Q    What division are the Sonics in?

A    They are in the Northwest Division.

Q    And just kind of -- what division would they be in if they go to Oklahoma City?

A    The Northwest Division.

Q    Is that the basic structure of the league?

A    Yes.

Q    Now the season starts.  Every season the goal is to try to make the playoffs; is that right?

A    That's right.

Q    How many rounds -- what do you have to do to get to the

first round of playoffs?

A   You have to be one of the top eight teams in your conference.

Q   So you have to be in the top eight out of 15?

A   Out of 15, that's correct.

Q   And if you make it into the first round of the playoffs what is that called?

A   Basically known as the first round, opening round.

Q   And how many games are in the first round of the playoffs?

A   Seven maximum.

Q   And is it the first team to win four advances to the second round?

A   That's correct.

Q   So you start with 15, you get down to eight, and then you have the first round of the playoffs, and four teams come out of that?

A   That's correct.

Q   And what's that next round?

A   Kind of the semi-conference finals.

Q   And then after that you are down to four?

A   You are down to two, the conference finals.

Q   That's right, because this is going on in the other --

A   That's correct.

Q   -- the whole other conference as well, right?

A   That's correct.

Q   So then you get down to two, and then have you the conference finals, and then have you the winner of the conference?

A   That's correct.

Q   So one team out of 15 meets the other one team from the 15 in the other conference?

A   That's correct.

Q   And that's what was going on last night in the final playoff game?

A   That's correct.

Q   And was '04-'05 the last time the Sonics were in the playoffs?

A   It was.

Q   And how far did they go?

A   They made to the second round of the playoffs or the semis.

Q   What percentage of revenues were attributable to the playoffs?

        MR. JOHNSON:  Objection.  This goes well beyond the scope of the direct.  Mr. Barth is an expert witness.  He will be offering expert testimony on behalf of the PBC in their case.

        THE COURT:  Counsel, I thought we had an agreement they you were going to call witnesses once.

        MR. JOHNSON:  We never had that agreement with this

witness.  He is an expert -- We have talked about it.  He knows my position.  He is an expert who relies on another expert whose expert testimony has not been given or admitted.

MR. KELLER:  This isn't even expert testimony.  He is just talking as the -- at the time as the chief financial officer.  He is now the current CEO of the team.  This is what he does.

THE COURT:  I thought at our pretrial conference we talked about calling witnesses once when they were available.  Was that not the agreement?

MR. KELLER:  In all fairness, I know that counsel wanted to do that were Mayor Nickels and Mr. Licata, but I didn't understand it to be global.  That was the impression when I walked out of there.  I am not sitting here saying there was an agreement.  If I need to recall Mr. Barth tomorrow I guess I will.  It seems a little silly.

THE COURT:  Why don't we finish up with Mr. Barth so he can go on his way?  Is there a problem with that?  Is there another witness waiting that needs to be accommodated?

MR. JOHNSON:  No, your Honor.  There is a witness whose testimony he is going to rely on for part of his expert opinions who has not yet testified.

THE COURT:  Isn't that Mr. Keller's problem?

MR. JOHNSON:  I guess so.

THE COURT:  Go ahead.

BY MR. KELLER:

Q   I think where we were is you were telling us what it takes to get to the playoffs.  And now I wanted Judge Pechman to understand financially what it means to the team when you actually do make the playoffs.

What percentage of the revenue -- for each of those -- Strike that.  Are there four rounds in the playoffs or five?

A   There are -- there would be four rounds.

Q   What percentage of revenue is attributable to a round of playoffs for the Sonics?

A   About four percent of their overall revenue will be generated.

Q   Is that top line revenue?

A   That's right.

Q   Or is that operating income?

A   That is top line.

Q   So if the team is fortunate enough to make the first round of playoffs it will have a four percent bump in revenue?

A   That's correct.

Q   And if it makes it into the second round of playoffs, would that be another incremental four percent or more?

A   A little bit more, between four and six.

Q   Is that, in fact, what was experienced in '04-'05 approximately?

A   That's correct.

Q    You would like to make the playoffs every year?

A    Sure would.

Q    Try?

A    Try.

Q    Do your best?

A    That's correct.

Q    But it has been how many years?

A    Since 2004-2005.

Q    What kind of --  Has the decline in the Nielsen Ratings had any other impact on the financial or other aspects of the organization?

A    Basically, in general, again, it has an overall effect mainly on our sponsorship, but also in the fan interest overall.  It shows our decline in fan interest basically, which is usually an indicator on our ticket sales, where we would be moving towards our ticket sales.

Q    I will go out of order a little bit.  I want to back up. Are you the guy that has been trying to run this business this last year?

A    I have.

Q    Are you the guy who would have to try to run this business over the next two years?

A    Yes.  I hope.

Q    What kind of operational challenges have you faced this past year because of the situation involving the lease and

the efforts to relocate?

A    We have had significant challenges in the ticket sales area.

Q    Can you explain?

A    The fan apathy and our brand recognition has been very -- it has been very difficult.  The overall -- even when it comes to looking at our ticket sales we have had an indication where we have had no interest.  For example, after the Board of Governors voted to relocate for Oklahoma we received no phone calls, either positive or negative, or anything along those lines.  That would be the same with when we received in the lottery the fourth pick.  We received no phone calls.  We had salespeople waiting and didn't receive any phone calls.

Q    Let me understand that.  You say in the lottery when you had the pick.  Is that normally a marketing event?

A    It is normally a large event.

Q    Why is that?

A    At that point in time you normally would have the ability at least to know that you are going to get a fairly good player out of the draft, especially if you are drafting in the fourth pick.

Q    And when did that happen?

A    That happened in May.

Q    And you had people standing by with phones hoping people

would call in and generate ticket sales?

A    Yes.

Q    What happened?

A    We received no phone calls.

Q    Not even one?

A    No.    We did not go out and market it, but we normally would receive phone calls no matter what.    When we had the -- I think it was the tenth or eleventh pick with a totally unknown player named Mr. Mouhamed Sene, we received phone calls some of them negative but some of them positive as well.    And we saw nothing this year at all, not a one.

Q    These problems in terms of --    Is there an expression "fan avidity?"

A    Overall that is exactly what it is.    Basically our brand itself as you look at it are individuals who have obviously a problem with the fact of our ownership group and their being from Oklahoma.    The apathy towards that has been very strong.

Q    You are not being judgmental or criticizing that sentiment, are you?

A    None whatsoever.

Q    That is just the reality you are trying to operate a business in?

A    Absolutely.

Q    What do you anticipate in going forward if you end up here during the lame-duck period with regard to this operational

issue we have been talking about?

A    Well, there is another indicator that we look at.  It is called no show rate, which is basically the individuals who pay for tickets but then don't show up.  And that number is 28 percent, which is a large number considering that they paid for the tickets going forward.  We kind of use that as a barometer to start to look at how we are going to do.  We anticipate that our ticket sales will be significantly down.

Q    Did you prepare an exhibit to help illustrate what the trend has been on what you have referred to as the no-show rate?

A    I have.

Q    Could you take a look at Exhibit 508?

THE COURT:   Any objection to 508?

MR. JOHNSON:   No, your Honor.

THE COURT:   508 is admitted.

(Exhibit 508 admitted)

BY MR. KELLER:

Q    What is Exhibit 508, Mr. Barth?

A    508 is the no-show rate.  It is basically paid attendance, people that paid for their tickets but didn't show up for our games.

Q    Does this show the trending over time since the '03-'04 season?

A    It does.

Q   I want to make sure I understand.   Does this mean I am a ticket holder, I bought a ticket but I don't even bother to use it?

A   That's correct.

Q   Does it mean more than that?   Does it mean not only do I not bother to use it but I don't give it to someone in my family or friend and they use it?

A   That's correct.

Q   I am not using it and I am not even giving it away?

A   That's correct.

Q   And last season approximately 29 percent of all the tickets sold weren't even being used?

A   That is correct.

Q   And on an incremental basis did that represent about a 50 percent increase from where it had been in the '03-'04 season?

A   That's correct.

Q   Going back generally to operational issues, what other areas have you had operational challenges in this past year because of the situation with the City and the lease and relocation and just everything that brings us here?

A   The sponsorship area, which is our signage area in the building where we put signs up in the building and sell signs to corporate sponsors, we have four point --

Q   Could you tell us just a little bit about what that

revenue base is and why it is important?

A    Overall it is about $6 million, and varies.    Again, it is both TV exposure but also our corporate individuals that look to get exposure through signage in our arena, and/or entertainment or some other value that they feel within -- community relations maybe, whatever that might be.

Q    And what kinds -- what has been the problem this past year?

A    We have a $4.3 million of that business up for renewal. We have two large sponsors that told us to date, which is about $1.1 million, that they are not going to come back. The main reason was they didn't want to be associated with all the turmoil that is going on and the brand.    And they also indicated, one of them, that there was what they called arena fatigue, that this has been going on for so long and it was time to get out.

Q    You have used the expression a few times "the brand."    Is that the goodwill of the Sonic business in the community?

A    Yeah.    I think it is how it is looked at within the community.    I think it is how fans judge when they see the logo itself, what does the Sonics mean to an individual.

Q    What are you anticipating on a go-forward basis over the next two years if the team is required to stay here in a lame-duck status in terms of the sponsorship and advertising revenue base?

A    We already know that the $1.1 million isn't coming back. I think it will be very difficult for two more years. Anybody that we have up for renewal that is not through 2010, I think it will be very difficult to renew those individuals.

Q    What's another area with respect to the operational challenges that you have had during the last year as a result of all this?

A    We have had a significant amount of turnover this year.

Q    Are you talking about employees?

A    Yes.

Q    Can you expand on that?

A    We had 23 employees leave in the last six months.  Our last employee to leave was a key vice-president in our organization who oversaw the signage and sponsorship that we talked about.

        THE COURT:   Can you tell me the size of the company employees so I can understand what 23 means?

        THE WITNESS:   There is a total of 125 employees.

BY MR. KELLER:

Q    On a go-forward basis, again if the team is required to stay here in this environment and try and operate, what are you anticipating on the employee retention issue?

A    I think it will only get worse over time.  A big part of that is there are certain expertise within the business itself, and trying to find and replace those will be very

difficult.

Q    Explain what you mean by that last point.

A    There are individuals, for example, who do game operations who are -- it is a very specific job and have kind of what I call technical expertise.  The same would be in our ticket sales area.  There are individuals who at the vice-president level and along those lines, if they were to leave it would be difficult to replace those to come into what is known as a lame-duck period.

Q    Anything else on the employee retention front?

A    Yeah.  I think just overall the keeping up the general morale as we go forward is going to be a difficult area.

Q    How important is that?

A    I think it is important for any company.  It basically goes to every facet of our organization, from our sales all the way down.  It would be very difficult from a leadership standpoint as well.

Q    Do you still do your best to provide that leadership?

A    Absolutely.

Q    How about Mr. Bennett's ability to provide that leadership?

A    Mr. Bennett has been very good.  He has been good to our employees.  We have actually currently a retention plan that was put together that we felt was needed under my approval from Mr. Bennett to get that plan.  It is a very good plan in

561

my opinion.

Q    What are some of the other operational challenges that you have had this past year?

A    We have really had operational issues from the standpoint of just our lease in general.

Q    And what do you mean by that?

A    We have areas that on an ongoing basis we have issues with regard to our sponsorship, with regard -- for example, all of our sponsorship and our signage must be approved by the City. So at any point --

Q    Does that mean --  Excuse me for interrupting.  Does that mean any time you want to enter into a new arrangement with a sponsor or new advertising there is some kind of approval process?

A    That's correct.

Q    Explain that.

A    Basically if we were to put signage up -- new signage in an area they have the final right to tell us whether or not that placement can be done.  We have had issues in the past where -- even recently, where we have tried to put signage up, for example on an elevator shaft.  But since it could be seen from the outside it was not allowed.  Our client came back and asked us what we could help do otherwise.  So we asked about putting signage outside on the suite level entrance that would mark that as their level.  But, again,

since it was going to be seen from the outside the City had final approval and said that was out.  And we have had an issue where we have had -- we have put up signages throughout the vom and been asked to take down other --

Q   Sorry?

A   Throughout the vom, in the area -- the lower level area where you enter, basically the vomitories.

THE COURT:  Say that word again.

THE WITNESS:  Vomitory.  I'm sorry.

BY MR. KELLER:

Q   V-O-M-S?

A   Yes.  What is known as the entryway into the arena.  In those instances where we put those signs up we were asked to take our signs down because it was going to be too commercialized.

Q   Any other operations of that kind this past year?

A   In general we have other issues regarding concessions. All of our concessions have to be -- not only the menu but the individual pricing has to be approved by the City, even though we operate the concessions for all events through an air market third-party that we have.

Q   Have issues come up from time to time, I don't mean big disagreements, where you disagreements with the City on basic things like pricing and products as part of the concessions?

A   Sure.  Yeah.

Q    Was there some issue over a 20-ounce Pepsi bottle?

A    There was a discussion about whether or not we could put a 20-ounce Pepsi bottle in because maybe the manpower was going to be too much as far as trash and clean up, along those lines.  We had a sponsor who really wanted that.  That was one of their major selling points.

Q    And the City was at least initially balking at letting you carry a 20-ounce Pepsi bottle?

A    That's right.

Q    Did you get it resolved?

A    We did.

Q    On a go-forward basis, what do you think the future holds for these kinds of interactions if we are here under a court order?

A    Again, I think the challenges just get worse as we try to maximize every revenue that we possibly can.  I think it will just continue to get worse.

Q    Again, generally, on the operational front, do you face any challenges in the area of the suites?

A    Yeah.  Our suites --  First and foremost, the suites itself are split 60/40, where 60 percent goes to the City and 40 percent goes to the Sonics.  We sell and market the suites.  But, again, final pricing and final approval of the agreements themselves are done by the City.

Q    So you sell them, you market them, put them under lease,

the City gets 60 percent of the suite sales revenue?

A    That's correct.

Q    And under the lease what is it -- what are the City's rights with respect to the marketing?

A    They have both pricing and overall say on the contract. For example, we had a contract this year where we asked -- the client asked for an out clause in our lease if the Sonics were to leave.  They were willing to commit to a three-year time period, but if the Sonics leave they wanted an out.  The City basically said that they would balk at that, and so therefore we now are trying to come up with a -- we are trying to go in and renew that individual right now.

Q    And so were you able to effect that sale without some kind of provision addressing the what if?

A    No, I was not.

Q    For what period -- if we roll back a few years, for what period of time are these suite contracts marketed?

A    Originally they --

Q    A different question.  For what period of time do you offer a suite license to the customer?

A    Originally they were set up in kind of intervals of three, five, seven and nine.

Q    What about now?

A    Now we are marketing them no longer than 2010.  And we are basically, in general, almost on an annual basis, a

year-to-year basis.

Q    Can you take a look at Exhibit 509?  Is that a summary that you helped put together, Mr. Barth, talking about the contract payments under suites and what the trend has been?

A    That is correct.

MR. KELLER:  We will move for the admission of 509, your Honor.

MR. JOHNSON:  No objection.

THE COURT:  509 will be admitted.

(Exhibit 509 admitted)

BY MR. KELLER:

Q    Can you describe for Judge Pechman what this is setting forth?

A    This represents the Sonics' share over the years of revenue under the 40/60 split that is currently in place.  If you were to look at the last two years you can see the drastic drop off due to the fact that all the contractual obligations are up for renewal.  So to date for the '08-'09 season we have 5.5 suites, so five suites and someone is renting half of a suite, which represents 261,525 committed dollars for next year.

Q    How are you able to have columns that are already for the '08-'09 season and another column for the '09-'10 season when those seasons haven't happened?

A    The suite itself is contractually obligated for those two

years.

Q   So in terms of next season, the total amount of contractual payments that are obligated for suites for -- not the total amount, but the Sonics' share of contractual suite payments in place for next year is $261,000?

A   That's correct.

Q   What has the impact of all this had on the ability to try and market the suites?

A   Marketing suites, again, is very difficult for the same environment.  Individuals are not willing to commit.  They have indicated to us almost the same line, that unless the arena fatigue, and unless the individuals that are overall -- this gets resolved, as far as the arena, they are not willing to go forward with commitments.

Q   Now, part of all this is because a decision has been made to relocate, correct?

A   That is correct.

Q   The second line on this chart is not dollars.  What is that?

A   That is the contractually obligated suites.

Q   So that is the number of suites?

A   That's correct.

Q   So looking at the column for like the '06-'07 season, that was the first year of PBC's ownership; is that right?

A   That's right.

Q    That means --  How do you get 24.5?  How do you get a half a suite under contract?

A    People commit for half a suite.  So they will commit for half of a year or half of events.

Q    How many suites are there?

A    There are 48 total suites.

Q    So even back in '05-'06 less than half the suites were under contract?

A    That's correct.

Q    And for next season five and a half out of 48 suites are under contract?

A    That's correct.

Q    Are there any other operational issues that have been a real challenge for you this past year as a result of the effort to relocate, the dispute over the lease and just the general environment you have had to operate under?

A    I think in general I have pointed out the major revenue sources.  Next we have to also look at our expense line items and figure out how we go from there.

Q    What do you mean by that?

A    We anticipate right now -- our loss is anticipated at $27.6 million.  As our revenues decrease we have to find some way to offset those losses and see if there is some way to mitigate those through cost reductions somewhere.

Q    That anticipated loss number you just gave, is that for

the fiscal year that will end in September of '08?

A    That is correct.

Q    That's got some extraordinary expenses, right?

A    It does.

Q    Including this guy standing here behind the lectern?

A    That's correct.

Q    Including the efforts to try and get a new arena, right?

A    A little bit, but not as much.

Q    If you back out that kind of extraordinary stuff from strictly a basketball operations kind of level what would your loss have been?

A    Around $24 million.

Q    Thank you.  Did you put together a schedule to help illustrate what the trend has been regarding season ticket holder attrition?

A    I did.

Q    Would you take a look at Exhibit 507, please?

        THE COURT:  Any objection to 507?

        MR. JOHNSON:  As long as it was prepared by Mr. Barth, with that foundation, we have no objection.

        MR. KELLER:  Did you put this together?

        THE WITNESS:  Yes.

        THE COURT:  507 is admit.

                    (Exhibit 507 admitted)

BY MR. KELLER:

Q    What is Exhibit 507, Mr. Barth?

A    507 is the season attrition rate, it uses the 2002-2003 rate, the base year for season tickets.

Q    When you say a base year and attrition, can you explain what you mean by that?

A    A base year is basically saying, here is what the season tickets are by category for that year.  And then the attrition is over each season how many season tickets stayed basically in those categories from the '02-'03 season.

Q    Is this like looking at your high school freshman class and how many of you were there by the time of graduation?

A    Yes.

Q    So in the 2002-2003 season there were 190 season ticket holders?

A    There were 190 club seats at that point in time.

Q    Is that what this is, club seats?

A    That's correct.

Q    And out of how many club seats?

A    At that time I believe there were 1,100, a little over 1,100.

Q    So if we take that 190 people that were buying club seats on a season basis as of 2002-2003, how many of them were still holding their tickets last year -- at the end of last season?

A    72.

Q    And in the right-hand column do you have the attrition rate?

A    That's correct.

Q    As you go down this chart is it showing the attrition rate for the court-side seats?

A    Yes.

Q    And the lower bowl, the upper bowl and the different categories of seating that are shown?

A    Yes.

Q    All of these are essentially 50 percent or more attrition rate over time?

A    That's correct.

Q    Now, what is the current number of season ticket holders?

A    3,992, if I remember correctly.

Q    Out of how many seats in the house?

A    The announced attendance was 17,072. It is a little less than that actually. The physical manifest, I would say it is about 16.4.

Q    Is another customer metric that you use to gauge performance and fan avidity and acceptance and fan base something called paid attendance?

A    Yes.

Q    Did you put together a summary to help illustrate what the trend has been on the paid attendance?

A    I did.

MR. KELLER:  I will move for the admission on 510.

MR. JOHNSON:  No objection.

THE COURT:  510 will be admitted.

(Exhibit 510 admitted)

BY MR. KELLER:

Q   Is 510 --  Could you take a look at Exhibit 506, please? I'm sorry.  I do want 510.  Is 510 the summary you put together of the paid attendance?

A   That's correct.

Q   Can you pull up the top half there?  Could you just -- First, what is this generally trying to depict?

A   It is based off of the reporting that we do to the NBA for what we call gate receipts or ticket reports.  It shows the average regular season net gate, and then it also has where we rank within the league.

THE COURT:  I need a clarification.  Are we talking about people who don't own season tickets but simply go buy a single ticket.

THE WITNESS:  This is all ticket sales.

THE COURT:  All ticket sales, including the season ticket holder?

THE WITNESS:  That's correct.

THE COURT:  Thank you.

BY MR. KELLER:

Q   So anybody coming through the turnstile on a paid ticket?

A    It is not so much a turnstile as it is they just paid for a ticket.

Q    The second line, is that showing the --   What is the difference between average regular season net gate receipt -- Those are dollars?

A    That's correct.

Q    And then the paid attendance, is that a head count?

A    That's correct.

Q    Why is there a difference in the league ranking between the dollars and the head count within an individual year?

A    Pricing would make a difference, so you could have basically -- you could be the 13th rank, but you may raise your prices or lower your prices which would have an effect on your ticket dollars.

Q    So back in 2000-2001, in terms of relative ranking, does that mean the Sonics were about 17th out of 30 teams?

A    In average gate receipts, that's correct.

Q    And 13th on a head count?

A    That's correct.

Q    Let's go to the next page of this exhibit that carries over into the more recent era.   '06-'07, the season that just went by, is that showing that you are 27th out of 30 teams in the league when it comes to net gate receipt and head count?

A    Yes.

Q    Does that mean there are only three teams that are having

a poorer showing?

A    Yes.

Q    And the dollars in '07-'08 on the net gate receipt, does that show an approximate 25 percent decline from the '05-'06 season?

A    That looks correct.

Q    And in terms of the average from a head count, this is an average per game; is that right?

A    That's right.

Q    And that has declined from about 11,400 from the '05-'06 season to 9,100?

A    That's correct.

Q    What do you anticipate going forward if we are here the next two years with the metrics like the one we are looking at right now?

A    I don't know about physical projections. Again, as we talked about, with everything going on in the marketplace I don't anticipate them going any further upward, that's for sure. I would think we would be either 27th or lower, and probably at 30, potentially.

Q    Did you put together a summary of all the payments that have been made to the City under the lease and pursuant to admissions taxes that paid?

A    I did.

Q    Why don't you just explain what the admission tax is?

A   Admissions tax is a five percent tax that is paid on all paid tickets in general.

Q   And who do you pay that to?

A   That is paid to the City.

Q   If you are having a poor season and people aren't buying tickets, for whatever reason they not buying tickets, and you start giving lots of tickets away just trying to get people in the house, do you still have to pay admission tax on them?

A   We do.  We pay admissions tax on comp tickets as well.

Q   On the face value of the ticket?

A   That's correct.

Q   So if you give away $10,000 worth of complimentary tickets to just fill up the house you end up having to pay the City?

A   It depends on the price of the ticket.

Q   Exhibit 504, is that the summary you put together of what the historical payments to the City have been since the beginning of this lease and the projection for what it will be for the current year that we are in right now?

A   That's correct.

        MR. KELLER:  We will move for the admission of 504, your Honor.

        MR. JOHNSON:  No objection.

        THE COURT:  504 will be admitted.

                    (Exhibit 504 admitted)

BY MR. KELLER:

Q   This has a lot of numbers on it.  I want to sort of travel at 20,000 feet if we can, Mr. Barth.  It seems to be broken up into buckets based on the headings on the left side.  The first grouping you have are called non operational fee payments.  Do you see that?

A   Yes.

Q   And what is that bucket?

A   Those are payments that are within -- in general within the lease itself that have splits to them, so they have revenue sources in some manner.  For example, the suites, as we talked about, have a 60/40 split.  I guess this is what I consider a non operational payment.

Q   And is what is depicted on Exhibit 4 the City's slice of the pie under any of those ones that are shared for the particular product?

A   Yes.  Everything here is on the City's side.  It is the actual payments we made to them.

Q   So, for example, if we look at the '06-'07 season, that column, and we see total payments in this bucket we have been talking about of $5,885,000, what does that represent?

A   That represents the total payments for non operating -- what I consider non operating fee payments for that year.

Q   By the way, when did you prepare Exhibit 501?

A   This was prepared a little bit further back.  It was probably prepared in the May time period, maybe even a little

further back than that actually.

Q    And you had a projection for '07-'08.  Is that because the year is not over?

A    Yes.  And I have subsequently tried to update that as well.

Q    Is that reflecting that this first bucket of the operational payments since the beginning of this lease have been over $94 million?

A    Yes.

Q    The next bucket, operational fees.  What is that?

A    Those are operational costs that we have paid to the City under the lease.  Such examples are the Sonics' rent or playoff rent, and basically the cost to cover the operations, which are in the contract, which are in the premises use and occupancy agreement.

Q    So these are payments that are called for under the lease but they are more in the way of operational reimbursements rather than rent, so to speak?

A    Yes.  Not all of them are called for in general.  There are a few that aren't, but, yes.

Q    Which one is not called for that is included here?

A    Payments to the City of Seattle for fire department and police and along those lines.  Some of them are what I would call variable costs as we go forward.

Q    Some of these seem pretty self-evident, like playoff rent.

Why is it a separate line item?

A    Again, that is what I consider a variable cost from a general standpoint.  In essence, we don't pay rent unless we make it to the playoffs.

Q    And then if you do what percentage of the rent goes to the City?

A    They get eight and a half percent.

Q    Of?

A    Of the total gate.

Q    Is that why there is not an entry there?

A    Since 2004-2005, that's correct.

Q    And then you have a reference to quarterly rent.  What is that?

A    That is the rent -- the annual rent that we pay to the Seattle Center.

Q    Is that something that determines something not dependent on gate revenues or club-seat sales or suite sales?

A    Yes.

Q    Was that a fixed amount in the lease with an escalator each year?

A    That's correct.

Q    So for the last season that we have been in, that number that have you of $1.17 million, that is accurate, right?

A    That is the estimate for the '07-'08.  But, yes, that is accurate.

Q    And the next line item you have is Storm rent.  You are not going to be paying Storm rent for next year; is that correct?

A    That's right.

Q    Why is that?

A    We sold the Storm to a local owner.

Q    Are they staying here in Seattle?

A    Yes, they are.

Q    The next line is referring to security and service and stage labor.  What is that?

A    That is labor that is on top of the rent.  So if we were to do a pregame function, for example, we pay an additional portion to reimburse them for those costs.

Q    Let me go to the bottom line of this bucket here.  During the '06-'07 season, which would be the prior year, there is a total additional payments of approximately 1.9 million.  So if you add the two buckets together it was about $7,788,000; is that right?

A    That's correct.

Q    Including in the projection for this year in terms of the total amounts that have been paid from these first two buckets that we have been looking at to the City over the life of this lease so far, is it about $114 million?

A    That's correct.

Q    Is the admission tax here in this schedule?  Yeah, that

was up in the first bucket.

A    Right.

Q    And then you have a category called "other."  What is that?

A    "Other" is what we consider customer parking.  It is basically -- we don't receive any of the revenue or pay, in general, except for our employees.  But this is basically an estimate of how much revenue they would have generated.  And that came from the KeyArena subcommittee.

Q    Is this line item for --  Is this not a cash expense?

A    It is not.

Q    Then let's not talk about it.  Bottom line, are the amounts that are due to the City for the past quantifiable?

A    They are.

Q    From your perspective are the projected amounts that will be due over the next two years for all of these categories that we have been looking at for these two buckets of non operational and operational quantifiable?

A    Yes.

Q    In fact, have you done some work in that regard?

A    I have.

Q    We will talk about that probably when we come back.

        THE COURT:  We need to take a recess.  All right.  Ladies and gentlemen, we will be at recess, and we will be back in session in 15 minutes.

(Court in recess.)

THE COURT:  Please be seated.

MR. KELLER:  Mr. Barth, I'm going to try and get through this very, very quickly.  It's deep in the afternoon and numbers have a way of doing things to us in the afternoon session.

BY MR. KELLER:

Q   Is Exhibit No. 595 the summary that you put together of a projection of the payments that will become due for those operational and nonoperational budgets that we've been looking at on a go-forward basis for the last two years of the lease?

A   I'm sorry.  I don't have 595.

MR. KELLER:  I'm sorry.

THE COURT:  I did hear you right, 595?

MR. KELLER:  Is it not in the list I handed up?  Move the admission of 595.

MR. JOHNSON:  Objection, lack of foundation.  This is the report that is premised on the other expert's report I believe.

MR. KELLER:  Move for admission for illustrative purposes, Your Honor.

THE COURT:  First of all, Mr. Keller you need to give me some more background.  I don't know what it's illustrative

of.

BY MR. KELLER:

Q   Is Exhibit No. 595 something you put together to help illustrate your testimony about the quantifiable nature of the payments that are due as a result of a lease, direct payments to the City over the next two years?

A   Yes, it is.

Q   Is it something that you put together to help illustrate your testimony?

A   Yes.

MR. KELLER:   Move admission of 595 for illustrative purposes.

MR. JOHNSON:   I will object and ask if I could question what this is.   This is all conclusions drawn off the analysis of another expert.

MR. KELLER:   I can ask the questions --

THE COURT:   He's asked to voir dire.
Go ahead.

VOIR DIRE EXAMINATION

BY MR. JOHNSON:

Q   Mr. Barth, Exhibit No. 595, is this a two-page document?

A   Yes, it is.

Q   Second page is the analysis that you performed?

A   Yes.

Q   Using your own methodology?

A    Yes.

Q    The first page is the analysis that you performed using the methodology that was developed by MZ Sports?

A    That's correct.

Q    And we've talked about this under oath at your last deposition.  You don't have any opinion one way or the other as to the accuracy of MZ Sports's analysis?

A    I have looked at the reasonableness of it and relied on their expert.  Their expertise.

Q    You've now analyzed it since the deposition we had two weeks ago?

A    I looked at it.  That's all I have done.

Q    And do you stand behind the assumptions made in that report?

A    Again, I stand behind the fact that their expert opinion but nothing anything that I have made conclusions on.

Q    Do you know anything about how they went about creating their expert opinions that you relied upon for the first page of this report?

A    I know they did comparables.

Q    Did comparables of what?

A    They do comparables of lame-duck situations over for two individual franchises.

Q    Do you know that you in your deposition you have a different definition for lame duck than they use in doing

their comparables?

A   I did not know that.

MR. JOHNSON:   Your Honor, I move to not have this witness testify about this document until foundation of the underlying expert opinion that forms the basis of it is tested in this court.

THE COURT:   Mr. Keller, do you wish any additional questions?

BY MR. KELLER:

Q   Did all you -- first of all, the second page is based on your own computation methodology?

A   That is correct.

Q   As to the first page, is what you did was you took the numbers that MZ Sports was projecting over the lame-duck period, and you ran that through the lease in terms of what that would calculate out to in terms of direct payments to the City?

A   I ran that, yes.

MR. KELLER:   It seems, Your Honor, he's entitled to use this is a calculation.   Not anything more formal than that.   He's not vouching for MZ Sports.   He's saying if you run their top line revenue projections for this lease documents here is what it works out to.

THE COURT:   I take it, what you're trying to tell me is MZ Sports is some sports analysis company that used a

model and he plugged in the numbers based upon their model.

MR. KELLER: Yes. And representative from MZ Sports has been deposed by the City. He's on the list as a potential witness for the balance of trial.

THE COURT: Second page, obviously his calculations, you can go ahead and use. The first page you can go ahead and use subject to connecting it up. In other words, you put on your witness later. If you don't connect it up, I will hear motion to strike.

BY MR. KELLER:

Q    Let's start with the second page. I want to do this quickly. It tells us what methodology you utilized.

A    We used a two-year average of the payments.

Q    Excuse me, for a minute.

MR. KELLER: So I need to move admission of 595 for illustrative purposes subject to exactly what Your Honor just said.

THE COURT: Yes. It's admitted.

(Exhibit No. 595 admitted subject to the Court's comments.)

BY MR. KELLER:

Q    Tell us the methodology you employed for coming up with a reasonable quantification of the direct payments that the City will receive over the next two years of this list?

A    I used a two-year average using Exhibit No. 504, which was the -- all the payments to the City. I came up with a

two-year average basically looking at the trend. Compared that then to the '07-'08 column there that says Actuals. That percentage change, which turned out to be 36 percent, for example, looking at suite rentals in the first one, was then applied against the '07-'08 numbers to come up with the '08, '09, $387,000 for suite rentals.

Q   Just methodology you took '05-'06 season and the '06-'07 season, added each number up, came up with an average; is that correct?

A   That's correct.

Q   Next step is you look at to what extent there has been a decline in the '07-'08 season from that two-year average?

A   That's correct.

Q   Then did you apply that percentage to find on a go-forward basis for each subsequent two years?

A   I did.

Q   And the bottom line, what will be due to the City in the direct payments under the lease?

A   I believe it's $10.5 million.

Q   Is that cumulative for the two-year period?

A   That is correct.

Q   You included admissions taxes in this calculation?

A   I did.

Q   Is that within the lease?

A   It is not.

Q    But because it's a direct tax that is on the lease, you included it -- I mean, that's on the game receipts?

A    Yes.

Q    Now, as to the first page, using however MZ Sports got to the numbers that they got for the lame-duck period, what is the projected amount that will be due in direct payments to the City?

A    $9.2 million I believe.

Q    Thank you.

     I want to ask you about some indirect payments that flow from the activities of the Sonics.

     Do you pay city B and O tax?

A    We do.

Q    Do you pay sales tax on certain sales?

A    Yes.

Q    What kinds of sales?

A    Merchandise sales.

Q    And did you prepare a summary of what the B and O tax statements to the City of Seattle and what the City of Seattle's slice of the sales tax on merchandise sales would be over the next two years?

A    I did.

Q    And take a look at Exhibit No. 511, if you would.

          MR. KELLER:  I move for the admission of 511.

          MR. JOHNSON:  Looks like there is the same objection.

Relying on MZ Sports's analysis once, again.

THE COURT:  Let's do the same thing.  We'll admit it conditionally upon subject to connecting it up.

(Exhibit No. 511 admitted subject to the Court's comments.)

BY MR. KELLER:

Q   Very generally, Mr. Barth, B and O tax over the next two years -- is that a city-tax that is based on the revenues?

A   Yes.

Q   And what's the City B and O tax over the next two years?

A   First page, $307,000, second page $322,000.

Q   How about with respect to the City's slice of the state sales tax on purchased merchandise sales?

A   Approximately $18,000.

Q   Take a look if you would at Exhibit No. 514.

MR. JOHNSON:  Let me check and see if there is MZ Sports in there.

No objection.

THE COURT:  514 admitted.

(Exhibit No. 514 admitted.)

BY MR. KELLER:

Q   Is this an e-mail dated September 29th, 2004 from an attorney Gerry Johnson, among others, yourself?

A   It is.

Q   This is back when Mr. Schultz's group owned the team?

A   That's correct.

Q  Mr. Johnson, he was a attorney with what law firm?

A  K&L Gates.

Q  I don't think they were called that.  Preston Gates back then?

A  Yes.

Q  Was he providing legal counseling in connection with the team's efforts to get an arena?

A  Yes.

Q  What is this exhibit?

A  Some talking points that were put together for a meeting that was going to take place between Mr. McLaughlin and Mr. Barer with the City of Seattle.

Q  Turn to the second page.

   Would you pull up the first three paragraphs for us.

   The Preston Gates firm -- was one of the talking points that back in fall of 2004 that the lease doesn't work for either party?

A  Yes, it was.

Q  Was another one of the talking points that it's the worst lease in the NBA and the Sonics are losing money and the Sonics were going to have to consider a sale of the franchise, including the possibility, even possibly moving outside the City or even the region?

A  Yes.

Q  Does it go on to make the case from the City's perspective

589

the deal is broken, too; it's not working?

A    Yes.

Q    You were asked questions about for Sonics being here 41 years?

A    Yes.

Q    Year that was the 40th-year anniversary, what season was that?

A    It was 2006-2007 season.

Q    Were you running the franchise at that time?

A    I was.

Q    Do you think that that would provide a good opportunity from a marketing and sales standpoint to try and leverage off the heritage and goodwill in the community by having a 40th year promotional sales effort?

A    I did.

Q    What was done to try and leverage off all that goodwill in the community to try and increase ticket sales and bring people into the door?

A    Basically we brought what we call the legends out, players from the past back into the market.  We tried to go out and do promotions with them.  We also did refurbishments of courts, along those lines.  Thought it would be good for us -- while we were in the stages of Olympia, to make sure that everyone understood the fact that there was a legacy as we were trying to get an arena.

Q    From a marketing sales perspective, was a significant amount of money spent trying to promote this concept of a 40-year legacy?

A    There was about $455,000 if I remember right spent on it.

Q    From a business perspective, was it successful?

A    From a business standpoint we -- our revenues decreased. So I would say that no.

            MR. KELLER:   Thank you.   That's all I have.

                    REDIRECT EXAMINATION

BY MR. JOHNSON:

Q    You just talked a little bit about ticket sales and the 40-year legacy.

     In fact, you wrote in a memo to Mr. Bennett so he could pass it on to the other owners for a partnership briefing that the most -- the best attendance you were getting at any games during that season were the games where you were bringing in Sonics legends for those games, correct?

A    That's correct.   Early on, that's correct.

Q    And the fact that the overall revenue went down was because you also wrote in the memo it was one of the worst records that you had had in 22 years, back in '05-'06, correct?

A    I believe that I said that along with the uncertainty of the team.

Q    Uncertainty of the team because the press had announced

that the owners were from Oklahoma City, and they might -- even back when they first bought the team people thought they might try to move, didn't they?

A    There was a perception of that, yes.

Q    Didn't that affect ticket sales?

A    It did.

Q    Before this year they actually announced they were going to move?

A    Before this year, yes.

Q    That affected ticket sales, didn't it?

A    It had an effect on it, yes.

Q    And now you're talking about tickets -- you were talking about you weren't getting phone calls for next year?

A    Yes.

Q    You're not selling tickets for next year?

A    We are --

Q    You haven't let any season ticket holder that wants to renew for next year?

A    We are not actively out marketing.  Didn't think it was prudent to go ahead and take people's money until we knew where we were going to be.

Q    You're not accepting ticket sales -- I can't give you money right now to reserve tickets, can I?

A    You cannot.

Q    You're not accepting leases for suites, are you?

A    We are accepting leases for suites.

Q    When are the conditions of those leases; that they can get their money back if the team leaves?

A    No.   That is something the City wouldn't allow us to do. The normal suite lease agreement that we currently have.

Q    Let's talk about the City for a second in this lease.

You complained about some dispute you had with the City over signage?

A    Yes.

Q    You were able to work out that dispute, though, weren't you?

A    In certain circumstances, yes.

Q    And the way the lease is it gives the City rights over that signage, correct?

A    City has rights, yes.

Q    It's because KeyArena is a public building?

A    KeyArena is a public building.

Q    You can't have a public building with all kinds of crazy advertisements on it.

A    It's a public building, right.   That's correct.

Q    So what the City did is they went with what you said they could do in the lease?

A    Again, that's true.   At the same time it also limits the amount of revenue we can generate.

Q    That's what the lease says?

A    That is correct.  The lease says they have final approval.

Q    You were able to work that out without coming to court?

A    Yes.

Q    Because that's what the lease says?

A    Lease says they have final approval, yes.

Q    You had some disputes about concessions with the City?

A    We have.

Q    And but ultimately the lease says the City has certain rights with respect to concessions?

A    That is correct.

Q    You were able to work those disputes out with the City ultimately?

A    Ultimately we really don't have much of a chance to do anything else other than they have final approval.

Q    So you just have to comply with what the lease says?

A    That's correct.

Q    You don't like that?

A    It's what the lease says.  I don't have an opportunity to do anything differently.

Q    Let's turn to a different topic.

      I want to turn to some exhibits that Mr. Keller went through.  Let's go with Mr. Keller's order and start with 505, please.

      To put this exhibit in perspective, the 2006-2007 season, that was the worst season the Sonics had had in 22 years up

to now, correct?

A    That's correct.

Q    And that was the first season of the Oklahoma group's ownership?

A    That's correct.

Q    2007-2008, that was worst season the 41-year history of the team?

A    That's correct.

Q    And that was the year that the Oklahoma group announced before the start of the season that they were going to seek arbitration to move the team?

A    That's correct.

Q    The year that the Nielsen ratings were 3.12 was the year Sonics went to the playoffs?

A    That's correct.

      To put that in perspective, though, 3.12 compared to the Nielsen ratings, for example, for the Mariners would be a 14 or 15 when they were in the playoffs.

            MR. JOHNSON:    Objection.    Move to strike, lack of foundation.    He's volunteering Nielsen ratings --

            THE COURT:    Sustained, but not on those grounds. It's beyond the scope of the question.

            MR. JOHNSON:    Thank you, Your Honor.

BY MR. JOHNSON:

Q    Mr. Barth, I want to talk to you about the Exhibit No.

508, the paid no-show rate.

First of all, does this relate to all tickets sold or just season tickets?

A    All tickets sold.

Q    Even in the season when the Sonics went to the playoffs, there were 16.4 percent that of the people that paid for tickets didn't show up?

A    That's correct.

Q    Is this a trend that is consistent in terms of a certain 10-plus percent don't show that up to NBA games?

A    Not that I know of.

Q    Have you looked at other NBA situations?

A    I have not.

Q    Have you ever thought this seems high for people who have paid for games and not shown up and tried to figure out whether these numbers are actually accurate?

A    I think what it shows is the continued issue that we have with our fans, as far as our season tickets and our renewal rates, it's been a struggle, even since '03-'04, to renew our season tickets.  A good barometer for regarding season tickets renewals.

Q    I heard your testimony on that.

I'm asking you about the year that team actually went to the playoffs.  16 percent didn't show up.  I'm asking if you thought that seems odd, because you want everyone who buys a

ticket to show up, right?

A    Yes.

Q    Because you make money on selling concessions?

A    Yes.

Q    Okay.  Have you done any analysis to see if Ticketmaster's Artix reporting system you're relying on is accurate?

A    That's been accurate ever since we've used it, as far as being able to generate reports.  I don't have any to reason think it wouldn't be.

Q    When you say it's been accurate, you mean you've used their reports.  You haven't said this report seems odd; we should double check whether it's accurate?

A    Those reports are audited actually overall.  Financial statements that are generating revenue are audited by an audit firm.

MR. JOHNSON:  504.

BY MR. JOHNSON:

Q    Mr. Barth, this is the spreadsheet that shows the revenues to the City historical, year by year?

A    Yes.

Q    If you look at the top -- the nonoperational fee payments.  If you look at the '97-'98 season?

A    Yes.

Q    The City received $10 million in revenue that year?

A    $10 million in payments, yes.

Q   And if you look at the 2006-2007 year?

A   Yes.

Q   The City received 5.5?

A   That's correct.

Q   And $5.5 million?

A   I think it's 5.8 million; is that correct?

Q   Honestly, I can't read the spreadsheet.

The point is there has been over time a variance in these numbers?

A   Has been, yes.

Q   And they even between -- if you look at '95-'96, '96-'97, '97-'98, there is huge variance in those numbers, isn't there?

A   There is a variance.  A portion of that is the fact that the lease calls for decrease in the percentages to the City over time.  For example, in '95-96 the suite split was the 80/20, 80 to the City, 20 to the Sonics.  And, again, in '06-'07 that is now 40 percent to the Sonics and 60 percent to the City.

Q   So the lease split has actually gone down over time so that the Sonics get more?

A   The Sonics get more as it goes on, that's correct.

Q   So all of the things that you talked about here, the suite rentals, the lease suites, the club seats, the concession splits, these are all things that are part of the lease that

you signed?

A   That's correct.

Q   They were part of the deal from the outset?

A   That's correct.

Q   They were intended to start out in a way so that the revenue would be higher for the City at the beginning and would diminish over time?

A   That is correct.

Q   There is nothing on this exhibit that you're complaining about, isn't it just what it says in the lease?

A   That is correct.

Q   I want to turn to your financial projections.

596, second page.

MR. JOHNSON:  I'm sorry, 595, Your Honor.  Apologize.

BY MR. JOHNSON:

Q   Mr. Barth, you with me?

A   Yes.

Q   Now, these are revenue numbers you generated using your own methodology?

A   Second page, yes.

Q   That's where I want to focus on.

What you did is you took the average of the two previous years numbers, correct?

A   Correct.

Q   And then you applied that to the next year?

A    That's correct.

Q    And then you took the difference and applied that into the future?

A    That is correct.

Q    And this is the methodology that you have never used before in your professional work for the Sonics ever?

A    I wouldn't say that's true.  I have used averages before many times.

Q    Mr. Barth, you have never created a budget, tried to forecast in the future using this methodology?

A    We forecast only on one year's -- one previous year.  Not two years.  That's correct.

Q    So you've never taken two-year previous average -- you have never done this formula before in your actual professional work as the president and CFO of the Sonics?

A    Not sure.  I have done averages many a times.  I would potentially used a two-year average to look at game receipts and many other things.

Q    You never testified as an expert, have you?

A    I have not.

Q    You continued the negative downturn in the numbers through the final year of this exhibit?

A    Yes.

Q    Do you know that that contradicts the opinions of MZ Sports regarding the effect?

A    Yes.

Q    Yet you still rely on the opinions of MZ Sports?

A    I tried to show two different methods that would give you a trend or analysis based on two different methods.

Q    What you're doing is you're forecasting?

A    I'm forecasting, yes.

Q    You're forecasting two years out?

A    Forecasting out, focusing for the next two years, correct.

Q    That's not something you typically do in your role as CFO and president of the Sonics, correct?

A    I project one year out.  That's correct.

Q    In fact, you never project two years out?

A    I wouldn't say never.

Q    Well, you haven't done it since -- maybe you've done it since your deposition.  That wasn't something that was part of your routine, correct?

A    It's not part of our overall budget process to go two years out.

Q    And the reason it's not part of your overall budget process is because it's really hard to create budgets in this business, isn't it?

A    It is difficult to create budgets, yes.

Q    Let's look at some budgets that have been created and put into evidence in this case.

Let's start with Exhibit No. 35.

MR. JOHNSON:  Move to admit 35.  I think it's a better copy of Exhibit No. 1.

THE COURT:  What do you want in, 1 or 35?

MR. JOHNSON:  1 is one where we tried to look with another witness earlier today, Mr. Bennett, I believe, and he couldn't even read the table.

MR. KELLER:  If it's the same and a better copy, you want to substitute one for the other, that's fine.

THE COURT:  We'll substitute 35 in for 1 and basically just substitute in 1.

MR. JOHNSON:  That's fine.

THE COURT:  Do you want to substitute this copy in or Exhibit No. 1?

MR. JOHNSON:  Yes.  Let's do that.

THE COURT:  We'll substitute this copy in for Exhibit No. 1, and we'll call it 1 which has been admitted.

MR. JOHNSON:  Very well.

BY MR. JOHNSON:

Q   Exhibit No. 1, can you go to page 50?

A   I'm sorry?

Q   Page 50.

You know what Exhibit No. 1 is Goldman Sachs' report?

A   Yes.

Q   Or a version of it?

A   A version it was, yes.

Q    You recall that those reports all had financial projections associated with them?

A    Yes.

Q    And you participated to some degree, because you were CFO of the Sonics with the Schultz group when they were preparing the Goldman Sachs' report?

A    I participated in some manner, yes.

Q    You participated in some manner in creating these projections?

A    For -- I believe it was for the '06 and '07 years.  That might be true, yes.

Q    We want to look at EBITDA lines for '07, '08, '09 and '10.

          MR. JOHNSON:  Let's focus on '09 and '10.

BY MR. JOHNSON:

Q    Goldman is estimating $3.7 million loss in '09?

A    Yes.

Q    And $1.9 million loss in '10?

A    Yes.

Q    Both of these assumptions are based on the belief that the team would play in KeyArena through the term of its lease?

A    I believe that was based on more than that.  I think it was based on, if I remember correctly, the assumption that they would be moving into either a new building or into a new lease arrangement during that time.

Q    A new building at the -- so there might have been an

assumption that a new building was going to be built, and they would be moving in after the lease was up?

A    That's correct.

Q    But still for the '09-'10 season they would be stuck in -- you know, I say stuck, I have heard Mr. Keller so much.

But they get the opportunity to play with the beautiful sidelines of KeyArena?

A    Yes.

Q    And they get that opportunity, and apparently according to this, Goldman Sachs was saying they would only who $3.7 or $1.9 million?

A    That is what they say, yes.

Q    Let's look at another projection.

MR. JOHNSON:    Objection 78 is a four-page document.

MR. KELLER:    No objection.

BY MR. JOHNSON:

Q    So this is -- I think we may have talked about this in your deposition.

My understanding this is the report that MZ Sports did for Mr. Bennett's group when they were buying the team?

A    I have not seen this report.    So I don't know that.

Q    So I think the evidence has already shown or will show that this was a report done -- I think Mr. Bennett testified about it -- that they needed to do to get the board of governors' approval to purchase the team.

A    I believe -- there were projections that needed to be done.  I believe MZ Sports's projections.

Q    Let's focus on the '09-'10 season.

THE COURT:   Counsel, he said he's never seen this before.

MR. JOHNSON:  Your Honor, I am trying to make a point that a lot of different people with a lot of different views have made a lot of different projections that are wildly different.

THE COURT:  I understand the point.  But I'm trying to figure out -- he just told you that he's never seen it before.  So how can you ask him questions about the report that he hasn't seen?

MR. JOHNSON:  All right.  If the report is not offered into evidence, I will offer it into evidence now.  I think it has been.

MR. KELLER:  Foundation.  No foundation.

MR. JOHNSON:  Has it been offered?

I will save this for MZ Sports, Your Honor.

THE COURT:   Okay.

BY MR. JOHNSON:

Q    Have you seen Exhibit No. 310?

A    I have not.

Q    All right.  How about an exhibit -- we were all talking about 153, Icon three-year outlook.

THE CLERK:  Do you have it?

THE WITNESS:  I don't think so.

THE COURT:  Mine says 153 not used.  There is no 153.

MR. JOHNSON:  I'm sorry, I am reading deposition number on it.  It's Exhibit No. 5.  I apologize.

BY MR. JOHNSON:

Q    Have you seen Exhibit No. 5 before?

A    I have not.

Q    Do you know Mr. Bennett hired consultants to forecast revenues for the team?

A    I knew that he had hired MZ Sports, as I said, to do the projections for the NBA.  But other than that, I'm not aware that he did anything for the team on a going-forward basis.

Q    Did you know he hired Icon?

A    I did know that, yes.

Q    Would you look at page 11.

My first question in the column 2006-2007?

A    Yes.

Q    Does that look like it's the actual -- your actual internal numbers?

A    That does look like our internal numbers, yes.

Q    2007-2008, are those your internal numbers?

A    I would have to look.  But I think so.

Q    You don't think -- what I'm asking, can you tell -- look at the end.

Did you lose $26 million in 2007-2008?

A    That sounds about right.

Q    Did you lose $40 million in 2008-2009?

A    That's not finished.

Q    Okay.  In fact, 2007-2008 is not finished?

A    That's correct.

Well, 2007-2008 is not correct.  That's correct.  It's not finished.

Q    That's the number you said was 24 earlier in your testimony?

A    I said it was 27.6 if I remember right.

Q    Then why did you say that 26.6 looks right here?

A    Sorry.  My apologies.

Q    And really, I'm just trying to figure out which of these numbers are projections if you know.  But you don't.

So we'll move on.

A    I have never seen this report.

Q    Yeah.  All right.

You would agree, Mr. Barth, it's always better for your revenue outlook if the team has a good year?

A    Yes.

Q    And, in fact, just four seasons ago, the 2004-2005, Sonics made an unexpected run at the playoffs.  They were not picked to do well at all, and they had an unexpected run at the playoffs.

A    That's correct.

Q    The team had a financial benefit from that, right?

A    Yes.

Q    I believe in your deposition one of the things you described is that the team sold more single-game tickets than they would normally sell -- I'm sorry --

A    In 2004-2005, that's correct.

Q    And it's because fan interest grew as the team did unexpectedly better than everyone expected them to do?

A    I believe that was one of the reasons, yes.

Q    And the advantage to selling those single-game tickets is that people pay more for them than they do for season tickets?

A    That's correct.

Q    Season tickets tend to be discounted, correct?

A    Season tickets tend to be discounted from single-game ticket prices, yes.

Q    Probably if there is a lot of fan interest and people are showing up to buy single-game tickets, it's less likely they won't show up for the game?

A    I'm sorry, one more time.

Q    If I'm going up and I buy a single-game ticket, it's less likely I'm not going to show up for the game than if I'm a season ticket holder?

A    I can't say that.

Q    So this unexpected good season that you had just four years ago, the benefits of that spilled over into the following season, didn't they?

A    There are certain benefits that come from a winning season that may spill over into next season.

Q    And the benefits were that your revenue increased and ticket sales increased the summer before that next season, now three years ago?

A    I'm not sure I follow what you said.

Q    When the team made the playoffs unexpectedly four years ago, the aftermath, the selling season for the next year, the team benefitted from their good performance the previous year, the year of the playoffs, correct?

A    The team benefitted in some ways, yes.

Q    And how you benefitted is you sold more season tickets for the next year?

A    We sold an incremental 240 new season tickets.

Q    That ended up in that year, the '05-'06 year, the team lost $1.5 million?

A    That's correct.

Q    This year how much did you loose?

A    27.6 million.

Q    So that is $26 million difference in two years?

A    That's correct.  But I think you need to put that into perspective.  Our payroll went down from this year by about

15 to $20 million from where it was in the '05-'06 season.

Q    Two years before Mr. Bennett bought the team the team lost $26 million?

A    Again, I would have to see our financial statements to make sure.

Q    So $26-million loss, $1.5-million loss, whatever-million-dollar loss, $26-million loss?

A    27.6, yes.

Q    $3.5 million of which is litigation expenses?

A    Correct.

Q    That kind of fluctuation is why it's really hard to budget and really hard to predict out into the future in this business, correct?

A    Revenues are much easier probably to predict than team salaries because they change based on trades, and they're a large component of the budgeting process.

Q    You testified when Mr. Keller was talking to you about some contingency plans that you're developing for next year?

A    I don't remember testifying to that.

Q    I'm sorry.

    You talked about if you wanted to give away tickets then you would still have to take admissions tax on those?

A    Yes, that's correct.

Q    That was the reason why you were explaining that things might be difficult next year?  What was the point of that?

A    I was just pointing out that when we give out tickets, we actually have to pay admissions tax associated with that.

Q    But you did talk to me a couple weeks ago about your contingency plan, correct?

A    That's correct.

Q    Giving out tickets isn't any part of your contingency plan right now, is it?

A    We're looking at all areas.  We're looking at yield, we're looking at variable cost, and we're looking at kind of everything on the scope, based on what we think will be a very difficult time.

Q    But when I talked to you two weeks ago you told me you were looking to reduce comps and increase ticket prices, correct?

A    That's the yield that I was talking.  About not increase ticket prices.  I said increase the yield.

Q    In any event, no matter what happens over the next two years you understand and agree that you are going to do the best you can to make the team do as well as it possibly can?

A    I will do everything I can, yes.

MR. JOHNSON:  Thank you.

THE COURT:  Any redirect?  I'm sorry, recross.

RECROSS EXAMINATION

BY MR. KELLER:

Q    There was a point, Mr. Barth, where you wanted to give a

comparison of the Nielsen ratings that the Sonics enjoyed during their last foray into the playoffs several years ago which was 3 point something.  You wanted to give a comparison.

Do you recall that?

A   Yes.

Q   Could you tell us what it is you wanted to share with us?

A   Basically trying to put it into a comparison of ratings and along the lines of what the Mariners pulled when they were in their playoff runs and along those lines.  They were pulling 14s and 15s.

Q   Again --

MR. JOHNSON:  Objection, lack of foundation. Move to strike.

THE COURT:  Just a minute.

Are you laying foundation?

MR. KELLER:  I was going to try.

BY MR. KELLER:

Q   Is it part of your job to keep abreast of how your Nielsen ratings compare with your competitors in professional sports and continue aspects of out local town?

A   Yes.

Q   As part of the ordinary course of your activities, do you monitor what Nielsen ratings are for Mariners, Seahawks, that sort of thing?

A   I wouldn't say I overall monitor them, but I do look at them, yes.

Q   Is that what you based your answer on?

A   Yes.

MR. JOHNSON:   Same objection.   I would like to know how he monitors the Nielsen ratings in his deposition --
Mr. Barth, in your deposition you told me that that was not public information.

A   That's true.   We do not -- Sonics don't publicize those.

MR. JOHNSON:   Object, move to strike unless he can tie up how he gets nonpublic information about the Mariners.

MR. KELLER:   I have nothing further to add.   I don't understand the objection.   He says he has -- he monitors, keeps abreast of the information.   It's part of his job.

Offer as an illustrative comparison.

THE COURT:   I know what the Nielsen ratings are. They're talked about frequently in the press.

What I don't know is how people get access to them.

Do you have a subscription like you get by Consumer Reports or any other data compilation?

MR. KELLER:   Thank you.   That helps.

BY MR. KELLER:

Q   Why is it you have access to the Nielsen data?

A   I do not have access to the Mariners ratings.   I only know that from what I have seen reading in the papers.   As you

said, along those lines, when they're released.  I know what they were during the timeframe that the playoffs were going on and their time of runs.

Q   In terms of your access to Nielsen ratings about your team, how do you get that?

A   From Fox Sports Northwest, yes.

MR. KELLER:  Thank you.  That's all I have.

REDIRECT EXAMINATION

BY MR. JOHNSON:

Q   Are you keeping track of the Nielsen ratings right now?

A   For the -- for the they're not playing this season --

THE COURT:  For the trial?

MR. LAWRENCE:  We're only on Court TV.

MR. JOHNSON:  Sketches are nice.

BY MR. JOHNSON:

Q   No, what I really was trying to get at is the Mariners aren't having such a great year this year, are they?

A   They are not.

Q   Would you be surprised to learn their Nielsen rating right now on Fox Sports Northwest is 1.1?

A   I would be surprised to learn that, yes.

Q   You have no basis to disagree with that?

A   I know that in the past they've never been that low.

Q   They're having a pretty bad year aren't, they?

A   They are.

MR. JOHNSON:  No further questions.

THE COURT:  Anything further?

MR. KELLER:  No.

THE COURT:  Thank you.  You may step down.  That next witness, please.

MR. LAWRENCE:  We would call Lon Hatamiya.

LON HATAMIYA

The witness, after being duly sworn, testified as follows:

THE CLERK:  State your full name and spell your last name for the record.  It is Lon Hatamiya, L-O-N, last name H-A-T-A-M-I-Y-A.

DIRECT EXAMINATION

BY MR. JOHNSON:

Q   Good afternoon, Mr. Hatamiya.  It's getting late in the afternoon, and you're another expert who is going to talk to us a little bit about numbers.  We're going quickly into your background and find out what your basic views are and break for the day and get back and lay the foundation.

So I would like to start with your background as it relates to your qualifications for your expert report.

A   Yes.  My undergraduate degree is in economics from Harvard University.  I also have my law degree and MBA Master's of Business Administration.

Q   How about postgraduate employment that you may have been involved in that lends to what ultimately became your expert

report?

A   Well, currently I serve as an economist and director for Navigant Consulting.  Prior to that, I served three and a half years with as an economist and director with LECG. Before that I served in the public sector 11 years.

Q   Let's stop there.

Did you have more than one role in the public sector?

A   I did.

Q   Let's go from the first one up to before you started doing consulting work?

A   I was an appointee of President Clinton at the U.S. Department of Agriculture, where I headed up the Agriculture Marketing Service.  And then subsequently, I was the administrator of the Foreign Agricultural Service.  I returned to California when Governor Davis was elected as his Secretary of Technology Trade and Commerce.

Q   What sorts of opinions were you asked to give in this case?

A   Most specifically I was asked to provide an independent objective analysis to identify certain economic contributions that the Supersonics make to the local economy.

Q   Did you perform some research and come up with such an opinion?

A   I did.

Q   What was the opinion?

A    My opinion was that the SuperSonics make a positive contribution to the local economy.

Q    Can you, in general terms, give us a sense of the conclusions that you drew?

A    Conclusions I drew were specific utilizing an input/output model widely acclaimed and recognized and used by academics and economic consultants and public sector officials to determine the economic impact of specific projects within their community.

Q    Let me stop you there.

Let's talk about what your background qualifies you to work with these input output models.

A    I think a number of different things.  My general background, becoming an expert about regional, national, international economics serving not only at the U.S. Department of Agriculture and also as the Secretary of Commerce for California, which at the time I served was the fifth largest economy in the world.  And I focused on regional impacts and regional economics in all of those roles.

Q    Let's focus on how you actually went about generating the model for this case.  Okay?

What was the first thing that you did?

A    The first thing I did as I mentioned I used an input/output model.  I had to identify appropriate inputs.

In this case, it was straightforward.  Utilized financial statements and more specifically the consolidated income statements of the SuperSonics.

Q   So you got your inputs.

Now, how did you go about getting your outputs?

A   Outputs were also straightforward.  Because as an economist, I have, over the past several years, engaged in economic impact studies, and I have used a very specific model, which is called the RIMS II Model, Regional Input/output Modeling System that utilizes the Department of Commerce data.

Q   All right.  So you have your inputs and you have your outputs.  It seems pretty straightforward.

A   It is a straightforward model.  The complexity of the model is in how you choose your inputs and how you apply to output multiplier model that is presented by, again to the Department of Commerce Bureau of Economic Analysis.

I took line by line, as I mentioned, the consolidated income statements from the Sonics over the last five years.  And going line by line, very labor-intensive, looked at those very specifically to match them up with multipliers that are also identified in this RIMS II model.

Q   Using this model, did you come to a conclusion as to the total economic impact of the Sonics in the region?

A   I did.

618

Q   Can you explain what we're seeing on slide number 1?

A   If I could go through this specifically.  As I mentioned, I looked at the last five years of available financial statements from the Sonics.  I started 2003.  This is the same approach I took for each year.  Again, very labor intensive.  I went down by all the expenditures year by year that the Sonics made.

And those are outlined very specifically in these financial statements.  And then I applied those very specifically to the appropriate multiplier.  These multipliers apply to roughly 400-plus different industries that are specific to the Seattle region.

I came up with these numbers based upon the multiplier model.  It ranged from 183 -- $183.3 million in 2003 to a high of $193.6 million in 2004; 2005, slightly less than that, $189.9 million; 2006, $184 million; 2007, $188.2 million.  It was about a five-year average of about $187.8 million over that five-year period.

MR. JOHNSON:  Your Honor, this might be a good time to break for the day.

THE COURT:  All right.  Thank you, sir.  You can step down.

(Court adjourned.)

619

C E R T I F I C A T E

We certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/S/ Barry L. Fanning, CCR, RMR, CRR

/S/ Nichole Rhynard, CCR, RMR, CRR