620

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

CITY OF SEATTLE,                    )  Cause No. 07-01620-MJP
                                    )
          Plaintiff,                )  Seattle, Washington
                                    )  June 19, 2008
     vs.                            )  Volume IV
                                    )
PROFESSIONAL BASKETBALL CLUB,)
LLC,                                )
                                    )
          Defendant.                )
                                    )
_____)

BENCH TRIAL
VERBATIM REPORT OF PROCEEDINGS
BEFORE THE HONORABLE MARSHA J. PECHMAN
UNITED STATES DISTRICT JUDGE

APPEARANCES:

  For the Plaintiff:        Paul Lawrence
                            Jeffrey Charles Johnson
                            Gregory Narver

  For the Defendant:        Bradley S. Keller
                            Paul Taylor
                            James Webb


  Reported by:             Barry L. Fanning, CCR, RMR, CRR
                           Nichole Rhynard, CCR, RMR, CRR


Proceedings recorded by mechanical stenography, transcript produced by Reporter on computer.

EXAMINATION INDEX

EXAMINATION OF:                                                    PAGE
  LON HATAMIYA
  DIRECT EXAMINATION            BY MR.  JOHNSON            622
  CROSS-EXAMINATION             BY MR.  TAYLOR             635
  REDIRECT EXAMINATION          BY MR.  JOHNSON            655
  RECROSS-EXAMINATION           BY MR.  TAYLOR             657
  SHERMAN ALEXIE                                          658
  DIRECT EXAMINATION            BY MS.  JENSEN             658
  REDIRECT EXAMINATION          BY MS.  JENSEN             686
  MATTHEW WADE
  DIRECT EXAMINATION            BY MR.  NARVER             689
  BRAD R.  HUMPHREYS
  DIRECT EXAMINATION            BY MR.  TAYLOR             717
  CROSS-EXAMINATION
  REDIRECT EXAMINATION          BY MR.  TAYLOR             756
  MITCHELL ZIETS
  DIRECT EXAMINATION            BY MR.  TAYLOR             760
  CROSS-EXAMINATION             BY MR.  JOHNSON            781
  REDIRECT EXAMINATION          BY MR.  TAYLOR             803
  DEBORAH JAY
  DIRECT EXAMINATION            BY MR.  WEBB               805
  CROSS-EXAMINATION             BY MR.  JOHNSON            816

EXHIBIT INDEX

EXHIBITS ADMITTED                                                  PAGE
  336                                                      676
  337                                                      677
  218                                                      693
  219                                                      699
  610                                                      764
  78                                                       796
  614                                                      809
  333                                                      819

P R O C E E D I N G S

_____

THE COURT:  Counsel, this morning I wanted to bring you up-to-date on the time.  Yesterday the plaintiffs used 192 minutes, the defense used 105.  That means the running balances for the plaintiffs 409, for the Defense 488.  I also wanted to let you know that I have read Mr. McClendon's deposition.

MR. KELLER:  When you say the running balance, is that time remaining or time elapsed?

THE COURT:  Time remaining.  That's what's left. Every day you get a declining balance, just like the bank.

MR. KELLER:  That assumes I had a balance.

THE COURT:  Mr. Johnson.

LON HATAMIYA

CONTINUED DIRECT EXAMINATION

BY MR. JOHNSON:

Q   Good morning, Mr. Hatamiya.  We left the trial yesterday with discussing your first conclusions about the economic impact of the Sonics in Seattle.  We have a demonstrative that shows your conclusions.  Let's quickly explain again how we get to these numbers.

A   Yes, Mr. Johnson.  If I may, again, these are the total aggregate economic benefits that the Sonics bring to the

local economy.  The local economy in this instance is defined as the Seattle-metropolitan division, which includes King County and Snohomish County.  I am pronouncing that correctly.  This is derived directly from the inputs I received from the Sonics' consolidated income statements, from each of the five previous years, starting in 2003 going through 2007.

Q    Let me stop you there for a second.  What do you mean when you say, inputs from the Sonics' financial statements?

A    The way the RIMS -- the two model is established, it is established as a national input/output model, and it shows goods an services purchased within the economy and the outputs are good and services sold.  And so the inputs in this case are the expenditures and the revenues of the Sonics from year to year.  And I took those line by line of items and categorized those with the appropriate outputs that are also provided through this RIMS-2 study.

Q    Did you make any adjustments to the inputs?  In other words, inputs are the Sonics expenditures.  Did you make any adjustments to the raw numbers that you got from the financial statements?

A    Yes, Mr. Johnson.  I took very conservative approach in applying the inputs.  I assumed that only 50 percent of the players' salaries would be spent in the local economy, and I also neglected to use certain line items within the

expenditures that didn't fall within any specific category. So, again, I took a very conservative approach in analyzing those inputs.

Q   Why did you assume that only 50 percent of the players' salary line item would be spent in the local economy?

A   I think that was a presumption made by the fact that not all the players live here full-time.  I think subsequent to that I received a listing of where the players lived, and actually more than 50 percent of the players live within the Seattle area.

Q   You mentioned that the region that you studied was I believe you called it the Seattle-metropolitan region?

A   Metropolitan division, that's correct.

Q   That included King and Snohomish counties?

A   That's correct.

Q   Why did you use that region?

A   That was the most specifically defined area based upon the data that is available.  It is based upon census data, it is based upon Department of Commerce and Bureau of Economic Analysis data.  And the beauty of the RIMS-2 models is it allows you to identify very specifically geographic regions. The smallest region for this area was that two-county area that I mentioned.

Q   So that was the smallest region that you had appropriate data for that -- Let me back up.  You got your data from the

government?

A    That's correct.

Q    And the government tracks this data or cuts it up into various regions?

A    That's correct.

Q    In this situation this was the smallest region that you could get your hands around from the government?

A    Yes.    That's correct, the most specific data that is available.

Q    So the average economic impact in Seattle on or below this time period in the region is 187 million?

A    That's correct, almost 188 million.

Q    What do you mean by economic impact in the region?

A    That is the contributions that they make, not only the expenditures that the Sonics are making, but based upon the multipliers, the way they pay the direct, indirect, induced impacts that are incurred by those expenditures in the economy.    Once a dollar is spent it is multiplied many times over by the services and goods that are purchased within that economy.    And so the expenditures from each of these given years multiply over that period of time within that specific year time and you come out with a much greater number of the economic impact into the local community.

Q    All right.    Did you use this data to come up with any other conclusion about the Sonics impacting the local

economy?

A    Yes, I did.

Q    Can we get the next slide, John?  Did you come up with a conclusion as to the number of jobs that are created or supported by the Sonics in Seattle?

A    Yes, I did.  The RIMS-2 analysis also provides multipliers for employment.  And based upon the total economic impact that I showed previously, I came up with a number that the Sonics create and support nearly 1,200 to 1,300 full and part-time jobs per year over that same five-year period.

Q    All right.  You are using two terms, create and support. Let's take create first.  What do you mean that the Sonics create some subsection of this?

A    Well, they create these jobs directly.  Their expenditures create jobs.  Out of this number we know specifically there are roughly 120 jobs that the Sonics provide each year.  I think that varies from 120 to 125 over that five-year period. So those are directly created by the expenditures of the Sonics.

Q    You are talking about people that work for the Sonics?

A    That's correct, including the players, including the management, including the day-to-day operations of the team. That's correct.

Q    So that makes sense, the Sonics are here, they have to employ people.  Where do these other thousand or so jobs come

from?

A    These are all indirectly or directly related to those expenditures that are made by the Sonics.  Their contribution in the economy support these jobs and actually create many of these jobs.  The way the RIMS-2 model is established is it depends upon earnings, household income, Bureau of Labor statistic numbers of specifically people placed in a number of industries across the Seattle economy.  Without these expenditures by the Sonics these jobs would not exist.

Q    All right.  Using the same data did you come up with any other opinions?

A    I did.

Q    What were your other opinions?

A    My other opinion was that what also is provided in the RIMS-2 analysis are earnings multipliers by the money and the economic benefits that are generated by the expenditures of the Sonics.  It also creates an increased earnings base within the Seattle economy.

Q    Next slide.

A    Those earnings, again, creates anywhere from 25.3 million, which was the low in 2006, to a high of about 26.3 million in 2005.  But, again, this is additional household income that is generated in terms of earnings multipliers because of these expenditures and economic activity engaged in by the Sonics from year to year.

Q   Okay.   Let's talk about this kind of input/output study that you are doing here.   Is this something that you invented or is this something used elsewhere?

A   No, this is a widely accepted, widely acclaimed model -- input/output model that is used by public sector officials, by private entities in a broad range of activities.

Q   Can you give me some examples of where this is used elsewhere?

A   Well, in the public sector it is used, for example, by the Department of Transportation to determine the impacts of new highway investment, new airport development, new port development, for example, across the country.   In the private sector it is used by economic development specialists within the local community, oftentimes the chamber of commerces and local governments, to take a look at what impacts would be for the establishment of a new amusement park, the creation of a new shopping center, the creation of a new retail outlet.

Q   Are you aware of the uses of this study -- these kinds of studies with respect to professional sports teams?

A   Absolutely.   It has been used many times over for the impacts of a new sports arenas across the country.

Q   Did you have the opportunity to review any uses of impact statements like this that were used in Oklahoma?

A   I have.   In my review of these --

MR. TAYLOR:  Objection on the grounds of relevance, your Honor.  This is about the Seattle economy, not Oklahoma, which is a different economy.

MR. JOHNSON:  Your Honor, the PBC has used economic impact statements very similar to these in their effort to obtain funding in Oklahoma City.  To the extent Mr. Taylor is going to criticize Mr. Hatamiya for using this kind of study, I think it is relevant.

MR. TAYLOR:  This is the same study they tried to go into the other day and it was excluded or kept out.

MR. JOHNSON:  It has been admitted, your Honor.

THE COURT:  This study has been admitted?  What is the exhibit number?

MR. JOHNSON:  It is Exhibit 182.

THE COURT:  Mr. Taylor, has it been admitted.

MR. TAYLOR:  I am told it has.  I still object on the grounds of relevance with this witness.

THE COURT:  Overruled.

BY MR. JOHNSON:

Q  Mr. Hatamiya, can you turn to Exhibit 182?

THE COURT:  One clarifying question.  How do you know this is the methodology that was used in Oklahoma?

MR. JOHNSON:  I can ask Mr. Hatamiya.  I don't, your Honor.

THE WITNESS:  Mr. Johnson, in answer to your

question, I have had the opportunity to review the various documents in preparation for this trial. A study that was prepared for the City of Oklahoma -- Oklahoma City --

BY MR. JOHNSON:

Q   Let me stop you there. To refresh your recollection, I think this was prepared for the State of Oklahoma?

A   I believe that is correct. And based upon my review of this they used very similar input/output analysis. I took a look at the ultimate numbers. They were using very similar input and output multipliers that I utilized in my own study.

THE COURT:   That wasn't the question. Did PBC use this methodology?

MR. JOHNSON:   Your Honor, let me clarify.

BY MR. JOHNSON:

Q   Mr. Hatamiya, would you take a look at Exhibit 182?

A   Yes.

Q   Is this the study that you are referring to that you looked at?

A   Yes. It is referred to as the Sonics relocation proposal. I believe at the bottom it says Professional Basketball Club. I believe they paid for that study.

Q   Can you turn to the second page of the study?

A   Yes.

Q   Can we highlight the section "projected total economic impact?" Can you highlight the "annual amount?"

Mr. Hatamiya, can you discuss this section -- What makes you think that the PBC -- the folks at PBC hired were using a model similar to yours?

A   Because in order to reach the 171.7 million total economic impact on an annual basis -- That is not just directly related to the expenditures made by the basketball team within that region. It is also multiplied by some factor and it is probably the appropriate geographic factor in the Oklahoma City area or the State of Oklahoma.

Q   Because the team isn't going to spend -- isn't going to move to Oklahoma and suddenly start spending $171 million in the local economy?

A   That's correct. They don't spend that much in the Seattle economy.

Q   So this is the indirect benefits of the monies they will spend in Oklahoma that this report is trying to --

A   That's correct. I came to the conclusion it is the direct, indirect and induced benefits that are provided to that local economy. And it is very similar to the analysis that I provided here for the Seattle economy.

Q   All right. How did you first come into contact --

THE COURT:   Sorry, Mr. Johnson. I need a clarification here. The document that has been introduced, I can't see any of the calculations that comes up with that number, so I don't know how it is that your expert indicates

that it is the same calculation.

MR. JOHNSON:  Can I lay some more foundation about that, your Honor?

THE COURT:  Certainly.  Go ahead.

BY MR. JOHNSON:

Q   Mr. Hatamiya, I want to turn to your background.  How did you first come into contact with these input/output studies?

THE COURT:  Mr. Johnson, that doesn't answer my question.  I am asking -- I am trying to look at this document that you put into evidence.  Where can I find the calculations that Mr. Hatamiya says are the same ones that he used in his calculation?

MR. JOHNSON:  Your Honor, I am happy to ask Mr. Hatamiya.  I'm sure you don't want to hear this from me.

THE COURT:  No, I don't.  I would ask for some clarification because I am trying to figure out if I have the whole document here.

MR. JOHNSON:  I think what you are looking at is a summary report.  I think what Mr. Hatamiya is saying, is that based on the way the numbers come out he can --

THE COURT:  Ask the question, please.

THE WITNESS:  Mr. Johnson, I will be glad to explain how I reached that determination.  I reviewed just the available numbers, your Honor, that were here.  And based upon my knowledge of the expenditures made by the Sonics

within the local economy here, you can't reach that $171.7 million level without some multiplier impact.

As I recall from my review of other documents there were multipliers that were created for the State of Oklahoma that were utilized in this study. And very similar to the multiplier input/output analysis that I provided.

And as I looked at this study I thought if I could generate those same input/output numbers that I utilized here from the RIMS-2 I would more than likely come up with a similar number to this in Oklahoma. But I wasn't asked to do that. I was only asked to review how they reached this number.

BY MR. JOHNSON:

Q   Mr. Hatamiya, if you turn to Page 4 of this exhibit, which is I think 14403?

A   Yes.

Q   And you look at the note 1 near the bottom of the page.

A   Yes. I am glad you pointed that out. That is the ultimate multiplier, which is based on 1.89 and -- That is for the employment numbers. Very similar to the multiplier that -- I would say it is the same one because a regional multipliers are different in Oklahoma than they are in Seattle. But it is a similar use of a multiplier -- an output multiplier to come to that ultimate number.

Q   If you turn to the last page of this exhibit,

Mr. Hatamiya, there is a section where it says, "total ancillary impact?"

A   Yes.  I am glad you noted that again.  It says based on --

Q   Projected --

A   Based on a 2.67 times multiplier effect.  Again, that goes down -- it is about three-quarters of the way down that page. Very similar.  It comes up with the number 126.377.

Q   It is difficult to read with the picture of Kevin Durant there.

A   Again, another output multiplier utilizing the study similar to the ones I have used in my study.

Q   Mr. Hatamiya, how did you first come into contact with these multiplier analyses?

A   During my tenure as Secretary of Technology, Trade and Commerce of California I had oftentimes many private sector entities that came forward with proposals for state support, and they had utilized many of these input/output analyses to show the total economic impact of proposed new developments in the State of California.

Q   Mr. Hatamiya, if the Sonics move from Seattle to Oklahoma City where is that $181 million a year going to go to?

A   Well, it may go away.  There is no certainty that money will continue to be spent here.  Obviously the money that is spent by the Sonics were not be spent in the Seattle economy.

Q   Where will that be spent?

A   It will be spent wherever the team moves to.  And I guess in this study they would presumably be in Oklahoma City.  So much of that impact would shift to Oklahoma City.

MR. JOHNSON:  Thank you, Mr. Hatamiya.

CROSS-EXAMINATION

BY MR. TAYLOR:

Q   Good morning, Mr. Hatamiya, my name is Paul Taylor and I represent the Professional Basketball Club.

A   Good morning, Mr. Taylor.

Q   182, that is not Oklahoma City, that is its entire state of Oklahoma that was being measured under this multiplier, right?

A   That's correct.

Q   I want to talk first about the economic impact on Seattle as the Sonics leave Seattle.  It is your opinion, is it not, that if the Sonics leave the people who buy tickets to the Sonics won't spend that money on something else, right?

A   It is my opinion that they won't be spending it on the Sonics, that's true.

Q   Isn't it your opinion that they will simply stop spending it?

A   To some extent that is correct.

Q   Can we publish the deposition of Mr. Hatamiya, please? Can we have Page 27, Line 10, please, on the screen?

    "It is your expert opinion that if the Sonics leave the

people who buy tickets for the Sonics won't spend there money on something else, true?"  Answer:  "True."

In fact, it is also your opinion that the fans will save their hard earned money rather than spend it on something else, their Sonics money, right?

A    That's correct.

Q    It is also your opinion that some of these people might actually take their Sonics money and put it in a tin can in the backyard, right?

A    I guess that is up -- depending upon the saving patterns of the people of Seattle, that's correct.

Q    Let's take a look at 28 Line 4.  "It is your opinion they will just stop spending their money, go into a tin can in the backyard or whatever?"  "That's part of it.  That's absolutely right."

A    I think that is exactly what I just answered, Mr. Taylor.

Q    Let me ask you some questions about that.  You are basically offering an opinion on consumer spending patterns, right?

A    I was offering an opinion by the question you asked me in response to an expert opinion you had performed.

Q    And did some research and you concluded that people will stop spending, right, stop spending their Sonics dollars?

A    I did some research that reflected that consumer spending, if your first choice is not available you are not necessarily

going to spend it on another choice.

Q   Let's talk about that, please.   Exhibit 609.

MR. JOHNSON:   That has not been provided to us.

THE COURT:   I am assuming its impeachment.

BY MR. TAYLOR:

Q   Could we have Exhibit 609 up on the screen?  This is the article you cited --

MR. JOHNSON:   Objection, your Honor.   This has not been admitted.   I am not allowed to put stuff up on the screen that hasn't been admitted.

THE COURT:   This is used for purposes of impeachment. Let's take a look at the rule.

MR. JOHNSON:   The learned treatise exception?

THE COURT:   The learned treatise exception.   The document does not have to be admissible.

MR. JOHNSON:   All right.

BY MR. TAYLOR:

Q   Exhibit 609, this is the article you cite in your report for the proposition that there is a significant body of literature that indicates when consumers first choices are unavailable they don't automatically spend their dollars on other choices but make no spending choice at all, right?

A   That's correct.

Q   Let's take a look at what this article really says.   And by the way, in this article they weren't looking at sports

638

dollars, were they?

A    No, they were looking generally at consumer patterns.  I think that was a reference that I made in my response to the opinion provided by your expert.  I also mentioned that was a large body of other marketing and consumer choice documents that I didn't have time to review or reflect upon because I was asked to provide an opinion within a day of receiving that expert report.

Q    So you were in a hurry and this is the article you grabbed?

A    This is the article that was provided to me by colleagues of mine at the UC Davis Graduate School of Business that are experts in marketing.

Q    Let's take a look at Page 222 of the document.  If we could blow up the top table?  So this article was looking at people's consumer behavior in buying cordless phones, radio, cassette players, auto focus cameras, those kinds of consumer goods?

A    I believe that was the case.

Q    All right.  And what this article studied was what people do if they look at one phone versus another phone and they can't make a decision, right?

MR. JOHNSON:  Excuse me, your Honor.  We don't have table two in the documents that was provided to us.

THE COURT:  I don't either.  I am sorry.  It looks to

me like it is out of order.  Turn the next page.  It is on the backside.

MR. LAWRENCE:  We have every other page.  I have a figure two, table three; figure one, table seven.

THE COURT:  Mine goes figure one, table three; figure two, figure three.

MR. LAWRENCE:  Right.  But this is table two.  None of us have a table two.

MR. TAYLOR:  I can solve the problem.  I will work from the first page at this point.

BY MR. TAYLOR:

Q   If we could blow up the synopsis at the start?  If we could have the third line highlighted?  "Uncertainty may lead to choice deferral."  This article was talking about people deferring choices to spend, not stopping spending, right?

A   No, I think it went beyond that as well.  That was my interpretation and my opinion of the conclusions of this article, as well as a review of other consumer choice materials, and in discussions with consumer choice experts and marketing professors from certainly educational institutions.

Q   Well, let's read a little more about what this article really says.  If we could go to the fifth line down -- I'm sorry, starting at the fourth line, building on research.  It says, "building on recent research, the article shows that

the decision to defer choice is influenced by the difference in attractiveness among the alternatives provided." It doesn't say stop spending, it says "defer choices," right?

A   That's correct, that's what this says.  Again, if you are asking me about my interpretation of it --

Q   I didn't ask you --

A   I think I have already explained that.  I'm sorry, Mr. Taylor.

Q   Sir, I asked you what it says, not your interpretation. We can all read it.  Let's look at the first paragraph of the article.

"Consumers often face situations requiring choosing among several alternatives in the marketplace."

Now, if we go five or six lines down it says, "a recent analysis of a sample of consumers."  "A recent analysis of a sample of consumers finds that the difficulty of selecting a single alternative was one of the most important causes for delaying a number of purchases."  Do you see that?

A   Yes, I do.

Q   This says "delay," you say stop, fair?

A   Yes.

Q   Let me ask you another question about that.  Can we have Exhibit 525 on the screen, please?  Page 3, please.

MR. JOHNSON:  It has not been admitted, your Honor.

MR. TAYLOR:  It is for impeachment, your Honor.

THE COURT:   That doesn't stop you from having to admit it.   What are you intending to do?

MR. TAYLOR:   Just for impeachment purposes.   I am not offering to admit it.

THE COURT:   First of all, what is it?

MR. TAYLOR:   This is a document prepared by the Seattle City Council staff studying the issue of the impact of sports teams on the City of Seattle.

THE COURT:   Let's lay some foundation here, please.

BY MR. TAYLOR:

Q   You indicated that you looked at the research and the literature that was out there on sports and economics and the economic impacts on cities?

A   I don't recall saying that.   I looked at the research and impacts of the RIMS and input/output studies.

Q   Did you look at anything -- any literature on the economic impact of sports teams in preparing your opinion?

A   Aside from the ones that were provided to me that I think I have already mentioned from Oklahoma City, I did not.

Q   Did you read any economic journals, for example?

A   I read economic journals about the effectiveness of the RIMS-2 analysis.

Q   Did you read anything at all about the impact of sports teams on local economies?

A   I did not.

Q    Did you look at the impact of sports teams on county economies?

A    I did not.

Q    Or on the impact of sports teams on King County and Snohomish County?

A    Only from my own report.

Q    The City's lawyers, did they provide you with this study prepared by the council staff?

A    I don't recall reviewing this study.  No, I do not.

Q    Well, do you agree or disagree with the following conclusions, sir?  "The economic literature is unanimous that the presence of a pro sports team has no measurable impact on a local economy."  Agree or disagree?

A    I disagree.

Q    Do you understand that that is what the Council's staff told the Seattle City Council?

        MR. JOHNSON:  Objection, your Honor.  How is he supposed to know what the Council's staff told anyone?

        THE COURT:  Isn't that part of the point, that he doesn't know that?  I am trying to understand your objection, Mr. Johnson.

        MR. JOHNSON:  Lack of foundation, your Honor.

        THE COURT:  Overruled.

BY MR. TAYLOR:

Q    Do you understand that the Seattle City Council staff told

the City Council that the economic literature is unanimous that there is no measurable impact from a sports team on a local economy?

A   I think, as I mentioned, Mr. Taylor, I am unaware of any communication from the City staff to the City Council.

Q   Do you understand that they went on to say that there are few areas of economic analysis where the opinions are unanimous -- that the opinions are unanimous that there is no impact on local economies from sports teams?  Do you understand that's what the Council was told?

A   I do not understand that, because I was unaware that is what the Council was told.

Q   Let me ask you some other questions, just basic supply and demand.  By the way, you have a Ph.D. in economics?

A   I do not.

Q   A Masters degree in economics?

A   I have a Masters in business administration with a concentration in economics.

Q   Economics or was it finance?

A   It was economics.

Q   Let's talk about supply and demand.  You understand that the Sonics have revenues, right?

A   Yes.

Q   And they take those revenues -- they get those revenues from selling tickets and suites and sponsorships and the

like, right?

A    Correct.

Q    And this is money that comes out of the local economy and into the Sonics' pockets?

A    Correct.

Q    Then the Sonics turn around and use those revenues to pay their expenses, to get the inputs, I think you called them, right?

A    That's correct.

Q    And those input payments they make when they buy raw materials and such, that's what you take and you multiply to get your number, right?

A    Through the various industries and multipliers that are provided, that is correct.

Q    I want you to make an assumption for me.  I know you disagree with it.  I want you to assume that if consumers can't buy Sonics tickets they will spend their money on something else.  Okay?  Will you make that assumption for me?

A    As you have already noted I will make that assumption but I disagree with that.

Q    I recognize that.  But if those Sonics dollars are spent elsewhere then those businesses will have more revenues, right?

A    I think it depends upon the model.  It depends upon the type of expenditures that are made.  I think you are

comparing apples to oranges.  The expenditures made by the Sonics are very specific.  They go into specific goods and services within the economy.  Now, how somebody else spends would be very different.  And in this model the multipliers are very different, so the impacts upon the economy will be very different.

Q   We are going to get to that, Professor -- I'm sorry, Mr. Hatamiya.  But for right now would you agree that if this money is not spent on the Sonics, and we are making the assumption they are going to spend it elsewhere, a simple question, the businesses where it is spent will have more revenue, right?

A   I don't know about more revenue but they will have those expenditures whichever way they are spent.

Q   They will have revenue that was being used to purchase Sonics tickets that is now being used, for example, to purchase Mariners tickets?

A   That's if you make that jump to the conclusion.

Q   I understand that.  You would agree then that, for example, the Mariners will have more revenues?

A   That's only if I agree that the assumption is --  You are asking me a question that I don't agree with the basic premise of.  So to presume the understanding, I can't agree with that.

Q   I understand that.  But if -- We will take it a step

further.  Assume the Mariners do have more revenue from whatever source.  Okay?

A   The way they are playing right now that is probably hard to determine, but that is true.

Q   That may well be.  They will have more revenue to spend on goods and services, right?

A   If there is added revenues to their bottom line, that's correct.

Q   And so that will increase -- through your multiplier that will increase the economic activity generated by the Mariners, right?

A   Based upon their inputs, that's correct.

Q   So if I am right that Sonics dollars will be spent elsewhere, those dollars will reverberate through the economy just like it would have been if the Sonics were spending them, right?

A   Only if you are right in your assumption, that's correct.

Q   The Sonics' payroll is about what, one one-thousandth of the greater Seattle economy -- or greater Seattle payroll?

A   I don't know the exact number of that.

Q   Does that sound about right?

A   I can't make a conclusion because I don't know the numbers and the comparisons.  I wouldn't answer that accurately.

Q   Do you remember reading Mr. Humphreys' report?

A   I do.

Q    And he talked about what percentage of the Seattle payroll consisted of the Sonics' payroll?

A    Yes, he did.

Q    He said one-tenth of one percent?

A    I don't recall exactly what number he used.

Q    Could the witness be shown Exhibit 113, please?  Take a look at Page 9, please.  Top paragraph.  Does that refresh your recollection that the payroll of the Sonics represents approximately one-tenth of one percent of the total metropolitan area payroll?

A    Well, it refreshes my recollection that's what Professor Humphreys says.

Q    In order of magnitude you wouldn't disagree with it, would you?

A    If those numbers are correct.  Again, I don't have any justification or basis to determine that at this point.  This is Dr. Humphreys' report.

Q    Let me ask you a question.  The Sonics generate, you said, $187 million a year in total economic activity?

A    That's correct, average over the last five years.

Q    That is almost a billion dollars over the last five years, right?

A    If you multiply that out it is less than a billion, that's true.

Q    Just shy of a billion?

A    Just shy of a billion.

Q    If one-tenth of one percent of the payroll in town can end up generating by the time it is spent and re-spent almost a billion dollars in five years, doesn't that mean if you take all the rest of the payroll, the other 999, that you would really end up with, under this multiplier analysis, a net economic impact of about a thousand billion dollars in five years, right?

A    I don't follow that analysis.  Mr. Taylor, if you would allow me to answer that question --

Q    Certainly.

A    I think you are asking me just primarily based upon the salaries.  My analysis included much more than just salaries. The salaries were a component of the entire expenditures made by the Sonics.  And my analysis shows what the total economic impact of those were.  And not to minimize what that impact is on the Seattle economy.  It is quite large, absolutely.

Q    Would you agree that payroll -- the size of payroll is a proxy for measuring the size of a business?

A    I guess it depends upon the type of business you are involved in.  In this instance it is a percentage of the total expenditures that are made.

Q    So if the size of the Sonics business was one-tenth of one percent of the total Seattle economy then the Seattle economy would be generating 999 times more than the Sonics?

A   Again, I don't follow your line of reasoning or your question here.

Q   I am just wondering if --  You would agree the Sonics are a small business, right?

A   Not in the terminology of -- a definition of a small business.

Q   60 to $80 million, smaller than a Macy's for example?

A   I don't know what Macy's is.  I can't make that comparison.

Q   Well, if a business the size of the Sonics can generate a billion dollars in five years can you tell us how many billions of dollars are generated by all the Seattle businesses in five years, or do you know?

A   Not without doing an empirical study, not without doing a similar economic analysis that I performed for the City of Seattle.

Q   By the way, when you took a look at Mr. Humphreys' study, did you ask the City's attorneys to give you any prior analyses that the City had done of the impact of sports teams on the local economy?

A   I did not because I was a unaware that any had been done.

Q   Your experience using the RIMS-2 process, my understanding is that have you done it five times before this case?

A   That's correct.

Q   And four of those five times were you working for

Wal-Mart?

A    That's correct.

Q    You were helping Wal-Mart try to convince a town to let Wal-Mart come to town?

A    No, I was doing economic impact studies of existing Wal-Mart facilities within the community.

Q    You were trying to show that Wal-Mart generates a lot of activity?

A    That's correct.

Q    You have testified as an expert before?

A    I have.

Q    We had an expert here on Tuesday who testified in the Anaheim Angels case.  You testified in that case too, right?

A    That's correct.

Q    In that case a team known as the Anaheim Angels changed their name to the Los Angeles Angels of Anaheim?

A    That's correct.

Q    And you studied things and you gave an expert opinion that because of the name change from the Anaheim Angels to the Los Angeles Angels in Anaheim more people stayed in hotels in Anaheim?  That was your expert opinion?

A    That is a simplification of my opinion.  I stated that hotel tax revenues went up after the name change and you could extrapolate any kind of conclusion from that.

Q    Why don't we take a look at page 54, Lines 1 through 15 in

your deposition?  And we look at Line 8.  "That means that you as a professional economist had concluded more people were coming to hotels in the city of Anaheim?"  Answer: "That's correct."  Question:  "Because the name had changed?" "That's part of my analysis, that's correct."

So you as an expert said, the baseball team changed it's name from the Anaheim Angels to the Los Angeles Angels in Anaheim, and because of that more people were staying in hotels in Anaheim, true?

A    That was a factor involved with a basis of factual numbers that were calculated.  I relied upon hotel tax revenues that had gone up after the name change, that's correct.

Q    Let's take a look at exhibit -- Appendix G to your report, please.  That is 207, I believe.  So as I understand what you do in this multiplier analysis is, you find out ways in which the Sonics spend money and then you multiply that money, right?

A    That's a simple version of saying that.  I think I explained that in my answers to Mr. Johnson's questions.  It is a very labor intensive activity, going through the consolidated income statements line by line, and then correlating those line by line expenditures with the multipliers that are provided by the Bureau of Economic Analysis, Department of Commerce and the RIMS-2 models.

Q    Let me ask you some questions.  You are assuming all this

money gets spent in the Seattle area, right?

A    Spent within the Seattle definition that I provided for, the metropolitan division, that's correct.

Q    King County, Snohomish County, etcetera.  If money is not spent here it shouldn't be on your chart here, correct?

A    That's correct.

Q    Let me ask you a question.  Real estate.  Do you see that?

A    Yes, I do.

Q    You are calculating 5 million, $6 million of real estate approximately?

A    Yes.

Q    And that's the rent the Sonics pay?

A    Well, as I can recall it is delineated in the income statement as rent and office expenses.

Q    But you know that the rent here is used to cover debt service on the bonds that were floated to pay for the KeyArena?

A    I wasn't aware that the entire rent was for KeyArena.  If could have applied to many other -- their practice facility, their offices.

Q    Those are all covered by the lease, though, right, or did you know that?

A    I didn't know that for a fact, no.

Q    If the money is being used for debt service that means it is going out to the bondholders, right?

A    If that is the presumption.  And, again, I don't know the answer to that.

Q    Well, unless all the bondholders live in King County and Snohomish County we shouldn't even be looking at this $6 million, should we?

A    No, I believe you should if it was based upon my assessment that these were under the delineated multiplier effect that I talked about.  Again, I used my judgment -- best judgment on all the line items that were there.

Q    If it is not being spent in King and Snohomish County we shouldn't be considering it, should we?

A    That's correct.  This is based upon my best judgment of what was being spent in the local economy.

Q    Did you ask anybody where does this real estate money go?

A    I used my judgment because it was based upon my previous experience in reviewing income statements, financial statements.  I have reviewed many of these in my experience.

Q    My question was much simpler.  Did you ask anybody where this real estate money goes?

A    No, I did not.

Q    By the way, did you notice when you looked at these financial statements, were these consolidated for the Sonics and the Seattle Storm, or were these just Sonics?

A    Some of them were consolidated.  And I retracted out where the Storm -- for example, the salaries of the Storm players.

I was focusing directly on the expenditures of the Sonics.

Q   All right.   Let's look at another line.   Air transportation, third from the bottom.   You are assuming that is paid to a local company?

A   That's correct.

Q   Did you make any effort to find out whether the Sonics use a charter outfit that isn't based in Seattle?

A   I did not.

Q   A small point.   Insurance carriers, six down.   Did you make any effort to find out whether they have a local carrier or maybe a carrier based in New York City with the NBA?

A   No, I assumed it was a local carrier.   I presumed at least the line item that was in the consolidated statement was spent locally.

Q   Is it fair to say that you simply presumed without doing any investigation that all of these dollars that you say are spent in Snohomish County and King County are actually spent in Snohomish County and King County?

A   I think I made an educated guess as to my previous experience on what these expenditures are made utilizing this model from before.

Q   I think my question was different.   I apologize if it wasn't clear.   Is it fair to say you made no investigation whatsoever of where these monies were spent, but instead you made a guess?

A    No, it is not fair to say.  Again, let me repeat what I just said.  I made an educated guess based on my previous knowledge of where these expenditures were made.

I will also go on to say, as I mentioned earlier, that I took a very conservative approach.  There are various line items within the income statements that I didn't include in here, because I couldn't determine where they fell under the multiplier effects.

I also took only 50 percent of the players' salaries, which again is a conservative approach to this multiplier. It could be much greater than that based upon my previous knowledge of working with these models.

Q    Have you ever studied the spending patterns of a professional basketball team and where their money goes?

A    Only in this instance.

MR. TAYLOR:  Nothing further.

REDIRECT EXAMINATION

BY MR. JOHNSON:

Q    Can we get the first slide up again, John?  Mr. Hatamiya, Mr. Taylor was asking you at the beginning of your examination a lot of questions about consumer spending.  Does your report have anything to do with consumer spending?

A    No, it does not.  My opinions provided on consumer spending were in response to the expert report that he provided.

Q   What was the origin of your opinion regarding the kernel that started your opinion regarding what you might do if a team moved from town with respect to being a season ticket holder?

A   Well, it was based on my own experience.  I was a season ticket hold of the Sacramento Kings for many years.  After I had children I stopped spending money on the Kings.  It was not spent elsewhere, it was put into savings.  And it was based upon just common sense approach.  Seattle SuperSonics fans aren't necessarily Seahawks fans or Mariner fans.  I am sure if you ask most of the museum directors or the theater directors in Seattle, I don't believe their revenues are going up.  So that was a presumption -- an educated presumption, a common-sense approach that I took.

Q   The output dollar figures that are shown here on this exhibit, these are all based on actual expenditures by the Sonics?

A   That is correct.  They are not extrapolated, they were not estimated, they are not projected.  These are directly related to line-by-line items and consolidated -- I will say audited consolidated income statements for the Sonics for each of those years.

          MR. JOHNSON:  Thank you, Mr. Hatamiya.

          THE COURT:  Mr. Taylor, anything further?

                          RECROSS-EXAMINATION

BY MR. TAYLOR:

Q   The article I asked you questions about is the article you cited in your report, Exhibit 208, true?

A   True.

MR. TAYLOR:   Nothing further.

THE COURT:   I have a question.

THE WITNESS:   Yes, your Honor.

THE COURT:   Using your model, does it work no matter what the business is?  In other words, you could use it for Wal-Mart, you could use it for Sonics, you could use it for Boeing?

THE WITNESS:   That is correct.

THE COURT:   So it is your opinion then that every business can be evaluated with a dollar number?

THE WITNESS:   That is correct.  And it has been shown through empirical evidence that that can occur.

THE COURT:   And there is nothing unique about the type of business?

THE WITNESS:   Nothing unique about the type of business.  You just have to be able to interpret the correct inputs as they correlate to the outputs.

THE COURT:   So evaluating this sports team then is no different than evaluating a box store?

THE WITNESS:   That's correct.  That is exactly right.

THE COURT:   Thank you.  Any questions based upon my

questions?

MR. TAYLOR:  No, your Honor.

THE COURT:  Thank you.  You may step down.  Next witness, please.

MS. JENSEN:  The City calls Sherman Alexie.

Whereupon,

SHERMAN ALEXIE

Called as a witness, having been first duly sworn, was examined and testified as follows:

MS. JENSEN:  Good morning, your Honor, Michelle Jensen, K&L Gates.

THE CLERK:  Please state your full name for the record, spelling your first and last name.

THE WITNESS:  My name is Sherman Joseph Alexie, Jr., S-H-E-R-M-A-N, last name A-L-E-X-I-E.

MS. JENSEN:  Michelle Jensen, K&L Gates for the City of Seattle.  May I inquire?

THE COURT:  Go ahead, please.

SHERMAN ALEXIE

DIRECT EXAMINATION

BY MS. JENSEN:

Q   Mr. Alexie, what do you do for a living?

A   I am a writer, first and foremost, but I am also a professor and the artist in residence at the University of Washington Department of American Ethnic Studies.

Q    When you write who do you write for?

A    Everybody on the planet, I hope.  By and large I am a literary fiction writer.  I depend on about 150,000 hard core readers.

Q    Do you ever write any journalistic pieces?

A    Yes, actually I have worked for Time Magazine, Newsweek, The Rolling Stone, The Los Angeles Times, The New York Times, the Seattle PI, the Seattle Times, the Seattle Weekly and The Stranger.

Q    And what kind of --  I would like to ask a little bit about The Stranger for a minute.  What kind of publication is The Stranger?

A    It is the local lefty, alternative, gay friendly, art friendly, satirical weekly.  And I think it is the best journalism in the city.

Q    So you would agree that it is a fairly edgy publication?

A    Extremely edgy.

Q    And the contributing journalists often use hyperbolic language, would you agree?

A    That is sort of standard for The Stranger.

Q    And they occasionally use what some might consider vulgar or profane language?

A    Yes, they do.

Q    Where do you live, Mr. Alexie?

A    I live in the Central District, 1617 32nd Avenue, here in

660

Seattle.

Q    How long have you lived in Seattle?

A    I have lived in Seattle in 14 years.

Q    You didn't grow up in Seattle, did you?

A    No.  I grew up on the Spokane Indian Reservation, 60 miles northwest of Spokane.

Q    And you go to Sonics games, correct?

A    Yes.  I have been going since I have been here 14 years, but I have been a full-time season ticket holder for 12 years.  I have been to approximately 300 games.

Q    So 12 years would be since 1996?

A    Yes.

Q    And why do you have season tickets to the Sonics?

A    There is a few reasons.  First and foremost, it is really about my relationship with my father.  My father was a huge professional basketball fan.  For him it started with George Mikan and the Minneapolis Lakers before they moved to Los Angeles.  So I grew up as a Lakers fan actually.

When I became a Sonics fan really is when they drafted Gary Payton.  It was can quite a tragedy of Shakespearian proportions in my household when I turned my back on my father and startled rooting for the Sonics.  So it is a big thing to my father.  He taught me how to play basketball. The first thing we ever played on was a Folgers coffee can nailed to a pine tree in our yard.  You can become a good

shooter when you are using a roll of duct tape into a Folgers coffee can.

I grew up in eastern Washington where basketball is huge. High school basketball is the center of the social life of a small town. In high school when I would play or when anybody would play you would get caravan to go the to next game in the next city and you would look behind you and you would see 70, 80, 90 sets of headlights.

In Reardan where I went to high school there was a famous incident where these guys knew the entire city would be empty because there was a big game a couple of towns over and they looted every business in town because they knew everybody would be gone.

So when I moved to Seattle I was terrified, huge city for me, huge city. I mean, I went to high school with 50 kids. So one of the ways in which I made it small and intimate and like home is through the Sonics. They became my team.

MR. KELLER: Excuse me, your Honor. I hate to interrupt but maybe we could have a question.

THE COURT: That is actually the way it goes.

MS. JENSEN: I understand, your Honor. I will break it up. Thank you.

BY MS. JENSEN:

Q  So you say you became a season ticket holder in order to make Seattle smaller; is that correct?

662

A   Yeah.  They became my social place as well.  Most of my friendships in the city are also based on basketball, you know, with the guys I went to college with, the new guys I have met here.  We play basketball together, we go to the games together and our social lives revolve around Sonics basketball.

Q   Let's talk a little bit about your experiences at Sonics games.  How would you describe the crowd, the fans at a Sonics game?

A   When we are winning?  As loud as any arena in the country.  I would come away from those games with my ears ringing.  And I have speech impediments and I need to hear myself in order not to lisp and stutter so much.  I would come out of those games lisping and stuttering because my hearing had been so affected.  It was really amazing.

And when big stars come to town from other teams, Kobe Bryant, Alan Iverson or LeBron James the same thing would happen.  This year, any number of games, 20 or 30 games, the place would be packed and loud and I would walk out stuttering and lisping.

Q   What you would describe the racial make up at a Sonics game?

A   Well, one of the things -- the great things about professional basketball is it is the most diverse sport in the country.  75 percent of NBA basketball players are

African-American.   And there are 75 players in the NBA from 31 different countries.

Q    I am sorry, Mr. --

A    One of the NBA's slogans is NBA is a global game -- the global game.

Q    And based on your observations sitting in KeyArena for 12 years watching games, how does that appear to effect the racial make up of the fans that come to the games?

A    When certain stars come to town or when Kevin -- when we got Kevin Durant or when we had Ray Allen and Rashard Lewis, superstars, there is a lot more black people in KeyArena then there are in most public venues in the Seattle region.   I live in the Central District, my office is also in the Central District, so on game days you will see dozens of jerseys of NBA teams if that team is coming to town.   You will see a lot of Kevin Durant jerseys a lot of Sonics jerseys.   Before games you get their early.   My seats are behind the visitors' bench.   You get their early.   I will generally have to ask somebody to move, a couple of black teenagers to move from my seats because they come down early to be close to the players.   So it is just packed -- my section is packed before games and after games when they come rushing down trying to get autographs from the players going into the visitors' tunnel.

Q    Would it be fair to say in your opinion there appears to

be a an identification with the players that brings a more diverse crowd into KeyArena?

A    A really strong identification, not only with African Americans, but because there is 31 countries, when a player like Pau Gasol, who just played in the NBA finals for the Lakers, is from Spain, and you will see Spanish folks in the crowd, Spanish-Americans and Spanish nationals.  When Yao Ming comes to town, who a Chinese, he is his seven foot eight giant, this God, when he comes to town there will be thousands of Chinese-Americans, Asian-Americans and Chinese nationals.  So the racial demographics of the arena change every time the racial demographics of the players change.

Q    Is that something you value about going to Sonics games?

A    Of course.  I am an ethnic minority living in a city that is 78 percent white, so I often feel very alone and isolated and a little --  When you look out on the floor and you see all these -- all this diversity you realize the power of that.  Being a Native American in a really white city I realize by watching these amazing athletes it ends up being a positive thing for me, I feel special because those players on the floor are special.

Q    And we talked a little bit about how the diversity of the crowd that comes out might be of value.  What else is special about those NBA players that are on the floor in your opinion?

A   Oh, I mean -- Professional athletes are amazing in any form.  But the great thing about basketball is they are barely wearing any clothes, they play in their underwear, so you can see their muscles, you can see their size, you can see their ability.  I mean, LeBron James who is probably the best player in the world is six foot eight, 260 pounds.  He can jump four feet off the ground.  When we look at history, when we look at mythology, when we talk about Hercules, when we talk about Athena, when we talk about these gods what we are talking about is physical accomplishment.  So when I look at a LeBron James I look at current mythology, I look at the way in which a 100 years from now people will be talking about LeBron James the way we talk about Hercules.

THE COURT:  Mr. Alexie, I can't get a record on you.  You have to slow down.

THE WITNESS:  Okay.

BY MS. JENSEN.

Q   We will try to calm your excitement, Mr. Alexie.

THE WITNESS:  Sorry, judge.

BY MS. JENSEN

Q   So if the Sonics leave town, though, why couldn't you just go follow college basketball, like the Huskies or high school basketball, Garfield and Roosevelt are here?

A   You know, that is like telling Seattle they only get to have me as a writer and not Shakespeare.  That would be the

666

choice they are making.  Professional basketball, they are the greatest athletes in the world.  And as much as I love watching college basketball, as much as I love watching high school basketball --  I mean, I go to random high school games every year just to watch.  It is not the same.  The Sonics would beat the Huskies by 70 points.  The Sonics would beat the best high school team in the city by 150 points.  So you are talking about excellence.  And I want to see the very best.

Q   Thank you.  How would you respond to people who say that Seattle should worry about more important things, like schools and transit rather than professional sports?

MR. KELLER:  We would object, your Honor.  Mr. Alexie is not here as an expert.  He is not here to provide commentary on people's positions.

MS. JENSEN:  Your Honor, if I may respond?

THE COURT:  Go ahead.

MS. JENSEN:  The City is not offering Mr. Alexie as an expert on any matter.  The testimony he is offering is personal opinion squarely within the bounds of 701.  I believe he is entitled to testify his opinion as to why professional sports might be equally important as other issues we have pressing here in Seattle.

MR. KELLER:  The opinion needs to be helpful to the trier of fact.  I don't think his personal opinion is what we

are here about.

THE COURT:  The question was, how would you respond to people who say we should be worried about more important things, like schools.  That is not the issue in this case. We are not worried about schools, we are worried about this team.  So how about if we ask a question that goes to why the Sonics should stay here?

MS. JENSEN:  Thank you, your Honor.

BY MS. JENSEN:

Q   Why do we need the Sonics to stay here, Mr. Alexie?

A   Number one, it is a diverse sport.  It presents the kind of diversity that doesn't exist elsewhere in Seattle.  Number two, it is also the sport of poverty.  It is a celebration of the American dream of all these players, all these people rising up from poverty into positions of extreme privilege, extreme talent.  The NBA acknowledges this.  The logo is the shadow, the silhouette, of Jerry West, who was an NBA basketball player in the '60s and '70s who grew up really poor in West Virginia.  So the NBA's very roots are about the rise from poverty.  They acknowledge that with their logo. So when you see a player --

And also, Seattle, it is amazing, we have had a renaissance of professional basketball players coming from Seattle.  Right now there are seven players in the NBA who are from Seattle, who played high school basketball in

Seattle.  The story of the rise exists on a very personal and intimate level here.

Q  I would like it if you could talk a little bit more about your experience as a season ticket holder.  As you have sat in KeyArena over 12 years have you observed fluctuations in how full the arena is on any given game night?

A  You know, when it comes to fans it is a pretty basic formula, you win games you fill the arena.  Or if great teams come, great teams that are well managed and well coached and well staffed, when they come to town the arena is filled.

Q  In your experience when does the arena tend to be the most packed?

A  In the playoffs certainly.  During the playoff runs, during the end of the season, when we were competing to get into playoffs to improve our position, that's when the gym is packed.

Q  Would it be fair to say during the 2005 playoff run it was fairly packed in there?

A  That was the glory days.  We won 52 games that year when most people had been predicting the Sonics would finish last. But with an amazing coach, Nate McMillan, who the players believed in, Ray Allen, Rashard Lewis, two amazing allstars playing at the top of their game, we ended up in the playoffs surprisingly.  We upset the Sacramento Kings in the first round surprisingly.  And then we played the San Antonio Spurs

who were the dynasty at the time.  We took them to six games. The place was going crazy, hugging strangers, jumping up and down, spinning around.  In the sixth game Ray Allen had three-pointer, Ray Allen who just won an NBA title with the Boston Celtics, Ray Allen had a three-pointer that would have won the game and sent it to a seventh game in San Antonio. Who knows what would have happened in that game?  We might have won it.  But when Ray Allen took that shot, that is one of my favorite Sonics memories.  He missed it.  But as it floated through the air, stuck in that moment between the mystic and the real, everything you dream about when you watch professional basketball was occurring.  A great player. One of the greatest shooters ever.  Maybe the greatest shooter ever, and he played for us, and he had the chance to win the biggest game I have seen as a season ticket holder. And I remember that moment vividly.

Q    The Sonics obviously didn't go to the playoffs this year, did they?

A    No, they didn't.

Q    How is the team's record this year?

A    The team finished up 20 and 62, 20 wins, 62 losses.

Q    What did you observe about attendance in the arena this year when you were there watching games?

A    Well, number one, we had no established superstars.  Ray Allen and Rashard Lewis had either been let go or traded.  So

the connection with the past was severed.  We had obtained Ray Allen in a trade for Gary Payton.  And Gary Payton is the most beloved Sonic ever.  He is a folk hero in this city.  So Ray Allen took his place --

MR. KELLER:  Excuse me.  I wonder if Mr. Alexie can answer the question, your Honor?

MS. JENSEN:  Your Honor, I am happy to repose the question.

THE COURT:  The question is what did you observe about attendance in the arena this year when you were watching games.

THE WITNESS:  What I noticed was that without the superstars we had the year before attendance really dwindled.  And that with the superstar -- potential superstar we did have in Kevin Durant people were interested at the beginning of the season in him.  But as the team struggled, and as the Sonics organization itself struggled to promote the game, the attendance dwindled at certain games as the year went on.

MS. JENSEN:  Thank you.  Your Honor, we have a witness binder prepared for Mr. Alexie.  He will be working with two exhibits.  The Court has copies of the exhibits.

THE COURT:  Are these once you gave to Ms. Scollard previously?

MS. JENSEN:  Yes, they are, your Honor.

THE COURT:  What are the numbers, please?

MS. JENSEN:  Exhibit 336 and Exhibit 337.

BY MS. JENSEN:

Q   Do you have your binder?

A   Yes.

Q   I would like to talk more specifically about your experience as a season ticket holder.  As a season ticket holder I understand -- are there special benefits that go with that status?

A   Yeah, there are official benefits.  You know, there is a season ticket holder party, there is chances to meet the players, you get discounts on tickets and discounts on merchandise, you get this really cool press packet with a great book about the year to come and Sonics history.  So there are official benefits.  There are also unofficial benefits.  You get treated better.  You do.  I guess the best analogy I can come up with, it is like being a high roller in Vegas.  You get comped a lot of things.  And over the years, three or four times a year, ticket folks would come to my seats, and I had great seats, but they would bring me down to even greater seats.  And that happened in previous years.

Q   You mentioned a special season ticket holder parties.  What have those been like historically?

A   All the parties that happened the last couple of years I have been out of town for.  But one of the great -- one of the most entertaining, wonderful things that had happened

over the years was the seat relocation party.  Every year when you reapply to have season tickets, it happens in April, you put down your deposit and you say, yes, I am going to be a season ticket holder again, you get assigned in August the chance to come into KeyArena and relocate your seats.  You can improve your seats, you can move to a different part of the arena, you get to go on the Court, you get to go in the locker rooms, you get to go all over KeyArena.  That was one of the most fun things to do.

Q    After the change in ownership in 2006 did you notice anything different about that Seattle relocation party?

A    Yes, especially last year, last August.  In previous years as a season ticket holder --  The first thing you get to do is you get to drive into the parking lot and you get to park in the players' parking lot.  As you pull in you are thinking I wonder whose slot this is, am I in Ray Allen's slot, am I in Rashard Lewis' slot.  There is banners and posters everywhere.  This last August you pulled in and you got to park in the same slot but there was no signs or banners. There was only these photocopied signs that said "ticket relocation."  Even outside the arena it was quite the change. And when I walked in -- when my wife and my sons and I walked in there used to be banners leading the way down the hallways toward the arena, and you would get to this desk where you would check in.  And in previous years at that desk there had

been popcorn machines.  One year there were these incredible cucumber sandwiches, free pop, free water, free fluids, free candy.

Q   How did it compare to the most recent?

A   Last August?  There was a desk of people who didn't know who I was, didn't recognize me when I walked in.  There was one fluid barrel, one of those cool barrels, that was empty. I don't know if it had been anything in there to begin with but it was empty when I got there.  We walked down onto the floor.  The ticket person who was showing me around didn't know who I was.  I had to introduce myself.  And we walked around the arena.  I went alone pretty much walking around with my sons and wife looking at the seats.  In previous years the seat ticket person was with me.  In fact, a couple of years when none of us could make it the seat ticket people would get on their cell phones and call me.  So I forget where I was, I was on book tour, and they would call me.  The season ticket person was actually saying, well, this is what it looks like from here, and was taking cell phone photographs of the view.  This year the person didn't know who I was, and as walked around didn't really interact with us, let us go on our own.  On previous years we would go on the Court to shoot baskets.  And with people around -- the staff would come out and guard me.  I would challenge them. One year there was a tall, skinny basketball player kid who

was working there, and I challenged him, and he saw an old, fat, middle-aged guy, and he thought could take me and I scored on him a few times.  That was fun.  One of the big highlights was going into the locker room with my sons.  The big thing was the shower --

Q   What was about it the locker room?

A   For me it is like going into a church, right.  You are going into the locker room.  One of the big things for my sons was the showerheads which are ten feet off the ground.  And the lockers where they had jerseys hanging for the players.  Three years ago my sons and I went without my wife and we actually sat in Ray Allen's locker.  And the Sonics took pictures.  They were taking pictures in the locker room of season ticket holders sitting in the locker of their favorite player.  That didn't happen this last year.  In fact, as we walked in there were three staff people sitting there watching TV.  And I talk a lot, you can tell.  I am friendly.  I joke.  And I tried to interact with these guys.  And they literally looked at us, didn't say a word and looked back at the television.

Q   Sounds like it was quite a different experience.

A   It was incredibly rude.  It was heartbreaking.  My sons loved that moment so much of us being in that locker room and getting our picture taken that that photo -- they put the photo on the wall between their bedrooms.  It is that photo

and then a photo of them light saber dueling.

MR. KELLER:  Again, your Honor, I think we need to get some questions, so we can go in a question and answer format, rather than having the witness going on.

THE COURT:  We need some questions, please.

MS. JENSEN:  I understand, your Honor.

BY MS. JENSEN:

Q   Mr. Alexie, I want to change gears a little bit.  Have you renewed your season tickets for next year?

A   I haven't been allowed to renew my season tickets for next year.

Q   Why is that?

A   We received a letter here in the spring that said due to circumstances that they weren't selling season tickets.

Q   And, Mr. Alexie, can you please turn to Exhibit 336 in your binder?

A   I see it here.

Q   And take a minute to review.

A   Yes, I remember getting this letter.

Q   And what is it?  Is that the letter that you received?

A   Yeah, it is the generic letter sent out to season ticket holders that states that they are not selling -- or not assigning season tickets at the present time because of the various proceedings.

Q   So this isn't the actual e-mail you received but it is a

form e-mail you received?

A    Yes.

Q    And that particular e-mail is dated April 14th; is that correct?

A    Yes.

Q    And is that around the time that you received that e-mail?

A    We would get these kinds of -- for the next season we would always get these in April.  So, yes, April is the date for these kind of letters.

MS. JENSEN:  Your Honor, I would move for the admission ever Exhibit 336.

MR. KELLER:  No objection.

THE COURT:  336 will be admit.

(Exhibit 336 admitted)

BY MS. JENSEN:

Q    Mr. Alexie, we talked about this a little bit, but I want to look at Paragraph 1 of this letter e-mail.  The sentence starting "typically."  "Typically this is the time of year we initiate a renewal campaign for the upcoming season.  However, with the current uncertainty surrounding the team's status about playing next season we feel it is prudent to wait until this matter is resolved before presenting you with renewal information."

What did you understand when you received this and you saw that language?

A   They weren't selling season tickets.   They weren't interested in selling season tickets.

Q   And they weren't interested in selling tickets because?

A   I took it that they were leaving, that they were operating as if they were leaving.

Q   And, Mr. Alexie, did you receive a later e-mail from the Sonics front office about your season ticket package?

A   Yes, I did.

Q   And I would like to you please turn to Exhibit 337 in your binder, and just take a look at that.

MR. KELLER:   No objection, your Honor.

THE COURT:   337 will be admitted.

(Exhibit 337 admitted)

BY MS. JENSEN:

Q   Mr. Alexie, I would like to direct your attention to the first paragraph of that e-mail, after "dear fan."   "Today the NBA Board of Governors voted to approve the Professional Basketball Club, LLC's application to relocate the Sonics to Oklahoma City."

Do you know who the Professional Basketball Club is?

A   Yes.

Q   And what did you understand when you --   Let's look at the next paragraph.   "The immediate future of the team, however, is still uncertain as we now await the outcome of the June federal court trial over the KeyArena lease."

Do you see that language?

A    Yes.

Q    And in the next paragraph, "when the trial concludes you will be contacted on the next steps regarding your account."

What does this refer to when it says "your account?"  For a season holder what is an account?

A    The season ticket holder, depending on how long you have been a season ticket holder, you have a priority number that places you on a list in terms of where you get to choose, where you get the seat, various privileges, various levels of those privileges.  And that's what your account is about.

Q    And so did you understand that your account was effectively frozen at this point?

A    There is nothing I can do.  My account, my priority number, none of that meant anything.

Q    Thank you, Mr. Alexie.  One last question.  I understand you can't currently renew your season tickets, but if the Sonics are required to play the remaining two years of their lease here will you renew?

A    Of course.

Q    Why if they are going to leave --  Say they plan to leave at the end of the lease term, why renew for those final two years?

A    They have been here 41 years, I have been a season ticket holder for 12 years.  I love this team.  I love what it

represents.  I love its history.  If they leave I haven't been given -- the fellow fans have not been given the proper way to say good-bye.  There was no celebration of our history, there was no celebration of Sonics' history.

MR. KELLER:  We are going off.  This is not responsive.

THE COURT:  I think he is telling you the why.

THE WITNESS:  I am hoping in those two years, if they do leave, that the season ticket holders, the fans, the city and the team will have the chance to celebrate each other, if it is only two years left.  And beyond all that, I don't know if professional basketball will come back.  There is no guarantee of that.  If it does it is going to be for who knows when.  So I want two more years of the Greek gods.

MS. JENSEN:  Thank you, Mr. Alexie.  Nothing further.

CROSS-EXAMINATION

By Mr. Keller:

Q   Good morning, Mr. Alexie.  My name is Brad Keller.

A   Good morning.

Q   I represent the PBC.  I am going to ask you a question. We have never chatted, you haven't had your deposition taken or anything, right?  I am going to ask you a question, and I have a feeling the answer may be yes.  Do you have a passion for basketball?

A   Yes.

Q   You have been a loyal and faithful fan for many years?

A   Yes.

Q   Thank you for your support.  It is very much appreciated.

Take a look at Exhibit 337, if you would?  You received this what, three or four days after Exhibit 336, the other one we looked at?

A   Yes.

Q   Now, take off your hat as a passionate basketball fan and try and look at PBC and professional basketball as a business for a moment.  Would you agree that with the NBA having approved relocation to Oklahoma City, and with the ownership trying to move the team and not have to play the next two years, it would make sense to not want to take your dollars for a ticket renewal -- season ticket renewal until this case gets resolved?

A   That would have made sense.  That would have made great sense to put, Dear Sherman Alexie on the letter.

Q   I'm sorry.  I'm sorry that the locker guy didn't know who you are, I am sorry there wasn't popcorn when you came in the door.

MS. JENSEN:  Your Honor, I will object.  He is mocking the witness.

MR. KELLER:  I am not.

THE COURT:  Well, let's ask a question, please.

By Mr. Keller:

Q   Really, again, just as a business person, can you understand why the owner of a franchise wouldn't want to take your money for two, two and a half months until this thing gets resolved?

A   As a business person?

Q   Yes.

A   Yes, I understand that.

Q   Thank you.  I gather that basketball for you in your life has been a big thing in terms of your relationship with your father; is that right?

A   Yes.

Q   And was your dad a fan of the Lakers when they were still in Minnesota?

A   When he was a child, yes.

Q   The Minnesota Lakers relocated and became the Los Angeles Lakers, right?

A   Yes.

Q   Did your dad continue to be a fan of the Lakers?

A   Yes.

Q   So his loyalty to that team followed it from one city to the other?

A   His did.

Q   I spent a little time reading The Stranger.  Did you write in The Stranger that if the Sonics move to Oklahoma City you're not going to give up on the Sonics either?

A   I think the tone of that was much more questionable.  I think I said, will I have to give up on the Seattle SuperSonics.  And I wondered if I would have to travel to Oklahoma City to see some games.

Q   Could I ask that the witness be handed Exhibit 611, please?

MS. JENSEN:  Again, your Honor, we don't have a copy.

THE COURT:  Actually, we need to take our morning recess.  Can we come back to 611?  We will be at recess for 15 minutes.

(Break)

THE COURT:  Please be seated.  All right.  Mr. Keller, you were at 611.

MR. KELLER:  Yes.

BY MR. KELLER:

Q   Mr. Alexie, I'm going to put 611 into evidence.  I don't want to put it up on the screen because of some of the language that is in it.

You had a chance to look at that over the break?

A   Yes, I did.

Q   Did you write these words:  I'm not going to give up on the Sonics and move to Oklahoma City?

A   Yes.  Can I clarify?  This column was not a Sonics Death

Watch column.  This was written shortly after --

THE COURT:  Mr. Alexie, you have to --

A   Yes, I wrote those words.

BY MR. KELLER:

Q   Thank you.

A   Sorry.

Q   Did you say that you fly to Oklahoma City to make bets with your friends on how soon Danny Fortson picked up his first bat.

Did you write those words?

A   Yes.

Q   Danny Fortson is a player on the team?

A   He was a player on the team.

Q   Did you say you might even become a fan of Clay Bennett if he proved to be a smart owner?

A   Yes.

Q   Now, in this same piece that I have been ask you about, did you acknowledge that plenty of people are happy that the Sonics are --

A   Yes.

Q   And that plenty of people don't give a blank at all?

A   Yes.

Q   And that you were struggling somewhat personally and had turmoil because you were living in a city where most, if not all of the citizens, didn't care about your losses?

A    Yes.

Q    You grew up in Eastern Washington?

A    Yes.

Q    And was it in high school that you decided to leave the native school on the Native American Indian reservation to go to a private school or public school?

A    I left the reservation school at the beginning of eighth grade to attend a public school, Reardan.

Q    You were a high school ballplayer yourself?

A    Yes.

Q    Basketball?

A    Yes.

Q    So basketball became a big part of your life in middle school and high school?

A    Yes.

Q    It became a big part of the life between the -- bond between your father as well, right?

A    Yes.

Q    When did you first go to a Sonics game?

A    Once a year they would come to Spokane and play exhibition games in the old coliseum.  First Sonics game I went to was an exhibition game in 1976 the year before they played for the championship.

Q    I think you said growing up in Eastern Washington high school basketball was the center of social life in a small

town.

Did I get that right?

A    Yes.

Q    In Eastern Washington Gonzaga basketball is a big deal, too?

A    Gonzaga basketball, yes.

Q    Do you remember being at the Phoenix Suns/Sonics game this past year?

A    There would have been two of them.

Which one are you referring to?

Q    The one you wrote about in your March column about Sonics Death Watch in The Stranger?

A    Yes.

Q    And do you remember observing that at that game -- by the way, Phoenix is a good team, right?

A    Phoenix is a great team.

Q    There were more Phoenix fans than there were Sonics fans in KeyArena, right?

A    I think I remarked there were thousands of orange jerseys. Most with Steve Nash's name on them.

Q    Take a look at Exhibit No. 612.  See if that refreshes your recollection?

A    Yes.  Suns fans out-numbered Sonics fans.

BY MR. KELLER:

Q    There was a Suns fan sitting in close proximity to you,

right?

A    Yes.    In front of us.

Q    She was a woman from Victoria BC, right?

A    Yes.

Q    She was a Phoenix Suns fan; is that right?

A    She was wearing a Steve Nash Jersey.    That made her Phoenix Suns fan and a Steve Nash fan.

Q    She asked you:    Do you think they're really going to Oklahoma?

Do you remember herring a you that?

A    Uh-huh (affirmative).

Q    Is that a yes?

A    Yes.

Q    Your response was:    Yes, they're gone.    Right?

A    Yes.

MR. KELLER:    Thank you, Mr. Alexie.

THE COURT:    Any redirect?

MS. JENSEN:    Briefly, Your Honor.

REDIRECT EXAMINATION

BY MS. JENSEN:

Q    Mr. Keller asked you about an article in which you commented about Clay Bennett.

Do you remember when that article was written?

A    Yeah.    That was in 2006, shortly after the sale.

Q    And he also mentioned language that indicated that you

might have been feeling despondent at the time that your aloneness in Sonics fandom.

Can you explain what you meant by that?

A   At that time it didn't seem anybody cared about the team. There was no response really from the general population, about the sale of the team, about the sale to Oklahoma City. So I felt at that point when I wrote it that nobody cared. My opinions have changed.

Q   He also asked you about a more recent column regarding a Phoenix Suns game.

Do you recall when that was written?

A   Yes.

Q   And when was that?

A   It was written this spring.

Q   What were your feelings about the team this spring?

A   Well, when I wrote the first article, when I felt despondent, when I talked about traveling to Oklahoma City and still following the Sonics, I was still hoping, I believed the Oklahoma City guys were going to make an honest effort to build an arena here, and that they might be good owners.  And I was going to follow the team because they were going to try here.  And if they didn't try here, I would still follow them.  I don't feel that same way about the ownership.

And the column I wrote this spring -- when you step into

an arena and you see that, when you see thousands of those jerseys, of course, I was depressed, of course I was distraught.  Because I feel ownership created a situation where many fans from another team were able to buy the tickets.  So that's the situation that occurred.

Q    Mr. Alexie, you have sons, don't you?

A    Yes.

Q    Do you take them to Sonics games?

A    Yes.  The youngest --

MR. KELLER:  Well ---

MS. JENSEN:  Your Honor, he inquired into his relationship with his father.

THE COURT:  Overruled.

A    Yes.  I take my youngest to the -- he's six.  Noise gets him.  So he wears headphones and we watch the game together at home.  And I have a little Sonics hoop and -- Nurf hoop that is set up in my TV room.  And when we watch the game he shoots baskets.

Q    If the Sonics are required to stay for the remaining portion of the lease term will you continue to take your sons to games?

A    Yes.  I will take them to more games now.

MS. JENSEN:  Thank you.  No further questions.

THE COURT:  Any recross?

MR. KELLER:  Nothing further.  Thank you.

THE COURT:  Thank you.  You may step down.

Next witness, please.

MR. LAWRENCE:  City calls Matthew Wade.

MATTHEW WADE

After being sworn testified as follows:

THE CLERK:  Please state your name and spell your last name for the record, spelling your first and last name.

THE WITNESS:  Matthew Christopher Wade, M-A-T-T-H-E-W W-A-D-E.

DIRECT EXAMINATION

BY MR. NARVER:

Q   Good morning.

A   Good morning.

Q   What is the Athletes' Foundations LLC?

A   It's a company I started to professional athlete with their philanthropy and community outreach.

Q   What is your title?

A   President, executive director.

Q   You're the guy?

A   Yes.

Q   Before you founded the Athletes' Foundation, you worked for the Sonics?

A   I did.

Q   You started as an intern back in the '80s?

A   Early '90s.

Q   I want to talk to you a bit about the position you held with the Sonics, beginning in I believe 1996.

What job did you take then?

A   I was -- it was actually earlier than '96.   It was community relations manager.

Q   Manager of community relations.

What does that job entail?

A   It's basically a link between organization, community, and its players.

Q   You held that job until --

A   2003 I think.

Q   Okay.   During your years as the community relations manager, how many community charitable appearances, things like that, did you attend the Sonics players?

A   I was there pretty much every one of them.   We averaged about 300 a year, year around.

Q   I want to be clear here.

The term "appearances" is used a lot in some of the documents I have seen.   That encompasses a whole range of things, doesn't it?

A   That's correct.   And it ranges from clinics -- basketball clinics for five to ten kids to school assemblies, with six, seven hundred kids.   Sponsorship meetings, you know, meet and greets.   Court side club appearances.   Meeting court-side seat holders.   Season ticket holder parties.   Things of that

nature.

Q   So it sounds like a way range of things.

My questions today will focus on a particular type of those appearances.  I want to talk primarily in things where the audience for the players were children.  I want to talk about appearances at schools, Children's Hospitals, community centers things like that.  I understand, too, that as we look at the number of appearances they're also season ticket holder things.  That's not quite the focus of my question. But I wanted to clarify.

From the events you attended with players I -- I know it's a hard thing to generalize.  I wonder if you could provide a description of what you observed in the kids, their reactions to the presence of a professional basketball player.

What were you able to observe?

THE COURT:  Mr. Narver, that was at least five questions.  Please, I can't tell which question he's going to answer.  So one question at the time.

MR. NARVER:  Absolutely.

BY MR. NARVER:

Q   Can you describe in general terms what you were able to observe in the reaction of the children to the appearance by Sonics players in the events you attend?

A   The kids go crazy, they go ecstatic.  They love to see these guys come into a room.  For instance, a school gym, the

whole gymnasium is filled with kids, teachers, parents.  When a player walks into that gymnasium it explodes -- smiles, grin from ear to ear, clapping, cheers.

Q    But you also do work with football players with your foundation; is that right?

A    Yes.

Q    You've been at events with pro baseball players?

A    Yes.

Q    Same effect?

A    Relatively.  It's a different type of effect.  With Sonics players, these guys are six ten, seven-foot-tall guys.  Whereas, football and baseball players -- it's almost like they have to wear their uniform, so they have to be identified.  Because they -- football players wear helmets; you can't see who they are.  Like a football player, once identified, we know them pretty well.  Baseball player are the same.  They look like you and me, and they're just regular guys.  But with basketball players, they're just huge guys.  I mean, seven-foot-tall guys, with 20 foot shoes.  Huge shoes, boats.  They're enormous.

Q    20-foot shoes?

A    20, whatever -- big shoes.

MR. NARVER:  City offers Exhibit No. 218 into evidence.

MR. KELLER:  No objection.

THE COURT:  218 admitted.

(Exhibit No. 218 admitted.)

BY MR. NARVER:

Q    Before we talk about 218, are you aware based on your years with the Sonics or your knowledge of the current situation, if there is a required number of community appearances NBA players are supposed to make every year?

A    There are.  I don't know the exact numbers.  I know there are a certain amount of personal appearances and mandatory appearances that each team's employers are required to do.

Q    Is that the case when you were working for the Sonics in community relations?

A    Yes.

Q    Were there some players who did more?  Did extra appearances?

A    Absolutely.

Q    Exhibit No. 218 is a collection of documents.  I will represent these were documents you provided to me.

Do you recognize -- if you just flip through, I think you have a book in front of you.  Can you flip through 218 before I start asking that a few of them and tell me if you recognize what those documents are?

A    After the NBA lock-out, there was a real effort on behalf of --

Q    Could you just start by flipping through those pages.  I

want to establish that these are documents that you are familiar with.

A    Yeah, I recognize them.

Q    These are things that came to you when you worked for the Sonics?

A    Yes.

Q    If we look at the first page of this, on the screen I think there is a part highlighted, which reads:  Seattle's players appeared most frequently with the team total of 195 appearances in an average of 15 appearances per player.

Do you see that?

A    Yes.

Q    195 appearances.  That's for one NBA season?

A    A majority of them are during right season spread out also during the course of year.

Q    Is that the number that was required by the league at the time or is that higher?

A    That's higher.

Q    Can you turn to the second page of 218.

There is a highlighted portion.  There is a communication from you from somebody at the NBA; is that right?

A    That's right.

Q    Second paragraph it says:  Sonics leaded league with 167 appearances as compared to a league median of 87.

Do you see that?

A    Yes.

Q    That's the communication from NBA to you about the Sonics players going to more appearances in the community than other teams?

A    Yes.

Q    Is that consistent with your years with the team that the Sonics were out front on that?

A    Absolutely.

Q    Could you turn also on Exhibit No. 218.  That's going to appear on the screen, this is to the seventh page of this exhibit.  It's on the heading of the Boys & Girls Club?

A    Uh-huh (affirmative).

Q    This is addressed to you.  It's something called Full House Sports and Entertainment.

     Can you tell me what that refers to?

A    When we moved into the new building, at the time KeyArena, we formed this company, Full House Sports and Entertainment. And the Sonics were part of that.

Q    So this is associated with your work for the Sonics?

A    Yes.

Q    I would like you to look at the highlighted portion which reads, and this is a communication from Boys & Girls Club saying:  Your relationship shows that NBA and WNBA teams can make a difference in the community.  The commitment that you've made today will make a difference in our youth and

family members lives for years to come.

Do you see that?

A    Yes.

Q    It appears there is a reference to a specific event that involved 350 youth and family members.  I said like you to youth were real excited to see Gary Payton and Vin Baker? Sonics players at the time?

A    Yes.

Q    Real team players, talking to youth while giving them real life experiences and good advice.

Were you at that event?

A    Yes.

Q    Is Gary Payton a guy who did a lot of appearances in the community?

A    And more.

Q    What do you mean?

A    I mean he went above and beyond sometimes.  He was the face of the franchise, and he recognized that.  He would take it upon himself to do even more than the requirement the NBA would mandate.

Q    Can you look at next page of Exhibit No. 218, please. It's on the heading -- actually, maybe the eighth page of Exhibit No. 218.  I think to Make A Wish.

What is the Make A Wish Foundation?

A    The Make A Wish Foundation grants wishes to children who

have life-threatening diseases.

Q   Is that something Sonics players were involved with during your years with the team?

A   Yeah.  In particular Gary.

Q   Gary Payton?

A   Yeah.

Q   Can you look at the tenth page.  It's the heading Hilltop Elementary School Home of the Huskies.  That's a letter to you from somebody at the school?

A   Yes.

Q   It refers to an event that took place with Rashard Lewis.
    Is that an event you attended?

A   Yes.

Q   And Rashard Lewis was a Sonics player at the time?

A   Yes.

Q   This one says:  The Husky gym was packed with over 700 students and staff eagerly waiting to meet Rashard and hear him speak to us about the importance of reading.
    Do you remember that he did that?

A   Yes.

Q   And down below it says:  He gave many practical reasons why it is important to read for in formation, as well as enjoyment.  He's a wonderful role model for our students.
    Do you remember receiving that letter?

A   Yes.

Q   Did you receive a lot of letters like this when you worked for the Sonics?

A   Pretty much after every appearance we got a nice letter from a nonprofit or school we visited, yeah.

Q   Finally, last page of 218, something on the heading Children's Hospital Foundation, a letter you received.

It appears a Sonics player made an appearance around Christmas; is that right?

A   Yes.   We made an annual trip to Children's.

Q   Were there trips to Children's other than an annual appearance?

A   Yeah.   Children's Hospital is a big -- is a big deal for these players.   At the time Gary Payton connected with the children in Children's Hospital every year and struck up friendships.   Things like that.

Q   Did you go with him on those appearances?

A   Yes.

Q   How do the kids react to him?

A   I mean, they were elated.   Gary walks into a room and it's, you know, he has a cure for whatever that little child is ailing from.

Q   After you worked for the Sonics you started the Athletes' Foundation.   Why did you do that?

A   I just started it -- after I left the Sonics, I wanted to say in helping professional athletes with their community

outreach.  Sometimes players go astray.  But, you know, with their community outreach I wanted to just help them facilitate that with my connections with all nonprofits in the area.  It just was something I really wanted to do.

Q  You continued with some Sonics players?  You helped them set up foundations.  I guess that's the point --

A  Yes.  Foundations or the community outreach.  Some set up foundations.  Others, this is what I want to do.

Q  Ray Allen was one?

A  Yes.

Q  Rashard Lewis?

A  Yes.

Q  They were both well-known Sonics players?

A  Yes.

MR. NARVER:  Exhibit No. 219.  City offers 219.

MR. WEBB:  No objection.

THE COURT:  Admitted.

(Exhibit No. 219 admitted.)

BY MR. NARVER:

Q  219 is a series of photographs.  I'm only asking about a few of them.  Could you look at two photos on your screen which both from Exhibit No. 219 and tell me what we're looking at.

A  This is a unveiling a grand opening of the Rashard Lewis Theater at the Ronald McDonald House in Seattle.

Q    What's the Ronald McDonald House?

A    A house where families whose children are receiving
treatment at Children's Hospital can stay close.  You know
all the amenities are there for the families.

Q    What is the Rashard Lewis Theater?  What is that about?

A    I don't know the year.  But Ronald McDonald House was
building a new Ronald McDonald House.  I had meetings with
them regularly.  One of the ideas that came up was from
Ronald McDonald House was that they had the space down below
in the basement area.  They wanted to do something down
there.

I went to Rashard and I asked him, he's connected with the
Ronald McDonald House, do you have any ideas about what can
we do?  He said let's do a home entertainment theater.  It's
a home entertainment theater.

Q    Were you at this event when it was opened?

A    Yes.

Q    How many kids and families there for that event?

A    About 50.  50 parents, children.

Q    It looks like Ronald McDonald himself was there as well?

A    And woman in -- yeah.  You got the big guy.

And the one in yellow, that is Rashard's mom, Juanita.

Q    What are we looking at here?

A    This is a giving tree, we came up with.  It's what we did
-- we partnered with a nonprofit.  In this case it was the

Salvation Army.  And we hung ornaments on the tree, with each child's wish.  And fans of the Sonics would come in, take an ornament of the tree, go shopping in the mall, and come back. That is Ray Allen on the left.  He would autograph whatever the fan wanted in exchange for the gift.

Q    What about this far right that is Rashard Lewis?

A    Yes.

Q    What are we looking at here?

A    This was called Truckloads of Love.  And basically what it is an idea where we would fill up the back of his pickup trucks with food for Northwest Harvest.  So the idea was fans would come in, drop off bags of food for Northwest Harvest. In exchange, Rashard would autograph whatever they wanted.

Q    The photos we've looked at are activities that went through their foundation, the Rashard Lewis and Ray Allen foundations?

A    Correct.

Q    Ray Allen and Rashard Lewis are not playing for Sonics any more?

A    No.

Q    Yesterday, Mr. Barth from the Sonics, was he on the stand, he said he believed those foundations are still active in Seattle; is that correct?

A    No, they're not.

Q    I will ask you one last thing.  I think, as you know from

this lawsuit, what the City is in court asking for -- is for the Sonics to play two more years at KeyArena.

You understand that is what we're doing here?

A    Yes.

Q    How many players on an NBA roster?

A    13.

Q    Each one has a certain amount of appearances they're required to make every year?

A    Yes.

Q    Some choose to make more from your years of experience; is that right?

A    Yes.

Q    Some of these are going to be -- some appearances of the time you mentioned before season ticket holders and things. But others are community centers, clinics, schools?

A    Yes.

Q    Players go and talk about, as we looked at these documents, reading, nutrition, don't take drugs, things like that?

A    Yes.

Q    I believe you testified a number of kids at these things ranges.  Sometimes it's a couple dozen, sometimes we're talking hundreds?

A    Yes.

Q    You've personally been to hundreds of those events over

the years, right?

A    Hundreds, yes.

Q    Based on your personal experience what you've observed there, do you think it's going to make any difference to those kids getting a visit if the player who is on a lame-duck basketball team?

          MR. NARVER:   Based on his personal experience as well as Rule 701.

          THE COURT:   Sustained.

          MR. NARVER:   Nothing further.

          MR. WEBB:   For the record, Jim Webb from McAfee & Taft in Oklahoma City on behalf of PBC.

BY MR. WEBB:

Q    Good morning.

A    Good morning.

Q    You make charity your business, don't you?

A    Yes.

Q    And you take great pride in the charitable enterprises you've been involved in over the years, don't you?

A    Yes.

Q    And involving NBA players?

A    NBA football, yes.

Q    NFL players?

A    Yes.

Q    Major league players?

A    Not so much baseball.

Q    As I understand your business, athletes come to you, maybe with an idea of somehow they might want to give back to the community; is that right?

A    Yes.

Q    And then you figure out ways to make that happen, correct?

A    Yes.

Q    But you don't help for free, do you?

A    No.

Q    You charge your clients, don't you?

A    Yes.

Q    You have various charges depending on the particular athlete, correct?

A    Yes.

Q    And the particular event, correct?

A    It's a flat fee.

Q    But it's how you make your living, isn't it?

A    Yes.

Q    And you've been making your living doing that since the time you worked for the Sonics, right?

A    After the Sonics, yeah.

Q    You left the Sonics as part of a reduction in force in 2003, didn't you?

A    Yes.

Q    They eliminated your position, didn't they?

A    Yes.

Q    You worked under -- strike that.

You never worked for my client, did you?

A    No.

Q    You worked for the Schultz group, correct?

A    Yes.

Q    That's the group that laid you off, right?

A    And Ackerley, yeah.

Q    Well, the Schultz group is the one that laid you off though, right?

A    Yes.

Q    You also worked for the Ackerley group before the Schultz group, correct?

A    Yes.

Q    I want to look at some documents I was looking at a moment ago with counsel for the City. As I understand, this is a compilation of documents you held on to since your time with the Sonics, correct?

A    Yes.

Q    And when the City asked you for them you gave them this compilation of documents, correct?

A    Yes.

Q    And counsel for the City is asking a few questions about it. I want to look at the second page. These aren't numbered. So I'm not sure how -- second page, top it says

Douglas Young?

A    Uh-huh (affirmative).

Q    Do you see that?

A    Yes.

Q    That's from 2002, correct?

A    Yes.

Q    The document he showed you, the Boys & Girls Club letter, that was from 2001, wasn't it?

A    Yes.

Q    The next one is Hilltop Elementary School Husky letter. That was from around about the time of September of 2001, correct?

A    Yeah, that sounds about right.

Q    Then finally the last document in that compilation was from December 23, 2002, correct?  That's the Children's Hospital Letter letter?

A    Yes.

Q    So these are all letters going back to your work at the Sonics, correct?

A    Correct.

Q    Under prior ownership, correct?

A    Correct.

Q    You were laid off by prior ownership three years before my client bought the team, weren't you?

A    I guess -- I don't know when he bought the team.  But yes.

Q   If I tell you that the evidence is that my client bought the team in 2006, would you have any reason to dispute that?

A   No.

Q   You had been gone from the team for three years by then, correct?

A   Yes.

Q   Since that time you've been focusing your efforts not on working for a team as an employee, but working with individual athletes, correct?

A   Yes.

Q   And you found that you liked that better don't you?

A   Better?  I don't know.  I liked my work with the Sonics. I enjoyed it.

Q   Do you not like your work with individual players?

A   I like that too.

Q   Gives you more flexibility, working for individuals, doesn't it?

A   I guess, yeah.

Q   You're not answering to anybody; you get to be the man that runs the show, right?

A   Yeah.  Work out of my home.

Q   As your business operates, part of the way to keep that operating is to get new clients, right?

A   Try to, yeah.

Q   I don't know the answer to this question.  I have never

met you until just you now.

Is it easier for you in your experience to get players that are playing in town, or are you able to get players from all over the place?

A   Well, I mean I have players that live in Seattle that play outside the city, you know, in other MBA venues or other NBA cities.  I also have an athlete that doesn't live in the city and lives in Los Angeles.

Q   What's his or her name?

A   Vladimir Radmanovich.

Q   NBA player for the Lakers?

A   Yes.

Q   No connection with Seattle?

A   He played for the Sonics.

Q   No connection currently with Seattle, correct?

A   No.

Q   And you represent Jamal Crawford?

A   Yes.

Q   Player for the Nix?

A   Yes.

Q   As a matter of fact, you put on an event this past Saturday involving Mr. Crawford, didn't you?

A   Yes.

Q   What was that event?

A   High-Tops and Helping Hands.

Q    Mr. Crawford, a New York Nix player, came into town for that?

A    He lives here.

Q    He was at that event?

A    Yes.

Q    And also at that event were two players form the Portland Trailblazers, correct?

A    No.

Q    Brandon Roy didn't come?

A    He did not.

Q    He was planned to come, but he didn't make it?

A    Yeah.

Q    And how about Martell Webster, did Mr. Webster make it to the event?

A    Did not come, no.

Q    Did Spencer Hawes from the Sacramento Kings make it?

A    Yes.

Q    You had at least planned for players from other teams to come in for this event here in Seattle, correct?

A    Yes.

Q    You've been described in some very nice press reports I have seen about you as a charitable bulldog.

     Would you agree with that assessment?

A    I look more like a bulldog.

Q    Your words not mine.

710

A    Yes -- I don't know what a bulldog is.

Q    You have been described by your clients as relentless, though, haven't you?

A    I work hard for my clients.

Q    Would you agree with that characterization that you're relentless at what you do?

A    Sure, yeah.

Q    You're tenacious at what you do, correct?

A    Absolutely.

Q    You may not remember the specific time.  But you were aware my client purchased the Sonics, correct?

A    Yes.

Q    And you were aware that whether through radio coverage, TV coverage, newspaper, whatever, you were aware generally that they were making an effort in Olympia to get something done regarding a new arena for the Sonics, weren't you?

A    Yes.

Q    And so I'm assuming that you took that relentless, tenacious nature you have and you did everything you could, make phone calls, you did anything you could to lobby and make that effort successful, right?

A    Me, personally?

Q    Yes.

A    No.

Q    Even though you put great value in the team being here and

the charitable activities they bring to the community, correct?

A    I think they're a valuable commodity.

Q    You didn't do anything that might have saved the team for this community, did you, as far as lobbying in Olympia?

A    No, I didn't go down to Olympia, no.

MR. WEBB:    That's all I have.

THE COURT:    Any redirect?

MR. NARVER:    No.

THE COURT:    Thank you, sir.    You may step down.    Next witness, please?

MR. LAWRENCE:    Your Honor, for our final witness, so to speak, I understand and appreciate you reading Aubrey McClendon's deposition.    There are five minutes of video that we would like to play from that deposition.

THE COURT:    Why don't you give my tape and I will watch it elsewhere.

MR. LAWRENCE:    We would be happy to do that.

MR. KELLER:    Excuse me, we had covered this in pretrial.    Now that some video is going to be reviewed by the Court, could we have the opportunity to help counter-designate that?

THE COURT:    Certainly.    I haven't watched any video yet.    Is it the same clip off the deposition?

MR. LAWRENCE:    I'm sorry.    There are three clips

included in the designations that you read last night -- to observe his demeanor in deposition.

THE COURT:  I have read the words.

MR. LAWRENCE:  Right.  We would be happy to submit the video to watch at your convenience.

THE COURT:  Mr. Keller, you'll get a chance if you want me to watch certain other portions.

MR. LAWRENCE:  This a question for Your Honor.  We submitted to Your Honor the deposition designations in support of our case.

Do we need to publish and formally have the Court accept that?  If so we would do that now.

THE COURT:  You've given me each deposition?  We'll make them part of record.  We've already marked them for those objections I have sustained or overruled.

MR. LAWRENCE:  In addition to that, I think there may be some additional ones with respect to their designations, but there have been certain exhibits that are associated with that.  And I assume that Your Honor will rule on those with respect to the objections that are filed with that?  Do you want us to move those now?  I'm trying to get what Your Honor would like us to do.

THE COURT:  I'm sorry, I'm not understanding which documents you're talking about.

MR. LAWRENCE:  With respect to -- with respect to the

deposition segments that you have read, as you have commented on, there are references in those segments to documents that are trial exhibits that should be formally accepted or rejected based on an objection.

So again I'm just asking Your Honor how she would like to proceed.  Should we submit the numbers to you and with any objections and let you rule on them in that context in which case that is fine.

(Cell phone rings.)

THE COURT:  Sir, you need to remove yourself.

MR. LAWRENCE:  I am just asking the procedure you would like to do.  We have a list of the documents with the objections that were on the pretrial order and you can just look at them and rule.

THE COURT:  I'm trying to understand which documents you're talking about.  In the depositions you gave me there were no documents included.  I have since gotten another book that has documents.  But I did not recall that any of the objections that were highlighted to be preserved in the depositions referenced in of the documents.  So I did not rule on any objections except the ones that you outlined for me.  And I don't recall that any of them went to documents.

MR. LAWRENCE:  Then again, the issue is then those documents just need to be reflected of record as having been admitted with this case.  In other words, we gave you -- as

Your Honor will remember, you asked for the documents referenced in the depositions.  We provided that subsequently to you.  Those are trial exhibits, and we would ask that those be admitted into this case in the same way that Your Honor has reviewed the depositions.

THE COURT:  Well, then, Counsel, what I suggest that you do is review those with opposing counsel.  Because in the deposition there are different numbers than what we have here.  I don't have any way of cross-referencing them.

MR. LAWRENCE:  I believe that we provided a list to Your Honor that references the particular exhibit to the particular deposition and the lines within the deposition that did not get to you.  We did submit that I believe to the Court.  They're essentially --

THE COURT:  Well, you may have, but I haven't reviewed that.  In other words, last night I reviewed Aubrey McClendon's deposition and the e-mails and the exhibits that were part of his deposition.  I did not go back to the other depositions and review.  If that's something you want me to do we'll take a look.

But let's see if there is any objections.  Are you trying to bring in new numbers into the case?  Or do you simply want them to be filed as part of the deposition testimony.

MR. LAWRENCE:  They are filed as part of deposition testimony which I understand will be part of the official

record of this court.  In order to keep clarity, we believe that the documents referenced should be referenced by their trial exhibit number rather than their deposition exhibit number.

So, for example, you know, in the deposition of McClendon there were several exhibits -- deposition Exhibit No. 21 is our Exhibit No. 248.  We believe there ought to be formal entry of the exhibits with their trial exhibit number as opposed to deposition exhibits.  We are happy to proceed to provide that in whatever form.  I would suggest we provide a list and make sure if they have any objections, that those are reflected on the list, and then Your Honor can rule on their admissibility in that format, unless you would like it in another format.

THE COURT:  How about if you talk with the defense and see if there is any objections to those exhibits that you wish to -- that have been referenced in the deposition.  And then I don't think you really want to take your time to do that.

MR. LAWRENCE:  No.  I would prefer to do the list.  With that understanding, then the City would rest.

THE COURT:  City has rested.

MR. LAWRENCE:  Actually, I'm sorry.  I apologize.  Can I move admission of certain exhibits at this point that were not introduced in evidence by a witness?  I

apologize.

MR. KELLER:  How long is this list?  I'm going to have to respond -- I need an opportunity to look at it.

MR. LAWRENCE:  I just gave him the list.  We can take it up after he's had an opportunity to review it.

THE COURT:  Look at the list and see if -- has it been referenced?  Is there a reason for me to know about this and how am I to put it in context?

MR. LAWRENCE:  These are exhibits that we think are self-evident, or in one case there is, like, requests for admissions and the answers to those.  So these are all exhibits that we believe do not need individual testimony for Your Honor to understand in the context of this case.

THE COURT:  All right.

MR. LAWRENCE: With that we rest.

THE COURT:  The City has rested.

MR. KELLER:  With respect to the list, would it be acceptable for me to give -- if I need to give you a position individually after the noon hour so I can look at it?

THE COURT:  That's fine.  We can take them at the end of the day.  You look at them.  Take your time.

Let's use our time for testimony.

MR. KELLER:  We call Mr. Humphreys.

                    BRAD R. HUMPHREYS

The witness, after being duly sworn, testified as follows:

THE CLERK:  Please state your name and spell your last name for the record.

THE WITNESS:  Brad Runyon Humphreys, B-R-A-D H-U-M-P-H-R-E-Y-S.

DIRECT EXAMINATION

BY MR. TAYLOR:

Q   Good morning, Mr. Humphreys.

Do you have some opinions about the economic impact of sports franchises on cities?

A   Yes, sir, I do.

Q   Before I get to those, I want to know a little bit about your background.

What do you do for a living?

A   I'm an associate professor with tenure of economics.  I hold a chair in the Economics of Gaming at the University of Alberta Department of Economics in Edmonton, Alberta.

Q   How long have you been at the University of Alberta?

A   One year.

Q   Were you before that?

A   Immediately before I was in Alberta, I was an Associate Professor in the Department of Recreations Sport and Tourism at the University of Illinois Urbana-Champaign.  I was there for three years, and I was a tenured professor there.  And before that, I spent about 13 years as an assistant and Associate Professor with tenure at the University of Maryland

Baltimore County, where I was in the economics department.

Q    Do you have any advanced schooling in economics?

A    Yes, I do.    I hold a Ph.D. and Master's Degree in Economics from the Johns Hopkins University in Baltimore; Bachelor's Degree in Economics from West Virginia University; and I hold a Bachelor's in Business Administration from West Virginia University as well.

Q    Have you ever studied the economic impact of the presence or for that matter the departure of a pro sports team on a city?

A    I have spent the better part of the last ten years doing economic research on exactly that question -- the question of what is the economic impact of professional sports franchises and facilities on urban economies in the United States.

Q    Approximately, how many cities have you studied in this regard?

A    I have studied the economic performance of every city in the United States that had either a professional football, basketball, or baseball franchise over the period 1969 to late 1990s.    So that is 39 U.S. cities.

Q    And have you ever studied specifically the economic impact of the departure of a pro sports franchise on a city?

A    Yes, I have.    In trying to assess what the overall economic impact of professional sports are, I tried to measure or capture all the different types of events that --

Q    Before we get to that, can you tell us -- do some of the teams you have studied their departures, the impact of their departure?

A    Every professional sports team that left any U.S. city over the last 40 years roughly.  So I think there is about 19 different sports franchises in the NFL, NBA and major league baseball who have left cities over that period.

Q    You studied the impact of basketball teams?

A    Yes.  NBA franchises that departed cities in my data.

Q    Baseball teams?

A    Yes.

Q    Football teams?

A    Yes.

Q    East Coast, West Coast?

A    Every city in the United States.

Q    Not every city but --

A    Every city that had a team.

Q    How do you study the economic impact of a sports team, either presence or departure?

A    Economic theory tells us about the determination of how economic indicators work in the local economy.  So performance metropolitan economies.  And we know there are --

Q    Stop right there.

You said economic indicators.  What do you mean?

A    Income per capita, measure of the amount of income that

everybody on average earns that lives in the city, and also employment and earnings in specific sectors of the economy. So, say, the service sector or people that work in hotels and bars and restaurants and things like that, earnings and number of people employed in those areas.  That would be economic indicators that I'm talking about.  Generally accepted measures of economic performance in an urban economy.

Q    Where do you get the data for these economic indicators?

A    The U.S. government collects and disseminates this data. Department of Commerce.  They're called regional economic accounts.  And U.S. the government basically collects these metropolitan-area-specific data for every city in the United States and makes those available to researchers.  And I use those data.  It's a standard data source.

Q    You come up with this data, the economic indicators for a given town.  What do you do with it?

A    We know from economic theory that factors that affect economic performance of the cities, like the population of the city, the composition of various industries in the city, lots of unobservable factors that we know affect cities' economy.  Business cycle.  All these things that affect global economic performance are also measurable.

So statistically in my research, I control for all those other factors the economic theory tells us about -- tells us

will affect local economic performance.  And then also the sports environment in these cities are changing; teams are leaving, teams are getting up -- cities are getting new teams, new facilities are being built.  So that is varying both within individual cities and across cities.

For example, in Seattle the Pilots left in 1969.  That is some variation in the sports that are available in that city. And I can exploit in my research statistically that sort of variation to understand the relationship between all sorts of sports-related events, like building --

Q   Let me stop you there.

What you try and do is isolate out the other variables so that you're focused just on impact of the sports team?

A   Exactly.  We want to make sure we control for other economic factors that affect economic performance.

Q   How do you control for those other factors?

A   Statistically.  We develop -- economists have developed a number of econometric models that statistically allow us to hold some of these things constant --

Q   Hold on.  We are not in graduate school.

Econometric model.  What is that?

A   Econometric model is a tool that economists use when they want to take economic theories and apply to economic data to test to see whether those theories work or not.  So it's a statistical model.

Q   And for a given city that you're going to study, how long does it take to assemble the data, work through the model, and come to a conclusion?

A   It takes a considerable amount of time.

Q   Ballpark?

A   Thousands of hours.  You have to collect a lot of data city-specific data on franchise moves and stadium construction and things like that, and also collect these additional data on economic performance.  I would estimate perhaps thousands of hours over the last ten years doing this for research.

Q   Have you had any articles published?

A   Yes.  I published personally over 30 articles in peer-review journals.

Q   Just on sports?

A   I have other areas of research.  But a significant portion of them have been on the economic impact of professional sports franchises.  I guess maybe in the neighborhood of ten.

Q   Peer-reviewed academic -- what does that mean?

A   Peer-reviewed process is central to science moving forward and disciplines like economics.  And the idea is that I write a paper, and I send it off to a journal.  And that journal sends it to other recognized experts in the field of economics and economics of sports and asks them to read the paper and assess whether or not the paper -- results in the

paper are correct, and that this has been carried out in the correct way. I don't know who those people are. It's all blind to me.

But the journal makes an assessment based on those reports about whether it's right or not and if the other outside experts have read it and thought that it's right, then they publish it. And if they have concluded that there are problems with the paper it will be rejected and you'll have to go and make changes to it or maybe it will never be published. I don't know. That's the way peer-review process works.

Q Well, based on your work over the years and your studies of various towns, have you reached any conclusions about whether the departure of a pro sports franchises has any economic impact on a city?

A Yes. I have reached a conclusion on that.

Q Tell us about that.

What did you conclude?

A I concluded that the departure of a professional sports franchise from a city will have no detectible economic impact on the economy in that city.

Q Wait a second. Sonics have a payroll of $60-odd million. That payroll the will go to Oklahoma City.

Won't there be a $60 million hole in the economy?

A Well, it's important to recognize the difference between

economic activity that the Sonics generate.  The Sonics clearly generate economic activity.  You can't go outside KeyArena on game night and not conclude that Sonics are generating economic activity.

But the question is, do the Sonics generate new economic activity in the Seattle economy?  And the answer is, no, they don't.  The Sonics are an entertainment business like many, many other entertainment businesses in the Seattle area.  And so consumers spend their entertainment dollars on whatever entertainment options they have that makes them happy.

And for Sonics fans that is spending it on the Sonics. But when the team leaves, they don't take that consumer spending with them.  That spending remains in the local economy.  It simply gets spent on other entertainment activities by whatever those consumers want to spend it on all over the metropolitan area.

Q   Stop.  Stop right there.

We heard testimony this morning that people won't spend their Sonics dollars -- we will call them -- elsewhere.

Have you taken a look at the academic literature on that subject?

A   Well, there is none.  But you could say that I looked -- I have looked in the past for such evidence.  But there is no peer-reviewed evidence that suggests that anything like that will happen that I'm aware of in the economic literature.

Q   You mean that they won't stop spending?

A   Right.

Q   What does the literature say?

A   Literature says that they just go out and spend their entertainment dollars on other activities.

Q   Is that just Brad Humphreys or do most economists think that or what?

A   That's the consensus of a large number of economists who have been doing research in this area for the past 30 years.

Q   All right.  Let's me ask you a question.

We still got $60 million in payroll that is leaving.  But if I understand this, the money that is spent elsewhere goes into those different companies -- be it the movie theater or Mariners or what have you, and that causes them to increase their spending?

A   That's right.  Well, it allows them to pay the salaries of employees just like the Sonics do.  Now they might not be as high-earning employees as the employees of the Sonics, but there are more of them and they are still getting paid.  So it's just a redirection -- spending -- the pay goes into different pockets that still circulates in the local economy.

Q   In all the cities where you studied this, did you find any place where this wasn't the result?

A   No.

Q   Your analysis of this -- again, is this an opinion just of

Brad Humphreys, or are your views shared by others who have studied the issue?

A   I would argue there is an unusual amount of consensus among economists on this particular issue.  It's by far the consensus of all the scholarly research publishing peer-reviewed journals that there will be no economic impact of a franchise -- professional sports franchise departure in a local economy.

Q   When you say it's an unusual consensus among economists, what does that mean?

A   Well, I think that economists typically have a -- the general public has the perception that economists can't agree on very much at all.  Ask two different economists their opinion on some issue, and you'll get three different answers to that.

But in this case it's pretty clear, and there is a pretty strong consensus among the academic researchers that work in this area about this lack of economic impact from a departure of a pro sports franchise.

Q   Is there any peer-reviewed descending literature that says, no, there is an impact?

A   Not that I'm aware of.  You'll find a few papers that might claim economic impact of the presence of a franchise, but not in economics journals.

Q   Papers, you mean something that didn't make the

peer-review process, didn't make the cut?

A    That's right.

Q    Did you take a look at Seattle to see if there might be something unique about the Seattle economy that would take it out of the other 39?

A    Yes.  Certainly, I did.  Because in my research I focused on the behavior and economic performance of all these 39 U.S. cities that had professional sports teams.  It's important to make sure that Seattle is not in some way unique, which would make the results that apply to all cities on average not apply to Seattle.

But I looked at the characteristics of economic performance in Seattle that I used in my research compared to that economic performance.  For example, the level of income per capita, the population of Seattle compared to other economies, and concluded that Seattle in a typical sense looks pretty much like all the other cities in the United States that have professional sports team.  It's not exceptional in any way I can find.  So I believe that -- in other words, it applies to all cities in general; should certainly apply to Seattle.

Q    What does that mean?

Is the departure of the Sonics going to have an economic impact in Seattle or will it just redistribute the spending?

A    It won't have a net impact I don't believe on Seattle's

economy.  It will redistribute spending throughout the Seattle area.  That's clear.  But the overall impact will be none whatsoever.

Q    Let me ask you a question.

You say "redistribute spending".  You've got restaurants around KeyArena that on game night they may have a surge in customers.

What's going to happen to that money?

A    It will be spent somewhere else in Seattle by the same consumers.  They won't go to KeyArena, they won't go to the game, but they will still have in their entertainment budget to go out and get dinner or do entertainment activity. They'll spend it on some other alternative entertainment activity.  I don't know where it will be.  It's difficult to determine precisely where in the metropolitan area.  It will be somewhere.  That's entirely consistent with the results in modern research and all other published research in this.

Q    Slow down.  Our court reporter is having a trouble.

A    You should pity my students that have to listen to me speak at this pace.

Q    No comment.

You said the metropolitan area.

Did you look at just Seattle or did you look at some broader section?

A    I looked at the Seattle metropolitan area, and not just

the confines of the City of Seattle.  And that's because I need -- I think that's the most accurate and appropriate way to look at this question.

Q    Why is that?

A    Well, it's because economic activity doesn't fall nicely within the political boundaries we have set up in cities.  So people don't spend all their money where they vote, and they spend their money all over the metropolitan area.

So to simply focus on nothing but the City of Seattle would not be very accurate.  And there are all sorts of transactions -- people from outside the city are coming into the city, people from inside who live in the city are going outside the city to spend money.  These transactions take play elsewhere spatially and temporally throughout the city.

And -- I think the professionally the appropriate way to look at it is to take the entire Seattle economy, metropolitan statistical area as a unit of analysis and not draw these --

Q    Slow down.

"Metropolitan statistical area".  Did you define that or did somebody else?

A    Federal government defines it.  It's a standard definition of "metropolitan area".

Q    I want to change gears on you.

We heard this morning about the RIMS II model and using

multipliers to calculate economic impact.

Have you ever taken a look at those?

A    Yes, I have.  In fact, the reason I started on this research agenda to try to understand the economic impact of professional sports franchises and facilities was spurred on just by such an economic impact study, using these regional input/output multipliers.

When I lived in Baltimore, I saw the economic impact study that was generated for the Browns --

MR. LAWRENCE:  I'm going to object.  This was not disclosed in his expert report.  This is a new opinion that we've not heard before about the Browns --

MR. TAYLOR:  The first page of his export report.

I'm sorry, second page, Your Honor.

MR. LAWRENCE:  I would be happy to have you see the report.  Second page talks about generically economic impact study.  It says nothing about any specific study.  And I did not know he was going to testify about any specific study.  I didn't have an opportunity to ask him a question about anything specific.  It's a generic issue.

And I didn't object when he was talking generically.  Now it's going to a specific study which was not disclosed in his expert report.  I think it's beyond the scope of his expert report.  He's classified generically about economic impact studies going to something that is not identified in the

report.   That should have been identified in his report.

THE COURT:   Mr. Taylor, the RIMS II model you're talking about, is that an economic study?

MR. TAYLOR:   Yes.   Economic impact study.

THE COURT:   Objection overruled.

Ask your question.

BY MR. TAYLOR:

Q   You were talking about something you did ten years ago that got you to take a look at the RIMS study.

Can you tell us about that?

A   I have read dozens of these economic impact studies over the course of my academic career.   And the regional input/output models, that's the workhorse of these economic impact studies.

And it was my opinion that they vastly overstate the net economic impact of professional sports on a local economy. They're forecasts.   And --

Q   Let me ask you a question.

You used the word "net economic impact".

Are these measuring net economic impact or gross economic impact?

A   Well, they're typically not very careful about what it is they're measuring in these things.   They use other words like total economic impact or something --

Q   Slow down.

Have you testified many times in court?

A   Very few.

Q   Just take it easy.

A   So --

Q   Let me ask you, what's the difference between gross economic impact and net?

A   Gross economic impact would be the total amount of spending which would be associated with something.

Q   So when we see the Sonics' payroll is $60 million, but it multiplies through the economy, that's the gross effect?

A   That's right.

Q   What is net?

A   That's the new economic activity that is associated with that.

Q   Do these RIMS studies typically measure gross or net economic impact?

A   Well, it depends on the way the studies are set up.   But it's really hard to get at the numbers that would allow you, the RIMS model, to identify the net.

What most people do who perform these studies is to estimate the net.   You take the total amount of revenues generated by the Sonics, and you feed that into a regional input-output model and you arrive at the gross economic impact number.   But it's just the amount of money that is

being spent in the local economy that can be attributed to the Sonics. It's not new economic impact. You have to figure out exactly how many people came into Seattle from outside Seattle to get to that.

Q    Let me ask you another question.

Among trained economists, is there a view one way or the other about the reliability of these RIMS studies?

A    I will say this:  RIMS studies are never published in peer-reviewed economics journals.

Q    They never make the cut?

A    No, they don't make the cut.

Q    Why not?

A    Because the methodology is flawed, is the consensus among research economists. They're not -- they wouldn't be able to get through the cut to make peer-reviewed journals because of these methodological problems, which are well recognized. I mean there are papers about the methodological problems in regional input/output models. They're very, very seldom published in peer-reviewed journals.

Q    Thank you.  On cross-examination slow down.

THE COURT:  Mr. Lawrence?

CROSS-EXAMINATION

BY MR. LAWRENCE:

Q    Good morning, Professor Humphreys.

I was counting; I think you used the term "city" ten times; "town" was used by Mr. Taylor a couple of times.

But you don't study cities or towns; is that right?

A   That's right.  I study metropolitan statistical areas.

Q   So when Mr. Taylor asked you about all the studies you've done of cities, the answer should have been zero, correct?

A   No, that's not correct.  Because in some cases the metropolitan statistical area is identical to the city.

Q   Can you name one where you've done that?

A   Not off the top of my head, no.

Q   As you sit here today, knowing what you know and what you just said, the correct answer when Mr. Taylor asked you how many cities you've evaluated, you should have said none that I recall?

Is that yes?  Is that answer:  That's correct, sir?

A   Yes, that's correct.

Q   How many towns have you studied?

A   I don't know the difference between a city and a town is.

Q   So the same answer.  Whenever he mentioned the word "town", you should have said, sir, I don't study towns that I recall, correct?

A   Correct.

Q   So what you instead study are metropolitan statistical areas, correct?

A   That's correct.

Q   So let's get a sense of what that is with respect to your quote study about Seattle, right?

A   Correct.

Q   Mr. Taylor asked you whether you did a study about the impact on Seattle.

    You did no study about the impact on the City of Seattle, did you?

A   No, I didn't.

Q   So when you use the word Seattle, you are talking about the Seattle metropolitan -- what is it?  Metropolitan statistical area?

A   Correct.

Q   And you define that in your paper, and that's defined "King County"; yes?

A   Yes.

Q   Plus Snohomish County?

A   Yes.

Q   Plus Pierce County?

A   Yes.

Q   So it includes Tacoma, Seattle, Bellevue, Everett, and every town within that three-county region, correct?

A   Yes.

Q   Seattle is just a part of that region, correct?

A   Correct.  King County.

Q   Seattle is not the entire King County.  Or do you think it

is?

A    No.

Q    Do you know statistically what percentage of that area Seattle represents?

A    No.

Q    I would like you to look at Exhibit No. 338, please.

A    Okay.

Q    Exhibit No. 338 shows on the right the total population for the Seattle metropolitan statistical area.

Do you see that?

A    Yes.

Q    That's Snohomish, King, and Pierce County.  The total is 3,263,497.

Do you see that?

A    Yes.

Q    It also shows the City of Seattle population?

A    Yes.

Q    That population is 582,454, correct?

A    Correct.

Q    That's less than 20 percent of the total population of the area that you've called Seattle, correct?

A    Federal government calls it Seattle.

Q    For the purpose of your testimony, I want to understand what is and not at issue.

In terms of what you studied, this metropolitan

statistical area, the City of Seattle is less than 20 percent of that area, correct?

A   If you say so, yes.

THE COURT:  We need to find a place to stop.  We will be back at 1:30.  Thank you, sir.  You may step down.  We'll be at recess.

(Lunch recess taken.)

THE COURT:  Are we ready to begin?

MR.  LAWRENCE:  We are, your Honor.

THE COURT:  Go ahead, Mr. Lawrence.

By Mr. Lawrence:

Q   At the break we were clarifying that what you had studied is not cities but metropolitan statistical areas; is that right?

A   Yes.

Q   And, in fact, you told Mr. Taylor that in your report, didn't you?

A   Yes.

Q   In fact, you said the research that you relied upon was the peer-reviewed academic journals that had examined the economic impact of the departure of a professional sports franchise from a US metropolitan area, correct?

A   Correct.

Q   And that what have you done is you have done a historical

data drawn from the past economic performance of every US metropolitan area, correct?

A    Correct.

Q    So can you use that term to reflect what research you have done and relied upon?

A    Yes.

Q    Now, in terms of the research in this area, it is well known in the literature, is it not, that the smaller geographic area that you choose to look at the easier it is to find economic benefits, correct?

A    In which literature are you referring to?

Q    Could we have your deposition published, please? Referring you to Page 16.

A    Yes.

Q    Starting on Line 22, you were asked.  "I believe you said that it's well known in the literature that the smaller the geographic area of interest you choose the easier it is to find economic benefits?"  And if you turn the page you say, "yes."

A    Yes.

Q    That is accurate?

A    That is accurate, yes.

Q    So, for example, you acknowledge that there are significant economic benefits in the area immediately around KeyArena from the presence of Sonics games, correct?

A    That's correct.

Q    And you also know that the City of Seattle as an area is smaller than the Seattle MSA, correct?

A    That's correct.

Q    It is less than 20 percent of the population.  So based on what we have just learned, since the City of Seattle is a smaller geographic area of interest than the Seattle MSA, if one were to look only at the City of Seattle it might be easier to find economic benefits from the Sonics than when one looks at the Seattle MSA; is that correct?

A    From the perspective of gross economic impact, yes.

Q    Well, from the perspective of what you look at in your studies; is that right?

A    Well, the literature that I was referring to in my report is the literature that criticizes economic impact studies, regional input/output models.

Q    I'm sorry, I am not talking about that.  Let's look to your deposition and see what you said in your deposition. Page 19, please, starting on Line 23.  Question:  "Based on what you've told me, since the City of Seattle is a smaller geographic area of interest than the Seattle MSA, if one were to look at the city of Seattle it might be easier to find economic benefits from the Sonics than when one looks at the Seattle MSA?"  And you answered, "yes."

      That was accurate at the time?

A   Yes, gross economic benefits.

Q   I am just talking about economic benefits, right?

A   That is unclear to me.

Q   That's fine.  We will talk about --

MR. TAYLOR:  Your Honor --

By Mr. Lawrence:

Q   What is unclear to you in your deposition about your answer, sir?

A   When you say economic benefits, there are gross economic benefits, there are net economic benefits.  It is unclear in that question which one of those types of economic benefits were being referred to.

Q   I will be happy to go through the deposition.  I was talking about your term of economic benefits, which I assume is net?

A   I think that is your question.

Q   Sir, you would agree the net economic benefits to the KeyArena area -- there are net economic benefits that would be lost if the Sonics left?

A   Gross economic benefits.

Q   Are you saying that the spending in the KeyArena area would be transferred within the Seattle KeyArena area?  I want you to tell me the difference between net and gross, because maybe I am misunderstanding you.

A   Gross is total economic activity spent.  Net would be

incremental effect.

Q   Okay.   That's what I am trying to find.   Your basic premise is if I am not spending a dollar at the Sonics I will spend my dollar somewhere else?

A   Right.

Q   Now, you have agreed in your report you looked at some statistical evidence about season ticket holders that something like eight percent of the season ticket holders come from outside the Seattle MSA, right?

A   Right.

Q   And you acknowledge that those eight percent of season ticket holders who are coming into the Seattle MSA to spend dollars, their dollars might not end up within the Seattle MSA when they spend it on other discretionary income, correct?

A   Correct.

Q   So when we say that those eight percent of the dollars are lost to the Seattle MSA, what economic benefit term do you use?   Is that a net or gross issue?

A   That is gross.

Q   That is gross.   Okay.   So then we are fine.   So, again, the question is, since Seattle is a smaller geographic area of interest than the Seattle MSA, if you just look at the city of Seattle it would be easier to find economic benefits, correct?

A    Gross economic benefits.

Q    Now, you could have looked -- technically you could have looked at the impact on the City of Seattle's economy from the departure of the Sonics, correct?

A    King County, not the City of Seattle.

Q    Could we look at your deposition on Page 12, starting at Line 14?  I asked:  "Let me ask you:  If you had been asked to look specifically at the impact on the City of Seattle's economy, could you have done that?"  Answer:  "Well, technically, yes.  Technically I could have."  And if you want to read the rest of that answer go ahead.  I don't want to --

A    If I could --

Q    Was that what you answered at your deposition?

A    Yes.

Q    And you understand this is a dispute between the City of Seattle and the SuperSonics, correct?

A    Yes.

Q    It is not a dispute between King County and the --

A    I understand.

Q    It is not King, Snohomish and Pierce County?

A    I understand.

Q    And you understand that the lease at issue is with the City of Seattle?

A    Correct.

Q   So there would have been nothing arbitrary to be interested in what the impact of the departure of the Sonics would be on the City of Seattle, correct?

A   I don't know.  Arbitrary?  I don't know --  It is arbitrary to look at a certain set of Seattle -- of the Sonics ticket holders.

Q   Let's just go to your deposition, sir.  That's fine. Page 14.  Starting on Line 10 you were asked:  "You understand the lease is with the City of Seattle?"  And your answer was:  "I understand that."  My question next was: "When you say -- when you use the term arbitrary line drawing in the sense of something you want to avoid, you would agree it is not an arbitrary question in this case to understand what the impact of the departure might mean to the City of Seattle since it is a city lease and it was the city that made the public subsidy investment in the arena?"  Your answer was:  "I understand who the parties are involved in the suit, yes."  My question was:  "So there would be nothing arbitrary to be interested in what the impact is on the City of Seattle, correct?"  And you answered:  "Correct."

A   Okay.  I understand now.  Sorry.

Q   And it is correct that the PBC did not ask you to look at the impact of the departure of the Sonics on the City of Seattle, correct?

A   Correct.

Q   They asked you to look at the Seattle MSA?

A   Correct.

Q   So even looking at the Seattle MSA, you acknowledge there are a couple of areas where there would be a loss to the Seattle MSA, let alone the City of Seattle, from the departure of the Sonics, correct?

A   Correct.

Q   We talked about one.  That is the eight percent of the people who come into the Seattle MSA to see the Sonics, correct?

A   Correct.

Q   And the other, and I think you touched on this with Mr. Taylor, are the actual Sonics players and front office personnel, correct?

A   Correct.

Q   That have a total payroll somewhere in the nature of $73.6 million for 2007-2008?

A   Correct.

Q   And some portion of that team payroll when the team moves to Oklahoma City is lost to the Seattle metropolitan statistical area, correct?

A   Yes.

Q   And would certainly be lost to the City of Seattle to the extent the payroll is in the city?

A   Yes.

Q   Now, with respect to the other 92 percent of the people who go to games in your view, they live within this three-county area, correct?

A   Yes.

Q   And your view is --

A   Season ticket holders.

Q   Yeah, season ticket holders.  That is all you looked at?

A   That is all I looked at, correct.  I don't know anything about walk-up purchases.

Q   So your basic testimony is that if I live in Bellevue and come into Seattle to watch a Sonics game, and I am a person that does that 41 times a year, and I can't go to the Sonics 41 times a year, I will just spend that dollar somewhere else within the Seattle metropolitan statistical area, correct?

A   That's correct.

Q   So if I am that Bellevue person who used to come into Seattle 41 times a year I instead go see movies in Bellevue, that's a dollar that stays within the MSA, correct?

A   Yes, that's correct.

Q   But that dollar doesn't stay in Seattle, correct, the City of Seattle?

A   If your question is if it is spent, it clearly doesn't, if it is spent in Bellevue.

Q   You would agree then that there are some people who live outside of Seattle who are season ticket holders and other

ticket holders who come into Seattle to see Sonics games who will spend their discretionary dollars somewhere outside the City of Seattle if the Sonics leave?

A    Undoubtedly some of them will, yes.

Q    Undoubtedly some of them will.  Now, did you make any effort to find out the percentage of season ticket holders who live outside the City of Seattle?

A    No.

Q    But you were given an Excel spreadsheet by Danny Barth, I believe, that had information about all the season ticket holders on it?

A    Yes.  It had their zip codes where they lived.

Q    Mr. Taylor sent that to me, correct?

A    Yes.

Q    So what I got was what you had?

A    Yes.

Q    And you said you couldn't just readily turn that into information about the number of season ticket holders in Seattle?

A    No.  I could.

Q    You could?  Okay.  Let's see what one could have done.  I will use the ELMO.  I don't really want to enter this as an exhibit but use it because it is a long exhibit, 339, which you both should have.  339 is the printout of the spreadsheet that was provided to me by Mr. Taylor that supposedly was

given to you by Mr. Barth.  Do you see that?

A    Yes.

Q    Now, for the purposes of privacy sake I have blacked out the street address information, because we don't want to give that information publicly.  In addition to the zip code it shows what city people live in, correct?

A    Correct.

Q    So the way Excel works, if you had just gone to the city column and asked to put that, for example, in alphabetical order, you would have all the people from Seattle in one grouping, right?

A    Correct.

Q    Let's see what happens when you do that.  Turn to 340.  In 340 what we have done is taken that same Excel spreadsheet and done it alphabetically and kept the numbering on the side so we understand the numerical values.  You see it starts with number one and it goes to 2284, correct?  2284 is the last number?

A    Sure, I will stipulate to that.

Q    This is from the year 2006, correct?

A    Correct.

Q    If you want to check you can go start looking and you see the first number where Seattle shows up 1201, and the last number where Seattle shows up is 2024, which I have done the math to make this easy so you don't have to.  So there are

823 Seattle season ticket holders out of 2284.   Okay?

A   Okay.

Q   And that is the information provided by Danny Barth, correct?

A   Yes.

Q   And that represents -- again, I did the math to make it easier -- 36 percent of the season ticket holders for the Seattle Sonics live in the City of Seattle, and 64 percent live in the remainder of the Seattle MSA.   Okay.   Actually some of those live outside.   Eight percent live outside the Seattle MSA.

So if we take your notion that the people who live outside the Seattle MSA don't spend their discretionary Sonics dollars in the Seattle MSA that you agreed to in your report, and applied that to the smaller geographic area for the City of Seattle, that would tell us that 64 percent of the economic activity associated with the presence of the Sonics in Seattle is likely to have their dollars spent somewhere other than the City of Seattle within the MSA?

A   No, it does not.

Q   Well, a lot of that might --

A   You didn't --

MR. TAYLOR:   Your Honor --

MR. LAWRENCE:   Just a second, Mr. Taylor.   I didn't realize he was talking --

THE COURT:  Mr. Lawrence, talk to me.

MR. LAWRENCE:  I apologize, your Honor, for talking at the same time as the witness.

THE COURT:  Okay.  Let's back up, give him the question again and give him an opportunity to respond.

By Mr. Lawrence:

Q   Did you make any effort to determine what dollars associated with the 64 percent of the season ticket holders that live outside the City of Seattle would be spent within the city or outside the city of those discretionary dollars?

A   There is no way to know the answer to that question.

Q   You would expect some of it would?

A   I don't know.

Q   So you expect that people from Snohomish County who come into Seattle to watch the Sonics 41 times a year are going to substitute those 41 trips with other trips to Seattle?

A   There is just a lot of transactions going on.  How do we know that people who live in Seattle aren't going outside of Seattle when the Sonics leave and spending their money somewhere else?  That is a loss to Seattle.  I just have no basis to make any sort of a professional opinion about where these transactions are taking place because this is gross economic benefit.  My research is focused on net economic benefit.  And I believe that --  My professional opinion is, and the research literature concludes, that it is these net

economic benefits that I have examined and not these gross economic benefits which you were talking about which are the important issues in answering this question.

Q   I am sorry, sir.   I thought your testimony was that if I used to spend a dollar at the Sonics -- my discretionary dollar at the Sonics, I might spend that somewhere else, and so there is no net loss of dollars, right?

A   That's right, in the MSA.

Q   I am asking you now about the City of Seattle's economic impact, correct?

A   But the answer is I don't know.

Q   Okay.   Maybe we will disagree on that.   You have no idea what the net economic impact on the City of Seattle is if the Sonics leave?

A   I suspect it is zero.

Q   How do you --   Have you studied any cities?

A   Have I studied very specific geographic areas?

Q   Any cities.   We established you haven't, correct?

A   Correct.

Q   And your theory is that dollars -- if I have a discretionary dollar to spend on the Sonics I will spend it somewhere else?

A   Yes.

Q   And when you look at as big an area as King, Snohomish and Pierce County there is a lot of places I can spend my dollars

if I don't spend it in Seattle and still have a net zero, correct?

A    But there is -- there are other transactions going on.

Q    Is that --  Sorry.  Go ahead.

A    There is all sorts of -- there is quite a bit of spatial complexity in economic transactions.  I mean, people are going across these political borders and buying stuff, goods and services.  It is impossible.  We don't have the data to answer that question.  I don't know.  You can make assumptions.  You certainly can.  I don't think they would be justified.

Q    So you don't know is the answer?

A    Yes.

Q    And so whatever testimony you have given here today does not tell us what the net economic impact on the City of Seattle is from the departure of the Sonics, correct?

A    Yes.

Q    Thank you.  Now, in fact, your research tells you that professional sports teams have a net negative impact on a metropolitan area, correct?

A    That's correct.

Q    So the City of Seattle is worse -- sorry, not the City of Seattle, the Seattle metropolitan statistical area in your view is worse off economically for having the Sonics, correct?

A    Or at least no better off.  It could be.

Q    It might be worse off for having the Seahawks?

A    Could be.

Q    It might be worse off for having the Mariners?

A    Yes.

Q    And in your view Oklahoma City might be worse off for having the Sonics move there?

A    Yes.

Q    Even though you acknowledge that there is substantial economic activity generated by people who attend Sonics games or any professional sports games, correct?

A    Absolutely.  Yeah.

Q    And that is related to the spectator spending hundreds of dollars on tickets and concessions, significant spending outside of the facilities, parking, food and drinks, hotel rooms, licensed merchandise, gas and other consumer goods and services?

A    Yes.

Q    You admit that all that economic activity takes place with respect to a professional sports team?

A    Yes, I do.

Q    And the question is where do those dollars go when the team goes?

A    That's correct.

Q    And the question is where do those 64 percent of the

Sonics season ticket holders who don't live in Seattle spend their dollars when they can't go to Seattle to spend them on the Sonics.  That would be the question?

A    There are more questions.  That is one.  When figuring out the overall effect on these very small specific geographic areas you need to take into account where -- not just what the effect of people who go to Sonics games are but potentially people who come into the city who wouldn't have come into the city if the Sonics were here.  There is a very complicated set of transactions that are going on here and not this one specific type of spending that you are focusing on.  This is the difference between gross and net.

Q    So dollars might be coming into Seattle from Oklahoma City?

A    Well, some probably are.

Q    Yeah, the ownership here is claiming they lost $24 million last year, and they had to put $24 million into the Seattle economy in order to cover that loss, right?

A    I have no knowledge of that.

Q    Let me ask you to assume the testimony in this case then is that the Sonics lost -- actually lost $27 million, and some of that 3.5 million went to Mr. Keller's firm, but some probably went to McAfee Taft in Oklahoma City.  But the $24 million net, they had a loss, the owners had to put money into the team, right?

A    Yes.

Q    And that money is flowing from Oklahoma City to Seattle metropolitan statistical area?

A    And it leaks right back out too, sure.

Q    So maybe that is a net gain for the City?

A    I don't know.

Q    It could be?

A    I don't know.

Q    Now, your bottom line, though, is that when you look at an MSA area there is no net loss from having a team --  Well, you think there is a negative from having a team.  But there surely is no net loss with the team leaving, right?

A    Right.

Q    But you know, do you not, that in fact public entities routinely invest in sports arenas in order to attract teams, correct?

A    Yes, they do.

Q    And sometimes they even bring lawsuits in order to keep teams?

A    Yes.

Q    That happened in Cleveland?  You have to answer yes or no.

A    Yes.

Q    Certainly it is happening here.  So there is --  You have a conclusion as to why public entities do that, don't you?

A    Yes, I do.

Q    And one of the reasons that entities do things like invest in arenas and bring lawsuits to keep teams there is because of the intangible benefits that accrue from having a sports team in your area; is that right?

A    Yes.

Q    And would you describe those intangible benefits as community spirit?  Is that one?

A    Yes.

Q    Local pride?

A    Yes.

Q    Shared commodities of experience and glories of past teams?

A    Yeah.

Q    All sort of things that generate a lot of satisfaction for individuals, correct?

A    Yes.

Q    Those are the type of individual -- I'm sorry, those are the type of intangible benefits that sports teams bring to a community, correct?

A    Yes.

Q    And you would agree that it is difficult to put a money value on those intangible benefits, would you not?

A    People have done it.  I mean in the research literature people have done it.  There are many such examples of --

Q    Can you --  Sorry.  Go ahead, finish your answer.

A    -- putting dollar values on intangible benefits like that.

Q    Can we see Page 68 of your deposition?  Starting at Line 5 I asked you:  "Would you agree that the -- trying to place a money value on those intangible benefits is difficult?"  And you answered:  "Difficult but not impossible."  I asked: "Have you ever tried to do that?"  And you answered:  "No."

A    That's correct.

Q    And do you have any reason to believe that those intangible benefits don't apply to Seattle with respect to the Sonics?  Sir?

A    Yes.

Q    Do you have any reason to believe --

A    No, I don't.  I still have no reason to believe it doesn't apply to the Sonics.

Q    You do agree the presence of the Sonics bring intangible benefits to this community?

A    Yes.

        MR. LAWRENCE:  Thank you.  I have nothing further.

        THE COURT:  Any cross-examination -- I'm sorry, redirect examination.  Excuse me.

                    REDIRECT EXAMINATION

BY MR. TAYLOR:

Q    There were a lot of questions about cities versus metropolitan statistical areas.

A    Yes.

Q   You read Mr. Hatamiya's report?

A   Yes.

Q   Did he select a city or the MSA for his analysis?

A   Kind of something in between, I believe.  It was definitely not the City of Seattle, it was a larger area.

Q   He went up north to Snohomish?

A   Yeah.

Q   Tell us briefly the difference between gross economic activity and net economic benefit?

A   Well, the net -- the important consideration here is the net economic benefit is how much new activity there would be, accounting for all these different sort of transactions. People come into the suburbs to KeyArena and to the games, and people go from Seattle out into the suburbs and spend money, and all sorts of transactions like that.  To focus on one little piece of that, that is the gross or that is -- associated with that --  Net would be after we sort of net out or account for all these different transactions, what there is that is new, what is incremental economic benefit.

Q   So the gross economic benefit includes the money that goes back and forth across the 520 bridge?

A   Yeah.

Q   From Bellevue to Seattle, vice versa, up north and all around town.  Net, though, you are looking for is there new money created that didn't otherwise exist?

A   And not just moved around, that's right.  That is the important distinction here.

Q   You were asked about money from Oklahoma City coming in. You said, well, it is going to leak right back out.  What does that mean?

A   If this money -- if the Sonics are making a loss that means their expenses are greater than their revenues.  Some money has to come in to cover those expenses.  Those expenses go into player salaries and travel and things like that. Much of that money doesn't stick around in Seattle and create new net economic benefit.  It just goes to pay whoever provides the transportation services to get the team to away games, players don't all live in the city, that money leaks out, many of the things they buy is not locally produced and that money leaks out.  By the time all those things are sort of watered down, that cash flow into town, there is not much economic impact left there.

Q   Is there a consensus in the literature as to whether it is appropriate to rely on an MSA to determine the net economic impact of the arrival, presence or departure of a pro sports team?

A   In the research literature that is published in peer-reviewed academic journals the consensus is that the MSA is the appropriate level of analysis for this sort of thing.

Q   And that data gives you a statistical valid basis to draw

your conclusions?

A   Yes.

Q   You were asked about the player salaries.  And this is where we began this morning.  The player salaries are going to leave, money spent on the Sonics will be spent elsewhere?

A   Yes.

Q   And that will give more revenues to those companies?

A   That's right.  There is entertainment spending that used to go to the Sonics because of these players that gets spent perhaps out in the middle of Bellevue, I don't know, somewhere in the city, and that provides revenues for those firms to hire people and pay their salaries, and that still stays around in Seattle.

Q   So it is like water, it seeks its level?

A   Exactly.

        MR. TAYLOR:  Nothing further.

                RECROSS-EXAMINATION

By Mr. Lawrence:

Q   Just so we are using the right terminology, when you say it stays around in Seattle, you are talking about Seattle MSA, not the City of Seattle?

A   Yes, but some of it stays in the City of Seattle.

Q   Some does, but some leaks out or ends up outside the City of Seattle?

A   Yes.

Q   And the City of Seattle is 18 percent of the population of the Seattle MSA?

A   Yes.

MR. LAWRENCE:   Thank you.

MR. TAYLOR:   Nothing further, your Honor.

THE COURT:   Thank you, sir.   You may step down.

THE WITNESS:   Thank you very much.

THE COURT:   The next witness, please.

MR. KELLER:   We are going to call Mr. Mitch Ziets.

Whereupon,

MITCHELL ZIETS

Called as a witness, having been first duly sworn, was examined and testified as follows:

THE CLERK:   Please state your full name for the record, spelling your first and last name.

THE WITNESS:   Mitchell Ziets, M-I-T-C-H-E-L-L, Z-I-E-T-S.

DIRECT EXAMINATION

BY MR. TAYLOR:

Q   Mr. Ziets, I am Paul Taylor and I represent the Professional Basketball Club.   Have you done an analysis of the projection of losses for the Sonics if they stay in Seattle for the two remaining years of the lease?

A   Yes, I have.

Q   All right.   I want to talk to you at some length about

that.  Before I do, would you tell us what you do for a living, please?

A   I run an investment banking firm called MZ Sports. MZ Sports is a boutique investment bank focusing solely on the sports business.  And what we do principally is we advise teams and team owners on building new stadiums and arenas, negotiating leases and advise prospective buyers of sports teams, and we also do valuations of sports teams.

Q   Talking about potential buyers, buyers of franchises, how many different franchise buyers have you worked with?

A   Since 2001 we have worked with 30 different buyers.

Q   Have you done anything regarding professional basketball teams?

A   Yes, we have.  We have worked on a number of transactions.

Q   Can you tell us which ones?

A   Sure.  We have represented buyers of the Cleveland Cavaliers.  These are in addition to our work on the Sonics. Cleveland Cavaliers, Philadelphia 76ers, Portland Trailblazers, Atlanta Hawks.

Q   Any other sports?

A   Yes, numerous deals in other sports, the Minnesota Vikings, the Los Angeles Dodgers, Atlanta Braves, Anaheim Ducks, the Washington Nationals.

Q   Anaheim Ducks, that's hockey?

A   Yes.

Q    Nationals, that is baseball?

A    Baseball, yes.

Q    You say you advise them on acquiring franchises.  How do you do that?  What do you do?

A    First we go in and we assess the business through what is called a due diligence process, so we look at all the books and financial records and operations of the team.  And then we put together a financial model, which is really an operating projection of how we expect the team to perform operationally and financially over time.  And then we use those projections to help the team owner raise capital, which is generally raising debt, either going to banks or going to Wall Street to raise debt, borrow money to close on the transaction.

Q    You used a couple of phrases there, first financial models and second projections.  What is the tie between the two?

A    They are basically one and the same.

Q    When you say "financial model," tell us what it is?

A    Sure.  A financial model is a model that looks at all of the team's different revenue streams, like tickets, sponsorships, suites, TV deals, that kind of thing, looks at all those revenues and then looks at all the team's expenses, players, arena-related expenses, general front office expenses, things like that.  And then we take that out into the future and try to project what we think the team is going

to do so they can go borrow money against that.

Q   And to do that you have to look at what is happening elsewhere out in the league, for example, the NBA?

A   Typically what we do to make an assessment of what can happen in the future, especially with teams whose past performance can vary widely from year to year and from team to team, is we will look at a number of teams in similar markets, similar size markets and we will look at league averages and assess what we think the team can do, can it improve its operations, is it already doing better than we would have expected otherwise, things like that.

Q   You also indicated you are involved in team valuations?

A   Yes.

Q   What is that -- what does that entail?

A   Typically when someone is buying a team they need to understand the value of what they are buying.  And so we will be retained either as part of our work in assessing the operations of the team or separately get hired to do a valuation of the franchise.  And typically in sports what that -- the way we do that is we look at comparable deals, how have other teams traded, how have they sold, for what price over the prior four or five, six years.  We can get a sense of what this team should sell for using that methodology.

          THE COURT:   Mr. Taylor, wait just one moment, please.

764

Go ahead.

MR. TAYLOR:  Thank you, your Honor.

BY MR. TAYLOR:

Q   How long have you been in this business, not just
MZ Sports but the sports business?

A   20 years.

Q   How did you get started in it?

A   I started in 1988.  I went to a municipal financial
advisory firm in Philadelphia called Public Financial
Management, and we just started a sports group to focus on
new stadiums and arenas.  That was the start of the recent
stadium boom in this country.  So the firm had just done its
first stadium down in Miami, and other teams -- other teams
in other cities started looking at new stadium construction
at that point.  So I joined and got put into that group that
was doing new stadiums and went from there.

Q   Have you ever testified in court before?

A   No.  No, I have not.

Q   Could the witness be shown, please, Exhibit 610?

MR. TAYLOR:  We would offer it for illustrative
purposes only.

MR. JOHNSON:  No objection, if offered for only
illustrative purposes.

THE COURT:  610 is admitted.

(Exhibit 610 admitted)

BY MR. TAYLOR:

Q   Could we have Page 2 of 610, please?  There is a phrase there on sentence number one that says "lame duck."  What is a lame-duck situation?

A   What we define as a lame-duck situation is a situation where a team is not going to stay in its current market where it plays for very much longer, and the fans know that.  So it is on borrowed time basically.

Q   Kind of like a politician riding out his last years of office?

A   Yes.

Q   What did you do in this case?  I see three steps here. Just tell us 20,000 feet what you did?

A   Sure.  In assessing what we thought the financial impact of the last two lame duck years would be here in Seattle we did three things.  First, is we went out and identified comparable situations.

Again, you mentioned the valuations earlier and asked how we did that.  Typically in finance we want to see things that have actually happened before.  So we want to understand what has really gone on before.  So we wanted to find comparable situations.  That was the first step.

The second step is, once we identified those situations we wanted to understand what the financial impact was of those teams being lame ducks.

And then the third is, once we understood the financial impact, to apply that financial impact to the Sonics situation for the last two years.

Q   Turn to Page 3, please.  "Comparable situations, selecting the proper teams to evaluate."  I see a number of teams listed there, and a couple are highlighted.  What is going on in this page?

A   What we have done there is we have identified all of the relocations in the top four sports leagues since 1990.  So we went back and looked at all those, and there are 11 different ones on this page.  And then we tried to identify the ones that we thought would be comparable.  What we found is that most of these teams announced they were leaving their host city in the last year, either at the end of their last season or during their last season.  And when they do that we can't really evaluate any financial impact because they have already sold all their tickets, they sold all their suites, all their sponsorships and then they leave town.  So there really is no financial impact.  So we couldn't use those.

Q   Stop right there.  So the fact that they are leaving -- if they announce they are leaving mid season -- if they announce in the middle of the season that they are leaving at the end of the season you didn't deem that a lame-duck situation?

A   We didn't deem that we could figure out what the financial impact was of that situation.  When you pick something that

happens in the middle of a season we don't know how many tickets they have sold before they made that announcement and after they made that announcement.  So we really wanted teams that announced they were leaving or it became clear that they were leaving with at least one year, but hopefully multiple years, so we could measure their financial impact or financial operations from year to year.

Q   Now, the Sonics are in a what, two-year lame duck scenario if they stay here?

A   Yes.

Q   Did you find any comparable two-year lame ducks?

A   We found two.  The Houston Oilers of the National Football League were a two-year lame duck, and also the Charlotte Hornets of the NBA were a two-year lame duck.

Q   Let's talk about Houston for a second.  Turn to Page 4, please.  Tell us what happened in Houston that made them a two-year lame duck?

A   The Houston Oilers were looking for a new stadium in the early '90s, not unlike what has been happening here over the past few years.  And basically by mid 1995, the summer of 1995, it became clear that relocation was an option.  And there were a lot of articles about relocation.  In fact, one of the preseason game for the Oilers, I think this is the first time this has ever happened, was cancelled that summer. And people thought it was all part of a leverage play to try

to get a new stadium.  A series of articles came out in August of 1995 about relocation to Tennessee possibly.  So we felt that was the start of what we would consider to be the lame-duck period.  And so we felt that in 1995, which is when the team actually signed to relocate to Nashville, that was later in the season, we felt the '95 season, and then the 1996 season, which was their last season in Houston, were the two lame duck years.

Q   So they played those two seasons in Houston even though everybody knew they were going to Tennessee?

A   Yes.

Q   Did you take a look at what happened to them financially during that period?

A   Yes, I did.

Q   Let's take a look at Page 5, please.  Tell us your overall conclusion and then we will walk through how you got to it, okay?

A   Sure.  My overall conclusion was that during the two-year lame-duck period the team's ticket revenues declined by over 40 percent.

Q   All right.  Let's talk about how you got there.  The first line I see is "estimated 1994 ticket revenues based on actual attendance figures."  What does that mean?

A   What that means is we had data for 1995.  We knew the team's attendance in 1995 and the team's ticket prices in

1995.    We did not have the team's ticket prices in 1994, so we had to estimate those.

Q    Stop.    Did you have attendance figures from 1994?

A    Yes, we had attendance figures for 1994.

Q    I see two columns there, "next estimated "94 ticket revenues."    One says, 18.1 million, the other says 20.4.  Tell us how you got the 18.1 million estimate?

A    We knew the 1994 attendance, and we estimated the 1994 ticket price to be the same as the 1995 ticket price, which was $41.    And when you multiply the attendance by the ticket price you get $18.1 million, which was our estimate.

Q    And what about this $46 per ticket, where does that come from?

A    Separately we also analyzed the estimated ticket revenues in 1994, assuming a higher ticket price than $41, and in this case $46, based on the theory that their ticket prices would have dropped from 1994 to 1995 because they were losing attendance.

Q    So we knew in '95 it was 41, and you figured maybe they dropped it from a slightly higher price in 1994?

A    That's correct.    Since we didn't know the exact number we did a range.

Q    Then we see the next line, "expected '96 ticket revenues based on average league ticket prices and assuming no attendance decline."    That is a mouthful.    What does that

mean?

A   What that means is this is how we would have expected the Oilers to perform if they performed like other National Football League teams performed.  In other words, if their ticket prices went up at the average of other teams, which was five percent a year for those two years.

Q   It says, "assumes no attendance decline," meaning they are not in a lame-duck situation?

A   Correct, if they were a normal, ongoing franchise situation in Houston.

Q   So this middle line then tells us how we would have expected them to perform if it hadn't been announced that they were relocating?

A   Correct.

Q   What numbers do we get?

A   We get $20 million, assuming that they would have started at $41 per ticket, and 22.4 million if they had started at $46 a ticket.

Q   And you assumed the same 1994 attendance figures?

A   Yes.

Q   Why did you do that?

A   We assumed that they would have stayed steady in 1994. Having said that, I should mention that in --  Their attendance had already dropped 20 percent from 1993 to 1994, but we felt that was for other factors.  One thing we wanted

to do when we did this analysis is we didn't want to cherry pick off the best numbers we could find.  So their attendance in 1993, again, was 20 percent higher than '94, but we started with 1994.

Q   Then we get down to actual 1996 ticket revenues.  What is that?

A   The actual '96 ticket revenues is what they actually earned in ticket revenues, which is clearly the same for both columns because it was an actual number.

Q   "Shortfall in ticket revenues" down there at the bottom, 41 percent, 48 percent.  What does it mean, how did you calculate it?

A   What that means is in the first column, based on our expectations in 1996, their last year, they fell 41 percent short of that number.  So we ascribed the 41 percent financial impact due to their being a lame duck.  The same thing in the next column, at 48 percent.

Q   So you compared the actual results to what they would have been had they performed normally, and the difference is attributable to the lame-duck status?

A   Yes.

Q   Let's turn to Page 6.  Now, at Page 5 we were looking at ticket revenues.  Let's turn to Page 6.  What is going on with Page 6, "suite revenue decline"?

A   On Page 6, using a similar methodology to the prior page,

we looked at what their suite revenues were in 1995, and then what we would have expected them to be in 1996 if they grew like a normal NFL team, which was around eight percent.  That was the league average.  And then we compared that to what they actually did in 1996.

Q   So essentially the same methodology as you did with tickets?

A   Correct.  With one exception, which is we did not have two years worth of data, we did not have 1994 data.  And I can only speculate that the numbers would have -- the decrease would have been worse.  But we didn't assume anything for 1994 here.

Q   So this is actually then a conservative approach on the suites?

A   I would have to believe so.

Q   What was the shortfall in suite revenues then relative to what you would have expected if they were not lame duck?

A   A 50 to 50 percent decrease (sic).  We would have expected $2.5 million in revenues if they operated as a normal NFL team in 1996.  But they only generated 1.3 million.  So half.

Q   Go to Page 7, please.  "Sponsorship revenue decline." What are sponsorship revenues?

A   Sponsorship revenues are revenues that are generated with corporate partners who buy signs, who have separate sponsorship and promotion deals with the teams.

Q    Do those typically decrease when a team is leaving town?

A    Yes.

Q    Why is that?

A    It is because corporations don't want to align themselves with a team that is leaving town.

Q    Here again we see '95 sponsorship revenues.    Why no '94?

A    We did not have 1994 data available to us.

Q    The same methodology here, actual sponsorship revenue, a million five, and then expected revenues is not a lame duck?

A    Yes.

Q    The middle block?

A    That's correct.

Q    "Shortfall in sponsorship revenues."    How do you calculate that?

A    We would have expected them to be at $1.9 million in 1996 if they operated as a normal NFL team, based on growth from 1995.    But instead they went down to 1.3 million.    So that was a 29 percent shortfall compared to where we expected them to be.

Q    Let's turn now to Page 8.    Charlotte Hornets, are they one of the other lame-duck scenarios you selected?

A    Yes, they are.

Q    What kind of team are the Hornets?

A    Charlotte Hornets are a basketball team in the NBA.

Q    Why did you pick them as a lame duck -- as a comparable

lame duck?

A    Because, similar to Houston, their relocation and their status as a team that was going to leave their host city played out over a multiple year period of time, so we could measure the impact of that.

Q    So they were somewhat like the Sonics, they are playing for two years even though the fans know for those two years they are leaving?

A    Correct.

Q    Did you study what happened in Charlotte as a result of that?

A    Yes, I did.

Q    Let's go to Page 9.  "Charlotte Hornets attendance decline."  First of all, where did you get those attendance figures?

A    I got those attendance figures from the NBA.

Q    Were you also able to get revenue figures?

A    No, just attendance figures.

Q    The NBA wouldn't give those out?

A    Correct.

Q    I see base here, 1999-2000.  Why did you pick 1999-2000 as your base year?

A    The drumbeat for relocation really picked up in the summer of 2000.  So while it wasn't legally or officially announced the team is moving, there were a series of articles about the

team moving.  There were negotiations between the team and the public sector played out very publicly in the media.  The team scheduled a preseason game that summer.  They scheduled it and then played it the following fall in New Orleans, right at the height of the time they were looking at New Orleans as a possible relocation city.

Q   Well, what happened during its lame-duck years in Charlotte?

A   Well, to understand Charlotte you have to understand where they were before the lame-duck years.  They had a very large arena, I think 22,000 seats.  They came into the league in 1988, and led the league in attendance for like nine straight years, over 20,000 people a game.  It started to drop towards the end of the 1990s.  It dropped to about 16,500 in this year.  And there were a series of reasons why that is.

Just like Houston, we didn't pick the top point of attendance.  It came down for other reasons first.  And then we picked the year where we thought the relocation discussion really heated up.  So we took the 1999-2000 season as our base year.  At that point the attendance was 16,500 people per game.  In the two lame-duck years, which were the next two seasons, the 2000-2001 season and the 2001-2002 season, you can see the attendance dropping from 16,500 all the way down to roughly 9,500.

Q   And is that where you get your 42 percent decline?

A    Yes, it is.   Again, one thing I do want to mention on that page, this is just an attendance decline, so unlike Houston, because we did not have revenues, we didn't have ticket prices here, we don't know exactly if they reduced their ticket prices while they were losing attendance.   Teams often do that.   Clearly Houston did do that.   So we didn't even factor that in.   I assume the dollar loss would have been greater than the attendance loss.

Q    So using the attendance figures is actually a conservative method?

A    I believe it is.

Q    So you got this learning from Charlotte and from Houston. Let's turn to Page 10.   Tell us how you worked through your process applying that learning to the Seattle Sonics?

A    Well, first of all, what we had to do, similar to the other situations, is we had to determine the base year, the starting year, which wasn't necessarily this past season for us.   We wanted to pick the right year where it was clear the relocation was driving a lot of the economics.

Q    We will talk more about base year in a second.   I just want a 20,000 foot picture?

A    That is the first thing we did.   Then what we did is we took the information that we learned from the other two comparable deals and applied it to the Sonics situation.

Q    So you applied the percentages you learned in Houston and

Charlotte to the Sonics?

A    Yes.    And then what we did is, because the team's revenues and expenses are much larger than just tickets and sponsorships and suites, we overlaid those reductions, those economics on the team's entire income statement to see what the overall impact would be?

Q    Let's focus now on step one, determining the base year. Turn to Page 11, please.    2006-2007 is selected as base year. Tell us why?

A    We looked at a number of years, principally 2005-2006 and 2006-2007, and we determined that the 2005-2006 year, which was the year after the team made the second round of the playoffs and did quite well, was a bit of an aberration, in other words a high point, and we didn't think it was appropriate to use that as our base year.    And so we looked at 2006-2007 as the base year, which is more of an ongoing, steady state type of year.

Q    Turn to Page 12, please.    Up at the top, "Sonics revenues are expected to decline by 14 to 16 million from '06-'07 to '08-'09 in certain categories.    Tickets, 40 to 48 percent decline."    How did you get that?    Why did you use 40 to 48 percent?

A    The 40 to 48 percent range was based on Charlotte and Houston.    In Houston the range that we showed earlier was 41 to 48 percent on the two scenarios we ran for tickets.    On

Charlotte I believe the number was 42 percent.  So it felt right in that range.  We felt comfortable that a 40 to 48 percent ticket reduction range was appropriate.

Q   "Concessions follows tickets."  What does that mean?

A   What that means is generally concessions are based on attendance.  It is based on -- well, it is based on attendance of people in the building.  So we felt that generally you will see the same pattern in concessions as you will in tickets.  So while it doesn't say it here, we assume the same 40 to 48 percent decline.

Q   And this is over two years?

A   Yes, this is over two years.

Q   "Suites, 50 percent decline."  Where do we get that from?

A   We got that from the Houston situation where they had a 50 percent decline.

Q   And what do we come out with?

A   Sponsorships at 30 percent.  When you add that in we came out in total at 14 to $16 million decline within those four categories.

Q   Turn to Page 13, please.  Step three, "overall financial projections for 2008-2009.  Projected operating loss is 30 to $32 million."  How did you get that?

A   We took the team's financial statements and we took the two-year loss for tickets, concessions, sponsorships and suites.

Q   Stop.   Financial statements for the base year?

A   Yes, for the base year 2006-2007.

Q   I interrupted.   Please continue.

A   So we took those --   For those four categories we took the numbers from 2006-2007, and then applied the declines from the prior page, the 14 to $16 million over a two-year period, and then for all of the other revenue steams and expenses we got the numbers that the team provided from this past season. And we basically just used normal inflations for all of those.   We didn't make any assumptions as to unusual patterns in any of the other categories.

Actually one thing I do want to mention.   We actually had the player payroll going down as opposed to increasing and driving a higher loss number.   The player payroll was given to us by the team.   And that actually goes down.

Q   So that, again, makes it a conservative analysis as opposed to an aggressive one?

A   Yes.

Q   So operating profit then, projected low decline, projected high decline.   What does that mean?

A   That is our projection for how much money the team will lose on an operating basis based on the two scenarios we ran for tickets, 40 to 48 percent.   This is before any debt service.   This is just pure operations.

Q   Similar to EBITDA?

A    Yes, exactly.

Q    Turn to Page 14, please.   This is the projection for the 2009-2010 season?

A    Yes.

Q    All right.   It says, "no further revenue reductions are assumed after '08-'09."   Why not?

A    The reason for that -- and I wrestled with this a lot, is the comparable deals that we had were two-year lame duck situations.   And here we have a --  We used 2006-2007 as our base year.   That would be the third year.   And we just made a decision that the economic loss manifested itself in two years.   After that you have kind of reached steady state.   So that third year there is no further decline.

Q    So by the third year the lame duck is basically dead?

A    Yes.   I don't know if that is right or not, but we didn't assume another year of decline.

Q    You figured it would hold steady once it reached that low from the year before?

A    Yes.

Q    Tell us what is going on then from here?

A    In this page we show the 2008-2009 years -- year from the prior page, and then we had the one year 2009-2010.   And frankly these are driven by inflation.   There was nothing magical about them.   And when you look at the losses, and I will look on the left-hand side, you can see roughly 30 to

$31 million of operating losses per year, for a total of $61 million.  And then on the right-hand side of the page, a total of $65 million for those two years.

Q    So the total loss for the last two seasons you projected 60.9 million to 64.9 million?

A    Yes.

Q    Let's come back to Page 13 for a second, 2008-2009.  You project a low decline of 30.1 million and a high decline of 32.1 million.  Have you had a chance to find out from the team what the operating loss for this year is expected to be?

A    Our understanding currently is that the operating loss is supposed to be in the 27 to $30 million range.

Q    And expected to be, that's because the fiscal year closes in September?

A    Correct.

Q    So at least based on expected losses your methodology came pretty close?

A    Yes.  For next season?

Q    Yes.

A    Yes.  Almost like it would mirror this season.  Thank you.

          MR. TAYLOR:  Nothing further.  Thank you.

          THE COURT:  Any cross-examination?

          MR. JOHNSON:  Just a little, your Honor.

                        CROSS-EXAMINATION

BY MR. JOHNSON:

Q  Good afternoon.

A  Good afternoon.

Q  Mr. Ziets, when you were picking your comparables we saw a slide that there was what, 11 teams that had left their cities during the time frame that you looked at?

A  Correct.

Q  And you looked at two of those --

A  Correct.

Q  -- is that right?  We are going to talk about -- in fact, let's do talk about it.  There are a couple of teams that we talked about during your deposition that you considered but rejected?

A  Yes.

Q  Potential comparables.  And I believe one of those teams was the Montreal Expos.  Do you remember that discussion?

A  Yes, I do.

Q  And there had been some talk for some period of time, maybe a year or two, or maybe three even, about contraction in Major League Baseball before the Montreal Expos were contracted, correct?

A  Correct.

Q  Despite that talk of contraction, and despite the fact they actually were contracted, their last two years were actually two of their highest attendance years over the last ten years?

A   They were relocated not contracted.

Q   I'm sorry, relocated.

A   Right.

Q   So, in fact, their last two years before relocation, even though there had been talks about them being contracted, those were good attendance years for that franchise in Montreal?

A   There were mitigating reasons for that.

Q   What I want to know is why you rejected them from your model?

A   That is a fair question.  After you brought that up in the deposition I did go back and look at that situation.  That is a fair question.  And we went back and looked to see what happened with their attendance in the intervening years, which for them was a very long period of time.

      And basically what we saw was they had strong attendance through 1997.  And then for a variety of reasons well before contraction -- contraction was a 2001 situation, well before a contraction their attendance fell way off from roughly one and a half million down to roughly 800,000 they averaged after that.  A lot of that had to do with their good players continually leaving.  There was a stadium situation that was talked about there.

      The contraction issue came up in the fall of 2001.  By that time the team was averaging roughly 800,000, which is

basically one-third of Major League Baseball's average.

In the last two years -- You are right, their attendance did go up. The reason for that in large part is they played a whole host of games in Puerto Rico, and those games helped bring up the average.

Ut what happened was, when we looked at that after the deposition after you brought that up appropriately, is they had lost basically their fan base four, five, six years earlier. So they were operating roughly at one-third of Major League Baseball's attendance averages. In other words, there was nothing left to go.

So for Seattle, if you were averaging one-third of what the NBA averages, like 4,000 a game or 5,000 a game, that would be analogous to where Montreal was at that point.

You are right, we should have looked at that. But there was no -- They were already down so far we would have rejected that as a comp.

Q    With the other comparables what you are really doing when are accepting them or rejecting them as comparables, what you are saying is -- you are making a value judgment as to whether the potential ticket buyers for that franchise have had the opportunity to be impacted by the lame-duck status, correct?

A    That's correct.

Q    And there is a line there -- In most situations this is

not a black and white case where a team announces that it is going to leave, there is usually rumblings of some sort or another before that, correct?

A   That's correct.

Q   And oftentimes it is a stadium financing effort that fails or that passes, correct?

A   Correct.

Q   For it to fall within your model you needed to be absolutely, positively, pretty darn sure that relocation is going to happen, right?

A   Yes.

Q   And the thing that makes the Sonics fit into your model is the fact that Mr. Bennett announced before last year that the team was going to file for arbitration and seek to move to Oklahoma City, correct?

A   Correct.

Q   And it was that decision that created the lame-duck effect in this case?

A   Well, we took it back one year prior.  We took it back to the '06-'07 season.  Yeah, that would be the -- that is the right time frame.

Q   Excuse me.  I need to clarify.  The '06-'07 was your base year?

A   Yes.

Q   Where you were using actuals?

A    Yes.

Q    From there on you are projecting, correct?

A    That's correct.

Q    So what created the lame-duck situation was Mr. Bennett's decision to file for arbitration before last season?

A    Correct.

Q    And, in fact, you know a lot about the NBA, Mr. Bennett didn't have to file for relocation until March of 2010, correct?

A    I believe that's correct.

Q    If he wanted to play out his lease he wouldn't have had to file for relocation until March of 2010?  That's when the deadline is?

A    I believe that's when the deadline is.

Q    When would that 2009-2010 basketball season end?

A    The regular season ends in April.

Q    And if the Sonics were good enough to go to the playoffs in 2010?

A    Through June.

Q    So the decision by Mr. Bennett to announce his leave was an expensive decision, wasn't it?

A    I don't know how else you would do it.  But, yes, it was an expensive decision.  But waiting until 2010 to then decide where you are going to play three months or four months later, I'm not sure how you do that.

Q    Well, let's look at your chart, if we can.    If you look at Page 12 of that, Mr. Bennett's decision to announce relocation early cost him between 4.4 and $16.4 million, didn't it?

A    Correct.

Q    And, in fact, because the City shares suite revenue with Mr. Bennett, it actually cost the City money, his early announcement, didn't it?

A    Yes.

Q    And you are not aware of anybody forcing Mr. Bennett to incur this 14.5 million or 16.5 million by announcing early, correct?

A    No.

Q    All right.    Now, this lame-duck analysis that you did, this is the first time you have ever done this?

A    The first time I have ever done a lame-duck analysis, yes.

Q    And you have never heard of anyone else doing this, or at least you hadn't by the time we took your deposition?

A    Correct.

Q    And there is no guidelines in the field for how you do a lame-duck analysis?

A    No.    Typically when you do financial analyses we look at projections and we look at comparables to see if we can find any similar situations in the past.

Q    You agree this analysis is not something that is black and

white?

A    Correct.

Q    And there is room for interpretation?

A    Yes.

Q    And it is inexact?

A    Yes.

Q    And, in fact, you described this kind of analysis as more art than science?

A    Correct.

THE COURT:    Counsel, we need to find a place to stop.

MR. JOHNSON:    This would be great, your Honor.

THE COURT:    All right.    Ladies and gentlemen, we will be at recess for 15 minutes.

(Court in recess.)

CROSS-EXAMINATION

BY MR. JOHNSON:

Q    Could we please get Exhibit No. 177.    I want to ask the witness a question, if this is his report.    Something written in there.    Focus on Exhibit No. 2, page 6.    107523.

Do you recognize this portion of your report, Mr. Ziets?

A    Yes, I do.

Q    And this is a section where you sought to anticipate potential criticisms --

I'm sorry, Your Honor, it's page 6 at the bottom, is the

page number.  We're focused on Exhibit No. 2.

This is where you were anticipating some potential criticisms of this report?

A    Yes.

Q    I want to focus on the third issue that you raised, where you say the potential criticism is that it would be impossible to isolate lame-duck status versus other variables impacting financial profile, such as on-court performance, staffing cuts, and owner antipathy?

A    Correct.

Q    I think what your answer here is, that because of the situation with -- with Houston and with Charlotte, those weren't factors with respect to those two teams?

A    That's correct.  The way we did our analysis, correct.

Q    Just so I understand, you were able to, in essence, come to the conclusion that for the Hornets, ticket sales weren't impacted by on-court performance?

A    That is correct.  In fact, they were winning, making it to the second round of the playoffs.  And their attendance was taking a nosedive.

Q    And in Houston, ticket sales weren't impacted by their on-field performance?

A    Similar.  In fact in the first case, first time in Houston's history the team did much better in those last two years than in 1994 which was the base year.  And, again,

their attendance also nose-dived.  While the team was doing better on the field, attendance was going the other way.

Q   Would you agree if the Sonics' ticket sales were impacted by on-court performance, these would not be good qualities in the situation?

A   Well, I felt these were good comps for the analysis we were doing.  I felt I was able to isolate winning performance, on-court performance away -- take that out of the equation because these were teams that were not losing a large share of their games and losing attendance.

Q   All right.

MR. JOHNSON:  Your Honor, may I approach with a new exhibit?

Admission of Exhibit No. 343.

MR. TAYLOR:  Foundation.

MR. JOHNSON:  My understanding is that counsel were stipulating to the elements of the exhibit, their wins and attendance figures.  They're from Danny Barth's attendance figures and the wins are a matter of public record.

THE COURT:  Have they seen it so they know whether they'll stipulate to this exhibit?  I mean --

MR. TAYLOR:  First time I have seen it is when it was handed to me.  I was given something that had a win/loss record.

THE COURT:  Apparently is there no stipulation.

Sustained.

BY MR. JOHNSON:

Q    Mr. Ziets, will you take a look at this, and assume for purposes of my questioning that this is --

MR. JOHNSON:    I'll use this for impeachment, Your Honor.

THE COURT:    What are you impeaching him about?

MR. JOHNSON:    He's claiming that his comparables were appropriate comparables because there was -- he was able to control for the win/loss record because those teams, even though they won more games last two years, still continue to lose money.    That's not the situation with the Seattle SuperSonics.    I want to discuss that with him.

MR. TAYLOR:    Same objection as to foundation whether it's impeachment or otherwise.    We don't know where it came from.

THE COURT:    Sustained.

MR. JOHNSON:    We have a stipulation on the number of wins per year.    I don't need this exhibit.    That's fine.

THE COURT:    Okay.    Ask another question.

BY MR. JOHNSON:

Q    Mr. Ziets, you would agree that if, in fact, the Sonics attendance was tracking their win/loss record that using these two comparables in this kind of analysis may not be appropriate, correct?

A    I guess I view it differently.  I view it that if the other two teams that were comparables were losing a lot of games, like the Sonics, that there is a chance that their attendance losses would be greater than what we showed.  I don't know that.  But I still think they're comparable.  If anything, those other teams, I believe, would have lost more money.  If they lost more games, like the Sonics, it would only make the numbers worse.

Q    But in fact, you've done nothing in your analysis to actually try to control, for any scientific way, control for win/loss record as it affects attendance?

A    That is correct.

Q    With respect to owner antipathy, you came to the conclusion there was no owner antipathy with respect to Charlotte Hornets or the Houston Oilers that could have affected ticket sales.

A    In our lame duck period, I would agree with that.  Other than as it relates to relocation, yes.

Q    So if there is owner antipathy in Seattle, then it wouldn't be the right kind of comparable for this kind of situation?

A    I didn't state it clearly in the report but the owner antipathy as relating to relocation, which always happens.  So in 1995 Bud Adams was excoriated, he was the owner of Houston Oilers, because of relocation.  Same thing happened

in -- with the Hornets starting in 2000.

So during those lame-duck periods, we tried to be careful to pick the right lame duck years. There was owner antipathy as part of the relocation process as opposed to it as a separate variable.

Q   Maybe you can explain what you mean by "controlling for owner antipathy." I guess I don't understand it now.

A   We wanted to make sure we looked at the comparable situations that -- as best we could, because it's not perfect, that the change in the financial fortunes of the team were tied to the relocation discussion and the fans' feeling about relocation, period. So separate from wins and losses, separate from, you know, anything that happened in the front office -- let's say the front office cut half of their marketing staff, so they weren't selling. Separate from any other issues going on with the owner. So we really tried to isolate the relocation variable from those other variables.

Q   So the fact that there is this lawsuit going on, and that Mr. Bennett -- or the PBC is being accused of breaching their lease, that is separate and apart from the normal owner antipathy that occurs with somebody relocating at the end of a lease, correct?

A   I would say it's the same thing. Any antipathy that comes about from a community towards an owner because of relocating

the sports franchise, that antipathy is relocation-driven.

Q   Did you control for whether the Oilers or the Hornets had recently traded away some of the team's best and most beloved players?

A   Not -- I'm trying to think what that would be.  On court and on the field, they were doing better.  So generally, you know, the fans will react to that.

Q   And that's not case with the Sonics?

A   That's not the case with the Sonics.

Q   You've assisted 30 different buyers or sellers of major league sports franchises?

A   Yes.

Q   You've been quoted in various places as to your views on why someone might be interested in buying or selling a major league sports franchise?

A   Yes.

Q   Some reasons you cited are that people who are interested in buying or selling -- or buying major league sports franchises are interest in the tax benefits of such a transaction?

A   Yes.  That's one of the reasons.

Q   And, in fact, the full purchase price is fully amortized and subject to tax benefits, correct?

        MR. TAYLOR:  Beyond the scope, also relevance.

        THE COURT:  Sustained as beyond the scope.

BY MR. JOHNSON:

Q    The other reason why folks might by a sports franchise is because the franchise appreciates?

A    Correct.

MR. TAYLOR:    Scope.

MR. JOHNSON:    I object to that, Your Honor, or not object, but my response is they're talking about $60 million in losses.    And there's other financial reasons why people buy sports franchises.    That directly goes to this harm they're claiming they're suffering.

THE COURT:    That may all very well be true.    But that's not what this gentleman was put on the stand to testify to, and he has in direct examination not touched on those issues.    That is what is meant by "beyond the scope".

MR. JOHNSON:    All right.

BY MR. JOHNSON:

Q    Mr. Ziets, part of the loss that you've identified, you're an expert in sports franchises and finances?

A    Yes.

Q    And if asked, you could work on a business plan to attempt to lessen those losses, couldn't you?

MR. TAYLOR:    Scope.

THE COURT:    Sustained.

BY MR. JOHNSON:

Q    Mr. Ziets, these projections you did in this circumstance,

that's not the first time you've done projections for the PBC, correct?

A    That is correct.

Q    In fact, you did projections for PBC back when they were trying to get approval from the NBA for the purchase?

A    That is correct.

Q    Let's turn to Exhibit No. 78.

THE COURT:    Is that one of the exhibits that was on the list?

MR. JOHNSON:    Should have been.

BY MR. JOHNSON:

Q    Mr. Ziets, first of all, Your Honor move --

First of all, Mr. Ziets, is Exhibit No. 78 your work?

A    Yes, it is.

Q    It's work performed, estimates and forecast performed for PBC?

A    Yes, it is.

MR. JOHNSON:    Move for admission of Exhibit No. 78.

MR. TAYLOR:    No objection, Your Honor.

THE COURT:    Exhibit No. 78 is admitted.

(Exhibit No. 78 admitted.)

BY MR. JOHNSON:

Q    Mr. Ziets, you take your role seriously in your performing your forecasting work?

A    Yes, I do.

Q   Always try to do the best work you can?

A   Yes.

Q   Most accurate work you can?

A   Yes.

Q   You have a reputation in the NBA?

A   Yes, I do.

Q   Good reputation?

A   Yes.

Q   And it's important that when you're trying to do work for the NBA that you do the best and most accurate work you can?

A   Yes.

Q   And this Exhibit No. 78 was something you prepared for ultimate submission to the NBA?

A   Yes, it was.

Q   And you prepared it for submission because the PBC needed an extended forecast throughout the term of their lease in order to get approval for the sale by the -- from the NBA?

A   Yes.   That was part of the approval process.

Q   All right.   So to the best of your ability you performed these forecasts based on the assumption that PBC would play out their lease at KeyArena, correct?

A   Yes.   And move towards a new building in Seattle.

Q   Let's look at the -- can we focus on the EBITDA after "Extraordinary," about two-thirds of the way down?

A   Yes.

Q   So I'm reading this right, this line item is the same line item that would apply -- would be similar to the bottom line loss figure and the last page of the slide show that Mr. Taylor used with you?

A   Yes.

Q   So back in 2006 when you were trying to estimate the revenue and losses for the Sonics to play throughout the term of their lease at KeyArena, you estimated that for 2009 they would lose $410,000?

A   2008?

Q   I'm sorry.  Yeah, 2008 -- I want to focus on the same last two years that we just looked at from your report.  2009 is $858,000 profit?

A   Yes, that's correct.

Q   And 2010 is a $697,000 profit?

A   Is that a 6 or an 8?  Yes.  That's right.

Q   Back when you were forecasting the Sonics' revenues with the assumption that they would be playing in KeyArena throughout the term of their lease at the time that PBC bought the team, you forecasted profits for the last two years of the lease?

A   That's correct.

Q   All right.

THE COURT:  Counsel, if you want this exhibit to be useful, you've got to give me something I can read.  It's

impossible to read.  The print is so small.  I won't have the screen to blow it up.

MR. JOHNSON:  I'd be happy to substitute the exhibit.

THE COURT:  You'll have to do something if you want those numbers to somehow be part of the record.  You haven't got a record because it's illegible.

MR. JOHNSON:  I apologize.  This was the way the document was produced to us.  If counsel will stipulate, we can make it more legible.

BY MR. JOHNSON:

Q   Mr. Ziets, this is an example of showing that it's difficult to forecast in this business, isn't it?

A   Yes, it is difficult.

Q   In fact, most teams don't forecast beyond one year out into the future, correct?

A   I don't know about that.  For different purposes they're multiyear forecasts, yes.

Q   Now, I understand that this forecast was based on the assumption that the team would have a new building being built that they would move into after the term of the lease?

A   That is correct.

Q   Explain to me why having a new building built would make any difference.

A   The reason it would make a difference is because the fans, the ticket buyers, corporate partners -- everyone that really

helps the team drive revenues would know that the team is staying here long term.  They would react based on that.  We viewed this was a financial projection moving towards a new building.

Q   So even in KeyArena, the way it exists today and with the lease that exists today, a team can make money according to your forecast?

A   A team can make money, yes, yes.  Everything has to go right.  And move towards a new arena.

Q   Now I want to turn your attention to the Exhibit No. 310.  Go ahead.  Show Exhibit No. 310.

MR. TAYLOR:  If we could get clarification.  Our record shows it's not in.

THE CLERK:  I do not show it's been admitted.

BY MR. JOHNSON:

Q   Mr. Ziets, do you recognize Exhibit No. 310?

A   Yes.

Q   Is this the document that you received from Mogen Company, which was a commentary on your financial projections?

A   That's correct.

Q   Mogen Company was hired by the NBA to review your projections of PBC's finances back in 2006 when they were buying the team?

A   Correct.

MR. JOHNSON:  Move admission of 310.

MR. TAYLOR:  Hearsay.  It was not prepared by this witness.  It was prepared by a different company.

MR. JOHNSON:  It's -- all right.

THE COURT:  Do you have a response?

MR. JOHNSON:  I was thinking of one.

THE COURT:  Looks like hearsay to me.  Sustained.

BY MR. JOHNSON:

Q   Mr. Ziets, do you recall Mogen Company was hired by the NBA to comment on your report?

A   Yes.

Q   And they commented on your report that you had underestimated in their view the total losses that PBC was going to suffer over the term of the lease?

A   Yes, they did.

Q   And they in fact thought that PBC needed to have another $28 million available at that time because there could be another $28 million in losses?

A   That's what they believed, yes.

Q   Did you agree or disagree with that?

A   I disagreed with them.

Q   So you still thought your projections at that point were correct?

A   Yes, I did.

Q   So you disagreed at that point with Mogen Company projections?

A    Yes.

Q    Mr. Ziets, you mentioned before the break that you didn't know how Mr. Bennett could have waited to announce his intent to relocate?

A    Correct.

Q    Didn't actually nine of the 11 teams that you used to review to find potential comparators wait until end to announce their intent to leave?

A    They waited until they were in their last season.  I think it was because Montreal we agreed, you know, went earlier.

Q    Those teams all waited until their last --

A    They did.  But you may not have a place to play.  You take your chances if you do that.  They felt they had places to play.

Q    How many NBA arenas, NBA-able arenas are available in the United States right now that are not occupied?

A    Right now, there is one in Kansas City.  There may be others depending on business arrangements.

Q    How about one in Oklahoma City?

A    There is one in Oklahoma City.

Q    How about Las Vegas?

A    I don't believe that is a viable opportunity right now.

Q    So there is at least two places that a team could move if they wanted to announce today that they were going to leave for next year?

A   For next year?

Q   Yeah.

A   Right.  That is true.  By 2010 there could be other teams playing in those buildings.

Q   Could be?

A   I would be nervous about that as a business person.

Q   Thank you.

THE COURT:  Any redirect?

MR. TAYLOR:  Yes, Your Honor.

REDIRECT EXAMINATION

BY MR. TAYLOR:

Q   The 2006 projections that you were asked about where it actually projected potentially making money as opposed to losing money, what were those based on?  What assumption?

A   We assumed the team would be in this market and have an agreement for a new arena and moving towards a new arena situation here.  They would be here long term.

Q   It was PBC who asked you to prepare projections that assumed they would be getting a new building here?

A   That is correct.

Q   And you said something about sponsors?

A   You assumed a lot more sponsors for that scenario.  Yes.

Q   Why?

A   For a number of reasons.  One is sponsors would have a positive view of the team because the team would be viewed

804

positively, because it's going to be staying in the region.

And then also, a lot of times sponsors will sign on while you're in your old building prior to getting your new building because they want to form relationships. For a lot of reasons. It could be when you move to new building you have preferential treatment. Could be for relationship purposes. But you often see an uptick while a team is in an old building before the new building.

Q    Uptick all the way across the board? Sponsorships --

A    Yes.

Q    You were asked whether you factored in a lawsuit impact into your analysis, and you said no. If you factored that in, what do you think would have happened to the numbers?

A    The numbers -- numbers would have gone down. We actually -- we actually just looked at the comparables and took the exact same behavior patterns that happened in the comparables as opposed to even thinking about what was going on here with the lawsuit or with the wins and losses. All of that would have made the numbers -- you know, the losses bigger. We didn't do any of that.

Q    You took a conservative approach?

A    Yes.

MR. TAYLOR: Nothing further.

MR. LAWRENCE: Your Honor, for a second, I don't want to interrupt the proceeding, but on page 260 of the

transcript on June 17 indicates Exhibit No. 310 was admitted. If we could clarify that.

THE COURT:  Do you want to do that right now?

MR. LAWRENCE:  Yes.  On June 17, page 360, Exhibit No. 310 was admitted.  I would like the record to reflect 310 is admitted in this proceeding.

THE CLERK:  I have it on the docket sheet.

THE COURT:  Yes.

MR. LAWRENCE:  No further questions.

MR. KELLER:  Thank you.

THE COURT:  You may step down.

MR. KELLER:  We'll call as our next witness Ms. Deborah Jay.

DEBORAH JAY

  The witness, after being duly sworn, testified as follows:

THE WITNESS:  Evelyn Deborah Jay.  E-V-E-L-Y-N, J-A-Y.

DIRECT EXAMINATION

BY MR. WEBB:

Q   You have a Ph.D., correct?

A   Yes.

Q   I will call you Dr. Jay if that's all right with you?

A   Yes.

Q   What work did the owners of the Sonics ask you to do for them?

A    I was asked to conduct an independent objective survey with a representative sample of adults in the Seattle metropolitan area and in the City of Seattle to determine whether it would or would not make a difference if the SuperSonics or Sonics were to leave Seattle.

Q    Generally speaking, how is what you did any different than walking into a grocery story and asking people what they think?

A    First of all, the demographic of a grocery story would skew towards women.  Wouldn't necessarily be representative of adults in the Seattle metropolitan area or the City of Seattle.

What we did was a scientific survey where adults in households in Seattle would have a known probability of selection.  It would be random which is very different from arbitrary.  It would be projectable and also have a known error rate with respect to sampling error and the precision of the estimate.

Q    When you say "arbitrary," in my example of going into a grocery store, the arbitrary would happen on the aisle that you were on; that you were talking to?

A    Correct.  It's very difficult to do a probability sample to even project the customers of a single store.  If you were just intercepting people in that store, for example, if you intercepted people in front of the frozen pizza you might get

a different demographic than if you intercepted people in the fresh-vegetable aisle.

Q   Before we go into the details of the work that you did for my client, I want to have you tell the Court about yourself.

What do you do for a living?

A   I am the President and Chief Executive Officer of Field Research Corporation, one of the oldest public opinion and marketing research firms in the United States, which was started by Marvin Field.

Q   Generally speaking, what does that company do?

A   We do approximately 300,000 interviews a year.  We do surveys for government agencies such as the Centers For Disease Control, the State of California, we do work for private corporations such as Microsoft and Starbucks.  And we do work in the -- for law firms in intellectual property cases and employment litigation and cases such as this.

Q   What is your academic background?

A   I have a bachelors degree in psychology and political science from the University of California at Los Angeles.  I have a Ph.D. degree from the University of California at Berkeley.  The Ph.D. is in political science with an emphasis on psychology, survey methods, and statistics.

Q   How long have you been working in this field?

A   I have been working in the area of survey research for over 30 years beginning at the University of California at

Berkeley. Also I worked at SRI International. It was founded by Stanford University at Stanford Research Institution, and now Field Research Corporation since 1991.

Q You talked about doing work for law firms. Do you do consulting expert work for law firms?

A I have been a consulting expert as a testifying expert in connection with litigation.

Q In fact, you've done work for the predecessor firms to K&L Gates, haven't you?

A Yes. I have been retained by -- I was retained multiple times by Preston Gates Ellis and Kirkpatrick Lockhart.

Q How much of your work is litigation related?

A About 15 percent of Field Research Corporation's work is related to litigation. About half of my project work is related to litigation and the other half I work for private corporations and for government agencies and nonprofit foundations.

Q The work that you did for my client, approximately how many hours of effort went into that work?

A About -- approximately 2,000 hours.

Q You don't work for free, do you?

A Field Research does not work for free.

Q And approximately how much did my client pay your company for the work that was done in this case?

A Approximately $100,000.

Q    How many different people -- actual individuals -- did you interview as part of this process?

A    We interviewed 604 adults.   That would include -- we started with an initial random sample of 402 adults in the Seattle metropolitan area in King County, Snohomish County, and Pierce County.   And then we did an over-sample, an additional 202 interviews in the City of Seattle.   So we had 402 interviews that were projectable to the three counties. That initial sample included 74 adults in the City of Seattle.   So we had 276 adults who were projectable to the City of Seattle.

Q    Based upon your expertise, is that a sufficient number of people to talk to get the information you were after?

A    Yes.   Because of the way the sample was selected and the interviews were conducted, it was a random selection, telephone numbers were randomly generated.   And within households, we randomly selected adults to interview.

Q    Did you prepare a short slide show to help the Court understand your testimony here today?

A    Yes, I did.

MR. WEBB:   I would ask permission to pull up Exhibit No. 614 for illustrative purposes only, please.

MR. JOHNSON:   No objection, Your Honor.

THE COURT:   614 admitted.

(Exhibit No. 614 admitted.)

BY MR. WEBB:

Q   Dr. Jay, tell us what we're seeing on this first page of Exhibit No. 614.

A   Right.  This includes some of the questions that were included in the field survey that was conducted.  The questions specifically relating to what residents, adults age 18 and older in the Seattle metropolitan area, whether they thought they would be better off, it would make no difference, or they would be worse off if various teams were to leave Seattle.  And so I listed professional teams as well a fictitious team, the Seattle Needles, just to get a gauge on guessing.

Also response categories -- the order was randomized across respondents, so categories A, B, and C in that first question would sometimes B would be first and sometimes C would be first and so on.  To make sure there was no order effect, similarly the order in which the various teams were read was also randomized across respondents.

If a respondent said that they would be better off or worse off, we asked how much better off or worse off they thought they would be.  And, again, the categories were slightly, somewhat, and much better off or worse off.  And those categories were also the order was rotated.

So for approximately half of the respondents it would be slightly somewhat better.  And for the other half it would

be -- I mean, slightly, somewhat, much better or much worse. And then it would be in reverse order for other respondents.

Q   So what you just talked about in an earlier, you said in the top part of this page the A, B, and C would be put in different orders.  Why do you do that?

A   I wanted to make sure that there were no primacy or recency effects.  Primacy effects go to a response bias where people tend to select the first category they're read or a recency bias where people tend to select the last category they're read.  And every possible combination of A, B, and C were used in this survey.

Q   Who decided specifically what words to use when these questions were asked?

A   I did.

Q   How did you go about doing that?

A   First of all, I tried to understand what the issue was to be addressed in the survey and then based upon my 30 years of experience designing surveys looking at various issues, I formulated questions.

The survey itself included a wide variety of questions and this question I thought was a balance question that people could say they were better off or they could say they were worse off or that it made no difference to them if a team were to leave Seattle.

Q   As you're formulating those questions, is it important

that you make the question fair?

A    Yes.

Q    Is it important that you make it objective?

A    Yes.

Q    Is it important you make it clear?

A    Yes.

Q    Let's go to the next slide.

What did you find in response to the questions that we just looked at on the last page?

A    Okay.    This is a summary of the results with respect to the SuperSonics, for both Seattle metropolitan area and City of Seattle.    So 58 percent of the 402 respondents in the Seattle metropolitan area said it would make no difference if the SuperSonics were to leave Seattle.

The comparable percentage for the City of Seattle was 54 percent.    And that would be 54 percent of the 276 respondents.    The percentage for better off was 7 percent for the Seattle metropolitan area, 12 percent said they would be better off if the SuperSonics were to leave the City of Seattle.

Then percentage for -- who said they would be worse off in the Seattle metropolitan area was 31 percent.    A similar percentage in the City of Seattle said they would be worse off, 33 percent.    The remaining two percentages relate to the percent who said they did not know or have an opinion as to

whether they would be better off or worse off or whether it would make a difference.  Or they did not -- I believe one person in the Seattle metropolitan area didn't answer the question, refused to answer it.

Q   At the top of these columns there are numbers and it says "N equals 402."

A   N just relates to the size of the sample.  So again for the Seattle metropolitan area, those percentages are based on 402 respondents, and for the City of Seattle it's based on 276 respondents.

Q   So if I'm reading this correctly, out of 402 respondents for the Seattle metropolitan area, 65 percent said it would make no difference or they would be better off if the Sonics left?

A   Yes.

Q   And similarly for the City of Seattle, out of the 276 respondents 66 percent said it would make no difference or they would be better off if the Sonics left?

A   Yes.

Q   How did these results compare to the other teams that you were looking at, other professional teams in Seattle?

If you need we change to the next slide you have given us.

A   I have a slide which summarizes the results for all of the actual professional teams.  My control question isn't up there.  But only two -- one to two percent said that it would

make a difference if the Seattle Needles were to leave Seattle. So it shows there was a very small amount of guessing in connection with the survey.

So the SuperSonics, the results who said they would be worse off, the screen is split, is 33 percent in the City of Seattle, and actually that is quite close to the percent who said they would be worse off for the Storm, which was 30 percent.

The results for the SuperSonics -- the percent who said they would be worse off is a little higher than for the Storm. It's 31 percent versus 23 percent. But it's considerably less than for the Mariners in the Seattle metropolitan area where 57 percent said they would be worse off. And similarly in the City of Seattle, the 33 percent while -- who said they would be worse off for SuperSonics. While that is very similar to the percentage who would be worse off if the Storm were to leave, it's considerably lower than the percent who said they would be worse off if the Mariners left which was 56 percent.

And then with respect to the Seahawks, again, 57 percent, a majority in the Seattle metropolitan area thought they would be worse off and not quite half, 49 percent in the City of Seattle said they would be worse off if the Seahawks were to leave.

Q   When you asked the questions, why didn't you ask yes or no

questions, such as would it make a difference to you if the Sonics left Seattle?

A   Well, typically in a litigation survey you're concerned about all kinds of response, effects, or just as I mentioned recency effects and primacy effects, where there is a tendency for some people to take the first category or the last category.

There is a concern in asking yes or no questions with respect to attitudes that you might get what is known as a yea-saying or acquiescence, so that people just are lazy in answering questions.  So they just say yes to yes no questions.  That is why often when you're measuring attitudes, in particularly where you don't want people to guess, you want them to think about their answer, you ask multiple choice questions.

Q   Looking back on your 30 years of experience on this survey that you did, do you think you asked the right questions?

A   I think the questions provide a representative and reliable measure of whether people in the Seattle metropolitan area and in the City of Seattle believe it would or would not make a difference to them if the SuperSonics were to leave.  And based on my survey, I believe that it's clear that a majority believes that either it would make no difference to them or they would be better off if the Sonics were to leave Seattle.

MR. WEBB:   Thank you, Dr. Jay.   I have no further questions.

CROSS-EXAMINATION

BY MR. JOHNSON:

Q   Good afternoon, Doctor.

A   Good afternoon.

Q   So, Dr. Jay, your firm has been around for a long time. Do you do opinion polls, field research polls?

A   We do all kinds of surveys at Field Research.

Q   One of things you do is the field report opinion poll, correct?

A   We do the field poll.

Q   Another thing you do, as you mentioned in your direct, is you do marketing polls for companies like Microsoft for marketing research, correct?

A   Yes.   We do marketing research.

Q   And another thing you do is you prepare reports for lawsuits like this, correct?

A   Yes.

Q   You agreed with your counsel that survey questions should be clear, correct?

A   Yes.

Q   Objective?   They should be understood by most people the same way?

A   Yes.

Q    And it should be unambiguous?

A    Yes.

Q    And let's go ahead and look at the actual -- the full question that you asked respondents in this case.

Can we get Exhibit No. 333, the cutout at page 11.

Dr. Jay --

MR. WEBB:  I don't know whether this exhibit has been admitted.

MR. JOHNSON:  I'm using it for impeachment.  They gave a partial section of her report.  They didn't have her full question.  I think the record ought to reflect her full question.

MR. WEBB:  Exhibit No. 33 is that thick (indicating).  It's not a question.  It's a snippet.  Its out of her entire report which is this thick.  If he wants to take a snippet out of a snippet, I don't think that's appropriate.

MR. JOHNSON:  I would like to move to admit Exhibit No. 333, excerpts of Dr. Jay's opinions.

THE COURT:  Who did the excerpts, Counsel?  Can you lay some foundation here?

MR. JOHNSON:  Your Honor, the main report, and one of the exhibits to the report which deals with the answers to the specific questions posed for the Sonics.  I didn't we needed to have the answers to the questions for the Mariners and the Needles and the Seahawks --

THE COURT:  So you prepared this document?

MR. JOHNSON:  Yes.

THE COURT:  333.

MR. JOHNSON:  Is there an objection?

THE COURT:  There is an objection.

MR. JOHNSON:  In my note there was not an objection listed on the exhibit list.  I apologize.

MR. WEBB:  I don't have a objection if they want to include the entire report.  Under Rule 106, I think that's the appropriate way to do it, not take a portion that they want and put it in as an exhibit.

MR. JOHNSON:  That is what I was moving for.

MR. WEBB:  For the entire report or for 333?  That is what I'm trying to figure out.

MR. JOHNSON:  If the Court needs some answers to questions about the Needles and Mariners, I will move for inclusion of the entire report and we'll have that.  I was trying to make this easier.

THE COURT:  Do you want to move the full report in?

MR. JOHNSON:  Yes, Your Honor.

THE COURT:  Let's give it a number and we'll move it in.  That, however, is not 333.  So does this document have an exhibit number?

MR. WEBB:  Does not.

THE COURT:  What's the next number.

MR. WEBB:  They can substitute the entire report for --

THE COURT:  How about we substitute 333 with the entire report.  And we'll admit it.  Admitted.  Go ahead.

(Exhibit No. 333 admitted.)

MR. JOHNSON:  For demonstrative purposes, do you mind if we work off one?

MR. WEBB:  No problem.

BY MR. JOHNSON:

Q   Dr. Jay, in your slide show, you excerpted just the last section of this question, correct, the second bullet point?

A   Well, that was the question.  There was an introduction and there was actually an introduction to the entire questionnaire.  So there were several questions that came before the question, including this transition, the bullet point that comes before this series of questions.

So there is an introduction to the whole survey, and there are several questions that precede this.  And this is one of the questions that comes before the question that was in the slide.

Q   This instruction is read to everyone who takes the survey immediately before the bullet above is read, immediately before the bullet below, correct?

A   Yes.

Q   That was read to everyone who took this survey, correct?

A    Yes.

Q    What you wanted to do in this survey is figure out whether or not the residents of the Seattle area cared if the Sonics moved, correct?

A    I wanted to determine whether they cared or thought it would make a difference or whether it would have an impact.

MR. JOHNSON:    Could I get page 21, line 2 of your deposition.    I move to publish the deposition, Your Honor. Page 21, line 2 through line 6.

THE WITNESS:    Excuse me, I'm trying to find where my deposition --

MR. JOHNSON:    It's on the screen.

THE WITNESS:    I'm sorry.

BY MR. JOHNSON:

Q    I took your deposition not more than a few weeks ago, Dr. Jay, and asked you the question, whether they care:    So you believed that your survey does measure whether adults in City of Seattle want the Sonics to leave the city.

Your answer:    Whether they care, I measured whether they care, whether the Sonics leave the city.

Do you remember that?

A    Yes.    I believe that is what I just said I did.    That I measured whether they care whether they thought there would be a difference or whether it would impact them.

Q    That is actually not what you said.    Would you like to

821

read that again.  You're throwing in the word "impact."
That's not what you said.

MR. WEBB:  Objection, argumentative.

THE COURT:  Pose a new question.  You posed two
questions.

BY MR. JOHNSON:

Q   Your survey measured whether the people surveyed care if
the Sonics leave the city, correct?

A   Yes.

Q   In fact, the survey absolutely unequivocally measures
whether local residents care whether the Seattle Sonics leave
Seattle, correct?

A   Yes.

Q   You didn't ask them that, did you?

A   I did not use those exact words.  But I measured whether
they cared whether the Sonics leave the City of Seattle.  I
believe that if the residents of the Seattle metropolitan
area and the City of Seattle cared, they would say it would
make a difference to them.

Q   Thank you.  Can we go back to her report.

This is question you asked them.

You asked them:  I would like to ask you what you think
the impact would be on you if any, if the following Seattle
sports teams were to leave Seattle.  Once again, if you do
not know the answer to the question, or do not have an

opinion, just say so.

All right.

Then you give them three options.  They can say whether they would be better off, whether they would be worse off, or whether it makes no difference, correct?

A   Yes.

Q   All right.

You think that's a fair way of getting at whether people care?

A   Yes.

Q   Let's get Exhibit No. 329, please.

MR. JOHNSON:  Move admission for 329, Your Honor.

MR. WEBB:  Objection.  Hearsay and its relevance.

MR. JOHNSON:  The only objection in the record is relevance is an impeachment document, using it for impeachment.

MR. WEBB:  Then it doesn't come in as an exhibit.  I object on relevance grounds.

THE COURT:  I'm not understanding what impeachment this would go to.  Where is this from?

MR. JOHNSON:  Let me lay the foundation, Your Honor.

THE COURT:  Okay.

BY MR. JOHNSON:

Q   Dr. Jay, this Exhibit No. 329 comes from your website.  It's an example of the field poll, correct?

A    That's what you indicated it looks like it.  I didn't prepare this.  It appears to be prepared by Mark DeCamillo (phonetic) and Marvin Field.  I know some of our press releases for the field poll are on our website.  Mark DeCamillo directs the field poll.  So this would be on our website.

Q    You are CEO of the company?

A    Yes.

Q    You have been putting out this field poll since 1947, your company has been.  Correct?

A    Yes.

Q    And it's a public opinion poll that is well known, correct?

A    Field poll is well known.

Q    Yes.

     And you advertised these polls as being very reliable because they're independent, correct?

A    These polls are independent.  That's one part of the work that Field does.  It's less than ten percent of the work that Field Research Corporation does.  Mark DeCamillo directs the field poll and it's a part of the Field Research Corporation.

Q    You market this poll as an independent nonpartisan objective poll, correct?

          MR. WEBB:  Objection.  We're laying a foundation for an irrelevant document.  Objection is relevance, not

824

foundational.

THE COURT:  Sustained.

BY MR. JOHNSON:

Q   When you're asking a question in your field polls, you know how to ask a question trying to get to the public's opinion, don't you?

A   Again, Mark DeCamillo directs the field poll.  These are done as part of a new service, not for a litigation survey. They're done often in the context of an election with all the constraints of an election.

They're done for news stories.  They're done for a very different purpose, under a variety of different constraints. They tend to try to maximize opinions where surveys and litigation as is stated in the reference manual on scientific evidence are to try to minimize guessing.  And so it's a very excellent device to do election polling.  It is independent and nonpartisan.

But Mark DeCamillo directs that poll.  And he designs them for the news service that it's done for.

Q   He designs them to get out people's opinions, correct?

THE COURT:  I'm not understanding the reference.  The name of her firm is Field.  Are you talking about any study that her field does?  Are you talking about a specific study?

MR. JOHNSON:  Maybe I can get to this another way.

BY MR. JOHNSON:

Q    Your company regularly conducts public opinion polling in the State of California, and it is well known for doing that?

A    Yes.

Q    You have regularly made those polls available on your website to the media, correct?

A    The field poll does regularly make available results from publicly released surveys that are done in connection with the news service.

Q    When you want to find out people's opinions on things in those field polls, you ask questions like, Do you approve or disprove of something.   Correct?

MR. WEBB:   Objection.   We're still laying the same foundation for an irrelevant document.

MR. JOHNSON:   I'm not talking about the document. I'm asking her about what these questions are --

THE COURT:   Counsel, I'm trying to follow what you're trying to do here.   It is my understanding a field poll is a specific kind of forum.

MR. JOHNSON:   I'm sorry.   A Field Poll is a brand named poll that they're famous for in California.

THE COURT:   She didn't do a Field Poll.

MR. JOHNSON:   I know.

THE COURT:   So I'm not understanding why we're going into what a field poll does when that's not what she did.

MR. JOHNSON:   Because the questions asked in a Field

Poll are straightforward and get to the answers and they differs from the questions she asked here.

MR. WEBB:  Your Honor, she said it's for a completely different purpose, and going from Field Polls that she didn't even take part in.

THE COURT:  All right.  Objection is sustained. Let's ask another question.

BY MR. JOHNSON:

Q   Dr. Jay, you asked this question.  What you didn't ask is people -- you didn't ask people whether they care whether the Sonics leave Seattle, correct?

A   I did not use those exact words.  But I believe that the questions measured whether people care.  Because I believe if people cared they would have said it would make a difference to them.  But they would not have said it would make no difference, that they would have said either they cared and that they would be better off or either they cared and they would be worse off.

Q   What you really asked people is whether it impacted them. You didn't ask them whether they would be worse off, better off if the Sonics left.  You didn't ask them whether they approved or disprove of the Sonics leaving.  You didn't ask them whether they favor or oppose the Sonics leaving?

MR. WEBB:  Objection, compound.

THE COURT:  Sustained.

BY MR. JOHNSON:

Q   Those are all questions you ask when you're trying to get someone's opinion, correct?

A   You rattled off a lot of different questions.  The questions that you formulate relate to the purpose of the survey.  And this question is a balance question.  It measures whether it does or doesn't make a difference, and if it makes a difference whether you would be -- you think you would be better off or worse off.  It's a question that measures the impact or whether you care whether the Sonics leave Seattle.

Q   Can we get -- you got answers to some verbatim answers to these questions?

A   We ask respondents who said they would be better off and respondents who said they would be worse off.  The reasons why they thought they would be better off and the reasons why they thought they would be worse off.

Q   Could we look at PBC 107493 which is page -- in Appendix O of Exhibit No. 333.

MR. WEBB:  Can I get a clarification on the document we're going from 333?

MR. JOHNSON:  For right now, it's Appendix O, 107493.

THE COURT:  What's the page again?

MR. JOHNSON:  I'm sorry, Your Honor.  It's page 1 of Appendix O.

BY MR. JOHNSON:

Q   Dr. Jay, this middle column, 10-C, indicates the responses that you got to the questions you asked.

A   Actually, you're not showing the questions that were asked for those responses.  It was a later bullet point on the page.

Q   Right.  These are people that said they would be better off if the Sonics left.  These are the people that want the Sonics to leave down, right?

A   Yes.

Q   And this is what they said?

A   Yes.  But it's a response to different bullet points than you have on the screen.

Q   No.  But you asked both of those bullet points on the screen before you got to that another question, correct?

A   Yes.  But neither of those questions are C-10-C, and you're not showing the question that comes below it.  That is a response to -- I'm just pointing out that is a response to a question that followed those first two bullet points.

Q   What these people thought you were asking them is what -- how the Sonics leaving would impact them financially?

        MR. WEBB:  Objection, speculation, calls for absolute speculation on this witness's part.

BY MR. JOHNSON:

Q   You can look through the four pages of responses and

virtually everyone talks about it's going to cost them money if the Sonics stay?

THE COURT:   Counsel, do you want a response to the objection?

MR. JOHNSON:   No, Your Honor.

THE COURT:   Then sustained.

BY MR. JOHNSON:

Q   Despite the fact that we can disagree about whether the question you asked is the appropriate one, let's -- we can agree on one thing:   This is the population you were measuring?

MR. WEBB:   Objection, foundation.

BY MR. JOHNSON:

Q   In your deposition you told me you were looking at -- I think it's in your report -- King, Pierce and Snohomish Counties, correct?

A   I was looking at King, Pierce and Snohomish counties, but the -- I was looking at adults age 18 and older.   And I used census data.   You have a different set of population numbers. This does not match data on www.census.gov website that I looked at with respect to the adult population age 18 and older.

Q   What was the population of Seattle that you thought you were measuring?

A   Approximately 2.5 million adults.

Q   That was for the metropolitan region, I think, is what you meant to say and I think you said 500,000?

A   I'm sorry.  2.5 million for the three counties.  Adult population age 18 and older and approximately a half million for the City of Seattle.  So again, my numbers that I recall from my files don't exactly much these numbers.

Q   So I will take your numbers.  Given your numbers and your poll, at least 165,000 residents of Seattle feel like they would be worse off in Sonics leave, correct?  That's a third of the population of the City of Seattle.  You said 33 percent of the population of the City of Seattle feels like they would be worse off?

THE COURT:  Counsel, you have to -- you have to wait for an answer before you ask the next question.

MR. JOHNSON:  All right.

THE COURT:  You have two questions in front of her. Which one do you want answered?

MR. JOHNSON:  The first.

THE COURT:  Pose it again.

BY MR. JOHNSON:

Q   A third of the citizens of Seattle that are adults, according to your poll, feel like they would be worse off if the Sonics left?

A   Yes.

Q   That's approximately 165,000?

A    Yes.

Q    And for the regional metropolitan area, it's about 775,000, correct?

A    Yes.

Q    Feel like they would be worse off?

A    Yes.

Q    Thank you.

MR. WEBB:   Nothing further.   Thank you.

THE COURT:   You may step down.

(Court adjourned.)

C E R T I F I C A T E

    We certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/S/ Barry L. Fanning, CCR, RMR, CRR

/S/ Nichole Rhynard, CCR, RMR, CRR