UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

| | | |
|---|---|---|
| CITY OF SEATTLE, | ) | Cause No. 07-01620-MJP |
| | ) | |
| Plaintiff, | ) | Seattle, Washington |
| | ) | June 20, 2008 |
| vs. | ) | Volume V |
| | ) | |
| PROFESSIONAL BASKETBALL CLUB, | ) | |
| LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

BENCH TRIAL
VERBATIM REPORT OF PROCEEDINGS
BEFORE THE HONORABLE MARSHA J. PECHMAN
UNITED STATES DISTRICT JUDGE

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | Paul Lawrence |
| | Jeffrey Charles Johnson |
| | Gregory Narver |
| For the Defendant: | Bradley S. Keller |
| | Paul Taylor |
| | James Webb |
| Reported by: | Barry L. Fanning, CCR, RMR, CRR |
| | Nichole Rhynard, CCR, RMR, CRR |

Proceedings recorded by mechanical stenography, transcript produced by Reporter on computer.

834

EXAMINATION INDEX

EXAMINATION OF:                                                    PAGE
WALLY WALKER
 DIRECT EXAMINATION          BY MR. TAYLOR          835
 CROSS-EXAMINATION           BY MR. LAWRENCE        891
 REDIRECT EXAMINATION        BY MR. TAYLOR          922
 RECROSS EXAMINATION         BY MR. LAWRENCE        925
MATTHEW GRIFFIN
 DIRECT EXAMINATION          BY MR. KELLER          926
 CROSS-EXAMINATION           BY MR. LAWRENCE        970
 REDIRECT EXAMINATION        BY MR. KELLER          993
 RECROSS EXAMINATION         BY MR. LAWRENCE        996
NICHOLAS LICATA
 DIRECT EXAMINATION          BY MR. KELLER          996


                          EXHIBIT INDEX
EXHIBITS ADMITTED:                                                PAGE
 570                                                    887
 610                                                    907
 624                                                    923
 579                                                    924
 522                                                    999
 520                                                   1001
 525                                                   1010
 518                                                   1014

P R O C E E D I N G S

_____

THE COURT:  Good morning.  It is not a good morning?
Good morning.  All right.  Counsel, the first thing we need
to review is what our balances are.  Yesterday the City used
174 minutes, for a balance of 235, the defense used 131
minutes for a balance of 357.

So who do we have coming this morning?

MR. KELLER:  This morning as our first witness, your
Honor, is Mr. Wally Walker.  Mr. Walker.

Whereupon,

WALLY WALKER

Called as a witness, having been first duly sworn, was
examined and testified as follows:

THE CLERK:  Please state your full name for the
record, spelling your first and last name.

THE WITNESS:  Wally Walker, W-A-L-L-Y  W-A-L-K-E-R.

DIRECT EXAMINATION

BY MR. TAYLOR:

Q   Good morning, Mr. Walker.  My name is Paul Taylor, I
represent the Professional Basketball Club?

A   Good morning.

Q   You were formerly the president and general manager of the
Seattle SuperSonics when they were owned by the Schultz

group?

A    When owned by the Schultz group my title was president and chief executive officer.

Q    President and chief executive officer.  You were also an owner of the Sonics during that time?

A    Yes.

Q    From what time period were you an owner of the Sonics?

A    I had an equity interest from the inception of my employment with the Sonics starting in 1994.

Q    And when did the Schultz group acquire the Sonics?

A    2001.

Q    I want to talk to you about KeyArena and its adequacy as an NBA basketball facility.  Okay?  From your perspective as an owner and chief executive officer, KeyArena was not a competitive NBA facility?

A    Starting when?

Q    As early as 2004.

A    I believe I said publicly that it was a challenging arena at that time, yes.

Q    And one of the problems was the terms of the lease, true?

A    Yes.

Q    The lease was not competitive with other NBA leases, right?

A    Yes.

Q    The lease made things extremely challenging for the

Sonics, correct?

A    Relative to our competition, yes.

Q    And one of the problems was the revenue sharing component of the lease, right?

A    Yes.

Q    And that is because suite revenue and ticket revenues had to be shared with the City?

A    That's correct.

Q    And that made it, in your estimation, an onerous lease, true?

A    Yes.

Q    One of the worst in the league?

A    Yes.

Q    In addition to the lease, the facility itself was also a problem, wasn't it?

A    I wouldn't totally subscribe to that, no.

Q    Let me ask you this:  Was the footprint very small by NBA standards?

A    Oh, yes.

Q    And that created problems with points of sale issues, space for premium customers and those kinds of things, right?

A    Yes.

Q    And those are all important drivers of revenue, true?

A    Correct.

Q    And that's the reason the building was a problem from a

financial perspective for the team, true?

A    Yes.

Q    Because of the inadequacies of KeyArena the team made a decision to go to the Washington legislature to try and get tax funds for a significant overhaul of KeyArena.  Do you recall that?

A    Yes, I do.

Q    And you first went to the legislature in the 2005 session to lobby funds to remodel KeyArena, right?

A    Yes.

Q    You were seeking 200 million in tax dollars for renovation, true?

A    Thereabouts.  The total project would have been about that.

Q    And you made a serious effort to get legislation to authorize this $200 (sic) in tax funding?

A    Well, we were serious.

Q    You hired lobbyists, for example?

A    Yes.

Q    Tim Ceis, deputy mayor, he came down to Olympia to help?

A    He did.

Q    You had lawyers helping?

A    Correct.

Q    In fact, it was K&L Gates working for the Sonics back then, right?

A    In terms of drafting legislation, yes.

Q    One of the lawyers was K&L Gates' lawyer Gerry Johnson, do you recall that?

A    Yes.

Q    If we could be shown Exhibit 514, please?

MR. LAWRENCE:  Has this been admitted?

MR. TAYLOR:  Yes, it has.

BY MR. TAYLOR:

Q    This is a memo prepared by Mr. Johnson in September of 2004.  "Some talking points and an outline for a proposal for the City."  I want you to turn to the second page, please.  "Sonics talking points."  If we could look at the first line.  The team's counsel back in 2004 wrote, "the current lease between the City and the Sonics does not work for either party."

Do you agree with what he was saying there?

MR. LAWRENCE:  Objection, your Honor.  He hasn't established a foundation.  This was not sent to Mr. Walker. He doesn't know that Mr. Walker received this document.  I am not sure why Mr. Walker is being questioned about this document.

THE COURT:  I thought he just established that the lawyer working from your law firm, Mr. Johnson, put together the talking points for Mr. Walker and the Sonics' effort in the legislature.

MR. LAWRENCE:   No, because it is not addressed to Mr. Walker.

THE COURT:   Well, the issue is does he agree with the statement, not necessarily whether he received the document.

MR. LAWRENCE:   If it is limited to that, your Honor, I will withdraw the objection.

THE COURT:   Okay.

BY MR. TAYLOR:

Q   Mr. Walker, once again, you were the president of the team in 2004?

A   Yes.

Q   President and general manager?

A   Chief executive officer.

Q   I'm sorry.  I apologize.  Do you agree with what your lawyer wrote in September 2004 when he said, "the current lease between the City and the Sonics does not work for either party?"

A   I would limit what I knew to the Sonics.

Q   So we will put aside the City.  You agree it wasn't working for the Sonics?

A   Yes.

Q   K&L Gates also wrote in 2004, "from the Sonics perspective it is the worst lease in the NBA."  Do you agree with that?

A   We said it was amongst the worst.  There was another team that tried to claim that title.  It was amongst the worst.

Q    That's fair.  Thank you.  He goes on to say, and you tell me as former president if you agree, "the Sonics are losing money and cannot afford to invest more in the team if increased revenues only mean larger lease payments to the City."  Do you see that?

A    Yes.

Q    That was a true statement, right?

A    That would have been discretionary, but I would agree with it.

Q    He goes on to say back in 2004, "current Sonics ownership must consider sale of the franchise under these conditions."  Do you see that?

A    Yes.

Q    And he went on to say -- K&L Gates went on to say, "the team has to consider moving possibly even outside the region."  Do you see that?

A    Yes.

Q    You didn't want to move the Sonics, did you?

A    Did not.

Q    You wanted to fight to keep them in Seattle?

A    Of course.

Q    We were talking about your efforts in 2005 in the Washington legislature.  You had the lobbyists, you had Mr. Ceis, you had the backing of the law firm K&L Gates.  Even with all that you thought it was a long shot in 2005.

Why was that?

A   My recollection is we got a late start.

Q   What does that mean?

A   We weren't down there, what we were told by the people who understood it far better than I did, as early as they would have liked or I guess we would have liked.

Q   Did you have any success in the 2005 session?

A   We obviously didn't get the legislation passed, no.

Q   It didn't even get out of committee?

A   It did not.

Q   Did you go back in 2006?

A   Yes.

Q   And this time you were seeking approximately $220 million?

A   That was the estimate of the entire project, so the tax dollars would have been something less than that.

Q   Order of magnitude in that range?

A   Yes.

Q   And this time we have a team of what, at least three lobbyists?

A   Yes.

Q   You had a public relations firm?

A   That's correct.

Q   And this time I imagine you had all your ducks in a row in a timely fashion, right?

A   I think we were better.  Ducks in a row?  That is

843

subjective.  I don't know.

Q    Let me rephrase it.  Were you more timely in 2006 than in 2005?

A    I believe we were down there earlier, yes.

Q    And you had learned some lessons in 2005 that could help you shape your approach in 2006?

A    I think we developed some relationships that were helpful.

Q    You were building on the work you had done in 2005?

A    Yes.

Q    And you had the lobbyists, the public relations firm, and again you had the backing of the law firm or the assistance of the law firm K&L Gates?

A    Correct.

Q    Their role was to draft legislation?

A    Yes.

Q    And they did so?

A    They did.

Q    And you had fans and other people lobby, kind of a grassroots effort campaign?

A    We did.

Q    Mr. Schultz, the chairman of Starbucks and the principal owner of the team, he went down and testified?

A    Yes.

Q    And he worked with legislators?

A    He did.

Q   You worked hard?

A   I think so.

Q   You, Mr. Schultz, your lobbyists, your public relations firm, your lawyers, you all did your best?

A   We worked hard.  We tried.

Q   And the effort failed?

A   Again, no legislation passed.

Q   Now, one thing that didn't happen in 2006 was -- the City refused to help you in your effort in 2006, right?

A   They eventually did help.  Early in the process not so much.

Q   Isn't it true that the City of Seattle was unwilling to work in Olympia on behalf of their own building and their primary tenant?

A   Towards the end of the session Mr. Ceis came down again and they were down being proactive and helping.

Q   Isn't it true they were unwilling to work in Olympia even though they had pledged to do so the year before?

A   Like I said, they came down eventually in the session. Early in the process I don't recall them being there.

Q   Could the witness be shown Exhibit 616, please?

        MR. LAWRENCE:  Your Honor, it should not be shown. It is not an admitted exhibit.  If it is being used to impeach him or refresh his recollection --  It is not an exhibit at this point.

THE COURT:  Mr. Lawrence, I have no idea what it is being used for.

MR. LAWRENCE:  I thought it was being put up you on the screen.

MR. TAYLOR:  I am using it for impeachment, and for that purposes I would like to put it up on the screen so the witness can see it.

THE COURT:  All right.  Where is 616?

BY MR. TAYLOR:

Q   616 is an e-mail you wrote, right, Mr. Walker?

A   That's correct.

Q   And you wrote it to all of your co-owners of the Sonics?

A   Right.

Q   And you wrote it in January of 2007, a year after the 2006 session -- eight months after?

A   Yes.

Q   And you wrote then --  Let's take a look at the second paragraph.  Starting with the second line, in January of 2006, if we could have that highlighted please?  You wrote then in January of 2006, "the City of Seattle by resolution was unwilling to work in Olympia on behalf of their own building and their primary tenant, us, even though they had pledged do so the year before."

You went on to say --  If we could highlight the sentence that begins "given"?  "Given the extremely late start and

lack of cooperation from our landlord we knew that we were an extreme long shot to get legislation passed?"

A year after the fact you didn't say a word about Mr. Ceis helping you in the 2006 session.  You said they didn't help and they broke their promise, right, Mr. Walker?

A   I wrote what I wrote.  But Mr. Ceis did come down, I believe it was in March, for a hearing.  And then later in the session he was helpful.

Q   After the session you told your partners, your co-owners, that the City broke its promise to you, right?

A   We had hoped from the year before that they would be involved from the outset of the process, and they got started a little later.

Q   They pledged to help and they didn't help.  True statement?

A   Like I said, at the beginning we didn't believe -- I didn't believe they were helpful, but then they were.

Q   Where do we see you telling your partners after the session that the City came down to help you after you told them the City broke its promise?

A   It is not in this letter.

Q   Thank you.

A   It did happen.

Q   One of the problems or one of the reasons you were unsuccessful in getting legislation passed, at least in your

estimation, was some of the politicians you were dealing with, true?

A    Well, we had our frustrations, and I assume vice versa.

MR. TAYLOR:  By the way, your Honor, if I can come back to 616 for a minute, I would move for its admission.

MR. LAWRENCE:  No objection, your Honor.

THE COURT:  616 will be admitted.

(Exhibit 616 admitted)

BY MR. TAYLOR:

Q    Coming back to my question, Mr. Walker.  One of the reasons in your mind that you were unsuccessful in Olympia was the politicians you were dealing with, true?

A    Yes.

Q    And in your estimation the governor, for example, is -- or was risk averse and unwilling to get out front, right?

A    In 2006?

Q    In 2006, 2007, did she ever do anything other than be risk averse?

A    I thought the governor was helpful to the process in 2006.

Q    Let me move forward.  You were back in front of the legislature in the 2008 session, weren't you?

A    I was back in front of the legislature?

Q    A group you were with was in front of the legislature in 2008, true?

A    Oh, at that point I was trying to be helpful.  I guess you

would call it a group.  But I wasn't engaged in that process, no.

Q   Weren't you providing an analysis of the politicians and their prospects with certain politicians?

A   I am sure I had an opinion but I don't believe it was very informed.

Q   Well, you had an opinion that Chopp -- Mr. Chopp, that is the speaker of the house?

A   Correct.

Q   Your opinion was he didn't want to do it and was hiding behind process, true?

A   I very well could have said that.

Q   And as to the governor, it was your opinion she is so risk averse she is unwilling to get out front, right?

A   Could have been an opinion, yes.

Q   And as to Mayor Nickels, your view was he is probably willing to get out front but probably has the least credibility, right?

A   I thought Mayor Nickels had done a very good job in 2008 in trying to promote what we viewed as a good solution.

Q   Wasn't it your view that Mayor Nickels was probably willing to get out front but probably has the least credibility?  Your words, true?

A   I assume so, yes.

Q   Well, take a look at 628, please?  We don't need to put it

on the screen.  Read that to yourself, please, just the top e-mail block.  Have you had a chance to read that, Mr. Walker?

A   I have.

Q   Do you agree that it was your view Mayor Nickels is probably willing to get out front but probably has the least credibility?  True?

MR. LAWRENCE:  Your Honor, this is improper impeachment.  That was a statement by a third-party, not by Mr. Walker.  I think that is an improper use of that document.  It is from Mr. Stanton, not Mr. Walker.

MR. TAYLOR:  I asked if it was his view that Mayor Nickels was probably willing to get out front but probably has the least credibility.

THE COURT:  Mr. Taylor, you can't impeach somebody with somebody else's statement.  You can ask him if he agrees with it, but if it is not his writing you can't impeach with a prior inconsistent statement.

BY MR. TAYLOR:

Q   Very well.  Let me agree with you what Mr. Stanton said, Mayor Nickels is probably willing to get out front but probably has the least credibility?

A   Well, Mayor Nickels has been very helpful in our process from my perspective in 2008.

Q   Were you successful or was the group successful in 2008 in

the legislature?

A    No.

Q    And this group was Steve Ballmer --  Steve Ballmer was involved?

A    Yes.

Q    Matt Griffin?

A    Yes.

Q    Tim Ceis?

A    Tim I wouldn't consider part of, if you want to call it a group, that group, no.

Q    Tim Ceis assisted that group in Olympia in 2008, true?

A    Again, I wasn't involved in that legislative process.  I know there was contact, but I can't answer that.

Q    Were you sharing your observations of the political process, the legislative process, in March of 2008 with Matt Griffin, K&L Gates' lawyer Gerry Johnson, K&L Gates' lawyers Slade Johnson, Mike McGavick?

A    We were, sure.

Q    You were frustrated with what was happening or not happening in the legislature, right?

A    I stayed frustrated with that, yes.

Q    And in your view it was the same problems you had encountered in the past in terms of politicians unwilling to help?

A    I wished for a successful outcome so I got frustrated.

Q    And you thought there was a lack of leadership?

A    I vented and used that term, yes.

Q    In fact, you concluded it is the single finger-in-the-air lack of leadership that has gotten us to this place, true?

A    I used that term, yes.

Q    And even back then in March of 2008 you were worried about this trial, weren't you?

A    I don't recall being worried about it.

Q    Don't you remember asking Mr. Griffin, Mr. Johnson, Mr. Gorton and Mr. McGavick, "think how ugly the trial will be, how ugly the Sonics departure will be, and then we will rely on an NBA mandate that another team can move here after a scorched earth, incriminating process."  True?

A    Yes.

Q    And you were right, weren't you?

A    Let me say this:

Q    Just answer my question, please.

        MR. LAWRENCE:  Your Honor, let him answer the question without interruption from counsel.

        THE COURT:  Mr. Lawrence, his answer was not to the question.  He wanted to say something different.  He can answer the question.

        THE WITNESS:  What was the question?  Yes, please.

        MR. LAWRENCE:  I will withdraw the question, your Honor.

BY MR. TAYLOR:

Q    I want to move on now away from the legislative process and into your role in this lawsuit.   Okay, Mr. Walker?

A    Sure.

Q    Could we have Exhibit 147 shown, please.   147 is the arbitration demand filed by the Professional Basketball Club. If we could have the filing date blown up, please, right above the yellow highlighted line?

The arbitration was filed on September 19th of 2007, do you recall that?

A    I see it there.   I don't recall it at the time.

Q    All right.   Two days later on September 21st, 2007 you were retained as an expert consultant by the City of Seattle, true?

A    No.

Q    Two days later on September 21st you were retained by the firm of K&L Gates to assist them in their continuing representation of the City of Seattle, true?

A    September 21st?

Q    Yes.

A    I have no knowledge of that date.

Q    You were retained on September 21st to assist and consult with K&L Gates and the City with respect to efforts to retain the Seattle Sonics and Storm in the City of Seattle beyond the terms of the existing KeyArena lease, true?

A    I was concerned, and my goal was for the Sonics to remain here.  The consultant thing, there was a document I signed in February.  I don't have any recollection of September 21st.

Q    Let me see if I could refresh your recollection.  Can the witness be shown, please, Exhibit 625?

      Your Honor, I would move the admission of 625.

            MR. LAWRENCE:  No objection, your Honor.

            THE COURT:  Exhibit 625 will be admitted.

                        (Exhibit 625 admitted)

BY MR. TAYLOR:

Q    625 is the letter written to you by lawyer Gerry Johnson of K&L Gates, true?

A    Yes.

Q    "Dear, Mr. Walker."  That is you?

A    Yes.

Q    First paragraph, "I write to confirm our mutual understanding that you were retained as a non testifying expert consultant beginning --"  What day, Mr. Walker?

A    It says September 21st.

Q    September 21st.  Turn to the second page, Page 2.  Your signature?

A    Yes.

Q    Right above it, it says "approved and agreed."  Do you see that?

A    Yes.

Q   Let's go back to the first page and see what you were retained to do beginning on September 21, two days after the arbitration demand was filed.  If we could look at the first paragraph in particular -- I'm sorry, the first numbered paragraph.

You were retained specifically to assist and consult with K&L Gates and the City, both parties, with respect to efforts to retain the Sonics and the Storm in the City of Seattle beyond the term of the existing KeyArena lease.  Do you see that?

A   I do.

Q   Let's drop down now to the last paragraph, in particular the second line, middle of the line, "you acknowledge."  If we could have that highlighted, please?  You acknowledged that absent your retention as a consultant you would not have access to the confidential plans and strategies by the City -- or that the City and K&L Gates are developing to meet the goal of keeping the Sonics and Storm in Seattle for the long-term.  Do you see that?

A   I do.

Q   I want to turn now to the City's confidential plans and strategies for keeping the Sonics in Seattle for the long-term.  I want to talk about your role in that.  Okay?  Are you with me?

A   Sure.

Q    I want to take us all to October 7th, 2007.  Do you recall that date?

A    I do.

Q    There was a meeting at your house, was there?

A    Yes.

Q    By this time the arbitration demand had been filed and the City had sued the Professional Basketball Club; true?

A    I believe so.

Q    Slade Gorton was the lead counsel for K&L Gates, true?

A    I believe so.  I certainly wasn't focused on that.

Q    At this meeting were the following people:  Slade Gorton, who was the lead counsel for the City in the lawsuit, you were present, and you had just been retained to assist K&L Gates and the City with respect to efforts to retain the Sonics beyond the term of the existing lease --

A    I hadn't been retained at that point.

        MR. LAWRENCE:  Excuse me.  I would like a question rather than a series of statements by counsel.  Can we get a question in there?  He is just make making a statement.

        THE COURT:  Overruled.

        MR. LAWRENCE:  What is the question, your Honor?  How is he questioning?

        THE COURT:  Mr. Lawrence, it is overruled.

BY MR. TAYLOR:

Q    Let's go back to 625 --

THE COURT:  Did you wish to complete your question?

MR. TAYLOR:  No.  I will withdraw the question for the time being.

BY MR. TAYLOR:

Q  Come back to 625.  Top block, please.  You were retained as an expert consultant beginning on September 21st, 2007. That was before the meeting at your house on October 7th, 2007, true?

A  There had been no discussion of the term, I was just trying to be helpful.  You see this is dated January 29, 2008.  I never heard this term until the beginning of January 2008.

Q  Mr. Walker, according to the document you signed, agreed and approved, you were a consultant beginning on September 21st, 2007, true?

A  That is what it says.

Q  Yes, it is.  And that is before the meeting at your house, was it not?  September 21st is before October 7th?

A  That's true.

Q  So at the meeting at your house, lead counsel of K&L Gates, you were present --  Steve Ballmer was also present?

A  Right.

Q  And Mike McGavick?

A  That's right.

Q    The purpose of the meeting was to discuss ways to keep the Sonics in Seattle?

A    Yes.

Q    Senator Gorton brought a document with him, did he not?

A    He did.

Q    And that document was entitled "The Sonics Challenge.  Why a Poisoned Well Affords a Unique Opportunity."  Do you recall that?

A    I do.

Q    This was not the first time had you seen that document, was it?

A    No, I had seen it prior.

Q    In fact, you were given access to that document two days after September 21st, the day you became the expert consultant, true?

A    I think perhaps earlier.

Q    Even earlier?

A    I think so.

Q    You had been working with that document for a while then?

A    I think so.

Q    And the reason you had access to it was because you had agreed, per 625, that you would keep in confidence the confidential plans and strategies the City and K&L Gates are developing to meet the goals of keeping the Sonics in Seattle?

A    No.

Q    Take a look at 625, please.  You acknowledged then, absent your retention as a consultant, you would not have access to the confidential plans and strategies the City and K&L Gates are developing to meet the goal of keeping the Sonics in Seattle for the long-term.  Do you see that?

A    I see it.

Q    Let's come back to the meeting at your house on October 7th.  The poison well presentation, that was the only document used at the meeting, true?

A    Yes.

Q    The meeting lasted an hour-and-a-half?

A    Thereabouts.

Q    I realize you didn't spend the whole time looking at the document, but the four of you, lead counsel Gorton, McGavick, Ballmer and you, consultant, went through the document, true?

A    We flipped through the document.

Q    When you first saw the draft on September 23rd you looked through it?

A    Again, I can't remember exactly when I saw it.  I thought it was before that.

Q    Take a look at 619, please.  If the witness could be shown Exhibit 619?

          THE COURT:  Did you want 619 on the monitor?

          MR. TAYLOR:  I'm sorry, your Honor?

859

THE COURT:  Did you want 619 on the monitor?  625 is still up.

MR. TAYLOR:  I would move the admission of 619, your Honor.

MR. LAWRENCE:  Your Honor, this is a hearsay document.  There has been no foundation established that Mr. Walker was acting in his role with the City at this meeting.  That foundation needs to be laid if this is going to be treated as an admission against a party opponent.  Right now it is just an out-of-court statement by Mr. Walker.  There is no foundation laid at all that anyone at that meeting was acting on behalf of the City.  He needs some evidence of that in order to get to this poisoned well document being a City document.  He hasn't established that.  Mr. Walker answered no when asked whether or not he was working under a consulting agreement at this meeting.  Mayor Nickels answered no when he was asked whether he had authorized a poisoned well type strategy.  There is no evidence of record to establish any foundation that this was a City meeting or anyone representing the City.

THE COURT:  Do you wish to respond?

MR. TAYLOR:  Yes.  I haven't move the admission of the document itself.  We are talking about Exhibit 619, which is an e-mail from Mr. Walker to Mr. McGavick.  I am not offering the underlying document --

MR. LAWRENCE:  Again, this e-mail is hearsay because it is not -- Mr. Walker was not acting with respect to the City with respect to this e-mail.  It is an out-of-court statement not taken under oath.  So it is a hearsay document.

THE COURT:  Well, he hasn't offered it.

MR. LAWRENCE:  He did offer 619, your Honor.  I thought that's what he just said.

MR. TAYLOR:  I am offering 619.  619 was prepared by Mr. Walker two days after he was retained by the City as an expert to assist in keeping the Sonics in Seattle.

MR. LAWRENCE:  Your Honor, he needs to ask Mr. Walker whether this was done in that consultant's role or not to lay the foundation for its admission.

THE COURT:  Mr. Lawrence, the letter from K&L Gates basically indicates that Mr. Walker was a consultant as of September 21st, and it was signed off by Mr. Johnson from your law firm.  So I believe that leads an establishment -- that establishes that Mr. Walker was acting as a consultant at that time and making statements concerning the strategy that the City had.

MR. LAWRENCE:  Can I respond, your Honor?

THE COURT:  No.  You have made your argument.

MR. TAYLOR:  Move the admission of 619, your Honor.

THE COURT:  619 will be admitted.

(Exhibit 619 admitted)

BY MR. TAYLOR:

Q    Can we have 619 up on the screen?  This is a letter -- an e-mail you sent to Mr. McGavick on September 23rd, 2007.  Do you see that?

A    That's correct.

Q    That is two days after you became the City's expert, September 21st.  Two days after you became the expert you got sent the poisoned well presentation, true?

A    Yes.  But I had seen it before.

Q    Mr. Walker, let me ask you a question.  When were you first subpoenaed to produce your records in this lawsuit?

A    First subpoenaed?  April.  Mid, late April.

Q    Is it correct at that time you did not produce all of your documents in response to the subpoena?

A    That's correct.

Q    All right.  And isn't it true that as recently as this Monday you finally produced approximately 700 more e-mails that had been withheld?

A    That's true.

Q    Where is the earlier version of the draft you say now that you saw, Mr. Walker?

A    I believe it is in my calendar notes, which have also been produced.

Q    Your calendar notes show you receiving it on

September 23rd, do they not?

A   They show earlier entries as I went back and looked at it.

Q   We will get to your calendar in a minute, okay?

A   Sure.

Q   Coming back to October 7th, the meeting at your house. You had the poisoned well document.  In fact, you got a draft --  The meeting was on a Sunday, right?

A   Yes.

Q   You had received a draft Friday from K&L Gates, right, a proceeding Friday, October 5th?

A   I believe that's right.

Q   Take a look at 620, please.

        MR. TAYLOR:  I would move its admission.

        MR. LAWRENCE:  Again, we would object on the same basis, your Honor.

        THE COURT:  620 will be admitted.

                    (Exhibit 620 admitted)

BY MR. TAYLOR:

Q   By the way, Mr. Walker, coming back to the earlier draft you saw, did you give it to us in response to the subpoena?

A   I don't think I had it.  In fact, I'm sure I didn't.

Q   Other people had it, didn't they?  K&L Gates would have had it, McGavick would have had it and you had it, right?

A   I would have seen it.

Q   K&L Gates would have had it, right?

A    I'm not sure.

Q    Do you know why in all the reams of paper in this lawsuit this supposed earlier draft hasn't been produced by anybody?

A    I don't know.

Q    Friday before the poisoned well meeting, Exhibit 620, K&L Gates sends out the latest draft.  Linda Jacobs -- by the way, you know her to be Gerry Johnson's secretary?

A    Yes.

Q    Gerry Johnson is a K&L Gates lawyer?

A    That's correct.

Q    The Friday before the meeting she says, "here's the latest draft without the color background."  Do you see that?

A    Yes.

Q    "It's not pretty but the master they are working off." K&L Gates was keeping the master of the poisoned well plan, true?

A    I am not sure about that.  Mr. McGavick was the one I was conversing with.  He was the one doing the drafting.

Q    Well, on Friday, October 5th K&L Gates had the master, true?

A    I am reading it here.

Q    Friday, October 5th K&L Gates had the master, true?

A    I see it.  But I don't recall how that works.

Q    She asks -- K&L Gates asks, "if you have revisions please call me or fax changes."  And she, in fact, suggested you fax

it directly to Gerry Johnson, the lawyer.  Do you see that?

A    I do.

Q    Did you make any changes?

A    I'm not sure.

Q    Let's go now to the plan itself.  Senator Gorton had brought the document with him to the meeting?

A    That's right.

Q    And Senator Gorton distributed it to the participants of the meeting, you Ballmer, McGavick, true?

A    We each had a copy.

Q    And the purpose of the meeting was to discuss ways to keep the Sonics in Seattle, right?

A    Yes.

Q    And at the meeting and in the plan you talked about the fact that you wanted the, quote, Oklahomans to sell the team, right?

A    If there was an arena solution here, and the Oklahomans would not take advantage of it, then we hoped they would sell the team to keep it here.

Q    Well, for the best outcome the Oklahomans have to be willing to sell.  That was the plan, wasn't it?

A    Our goal was to keep the team here.  We had no way to do anything other than hope they would sell to local ownership.

Q    Take a look at Bates number 218 of Exhibit 567.

         THE COURT:   567, is that what you said?

MR. TAYLOR:  567, your Honor.

BY MR. TAYLOR:

Q   Turn to Bates number 218, please.  Do you have that yet, Mr. Walker?

A   I am not sure what Bates 218 means.

Q   If you look in the lower right hand corner there is document numbers WW 00218?

THE COURT:  In other words, Page 24.

THE WITNESS:  Okay.  I've got it.  Thank you.

BY MR. TAYLOR:

Q   Are you with me?

A   I am.

Q   "Under the poisoned well plan for the best likely outcome the Oklahomans have to be willing to sell."  True?

A   Right.

MR. TAYLOR:  Your Honor, we move for the admission of 567 at this point.

MR. LAWRENCE:  Your Honor, if I may, could I ask the Court for a continuing objection?  Again, we don't believe there is any foundation laid this was a City plan.  In fact, the document indicates otherwise.  If I could have a continuing objection we will speed this along.  If not, I will make my same objection, there is no foundation that this is a City plan or City document.  The document pages 18, 28, 30, 31 I think suggest that this was not partnered with the

City, but that the City was a future partner and this was not a City plan.  He hasn't issued any foundation that this was a City plan, that Mr. McGavick was working for the City, the author of the document.  This is a hearsay document.  There is no foundation to link it to the City.

THE COURT:  Do you want to respond, Mr. Taylor?

MR. TAYLOR:  Yes.  The master of the document came from K&L Gates.  We know that K&L Gates was distributing it two days before the meeting for everybody to review the document.  The document was then brought to the meeting by Senator Gorton.  Senator Gorton as of the date of the meeting was the City's lead counsel in this lawsuit.  That's what he was retained to do.  Mr. Walker as of this date had been retained as an expert by the City.  He had received the first draft of this document two days after he was retained as an expert by the City.  There is perhaps closing argument to be made that K&L Gates and the City had no part of this, but that goes to weight not to admissibility.  K&L Gates has not designated anybody from their firm, Gerry Johnson, Senator Gorton or anyone else to come in and say this wasn't our work on behalf of the City.

THE COURT:  567 will be admitted.

(Exhibit 567 admitted)

BY MR. TAYLOR:

Q   Could we have the first page of the poisoned well put up

on the screen, please?  "The Sonics challenge.  Why a poisoned well affords a unique opportunity.  We know for the best likely outcome the Oklahomans have to be willing to sell."  We saw that at Page 218.

If we go to Page 226, please.  You wanted to make the team available for purchase, true?

A   The best outcome was for the Oklahomans to stay here.  Shy of that, that would be next.

Q   218, please.  You say the best outcome was for the Oklahomans to stay here.  But on this date the best likely outcome would be the Oklahomans have to be willing to sell?  True, Mr. Walker?

A   No.

Q   Does it not say in the poisoned well plan for the best likely outcome two things have to happen next, Oklahomans have to be willing to sell, true?

A   That's true if they are not going to keep the team here.

Q   Well, let's talk a little bit more about whether you wanted the Oklahomans to stay here or head on back to Oklahoma City.  If we could go to Page 202.  I'm sorry, that's the wrong.  Page 227.  I apologize, your Honor.  "The path forward."  This was the path forward to keeping the Sonics in Seattle, true, Mr. Walker?

A   If the Oklahomans were not keeping the Sonics here, that's what this addresses.

Q   No, this addresses -- the plan addresses making them sell, true?

A   That's what it says.

Q   And that was a discussion that day, true?

A   I don't recall that we discussed it.

Q   The goal was to make them sell.  And then you started talking about how to do that.  Let's take a look at what the plan was.  First bullet point -- I'm sorry, the first indented bullet point, "critical path."  "The critical path is to separate the NBA from the Oklahomans while increasing the exposure for each."  Do you see that?

A   I do.

Q   The Oklahomans, is that your way of referring to the Professional Basketball Club?

A   Well, that's what it refers to here, yes.

Q   And you knew by this time that they were seeking to relocate the team to Oklahoma City, true?

A   I believe so.

Q   And as a former executive of the Sonics you attended NBA Board of Governors meetings presumably?

A   Yes.

Q   You knew the Sonics under the league constitution could not move to Oklahoma without the NBA's approval, right?

A   I was aware of that.

Q   And as a result the critical path was to separate the NBA

from the Oklahomans, right?

A    What I believe that referred to, if there was an arena solution here, which there wasn't at this point, and the Oklahomans would not stay here even with an arena solution, then the NBA would have to sign off on that solution, and we hoped to keep the team here.

Q    Mr. Walker, the goal was to make them sell, and the critical path was to separate the Oklahomans from the NBA while increasing the exposure for each, just as it says here, true?

A    That's what it says, if they are not going to keep the Sonics here.  That was the preferred opinion that we shared at the meeting.

Q    You knew they didn't want to keep the Sonics here, right? They had filed for relocation.

A    Well, until there was an arena solution that was a challenge that could not be overcome for at least post 2010. Our goal was to start a process to get an arena solution at least to put them to the test whether they would stay or not.

Q    So you wanted to try to persuade them to stay; is that what you are saying?

A    We wanted to at least have a competitive arena solution here, which I believed was the KeyArena remodel, and to go from there.

Q    Wasn't the goal to lock them into losses here in Seattle?

What was the goal, wasn't it?

A    No.

Q    Drop down --  If we could go down a little more on the path forward, making them sell.  "Making them sell.  The path forward."  And we are talking now about the second bullet point.  "The City has already taken the first of several steps."  Do you see that?

A    Yes.  I see it here.  I was on the wrong page.

Q    Are you with us, Mr. Walker?

A    Yes.

Q    "The City has taken the first of several steps on the path to making them sell.  First they hired Slade Gorton and used the misstep of an out-of-state arbitration filing to file suit, increasing the prospect of locking them into losses in Seattle."  Do you see that?

A    I do.

Q    "Them" is the Oklahomans, as you say; we call them the PBC, true?

A    Sure.

Q    Let's go now to Page 229, continuing on the path forward.  Your testimony is the group wanted to keep the team in Seattle.  Let's take a look at what the plan was, making them sell at the poison well meeting.  "So it is a pincer movement.  Increasing the Oklahomans' costs in an unpleasant environment while increasing the league's belief of an

alternative solution, gains a good new owner and keeps it in a desirable market." "Good new owner." You have no intention of trying to keep the PBC as the owners of the Sonics, did you, Mr. Walker, you wanted a good new owner?

A   The group discussed that day the preferred outcome would be for PBC to keep the Sonics here.

Q   The good new owner was Mr. Ballmer; that's why he was there at the meeting, right?

A   The meeting was to at least get him thinking about a plan of being an owner if the Sonics were going to leave otherwise.

Q   Mr. Ballmer was there because he was the good new owner you had in mind, true, Mr. Walker?

A   I believe it is a generic term, but would he qualify.

Q   Well, there wasn't any other good new owners at that meeting, was there?

A   It wasn't me.

Q   Page 236, please. You say this meeting was designed and built around keeping the PBC in Seattle. But the path forward, immediate next steps, "number one, Gorton, et al --" That's Senator Gorton and his law firm, K&L Gates?

A   Senator Gorton. I don't know who et al refers to.

Q   That is a legal term.

A   Is it?

Q   "Gorton, et al, increase the pain of staying, financial

and reputation."  Do you see that?

A    I do.

Q    That was pain for the PBC, true?

A    I assume so.

Q    But you say now, no, we wanted the PBC to stay here in KeyArena, don't you?

A    Yeah.

Q    Mr. Walker, I want to go back in time now, back in time to the events that led to the poisoned well meeting on October 7th and the poisoned well strategy.  Okay?

A    Sure.

Q    We are going to go back to the summer of 2007.  This is before the PBC had filed an arbitration demand, and this is before the City had filed a lawsuit.  Okay?

A    Okay.

Q    I want to go back to July 9th -- Monday, July 9th.  You had lunch with Senator Gorton that day?

A    I believe I had had lunch with him on the 19th.

Q    Take a look at your calendar, please.  If we could have --

MR. TAYLOR:  Move to publish Mr. Walker's deposition, your Honor.

THE COURT:  All right.

BY MR. TAYLOR:

Q    If we could have Page 120, Line 18 up on the screen?  Are you with me there, Mr. Walker?

A    I see it, yes.

Q    We are looking at your calendar there, Monday, July 9th, Slade Gorton.  "Is that the first contact you had with Mr. Gorton about keeping the Sonics in Seattle?"  "We had lunch so its possible."  That was right around the time you and Senator Gorton started talking about ways to keep the Sonics in Seattle, true?

A    To go back, we had lunch on July 19th.

Q    We will get to July 19th.

A    I am not sure I talked to him prior to that.  I know we had lunch that day.

Q    Take a look at your calendar, please, Exhibit 601.  Turn to July 9th.  Do you see the entry there?

A    I do.

Q    Slade Gorton.

A    Right.  It doesn't have to do with lunch.

Q    You told us in your deposition you had lunch that day?

A    No.  I said we had lunch in the summer.  If you look at July 19th, we had lunch that day.

Q    All right.  Let me ask you a question.  You had lunch -- your calendar shows you with Slade Gorton on July 9th.

A    Well, if you look to see how the calendar works, when I have an arrow to the right it means I am deferring the contact.  I have written his name down.  A point to the right means we didn't have contact that day.  There is a key up

above.

Q   All right.   You say you had no contact with Senator Gorton that day about keeping the Sonics in Seattle.   The very next day who did you talk to?   Look at your calendar, July 10th.

A   Right.

Q   Tim Ceis.

A   Right.

Q   So the calendar shows Mr. Gorton July 9th, we know you talked to Mr. Ceis July 10th.   True?

A   No.   I tried to reach Mr. Ceis on July 10th.   Look at the key up above.

Q   You were unsuccessful?

A   Correct.

Q   So you were trying to reach both Mr. Gorton and Mr. Ceis in this two-day period about keeping the Sonics in Seattle?

A   Slade, I can't recall the catalyst.   I do remember the catalyst for calling Mr. Ceis.   And it was related to keeping the Sonics in town.

Q   Now, you say that this calendar entry indicates what, that you didn't try to call him?   What happened?

A   Which entry are you talking about?

Q   July 10th, Mr. Ceis.

A   It means I tried to reach him.

Q   You placed a call to him?

A   Correct.   I assume so, with the phone number there.

Q   We will take a look at your deposition just to be sure. Page 120, Line 24 through Page 121, Line 2.  We were talking about your entry with Mr. Ceis that day.  And you told us, "on the way I do it, that just means that I placed a call to him."  Right?

A   Right.

Q   That same day you also placed a call to Slade Gorton.  If you turn to the next page in your calendar, Exhibit 601.

A   What date are you talking about?

Q   July 10th.

A   It looks like I talked to his assistant that day.

Q   You were reaching out to Senator Gorton?

A   Well, we were trying to set up this lunch.

Q   Three days later, even though you apparently didn't have lunch with Senator Gorton, and you were unable to get through to Mr. Ceis, you knew that the City wanted to present some information to the NBA about KeyArena, didn't you?

A   Yeah.  I think --  Again, looking at my entries, Mr. Ceis and I had a conversation which looks like it was on the 13th.

Q   And were you talking with Mr. Ceis about trying to keep the Sonics in Seattle?

A   Well, that was my goal, yes.

Q   All right.  And your goal was for a new arena or a substantially remodeled KeyArena?

A   Competitive arena.

Q   And you knew by then the City had a plan for a $300 million remodel?

A   I didn't know of a plan at that point.  What Mr. Ceis told me that day was he wanted to present some numbers on what a remodeled Key would do.

Q   Didn't he tell you he wanted to split up the funding three ways?

A   I don't think he told me that until we visited the next month.

Q   Why don't you take a look at Page 121 of your deposition down at Line 23?  His original idea was splitting it up three ways for funding the remodel.  Do you see that?

A   I don't see it yet.

Q   Last line of the page.

A   I'm sorry.  I do see it.  Right.  Are you asking about that or the timing of it?

Q   Both.

A   Yeah, I am pretty sure he told me that in August.

Q   Well, take a look at your calendar, July 13th.

A   Right.

Q   The City would like to present numbers to the NBA?

A   Right.

Q   You say August calendar but it may say July?

A   The calendar says August if you look at the next month.

Q   We will work forward to that.  July 19th you had lunch

with Senator Gorton?

A    That's right.

Q    And on that day you and he talked about the Sonics?

A    That was amongst our topics, not the main one.

Q    Well, he was working on Sonics ideas, right?

A    He was working on a Bellevue arena.

Q    Wasn't he working on Sonics ideas?

A    No, he was working on the Bellevue arena.

Q    Take a look at Exhibit 617, please.  Down there at the bottom, "Mr. Gorton --" your words, "Mr. Gorton is working on some Sonics ideas."

A    Right.  It wasn't the primary reason for the lunch.

Q    And there was not much cooking yet but he wanted to quietly bounce some thoughts off of you.  Do you recall that as part of the lunch?

A    I think that's a fair characterization.

Q    And Senator Gorton's plan was both complex and ambitious, true?

A    Very.

Q    At that same time period you were talking about -- or talking with Mike McGavick?

A    Right.

Q    And you and he were talking about some very Machiavellian stuff that might work or at least be fun.  Do you remember that?

A   Mike was out of the country.  And I think this refers -- I see his line here.  I think it refers to information he was getting from a friend of his.

Q   You and Mr. McGavick were talking about very Machiavellian stuff that might work or at least be fun, true?

A   It says very Machiavellian stuff that he thinks might work, referring to another friend of his.

Q   Well, what did you and Mr. McGavick discuss about the very Machiavellian stuff?

A   I don't know that we did.

Q   The very Machiavellian stuff, was re the Sonics, true, Mr. Walker?

A   That wasn't part of our discussion this morning.

MR. TAYLOR:  Can we have 617 put up for impeachment purposes, your Honor?

THE COURT:  Go ahead.

BY MR. TAYLOR:

Q   Can we have the middle e-mail blown up, please?  "Re Sonics:  A friend of mine has been writing and suggesting," etcetera.  And then he describes it to you as very Machiavellian stuff that he thinks might work, or at least be fun.  Do you see that?

A   I do.

Q   What was the Machiavellian plan, Mr. Walker?

A   I recall an e-mail forwarded from his friend to

Mr. McGavick, it wasn't a friend he identified or that I think I knew.

Q   Let's move forward.  July 19th you have lunch with Slade Gorton.  You talk about the Sonics?

A   Yes.

Q   The very next day you called the office of the Mayor of Seattle.  Do you remember that?

A   I did not call him.

Q   Take a look at your calendar, please, July 20th, Exhibit 601.

A   Right.

Q   We see an entry 10.

A   Getting there.  Yes.  Um-hum.

Q   In fact, if we look at these pages side by side, July 19th, we see Slade Gorton lunch, Bellevue Club.  The very next day we see an entry Ken Nakatsu.  Do you see that?

A   Yes.

Q   Mr. Nakatsu works for Mayor Nickels, true?

A   Yes.

Q   He and Mr. Ceis here are essentially the deputy mayors, true?

A   I wasn't aware of that.

Q   Did Mr. -- Strike that.  Did you talk to Mr. Nakatsu that day?

A   No.

Q   You reached out to him?

A   No, he left me a message.   I am pretty sure what I did was just record his numbers.

Q   So he reached out to you -- the mayor's office reached out to you?

A   Yeah.

Q   And you set up a lunch with Mr. Nakatsu?

A   That's right.

Q   You had lunch with him on the 24th of July?

A   That's correct.

Q   And this is before the PBC has filed for arbitration, right?

A   Yeah.

Q   And the City had not filed a lawsuit?

A   Right.

Q   You were worried, though, that the PBC was thinking about moving the team?

A   I was.

Q   And you didn't like the prospect of the PBC moving the team?

A   Right.

Q   And you sat down with Mr. Nakatsu to discuss the fact that the Sonics -- the PBC might be moving the team?

A   Well, I recall that he called me to set up a get-together because he wanted to talk about arena financing and things

having to do with the NBA.

Q   As of this date you wanted to fight the PBC's efforts to move to Oklahoma, true?

A   True.

Q   You wanted to make it too expensive for them to leave, true?

A   I hoped if they were attempting to leave it would be difficult, which would entail expense.

Q   You wanted to make it too expensive to leave, true?

A   I think so, yes.

Q   And you wanted to make it too litigious for the PBC to leave, true?

A   I wrote it in an e-mail.

Q   Let's take a look at that e-mail, Exhibit 618.  You wanted to make it too expensive and too litigious for the PBC to move the team, right?

A   I would have been fine with whatever it took to keep them from moving the team.

Q   You wanted to make it too expensive --  Can we have the witness shown 618 for impeachment purposes and have it up on the screen, please?  Bottom e-mail, please.

A   Yep.

Q   This is an e-mail you sent on July 24th to John Stanton.  Do you see that?

A   I do.

Q   Who is John Stanton?

A   A good friend.

Q   He was another potential owner?

A   At this point not, but he was a previous owner.

Q   And at the meeting with the City, the City had arranged -- you delivered a message about fighting Clay Bennett's attempt to leave, didn't you?

A   That's what it says, yes.

Q   And you wanted to -- you told the City you wanted to make it too expensive and too litigious for Mr. Bennett to move the team, true?

A   That was my opinion, yes.

Q   And the City agreed with your goal of fighting attempts to leave, making it too expensive and too litigious, true?

A   I'm not sure about that.  I said I got the impression in this e-mail --

Q   You said you got the impression that they were in total agreement, true?

A   My recollection -- I'm not sure it is true.  My recollection is that they said we intend to enforce the lease, which I viewed as positive.

Q   On the day of the lunch you wrote that they were in total agreement with your plan of making it too expensive and too litigious for the PBC to move the team, true?

A   It wasn't planned.  It was an opinion.

Q    Well, they were in total agreement with your opinion that you needed to make it too expensive and too litigious for the PBC to move the team, true?

A    They said they were going to enforce the lease.

Q    They said they were in total agreement?

A    I don't know if they said that.

Q    Would you agree with me on the day of the meeting, shortly after -- the night of the meeting you wrote they were in total agreement?

A    I said I got the impression.    That's not --  I believe that's what I wrote, yes.

Q    You and the City, in this meeting arranged by the City, talked about the value of buying more time.   Do you see that?

A    I do.

Q    And that was the notion of locking in the Sonics to give you time to find a different owner, right?

A    No.   I would view that as buying time at that point to get an arena solution.

Q    By the way making it too litigious for the PBC to move the team.   You couldn't file a lawsuit against the PBC to make it too litigious for them, could you?

A    I would be practicing without a license here, yes.   No, I could not.

Q    The only body that could make it too expensive and too litigious for the PBC to move the team was the City of

Seattle, true?

A   I don't have a legal opinion on that.

Q   Let's move forward into August.  Beginning in early August you were beginning to gather financial data about the Sonics, right?

A   Gather?  I had some.

MR. TAYLOR:  By the way, your Honor, I would move the admission of 618.

MR. LAWRENCE:  Is that what is on the screen?

MR. TAYLOR:  Yes.

MR. LAWRENCE:  I would object.  It is a hearsay document by --  It is a hearsay document.  There is no evidence Mr. Walker was under a consulting agreement with the City at the time, and I don't think it was inconsistent with his testimony either.  His testimony --  This is not a document under oath as required to be a hearsay exception for prior inconsistent statements.

THE COURT:  You think that a prior inconsistent statement has to be under oath in order for it to be inconsistent?

MR. LAWRENCE:  I would be happy to read the rule, your Honor.  The rule says for it to be a prior inconsistent statement, not related to an admission to a party opponent, sorry, I have to get my glasses on, it has to be a statement, A, inconsistent with the declarant's testimony and was given

under oath subject to the penalty of perjury at a trial, hearing or other proceeding or in a deposition.

THE COURT:  Well, that's when a statement is not hearsay.  You just told me that this was hearsay.

MR. LAWRENCE:  I am saying it is hearsay.  But to get the hearsay exception for a prior statement of a witness it needs to be under oath.  This is hearsay because it is an out-of-court statement.

THE COURT:  No, Mr. Lawrence, you are reading the rule incorrectly.  Hearsay is defined, and then it says what is not hearsay.  That gives a definition of what is not hearsay.  If it is a statement under oath it is not hearsay.  This is not a statement under oath, so it is hearsay.  But it is not being offered for its truth, it is being offered to impeach his recollection.

MR. LAWRENCE:  But his recollection was consistent with the e-mail, so it is not offered for impeachment.  He agreed with exactly what this says.  Mr. Taylor tried to make it otherwise.  But it is --  My objection is that it is hearsay and it does not fall within a hearsay objection (sic).

THE COURT:  So you agree with me that your reference to the rule is incorrect.

MR. LAWRENCE:  Your Honor, I was anticipating their argument as to why it would fall outside the hearsay rule.  I

assert that it is hearsay and does not fall within an objection -- does not fall into an exception, and I agree what I read you was the exception to the hearsay rule.

THE COURT:  Actually --

MR. LAWRENCE:  I'm sorry, your Honor.  You're right.  It says statements which are not hearsay.

THE COURT:  It is not the exception, it is the definition of the exception.

MR. LAWRENCE:  You're right.  I apologize.

THE COURT:  All right.  Overruled.

BY MR. TAYLOR:

Q   Can we have 618 up on the screen?  The middle block.  Now, you wanted to make it too expensive and too litigious for Mr. Bennett and the PBC to move the team to Oklahoma.  Mr. Stanton, potential owner, wrote back to you, didn't he?

A   Yes.

Q   And he agreed that it should be too expensive and too litigious.  In fact, he went a step further.  He says, "agree completely, it should be excruciating for the PBC to consider early departure."  Do you see that?

A   I do.

Q   Did you want to make it too expensive or too litigious or did you want to step it up to excruciating?

A   I just wanted them to stay, period.

MR. TAYLOR:  Move forward to August.  Is this an

appropriate time for a break, your Honor?

THE COURT:  That's fine.  Ladies and gentlemen, we will be at recess for 15 minutes.

(Court in recess.)

THE COURT:  Please be seated.  Go ahead, Counsel.

MR. TAYLOR:  Thank you, Your Honor.

Could the witness be shown Exhibit No. 570.

Your Honor, I move admission of 570.  This was written by Mr. Walker approximately a month after he was retained as a consulting expert, and it was written to Mr. Gorton, Mr. Ballmer, and Mr. McGavick, same people at the meeting at Mr. Walker's house.

MR. LAWRENCE:  I think foundation needs to be laid whether Mr. Walker was a consultant at any time for the City and we would object on lack of foundation with respect to that point.

THE COURT:  The consultant's agreement has already established that.  So the objection is overruled.  570 will be admitted.

(Exhibit No. 570 admitted.)

BY MR. TAYLOR:

Q   Turn, please, to the second Exhibit No. 570, please.  If we could have blown up item number 3 that starts at WW to NBA.  We will find out what those initials are in a minute.

Do you recall that part of the poison well approach was to

separate the Oklahomans from the NBA?

Do you recall that?

A   I recall it was in there, yes.

Q   This document was prepared ten days after that meeting. Item number 3 says WW to NBA.  That's from Wally Walker?

A   I believe so.

Q   To the National Basketball Association?

A   Right.

Q   Let's drop down to what you were supposed to do:

WW to do this tomorrow, three purposes.

Item number 2.

Could we have that pushed over so we can see the full?

The plan detailed on October 7 was to separate Oklahomans from NBA.  Ten days later you were given a task, weren't you? Item number two?

A   I got an e-mail.

Q   Your job, ten days after the poison well meeting, learn what the Oklahoma City boys are up to and if there is any opening, continue to drive a wedge.

Do you see that Mr. Walker?

A   I see it.

Q   That was your job?

A   Well, Mr. McGavick wrote it in the e-mail.  It related to a meeting with Oklahomans and the City.  It happened in New York along with NBA.

Q   It was your job to drive a wedge between them, right?

A   Well, I didn't think at the time I was working for Mr. McGavick, but he sent the e-mail.

Q   You were an expert for the City not for Mr. McGavick, right?

A   At that time I was a citizen.

Q   You entered into a consulting agreement with the City not Mike McGavick, true?

A   Yeah.  In January I did.

Q   As of September 21, you did --

A   No.  I know what it said.

Q   Your job was to continue to drive a wedge and you talked with Mr. McGavick that day about how to drive the wedge, didn't you?

A   I don't recall the conversation.

Q   Let's look at your calendar, Exhibit No. 601, on October 17th.

A   I'm sorry, what date?

Q   October 17th.

A   Okay.

Q   Exhibit No. 570, learn what the Oklahoma Boys are up to, and if there is any opening, continue to drive a wedge.  That is dated October 17.

    And then we look at your notes on October 17.

    Do you see that?

A    I do.

Q    You were talking to the NBA, weren't you?

A    I had a conversation with Mr. Litvin it looks like that day.

Q    You wrote three things right under that conversation, didn't you, one, two, three?

A    Right.

Q    Item number 3, wedge.

Do you see that?

A    Right.

Q    It was your job to drive a wedge between the Oklahomans. And the NBA as a part of that you talked to Mr. Litvin on 17th just as it says in the e-mail, right, Mr. Walker?

A    The way I do this typically is I would be transcribing from the e-mail from the date before kind of topics.  So I did put wedge down, not my word.  But I did put it down, and I did talk frequently with Mr. Litvin.

Q    You were driving a wedge just the same, true?

A    No.  Only connective conversation I had -- all the conversation I had with Mr. Litvin that whole Fall would have been related to his frustration with Mr. McClendon's comments back in August.

MR. JOHNSON:  Nothing further, Mr. Walker.  Thank you.

THE COURT:  Any cross-examination?

CROSS-EXAMINATION

BY MR. LAWRENCE:

Q   Good morning, Mr. Walker.

A   Good morning.

Q   I would like to start by getting a little bit better understanding about who you are.

Would you tell us about your basketball career, starting with your college.

A   I played University of Virginia graduated there in 1976.

Q   And how did you do as a player at University of Virginia?

A   I was a good player there.

Q   Did you earn any honors?

A   I did.

I was also proud that I was an Academic All-American, but also was Most Valuable Player in the UCC tournament.

Q   What happened after your time at the -- did you graduate from the University of Virginia?

A   I did.

Q   And what happened next?

A   I got drafted by Portland Trailblazers in the summer of '76 and played with them -- that season.

Q   And at some point did you come to the Seattle SuperSonics?

A   I was traded to the Sonics in November of 1977.

Q   How did the team do that year?

MR. TAYLOR:   We're getting far afield, 20 years out

of the scope.

MR. LAWRENCE:  It goes to Mr. Walker's connection to the Seattle SuperSonics and the reasons why he's interested in keeping the Sonics in Seattle long term.  It will be brief.

THE COURT:  I told you I would let you know when there are things you didn't need to go over.

I have actually have seen Mr. Walker play, and I was there in the late '70s watching him.

MR. LAWRENCE:  If I could establish for the record that he was on the team that -- thank you.

THE COURT:  You can establish was he was on the team.

BY MR. LAWRENCE:

Q   So you started in 1977, correct?

A   Correct.

Q   And would you tell me briefly how long you were with the Seattle Sonics team?

A   Player, five years.

Q   Were you on the '79 championship?

A   I was.

THE COURT:  I was there, too.

MR. LAWRENCE:  Appreciate that.  But we do have to make a record for our appeal.

THE COURT:  All right.

MR. LAWRENCE:  Thank you.

BY MR. LAWRENCE:

Q   Although Your Honor may be aware, if you could describe how the team did between '77 and '79, the progress of the team in terms of its quality.

A   When I got traded to the other team, it was two and ten. And we went from two and ten to five and 17 and then Lenny Wilkins took over.  If we weren't the worst team at five and 17, we were one of the worst couple.  We went from their to NBA finals.  One of the greatest seasons of team turnarounds in sports history.

Q   What did you observe between the level of civic support for the team during those years?

A   I was tremendous.  After we got going in 19 -- I guess it was late '77 and '78 when we really caught fire.

Q   After you retired from basketball, what did you do?

A   I went to graduate business school at Stanford.

Q   Did you get a degree?

A   I did.  I got an MBA.

Q   And then at some point did you get back into the basketball industry?

A   In 1994, I was hired by the Sonics.  Prior to that I had done broadcasting.  I was in touch that way.

Q   Tell us about your, I guess, career as in management with the Sonics.

A   In 1994, I became president and general manager, and then

in 2001 I became president and chief executive officer.

Q    And how long did you stay with the team?

A    In front office about 12 years.

Q    At some point did you become an owner of the team?

A    I did.

Q    Tell us when that happened.

A    Actually, part of my contract in 1994 I referenced earlier without detail, I had a form of equity interest.  In 2001 I had a different form.

Q    So were you a part owner -- prior to 2001 the Ackerleys were the principal owners?

A    Yes.

Q    You were part owner?

A    Yes.  Very small.

Q    And starting in 2001 was that the Schultz group?

A    Yes.

Q    You were one of the owners within the Schultz group?

A    That's right.

Q    And so you were an owner during two sales; sale from the Ackerley to Schultz group, correct?

A    Right.

Q    And from the Schultz group to the Bennett group?

A    Right.

Q    Did the team appreciate in value during those times?

A    It did.

Q   Can you describe, if you recall, the relative sales price of what the purchase by the Schultz group was and compared to the sale to the Bennett group?

A   Yeah.   In 2001 the franchise traded for $200 million, and then in 2006 $350 million.

Q   So the value of the franchise appreciated from 200 in 2001 to $350 million in 2006, despite testimony we've heard about KeyArena?

A   Correct.

Q   You were asked about the KeyArena lease.   And I think you testified that it was not a favorable lease for the Sonics when the Schultz group was -- starting -- starting --

A   2001.

Q   Now, did the Schultz group during the time you were there honor the lease and play according to the terms of the lease?

A   Yes.

Q   And at the time of the sale to the Bennett group there was some discussion about the KeyArena lease?

A   Yes.

Q   And what did that discussion revolve around?

A   It revolved around the obligations to fulfill the lease.

Q   Could we see Exhibit No. 65, please.

    Do you have Exhibit No. 65?

A   I do.

Q   Would you look at the last sentence of the first

paragraph.   This is a letter from Mr. Bennett to Howard Schultz, basketball coach of Seattle.

Do you see that?

A   I do.

Q   There is a provision:   In addition, we will obviously assume all of the BCOS obligations regarding the KeyArena use agreement.

Do you see that?

A   I do.

Q   That's the lease?

A   Right.

Q   We intend to honor those obligations just as the current ownership has done.

Do you see that?

A   Yes.

Q   Tell us how the current ownership group -- that is the Schultz group -- had honored the lease --

A   By provisions of the lease we continued to play all games there.   In addition, we did say even though we were frustrated by the political process that we would -- intended to honor the lease through its duration 2010.

Q   When Mr. Taylor was asking you questions about -- I think he showed you a document that indicated that the group was looking for alternative sites potentially other than a renovated KeyArena.

Do you remember that testimony?

A    Vaguely.

Q    And, in fact, in addition to renovating KeyArena were there times that the Schultz group looked at other potential sites in the area?

A    Of course, yes.

Q    But in the context of looking at those other sites in the area, did the Schultz group ever consider breaching the lease with the City and leaving early?

A    No.  I believe we were very consistent in saying we were looking at alternative post 2010.

Q    You were asked questions about KeyArena as a facility. Mr. Taylor asked you about some things that were not -- I guess were not up to what you would like in terms of the footprint.

Do you remember that?

A    Right.

Q    Would you tell us in terms of KeyArena, what was good about it as a place to play basketball?

A    Yeah.  It was a good home court when the stands were full. It had great proximity and sidelines for the fans.  In fact I felt one of our big challenges in telling the story about getting the KeyArena remodel done was that people really liked it.  They didn't understand why it required any public money.

Q    And I believe that Mr. Taylor asked you about efforts to come up with a plan to renovate KeyArena, correct?

A    Right.

Q    That's approximately $200 million plan that was proposed for those two legislative sessions?

A    Right.

Q    And from the Schultz ownership group's perspective, did those renovation plans meet the needs of the team?

A    We felt it did, yes.

Q    And what about the NBA, what was their level of support for those renovation plans?

A    Commissioner Stern came out in support of the plans and we believe it was the 2006 legislative session.

Q    What did he do?

A    He came to Olympia when we had a hearing about our legislative proposal.

Q    Now, Mr. Taylor asked you some questions about what the City did or did not do in terms of the 2006 legislative session.

     Do you remember those questions?

A    Yes.

Q    I would like you to tell us what the City did at the end of the legislative session with respect to the renovation -- sorry, the legislation pending in Olympia.

A    Yeah.  They were in support and, again, I think I

mentioned Mr. Ceis was in Olympia for the hearing.  In fact, the same one where Commissioner Stern attended, again, from a slow start by March, at least I believe that is when the hearing was they were in support of our solution.

Q    And so Mr. Ceis, did he testify at that hearing?

A    I believe so.

Q    And was that the principal hearing before the legislature regarding 2006 legislation?

A    Yeah.  That was certainly the highest profile.

Q    The same one Commissioner Stern testified at?

A    Yes, uh-huh (affirmative).

Q    Who else testified on behalf of the Schultz group?

A    Mr. Schultz and myself.

Q    I would like to cover some ground Mr. Taylor asked you about regarding your actions with respect to the team following the sale of the Sonics to the Bennett group.  Okay?

A    Sure.

Q    Let me ask, with respect to the Bennett group's efforts in Olympia in the 2007 session, tell us whether or not -- whether or not you had any sort of involvement or support in those efforts?

A    I didn't have any involvement but was supportive in the sense that I wanted them to succeed.

Q    And do you recall whether or not you made any efforts to specifically with respect to Mr. Bennett and Ross Hunter?

A   Yes.

Q   Tell us who Ross Hunter is?

A   I don't remember his committee, but he's a state represent or senator.  I believe he's a state rep.  I don't want to speculate on what his committee is.

Q   He's a legislator in Olympia?

A   Yes.

Q   Committee head?

A   Yes.

Q   Can you tell us what help he provided to Mr. Bennett with respect to Ross Hunter?

A   It was minimal.  But I just related to Mr. Bennett the one time I saw him oppose the sale, he gave a speech and was concerned about what Mr. Hunter was doing on the project's behalf.  I knew Mr. Ballmer had told me he had contacted Mr. Hunter on behalf of the PBC in hopes to influence his support.

Q   I would like to jump forward to July is of 2007.  Okay? And Mr. Taylor started asking you questions about that period and one set of questions had to do with conversations, lunches you had with Senator Gorton?

A   Sure.

Q   There was a lunch he asked you about that took place on July 19 with Senator Gorton?

A   Right.

Q    Was that the first substantive discussion you had with Senator Gorton about ideas related to the Sonics?

A    Yes.

Q    Could you tell me what ideas were discussed at that lunch?

A    Big idea, ambitious idea was a Bellevue project that Mr. Gorton was talking about privately financing.  So it required a huge private investment.

Q    Was the Bellevue project something he represented he was doing on behalf of the City of Seattle?

A    No.

Q    I take it by building a Bellevue arena the City of Seattle wouldn't have any ownership interest in that?

A    I don't think we got that level of detail.  I would suspect not.

Q    And let's sort of stick on the Bellevue project track.

Did you have further discussions with Senator Gorton and others following that July 19 lunch about the Bellevue project?

A    Yes.

MR. TAYLOR:  Your Honor, this is hearsay.

BY MR. LAWRENCE:

Q    Could you tell us what --

THE COURT:  Do you want to respond to the objection?

MR. LAWRENCE:  I was going to rephrase my question.

THE COURT:  Okay.

BY MR. LAWRENCE;

Q   Could you tell us what next steps occurred with respect to the Bellevue project?

A   Well, I visited with Mr. Sarkozy -- I believe his title is Bellevue city manager -- and talked about the site and what --

MR. TAYLOR:   This is hearsay:  I visited with him and I talked about...

THE COURT:   It's not hearsay what he said.  It may be hearsay with who he's speaking to.

Overruled.

BY MR. LAWRENCE:

Q   So obviously with that admonition, don't tell us with Mr. Sarkozy said, but you had a meeting when with Mr. Sarkozy?

A   Late July, early August.

Q   What is Mr. Sarkozy's position?

A   I believe Bellevue city manager.

Q   What was the next step you can remember with respect to this Bellevue project?

A   Only Mr. Gorton was trying to figure out how to come up with a very large sum of money if he was going to get it privately financed.

Q   Did at some point this Bellevue concept get discussed with Mr. Ballmer?

A    It came up I believe in early September when we played golf.

Q    Did you have a discussion with Mr. Ballmer about that?

A    Yeah.   Yes, I did.

Q    As a result of the discussion, what happened to the Bellevue project?

A    Well, Mr. Ballmer, who would have been a lynchpin potentially, if that was going to be a project that got off the ground wasn't interested in that project.

Q    Do you recall the date of that?

A    September 9.

Q    In terms of your interaction with Senator Gorton between July 19 and September 9 with respect to the Sonics, did you ever have any interaction with him about any other concepts other than this Bellevue project?

A    I don't believe so.

Q    And, again, the Bellevue project, as you understood it, was not a City of Seattle plan, correct?

A    That's correct.

Q    But as Mr. Taylor pointed out, you had a meeting with somebody from the City on July 24.

     Do you remember that?

A    I do.

Q    What's your recollection of how that meeting came about?

A    July 24th meeting?

Q   Yes, with the City representative.

A   I got a phone call I think we established it was July 20th.  We then set up a lunch.

Q   Did you come to understand any precipitating events or anything that occurred prior to that phone call that led to the meeting?

A   I'm not sure.

Q   What was the purpose of the meeting as you understood it?

A   The city was getting -- my term -- more aggressive about trying to find a KeyArena solution and wanted to understand how to go about it.

Q   And when you say a "KeyArena solution", what was your understanding of what that was?

A   It was a remodel of the KeyArena.

Q   It was similar to what had been proposed for the Schultz group in 2005, 2006?

A   Similar if not identical.

Q   So the KeyArena solution road was essentially the project -- sorry was the project that the Schultz group had supported in Olympia in 2005, 2006?

A   That was my understanding.

Q   What's your understanding of why the City was talking to you?

A   They were very interested in keeping the Sonics here.

Q   What did you bring to the table?

A    Some knowledge of the building and the NBA.

Q    What was your interest at that time with respect to the Sonics?

A    Keep them here.

Q    Has that been your interest throughout this entire period?

A    Yes.

Q    Until today -- to today?

A    Yes.

Q    Why are you interested in keeping the Sonics in Seattle?

A    Besides my own personal history, I have -- because of my number of years being able to observe the impact the Sonics have had on the community, all kinds of people bring together diverse groups, joy, inspiration.  It's a unique asset.

Q    Has that been the goal of all your efforts with respect to what Mr. Taylor asked you about, the Bellevue project, KeyArena solution, the --

A    Yes.

Q    Are you getting paid for that?

A    I am not.

Q    Is there any promise of a job or ownership interest at the end of the day?

A    No.  I don't have an interest in this.

Q    You're participating out of your personal interest?

A    Correct.

Q    Again trying to keep the timeline right, Mr. Taylor I

think showed you an e-mail that indicated you had obtained a draft of plan that was provided to Mr. Ballmer, I guess, PowerPoint that was provided to Mr. Ballmer at least as of September 23.

Do you remember that?

A    I do.

Q    I believe you indicated that you believe that was not the first time that you saw that.

A    I'm pretty sure I have seen it before.

Q    Do you have Exhibit No. 601 with you?

If you could review that.

Does reviewing your calendar refresh your recollection as to when you may have earlier seen the PowerPoint?

A    I'm looking.  I know Mr. McGavick and I talked about it frequently.  I'm looking for edits.

Q    Perhaps if I could direct your attention to September 7?

A    Okay.  Okay.

Q    Looking at September 7, does that refresh your recollection about when you may have earlier seen the PowerPoint?

A    Yeah.  I see it.  Slides 1121 and 22.  So I think that is likely.

Q    Do you have a recollection, though, that before July 23rd you had seen a version of the PowerPoint?

MR. TAYLOR:  This is leading.

MR. LAWRENCE:  Sorry.  I will restate the question.

THE COURT:  It is cross-examination.

MR. TAYLOR:  He is an expert consultant.

THE COURT:  Let's pose a new question.

BY MR. LAWRENCE:

Q  Do you think that July 9 was the first time that you saw the slide for the PowerPoint?

A  I'm sorry, July 9?

Q  I'm sorry, do you think that September 9 is the first time that you saw the slides for the PowerPoint?

A  I'm not sure.  I do know Mike and I, I believe, started working on it in August.  We had a lot of dialogue at that point.

MR. LAWRENCE:  Your Honor, we would move admission of Exhibit No. 601.

MR. TAYLOR:  No objection, Your Honor.

THE COURT:  Exhibit No. 610 admitted.

(Exhibit No. 610 admitted.)

BY MR. LAWRENCE:

Q  And can you tell us whether or not as of September 9 you had been retained by the City of Seattle as a consultant?

A  I learned more about that.  But I don't believe so, no.

Q  You mentioned Mike McGavick.

For the record, could you indicate who he is?

A  He's a good friend.

Q   How long has he been a good friend?

A   Last couple years when we became closer friends.   But we've been acquainted for probably eight, ten years.

Q   And how often do you see Mr. McGavick?

A   Oh, in 2007 several times a week.

Q   Why is that?

A   We were neighbors, our sons were friends, and we were unemployed.

Q   So you indicated I think that Mr. McGavick was the author of the PowerPoint presentation; is that right?

A   Yes.

Q   And did Mr. McGavick ever tell you that he was working for the City of Seattle when he authored that PowerPoint?

A   No.

Q   Did you believe that Mr. McGavick was working for the City of Seattle when he authored the PowerPoint?

A   I do not have any knowledge of that, no.

Q   What was your belief as to who Mr. McGavick was working on behalf of in preparing that PowerPoint?

A   Concerned citizen, grew up here.   Told the story of hiding the radio under his pillow and listening to Bob Blackburn growing up.

Q   Why don't you tell us who Bob Blackburn is.

A   He was the original voice of the Sonics.

Q   And do you recall actually the nickname for the PowerPoint

presentation was Blackburn?

A    I had recalled that, yeah.

Q    Why did Mr. McGavick get you involved with the PowerPoint presentation?

A    Well, I assumed because he thought I could be helpful.

Q    And what was your understanding about what your role would be with respect to that PowerPoint?

A    Well, just trying to be a resource.

Q    Mr. McGavick, did he explain that to you before September 21, 2007?

A    I'm fairly certain the dialogue began in August.

Q    And was Mr. McGavick the person who brought you into this?

A    Oh, yeah.

Q    It wasn't Senator Gorton?

A    No.

Q    What did you understand Senator Gorton's role to be with respect to the PowerPoint?

A    Wasn't clear to me as related to bringing in the documents.  I know that's been established here.  I do recall that.  As related to our meeting, he was offering political advice about how to navigate the political waters here.

Q    Was he acting, to your understanding, as a legal representative of the City of Seattle at the time of the meeting?

        MR. TAYLOR:   Foundation.

THE COURT:  Just a minute.

Asked for his personal perception.  Overruled.

A   I didn't ever think about that.  It didn't come up in the discussion.

BY MR. LAWRENCE:

Q   Did Mr. Gorton indicate he was there on behalf of the City of Seattle?

A   Not that I recall.

Q   Do you recall when Mr. Gorton became involved in the PowerPoint process?

A   He was there and delivered documents that Sunday morning. That's the only knowledge I have.

Q   That was the first time you had any understanding of his involvement?

A   Yeah.

Q   That was the October -- I am sorry --

A   7th.

Q   How about Gerry Johnson, what was your understanding of Gerry Johnson's role in the PowerPoint project?

A   I don't know if I knew what his role was.  I know he sent some -- he did some research, sent out along to Mr. McGavick and myself.

Q   Do you recall when Mr. Johnson first got involved?

A   I don't recall specifically, no.

Q   Was Mr. Johnson at the meeting with --

A   No.

MR. LAWRENCE:   I would like to get that PowerPoint up on the screen.   It's Exhibit No. 567.

Could we maybe have the version that you guys have? It's easier to leave.

BY MR. LAWRENCE;

Q   Let me ask you, what was your understanding of the purpose of the meeting with Mr. Ballmer?

A   We hoped to engage his interest.

Q   In what?

A   Well, in ultimately being an owner which we talked about a lot, if PBC was trying to move the team.

Q   What was the situation, as you understood it, with respect to Bennett's group and the Sonics as of the time of this meeting?

A   Relationship at the time of this meeting?

Q   What was your understanding in terms of Mr. Bennett and what his efforts where in respect to keeping the Sonics in Seattle or leaving?

A   Yeah.   I mean it was all negative from all I knew at that point.

Q   He had filed this arbitration demand before --

A   Right.

Q   At that time, was your understanding Mr. Bennett was taking steps to move the Sonics to Oklahoma City?

A    Correct.

Q    I would like to look at a few pages of this exhibit.    If you could look at page 212.

Do you have that in front of you?

212 states a workable partnership with the City is needed to approve lease and facility.

Do you see that?

A    I do.

Q    What was your understanding of that?

A    Just that if the Sonics were going to flourish and have a competitive arena facility, which was also the goal of this meeting, then there had to be this partnership with the City; speaking for myself, I thought was the most economically, politically viable outcome.

Q    Can you explain why if the PowerPoint was a Machiavellian plan, as we've heard it argued of the City, there is the slide that talks about creating a working partnership with the City?

A    I don't know.

Q    Would you turn to the next page I believe.

On that slide it says:    After a long period of brinkmanship, mayor is now willing to deal and lead in securing a workable arrangement from other public partners.

Do you see that?

A    Yes.

Q   What is that referring to?

A   I think -- it was referring to the fact that the City was willing to make a sizable investment in KeyArena and the KeyArena remodel in a way that I hadn't heard before and gave me hope it was possible.

Q   Can you describe what that investment was?

A   As Mr. Ceis described to me some time before this he talked about $100 million figure.

Q   And do you recall when Deputy Mayor Ceis described it to you?

A   It was August.

Q   Was that at the meeting face to face?  Where did that occur?

A   It was at the time we got together in August.

Q   Personal meeting?

A   Yes.

Q   Do you recall whether there was any discussion of a plan between the City and anybody to try to force the sale of the team?

A   No.

Q   So when Mr. Ceis was talking about the City's investment of $100 million, he wasn't talking about a quid pro quo or getting rid of the Bennett ownership?

A   No.  He just wanted the same thing that we were talking about a lot.  Have a KeyArena solution so the Sonics remained

here.

Q   Did it matter to you who the owner of the team was?

A   Did not.

Q   Going back to the PowerPoint, page 213, you described the Mayor's willing to deal and lead.

Do you see that?

A   Yes.

Q   Then there is a reference to briefing NBA officials in New York City later this month?

A   Right.

Q   Do you have an understanding what that was about?

A   Yeah.   That would refer to the meeting in mid-October with representatives from the NBA, PBC, Senator Gorton, I believe Robert Nellams from Seattle Center and Mr. Ceis.

Q   What was the purpose of that meeting as you understood it?

A   I thought it was for the City to inform both PBC and the NBA that they were serious about trying to find an arena solution.

Q   And an arena solution being what?

A   Remodel of KeyArena.

Q   And the PBC was at the meeting with the NBA and the City?

A   I believe so.

Q   In a meeting with the PBC, did the City ever describe it was meeting with PBC and the NBA together about a remodel of KeyArena in order to force PBC to sell?

MR. TAYLOR: Object on --

MR. LAWRENCE: I will restate the question. Sorry.

BY MR. LAWRENCE:

Q What was your understanding of why PBC was at that meeting?

MR. TAYLOR: Same objection, lack of foundation.

BY MR. LAWRENCE:

Q If you have one?

THE COURT: Just a minute.

Mr. Lawrence, I'm not understanding. Was Mr. Walker at that meeting?

MR. LAWRENCE: No, he was not at the meeting.

THE COURT: So how does he know who was there?

BY MR. LAWRENCE:

Q Can you tell us how you gained an understanding of the meeting?

A Yeah. I think two different ways. One, Senator Gorton communicated and I talked to Mr. Litvin at NBA as well.

Q Do you have any independent study why PBC was at the meeting?

MR. TAYLOR: Foundation.

THE COURT: Sustained.

BY MR. LAWRENCE:

Q Okay. If we could turn to page 218. I'm sorry, I meant 22. I'm sorry. 225.

Now, this is the section of the PowerPoint dealing with Path Forward. Do you see that?

A   Yes.

Q   Part of the Path Forward was this renovating KeyArena, correct?

A   Yes.

Q   And it says: Creates alignment with one of the key figures this all this, the mayor.

Do you see that?

A   Right.

Q   Can you explain why, if this was a plan prearranged with the City of Seattle, you're talking about trying to take steps to align yourselves with the mayor?

A   We didn't have anything close to a plan. Again, these were ideas to hopefully stimulate interest.

Q   If you could look at page 237, please. This is part of the PowerPoint presentation called Recommended Further Steps.

A   Page 37?

Q   I'm sorry --

A   Yes, okay. I'm sorry.

Q   Further Steps is close with the City.

Do you see that?

A   I do.

Q   Do you have any understanding why, if this were a preconceived plan approved by the City, you were suggesting

that there needed to be closure happening with the City?

A   My recollection it wasn't anything close to closure.

Q   Were you aware that this was part of any City plan?

A   No.

Q   Do you have any understanding that your meeting was planned by the City?

A   No.

Q   Let's talk about what took place at the meeting.

How was this PowerPoint used at the meeting?

A   Everyone had a hard-copy in their hand.  And I would say the patience level for staying on individual pages was very low.  It was -- Mr. McGavick -- he had written talked about -- I'm not sure each page talked about -- he was one doing the talking as we all flipped through.

Q   So it wasn't like there was a full discussion of each page?

A   Oh, by no means.

Q   And how much of the meeting was taken up with going through the PowerPoint?

A   I'm guessing I would say an hour or less.

Q   And then there was a discussion about what to do?

A   Some discussion about, you know, okay, that's fine, but what is next?  And certainly I was directed towards Mr. Ballmer, because he certainly hadn't made up his mind.

Q   There was suggestion by Mr. Taylor in his questioning that

the goal of this was to force Mr. Bennett to sell -- to sell the team.

Was that your understanding of what came out of this meeting?

A    No.   Mr. Ballmer --

Q    What came out of the meeting?

A    Oh, sorry.

There were still a question whether the KeyArena remodel was economically viable.  And until that had been explored and studied by somebody didn't Mr. Ballmer, nor anyone in the NBA should think it was worth pursuing.  So Mr. Ballmer wanted to make sure before he got interested at all that he knew what the economics of the remodel would look like.

Q    Did you have continuing involvement the efforts with Mr. Ballmer?

A    I did.

Q    Could you tell us about what happened next with respect to those efforts?

A    Well, the next major thing I did was try to be helpful on the economic analysis of the KeyArena remodel.  And that was in conjunction with the City.  And then the independent analysis firm that the City hired.

Q    So you did some work with respect to renovating KeyArena?

A    Yes.   On the model.

Q    And tell me whether or not you understood you were doing

that work for the City?

A    I believed I was helping the City, yes.

Q    What time period are we talking about?

A    We're talking certainly December and I believe November as well.

Q    Other than working on renovating KeyArena, did you have any discussion with anyone on behalf of the City about forcing Mr. Bennett to sell during the time you were doing this work?

A    No, I did not.

Q    Were you asked to work on any sort of effort to force Mr. Bennett to sell during this time?

A    No.

Q    So your efforts were exclusively related to giving information and working on renovating KeyArena?

A    Right.  The primary issue challenge remained:  Was there going to be a competitive facility here in Seattle.  That was job-one; we had to determine if there was one and what it would look like.

Q    If there wasn't one, was there any help for an NBA --

A    No.

Q    -- ever in --

A    Without a competitive arena, no.

Q    At some point did Mr. Ballmer agree to participate in this effort?

A    Well, he got in touch with Matt Griffin and at least was willing to explore the possibility.

Q    Do you recall when that was?

A    I was first aware of it I think late October.

Q    And do you recall when Matt Griffin sort of made -- announced publicly that he was meeting a potential investor group interested in the Sonics?

A    I recall after the first of the year.  Nothing more specific than that.

Q    That is January '08.

A    Might have been later than that.  I don't think it was earlier than that.

Q    Did you tell people at the City about Mr. Griffin's and Mr. Ballmer's interest prior to January of '08?

A    I think they had knowledge.  Certainly Mr. Griffin's involvement.  I don't know if Mr. Ballmer was ever disclosed. I don't know.

Q    You don't recall disclosing Mr. Ballmer's involvement to the City?

A    I don't recall that, no.

Q    During this time period, did you continue to have interactions with Joel Litvin of the NBA?

A    Yes.

Q    What was the nature of those interactions?

A    Really to keep him informed of the efforts in Seattle to

get an arena solution, because that was the primary issue for the NBA.

Q   Did you ever tell Mr. Litvin that your goal was to drive a wedge between the NBA and Mr. Bennett?

A   No.  That would not describe any of my conversations.

Q   Do you think that describes any of your actions that you took with the NBA during this entire period?

A   No.

Q   Did you suggest in any way that you were not interested in working with the Bennett group if you were able to get it renovated, Key solution?

A   No.  That goes to Mr. Ballmer too.  He wasn't, nor did I know anyone, who was dying to be an NBA owner.  If there would be a solution that worked for PBC and keep the Sonics here, that was the preferred outcome.

Q   In fact, did you communicate that to Mr. Litvin?

A   Yes.

Q   Did there come a point where some sort of proposal was put forward by Mr. Ballmer with respect to a plan for renovating KeyArena?

A   Plan put forward by Mr. Ballmer.

Q   Mr. --

A   Well, during the legislative session -- I wasn't directly involved in that whole process.  So I wouldn't speak very well to it.

Q   As we get into January, legislative session 2008, did you have any personal involvement?

A   Just I was part of the communication loop and was on the e-mails and would offer opinions for whatever they were worth and also try to stay in touch with the NBA.

Q   So during the entire course of this period of time from July of '07 to the present day, have you ever taken any actions that you would consider efforts to try to force Mr. Bennett to sell?

A   No.

Q   Force him to incur huge losses?

A   We didn't have any way to control that.

Q   And have you consulted at all with respect to the litigation here?

A   I'm sorry, I don't understand.

Q   Are you a litigation consultant?

A   My -- no.

Q   You're just a basketball fan that wants to save the Sonics for Seattle; is that fair?

A   That's correct.

        MR. LAWRENCE:  Thank you.  Nothing further.

        THE COURT:  Any redirect?

                    REDIRECT EXAMINATION

BY MR. TAYLOR:

Q   As I understand it, your involvement here is just as a

concerned citizen?

A    Yes.

Q    I want to talk about what you were concerned about.

         MR. TAYLOR:   Can we have Exhibit No. 624, please.

         Move admission of Exhibit No. 624, e-mail from Mr. Walker to Mr. Johnson and back and forth.

         MR. LAWRENCE:   I was looking at it on the screen.   I got it.

    No objection, Your Honor.

         THE COURT:   624 will be admitted.

                    (Exhibit No. 624 admitted.)

BY MR. TAYLOR:

Q    By January 2, this lawsuit was ongoing?

A    As far as I know.

Q    Discovery was just getting started in this lawsuit?

A    Wouldn't have knowledge.

Q    You and K&L Gates were concerned about you, Wally Walker, being deposed, right?

A    I don't think I thought about it.   But I see it in the letter.

Q    In fact, on January 2 K&L Gates wrote you a letter:   To bolster our chances of protecting you from being deposed.

    Do you know the?

A    I do.

Q    As a result of this -- let's take a look at Exhibit No.

571.

MR. TAYLOR:  Move admission of 579.

MR. LAWRENCE:  No objection, Your Honor.

THE COURT:  579 admitted.

(Exhibit No. 579 admitted.)

BY MR. TAYLOR:

Q   So after the lawsuit gets started and K&L Gates is concerned about you being deposed and wanting to protect you from being deposed, they sent you another consultant letter, didn't they?

A   Looks like a different one, yes.

Q   This time they made you a consultant to the prospective owners and their designated representatives.

Do you see that?

A   I do.

Q   Let me ask you a question.  The date is January 29, 2008?

A   Right.

Q   Did you know that's the day we met in this very courtroom to talk with the Court about discovery and depositions?

A   No idea.

Q   You had one conversation with Clay Bennett after he bought the team.  Did I understand that right?

A   That's right.

Q   Did you tell him about the October 7 meeting where you went through the poison well PowerPoint?

A    No.  I saw him after a speech.  Would have been March of '07.

Q    My question is:  Did you tell him about the meeting where you went over the poison well --

A    I didn't talk to him subsequent to that.

Q    You didn't pick up the phone and try and see if he was interested in a KeyArena solution?

A    No.

MR. TAYLOR:  Nothing further, thank you.

RECROSS EXAMINATION

BY MR. LAWRENCE:

Q    Are you aware whether K&L Gates was retained by the Griffin group to work on legislation for the Griffin group?

A    Was I aware?

Q    Are you aware?

A    I believe I knew they were there, yes.

Q    Did you in fact have your deposition taken in this case?

A    I did, yes.

Q    Was it a pleasant experience?

A    No.

Q    Is testifying here a pleasant experience?

A    No.

Q    Is that something you wanted to avoid?

A    Let me -- I shouldn't say it's an unpleasant experience.
But I wasn't very sophisticated about the process, and

from all I know, being deposed wasn't a good thing.

Q   Something you wanted to avoid?

A   Yes.

MR. LAWRENCE:  Thank you, sir.

THE COURT:  Okay.

MR. TAYLOR:  Nothing further.  Thank you.

THE COURT:  Thank you.  You may step down.

MR. KELLER:  We'll call Mr. Matthew Griffin.

MATTHEW GRIFFIN

The witness, after being duly sworn, testified as follows:

THE CLERK:  Please state your name and spell your last name for the record.

THE WITNESS:  My name is Matt Griffin.  M-A-T-T G-R-I-F-F-I-N.

DIRECT EXAMINATION

BY MR. KELLER:

Q   Good morning.  Brad Keller representing the Professional Basketball Club.  We only have a few minutes before the noon hour.  Let me try and set the stage a little bit for some things we'll go into a little more detail on the afternoon session.

Around mid-October of 2007 did Steve Ballmer inquire about whether you would be willing to work with him or on his behalf with relation to the Seattle SuperSonics?

A   Yes.

Q   Do you recall it was around this time that Mr. Ballmer forwarded to you an e-mail that laid out, among other things, some information concerning some activities that Wally Walker would be undertaking?

A   It was about that time.

Q   Let me show you Exhibit No. 570.  I believe this was admitted this morning.

Mr. Griffin, is this an e-mail dated October 17 of 2007 that Mr. Ballmer forwarded to you on October 18?

MR. LAWRENCE:  Your Honor, I don't believe that Mr. Griffin is an adverse witness, and I believe that we should proceed with direct examination without leading questions.  Object to the leading nature of all these questions.

MR. KELLER:  I think it was nonleading; two, I think the status of whether the witness will become adverse will become more apparent as the examination goes on.

THE COURT:  The question was nonleading.  So I don't understand the objection.

MR. LAWRENCE:  I will withdraw the objection, if it's nonleading.

THE COURT:  All right, go ahead.

BY MR. KELLER:

Q   Mr. Griffin, do you remember the question?

A   Could you please repeat it?

Q    Happy to, sir.

Is this an October 17, 2007 e-mail from Mr. Walker that Mr. Ballmer forwarded to you the following day, last fall, October 18, 2007?

A    Yes.

Q    Did you look at Mr. Walker's e-mail when it was forwarded to you by Mr. Ballmer?

A    I would assume that I did.  Because I was in the process of evaluating whether or not to help Mr. Ballmer.

Q    Let's go to the second page if we could.  And there is an e-mail from Mr. McGavick.  Do you see that?  Next steps if you would?

A    Yes.

Q    Would you pull up that whole part there?  Do you see it identifies as the next step:  Mr. Ballmer was to focus on identifying an owner rep to oversee the process on his behalf.

Do you see that?

A    Yes.

Q    And was what was going on here, Mr. Griffin, was that Mr. Ballmer had been asked to identify somebody who would act on his behalf in connection with what was going to unfold about the Sonics, and he was asking you, are you interested?

A    Correct.

Q    Let's go back to the first page.

That's what the e-mail to you was:   Are you interested, right?

A   Yes.

Q   Now as part of the background information you did go and read the earlier e-mail from Mr. McGavick, right?

A   I would assume that I did.

Q   Let's go back to Mr. McGavick's e-mail.   Would you blow up all of section number 3.   When you read it, and you read item number 2 that says -- first of all, these are things that were being identified for Mr. Walker to do; is that correct?

A   I think so.

Q   When you read this back in the Fall of 2007 and started talking about the Oklahoma Boys, did you understand at the time that that was referring to the new Sonics' ownership group?

A   I would assume, yes.

Q   When you read it and it talked about continuing to drive the wedge -- do you see that?

A   Yes.

Q   What was the wedge?

A   I don't remember any discussions about a specific wedge.

Q   Whether you recall any discussions or not, when you read it what did you think the wedge was?

A   I don't remember focusing on that much of specifics of this e-mail.   I was still in the process of deciding whether

I was going to help or not help Mr. Ballmer and his effort.

Q   Looking at it today, what do you think the wedge was?

        MR. LAWRENCE:  Objection, relevance.

        THE COURT:  Overruled.

A   I don't know the answer.

BY MR. KELLER:

Q   Do you see it says that if there is an opening, to drive the wedge?

A   Yes.  I see the written statement.

Q   What did you think at the time was the opening?

A   I'm sorry, but I don't remember focusing on this paragraph.

Q   Can you think of anything today that it could be talking about, that would be opening and drive the wedge with respect to the Sonics, other than create a division between the NBA and the PBC regarding the team?

A   No.

Q   Thank you, sir.

        THE COURT:  We need to find a place to stop.

        MR. KELLER:  This is just fine, Your Honor.

                      (Lunch recess taken.)

THE COURT:  Good afternoon.  Are we ready to continue.

MR. KELLER:  We are.  Thank you, your Honor.

BY MR. KELLER:

Q   Mr. Griffin, I would like to switch gears and move down chronologically a little bit.  After receiving this e-mail from Ballmer inquiring about your interest in looking into this deal for him --  Did you then meet with Mr. Ballmer?

THE COURT:  I'm sorry, Mr. Keller.  You need to reference back for me.

MR. KELLER:  That would be Exhibit 570.

BY MR. KELLER:

Q   After reading this did you then meet with Mr. Ballmer?

A   I met with Mr. Ballmer a number of times over the few months.  Yes, I met with Mr. Ballmer a number of times.  I don't remember meeting with him soon after this memo came.

Q   Do you recall your first meeting with him about your potential involvement and the Sonics in a meeting at his office?

A   Yes.

Q   Did you agree at that meeting or shortly afterwards to act as, in effect, his representative or emissary to look into the situation regarding the Sonics?

A   I did within a week or two after that meeting.

Q   At the meeting with Mr. Ballmer -- First of all, his office is over at Microsoft in Redmond?

A   Yes.

Q   Sitting there in that meeting with Mr. Ballmer, did Mr. Ballmer flip through a PowerPoint presentation that he had?

A   Yes.

Q   And that meeting lasted about an hour?

A   Yes.

Q   And after the meeting did Mr. Ballmer provide you with a copy of this PowerPoint presentation?

A   Yes.

Q   And is the PowerPoint slides the only document that you recall going over with Mr. Ballmer at that meeting in his offices?

A   Yes.

Q   And do you remember within a few weeks after that meeting with him you were taking a trip to China?

A   Yes.

Q   Did you want an electronic version of the PowerPoint presentation so you could take it with you on your laptop to China and work with it at your convenience?

A   Yes.

Q   And did you get an electronic version of it so you could have it on your laptop and work with it when you went to

933

China?

A    Yes.

Q    This electronic PowerPoint that you went over with Mr. Ballmer in his office, do you recall that there were slides in there that talked about the path forward?

A    Yes.

Q    Let's look at Exhibit 567, if we could.  Turn to the second page just to orient you, Mr. Griffin.  This PowerPoint -- this is the poisoned well PowerPoint.  This is what you went over with Mr. Ballmer during that approximate one-hour meeting in his office in October?

A    It appears to me to be the same document.

Q    Turn to the Bates Page 218, those little digits in the lower right-hand corner.  I want to direct your attention to that second bullet point.  For the best likely outcome two things have to happen, the Oklahomans have to be willing to sell and the public folks have to do the right thing.

If the Oklahomans weren't really willing to sell there wasn't really a whole lot for you to do on Mr. Ballmer's behalf, was there?

A    Correct.

Q    Getting the Oklahomans to sell was an important part of the go forward plan, right?

A    The only other piece of that question is, we talked about whether or not the NBA team had to be the Sonics or whether

it could be another NBA team.

Q   But the initial approach was to get the Oklahomans to try and sell, right?

A   As Steve and I met and we went through this PowerPoint presentation Steve read certain pages to me as part of the discussions.  And other pages he just went blah, blah, blah.

Q   Maybe you didn't hear my question.

A   I apologize.  I thought I was answering it.  I apologize.

Q   Was the initial approach to try and get the Oklahomans to sell?

A   I don't know if we focused on this page and even discussed it.

Q   Whether you focused on it or not, it was part of what you had in front of you, right?

A   Absolutely.

Q   It was part of what you had on your laptop to study and review at your leisure on your trip to China, right?

A   Correct.

Q   And it clearly talks about, for the best likely outcome one part of that means you have to get the Oklahomans to sell, right?

A   Those statements are correct.

Q   Then turn, if you would, to the page with Bates 229.  I'm sorry.  My mistake.  227.  Can we blow up the second bullet point there, the whole section there?  Do you see on the

first bullet point it talks about increasing the prospect of locking them into losses in Seattle?

A    Yes.

Q    It is talking about the current owners of the Sonics, right?

A    Yes.

Q    Mr. Griffin, at the risk of stating the obvious, you had no ability to lock the PBC into losses at KeyArena, did you?

A    Not that I know of.

Q    The only body that could do that was the City who was working with Mr. Gorton and his law firm that was working on this lawsuit by this time, right?

A    Yes.

Q    So when it talks about increasing the prospect of locking them into losses, it is talking about things that the City and its law firm and Mr. Gorton; if anybody was going to do it they would have to do it, right?

A    Yes.

Q    And one way they could do it was by trying to enforce the lease and make the PBC stay in Seattle for two years, right?

A    Yes.

Q    In fact, you can't think of any other way you know of that they could lock them into losses other than trying to enforce the lease, right?

A    I hadn't thought of any other.

Q    Turn if you would to Page 229.   "The path forward.   Making them sell continued."   Do you see that first reference in the first bullet point to a pincer movement, increasing the Oklahomans cost to an unpleasant environment while increasing the league's belief that there is an alternative solution?

A    Yes.

Q    You had no ability to increase the PBC's costs in an unpleasant environment, did you?

A    Not that I know of.

Q    As far as you know at the time you were reviewing this the only person that could do that with Mr. Gorton and his client the City, right?

A    Yes.

Q    The only way you knew then or now they had as a means to accomplish that was by trying to enforce the lease and lock them into the losses, right?

A    Yes.

Q    Do you see that reference to a pincer movement?

A    Yes.

Q    Is that the same thing as trying to drive a wedge?

A    I don't think so.   I will admit I looked up pincer movement last night.   And it talked about a military maneuver that comes from both the outsides as opposed to -- a movement from the outsides.

Q    So what is the movement from the outside?   Is it going to

be working the NBA to drive a wedge or is it going to be the City's lawsuits to lock them into losses or both?

A    I don't know the answer.

Q    Can you think of anything other than those two options?

A    No.

Q    Thank you, sir.  Turn, if you would, to Bates number 236. "The path forward.  Immediate next steps."  And blow up the first bullet point there, that first section down through one.  The reference to Gorton, et al, increasing the pain of staying, financial and reputation.  Do you see that, sir?

A    Yes.

Q    You and Mr. Ballmer, you didn't have the ability to increase the pain of staying, either by financially or by reputation, did you?

A    No.

Q    The only person you knew that could do that at the time you were reading this would be the City of Seattle and Mr. Gorton, its attorney in this case?

A    Yes.

Q    That reference to Gorton, et al, you understood it to mean the City, didn't you?

A    I didn't think about it actually.

Q    Think about it now, please.

A    It could be Gorton, it could be the City, it could be the other people in Gorton's office.

Q    Other lawyers at the law firm representing the City?

A    Yes.

Q    Do you remember in October or November you participated at a meeting at the law offices of K&L Gates?

A    Yes.

Q    You were there?

A    Yes.    But you need to refresh my memory a little bit about which meeting.

Q    I am talking about a meeting in the October/November 2007 time frame at the offices of K&L Gates and Ellis?

A    Yes.

Q    Wally Walker was there?

A    Yes.

Q    Slade Gorton was there?

A    Yes.

Q    Mike McGavick was there?

A    Yes.

Q    As of the time of that meeting you understood that K&L Gates was working for the City, didn't you?

A    I did.

Q    And you wanted to keep K&L Gates working for the City because you believed it was easier to control them that way, right?

A    I don't remember going through that thought process at all.

Q   Please look at Exhibit 622.

MR. KELLER:  I will move for its admission, your Honor.

BY MR. KELLER:

Q   Is Exhibit 622 an e-mail that you wrote --

THE COURT:  Mr. Lawrence, is there any objection?

MR. LAWRENCE:  Your Honor, again, I am not sure what the purpose of the introduction of this --  To refresh his memory I think --  He can review it to see if it refreshes his memory.  If it is for the truth, it's hearsay.  If it is for impeachment, I don't think he has testified to something that is impeachment.  I would object as hearsay at this point, your Honor.

MR. KELLER:  It is on the second page, your Honor. It is the second bullet point up from the bottom.

THE COURT:  622 will be admitted.

(Exhibit 622 admitted)

BY MR. KELLER:

Q   This is an e-mail you wrote on November 17th, 2007, Mr. Griffin?

A   Yes.

Q   This is one of your periodic status reports to Mr. Ballmer, right?

A   Yes.

Q   Let's look at the second page, second bullet point up from

the bottom.  Did you write at that time:  "We haven't hired K&L Gates yet; I'd like to keep them working for the City for a while, which is easier to control."  Your words, sir?

A    Yes, they are.

Q    Thank you.  Now, I asked you about that reference in the earlier e-mail to the wedge.  I asked you about the pincer movement.  Did you have e-mail discussions with Mr. Ballmer about the need to posture Mr. Bennett so he was in a box?

A    Yes.

MR. KELLER:  I will move for the admission --

BY MR. KELLER:

Q    Do you Exhibit 573, sir?  Is this another one of your periodic e-mail reports to Mr. Ballmer, this one dated on November 25th of 2007?

A    Yes.

Q    And do you have --

MR. KELLER:  I will move for the admission of 573.

MR. LAWRENCE:  No objection, your Honor.

THE COURT:  573 will be admitted.

(Exhibit 573 admitted)

BY MR. KELLER:

Q    We will look at the heading to orient ourselves.  It is from you to Mr. Ballmer, and you are giving him a status report on what your efforts are with respect to your activities concerning the Sonics, right?

A    Yes.

Q    Let's go down to the whole section that talks about the league piece.  Now, you broke your reports up into what was it, buckets?

A    Yes.

Q    This bucket you are talking about here is the league piece, right?

A    Yes.

Q    And your third bullet point was, "obviously Bennett isn't in a box yet," right?

A    Yes, that's what it says.

Q    And by being in "a box" you meant being in a position where he would have to sell, right?

A    I am not sure whether I meant whether he would have to sell or whether he would have do something different.

Q    What is it that you were trying to get him to do at this time, other than sell?

A    I would have been happy if he stayed.

Q    Do you remember we looked at your PowerPoint a few minutes ago?

A    That wasn't my PowerPoint, it was one that was given to me before I got involved.

Q    Fair enough.  Do you remember we looked at the PowerPoint?

A    Yes.

Q    Nothing in there about having Mr. Bennett stay, is there?

A    Not in that PowerPoint.

Q    It is all about making him sell, right?

A    Yes, in that PowerPoint.

Q    Okay.  So as of November of 2007 in your report to Mr. Ballmer you said Mr. Bennett wasn't in a box yet, right?

A    Yes, that's what it says.

Q    And the bullet point above that says, "Gerry sent me a message on Friday.  He wants to discuss Wally's back channel on Monday."  Do you see that?

A    Yes.

Q    Was that Wally Walker's back channel to the NBA?

A    Yes.

Q    Was that part of the driving the wedge or the pincer movement?

A    I don't know the answer to that.

Q    It was Mr. Walker that was the one that was interfacing with the NBA, though, to the extent your group was, right?

A    Yes.

Q    Can you take a look at Exhibit 574?  Is this another one of your e-mail reports to Mr. Ballmer?

A    Yes.

        MR. KELLER:  Move for the admission of 574, your Honor.

        MR. LAWRENCE:  No objection, your Honor.

        THE COURT:  574 will be admitted.

(Exhibit 574 admitted)

BY MR. KELLER:

Q   This report is on December 2nd, 2007, correct, Mr. Griffin?

A   Yes.

Q   Let's go down to that same bucket, the league piece.  You wrote at that time that "Wally's deep throat at the league is Joel Litvin, COO, I think."  Were those your words, "deep throat"?

A   I wrote this.

Q   Why did you think that it was Mr. Litvin?  Is it based on something Mr. Walker told you?

A   Yes.

Q   Then it goes on and says, "Wally thought the mayor's position to assemble electeds was a big step forward along with the two new city council members."  So was Mr. Walker in fact working with the City in connection with the electeds?

A   I don't think so.

Q   Or are you just commenting that it was a good step forward?

A   That is my impression.

Q   How about the next entry on November 30?  It says, "Wally communicated the improving political front to Litvin, but he needs more good news.  This week I'll push Ceis to help create more good news."  Do you see that?

A    Yes.

Q    That is referring to Deputy Mayor Tim Ceis?

A    Yes.

Q    How do you create good news?

A    In this case my belief was that if we could get the City officials or the State officials to move forward on systems for funding of KeyArena it would be good news for the City and for the efforts.

Q    Wasn't that the whole wedge and pincer movement, have the City suddenly have an arena solution, and here is a local buyer and thereby drive a wedge at the NBA level between the league and the Oklahomans?  Wasn't that it?

A    I didn't think of it in those terms.

Q    What else could it be?  Do you have any explanation?

A    I only believe that without having a renovated KeyArena and having a funding plan for renovating KeyArena there wasn't a discussion to have with Mr. Bennett or the NBA about a chance of having the NBA -- having an NBA team in Seattle.

Q    But if you want to have a discussion with Mr. Bennett about him staying there why do you need drive a wedge?  Isn't a wedge to separate two things, Mr. Griffin?

A    Yes.

Q    Wasn't the whole thing here to try and separate any sense of working together between the NBA and the PBC by having -- look, we have got an arena solution, we have got local

buyers, so that will be the wedge to separate them? Isn't it obvious?

A    Not to me.

Q    Do you have any other explanations --

A    I believe --

Q    -- that you can tell us today?

A    Only that I believed we needed a renovated KeyArena to basically have an NBA team here in Seattle.

Q    And you needed a team, right?

A    We needed a team.

Q    And one of the ways to get a team -- one way would be to force a sale, right?

A    That would be one way.

Q    Let's go to another one of your reports to Mr. Ballmer, Exhibit 623.

        MR. KELLER:  Move for the admission of 623, your Honor.

        MR. LAWRENCE:  I will object as hearsay, your Honor.

        MR. KELLER:  I will ask a few more questions.

BY MR. KELLER:

Q    Mr. Griffin, was part of what was going on here you knew that the league would be considering the PBC's relocation application come the spring?

A    Yes.

Q    And that meant that -- you had a concern, didn't you, that

the league would say that the team could move?

A   Yes.

Q   And then you knew that there was a chance that this very lawsuit that you are testifying in could possibly, I hope not, but could end up saying that the team can move, right?

A   Yes.

Q   And in that event you knew that Mr. Bennett, he might have a shorter negative tail, that he'd feel the bleeding, right?

A   I don't know if those were the specific words but, yes, it would cost him some money.

MR. KELLER:   Move for the admission of 623, your Honor.   It is on the second page, about one-third of the way.

MR. LAWRENCE:   No objection, your Honor.

THE COURT:   623 will be admitted.

(Exhibit 623 admitted)

BY MR. KELLER:

Q   623 is your December 11 e-mail report to Mr. Ballmer, right?

A   Yes.

Q   Again, let's go to that bucket on the league piece, okay?

A   Yes.

Q   And let's go to the top of the second page.

A   Yes.

Q   The context of this, sir, is you knew that there was going to be a meeting in the spring of the league on relocation to

Oklahoma City, right?

A    Yes.

Q    So let's look at what you wrote.  You laid out for Mr. Ballmer some of the different scenarios that might happen, right?

A    May I take a minute just to read the paragraph?

Q    Absolutely, sir.

A    Could you repeat the question, please?

Q    Were you laying out one scenario that could happen as how things might unfold in your report to Mr. Ballmer?

A    Yes, there are several scenarios listed here.

Q    And one of them is that the league would say that the team could move subject to relocation, right?

A    Yes.  In fact, I --

Q    I'm sorry?

A    I'm sorry.  The statement says, "the league says it can move subject to a lawsuit resolution."

Q    In fact, that is exactly what ended up happening the following April, right?  The NBA said, PBC, you can move to Oklahoma City as long as this lawsuit either gets resolved consensually or the court says you can move, right?

A    I will take your word for it.

Q    Isn't that your understanding, Mr. Griffin?

A    I actually don't know the formal words of what were used at the league vote.

Q   The gist of it, though.

A   Absolutely, the gist of it.

Q   And then you say this court case might say they can't move, right?

A   Yes.

Q   In fact, that is what the City is here trying to make happen, right?

A   Yes.

Q   And then you say the City and the County might pass legislation and first serve up the State.  And you talk about in 2009.  That would be the next legislative session, right?

A   Yes.

Q   In that event you said that Mr. Bennett would have a shorter negative tail to avoid but he would feel the bleeding, right?

A   Yes.

Q   By December of 2007, just generally speaking, were things picking up speed?

A   In which area?

Q   On all fronts, the league piece, the legislative effort, the whole effort of your group?

A   Actually I don't know if they were on all fronts, but we were trying to pick up the pace clearly in the legislative front.

Q   Let's take a look at Exhibit 575.  Strike that.

Did you as part of things picking up speed in mid December engage a political -- excuse me, a public relations consultant?

A   Yes.

Q   And who was that?

A   Melinda Williams.

Q   Why did you want to have a public relations consultant?

A   If we started to have -- spend any time with the press I wanted some advice and someone to sort of help me with the calls.

Q   Somebody to help you with the messaging?

A   Help me with the messaging, help me with the calls.

Q   Let's take a look at Exhibit 575.

MR. KELLER:   I will move for the admission of Exhibit 575, your Honor.

MR. LAWRENCE:   Your Honor, it is hearsay at this point.

MR. KELLER:   I will continue on, your Honor.

THE COURT:   All right.

BY MR. KELLER:

Q   Did you meet with Ms. Williams on I think it was the 17th of December?

A   I can't remember whether it was a meeting or whether it was a phone call.

Q   And did you generally take that opportunity to update her

on what the status was of events and your strategies?

A    Yes, both the information she should -- mostly about information she should know.

Q    And you made an outline about it which you then passed on to Mr. Ballmer?

A    Yes.

Q    And that is what Exhibit 575 is?

A    Yes.

MR. KELLER:  I will move for the admission of 575, your Honor.

MR. LAWRENCE:  It is still hearsay, your Honor.

THE COURT:  Are you trying to establish that what is said here is the truth or the fact that he did the outline for Mr. Ballmer?

MR. KELLER:  The latter, and what was said at the time, not the truth.

THE COURT:  Overruled.  575 will be admitted.

(Exhibit 575 admitted)

BY MR. KELLER:

Q    Sir, if you would, go to the second page that is saying bucket, referring to the league.  Pull up all four, if you would.  Let's deal with the section that deals with my client, Mr. Bennett.

One of the points there is that he needs to sell at a reasonable price, right?

A    Yes.

Q    The last point is that, "a litigation win to stay and force bleeding of about $20 million per year will help."  Do you see that?

A    Yes.

Q    Now, you didn't have any litigation going, did you?

A    No.

Q    The only litigation you knew about or were getting reports about was from Mr. Gorton and the one that his firm was handling, right?

A    Yes.

Q    And when you were writing that the forced bleeding will help from a litigation win, one of the things was that it would help make him sell at a reasonable price, right?

A    I just don't know if it was sell at a reasonable price or make him take action.

Q    One of the things, though, was it would make him sell?  One of the scenarios was make him sell at a reasonable price, correct, sir?

A    One of the scenarios, yes.

Q    Thank you, sir.  That meeting with Ms. Williams and that report to Mr. Ballmer that we just saw, that was on December 17th, right?

A    Yes.

Q    The following day do you remember you got a rather

detailed report from Mr. Gorton?

A   I don't remember a specific report that came the following day, so if you could help me with the exhibit.

Q   Absolutely, sir.  576, please.

MR. KELLER:  And I will move for its admission.

MR. LAWRENCE:  No objection, your Honor.

THE COURT:  576 will be admitted.

BY MR. KELLER:

Q   Let's look at the heading on Mr. Gorton'S December 18 e-mail There.  Let's look at some of these players.  First, it is from Mr. Gorton, right?

A   Yes.

Q   And besides you, Mike McGavick is getting -- is being copied there?

A   Yes.

Q   By the way, Mr. McGavick, did he used to hold a position of some kind on Senator Gorton's staff?

A   Yes.

Q   Do you know what it was?

A   No, I don't know.

Q   And then Mr. Walker and then there is Gerry Johnson.  He is from K&L Gates and Ellis as well, correct?

A   Yes.

Q   This is kind of a long e-mail.  We are not going to spend too much time on it.  But the first item I would like to look

at is on the second page, second paragraph up from the bottom.  The last report we looked at you were talking about Bennett selling at a reasonable price, right?

A   Yes.

Q   This one Mr. Gorton is talking about Bennett selling at a reasonable price, right?

A   Yes.

Q   But Mr. Gorton says only if he is pressured by the NBA or if he faces an expensive and unpleasant legal future, right?

A   That's what it says.

Q   You didn't have the ability to deliver an expensive and unpleasant legal future for PBC, did you?

A   No.

Q   The only one that could do that, that you knew of at the time, was the City and its law firm K&L Gates, right?

A   Yes.

Q   Let's go back to the first page.  And this would be the fifth paragraph down, the one that begins "Bennett owns the team."  Are you with me, sir?

A   Yes.

Q   Mr. Gorton reported that "Bennett owns the team, he wants it in Oklahoma City, and sees relatively clear sailing to NBA approval except for our lawsuit, which can at best delay his move and make it more costly."  Do you see that?

A   Yes.

Q   That is the same thing you have been reporting about in your reports to Mr. Ballmer, that the lawsuit could impose some bleeding and make it costly, right?

A   Yes.

Q   By the way, do you see there it says "our lawsuit"?

A   I don't see it.  Can you point me in the direction, please?

Q   It says that in that same paragraph we were just looking at.  You didn't have a lawsuit pending, did you?

A   No.

Q   The only lawsuit you knew of that would qualify as "our lawsuit" is the City lawsuit and the K&L Gates' role in it, right?

A   Yes.

Q   And Mr. Gorton was their legal counsel in that lawsuit, right?

A   Yes.  Or part of the team.

Q   So when he said "our lawsuit", you knew he was referring to the City's lawsuit, right?

A   Yes.

Q   You knew he was reporting that the City's lawsuit could at best delay the move and make it more costly, right?

A   Yes.

Q   And you knew that what he was suggesting was that that would be one way to force the PBC to sell at a reasonable

price, right?

A   Yes.

Q   Was that the forced bleeding that you had estimated at $20 million per year?

A   When I talked about the $20 million a year, that is what I had heard as an estimate of the losses incurred by staying in his current location.

Q   Was the lawsuit and the ability to force the team to stay here the means to impose a forced bleeding?

A   Yes.

Q   Let's go down to the last paragraph on Exhibit 576 on the first page.  Mr. Gorton reports on his views as to how you guys all ended up where everybody was, right?

A   Sorry.  May I take a minute to read this paragraph?

Q   Absolutely, sir.  Okay.  Do you see Mr. Gorton kind of gives his views as to how things ended up where we are?

A   Yes.

Q   And he says, "part of the problem is that a lot of elected officials just don't have a stake in the loss of the Sonics or their retention for that matter."

A   Yes.

Q   In Mr. Gorton's view none of the electeds can really be blamed at the loss, and that to the extent it can be put at anyone's feet, that blame belongs on Howard Schultz.  Do you see that?

A    Yes.

Q    He says, part of the problem is none of the electeds see much glory in a win except for possibly the mayor, right?

A    That's what it says.

Q    You had a number of meetings with Slade Gorton, right?

A    Yes.

Q    A number of e-mail communications with him, right?

A    Yes.  Mostly e-mails I received.

Q    You and Mr. Gorton did discuss how to try to force Mr. Bennett to sell the team, didn't you?

A    I don't remember being in active discussions on that with Mr. Gorton.

         MR. KELLER:  Can we move to publish Mr. Griffin's deposition, Page 63?  And I would like to play Lines 14 through 23, your Honor.

                         (Audio played)

BY MR. KELLER:

Q    That was your answer when your deposition was taken, right?  Sir?

A    Yes, it was.

Q    First of all, it wasn't that long of a deposition, was it, two hours maybe?

A    By my hand it was a long time, it was five and a half hours, by my standards.

Q    Mr. Taylor took too long then.  You took an oath to tell

the truth before you sat down and gave that testimony you just looked at, right?

A    Absolutely.

Q    Now, after your deposition was taken there is a process by which you got a copy of the transcript and you got a chance to look at it, right?

A    Yes.

Q    Did you forward a copy of that transcript on to your attorney?

A    Yes.

Q    And about a month after your deposition was taken did you submit a purported correction changing that answer that we just saw on the screen from a "yes" to "I don't remember"?

A    I know I made one change like that in my deposition, and I don't remember if it was at this point in the deposition.

MR. KELLER:  Your Honor, I would like to use Exhibit 629 now for illustrative purposes.

BY MR. KELLER:

Q    Mr. Griffin, I have put on the screen in front of you Exhibit 629.  And what it is -- it has some of the things that I just went through with you.  Do you remember when we started your examination we looked in mid-October when you got that first e-mail that talked about continuing to drive the wedge?

A    Yes.

Q    And then in October we looked -- excuse me, and then we looked at the PowerPoint presentation on the poisoned well that talks about increasing the prospect of locking them into losses?

A    Yes.

Q    We also saw on the PowerPoint, the reference to increasing the Oklahomans cost in an unpleasant environment.  Do you remember that?

A    Yes.

Q    And also in the same PowerPoint about how Mr. Gorton, et al, were going to increase the pain of staying.  Do you remember that?

A    Yes.

Q    And then your e-mail report to Mr. Ballmer, November 25th, that Mr. Bennett isn't in a box yet?

A    I wrote that.

Q    And then your e-mail report two weeks later laid out the scenario, if the court case says they can't move, and he ends up with a shorter negative tail to avoid but still feels bleeding.  Do you remember that?

A    Yes.

Q    And then a week later talking about how Bennett needs to sell at a reasonable price, and the litigation's win to stay and forced bleeding will help?

A    Yes, that was one of the alternatives.

Q    And then two days later we saw the exhibit that talked about Bennett will sell only if pressured by the NBA or he faces an expensive and unpleasant legal future, right?

A    Is that last one a memo written by Mr. Gorton?

Q    Yes.

A    Yes.

Q    The plan, sir, part of it, one of the approaches was force them to sell by making them bleed, right?

A    Yes, one of the possibilities.

Q    And the only one who could make them bleed was if the City -- was the City and its lawsuit trying to make them stay, right?  You did not have that ability?

A    We did not have the ability.

Q    You had the ability to be a buyer waiting in the wings if they bled enough that they said yes, right?

A    Correct.

Q    Take a look, if you would, sir, at Exhibit 626.  Was this an e-mail report that you received from Slade Gorton in mid February of 2008?

A    Yes.

        MR. KELLER:  I will move for its admission, your Honor.

        MR. LAWRENCE:  No objection, your Honor.

        THE COURT:  626 will be admitted.

                    (Exhibit 626 admitted)

BY MR. KELLER:

Q    And the people receiving this includes your public relations person, yourself, Mr. McGavick, Gerry Johnson of K&L Gates; is that right?

A    Yes.

Q    Let's look at the third and the fourth paragraphs. Paragraph Number 3, it talks about conversations going on between the governor and the mayor; is that right?

A    Let me just read from that list.

Q    Absolutely, sir.

A    I'm sorry, I'm not seeing the reference to the mayor.

Q    It says, "the governor has spoken directly to the mayor."

A    Oh, next paragraph.  Excuse me.  Yes.

Q    One of the problems that was being reported was that the attitude of the voters was so negative that the mayor now wanted plans to put the Seattle Center use issue on the ballot in the fall.  Do you see that?

A    Yes.

Q    The problem, Mr. Griffin, tell me if I'm wrong, was there was too much public antipathy about putting money into the Center to facilitate a renovation of KeyArena, or at least that is what was being reported, right?

A    Yes.

Q    And then it goes on -- Mr. Gorton in the next paragraph reports that "there is a meeting of the Board of Governors of

the NBA coming up in April," right?

A    Yes.

Q    And Mr. Gorton reports that he had told the governor that with that schedule it means it is almost inevitable that the NBA is going to approve the transfer in April, right?

A    Yes.

Q    But then he says, "subject to the lawsuit."  And then goes on and says, and that it would considerably undercut our chances of specifically enforcing the KeyArena lease.  Do you see that?

A    I don't actually.  Can you point me to the paragraph?

Q    It is the paragraph that talks about, I told the governor that this schedule almost inevitably means that the NBA will approve the lawsuit in April.

A    "Approve the transfer in April."

Q    Yeah.  I'm sorry.  "Subject to the lawsuit."  And then goes on to say, "it would considerably undercut our chances of specifically enforcing the lease."  Do you see that?

A    Yes.

Q    Was the problem here that if the electeds didn't act, and there was such antipathy about a new arena, it couldn't make a showing to the NBA of real interest in keeping this team, that there was concern that it would undercut the chances of winning on specific performance?

         MR. LAWRENCE:  Objection.  Calls for speculation

about what Slade Gorton meant by that.

THE COURT:    Let's rephrase.    Sustained.

BY MR. KELLER:

Q    Did you understand what he was saying to be that the potential problem here is that if there was so much antipathy that Olympia couldn't act and come up with funding for a new arena, and the NBA approved it, that that would undercut the prospects of specific performance?

A    Yes.

Q    And the problem --    That's why there was this big effort that was made to get Olympia to act in this last legislative session, so a statement about the perceived value of an NBA team to this community could be made to the NBA, right?

A    That is correct.

Q    Because you wanted to show David Stern and the NBA Board of Governors that we care about basketball in this town, we are going to fund an arena?    That is part of what was going on here, right?

A    Yes.

Q    And Olympia said at the time, no interest, no money, right?

A    No vote in our favor, correct.

Q    It didn't even get out of committee, did it?

A    I don't think so.

Q    Turn, if you would, to Exhibit 627.

MR. KELLER:  I will move for its admission, your Honor.

MR. LAWRENCE:  Was that provided to us, Counsel?

MR. KELLER:  It should be.

MR. LAWRENCE:  No objection, your Honor.

THE COURT:  627 will be admitted.

(Exhibit 627 admitted)

BY MR. KELLER:

Q   Why don't you pull up that top e-mail?  This is an e-mail from Mr. Walker in March of 2008 to yourself, Mr. Gorton and others, correct?

A   Yes.

Q   Let's look at that second full paragraph.  Do you see Mr. Gorton (sic) is talking about the problem being lack of leadership down in Olympia?

A   You said Mr. Gorton.  Did you mean Mr. Walker?

Q   I absolutely did.  Thank you, sir.  Do you see that Mr. Walker was talking about the problem was lack of leadership?

A   Yes.

Q   He was talking about political leadership, right?

A   Yes.

Q   And he goes on to comment how ugly the trial will be, how ugly the Sonics departure will be.  Do you see that?

A   Yes.

Q   A pretty accurate prediction, don't you think?

A   I don't have a comment.

Q   He goes on and says, "then we will rely on the NBA mandate approval that another team will move here after that scorched earth, incriminating process."  Do you see that?

A   Yes.

Q   What do you understand him to be talking about with respect to a "scorched earth, incriminating process"?

A   Bad will between the City and the NBA.

Q   Because of things like exactly what is happening here this week?

A   Possibly.

Q   Is that what you understood at the time, in part?

A   In part.  In part the unfortunate comments that people had made in the press.

Q   Comments by both the City and by the team, just all the acrimony?

A   Yes.

Q   Next paragraph, please.  Do you see he talks -- Mr. Walker talks about really the need to kind of get it done that year, right?

A   Yes.

Q   And that year meant the -- this legislative session that just ended, right?

A   Correct.

Q    He says, "if you think it is going to happen in the future, it is not," right?

A    Yes.

Q    So if somebody -- I mean, he is not particularly optimistic, is he?

A    Wally was not.

Q    He is not someone expressing the sentiment that a lot can happen in two years, is he?

A    No.

Q    It is just the opposite, he is saying the time is now or it ain't going to happen, right?

A    That is what Wally is saying.

Q    And it didn't happen, right?

A    Correct, it didn't happen.

Q    Now, there did come a point in time where with great -- Strike that.  There did come a point in time, with quite a bit of publicity, you and Mayor Nickels stood side by side on a podium, some King County Council members, and made a public announcement we are a group -- I represent a group of local buyers and we are prepared to buy this team if Olympia will fund a new arena, right?

A    That is part of what we said.

Q    And after going public with this proposal do you remember that Mr. Stanton provided you with some input about what the public reaction was to the new arena proposition that you and

the mayor were trying to accomplish?

A   Mr. Stanton provided some data on a poll, but I don't remember exactly which part of the proposal that poll is based on.

Q   Let me help you out.  Take a look at Exhibit 587.

A   587?

Q   Yes, sir.

        MR. KELLER:  I will move for its admission.

        MR. LAWRENCE:  Objection.  Hearsay, your Honor.  We also object on 702.

        THE COURT:  Any response?

        MR. KELLER:  I am offering it to show that this is what he was told and that he knew it.  He just said he didn't recall it.

        THE COURT:  You want him to refresh his recollection?

        MR. KELLER:  I will start with that.

BY MR. KELLER:

Q   Take a look at Exhibit 587, sir.

A   Yes.

Q   Does this refresh your recollection as to the results of the polling data that you were provided with by Mr. Stanton?

A   Yes.  I remember the numbers, I just didn't remember the highlighted Paragraph 1 that included the $150 million.

Q   And that's what I want to establish.  By this time it was very publicly known that the group that you were the

representative for was willing to put up $150 million towards a renovated KeyArena, right?

A    Yes.

Q    So at this point the public money piece was an additional $150 million, right?

A    Approximately, yes.

Q    And the City had said, you can count on us for 75 of it, right?

A    Yes.

Q    So the missing piece was $75 million, right?

A    Yes.

Q    That's all you wanted Olympia to do, was to authorize King County to take $75 million of future tax revenues from an already existing tax to plug that $74 million hole, right?

A    Either the City or the County.

Q    And they wouldn't even do that for you, right?

A    That's correct.

Q    And this survey that Mr. Stanton provided, it informed the public that there was going to be $150 million of private money, right?

A    Yes.

Q    And it told them that all that was needed was another 150 of public money, right?

A    Yes.

Q    And even then 59 percent of the people in response were

opposed to public monies being used to rebuild KeyArena for professional basketball, right?

A    Yes.

Q    And of that 59 percent 47 percent, almost half the people, said they strongly opposed it, right?

A    Yes, that's what the data says.

Q    That wasn't what you wanted to hear, right?

A    No.

Q    And that wasn't what Mr. Stanton wanted to hear, right?

A    Correct.

Q    And that was part of the problem in Olympia, wasn't it?

A    Yes.

Q    The legislators sensed the people that put them in office didn't support a rebuild, even with KeyArena, even with local investors, even with $150 million of private money.  That was the problem, right?

A    I don't know whether the legislature was thinking about their constituents or about their own beliefs.

Q    Either way it was the same thing, right?  Same result, right?

A    Same result, slightly different reason.

Q    Now, before you were willing to stand up and say -- recommend to Mr. Ballmer that he buy this team you had to do some due diligence work, right?

A    Correct.

Q    Part of that was to familiarize yourself with KeyArena --

A    Yes.

Q    -- right?

A    Yes.

Q    Familiarize yourself with the existing lease, yes?

A    I don't know if I read the existing lease because I believed there would be a new lease.

Q    You had to at least familiarize yourself what the terms of a new lease for your group, if you succeeded, was going to look like, right?

A    Yes.

Q    You had to run some numbers and see if you could recommend this thing to Steve Ballmer, right?

A    Correct.

Q    And when it came to the financial analysis of running the numbers, that was part of what Wally Walker was doing, right, providing some assistance there?

A    Some input.

Q    Now, when you -- and as part of assessing KeyArena you went out and toured the facility?

A    Yes.

Q    Mr. Gorton went with you, right?

A    Yes.

Q    Did you come to the conclusion that KeyArena as it then existed was not an adequate arena for NBA basketball?

A    I didn't make the conclusion on my own.  I used basically the studies that had been done of the way the arena should be improved.  So left automatically the fact that it needed to be improved.

Q    Did you conclude for it to be an adequate arena for NBA basketball KeyArena needed $350 million in renovation?

A    In round numbers, yes.

Q    And did Mr. Ceis from the City agree with you that to be a viable NBA arena KeyArena needed $300 million in renovations?

A    I don't remember a specific discussion, but the answer would probably be yes.

Q    You believe you did discuss it with him that -- you probably did discuss it with him and he was in agreement with that?

A    Yes.

            MR. KELLER:  Thank you very much, Mr. Griffin.

            THE COURT:  Any cross-examination?

            MR. LAWRENCE:  Sure, your Honor.

                        CROSS-EXAMINATION

BY MR. LAWRENCE:

Q    Good afternoon, Mr. Griffin.

    Could you tell us a little bit about yourself, where you grew up?

A    Sure.  How much detail would you like?

Q    Not amazing.  Did you grow up in Seattle?

A    I grew up in Seattle.  I grew up in the south part of Seattle.  I went to Hawthorne Elementary, I went to Lakeside School for seventh grade through twelfth grade.  I went to college in the east, Princeton.  I went to grad school in Stanford.  I came back here to work in '77.  I have been here most of the time since then.

Q    Since you have returned to Seattle can you tell us generally what you have done?

A    I have been in the real estate development business in downtown Seattle, playing a role in a number of major products.  In the last ten years I have been fortunate enough to split my time between major real estate projects and some work for some nonprofits here in Seattle.

Q    Could you describe the work for the nonprofits you have done here in Seattle?

A    The three that I have spent the most time in the last -- the bulk of the time in the last ten years are Lakeside School, where I have been a trustee.  I was chair of the last capital campaign.  We raised $50 million.  I became chair of the board.  And I am the current chair of the capital campaign for $105 million, where most of it is for -- 45 million of it is for scholarships.  I have been on the YMCA board for 25 years.  I am the current chair of the YMCA board in the last capital campaign.  I am currently co-chair of their capital campaign for $40 million.  And I have been

on the executive committee for the Downtown Seattle Association, which works to champion a vibrant urban core over the last dozen years, including chairing the board and serving on the executive committee.

Q   And could you just briefly describe the work you have done in terms of development here in Seattle?

A   Yeah.   In the development work, for ten years, in the time frame of '77 to '88, I was the partner at Wright Runstad in charge of a number of major office buildings in town, a 35-story Levlad on 3rd Avenue, a 42-story Wells Fargo Center, a 55-story Washington Mutual Tower.  In '94 when I joined a group to work on a three-block development for the rehabilitation of the downtown core, our team -- I headed up the team that bought the old Frederick & Nelson building that had been vacant, traded it to Nordstrom, built Pacific Place and renovated the Nordstrom's block, which included their old store.  And then in the last five years I was asked by Washington Mutual to figure out their headquarters and put the deal together between Washington Mutual and SAM.  I was in charge of overseeing the $440 million budget to build that project.

Q   The SAM being the Seattle Art Museum?

A   Seattle Art Museum, yes.

Q   When did -- Your first involvement in KeyArena, the Sonics, etcetera, was with Mr. Ballmer approaching you?

A    Yes.

Q    And when was that?

A    Mid-October.

Q    So at that point did you understand that the Sonics had filed for arbitration?

A    I don't know if I did or not.  Steve told me about it.  I knew about it after that.

Q    Were you following this at all?

A    Not very closely.

Q    And why is that?

A    Well, I am only a moderate sports fan.

Q    Well, when Mr. Ballmer asked you to be involved why did you become involved if you are only a moderate sports fan?

A    There are several issues for me.  One is, first of all, I admire Steve Ballmer, and so the chance to be able to work with Steve was appropriate -- interesting for me.  But in the time that I said I wanted to basically do my own due diligence on this project, I wanted to find out from some friends in the city about sort of the situation at KeyArena. And the conclusion that I came to is that an empty KeyArena would be very similar -- I would worry about it being similar to the empty Frederick & Nelson building in downtown Seattle. Which as you may remember during the early '90s was vacant, and the decay not only took place in that building but spread to the neighborhood.  It basically hurt the neighborhood.  As

part of my interest in the urban core I worry about the same thing happening with an empty KeyArena.

Q    So specifically with KeyArena, what were the consequences of an empty KeyArena to you?

A    Well, I worry about a couple of things.  I mean, first of all, we are at a time here as a community we are trying to figure out how to reenergize Seattle Center, which is 45 years old and something worth doing.  But also KeyArena is one of the main legs of that stool.  But also knowing from the Frederick & Nelson experience how small businesses in a neighborhood can easily go bankrupt.  There is a small difference between --  Having a vibrant building which is full of people coming on a regular basis oftentimes will change their sales 10 to 20 percent.  Ten to 20 percent for a lot of those mom and pop businesses is the difference between surviving and going under.  I worry about that for the lower Queen Anne neighborhood.

Q    Rather so much in taking pride in the sports, the attributes a sports team brings, you are more concerned about urban development and urban vitality; is that fair?

A    That's correct.  I will admit that having a sports team is like having great art museums and operas and things.  They add good things and basically quality of life for people, they allow you to attract talent when you wouldn't otherwise.

Q    So I take it that you have just described what you did in

response to Mr. Ballmer's request, correct?

A    Correct.

Q    And then what was your next involvement after that?

A    I am not sure about the exact step.  I obviously gathered some material, read the material, tried to -- started to formulate my own opinions.  But what was most -- most important to me was to figure out if there was a way to get the funding plan done with the City and the State.

Q    Why was the funding plan so important in your mind?

A    Because I believe that if we don't have a competitive arena, whether it is today or whether it is two years from now, it will be difficult to make the case to the NBA that we ought to have a professional basketball team in Seattle.

Q    And you said yes to Mr. Ballmer?

A    Yes, I did.

Q    At the time that you said yes did you have any understanding that the efforts you were going to be embarking with was some sort of plan conceived by the City of Seattle or not?

A    No.

Q    Was it your understanding that it was a plan conceived by the City of Seattle?

A    No.

Q    What was your understanding of where the plan came from?

A    I am not sure --

MR. KELLER:  Can we have some foundation here, your Honor.

BY MR. LAWRENCE:

Q   Did you come to an understanding about where --

THE COURT:  Do you wish to withdraw the question?

MR. LAWRENCE:  I'm sorry.  I was jumping ahead and trying to restate it.  I will withdraw the question.

THE COURT:  Go ahead.

BY MR. LAWRENCE:

Q   Mr. Griffin, when you said yes did you make efforts to come to some understanding as to where the idea generated for Mr. Ballmer to become involved?

A   Yes, I did.  I know that he had been talked to over the summer by John Stanton, Wally Walker, others, encouraged him to become involved.

Q   And Mr. Keller asked you about a PowerPoint presentation.  Do you recall that?

A   Yes.

Q   I want to understand how you used that or not going forward.  I believe you indicated that you reviewed that PowerPoint with Mr. Ballmer, correct?

A   Yes.

Q   And you reviewed that PowerPoint I think coming back -- going to or from China on a plane?

A   I am not ever sure if I reviewed it when I was in China,

but I wanted to have it along with me in case I had any questions and I wanted to look into it for data.

Q    After you came back from China how often did you consult the PowerPoint?

A    Very rarely.  Again, that PowerPoint presentation was done before I was involved.  I found it had some interesting information in it.  The place that I referred back to several times, and the only one I can referring back to it for, was the one about the market data, where Seattle was compared to the other metropolitan markets in the country.

Q    Maybe we could have 567 so we can see what that data is. If you could look at page WW 203.  Can you tell us whether that is the market data you were referring to?

A    Yes, it is.  The top 20 designated market areas, 2006.

Q    Mr. Keller went through a number of pages on this PowerPoint with you.  Do you remember that?

A    Yes, I do.

Q    He didn't show you this page, did he?

A    No.

Q    He showed you a number of other pages.  Did you refer to any of the pages that he showed you going forward after you returned from China?

A    I can't say whether I ever referred to them or not, but they weren't a key part of the way I used this document.

Q    What did you understand that Mr. Ballmer wanted to

accomplish going forward?

MR. KELLER:  I will object, your Honor.  It is calling for hearsay.

MR. LAWRENCE:  Let me restate the question, your Honor.

BY MR. LAWRENCE:

Q   What did you understand you were to do going forward as the representative of Mr. Ballmer?

A    Mr. Ballmer and I discussed our objectives, believing that two things were important.  One was that it was important to have an NBA team in Seattle for some of the reasons we have talked about.  The reasons are basically adding to the vibrancy of the community, like operas and the symphonies, etcetera.  The second part was the ability to help KeyArena.

In that process we moved forward with the -- came to the conclusion if it was possible to have it be the Sonics, that would be great.  They have a long history in Seattle.  But if it was another NBA team, that would satisfy our objectives as well.

THE COURT:  We need to find a place to stop.

MR. LAWRENCE:  This is a fine place, your Honor.

THE COURT:  We will be at recess for 15 minutes.

(Short recess taken.)

THE COURT:  Please be seated.

CROSS-EXAMINATION

BY MR. LAWRENCE:

Q   Mr. Griffin, at the time of the break you were describing two, I guess, end solutions that you were looking at.

One of those was the possibility of purchasing the team, correct?

A   Yes.

Q   And that would have been from Mr. Bennett?

A   Yes.

Q   And the other one was obtaining another NBA team, correct?

A   Yes.

Q   Could you explain that?

A   Well, again, in our goal to have an NBA team here in Seattle for the things that we believe that are important, again, about what it adds to the social fabric, as well as KeyArena and that neighborhood, and we understand that Mr. Bennett wouldn't have to sell the team to us if he didn't want to.  And our hope was to be able to sit down and have a discussion with Mr. Bennett and the NBA and see if in fact there was an arrangement that we could work out where we could get an NBA team here in Seattle.

Q   So those were two separate solutions, correct?

A    Correct.

Q    And what was your understanding about whether or not you could force Mr. Bennett to sell?

A    I don't know how we could force someone to sell.

Q    If I could bring your attention to Exhibit No. 575.

A    Yes.

Q    And you remember discussing this e-mail with Mr. Keller, correct?

A    Yes.

Q    And if you could turn to the second page, which is the outline that Mr. Keller went through.

Do you recall that?

A    Yes.

Q    If we could highlight the league part at the bottom. Section 4(d) is entitled Bennett, correct?

A    Yes.

Q    And what is 4(d) referring to?  What is "Bennett"?

A    I'm sorry.  Mr. Bennett, of the Professional Basketball Club.

Q    What is the first listed option?

A    Needs to accept the Key as workable.

Q    You go on to say that there is bad blood with the City, correct?

A    Yes.

Q    When you say, Needs to accept the Key as workable, what is

the end goal of (d)(1)?

A    Well, at the end of the lease if Mr. Bennett doesn't believe that KeyArena is workable, there is no -- I wouldn't know of any way to make him stay.

Q    Was one of the things that you were hoping to accomplish to convince Mr. Bennett that a renovated KeyArena might be workable?

A    Yes.

Q    And in that case, what would have happened to the team?

A    Well, we would have been -- we would have been perfectly okay -- in fact, there are many ways that we would appreciate it more if Mr. Bennett or some other owner owned the team and stayed in Seattle.  It would certainly make my life simpler.

Q    So can you tell me whether or not you understood that the goal you were representing Mr. Ballmer was excluded Clay Bennett continuing ownership of the team?

A    Definitely did not.

Q    Did you have an understanding that Mr. Ballmer preferred his personal ownership of the team?

        MR. KELLER:   Your Honor, he would have no other understanding other than hearsay.

        MR. LAWRENCE:   Rephrase, Your Honor.

BY MR. LAWRENCE:

Q    In terms of what you did as a representative of Mr. Ballmer, did you make it the priority for Mr. Ballmer to

obtain a team?

A    No.  In fact, in the outline with Melinda, up in paragraph 1(d)(i), it says if -- once the team okay if someone else owns it.  That was comments by Steve.

Q    Right under that it says "reluctant white night".
      What is that referring to?

A    That is Steve's willing to be pulled in and help if that's what is necessary to have an NBA team in Seattle.

Q    In terms of the understanding of your task, getting a team for Mr. Ballmer was not the first priority?

A    Correct.

Q    If we could turn to Exhibit No. 573.
      Exhibit No. 573 is one of the updates to Mr. Ballmer that you provided, correct?

A    Yes.

Q    And Mr. Keller pointed out that you created sort of groupings of different pieces of what you were trying to do.
      Do you see that?

A    Yes.

Q    The Lease Piece, what was that involvement?

A    It would be the items necessary to enter into a lease with the City.

Q    So that was trying to figure out the terms of a new lease for KeyArena if that was the direction you ended up going?

A    Yes.

Q    The next one is a Political Piece.

Do you see that?

A    Yes.

Q    What was within that section?

A    Well, no pun intended, the key piece was to find the resources for the renovation to which they would believe it would take political will to make that happen.

Q    If that is the funding package that we've talked about?

A    Yes.

Q    And we talked about with Mr. Keller?

A    Partly from the City and partly from state help --

THE COURT:   Stop just a second.

(Pause in proceedings.)

MR. LAWRENCE:   Do you need the last question and answer back?

THE COURT:   No, I have it here.   Thank you.

BY MR. LAWRENCE:

Q    And you see under the Political Piece there is a reference to Gerry having rough legislation drafted by January.

Do you see that?

A    Yes.

Q    And who is Gerry -- who does that refer to?

A    That is referring to Gerry Johnson who was representing us with legislation.

Q    Is there some point at which you retained Gerry and K&L

Gates to help you out?

A    Yes.

Q    Describe when that was and what you were asking K&L Gates to do.

A    Particularly the area I remember asking for help from Gerry Johnson K&L Gates were in helping understand how we would work on the funding package with the City, as well as state legislature, and then in drafting the lease representing us in the drafting and negotiating of the lease with the City, if we were fortunate enough to be able to go forward.

Q    Did K&L Gates work on drafting legislation?

A    Yes.

Q    Were you ever charged for any piece of this litigation?

A    Not that I know.

Q    If you recall, there was a question from Mr. Keller referencing an e-mail.  It's Exhibit No. 622.
     Do you remember, we talked about keeping K&L Gates working for the City.  Do you remember that e-mail?

A    May I check it to make sure I'm not confused?

Q    Let's go to 622.

A    I have it now.

Q    Okay.  What is the date of that?

A    November 17, 2007.

Q    And why did you want to keep K&L Gates working for the

City at that time?

A   My intent here was really financial, in being as cheap as I am and not having to start paying any bills.

Q   Did it have anything to do with the litigation plan with the City?

A   No.

Q   Can we go back to 573 then.

I think we have gone through the Lease Piece, Political Piece.

Next one League Piece.  What was that about?

A   Again, any solution that involved KeyArena having an NBA team in Seattle we believed that the league would be important as a decision-maker.

Q   And can you explain why you believe the league was going to be important?

A   Well, to this point in time, the league had said that they didn't believe that KeyArena was a competitive KeyArena.  And we had believed that we needed to fix KeyArena in a way that it could be competitive, and at the end of the day it was important that the NBA believe it be competitive, and they also make the decision about where teams get located.

Q   And then finally, the last piece seems to be Other Real Estate.  Do you see that?

A   Yes.

Q   What does that refer to?

A    This is the piece we had the least amount of discussions on.  It was a belief to make the KeyArena successful it would be helpful if some of the other real estate in that neighborhood that the City owned could also be redeveloped.

So we had some preliminary discussions with the City about the possibility of buying that real estate if in fact we went forward, so we could really improve the whole neighborhood and have enough critical mass to make that area work.

Q    I notice that in your reporting there is no piece entitled Litigation Piece; is that right?

A    Correct.

Q    Why is that, if there was some plan to use the City's litigation as part of what you were doing?

A    It wasn't a key part of our puzzle.

Q    Did Mr. Ballmer want reporting on litigation as part of the work you were doing for him?

A    I didn't make any.

Q    In any of your status memos, did you have a litigation piece?

A    I don't remember any.

Q    I just want to briefly go back for a second to the -- just ask you a question about the PowerPoint presentation.

I think you said Mike McGavick wrote that; is that right?

A    I think Mike McGavick wrote it.  Mike is the one who transmitted it to me.

Q    I believe you were asked about some of his employment. But after he left the political arena, do you know what Mr. McGavick did?

A    He is -- he has taken a job in the banking -- or the insurance industry.

Q    Do you know whether or not he had anything to do with Safeco insurance?

A    He did.  But I thought that was before his political endeavors.

Q    Could you look at 576 now, please.

A    Yes.

Q    This is the e-mail to you from -- to you and Mr. McGavick and Mr. Walker and Mr. Johnson from Slade Gorton, correct?

A    One of the e-mails from Mr. Gorton.

Q    This was in December; is that right?

A    Yes, December 19.

Q    At the bottom of the first page he's talking about the politicos.

Do you see that?

A    Yes.

Q    There is a discussion about the mayor, starting at the bottom, moving over to the left.

Do you see that?

A    Looking for it.

Yes.

Q   It talks about a mayor who has -- mayor has a stake in success because of the ownership of KeyArena and the Seattle Center.

Do you see that?

A   Yes.

Q   This isn't talking about the mayor having some plan with you guys, correct?

A   No.

Q   Did you ever sit down with the mayor and discuss litigation planning with him?

A   No.

Q   With the City attorney?

A   We had one meeting with the City attorney, but not to plan their litigation.

Q   What was that meeting about?

A   Only to let the City attorney know that we were -- there was a group emerging that might be willing -- or that would be willing to take an ownership position in Sonics if they were available.

Q   And was that the group led by Mr. Ballmer?

A   Yes.

Q   When did that occur?

A   I'm sorry, I don't know without looking at the calendar. March possibly.

Q   March of 2008?

A    Yes.

Q    But not before litigation started in 2007?

A    No, no.  It was March of 2008.  It was after we decided that we could afford to put in $150 million.

Q    And before March of 2008, had you had any communication identifying Mr. Ballmer and the other members of that group to the City?

A    I don't remember whether it was March or mid-February, but some timeframe about then told the mayor's office and others about who the other members of the group were.

Q    That would have been Mr. Ceis?

A    Yes.

Q    Just so we know, we have Mr. Ballmer.  What other members of that group were?

A    Composed of Mr. Ballmer, John Stanton, Jim Sinegal and myself.

Q    I think we've heard about Mr. Stanton.

     Tell me about Mr. Sinegal.

A    In terms of what his role is in the city or?

Q    Yes.  What does he do?  What is his role?

A    Jim Sinegal is the CEO of Costco.  He's been a basketball fan for years.  He has a number of philanthropic issues in Seattle, including sharing the board at Seattle U and co-chair of their campaign.  He's a very good civic-minded citizen.

Q   So is it correct then that from October, when you were first contacted by Mr. Ballmer to act as his representative, through at least mid-February 2008, the City did not know who was in the prospective owners group?

A   I think that's correct.  It's correct it was a long period of time.  I can't remember the exact date.

Q   So if the City wanted to conspire with those people, they didn't even know who to call, did they?

MR. KELLER:  That's argumentative.

MR. LAWRENCE:  I will withdraw.

MR. KELLER:  We're dealing Mr. Griffin.

MR. LAWRENCE:  Withdraw the question.

BY MR. LAWRENCE:

Q   Mr. Keller asked you about the notion of driving a wedge.  Do you remember that?

A   Yes.  I remember the question.

Q   I think you also -- I'm not sure the analogy was correct, but he tried to analogize it to the pincer movement that you looked up?

A   Yes.

Q   When you got back from China and you went back to carry out Mr. Ballmer's instructions, what did you do if anything to drive a wedge between the NBA and Mr. Bennett?

A   I don't remember any specific actions geared towards that item.

Q    Did you do that at all?

A    I'm not sure if there was something that might tangentially might have that effect.  But the bulk of our efforts from the time I started were all around trying to make sure we had a financing plan that have a renovated KeyArena.

Q    With the renovated KeyArena there were three possible solutions, correct?

A    Yes.

Q    Mr. Bennett could take the team to a renovated KeyArena?

A    Yes.

Q    Mr. Bennett could sell the team to a prospective owner like the Ballmer group?

A    Yes.

Q    Or another NBA team other than Sonics could be obtained to play at KeyArena?

A    That is correct.  Although I will say it is only the latter two that we talked much about, although we would have been pleased to have Mr. Bennett stay.

Q    Why during this time period that you were working on it did the option of Mr. Bennett staying -- why wasn't that pursued more?

A    Our belief was that there was enough animosity between the City and the basketball club that it wouldn't work.  We were sorry to see that.

Q   Did Mr. Bennett ever indicate to your knowledge a willingness to stay in a renovated KeyArena?

MR. KELLER:  Excuse me, Your Honor.  I don't think we have established the witness even had any dealing with Mr. Bennett.

BY MR. LAWRENCE:

Q   Did you hear from any source --

THE COURT:  You're withdrawing the question?

MR. LAWRENCE:  Yes, Your Honor.

BY MR. LAWRENCE:

Q   Did you ever hear from any source whether Mr. Bennett was willing to accept staying at the renovated KeyArena?

MR. KELLER:  That calls for hearsay.  He just answered yes or no.  If it goes beyond that it would --

A   Could you rephrase the question?  Restate.

BY MR. LAWRENCE:

Q   Did you hear from any source whether or not Mr. Bennett was willing to stay in the renovated KeyArena?

A   No.

Q   It was publicly announced that at some point that your group was willing to put $150 million up to renovate KeyArena; is that right?

A   That's correct.

Q   Was that offer contingent on anything other than the $150 million coming from the State and/or City?

A    Well, it's clearly consistent or contingent upon having a funding plan, where the other 150 is coming from the City, State, or other sources, and then obviously contingent on being able to get a team.

Q    That was your end goal?

A    Yes.

Q    Mr. Keller put you through a number of e-mails that indicated that various people, Mr. Gorton and others, used terminology like bleeding Clay Bennett, etcetera.

     Did you remember those e-mails?

A    Yes.

Q    One of the illustrative exhibits he showed you was a whole series of snippets from various e-mails and memos.

     Do you remember that?

A    I'm not sure which memos you're referring to, but I understand the flavor.

Q    Let me just ask you straightforwardly:  Did you and Mr. Ballmer want to bleed Clay Bennett, or did you want to get a team in Seattle Center for the future of Seattle?

A    We clearly wanted a team in Seattle Center.

     MR. LAWRENCE:  Thank you, Mr. Griffin.

     THE COURT:  Any further examination?

     MR. KELLER:  Briefly.

                    REDIRECT EXAMINATION

BY MR. KELLER:

Q   Counsel for the City asked you about whether you did anything to drive a wedge -- whether you personally did anything to drive a wedge with the NBA or something that could be characterized as a pincer movement.

Mr. Lawrence just asked you about whether you personally had done anything to drive a wedge between the NBA and the Professional Basketball Club or to implement anything that would be a pincer movement.

Do you remember being asked about that?

A   Yes.

Q   You, yourself, didn't have any dealings with the NBA, did you?

A   No.

Q   Wally Walker was the one who was supposed to be dealing with the NBA, right?

A   Wally Walker is the one that had interaction with the NBA.

Q   Wally Walker is the one who was dealing with someone who you in your memo characterized as a "deep throat", right?

A   Correct.

Q   Now, you said there was three alternatives here that you were pursuing.

One was to potentially get another NBA team, right?

A   Yes.

Q   Yourself, Mr. Griffin, tell us what efforts you made to get another NBA team during this period -- that is, some team

other than the Sonics.

A    We didn't believe we could make an effort to get another team unless we had a renovated KeyArena.  We didn't make any effort.

Q    Without a renovated arena, from your standpoint Seattle just isn't a credible NBA market, is it?

A    I think that's correct.

Q    From a business proposition, just as a business person, no way were you going to recommend to Steve Ballmer to put money into a team without a new facility, right?

A    Correct.

Q    Dollars just aren't there, correct?

A    Correct.

Q    That facility will not drive enough revenue to sustain what an NBA cost to own and operate, right?

A    That's my belief.

Q    You said one of the other three alternatives was -- I think you said it was your hope to convince Mr. Bennett that a renovated KeyArena would be acceptable if you stayed, right?

A    I don't know if it was to convince Mr. Bennett, but if Mr. Bennett decided to stay it would be just fine.

Q    And you never reached out to him and communicated with him to make any effort to try and convince him in that regard, did you?

A   Correct.

MR. KELLER:   Thank you.

THE COURT:   Anything further?

RECROSS EXAMINATION

BY MR. LAWRENCE:

Q   Mr. Griffin, did you think it would be worthwhile to reach out to Mr. Bennett if you didn't have a funding package and a renovated KeyArena to talk about?

A   No.

MR. LAWRENCE:   Thank you.

MR. KELLER:   Nothing further, Your Honor.

THE COURT:   Thank you.   You may step down.

MR. KELLER:   We call as our next witness, Mr. Nicholas Licata.

THE COURT:   Please come forward sir.

NICHOLAS LICATA

The witness, after being duly sworn, testified as follows:

THE CLERK:   Please state your name and spell your last name for the record.

THE WITNESS:   Nicholas Joseph Licata.   Last name L-I-C-A-T-A.

DIRECT EXAMINATION

BY MR. KELLER:

Q   Good afternoon, Mr. Licata.   I'm Brad Keller.   I represent the Professional Basketball Club.

I want to take you back in time to what was the 2006 legislative session in Olympia.  Just to orient you, Mr. Schultz and his organization owned the Sonics at that time.  Okay?

A    That's correct.

Q    Do you remember that the mayor and the mayor's office wanted to provide support to the Schultz group for publicly funding a remodel of KeyArena at that time?

A    Yes, I do recall that.

Q    Do you recall that the mayor's office was providing some support to the Schultz group?

A    Not quite sure I understand what you mean by "support".

Q    Some support to their legislative efforts in Olympia.

A    It's my understanding that mayor's staff -- may have been the deputy mayor, I'm not sure -- was in Olympia talking to legislators supportive of retaining the Sonics in Seattle.

Q    Did you and others on the city council initially have a concern that the mayor's office had not coordinated with and gotten the council on board for supporting that legislative effort?

A    Yes.  That's a correct representation.

Q    Would it be fair to say that you felt as if the city council had not been kept in the loop and kept abreast of what the mayor's office and the Schultz group were up to?

A    That was my feeling at that time --

Q   Thank you, sir.

You felt as if you were learning about it by reading about it in the newspaper, right?

A   That's roughly correct.

Q   As a result, did you notify some legislators down in Olympia in connection with the '06 session that the mayor had not kept the council in the loop and that you believed that these issues needed to be closely looked at before any action was taken in support of the remodel of KeyArena?

A   I believe I did make those statements to state legislators.

Q   And you did that as a member of the city council, right?

A   I was a member of the city council and I let them know that.

Q   And you e-mailed key legislators down in Olympia, expressing your concerns and urging that no action be taken in support of a remodel until the effort could be vetted and --

A   I don't remember the exact words.  That sounds like the general thrust.

Q   Would you take a look at Exhibit No. 522.

MR. KELLER:  I will move for its admission, Your Honor.

MR. NARVER:  The city objects to portions of 522 that lay out poll results on the grounds of hearsay and Rule 702.

No objection to the other portions that e-mail.

MR. KELLER:  They're offered for the fact they were passed on and stated, communicated to the legislators, Your Honor.

MR. NARVER:  If they're not offered for truth of those statements, the City does not object on that ground.

THE COURT:  522 admitted.

(Exhibit No. 522 admitted.)

BY MR. KELLER:

Q   Pull up Exhibit No. 522.  Is this an example of one of the e-mails you sent to key legislators in connection to the ' legislative session expressing your views?

A   Yes.

Q   In second full paragraph you make a point that the city council was still reviewing the issue and was not going to be done until after the legislative session was over, right?

A   Yes.

Q   Then in the next paragraph you shared what were the results of some polling that had been done about our community's views about using public moneys in connection about the Sonics and rebuilding KeyArena, right?

A   That's correct.

Q   And let's go to page 991, next page.  You shared some information about something called the Hebert poll?

A   That's correct.

Q   You wanted the legislature to know the results of the Hebert poll had been that 80 percent of the Seattle resident voters that have been surveyed do not support using the tax for the Sonics, right?

A   That's what it says, yes.

Q   You also shared the results of what had been a KING TV poll on the next page under heading Second Poll?

A   Yes.

Q   The results of that poll had been 65 percent of the people were saying they did not support the concept of using tax dollars for a professional basketball team, right?

A   Uh-huh (affirmative).

Q   Then you also shared with the legislators a third poll that had been also done by the Hebert Research Company that showed only 7 percent supported using tax dollars to retain the Sonics in King County, right?

A   Yes.

Q   Besides sharing polling data in connection with the '06 legislative session, did you also want to communicate with them about some of the other issues, such as questions about whether there would be economic benefits from spending money on an arena?

A   I certainly raised those issues.  I don't know if I raised them with the legislators or not.

MR. KELLER:  Move for admission of 520.

1001

MR. NARVER:  No objection.

THE COURT:  520 admitted.

(Exhibit No. 520 admitted.)

BY MR. KELLER:

Q    Is Exhibit No. 520 an e-mail that you sent to one of the legislators in the middle of the '06 session while they were considering funding for a remodel providing information that you thought was important for them to know?

A    Yes.

Q    And if we scroll down to right below where you signed it, it said:  There are two documents embedded in the e-mail. The first lays out reasons why the welfare of the Sonics should not be linked to the welfare of Seattle Center's KeyArena, because you believed it was critical that the legislators understand that, correct?

A    That's correct.

Q    And then if you go down to the bottom here, there is a heading.  It says:  Sonics' welfare and that of Seattle Center's KeyArena are not linked.

You point out there that the team had argued that KeyArena will become a white elephant if the Sonics leave.

A    Yes.

Q    What do you mean by "white elephant"?

A    Well, I think the vernacular of a white elephant is something that is not necessarily valued very highly.

Q   In other words, an empty, unused facility that would be a problem for the Center and a problem for the neighborhood; is that the concept?

A   That's probably a fair, rough translation.

Q   What you wanted to point out to the legislators is that you, the City of Seattle, had retained experts to study that issue and it wasn't so, right?

A   The consultants were hired by the City.  And I'm not sure that the consultants said it's not a white elephant.  But they did come to conclusions that I used to justify this position.

Q   Let's be a little precise then.

The City hired consultants to study what KeyArena would be like without the Sonics, and those consultants told the City that KeyArena could turn a profit without an NBA team by increasing concerts, ice shows, and having college and high school games, right?

A   That was an option that they identified and one that I passed on to the legislators.

Q   Top of the next page, that is kind of exactly what it says, right?

A   Yes.

Q   You wanted Olympia to know the City hired independent experts, and the bottom line was even without the Sonics KeyArena pencils out, right?

A    That's what I said.  It could pencil out.

Q    The consultants that were hired were sports' industry experts, right?

A    That's true.

Q    And let's skip two paragraphs down.

This paragraph talks about how -- I hate to say "modest" when I refer to $20 million, but by the kind of dollars that were being asked for at the time --

A    It seemed modest.

Q    -- it is modest.

But this paragraph is talking about how for a modest investment of $20 million could be turned into a terrific facility with a -- for a more diverse group of concerts and other family-oriented entertainment, right?

A    Well, I didn't use the word "terrific facility".  I said it could possibly operate in the black.

Q    That was more than possibly?

A    That was the conclusion of the expert.  That's correct.

Q    One of the reasons you articulate in the next paragraph -- could we see the one that says Sonics play 40 games.

A    That's right.

Q    While there are 40 home games, at that time, for the Sonics, the math was that was the City made about $5,000 on a net basis from each of the games, correct?

A    That was from material I reviewed for the last couple

years before this information came out.

Q   I meant to ask you, this is an issue -- as of this time, this is something you really, for lack of a better term, you sunk your teeth in this; you got involved in this issue?

A   I reviewed a lot of documents.

Q   This is really something you studied, right?

A   I devoted a fair amount of time to it.

Q   And what you were pointing out here is that while there is a $5,000 net profit for a basketball game, you can make 10 times that from some of the bigger-name concerts, right?

A   That was what the data showed.

Q   And this was back in February of '06.

    To this day, you consistently believe, don't you, that KeyArena could be operated profitably without a professional basketball team playing there, recognizing that the margin of profit will vary depending upon certain variables?

A   That's correct.   I have always stated that the other variables are other venues that might be competing with KeyArena.

Q   My point is:  Today, sitting here testifying, you believe that KeyArena can be operated profitably without a professional basketball team, recognizing that the amount of the profit will vary depending on the certain variables?

A   I would say as a lone, individual city council member, that was my conclusion.

Q   You are a city council member who has been involved and spent time and researched and studied quite a bit of information and materials about this --

A   That's true.

Q   Is it your view that if you take away a sporting event from a place like KeyArena that the public that would attend that event are still going to spend those entertainment dollars somewhere else in the area?

A   Not necessarily.  It's usually referred to as discretionary income.  And the debate and the literature shows that the discretionary income could be spent somewhere else, depending on choices of people who go to a particular event.  Whether it's to a concert or museum as opposed to a sporting event.  Discretionary dollars could be spent somewhere else or not spent at all.  Certainly some portion of it is discretionary dollars that would be spent somewhere else.

        MR. KELLER:  Move to publish Mr. Licata's deposition.
    May we see page 8 at line 24.

        THE WITNESS:  Do I look at the screen?

        THE COURT:  Go ahead, Mr. Keller.

BY MR. KELLER:

Q   You were asked the question:  Isn't it your view that if you take away the football game, for example, those people are still going to spend their money someplace else in

1006

Seattle, right?

Answer:  That's the argument back and forth.  There is a technical term for it that I can't recall.

Is that your answer?

A   Yes.

Q   And that term is referred to as the transfer of disposable income, right?

A   That's correct.

Q   And this is an issue you've devoted quite a bit of time to studying, isn't it?

A   I have looked at it.

Q   And do you believe and agree with those who say that the economic impact of sporting events is probably much lower than what you would expect because people transfer and spend their disposable income elsewhere in the local economy?

A   That's why I said it went back and forth.

Generally, the side that is arguing that the presence of the team is critical to the economy will use what they call high multiplier numbers.  Those people arguing that the presence of a team is less important will use lower multiplier numbers.

Q   Let's continue and look at your answer at your deposition.

Will you look at the next question and answer.

Question:  Was that "transfer of disposable income"?

Answer:  Transfer of disposable income.  How much is

transferred, how much of it is questionable.

Do the people who generally promote publicly built stadiums managed by private companies argue that the number is very high.

There is a lot of economic data that shows its questionable and generally is probably much lower than what you would expect.

Question:  All right.  And you believe and agree with the economists who say it's much lower than some project, correct?

Your answer was:  Yes.

Right?

A    Uh-huh (affirmative).  Yes.

Q    We went on and asked you:  You held that belief for a long time?

Your answer was:  Yes.

Right?

A    Yes.

Q    And you have studied the issue quite extensively, haven't you?

A    Extensively, yes.

Q    Do you believe the Sonics have only a limited impact on Seattle?

A    I believe if you're talking about economic terms, I would say that their impact in comparison to the full picture of

our economic economy, yes, is small.

Q    Do you believe the Sonics have only a limited impact on Seattle?

A    I would say that is probably also true.

Q    Is that a belief that you have formed after studying this issue?

A    It's an opinion that I formed.  In looking at the number of studies I have looked at, a number of professional sports teams across the country, no matter where they're located, no matter what kind of sport they're playing, that overall generally professional sports teams by themselves don't necessarily account for a major influence in a city of our size.

Q    Did the City government also have its staff review the economic literature and provide input on this question of do sports teams really provide any net economic benefit?

A    Our central staff looked at some data that was presented to the mayor's advisory group.  But I don't know if -- how much it looked at other studies.

Q    Do you remember Mr. Alves?

A    Yes.

Q    Do you remember he was the staffer that gave the report to the committee about the economic --

A    Yes.

Q    Would you take a look at Exhibit No.  525.

A    Yes.

Q    Do you recognize that as the report that Mr. Alves did for the council on this issue?

A    Yes.

MR. KELLER:  I will move admission of 525.

MR. NARVER:  City objects on the grounds of hearsay and Rule 702.  This is a summary of some opinions of outside experts, but there is no expert to testify as to their validity, and it's hearsay.

MR. KELLER:  This is a City document.  It's their staff assigned to investigate it, reporting to the council.

THE COURT:  Mr. Narver, isn't that correct; this is a document generated by the City --

MR. NARVER:  Generated by the council staff, but it's summarizing the expert opinions without the experts here to testify.  It's a City document.  I'm not contesting the authenticity of it.  But opinions expressed, there is no expert here to testify to validity.

THE COURT:  Why does that make a difference?

MR. NARVER:  I believe it's prohibited under 702.

MR. KELLER:  At this point, it's an admission of a party opponent.

THE COURT:  That is what I'm trying to figure out. If it's an admission of party opponent, what is the interplay with 702?

1010

MR. NARVER:  This is summarizing expert opinions. Even if there is no hearsay problem, it's still a -- summarizing outside experts --

MR. KELLER:  I don't believe there is any 702 issue exception to it.  Admission of a party opponent.

THE COURT:  No, I don't believe there is.  I don't know that there is any reason why you need someone to explain it.  I will admit it.  525 will be admitted.

(Exhibit No. 525 admitted.)

BY MR. KELLER:

Q   I'm going to refer to the Bates number, the digits printed in the lower right-hand corner.  Can you turn to the one that has Bates number 438.

A   Page?

Q   I'm sorry.   439.

A   Yes.

Q   I want to go to the bottom line.  The bottom line under Council staff's investigation of this issue is that there is no empirical evidence showing that major league teams under stadiums and arenas are effective drivers of local and regional economies.  There is abundant evidence that they are not.

To quote two authorities in the field:  Few fields of empirical economic research offer virtual unanimity of findings, but independent work on the economic impact of

stadiums and arenas has uniformly found there is no statistically significant positive correlation between construction of a facility and economic development.

Right?

A    That's what I read.

Q    This review and this investigation was being done in conjunction with the KeyArena subcommittee task force investigation, right?

A    It was done for the council.  I don't know if it was done for the subcommittee.  It was certainly done for city council.

Q    Do you remember Initiative 91?

A    Yes, I do.

Q    What is it?

A    Pardon?

Q    What is it?

A    Initiative 91 was an initiative to the people of Seattle that was put on the ballot that proposed that any funding of a public sports facility -- may have been limited to KeyArena, I don't recall -- bring a fair return to the public investment.

Q    Did it become law?

A    Yes, it did.

Q    Does it remain law to this day?

A    Yes.  It's still law.

Q    It's an initiative that was put out for public vote, right?

A    Yes.

Q    It remains the law of this city, right?

A    That's correct.

Q    Were you active in sponsoring and supporting it?

A    I was active in supporting it.  And I'm not sure about the definition of sponsoring it.  But I certainly had input on its creation.

Q    Was it passed by the voters -- was it in November of 2006?

A    I don't recall the date, but it was passed in November.  I guess 2006.

Q    Was it in part a response to the fact that the Sonics had been sold, and the new owners were in Olympia looking for public funding for a new arena in the area?

A    I wouldn't venture a conjecture as far as what motivated people to vote.

Q    Fair enough.

How about you?

A    I would have voted for that initiative even if the team hadn't been sold.

Q    That's not what I meant.

From your perspective, was Initiative 91, the proposing of it to the voters, was it in part a response to the fact that the Sonics had been sold, and the new owners were looking for

public funding?

A    I would say that was not the primary motive, no.

I would say the primary motive was that the very principle of the initiative, which is to obtain a fair return from a public investment.

Q    Fair enough.

But maybe I have to ask a better question.

Was it in part in response to the fact that the Sonics had been sold, and the new owners were looking for public funding?

A    I would not predicate the answer on whether the team had been sold.  I would predicate it rather on whether whatever owner was seeking excessive public funding.

Q    When you put out an initiative for public vote, is there a kind of a statement where the City attorney's office has summarized what the initiative is; then somebody can submit a statement for, and then someone submits a statement against?

A    That's correct.

Q    That way the voter can see what the City's attorney's office says the law is and can see somebody who is advocating for it and see what they say, and see somebody who is against it, right?

A    That's correct.

Q    What was your role in the preparation of the statement for Initiative 91?

A   I believe I looked at it before it came in.  And the pamphlet, I didn't draw it up.  They ran it past me and I approved it.

Q   You remember I just asked you if it was in part a response to the fact that the Sonics had been inquiring about receiving public funding?

A   Yes.

Q   Exhibit No. 518 is the Initiative 91 proposal, right?

A   I'm sorry, I don't have it.  Okay.

MR. KELLER:  Move admission of 518, Your Honor.

MR. NARVER:  No objection.

THE COURT:  518 will be admitted.

(Exhibit No. 518 admitted.)

BY MR. KELLER:

Q   Let's go to the part you say you reviewed, the part that says statement 4.  Turn if you would to the third page, the top bullet point?

A   Okay.

Q   This is one of the reasons why you are urging people to vote in favor of the initiative, right?

A   Yes, that's correct.

Q   And you are telling people that a yes vote says there are more important things than a new stadium for wealthy out-of-state Sonics owners?

A   That's what it says.

1015

Q   Does that refresh your memory, Mr. Licata, that Initiative 91 in part -- I'm not trying to say primarily, exclusively, or anything -- was a reaction to the fact that the Sonics had been sold; there were no owners, and they were seeking public funding.

A   That seemed to be correct.  I thought your question was for me personally.  This was signed by more than one person. That's a compilation of a number of our views.  But that was not my particular view.  But I certainly signed off on it.

Q   And you also wanted to address some of the arguments that the Sonics then-current owners and prior owners had used this notion that we, a team, we promote economic development.

You address that in the voters' pamphlet, right?

A   Yes.

Q   Let's look four down.  It's highlighted here.

You wanted to point out to the voters that the studies were that the Sonics would have a limited impact on Seattle; that most money spent at pro sports game is discretionary and will otherwise be spent elsewhere in the region, right?

A   That's correct.

Q   Because this is the pamphlet that people are going to go out and use when they vote, you believed then and you believe now it was really important for you to try and be accurate and correct, right?

A   Yes.

Q   You believed that to be the economic state of the world then and you believe it now, don't you?

A   That's correct.

THE COURT:   Mr. Keller.

Mr. Mr. Narver are, you intending to cross-examine?

MR. NARVER:   Yes.   Not lengthy but there will be cross.

THE COURT:   About how long?

MR. NARVER:   Not long.

THE COURT:   We're going to have the witness come back.   So we'll be in session again next Thursday.

Mr. Licata, can you be here at 9:00?

THE WITNESS: I believe I can.

(Court adjourned.)

1017

C E R T I F I C A T E

     We certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


/S/ Barry L. Fanning, CCR, RMR, CRR

/S/ Nichole Rhynard, CCR, RMR, CRR