The Honorable Marsha J. Pechman

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| CITY OF SEATTLE, a first-class charter city,<br><br>Plaintiff,<br><br>v.<br><br>THE PROFESSIONAL BASKETBALL CLUB, LLC, an Oklahoma limited liability company,<br><br>Defendant. | No. C07-1620MJP<br><br>DECLARATION OF STEVEN C. MINSON IN SUPPORT OF DEFENDANT'S MOTION (i) TO EXCLUDE REBUTTAL TESTIMONY OF CEIS; OR (ii) TO COMPEL PRODUCTION OF ATTORNEY-CLIENT COMMUNICATIONS<br><br>**NOTE ON MOTION CALENDAR FOR IMMEDIATE CONSIDERATION** |

Steven C. Minson declares as follows:

I am one of the attorneys of record for defendant The Professional Basketball Club, LLC in this action. The following is true and correct and based upon my own personal knowledge:

1. Attached hereto as Exhibit 1 is a transcript of the press conference given by Paul Lawrence and Tim Ceis on June 20, 2008.

2. Attached hereto as Exhibit 2 are excerpts of the April 28, 2008, deposition of Tim Ceis.

I declare under penalty of perjury under the laws of the State of Washington that this declaration is true and correct.

DECLARATION OF STEVEN C. MINSON (C07-1620MJP) - 1

BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

| | |
|---|---|
| 1 | DATED in Seattle, Washington, this 24th day of June, 2008. |
| 2 | |
| 3 | |
| 4 | _____ |
|   | Steven C. Minson, WSBA #30974 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

DECLARATION OF STEVEN C. MINSON (C07-1620MJP) - 2

BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

# CERTIFICATE OF SERVICE

I hereby certify that on the 24th day of June, 2008, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Thomas A. Carr (thomas.carr@seattle.gov)
Gregory C. Narver (gregory.narver@seattle.gov)
Seattle City Attorney
600 Fourth Avenue, 4th Floor
P.O. Box 94769
Seattle, WA 98124-4769

Slade Gorton (slade.gorton@klgates.com)
Paul J. Lawrence (paul.lawrence@klgates.com)
Jeffrey C. Johnson (jeff.johnson@klgates.com)
Michelle Jensen (michelle.jensen@klgates.com)
K&L Gates
925 4th Avenue, Suite 2900
Seattle, WA 98104

K. Michael Fandel (mfandel@grahamdunn.com)
Graham & Dunn PC
Pier 70
2801 Alaskan Way ~ Suite 300
Seattle, WA 98121-1128

/s/ Bradley S. Keller
Bradley S. Keller, WSBA #10665
Byrnes & Keller LLP
1000 Second Avenue, 38th Floor
Seattle, WA 98104
Telephone: (206) 622-2000
Facsimile: (206) 622-2522

DECLARATION OF STEVEN C. MINSON (C07-1620MJP) - 3

BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

**EXHIBIT 1**

# Sonics Trial: Following the court case
http://blog.seattlepi.nwsource.com/sonicstrial/archives/141708.asp

## Portion of Q&A with Paul Lawrence and Tim Ceis

Here is a portion of an interview with city attorney Paul Lawrence and Deputy Mayor Tim Ceis after Day 5. There is more to come, stay tuned.

CEIS STATEMENT

Good afternoon, so I just wanted to start off by saying from the city's perspective we're very pleased about how the case is going. We were hopeful we would wrap up the testimony today but we didn't, we have to come back on Thursday so we'll be here. And Thursday I believe is closing arguments.

But we're very, very pleased with how the case has gone as of today and we're looking forward to having a good conclusion. So with that I think Paul and I will take any questions about what went on today.

Q. Do you agree with Sen. Gorton's assessment that failing to win a KeyArena renovation undercuts your "specific performance" argument?

A. Lawrence: No. Our position is the "specific performance" case is based on the terms of the contract. Whether the Seattle Sonics are a unique tenant and whether they bring benefits to the city over and beyond the rent that are measure, that's the "specific performance" case and that has nothing to do with what Sen. Gorton said.

Q. Do you know what Sen. Gorton was basing that opinion on?

A. Lawrence: You'll have to ask Sen. Gorton.

Q. Did the city have unclean hands in suing the Sonics for the "specific performance" lease?

A. Lawrence: Absolutely not. What you saw in the testimony today was a testimony from Wally Walker, a member of the 1979 championship team, a long-time Seattle resident, active in the community and with the basketball team. He as a citizen wanted to keep the Sonics here and worked towards that effort. And I think there's been a lot of arguments by counsel trying to put 2 and 3 together to make 4 but it doesn't add up because there is simply no evidence of any sort of plan, as they look at.

I think if you look at the document they point to so often, you'll see that it clearly does not involve the city. It anticipates later on in an effort to keep the Sonics in Seattle but there's nothing that suggests that plan involves the city at its inception. Of course this all happen after Clay Bennett announced very clearly his intent to leave Seattle for Oklahoma City.

Q. But didn't it happen after the city hired Slade Gorton as its attorney?

A. No. It didn't happen. As the testimony that came up today dates back to July 2006 before K&L Gates was approached. Sen. Gorton, prior to being retained by the city, was independently working to find a solution. And as you heard today, what he was working on originally was a Bellevue arena which is not in the interest of the city of Seattle as a solution for the Sonics.

Q. If you had do-overs and you were giving advice to them on their PowerPoint, would you advise them not to use their "Poison Well" quote on their cover of their PowerPoint?

A. Lawrence: nI think if Mr. (Mike) McGavick who wrote that would have to address that to his own attorneys. Again, the city had nothing to do with that so it's not our place to say what he should or shouldn't have said.

Q. What would you have done? Would you advise them not to do that?

A. Lawrence: I don't give advice. He doesn't ask me for advice and again we were not engaged in that effort to convince a prospective owner to come to Seattle and act to provide an alternative to a team leaving.

Q. When was it that Sen. Gorton retained by the city?

A. Lawrence: The K&L Gates firm was retained a couple of days after the arbitration was filed. I remembering called in on Friday and working all weekend to get a complaint filed on Monday and the arbitration date was the 19th, which I believe was a Wednesday.

Q. What is Gates' history with the city of Seattle as far as representing with various other litigations?

A. Ceis: We don't have an ongoing retainer with them on litigation issues. They act for us on various capacities as bond counsel case, on other legal matters but it's on a case-by-case basis.

Q. You said K&L Gates was retained in September and the meeting at Mr. Walker's house was in October, so who was Mr. Gordon representing?

A. Lawrence: Mr. Gorton represented himself. When we (K&L Gates) were retained, we indicated to the city that prior to that date Sen. Gorton and Gerry Johnson were working to find prospective ownership and alternative solutions to losing the team. That was disclosed to the city. It was reflected in the retention agreement with K&L Gates that there was work being done by Sen. Gorton and Gerry Johnson ongoing at the time that we were being retained on the litigation.

Q. Johnson is working on this case, right?

A. Lawrence: No you are not familiar. There are two Johnsons. Attorney Jeff Johnson is a litigation attorney who is working on this case. Gerry Johnson does not do litigation.

Q. In hindsight, knowing that Mr. Gorton was trying to keep long-term basketball here, was he the best choice for counsel?

A. Ceis: As Paul said the representation agreement, they disclosed the work that Sen. Gorton and Gerry Johnson were doing and the city didn't see any conflict in that work. They were pursuing long-term tenant for the KeyArena, basketball and that's what they were working on. That was our interest, too, is to have short-term and long-term tenancy of the National Basketball Association in KeyArena. So there were no conflicts there.

And given Sen. Gorton's long history in professional sports in this city going back to the Pilots and bringing Major League Baseball back to Seattle, helping to save the Seahawks in Seattle, it was an obvious choice to have for us to have him on board.

Posted by **gary washburn** at June 20, 2008 5:47 p.m.

· Return to Portion of Q&A with Paul Lawrence and Tim Ceis

# Sonics Trial: Following the court case
http://blog.seattlepi.nwsource.com/sonicstrial/archives/141711.asp

## Lawrence and Ceis Part II

Q. Didn't Mr. Griffin acknowledge on the stand that the only one able to inflict "bleeding" on the owners that would cause them to call would be the city?

A. Lawrence: What Mr. Griffin stated that in terms of legal action, that they city would be the entity enforcing its lease, which it has the legal right to do. It says in the lease that either party has the right to specifically enforce the lease. The city has made that clear going back to July of 2006, well before anything that was discussed in the courtroom today, that they would specially enforce this lease against Clay Bennett or any other owner because that's what their bargained for and the city wants the full benefit of its bargain.

The city's decision to enforce this lease was announced to Mr. Bennett Day One when he purchased the team in July 2006, long before any events you heard about today.

Q. Wally Walker kept saying he was not a consultant with the city until Jan. or Feb. 2008 yet Bennett's lawyer accepted a letter from Sept. 19, 2007 that he was a consultant and that never got resolved. Why?

A. Lawrence: I think that's a pretty simple explanation. He signed the letter at the end of January or February but the letter reflected that he had been providing advice as he testified with respect to economics and the NBA process with respect to the approval of a renovated KeyArena going back to September.

Q. You said there was no conflict in hiring Slade Gorton? But doesn't that cut directly to a direct conflict because he saw the only way to keep a team here was to force a sell?

A. Ceis: (Gorton and Johnson) disclosed they were doing that work. They didn't give us any details about it. We were not engaged in that work. All we were engaged with in K&L Gates was litigation, the work that Sen. Gorton was going in terms of talking to (prospective) owners was something we were not involved in.

Q. Were you worried about a perception of there being a conflict of interest?

A. Ceis: Again our interest was ensuring we had a tenant in KeyArena and we wanted basketball as a tenant. So again, we saw no conflict.

Q. Was K&L Gates actually aware of Gorton and Johnson working with potential new ownership?

A. Lawrence: The people who work on the litigation for the city for K&L Gates had nothing to do and were not aware of the PowerPoint. I think as it came out today Sen. Gorton and Gerry Johnson in connection with the matters they told the city about that they were acting on separately were the K&L Gates people involved with PowerPoint.

Q. When did the K&L Gates people aware of PowerPoint?

A. Lawrence. Mr. Gorton and Mr. Johnson were aware of it at some point around the meeting time.

Q. And when did you find out?

A. Lawrence: I can't remember when it came out in terms of a discovery request from the... it came out in the discovery request direct either Mr. Griffin or Mr. Walker or Mr. Stanton, I can't remember.

Q. Can you explain how a bulk of Wally Walker e-mails arrived on Monday?

A. Lawrence: You'll have to probably address that to Mr. Walker's attorney as best as I understand it. Mr. Walker, in response to his attorney's request, went back and checked and apparently and he apparently had

not checked his "sent mail" files until a couple of days ago. So Mr. Walker's attorney, trying to make sure the production was complete, went back asked Mr. Walker if he had checked X, Y, Z files and apparently the "sent mail" file had not been checked.

Q. Paul you said you have shown no link between the city and attempting to get Bennett to sell? What is the need for Mr. Ceis to testify?

A. Lawrence: To make the point that he made here and I was talking about, at the point of the retention of K&L Gates by the city, it was disclosed to the city that Sen. Gorton and Gerry Johnson had previously and on a ongoing basis had a continuing effort to try to find a prospective owner. And to establish that Mr. Ceis and nobody at the city had an awareness of the PowerPoint presentation.

Q. Deputy Mayor when is the last time you had substantial talks with Clay Bennett?

A. Ceis: The last discussions I had with Mr. Bennett's representatives were in New York City in October.

Posted by **gary washburn** at June 20, 2008 6:20 p.m.

· Return to Lawrence and Ceis Part II

4

# Sonics Trial: Following the court case
http://blog.seattlepi.nwsource.com/sonicstrial/archives/141716.asp

## Ceis and Lawrence Part III

Q. What happened at that meeting with the NBA and Bennett in October in New York?

A. Ceis: We went back to see the NBA about KeyArena, to discuss the renovation of KeyArena with them and we showed them the design and cost estimates for it. So it was to put KeyArena back on the table as a venue for basketball, to keep basketball in Seattle.

Q. And did they reach any conclusions about your presentation?

A. Ceis: Well as you can tell we are in a continuing process with that right now, so you can reach your own conclusion on the outcome of that meeting.

Q. Mr. Ceis, does the city have clean hands?

A. Lawrence: I think saying anything more, you'll have to come back for Part VI to hear.

Q. Mr. Lawrence, what happened in the morning session during the Walker testimony when you mentioned the word "appeal?" Does that mean you think you are going to lose the case?

A. Lawrence: I think it only caused a stir because with all due respect to you guys (media), you probably haven't covered too many trials. From Day One, Judge Pechman realized that this case could go up on appeal. For each party to preserve their rights on appeal, there are some very technical things you need to do in terms to objections to evidence. If you don't make (them) you waive your rights and then not simply because a judge has ruled once on a piece of evidence if you don't make the objection on a continuing basis to that line of evidence, then you may lose your rights to appeal.

My job, among other things, is to make sure the record is complete and in the case there is an appeal, whether the PBC appeal, the Sonics appeal or both sides appealing. Part of my job to do it right is to make sure the record is correct.

Q. Deputy Mayor Ceis, did you call KeyArena one of the finest basketball arenas in the country during a dinner with Clay Bennett?

A. Ceis: Yes I remember that comment to Mr. Bennett, yes. And I was referring to a fan's survey that was done in about 1998 where the fans around the NBA said KeyArena was the best place to watch basketball in the country.

Q. Why would Gorton suggest the failure to win the KeyArena renovation hurts the city's "specific performance" clause?

A. Lawrence: We don't believe that it has anything to do with the case. You have heard PBC make the argument of "why bother? there's no point." And I don't like to speculate what Sen. Gorton was thinking about. But that argument is being made by PBC and if there had been a funding proposal approved, PBC wouldn't be making that argument. Regardless, we don't think that's relevant but we've heard PBC make that argument during the trial.

Q. Mr. Lawrence, what are your plans over the next five days?

A. Lawrence: Catching up on my sleep. But principally, there are two things we are going to be focused on. One we have to prepare for the court, proposed finding of fact and inclusions of law, which is essentially looking through the evidence that's been presented and putting them in a form of finding that are facts that have been supported by the testimony to date and setting forth our legal arguments in the form of conclusions of law we hope the court will adopt and probably more than that drafting our closing argument

Thursday before the judge.

Posted by **gary washburn** at June 20, 2008 6:46 p.m.

· Return to Ceis and Lawrence Part III

6

**EXHIBIT 2**

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

THE CITY OF SEATTLE, a               )
first-class charter city,            )
                                     )
            Plaintiff,               )
                                     )
                                     )
    vs.                              ) No. C07-1620 MJP
                                     )
THE PROFESSIONAL BASKETBALL          )
CLUB, LLC, an Oklahoma limited       )
liability company,                   )
                                     )
            Defendant.               )

Excerpt of Deposition Upon Oral Examination

of

TIM CEIS

Taken at 1000 Second Avenue, Suite 3800
Seattle, Washington

DATE:   April 28, 2008

REPORTED BY:   Brigid M. Donovan, RPR, CCR
   CCR NO.:    2070

STARKOVICH REPORTING SERVICES
(206) 323-0919

Page 14

1  insert and talk back and forth, but let's get to that.
2  Q  You wrote that you discussed the Key Arena
3  with Joel Litvin at the NBA?
4  A  I didn't write that. That appears that Brian
5  Robinson wrote that to me.
6  Q  Okay.
7  A  Alls I wrote was we were working on updated
8  revenue projections above that.
9  Q  And who is the consultant you were working
10 with?
11 A  I'm sorry. I don't recall the name of that
12 consultant.
13 Q  Can you describe him?
14 A  Yeah. It was a consultant that we hired off a
15 group of consultants that had NBA experience and were
16 recognized by the NBA as experts in coming up with
17 revenue projections for facilities such as Key Arena.
18 Q  Were they from the East Coast, West Coast,
19 north, south?
20 A  East Coast firm.
21 Q  New York, Boston, Atlanta?
22 A  I don't recall the name of the firm,
23 Counselor. I am sure it's in the record.
24 Q  Have you been working with them directly or
25 somebody else?

Page 15

1  A  No. That work had been done directly through
2  Seattle Center, Robert Nellams.
3  Q  Are you aware that K&L Gates has been
4  representing the Griffin buyers group in the course of
5  this episode?
6  A  I was told that at some point.
7  Q  When did you learn that?
8  A  I would say the very early part of this year,
9  2008.
10 Q  And who did you learn it from?
11 A  Gerry Johnson.
12 Q  And did you approve of the city's law firm
13 representing a potential buyer?
14 A  I raised no objections.
15 Q  Okay. Are you the point man for the mayor's
16 office in this endeavorer to save the Sonics?
17 A  Yes.
18 Q  When you say you raised no objections, what
19 were you told about what K&L Gates was going to do for
20 the Griffin group?
21    MR. NARVER: Object to the form. And I
22 just want to be sure the witness is aware that
23 communications with his attorneys in their capacity as
24 attorneys for the city of Seattle are protected. The
25 disclosure of representation on behalf the buyers'

Page 16

1  group, you can answer limited to that. But be careful
2  you don't go into areas where the substance of
3  attorney/client communications relating to K&L Gates'
4  representation of the city in this lawsuit is indicated.
5  Q  If you understand that, go ahead.
6  A  Yeah. Yeah. I am working through that right
7  now. Thank you.
8  Q  It's a mouthful.
9  A  It was disclosed to me that Mr. Griffin and
10 his partners were represented by K&L Gates and would be
11 working with them on the potential future relationship
12 with the city of Seattle, if they were successful in
13 acquiring a team, and would be working with them on
14 negotiating the terms of a business relationship with
15 the city.
16 Q  So you understood then that K&L Gates would be
17 negotiating on behalf of the Griffin group with the
18 city?
19 A  At some point.
20 Q  Okay. And likewise, at other times K&L Gates
21 would be negotiating for the city with the Griffin
22 group?
23    MR. NARVER: Object to the form.
24 Mischaracterizes his testimony.
25 A  We were not using K&L Gates to negotiate with

Page 17

1  the Griffin group.
2  Q  How do you know that?
3  A  Because I was involved in discussions with
4  Mr. Griffin.
5  Q  On this issue?
6  A  Yes.
7  Q  Tell me about those discussions.
8     MR. NARVER: Object to the form. I am
9  sorry. By this issue you mean the -- what do you mean
10 by this issue?
11 Q  Discussions with Mr. Griffin on the issue of
12 whether the city would be representing K&L -- whether
13 K&L Gates would be representing the city in the
14 negotiating with Griffin.
15    MR. NARVER: In negotiations between the
16 city and Griffin?
17    MR. TAYLOR: Yes.
18 A  Can you restate the question, please?
19 Q  Tell me the discussions you had with
20 Mr. Griffin about whether K&L Gates would be
21 representing the city in negotiating with Griffin?
22 A  I didn't have a conversation about his
23 representation with Mr. Griffin.
24    MR. TAYLOR: Can I have his last answer
25 read back?

Page 18

1             (The previous answer was
2              read.)
3    Q   Those are the discussions I am getting at,
4  your discussions with Mr. Griffin about the role of K&L
5  Gates.
6    A   I am sorry. Perhaps you didn't understand my
7  answer. I was talking, referring to discussions about
8  K&L Gates' representation of Mr. Griffin. I was not
9  talking about substantive issues related to the lease.
10   Q   I understand that. But whatever it was that
11 you and Mr. Griffin discussed regarding the role of K&L
12 Gates.
13   A   Oh, I see. Counselor, thank you. Now I
14 understand. I did not discuss the role of K&L Gates
15 with Mr. Griffin; I discussed it with Mr. Johnson.
16   Q   Did you ever talk with anybody from the
17 Griffin group about the role of K&L Gates?
18   A   I do not believe so.
19   Q   Did you understand that K&L Gates would be
20 disclosing the substance of meetings it had with you to
21 the Griffin group?
22   A   I assumed and continue to assume that I have
23 attorney/client privilege with K&L Gates as appropriate.
24   Q   I appreciate that. My question was slightly
25 different. Did you understand that K&L Gates would be

Page 19

1  disclosing to the Griffin group the substance of
2  meetings it had with you?
3           MR. NARVER: Object to the form. Asked
4  and answered.
5    A   I don't believe that there was a conversation
6  directly on point with that. Again, I was relying on
7  the fact that I had a attorney/client privilege with
8  K&L Gates on appropriate matters.
9    Q   Let me rephrase it then. Fair to say then you
10 did not understand that K&L Gates would be disclosing to
11 Griffin the substance of meetings it had with you?
12          MR. NARVER: Object to the form.
13   A   I would answer that I didn't understand nor
14 did I have an understanding that that would be the case.
15 Again, I was relying on attorney/client privilege and my
16 understanding of that relationship. And so that
17 question never directly came up.
18   Q   Did anybody at K&L Gates ever tell you they
19 were going to disclose to the Griffin group the
20 substance of conversations it had with you?
21   A   Not that I recall.
22   Q   Okay. Does it surprise you to know or to
23 learn that they were doing that?
24          MR. NARVER: Object to the form.
25   A   I don't have a comment on that because I don't

Page 20

1  know and I've not seen any information to that regard.
2    Q   And how about Wally Walker, is he advising the
3  city on this or the Griffin group or where does he fit
4  in on this?
5    A   Wally Walker has been advising the city
6  beginning sometime last fall, the fall of '07, early
7  fall.
8    Q   Who arranged that? Was that through you?
9    A   Wally did contact me and I asked him for some
10 assistance in these matters and he volunteered that he
11 would help, yes.
12   Q   But why did you contact him?
13   A   He contacted me.
14   Q   What did he say?
15          MR. NARVER: I am going to object to the
16 form that -- and instruct that from the time he is
17 retained as a consultant forward we are asserting
18 privilege as to those communications to the extent they
19 involved attorney/client involvement as well. But when
20 Mr. Walker first contacted you, before he was retained
21 as a consultant, you can testify as to those
22 conversations.
23          THE WITNESS: Okay.
24   Q   What did he say?
25   A   Mr. Walker said that he was available to help

Page 21

1  in our efforts to enforce the lease and that he'd be
2  willing to provide those services to us.
3    Q   Was there a discussion of price or was he just
4  being a good citizen?
5    A   There was no discussion of price. I believe
6  he was offering those services pro bono.
7    Q   Did he tell you whether he was working with
8  any group of potential buyers at that time?
9    A   He did not.
10   Q   How long did that first conversation last?
11   A   It was probably a 15-minute phone call at
12 most.
13   Q   Did you subsequently have a meeting with him?
14   A   Yes.
15   Q   And when did that meeting occur?
16   A   I do not recall the exact date. It would have
17 been early in the fall and it would have been in the
18 offices of K&L Gates.
19   Q   Who was at the meeting?
20   A   That would have been Mr. Johnson, Mr. Nellams,
21 myself, and Mr. Gordon.
22   Q   Had Walker been retained as a consultant by
23 the city by the time of this meeting?
24   A   I had instructed K&L Gates that he was
25 offering his services to us pro bono to work on this

Page 22

1  with us and I instructed them to contact him.
2     Q    What happened at this meeting?
3          MR. NARVER: Object to the form and
4  instruct the witness not to answer on the grounds of
5  privilege.
6          (Exhibit 402 marked for
7              identification.)
8     Q    I'm going to ask you some questions about the
9  bottom email there from Slade to Griffin, et al.
10    A    Sure.
11    Q    Do you know what my first question is going to
12 be?
13    A    I'm afraid I do, yes.
14    Q    Did he really bring the ████████?
15    A    No, he did not. Well, Slade did actually
16 bring them to the meeting with the mayor.
17         MR. NARVER: While I appreciate that
18 question and answer...
19         MR. TAYLOR: It's not legal advice.
20         MR. NARVER: That's true.
21         MR. TAYLOR: Or maybe it was.
22         MR. NARVER: I am going to continue to
23 assert privilege as to meetings between city
24 representatives and attorneys of -- you may have been an
25 issue on arguing waiver at some point, but no evidence

Page 23

1  that any representative of the city has waived that
2  privilege. So I am going to continue to assert
3  privilege as to meetings between city and their counsel
4  and instruct the witness not to answer questions about
5  the substance of those meetings.
6          MR. TAYLOR: Last time we had this
7  discussion off the record -- today we will have it on
8  the record -- would you state, please, the
9  attorney/client privilege relationship between K&L
10 Gates, the Griffin group, and the city of Seattle, so we
11 know what position the city is asserting so we can seek
12 appropriate relief with the court.
13         MR. NARVER: I am here as a
14 representative of the city and I can state there is an
15 attorney/client privilege between the city of Seattle
16 and K&L Gates with respect to this lawsuit that we're
17 here today. I am not the right person to ask about the
18 relationship between K&L Gates and the Griffin group.
19 You, I know, are taking the deposition of Matt Griffin
20 later this week. I think he would be an appropriate
21 person to ask about that. But here today on the record
22 with Mr. Ceis I am going to assert the attorney/client
23 privilege with K&L Gates and the city.
24         MR. TAYLOR: I want it clear, Greg, that
25 if the city has an understanding with K&L Gates about

Page 24

1  what communications it can and cannot have with Griffin
2  about city privileged matters, it is your obligation to
3  state it on the record now. If it later turns out that
4  there is such an agreement and you knew about it, we
5  will be seeking appropriate relief against the city
6  attorney's office. There is obviously something in
7  place which allows Slade Gordon to disclose privileged
8  matters from the city to his other clients. We are
9  entitled to know that agreement. We are entitled to
10 know it now, if you know it. If you don't know what the
11 deal is, that's fine.
12         MR. NARVER: I do not have anything to
13 disclose in response to your question there. I am here
14 representing Mr. Ceis and I am continuing to make
15 that --
16         MR. TAYLOR: We are facing a shell game
17 here. Who does know?
18         MR. NARVER: You are deposing Mr. Griffin
19 later this week. I think he would be the person to ask.
20         MR. TAYLOR: Are you saying that nobody
21 at the city knows the circumstances of when K&L Gates
22 can or cannot disclose city confidences to the Griffin
23 group.
24         MR. NARVER: I am telling you what I know
25 here on the record, Paul. I am not hiding anything from

Page 25

1  you.
2          MR. TAYLOR: Okay.
3          MR. NARVER: I am absolutely not.
4          MR. TAYLOR: Is it Carr who arranged this
5  or who set up this deal?
6          MR. NARVER: I only know about the city's
7  retaining K&L Gates to represent us in this lawsuit. I
8  know when that happened and I know that that's the
9  arrangement we are working under. I know that at the
10 time there was a disclosure made to the city of other
11 relationships as well so that appropriate -- it could be
12 appropriate waiver of possible conflicts. Beyond that I
13 don't have -- I don't know.
14         MR. TAYLOR: Okay. Can you commit to us
15 to find out if there is such an issue -- if there is
16 such an agreement, because obviously there is going to
17 be some major issues as far as K&L Gates as far the
18 attorney/client privilege.
19         MR. NARVER: You have already made that
20 clear and you made that clear in prior depositions. And
21 we can -- yes, you are entitled to know that
22 arrangement. I don't know it here today and it's not
23 affecting any of my instructions to Mr. Ceis.
24         MR. TAYLOR: Okay. Maybe during a break
25 you can call Mr. Carr and find out if he's aware of such

| Page 26 | Page 28 |
|---|---|
| 1  an agreement so we don't have to repeat this deposition<br>2  at some future point.<br>3     Q   Let me ask you: Exhibit 402, you've had a<br>4  chance to read it. Senator Gordon reports that on<br>5  January 28th he met with you and Mr. Nickels -- Mayor<br>6  Nickels. Do you see that?<br>7     A   Yes.<br>8     Q   Was there such a meeting?<br>9     A   Yes.<br>10    Q   Who was present other than you, Gordon, and<br>11 the mayor?<br>12    A   That was the whole meeting was those three<br>13 attendees.<br>14    Q   Okay. Senator Gordon discloses in this email,<br>15 he began by emphasizing that the outcome of the city's<br>16 lawsuit to enforce the Sonic's lease would be<br>17 significantly affected by whether we had a credible<br>18 local purchaser or purchasers. Do you see that?<br>19    A   Yes.<br>20    Q   Did he begin the meeting by so emphasizing?<br>21       MR. NARVER: Object to the form.<br>22 Instruct the witness not to answer.<br>23    Q   Did you know that Senator Gordon was going to<br>24 disclose the results of this meeting to Mr. Griffin and<br>25 his group? | 1     A   By January 29th we were attempting to increase<br>2  our chances of success in the legislature to finance a<br>3  renovation of Key Arena. There were discussions that<br>4  local ownership may be of benefit in that legislative<br>5  strategy.<br>6     Q   What was Mike McGavick's role in all of this?<br>7     A   Mike McGavick, as I recall, attended one<br>8  meeting and had some discussions with us about his<br>9  willingness to help.<br>10    Q   So you were at a meeting with McGavick?<br>11    A   Yes.<br>12    Q   Who else was present?<br>13    A   Wally Walker, Gerry Johnson, Slade Gordon, and<br>14 Robert Nellams.<br>15    Q   Where did the meeting take place?<br>16    A   The offices of K&L Gates.<br>17    Q   Mr. McGavick was not retained by the city as a<br>18 consultant or advisor, was he?<br>19    A   I did not directly retain him, no.<br>20    Q   Tell me what happened at this meeting.<br>21    A   We had discussions about issues related to the<br>22 legislative strategy to obtain funding for a renovated<br>23 Key Arena.<br>24    Q   When was this meeting?<br>25    A   I would have to -- if I recall correctly it |
| Page 27 | Page 29 |
| 1        MR. NARVER: Object to the form and<br>2  instruct the witness not to disclose the substance of<br>3  any communications with counsel.<br>4        MR. TAYLOR: If Senator Gordon told him<br>5  that he was going to be telling Griffin about this<br>6  group, I am entitled to question him about this meeting.<br>7  Let's take it a step at a time.<br>8        MR. NARVER: Take it one step at a time.<br>9  I think you are jumping too far.<br>10    Q   Did Mr. Gordon disclose to you at this meeting<br>11 that he was going to be telling Griffin at all about<br>12 what happened at the meeting?<br>13       MR. NARVER: You can answer that question<br>14 yes or no.<br>15    A   No.<br>16    Q   Did you know that Senator Gordon was in<br>17 contact about these matters with Griffin?<br>18       MR. NARVER: That one I am going to<br>19 instruct you not to answer.<br>20    Q   Let me ask you: As of January 29th, did you<br>21 believe that the lawsuit to enforce the lease would be<br>22 significantly affected whether or not you had a credible<br>23 local purchaser?<br>24       MR. NARVER: Object to the form. Calls<br>25 for legal conclusion. You can answer that. | 1  was either in early to mid December.<br>2     Q   Why was McGavick involved?<br>3        MR. NARVER: Object to the form. Calls<br>4  for speculation.<br>5     A   As I recall he is a friend of Mr. Walker, and<br>6  Mr. Walker believed he had some insights into the<br>7  attitudes of Republican members of the legislature about<br>8  Key Arena and the city of Seattle.<br>9     Q   Tell me as best you can everything that was<br>10 discussed at this meeting.<br>11       MR. NARVER: The McGavick present<br>12 meeting?<br>13       MR. TAYLOR: Yes.<br>14    A   We discussed matters related to our pursuing<br>15 funding for a renovation of Key Arena with the<br>16 legislature. We discussed Mr. McGavick's perceptions<br>17 about that, as well as other people in the room,<br>18 obviously, expressed their ideas. That's all I recall<br>19 of that meeting.<br>20    Q   And what was the thinking about what you were<br>21 going to ask for from the legislature at this point in<br>22 time?<br>23    A   At this time we were asking the legislature<br>24 for a funding bill that would provide a revenue stream<br>25 that could support up to $150 million to pay towards a |

## Page 38

1  the meeting in detail to McGavick, Ballmer, and Walker?
2      MR. NARVER: Objection. It does call for
3  a legal conclusion.
4   Q  Go ahead and answer.
5   A  I don't think it was in keeping with the
6  confidentiality agreement.
7   Q  Have you had any discussions with Senator
8  Gordon about that?
9      MR. NARVER: Object to the form and
10 instruct the witness not to disclose the content of
11 attorney/client communications.
12  Q  Let's go through this. First of all, did you
13 know Ballmer was involved by mid October of '97?
14  A  No, I did not.
15  Q  When did you first learn of Ballmer's
16 involvement?
17  A  That would have been in early February.
18  Q  Did you know that Gordon was working with a
19 group of potential investors in mid October?
20     MR. NARVER: Object to the form.
21 Foundation.
22  A  I knew that Mr. Gordon was having
23 conversations with parties that were possible investors,
24 yes.
25  Q  How did you know that.

## Page 39

1   A  He told me that.
2      MR. NARVER: Object to the form and
3  instruct the witness not to disclose anything further.
4      THE WITNESS: Sorry.
5      MR. NARVER: That's all right.
6   Q  Okay. Tim and Robert with occasional
7  interjections on my part presented a PowerPoint on Key
8  Arena, total 2008 estimated cost, 260 million. Do you
9  see that?
10  A  It's on?
11  Q  Last paragraph there on the first page.
12  A  Yes.
13  Q  Okay. Is that the number you gave to the NBA
14 that day, 260 million?
15     MR. NARVER: I want to clarify something.
16 Obviously, you've pointed out there was a
17 confidentiality agreement. Your clients were parties to
18 it. The city was party to it as well. I assumed we
19 were all operating under the assumption that testifying
20 about it here today doesn't breach that -- as you know,
21 under the terms of the protective order, deposition
22 transcripts are designated confidential for at least 14
23 days and then I assume at that point we can determine
24 whether or not a designation of this portion of the
25 testimony needs to be kept confidential.

## Page 40

1      MR. TAYLOR: That's fine. His testimony
2  doesn't amount to a waiver one way or the other on this.
3  It's independent of whether Slade's communication --
4      MR. NARVER: I understand your point.
5      MR. TAYLOR: Set the city up.
6   Q  Is that the number you used with the NBA,
7  260 million?
8   A  Yes.
9   Q  Why did you use that number?
10  A  That was, at that time, the precise
11 architectural estimate for the renovation that we
12 presented to the NBA.
13  Q  And where did you get that number from?
14  A  There was -- there were a series of numbers
15 based on year of construction starts and inflation. And
16 so I believe that was a number that was a point in time
17 on those estimates, if I recall correctly.
18  Q  I want you to take a look at Exhibit 3 and
19 look at the very last page.
20  A  Yes.
21  Q  The last page of Exhibit 3, are those the
22 numbers you are referring to?
23  A  Yes.
24  Q  Okay. You knew when you were with the NBA on
25 October 16th of 2007 that there is no way it would have

## Page 41

1  been possible to start construction in 2008, right?
2   A  Yes.
3   Q  Okay. Given that you knew that, why did you
4  give them the $260 million number for 2008?
5   A  I believe we disclosed to them that it was in
6  2008 dollars.
7   Q  Understood. Why did you do that as opposed
8  to, for example, if you started in '10, 314,000?
9   A  Million.
10  Q  Million. If we could get it down to 314,000
11 we wouldn't --
12     MR. NARVER: We wouldn't be sitting here.
13  Q  If you work that magic you can be mayor.
14  A  I could be something greater than mayor.
15  Q  Careful what you wish for.
16  A  NBA commissioner.
17     In my experience in construction projects,
18 when you are discussing costs you always pick a
19 reference point. Sometimes it is in today's dollars and
20 sometimes it's year of expenditure dollars. And for
21 this presentation and meeting we chose to use today's
22 dollars as the reference point. But fully disclosing,
23 because we gave this information to them, that depending
24 on the start date the estimates changed.
25  Q  Exhibit 3, this is the presentation you gave

CEIS

CERTIFICATE

STATE OF WASHINGTON )
                    ) SS.
COUNTY OF KING      )

   I, the undersigned officer of the Court, under my commission as a Notary Public in and for the State of Washington, hereby certify that the foregoing deposition upon oral examination of the witness named herein was taken stenographically before me and thereafter transcribed under my direction;
   That the witness before examination was first duly sworn by me to testify truthfully; that the transcript of the deposition is a full, true and correct transcript of the testimony, including questions and answers and all objections, motions, and exceptions of counsel made and taken at the time of the foregoing examination;
   That I am neither attorney for, nor a relative or employee of any of the parties to the action; further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially interested in its outcome.

   IN WITNESS WHEREOF, I have hereunto set my hand and seal this 8th day of May, 2008.

   _____

   Brigid M. Donovan
   NOTARY PUBLIC in and for
   the State of Washington,
   residing at Federal Way.
   My commission expires
   December 19, 2008.

      STARKOVICH REPORTING SERVICES
             (206) 323-0919

                STARKOVICH
            REPORTING SERVICES
              P.O. BOX 22884
          SEATTLE, WASHINGTON 98122
              (206) 323-0919
            FAX (206) 328-0632

            May 8, 2008
To:  Gregory C. Narver
     City Attorney's Office
     600 Fourth Avenue, 4th Floor
     P.O. Box 94769
     Seattle, Washington 98124-4769
Re: The City of Seattle v The Professional Basketball Club
Deposition of:  TIM CEIS
Date Taken:  April 28, 2008
Cause No.:  C07-1620 MJP

Enclosed are two forms: "Affidavit" and a "Correction Sheet." Instruct the deponent to review the deposition, record any corrections over his signature on the Correction Sheet, and sign the Affidavit before a Notary Public. If there are corrections, please furnish other counsel with copies. Return both forms to this office for their inclusion in the original transcript. The transcript will be forwarded to the appropriate party
_____.

Thank you for your assistance in obtaining signature.

By: Brigid M. Donovan, RPR, CCR

cc: Paul Taylor

      STARKOVICH REPORTING SERVICES
             (206) 323-0919