City of Seattle v. Professional Basketball Club LLC

Doc. 129

The Honorable Marsha J. Pechman

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| CITY OF SEATTLE, a first-class charter city,<br><br>Plaintiff,<br><br>v.<br><br>THE PROFESSIONAL BASKETBALL CLUB, LLC, an Oklahoma limited liability company,<br><br>Defendant. | No. C07-1620MJP |

# DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW



BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

Dockets.Justia.com

# I. FINDINGS OF FACT[1]

## A. The Parties and the Lease

The Professional Basketball Club ("PBC") is a limited liability corporation and a resident of the State of Oklahoma. The City of Seattle is a resident of the State of Washington. The City and the PBC are parties to a lease. Ex. 600. The City is the landlord; the PBC is the tenant. By its terms, the lease expires on September 30, 2010.

## B. The Threshold Issue: All of the City's Claimed Losses Are Quantifiable and Can Be Calculated with Reasonable Certainty.

The threshold question under specific performance is whether a party has an adequate remedy at law—i.e., whether a party's claimed losses from nonperformance are quantifiable and can be calculated with reasonable certainty. Here, the City claims injuries consisting of: (i) base rent and other payments due under the lease; and (ii) items not provided for in the express provisions of the lease consisting of (a) "economic benefit" to the community at large generated by the Sonics, and (b) claimed "intangible benefits" to the community resulting from the Sonics' presence in the community. The Court is not deciding in this case whether the "economic" and "intangible" benefits are compensable or legally cognizable damages for nonperformance of the home game provision of the lease. However, to the extent they are cognizable, all of these amounts are quantifiable and can be calculated with reasonable certainty.

The amounts owed under the lease by the PBC for the two remaining seasons can be calculated with reasonable certainty. The payments due under the lease are broken into two categories. Ex. 600. The first consists of fixed pre-season and quarterly rental payments. Id. at 0223. These are fixed amounts which are subject to annual set increases. Id. The second is a variable component consisting of a percentage of various revenue streams, including suite leases, club seat sales, and concessions. Id. at 0225-227.

---

[1] All Findings of Fact that are more appropriately characterized as Conclusions of Law are so deemed, and vice versa.



BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

The evidence showed at least two ways to calculate the amounts due for the remainder of the lease term. The first is based on the average of the rental payments for the 05/06 and 06/07 seasons, reduced by the percentage decline in revenues in the 07/08 season. Verbatim Report of Proceedings ("Tr.") 585-86. The second is based on comparable attendance declines for "lame-duck" sports franchises, i.e., those publicly known to be leaving for a different city. That percentage decline is applied against the PBC's performance in a base year of 2005-2006. The rent is calculated based on the resulting projected performance figures. Tr. 586.

The parties' expert economists disagreed about whether the Sonics generate a net tangible economic benefit for the community at large. Compare Tr. 618 (Sonics generate average economic activity of approximately $187 million per year) versus Tr. 723-26 (Sonics' departure from Seattle would have no net economic impact). The City presented testimony that the economic impact of the Sonics can be measured using the so-called "RIMS-II" analysis. Tr. 617, 657.

Because the Court is sitting in equity, and there is no claim for damages, the Court need not make a finding as to the amount, if any, of the tangible economic benefit the Sonics provide to the community at large. The Court also need not decide if such amounts are legally cognizable as damages. The Court does, however, find that if and to the extent there is a tangible economic benefit, it can be determined with reasonable certainty. With regard to the potential intangible economic benefits the Sonics provide to the community, it is also possible to calculate a dollar value with reasonable certainty. For example, "Contingent Valuation Methodology" ("CVM") is an economic methodology by which citizens are surveyed about how much they would be willing to pay to keep a particular team in their city. Tr. 387-88. Such valuations have been done in connection with the Pittsburgh Penguins (hockey), the Jacksonville Jaguars (football), and the Anaheim Angels (baseball). Tr. 387-88, 417; see also Tr. 755-56. Again, because there is no damages claim in this action, the Court need not determine whether such damages are legally cognizable. Nor does it need to make a finding as to the dollar amount, if any, of the intangible



BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

economic benefit the Sonics provide to the community. The Court does, however, find that such an amount could, if necessary, be calculated with reasonable certainty.

**C. <u>KeyArena and the Lease</u>.**

KeyArena was built almost 50 years ago for the 1962 Seattle World's Fair. Ex. 500 at 1. After the Fair, the City purchased the building from the State of Washington for $2.9 million. <u>Id.</u> The City converted it into the Seattle Coliseum—a multipurpose venue for sports, concerts, trade shows, family events (e.g., the circus), etc. <u>Id.</u> In 1967, the Coliseum began being used by the Seattle SuperSonics, then a new franchise in the NBA. <u>Id.</u>

Fifteen years ago, in 1993, the PBC's predecessor in interest and the City began discussing a private/public partnership for a $100 million remodel of the aging and deteriorating Coliseum. Ex. 500 at 1-2. The funding mechanism envisioned—using a percentage of the team's revenues to pay off bonds issued to fund the renovation—with no dedicated tax dollars was unprecedented. <u>Id.</u>

The financial terms of the arrangement were as follows. First, the Sonics contributed approximately $21 million cash. Ex. 500 at 2. Second, they agreed to pay an annual base rent—initially $800,000—with a yearly escalator. Ex. 600 at 0223. Third, the Sonics committed to pay, as additional rent, a percentage of the team's revenues from suite sales and rentals, club seats and other income streams to satisfy the debt service. <u>Id.</u> at 0226. For its part, the City pledged its credit to support the issuance of bonds to pay for the project. Ex. 500 at 2. The arrangement was designed so that no tax dollars would be used. <u>Id.</u> The parties predicated the agreement on two interrelated assumptions: (i) that KeyArena would be a competitive NBA arena for the life of the lease (Tr. 161-162) and (ii) the revenue sharing payments would be adequate to cover the first fifteen years of debt service on the bonds.

From 1995 to 2007, the Sonics paid approximately $110,000,000 in base rent and revenue sharing. Ex. 500 at 26; Ex. 504. The Sonics also made capital improvements of approximately $21,000,000. Ex. 500 at 26.



BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

## D. The Intent of the Parties in Negotiating the Lease.

In negotiating the lease, the parties intended to create a financial structure that would enable the Sonics to remain competitive within the NBA for the duration of the lease. Tr. 161-62. This is why the Sonics' revenue sharing obligation was structured to decline over time. Ex. 600 at 0226. For example, in the first year of the lease (1995) the Sonics were obligated to pay the City 60 percent of club seat revenues. That figure declined by two percent per year until 2005, when it would be fixed at 40 percent for the balance of the lease. Likewise, for suite receipts, in 1995 the Sonics were obligated to give the City 80 percent of such revenues. Id. The revenue sharing obligation dropped by two percent per year until 2005, when it would be fixed at 60 percent. In short, as the Sonics' future costs increased, so too would the Sonics' share of the revenues.

The lease itself is actually a series of interrelated agreements and amendments, which totals over 100 pages and covers many issues beyond the Sonics' playing games at KeyArena. Thus, it included provisions governing the design and construction of the facility (Ex. 600 at 0211-18), delineation of the portion of the premises available to the Sonics (id. at 0220-222), rent (id. at 0223-24), audit rights (id. at 0227-229), personnel and staffing obligations (id. at 0229-233), first aid facilities (id. at 0230), maintenance obligations of the parties (id. at 0233), the Sonics' rights and obligations regarding concession sales, suite leases and rentals (id. at 0236), video production, broadcast, and cablecast transmission rights (id. at 0241), ticket administration (id.), the relationship with the NBA (id. at 0252), and many other operational issues.

The lease does not have any provision requiring the PBC to have Sonics players engage in charitable or community works. Ex. 600; Tr. 116. Likewise, the ordinance authorizing the lease said nothing about charitable or community activities. Ex. 32. The City may have assumed the Sonics would provide such activities (Tr. 143-44), but there is no evidence that they were the subject of any negotiation between the parties.

The lease contains a specific performance clause:



BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

> The obligations of the parties to this Agreement are unique in nature; this Agreement may be specifically enforced by either party.

Ex. 600 at 0263, ¶ L. The clause does not delineate which portions of the lease and the other incorporated agreements are, or are not, specifically enforceable. There was no evidence offered about the negotiations that led to the specific performance clause or about which provisions of the lease are, or are not, specifically enforceable.

**E. The Economics of the Lease No Longer Work for the City**

After several years, and due to circumstances beyond the parties' control, the agreement began failing for both parties. From the City's perspective, beginning in around 2001, the financial component of the arrangement began failing because of several events. Ex. 500 at 2. First, when the remodeled KeyArena opened, it was the only professional sports facility in the region with modern suites and so-called premium seating arrangements. But with the addition of taxpayer-subsidized Safeco and Qwest Fields, and the Everett Events Center, the available suite and premium seating inventory in the area nearly tripled, as did the competition for high net-worth customers. Tr. 166; Ex. 500 at 2. The increased competition, combined with regional economic downturns, had a "profound" impact on sales of suite and premium seating at KeyArena. Ex. 516; Tr. 84-85, 167-168. It created, in the words of the director of the Seattle Center, a "perfect storm." Nellams Dep. at 50:8-16. As a result, the revenue sharing stream was no longer sufficient to cover debt service on the bonds. Ex. 500 at 2; Tr. 169.

**F. KeyArena Has Not Been a Competitive NBA Facility for Many Years.**

The Mayor acknowledged that KeyArena has "significant shortcomings that affect the financial health of the Sonics," Tr. 68-69, and that an NBA team cannot be viable in KeyArena given the lease and the facility. Tr. 76-77. The PBC and its predecessors have been economically hampered by (i) the revenue sharing obligations under the lease, and (ii) the revenue generating limitations of KeyArena. The City has known of these problems for several years. Tr. 76, 81.

Looking first at the lease, the terms are not competitive with other NBA leases. Tr. 836. Its revenue sharing provisions make it "onerous" relative to other NBA leases (Tr. 837), and make



BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

it "one of the worst in the league." Id. The City acknowledges that the Sonics cannot be financially successful given the limitations of the facility and the terms of the lease. Tr. 77.

As to the facility, the parties agree that KeyArena has not been economically viable for men's professional basketball for several years. Of the 29 NBA arenas, KeyArena is the smallest, barely one-half the average size of other NBA facilities. Ex. 500 at 3, 35. The small size limits point of sale opportunities for food, beverages, and merchandise. Ex. 500 at 35. The size and configuration also make it impossible to offer enough premium seating alternatives. Ex. 500 at 3, 35; Tr. 354-355. As a result, the Sonics' premium seating revenues are among the lowest in the NBA. Ex. 500 at 3, 35.

At least in part because of these shortcomings, the PBC's operating losses for the 07/08 season are projected to be approximately $24 million. Tr. 568.[2] For the remaining two seasons (08/09 and 09/10), the projected total operating loss for the PBC is between approximately $61 and $65 million. Tr. 781.

By contrast, if the Sonics are permitted to move to Oklahoma City beginning with the 08/09 season, they are projected to earn $7 million in 08/09 and $10 million in 09/10. Tr. 436-437.

**G. The City Has Been Unable to Find a Solution for KeyArena.**

Although the parties agree about KeyArena's deficiencies, the parties disagree about whether KeyArena could, at considerable expense, be made economically viable for men's professional basketball. The City believes that it can be made into an economically viable NBA facility through a renovation. Tr. 93. The PBC does not believe that KeyArena can be made into an economically viable NBA facility. Tr. 354-355. Regardless, there is no reasonable prospect that KeyArena could be made into an economically viable facility before the end of the current lease.

---

[2] The PBC's fiscal year does not end until September 30, 2008.



BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

## H. The Public's Attitude About the Sonics.

The results of a survey by Field Research, taken in November 2007, show that 66 percent of Seattleites either believe it would make no difference to them if the Sonics left Seattle, or they would be "better off." Ex. 333 at 22; Tr. 812-814. Of the remainder, 13 percent said they would be only "slightly worse off if the Sonics left," 8 percent said they would be "somewhat worse off" and only 12 percent said they would be "much worse off" if the Sonics left Seattle. Ex. 333 at 24. The Field Research poll results are consistent with earlier polls. Tr. 999-1000; Ex. 522.

The poll results are consistent with the election results on Seattle Initiative 91 in November 2006. That initiative provided that City funds could not be used on professional sports facilities unless the City was guaranteed a minimum rate of return on the funds it contributed to building the facility. Ex. 518. The "Statement for" Initiative 91 in the official Voting Guide explained that in terms of City priorities, there were more important things than new sports facilities, "such as keeping schools open, affordable housing, healthcare, lower taxes, roads and transit, and real economic development." Ex. 518. Initiative 91 passed by approximately 75 percent.

The polling results are also consistent with the television ratings for team broadcasts. For example, Nielsen ratings have declined by more than 50 percent since 2004[3]:

| 2004 | 3.12 |
|---|---|
| 2005-2006 | 1.67 |
| 2006-2007 | 1.60 |
| 2007-2008 | 1.24 |

The 1.24 rating for the 07/08 season means that, on average, out of over 1,000,000 potential households, approximately 20,000 were watching the Sonics. Tr. 546-47.

The drop in television ratings tracks the drop in attendance. For example, there has been a season ticket attrition rate of fifty-five percent from the 03/04 season to the 07/08 season. Ex. 507. Average attendance per game has dropped from 13,798 in 00/01 to 9,146 for the 07/08 season. Ex. 510. Seattle's attendance ranks 27th out of 29 NBA teams. Id. Similarly, since the

[3] Ex. 505.



BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

03/04 season, there has been a 50 percent increase in "no shows," i.e., people who paid for a ticket but did not attend. Ex. 508. "No shows," i.e., tickets purchased but not used, went from 19 percent in the 03/04 season to 28 percent in the 07/08 season. Id.

It may be that at some time in the past, the Sonics were an important part of Seattle's community fabric. For whatever reasons, that is no longer true. Even if it were true, an order of specific performance can, at most, only require the team to play in Seattle for two additional seasons. A team performing pursuant to a court order will, given the open hostilities between the PBC and City leadership, generate "muted" enthusiasm. Tr. 104.

**I. The PBC Purchased the Team with the Intention of Securing a New Facility in Which to Play.**

When the PBC purchased the Sonics, it was aware that the prior owner had incurred significant losses over the past several years. Tr. 340. The PBC was also aware of the shortcomings of KeyArena. In acquiring the team, the PBC intended to work toward obtaining a new facility in the Seattle area in which to play. Tr. 339-341. The PBC believed that if it could obtain a new facility, it could operate profitably in the Seattle area. Id.

**J. The Principal Asset of the PBC Will Be Seriously Harmed by Specific Performance.**

If the Sonics remain in Seattle by court order for the last two years of the lease, the team and organization will be substantially injured. The PBC is projected to lose upwards of $65 million in the last two years of the lease. Tr. 781. In the past six months alone, the Sonics have lost approximately 20 percent of its employees, including key executives, as a result of the uncertainty arising out of the litigation. Tr. 559. Morale is declining, and it is difficult for the owners to provide visible leadership given the animosity they encounter in Seattle and in KeyArena. Specific performance will also have an impact on the team's ability to attract players and coaches. Tr. 442. This, in turn, would impact the quality of the team that would play in Seattle for two years under a court order. Similarly, sponsors no longer desire to be associated with the team, further depressing the team's already dismal economic performance. Tr. 445-46. The team cannot successfully market suites. Potential subtenants want "opt out" clauses allowing



BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

them to terminate their lease when the Sonics leave. The City has, however, declined to allow such clauses. Thus, there is an economic stalemate on suites. Given these and other problems, an order of specific performance would trigger a steep economic and performance decline. It would also be extremely difficult to operate the business in a viable, competitive fashion during the last two years.

**K. The City's Lawsuit Is Being Used to Force the PBC to Sell Its Principal Asset.**

"Winning" this lawsuit cannot, by itself, produce a long-term benefit to the City:

> Bennett owns the team, wants it in Oklahoma City, and sees relatively clear sailing to NBA approval except for our lawsuit which, at best, can delay his move and make it more costly.[4]

The evidence shows that because winning the lawsuit would not accomplish its goal, the City became involved in a plan to use this lawsuit, and the threat of specific performance, to try to force the PBC to sell its principal asset—the Sonics—to a group of local owners.

On July 24, 2007, there was a meeting between a representative of the Mayor's office and Mr. Walter Walker. Mr. Walker was the former CEO of the Sonics and was interested in keeping the Sonics in Seattle and "fighting [Mr. Bennett's] attempt to leave." Ex. 618. Mr. Walker told the City that he wanted to make it "too expensive and too litigious for [Bennett to leave]." At the meeting, the City gave the impression that "they were in total agreement," and that "they (administration) understand the value of buying more time." Id.

Soon thereafter, the City instructed K&L Gates to hire Walker as an "expert consultant" beginning on September 21, 2007. Ex. 625. His role was to assist "K&L Gates and the City with respect to efforts to retain the Sonics and the Storm in the City of Seattle beyond the term of the existing KeyArena lease." Id.

The strategy to use this lawsuit to force the PBC to sell the Sonics was set forth in a document prepared and/or at least approved by the City's law firm (K&L Gates) and consultant Walker. Exs. 567, 575, 620; Tr. 857-858. The document was distributed, reviewed and discussed

---

[4] Ex. 576 at 1.



BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

at an October 7, 2007, meeting. Tr. 857-58. Present were the City's lead litigation counsel, potential buyer Steve Ballmer, Mike McGavick, and Walker. Tr. 856. The purpose of the meeting was to discuss how to keep the Sonics in Seattle. Tr. 857. The document detailed a strategy to force the PBC to sell the team to Seattle-based owners, and to persuade the NBA to not allow the PBC to relocate the team to Oklahoma City. The strategy included the following:

> The critical path is to separate the NBA from the Oklahomans, while increasing the exposure for each.[5]
>
> So it is a pincer movement: increasing the Oklahomans [sic] costs in an unpleasant environment while increasing the league's belief that an alternative solution gains it a good new owner and keeps it in a desirable market.[6]
>
> Gorton, et. al, increase pain of staying (financial and reputation).[7]

With respect to persuading the NBA not to permit relocation in particular, Walker was tasked to "drive [a] wedge" between the PBC and the NBA. Ex. 570 at 00243; Ex 601 (Oct. 17, 2007, entry).

Soon after this meeting, prominent local developer Matt Griffin joined the buyer's group, becoming its manager and public spokesman. As Griffin explained, the goal of the lawsuit was to make the PBC sell through "forced bleeding of about $20 [million] per year."[8]

Thereafter, the City pursued a two prong strategy: (i) persuade the NBA not to approve relocation of the Sonics to Oklahoma City by persuading Olympia to approve funding to remodel KeyArena into a viable NBA facility and showing that there were qualified owners; and (ii) induce the PBC to sell to these local owners through the threat of specific performance and huge losses. The effort to persuade the NBA not to approve relocation and to persuade Olympia to approve funding failed.

---

[5] Ex. 567 at WW00227.
[6] Id. at WW00229.
[7] Id. at WW00236.
[8] Ex. 575 at Griff_00001052.



BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

## II. CONCLUSIONS OF LAW

This court has jurisdiction pursuant to 28 U.S.C. § 1332.

Specific performance is an extraordinary remedy. There is no right to specific performance, and it is not available where there is an adequate remedy at law. Wash. Trust Bank v. Circle K Corp., 15 Wn. App. 89, 546 P.2d 1249 (1976).

The general rule is that landlords may not obtain specific performance compelling tenants to operate businesses. See 8600 Assocs., Ltd. v. Wearguard Corp., 737 F. Supp. 44, 46 (E.D. Mich. 1990) (decisions denying injunctive relief to landlords reflect "the modern trend and the majority rule"); Mayor's Jewelers, Inc. v. State of Cal. Pub. Employees' Retirement Sys., 685 So.2d 904 (Fla. App. 4th Dist. 1996) ("[A]lmost every other court confronted with this issue has denied injunctive relief requiring a tenant to specifically perform a lease."). Additionally, specific performance is typically denied even where the landlord and tenant have agreed that the landlord is entitled to mandatory injunctive relief if the tenant failed to keep the store open as required. See 8600 Assocs. Ltd. v. Wearguard Corp., 737 F. Supp. 44, 46 (E.D. Mich. 1990).

Landlords are generally denied specific performance for either of two reasons. First, a landlord's legal remedy—money damages for compensable losses—is typically an adequate remedy. Second, specific performance of a lease cannot be accomplished with a single act, such as conveying a piece of property, but requires continuous, protracted interaction between parties and court supervision of that relationship. Both reasons apply here and require that the City be left to its legal remedy.

### A. Monetary Compensation Is an Adequate Remedy for Nonperformance of the Home Games Lease Provision.

Where a landlord can be compensated with money, the rule against specific performance of continuous operations clauses is almost universal. See, e.g., CBL & Assocs., Inc. v. McCrory Corp., 761 F. Supp. 807, 809-10 (M.D. Ga. 1991); New Park Forest Assocs. II v. Rogers Enters., Inc., 552 N.E.2d 1215 (Ill. Ct. App. 1 Dist. 1990); Sizeler Prop. Investors, Inc. v. Gordon Jewelry Corp., 544 So.2d 53 (La. Ct. App. 4th Cir. 1989); Lorch, Inc. v. Bessemer Mall Shopping Ctr.,



BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

Inc., 310 So.2d 872, 876 (Ala. 1975); Madison Plaza, Inc. v. Shapira Corp., 387 N.E.2d 483, 486-87 (Ind. Ct. App. 1 Dist. 1979); Price v. Herman, 81 N.Y.S.2d 361 (N.Y. Sup. Ct. 1948), aff'd, 87 N.Y.S.2d 221 (N.Y. App. 1949); Bradlees Tidewater, Inc. v. Walnut Hill Inv., Inc., 391 S.E.2d 304 (Va. 1990); Grossman v. Wegman's Food Markets, Inc., 350 N.Y.S.2d 484 (N.Y. App. 1973).

Here, the compensable monetary damages to the City—rent for the balance of the lease—can be calculated with reasonable certainty. To the extent legally cognizable—an issue the Court need not address—the additional claimed tangible and intangible economic benefits, if any, are quantifiable and can be calculated with reasonable certainty.

**B. Specific Performance Is Denied Where Ongoing Supervision Is Necessary.**

Specific performance is also denied where the contract calls for a succession of acts whose performance cannot be consummated by one transaction, and which requires ongoing supervision. This has long been the rule in Washington. In Cahalan Investment Co. v. Yakima Central Heating Co., 113 Wash. 70, 193 P. 210 (1920), for example, plaintiff sought an order requiring defendant to provide its apartment building with steam heat for the remaining three years of a commercial services contract. As the Court explained:

> A court of equity is always loath to specifically enforce a contract the enforcement of which requires the subsequent supervision and direction of the court, especially so where the contract extends over a considerable period of time. . . . Many differences can arise, and most certainly will arise, between the parties during this time over the question whether the contract is being properly performed, to settle which will require investigations and orders on the part of the court. . . .

113 Wash. at 74-75. Accordingly, specific performance was denied, and plaintiff was left to its legal remedy. Id. at 75 ("To conduct a private business is not the function of a court of equity.").

Given the burdens of requiring parties to run a business, this rule applies when landlords seek to enforce "continuous operations" clauses. In M. Leo Storch Ltd. v. Erol's, Inc., 620 A.2d 408 (Md. Ct. App. 1993), the Court recognized that knowledge and judgment were required in "innumerable" day-to-day business decisions. Hoping to persuade the Court that the burdens of



BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

ordering specific performance would be minimal, the landlord argued that the Court could issue "a simple order that says, you may not continue to breach the continuous operations clause." 620 A.2d at 412. This was rejected. As the Court explained, "if a dispute arises in the future, the court will become a referee." Id.

Here, the lease is more than one hundred pages long and controls many detailed and minute aspects of the parties' relationship, including revenue sharing, signage, concessions (including items and pricing), marketing, and other issues. The lease is, in this respect, similar to a shopping center lease between a landlord and tenant. Specific performance would require the Court to monitor and supervise the detailed and complex relationship between the parties. This is another reason to deny specific performance.

**C. Specific Performance Is Not Available with an Ambiguous Clause.**

The specific performance clause of the lease is ambiguous. It does not detail which of the many provisions of the lease are, and are not, specifically enforceable. Specific performance requires clear and unequivocal evidence that leaves no doubt as to the terms, character and existence of the contract. Russell v. Cook, 78 Wn. App. 427, 896 P.2d 1317 (1995). It likewise requires a level of certainty and definiteness of terms that leaves no reasonable doubt as to what the parties intended, and no reasonable doubt of the specific thing that equity compels a party to do. Haire v. Patterson, 63 Wn.2d 282, 386 P.2d 953 (1963). Here, there is not clear and unequivocal evidence of what portions of the lease were intended to be specifically enforceable. The City put on no proof as to which terms of the lease fell within the specific performance clause. Because it is ambiguous, it is not subject to specific performance.

**D. In Balancing the Equities, the City Will Gain Little From Specific Performance, and the Hardships on the PBC Would Be Great.**

Even if the City did not have an adequate remedy at law, specific performance is not warranted. A court must ensure that specific enforcement will not be oppressive, unconscionable, or result in undue hardship to any party involved. Crafts v. Pitts, 161 Wn.2d 16, 162 P.3d 382 (2007). "The relative burden imposed upon the defendant as compared with the benefit the



BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

plaintiff will derive from the performance of a contract may be a ground for a court's refusal to direct specific performance." 71 Am.Jur.2d § 94 (2008). Restatement (Second) of Contracts § 364(1)(b) (1981); 25 David K. DeWolf & Keller W. Allen, Washington Practice: Contract Law & Practice § 15:1 (2007).

Here, the balance of hardships weighs against specific performance. The "hardship" on the City will be modest if the Sonics depart two years earlier than would otherwise be the case. The City will lose only the remaining "muted" benefit of a team for which public interest has steadily declined over the past several years. Seattle will still be a world-class city with a wide variety of sports, cultural and entertainment options. By contrast, the PBC will lose upwards of $65 million if forced to stay in Seattle these two years. Likewise, the business will degrade as employees leave, morale plummets and performance suffers.

**E. Even If Specific Performance Were Otherwise Proper, the City's Claim Is Barred by Its Inequitable Conduct.**

The City has certain rights as a landlord. Those rights do not include forcing its tenant—the PBC—to sell its principal asset—the Sonics—to the City's preferred owner. Equity does not allow a plaintiff to use specific performance to extract more than it bargained for in the contract at issue. Portion Pack, Inc. v. Bond, 44 Wn.2d 161, 265 P.2d 1045 (1954). Whatever right the City may have had to try and enforce the last two years of the lease, it did not have the additional right to use specific performance as a means to undermine the PBC's business to try to force it to sell the team.

Equity also requires clean hands. Income Investors, Inc. v. Shelton, 3 Wn.2d 599, 602, 101 P.2d 973 (1940). Stated somewhat differently:

> any willful act in regard to the matter in litigation, which would be condemned and pronounced wrongful by honest and fair-minded men, will be sufficient to make the hands of the applicant unclean.

Rose v. Nat'l Auction Group, Inc., 646 N.W.2d 455, 463 (Mich. 2002) (quoting 2 Pomeroy's Equity Jurisprudence, § 404, p. 143 (1941)).



BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

The clean hands doctrine protects the Court's integrity, rather than the opposing party's interests. It ensures that the judicial system does not become a party to impropriety:

> That doctrine is rooted in the historical concept of court of equity as a vehicle for affirmatively enforcing the requirements of conscience and good faith. This presupposes a refusal on its part to be 'the abetter of iniquity.'

Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co., 324 U.S. 806, 814 (1945).

The City has unclean hands. This lawsuit seeks specific performance as a further way of "locking" the PBC into huge losses and thereby forcing it to sell its principal asset—the Sonics. The City argues that it was not involved in the conduct, even though it was carried out by its lead counsel and its expert consultant. More fundamentally, Seattle's Deputy Mayor participated in discussions about the subject of the PBC's only selling the team "if pressured by the NBA or if [it] faces an expensive or unpleasant legal future." Tim Ceis Dep. at 99-100. Even assuming that the City was not a direct participant in the unclean hands conduct, the City is responsible for the actions of its agents, K&L Gates and Walker. The standard for whether a principal is responsible for the unclean hands acts of its agents is inquiry notice. Am. Ins. Co. v. Lucas, 38 F. Supp. 896, 923-924 (W.D. Mo. 1940). "To hold otherwise, would mean that this beneficent maxim of equity could be defeated merely by the principal (for whose benefit an agent grossly abused the powers of the court of equity) closing his eyes." Id. at 923-24. Here, the City had actual notice by not later than September 21, 2007, that K&L Gates was involved in efforts to keep the Sonics in Seattle beyond the term of the lease. This information was communicated to the Seattle City Attorney in connection with his retention of K&L Gates. The City, through the City Attorney, consented to K&L Gates' efforts. Likewise, Mr. Walker was retained as a consultant by K&L Gates at the direction of the Deputy Mayor of Seattle. Accordingly, the City is responsible for the acts of its agents, and its inequitable conduct bars it from the relief it seeks.

DATED this 24th day of June, 2008.

BYRNES & KELLER LLP

By: /s/ Paul R. Taylor, WSBA #14851



BYRNES & KELLER LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

Bradley S. Keller, WSBA #10665
Paul R. Taylor, WSBA #14851
Steven C. Minson, WSBA #30974
Byrnes & Keller LLP
1000 Second Avenue, 38th Floor
Seattle, WA 98104
Telephone:(206) 622-2000
Facsimile: (206) 622-2522
Email: bkeller@byrneskeller.com
ptaylor@byrneskeller.com
sminson@byrneskeller.com
Attorneys for Defendant
The Professional Basketball Club, LLC

## CERTIFICATE OF SERVICE

I hereby certify that on the 24th day of June, 2008, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Thomas A. Carr (thomas.carr@seattle.gov)
Gregory C. Narver (gregory.narver@seattle.gov)
Seattle City Attorney
600 Fourth Avenue, 4th Floor
P.O. Box 94769
Seattle, WA 98124-4769

Slade Gorton (slade.gorton@klgates.com)
Paul J. Lawrence (paul.lawrence@klgates.com)
Jeffrey C. Johnson (jeff.johnson@klgates.com)
Michelle Jensen (michelle.jensen@klgates.com)
K&L Gates
925 4th Avenue, Suite 2900
Seattle, WA 98104

/s/ Paul R. Taylor
Paul R. Taylor, WSBA #14851
Byrnes & Keller LLP
1000 Second Avenue, 38th Floor
Seattle, WA 98104
Telephone: (206) 622-2000
Facsimile: (206) 622-2522
ptaylor@byrneskeller.com