The Honorable Marsha J. Pechman

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

CITY OF SEATTLE, a first-class charter city,

                     Plaintiff,

      v.

PROFESSIONAL BASKETBALL CLUB LLC, an Oklahoma limited liability company,

                   Defendant.

No. C07-01620-MJP

PLAINTIFF CITY OF SEATTLE'S
FINDINGS OF FACT AND
CONCLUSIONS OF LAW

The City of Seattle's claim for specific enforcement of Article II of the Premises Use & Occupancy Agreement ("Lease") came on for trial without a jury before this Court on June 16, 2008. The Court after hearing the testimony of the witnesses, and after considering the exhibits admitted into evidence and the argument and motions of Counsel, all as set forth in the record of this case, should enter the following Findings of Fact:

PLAINTIFF CITY OF SEATTLE'S
FINDINGS OF FACT AND
CONCLUSIONS OF LAW - 1
Case No. C07-01620-MJP
K:\2065932\00001\20516_HAH\20516P228L

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

Dockets.Justia.com

# TABLE OF CONTENTS

## FINDINGS OF FACT

I. The Parties     4

II. The Lease     4

III. KeyArena     7

IV. PBC Assumed the Lease     9

V. The Uniqueness of the Sonics     13

VI. Economic Benefits of the Sonics     17

VII. Intangible Benefits of the Sonics     20

VIII. PBC's Defense of Financial Undue Hardship Based on Self-Inflicted and Foreseeable Harm     25

VIII. PBC's Defense of Undue Hardship – Due to its "Good Faith" Efforts     36

IX. PBC's Defense of Unclean Hands is Unsubstantiated by the Facts     48

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

1

**CONCLUSIONS OF LAW**

2

I.    Standard Governing Grant of Specific Performance.                                    55

II.   Specific Performance is Available in this Case as a Contract Remedy.                 56

III.  Courts Will Give Effect to Parties' Selection of Remedies for Breach of Contract
      Absent Public Policy Considerations Not Present Here.                                57

IV.   Specific Performance Will Not Require Ongoing Supervision by the Court.              59

V.    Conditions Under Which Specific Performance is Available.                            60

VI.   Damages Would Be an Inadequate Remedy Because it Would Be Difficult if Not
      Impossible for the Sonics to Obtain a Suitable Substitute.                           60

VII.  PBC Agreed Its Obligations Under the Contract Were Unique.                           63

VIII. Damages Would Be An Inadequate Remedy Because They Would Be Difficult to
      Prove With Reasonable Certainty.                                                     64

IX.   Courts Routinely Specifically Enforce Contract Obligations with Respect to Sports
      Teams.                                                                               65

X.    Specific Performance is an Available Remedy in Commercial Lease Cases.              68

XI.   Specific Performance is Appropriate to Protect the City's Investment in the
      KeyArena Rebuild.                                                                    69

XII.  Specific Performance Would Not Be Oppressive, Unconscionable, or Result in
      Undue Hardship.                                                                      71

XIII. PBC's Self-Inflicted Harm is Not a Basis for Asserting an Undue Hardship Defense.   75

XIV.  PBC Cannot Assert an Unclean Hands Defense.                                         75

XV.   Purposes of Equity and Conclusion                                                   80

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

# FINDINGS OF FACT

## THE PARTIES

1. Plaintiff the City of Seattle (the "City") is a first-class charter city in Washington.

2. Defendant the Professional Basketball Club, LLC ("PBC") is an Oklahoma limited liability company.

## THE LEASE

**A. The City and SSI Negotiated a New Lease to Keep the Sonics at Seattle Center.**

3. In 1993-94, the SSI Sports, Inc. ("SSI") threatened to move the Sonics from Seattle Center at the end of the existing lease term unless the City agreed to build a state-of-the-art basketball arena. (6/16/08 Trial Transcript ("Tr."), V. Anderson, 141:17-23 (Trial Exhibit ("Ex.") 41))

4. Seattle Center's mission is to be the nation's best gathering place; be home to the finest cultural and educational organizations, sports teams, festivals, community programs and entertainment facilities; to delight and inspire the human spirit in each person; and bring people together as a rich and varied community. Retaining the Sonics comported with Seattle Center's mission. (6/16/08 Tr., V. Anderson, 140:13–141:16; 6/16/08 Tr., G. Nickels, 52:20-53:1, 69:3-15 (Ex. 500, KALD_00002862, KALD_00002867-2869), 123:17–125:12; 6/16/08 Tr., V. Anderson, 141:17-25-143:1 (Ex. 41, p. 5))

5. Virginia Anderson served as the Director of Seattle Center for 18 years. (6/16/08 Tr., V. Anderson, 134:5-7) During her tenure, Ms. Anderson negotiated and executed the Lease on the City's behalf. (6/16/08 Tr., V. Anderson, 138:16-21)

---

PLAINTIFF CITY OF SEATTLE'S
FINDINGS OF FACT AND
CONCLUSIONS OF LAW - 4
Case No. C07-01620-MJP

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

6.     The City and SSI were represented by counsel during the Lease negotiations. (Pretrial Order ("PTO"), Admitted Fact No. 1; 6/16/08 Tr., V. Anderson, 144:13-23)

7.     Representatives of SSI and the Seattle Center first negotiated a Memorandum of Understanding executed on March 22, 1993, which states: "The City acknowledges the long standing commitment of the Sonics to the Seattle community. The Sonics will continue to provide certain public services and benefits as part of their long-term tenancy in the Coliseum." (6/16/08 Tr., V. Anderson, 141:17-25 – 143:1 (Ex. 41, p. 5))

8.     The City and SSI subsequently negotiated a new lease for the Sonics to continue to play at Seattle Center. (PTO, Admitted Fact No. 1; 6/16/08 Tr., G. Nickels, 78:5-12 (Ex. 45); 6/16/08 Tr., V. Anderson, 134:11-16, 136:6-137:22 (Ex. 40))

9.     The 15-year lease term was a compromise between the Sonics ownership and the City. Originally, the City wanted a 20-year lease and the Sonics wanted a 10-year lease. (6/16/08 Tr., V. Anderson, 148:13–149:19)

**B.     The Terms of the Lease are Clear.**

10.     The Recitals to the Lease state: "Whereas, in order to induce SSI to become the principal user of a new playing facility on a long-term basis in lieu of having the SuperSonics play in an alternative venue, and to maintain the SuperSonics NBA franchise in Seattle, the City will construct a new Seattle Center Coliseum to replace the Current Facility." (6/16/08 Tr., G. Nickels, 78:5-12 (Ex. 45, p.1))

11.     The Recitals further state: "Whereas, the City desires to construct a new, state of the art professional basketball playing facility in order to enhance the City but cannot do so without a long-term, principal user." (6/16/08 Tr., G. Nickels, 78:5-12 (Ex. 45, p. 1))

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

12.     The Recitals further provide that the then "Current Facility is a thirty year old structure that can no longer provide the SuperSonics with a playing venue that is either structurally or economically comparable to the sites in which other NBA teams play." (6/16/08 Tr., G. Nickels, 78:5-12; Ex 45, p. 1)

13.     Article II of the Lease requires the Sonics to play all home games in the remodeled arena through the end of the 2009-10 NBA season.  (6/16/08 Tr., G. Nickels, 78:5-12 (Ex. 45, p. 6))

14.     Article IV.D of the Lease gave Sonics ownership equal rights to make decisions regarding the design and construction of the renovated arena.  (6/16/08 Tr., G. Nickels, 78:5-12 (Ex. 45, p. 8))

15.     Article IV.G of the Lease gave Sonics ownership an "unrestricted and unlimited right" to request changes to the renovation of the arena.  (6/16/08 Tr., G. Nickels, 78:5-12 (Ex. 45, p. 9))

16.     Article XXVII.L of the Lease states that "The obligations of the parties to this Agreement are unique in nature; this Agreement may be specifically enforced by either party."  (6/16/08 Tr., G. Nickels, 78:5-12 (Ex. 45, p. 59))

17.     Article XXV.A of the Lease states that "[a]ll claims, disputes, and other matters in question" arising out of the Lease must be submitted to binding arbitration. (6/16/08 Tr., G. Nickels, 78:5-12; Ex. 45, p. 54)

18.     There are no provisions in the Lease that allow the Sonics to leave early due to unforeseen circumstances.  (6/16/08 Tr., G. Nickels, 78:5-12 (Ex. 45), 127:2-128:1; 6/16/08 Tr., V. Anderson, 150:7-12)

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

1    19.    Mr. Bennett admits that there are no provisions in the Lease that allow PBC to

2    terminate the Lease early under any circumstances.  (6/17/08 Tr., C. Bennett, 268:2-5)

3                                        **KEYARENA**

4

5    **A.       The City Built KeyArena to the Sonics' Specifications.**

6          20.    The 30-year old Coliseum was renovated between 1994 and 1995 and renamed

7    KeyArena.  (6/16/08 Tr., G. Nickels, 69:3-15 (Ex. 500, KALD_00002865))

8          21.    The old Coliseum was gutted completely as part of the renovation to add more

9    than 3,000 additional seats, luxury suites, and concessions space to meet the Sonics' needs.

10   To satisfy the Sonics, the City had to, amongst other things, dig down 38 feet below the

11   original Coliseum.  (6/16/08 Tr., V. Anderson, 151:7–154:15 (Ex. 215))

12         22.    The Sonics ownership had substantial input in the design and reconstruction

13   ofKeyArena as a state-of-the-art NBA facility.  (6/16/08 Tr., V. Anderson, 139:3–140:11)

14

15         23.    The City and SSI understood that professional sports is a cyclical business that

16   depends on the success of the team.  (6/16/08 Tr., V. Anderson, 171:15-172:5)  The Sonics

17   specifically wanted KeyArena designed as a smaller venue due to SSI's view of the cyclical

18   nature of the business.  (6/16/08 Tr., Virginia Anderson, 171:10-24)

19

20         24.    The Sonics are the prime tenant of the Seattle Center's KeyArena.  (6/16/08

21   Tr., G. Nickels, 52:20-22, 69:3-15 (Ex. 500, KALD-00002867, KALD_00002870))

22         25.    The NBA approved the relocation of the Sonics to the renovated KeyArena

23   because KeyArean met with the then existing standards of the NBA.  (Dep. Designations, J.

24   Litvin, 23:3-8)

25

26

PLAINTIFF CITY OF SEATTLE'S
FINDINGS OF FACT AND
CONCLUSIONS OF LAW - 7
Case No. C07-01620-MJP

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

26.     The Sonics have complied with the obligations to play home games at KeyArena since the outset of the Lease.  (PTO, Admitted Fact No. 6)

27.     KeyArena's use as an NBA facility increases the facility's publicity and makes it easier for the Seattle Center and KeyArena staff to market the facility for other events. (6/16/08 Tr., J. Singh, 197:18-24)

28.     KeyArena and the Sonics are extraordinarily important to the success of the entire Seattle Center campus, which is a civic gathering place for arts, athletics, recreation and cultural engagements. (6/16/08 Tr., G. Nickels, 52:20-53:1, 69:3-15 (Ex. 500, KALD_00002862, KALD_00002867-2869), 123:17–125:12; 6/16/08 Tr., V. Anderson, 141:17-25-143:1 (Ex. 41,  p. 5))

**B.      The City Incurred the Debt Necessary to Finance KeyArena.**

29.     In 1994, the City spent approximately $84 million, including incurring $74 million in debt towards the basketball arena renovations.  (6/16/08 Tr., V. Anderson, 146:16-25 – 147:1-16 (Ex. 33))

30.     The City ultimately is responsible for the bonds, not the Sonics or any other tenant or user of KeyArena.  (6/16/08 Tr., V. Anderson, 147:17-25, 159:7-15, 169:8-12, 169:25-170:10)

31.     SSI favored the revenue sharing arrangement that permitted the Sonics to rely on the debt capacity and favorable interest rates of the City.  (6/16/08 Tr., V. Anderson, 159:7-15, 169:8-12, 169:25-170:4)

32.     The City has spent approximately $5.5 million on capital improvements to KeyArena and $120,000 to $150,000 on major maintenance since its renovation.  (6/16/08 Tr., J. Singh, 191:8-13)  These funds were spent on a new advertising ring, a new sound

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

system, a new lighting system, and suite upgrades. (6/16/08 Tr., J. Singh, 190:15-25 – 191:1-7, 191:14-25 – 193:1-21 (Ex. 215); 6/17/08 Tr., J. Singh, 215:6-25 – 216:1-22)

33.     The City still owes approximately $35 million in principal related to the renovations to KeyArena in the mid-1990s. (6/16/08 Tr., G. Nickels, 56:1-6)

**C.     KeyArena is the Same Today as Before PBC Purchased the Sonics**

34.     Clayton Bennett admits that any issues PBC has with KeyArena are the same today as they were before PBC purchased the Sonics. (6/17/08 Tr., C. Bennett, 269:17-272:8 (Ex. 335))

35.     PBC's complaints about the viability of KeyArena are not credible. PBC's own consultants informed PBC's investors that KeyArena is a functional building for an NBA team (6/17/08 Tr., C. Bennett, 274:6– 276:9 (Ex. 264)), and Mr. Bennett testified at a February 13, 2007 Washington State Senate Ways & Means Committee hearing that while KeyArena might not be a state-of-the-art facility at some point in the future, that was not the case at the time of purchase. (6/17/08 Tr., C. Bennett, 276:10-25 – 277:1-13 (Ex. 97))

36.     Neither the condition of KeyArena nor the terms of the Lease have changed between the time PBC bought the Sonics and present day. (6/16/08 Tr., J. Singh, 189:10-25; 6/17/08 Tr., J. Singh, 233:18-25)

## PBC ASSUMED THE LEASE

**A.     PBC Bought the Sonics and Assumed the Lease.**

37.     The Basketball Club of Seattle, LLC ("BCOS") sold the Sonics to PBC in July 2006 for $350,000,000. (PTO, Admitted Fact No. 8; 6/18/08 Tr., C. Bennett, 479:23-480:3;

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

6/17/08 Tr., C. Bennett, 263:5-21 (Ex. 62, PBC_09356))  The only contingency in the purchase agreement was NBA approval.  (6/18/08 Tr., C. Bennett, 480:7-8)

38.    In a side letter dated July 18, 2006 in connection with and required for the sale, Clayton Bennett for PBC wrote to Howard Schultz of BCOS:  "In addition, we will obviously assume all of BCOS' obligations regarding the Key Arena Use Agreement at closing and intend to honor those obligations just as the current ownership group has done."  (6/17/08 Tr., C. Bennett, 264:1-23; 6/18/08 Tr., C. Bennett 475:4-22, 476:15-20) (Ex. 65); *see also* Ex. 62, PBC_09381 (Section 5.3); 6/20/08 Tr., W. Walker, 895:17 – 896:15)

39.    PBC and BCOS executed a Franchise Purchase Agreement ("NBA Franchise Agreement"), dated July 14, 2006.  Section 1.2(a)(i) of the NBA Franchise Agreement provides: "*Assumed Obligations*.  Effective as of the Closing Date, Buyer hereby agrees to assume, pay, perform, discharge and otherwise satisfy promptly when due all liability and obligations of [BCOS] existing or accrued as of the Closing and all liabilities that arise on or after the Closing as a result of [PBC's] operation of the Businesses and ownership of the Purchased Assets on and after the Closing Date …."  (6/17/08 Tr., C. Bennett, 263:5-21 (Ex. 62, PBC_09355))

40.    PBC knew prior to purchase that the Lease had been characterized by NBA Commissioner David Stern as "the most unfavorable in the NBA."  (PTO, Admitted Fact No. 13; Dep. Designations, A. McClendon, 96:20 – 97:15, 109:18-23; 6/17/08 Tr., C. Bennett, 249:2-4)

41.    PBC became a party to the Lease through an Instrument of Assumption executed on October 23, 2006.  (PTO, Admitted Fact No. 10)  The Instrument of Assumption stated in part: "PBC acknowledges having been provided a copy of the [Lease] and agrees

PLAINTIFF CITY OF SEATTLE'S
FINDINGS OF FACT AND
CONCLUSIONS OF LAW - 10
Case No. C07-01620-MJP
K:\206593\00001\20516_HAH\20516P228L

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

that, from and after the Closing Date, it shall assume, and hereby agrees to satisfy or perform

(as applicable), all liabilities and obligations of BCOS under the [Lease]." (6/17/08 Tr., C.

Bennett, 265:3-25 – 266:1-8 (Ex. 79, p. 2); Dep. Designations, A. McClendon, 96:7-19)

42.     Mr. Bennett admits that when he signed the Instrument of Assumption, he was

aware of all the risks and the losses associated with operating under the Lease, including the

combined risk that PBC would not be able to renegotiate the Lease with the City, that PBC

would not obtain an alternative venue, that it would be obligated to play home games at

KeyArena, that it would face "lame duck" seasons through 2010 at KeyArena, and that it

would be operating under a Lease involving over $20 million in operating losses at the time

PBC signed the Instrument of Assumption. (6/17/08 Tr., C. Bennett, 266:9-25 – 267:1-18

(Ex. 79))

43.     In signing the Instrument of Assumption and agreeing to abide by the terms of

the Lease, PBC did not seek any amendment to its obligation allowing for early departure of

the Sonics – despite PBC's knowledge of the team's historic losses and the uncertainty of a

successor venue. (6/18/08 Tr., C. Bennett, 448:12-449:12; 6/17/08 Tr., C. Bennett, 266:9-25-

26:1-18)

44.     On November 1, 2006, PBC received written confirmation of the NBA's

approval of PBC's purchase of the Sonics from BCOS ("Approval Agreement"). Section 1(a)

of the Approval Agreement required PBC to assume all liabilities and obligations arising from

PBC's membership in the NBA. (6/18/08 Tr., C. Bennett, 481:1-24 (Ex. 81, PBC_06427)) In

Section 6(c), PBC also agreed to cause the Sonics to pay all expenses, liability and obligations

in the ordinary course and in a timely fashion. (6/18/08 Tr., C. Bennett, 481:1-24 (Ex. 81,

PBC_06439))

PLAINTIFF CITY OF SEATTLE'S
FINDINGS OF FACT AND
CONCLUSIONS OF LAW - 11
Case No. C07-01620-MJP

K:\206593\00001\20516_HAH\20516P228I

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

45.     The Lease is valid and binding between the City and PBC.  (PTO, Admitted Fact No. 11)

**C.     Less Than One Year After Assuming the Lease, PBC Decided to Breach the Lease and Relocate the Team.**

46.     In the fall of 2007, PBC publicly announced that it intended to relocate the Sonics (to Oklahoma City) beginning in the 2008-09 NBA season.  On September 19, 2007, PBC filed for arbitration, seeking a declaration that it not be required to schedule and play its home games at KeyArena for the remaining two years of the Lease and instead pay only money damages.  On September 24, 2007, the City sued for a declaratory judgment that it was entitled to specific performance of the Lease.  (Dkt. # 1 (Complaint))

47.     PBC intends to relocate to Oklahoma City, Oklahoma prior to the end of the Lease term for the start of the 2008-09 NBA season if the Court rules that the City is not entitled to specific performance of Article II of the Lease.  (PTO, Admitted Fact No. 14)

48.     PBC filed for NBA approval of the Sonics relocation after this litigation began. (6/17/08 Tr., C. Bennett, 331:13-15)

49.     The NBA Board of Governors' decision approving the relocation of the Sonics to Oklahoma City is good only for the 2008-09 NBA season, and is contingent upon PBC obtaining a judgment in its favor in this case or a settlement that allows the Sonics to move to before the end of the Lease term.  (6/17/08 Tr., C. Bennett, 328:2-25 – 331:1-9)

50.     With respect to the pending litigation, the NBA's approval of PBC's request relocate to Oklahoma City for the 2008-09 season requires that PBC first obtain a timely legal determination (or settlement agreement), i.e., a resolution of the ongoing litigation, establishing that the Lease does not require the Sonics to play home games at KeyArena in

PLAINTIFF CITY OF SEATTLE'S
FINDINGS OF FACT AND
CONCLUSIONS OF LAW - 12
Case No. C07-01620-MJP

K:\206593\00001\20516\_HAH\20516P228I

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

Seattle for the remainder of the Lease term and relieving the Sonics of any obligation to do so. (PTO, Admitted Fact No. 15; 6/17/08, C. Bennett, 329:14-330:9 (Ex. 287- AEO))

51.     PBC admits it will comply with a declaration by the Court that it is required to specifically perform its obligations under Article II of the Lease to play Sonics Home Games exclusively at KeyArena through the 2009-10 NBA season.  (PTO, Admitted Fact No. 16; 6/17/08 Tr., C. Bennett, 326:13-17)   If PBC is ordered by the Court to specifically perform, PBC will run its operations under the Lease according to reasonable business judgment in its best interests, not spitefully or reacting negatively to the relationship with the City.  (6/16/08 Tr., C. Bennett, 326:13-327:15)

## THE UNIQUENESS OF THE SONICS

### A.      The Sonics' History with Seattle

52.     When PBC bought the team, Clayton Bennett said "The Sonics and Storm are synonymous with Seattle, and it is our desire to have the Sonics and Storm build upon their great legacies in the Seattle area."  (PTO, Admitted Fact No. 21; 6/17/08 Tr., C. Bennett, 278:16-25 – 279:1-6 (Ex. 66))

53.     The Sonics NBA franchise was started in Seattle in 1967 and has played in Seattle for 41 seasons.  (PTO, Admitted Fact No. 17)

54.     The Sonics were the first major professional sports team in the City.  (6/16/08 Tr., G. Nickels, 53:2-5, 69:3-15 (Ex. 500, KALD_00002871))

55.     The Sonics won the NBA championship in 1979, which was Seattle's first national championship in any professional sports league for Seattle.  (PTO, Admitted Fact No. 17)

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

56.     The Sonics' 1979 NBA championship was a source of civic pride and there was a tremendous amount of excitement around the team during its playoff runs in the 1990s. (PTO, Admitted Fact No. 17; 6/17/08 Tr., C. Bennett, 279:7-279:14)

57.     The Sonics have a rich history and tradition in Seattle, and generations of fans have enjoyed their presence. (6/19/08 Tr., S. Alexie, 678:24-679:14; 6/18/08 Tr., D. Barth, 543:14-18, 590:19-24, 606-608:17)  Since 1967, 21 million fans have come to see the Sonics play during the regular season.  (6/16/08 Tr., G. Nickels, 69:3-15 (Ex. 500, KALD_00002860, KALD_00002886))

58.     The Sonics' on-court performance has a direct effect on attendance at their games, which in turn impacts revenues.  (6/18/08 Tr., D. Barth, 608:1-20; 6/19/08 Tr., S. Alexie, 668:3-670:18)  Attendance (and resulting revenue) improves when the Sonics make it into the NBA playoffs.  (6/18/08 Tr., D. Barth, 550:11-18, 552:17-25, 606:22-608:17; 6/19/08 Tr., S. Alexie, 668:3-16; Ex. 343)

**B.      Uniqueness of the NBA Game in Seattle**

59.     If the Sonics leave Seattle, Seattle citizens will no longer have the opportunity to watch live NBA games in Seattle, including Sonics player and NBA 2007-2008 Rookie of the Year, Kevin Durant.  (6/19/08 Tr., S. Alexie, 663:9-24, 678:16-679:14)

60.     The NBA has the finest basketball players in the world, and draws the best players from around the world.  (6/18/08 Tr., C. Bennett, 440:21-24; 6/18/08 Tr., D. Barth, 526:3-18)

61.     Watching NBA games is a unique experience in professional sports because fans are in close proximity to the court, and so feel the excitement of the game and a connection to the players that is greater than in other sports.  (6/18/08 Tr., C. Bennett, 438:5-

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

11) Fans can see the players' faces and expressions and feel their energy. (6/18/08 Tr., C. Bennett, 438:12-13)

62.     The NBA has no current plans for expansion and there is no known NBA team that could play in KeyArena for the 2008-09 and 2009-10 seasons if the Sonics relocate. (6/17/08 Tr., C. Bennett, 244:24-25 – 245:1-9, 277:23-25 – 278:1-2 (including C. Bennett Deposition at 155:24-25 – 156:1-16 for impeachment purposes))

63.     The only substitute for the Sonics is another NBA team. (Dep. Designations, A. McClendon, 105:5-24) A college basketball team would not be an adequate substitute tenant for the Sonics at KeyArena. (6/16/08 Tr., J. Singh, 196:22-25 – 197:1-7; 6/16/08 Tr., G. Nickels, 53:7-11) College teams play fewer home games and have smaller audiences than a professional basketball team. (6/16/08 Tr., J. Singh, 196:22–197:7)

64.     An NBA team is a unique commodity, due to the small number of teams (30 total) and the relative infrequency with which they come up for sale. (6/18/08 Tr., D. Barth, 526:19-23, 547:24-25) The opportunity to purchase an NBA team is rare. (6/17/08 Tr., C. Bennett, 244:1-20 (Ex. 23), 277:18-22)

65.     Mr. Bennett is on the NBA Board of Governors and explained there are no expansion proposals before the Board at this time. (6/17/08 Tr., C. Bennett, 244:24-25 – 245:1-9)

C.      **Factors Impacting Fan Interest Today**

66.     During the 2006-07 season, the first year of PBC's ownership, the Sonics had the worst win-loss record in the team's previous 22 years. (6/18/08 Tr., D. Barth, 593:24-594:2)

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

67.     Prior to the 2007-08 NBA season, PBC traded Ray Allen and let Rashard Lewis leave (the Sonics' two leading scorers for the 2006-07 NBA season; Ex. 197 (Defendant's Response to RFA Nos. 37 & 37); 6/17/08 Tr., C. Bennett, 326:3-12)  These decisions contributed to diminished attendance at Sonics games.  (6/19/08 S. Alexie, 670:12-18)

68.     Prior to the 2007-08 NBA season, PBC filed for arbitration, seeking a declaration that it not be required to schedule and play its home games at KeyArena for the remaining two years of the Lease and instead pay only money damages.  (Ex. 147)

69.     Game attendance for the 2007-08 NBA season was diminished by PBC's announcement before the season of its intent to relocate the team to Oklahoma City. (6/19/08 Tr., M. Ziets, 785:12-786:6; 6/18/08 Tr., D. Barth, 590:25-591:11)

70.     During the 2007-08 season, the Sonics winning percentage (20-62) was the second worst in the NBA and the worst in Sonics' history.  (6/18/08 Tr., D. Barth, 594:6-12; Ex. 197 (Defendant's Response to RFA No. 35); 6/17/08 Tr., C. Bennett, 273:4-13)

71.     Mr. Bennett admits that team play and a team's record are factors that impact the success of a professional sports franchise.  (6/17/08 Tr., C. Bennett, 272:25 – 273:1-3)

72.     PBC has alienated fans by failing to promote the Sonics, including new potential superstar and Rookie of the Year Kevin Durant, and alienating season ticket holders with indifferent treatment.  (6/19/08 Tr., S. Alexie, 670:12-18, 671:9-675:1, 675:20-679:14 (Exs. 336 & 337))

73.     Many season ticket holders purchase season tickets for decades but their attendance at the games varies based on the success of the team.  (6/16/08 Tr., V. Anderson, 172:15-25)

PLAINTIFF CITY OF SEATTLE'S
FINDINGS OF FACT AND
CONCLUSIONS OF LAW - 16
Case No. C07-01620-MJP
K:\206593\20000\1\20516_HAH\20516P228I

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

## ECONOMIC BENEFITS OF THE SONICS

**A.    The Sonics' Expenditures Provide the City Direct Economic Impacts**

74.    Every NBA team has an economic impact on the city in which it is located. (6/17/08 Tr., C. Bennett, 282:19-21)  The City receives many economic benefits from the Sonics including lease payments, enhanced economic activity in the "Uptown" neighborhood surrounding KeyArena, which provides jobs and tax revenue for the city, and the ability to attract a talented work force to the region.  (6/16/08 Tr., G. Nickels, 53:16-55:8, 124:13–125:12 (Ex. 500, KALD_00002867-2868))

75.    The Sonics bring substantial economic benefits to the Seattle metropolitan area – an average of at least $187.8 million dollars per year between 2003 and 2007, based on a conservative view of dollars spent by the Sonics' derived from the Sonics' consolidated income statements and data from the United States Department of Commerce Bureau of Economic Analysis.  (6/18/08 Tr., L. Hatamiya, 618:13-18, 617:1-17; 6/19/08 Tr., L. Hatamiya, 623:22-624:10, 655:4-12)  The Seattle metropolitan area will lose these economic benefits for the next two years if the PBC is permitted to breach its Lease with the City. (6/19/08 Tr., L. Hatamiya, 634:20-24)

76.    Mr. Hatamiya's conclusions are consistent with PBC's estimates that relocation of the Sonics to Oklahoma City would have a total annual impact on the state economy of approximately $171,000,000 annually.  (6/17/08 Tr., C. Bennett, 289:15–290:18 (Ex. 182, PBC_14400))

77.    The Sonics create and support more than 1,200 jobs in the Seattle metropolitan area.  (6/19/08 Tr., L. Hatamiya, 626:6-10)  Sonics'-related expenditures support another

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

approximately 1,100 jobs in the Seattle metropolitan area. (6/19/08 Tr., L. Hatamiya, 626:24-627:9)

78.     The Sonics increase the earnings base in the Seattle metropolitan area. (6/19/08 Tr., L. Hatamiya, 627:13-18) Sonics-related expenditures add between approximately $25.3 to $26.3 million per year to aggregate household income. (6/19/08 Tr., L. Hatamiya, 627:20-25)

79.     The Sonics bring significant economic benefits to the businesses surrounding KeyArena. (6/19/08 Tr., B. Humphreys, 738:23-739:1, 723:22-724:4, 725:11-15, 732:10-12) These economic benefits to the businesses around KeyArena would be lost if the Sonics leave. (6/19/08 Tr., B. Humphreys, 740:17-20, 723:22-724:4, 725:11-15)

80.     If the Sonics relocate, the City will be deprived of certain taxes generated by the spending that occurs on game days and the taxes generated by the team's payroll. (6/17/08 Tr., C. Bennett, 283:4-25 – 284:1-2)

81.     If the Sonics relocate, the City will be deprived of approximately 150-175 jobs associated with the team's basketball operations. (6/17/08 Tr., C. Bennett, 284:7-13) If the Sonics relocate, indirect jobs created by the team's spending will be lost also. (6/17/08 Tr., C. Bennett, 284:14-21)

82.     The presence of an arena and sports team in an urban neighborhood is intended to and does foster the development and vitalization of that area, including its hotel, retail, restaurant and entertainment options. (6/18/08 Tr., C. Bennett, 432:15-433:24) These are elements common to the presence of an arena and sports team, including both in Oklahoma City and in King County. (6/18/08 Tr., C. Bennett, 432:15-433:24)

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

**B.    Consumer Spending Related to the Sonics Provides the City Economic Benefit**

83.     In addition to purchasing tickets, Sonics attendees spend significant discretionary income on Sonics-related activities, including arena concessions, parking, food and beverages from local businesses, hotel rooms, licensed merchandise, gas and other consumer goods and services.  (6/19/08 Tr., B. Humphreys, 752:9-21)

84.     If the Sonics leave the region, Sonics ticket purchasers will not simply transfer their Sonics spending to another form of entertainment in the City of Seattle.  (6/19/08 Tr., L. Hatamiya, 635:14-22, 636:24-637:1, 656:1-14)  At least 8% of Sonics' season ticket-holders live outside the combined King, Pierce and Snohomish County area (the "Seattle metropolitan statistical area")  (6/19/08 Tr., B. Humphreys, 741:6-10, 746:5-748:19)  If the Sonics leave Seattle, it is unlikely that Sonics season ticket holders from outside the Seattle metropolitan statistical area will travel into Seattle to spend the same discretionary income they previously spent on Sonics-related activities on another entertainment activity.  (6/19/08 Tr., B. Humphreys, 741:10-25)  The City will lose some, if not all, of the economic benefits of spending associated with Sonics ticket holders from outside the Seattle metropolitan statistical area. (6/19/08 Tr., B. Humphreys, 744:3-7)  Over 60% of Sonics season ticket holders live outside the City of Seattle within the Seattle MSA.  The City will lose some, if not all, of the economic benefits of spending associated with Sonics ticket holders from outside the City of Seattle but within the Seattle metropolitan statistical area.  (6/19/08 Tr., B. Humphries, 745:10-751:17)

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

## INTANGIBLE BENEFITS OF THE SONICS

**A.    The Sonics Provide Substantial Intangible Benefits to the City.**

85.    Professional sports teams bring intangible benefits to their home communities. (6/19/08 Tr., B. Humphreys, 755:1-5)  These intangible benefits include community spirit, local pride, shared experience, common history, individual and collective satisfaction, and national visibility.  (6/19/08 Tr., B. Humphreys, 755:6-20; 6/18/08 Tr., D. Barth, 541:11-543:13)  Specifically, the Sonics bring these intangible benefits to Seattle.  (6/19/08 Tr., B. Humphreys, 756:8-17)  These intangible benefits are difficult to measure.  (6/19/08 Tr., B. Humphreys, 755:21-756:17)

86.    NBA basketball is a uniquely diverse sport, and the Sonics bring that diversity to Seattle Center.  (6/19/08 Tr., S. Alexie, 662:21-664:12, 667:10-668:2)  Sonics games at KeyArena attract a racially and economically diverse crowd, who come to see the multi-ethnic and multi-national athletes who play for the Sonics and visiting teams.  (6/18/08 Tr., D. Barth, 525:23-526:18; 6/19/08 Tr., S. Alexie, 663:9-664:12)  The diversifying effects of Sonics games provide cultural, intangible benefits to the City of Seattle.  (6/19/08 Tr., S. Alexie, 664:14-21)

87.    NBA basketball players are uniquely talented athletes.  (6/19/08 Tr., S. Alexie, 665:21-666:9)  The Sonics' presence in Seattle gives residents and visitors the opportunity to see these superlative athletes – including the Sonics' current NBA Rookie of the Year Kevin Durant – perform in person.  (6/18/08 Tr., D. Barth, 524:22-526:10; 6/19/08 Tr., S. Alexie, 664:22-666:9)

PLAINTIFF CITY OF SEATTLE'S
FINDINGS OF FACT AND
CONCLUSIONS OF LAW - 20
Case No. C07-01620-MJP

K:\206593\00001\20516_HAH\20516P228I

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

88.     Mayor Nickels and the City Council agree that the Sonics provide intangible

benefits that are impossible to measure such as civic pride, goodwill, prestige, trade,

commerce, and cultural and general economic benefit.  (6/16/08 Tr., G. Nickels, 54:22– 55:8,

60:20–61:7, 62:24–63:3 (Ex. 31); 6/17/08 Tr., C. Bennett, 279:7-14)  The Sonics provide a

gathering place and nexus for identification that allows local residents to build community

and social networks.  (6/19/08 Tr., S. Alexie, 661:14-662:6, 669:1-3; 6/20/08 Tr., W. Walker,

905:9-13)

89.     At least 33% of Seattle residents surveyed (one-third of the adult citizens of

Seattle, i.e., 165,000 people) and 31% of Seattle metropolitan residents surveyed (nearly one-

third of adult citizens of the Seattle metropolitan area – i.e., 775,000 people) state they will be

"worse off" if the Sonics leave the region.  (6/19/08 Tr., D. Jay, 819:3-5 (Ex. 333, Table 10),

830:7-831:6)  Seattle and Seattle metropolitan residents surveyed cited negative economic

impact, loss of the Sonics' community and charitable activities, loss of the Sonics' long

history in Seattle and community pride as reasons they would be "worse off" if the Sonics

leave the region.  (6/19/08 Tr., D. Jay, 819:3-5 (Ex. 333, Appendix P))

**B.     The Sonics Provide Benefits Through Community Services and Charitable Giving.**

90.     Part of the NBA mission is to provide charitable and community support, and

NBA teams engage in a broad range of charitable and community activities in every one of

their home cities, including Seattle and the greater Seattle region.  (6/17/08 Tr., C. Bennett,

279:15-280:14)

91.     The NBA Uniform Players Contract requires all players to make at least 12

community appearances per year.  (6/18/08 Tr., D. Barth, 528:21-529:3; 6/19/08 Tr., M.

PLAINTIFF CITY OF SEATTLE'S
FINDINGS OF FACT AND
CONCLUSIONS OF LAW - 21
Case No. C07-01620-MJP

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

K:\206593\20000\1\20516, HAH\20516P228I

1    Wade, 702:5-12)   Historically, Sonics players have far exceeded this minimum required

2    number and have, in fact, led the NBA in player appearances.  (6/19/08 Tr., M. Wade, 692:23-

3    695:8, 696:13:20 (Ex. 218), 702:10-12)  The Sonics organization maintains two full-time

4    employees to manage and track its players' public appearances.  (6/18/08 Tr., D. Barth, 529:4-

5    24 (Ex. 59))

6

7           92.     The Sonics participate in the NBA's league-wide "NBA Cares" program.

8    (6/18/08 Tr., D. Barth, 528:16-529:24 (Ex. 59))  In 2006, Sonics NBA Cares events included

9    a student assembly and rally to inspire kids to get involved in community service, an open

10   scrimmage to allow the public to see a Sonics practice first-hand, and multiple events in

11   which Sonics players visited local elementary schools to read to children.  (6/18/08 Tr., D.

12   Barth, 529:4-24 (Ex. 59), 531:6-10)  Many of the Sonics' contributions to the community

13   consist of appearances and activities in the community in which players and staff contribute

14   their time and themselves.  (Id.; 6/18/08 Tr., D. Barth, 533:9-534:1 (Ex. 107), 535:14- 23 (Ex.

15   198))

16

17          93.     The Sonics are involved heavily in local charitable and community activities

18   and are a great corporate citizen, supporting a wide variety of civic and charitable

19   organizations, and appearing at schools, hospitals, and in the broader community.  (PTO,

20   Admitted Fact No. 22; 6/17/08 Tr., C. Bennett, 279:15-280:11)

21

22          94.     The Seattle community is enriched in unquantifiable ways by the community

23   and charity work done by the Sonics and individual Sonics players.  (6/16/08 Tr., G. Nickels,

24   60:20–61:7 (Ex. 31), 62:10-63:2)

25          95.     As part of NBA Cares, the Sonics actively supports the Read to Achieve

26   Program in Seattle, which is a year-round campaign to help young people develop a love for

PLAINTIFF CITY OF SEATTLE'S
FINDINGS OF FACT AND
CONCLUSIONS OF LAW - 22
Case No. C07-01620-MJP

K:\206593\00001\20516_HAH\20516P228I

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

reading and encourage adults to read regularly to children. (PTO, Admitted Fact No. 26; 6/18/08 Tr., D. Barth, 538:12-539:7 (Exs. 203 & 198)) The Sonics started the Read to Achieve program in Seattle in 1996 in conjunction with the Seattle Public Schools. (PTO, Admitted Fact No. 26) The rest of the NBA, as well as the WNBA, subsequently adopted the Read to Achieve program. (*Id.*) On January 22, 2008, Sonics players Luke Ridnour and Chris Wilcox read to Seattle area school children as part of the Read to Achieve program. (*Id.*)

96.     The Sonics actively supports the NBA's Hip to Be Fit Program, which is dedicated to educating Seattle's students about the importance of proper nutrition and physical fitness. (PTO, Admitted Fact No. 28; 6/18/08 Tr., D. Barth, 537:15-538:11 (Ex. 201)) On March 17, 2008, Sonics players Mickael Gelabale and Mouhamed Sene visited Brighton Elementary, where Sonics Legend Donald Earl "Slick" Watts teaches physical education, to participate in the Hip to Be Fit Fitness Clinic with the elementary school students. (PTO, Admitted Fact No. 28)

97.     Virginia Anderson explained that the Sonics' civic and community involvement was one of the reasons the City endeavored to develop a new facility and new lease that would be beneficial to the Sonics. (6/16/08 Tr., V. Anderson, 145:25-146:15 (Ex. 32), 142:21–144:9 (Ex. 41, p. 5), 148:1-12 (Ex. 45))

98.     The Seattle City Council repeatedly and publicly recognized that the Seattle community has been immeasurably enriched through the volunteer work of Sonics players. (PTO, Admitted Fact No. 23)

99.     The Sonics are part of the Sonics & Storm Foundation (the "Foundation"), which supports community programs that teach, encourage and motivate children, young

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

adults and families. (PTO, Admitted Fact No. 24; 6/18/08 Tr., D. Barth, 539:8-18, 540:4-22 (Ex. 204)) The Foundation focuses on educational and health & fitness initiatives and seeks to make a difference through the game of basketball. (PTO, Admitted Fact No. 24)

100.    The Foundation and Sonics and Storm players donate more than $1 million per year to the region's communities. (6/17/08 Tr., C. Bennett, 280:22-25 – 281:1-6 (Ex. 66))

101.    The Foundation made financial contributions to build or refurbish 26 basketball courts through the Neighbor Hoops program. (PTO, Admitted Fact No. 25; 6/16/08 Tr., G. Nickels, 60:20-25 – 61:1-7 (Ex. 31); 6/18/08 Tr., D. Barth, 539:19-21; 6/17/08 Tr., C. Bennett, 279:22-25 – 280:1)

102.    The Foundation recently awarded $10,000 in scholarships to four college-bound seniors at Rainier High School. (PTO, Admitted Fact No. 27; 6/18/08 Tr., D. Barth, 539:22-23) Each student received $2,500 as the recipients of the newly named Dennis Johnson Memorial Scholarship Fund, named after the Sonics Legend who passed away in February 2007 at age 52. (PTO, Admitted Fact No. 27)

103.    The Foundation supports The Sonics Jr. Wheelchair Basketball team, which plays tournaments around the region, and promotes the participation in basketball by differently abled youth. (6/18/08 Tr., D. Barth, 539:24-540:2 (Ex. 204))

104.    Historically, individual Sonics players, including Ray Allen and Rashard Lewis, have also established their own foundations for the benefit of the Seattle community. (6/19/08 Tr., M. Wade, 699:5-700:22 (Ex. 219)) Through their foundations, Ray Allen and Rashard Lewis sponsored charitable donations, coupled with community events, like the Rashard Lewis Theater at the Ronald McDonald House at Children's Hospital, a Giving Tree partnership with the Salvation Army that provided Christmas presents to needy kids, and

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

Truckloads of Love, a food drive for Northwest Harvest. (6/19/08 Tr., M. Wade, 699:20-701:17 (Ex. 219)) Since Ray Allen and Rashard Lewis left the Sonics, their foundations have stopped working in the Seattle community. (6/19/08 Tr., M. Wade, 701:18-24)

105. Through their work in local schools, hospitals and other community appearances, Sonics players serve as important role models and aspirational figures to the children in the Seattle metropolitan community. (6/19/08 Tr., M. Wade, 697:21-698:21 (Ex. 218), 702:13-703:6)

106. If the Sonics leave Seattle, Seattle citizens will be deprived of the wide variety of non-financial benefits, including the charitable and community service activities the Sonics and the NBA promote throughout the Seattle metropolitan area. (6/17/08 Tr., C. Bennett, 282:13-18)

107. The presence of the Sonics in Oklahoma City would produce non-financial benefits for that City. (PTO, Admitted Fact No. 29; Dep. Designations, A. McClendon, 197:8-25)

108. The presence of the Hornets in Oklahoma City produced non-financial benefits for that City. (PTO, Admitted Fact No. 30)

### PBC'S DEFENSE OF FINANCIAL UNDUE HARDSHIP BASED ON SELF-INFLICTED AND FORESEEABLE HARM

**A.      PBC is Comprised of Sophisticated Investors.**

109. PBC is compromised of sophisticated investors. (6/17/08 Tr., C. Bennett, 240:20-25 – 241:1-23, 242:11-16; Dep. Designations, A. McClendon, 12:1-10, 13:7-12)

110. PBC's chairman is Clayton Bennett. Mr. Bennett is chairman of Dorchester Capital, and has made substantial investments of numerous types, including investments in

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

real estate, securities, venture capital, managed accounts, equities, bonds, limited partnerships and operating companies. (6/17/08 Tr., C. Bennett, 236:10-25 – 237:1-9) Mr. Bennett has previously been involved with other sports businesses: between 1992 and 1998, he was the owner representative for another NBA team, the San Antonia Spurs, on the Board of Governors of the NBA. (6/18/08 Tr., C. Bennett, 433:25-434:9; 6/17/08 Tr., C. Bennett, 235:7-12, 236:2-9); he was involved in the temporary relocation of the NBA franchise New Orleans Hornets to play in Oklahoma City (following Hurricane Katrina) (6/18/08 Tr., C. Bennett, 434:16-434:24); and he owned a professional baseball team and developed a new facility for that team. 6/18/08 Tr., C. Bennett, 433:25-434:9) Mr. Bennett is a sophisticated and experienced investor who understands the process of due diligence and knows what it means to sign a contract. (6/17/08 Tr., C. Bennett, 237:22-238:2, 272:12-15)

111. Aubrey McClendon is a co-owner of PBC. (6/17/08 Tr., C. Bennett, 240:20-25 – 241:1-3) Mr. McClendon is the chairman, CEO, and co-founder of Chesapeake Energy Corp., which is one of the largest natural gas companies in the United States. (6/17/08 Tr., C. Bennett, 241:4-10) Aubrey McClendon's personal net worth is approximately $2.8 billion.

112. Tom Ward is a co-owner of PBC. (6/17/08 Tr., C. Bennett, 241:11-12) Mr. Ward cofounded Chesapeake Energy Corporation with Mr. McClendon. (6/17/08 Tr., C. Bennett, 241:12-13) He is the former President and Chief Operating Officer of Chesapeake Energy Corporation. He is the CEO Sandridge Energy. (6/17/08 Tr., C. Bennett, 241:13-14)

113. Jeffrey Records, Jr. is a co-owner of PBC. (6/17/08 Tr., C. Bennett, 241:17-18) Mr. Records is the Chairman of MidFirst Bank, the top performing private financial institution in the United States in 2005. (6/17/08 Tr., C. Bennett, 241:19-21)

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

**B.     PBC Expected its Losses Based on the Sonics' Historic Losses.**

      **1.     PBC expected approximately $60 million in losses over the next two years.**

114.     PBC knew BCOS had experienced operating losses before PBC bought the team. (PTO, Admitted Fact No. 32)

115.     In considering the purchase of the Sonics, PBC's investors were informed that PBC would be assuming the Sonics/Storm Lease with the City, that the Lease required the Sonics to share revenues with the City, that the investors would continue to lose money while operating under the current Lease arrangements, and there was no assurance that the City would agree to any changes to the Lease. (6/17/08 Tr., C. Bennett, 254:15-25 – 255:1-24, 256:1-12 (Ex. 75, PBC_10654), 258:1-25 – 259:1-10)

116.     In considering the purchase of the Sonics, PBC investors were informed that the Sonics may have to play in KeyArena under the terms of the current Lease until the end of the Lease Term and that there was no assurance that PBC could renegotiate the Lease with the City or locate a suitable alternative playing site. (6/17/08 Tr., C. Bennett, 255:25 – 256:1-12; Ex. 75, PBC_10654)

117.     In considering the purchase of the Sonics, PBC investors were informed that the Sonics operating loss in 2004 was $20,900,000 and net loss was $23,820,000. (6/17/08 Tr., C. Bennett, 256:13-25 – 257:1-3 (Ex. 75, PBC_10684))  In considering the purchase of the Sonics, PBC investors were informed that the Sonics operating loss in 2005 was over $27 million and net losses were over $29 million. (6/17/08 Tr., C. Bennett, 257:7-11 (Ex. 75, PBC_10684))  PBC's investors knew of these losses before they purchased the Sonics and that the Sonics were playing under a lease that ran through the 2009/2010 season. (6/17/08 Tr., C. Bennett, 257:12-25)

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

118. PBC's expected losses for the last two years of the Lease are not materially different from the $52 million plus losses experienced by the Sonics in the two years prior to the purchase, losses the investors were aware of before they purchased the Sonics. (6/18/08 Tr. C. Bennett, 513:23-514:11, 522:25-523:4)

119. PBC knew before PBC purchased the Sonics that it was possible PBC would be unsuccessful in getting a new arena for the Sonics. (6/17/08 Tr., C. Bennett, 248:11-13 (including C. Bennett Deposition at 96:5-14 for impeachment purposes); 6/18/08 Tr., C. Bennett, 522:8-522:24) PBC knew if it did not get a new arena it would do not better than the team had done the year when the Sonics lost $29 million and that those losses would continue into the future. (6/18/08 Tr., C. Bennett, 522:25-523:4; 6/17/08 Tr., C. Bennett, 248:1-10, 249:5-8 (including C. Bennett Deposition at 98:8-19 for impeachment purposes)

120. PBC knew there was a risk that the Sonics would have played under the Lease even if PBC secured a successor venue because the successor venue would not be ready before the end of the 2009-10 season. (6/17/08 Tr., C. Bennett, 258:22-25 – 259:1-10)

121. Any material difference between the losses suffered by the Sonics in the years before PBC's purchase, and those anticipated for the last two years of the lease are the result of PBC's decision to announce it intent to relocate before the beginning of the 2007-08 season, which had the effect of creating a lame duck situation, and which could result in at least $14-16M of the $60M in losses over the last two years of the Lease. (6/19/08 Tr., M. Ziets, 777:7-779:11, 787:1-13)

122. PBC's anticipated losses for the 2008-09 and 2009-10 NBA seasons are projections only, and what its actual results will be are subject to "moving parts" that PBC

PLAINTIFF CITY OF SEATTLE'S
FINDINGS OF FACT AND
CONCLUSIONS OF LAW - 28
Case No. C07-01620-MJP
K:\206593\00001\20516_HAH\20516P228I

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

would need to, but has not, focused on or even really examined. (6/18/08 Tr., C. Bennett, 436:16-426:22)

123. As part of the mandatory sale approval process, MZ Sports prepared revenue projections for PBC to provide to the NBA. (6/19/08 Tr., M. Ziets, 796:4-797:18 (Ex. 78); 6/17/08 Tr., C. Bennett, 260:8-23 (Ex. 310)) Moag and Company, hired by the NBA to review PBC's revenue projections at the time of purchase, disagreed with MZ's analysis and stated PBC could expect an additional $28 million in losses through the end of the Lease term and would need additional operating capital to cover those losses. (6/19/08 Tr., M. Ziets, 801:8-18 (Ex. 310)) The NBA explained to PBC's investors that the operating losses might not be within projections and that PBC might need an additional $28 million in equity before the end of the KeyArena Lease in 2010. (6/17/08 Tr., C. Bennett, 260:8-261:14 (Ex. 310, PBC 107999)) Moag and Company stated PBC would need even more money if its attempts to obtain a new arena were unsuccessful and, again, even more money than that if it ended up in a "lame duck"situation. (6/17/08 Tr., C. Bennett, 261:18-262:7 (Ex. 310, PBC 107999))

124. Mr. Bennett admitted that the NBA warned the PBC investors of the economic risks and "lame duck" status that PBC now claims are an undue hardship. (6/17/08 Tr., C. Bennett, 261:22-25 – 262:1-7 (Ex. 310, PBC 107999))

125. PBC knew when it bought the Sonics that the Mariners/Safeco Field and the Seahawks/Qwest Field compete for the same sports dollars as the Sonics in the Seattle economy. (6/17/08 Tr., C. Bennett, 249:21-25 – 250:1-11)

**2.   PBC did not care about potential losses – it wanted the team.**

126. PBC primarily relied on the Goldman Sachs report prepared for BCOS for its due diligence regarding the Sonics' finances before buying the team. (6/17/08 Tr., C.

PLAINTIFF CITY OF SEATTLE'S
FINDINGS OF FACT AND
CONCLUSIONS OF LAW - 29
Case No. C07-01620-MJP

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

Bennett, 242:17-24)  PBC did not do an independent determination of the fair market value of the Sonics.  (6/17/08 Tr., C. Bennett, 242:17-24)

127.    Before the purchase, Mr. Bennett was aware that the value of an NBA franchise is often realized through franchise value appreciation, although some owners do make operational profits.  (6/17/08 Tr., C. Bennett, 245:10-25 – 246:1-4 (Ex. 23) (admitted only to show Mr. Bennett's state of mind))  Mr. Bennett also understood that no NBA team has ever been sold for an amount less than the amount of the previous sale.  (6/17/08 Tr., C. Bennett, 246:1-4)

128.    Before the purchase, Mr. Bennett was also aware that NBA investors could receive tax benefits from the purchase of a franchise.  (6/17/08 Tr., C. Bennett, 247:2-8)

129.    Aubrey McClendon did not review the Sonics' historical financial statements before committing to the purchase or the Goldman Sachs due diligence materials.  (Dep. Designations, A. McClendon, 91:17 – 92:7, 92:19-93:9, 105:25-107:4)

130.    All of the alleged shortcomings of KeyArena were chronicled in a February 2006 public report prepared by a commission appointed by Mayor Nickels.  (6/16/08 Tr., G. Nickels, 69:3-15, 70:23-25 – 71:1-6 (Ex. 500, KALD-00002865-2866), 122:21–123:16)

131.    In May 2006, Mayor Nickels commissioned another public report that included a description of KeyArena's shortcomings.  (6/16/08 Tr., G. Nickels, 80:5-24 (Ex. 529, pp. ix-x, 40)

132.    Mr. Bennett further admits that PBC had a team of lawyers assisting it with the purchase and could look at any public document related to KeyArena, but does not remember whether PBC reviewed these public documents prior to purchasing the team.  (6/17/08 Tr. C. Bennett, 251:21-25- 252:1-8 (Exs. 500 & 529); 6/16/08 Tr., V. Anderson, 179:11-22)

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

**C.   PBC's Investors Admitted They Can Afford the Losses.**

133.   As a condition of purchasing the Sonics, PBC's investors expressly

acknowledged the risks inherent to PBC's purchase of the Sonics; that the company's future

was subject to factors outside its control; that they expected to incur operating losses for the

foreseeable future; and that they knew they would be subject to mandatory capital calls.

(6/17/08 Tr., C. Bennett, 252:21-25 – 254:1-11 (Ex. 75, PBC_10653))

134.   PBC's investors have substantial resources and can without difficulty fund any

forecast operating losses incurred by PBC during the 2008-09 and 2009-10 NBA seasons.

(6/17/08 Tr., C. Bennett, 238:3-8 (plus C. Bennett Deposition at 29:24-25 – 30:1-9 for

impeachment purposes); Dep. Designations, A. McClendon, 91:5 – 92:7)

135.   Aubrey McClendon admits that PBC's capital assessments have not caused

him a financial hardship.  (Dep. Designations, A. McClendon, 121:7-14)

136.   Aubrey McClendon admits that the value in NBA teams is generally in their

capital appreciation, not in their short-term gains or losses.  (Dep. Designations, A.

McClendon, 88:17 – 89:8, 89:22 – 90:11)

137.   The NBA must approve the sale of NBA teams.  (6/18/08 Tr., C. Bennett,

480:9-18)  As part of this process, the NBA evaluates the ownership's financial status.

(6/18/08 Tr., C. Bennett, 480:9-18)  PBC submitted the required financial materials to the

NBA to qualify for ownership.  (6/18/08 Tr., C. Bennett, 480:9-18)

138.   The Sonics franchise appreciated in value from $20 million to $200 million the

Ackerleys during their ownership of the team, including their ownership through the transition

to KeyArena, and further appreciated in value under the current KeyArena Lease by $150

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

million between 2001 and 2006 for the Schultz ownership group. (6/20/08 Tr., W. Walker, 895:1-8)

**D.      PBC's Harms are Self-Inflicted Because PBC Made the Sonics a Lame Duck.**

139.      PBC was not required to relocate early to Oklahoma City. (6/18/08 Tr., C. Bennett, 452:8-20)

140.      PBC could have played out the Lease term and then applied to move to Oklahoma City for the 2010-2011 NBA season. (6/18/08 Tr., C. Bennett, 452:17-20, 453:2-9)

141.      To the extent PBC's forecasted losses of $4.4-$16.4 million stem from a "lame duck" effect, PBC created the "lame duck" effect by filing for arbitration seeking to relocate the Sonics in September 2007 – more than two years before the end of the Lease term in March 2010. (6/19/08 Tr., M. Ziets, 785:12-786:6; 6/18/08 Tr., D. Barth, 590:25-591:11)  To avoid a "lame duck" effect on revenues, nearly all professional sports teams that have relocated in the last 18 years have waited until the final season under their Leases, to announce their intent to relocate. (6/19/08 Tr., M. Ziets, 766:8-19; 802:6-14)

142.      When there is an NBA-viable stadium available for the following season, a team can wait until the final year of its Lease to announce its intent to relocate with little risk of having no venue in which to play the following season. (6/19/08 Tr., M. Ziets, 802:11-14) Currently, there are at least two unoccupied NBA-viable arenas in the United States standing empty and available: the Sprint Center in Kansas City, and the Ford Center in Oklahoma City. (6/19/08 Tr., M. Ziets, 802:15-803:3)

143.      To the extent PBC will suffer "lame duck" losses, PBC's voluntary decision to announce its intent to relocate – before it was actually free to relocate – was an expensive one.

PLAINTIFF CITY OF SEATTLE'S
FINDINGS OF FACT AND
CONCLUSIONS OF LAW - 32
Case No. C07-01620-MJP

K:\2065932\00001\20516_HAH\20516P228I

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

(6/19/08 Tr., M. Ziets, 786:20-23, 787:10-13)  To the extent that PBC has created a "lame

duck" effect that has alienated sponsors or employees, PBC alone is responsible for those

losses.  (6/18/08 Tr., D. Barth, 558:7-13, 559:12-23)  To the extent PBC has created a "lame

duck" effect, that effect has also cost the City of Seattle through lost suite revenue, which it

shares with the PBC.  (6/19/08 Tr., M. Ziets, 787:6-9; 6/18/08 Tr., D. Barth, 566:7-17)  To the

extent PBC has invited a "lame duck" effect, that effect will culminate in 2008-09; no further

declines in revenue are projected for 2009-10, the final year of the Lease.  (6/19/08 Tr., M.

Ziets, 780:2-13)

144.    In its 2006 projections for the NBA, the PBC failed to account for litigation

expenses, which were entirely foreseeable should the PBC attempt to break its Lease with the

City of Seattle.  (6/19/08 Tr., M. Ziets, 804:11-20)  To the extent PBC has incurred

extraordinary litigation expenses in 2008, it voluntarily undertook those expenses as part of its

legal endeavor to breach its Lease.  (6/18/08 Tr., D. Barth, 567:25-568:6)

145.    PBC has done very little to market its top draft pick and NBA Rookie of the

Year Kevin Durant.  (6/18/08 Tr., D. Barth, 527:4-6, 555:6-7)  PBC has stopped marketing

Sonics tickets, nor is it selling any tickets for next year.  (6/18/08 Tr., D. Barth, 591:12-24)

After purchasing the Sonics, PBC reduced the organization's marketing efforts to season

ticket holders, and this year has suspended season ticket renewals entirely.  (6/19/08 Tr., S.

Alexie, 671:20-678:15 (Exs. 336 & 337))

146.    Aubrey McClendon admits that one of the reasons the PBC is losing money is

that both attendance and corporate sponsorships have decreased as a result of the team's poor

performance.  (Dep. Designations, A. McClendon, 63:8 – 64:3; 110:4-17; 128:17 – 129:13)

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

147. A team's winning percentage and participation in the playoffs (among other factors) affects attendance, which impacts revenue. (6/16/08 Tr., V. Anderson, 150:13–151:4; Ex. 197 (Defendant's Response to RFA No. 34); Ex. 343; 6/16/08 Tr., G. Nickels, 71:7-11; 6/16/08 Tr., V. Anderson, 176:18-25 – 177:1-16)

**E.    PBC's Claims of a Dysfunctional Relationship are Unsubstantiated.**

148. From the perspective of day-to-day operations between the Seattle Center staff and PBC operational staff, the relationship between the City and PBC has been positive, cooperative, and team-oriented. (6/16/08 Tr., J. Singh, 182:1-25 – 183:1-20, 187:17-23; 6/16/08 Tr., G. Nickels, 104:15-20; 6/18/08 Tr., D. Barth, 592:7-593:19)

149. For example, the City, Seattle Center, and KeyArena staff worked with PBC to create "The Family Lounge" at KeyArena for the benefit of the player's families. (6/17/08 Tr., J. Singh, 232:21-233:17) PBC paid for the upgrades in KeyArena necessary to create The Family Lounge, and the City gave up space that was critical to its ability to stage other events at KeyArena. (6/17/08 Tr., J. Singh, 232:21-25 – 233:1-17)

150. The Director of Commercial Facilities and Events at Seattle Center, Joytinder Singh, reports that the day-to-day operational relationship between the Seattle Center, KeyArena, and Sonics staff has not been affected by PBC's purchase of the Sonics, PBC's announcement that it was planning to move to Oklahoma or the announcement of this lawsuit. (6/16/08 Tr., J. Singh, 184:3-25 – 185:1-16) Mr. Singh has held management positions at KeyArena and the Seattle Center for 14 years. (6/16/08 Tr., J. Singh, 182:1-184:2)

151. Mr. Singh rejects the characterization of the day-to-day operational relationship between the Seattle Center, KeyArena and Sonics staff as dysfunctional and

PLAINTIFF CITY OF SEATTLE'S
FINDINGS OF FACT AND
CONCLUSIONS OF LAW - 34
Case No. C07-01620-MJP

K:\206593\00001\20516_HAH\20516P228I

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

reports that no one from PBC told him that the relationship was dysfunctional. (6/16/08 Tr., J. Singh, 185:4-6, 185:24–186:16, 186:17–187:2)

152.    Aubrey McClendon admits that any alleged "dysfunction" in PBC's relationship with the City does not give it a right to breach the lease. (Dep. Designations, A. McClendon, 101:3 – 102:2)

**F.      PBC's Claims of Staff Hardship are Self Imposed.**

153.    No free agents have refused to sign with the Sonics because of the anticipated relocation to Oklahoma City. (6/18/08 Tr., C. Bennett, 452:4-452:7)

154.    To the extent PBC is losing business and professional staff, it is because they do not know if their jobs will exist if the team relocates to Oklahoma City or because the staffs are not willing to relocate to Oklahoma City. (6/18/08 Tr., C. Bennett, 443:3-443:19) PBC lost senior staff because they believed relocation was a matter of time and were making alternative career choices. (Ex. 138)

155.    To the extent PBC is having difficulty attracting sponsors or marketing the team, it is because it has made itself a lame duck by announcing its intention to relocate to Oklahoma City within two years. (6/18/08 Tr., C. Bennett, 444:21-445:4)

156.    Mr. Bennett admits that PBC will do its best to operate the Sonics franchise in the best interests of the ownership of PBC even if PBC is ordered to finish the Lease in Seattle. (6/17/08 Tr., C. Bennett, 326:18-25 – 327:1-13)

**G.      PBC Overstates the Differences Between KeyArena and Oklahoma City's Ford Center.**

157.    If PBC relocates, it will play in Oklahoma City's Ford Center during the next two years, which is a substandard arena that is not up to NBA standards. (6/18/08 Tr., C.

PLAINTIFF CITY OF SEATTLE'S
FINDINGS OF FACT AND
CONCLUSIONS OF LAW - 35
Case No. C07-01620-MJP

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

Bennett, 472:7-473:9)  The Ford Center was built five or six years ago at a cost of $80 to $90 million.  (6/18/08 Tr., C. Bennett, 472:10-473:14)

158.     If it relocates to Oklahoma City, PBC projects making operating profits in the 2009-10 season principally because of the revenue generating opportunities from courtside seating and amenities.  (6/18/08 Tr., C. Bennett, 436:24-437:7, 437:19-438:3, 438:14-439:14, 439:15-24; Ex. 139)  However, these courtside amenities and other amenities will be available at the earliest in the 2009-10 season, assuming construction starts (which has not yet occurred) (6/18/08 Tr., C. Bennett, 474:3-9, 474:21-24)  To have the revenue-producing amenities of modern NBA arenas, the Ford Center will require a substantial renovation, which the State of Oklahoma will be spending $100 million of its own money to do over the next couple of years.  (6/18/08 Tr., C. Bennett, 472:21-473:10)

159.     PBC could have used its own private money to construct a basketball-only facility for the Sonics rather than seeking public money for a larger multipurpose facility, but did not consider that option.  (6/18/08 Tr., C. Bennett, 469:24-470:8, 470:17-471:5)

## PBC'S DEFENSE OF UNDUE HARDSHIP – DUE TO ITS "GOOD FAITH" EFFORTS

**A.     PBC Never Intended to Keep the Sonics in Seattle.**

160.     PBC's members never intended to own a team in Seattle.  (Dep. Designations, A. McClendon, 81:1 – 82:25 (Ex. 220))

161.     In February 2006, Clay Bennett told USA Today that bringing an NBA team to Oklahoma City is his long term aspiration.  (6/17/08 Tr., C. Bennett, 292:16-25 – 293:1)

162.     Mr. Bennett's fellow PBC investors share the same goal of bringing an NBA team to Oklahoma City.  (6/17/08 Tr., C. Bennett, 293:2-9)

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

163.     Aubrey McClendon admitted to Oklahoma City media that PBC bought the Sonics with the hope of relocating them to Oklahoma City.  (Dep. Designations, A. McClendon, 75:11-19 (Ex. 72); 183:13 – 6 (Ex. 110))

164.     PBC's intent if it was successful in obtaining a successor venue in Washington was to sell the team for a profit in a "sweet flip." (6/17/08 Tr., C. Bennett, 295:4 – 296:22 (Ex. 60); Dep. Designations, A. McClendon, 38:2-20)  Clayton Bennett told his fellow PBC investors Tom Ward and Aubrey McClendon in an email that he was not worried about the good-faith requirement because if they succeeded in obtaining a successor venue in Seattle, they would have a "sweet flip"—an NBA team that they could sell at a profit.  Mr. Bennett speculated that if they sold the Sonics after obtaining a successor venue, the "strength" of their investment team would help them obtain an NBA team in Oklahoma City.  (6/17/08 Tr., C. Bennett, 295:8–296:22)

165.     PBC was not required by anyone else to relocate; it made a choice to relocate. (6/18/08 Tr., C. Bennett, 489:6-18)

166.     From the day PBC's purchase of the Sonics was announced (on July 17, 2006), Mr. Bennett was focused on keeping himself within the window of opportunity relative to relocation, i.e., relocation before the end of the Lease term.  (6/18/08 Tr., C. Bennett, 484:12-16 (Ex. 265), 488:15-19)  Similarly, from the day PBC announced its purchase of the team, PBC considered relocation before the end of the Lease term, i.e., within the "window" period, as a possibility.  (6/18/08 Tr., C. Bennett, 488:20-22 (Ex. 265))

167.     PBC's preferred option with respect to relocation was to relocate to Oklahoma City and thus fulfill the long-term aspiration Mr. Bennett and his partners had to bring an NBA team home to Oklahoma City. (6/18/08 Tr., C. Bennett, 488:23-489:5 (Ex. 265))

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

168.     Mr. Bennett testified that he was consistently focused on making sure that what PBC did would satisfy good faith best efforts requirement. (6/18/08 Tr., C. Bennett, 481:1-6 (Ex. 81), 483:24-484:11))  Mr. Bennett testified that he was focused on making sure that no matter what, PBC met its good faith efforts obligation. (6/18/08 Tr., C. Bennett, 486:23-487:1)  Mr. Bennett testified that, throughout the twelve month good faith best efforts period, he consistently wanted to make sure he met that obligation. (6/18/08 Tr., C. Bennett, 487:2-487:5)

169.     Brent Gooden is a principal of the Gooden Group, an Oklahoma City public relations firm. (6/18/08 Tr., C. Bennett, 462:16-463:4 (Ex. 294))  The Gooden Group has provided public relations counsel to PBC since its purchase of the Sonics. (6/18/08 Tr., C. Bennett, 463:5-463:20 (Ex. 294))  In an email to Mr. Gooden, Mr. Bennett proposed that, assuming the legislation did not pass, PBC could now speak candidly and openly about its intentions outside of the political context and that PBC would work to negotiate an early termination of the Lease. (6/18/08 Tr., C. Bennett, 463:21-464:11 (Ex. 294))

170.     Even though some of the Seattle-based Sonics owners did not want to sell, Mr. Bennett and his fellow PBC investors made a decision not to include any owners that were not based in Oklahoma city. (6/17/08 Tr., C. Bennett, 293:10-25)

B.     **Renovating KeyArena was Never an Option.**

1.     **The City offered to renegotiate the Lease and renovate KeyArena.**

171.     Prior to PBC's purchase, Mayor Nickels advocated on behalf of the City and BCOS during two state legislative sessions to obtain funding to remodel KeyArena. (6/16/08 Tr., G. Nickels, 44:6-17; 43:21-44:5)

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

172.     In May 2006, Mayor Nickels, on behalf of the City, presented BCOS with three options for renovating KeyArena.  (6/16/08 Tr., G. Nickels, 44:18-25 – 45:1-25 (Ex. 231))  Each of the three options presented to BCOS changed the leasing terms for KeyArena and was designed to increase the Sonics' revenue.  (6/16/08 Tr., G. Nickels, 46:1-17 (Ex. 231))

173.     In the July 2006, after BCOS sold the Sonics to PBC, Mayor Nickels announced that he would enforce the terms of the KeyArena lease.  (6/16/08 Tr., G. Nickels, 47:20-25 – 48:1, 58:17-21, 268:17-25 – 269:1-7 (including C. Bennett deposition at 129:1-8 for impeachment purposes))

174.     In August 2006, shortly after PBC bought the Sonics, Mayor Nickels met Clay Bennett and expressed the City's interest in renovating KeyArena.  (6/16/08 Tr., G. Nickels, 48:2–49:3; 6/17/08 Tr., C. Bennett, 321:23-25 – 322:1-23)   Mr. Bennett admitted that he did not pursue this conversation very long because "[w]e had no interest in KeyArena."  (6/17/08 Tr., C. Bennett, 322:16-23)

175.     Mr. Bennett made no efforts to contact the City between August 2006 and July 2007 to discuss a renegotiation of the KeyArena Lease.  (6/17/08 Tr., C. Bennett, 323:19-25 – 324:1-3)

176.     David Stern, the NBA Commissioner, testified before the Washington State legislature in 2006 in support of a renovated KeyArena.  (6/17/08 Tr., C. Bennett, 297:20-25 – 298:1-13; 6/20/08 Tr., W. Walker, 898:10-16)

177.     A renovated KeyArena would cost substantially less than $500 million and had been approved by the NBA as meeting NBA standards in 2006, when submitted to the

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

Washington legislature by the Schultz ownership group. (6/18/08 Tr., C. Bennett, 507:3-19)

Nevertheless, PBC never considered a renovated KeyArena. (6/18/08 Tr., C. Bennett, 507:9)

### 2. PBC refused to consider a renovated KeyArena.

178.    Ed Evans signed PBC's purchase of the Sonics from BCOS and was a key ownership representative for a period. (6/18/08 Tr., C. Bennett, 475:23-476:14) Mr. Evans visited Seattle and KeyArena twice during the pre-sale negotiation period to do due diligence. (6/18/08 Tr., C. Bennett, 475:23-476:3)

179.    On July 20, 2006, Mr. Evans emailed Mr. Bennett and wrote that deputy mayor Tim Ceis had called him and that the call went "amazingly well" and was "incredibly positive." (6/18/08 Tr., C. Bennett, 477:1-477:13, 477:22-478:1 (Ex. 69)) Mr. Evans and Mr. Ceis discussed the renovated KeyArena solution that the City and the Schultz group had supported in the state legislature. (6/18/08 Tr., C. Bennett, 478:8-478:13 (Ex. 69)) Mr. Ceis told Mr. Evans that the City's offer to the Schultz group was a "starting point" and "nowhere near what [the City is] willing to do to keep the team." (6/18/08 Tr., C. Bennett, 478:2-478:7 (Ex. 69))

180.    Despite Mr. Evans comments, Mr. Bennett claims that KeyArena was "never an option," including at the time he signed the July 18, 2006 side letter with the Schultz ownership group, as he was not interested in renovating KeyArena, but was always and only focused on a new arena. (6/17/08 Tr., C. Bennett, 296:23-25 – 297:1-19; 6/18/08 Tr., C. Bennett, 478:23-479:11 (Exs 65 & 69); Dep. Designations, B. Gooden, 101:23-102:5, 131:13-16)

181.    On December 1, 2006, PBC's consultant Tim Romani of Icon wrote Clay Bennett that he had met that day with PBC's architect HOK and told them that PBC did not

PLAINTIFF CITY OF SEATTLE'S
FINDINGS OF FACT AND
CONCLUSIONS OF LAW - 40
Case No. C07-01620-MJP
K:\206593\00001\20516_HAH\20516P228I

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

need a detailed evaluation of Key Arena in terms of it being or not being an adequate NBA facility because that had been addressed. (6/18/08 Tr., C. Bennett, 426:1-16 (Ex. 264))

182. PBC never considered proposing a NBA-only stadium, rather than a world-class multipurpose event center, even though an NBA-only stadium might have been cheaper. (6/18/08 Tr., C. Bennett, 461:23-462:4)

183. Mayor Nickels eventually heard, although not through direct communications with PBC, that PBC was not interested in renovating KeyArena and wanted a new arena instead. (6/16/08 Tr., G. Nickels, 49:4-15)

**C. PBC Wanted the Most Expensive Arena in the History of the NBA.**

**1. PBC pitches a $500 million dollar arena to Olympia with no plan, no details, and then misses the deadlines.**

184. Rather than pursue BCOS' most recent $200 million plan to renovate KeyArena, Mr. Bennett and PBC developed a plan to build a new $500 million facility in either Renton or Bellevue. (6/17/08 Tr., C. Bennett, 298:10-23)

185. Mayor Nickels did not lobby against PBC's efforts to obtain funding from the State legislature for a new arena in Renton. (6/16/08 Tr., G. Nickels, 128:20–129:21) The Mayor, however, asked the Legislature to include funding for the retirement of the KeyArena debt in any legislation to build a new arena in Renton. (6/16/08 Tr., G. Nickels, 128:20–129:21)

186. When the Washington state legislative session began in January 2007, PBC did not have legislation to introduce, an arena plan finished, or a final number as to the cost. (6/17/08 Tr., C. Bennett, 300:14-301:2, 512:4-12 (Ex. 90)) PBC also faced opposition due to

PLAINTIFF CITY OF SEATTLE'S
FINDINGS OF FACT AND
CONCLUSIONS OF LAW - 41
Case No. C07-01620-MJP

K:\206593\00001\20516_HAH\20516P228I

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

the Washington state political leadership's doubts about Mr. Bennett's intentions. (6/18/08 Tr., C. Bennett, 457:7-12 (Ex. 322))

187.    PBC later committed to Governor Gregoire and Speaker of the House Chopp that it would have a detailed plan to them before February 1, 2007.  (6/18/08 Tr., C. Bennett, 511:2-16 (Ex. 545))  PBC missed the February deadline.  (6/18/08 Tr., C. Bennett, 512:18-19 (Ex. 90))  In February, PBC still had not named the site or outlined the finances of the plan for a new arena.  (6/18/08 Tr., C. Bennett, 512:13-15 (Ex. 90))

188.    Traditionally in Washington state, projects like PBC's proposed arena project have only been approved when virtually every detail of the project is contained in the state legislation, and King County is given only the right to authorize the tax sources to retire the bonds.  (6/18/08 Tr., C. Bennett, 513:5-11 (Ex. 90))  PBC never delivered to the state legislature proposed legislation that contained details of its project.  (6/18/08 Tr., C. Bennett, 513:16-22 (Ex. 90))

189.    After the legislative session ended, the PBC team of public relations and development professionals stopped working with respect to finding a successor venue in Washington state.   (6/18/08 Tr., C. Bennett, 469:5-21)  This was six months into the twelve month period in which PBC had contractually promised to make good faith efforts to find a successor venue in King County.  (6/18/08 Tr., C. Bennett, 469:22-23)

    **2.    PBC refused to specify a private contribution.**

190.    PBC never told the Washington state legislative leadership that it intended to make only a "nominal" direct contribution to the construction of the successor venue, and even that would have included credits for PBC's development costs and some portion of ongoing operating losses.  (6/18/08 Tr., C. Bennett, 455:20-455:25 (Ex. 272), 456:4-8;

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

508:14-25 (Ex. 89, PPA 004975); Dep. Designations, B. Gooden, 184:3-185:9, 206:207:7)

PBC intended its contribution to come out of ticket surcharges, parking fees, extraordinary

private or corporate investment (by others), and naming rights – all of which are elements of

an arena's revenue stream – with only a "nominal" or "neglible" contribution directly by

PBC.  (6/18/08 Tr., C. Bennett, 453:15-455:19 (Ex. 272), 306:8–307:7 (Ex. 98), 484:12-

485:20 (Ex. 265); 6/17/08 Tr., C. Bennett, 302:23– 304:7 (Ex. 97), 305:15–307:7

(Ex. 98), 509:9-510:23 (Ex. 263), 507:20-508:24 (Ex. 89); Dep. Designations, C. Bennett,

204:3-21 (Ex. 265); Dep. Designations, A. McClendon, 126:6-24, 127:18-21, 147:1-23 (Ex.

250))

191.   At the end of December 2006, PBC's financial consultant Tim Romani told

Mr. Bennett that PBC's economic models for the new arena included a cash contribution from

PBC of $10 million and another $50 million from arena revenues related to things like ticket

surcharges and parking.  (6/18/08 Tr., C. Bennett, 487:6-17, Ex. 265))  Mr. Bennett never told

the legislature PBC would invest $10 million in cash.  (6/18/08 Tr., C. Bennett, 487:18-488:3)

192.   To the contrary, in February 2007, Mr. Bennett confirmed that he would not

"be committing to a dollar figure for our ownership group" with respect to a private-public

partnership to build a successor venue.  (6/17/08 Tr., C. Bennett, 332:16-25 – 334:1-5 (Ex.

93))

**3.     PBC refused to accept responsibility for cost overruns.**

193.   PBC knew Governor Gregoire was concerned about PBC's failure to commit

to a private contribution or to cover cost-overruns, especially where PBC would be dictating

the design and construction of the new facility.  (6/17/08 Tr., C. Bennett, 334:11-336:6 (Ex.

268)  Nonetheless, in dealing with Olympia, PBC's position on the issue of cost overruns was

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

that it would not be responsible for cost overruns related to the building or buildings themselves. (6/18/08 Tr., C. Bennett, 425:10-16; 6/17/08, C. Bennett, 311:19-312:20)

194.    Even after PBC's legislation failed, PBC still refused to consider a plan that required PBC to cover construction cost overruns. (6/18/08 Tr., C. Bennett, 459:6-461:14 (Exs. 316 & 317))

**D.    A "Man Possessed" to Move the Team – Six Months Into the Good Faith Period.**

195.    On the morning of April 17, 2007, fellow PBC investor Tom Ward sent Clayton Bennett an email responding to a April 16, 2007 news article reporting that there was little hope PBC would keep the Sonics in Washington state, asking, "Is there any way to move here for next season? Are we doomed to have another lame-duck season in Seattle?" (6/17/08 Tr., C. Bennett, 313:1-22 (Ex. 115)) Mr. Bennett responded to Mr. Ward's email by stating, "I am a man possessed!  Will do everything we can.  Thanks for hanging with me, boys, the game is getting started!" (6/17/08 Tr., C. Bennett, 313:23-25 – 314:1-2 (Ex. 115))  Mr. Bennett contends that his "man possessed" statement refers to his commitment to keep the Sonics in Seattle. (6/17/08 Tr., C. Bennett, 314:3-14)

196.    Mr. Bennett's explanation is not credible because: (1) it was obvious that Mr. Ward was not asking whether they could keep the team in Seattle, (2) Mr. Ward's response to Mr. Bennett's "man possessed" statement clearly indicated that he thought Mr. Bennett was fighting to move the Sonics to Oklahoma City, (3) Mr. McClendon chimed into the email exchange by emphasizing that he too was willing to help in any way to "watch ball here next year", and (4) Mr. Bennett made no effort to correct Mr. Ward's and Mr. McClendon's misconceptions that Mr. Bennett was fighting to get the Sonics to Oklahoma City. (6/17/08 Tr., C. Bennett, 314:15-25 – 315:1-23 (Ex. 115))

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

197.     Mr. Bennett's explanation of his "man possessed" statement also is not credible because Mr. Bennett admits that shortly after he sent his "man possessed" email, he contacted Oklahoma City manager Jim Couch to hold dates at the Ford Center for the upcoming NBA season.  (6/17/08 Tr., C. Bennett, 320:1-10)

198.     Mr. Bennett's explanation of his "man possessed" statement also is not credible because he contacted Joel Litvin, an executive at the NBA, just a few days later to explain why Oklahoma City would be a good market for an NBA team.  (6/17/08 Tr., C. Bennett, 316:3-25 – 317:1-12 (Ex. 116))

199.     Mr. Bennett's explanation of his "man possessed" statement also is not credible because two days after writing that PBC could now speak candidly about its intentions and would work to negotiate an early termination of the Lease, PBC member Tom Ward emailed Mr. Bennett to ask if PBC could avoid playing a lame duck season in Seattle and Mr. Bennett replied that he was a "man possessed."  (6/18/08 Tr., C. Bennett, 464:17-25 (Ex. 115))

200.     Mr. Bennett's explanation of his "man possessed" statement also is not credible because ten days after Clay Bennett e-mailed that he was a "man possessed", he claimed that he did not know where the Sonics are going to play in the upcoming 2007-2008 season.  (Dep. Designations, A. McClendon, 166:16 – 167:8 (Ex. 120))

201.     Mr. Bennett's explanation of his "man possessed" statement is not credible because he did not clarify in an April 2007 email exchange with his fellow PBC investor, Aubrey McClendon, that he was possessed to keep the team in Seattle.  (6/17/08 Tr., C. Bennett, 318:3-25 – 319:1-2 (Ex. 120))  Instead, in response to Aubrey McClendon's question, "where will [we] be next year sir?", Mr. Bennett stated, "Quite likely we will play

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

next year in Seattle, but attempting to quietly and without litigation work through the lease. David has said we will need to find out soon. Lots of issues for the league on a permanent relocation." (6/17/08 Tr., C. Bennett, 318:3–319:2 (Ex. 120))

202.    Mr. Bennett's explanation of his "man possessed" statement is not credible because at the end of April 2007, he flew to Seattle to meet attorney Brad Keller in preparation for litigation over the KeyArena Lease. (6/17/08 Tr., C. Bennett, 320:20-25 – 321:1-15 (Ex. 501, PBC_12089); 6/18/08 Tr., C. Bennett, 466:17-467:17)

203.    Mr. Bennett did not meet with Mayor Nichols or Tim Ceis, or go with Terry McLaughlin to meet with City representatives. (6/18/08 Tr., C. Bennett, 466:17-467:17)

**E.    McClendon Confirmed PBC Always Intended to Move the Team to Oklahoma.**

204.    In an August 2007 interview with the Oklahoma City Journal of Record, PBC member Aubrey McClendon said that "We didn't buy the team to keep it in Seattle; we hoped to come here." (6/18/08 Tr., C. Bennett, 493:16-495:2 (Ex. 139)) Mr. McClendon explained that although it would be more difficult for PBC financially in Oklahoma City than in Seattle, PBC thought it would be great for the community. (Ex. 139) After reading the interview, Mr. McClendon wrote Mr. Bennett "Clay: Oh no, just read this, have I created problems for you? I am so sorry, the truth is we did but it with the hopes of moving to OKC[.]" (6/18/08 Tr., C. Bennett, 495:3-495:12 (Ex. 139))

205.    In response to Mr. McClendon's email, Mr. Bennett wrote Mr. McClendon that, yes, PBC got "killed" on this one, and that while he (Mr. Bennett) did not care about the public relations ugliness. (6/18/08 Tr., C. Bennett, 496:15-497:6 (Ex. 138))

206.    Mr. Bennett did not in his email ask Mr. McClendon how he (Mr. McClendon) could have said something so inaccurate. (6/18/08 Tr., C. Bennett, 496:15-497:6 (Ex. 138))

PLAINTIFF CITY OF SEATTLE'S
FINDINGS OF FACT AND
CONCLUSIONS OF LAW - 46
Case No. C07-01620-MJP

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

Mr. Bennett's concern in his email was about whether or not Mr. McClendon's statement undermined PBC's basic premise of good faith best efforts, and he wanted his lawyers to develop a strategy to respond. (6/18/08 Tr., C. Bennett, 497:12-16 (Ex. 138))

207.    On August 27, 2007, Mr. Bennett emailed Mr. McClendon that PBC intended to roll out a sixty day strategic messaging plan that would have little or no effect – or quite likely a negative effect – on Seattle. (6/18/08 Tr., C. Bennett, 497:17-499:11 (Ex. 145)) The purpose of the media campaign was instead to impact the national sports media and, most importantly, NBA Commissioner David Stern and the other NBA owners. (6/18/08 Tr., C. Bennett, 499:12-21 (Ex. 145))

**F.    The City's Elected Officials Reject PBC's Proposed Buy-Out.**

208.    PBC senior executive Terry McLaughlin had very positive relations with the City, was highly regarded by the City, and highly regarded by PBC and Mr. Bennett. (6/18/08 Tr., C. Bennett, 429:20-24) This was one of the reasons PBC chose Mr. McLaughlin to raise with the City the possibility of the City's agreeing to terminate or shorten the term of the Lease in late April or early May 2007. (6/18/08 Tr., C. Bennett, 429:12-24; 429:25-430:1; 6/16/08 Tr., G. Nickels, 49:16–50:3)

209.    Mayor Nickels instructed Deputy Mayor Ceis to reject the buyout offer. (6/16/08 Tr., G. Nickels, 50:4-6) When the City rejected PBC's buyout offer in May 2007, it was not aware of the Matt Griffin Seattle Center Investment Group's interest in buying the Sonics. (6/16/08 Tr., G. Nickels, 56:16-18)

210.    On July 19, 2007, Clay Bennett contacted Mayor Nickels to suggest a face-to-face meeting, however, the meeting was never scheduled. (6/16/08 Tr., G. Nickels, 50:9-18)

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

# PBC'S DEFENSE OF UNCLEAN HANDS IS
# UNSUBSTANTIATED BY THE FACTS

**A.    The City Affirms Policy Decision to Enforce the Lease.**

211.    In July 2006, shortly after PBC purchased the Sonics and before PBC assumed the Lease, Mayor Nickels announced that he would enforce the KeyArena lease.  He did not consult with Wally Walker, Matt Griffin or Steve Ballmer when he announced in the summer of 2006 that he would enforce the KeyArena lease.  (6/16/08 Tr., G. Nickels, 58:17-24, 59:13-23)

212.    In May 2007, Mayor Nickels rejected PBC's offer to buyout the KeyArena lease without the counsel of Mssrs. Walker, Griffin, or Ballmer.  (6/16/08 Tr., G. Nickels, 58:25 – 59:1-6, 59:13-23)

213.    Despite asking the Mayor July 19, 2007 to take the lead in finding a solution to keep the Sonics in Seattle, PBC shortly thereafter announced in a press statement that it would not entertain any further discussions with the City regarding KeyArena because it was not interested in a renovation of KeyArena.  (6/16/08 Tr., G. Nickels, 50:19-22)

214.    In response to the July 19 call to action by Mr. Bennett, Mayor Nickels focused on his most readily available solution, a renovated KeyArena, and did not foreclose further discussions with PBC regarding the KeyArena lease.  (6/16/08 Tr., G. Nickels, 51:2-7, 52:3-7)

215.    On September 10, 2007, the City Council unanimously passed Ordinance 122992, which expresses the City Council's position that the last two years of the KeyArena lease should be enforced.  (6/16/08 Tr., G. Nickels, 60:17–61:7 (Ex. 31))  The City Council decided to pass Ordinance 122992 because individual council members had made statements

PLAINTIFF CITY OF SEATTLE'S
FINDINGS OF FACT AND
CONCLUSIONS OF LAW - 48
Case No. C07-01620-MJP

K:\206592\00001\20516 HAH\20516P228L

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

criticizing the Mayor's efforts to obtain funding to renovate KeyArena from the State legislature. The City Council decided it needed to make a unified, official statement about the enforcement of the KeyArena lease. (6/16/08 Tr., G. Nickels, 122:12-20)

216.    When the City Council passed Ordinance 12292, nine days before PBC filed its arbitration demand, the Council had no reason to know that PBC would be filing an arbitration demand. (6/16/08 Tr., G. Nickels, 122:12-20)

217.    Ordinance 122992 states that the City Council in 1994 authorized the Mayor to enter into a 15-year rather than a 20-year lease with the Sonics because of the cultural, civic and community benefits obtained from having the Sonics play their home games in Seattle. (6/16/08 Tr., G. Nickels, 60:20–61:7 (Ex. 31))  As a result, the City Council and Mayor Nickels agree that the length of the lease term in the Sonics' lease is a material term of the contract "and a principal incentive for Council approval of the original contract." (6/16/08 Tr., G. Nickels, 60:20–61:7 (Ex. 31), 62:19-23)

218.    On September 19, 2007, PBC served an arbitration demand on the City. (6/16/08 Tr., G. Nickels, 51:8-19, 55:15-20 (Ex. 147))  Mayor Nickels was surprised when PBC filed the arbitration demand. (6/16/08 Tr., G. Nickels, 122:6-11)

219.    On September 21, 2007, Mayor Nickels' office hired K&L Gates, a law firm in Seattle, to enforce the Lease with PBC. (6/16/08 Tr., G. Nickels, 57:20-25)

220.    Based on his authority in the City Charter to enforce the City's contracts and manage its litigation, Mayor Nickels commenced this litigation after receiving PBC's arbitration demand. (6/16/08 Tr., G. Nickels, 52:8-16)

221.    Mayor Nickels did not consult with Wally Walker, Matt Griffin, or Steve Ballmer when he decided to file this lawsuit. (6/16/08 Tr., G. Nickels, 59:7-23)

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

222.    Mayor Nickels believes that it is worthwhile to enforce the Lease even though there are only two years left because the additional time will give the state legislature and the City additional time to craft a solution to keep NBA basketball in Seattle.  (6/16/08 Tr., G. Nickels, 59:24–60:10, 130:19–131:23)

**B.    City's Efforts to Obtain NBA Approval for a Renovated KeyArena.**

223.    On July 24, 2007, in response to the same Clay Bennett call to arms of regional leadership, Ken Nakatsu and Dwight Dively from the City and Wally Walker have lunch. (Wally Walker is a former player and life-long fan who wants to see the Sonics play basketball in Seattle but he never took any steps to force PBC to sell or incur financial losses.) At the meeting, the City seeks information from Mr. Walker to learn, based on his knowledge of the NBA and KeyArena, how it can make a renovated KeyArena plan work for an NBA team.  (6/20/08 Tr., W. Walker, 903:24 – 905:1; 922:6-20)  Mr. Walker expressed his personal opinion that the City should enforce the Lease and the City confirmed that was the City's current policy position.

224.    In August 2007, Wally Walker meets Deputy Mayor Ceis to discuss the City's potential $100 million contribution to a KeyArena remodel.  They do not discuss the City or any other party forcing a sale of the team.  (6/20/08 Tr., W. Walker, 913:1 – 914:1))

225.    The City, PBC, Senator Gorton and the NBA meet in mid-October in New York City.  The purpose is for the City to inform PBC and the NBA of its serious commitment to find an arena solution at KeyArena, and its concrete plans for moving that proposal forward.  (6/20/08 Tr., W. Walker, 914:8-22)  Wally Walker assisted the City in preparation for this meeting.

PLAINTIFF CITY OF SEATTLE'S
FINDINGS OF FACT AND
CONCLUSIONS OF LAW - 50
Case No. C07-01620-MJP
K\206593\0000\120516_HAH\20516P228\

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

226. On October 17, 2007, Wally Walker speaks to Joel Litvin at the NBA in order to get Mr. Litvin's reaction to the City's presentation of a KeyArena renovation to PBC and the NBA. (6/20/08 Tr., W. Walker, 889:24 – 890:4 (Ex. 601))

227. In November and December 2007, Wally Walker assists the City in its study of renovating KeyArena requested by the NBA as follow-up from the October meeting with the NBA and PBC about the economics of a remodeled KeyArena for an NBA team. (6/20/08 Tr., W. Walker, 918:17 – 919:19)

228. In January 2008, Tim Ceis forwards the Northmarq study – a study commissioned by the City of Seattle to determine the viability of a renovated KeyArena with a restructured lease – to the NBA, and expressed hopes to enter a lease consistent with that outlined in the report with the PBC. (6/16/08 Tr., G. Nickels, 126:4-18)

**C.      Local Group Forms to Evaluate the Possibility of a New Arena for PBC Ownership in Bellevue.**

229. On July 19, 2007, the same day Clay Bennett issues a call to Mayor Nickels and other regional leaders to step up if they expect to keep the Sonics in Seattle, Wally Walker and Senator Gorton have lunch to discuss potential arena solutions in the City of Bellevue. (6/20/08 Tr., W. Walker, 900:23 – 901:14)

230. Neither Senator Gorton nor Wally Walker had any formal engagement with the City when they lunched on July 19, 2007. (6/20/08 Tr., W. Walker, 901:8-10, 903:17-19)

231. In late July or early August 2007, Wally Walker meets with the Bellevue City Manager to follow-up on his lunch discussions with Senator Gorton. (6/20/08 Tr., W. Walker, 902:2-18)

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

232.    Between July 19, 2007 and September 9, 2007, Wally Walker and Senator Gorton do not have any discussions related to the Sonics other than concerning a potential Bellevue arena.  (6/20/08 Tr., W. Walker, 903:12-16)

233.    In August 2007, Wally Walker and Mike McGavick begin working on the Blackburn PowerPoint presentation.  The Blackburn PowerPoint presentation was authored by Mike McGavick as a concerned citizen and not for the City.  Mr. McGavick nicknamed the PowerPoint presentation "Blackburn" after the Sonics' original announcer Bob Blackburn.  (6/20/08 Tr., W. Walker, 907:9-13, 908:9 – 909:2)

234.    On September 9, 2007, Wally Walker and Steve Ballmer play golf and Mr. Ballmer indicates he is not interested in helping to fund a Bellevue arena.  (6/20/08 Tr., W. Walker, 902:24 – 903:11)

235.    On September 9, 2007, Wally Walker viewed portions of the Blackburn PowerPoint presentation from Mike McGavick prior to being retained as a consultant by the City.  (6/20/08 Tr., W. Walker, 907:9-22 (Ex. 601))  Mr. McGavick, not Senator Gorton, brought Mr. Walker into the discussion regarding keeping the Sonics in Seattle.  (6/20/08 Tr., W. Walker, 909:12-15)

236.    The City had no involvement in the creation of the Blackburn PowerPoint document.  The PowerPoint contemplated cultivating a partnership with the City, aligning goals with the Mayor and creating closure with the City.  (6/20/08 Tr., W. Walker, 912:2-19, 915:24 – 917:2 (Ex. 567))

237.    On October 7, 2007, Wally Walker hosted a meeting at his house with Steve Ballmer, Senator Gorton and Mike McGavick to discuss potential strategies for a local group

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

to purchase the Sonics in light of PBC's threats to move the team.  They flipped through the Blackburn PowerPoint.  (6/20/08 Tr., W. Walker, 855:1-8, 911:13 – 912:1)

238.    Senator Gorton's role at the October 7, 2007 meeting was to offer advice about how to navigate the political process from his own perspective and not as the City's legal representative.  (6/20/08 Tr., W. Walker, 909:16 – 910:8)

239.    The City did not plan or participate in the October 7, 2007 meeting.  (6/20/08 Tr., W. Walker, 917:3-7)

240.    The October 7, 2007 meeting culminated in a desire to investigate the economics of a KeyArena remodel.  (6/20/08 Tr., W. Walker, 918:6-13)  Deputy Mayor Tim Ceis first saw the Blackburn Powerpoint at his deposition in April 2008.

**D.      Local Investors Emerge With a Plan to Renovate KeyArena and/or Purchase the Sonics to Keep the Team in Seattle.**

241.    In March 2007, Clay Bennett requests that Steve Ballmer step up as a "Champion" for a new Sonics arena and to assist PBC in its legislative lobbying efforts.  (Ex. 555)

242.    In March 2007, Clay Bennett tells Steve Ballmer that "the well is poisoned so deep" in regards to state funding for a new arena.  ((Ex. 555); *see also* 6/20/08 Tr., W. Walker, 900:2-17)

243.    In mid-October, Matt Griffin becomes involved in the discussions to form a local investors group - the Matt Griffin Seattle Center Investment Group ("Griffin Group") (6/20/08 Tr., M. Griffin, 926:22-25, 928:2-24 (Ex. 570))  Matt Griffin's interest in owning the Sonics was to maintain and increase urban vibrancy and quality of life.  (6/20/08 Tr., M. Griffin, 973:8 – 974:24)

PLAINTIFF CITY OF SEATTLE'S
FINDINGS OF FACT AND
CONCLUSIONS OF LAW - 53
Case No. C07-01620-MJP
K:\206593\20000\120516, HAH\20516P228I

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

244.     The Griffin Group was not planned, organized, or facilitated by the City. (6/20/08 Tr., M. Griffin, 975:16-23)

245.     The Griffin Group had two alternative goals: to either purchase the Sonics or purchase another NBA team.  (6/20/08 Tr., M. Griffin, 979:6 – 980:1)

246.     The Griffin Group focused on procuring the financing for a renovated KeyArena so that the Sonics under PBC ownership, the Sonics under local ownership or a new NBA team could play there.  (6/20/08 Tr., M. Griffin, 990:21 – 991:19)

247.     Mr. Griffin and Mr. Ballmer had no intention of "bleeding" PBC.  (6/20/08 Tr., M. Griffin, 993:17-20)

248.     The Griffin Group offered to partner with the City financially to renovate KeyArena.  The Griffin Group proposed to match the public investment, dollar-for-dollar, up to $150 million.  (6/16/08 Tr., G. Nickels, 57:7-14)

249.     The Griffin Group does not have a vested interest in owning the team.  The Griffin Group saw team ownership as only a means to keep the team in Seattle in line with their civic goals.  (6/20/08 Tr., M. Griffin, 981:24 – 982:11 (Ex. 575))

250.     The City was not involved with the creation of the Griffin Group or its plans. Senator Gorton's December 19, 2007 e-mail to the Griffin Group shows that the Mayor had complementary goals.  (6/20/08 Tr., M. Griffin, 987:10 – 988:11 (Ex. 576))

251.     In either November or December 2007, Mayor Nickels became aware of the Griffin Group.  (6/16/08 Tr., G. Nickels, 56:7-15)  The purpose of the Griffin Group was to keep the NBA in Seattle by purchasing the Sonics.  (6/16/08 Tr., G. Nickels, 56:25 – 57:1-3) Neither the Mayor nor any of his staff played a role in the formation of this local investment group.  (6/16/08 Tr., G. Nickels, 56:21-23)

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

252. The Griffin Group did not meet with the City until mid-February or March 2008 to let the City know about the group's goals. (6/20/08 Tr., M. Griffin, 988:12 – 989:12)

253. The Griffin Group did not pay for any of this litigation. (6/20/08 Tr., M. Griffin, 984:14-15)

254. The Griffin Group did not discuss or focus on litigation to buy the team. (6/20/08 Tr., M. Griffin, 986:9-20)

255. Mayor Nickels was pleased with the Griffin Group's KeyArena proposal because it was in the range of dollars to make KeyArena a long-term successful facility for the Sonics. (6/16/08 Tr., G. Nickels, 57:16-19)

256. To the extent any or all of the above Findings of Fact constitute Conclusions of Law, they shall be deemed Conclusions of Law.

## CONCLUSIONS OF LAW

Based upon the above Findings of Fact, the Court makes the following Conclusions of Law:

**I.      Standard Governing Grant of Specific Performance.**

1. A decree of specific performance rests within the sound discretion of the trial court. *Crafts v. Pitts*, 162 P.3d 382, 389 (Wash. 2007). If the requirements of the doctrine are satisfied, however, specific performance is the presumptive remedy. *Id.*; *Egbert v. Way*, 546 P.2d 1246, 1248 (Wash. Ct. App. 1976); *Church v. Bruce*, 251 P. 854, 855 (Wash. 1927) ("Where . . . the agreement is in writing, is certain in its terms, is fair and just in all its provisions, is for a valuable consideration, and is capable of being enforced without hardship to either party, it is as much a matter of course for a court of equity to decree its specific

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

1  performance, as for a court of law to award a judgment of damages upon its breach.")

2  (quotation omitted).

3  **II.    Specific Performance is Available in this Case as a Contract Remedy.**

4        2.     For specific performance to be available as a contract remedy, the contract

5  must be valid and binding on the parties; have definite and certain terms; be free from

6  unfairness, fraud, or overreaching; and involve breach or threatened breach by the party

7

8  against whom specific performance is sought. *Crafts v. Pitts*, 162 P.3d 382, 388 (Wash.

9  2007).

10        3.     A party that assumes the obligations of a contract is subject to the remedy of

11  specific performance. *Baird v. Knutzen*, 301 P.2d 376, 376 (Wash. 1956).

12        4.     In the context of specific performance, "unfairness, fraud and overreaching"

13  exist if, at the time of contracting, a contract is induced by mistake or unfair practices

14  (procedural unfairness) or the exchange is grossly inadequate;. *Nelson v. Nelson*, 356 P.2d

15  730, 731-32 (Wash. 1960); *Gilman v. Brunton*, 161 P. 835, 837-38 (Wash. 1916); *Pasco Fruit

16

17  *Lands Co. v. Timmerman*, 152 P. 675, 676-77 (Wash. 1915).  A contract is not procedurally

18  unfair where it is entered into between sophisticated business entities, assisted by counsel,

19  following lengthy negotiations. *Wagner v. Wagner*, 621 P.2d 1279, 1283 (Wash. 1980).  Both

20  SSI and PBC, when they entered into the Lease and the Lease/Instrument of Assumption,

21  were experienced commercial entities with assistance of counsel.

22

23        5.     PBC admits the Lease is valid and binding as to it and the City; PBC signed an

24  Instrument of Assumption in which PBC assumed all obligations of the Lease, including the

25  obligation to play Sonics games in Key Arena through September 30, 2010.

26

PLAINTIFF CITY OF SEATTLE'S
FINDINGS OF FACT AND
CONCLUSIONS OF LAW - 56
Case No. C07-01620-MJP

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

6.    The terms of Article XXVII.L of the Lease are also definite and certain.  It states that the parties' obligations are unique and that specific enforcement is available as a remedy.

7.    The 15 year term of the Lease was specifically negotiated by SSI and the City. A primary purpose of the Lease was "to maintain the SuperSonics franchise in Seattle.  The contract between the City and SSI was supported by substantial consideration on the part of the City, including its ground-up construction of KeyArena in 1994-95.  The City spent $10 million in cash and $74 million financed by bonds to construct KeyArena.

8.    PBC wants to relocate prior to the start of the 2008-09 NBA season. Relocation prior to the end of the 2009-10 NBA season would breach the obligations of Article II and the Lease term.

9.    Specific performance is thus available as a contract remedy because the Lease is valid and binding; has clear and definite terms; is free from fraud, overreaching, or unfairness; and PBC has threatened to breach.

III.    **Courts Will Give Effect to Parties' Selection of Remedies for Breach of Contract Absent Public Policy Considerations Not Present Here.**

10.    Parties have freedom to contract as they choose absent a contrary public policy.  *See Keystone Land & Dev. Co. v. Xerox Corp.*, 94 P.3d 945, 948 (Wash. 2004); *Northwest Airlines v. Hughes Air Corp.*, 679 P.2d 968, 970 (Wash. Ct. App. 1984).  This includes the freedom to choose the remedy of specific enforcement.  *Mahoney v. Tingley*, 529 P.2d 1068, 1070-71 (Wash. 1975); *Gildor v. Optical Solutions, Inc.*, 2006 WL 1596678, *10 (Del. Ch. 2006); *Qantum Comm. Corp. v. Star Broad., Inc.*, 473 F. Supp. 2d 1249, 1266 (S.D. Fla. 2007); *Media Gen. Broad. v. Pappas Telecasting*, 152 F. Supp. 2d 865, 869 (W.D. N.C.

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

2001).  If the parties contract for a remedy, even one as extreme as forfeiture, "a court of equity will not interfere with that contract term in the absence of fraud, accident, surprise, or improper practice."  *Dunkin' Donuts of America*, *Inc. v. Middletown Donut Corp.*, 495 A.2d 66, 74 (N.J. 1985).

11.     Courts will give effect to the parties' agreement that their rights can be specifically enforced if a contract will not require unduly burdensome supervision by a court and is not a personal services contract.  *See, e.g.*, *Finance Auth. V. L.L. Knickerbocker Co.*, 106 F. Supp. 2d 44, 52 (D. Me. 1999); *Terex v. Trailer Corp. v. McIlwain*, 579 So.2d 237, 241-42 (Fla. Dist. Ct. App. 1991); *Humphries v. Ables*, 789 N.E.2d 1025. 1035-36 (Ind. Ct. App. 2003); *Stumpf v. Richardson*, 748 So.2d 1225 (La. Ct. App. 1999); *Ludington v. LaFreniere*, 704 A.2d 875, 878 (Me. 1997); *Peuse v. Malkuch*, 911 P.2d 1153, 1155 (Mont. 1996) (decided under statute).

12.     Courts will enforce a party's agreement to a specific performance clause where a sophisticated business entity agreed to a specific performance clause, then tried to breach and pay damages (rather than perform) only a year later.  *Minnesota Twins*, 638 N.W.2d at 227.

13.     A court will not rewrite a contract to relieve a party of its obligations on the grounds that its expectations in entering into the contract were disappointed, and thus that specific performance would be unduly burdensome.  *Blanck v. Pioneer Mining Co.*, 159 P. 1077, 1079-80 (Wash. 1916) (citing 6 Pomeroy's Equity Jurisprudence § 797).

14.     The City and SSI were sophisticated business entities, represented by counsel, who negotiated at length over the exact subject (the term of the Lease) at issue in this dispute. PBC assumed the Lease in 2006; it too was a sophisticated business entity that was fully

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

aware of the Lease term and the historic and projected financial difficulties of the Sonics and represented by counsel. PBC thus agreed to be subject to the remedy of specific performance. PBC's claimed disappointment of its hopes for a new arena does not relieve it from its specific performance obligation.

**IV.    Specific Performance Will Not Require Ongoing Supervision by the Court.**

15.    A court may consider whether specific performance will impose a burden on the court that is disproportionate to the benefit gained. Restatement (Second) of Contracts § 366 (1979). This is, however, a discretionary rule that is frequently ignored and always given significantly less weight where the public interest is affected. *Cahalan Investment Co. v. Yakima Central Heating Co.*, 193 P. 210, 212 (Wash. 1920) ("Where there is a public interest involved, to take control of a business is proper, and is sometimes necessary, even though the act may involve the conduct of the business for a time."); *Laclede Gas Co. v. Amoco Oil Co.,* 522 F.2d 33, 39 (8th Cir. 1975) ("While a court may refuse to grant specific performance where such a decree would require constant and long-continued court supervision, this is merely a discretionary rule of decision which is frequently ignored when the public interest is involved.") *Northern Indiana Public Service v. Carbon County Coal Co., 799 F.2d 265, 279-80 (7th Cir. 1986)* (where real party in interest is the public, their interest can be taken into account in determining whether to grant specific performance); *Mississippi Power & Light Co v. United Gas Pipe Line Co.*, 760 F.2d 618 (5th Cir. 1985) (granting specific performance to public utility after taking into account effect breach would have on utility customers).

16.    Courts' reluctance to order specific performance in light of ongoing supervision issues generally arise with respect to continuous operations clauses in contracts, because of the burdensome nature of continuing oversight by the court. *Cahalan Investment*

PLAINTIFF CITY OF SEATTLE'S
FINDINGS OF FACT AND
CONCLUSIONS OF LAW - 59
Case No. C07-01620-MJP

K\206593\20000\20516, HAH\20516P228!

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

*Co. v. Yakima Central Heating Co.*, 193 P. 210, ___ (1920); CBL Assocs., Inc. v. McCrory Corp., 761 F.Supp. 807, 809-10 (M.D. Ga. 1991).

17.     Under Article XXV of the Lease, all operational disputes between the parties over the last two years of the Lease would be subject to mandatory arbitration. The provision requiring court resolution of disputes over the term of the Lease, Article II, is an exception to this general rule. Thus, once the dispute regarding Article II is resolved this Court will have no further involvement in the parties' business relationship.

18.     Moreover, PBC has agreed that it will abide by this Court's order. PBC will operate its business in a commercially reasonable manner. There is no reasonable likelihood that further disputes will be brought before this Court. Even if some court oversight were required, oversight would be reasonable under the circumstances to protect the public interest.

## V.     Conditions Under Which Specific Performance is Available.

19.     Specific performance is the preferred remedy unless damages would not be as plain, adequate, complete and efficient a remedy for breach. *Crafts*, 162 P.3d at 388-89.

20.     In evaluating whether damages are an adequate remedy, courts consider whether (a) it would be difficult for the non-breaching party to obtain a suitable substitute or (b) whether damages would be difficult to prove with reasonable certainty. *Crafts*, 162 P.3d at 388-89.

## VI.     Damages Would Be an Inadequate Remedy Because it Would Be Difficult if Not Impossible for the Sonics to Obtain a Suitable Substitute.

21.     Damages are not as plain, adequate, complete and efficient a remedy as specific performance, if it would be difficult to obtain a suitable substitute because a substitute for the object of the contract is not available on the open market. *McLeod v. Keith*,

PLAINTIFF CITY OF SEATTLE'S
FINDINGS OF FACT AND
CONCLUSIONS OF LAW - 60
Case No. C07-01620-MJP
K:\2065932\00001\20516_HAH\20516P228I

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

417 P.2d 861, 864 (Wash. 1966); *cf. King Aircraft Sales, Inc. v. Lane*, 846 P.2d 550, 556

(Wash. Ct. App. 1993) (decided similarly under UCC). Money damages will not make a

party whole because the party cannot obtain the contracted-for benefit for any amount of

money. *Crafts*, 162 P.3d at 387. Only specific performance will put the parties in the

position they would have been in had the contract been performed. *Crafts*, 162 P.2d at 385-

86; *Montana Co. v. St. Louis Mining & Milling Co.*, 152 U.S. 160, 167 (1894).

22.     Specific performance is also appropriate where the subject of a contract is

unique because of a strong sentimental attachment developed through long-time association

with the subject of the contract, Such unique attachment makes damages hard or impossible

to assess. Restatement (Second) of Contracts § 360, cmt. b (1979) ("Some types of interests

are by their very nature incapable of being valued in money. Typical examples include

heirlooms [and] family treasures . . . that induce a strong sentimental attachment."); *Burr v.*

*Bloomsburg*, 138 A. 876, 879 (N.J. Chancery Ct. 1927) (specific performance generally

granted where subject of contract has special value on account of associations connected with

it); *Wehend v. Lundgaard*, 107 P.2d 491, 493 (Cal. Ct. App. 1940) (specific performance

appropriate where subject of contract is unique because of its "associated" qualities, like

articles with such rare or sentimental value they cannot be duplicated); *Cumbest v. Harris*,

363 So.2d 294, 297 (Miss. 1978) (court had equity jurisdiction in suit for specific

performance to obtain return of stereo system that plaintiff had acquired and specially built

over fifteen year period).

23.     Historically courts have granted specific performance when the subject of a

contract had special value to the party seeking relief: antiques, pieces of silver, a box

containing jewels, two China vases, the Pusey horn, papers of great value to establish

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

heirship, family pictures, picture painted by complainant, a silver tobacco box, paintings, jewels, and household furniture as heirlooms. *Burr v. Bloomsburg*, 138 A. 876, 879 (N.J. Chancery Ct. 1927).

24.     Specific performance is also appropriate where the subject of a contract, although not literally unique, has features which led the buyer to give it special value. Restatement (Second) of Contracts § 360, ill. 2 (specific performance appropriate to enforce contract for sale of particular racing yacht that, although one of similar class of boats, is regarded by buyer as a witch in light airs).

25.     Similarly, specific performance is appropriate if a contracting party depends on a contract for its supply needs, and there is no certainty that it will be able to enter into a substitute contract to obtain the same supply. *Laclede Gas Co. v. Amoco Oil Co.*, 522 F.2d 33, 39 (8th Cir. 1975).

26.     No NBA team other than the Sonics would bring with it the same historic connection to the City, as no other team has the associations created by a 41-year history in a City including a national championship. The evidence is undisputed that, for numerous Seattle residents, the Sonics have special value as a tenant because of this unique connection with the City.

27.     Regardless, there is no NBA team available to act as a tenant in KeyArena during the 2008-09 and 2009-10 NBA seasons if the Sonics relocate. A basketball team playing at a different level would not be a suitable substitute. The NBA is the premier basketball league in the world, and the level of play is different from that of college or semi-professional basketball teams.

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

28. Given their unique association with the City and the special value placed upon them by the people of Seattle, the Sonics are a unique tenant that could not be replaced by an award of money damages.

## VII. PBC Agreed Its Obligations Under the Contract Were Unique.

29. A court will enforce a party's agreement that the subject of its contract is unique. *Castle v. Cohen*, 676 F. Supp. 620, 630 (E.D. Pa. 1987), *aff'd and remanded on other grounds*, 840 F.2d 173 (3d Cir. 1988); *R.L. Kimsey Cotton Co. v. Ferguson*, 214 S.E.2d 360 (Ga. 1975); *Hamlet v. Hayes*, 641 S.E.2d 115, 118 (Va. 2007); *cf.* Restatement (Second) of Contracts § 359 cmt. a (1979) (in evaluating whether to grant specific performance, "a court may take appropriate notice of facts recited in [the] contract").

30. In *Crafts*, the Washington Supreme Court found that the subject matter of a contract for the sale of land was unique in part because the contract required delivery of a quit claim deed, which would have had the same effect (if performed) as an award of specific performance. 162 P.2d at 387, 389.

31. A principal purpose for the City to enter into the Lease and agree to finance the remodel of the arena was its stated desire to "maintain the SuperSonics NBA franchise in Seattle." As such the City negotiated a 15 year lease term that required the Sonics to play all home games in the new arena, and included a clause in the agreement wherein the parties agreed that their obligations were unique in nature and subject to specific enforcement.

32. Here, PBC expressly agreed that its obligations under the Lease are unique, and that agreement should be enforced.

PLAINTIFF CITY OF SEATTLE'S
FINDINGS OF FACT AND
CONCLUSIONS OF LAW - 63
Case No. C07-01620-MJP
K:\206593\00001\20516_HAH\20516P228I

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

**VIII. Damages Would Be An Inadequate Remedy Because They Would Be Difficult to Prove With Reasonable Certainty.**

33.     Damages are not as plain, adequate, complete and efficient a remedy as specific performance if it would be difficult to prove damages with reasonable certainty. *Crafts*, 162 P.3d at 388-89.

34.     In determining whether to grant relief in the form of specific performance, a court should take into account the effect of breach on the public. *Rabon v. City of Seattle*, 957 P.2d 621, 623 (Wash. 1998).

35.     "[P]ublic provision of a venue for professional sports franchises serves a public purpose in that the presence in a community of a professional sports franchise provides jobs, recreation for citizens, and promotes economic development and tourism." *CLEAN v. State*, 928 P.2d 1054, 1061 (1996) (citing *Kelly v. Marylanders for Sports Sanity, Inc.*, 530 A.2d 245, 257 (Md. 1987); *Lifteau v. Metro. Sports Facilities Comm'n*, 270 N.W.2d 749, 753-54 & n.5 (Minn. 1978); *Rice v. Ashcroft*, 831 S.W.2d 206, 210 (Mo. Ct. App. 1991); *Martin v. City of Philadelphia*, 215 A.2d 894, 896 (Pa. 1966); *Libertarian Party v. State*, 546 N.W.2d 424, 434 (Wis. 1996)).

36.     The City receives variable direct revenue streams from the Sonics' presence, including game day suite rentals, leased suites, club seats, and admission taxes. The amount of these revenues differs depending upon attendance, which in turn depends upon the performance of the team. Additionally, under Article VIII(2)(b) of the Lease, the City is entitled to receive 8.5% of the ticket revenues received from the first two home games of any playoff series. Because the direct revenues received by the City vary depending upon the Sonics' performance, these future revenues cannot be calculated with certainty.

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

37.     The Sonics' expenditures create jobs in Seattle, both jobs directly working for the Sonics (full or part-time) and job in industries supporting the Sonics, which will be lost when the Sonics leave town.  The number of jobs created in industries supporting the Sonics cannot be measured with certainty at a level smaller than a multi-county region.

38.      If the Sonics leave, some portion of the money that would have spent inside the City will be spent outside the City.  The net amount of money that will be lost to the City cannot be measured with certainty at a level smaller than a multi-county region.

39.     The presence of the Sonics assists the economic development of the lower Queen Anne region.  The departure of a central tenant from this urban area will have negative but unpredictable effects on the economic viability of that neighborhood.

40.     Because the Sonics create benefits for the citizens of Seattle that cannot be precisely measured, specific performance is the only remedy that will adequately protect against the loss of those benefits.

## IX.     Courts Routinely Specifically Enforce Contract Obligations with Respect to Sports Teams.

41.     Courts have repeatedly granted equitable relief barring a team from relocating in violation of a stadium or arena lease.  *King County v. Seattle Seahawks Inc., et al.* ("*Seahawks*"), No. 96-2-03538-6 SEA (King County Sup. Ct. of Wash. for King County Feb. 2, 1996) (attached to the City of Seattle's Trial Brief); *Metro. Sports Facilities Comm'n v. Minnesota Twins P'ship* ("*Minnesota Twins*"), 638 N.W.2d 214, 223-25 (Minn. Ct. App. 2002); *City of New York v. New York Yankees,* 117 Misc.2d 332, 336-37 (N.Y. Sup. Ct. 1983); *City of New York v. New York Jets Football Club, Inc.*, 90 Misc.2d 311, 315-16 (N.Y. Sup. Ct. 1977).

PLAINTIFF CITY OF SEATTLE'S
FINDINGS OF FACT AND
CONCLUSIONS OF LAW - 65
Case No. C07-01620-MJP

K:\206593\00001\20516_HAH\20516P2281

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

42. Specific enforcement of a sports team's lease is appropriate because there is no substitute for the unique connection between an established sports team and the citizens of the community in which it plays. *Minnesota Twins*, 638 N.W.2d at 223-25; *New York Jet.*, 90 Misc.2d at 315-16; *New York Yankees*, 117 Misc.2d at 336-37; *see also Nat'l Basketball Ass'n v. Minn. Prof'l Basketball Ltd. P'ship*, 56 F.3d 866, 871 (8th Cir. 1995) (affirming district court's finding that injunction against Minnesota Timberwolves' move to New Orleans served the "public interest").

43. Local governments ought to be able to protect their investment in a stadium or arena through the lease they negotiate with teams for the use of the building. *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 726 F.2d 1381, 1397 (9th Cir. 1984).

44. Courts regularly grant specific performance of agreements because sports franchises are by their nature unique and exclusive, which is the source of their value. *Triple-A Baseball Club Assoc. v. Northeastern Baseball, Inc.*, 832 F.2d 214, 223-224 (1st Cir. 1987). *Id.* A sports franchise has no readily ascertainable market value, it cannot be easily obtained from other sources, and it is of special interest because of its unique characteristics. *Id.* at 224. A team that plays at a lower level is not an adequate substitute, due to the difference in the quality of play. *Id.* at 225. Further, the value of the good will and future profits of a franchise cannot be ascertained with certainty, such that a damages award would not provide adequate and complete recovery. *Id.* Similarly, the costs of obtaining a franchise in the same sport and at the same level cannot be measured with certainty – assuming one even becomes available for purchase. *Id.* at 225.

45. The Sonics are one of thirty NBA franchises which makes it unique as a tenant. There is no market for 'sports-teams-as-tenants' to establish the monetary value of having the

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

Sonics as a tenant; regardless, an NBA franchise cannot be obtained as a tenant from another source. Further, the Sonics have a special value to the City in which they have played for 41 years. A team playing at a lower level would not be comparable to an NBA team, which is made up of the best basketball players in the world.

46.     The very nature of sports and a professional sports team, makes damages for their loss difficult if not impossible to calculate with any certainty. The amount the City will receive in variable direct revenues over the next two years cannot be determined with certainty. The City derives benefits from the presence of the Sonics, both indirect economic benefits and intangible, and the value of those future benefits, much like the on court performance of the team, cannot be determined with certainty over a two year period.

47.     The loss of a sports team deprives a community of the economic and intangible benefits of its bargain, which are not subject to a reasonable calculation, cannot be replaced by money, and – as they stem from the loyalty of fans and advertisers – cannot be restored once a team has left and severed its historic connection with the community:

> King County and citizens of this region will be injured through loss of the revenue and other economic benefits they derive from the playing of Seahawks football games in the Kingdome and through loss of intangible benefits flowing from the presence of a professional football team in Seattle. The Court finds that these intangible benefits were an important element of the bargain reflected in the 1986 Amended Agreement of the parties. The Court further finds that these injuries would be irreparable because the amount of damages will not be subject to reasonable calculation, the economic benefits to the community cannot be replaced by a monetary award to King County[,] the intangible benefits cannot be replaced by money, and because the chief source of revenue, the loyalties of the advertisers and fans, will be irreparably eroded unless the team is foreclosed from any further steps toward implementing a move to another community.

*Seahawks* at 2-3.

PLAINTIFF CITY OF SEATTLE'S
FINDINGS OF FACT AND
CONCLUSIONS OF LAW - 67
Case No. C07-01620-MJP
K:\206593\00001\20516_HAH\20516P228I

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

48.     The City's purpose in entering into the Lease was to secure the Sonics' continued long-term presence in KeyArena and Seattle, and by doing so secure for the City and its citizens the benefits identified in *CLEAN* and *Seahawks*.

**X.     Specific Performance is an Available Remedy in Commercial Lease Cases.**

49.     A lessee's rights under a lease will be specifically enforced. *Francone v. McClay*, 41 Haw. 72, 1955 WL 8780, *4 (1955) (specifically enforcing lease upon "general principal that where a contract is complete and certain as to the essential and material terms, parts and elements of a lease, specific performance will be granted"); *Houlihan v. East Side Landfill Auth.*, 597 F.Supp. 596, 600 (D. Pa.1984); *Humble Oil & Refining Co. v. DeLoache*, 297 F. Supp. 647, 661 (D.C.S.C. 1969); *Gold Standard Enterprises, Inc. v. United Investors Management Co.*, 182 Ill.App.3d 840, 538 N.E.2d 636 (1989).

50.     Specific Performance may be granted in cases of breach by an anchor tenant in a mall because of the broad but difficult to measure harm to the mall by decreasing business in surrounding stores. *Massachusetts Mut. Life Ins. Co. v. Assoc. Dry Goods Corp.*, 786 F.Supp. 1403 (N.D.Ind. 1992); *Dover Shopping Center, Inc. v. Cushman's Sons, Inc.*, 164 A.2d 785, 791 (N.J. Super. 1960); *see also Lincoln Tower Corp. v. Richter's Jewelry Co.*, 12 So.2d 452, 454 (Fla. 1943).  Similarly, specific performance is available in breach of a long-term lease by a railroad company to provide transportation within a county because damages are impossible to measure. *Southern Ry. Co. v. Franklin & P.R. Co.*, 32 S.E. 485, 486-89 (Va. 1899); *see also Lonoke Nursing Home, Inc. v. Wayne and Neil Bennett Family Partnership*, 676 S.W.2d 461, 463 (Ark. App. 1984) (specifically enforcing lease in favor of lessor); *Shell Eastern Petroleum Prod. v. White*, 68 F.2d 379, 380-81 (D.C.C. 1933) (same);

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

*Bennett v. Moon*, 194 N.W. 802, 804, 807 (Neb. 1923) (same); *Boh v. Pan Am. Petroleum Corp.*, 128 F.2d 864, 865 (5th Cir. 1942) (same).

51.     In a typical lease between two private parties, a lessor has no reason to seek specific performance rather than damages because breach does not have effects other than lost rent. The City's Lease differs because it is intended to benefit the public broadly.

52.     The Sonics are the anchor tenant of KeyArena; they play 41 regular season games a year, a sizeable fraction of KeyArena's schedule; no other NBA teams play in KeyArena; no substitute NBA team could be obtained; substantial evidence was introduced at trial that the Sonics' presence continues to draw hundreds of thousands of visitors to KeyArena a year, serving as a focal point for the Seattle Center as a whole; and another tenant (like a college basketball team) would not draw similar crowds. Further, the City receives millions of dollars a year as a percentage of the Sonics' variable revenue stream, but the exact amounts it will receive cannot be determined with precision. Breach of the City's Lease would cause broad but difficult to measure harm. The continued presence of the Sonics in KeyArena is necessary to protect the City's interest and the public interest

## XI.     Specific Performance is Appropriate to Protect the City's Investment in the KeyArena Rebuild.

53.     Specific performance is appropriate where a lessor has made improvements specific to the lessee that do not have the same value for other uses of the property, and the lessee has taken possession of the leased property. *Rowland v. Cook*, 38 P.2d 224, 225-26 (Wash. 1934); *Forrester v. Reliable Transfer Co.*, 109 P. 312, 316 (Wash. 1910). Except through specific performance, after breach of the lease the parties cannot be put in the position for which they bargained. *Rowland*, 38 P.2d at 225-26.

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

54.     While one Washington Court of Appeals decision, *Washington Trust Bank v. Circle K. Corp.*, 546 P.2d 1249 (Wash. Ct. App. 1976), states that damages are an adequate remedy for breach of a lease, that case involved a lease that a party had not yet entered, where there had been no tenant-specific improvements, and where breach of the lease did not affect the public interest. Further, the holding of *Circle K* is unsupported by either of the two Washington cases cited in its support.  The first, *Oldfield v. Angeles Brewing and Malting Co.*, 77 Wash. 158, 137 P. 469 (Wash. 1913), does not discuss specific performance at all, and addressed only which of two different theories of measuring damages is proper.  The fact that a party could seek damages as well as specific performance does not mean that specific performance is unavailable.  *Mahoney v. Tingley*, 529 P.2d 1068, 1070-71 (Wash. 1975). Regardless, *Oldfield* was decided prior to *Rowland v. Cook*, 38 P.2d 224 (Wash. 1934), in which the Washington Supreme Court held that specific performance was available to the lessor for breach of a lease under certain circumstances.  *Circle K* also cites *Nelson v. Nelson*, 57 Wash.2d 321, 356 P.2d 730 (1960), but that case rejects specific performance on the grounds that the contract was unfair, not on the grounds that a damages award would be adequate.

55.     Vendors of land, not just purchasers of land, are entitled to specific performance of a contract to sell land.  *Tombari v. Griepp*, 350 P.2d 452, 455 (Wash. 1960) (damages are inadequate for breach of contract to purchase land because, due to difficulty of valuing land that is not a commodity and does not have established market value, vendor might not be able to prove what its real harm would be); *Kofmehl v. Steelman*, 908 P.2d 391, 393 (Wash. Ct. App. 1996).

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

56.     The City spent $84 million in 1994-95 rebuilding KeyArena in a design uniquely suited to professional basketball.  This design is incompatible with the optimal use of a facility for other uses like hockey or flat floor shows.  PBC and its predecessors-in-interests have used the KeyArena facility to play Sonics games for thirteen years.  It would be difficult to assign a value to a lease with an NBA team that is not a commodity and does not have an established market value.  Specific performance is an appropriate remedy because only specific performance will put the City as a lessor in the position for which it bargained.

**XII.     Specific Performance Would Not Be Oppressive, Unconscionable, or Result in Undue Hardship.**

57.     A court may decline to grant specific performance if it would be oppressive, unconscionable, or result in undue hardship to a party.  *Crafts*, 162 P.3d at 386.

58.     An undue hardship defense is accepted under only the most extraordinary of circumstances.  *Dunkin' Donuts*, 495 A.2d at 75; *Lindenberger Cold Storage & Canning Co. v. J. Lindenberger, Inc.*, 235 F. 542, 565 (W.D. Wash. 1916) (contract entered into before World War One began and specific enforcement would result in confiscation of party's assets without compensation).

59.     To be "undue" or unreasonable, the hardship suffered by the breaching party if it performs must be out of all proportion to the hardship caused the plaintiff by breach.  *3615 Corp. v. N.Y. Life Ins. Co.*, 717 F.2d 1236, 1238 (8th Cir. 1983).

60.     Absent evidence of procedural unfairness or gross unfairness of consideration at the time of contracting, Washington appellate courts have not upheld an asserted undue burden defense to a specific performance claim.  *Nelson v. Nelson*, 356 P.2d 730, 731-32

PLAINTIFF CITY OF SEATTLE'S
FINDINGS OF FACT AND
CONCLUSIONS OF LAW - 71
Case No. C07-01620-MJP
K\20659321000011205l6_HAH\20516P228l

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

(Wash. 1960); *Gilman v. Brunton*, 161 P. 835, 837-38 (Wash. 1916); *Pasco Fruit Lands Co. v. Timmerman*, 152 P. 675, 676-77 (Wash. 1915).

61.     A party cannot assert an undue hardship defense where it has complied with a contract for years prior to its breach or threatened breach. *Colmenero Canal Co. v. Babers*, 297 P.2d 927 (Ariz. 1956).

62.     A court will not deny specific performance for undue hardship where the alleged hardship was foreseeable. *Carpenter v. Folkerts*, 627 P.2d 559, 562 (Wash. Ct. App. 1981); *Craft Builders, Inc. v. Ellis D. Taylor, Inc.*, 254 A.2d 233, 235-36 (Del. 1969); *Mohrlang v. Draper*, 365 N.W.2d 443, 447 (Neb. 1985); *Portland Section of Council of Jewish Women v. Sisters of Charity of Providence in Oregon* (hereinafter "*Council of Jewish Women*"), 513 P.2d 1183, 1188 (Or. 1973); *cf. Wash. State Hop Producers, Inc. Liquidation Trust v. Goschie Farms, Inc.*, 754 P.2d 139, 142-43 (Wash. Ct. App. 1988) (requiring that a supervening event be unforeseeable when claiming impracticability as a defense to breach of contract).

63.     Hardship that should have been foreseen, but was not, likewise is not an undue hardship. *Blanck v. Pioneer Mining Co.*, 159 P. 1077, 1079-80 (Wash. 1916) (equity will not intervene to relieve against hardship caused by a subsequent, forseeable change in events, such as a rise or fall in the value, profits, or losses of the undertaking); *Mohrlang*, 365 N.W.2d at 447; *cf. Pub. Util. Dist. No. 1 v. Wash. Pub. Power Supply Sys.*, 705 P.2d 1195, 1204 (Wash. 1985) ("A party who incurs an obligation with limited knowledge, conscious disregard of surrounding circumstances and awareness of uncertainty must bear the consequences of its decision.").

PLAINTIFF CITY OF SEATTLE'S
FINDINGS OF FACT AND
CONCLUSIONS OF LAW - 72
Case No. C07-01620-MJP
K:\206593\00001\20516_HAH\20516P228I

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

64.     The fact that a contract "is more costly than anticipated is a poor excuse [for breach], for contracts are designed to allocate risks such as this . . . ." *Union Oil Co. v. Leavell*, 220 F.3d 562, 566 (7th Cir. 2000) (ordering specific performance); *see also Wimberly v. Caravello*, 149 P.3d 402, 410 (Wash. Ct. App. 2006) (undue hardship defense inappropriate if result of party's calculated risk).

65.     A claim that the purpose of a lease has been frustrated, similarly, requires that the allegedly frustrating event have been unforeseeable. "If the supervening event which frustrates the purpose forming the basis of the lease was, or should reasonably have been, foreseen by the parties and there is no provision in the lease concerning it, then an inference that the risk was assumed by the promissor is justified." *Weyerhauser Real Estate Co. v. Stoneway Concrete, Inc.*, 637 P.2d 647, 650 (Wash. 1981).

66.     Ultimately, courts in equity will not save a party from a bad bargain. *Dean v. Gregg*, 663 P.2d 502, 503 (Wash. Ct. App. 1983); *Council of Jewish Women*, 513 P.2d at 1188 ("'Specific performance will not be refused merely because the contract turned out to be a losing one.'") (quoting 5A Corbin, *Contracts* § 1162 (1964)); *Mohrlang*, 365 N.W.2d at 447 ("An imprudent or bad bargain in and of itself is not an excuse for nonperformance of a contract.") (citing *Dean v. Gregg*).

67.     PBC and its predecessors in interest complied with the Lease for thirteen years, including a period of approximately seven years in which the team stated it was incurring substantial operating losses. PBC was willing to purchase the Sonics knowing that they were losing $29 million a year, virtually the same losses PBC now alleges it will incur in 2008-09 and 2009-10. As PBC and its predecessor-in-interest incurred losses equivalent to those

PLAINTIFF CITY OF SEATTLE'S
FINDINGS OF FACT AND
CONCLUSIONS OF LAW - 73
Case No. C07-01620-MJP

K:\206593\00001\20516_HAH\20516P228I

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

forecast for the remainder of the lease term, and PBC was prepared to continue to incur such losses, those losses do not constitute an undue hardship.

68. The City would lose the direct revenues if PBC breaches. The City would further lose the indirect economic and intangible benefits secured by the presence of the Sonics. These losses are substantial.

69. The alleged cost to PBC from performing is not out of proportion to the hardship that will be caused the City by breach.

70. When PBC purchased the Sonics, it knew they were losing $29 million a year; that they were required to play Home Games exclusively in KeyArena under the terms of the Lease through 2010; and that the Sonics would continue to incur comparable operating losses through 2010. The Lease does not contain a provision allowing PBC to terminate the Lease term early if there was a change in the economic circumstances of the NBA or of sports arenas in Seattle. PBC's alleged harms are consistent with the harms it anticipated it would incur.

71. PBC presents no evidence that free agents have declined to sign with the team due to the uncertainty of its future. PBC staff who have resigned have done so because of the prospect of relocation, not the prospect of specific enforcement of the Lease.

72. There is no evidence in this case of extraordinary circumstances that would establish an undue hardship defense.

73. The possibility that the background economic conditions of the NBA might change if other, larger arenas were later built in other cities was also foreseeable. Absent a provision in the Lease permitting early termination, the risk that the Lease would prove unprofitable was borne by PBC and its predecessors-in-interest.

PLAINTIFF CITY OF SEATTLE'S
FINDINGS OF FACT AND
CONCLUSIONS OF LAW - 74
Case No. C07-01620-MJP

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

**XIII. PBC's Self-Inflicted Harm is Not a Basis for Asserting an Undue Hardship Defense.**

74.    Self-inflicted hardship is not a viable defense to a specific performance claim. *Carpenter v. Folkerts*, 627 P.2d 559, 562 (Wash. Ct. App. 1981); *Mohrlang v. Draper*, 365 N.W.2d at 447.

75.    By PBC's own account, a substantial portion – approximately one-third – of its losses stem from the fact it is a lame duck team.  PBC made the choice to threaten to breach the Lease several years before the end of the Lease term.  This portion of PBC's loss is self-inflicted, and does not support an undue hardship defense.  Similarly, PBC has also chosen not to sell season tickets for next season, and to pursue a rebuilding strategy that has correlated with the worst season in its history.  Losses related to these choices are also self-inflicted.

**XIV. PBC Cannot Assert an Unclean Hands Defense.**

76.    A party does not have unclean hands where it consistently insists on its interpretation of a contract and any alleged wrongdoing is unrelated to the transaction it seeks to specifically enforce.  *J.L. Cooper & Co. v. Anchor Sec. Co.*, 113 P.2d 845, 858-59 (Wash. 1941).  Rather, the case law identifies five circumstances in which a court may decline to grant equitable relief on the basis of unclean hands.

77.    A party can have unclean hands if it seeks equitable relief on the basis of a contract that was formed under inequitable circumstances.  *Portion Pack v. Bond*, 265 P.2d 1045, 1050-51 (Wash. 1954) (refusing to grant equitable relief on the basis of party's assent, under difficult circumstances, to second contract unsupported by any new consideration); Nelson v. Nelson, 356 P.2d 730 (Wash. 1960) (contract formed under inequitable

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

circumstances); *Rose v. Nat'l Auction Group, Inc.*, 646 N.W.2d 455, 463 (Mich. 2002) (suit brought by plaintiff against defendant, both parties to an illegal scheme to use a shill bidder in auction, based on failure of illegal scheme).

78.     Unclean hands may exist where a party has committed fraud, false representations, or actionable misrepresentations prior to the formation of a contract, *Cascade Timber Co. v. N. Pac. Ry. Co.*, 184 P.2d 90, 104 (Wash. 1947); *Walsh v. Wescoatt*, 230 P. 160, 162 (Wash. 1924); *Ingram v. Kasey's Assocs.*, 531 S.E.2d 287, 292 (S.C. 2000),  or itself breached the contract upon which it sues, *Cascade Timber Co. v. N. Pac. Ry. Co.*, 184 P.2d 90, 104-05 (Wash. 1947).

79.     A court may decline to grant equitable relief on the grounds of unclean hands where a party unfairly delays before asserting its rights.  *Hallauer v. Certain*, 575 P.2d 732, 737-38 (Wash. Ct. App. 1978) (despite numerous opportunities, plaintiff seeking specific performance of land sales contract did not bring cause of action until three years had passed, during which value of land nearly tripled); *City of Duluth v. Riverbrooke Props., Inc.*, 502 S.E.2d 806, 813-14 (Ga. App. 1998) (declining to provide equitable relief where party slept on its rights).

80.     Unclean hands may bar equitable relief where a party has committed fraud upon the court or its equivalent.  In an equitable proceeding, "[a party] must be frank and fair with the court, nothing about the case under consideration should be guarded, but everything that tends to a full and fair determination of the matter in controversy should be placed before the court."  *J.L. Cooper & Co. v. Anchor Securities Co.*, 113 P.2d 845 (Wash. 1941); *see Income Investors, Inc. v. Shelton*, 101 P.2d 973, 974-75 (Wash. 1940) (unclean hands where party seeking accounting of debt related to its usurious loan willfully concealed, withheld and

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

falsified books and records, thus preventing accurate resolution of its claim); *Precision Instrument Mfg. Co v. Auto. Maintenance Mach. Co.*, 324 U.S. 806, 814-19 (1945) (conduct of party seeking specific enforcement of patent rights was steeped in perjury and undisclosed knowledge of perjury); *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 245, 246 (1933) (finding unclean hands where party prosecuting patent rights bought silence of prior inventor in related patent action).

81.　　In isolated cases, courts have declined to grant specific enforcement where doing so would be contrary to public policy or where granting the relief requested would not end the litigation. A court will not sanction a national organization's request for equitable relief barring a member group from using the trademark "Jaycees," the sole purpose of which is to punish the member for admitting women two years before the national organization did the same, while at the same time the national group has itself admitted women and continues to accept dues, new members, and resulting good will from its continued association with the member group. *U.S. Jaycees v. Cedar Rapids Jaycees*, 794 F.2d 379, 382 (8th Cir. 1986). Similarly, a court may decline to grant equitable relief where a party's prosecution of a lawsuit to enforce an obligation is anomalous and inconsistent with its other actions, such that performance of the obligation would not end the litigation. *Port of Walla Walla v. Sun-Glo Producers, Inc.*, 504 P.2d 324, 327-28 (1972).

82.　　A suit to enforce a party's contractual rights cannot be bad faith. *See Badgett v. Sec. State Bank,* 807 P.2d 356, 360 (Wash. 1991); *cf.* The legal pursuit of one's rights, regardless of motive, cannot be inequitable or unclean hands. *W.D. Cashin & Co. v. Alamac Hotel Co.*, 131 A. 117, 119-20 (N.J. Ch. 1925); *Seal v. Seal*, 510 P.2d 167, 173 (Kan. 1973); *see also Coca-Cola Co. v. Overland, Inc.*, 692 F.2d 1250, 1256-1257 (9th Cir. 1982); *Gostina*

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

*v. Ryland*, 199 P. 298, 299 (Wash. 1921); *Southern Music Pub. Co. v. Seeco Records, Inc.*, 200 F.Supp. 704, 705 (S.D.N.Y. 1960).

83.     If a plaintiff's alleged improper conduct has not injured the defendant, plaintiff's hands cannot be unclean.  *See McKelvie v. Hackney,* 360 P.2d 746, 752 (Wash. 1961).

84.     The Lease was not formed under inequitable circumstances.  PBC freely entered into the Lease, and the City in fact did not have the contractual right to stop it from assuming the Lease from BCOS.

85.     The City did not misrepresent anything to PBC prior to its assumption of the obligations of the Lease, nor did the City breach the Lease at any time.  In fact Mayor Nickels informed PBC of his intent to enforce the Lease in July 2006, and the Lease was not assumed by PBC until October 2006.

86.     The City filed litigation only after PBC threatened to breach by filing an arbitration demand, and when PBC threatened to breach the City acted immediately to protect its contractual rights.

87.     There is no evidence or allegation of misconduct obscuring the truth in this proceeding.

88.     The City's actions in seeking to enforce the Lease and the relief it seeks are wholly consistent with the enforcement of its contractual rights.  If PBC were to agree to perform its obligations under Article II of the Lease, the City's lawsuit would be moot.

89.     The City's policy decision not to negotiate an early termination of the Lease and instead to insist on specific enforcement of its contractual rights cannot be bad faith as a matter of law.

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

90.     The City did not wrongfully induce PBC to enter into the Instrument of Assumption or to threaten to breach the Lease. PBC entered into the Lease well before any of the allegedly wrongful conduct. PBC threatened breach, again, before any allegedly wrongful conduct by the City. Had PBC not filed for arbitration or otherwise threatened breach, there is no evidence to suggest the City would have filed suit, nor can PBC articulate a reason why the City would do so. .

91.     PBC presents no evidence that any of the City's allegedly improper actions caused it injury. PBC's relations with the NBA were not harmed. The NBA approved PBC's relocation request. PBC did not sell and does not intend to sell the Sonics to anyone.

92.     PBC's allegation that it will incur operating losses operating the Sonics in KeyArena does not constitute injury, but rather directly results from PBC's voluntary decision to purchase the team and assume the Lease. PBC will incur the same operating losses performing under the Lease pursuant to a court order that it would have incurred had it chosen to perform voluntarily (setting aside self-inflicted harm from making itself a lame duck). As the City's actions did not injure PBC, they cannot constitute bad faith.

93.     Under the law of agency, a principal is responsible for his agent's acts, but only if those acts were committed within the scope of the agent's authority. *General Ins. Co. of America v. Fort Lauderdale P'ship,* 740 F. Supp. 1483, 1489 (W.D. Wash. 1990). The scope of agency is defined by the agent's purpose. *Pilling v. Eastern and Pacific Enter. Trust*, 41 Wn. App. 158, 165, 702 P.2d 1232 (1985); Restatement (Third) of Agency § 2.02 (2006). When the parties to an agency relationship define the scope of authority in a written agreement, that agreement generally controls. *Phillips v. Andrews*, 332 F.Supp.2d 797, 803 (D.V.I. 2004) (citing Restatement (Second) of Agency § 34, comment h, which states in part:

PLAINTIFF CITY OF SEATTLE'S
FINDINGS OF FACT AND
CONCLUSIONS OF LAW - 79
Case No. C07-01620-MJP
K\206593\00001\20516_HAH\20516P228I

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

"Formal instruments which delineate the extent of authority, such as powers of attorney and contracts for the employment of important agents, either executed on printed forms or otherwise giving evidence of having been carefully drawn by skilled persons, can be assumed to spell out the intent of the principal accurately with a high degree of particularity.").

94.     Efforts by members of the City's law firm, K&L Gates, to seek local ownership for the Sonics, cannot be imputed to the City in this instance. Here the scope of K&L Gates agency relationship with the City was defined by its engagement letter with the City and was limited to work on the present litigation. K&L Gates specifically obtained a conflict waiver to allow it to continue its ongoing pursuit of a potential long term tenant for KeyArena. An agents conduct outside the scope of a defined agency relationship may not be imputed to a principal. Therefore, because the scope of K&L Gates agency on behalf of the City was expressly limited to conducting the litigation, and any work on behalf of potential new ownership was excluded from the scope of K&L Gates' duties on behalf of the City. K&L Gates' acts on behalf of any prospective ownerhsip group cannot be imputed to the City of Seattle.

## XV.     Purposes of Equity and Conclusion

95.     The purpose of granting an equitable remedy is to do "perfect justice," where a damages remedy would not be as "*plain, adequate, complete and efficient as the remedy of specific performance.*" *Crafts v. Pitts*, 162 P.3d 382, 288 (emphasis in original) (quotation omitted).

96.     In this case, the benefit of the City's bargain was the continued presence of the Sonics in Seattle through the end of Lease term, i.e., the end of the 2009-10 NBA season, and the public benefits that would result. The only remedy that will do "perfect justice" is specific

PLAINTIFF CITY OF SEATTLE'S
FINDINGS OF FACT AND
CONCLUSIONS OF LAW - 80
Case No. C07-01620-MJP

K:\2065932\00001\20516_HAH\20516P228J

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

1  performance, as a damages remedy would not secure the City the continued presence of the

2  Sonics – the benefit of its bargain.

3      97.    Thus, the City is entitled to a declaratory judgment that it has a right to

4  specifically enforce Article II of the Lease, which requires PBC to schedule Sonics home

5  games exclusively in KeyArena through the conclusion of the 2009-10 NBA schedule.

6

7      98.    To the extent any or all of the above Conclusions of Law constitute Findings of

8  Fact, they shall be deemed Findings of Fact.

9

    DATED this 24th day of June, 2008.

10

11                                    KIRKPATRICK & LOCKHART
                                      PRESTON GATES ELLIS LLP

12

13

                                      By /s/ Paul J. Lawrence _____
14                                        Paul J. Lawrence, WSBA # 13557
                                          Jeffrey C. Johnson, WSBA #23066
15                                        Jonathan H. Harrison, WSBA # 31390
                                          Michelle Jensen, WSBA # 36611
16                                    Attorneys for Plaintiff
                                      City of Seattle
17

18

19

20

21

22

23

24

25

26

PLAINTIFF CITY OF SEATTLE'S
FINDINGS OF FACT AND
CONCLUSIONS OF LAW - 81
Case No. C07-01620-MJP
K:\206593\00001\20516_HAH\20516P228I

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

# CERTIFICATE OF SERVICE

I hereby certify that on June 24, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all parties of record.

Dawn M. Taylor, Legal Assistant

CERTIFICATE OF SERVICE - 1
Case No. C07-01620-MJP
K:\2065932\00001\21032_PJL\21032P22J2

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022