```
 1                    UNITED STATES DISTRICT COURT

 2                   WESTERN DISTRICT OF WASHINGTON

 3                            AT SEATTLE

 4
    CITY OF SEATTLE,              )   Cause No. 07-01620-MJP
 5                                )
              Plaintiff,          )   Seattle, Washington
 6                                )   June 26, 2008
         vs.                      )   Volume VI
 7                                )
    PROFESSIONAL BASKETBALL CLUB,)
 8  LLC,                          )
                                  )
 9            Defendant.          )
                                  )
10  _____)

11                             BENCH TRIAL
12                  VERBATIM REPORT OF PROCEEDINGS
               BEFORE THE HONORABLE MARSHA J. PECHMAN
13                 UNITED STATES DISTRICT JUDGE

14
    APPEARANCES:
15
      For the Plaintiff:     Paul Lawrence
16                           Jeffrey Charles Johnson
                             Gregory Narver
17
      For the Defendant:     Bradley S. Keller
18                           Paul Taylor
                             James Webb
19

20
      Reported by:          Barry L. Fanning, CCR, RMR, CRR
21                          Nichole Rhynard, CCR, RMR, CRR

22

23  Proceedings recorded by mechanical stenography, transcript
    produced by Reporter on computer.
24

25
```

```
 1                      EXAMINATION INDEX

 2   EXAMINATION OF:                                    PAGE
     NICHOLAS LICATA
 3   DIRECT EXAMINATION         BY MR. KELLER           1020
     CROSS-EXAMINATION          BY MR. NARVER           1041
 4

 5

 6
                         EXHIBIT INDEX
 7   EXHIBITS ADMITTED:                                 PAGE
     553                                                1029
 8   532                                                1044
     582                                                1052
 9   630                                                1053
     42                                                 1053
10   Stipulated list of exhibits admitted              1055
     54                                                 1056
11   197                                                1057
     343                                                1057
12   568, 569                                           1058

13

14

15

16

17

18

19

20

21

22

23

24

25
```

P R O C E E D I N G S
_____

THE COURT:  Good morning.  It is not a good morning
for everybody?  All right.  Okay.  Counsel, we have some
things that we need to accomplish today.  And before I do
that, and I know that you should have received a phone call
about this, but let me for the record indicate that last
Friday the plaintiffs used 96 minutes, the defense used 204,
that leaves a balance for the City of 139, and for the
defense 153.

I would like to have us put Mr. Licata on, finish up with
his testimony so that he can be excused, and then we will
move into the other issues concerning whether or not there is
rebuttal and what the limitations on rebuttal are.

MR. KELLER:  Very well.

THE COURT:  Mr. Licata, please.  Mr. Licata, you have
previously been sworn, you are still under oath.  Take a
seat.

NICHOLAS LICATA

CONTINUED DIRECT EXAMINATION

BY MR. KELLER:

Q   Good morning, sir.  I believe where we left off, I guess
it was last Friday, I was asking you some questions about
I-91.  And we were talking about Exhibit 518.  And I would
like to pull that up on the screen and ask that you take a

1    look at it again with me.

2    A    All right.

3    Q    Mr. Licata, do you recall that one of the issues that was

4    being publicly debated in connection with I-91 was the extent

5    to which having a professional sports team would or would not

6    have an economic impact on our City?

7    A    Yes, that was part of the debate.

8    Q    And as part of the statement in favor of initiative 91 did

9    you tell us that you had reviewed that as part of your

10    activities?

11    A    I have reviewed it.

12    Q    Take a look on the third page of 518.  I think it is the

13    third yes on 91 up from the bottom.

14    A    All right.

15    Q    Next one down.  I think the way this thing is structured,

16    help me out if I'm wrong, is you're answering things that

17    opponents might say against I-91?

18    A    That's correct.

19    Q    So if somebody is saying yes you should vote -- making the

20    argument that a yes on I-91 would help economic development,

21    this is the answer to that?

22    A    That's correct.

23    Q    And the point that you were trying to make in this piece

24    was that the studies shows that the Sonics have a limited

25    economic impact on Seattle, that most money that is spent on

1  pro sports games is discretionary and would otherwise be

2  spent elsewhere in our region, right?

3  A    That's correct.

4  Q    And that was your belief then, right?

5  A    Yes.

6  Q    And that remains your belief to this day?

7  A    Yes.

8  Q    Do you agree, sir -- as I understand I-91, and I am going

9  to try to paraphrase it, and tell me if I am doing it

10  correctly, it was a notion that if you're going to use public

11  money on a sports facility the government body, the City of

12  Seattle, providing the money has got to get a fair return on

13  any public investment in the sports arena?

14  A    That was what I-91 was based on, in consideration of what

15  we had seen both around the country and city after city.

16  Q    So the concept was if the City of Seattle is going to use

17  public money on the sports arena it has got to get a fair

18  return for the dollars it puts in, right?

19  A    That's what we were asking for.

20  Q    As I understand it, a fair return was being defined in the

21  initiative as on a cash-on-cash basis, a return equivalent to

22  what a 30-year treasury bond would yield?

23  A    In a rough sense.  There was actually a little more detail

24  than that which involved lease arrangements and things of

25  that sort and offsets.  That would be a rough interpretation,

1    but there were modifications available.

2    Q    I will show you a few of the details in it in a minute.

3    But generally was that the gist of it?

4    A    As I said, subject to the other conditions, yes.

5    Q    Do you know of a single publicly owned and publicly

6    financed arena in the last ten years here in our state where

7    the government body in fact did earn a 30 year T-bill return

8    on its investment?

9    A    Well, the information collected from other -- the two

10   professional sports team buildings that have been built with

11   public subsidies, those books are not available to the public

12   so we don't know.

13   Q    My question was, are you aware of a single other arena --

14   A    No, I'm not.

15   Q    -- in this state in the last ten years that would have met

16   the criteria that was being laid down in I-91 for a return in

17   public investment?

18   A    I was not personally aware.

19   Q    This ordinance, in terms of defining what would be deemed

20   fair value, that is the return that the public owner and the

21   public -- giving the public money, in terms of defining what

22   would be fair value, didn't I-91 make it crystal clear that

23   no consideration would be given to anything other than a

24   cash-on-cash return?

25   A    Are you reading from somewhere on that "crystal clear"?

1   Q   Take a look at Exhibit 518 in front of you.   And I want

2   you to look at the description of I-91 that is provided by

3   the City Attorney's Office.   Do you see there is a section,

4   "City Attorney's explanatory statement"?   It starts at the

5   bottom of the first page.

6   A   Okay.   I see it on the screen.

7   Q   We are going to look at a section of this thing that was

8   actually written by the City's law department?

9   A   If it says City attorney that would be true.

10  Q   Let's look at the next page.   Do you see next number 2?

11  A   Yes.

12  Q   "The effect of the initiative if approved."   And go down

13  to the paragraph that starts "according to the initiative."

14  A   Yes, I see that paragraph.

15  Q   Take a moment to read it to yourself, sir.   I will ask you

16  some questions.

17  A   All right.

18  Q   You see it quite clearly says there "the fair value

19  requirement will be computed as the net cash-on-cash return"?

20  A   I do see that.

21  Q   And do you see it goes on, "and makes it crystal clear

22  that in computing fair value intangible benefits, such as

23  goodwill, cultural and general economic benefits would not be

24  considered fair value under the ordinance"?

25  A   That's true.   But in the paragraph -- the sentence above,

1  as I said, the other conditions that would apply would be

2  such things as goods, services and also depreciation.  It is

3  not as simple as just cash on cash.

4  Q   Am I missing something?  Doesn't that last sentence say

5  "the computation of return to the City would specifically

6  exclude all intangible, indirect, non-cash items, such as

7  goodwill, cultural or general economic benefits to the City,

8  as well as unsecured future cash returns"?

9  A   Well, that is true.

10  Q   Mr. Licata, it is crystal clear, isn't it, as written by

11  the City law department in this initiative, when it comes to

12  computing whether the City is getting fair value for public

13  investment on the I-91, goodwill, cultural and general

14  economic benefits are not to be counted, right?

15  A   There is no dollar assigned to those values.

16  Q   Thank you.  This initiative passed, didn't it, sir?

17  A   Yes, it did.

18  Q   This became the law of this City, didn't it?

19  A   Yes, it did.

20  Q   It passed overwhelmingly, didn't it?

21  A   Yes, it did.

22  Q   What was the percentage?

23  A   I do not know, but I think it was over 70 percent.

24  Q   So the law in this City, sitting here today, is that when

25  it comes to the investment of public monies in a sports arena

1    intangibles like civic pride, cultural, goodwill are not

2    ascribed any economic value for financing purposes?

3    A    And the reason we included that is because in the past,

4    not only in Seattle but other cities, those values are often

5    given inflated economic value.  That is the reason we wrote

6    it in the first paragraph, that we would include

7    depreciation, financing costs to make it fair.

8    Q    That is helpful information.  Now, see if you wouldn't

9    mind answering my question, please.  So the law in this City,

10   sitting here now, is that when it comes to the investment of

11   public monies in a sports arena intangibles like civic pride,

12   cultural value and indirect economic benefits are not

13   ascribed any economic value for purposes of a fair return,

14   correct?

15   A    That's correct.

16   Q    Thank you, sir.  I-91 was a pretty powerful statement by

17   the public about its views on spending public monies on

18   professional sports facilities, wasn't it?

19   A    I believe it was.

20   Q    And you championed it, right?

21   A    I did.

22   Q    Is it fair to say you were a tenacious opponent of efforts

23   to get a new arena or a remodeled arena built here in Seattle

24   for the Sonics?

25   A    Only in the context of excessive public subsidies.

1  Q    And when people were talking about $200 million remodels,

2  that is an excessive public subsidy from your standpoint,

3  right?

4  A    That is correct.

5  Q    This overwhelming 70 plus percent vote in favor of I-91,

6  is it true that you viewed it as being consistent with the

7  survey results and data that you were keeping tabs on?

8  A    It was roughly consistent.

9  Q    Could you turn to Exhibit 539?

10 A    Is that in the book or should I be looking at the screen?

11 Q    Either one.  It will not be in the small book that have

12 you, sir.  Do you recognize Exhibit 539, sir?

13 A    Not directly, but I am familiar with Elway Polls.

14 Q    This is actually a poll that you yourself did your best to

15 make sure that it was an unbiased survey, didn't you?

16 A    I have used Elway in the past.  I try to make sure

17 whenever we use Elway it is unbiased.  I actually don't

18 exactly remember this exact poll.

19 Q    You don't?  I will move on then.  Do you recall after

20 Mr. Bennett and his fellow investors acquired the Sonics he

21 came to visit you at your office?

22 A    Yes, he did.

23 Q    Was that sometime in the second half of 2006?

24 A    It may have been.  I don't recollect the exact date.

25 Q    And he wanted to talk to you about the efforts that he was

1   going to make to try and do a new arena in Renton?

2   A   We talked about retaining the Sonics.  I am not sure if we

3   talked specifically about Renton or -- actually I think we

4   talked about in general retaining the Sonics for this region.

5   Q   Did you talk about the prospects of a new arena?

6   A   We did talk about the prospects of both remodeling the

7   KeyArena and a new facility.

8   Q   Did you make your views about the use of public monies for

9   those purposes known to Mr. Bennett?

10  A   I told him that a reasonable amount of public subsidies

11  would be -- I would personally be in favor of, but something

12  to the tune of what had been proposed in the past I would

13  not.

14  Q   By "something that had been proposed in the past" that you

15  would be opposed to, you were talking about what had

16  previously been a two to $300 million remodel?

17  A   That's correct.

18  Q   You were aware I think in the 2007 legislative session in

19  Olympia the Sonics were down there trying to get some public

20  funding toward a new arena in Renton, right?

21  A   Yes.

22  Q   While the Sonics were lobbying Olympia for funding, is

23  that when you appeared to testify before a congressional

24  committee looking into the area of public financing for

25  sports arenas?

1   A    It may have been.   Again, I am not exactly sure on the

2   dates.

3   Q    Take a look at Exhibit 553 and see if that helps refresh

4   your recollection, that while the Sonics were in Olympia you

5   were testifying in Washington, DC on these issues?

6   A    Right.   I think it would have been towards the end of the

7   session.

8   Q    Okay.   And do you remember testifying in front of congress

9   about what you perceived to be the benefits of sports

10  facilities and sports teams?

11  A    Yes, I did.

12  Q    And if you look at Page 2 of your testimony here, about

13  two-thirds of the way down there is a paragraph that you

14  begin, "what are the benefits from these facilities",

15  question mark?

16       THE COURT:   Hold on, Mr. Keller.   I can't track with

17  you here.

18       MR. KELLER:   553 on Page 2.   I will move for the

19  admission of 553.

20       MR. NARVER:   No objection.

21       THE COURT:   Go ahead, Mr. Keller.   553, you moved for

22  admission.   No objection?

23       MR. NARVER:   No objection.

24       THE COURT:   553 will be admitted.

25                    (Exhibit 553 admitted)

```
 1              MR. KELLER:  Thank you, your Honor.  I apologize for
 2    any confusion.
 3              THE COURT:  That's okay.  I am having a hard time
 4    managing books here.  Go ahead.
 5    BY MR. KELLER:
 6    Q    Can we pull up that paragraph that begins "what about the
 7    benefits for these facilities"?  It is on the second page of
 8    the exhibit.
 9         This is your testimony before congress, right?
10    A    That's correct.
11    Q    And this is the paragraph talking about "what about the
12    benefits from these facilities", right?
13    A    Correct.
14    Q    You expressed the view that there was no lasting benefit,
15    right?
16    A    I expressed, as you read there, there is meager evidence.
17    Q    "While some retail businesses in the area might do more
18    business on a game night that the evidence that it improves
19    urban living or increases retail shopping was", your words,
20    "meager"?
21    A    That's correct.
22    Q    And then you went on to point out that actually crime
23    increases in the area?
24    A    Certain kinds of crime, that's true.
25    Q    At the time you testified you were a council member?
```

1    A    Indeed I was.

2    Q    Were you president at the time of the council?

3    A    I believe I was at that time.

4    Q    Let's stay in this spring of 2007 while the Sonics were

5    trying to get state authorized funding from Olympia for

6    Renton.   Did you speak with state legislators down in Olympia

7    about your concerns about large public subsidies for sports

8    arenas and that you were against that?

9    A    Yes, I did.

10   Q    Did you make your views against public subsidies for

11   sports arenas known at the state legislature in Olympia

12   during 2007 while the PBC was down there trying to get a new

13   arena for Renton?

14   A    I made my views that excessive public subsidies in sports

15   arenas was contrary to the public interest.

16   Q    And were you doing that in the spring of '07 while you

17   knew PBC was there trying to get funding for a Renton arena,

18   correct?

19   A    I knew they were down there as well as I believe other

20   City and county officials were down there taking the opposite

21   position that I was.

22   Q    You thought there were City officials in the spring of '07

23   that were down in Olympia supporting the Sonics efforts to

24   get an arena in Renton?

25   A    I didn't know that.

1    Q    You don't know that at all, do you?

2    A    That's correct.

3    Q    You were just guessing a moment ago?

4    A    I was under that impression.

5    Q    So did you make your views against public subsidies for

6    sports arenas known in Olympia while PBC was down there

7    trying to get funding for a Renton arena, yes?

8    A    Yes.

9    Q    Did you encourage Olympia to not make a large public

10   investment in a new arena that was being requested by PBC at

11   that time?

12   A    Yes.

13   Q    I will go to something else now.  Was one of your visions

14   for KeyArena to change its use from being sports and concerts

15   to a different, more culturally diverse venue?

16   A    As an option if the Sonics were to leave.  The first

17   preference would be to have the Sonics remain in the KeyArena

18   given that KeyArena was a very usable facility.

19   Q    You think it is just fine the way it is, right?

20   A    I think that with a minimal investment it could remain a

21   facility that was rated I guess in 2004 as the best facility

22   in the NBA.

23   Q    Well, back in 2006 you were actively studying is there a

24   future for KeyArena without the Sonics?  Yes?

25   A    As an option, that's true.

1  Q   And as part of that study you drew on consultants that the

2  City hired to help you evaluate that, right?

3  A   That's correct.

4  Q   And you drew upon people in the community and brought them

5  forward to present to City government their views about

6  options without the Sonics, right?

7  A   As a responsible elected official I needed to take a look

8  at all options.

9  Q   And you presented as one of the options a building that

10 would both be a better concert venue and a building that

11 would support music, film, technology and possibly even

12 Seattle's burgeoning gaming industry, didn't you?

13 A   As one of the alternatives, that's true.

14 Q   And you presented testimony and evidence from consultants

15 to the committees in 2006 that were studying the arena to

16 show that that was a viable option and with a relatively

17 modest investment KeyArena could be converted to those uses,

18 right?

19 A   In the context that in the worst case scenario if the

20 Sonics were to leave there could be an alternative economic

21 model that would work for the KeyArena.

22 Q   You didn't call it a worst case scenario back then when

23 you were in front of the PEL committee, the Parks and --

24 What does PEL stand for?

25 A   I'm not sure.

1   Q   It is called the PEL committee, right?

2   A   Which committee are you referring to?

3   Q   Parks and --

4   A   Are you talking about the City Council or are you talking

5   about the State?

6   Q   The City?

7   A   The City.  The City committee -- the City Council

8   committees changes their names about every two years so it is

9   not consistent.  It is the Parks committee.

10  Q   My point is, when you were presenting all these options

11  back in 2006 you were not talking about them as a worst case

12  options, you were putting them forth as potentially viable

13  options for KeyArena without the Sonics, weren't you?

14  A   Within the context I had publicly stated a number of times

15  that given my druthers I would prefer the Sonics stay in the

16  KeyArena with modest improvements.  If they did not we could

17  present a usable, sustainable economic model based on a

18  description of using other sources, other activities in the

19  KeyArena.

20  Q   And you believed that a usable and sustainable model for

21  KeyArena without the Sonics would include this more diverse

22  user group for concerts, music, film, technology and possibly

23  even gaming, right?

24  A   That's true.

25  Q   And do you remember characterizing those uses, things like

1    music, film, technology and promoting concerts and music as

2    being more reflective of the values of Seattle?

3    A   I don't recollect that statement.  It may be there.

4    Q   Let's look at you --  Let me see if I can help you here.

5    Can we have Exhibit 598 from the March 29th, 2006 PEL

6    committee meeting.  This is Mr. Licata.  It is the second

7    one.

8              MR. NARVER:  Are you offering it?

9              MR. KELLER:  I am just going to show it to him to see

10   if it refreshes his recollection as to how he characterized

11   it.

12                    (Video played)

13   BY MR. KELLER:

14   Q   Does that refresh your memory, sir?

15   A   Oh, yeah.  Great speech.

16   Q   Sounded good to me too.  Certainly not somebody with his

17   head down talking about worst case scenarios, is it?

18   A   No.  Again, the context is important.

19   Q   Thank you.  That was in March of 2006, right?

20   A   If the date says that, that's correct.

21   Q   Was this also around the time you were interviewed by

22   Sports Illustrated about your views about the Sonics efforts

23   to use tax revenues to renovate KeyArena?

24   A   It could have been.  I don't remember the date.

25   Q   Do you want --

1    A    I am not contesting the date.  I just don't remember the

2    exact date.

3    Q    Let me help you out here.  Take a look at Exhibit 615, and

4    see if that helps refresh your recollection time wise where

5    we are.

6    A    Is there something up here on the screen?

7    Q    No, it won't, sir.  It is the Sports Illustrated.

8    A    Given all the publicity I am surprised we are not on the

9    front cover.

10              THE COURT:   That might be reserved for me.

11              MR. KELLER:   I'm not going to say anything.

12   BY MR. KELLER:

13   Q    Does it refresh your memory, sir, that the spring of 2006

14   is the same time you were being interviewed by --

15   A    Yes.

16   Q    -- Sports Illustrated?

17   A    That's true.

18   Q    Now, at the time you were interviewed by Sports

19   Illustrated you were pretty active in these issues out here

20   in Washington about financing?

21   A    Yes.

22   Q    You were very very involved in a task force that was

23   reviewing KeyArena and the whole situation, right?

24   A    I presented information before the task force.  I wasn't

25   on it, though.

1  Q    You were closely following these things, right?

2  A    I was.

3  Q    You had been involved in opposing the Schultz group's

4  efforts to get financing?

5  A    I was opposed, again, to excessive public financing of the

6  arena.  Whoever the owners were, I didn't particularly pay

7  attention to the personalities.

8  Q    And you testified in front of congress, as we said, right?

9  A    I did, not just on the effort in KeyArena but past efforts

10 as well.

11 Q    And at the time you were interviewed by Sports Illustrated

12 had you recently been appointed as the president of the

13 King -- excuse me, Seattle City Council?

14 A    It would have been the beginning of the two-year term, so

15 that's true.

16 Q    And you told the reporter that you were the president of

17 the Seattle City Council?

18 A    He asked for my title and I gave it to him.

19 Q    Did you tell the reporter from Sports Illustrated during

20 this interview that the Sonics departure on an economic basis

21 would have near zero impact?  Is that what you told the

22 reporter?

23 A    I told the reporter given that I just read a report that

24 arts and culture had contributed close to a billion dollars

25 in the King County overall economy, and I was thinking to

1   myself at that moment, well, I am not sure it is going to be

2   that big of a plunk.  So I used that statement.

3   Q   Let's go back to my question.  Did you tell the reporter

4   that the Sonics departure on an economic basis would have

5   near zero impact?

6   A   Yes, I did.

7   Q   Thank you, sir.  From the standpoint of culture affairs of

8   our community did you tell the Sports Illustrated reporter

9   that it was your view at the time that the team's departure

10  would have close to zero cultural impact?

11  A   As I have stated before, it was a flippant remark made

12  off-the-cuff.  And I did make that statement.  I don't deny

13  it.

14  Q   Mr. Licata, did you tell the reporter in that interview

15  that from the standpoint of the cultural affairs of our

16  community it was your view at the time that the team's

17  departure would have close to zero cultural impact?

18  A   Yes, I did.

19  Q   Was part of your thought process at the time that even if

20  the Sonics left Seattle would still have two professional

21  sports teams and plenty of cities our size don't have three?

22  A   That's correct.

23  Q   And when you said at the time that there would be a

24  cultural impact of close to zero, were you also thinking

25  about not only the two other professional sports teams that

1   were here, but also the wide and diverse variety of cultural

2   and civic activities that are available in our community?

3   A   Yes.

4   Q   And when you said a cultural impact of the team leaving

5   would be near zero, was that comment probably influenced a

6   bit by the polling data that you were aware of and that we

7   looked at earlier showing that the public was against using

8   public monies to renovate KeyArena for the Sonics?

9   A   Actually it was more influenced by a study that had just

10   come out by The Arts Fund pointing out the wide variety of

11   cultural and arts activities going on in the region.  It was

12   more influenced by that than the polls.

13   Q   I understand it was more influenced by the fact that we

14   have a huge amount of cultural activities available to us

15   here, but was it also influenced in part by your awareness of

16   the polling data that we were looking at earlier that talks

17   about how the public was against using public money to

18   renovate sports facilities?

19   A   No, I don't think so.

20   Q   Would you look at Page 40 of your deposition?

21        MR. KELLER:  Did I publish that last Friday?  I can't

22   remember.

23        THE COURT:  Yes, you did.

24   BY MR. KELLER:

25   Q   Can we have 40 Lines 18 through 24, please?  Question:

1    "Were you also being informed by the poll results that you

2    had looked at over the years as far as public interest and

3    public interest in using public money to renovate?"  Answer:

4    "They probably influenced me but I am not sure that they

5    would be an appropriate tool to measure cultural value."

6    A    Yeah.

7    Q    That was your answer?

8    A    That's correct.

9    Q    Now, when you gave the answer -- not the deposition

10   answer, but when you told the Sports Illustrated reporter

11   that in your review the culture impact of the team leaving

12   would be near zero, I think you characterized that as a

13   reflexive response, right?

14   A    I think I characterized it as a flippant response.

15   Q    But was it reflexive also?

16   A    I have gone through a lot of definitions on this one word,

17   reflexive, flippant, non-thinking, whatever.

18   Q    Was it reflexive also?

19   A    I think that would probably be adequate.

20   Q    In your own way, whether it was flippant, reflexive,

21   whatever it was, in your own way you were trying to make the

22   point that Seattle is a world class City when it comes to

23   cultural events and opportunities?

24   A    Yes.

25   Q    And if the Sonics leave Seattle will still be a world

1    class cultural City?

2    A    That's correct.

3    Q    And it will still be a world class cultural City for many

4    reasons, even without the Sonics, right?

5    A    Yes.

6              MR. KELLER:    Thank you, sir.

7              THE COURT:    Cross-examination.

8              MR. NARVER:    Yes, your Honor.

9                              CROSS-EXAMINATION

10   BY MR. NARVER:

11   Q    Good morning, Mr. Licata.

12   A    Good morning.

13   Q    For the record, Greg Narver for the City of Seattle.

14   Mr. Licata, from the testimony you gave both on Friday and

15   this morning, is it fair to say you have some strong opinions

16   on whether or not public funds should be used to pay for

17   sports stadiums?

18   A    That's correct.

19   Q    If I can characterize it, just to move past it, you are

20   opposed to excessive public subsidies to stadiums?

21   A    So I make that clear, I am not opposed to public subsidies

22   point blank, but within the context of return to the public.

23   Q    You think there should be a significant contribution from

24   the owner of the team, too?

25   A    That's correct.

1    Q    You have held that opinion both as an elected official and

2    also as a citizen activist before you were elected?

3    A    Yes.

4    Q    And your opinion about that hasn't changed over the years;

5    is that right?

6    A    No.

7    Q    I-91 was about that subject, wasn't it --

8              MR. KELLER:   Your Honor, I think we should not be

9    leading this witness.

10              MR. NARVER:   Your Honor, this is cross-examination.

11   Counsel has elicited a lot of opinions which he clearly

12   viewed were favorable to his case.   I am trying to move

13   through --   When I get to the gist of this it won't be

14   leading.   I think we need to establish that Mr. Licata's

15   opinions -- these opinions have not been viewed as favorable

16   to the City.   I think some cross-examination just to

17   summarize the opinions that leading is appropriate here.

18              THE COURT:   The objection is overruled.

19              MR. NARVER:   Thank you.

20   BY MR. NARVER:

21   Q    I-91 was about that subject, whether or not there should

22   be public subsidies to stadiums?

23   A    Correct.

24   Q    And the congressional testimony you were shown, when you

25   testified to congress, that was also about that subject,

1    whether or not there should be public subsidies of stadiums?

2    A    That's right.

3    Q    You have also expressed opinions about whether or not

4    there would be financial impact on the broader region through

5    the loss of the sports team, too?

6    A    That's right.

7    Q    You have had those opinions both as a citizen activist and

8    also as an elected official?

9    A    Going back a number of years.

10   Q    I want to ask you now some questions about a different

11   topic, and that is what has been called the cultural value of

12   the Sonics to Seattle.

13        First I want to go back to the Sports Illustrated article,

14   Mr. Keller asked you about, in early 2006.  This was just

15   introduced.  Could that page be brought up again that

16   Mr. Licata was being shown?  I'm sorry.  Maybe it wasn't

17   brought up on the screen.  Do you have that in front of you,

18   the Sports Illustrated article?

19   A    Yes, I do.

20             THE COURT:   Number again, please?

21             MR. NARVER:   It was just used.   615.

22   BY MR. NARVER:

23   Q    Do you have the page in front of you that has your

24   comments?

25   A    You know, they are not highlighted so I have to find them.

1   Q   Well, the Sports Illustrated looks to be page -- I believe

2   it is the third page of the exhibit, which I think was

3   Page 110 of this issue of Sports Illustrated.

4   A   Yes.

5   Q   You have that, sir?

6   A   Um-hum.

7   Q   Going down about eight lines, there is a sentence that

8   begins, "a vocal opponent of the baseball and football

9   stadium deals, Licata, who does admit that his views are more

10  hard line than those of many of his colleagues --"  Do you

11  see that part?

12  A   Yes, I do.

13  Q   Do you agree with that characterization, your views are

14  more hard line?

15  A   Yes, I do.

16  Q   Now, Mr. Keller asked you about the part of this interview

17  where you said, on a cultural basis close to zero.

18         MR. NARVER:   The City offers Exhibit 532 into

19  evidence.

20         MR. KELLER:   No objection, your Honor.

21         THE COURT:   532 will be admitted.

22                (Exhibit 532 admitted)

23  BY MR. KELLER:

24  Q   Mr. Licata, I will show you a highlighted portion of

25  Exhibit 532.   Do you see that on the screen there?

1   A   Yes, I do.

2   Q   And the first part of that paragraph says, "you have been

3   saying for months you would like to see the Sonics stay in

4   Seattle"?

5   A   That's correct.

6   Q   I want to ask you about the second part of this that is

7   highlighted.  You say, "there is no doubt that my glib,

8   foolish remarks several months ago --"  Were you referring to

9   the Sports Illustrated --

10   A   Yes, I was.

11   Q   "-- on the relative unimportance of professional

12   basketball in Seattle was smug and wrong.  In my clumsy way I

13   was trying to point out that Seattle is a world class

14   cultural City for a variety of reasons, not just because of

15   the Sonics."  What is Exhibit 532?

16   A   This is a personal e-mail newsletter that I sent out to

17   the citizens in Seattle.

18   Q   To express your views on issues?

19   A   Yes.  At the beginning I think it is designed to provide

20   an opportunity for citizens to understand my votes, what my

21   thinking is behind the votes.

22   Q   So glib, foolish, smug, wrong, clumsy, why did you write

23   this in your newsletter?

24   A   Well, because I, first of all, believed it.  Moments after

25   I had said that quote I realized it wasn't probably accurate.

1   I had let it pass without correcting it.  I felt bad about

2   that.

3   Q   Had you heard anything from constituents when this quote

4   appeared?

5   A   Yes, I did.

6   Q   Did you ever hear anything about a reaction at KeyArena to

7   your comments?

8   A   Oh, I was told by someone --

9         MR. KELLER:  Objection.  Hearsay, your Honor.

10         THE COURT:  Sustained.

11   BY MR. NARVER:

12   Q   You heard from constituents who disagreed?

13   A   I heard from constituents.  I received e-mails, a number

14   of them, and a fair amount of derision in the newspapers as

15   well from columnists.

16   Q   Sitting here today do you believe that the cultural value

17   of the Sonics is close to zero?

18   A   No, I don't.

19   Q   More than zero?

20   A   Well, I don't think you can put a cultural --  I mean, I

21   don't think you can put a scale on cultural appreciation.

22   The fix I got myself in was that, as I pointed out earlier, I

23   had just read a report about cultural economic impact to King

24   County and Seattle on the multitude of opportunities that

25   people have.  In this conversation, which apparently was

1   about a 45-minute conversation, one quick statement that I

2   made about the economy he followed up and asked, how about

3   culture.  Trying to be amusing I said, oh, close to zero.  It

4   literally was an offhanded remark that did not have a basis

5   of anything other than a half fleeting thought.

6   Q   I want to ask you some questions about 525 that has

7   already been admitted into evidence.  Mr. Keller was asking

8   you about this document on Friday.  And I want to direct your

9   attention to the last page of this.  And this is a memo that

10  was prepared by Council's central staff; is that right?

11  A   Yes.

12  Q   The quote here that is highlighted is -- it is under a

13  question posed:  "Does this mean it is not worth $200 million

14  or so to keep the Sonics/Storm in the region?"  The response:

15  "It does not mean that."  The highlighted portion reads:

16  "There are benefits associated with sports teams that are not

17  easily quantifiable or captured in the economic studies.

18  People get excited about sports and that's worth something.

19  But precisely how much, we can't tell you."  Do you agree

20  with that statement?

21  A   Yes, I do.

22  Q   Do you believe that the benefit that the Council staff is

23  discussing here is similar to what you were talking about as

24  a cultural value -- the cultural value of the team a minute

25  ago?

1    A    I'm sorry.   Say that again.

2    Q    You just gave an answer about the cultural value of the

3    team to the City.   Is this benefit that the Council staff --

4    in your mind is that what we are talking about here, that you

5    can't put a dollar figure on it, that there is a value to the

6    City?

7    A    Yes.

8    Q    I will show you also Exhibit 31 which is already in

9    evidence.   This is ordinance 122492.   Just to be clear, what

10   is an ordinance?

11   A    An ordinance is legislation that gets passed by the

12   council that becomes law.

13   Q    How many votes are required to pass?

14   A    A majority, five.   Five votes.

15   Q    This is the Council acting as a legislative body passes

16   this thing?

17   A    Yes.

18   Q    We are going to look on the second page of Exhibit 31.

19   And I just want you to look at the final portion here that is

20   going to be highlighted.   Right there.   What was the Council

21   ordaining here?

22   A    Well, we were ordaining that the Council would not -- the

23   Council's intent was not to allow the City to amend the

24   contract that we have with, in this instance, the

25   Professional Basketball Club, to use the KeyArena to the

1    effect that it would be -- allow the owners to remove the

2    team before the end of their lease, which would have been

3    September 30th, 2010.

4    Q    This is the Council saying we think they ought to stay

5    through the end of the lease?

6    A    Yes.

7    Q    Is that your signature as the president?

8    A    Yes, it is.

9    Q    And this was passed on September 10th, 2007?

10   A    Yes.

11   Q    To your knowledge did anyone on the Council vote against

12   this?

13   A    No, not as far as I know.  I may have even been one of the

14   sponsors of the legislation.

15   Q    Sitting here today is it your opinion that the Sonics

16   should stay at KeyArena through the term of the lease?

17           MR. KELLER:  Your Honor, I will object under

18   relevance grounds.

19           MR. NARVER:  Your Honor, the PBC has put a lot of

20   Mr. Licata's opinions about the value of the team, whether or

21   not it should be subsidized into evidence.  I think he should

22   be able to state clearly as he sits here what his opinion is

23   about the issue here, whether or not they should stay through

24   the term of the lease.

25           THE COURT:  And what element of the contract action

1    does his opinion go to?

2         MR. NARVER:  Well, PBC has elicited testimony from

3    him which they view as unfavorable obviously to the City's

4    contract action, that the City doesn't care, that its elected

5    officials don't care about this team.  He, as president of

6    the City Council, stated a strong opinion about that.  I

7    think it is fair for him to be able, in response to the

8    opinions that were elicited about the value of the team, to

9    state what his view is, whether the team ought to stay

10   through the end of the lease.

11        THE COURT:  Do you want to answer the question now?

12   What elements of the contract does his opinion goes to?

13        MR. NARVER:  It goes to the intangible value of the

14   team, that there is a value to the team contrary to his

15   earlier statement about arena subsidies that were elicited by

16   PBC to try and show the City doesn't care.  PBC has made that

17   argument repeatedly, including using Mr. Licata's statements

18   to suggest the City doesn't care about this team.  I am just

19   asking what Mr. Licata's view is of whether the team ought to

20   stay through the end of the lease.

21        THE COURT:  The objection is overruled.  You can

22   answer the question?

23        THE WITNESS:  Yes.  Could you repeat that question?

24   BY MR. NARVER:

25   Q   Yes.  Do you believe that the Sonics should stay at

1   KeyArena through the end of the lease term?

2   A   Yes, very strongly.

3   Q   Why do you hold that opinion?

4   A   Because from my experience, both as a citizen activist and

5   as someone who has seen sports teams come and go in other

6   cities, and looking at their track records, I was concerned

7   that when a sports team is purchased before the end of the

8   contract the pattern appeared to be that in many instances

9   the team would be pulled from the City.  I did not want to

10  see that happen in Seattle.  I felt very strongly that we

11  have a contract.  And I would feel the same about any team

12  with the City, that the contract should be completed.

13  Q   A deal is a deal, is that your view?

14          MR. KELLER:  Your Honor, this is argument.

15          THE COURT:  Sustained.

16          MR. NARVER:  I withdraw the question.  Thank you,

17  sir.

18          MR. KELLER:  No further questions, your Honor.

19          THE COURT:  Thank you.  You may step down.  Next

20  witness, please.

21          MR. KELLER:  We have no more witnesses.  We have a

22  few exhibits we need to offer into evidence.  Subject to that

23  we will rest, your Honor.  Mr. Taylor will offer those if

24  that's all right.

25          MR. TAYLOR:  Your Honor, we would first offer

1    Exhibit 582.

2           THE COURT:   You need to tell me what it is and what

3    witness it is connected to.

4           MR. TAYLOR:   Exhibit 582 is a press conference

5    conducted by the Mayor and Senator Gorton on March 6th of

6    2008.   They were announcing the Ballmer group's offer to

7    contribute $150 million.   It is relevant because at Page 8 --

8           THE COURT:   582 is a press conference?

9           MR. TAYLOR:   Yes, by the Mayor and Senator Gordon.

10          THE COURT:   Go ahead.

11          MR. TAYLOR:   It is offered as a statement of party

12   opponent.   It is relevant because at Page 8 Senator Gorton,

13   speaking as lead counsel for the City, says that the City has

14   been working hand in glove with the Ballmer group -- that

15   includes, you remember, Wally Walker -- hand in glove from

16   the very start of the process of the Walker group.   We would

17   offer it on that basis.

18          MR. LAWRENCE:   There is no objection, your Honor.

19          THE COURT:   582 will be admitted.

20                 (Exhibit 582 admitted)

21          MR. TAYLOR:   Next, your Honor, is Exhibit 630.   That

22   is the retention letter between the City and K&L Gates in

23   this case.

24          MR. LAWRENCE:   No objection, your Honor.

25          THE COURT:   630 will be admitted.

1          (Exhibit 630 admitted)

2          MR. TAYLOR:  Finally, your Honor, we offer

3    Plaintiff's 42.

4          MR. LAWRENCE:  No objection, your Honor.

5          THE COURT:  What is Plaintiff's 42?

6          MR. TAYLOR:  Plaintiff's 42 is a report to the

7    Seattle City Council by the Seattle Center staff as to the

8    goals of the remodeled KeyArena and the proposed agreement

9    between the Sonics and the City that ultimately became the

10   lease.

11         THE COURT:  All right.  Counsel, it appears to be a

12   series of numbers so small as to almost be unintelligible.

13   What part of it is it you want me to take note of?

14         MR. TAYLOR:  The second page only, your Honor, the

15   goals of the project.

16         THE COURT:  The second page is what you are asking

17   for?

18         MR. TAYLOR:  Yes.

19         THE COURT:  Are you asking for the whole exhibit or

20   just the second page?

21         MR. TAYLOR:  We can go with just the cover page and

22   Bates number 1489, the second page.

23         THE COURT:  All right.  Thank you.

24          (Exhibit 42 admitted)

25         MR. TAYLOR:  Thank you.

1    MR. KELLER:  Thank you, your Honor.  With that PBC

2    rests.

3    THE COURT:  The defense has rested.  Is there any

4    rebuttal?

5    MR. LAWRENCE:  Your Honor, a couple of clean up

6    issues.  We had submitted jointly to the Court yesterday a

7    list of trial exhibits that were referred to in the various

8    depositions that have been provided to your Honor for

9    admission without objection.  I don't know if we need to put

10   that on the record here.  There was a document that was

11   provided to the Court, but I would be happy to read those

12   into the record at this point.

13   THE COURT:  Here is the problem, Mr. Lawrence.  These

14   are the exhibits that were to be part of the depositions that

15   I read.  Are you giving them different numbers now?

16   MR. LAWRENCE:  We thought the proper procedure, both

17   parties agreed, that the references should be to the trial

18   exhibit version of those rather than the deposition exhibit.

19   But we can provide a list to the Court, and I think we have,

20   that shows what the relative deposition exhibit was for each

21   of these exhibits.

22   THE COURT:  Is there an agreement on this?

23   MR. TAYLOR:  Yes, your Honor.  We have prepared a

24   stipulated list of exhibits that should come in.

25   THE COURT:  All right.  We will admit that list.

```
 1              (Stipulated list of exhibits admitted)

 2         MR. LAWRENCE:  Your Honor, there were additional

 3    exhibits that we stipulated to beyond the materials and

 4    deposition, particularly Exhibit 54.  And I don't know if

 5    this is within the stipulation as well.

 6         THE COURT:  What is 54?

 7         MR. LAWRENCE:  Exhibit 54 relates to community

 8    activities undertaken by the Sonics.

 9         THE COURT:  And what witness was the testimony

10    elicited from?

11         MR. LAWRENCE:  It is generally related to the civic

12    and charitable contributions that Mr. Barth and Mr. Wade

13    testified to.  That is agreed.

14         THE COURT:  Counsel, I can't put my hands on it.  Is

15    this something that you gave Ms. Scollard to pull?

16         MR. LAWRENCE:  We did not give it to her today.  We

17    gave the list of exhibits to Ms. Scollard yesterday.  I don't

18    know if she pulled them or not because they were agreed

19    exhibits, not related to today's testimony.

20         THE COURT:  Here it is.  Exhibit 54.

21         MR. LAWRENCE:  Yes.  It is a document relating to the

22    civic and charitable activities of the team.

23         THE COURT:  When you say "it is a document related",

24    what is it about that document?  It is how many pages?  I

25    don't have it here.  What is it about that document that you
```

1    want me to consider?  Can somebody give me a copy of it,

2    please?  Can somebody hand me a copy, please?

3              MR. TAYLOR:  Your Honor, I have one.

4              THE COURT:  Counsel, this doesn't say where it comes

5    from, who authored it.  What is it you want me to get from

6    this document?

7              MR. LAWRENCE:  Simply it is additional evidence of

8    the type of community and charity activities that the Sonics

9    bring to the City.

10             THE COURT:  And who wrote it?  Who documented it?

11             MR. LAWRENCE:  Your Honor, because there was no

12   objection to it --  It is from the Sonics, from PBC.  If you

13   look at it, it is from PBC.  It was written, we understand,

14   in conjunction with their efforts in Olympia.

15             THE COURT:  54 will be admitted.

16                  (Exhibit 54 admitted)

17             MR. LAWRENCE:  The next document is category

18   Exhibit 197, which is their responses to our request for

19   admission.

20             THE COURT:  It isn't here.

21             THE CLERK:  I don't have it either.

22             THE COURT:  Can I have a copy, please?  All right.

23   Mr. Lawrence, it is the answers to the request for admission.

24   Which admission is it you are asking me to take a look at?

25             MR. LAWRENCE:  Your Honor, since you have taken our

1  copy I don't have that handy.  We have cited in our proposed

2  Findings about five of those admitted facts that we would ask

3  you to rely on.  So they are reflected entirely in our

4  proposed Findings of Fact.

5          THE COURT:  Can these also be found in the pretrial

6  order?

7          MR. LAWRENCE:  Some of them are in the pretrial

8  order, yes, your Honor.

9          THE COURT:  Mr. Taylor, any objection to 197?

10         MR. TAYLOR:  No objection.

11         THE COURT:  197 is admitted.  What else,

12  Mr. Lawrence?

13                  (Exhibit 197 admitted)

14         MR. LAWRENCE:  Exhibit 343.

15         THE COURT:  All right.  Any objection to 343.

16         MR. TAYLOR:  No, your Honor.

17         THE COURT:  343 will be admitted.

18                  (Exhibit 343 admitted)

19         MR. LAWRENCE:  I think there were two defense

20  exhibits they offered as part of this stipulation, which I

21  guess they can speak to, 568 and 569.

22         THE COURT:  Mr. Taylor, what is this?

23         MR. TAYLOR:  Your Honor, Exhibit 568 is an agreement

24  that was entered into between the PBC, the City of Seattle

25  and the NBA relating to a meeting that occurred in

1    New York City last fall.  The parties agreed in that

2    agreement that neither the fact of the meeting, nor the

3    contents of the meeting would be disclosed to anybody under

4    any circumstances.  The agreement was signed by the City and

5    in particular by the City's lead counsel, Mr. Slade Gorton.

6        The two exhibits are interrelated.  If we look to

7    Exhibit 569 we see that Senator Gorton within 24 hours of

8    signing an agreement pledging to the NBA and the PBC that he

9    would not disclose the contents of the meeting, 24 hours

10   later he wrote a lengthy e-mail to Wally Walker and the

11   Ballmer group detailing everything that happened at the

12   meeting.

13            THE COURT:  Any objection?

14            MR. LAWRENCE:  There is no objection to either

15   exhibit, your Honor.

16            THE COURT:  568 and 569 will be admitted.

17                (Exhibits 568 and 569 admitted)

18            THE COURT:  Anything else, Mr. Taylor?

19            MR. TAYLOR:  No, your Honor.

20            MR. LAWRENCE:  Mr. Taylor was going to offer 583.  Is

21   that now withdrawn or has that already been discussed?

22            MR. TAYLOR:  Your Honor, we don't need to offer 583

23   at this point.

24            MR. LAWRENCE:  The one other exhibit that was the

25   subject of the filing to the Court that we offered that was

 1   objected to is Exhibit 355.

 2          THE COURT:   Exhibit 355?

 3          MR. LAWRENCE:   355, yes, your Honor.

 4          THE COURT:   What is it?

 5          MR. LAWRENCE:   It is an e-mail from Mr. Walker to

 6   Mr. Ballmer dated March 9th -- sorry, March 7th, 2008, in

 7   which Mr. Walker is indicating the results of a discussion he

 8   had with Joel Litvin of the NBA, that talks about the

 9   willingness to work -- in which Mr. Litvin asked Mr. Walker

10   whether people here, being Seattle, expected the NBA to force

11   Mr. Bennett to sell the team.   And Mr. Walker indicated, I

12   said that I had not heard that but that Seattle has to come

13   up with a competitive arena solution first and then deal with

14   the rest of the equation next.

15          MR. TAYLOR:   Your Honor, it is double hearsay.   First

16   of all, it is Wally Walker talking to Mr. Ballmer.

17   Mr. Walker is reporting to Mr. Ballmer what he said to

18   Mr. Litvin.   None of those people are parties to this action.

19   It is hearsay.

20          MR. LAWRENCE:   Your Honor, we are offering it under

21   two bases if would you like a response after you have had a

22   chance to review.

23          THE COURT:   Something has been blocked out on the

24   copy have.

25          MR. LAWRENCE:   That is an e-mail address which the

1    people asked to keep confidential.

2         THE COURT:   All right.   Your response.

3         MR. LAWRENCE:   Twofold.   First of all, now having

4    more closely read the hearsay rules, under 801(d)(1),

5    defining what statement is not hearsay, subsection (b) allows

6    the admission of a statement consistent with the declarant's

7    testimony offered to rebut an expressed or replied charge

8    against the declarant of fabrication or improper influence or

9    motive.

10        Certainly PBC has presented the case that Mr. Walker was

11   acting to force the team to sell -- force Mr. Bennett to sell

12   the team rather than acting consistent with his testimony on

13   our examination to simply try to find an NBA approved arena

14   in Seattle.   This was a consistent statement with what

15   Mr. Walker testified on cross, and rebuts the suggestion by

16   PBC of fabrication or improper influence or motive.

17        Secondly, it is offered to show Mr. Walker's state of mind

18   at the time rather than the truth of his statement to

19   Mr. Litvin.

20        THE COURT:   Mr. Taylor, you have been at some point

21   trying to argue to me that Mr. Walker is an agent of the

22   City.   Why doesn't it come in as an admission of a party

23   opponent?   I'm sorry.   Because they are not the agent.   Got

24   it.   Okay.

25        MR. TAYLOR:   It doesn't qualify under 801(d)(2).

1    801(d)(1), I'm not sure Mr. Lawrence read the rule close

2    enough.   801(d)(1) allows a document to be in to rebut a

3    recent allegation of a fabrication.   There has been no

4    allegation that Mr. Walker lied in his testimony.   In fact,

5    he truthfully disclosed his role in preparation of the power

6    point and how he attended the meeting.   So there has been no

7    allegation of fabrication.

8        The latter clause there under (b), improper influence or

9    motive, that refers to the notion that maybe somebody got to

10   a witness, and this is an attempt to show, no, that didn't

11   happen.   So, for example, if we claimed somebody had bribed

12   Mr. Walker then this might come in to say, no, he didn't --

13   he wasn't the subject of a bribe.   But it is not designed for

14   this kind of document.

15       THE COURT:   The document won't be admitted under

16   Rule 801(d)(1).   The declarant, Mr. Walker, has testified at

17   trial and he was subject to cross-examination concerning his

18   statement.   And it doesn't fit, A, because it wasn't given

19   under oath.   B, there isn't an allegation that he was

20   untruthful in his testimony.   And so the document is hearsay.

21       MR. LAWRENCE:   The only other clean up we have is the

22   depositions that were submitted to you.   I think we formally

23   need to publish those.   The ones that the plaintiffs

24   submitted were from Mr. James Couch, Mr. Brent Gooden,

25   Mr. Joel Litvin, Mr. Aubrey McClendon and Mr. Roy Williams,

1    so we would formally move to publish those depositions.

2         MR. TAYLOR:   No objection, your Honor.

3         THE COURT:   Those are the depositions the Court

4    indicated on the record previously that I have read your

5    designations?

6         MR. LAWRENCE:   Yes, your Honor.   I think that's all

7    the clean up we would have.   And we would offer, as your

8    Honor knows, Mr. Ceis as a rebuttal witness at this point.

9         THE COURT:   First, Mr. Lawrence, your offer of proof

10   as to what Mr. Ceis would be called to testify to.

11        MR. LAWRENCE:   A couple of items, your Honor.   First

12   of all, he would be offered to testify about the engagement

13   letter, which was just admitted at the defendant's request,

14   to explain the scope of the engagement of K&L Gates by the

15   City, and also the disclosure by K&L Gates of the prior and

16   ongoing work by Senator Gorton and Gerry Johnson to find

17   prospective owners for the Sonics, which was outside the

18   engagement of the City.   So he will talk to the letter which

19   your Honor just admitted.

20        Second, he was asked --   These are all subjects that we

21   were talking about that he was asked about at his deposition.

22   He will be asked whether or not he saw or approved in any

23   form the power point presentation which PBC has offered,

24   whether that was something he saw either in final or draft

25   form, and whether that was something he knew about and

1   authorized.  It was asked about and answered fully at

2   Mr. Ceis's deposition.

3        He will also testify about essentially what the City did

4   in response to Mr. Bennett's July 19th telephone conference

5   with the mayor of Seattle, which there has been testimony

6   about.  And the call to action, which is a document that has

7   been admitted in this case previously, whereby the mayor in

8   response to Mr. Bennett's determination not to talk about the

9   City about a renovated KeyArena, and calling on action, what

10  the City did in response which would essentially relate to

11  the instruction to have staff meet with Wally Walker on

12  July 24th, which Mr. Walker testified about, and what the

13  instructions to staff were, and the continuing efforts

14  thereafter by the City to work on a renovated KeyArena

15  solution for Seattle with Mr. Walker, with the NBA, including

16  meetings with the NBA that PBC attended, and continuing on

17  until the time that the City became aware of Mr. Griffin's

18  representation of a prospective ownership group, and when he

19  learned of the Griffin group in the first instance.

20       And then finally he would testify --  There has been

21  testimony brought out about the fact that he commented on

22  the, quote, dysfunctional nature of the relationship between

23  the Sonics and the mayor's office.  And he would testify his

24  explanation as to that statement.

25       None of these are matters that were either asked about and

1    answered at his deposition, or were not asked about and were

2    not subject to any issue of attorney-client privilege.

3        I would also add, with respect to the claims in the motion

4    to exclude, that the record is clear that after the break in

5    his deposition Mr. Taylor was allowed to ask anything that he

6    wanted with respect to Mr. Walker, etcetera, about the

7    efforts with the prospective ownership group.

8        THE COURT:  Mr. Lawrence, nobody has given me the

9    page.  I am assuming therefore it does not exist.  And I

10   understand from Mr. Narver's statement that there was nothing

11   on the record about withdrawing privilege.

12       MR. LAWRENCE:  What Mr. Narver's declaration

13   indicates, as the record in the deposition indicates, there

14   was an agreement to have a discussion at the break about this

15   issue.  There was a discussion at the break about the issue

16   in which what Mr. Narver said was communicated and agreed to

17   by Mr. Taylor.  Mr. Taylor then came back immediately after

18   the break and asked questions on the subjects related to

19   Mr. Walker, reflecting the fact that the City was not going

20   to assert any privilege with respect to discussions with

21   Mr. Walker, Mr. McGavick, etcetera.

22       I understand that Mr. Narver did not put that formally on

23   the record, but it has not been disputed that he made that

24   statement to Mr. Taylor, nor that Mr. Taylor was able to ask

25   questions about that subject for the remaining several hours

```
 1    of the deposition without any assertion of privilege by the
 2    City.
 3              THE COURT:  Well, Mr. Lawrence, it is disputed.
 4    Mr. Taylor filed an affidavit basically saying that no such
 5    discussion exists.  If I am looking at one lawyer that says
 6    there is a discussion, the other lawyer says there isn't one,
 7    there is nothing in the record.  What does the Court look to
 8    as objective evidence as to whether or not there was a
 9    waiver.
10              MR. LAWRENCE:  I would suggest, your Honor, that
11    Mr. Taylor did not deny what Mr. Narver stated in his
12    declaration.  The point of dispute from Mr. Taylor in his
13    argument in his reply was that the City did not waive
14    privilege with respect to its discussion with counsel related
15    to this litigation.  That is the only statement that
16    Mr. Taylor made in his declaration.  And that is actually
17    consistent with the discussion that Mr. Narver talked about,
18    because there was not a waiver with respect to this
19    litigation and the engagement by K&L Gates with respect to
20    that litigation.  I assure you that Mr. Taylor can confirm
21    that that's what he was talking about, not that it was not a
22    withdrawal of the assertion of privilege with respect to the
23    discussions with Mr. Walker, et al.
24       Again, if you look at the actual transcript, as we have
25    pointed out, there were no questions in which Tim Ceis was
```

1  instructed not to answer that relate to any of the subjects

2  that we are asking -- we would purport to ask him about.  So

3  I actually don't think that there is disagreement of counsel.

4  All that Mr. Taylor stated in his declaration was there

5  wasn't a waiver of privilege on every issue, which Mr. Narver

6  did not purport to state in his declaration.

7       I think Mr. Taylor could clarify this.  I don't believe he

8  is disputing what Mr. Narver said.  What he is saying in his

9  declaration, and in their reply, is that there wasn't a

10 complete waiver with respect to this litigation, which we

11 agree with.

12      THE COURT:  All right.  Mr. Taylor.

13      MR. TAYLOR:  Thank you, your Honor.  There are

14 apparently four subjects for rebuttal, the engagement letter

15 and what K&L Gates knew and what it told the City.  Second,

16 the power point.  Third, the July 19th meeting.  Fourth,

17 dysfunctional motive.

18      Rebuttal is designed to address new matters not previously

19 anticipated by these plaintiffs that were first raised in the

20 defendant's case-in-chief.  All of these matters were

21 addressed in opening statement by the defense.  We addressed

22 the power point.  We addressed clean hands, the dysfunctional

23 nature -- the comment by Mr. Ceis as to dysfunctionality is

24 in the deposition excerpts that we submitted at the beginning

25 of the case.  The July 19th meeting has been discussed

1    extensively by both sides throughout the case.

2        So, number one, it is not proper rebuttal.  Number two, we

3    have to address the issues of probative value.

4        What is really happening here, your Honor, is that on the

5    last day of trial the City is waiving the attorney-client

6    privilege.  They are going to have Mr. Ceis come up and

7    testify about discussions he apparently had with Slade Gorton

8    and Gerry Johnson about things they were doing, what they

9    were going to supposedly be doing when they were wearing the

10   City hat, what they were doing we will call it the Griffin

11   hat.  That necessarily raises issues about the

12   attorney-client privilege.

13       Had we been advised of this waiver in a timely fashion we

14   would have deposed Senator Gorton and Mr. Johnson.  And it is

15   entirely possible that what they have to say about these

16   discussions is different than Mr. Ceis.  But because they

17   delayed the privilege waiver we have not had the opportunity

18   to use the discovery that we are entitled to on this issue.

19       Next, your Honor, there is a question of probative value.

20   And this goes in particular to the question of Mr. Ceis'

21   knowledge of the power point and what he was told by Senator

22   Gorton or Mr. Johnson or perhaps the litigation team about

23   the power point.

24       What Mr. Ceis knows or doesn't know or was told or was not

25   told really proves nothing.  Mr. Ceis is not the only person

1    who works for the City.  There is the mayor, the mayor's

2    staff, Mr. Ceis' counterpart Mr. Nakatsu, and then City

3    Attorney Tom Carr.

4        The fact that Mr. Ceis wants to come in and say, I didn't

5    know anything about it proves nothing, because we know that

6    Senator Gorton was dealing with the mayor, the City attorney.

7    The fact that if -- as Mr. Ceis says, he was not told of it

8    by Senator Gorton does not tell us what Senator Gorton

9    disclosed to the mayor or to the City attorney.  So it is not

10   probative.

11       And, again, as to this issue we have been denied basic

12   discovery.  Had we known that this was the testimony, and had

13   they given us notice of an election of privilege waiver, as

14   they are required to do, then we could have deposed these

15   people on this issue.  We haven't had a chance to.  Instead

16   we get only testimony that we can't explore or use the

17   typical discovery tools for.

18           THE COURT:  Mr. Taylor in the deposition of Mr. Ceis

19   you asked the City to provide you with their designations of

20   waiver.

21           MR. TAYLOR:  Yes.

22           THE COURT:  Did that ever happen, whether on the

23   record or off the record?

24           MR. TAYLOR:  No waiver was ever communicated to us.

25           THE COURT:  You went on in the deposition and asked

1    several questions about various meetings in the fall of 2007.

2            MR. TAYLOR:  That is true.

3            THE COURT:  Was there something that you were told

4    that changed your tactic that you went into those issues?

5            MR. TAYLOR:  No, your Honor.  I simply tried to see

6    what I could get.  We had been struggling, and it is apparent

7    in the deposition, for sometime to figure out what lines they

8    were drawing.  I asked repeatedly.  I asked on the record.

9    Mr. Narver said he did not know because he did not know the

10   relationship between K&L Gates and the Griffin group.  No

11   waiver was communicated.  We asked, give us the boundaries of

12   what we can go into and what we can't.

13       As a practical matter, your Honor, think of the

14   circumstances.  If I, as a trial lawyer, am told by my

15   opponent that they are waiving privilege, the very first

16   thing I am going to do is subpoena the law firm for all of

17   its records, and I am going to go back to the City for

18   everything that has been withheld as privileged.  We didn't

19   do that because no waiver was ever communicated to us.

20       Throughout this case we have been unable to understand

21   what lines have been drawn.  Sometimes the witnesses are

22   allowed to answer questions about these meetings, at other

23   times they are not allowed to answer questions about these

24   meetings.  That has been their decision.  We don't know why.

25   We don't know how they made that decision.  But they never

1   communicated to us a waiver of the privilege.

2      Had they done so, as I indicate, we would have immediately

3   subpoenaed all of the records so that we wouldn't be in this

4   situation today.

5         THE COURT:  For the first hour of the deposition

6   Mr. Narver was making objections and blocking the witness'

7   answers under privilege.

8         MR. TAYLOR:  Yes.

9         THE COURT:  After the break did you ever go back and

10  ask questions about those same topics?

11        MR. TAYLOR:  Some of those topics were addressed

12  again, yes, your Honor.  Why he decided to allow them to

13  answer and why he didn't none of us at the deposition could

14  figure out what was happening or why in the world it was

15  happening.  We didn't know.  We don't know today what their

16  position has been on privilege, other than we do know now on

17  the last day of trial they are waiving it.  It is too late to

18  make such an election.

19        THE COURT:  All right.  Let's go through this.  Have

20  you finished what it is you wanted to argue to me?

21        MR. TAYLOR:  Yes, your Honor.

22        THE COURT:  Let's go through the four topics that

23  have been outlined.  Is there any problem with the engagement

24  letter?  The engagement letter was entered into on September

25  the 21st prior to the poison well power point.

1    MR. TAYLOR:  Actually the power point was --  Yes, it

2  was finalized after the engagement letter.  That's correct.

3    THE COURT:  So are you objecting to Mr. Ceis

4  basically getting on the stand and saying this is our

5  engagement letter, given that the power point wasn't made

6  until afterwards?

7    MR. TAYLOR:  We are objecting to any testimony from

8  him about what he was told about what K&L Gates was doing.

9  It is hearsay.  It is a waiver of the privilege.  We haven't

10  had an opportunity to depose Mr. Gorton and Mr. Johnson.  It

11  is also, of course, hearsay, and it is being offered for the

12  truth.

13    THE COURT:  What if the issue is he wasn't told?  In

14  other words, the lack of a statement versus a statement?

15    MR. TAYLOR:  It is still a waiver, your Honor,

16  because it goes into a communication between a lawyer and a

17  client.  Did the lawyer tell you this?  No.  You can't get to

18  the answer without waiving the privilege.  And it raises the

19  same issue.  Mr. Ceis is going to say, well, Mr. Gorton

20  didn't tell me X.  Had an election been timely made we would

21  have deposed Mr. Gorton to get his version of that same

22  conversation.  We have been deprived of that opportunity.

23    THE COURT:  All right.  Thank you.  Mr. Lawrence.

24  Aren't you in the position of attempting to argue that

25  Mr. Gorton exceeded the scope of his engagement and didn't

```
 1    tell the City what it is that he was doing with the Griffin

 2    matter, or you didn't tell the City what the Griffin --

 3            MR. LAWRENCE:  I didn't tell the City anything with

 4    respect to that personally in terms of K&L Gates.  What our

 5    position has been -- the City's position has been

 6    consistently, despite what Mr. Taylor has stated, is that

 7    K&L Gates was retained with respect to this litigation.  And

 8    all the work that we did with respect to this litigation we

 9    have consistently asserted privilege on.

10        We have also taken the position that Mr. Johnson and

11    Senator Gorton prior to the engagement were engaged in a

12    process, which we have heard something about from Mr. Walker,

13    to discuss a Bellevue plan, to discuss new prospective

14    ownership of the Sonics in Seattle --

15            THE COURT:  And the engagement letter doesn't include

16    the Bellevue arena, it merely speaks about the Seattle area.

17            MR. LAWRENCE:  The engagement letter does two things.

18    I am reading from an admitted exhibit so I think that is

19    fair.  It, first of all, sets forth the scope of the

20    engagement very clearly, which as we understand it we have

21    been retained to provide legal services in connection with

22    the enforcement of the lease between the City and the Sonics

23    on the KeyArena matter.  That is the scope of the

24    arrangement -- sorry, that is the scope of the engagement

25    that is clearly set forth.
```

1      The letter goes on, City policy is that KeyArena lease

2  should be respected and specifically performed through its

3  current term, and the City will oppose, in litigation if

4  necessary, any efforts by the Sonics to continue playing

5  professional basketball at KeyArena before the expiration of

6  the lease.  We will support, "we" being K&L Gates, the law

7  department working under your direction as well as at the

8  direction of Mr. Narver in efforts to enforce the City lease.

9              THE COURT:  All right.  That is in evidence.

10             MR. LAWRENCE:  In addition to that it goes on to say

11  that, "we have disclosed to you that both Mr. Gorton and

12  Mr. Johnson also are engaged in other efforts to retain

13  professional basketball in the Seattle area."

14      Reading from Page 2, the top paragraph.  "These efforts

15  are consistent with retaining the Sonics as KeyArena tenants

16  through the expiration of the City's KeyArena lease, and in

17  fact could lead to short and/or long-term extensions of the

18  Sonics use of the facility."

19      Now, admittedly when we offered Mr. Ceis the defendants

20  had not yet offered this as an exhibit.  That occurred this

21  morning.  We did not know they were going to offer this until

22  this morning.  And the testimony we are going to elicit is

23  indeed testimony consistent with this exhibit.  But when we

24  offered Mr. Ceis up, this had not been offered --

25             THE COURT:  Now the exhibit is in.  What do you need

```
 1   Mr. Ceis to testify to?
 2        MR. TAYLOR:  The main points I think, because the
 3   engagement letter is in, and I think it speaks very clearly
 4   as to what went on, and I think Mr. Ceis could confirm that,
 5   but most importantly we would speak to the questions of the
 6   power point and the alleged Machiavellian plan, which as your
 7   Honor knows from reading the depositions Mr. Taylor fully
 8   asked several questions to Mr. Ceis about whether or not he
 9   saw the power point or reviewed any drafts of it --
10        THE COURT:  What difference does it make whether he
11   saw it or not?
12        MR. LAWRENCE:  Well, I don't think their unclean
13   hands defense stands up.  Their unclean hands defense was
14   that the City and the prospective ownership group were
15   engaged in an inappropriate effort to use this litigation.
16   And Mr. Ceis can confirm that was not the case, that he never
17   saw or approved any of the language in the power point that
18   Mr. McGavick and Senator Gorton and Gerry Johnson worked on.
19        THE COURT:  You realize, don't you, that you are
20   basically arguing that your law firm did this outside the
21   scope of the engagement and on their own without permission
22   of the City?
23        MR. LAWRENCE:  Our position is that the carve out in
24   the engagement letter for the work that Mr. Johnson and
25   Mr. Gorton were doing is encompassed -- that encompasses the
```

1    work they were doing on the power point.

2        We also did provide a month ago to the defendants all the

3    e-mails.  We showed them for review, and offered recently to

4    provide -- we provided them to them last night, though they

5    never asked for them, the e-mails that were done in

6    conjunction with that meeting on the power point with respect

7    to Mr. Johnson and Senator Gorton.

8        The point is that there is a consistency between the carve

9    out and the engagement letter that says this was ongoing work

10   at the time you retained us, you agree that we can continue

11   to do that work and it doesn't conflict with what you are

12   engaging us to do, which is limited to the litigation.

13           THE COURT:  But the power point and the outside

14   owners hadn't been identified yet when you signed the

15   engagement letter in September.  So how can it be included in

16   the scope if it didn't exist?

17           MR. LAWRENCE:  I guess I am not quite sure I follow

18   the gist of your question.  As Mr. Walker testified there

19   were discussions involving a Bellevue plan with Mr. Ballmer

20   and Mr. McGavick.  And then when the Bellevue plan fell by

21   the wayside there were continuing efforts to talk to

22   Mr. Ballmer which culminated in the October 7th meeting

23   which, again, there has been testimony about.  Obviously that

24   October 7th meeting couldn't have been identified in advance,

25   but it was --

```
 1          THE COURT:  You are saying that Mr. Gorton's
 2   activities and Mr. Walker's activities with the Ballmer group
 3   were inside the scope of the engagement letter?
 4          MR. LAWRENCE:  No.  They were inside the scope of the
 5   carve out that was provided to the City.
 6          THE COURT:  And so that was all carved out and you
 7   didn't have any obligation to tell your client what you were
 8   doing?
 9          MR. LAWRENCE:  Senator Gorton and Gerry Johnson did
10   not tell the client that -- did not tell the City of Seattle
11   that they were meeting with Mr. Ballmer presenting with the
12   power point.  That's what happened.
13          THE COURT:  And they also didn't tell the City that
14   although the City signed a confidentiality agreement with the
15   NBA not to discuss their meeting in New York, Mr. Gorton
16   immediately came back and told Mr. Griffin about it?
17          MR. LAWRENCE:  That's correct.  Senator Gorton did
18   not ask the City for permission and, as you see, were not
19   copied what he sent to Mr. Griffin.
20          THE COURT:  Well, don't you suppose that is something
21   if there was a waiver of attorney-client privilege that the
22   defense would have wanted to explore rather than having this
23   document produced to them on the last day of trial?
24          MR. LAWRENCE:  That document was not produced to them
25   on the last day of trial.
```

 1          THE COURT:  Well, it was admitted on the last day of

 2   trial.

 3          MR. LAWRENCE:  Right.  They have had that document

 4   for a while from third-party production of Mr. Stanton and

 5   Mr. Walker.  And they specifically asked us to provide to

 6   them any communications with the City where Mr. Walker and --

 7   I'm sorry, Mr. Johnson and Senator Gorton were acting outside

 8   the engagement for litigation, which we searched and found

 9   there were no communications with the City.  So we are not

10   holding back on privilege things -- communication with the

11   City in which Mr. Johnson and Senator Gorton did with respect

12   to the prospective ownership issue.

13          THE COURT:  Let me see if I understand correctly.

14   You think it is okay for Mr. Gorton to go with the City to

15   meet with the NBA, sign an agreement saying that meeting was

16   confidential, and then the next day turn around and give it

17   to another client?

18          MR. LAWRENCE:  I am not going to make an ethical

19   judgment one way or another about Senator Gorton's actions.

20   The question is whether or not --

21          THE COURT:  I didn't ask you whether it was ethical.

22   You are trying to say it is okay in the context of this

23   litigation.  In other words, the defense wants to know what

24   the City has done.  Mr. Gorton is their lawyer.

25          MR. LAWRENCE:  I understand that.

```
1          THE COURT:  So you are trying to shield Mr. Gorton's
2   activities on the one hand, but at the same time offering up
3   statements by Mr. Ceis that he didn't know what Mr. Gorton
4   was doing.
5          MR. LAWRENCE:  I don't believe it is accurate to say
6   that we are trying to shield Senator Gorton's activities with
7   respect to, for example, disclosing the materials that he did
8   about the NBA -- I'm sorry, disclosing the results of the NBA
9   meeting to Mr. -- I'm sorry, I don't know if it went to
10  Griffin.  I can't remember who he sent the e-mail to.  But
11  that was never the subject of an attorney -- that is not an
12  attorney-client document because he was not acting as an
13  attorney on behalf of the City when he did that.  And we have
14  never asserted any privilege with respect to communications
15  between Senator Gorton and the Ballmer group or Mr. Griffin
16  or Mr. McGavick, etcetera.  All of that is not privileged.
17  We don't assert a privilege with respect to those
18  communications.  We never have.
19         THE COURT:  So are you going to put Mr. Ceis on to
20  testify that he is the only one who had the decision making
21  power, in other words, he was the client?  Because the
22  engagement letter goes to Mr. Carr.
23         MR. LAWRENCE:  The mayor's office was the client.
24  And the mayor has testified already that he was not part of
25  any plan to lead Mr. Bennett or force a sale of the team.
```

1    Mr. Ceis, who is the deputy mayor, the other spokesperson for

2    the mayor's office, has been more actively involved in

3    directing the litigation.  He will also basically confirm the

4    testimony that the City -- the mayor's office, who is our

5    client, did not see that power point in any form at any point

6    before it was provided to Mr. McGavick.  In fact, he

7    testified he did not see it.  He had not seen it at all until

8    the day of his deposition.

9         THE COURT:  Okay.  So the purpose of putting Mr. Ceis

10   on is to separate him from counsel, saying Mr. Gorton,

11   Mr. Johnson and the City's consultant for this litigation,

12   Mr. Walker, were off on their own doing their own thing?

13        MR. LAWRENCE:  As is consistent with the engagement

14   letter, yes.

15        THE COURT:  All right.  Mr. Taylor, do you have

16   anything else you want to say?

17        MR. TAYLOR:  It would be fundamentally unfair and

18   prejudicial to the PBC to allow Mr. Ceis to testify when we

19   have not been given the opportunity to depose Senator Gorton,

20   Mr. Johnson and others at the K&L Gates law firm about all of

21   the communications with their client, the City, including

22   communications about the power point.

23        MR. LAWRENCE:  Your Honor, one other point I forgot

24   to mention.  We disclosed in the pretrial order that if

25   Mr. Ceis was identified as a witness for PBC -- we disclosed

1    in the trial order if they were not going to call him live

2    that we would reserve the right to recall him as a rebuttal

3    witness.  Both parties went through the process also of

4    designating deposition testimony from him, which I guess if

5    had been offered would have addressed all these issues

6    because all these issues were designated.  But they

7    determined not to call him live or offer his deposition

8    testimony.  So consistent with our reservation in the

9    pretrial order to recall him as a rebuttal witness, that's

10   what we are doing.

11       In that sense I wanted your Honor to know that we had

12   reserved the right if they didn't intend to call Mr. Ceis,

13   although he was originally identified as a witness for PBC,

14   that we did intend to call him for rebuttal.  I should say we

15   reserved that right, your Honor.

16       THE COURT:  Mr. Taylor, do you acknowledge that

17   Mr. Ceis in his deposition indicated he never saw the power

18   point before?

19       MR. TAYLOR:  Yes, that is in his deposition

20   testimony.

21       THE COURT:  And that is not of contention?

22       MR. TAYLOR:  No.  Well, for argument purposes it is,

23   your Honor.  There is some inferences that can be drawn from

24   some events, but that will come up in closing argument.

25   There are competing facts that suggest perhaps he did see it.

1    For example, he is named.  Mr. Ceis, once again, went to the

2    NBA meeting.  The power point details the fact that Mr. Ceis

3    and Senator Gorton are going to the NBA meeting the following

4    week.  So somebody knew about Mr. Ceis in connection with the

5    power point.  If Mr. Ceis says he doesn't know, that is his

6    testimony.  There are competing inferences that can be drawn

7    from other documents.

8              THE COURT:  All right.  Let's talk about some

9    fundamental principles that are at play when we do discovery.

10   One of those principles is that each side has an opportunity

11   to explore and gather facts and circumstances and statements

12   that would assist in the presentation of their case.

13       One of the exceptions that we allow to that exploration is

14   the attorney-client privilege and that when the privilege is

15   asserted.  And we value the confidences of the lawyers with

16   their client to keep those secret, and the privilege belongs

17   to the client to assert.  That blocks the other side from

18   getting behind those advices and the scope of the engagement

19   and the activities that the client has asked for, that the

20   client has approved, that the client shares with others at

21   the behest of their lawyers.

22       We started the deposition with Mr. Ceis and Mr. Narver was

23   objecting to a very large number of questions posed by

24   Mr. Taylor indicating that he was asserting the privilege.

25   There is a break in the testimony.  I don't have any

1   knowledge of what was said during that break.  The bottom

2   line is that the record, which all lawyers know is what we

3   use --  The court reporter is sitting there for the purpose

4   of recording what the agreements are between the parties.

5   There is nothing in this record about the City waiving the

6   attorney-client privilege.  There is no writing that has been

7   offered up when Mr. Taylor on the record asks for the City to

8   outline what their attorney-client privilege is.

9       Mr. Taylor does go on to ask many questions.  He asks

10  questions about meetings and conduct, mostly about meetings

11  that the privilege could not surround anyway because there

12  were other people at the meetings.  And once you have someone

13  else at the meeting it breaks the privilege.

14      I wonder whether Mr. Walker's cloaking with his letter

15  nunc pro tunc can shield any meeting that Mr. Walker was at.

16  The case law is debatable as to whether that type of an

17  expert comes within the privilege or outside the privilege.

18      You cannot use the privilege as a shield and then turn

19  around and use it as a sword.  You have to decide early on

20  whether you are going to keep matters privileged or whether

21  you are going to offer them up.

22      In this instance the City never designated the scope of

23  the privilege that they wished to waive or to decline.  There

24  is nothing on paper, there is nothing on the record.

25      I therefore find it would be fundamentally unfair to allow

1    the City at this point to offer up testimony that the defense

2    didn't have an opportunity to explore, didn't have an

3    opportunity to depose Mr. Gorton, Mr. Johnson concerning

4    these statements, to ask Mr. Gorton about his dual

5    representation and the confidences that he may have been

6    passing from one group to the other.

7         Now, we already have in the record the engagement letter.

8    We already have in the record the fact that Mr. Ceis says

9    that he did not see these documents.  So that's part of the

10   record already.

11        MR. LAWRENCE:  That notion, the fact that Mr. Ceis

12   testified that he did not see the power point in any form,

13   that is something that comes in as a stipulation, your Honor?

14        THE COURT:  Well, Mr. Taylor basically says that he

15   answered that question in the deposition.  He is not

16   contesting that information be put before the Court now.  It

17   is one of the things I read in your memorandums.  I asked him

18   if he was willing to accept the fact that Mr. Ceis said he

19   hadn't seen the poison well Power Point.

20        MR. LAWRENCE:  Again, so the record is clear, if that

21   is a stipulated fact that is accepted then Mr. Ceis doesn't

22   have to testify about that.  And that's fine with us.

23        THE COURT:  Okay.  That's what I am trying to tell

24   you, is that those two facts, the engagement letter and the

25   fact that Mr. Ceis says he didn't see the Power Point that

1   was presented to him at the deposition, those are facts.

2      As to the other issues, I think they clearly implicate the

3   attorney-client privilege.  The City didn't waive it before

4   and didn't give clear notice that somebody else could --

5   didn't give clear notice to the defense that those matters

6   could be examined on, and so we are not going to go into

7   them.

8          MR. LAWRENCE:  May I ask a point of clarification,

9   your Honor?

10          THE COURT:  Yes.

11          MR. LAWRENCE:  One of the subjects that we offered on

12   for Mr. Ceis was the July 24th meeting, and meetings and

13   efforts that took place before K&L Gates was retained.  I was

14   not sure whether or not your Honor would preclude things

15   before September -- I'm sorry, he 19th or the 21st, I can't

16   remember when the engagement letter was, that did not involve

17   K&L Gates attorneys.

18          THE COURT:  The mayor testified extensively as to

19   what it is he did.  Is Mr. Ceis going to say there is --  Is

20   there something in that testimony that we haven't gone

21   through or that you didn't have an opportunity to put on in

22   your original case as to what the City was doing --  I am

23   assuming you are talking about July and August.  The mayor

24   testified about it, Mr. Bennett testified about it.

25          MR. LAWRENCE:  The only specific meeting that was not

1  testified about -- the mayor -- was the July 24th meeting

2  that Mr. Walker testified about.  It would be confirming of

3  what Mr. Walker testified with respect to that meeting, but

4  it would also clarify that there was no discussion of

5  litigation at that meeting.

6        THE COURT:  Well, then it is duplicative.

7        MR. LAWRENCE:  As long as your Honor is consistent

8  then we don't need to bring that point.  We made the two

9  points we wanted to bring, the engagement letter and the

10  power point.  I think those have been covered.

11        THE COURT:  All right.  Mr. Lawrence, are there any

12  other witnesses that you intend to call at this time in

13  rebuttal?

14        MR. LAWRENCE:  No.  We just wanted to make those two

15  points about Mr. Ceis, and they are in the record.

16        THE COURT:  All right.  Any surrebuttal to those two

17  points?

18        MR. KELLER:  Absolutely not.

19        THE COURT:  All right.  Counsel, I think that we

20  should take a break, and then we will come back and we

21  will -- I am sorry to the audience.  I blasted right through

22  a break I have always told you that you could have.  I wasn't

23  paying attention to the clock.

24        MR. KELLER:  I say no surrebuttal, but on the two

25  points I want to be clear what Mr. Taylor has stipulated to

1  regarding the second one is just that the testimony of

2  Mr. Ceis is that he didn't see it.  It is not a stipulation

3  that he didn't see it.

4          THE COURT:  That was my understanding.

5          MR. KELLER:  Okay.

6          THE COURT:  He has testified under oath in his

7  deposition that he did not see it.  Let's take our break, and

8  then we will come back and we will go forward with the

9  closing arguments.

10          MR. LAWRENCE:  Thank you, your Honor.

11

12                  (Short recess taken.)

13

14          THE COURT:  Please be seated.

15      Are we ready for closing argument?

16          MR. LAWRENCE:  We are, Your Honor.

17          THE COURT:  Go ahead, Mr. Lawrence.

18          MR. LAWRENCE:  Thank you, Your Honor.

19      We thank, first of all, the Court for your attention over

20  these past six days.  We're pleased to take the opportunity

21  here to discuss how the evidence presented fits into the

22  applicable law.  Looking at the evidence and applying the

23  law, we believe the City has made its case that it's entitled

24  to specific performance of the KeyArena lease.

25      There are a couple of themes that we are going to go

1    through in closing.  First, the City is not a developer.  The
2    City is not like a standard landlord.  KeyArena is not like a
3    strip-mall or a shopping mall.  Finally, the Sonics are not
4    like a Wal-Mart store.

5        So we ask that in assessing the lease at issue here and
6    the benefits bargained for under that lease, we should start
7    in recognizing that the City of Seattle is spending taxpayer
8    money, pledging taxpayer debt, and leasing public property is
9    not the same as a developer/owner of a strip-mall leasing
10   property.  The mall developer has a simple goal:  To earn a
11   profit on its investment.  The rent is typically set at a
12   rate that attempts not only to cover expenses like debt
13   service and operating expenses, but to return a profit to the
14   developer.

15       The City, however, has different motivation.  Rather than
16   earn a profit, the City seeks to provide benefits to its
17   citizens, public, police services, roads, social services,
18   economic development, cultural services, community services.

19       The motivation of public entities that provide support for
20   constructions of public sports arenas simply is to provide
21   benefits to its citizens.  This was recognized here in the
22   State of Washington in case of CLEAN v. State, where the
23   Washington Supreme Court recognized that the public provision
24   of a venue for professional sports franchises serves a public
25   purpose by providing jobs, recreation for citizens and

1    promoting economic development and tourism.

2        This concept is not found alone in the State of

3    Washington.  In other cases, in other states dealing with

4    sports arenas, we see that in Minnesota the Minnesota Supreme

5    Court noted that the construction of a stadium for use by

6    professional sports teams constitutes a public purpose for

7    which public expenditures may legally be undertaken.

8        In Pennsylvania, the Court noted that public projects are

9    not confined to providing only the bear bones of municipal

10   life.  It may provide gardens, parks, monuments, fountains,

11   libraries, museums, and generally speaking anything

12   calculated to promote the education, creation or the pleasure

13   of the public.

14       These decisions to support sports stadiums and allow

15   public money to be spent on sports stadiums reflect that the

16   City of Seattle and other public entities make public-policy

17   decisions to pursue public purposes for perceived public

18   benefit.

19       While the value to the public of sports stadiums may be

20   subject to the debate, the policy decision rests squarely in

21   the elected representatives of the people.  This also was

22   emphasized by the Washington Supreme Court in the CLEAN

23   decision where they stated, We are aware that an argument can

24   be and has been made that opportunities for recreation and

25   little positive economic impact flow to the community from

1    the presence of a major league baseball team.  This agreement

2    that underlies that debate, however, is best resolved by the

3    people's elected representatives.

4        That there is debate about the benefits, the economic, the

5    intangible benefits of a sports stadium misses the point.

6    The point is that if the City, in entering into the KeyArena

7    lease, was entitled to make public-policy decisions to obtain

8    certain benefits, and the City in deciding to enforce the

9    lease also is making a public-policy decision to obtain the

10   benefits, tangible and intangible, that flow from having a

11   sports stadium here in Seattle.

12       There was some decision about I-91.  Maybe the policy of

13   the City has changed in the last two years.  But that was not

14   the policy in effect in 1994, 1993, when the City of Seattle

15   negotiated the KeyArena lease.

16       With that navigation starting point, let's turn to the

17   lease at issue here.  Here the benefit that was bargained for

18   by the City was not profit.  As you heard Virginia Anderson

19   testify, the proposed revenue streams from the lease were

20   never envisioned to provide a reasonable return to the City

21   and its citizens as it might be required to under I-91.  This

22   was a shared-risk public-private partnership that perhaps

23   would break even.  But simply spending City money to break

24   even after 15 years and have out of date basketball only --

25   state-of-the-art basketball -- what was a state-of-the-art

1   basketball facility was not the benefit bargained for by the

2   City.

3       The benefit bargained for by the City was something much

4   more and the benefits that every City or state or county

5   looks for in having a sports team in a public building.  That

6   is, the very type of intangible and economic development

7   benefits that courts have recognized are appropriate.

8       That conclusion applies here, and it's clear from a couple

9   of things.  The testimony of Virginia Anderson which you see

10  here, where she was asked about how does this fit into the

11  Seattle Center concept?  And she testified that if you bring

12  together a rich and diverse community that means everybody.

13  There are a lot of people who find their way coming together

14  around opera, there are many others who find it around

15  sports.

16      It's also clear from the structure of the lease.  We

17  talked a little bit about that in the sense that the lease

18  was not intended to provide a reasonable rate of return to

19  the City on its investment in KeyArena.

20      It was intended to do something more than that.  And then

21  the lease itself.  This is the memorandum of understanding.

22  If you recall the testimony, this was a two-part agreement

23  with the Sonics' ownership and the Ackerley group.

24  Initially, in order to allow the City to fund the initial

25  construction activities related to the renovation proposal,

1    the parties entered into a memorandum of understanding, in

2    which the City said the City acknowledges a long-standing

3    commitment of the Sonics and Seattle community.  The Sonics

4    will continue to provide certain public services and benefits

5    as part of their long-term tenancy.

6        Subsequently, the parties signed the lease.  In that lease

7    this understanding of what the City hoped is reflected.  The

8    City desires to construct the state-of-the-art basketball

9    facility in order to enhance the City, without means of a

10   long-term user to do so.  In order to keep SSI, which is the

11   Ackerley group, in Seattle the City will construct a new

12   facility.

13       Consistent with those goals, the City sought to lock in

14   the benefits that they were trying to achieve in getting a

15   Sonics team in Seattle for the long term by requiring that

16   they stay in the lease and use the premises through September

17   30, 2010.  And all home games of the Sonics were to be played

18   in KeyArena through that date.

19       That locked the Sonics in to playing here for the full

20   term of the lease, so that the City could get the full

21   benefits of the Sonics playing here.  And then the key to

22   that lock was thrown away when the parties agreed that the

23   obligations to this contract are unique and agreement may be

24   specifically enforced by either party.

25       This was a lock-down agreement that gave the City the

1    right to specifically enforce the lease to make sure that it

2    was paying the full benefits of having the Sonics play in

3    Seattle through the 2010 season.  And as we know, the

4    defendants admit that the lease says what it says.

5        When Mr. Bennett was asked about the lease and whether

6    there was any out for him at all in the lease that allowed

7    him to leave early, he acknowledged no, there is nothing in

8    the lease that allows him to leave early.  And there is no

9    provision of the lease that allows the Sonics to leave early

10   because of failing attendance, because of the facility not

11   living up to current NBA standards, because of low revenues.

12   None of those provisions are found in the lease.

13       THE COURT:  Mr. Lawrence, doesn't the lease also have

14   a reciprocal agreement?  In other words, there were two sides

15   negotiating.  And it was Mr. Ackerley who needed a viable

16   venue.

17       Wasn't that part of what was bargained for; that the City

18   had to maintain its property as a viable venue?

19       MR. LAWRENCE:  The maintenance obligation under the

20   lease is clear.  There is no requirement that the City

21   upgrade on a continual basis the facility in order for it to

22   meet at every year whatever the then-current NBA standards

23   were.

24       The maintenance requirements which were set out in the

25   lease had the City keep the facility in good repair, and then

1    the further specified that about halfway through the lease

2    there would be a freshening up of the arena paid for by the

3    City, and certain specific maintenance items were set forth

4    in the lease as to what the City would do and originally it

5    was 2002-2003 season of what the City would do.

6        The City -- actually the third amendment to the lease,

7    which is an Exhibit No. 600, then sat down with the owners of

8    the Sonics and said here is what we're going to do to fulfill

9    this renovation requirement that is in the lease.

10       So in terms of what requirements are in the lease for the

11   City to maintain the facility and provide the one agreed-upon

12   upgrade that was complied with by the City.  There was

13   nothing in the lease -- you can look at the lease back and

14   fourth -- that required the City to keep the facility as a

15   state-of-the-art building for the entire 15 years of the

16   lease which is their suggestion.  It's not found there.

17       And in their proposed findings they cite pages 161 and 162

18   of Virginia Anderson's testimony.  But there is nothing in

19   her testimony that suggests that what the City was going to

20   was to provide to the Sonics a state-of-the-art facility

21   throughout the entire term of the lease.  We know that the

22   KeyArena remains fully functional.  Mr. Bennett said that to

23   the state legislature.  Anyone who goes to a basketball game

24   at KeyArena, as we showed in the pictures, it works just fine

25   to do professional basketball.

1    What has changed in those 15 years are new ideas that are

2    a revenue enhances outside of the basketball court itself.

3    But there is nothing in the lease, there is no testimony

4    about the intent of the lease that suggests the City was

5    committing itself to continually renovating the arena.  The

6    maintenance obligations were set forth in the lease.

7    Freshening up halfway through the lease of set forth in the

8    lease.  Sonics' ownership and the City agreed what that would

9    entail in the third amendment to the lease.

10    So I think until we heard the argument from Mr. Keller

11    here, there has been no suggestion by any prior owner that

12    the City was not living up to its agreement to maintain the

13    facility in the manner in which it agreed to when it signed

14    the lease.  So the notion that this was to be kept renovated

15    into some greater, bigger arena over the course of 15 years

16    is simply not supported by anything in the record.

17    In terms of the revenue issues, as Virginia Anderson

18    testified, this was a novel approach.  It was one that had

19    shared risk and shared benefit for both parties.  Actually,

20    when the Sonics were doing well in the '90s, as Mr. Barth --

21    you can look at Mr. Barth's chart about what money was being

22    paid out to the City, it was a large amount of money, and

23    presumably Sonics were also getting a large amount of money

24    because there was a sharing of revenue from the games.

25    But, again, there is risk that both sides took with

1   respect to this novel arrangement.  But there is nothing in

2   the arrangement that allows the Sonics to unilaterally say

3   sorry, we need to leave here because this is not working to

4   us, even though there are other NBA leases that have those

5   types of provisions.  There is nothing in this lease.

6       And, again, the revenue to the City was not intended to

7   give the City a profit.  It was intended to try to make this

8   as close to a break-even type of deal as possible.  But not

9   to give a profit.  And the reason the City wasn't interested

10  in profit is because it's the other benefits of having a

11  basketball team that the City was interested in obtaining.

12      Now, we'll talk a little bit more about all the things

13  that Mr. Bennett and PBC knew when they assumed the lease.

14  One thing that they knew is -- I'm going the wrong way,

15  sorry.  Shortly after they purchased the Sonics Mayor Nickles

16  told the City without equivocation the City will enforce the

17  lease.  The City had made a policy decision that it wanted to

18  elect the specific performance remedy that was bargained for

19  in the lease to obtain the benefits of the Sonics in the city

20  for the full term of that lease.  Mr. Bennett testified he

21  understood that in July of 2006.  And in October of 2006,

22  several months later, he signed an assumption of that lease

23  with no changes.  He didn't come to the City and say this

24  lease doesn't work; can you give us a break?  He didn't come

25  to the City and say look, I'm going to spend 12 months

1  looking for a new arena, and then I need to get out of here

2  if I don't because this doesn't work; so can we cut a deal to

3  allow me to leave if I do a 12-month good-faith effort

4  search?  He didn't come to the City and say we'll extend the

5  lease for a few years if you can change the way the revenue

6  structures works.  He didn't come to the City at any point

7  and say let's work on a renovation plan to make this a

8  state-of-the-art facility.

9       Instead, on October 23rd he signed the assumption

10 instrument agreeing to assume all obligations under the

11 lease, including the obligation to play Sonics games through

12 the 2010 NBA season without any requests for change, without

13 any efforts to negotiate with the City for change.  Signed on

14 to a deal and then less than a year later he was telling

15 everyone he was moving.

16      So the benefit of the bargain of this deal, as I said, for

17 the City was getting the Sonics to play in Seattle for 15

18 years and all the tangible/intangible benefits that go along

19 with the team playing in the city.

20      So what was the benefit of the bargain for the Sonics?

21 They got a then-state-of-the-art basketball facility per

22 their specifications.  They got scheduling priority for use

23 of the KeyArena and status as the principal prime user.  They

24 got the City's agreement to provide staff at games at City

25 expense, and they got the City's agreement to maintain the

1    facility as set forth in the agreement, on some version of

2    keeping the arena in a state-of-the-art facility process for

3    15 years.

4        I think, as I said, I think it's instructive that neither

5    the Ackerley group nor the Schultz group ever approached the

6    City to argue that the lease should be written -- rewritten

7    because it's not working.   The only person who has suggested

8    the lease should be rewritten -- that is, we should be able

9    to leave the lease earlier -- was Mr. Bennett's group.

10       THE COURT:   Mr. Lawrence, is that really quite true?

11   I mean basically Mr. Schultz was down at the legislature

12   trying to get to a different spot.   And isn't that inherently

13   saying to the City we want out; we wanting to elsewhere; we

14   want improvement?

15       MR. LAWRENCE:   No one in court has testified that the

16   KeyArena for the next 10 to 15 years as-is is a suitable

17   facility.   That's not I think part of case and no one is

18   suggesting that.

19       As is typical of sports arenas, you build it

20   state-of-the-art at the time; at the end of the lease it

21   needs to be renovated.   That is what happened here.   The

22   Schultz group was working with the City on a renovation plan

23   so that after the end of the lease, they could have what

24   would be then a 2010 state-of-the-art facility.

25       We're not suggesting that the Schultz group didn't want an

1    improved facility, if they were going to stay beyond 2010.

2    But the issue is no one has the complained that the City

3    wasn't meeting its obligations with respect to the facility

4    through 2010.  And I don't think anyone is asserting here

5    that if the Sonics were to play, although they could

6    certainly continue to play, that KeyArena would not need to

7    be renovated on a going-forward basis.  The question is:  Do

8    the Sonics have to stay as they originally agreed to through

9    the end of their lease?

10        I digress slightly from my argument to make the point that

11   they have the same problem in Oklahoma City.  You heard from

12   Mr. Bennett is that Oklahoma City, the Ford Center, is not

13   currently a state-of-the-art arena.  There is going to be

14   100-some-odd-million-dollars spent by the City to renovate

15   the Ford Center so that it will in the future be a

16   state-of-the-art arena.  It's not as if Mr. Bennett is

17   seeking to move from one non-state-of-the-art arena to a

18   state-of-the-art arena.  He's seeking to move from a

19   non-state-of-the-art arena to another non-state-of-the-art

20   arena because in a couple years from now it will be a

21   state-of-the-art arena.

22        It's a very parallel situation to what the Schultz group

23   is trying to do; that is, recognizing that you might be in an

24   arena that doesn't have the revenue-enhancing capabilities

25   through the end of your lease term, but then you get to move

1   into something that is current state-of-the-art, which is

2   what happened back in 1994.  That facility, you know, at the

3   time was current state-of-the-art.  It was done to Sonics'

4   specifications.  As Joel Litvin testified -- we read in the

5   deposition -- the NBA had to approve the move of the team

6   into the renovated KeyArena because it met existing NBA

7   standards at the time.

8       So the City promised to deliver.  That's what they did

9   deliver to the Sonics.  And the fact that at the end of the

10  lease it's not the state-of-the-art is neither surprising or

11  unexpected in the standard.  There is nothing in the lease

12  that says you get to leave because time ages a facility.

13      One of the questions that has been raised in briefing here

14  is whether the specific performance clause is ambiguous, what

15  are the "unique obligations" under that clause.

16      I think there are a couple that stand out.  One is the

17  City's obligation to give scheduling priority to the Sonics

18  which is Article VI of the lease.  It's a very specific

19  obligation with respect to meeting NBA requirements for

20  scheduling games there.  This is a unique obligation that

21  parties have.

22      Secondly, the Sonics use rights for KeyArena under Article

23  VII and Article X.B which cement their principal user status

24  for KeyArena, which make clear that the Sonics have rights to

25  use this public facility over and above any other tenant of

1    the facility.

2        And finally and foremost, in terms of this case, the other

3    unique obligation in this agreement is the Sonics' commitment

4    to play their home games here through 2009-2010 NBA season.

5    That is Article II.

6        Now, those particular obligations are clear, they're

7    unequivocal, they're easy to enforce.  This is nothing

8    ambiguous about them.  As we talk about in terms of the

9    requirements to show specific performance, you have to show

10   that what you're trying to enforce is a clear and definitive

11   contractual provision.

12       We posit, Your Honor, we leave absolutely nothing unclear,

13   it's entirely clear, the Sonics' commitment to play in

14   KeyArena for the 2009-2010 season.  That is a unique

15   provision and it's a clear provision.  There is nothing

16   ambiguous about it.  It can be specifically enforced.

17           THE COURT:  So if it's not ambiguous, do I throw out

18   the Virginia Anderson testimony about it?  Because you only

19   let in extrinsic evidence if the provisions of the term are

20   ambiguous.

21           MR. LAWRENCE:  As you approach a contract, you look

22   at it to determine whether or not ambiguus, terms are clear.

23   If there is a question about it, yes, you look to other

24   evidence.  The only other evidence in this Court that has

25   been presented about what the terms of the contract meant

1    would be that Virginia Anderson testimony, the memorandum of

2    understanding, that was trial Exhibit No. 41, I believe.  And

3    also you would look at the subsequent performance under the

4    lease, ranging from the fact that all of the owners of the

5    Sonics up until Mr. Bennett performed by playing other home

6    games there, despite the problems that were identified over

7    the past few years with the lease.  None of them sought to

8    avoid that clear obligation.

9         So you would look, yes, at Virginia Anderson testimony,

10   contemporaneous documents, and also course of performance to

11   the determine, clarify any ambiguity if Your Honor found some

12   in the contract.

13        I believe all that testimony is consistent that the City

14   was trying to obtain whatever benefits -- you can argue about

15   them, whether they're real or perceived.  The City thought

16   they were real enough to commit its dollars and debt, commit

17   everything involved with it in order to keep the Sonics here

18   without any return on its investment.

19        So I'm going to turn now to the elements of specific

20   performance.  Fortunately, there is a very recent Washington

21   Supreme Court case that talks about specific performance

22   Crafts v. Pitts case, 2007.  The Washington Supreme Court

23   recognized that this is a contract-specific remedy that can

24   be done by a court.  It's a valid, binding contract; a party

25   has committed or is threatening to commit a breach; the

1   contract has definite and certain terms; and the contract is

2   free from unfairness, fraud and overreaching.

3       There can be no dispute in terms of the evidence of this

4   case that all these starting elements were met.  It's an

5   admission of fact that we have a valid, binding contract.  No

6   one has suggested otherwise.

7       It's very clear Mr. Bennett and the PBC are threatening to

8   commit a breach of the agreement by wanting to leave early,

9   not fulfill the 15-year term of the lease.  The terms to play

10  all home games through 2009-2010 are certainly definitive and

11  certain as this is a specific performance clause.  And there

12  has never been any suggestion that the contract was somehow

13  procured through unfairness, fraud or overreaching.  As

14  Virginia Anderson testified, this was a negotiated contract

15  with both sides being represented by counsel back in 1993 and

16  1994.  That's not an issue in this case.

17      So the basic premises, basic elements upon which a party

18  can claim specific performance are met here.  And so the

19  question is:  Is there some reason not then to allow specific

20  performance?  There are a couple of reasons we think that you

21  don't have to go very much further in your analysis.

22      First of all, we cited these cases in our finding and

23  trial brief, Keystone and Mahoney cases.  The parties have a

24  freedom of contract as they choose absent a contrary public

25  policy, the fundamental principle recognized in law.  Two

1    sophisticated parties -- the City and the Ackerley group and

2    then the City and PBC -- when they signed the assumption had

3    the freedom to contract as they choose.  And this includes

4    the freedom to choose the remedy of specific performance.

5        And the courts will allow that choice of remedy to be

6    enforced because people have the ability.  And here parties

7    recognize that because of the unique nature of the

8    obligations that the parties ran into, the specific

9    performance was an appropriate remedy.

10       And I will note, if I can make rest for a second, there

11   are provisions in the contract that have alternative remedies

12   in them.  For example, the staffing provision requires the

13   City to provide staffing says that if the City doesn't

14   provide staffing, there are remedies specified for that.

15   There is no alternative remedies specified for failure to

16   play home games at KeyArena other than the general specific

17   performance clause.  The parties here freely contracted to

18   that remedy, and the courts routinely enforce the remedy to

19   which the parties agree.

20       Now, the one exception to that that you heard about that

21   might apply in this case is whether or not specific

22   performance would require extensive court supervision.  So

23   let's talk about that at issue for a second.  There is a very

24   simple straightforward answer to that.  The lease has a

25   mandatory arbitration clause in it.  With very little

1    exception, any dispute under the lease is subject to

2    mandatory arbitration and would never come before this Court.

3        Article II is an exception, hazardous waste is an

4    exception.  But operational issues like you heard about in

5    terms of the suite marketing, concession issues, none of

6    those could even be before this Court because they're all

7    subject to mandatory arbitration.  The only thing that is not

8    that is relevant is the lease term, which if Your Honor

9    ordered specific performance on and there is any dispute

10   about suites or concessions whatever, Your Honor would never

11   see either party here again.  We would be before some AAA

12   arbitrator resolving that dispute.  So there can't be a

13   burden on this Court.

14       THE COURT:  Mr. Lawrence, one of the underlying

15   things in this case is each side telling the other how badly

16   they've been treated and lots of accusations about who the

17   City wants as a tenant.

18       If both sides have an obligation to carry out the contract

19   in good faith, am I going to be embroiled with this same type

20   of proceeding that we've been going through for six days

21   where each side makes accusations against the other and the

22   accusation against the City, of course, is that it's

23   undermined its own tenant.

24       MR. LAWRENCE:  I can't imagine that to be the case,

25   Your Honor.

1          First of all, if you heard the testimony of the

2    operational people that deal with each other day to day,

3    there are no recriminations, no disputes that can't be

4    resolved as they would in any normal course in terms of

5    day-to-day operations of the Sonics and day-to-day operations

6    of the KeyArena --

7          THE COURT:  I'm not worried about people who change

8    out the arena or sweep the floors or take the tickets.

9          What I'm worried about is are we going to have an ongoing

10   allegation about the City undermining its tenant by plotting

11   to have someone else buy them out, forcing them to increase

12   loss, going to the NBA and undermining their business

13   position or leaking their secrets?

14         I would like to know how I can be assured that we're not

15   going to be back here with those kinds of problems.

16         MR. LAWRENCE:  I think there are couple of responses

17   to that.  I just don't see that happening.  I don't see any

18   of this would have happened in the first instance if

19   Mr. Bennett had simply played out his term at the lease

20   instead of announcing the year after he signed -- but it

21   doesn't really matter whose fault or who fired the first

22   shot.  I think Your Honor has a legitimate concern.  I think

23   that Mr. Bennett and the mayor are responsible people that

24   have both testified that if Your Honor enforces the lease and

25   allows the City to have the Sonics as a tenant for the next

1    two years, people will behave just fine.

2        I think if Your Honor is concerned about certain actions

3    that were taken by individuals, I think that can be addressed

4    by Your Honor so that those types of actions wouldn't be

5    continuing in the future.  But you've heard no testimony at

6    all from the mayor, who is the spokesperson for the City,

7    that he intended to bleed Mr. Bennett or call Mr. Bennett

8    names or anything like that.  Mr. Bennett was equally clear

9    that he has no particular beef with the mayor.  These are

10   sophisticated people who can get along once they understand

11   what the rights and obligations are.

12       THE COURT:  Well, let's talk about how sophisticated

13   they are.  Mr. Bennett calls the mayor wanting to meet in

14   July, and the mayor doesn't call him back.

15       MR. LAWRENCE:  I don't believe that was the testimony

16   at all.

17       THE COURT:  Well, Mr. Bennett called for a meeting

18   with the mayor.  These two gentlemen really haven't sat down

19   and talked about anything since the failure with the last

20   legislative session.

21       MR. LAWRENCE:  I misunderstood.  You're talking about

22   July 2007?

23       THE COURT:  Correct.

24       MR. LAWRENCE:  There was also a conversation July

25   2006 where they talked, and Mr. Bennett was told the City

1    wanted to enforce the lease.  They had dinner together where

2    again, the City expressed its preference for renovating

3    KeyArena.

4        Then what happened in July of 2007 was a conversation

5    between each side did converse and communicate.  Mr. Bennett

6    was saying I will work with you to get out of the lease early

7    and the mayor was saying, no, I want you to stay for the

8    lease.

9            THE COURT:  That's not real sophisticated when they

10   both go to their own corners and refuse to talk with one

11   another, is it?

12           MR. LAWRENCE:  As we get through in a later slide,

13   that is actually not what the City did in response to that.

14   What the City did in order to protect its future interest is

15   said, look, let's try to revisit the notation of a renovated

16   KeyArena.  That's what the City can provide.  We can provide

17   more money to that effort than was offered to the Schultz

18   group, and we want to engage in the process of presenting

19   this to the NBA.  You've heard about the NBA meeting.  This

20   was not an NBA meeting at which Bennett wasn't invited to.

21   He was there, he heard the pitch that the City made to the

22   NBA as to why a renovated KeyArena works --

23           THE COURT:  Mr. Lawrence, answer my question.

24           MR. LAWRENCE:  I'm trying to.

25           THE COURT:  Did the mayor ever call Mr. Bennett back

1   and say let's sit down, let's talk about this, and see what

2   we can do?

3         MR. LAWRENCE:   The mayor --

4         THE COURT:   I didn't hear it.

5         MR. LAWRENCE:   The mayor's position has been

6   consistent that he's willing to talk about -- the only thing

7   he's willing to talk about is something that would allow the

8   Sonics to stay through the end of the lease and hopefully

9   something future going forward.   Since that was not a

10  discussion that Mr. Bennett was willing to have there was no

11  discussion.

12        THE COURT:   So answer to my question is no?

13        MR. LAWRENCE:   Not -- the mayor was not willing to

14  sit down and discuss an early exit, correct.

15        THE COURT:   Let's move on.

16        MR. LAWRENCE:   I think once Your Honor clarifies what

17  the rights are with respect to that issue -- that is, whether

18  or not the City has a right to specifically enforce the lease

19  or Mr. Bennett has a right to leave early -- that clarifies

20  the principal point of dispute between the parties.

21      I don't think there is any evidence to suggest based on

22  the clarification there that the City would not treat

23  Mr. Bennett well over the next two years, or that Mr. Bennett

24  would treat the City poorly over the next two years.   The

25  main dispute has been what does the lease provide?   Does the

1  lease require them to stay?  Or is there some, as Mr. Bennett

2  testified, some out that allows him a remedy of leaving?

3  That's the fundamental dispute.  That will end based on what

4  Your Honor decides.  And then I think the parties will move

5  forward in a rational basis based on Your Honor's decision.

6      I don't know what they could be coming into court to fight

7  about.  All the cases that they rely upon -- that is, PBC

8  relies upon -- where the courts have said we're not going to

9  specifically enforce because of the potential for continuing

10  disputes have to do with clauses in leases relating to

11  operations of the business.

12      There are no issues that you've heard about in terms of

13  operational issues that will require this Court's attention

14  over the next two years.  That's the sole businesses of which

15  any court has said I'm not going to specifically enforce.

16  It's only because there are operational-type issues.  There

17  has never been a case where a court has said I am not going

18  to specifically enforce because the owner of the development

19  and the owner of Wal-Mart don't get along.

20      It's always been because there is something operationally

21  day to day that would require the Court's attention.  That's

22  why I started with that as my answer to Your Honor's

23  question.  There is no evidence here of those types of

24  day-to-day issues that could come back before the Court.

25      One other thing to consider is all the cases that deal

1  with this notion of we don't want the courts to get involved

2  in the middle -- all the cases that they cite, include

3  Calahan case, which is the principal case they cite for

4  proposition that the Court shouldn't get involved in specific

5  enforcement when there is an issue of supervision, state that

6  it's a discretionary rule that is frequently ignored and is

7  always given significantly less weight where the public

8  interest is involved.  We believe that the public interest is

9  involved here.  So again, the case law supports limited court

10  supervision for the sake of the public, even if you are

11  concerned principals can't get along.  It's supported by all

12  case law, the including principal case they cite in

13  Washington.

14     So we think the contract is clear.  Specific performance

15  is appropriate and been agreed to by the parties in terms of

16  their freedom of contract.  But if you were to go on to the

17  next step in the analysis, you would need to look at the

18  couple of issues.  This is also set forth in the Crafts v.

19  Pitts case.  The difficulty of proving damages which

20  reasonable certainty and the difficulty of procuring a

21  suitable substitute.  I would like to turn to these two

22  issues next.

23     In terms of where courts have ordered specific performance

24  related to the uniqueness of the subject of a contract or the

25  difficulties in procuring a suitable substitute, the courts

1    have looked at several things.  And I think this is actually

2    very critical.  If you look at the findings and conclusions

3    that the PBC has submitted to this Court, they completely

4    ignore the issue of uniqueness.  They don't recognize that

5    it's an issue for this Court; they don't argue that it

6    doesn't exist; they don't think they have done anything in

7    this courtroom to demonstrate that the Sonics are anything

8    other than a unique tenant to KeyArena.

9         And on that basis alone, on the uniqueness of the tenant

10   of the Sonics to KeyArena, that's sufficient evidence for

11   this Court to issue an order of specific performance.  If we

12   look at the case law, the areas where the courts have granted

13   specific performance on uniqueness including several.  One is

14   where the substitute for the object of the contract is not

15   available on the open market.  That's McLeod case out of

16   Washington which we cite in our brief.

17        Another type of uniqueness is where strong sentimental

18   attachments developed through long-time association with the

19   subject contract.  That is from the Restatement (Second) of

20   the Contract, Section 360, which is cited in our brief, in

21   the Burr v. Bloomsburg case out of New Jersey, which is cited

22   in our brief, as well as the Wehend case out of California.

23        "Furthermore, where the subject of a contract although not

24   literally unique has features which lead the buyer to give it

25   special value to specific performance will be enforced."

 1    That is again out of the Restatement of Contracts, Section

 2    360.   All these types of issues apply here.

 3        Let me talk about why Sonics unique in terms of evidence

 4    and then what the courts have done with respect to the

 5    uniqueness of sports franchises.  We know there is no market

 6    the City can go to to obtain a substitute NBA team.  This is

 7    not like a gas station where one gas station owner leaves and

 8    there are dozen other franchises you can go to to get a

 9    replacement tenant, or a jeans store leaves and there are

10    hundreds of other stores that can replace them.  There is no

11    market for an alternative NBA tenant for KeyArena.

12    Undisputed.

13        There is no substitute team of any kind that is available

14    with the 41-year history that the Sonics have with Seattle.

15    The Sonics fan and the City have a strong sentimental

16    connection with the Sonics.  You heard that in testimony and

17    whatever happens when you have a bad team, whatever effect

18    that has, there is a strong core of people that retain that

19    connection to the Sonics.  That is a significant number of

20    people in this community.

21        Sherman Alexie testified the Sonics have been here 41

22    years.  "I have been a season ticket holder for 12 years.  I

23    love this team.  I love what it represents.  I live its

24    history.  If they leave I haven't been given -- the fellow

25    fans have not been given the proper way to say good-bye."

1      This is an object to its lease to which there is

2  sentimental value, a long-term history and uniqueness that

3  can't be replaced by an alternative tenant.  A case that is

4  on point with this is Triple-A Baseball Association v.

5  Northeastern Baseball, Inc. out of the first circuit, 1987

6  case.  There the question was whether or not --

7           THE COURT:  You don't need to tell me about that

8  case.  I told you about it.

9           MR. LAWRENCE:  I appreciate that.  I wasn't sure if

10  Your Honor wanted to reveal that was the case that you were

11  asking about.

12           THE COURT:  It obviously is the case.  It's actually

13  the highest authority of anything that I have been cited,

14  although it's a federal and out-of-state case.  And so I

15  understand it.  I'm throwing it out mostly to say to

16  Mr. Keller why shouldn't I look to this.  So I understand how

17  it applies to you.

18           MR. LAWRENCE:  I would only just emphasize the quote

19  that we had which is the Court looked at the uniqueness of

20  the Triple-A franchise as a basis for specific performance.

21           THE COURT:  Can I back up a little bit on the issue

22  of the sentimentality.  The City is a corporation.  And I

23  don't know that I have ever seen any case law that basically

24  talks about does the City shed tears or does the City cry?

25  In other words, can a corporate entity have sentiment?  I

1    understand that the fans do.  We have spent a lot of time and

2    the fans obviously feel they have a stake in this.  But in

3    fact, the fans aren't parties to the lease.  And I don't

4    think you're going to find anything in there about the fans.

5        So if you want me to stick to the lease, is that really

6    something that I should be looking at?  I don't know that

7    there is such a thing as corporate tears.

8            MR. LAWRENCE:  I think that the City and any public

9    entity is uniquely different than a corporation, who is

10   created for the purposes of making money.  The City, you're

11   right, is a municipal corporation.  It's not a corporation

12   under the business laws of the State of Washington.  It's a

13   corporation that is set up through the municipal laws of the

14   State of Washington.  Yes, they call it a municipal

15   corporation.  We're back to the RCW.  It's a totally

16   different of set of provisions dealing with municipalities

17   than corporations.  The structure in the state law is that

18   they are different entities.  The structure of the state law

19   allows a City to act on behalf of the public.

20       Now, a business corporation were to go out and spend a

21   whole bunch of money for the benefit of somebody in the

22   public that was unrelated to the corporation, you would have

23   shareholder issue suits about that.  Here in some sense the

24   analogy would be the citizens of Seattle are the people that

25   the corporation, municipal corporation, represents.

1           So when the City acts, whether it's building a road,

2   providing lease services, providing a park, supporting the

3   Opera House, which they did, supporting the Symphony Hall,

4   which the City did, supporting theater, supporting social

5   services for the homeless, social services for alcoholics,

6   the City is all doing for the benefits of its citizens, so it

7   is unique, it is different.  It is fundamentally different.

8   That is why you get to those cases we looked at in the first

9   set of slides as to whether or not it's a valid public

10  purpose for a municipality, municipal corporation -- I think

11  actually the City is a Class A Charter, not a corporation at

12  all.  They're a separate entity called a Class A Charter.

13  But they're acting on behalf of their citizens.  And that is

14  what they are structured under the state law to do.  And if

15  they don't, they get sued, and they get slapped down.  That

16  is why it was important that the State of Washington Supreme

17  Court addressed can King County support a public baseball

18  stadium?  The supreme court said, yes, that's a valid public

19  purpose because of the benefits that flow to the citizens.

20          So I think with respect to cities, they act on behalf of

21  their citizens.  And the Sonics fans and basketball fans or

22  the opera fans or the theater fans or the people who believe

23  that homelessness is an important issue to be addressed,

24  they're all served and have a stake in what the City does.

25  And when the City decides to spend its money for those

1   purposes is doing so on behalf of the citizens.

2       And the fact, I'm sorry, I'm moving up to 12:00 hour.  I

3   will cite you a case that we've cited in our brief that

4   indicates that where the public interest is effective is in a

5   case of specific performance is entirely appropriate to look

6   to that public interest in deciding whether to grant specific

7   enforcement.  This is -- it is 12:00.  This might be an

8   appropriate time to take a break.

9           THE COURT:  I understand the position that you take

10  with the City, and obviously that's what city and governments

11  do -- act on behalf of the citizens.  But is the

12  sentimentality what they use?  Obviously, one of the points

13  you're going to make, and you've done in your briefing, is

14  that you take public-opinion polls and you can say two-thirds

15  of the people in the city don't care if the Sonics leave, but

16  there is a third who do.  You probably wouldn't get any

17  unanimity on any of those questions, whether it be

18  homelessness, opera; everybody would have a different

19  situation.  And obviously the City has to act for its

20  citizens.

21      But you put on testimony about essentially sentimentality

22  and, Mr. Alexie is being a representative of the fans; he's

23  disappointed he doesn't get his cucumber sandwiches, and he's

24  disappointed nobody knows his name in the locker room anyway.

25          But is that really something that we're here to value as

```
 1    opposed to the City acting in the best interest of the public
 2    at large?  Those emotions go to individuals; they don't go to
 3    entities.  That is what I'm trying to get you to engage me
 4    on.
 5            MR. LAWRENCE:  I understand what you're suggesting.
 6    And I think to a certain degree, the degree of emotional
 7    connection of an individual fan is way at the margins of
 8    relevance.  But I would say the City in going about its
 9    business, deciding to build roads, support homeless people is
10    consistently making public-policy decisions, as to what the
11    benefits will be to its citizens.  It's consistently making
12    public-policy decisions that probably don't have majority
13    public support, leadership.  I don't know that you could get
14    a majority of the people of Seattle to support spending
15    however many million dollars of went into the Opera House or
16    however many million dollars go to serving alcoholics,
17    provide a place for alcoholics to rehabilitate in the City of
18    Seattle.  It's not a majority rule.  The City makes a
19    public-policy choice to serve its citizens.
20        There has been a suggestion by PBC that citizens don't
21    care and that that public-policy choice should be dismissed
22    because the citizens don't care.
23        Well, Mr. Alexie makes clear that citizens do care, and
24    there is a reality to the public-policy choice that the City
25    makes to provide these differences to a segment of its
```

1   citizens.  This was affirmed by the defendant's own expert,

2   Mr. Humphreys; that there are real intangible benefits,

3   whether you call them sentiment or not, civic pride, sense of

4   community, all the things that Mr. Alexie testified about

5   Mr. Humphreys acknowledged.  These are part of the public

6   benefits that the City made a public-policy decision to

7   invest in back in 1994 and has made a public-policy decision

8   to support by seeking to specifically enforce the lease here

9   today.

10       Maybe the degree of sentimentality you see on the stand is

11  not as important.  But the fact that there is a connection,

12  the fact that that informs public-policy decisions of the

13  City, the fact it's a valid public purpose, all of those

14  things do weigh in the decision that the City has to make.

15  And the City based on those issues, which are real, which

16  were evidenced by the testimony, admitted by the expert,

17  validates the City's decision to enforce this lease rather

18  than to elect the damages remedy.

19       THE COURT:  Thank you.  We need to stop for lunch.

20  So we'll be back at 1:30.

21                    (Short recess taken.)

22

23       THE COURT:  Mr. Lawrence, my accountants tell me that

24  you have 30 minutes remaining.

25       MR. LAWRENCE:  Very good.  I will endeavor to save a

1    few minutes for rebuttal.

2        Good afternoon, your Honor.  Just a couple more brief

3    comments on uniqueness.  We talked about the Triple-A case,

4    the Minnesota Twins case, 38 Northwest 2nd at 223, 225, also

5    talks about the unique connection between a team and its

6    citizens as a basis for granting relief to require the Twin

7    to stay in that case as well.

8        A couple of other observations.  All of the shopping mall

9    cases that the PBC cites in their findings, the Facts and

10   Conclusions of Law, they list a number of cases, in none of

11   those cases did the court find the tenant unique.  It was in

12   all cases where they were replaceable commercial tenants.

13       In fact, in every one of those cases as well the court

14   found in whole or in part there were supervision issues as

15   well in finding those specific performance.

16       But in all those commercial cases, those leasing cases,

17   that they cite, in none of them was there an issue about

18   uniqueness like there is in this case.

19       In fact, in a couple cases we cited, particularly the

20   Massachusetts Mutual case, there the tenant was the anchor

21   tenant of the mall, and the court -- in the reported decision

22   that we have the court required anchor tenant to stay at the

23   mall, at least pending trial.  We don't know what happened

24   after that.  But that was a example where you had a unique

25   tenant in the shopping mall and the court said we will

1    require you to stay through the lease, at least through the

2    end of trial.  We don't know what happened after that.

3              THE COURT:  Doesn't that make sense?  You wouldn't

4    basically disrupt the status quo, after they move out make

5    them move back in?

6              MR. LAWRENCE:  They had already closed in that case.

7    The court forced them to reopen during the pendency of the

8    trial.

9         Finally I wanted to mention the land cases.  If there is

10   one thing that all the courts seem to agree on when it comes

11   to specific performance and the conveying of a piece land,

12   that is something you can get specifically performed.

13        I think this goes to the question of where does the

14   adequacy of damages play into this.  Well, land is easily

15   valued.  Anyone can go out and get a fair market appraisal of

16   a piece of land.

17        For example, in the Carpenter case, which we cite at 627

18   P.2d 555 out of Washington, there was an option purchase with

19   respect to a piece of land.  The purchase price under the

20   option I think was $95,000.  There was an unequivocal

21   testimony at trial that the fair market value due to

22   appreciation of the land was $179,000.  Well, one would think

23   that, well, then the damages can be easily calculated, you

24   just take $179,000 and subtract $95,000.  But the court says,

25   no, despite the fact that you could do that valuation,

1    because land is unique, will allow a specific performance.

2    The notion that there is something special about that piece

3    of land to the contractor that can't simply be replaced with

4    money, it can't simply be replaced with another piece of

5    land, just like here there is something special about the

6    Sonics that cannot be replaced with another tenant, can't be

7    replaced with Ice Capades or any other events.  There is

8    something unique about the Sonics in relationship to the City

9    that can not be replaced.  It is very close, in our view, to

10   a land case where the court, despite the ability to look at

11   fair market value, despite the ability of a jury to get fair

12   market value, always allow specific performance.

13       And the case we have been talking about, Crafts v. Pitts,

14   in the Washington Supreme Court also came to that very same

15   conclusion, again, about land, noting that the particular

16   land at issue had a special relationship to the purported

17   purchaser, just like the Sonics have a special relationship

18   to the City of Seattle.

19       I would like to turn to sort of the other side of the

20   equation from uniqueness.  And that has to do with whether or

21   not damages can be measured with reasonable certainty.

22       We think that uniqueness in and of itself should end the

23   Court's inquiry because they are a unique tenant and we are

24   entitled to specific performance.  But you can also look to

25   the question of whether the damages -- whether what the City

1    bargained for can be measured with reasonable certainty.

2         You have heard a lot of testimony about both the tangible

3    and intangible benefit benefits of having an NBA team in the

4    City.  I will just kind of briefly go through them.

5         Mr. Bennett testified that every NBA team has an economic

6    impact on the City in which it is located.  You heard the

7    testimony of Lon Hatamiya who talked about the economic

8    impact of the team on the community, the jobs associated with

9    the team, the game day spending associated with the team.

10   Those type of jobs and game day spending were acknowledged by

11   Mr. Bennett.

12        And even Mr. Humphreys, the expert who thinks that teams I

13   guess are an economic negative on a community, testified that

14   he looked only at this broad, three-county region, and he

15   can't really say what the economic impact on the City of

16   Seattle will be from the Sonics leaving.  He talked only

17   about what the economic impact on the King, Snohomish and

18   Pierce County region.  So even if you buy his concept of

19   transferability, he didn't say anything that was relevant to

20   the economic impact on the City of Seattle, especially in

21   light of the fact that he could have done that analysis, and

22   he knows that over 60 percent of the season ticket holders

23   live outside the City of Seattle, and that is reason to

24   believe they would spend their discretionary dollars outside

25   the City of Seattle, which would have a real economic impact

1    on the City.

2         So going on to the intangible benefits.  You heard about

3    the substantial community and charitable activities that the

4    Sonics engage in.  It is not simply a matter of volunteerism,

5    it is a matter of the NBA mission you heard.  The NBA mission

6    involves community and charitable involvement, which requires

7    players making appearances in the community at hospitals and

8    charities, etcetera.  This is part of the package you get

9    when you get an NBA team in your City.

10        In the general category of intangibles, their own expert,

11   Mr. Humphreys, testified clearly that intangibles do exist

12   with respect to a basketball team.

13        THE COURT:  What do I do with your expert who

14   basically says, yes, these things can be valued, and any

15   economic entity can have a dollar value put on it?  I asked

16   him specifically, as you know, are the Sonics any different

17   from a store, from a Walmart.  He says, Judge, we can put a

18   value on it.

19        MR. LAWRENCE:  When you asked Mr. Hatamiya that,

20   there is clearly an ability to put a value on the economic

21   activity that is generated with respect to the Sonics.  With

22   respect to a store, it would be different.

23        But putting that down, it doesn't work for two reasons.

24   First of all, the Sonics are not a Walmart.  And the

25   Sonics -- you can't replace the Sonics level of intangible

1  benefits and the uniqueness of them with any other entity in

2  terms of the economic --

3       THE COURT:  What am I supposed to glean from his

4  testimony?

5       MR. LAWRENCE:  The point of his testimony was that

6  there is a lot of economic activity generated from the

7  Sonics.  Economists can put numbers on things.  I remember my

8  first day at the University of Chicago where the economics

9  professor said I can put a value on whether or not you decide

10 to go save somebody who is being mugged based on the utility

11 value to you of making that save.  We know economists are

12 good at doing that.

13      The question is, can the court or fact finder to a degree

14 of reasonable certainty put a value on the benefits of that

15 kind of economic activity to the City, the benefits of that

16 kind of job creation to the City, the benefits of the

17 vitality of the Seattle Center to the City.  Those types of

18 benefits which are the consequences of the economic activity

19 are not easily ascertainable.

20      The standard for economic damages in the State of

21 Washington is you have to find with reasonable certainty and

22 there has to be data.  We don't know how to translate that

23 job creation, we don't know how to translate that economic

24 activity into a damages number.  Is it $187 million that

25 would be paid to the City?  We don't know.  We just know that

1   there is value to the City.  Again, part of the public

2   purpose in having sports stadiums, whether you believe it or

3   not, is the perception of the City that it gets a lot of

4   economic activity, that it gets jobs, that it helps immediate

5   neighborhoods.  How do you translate that into a dollar

6   value?  I don't think you can do that with reasonable

7   certainty under the standards in Washington for contract

8   damages.

9       And that distinguishes, for example, the damage award for

10  pain and suffering.  For pain and suffering under Washington

11  law there is no standards that guide a jury with respect to a

12  pain and suffering award.  It is simply left up to the

13  discretion of the jury.  It is a very different type of

14  analysis than you have with respect to economic damages.

15      There is another reason why that analogy doesn't make

16  sense.  In the case of a tort, the harm has been done, the

17  person has been injured, the person has lost a loved one.

18  You can't -- you don't have the choice to go back and say,

19  would I rather have damages in the form of pain and suffering

20  or would I rather have not had that accident and not been

21  injured.

22      In the case of a contract the courts say, look, there are

23  two ways that you could be made whole.  One, maybe can you

24  get damages that will make you whole.  But alternatively in

25  certain cases it is a matter of specific performance that

1    will make you whole.  And this was the point that was

2    emphasized in the Crafts case by the Washington Supreme

3    Court.

4        The question is not whether or not there is some ability

5    to measure, the question is whether or not a remedy at law

6    will provide an equal making whole.  "Equal" is the word the

7    Court terms, in terms of making an award.

8        In the Crafts v. Pitts case the court said, look, it is

9    not going to be equal if you get something related to the

10   fair market value to land because this land is special.  In

11   the same way here simply being awarded a dollar amount is not

12   going to make the City equal to whatever benefits it

13   perceives are associated with the team.  You can't put a

14   number to it.  You can't put the City in the same position as

15   if they got the Sonics for the last two years of the lease.

16       In contract damages you are entitled to be made whole.

17   And if the only way you can be made whole is by specific

18   performance, and the damages award would be something but not

19   equal, it might undercompensate, it might overcompensate, but

20   not equal, then you are entitled to relief in the form of

21   specific damages.

22       You can't in this case go to a jury and try to value

23   intangible benefits.  I don't know what the LA study was

24   based on, I don't know what the Jacksonville study was based

25   on, but there is no data out there that is going to tell you

1   what the value is on a reasonably certain basis for those

2   intangible benefits.

3       And that is exactly why in all the sports cases that we

4   cited the courts have said these benefits are not easily

5   calculable and therefore we will award specific damages.

6       This is the quote from Crafts that I was talking about.

7   "The question is always whether money damages would equally

8   compensate the injured party, not whether they are merely

9   available."  So the fact that an economist can come up with a

10  theory doesn't mean that the City would be equally

11  compensated for the loss of the Sonics by having some money

12  damages award.

13      This was brought home in the King County case when the

14  Seahawks tried to leave King County.  The Court noted that

15  King County and its citizens -- again, they are looking at

16  the citizens the same way as the other sports cases -- would

17  be injured.  And through the loss of intangible benefits

18  flowing from the presence of a professional football team in

19  Seattle.  And of course in that case the court in sitting in

20  equity decided to keep the team in Seattle.  Again, because,

21  as the court went on, these injuries would be irreparable

22  because the amount of damages will not be subject to

23  reasonable calculation.

24      So, in summary, we believe that we have shown -- we have a

25  lease with clear and certain terms, a lease that provides a

1    remedy of specific performance that the parties agreed to,

2    that this Court should honor the choice that the parties made

3    in entering into the contract.  It should further think that

4    the Sonics are a unique tenant, and on that basis alone

5    specific performance is warranted.

6        There is no possibility of this Court having to be

7    involved in supervision because of the arbitration clause,

8    and because if there are ongoing disputes I believe that they

9    can be addressed in a business-like manner between the City

10   Attorney's office and -- if it gets to that level.  But most

11   likely it would just be done between Mr. Barth and Mr. Singh,

12   who seem to be able to get along just fine.

13       The damages from the intangible benefits, every court that

14   has looked at a case involving sports teams has held that it

15   is impossible to ascertain with reasonable certainty.

16       There are a couple of other cases I mentioned.  I

17   mentioned the Massachusetts Mutual case.  We also cited a

18   case, Dover out of Delaware, which was another case where a

19   tenant in a mall was required to continue its lease.

20       And then there are cases where a landlord has made

21   substantial improvements in a facility to meet the

22   specifications with a tenant.  And in those cases as well

23   courts have ordered specific performance where you have put

24   substantial improvements into a facility like Seattle did

25   with KeyArena, and the tenant has been there for a long time.

1    That case is Loughlin v. Cook, 38 P.2d at 224.

2       So I would like to turn to the defenses that PBC has

3    raised, if I might briefly address those.  With respect to

4    unclean hands, I think the starting point in the Court's

5    analysis should be the law on unclean hands, and whether or

6    not any of the cases that have applied the unclean hands

7    doctrine are analogous to this case.

8       We went through the case law and we found several

9    circumstances where the misconduct at issue rose to the level

10   of unclean hands.  A contract formed under inequitable

11   circumstances, the Nelson case.  The Washington v. Rhodes

12   case out of Michigan.  Not the case here.  Broad or

13   misrepresentation prior to formation or materially breaching.

14   Again, not the case here.  That is the Walsh case out of

15   Washington.  Unfair delays before asserting rights.  Not the

16   case here.  That is the Hallauer case out of Washington Court

17   of Appeals.  If a party commits a fraud upon the court.  Not

18   the case here.  That is the income investors case out of

19   Washington.  The relief sought was contrary to public policy.

20   Again, not the case here.  The Cascade Timber case out of

21   Washington.  And the US Jaycees case out of the Eighth

22   Circuit.  None of these circumstances apply to the type of

23   misconduct alleged here.  We also don't believe that the

24   facts and circumstances show that the City itself was

25   involved in the misconduct claim.

1    If you look at the actual evidence in the case you will

2    see that -- as we have noted, as soon as PBC purchased the

3    team Mayor Nickels told Mr. Bennett that the City intends to

4    enforce the lease.   This is July of 2006, long before any of

5    the other issues raised by PBC occurs.

6    We see that again in May 2007, before anything occurs

7    Mayor Nickels again rejects the notion of a buyout by PBC.

8    So at least twice before, even the hint that PBC is creating,

9    Mayor Nickels had made the decision -- and testified on his

10   own made the decision as a matter of public policy the City

11   was going to enforce the lease.

12   The steps that took place that involved the City either

13   involved, as Mr. Walker testified, efforts to think about a

14   KeyArena remodel or the hiring of K&L Gates and Mr. Walker in

15   connection with the litigation.

16   The City continued in those two veins meeting with the NBA

17   and PBC to discuss a KeyArena solution in mid October 2007.

18   Again, not there to tell the NBA to force a sale but simply

19   to try to convince both parties that a renovated Key was in

20   fact a better solution.

21   On the other side of the equation, what we have seen

22   evidence of is Mr. Gordon, Mr. McGavick, Mr. Walker,

23   Mr. Ballmer meeting at various points through the period July

24   through September.   We heard the testimony that the meeting

25   was all about a Bellevue plan, which the City of Seattle

1   obviously would have no interest in at all.  That plan is

2   rejected by Mr. Ballmer.  Then the effort turns to these

3   individuals meeting with Mr. Ballmer in October 2007 to talk

4   about him being available potentially to purchase the team.

5       But, again, other than Senator Gorton and Gerry Johnson

6   who, as we talked about earlier, were disclosed to be doing

7   this work before they were engaged in litigation, there is no

8   evidence from Mayor Nickels or Mr. Ceis that the mayor's

9   office directed any efforts with respect to a prospective

10  owner, that the mayor's office knew at all in any way about

11  this power point.

12      And the power point itself, when you read through it,

13  anticipates the mayor's future participation in working with

14  the prospective owner group not present.  The only reference

15  there, as Mr. Walker testified, that in August 2007 he and

16  Mr. Ceis met to talk about the fact that the City is willing

17  to put more money into a KeyArena model.  And that's what,

18  quote, the offer was all about.  It was not an offer to

19  anyone.  It was an offer to everyone, anyone who wanted to be

20  in KeyArena, whether it be Mr. Bennett or somebody else that

21  the City was willing to put up $100 million towards a

22  renovated KeyArena effort.

23      The rest of those slides clearly contemplate a future with

24  the City, getting the mayor involved, getting the mayor on

25  board, but not a concerted plan.

1       The two do come together in early 2008 when the City first

2   meets with the Griffin group, and then they together go

3   forward with the idea of going to the State legislature to

4   try to get a KeyArena renovation funding plan.

5       THE COURT:  Mr. Lawrence, you are leaving out one

6   stop here.

7       MR. LAWRENCE:  Go right ahead.

8       THE COURT:  Mr. Gorton goes with Mr. Ceis to the NBA

9   to lay out their arena plan, Mr. Bennett is invited to that

10  meeting, they sign a document where they agree that they are

11  not going to tell anyone anything, because that might

12  actually be the best moment for all the parties involved to

13  cut a deal or to talk about what they can do to come to a

14  solution.  And Mr. Gorton, less than 24 hours later, sends an

15  e-mail to the Ballmer group, where they are talking -- and he

16  lays out name, rank and serial number, and they all talk

17  about going out and getting a beer.

18      MR. LAWRENCE:  I cannot explain Mr. Gorton's action.

19      THE COURT:  That is the City's actions because that

20  is Mr. Gorton.

21      MR. LAWRENCE:  I respectfully would disagree with

22  that for two reasons.  One, there is no evidence that

23  Mr. Gorton was directed by the City to provide that

24  information.  And indeed the e-mail was not copied to the

25  City, which if it was something done at the City's request

1    that you might expect.

2         THE COURT:  He signs on behalf of the City.  He signs

3    the NBA agreement not to talk about it.  He represents the

4    City there, Mr. Lawrence.  What is he doing turning around

5    the next day and violating the City's promise?

6         MR. LAWRENCE:  As I said, your Honor, I wish I could

7    explain what Mr. Gorton's thinking was.  I am not suggesting

8    that he did not violate the NBA confidentiality agreement.

9    All I am telling you is that there is no evidence that links

10   Mr. Gorton's actions to the City.  He was not acting within

11   the scope of his engagement with the City, which is set forth

12   in Exhibit 630, that was limited to the litigation.  What he

13   was acting --  Whether or not it would have been appropriate

14   for him to disclose to the City that the carve out that they

15   had discussed with the City to engage in other efforts to

16   retain professional basketball would have included --  Should

17   Mr. Gorton have requested the City's permission and should

18   the City have said no? I would agree with that.  I am not

19   going to deny that he did what he did.  All I am saying is

20   that --

21        THE COURT:  Is one of the ways --  If I give you your

22   specific performance --  I asked this question before.  If I

23   give you specific performance there is one way to ameliorate

24   the harm here to the Sonics, is to sever your ties with the

25   City.

1    MR. LAWRENCE:  That would be entirely within your

2  discretion.  We would be happy to withdraw and happy to let

3  the City Attorney's office, which would happen in the normal

4  course, take over any ongoing issues between the City and the

5  Sonics.  We have no vested interest in this.  The City has a

6  vested interest.  The citizens have a vested interest.

7  K&L Gates has no vested interest continuing to represent the

8  City if it would be to the advantage of the goal of keeping

9  the Sonics here for the next two years.

10    THE COURT:  What else would you like to argue to me.

11  You have a few moments left.

12    MR. LAWRENCE:  Just on the hardship.  You heard the

13  testimony that Mr. Bennett knew of all the issues that were

14  before him that he now complains about before he purchased

15  the team, the lease was the most unfavorable, the losses were

16  expected to be high.  The NBA warned him.  He knew about the

17  competing fields of the Mariners and the Seahawks.  He knows

18  that attendance is a factor in performance.  As Exhibit 343

19  shows, there is a pretty direct correlation between how the

20  team does and what the attendance is.  If he is losing money

21  and the team has the worst season in history I don't think

22  that is a hardship because of the lease relationship.

23    If you look at his claimed losses of 61 to $65 million you

24  can break that down into two easy elements.  One, he expected

25  losses based on the prior performance of the Sonics of 46 to

1   $48 million in the two years prior to which he purchased the

2   team.   Second, his expert testimony was that the lame duck

3   losses were 14 to $16 million.   That approximates exactly the

4   losses that he has created.

5        But he did not have to be a lame duck owner.   He could

6   have played out his lease here and then moved to Oklahoma

7   City or Las Vegas or Kansas City or any place he wanted to

8   move.   But he chose to impose a lame duck status on himself

9   by announcing three years before the lease expiration, before

10  this past season, when he didn't have to, that he was going

11  to move.   No one is forcing him to move.   No one forced him

12  to apply to the NBA early.   He could have played out his

13  lease and, as you heard the testimony, could have waited

14  until the very end of the 2010 season to apply to move to

15  wherever it is he wants to move, and he would have avoided

16  the lame-duck status and the lame duck losses he claims are

17  due to this dispute.

18       This is more than just about money.   As the court in the

19  New York Jets case said, "every home game not played at Shea

20  causes more than loss of rental.   That is only money.   It

21  results in injury to the welfare, recreation, prestige,

22  prosperity and trade and commerce of the people of the City."

23       And, your Honor, as much as we have got great and

24  wonderful cultural artistic values as a world class City, I

25  don't think anyone can question whether New York City would

1    still be a world class City without the New York Jets, but

2    still the court found that injuries associated, to even

3    New York, from the loss of a sports team, would have two

4    football teams, two baseball teams, a basketball team and a

5    hockey team, was still sufficiently important and

6    sufficiently unique and sufficiently hard to quantify that

7    the court ordered the team not to play two home games away

8    from New York.

9         Your Honor, the Sonics and the Storm are synonymous with

10   Seattle.  It is a unique relationship that can be protected

11   by the remedy of specific performance.  We ask you to defer

12   to the City's decision to elect that remedy to obtain the

13   benefits they bargained for in 1994.  Thank you.

14            THE COURT:  Thank you, Mr. Lawrence.  Mr. Keller.

15            MR. LAWRENCE:  Do I have any time left for rebuttal?

16            THE COURT:  I think you have about three minutes.

17   You started at 1:28.  When you came out you had 30.

18            MR. LAWRENCE:  Great.  Thank you.

19            MR. KELLER:  Your Honor, Brad Keller on behalf of the

20   PBC.  This case has absolutely nothing to do with deference

21   to the City of Seattle or any ordinance that the City of

22   Seattle created knowing this lawsuit was in the wings so they

23   could create a piece of evidence to come here and say there

24   are all these things important for the City because somebody

25   realized that these aren't in any of the old ordinances that

1    we put into place.

2        You do not tell a court sitting in equity or a chancellor

3    from old England that they should defer to the mayor of the

4    City of Seattle.  You sit here as a court of equity to decide

5    from the ground up whether or not the remedy of specific

6    performance is available under the facts of this case as we

7    stand here now in 2008 given all we learned.

8        And talking about a TRO from a King County Superior Court

9    that had a 14-day TRO in the context of a TRO hearing, or a

10   New York trial court on a TRO hearing, when we have had six

11   days of trial with a fully developed record for you to decide

12   these issues, it tells you nothing in terms of what you need

13   to know.

14       The threshold issue in this case is, and in every case

15   involving somebody's effort to specifically perform a lease,

16   is there an adequate remedy at law.  What are the economic

17   benefits that were actually bargained for in the expressed

18   written terms of this lease and are they quantifiable.

19       The economic benefits that are specified in the lease are

20   the base rent, percentage of club suite and seat sales and a

21   handful of other financial items.  There is no question that

22   that payment stream is quantifiable.  Mr. Barth established

23   that.

24           THE COURT:  Mr. Keller, one of the components is in

25   that is the City obviously uses credit, and it still has

1    $35 million owing on the arena.   Do the Sonics basically owe

2    any obligation to the City to pay that off?

3            MR. KELLER:   The obligation is to continue to pay the

4    rent and meet its financial and other obligations for the

5    balance of the two years.   If that doesn't cover their

6    remaining obligation on the bonds, the answer is no.   If it

7    does cover it, the answer is yes.   And I can tell your Honor

8    it probably won't, because we heard from the testimony that

9    the projection of financial payments under the life of the

10   lease were nine to $10 million, less any mitigation revenue.

11   I am not sure if there was actually evidence to this effect

12   in the case but I believe the current projection is at the

13   end of the two years the remaining balance on what is the

14   original debt, which has been moved over to other places on

15   the City balance sheets, will be about 20 to $25 million.

16       So instead of talking about things that are expressed

17   written provisions in the lease the City spent much effort

18   endeavoring to show that it would lose indirect benefits,

19   things that are nowhere in this lease itself.   And because of

20   that we see things that are really not protectable interest

21   in a specific performance case.

22       But here I realize you are not going to decide that in

23   this case, because you don't need to.   The evidence showed

24   that everything that was indirect that they talked about is

25   quantifiable.   One item was City tax revenue.   That was a

1   math exercise that was also done by Mr. Barth.   Another

2   indirect item was the alleged indirect benefit to our local

3   economy.

4       It doesn't make a difference if you use the gross economic

5   benefit, $180 million approach that Mr. Hatamiya used, where

6   nobody spends any of their leisure dollars on anything else,

7   or you use zero net economic approach of Mr. Humphreys, the

8   amount is quantifiable if it is compensable.

9       Your Honor's questioning of Mr. Hatamiya sums it up best.

10  Can you use this RIMS thing, is it the same thing for a

11  sports team as it is for a box store.   Yeah.

12      Then there was the analysis of the City staff itself, an

13  admission by the City that professional sports really are not

14  drivers of the local economy.   And that was the bottom line

15  from Mr. Alves' memo to the City council, Exhibit 525.

16      To quote two authorities in the field, there are few

17  fields of empirical research that offer virtual unanimity of

18  the finding.   That is, they are not drivers of the local

19  economy.

20      The disparity between these experts, it doesn't show that

21  the amount is difficult to quantify.   It just shows that if a

22  trier of fact later is permitted to consider indirect

23  economic benefits, the trier of fact, or maybe even the court

24  on a Daubert type motion, is going to decide what is

25  appropriate, gross benefit approach or net benefit approach.

1   Regardless it is quantifiable.

2       And then there was this debate over intangible economic

3   benefits, things like civic pride, sense of community, and a

4   supposed elevating of Seattle's visibility.  I think

5   Seattle's visibility has been elevated by what came out of

6   this courtroom in the last few days.

7       Let's talk about the more positive things now.  One thing

8   was clear from the evidence, and that is that unlike in the

9   case involving the Minnesota Twins, where there was a virtual

10  zero rent deal, and the intangibles were spelled out in the

11  enabling legislation and the leases as to what was the

12  exchange, this lease doesn't have any such expressed

13  provisions.  This lease was a construction financing

14  mechanism, where the revenue sharing feature was going to pay

15  off the bonds.  That was the hope.

16      And it is very very telling, I thought, that the original

17  ordinance back in 1994 that authorized Ms. Anderson to sign

18  this lease, Exhibit 32, makes absolutely no mention of such

19  intangibles as an expected benefit or reason for entering

20  into the lease.

21      Now, it is true that Ms. Anderson comes in now and she

22  says, well, you know, that was kind of an assumption that

23  there would be these kinds of things.  In Washington, with

24  Bird versus Huttesman and the Hearst case, subjective

25  assumptions really don't count in contract cases.  We deal

1   with the objective manifestations of the parties intent.   So

2   that doesn't really help them trying to establish an

3   expressed term, and certainly not a written term, about these

4   intangibles.

5       I think it was also very telling that since the enactment

6   of Initiative 91 it is the law here in Seattle that these

7   general intangibles that you are being told now are the be

8   all and everything, it is the law in this City and has been

9   for two years now, they count for nothing, zero, when it

10  comes to determining whether the City of Seattle is receiving

11  fair value for public dollars.

12      And it was telling when Mayor Nickels conceded that any

13  sense of civic pride would be, I think his words were, muted

14  if the only reason the team is here is because of a court

15  order.

16      Look, we need to be straightforward here.   What is at

17  issue here?   Not the glory days of the past.   What is at

18  issue is two years of lame-duck status.   What is the civic

19  pride and sense of community from a team that rightly or

20  wrongly has decided to go elsewhere?   Not much.

21      What civic pride is there from a team that in poll after

22  poll our citizens say they don't want to spend money on a

23  facility, and they say we would be better off without them?

24  Not much.

25      What civic pride is there when attendance is dwindling,

1    the arena is increasingly empty and local sponsors don't even

2    want their products tainted by the branding of a team that is

3    leaving?  Not much.

4        What civic pride is there when four times over four years

5    with three separate ownership groups Olympia in so uncertain

6    terms has said no to an arena?  Very little.

7        And what civic pride is there when 30 percent of the

8    people who pay for a ticket don't even bother to go to a

9    game?  And out of a million households less than 20,000, two

10   percent, even bother to turn on their TV set to watch a game?

11   Very little.

12       We also had testimony, and I think I will characterize it

13   as interesting testimony, from Professor Zimbalist about how

14   there are intangible benefits from just everything, talking

15   about the weather on the elevator, going to a house of

16   worship, talking about the Huskies, the Mariners, the

17   Seahawks.

18       Here again, we can debate in the next phase, if we have

19   to, whether that is compensable, and how much intangible

20   benefits there really is or isn't from a lame-duck status

21   team.  The issue now is can you quantify it if it is

22   compensable.  And the evidence was you can.

23       The evidence was there is this thing called this

24   contingent valuation methodology, and it has been used to

25   measure exactly these intangibles for an NHL franchise, the

1   Penguins and for an NFL franchise the Jaguars.  Professor

2   Zimbalist himself did it for the Anaheim Angels.  He computed

3   the value of such intangibles in the middle $7 million range.

4   That was Anaheim, a very popular Major League Baseball

5   franchise.  Even Mr. Humphreys testified that the intangible

6   benefits can and have been quantified.

7       So if, and I underscore if, intangible benefits over the

8   next two years is something that is part of the benefit of

9   the bargain here, it is quantifiable if they are compensable.

10      But what is clear, though, is it is not an expressed

11  written term of this lease.

12      And whether the Sonics leave now versus two years from

13  now, it makes no difference as to whether this is a

14  professional sports town in a world class City.  Mayor

15  Nickels said that right here in this courtroom from the

16  witness stand.  This was his testimony in the trial.  "If

17  they leave two years earlier is it still going to be a

18  profession along sports town?"  "Yes."  "Still be a world

19  class City?"  "Yes."

20      The question of whether there is an adequate remedy of law

21  is the threshold issue.  It is an issue as to which the City

22  has the burden of proof.  The City has the burden of proving

23  that the things it claims it is entitled to receive under the

24  lease and that it would lose cannot be quantified.

25      We submit the evidence here, where we have had a full

1  blown trial, unlike the TRO orders from some other trial

2  courts, has shown that they can be quantified.  If the answer

3  is the evidence shows they can be quantified, it should be

4  the beginning and the end of the case.

5       In the world of contracts there are times when

6  nonperformance and the payment of the financial consequences

7  of nonperformance is the most efficient way for a party to

8  proceed.

9            THE COURT:  Mr. Keller, let's assume that payment

10  would be the most efficient way to proceed.  In other words,

11  we know in the testimony that Mr. Bennett made the City a

12  $26 million offer, which of course could pay off their debt

13  at the arena if they chose to.  Is it up to me to tell the

14  City leadership you're asking for a bad bargain?  That is not

15  my role, is it?

16            MR. KELLER:  No.  Your role is to determine whether

17  under the facts of this case specific performance is an

18  available remedy.  And if the answer is no, well, they are

19  going to have to revisit what their approach was to that

20  buyout offer.

21       I will tell your Honor, since you raised that offer, that

22  offer was put together designed based on exactly how much the

23  financial payments would be under the lease to the City, and

24  what the remaining construction debt obligation would be at

25  the end of it.

 1          THE COURT:   That wasn't lost on me, Mr. Keller.

 2          MR. KELLER:   That was the PBC's effort to approach

 3     this the way one would approach any lease termination, what

 4     does the other guy need, what is fair.   That is different

 5     than what the setting will be if we have a contested

 6     proceeding later and we are talking about what are they

 7     actually entitled to.

 8          This is one of those situations where nonperformance and

 9     payment of the financial obligations is the most efficient

10     way.

11          PBC is going to have to pay at least nine to $10 million

12     over the next few years, less any mitigation revenue, no

13     matter what.   That is a lot of money to pay for a facility

14     that if it has its way it is not even going to be using it.

15          Why would it do that?   Because it is a lot less than the

16     $60 million loss that the team faces here.   It is a lot

17     better than trying to make a go of it for two years when you

18     have a landlord whose sole objective is to force you to sell

19     your team to someone else.

20          And when it comes to the direct financial payments

21     specified in the lease, to borrow a phrase from Mr. Lawrence,

22     listen, a deal is a deal.   The lease obligates it to pay

23     those amounts and it will.

24          So why is the home game provision any different?   This

25     lease says, play your home games at KeyArena, and there is a

1    generic specific performance clause.  Why isn't that, no pun

2    intended, game over?

3        There are two reasons.  The first is that the generic,

4    specific performance clause is just that.  It is a general,

5    free-floating clause, and it is because of that it is

6    ambiguous as applied to this dispute.

7        That specific performance clause, was it meant to apply to

8    the extensive process that is laid out in I think the first

9    20 pages of the lease about -- for the design and

10   construction of the remodel?  Was it meant to apply to the

11   home game provision?  Well, one thing is for sure it couldn't

12   have been meant to apply to everything.  There is a lot of

13   provisions in that lease that say we will pay X dollars for

14   this, we will pay Y dollars for that.  Those are things that

15   are never specifically enforced.  We are left to really guess

16   were these parties intended that the home game provision

17   would or would not be one of those provisions that would be

18   subject to specific performance.

19       And this is where the very heavy burden that the City

20   bears comes into play.  Because the burden of proof in a

21   specific performance case is a heightened one.  It is not a

22   mere preponderance.  Under Washington law the City has the

23   heightened burden of showing by, quote, clear and

24   unequivocal, close quote, evidence.  That is evidence that

25   leaves no doubt as to what the parties intended to be their

1      agreement.

2          Here again, Ms. Anderson's testimony as to what she

3      believed or what she assumed really is irrelevant under

4      Washington law.  In any event, she said nothing other than 13

5      years ago the City hoped to secure having a team for 15

6      years.  But she also said an equally fundamental assumption

7      of premise was that this arena was going to enable the team

8      to continue to be profitable over the 15 years, and that

9      KeyArena would remain a competitive NBA arena.

10         The second reason that this home game is at the beginning

11     and the end of this case, is when it comes to specific

12     performance what the lease says is just the starting point.

13     We wouldn't even be here if there wasn't a home game

14     provision.  The reason we are here is whether it should be

15     specifically enforced for the last two years given all of the

16     facts and circumstances related to what brings us here today,

17     13 years later, in what is now an utterly and completely

18     economically and relationship wise dysfunctional

19     relationship.

20         So to stand here and say that because of 13 years ago a

21     deal is a deal, that really tells you very little about what

22     a court in equity sitting here 13 years later, whether or not

23     it is equitable to specifically enforce the home game

24     provision.

25         You know, in every specific performance case there is

1    going to be an expressed provision that required somebody to

2    do something.  That is a given.  But what we need to decide

3    is whether it should be specifically enforced.  The threshold

4    issue, is there an adequate remedy at law.  And that is

5    whether the consequences of nonperformance are reasonably

6    quantifiable.  Here they are.  And we submit that is really

7    not much more needed to decide this case.

8        What's the rule in Washington on leases?  Can we see the

9    slide on Washington Trust?  This is a Washington Appellate

10   decision.  It makes it quite clear that a suit for specific

11   performance will not lie if there is an adequate remedy at

12   law.  "It has long been held in Washington that there is an

13   adequate remedy at law in damages for the breach of a lease

14   agreement."  That is the rule here.

15       Now, I just want to comment on the Sonics.  Counsel talked

16   a lot about Crafts versus Pitts.  Crafts versus Pitts is your

17   typical, one-shot sale of real estate case.  And in that case

18   there was something very unique about the parcel of land that

19   the buyer needed to have it to fill out a complement.  It is

20   your typical one-shot ownership of real estate case.  It is

21   not a lease case.  Lease cases are different.  A lease

22   holder's interest is different and the problems that they

23   raise on the continuous operation are very different.  I will

24   talk about that in more detail later.

25       Now, counsel talked about the fact that, you know, these

1    Sonics, they have been really good corporate citizens.   They

2    give back a lot to our community.   And somehow that should

3    change the outcome in this case.   Nothing in this lease

4    requires the team to do what it has done.   It is interesting

5    that there is nothing in the enabling ordinance that recited

6    such considerations.   And there is really nothing unique

7    about what the Sonics do as compared to the Storm, the

8    Mariners, the Seahawks, Boeing or Microsoft or any other good

9    corporate citizen in our community.

10       Trying to use a team's good communities work to justify

11   making it lose another $60 million reminds me of a saying, no

12   good deed goes unpunished.   And what message does it send to

13   companies who give back to the community?  Do so at your

14   peril because your good works may be the ball and chain by

15   which we make you continue to lose money here?  I don't think

16   that is the message to send.

17       These claimed losses are quantifiable.   The law is clear

18   when it comes to a lease the extraordinary remedy of specific

19   performance is not available if they are quantifiable.

20       Stop and think for a minute, why is it that specific

21   performance is considered so extraordinary.   It is because

22   money compensation is the currency of our judicial system.

23   You don't get to elect remedies.   It is money compensation.

24   That is our currency that we deal with here in this

25   courthouse.   Not court orders forcing you to try and operate

1   a business in a very public and openly hostile relationship,

2   in a facility that is no longer viable and with a landlord

3   who has for over a year now engaged in conduct designed to

4   try and force you to sell.

5       Last week I said the evidence would show that the marriage

6   was broken and that equity would not be served by enforcing

7   the estranged parties to continue under the same roof.  I am

8   sad that the evidence showed more than that.  It showed

9   scheming to undermine and take away the tenant's business.

10      I took no delight in exposing in this courtroom the

11  plotting to use this lawsuit to try and force PBC to sell.

12  This is my town too.  But I felt shame for those among us who

13  live in a world of power and privilege and who have not

14  learned from history's lessons that the end does not and

15  never will justify the means, and that using proper means is

16  the difference between doing the right thing and doing the

17  wrong thing.

18      The evidence presented showed that there was a plan to use

19  specific performance to lock PBC into tens of millions of

20  dollars to force it to sell the team.

21      Now, I want to quickly review with you what that evidence

22  was and why it can and should be laid at the feet of the

23  City.  It starts in July, but not with the first entry I have

24  in this chart.  Because remember you have to set the stage.

25      What had happened in July?  Mr. Bennett -- excuse me, PBC

1    had sort of been told by Olympia a few months earlier, no

2    financing.  And he had issued a very public statement.  He

3    had talked to the media, he had met with the mayor, he was

4    reaching out publicly.  This was referred to I think as the

5    call to action.  We didn't get anything done in Olympia.  We

6    are looking for some solutions.  Time is running out.  It is

7    time to do something.

8         Everything we are about to see that unfolded was going on

9    against the background of that public request for assistance.

10        We know that in mid July there was the e-mail from

11   Mr. McGavick characterizing what was about to unfold as very

12   Machiavellian stuff.

13        I thought it was amazing in the opening statement counsel

14   mockingly referred to our contention that there was a

15   Machiavellian scheme here.  Lo and behold the evidence shows

16   up with an e-mail in mid July characterizing what was about

17   to unfold as very Machiavellian.  And in Mr. Walker's comment

18   in that e-mail, which is trial Exhibit 876 -- excuse me, the

19   trial transcript, Mr. Gorton refers to the plan as complex

20   and ambitious.

21        Next was on July 24th.  That was the meeting that occurred

22   between Mr. Walker and Mr. Nakatsu, I believe it was, right

23   below the mayor.  And Mr. Walker described his desire to make

24   it too expensive and too litigious for PBC, and his takeaway

25   from the meeting was that the City was in total agreement.

1    This is also the e-mail, by the way, that Mr. Stanton

2    responded by saying it should be excruciating.

3         Then in mid October we have Mr. Walker's e-mail that gets

4    forwarded to Mr. Griffin that talks about continuing to drive

5    the wedge.  We have the entry in Mr. Walker's calendar.

6         And then we have the meeting on October 7th at

7    Mr. Walker's house where Mr. Gorton brings over the poison

8    well power point slide.  They all flip through it, go over

9    it.  Everybody was dancing around whether they spent any time

10   on those pages.  It is like they didn't want to touch them

11   because of what they said, because they talked about

12   increasing the prospect of locking them into losses,

13   increasing their costs in an unpleasant environment and how

14   Mr. Gorton would increase the pain of staying.

15        One thing that hasn't been exercised that I would like to

16   point out is what happened two days after that October 7th

17   meeting.  You will find it in Exhibit 601.  It is not on my

18   chart here, but it is Mr. Walker's calendar.  Two days later

19   Mr. Walker's calendar reflects a meeting at K&L Gates and

20   Ellis attended by himself, attorneys from the firm and

21   Mr. Ceis.  It says it right there in his calendar.  So one

22   thing you will have to decide is what is the likelihood that

23   two days later after the finalization of the whole poison

24   well power point presentation, after having spent two days

25   before going through it with Mr. Ballmer, whether they

1    weren't doing the exact same thing two days later with the
2    City's Assistant Deputy Mayor sitting there in the office of
3    K&L Gates with Mr. Gorton.
4        Next we have the Bennett isn't in a box e-mail from
5    Mr. Griffin in his report to Mr. Ballmer.  And we had another
6    thing from Mr. Griffin in December talking about Mr. Bennett
7    feeling the bleeding.  And we had Mr. Griffin's December
8    e-mail talking about how they need to get Mr. Bennett to sell
9    at a reasonable price, litigation-forced bleeding will help.
10   And also in mid December Mr. Gorton's e-mail that Bennett
11   will only sell if he faces an expensive and unpleasant legal
12   future.
13       So why is the City accountable for what we just looked at?
14   Well, the first reason is that the factual inference that the
15   City became complicit in the scheme is more than warranted.
16   It is somewhat compelling.  Think of that.  The July 24
17   meeting between Walker and the mayor's office.  They were
18   sitting there.  The takeaway is they are in total agreement
19   with the fact that we have to make this too expensive and
20   litigious for them.
21       Then you have Mr. Ceis two days after the October 7
22   meeting with Walker, with Mr. Gorton and the other people
23   from K&L Gates, right after the poison well is finalized.
24       In August you have Mr. Ceis publicly stating in the
25   newspapers that everything has become so dysfunctional, we

1   are all going down the drain.  The worse we make it for him,

2   the worse he makes it for us.

3       And then you have the mayor's admission that was in his

4   deposition that was played during his testimony here.  And I

5   am going to play it for you now.  His admission.  And he is

6   trying to effectuate a sale.  And that is one of the reasons

7   why we are here.

8       Can we see the mayor's testimony?

9                    (Video played)

10      I think, as your Honor just pointed out in questioning

11  Mr. Lawrence, what did the mayor do when Mr. Bennett tried to

12  reach out to him during this period of time in July and

13  August?  He didn't respond.

14      And then we have the mayor's press conference in March,

15  where standing there with Mr. Griffin, Mr. Gorton and the

16  mayor, Mr. Gorton says, and this is in Exhibit 582, Page 8,

17  that they have been working hand in glove -- that the buyers

18  have been working hand in glove with the City from the

19  beginning to the end of this process.  If you look at the

20  poison well document itself it actually indicates that the

21  mayor himself already was on board for certain things.

22      Can we see Exhibit 567?  This is at page Bates 522.  "The

23  path forward.  Let the public guys lead.  With the offer the

24  mayor has made to us and the planned trip to New York City

25  the mayor wants to make this happen.  Let him."  Is that

1    talking about let's enlist him down the road?  It says not

2    only is he on board, they have already got the plan to go to

3    the NBA to drive the wedge.

4        In the poison well path forward, your Honor, it didn't

5    just lay out a potential strategy.  In the ensuing months the

6    two groups, each in a coordinated manner, implemented the

7    precise pincer strategy that is laid out in this document.

8    Each one doing what the other needed and publicly joining

9    hands when it came time to come out of the closet, so to

10   speak.  And there is K&L Gates smack dab in the middle

11   coordinating all of this.

12       Here is Slade Gorton, the right side of his brain is

13   working for the Griffin group's lawyers, the left side is

14   working for the City's litigation lawyers.  We are supposed

15   to think the left side of the brain isn't talk to the right,

16   and vice versa.

17       You are being asked to accept that the City's attorney

18   wasn't telling his client what he was cooking up when the two

19   had the exact same objective, to keep the team here, and

20   forcing the sale would have accomplished that objective for

21   both.  That is contrary to logic.  That is contrary to common

22   sense.  And if there was even some fleck of plausible

23   deniability to this we didn't know, the law doesn't permit a

24   principal to act like a horse with blinders ignoring what its

25   agent is doing.

1     The legal standard is one of inquiry notice.  I don't

2  think this was in the briefing.  It was American Insurance

3  Company versus Lucus, 38 F.Supp. 896.  And the pertinent

4  discussion is at pages 922 through 924.  It is inquiry

5  notice.

6     If a person of ordinary prudence and diligence would have

7  inquired what K&L Gates and Walker were doing the law imputes

8  to the City all of the knowledge that a reasonably diligent

9  inquiry would have disclosed.

10     And as the case points out, there is good reason for it.

11  Because if you hold otherwise this basic maxim of equity that

12  he who seeks equity must do equity could be defeated by the

13  principal, the very person for the benefit it is being done,

14  by just closing their eyes.

15     THE COURT:  Mr. Keller, let's back up here.

16  Litigation we all know can often be unpleasant and

17  embarrassing, but it is also used to get people what they

18  want or to enforce people's rights.  On its most basic tenant

19  you don't disagree the City had the right to bring the suit?

20     MR. KELLER:  Absolutely.

21     THE COURT:  And you don't disagree that the City had

22  the right to do discovery?

23     MR. KELLER:  Absolutely.

24     THE COURT:  Or carry on discussions as to what they

25  are going to do with the arena if Mr. Bennett leaves.  So

1    what about the quality and nature of this violates the spirit

2    of the litigation here?

3             MR. KELLER:  I think it is different than the spirit

4    of litigation, because what we are dealing with is what did

5    the City have the legal right to seek.  And if it started out

6    having the legal right to insist on the team performing for

7    the last two years, it stops there.  I wouldn't be able to

8    talk about what I am talking about.

9        But when it goes beyond that, and it does it for the

10   purpose of trying to get something to which it has no right

11   under the contract, it is then using it for an improper

12   purpose.  It is then seeking to get something it has no right

13   to seek.

14            THE COURT:  So it has no right to sale?

15            MR. KELLER:  It has no right to force its tenants to

16   sell.  Does it have the right to try and work with the tenant

17   to get the tenant to stay longer?  Of course it does.  But if

18   the tenant doesn't want to because it believes, and in its

19   discretion it is entitled to believe, the arena is inadequate

20   both existing and renovated, it has no right to force its

21   tenant to sell or engage in any course of conduct that is

22   designed to try and accomplish that end.  And when you do

23   that you go over the line from a proper purpose to an

24   improper purpose.  And when you join hands and actively

25   become complicit with others to engage in acts to effectuate

1   that improper end you go from what is just a lawful exercise

2   of a legal right and cross over into the world of unclean

3   hands and improper behavior.

4       What I wanted to finish was why is it that the City is

5   accountable here?  What is it that gives them, if nothing

6   else, inquiry notice if they weren't complicit expressly?  It

7   is the very K&L Gates retention letter.  It is spelled out

8   that the firm was working to retain the Sonics as tenants,

9   and that those efforts could lead to a long-term extension.

10  That disclosure itself imposed on the City inquiry notice

11  about what it is that these lawyers that I am now going to

12  hire and are going to be my advocates and press my case, what

13  is it they are doing that could lead to this team staying

14  beyond the lease.

15      In fact, your Honor, go to the other side of the equation,

16  K&L Gates.  K&L Gates had a duty to disclose to the City not

17  just that it was generally doing some work for a buyer group

18  but in sufficient detail so that the City could give its

19  informed consent to the contemporaneous representation.

20      One can argue, and I am arguing that the Code of

21  Professional Responsibility, and particularly RP 7 1.7

22  subpart (b)(4) required K&L Gates fully disclose its

23  activities for the Griffin group in sufficient detail to get

24  the City's informed consent to the contemporaneous

25  representation.  And I ask you to infer that that law firm

1   was aware of and complied with its ethical obligations in

2   that regard.  And if it did so it had to disclose what it was

3   doing in working with the buyers trying to force a sale.

4       Now, to get back to what I think you were asking me

5   before, what is the line between what is okay and what

6   crosses over to what a court can deem unclean hands?  There

7   is no fixed standard.

8       Professor Dobbs in his treatise on remedies makes the

9   point that the conduct itself need not be unlawful.  But

10  really, your Honor, the case law is not very helpful in

11  fleshing out an objective standard against which to gauge

12  what happened here.

13      What is clear, though, is that a court sitting in equity

14  has very wide discretion to consider all the facts and judge

15  each case on its own.

16      I would submit, your Honor, the fact that I can't stand

17  here and cite a case to you where a landlord actively worked

18  to undermine its tenant, and to force its tenant to sell and

19  divest itself of an asset that belonged to the tenant, the

20  reason I can't cite a case to you just shows in certain

21  respects how unprecedented and inappropriate the conduct was

22  that occurred here.

23      Now, what Professor Dobbs does point out in this treatise

24  is that the unclean hands must be related to the equitable

25  relief that is being sought.  In other words, how close is

1    the nexus between what is inappropriate conduct and the

2    effort to obtain specific performance.  And that nexus issue

3    is at Section 2.4(2) at Page 95.

4        And here in this case the two go hand in hand.  When PBC

5    paid $350 million for this team, yes, it legally assumed a

6    lease that had what is now a two-year tail.  But what it

7    didn't legally assume was having a landlord who was trying to

8    use those two years as a bludgeon to try and force it to

9    sell.  Yet that is what has occurred, that is what happening

10   here.  And the conducts and acts that constitutes unclean

11   hands, they were like this when it comes to the relief of

12   specific performance.  The City and the buyers were working

13   hand in hand.  And they can only enjoy the fruits of their

14   scheme if specific performance is granted.

15       Your Honor, I submit that these issues really have a life

16   of their own that goes beyond and separate from the issue of

17   unclean hands.  What it really goes to is whether this Court

18   is willing to be used.  It goes to whether this Court is

19   going to permit itself to become the tool by which the forced

20   bleeding, forced sale strategy gets implemented.

21       Just like Mr. Griffin conceded on the stand, he had no

22   ability to impose the bleeding.  Only Mr. Gorton and the City

23   could do that.  Well, so too the only way the City can now

24   continue to try to force its tenant to sell is if you force

25   the bleeding.  We submit that a court in equity should not

1    countenance such attempts at misuse of its powers.

2        Whatever legitimate interest they had in those last two

3    years they lost the ability to come here claiming that they

4    were just trying to enforce their rights when it sought to

5    leverage the hardship to force the sale.  And however

6    laudable it may be that City government would like to retain

7    the team, the City doesn't have the right to enlist a court

8    of equity's aid in trying to get something it is not entitled

9    to under the lease, a tenancy that goes beyond two years and

10   a forced sale.

11       So what case law supports what I am saying?  I must admit

12   even after you asked your questions it has been difficult to

13   go out and find a lot in this area.  We did cite the US

14   Jaycees case, which I think does stand for the proposition,

15   look, it doesn't make a difference how strong you are when it

16   comes to your legal right, a court of equity is not going to

17   grant equitable relief if you seek to do it for an improper

18   or unconscionable purpose.  And trying to bleed your tenant

19   to force them to sell is an improper purpose.

20       I know your Honor is familiar with the US Jaycees case,

21   because you cited it in your First Global Communications

22   decision.  I acknowledge that was a very different factual

23   setting.  But First Global and US Jaycees they both stand for

24   the proposition you may have a very strong legal right to

25   something, but if the purpose for which you seek to enforce

1    it is improper then a court in equity is not going to assist

2    you.

3        I think Washington law recognizes this as well.  Can we

4    have the slide from the Arnold case.  This is from Arnold

5    versus Melani.  This was a case involving an encroachment.

6    The issue was whether there was going to be a forced removal

7    of the things.  And the Washington Supreme Court said, the

8    "doctrine is rather the judicial recognition of the

9    circumstance in which one party uses a legal right to gain

10   purchase of an equitable club to be used as a weapon of

11   oppression rather than in defense of a right."  We submit

12   that is what the evidence shows is happening here.  The City

13   wants to use specific performance as a club to inflict

14   financial harm on PBC to force it to sell.

15       Now, I want to spend a few moments talking about what the

16   evidence showed the other ways this marriage is broken,

17   besides the land grab that is going on for an asset that

18   belongs to PBC and only belongs to PBC.

19       I think it is more difficult to imagine a more

20   economically dysfunctional lease than what this one has

21   turned into.  The evidence shows this lease doesn't work for

22   either party anymore.  It hasn't worked for either party for

23   going on eight years now and through three different

24   ownership groups.

25       The mayor's 2006 task force report concluded the lease,

1    the facility, they are both dysfunctional and it has only

2    gotten worse since then.

3        Look, it is undisputed KeyArena is no longer a competitive

4    NBA arena, and it hasn't been one for years.  An NBA

5    franchise cannot operate profitably there.  It has been that

6    way for years.  That was conceded.  And the very economic

7    model that was underpinning this argument got turned upside

8    down 180 degrees when two new stadiums with fancier suites

9    and better amenities got built.  That was conceded.

10       Mayor Nickels himself admitted the changes in the

11   marketplace have had a profound impact on the lease

12   economics.  This was his testimony in the trial.  The

13   marketplace just fundamentally changed since the 13 years

14   that this lease was entered into, right?  Yes.  And it

15   changed and it had a profound impact?  Yes.

16       Now, counsel says, look, there are no substitutes.  We

17   can't get another NBA franchise.  Well, why is that?  Because

18   they don't have a competitive NBA facility, and haven't for

19   years.

20       You know, Mr. Walker and Mr. Griffin, they got on the

21   stand and they tried to sell you this, well, you know, it

22   wasn't just about forcing the sale.  That was just one of the

23   options.  Another option was to get another NBA team.  Well,

24   they can't get their stories straight.  Can they get another

25   NBA team or not?  The answer is they can't until they get a

1    competitive arena.  That is why there is no substitute.  And

2    there never will be in this town until there is a competitive

3    arena.

4        The City comes in and they say, hey, you know, we know

5    this facility doesn't work, we know you are losing tons of

6    money, we know it doesn't work.  But they say, you knew all

7    that.  You knew that when you bought this place, this team.

8        I've got three responses to that, your Honor.  The first

9    is, this isn't a misrepresentation case or a case of

10   nondisclosure.  It is a contract case.  What we knew, when we

11   knew it has nothing to do with whether now, given the toxic

12   relationship between these parties, given the extremely

13   difficult operating environment, where the equity is now

14   going to force one of these parties to struggle on and incur

15   $60 million in losses.

16       The second thing is, the assumption agreement that counsel

17   keeps talking about, it didn't just assume the liabilities,

18   it also assumed the rights, including the prior owners'

19   rights, and including my right to ask your Honor to consider

20   and take into account that just not my client couldn't fix

21   this arena solution here, but the prior ownership couldn't

22   with their 50 or $60 million of losses as well.

23       The third reason is PBC tried to fix the problem with a

24   newer arena, and a solution that its contract with the seller

25   gave it ultimate and absolute discretion over.

1        When that plan didn't work the losses that were

2    experienced far exceeded anything that had been projected

3    based on what were the inadequacies of the facility.

4        And I think the numbers here were very telling.  I put

5    together an exhibit to summarize them.

6            THE COURT:  Mr. Keller, can we come back to these

7    numbers after we take a break?

8            MR. KELLER:  Absolutely.

9            THE COURT:  Ladies and gentlemen, we will be at

10   recess for 15 minutes.

11

12                        (Short recess taken.)

13

14           THE COURT:  Please be seated.

15       All right.  Mr. Keller, I think we're going to look at

16   some numbers here.

17           MR. KELLER:  We are, but I'm going to doing it very

18   quickly because these exhibits are in evidence.  What I

19   wanted to point out to Your Honor is Goldman Sachs'

20   projections and the MZ Sports' projections, both of which

21   were done at the time PBC acquired the franchise, they were

22   done with the expectation that there would be a new arena

23   solution in the area.  And both of them projected -- yes,

24   they projected losses, but nothing even remotely to what in

25   fact has occurred.  The delta between the two is in the range

1      of $30 million.   Those exhibits are in evidence.

2          The point I want to make now is the losses are going to

3      get worse because of the lame-duck status.   The rhetorical

4      question I want to pose is:   To what end?   Because Mayor

5      Nickles says he's an optimist?   An optimist about what?   The

6      fact that PBC will drown in red ink and be forced to sell to

7      the Griffin gang?   An optimist that somehow Olympia, which in

8      four separate legislative sessions in working with three

9      different owner groups has said no is suddenly going to do an

10     about-face?   The evidence was the City had five years of

11     chances to fix the problem.   And we're here today because it

12     couldn't.

13         Your Honor inquired whether KeyArena being an economically

14     viable NBA venue was an express term of the lease.   The

15     evidence clearly showed that the parties very clearly

16     intended that it would be a competitive NBA facility, and it

17     would be a facility where the teams' operations could be

18     profitable.   The whereas clause reflects that and

19     Ms. Anderson testified.

20         Is it an express written term?   No.   But that doesn't make

21     it a non-issue.   Just the opposite.   For purposes of specific

22     performance, it very much makes it the issue because it

23     becomes part of the equation of undue hardship.   When we're

24     dealing with equities extraordinary powers, the question is:

25     Should those extraordinary powers be brought to bear with a

1  facility that no longer works; where the original intent was

2  that it would be competitive and it isn't; where the original

3  intent is that the team could be profitable playing here

4  because it would be in a competitive facility and it can't.

5      This facility hasn't worked for NBA basketball for years

6  when it comes to the economics of the sport.  The landlord

7  knows it; hasn't been able to fix it.  This team has been in

8  a downward spiral for five years, in part because of an

9  inadequate arena and a dysfunctional lease.  The dysfunction

10 developed long before PBC bought the team.  And it has just

11 gotten worse and it will continue to get worse.

12     A team is a business.  A business is a living and

13 breathing organization, not just an Excel spreadsheet.  This

14 business faces enormous obstacles here if forced to stay at

15 KeyArena the next two years, obstacles just trying to

16 preserve what it has left.

17     20 percent loss of employees the past few months will be

18 dwarfed by employee retention problems that it will face

19 going forward.  How do you provide leadership and instill

20 your culture into an organization when the owner can't come

21 to town without a personal security and can't, let alone sit

22 court side at a home game?  You can't.

23     How do you maintain employee morale when your team and the

24 whole organization is just trying to stem the bleeding until

25 they can leave in two years?  You can't.

1    How do you sell sponsorships and sell signage to area

2  businesses when your brand has become synonymous with

3  abandonment?  You can't.

4    How do you expect fans to support your product -- I'll say

5  it candidly -- when in their eyes you're nothing but a bunch

6  of carpetbaggers from Oklahoma City who came here to take

7  your team away?  You can't.

8    How do you convince your potential customers to spend

9  $5,000 to $7,000 for a single season ticket, let alone

10  $60,000 to $130,000 for a suite when the loyalty bond has

11  been broken, attendance is declining, and the community is by

12  all outward appearances apathetic?  You can't.

13    How do you attract coaches and professional staff to come

14  work in what is now a very public and openly hostile

15  environment in a dwindling fan base?  You can't.

16    How do you attract free agents or resign free agents in an

17  unstable setting like this?  It's going to be extremely

18  difficult.

19    This team and this business desperately needs to regroup

20  and rebuild.  They need to establish roots in a new home and

21  team pride.  They need the boost of an enthusiastic

22  supportive community and local leadership that through action

23  has spoken about how it values having a team not the

24  demoralizing bad blood setting we have here, where the

25  landlord and City leadership trying to make you bleed until

1    you will sell.  Getting rid of the City's lawyers doesn't get

2    rid of the problem.  Just like Mayor Nickles testified in

3    that admission I played for you earlier, his goal is to have

4    a local sale.

5        The undue hardship, Your Honor, goes beyond the $60

6    million in losses the team faces.  It's the struggle and the

7    obstacles of trying to run a business that depends on

8    community and fan support where the bond of the community and

9    the fans are in the process of being severed.

10       Professor Dobbs, again, in his treatise provides some

11   guidelines about undue hardship.  The "undue" in undue

12   hardship isn't whether you have deep pockets and can continue

13   funding capital calls, that you have some affluent investors.

14   There is no silk stocking exception to Section 364 of the

15   Restatement of Contracts.

16       Undue hardship is how does the hardship to PBC compare to

17   any nonquantifiable loss to the City?  We submit the balance

18   here is decidedly lopsided with a very significant hardship

19   on PBC.

20       Why is it that there is not a single Washington court that

21   in a reported decision has ever specifically enforced a

22   lease?  Why is it that courts generally refuse to force a

23   marriage and don't force the parties to have an ongoing

24   interactive relationship for any extended period of time?

25       And I want to respond to Your Honor's inquiry about the

1    Triple-A baseball club matter, because it is the difference

2    between a sale and a lease.   Triple-A involved a one-shot

3    sale.   That's all the Court was dealing with:   Are we going

4    to specifically enforce a sale of a franchise?   It was not

5    dealing with a lease.

6        So the protectable interest that the buyer had there was

7    the right to own the franchise with all that comes with

8    ownership of a franchise.   And the Court didn't have to deal

9    at all with how is an owner's interest from a bundle of

10   rights that come with ownership, they are very, very

11   different from a lessor's interest in the last two years of

12   the lease.   That is one very important difference.   Two,

13   because it's a sale, you don't have any of the ongoing issues

14   that you face in a lease situation.

15       I submit there is a difference.   If you look at page 225

16   of the decision, the Court pointed out that one of the

17   reasons why there was deemed to be no adequate remedy of law

18   was that there had been a failure of proof.   There had been

19   no evidence submitted regarding what the lost profits would

20   be and that they could be calculated.   We have just the

21   opposite in this case.   Every claimed loss that the City

22   claims has been shown to be reasonably quantifiable.

23       So those are the three reasons why I think the Triple-A

24   case provides very limited guidance from what we have here.

25   It's a lease, ongoing relationship, and we have shown an

 1   adequate remedy of law.

 2      Besides the operational challenges that the club faces,

 3   there is one thing that this trial did show.  That is that

 4   there is an enormous level of distrust and dysfunction

 5   between City leadership and the principals of PBC.  One of

 6   life's lessons, at least for me, has been when the generals

 7   can't deal with each other, that pretty much always permeates

 8   down to how the troops end up dealing with each other.

 9      But you did ask me to be specific as to what kinds of

10   disputes were likely such that the prospects of repeated

11   court intervention is a concern.  Well, I think Your Honor

12   pointed out one already.  Mayor Nickles wants to see this

13   team sold to local ownership.  You can get rid of the

14   lawyers, but you can't get rid of the mayor.  That is what

15   their goal is, and they have been work to go make it happen

16   behind the scenes and publicly.  And there has been not one

17   indication of remorse or any intent of stopping their plan.

18      What about more specifically?  You heard about suites and

19   how those -- by the way, suite marketing agreement is not in

20   the lease.  That is that separate agreement that is part of

21   Exhibit No. 600.  It's called the Concession and Suite

22   Marketing Agreement.  That's important because when counsel

23   stands up and says there is an arbitration clause, you won't

24   be bothered with all this, well, I would urge you to look in

25   the Concession and Marketing Agreement because guess what?

 1   It doesn't have an arbitration clause.  Section XXII.D

 2   provides for some mediation.  If it doesn't work you get the

 3   right to come to court.

 4       Well, the lease does have -- Section XX.R has one.  And

 5   then the two kind of incorporate each other.  We're going to

 6   be fighting in lawsuits over where the forum is.  Sound

 7   familiar?  We already did that once already before we got

 8   here.

 9       Back to the suite marketing thing.  Traditionally they've

10   been sold on three-, five-, and seven-year leases.  Team

11   wanted to be able to sell them with a termination provision.

12   City said no.  Why?  Because that would make relocation

13   easier.  Translated, deprive PBC of the ability to try and

14   stem the bleeding by selling short-term leases consistent

15   with the strategy.

16       There are many other areas that are fertile ground for

17   these parties to bicker.  There is scheduling provisions that

18   counsel talked about.  That is in the lease section XI.A

19   they have to work together regarding scheduling of home

20   games.  The City could drive up the team's losses by giving

21   it less attractive dates and giving the more attractive dates

22   to other users generating disputes.

23       There is repair and maintenance obligation that they each

24   had.  This is one thing I have never liked about long-term

25   leases.  In the waning years of the lease, there is an

1    economic disincentive to put money into repairs and

2    maintenance.   And the Repairs and Maintenance provisions in

3    the lease, section X and XII, and in the Concession

4    Agreement, section XII and XVII.   In the Lease and Concession

5    Agreement they have certain standards for repairs and

6    maintenance.   The parties will disagree.   The team doesn't

7    have an incentive to put money in the facility.   Frankly, the

8    City doesn't either.   Two more years, short horizon for this

9    kind of financing.

10       The City is required to individual game day support.   That

11   is in Section XIII.E of the lease.   Ushers, securities,

12   staging, engineers.   The standard is to operate in a

13   "efficient and orderly manner."   Both are going to be losing

14   money.   Natural tendency for the City to cut corners and

15   reduce staff.   And there is a potential for disputes there.

16       There is this process over concession prices and menu.

17   I'm not going to sit here and tell you that we're going to

18   fight over 20-ounce Pepsi's or whether nachos should have

19   more cheese.   The point is there is no economic incentive of

20   two years left to put out the best product and service and to

21   spend money experimenting on making it a better experience.

22   What you have is natural economic disincentives at work that

23   can be suffice.

24       Then you have the obligations regarding marketing of club

25   seats, which is in the concessions agreement in XXI.C.   PBC

1   is required to use its best efforts.  There is a reason for

2   that:  Because the City gets 40 percent of the revenue.  But

3   the club has an economic incentive to move potential club

4   seat folks to other seating where there is no economic

5   sharing.

6       And the standard isn't are we in fact going to mud wrestle

7   overall these things.  And there are two cases that were not

8   sited in any briefing but one is from Illinois and one is

9   from Maryland.  And they both recognize that look, it's

10  possible that there may never even be any disputes.  But the

11  judicial concern is if they arise.  If they arise courts just

12  don't want to be in the business of telling the operator how

13  to run his business.  Those two cases, the one from Illinois

14  is the New Park Forest Assocs. case at 552 N.E.2.d 1215 at

15  page 1220 and the Maryland case is M.Leo Storch, S-T-O-R-C-H

16  at 620 A.2d 408.  A lot of these things I talked about were

17  in the concession agreement.  There is no arbitration clause

18  there.

19      Your Honor, there is no right to specific performance.

20  All of these equitable maxims about hardship, not wanting to

21  force continuous relationships that required oversight, these

22  are very specific examples of what I think is an overarching

23  principle that the court exercise its discretion as to what,

24  standing here today, is fair and would be an equitable

25  result.

1       At some point you just need to stand back and say to

2   yourself:  Based on what I heard in this courtroom, sitting

3   here today, knowing what has happened and what got us here,

4   is it fair?  The intent here was an economically viable

5   arena.  It isn't and it won't be over the next to years.

6       You have a landlord that has been undermining its tenant

7   by forcing it to sell and it's just going to continue to do

8   that over the two years.  The parties don't get along, and

9   they're not going to get along.  The tenant faces enormous

10  operational hardships, things that will just continue over

11  the next two years.  Why exercise your equitable discretion

12  to force these parties to struggle and co-exist for two more

13  years in such a difficult environment, an environment that

14  was never contemplated when this lease was signed, and when

15  any claimed loss is quantifiable?  Enough is enough.  The

16  marriage is broken.  Please stop the bleeding.  Thank you.

17          THE COURT:  Thank you, Mr. Keller.

18          MR. LAWRENCE:  May I have a second, Your Honor?

19      I have a lot of ground to cover in three minutes.  Let me

20  try to do my best.

21      First of all, Mr. Keller is wrong about the law.  Let me

22  give you a good example.  We didn't hear very much cited.

23  It's probably because there is not very much in his favor.

24  But he said no court in Washington has ever specifically

25  enforced a lease.  Washington Supreme Court in Rowland v.

1    Cook, 638 P.2d 224, specifically enforced the lease against

2    the tenant where the landlord had done improvements at the

3    tenant's request.  We cited this in our brief.  It's a case

4    very similar to this case in that the City did lots of

5    renovations, built KeyArena to the specifications of the

6    Sonics.  In that circumstance the Washington Supreme Court

7    did specifically enforce a lease against a tenant.

8        It's not totally within this Court's discretion.  As the

9    Washington Supreme Court said in Crafts, "While a decree of

10   specific performance rests within the sound discretion of the

11   trial court, this does not permit a court to deny specific

12   performance where otherwise appropriate." 162 P.3d at 389.

13       That is what we believe the case is.  You heard a litany

14   of scheduling priorities, maintenance, game day support,

15   etcetera, etcetera, etcetera.  All issues on which there has

16   been no evidence of any disagreement at all.  And Mr. Barth

17   and Mr. Singh were very clear that they will work together to

18   do the best interest that they can.

19       Again, we saw some pages of this poisoned well plan.  Let

20   me talk about that.  I think that what the important pages

21   are, are the end of the plan, the path forward part of the

22   plan.  If you look at the path forward part of the plan, you

23   will see that the plan, rightfully or wrongfully participated

24   in by Mr. Gorton, clearly anticipated getting the City on

25   board.  It could not by the terms of the PowerPoint have been

1    a City plan because it contemplated getting the City on

2    board.   If the City were a participant why would it say that?

3         With respect to unclean hands, the one case they cite, the

4    Arnold case, does not support the proposition for which they

5    assert.  I invite Your Honor to read it.  The cases we cited

6    to you in the PowerPoint are the cases on unclean hands in

7    Washington and elsewhere.  And none of them involve the

8    situation here.

9         There is no injury regardless.  As Your Honor pointed out,

10   the only thing that has happened to Mr. Bennett is he's been

11   subjected to litigation and been subjected to litigation to

12   enforce a right which the City is entitled to enforce, is not

13   an injury.  He has not been forced to sell the team.  The

14   losses that he faces over the next two years are not a result

15   of unclean hands.  Simply a result of him having to stay here

16   which is a natural consequence of the specific enforcement of

17   the right that the City has.

18        With respect to undue hardship, what he knew is relevant

19   under the case law.  "The Court will not deny specific

20   performance for undue hardship where the alleged hardship was

21   foreseeable."  That's the Carpenter case, 627 P.2d, 555.

22   There is a case out of Delaware, Craft Builders.  These are

23   all cited in our findings.  Mohrlang out of Nebraska, Oregon

24   case, cases galore.

25        Hardship that should have been foreseen but is not

1   likewise an undue hardship.  Again, findings.  We have case

2   Blanck out of Washington, Mohrlang and Public Utilities,

3   which is out of Washington.

4       Of course, an equity will not save a party from a bad

5   bargain.  Dean v. Gregg, Washington Court of Appeals, 653

6   P.2d 502.

7       So what did we not here from Mr. Keller?  We did not hear

8   a lot of case law about specific performance or about unique

9   objects of a contract, about the other sports teams cases,

10  about the -- there is no case support for the notion that

11  damages are the currency of the courts, Crafts v. Pitts and

12  Mahoney, which we cite, make clear a party is entitled to

13  elect between remedies, including specific performance.

14      But mostly, let's see what is really going on here.  What

15  they're asking this Court to do basically in argument about a

16  misstep, and a major misstep, by Mr. Gorton, trying to hold

17  the City responsible.

18      Municipalities routinely build sports stadiums for

19  professional sports teams with public dollars, public

20  support.  In this case $10 million in cash, additional

21  millions dollars in improvements, tax support of the pledge

22  of the City's debt.

23      According to PBC, what they're asking this Court is that

24  in any case, in every case, a team is allowed to break its

25  lease whenever there is a better offer coming from another

1   City that is going to allow them to do better economically.

2   They're asking this Court to allow the Sonics to leave the

3   City with a KeyArena empty of their prime tenant.  They're

4   asking this Court to leave the City with $35 million in debt.

5   They're asking this Court to leave the City without the full

6   benefits of what the City bargained for in 1994.  They're

7   asking this Court to leave the City without the ability to

8   follow a team that likely is going to do much better, got a

9   number four draft pick coming up this evening, they have the

10  rookie of the year, they can follow the Boston Celtics from

11  being the worst team in the league to possibly a world

12  champion.  They are denying the City that.

13          And all of it, why?  For profits.  For their profits.

14  What he said is we are entitled under the law to take more

15  money elsewhere and run away from our lease, despite knowing

16  exactly what they got into a year before they decided to

17  breach, knowing exactly what they got into in entering into a

18  lease that required them to stay the term and had a specific

19  performance clause in it.

20          They should not come into this court and ask for your help

21  in allowing the them to break their lease in order to gain

22  money to make profits all at the expense of the City of

23  Seattle and its citizens.

24          We respectfully ask you to accept the City's election of

25  its remedies to gain the benefits that it thinks it will gain

1    over the next two years of the lease and specifically enforce

2    the lease to require the Sonics to stay and play out its full

3    term.   Thank you.

4              THE COURT:   Thank you.   All right I promised you that

5    I would let you know when a decision would be made.   I am not

6    going to open my mouth and decide this case today.   You've

7    given me much to think about and much to review.   I also

8    understand that time is significant for everybody involved.

9         So what I am planning on doing is telling you when a

10   decision will be posted, so that everyone will have an equal

11   opportunity to find it and all of the press will have an

12   equal opportunity to see it.   I will be posting a decision

13   next Wednesday afternoon at 4:00.   That's when you can expect

14   to see it.   So stay tuned.

15        Thank you, Counsel.   I would ask for both sets of

16   PowerPoint slides.   Mr. Lawrence, can you supply me with a

17   set of your slides?

18             MR. LAWRENCE:   Yes.   A color copy is being brought

19   over today.

20             THE COURT:   Is there any other issue we need to take

21   care of?

22             MR. LAWRENCE:   I don't think so.

23             THE COURT:   Okay.   Thank you, very much.

24

25        (Court adjourned.)

1        C E R T I F I C A T E

2

3        We certify that the foregoing is a correct transcript

4    from the record of proceedings in the above-entitled matter.

5

6

7    /S/ Barry L. Fanning, CCR, RMR, CRR

8    /S/ Nichole Rhynard, CCR, RMR, CRR

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25